## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONNECTICUT FAIR HOUSING CENTER | Case No. |
| and | |
| CARMEN ARROYO, individually and as next friend for Mikhail Arroyo | |
| *Plaintiffs,* | |
| v. | |
| CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC | |
| *Defendant.* | |
| | April 24, 2018 |

## <u>COMPLAINT</u>

## I.  INTRODUCTION

1.      The Connecticut Fair Housing Center ("CFHC") and Carmen Arroyo, individually and as next friend for Mikhail Arroyo (collectively, "Plaintiffs"), bring this suit for injunctive, monetary, and declaratory relief against Defendant CoreLogic Rental Property Solutions, LLC, formerly known as Corelogic SafeRent, LLC, ("CoreLogic" or "Defendant") for engaging in a pattern or practice of illegal discrimination on the basis of race, national origin, and disability in violation of the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601 *et seq*.  Carmen Arroyo also brings this suit against Defendant for violating the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq*., individually and as next friend for Mikhail Arroyo, and for violating the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681, *et seq.*, as next friend for Mikhail Arroyo.  Defendant's discriminatory criminal screening product—which disproportionately disqualifies African Americans and Latinos

from securing sorely needed rental housing—resulted in the denial of housing to Mr. Arroyo, caused and continues to cause CFHC to divert scarce resources to address the ongoing discrimination, and frustrates CFHC's mission of ensuring equal access to housing for all.

2.     Defendant is a consumer-reporting agency specializing in tenant screening that compiles and maintains files on consumers on a nationwide basis.  It maintains an extensive database of public records regarding consumers.  It then sells consumer reports generated from its database and furnishes these consumer reports to housing providers who use the reports to accept or reject prospective tenants.

3.     Defendant offers a tenant screening product called "Registry CrimSAFE" ("CrimSAFE") that determines whether a housing provider should accept or reject an application for tenancy based on an applicant's criminal history.  CrimSAFE uses an algorithm to interpret and evaluate an applicant's criminal records as found in Defendant's national public records database, which it aggregates from a number of primarily governmental sources.  Defendant then reports to a housing provider a "Crim Decision" that says the applicant should be accepted or is disqualified.

4.     Under Defendant's CrimSAFE product, the housing provider never knows the nature of the applicant's criminal record.  CrimSAFE only reports that a "disqualifying record" has been found, but does not provide any information about the record itself or information sufficient for the housing provider to locate the record.

5.     Plaintiff Mikhail Arroyo ("Mr. Arroyo") is a conserved person with disabilities who was injured in an accident in July 2015 that left him unable to speak, walk, or care for himself.  At the time of the events alleged herein, he resided in a nursing home but was eligible for discharge. His mother and conservator, Plaintiff Carmen Arroyo ("Ms. Arroyo"), sought to have Mr. Arroyo

move out of the nursing home and into her apartment.  She submitted a rental application on his behalf to her property manager, WinnResidential Connecticut, LLC ("WinnResidential"), which contracted with Defendant for tenant screening services, including the automated CrimSAFE decision-making product.  Mr. Arroyo's application to move into Ms. Arroyo's apartment was denied because Defendant's CrimSAFE report told WinnResidential he had "disqualifying" criminal records.

6.     In determining that Mr. Arroyo's criminal record disqualified him from living in Ms. Arroyo's apartment, Defendant did not take into account the nature or recency of Mr. Arroyo's alleged criminal offense, the outcome of the case, evidence of rehabilitation, the facts or circumstances surrounding the alleged criminal conduct, whether he was now able to commit a crime given his significant disabilities at the time of the application, or any other factor related to whether Mr. Arroyo posed any actual threat to safety or property.

7.     Defendant also did not provide WinnResidential with any information that would have allowed WinnResidential to take these factors into account and override Defendant's determination that Mr. Arroyo's criminal record was "disqualifying," nor, upon information and belief, did Defendant have a practice of providing this information to housing providers. Defendant did not tell WinnResidential the nature, number, or seriousness of the "disqualifying" criminal records; the reason the record "disqualified" Mr. Arroyo; whether it consisted of an arrest, charge, pending case, dismissal, or a conviction; or the date of the criminal record.  The only information Defendant gave WinnResidential in the CrimSAFE report was that the "Crim Decision" based on Mr. Arroyo's record was "disqualifying."

8.     Upon information, Mr. Arroyo has never been convicted of a crime.  His criminal record consists solely of a single charge for retail theft in Pennsylvania in 2014, when he was

twenty years old.  The grade of the charge was "summary offense," which is below the level of a misdemeanor.  The charge was ultimately withdrawn.

9.      Had Defendant appropriately screened Mr. Arroyo or provided information to the Arroyos or WinnResidential about the disqualifying criminal record, he would have been able to move in to Ms. Arroyo's apartment.  As a result of Defendant's actions and its determination that his criminal record disqualified him from tenancy, Mr. Arroyo remained in a nursing home for an additional year, even though it was no longer medically necessary and he desired to live with Ms. Arroyo.

10.     Defendant's policy or practice of making automated determinations, without individualized assessments, that applicants are disqualified from rental housing because of the existence of a criminal record has an unlawful disparate impact on Latinos and African Americans.

11.     Latinos and African Americans are arrested, convicted, and incarcerated at rates disproportionate to their share of the general population.[1]  This is true nationally, in Connecticut where Mr. Arroyo lives, and in Pennsylvania where he was charged with a crime.  Consequently, Defendant's policy of disqualifying people from rental housing based solely on the existence of a charge or conviction record has a predictable disparate impact on Latinos and African Americans.

12.     A policy that has a disparate impact may be permissible under the Fair Housing Act

---

[1] *See generally* U.S. Dep't of Housing & Urban Dev., Office of General Counsel, *Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-related Transactions* (Apr. 4, 2016), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF [hereinafter "HUD Guidance"].

if it is necessary to achieve a legitimate business interest, and there is no less discriminatory alternative that would achieve that interest. Defendant's use of arrests and/or charges, without convictions, to determine that applicants, including Mr. Arroyo, are disqualified from rental housing cannot be justified by a legitimate business purpose. The fact of an arrest does not constitute proof of past misconduct[2] and is not a reliable basis upon which to evaluate the potential risk to resident safety or property,[3] which Defendant cites as a goal of its criminal records screening products. Defendant's automated disqualification decisions based on prior convictions are also not necessary to achieve the goal of improving safety because they fail to consider information about the nature, seriousness, type, or recency of the underlying offense or information about what the applicant has done since the conviction.[4]

13. Defendant also has available to it at least two obvious less discriminatory alternatives for dealing with any potential concerns raised by applicants with criminal records. Instead of automatically determining that an applicant is disqualified for rental housing based on the existence of a criminal history, Defendant could evaluate applicants on an individualized basis by considering relevant mitigating circumstances, including the facts or circumstances surrounding the criminal conduct, the age of the applicant at the time of the conduct, evidence of rehabilitation efforts, and evidence that the individual has maintained a good tenant history before

---

[2] *See also Schware v. Bd of Bar Examiners*, 353 U.S. 232, 241 (1957) (explaining "[t]he mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense.").

[3] *See* HUD Guidance at 5.

[4] *Id.*

and after the criminal conduct. Alternatively, Defendant could supply information about the criminal history to the housing provider and allow the housing provider to conduct an individualized assessment to determine whether the applicant's criminal history demonstrates a realistic risk to safety or property, as some of Defendant's other tenant screening products already do.

14.     By conducting an individualized assessment into each applicant's criminal history, or by providing sufficient information to housing providers to allow them to do so, Defendant could achieve any legitimate business interest such as protecting resident safety and property. This approach would have a less discriminatory effect because fewer African-American and Latino applicants would be disqualified from rental housing when, like Mr. Arroyo, they present no realistic risk to safety or property.

15.     Defendant's policy or practice of declaring applicants disqualified for rental housing based on criminal records also constitutes intentional discrimination based on race and national origin. Defendant's discriminatory intent can be inferred because, upon information, it is aware of the overwhelming racial and ethnic disparity among those with criminal records, and of the obvious less discriminatory alternatives. Defendant nevertheless persists in offering a product that unjustifiably excludes Latino and African-American applicants, like Mr. Arroyo, from rental housing who present no risk to other residents or property.

16.     Defendant further discriminated against Plaintiffs on the basis of disability in violation of the Fair Housing Act by denying Mr. Arroyo's request for a reasonable accommodation and refusing to provide Mr. Arroyo with his consumer file or other information related to the "disqualifying" tenant screening report because his disabilities required that he make this request through his conservator.

17.     In her capacity as Mr. Arroyo's conservator, Ms. Arroyo repeatedly asked Defendant over a seven-month period to provide the consumer file it maintained on Mr. Arroyo so she could determine the reasons Defendant had disqualified Mr. Arroyo from tenancy, assess their accuracy, and, if necessary, request tenancy approval from WinnResidential as a reasonable accommodation of Mr. Arroyo's disabilities.   Defendant knew that Mr. Arroyo's disabilities prevented him from making the request himself and that Ms. Arroyo was his court-appointed conservator.   Defendant nevertheless refused to provide Mr. Arroyo's consumer file or any information about the disqualifying criminal record.   Defendant further improperly demanded that Ms. Arroyo provide a power of attorney executed by Mr. Arroyo, even though Mr. Arroyo was conserved and lacked the capacity to designate a power of attorney as a result of his disabilities.

18.     Defendant's actions constitute intentional discrimination based on disability, and its policy or practice of refusing to provide consumer files to conservators or guardians[5] and requiring a power of attorney has an unlawful, disparate impact on persons with disabilities who are disproportionately likely to be conserved or lack the capacity to designate a power of attorney.

19.     Defendant's discriminatory tenant screening product, including its disqualification of housing applicants with criminal records without individualized consideration, its restrictions on providing information to conserved applicants who lack the mental capacity to designate a power of attorney, and the disparate impact its policies and practices have on African-American and Latino applicants and applicants with disabilities, frustrate CFHC's mission of eliminating housing discrimination and ensuring that all people have equal access to the housing of their

_____

[5] "Conservatorship" is used within this complaint to refer to a court-appointed substitute decision-maker for an adult, regardless of whether this is referred to as a conservatorship or guardianship under state law.

choice.  To counteract this frustration of its mission, CFHC has had to divert its scarce resources to confront Defendant's discriminatory actions.

20.     As a direct result of Defendant's actions, CFHC diverted resources from other activities in order to investigate Defendant's conduct and assist individuals who have been denied housing as a result of its actions, including Mr. Arroyo.  CFHC staff spent a significant amount of time helping Mr. Arroyo obtain permission to live in his mother's apartment after Defendant reported his criminal record as disqualifying.  CFHC has also diverted resources towards education and outreach efforts aimed at rebutting the impression amongst housing providers, applicants, and advocates that automated criminal record screening products, like Defendant's, are permissible. CFHC has developed and distributed materials to assist housing applicants with criminal records, including applicants with disabilities, in avoiding unlawful discrimination in their housing search; investigated dozens of housing providers' criminal background policies that impose blanket bans rather than make individualized assessments; and investigated numerous complaints from people with criminal records who have been denied housing.   In the absence of Defendant's discriminatory conduct, CFHC would have devoted its scarce time and resources to other activities, including education and outreach aimed at other protected classes.

21.     Defendant further violated the Fair Credit Reporting Act by failing to provide Mr. Arroyo's consumer file and by failing to establish reasonable requirements for proper identification so as to enable conserved consumers or consumers without the legal capacity to execute a power of attorney to receive a copy of their consumer file.

22.     Defendant's actions towards Plaintiffs, its provision of an automated tenant screening product that fails to make an individualized assessment of an applicant's criminal history and frustrates housing providers' ability to do the same, and its policies that constrain the ability

of conserved consumers to access their consumer file constitute unfair practices in violation of the Connecticut Unfair Trade Practices Act.

## II. JURISDICTION AND VENUE

23. This Court has subject-matter jurisdiction pursuant to 15 U.S.C. § 1681(p) and 42 U.S.C. § 3613.  This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because the claims arise under the laws of the United States.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

24. Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b) as the acts complained of occurred in the District of Connecticut.

## III. PARTIES

25. Plaintiff Carmen Arroyo is a natural person and the co-conservator of Mikhail Arroyo.  Ms. Arroyo brings this action individually and as next friend for Mikhail Arroyo.

26. Mikhail Arroyo is a natural person and a "consumer" as protected and governed by the FCRA.

27. Carmen Arroyo and Mikhail Arroyo reside in Connecticut.

28. Plaintiff CFHC is a nonprofit corporation incorporated in Connecticut.  CFHC's office is located at 60 Popieluszko Court, Hartford, Connecticut  06106.

29. Defendant CoreLogic Rental Property Solutions, LLC, formerly known as CoreLogic SafeRent, LLC, is a Delaware limited liability company with a principal place of business in Rockville, Maryland.

30. Defendant is a "consumer reporting agency," as defined in 15 U.S.C. § 1681(f).  It regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports to third parties.

## IV.  FACTS

### A.  Defendant's Tenant Screening Services

31.      Tenant screening is the process by which owners and managers of rental housing receive and review applications to decide whether to offer an available home or apartment to an applicant.  Housing providers typically charge each applicant a fee, which is used to obtain a report from a third-party company, such as CoreLogic, that includes information in a person's background, including credit information, eviction history, and criminal records.

32.      Defendant offers a number of tenant screening products under the rubric of "Rental Property Solutions" (formerly "SafeRent"), which it describes as a "comprehensive leasing decision service to the single and multifamily housing industry."[6]

33.      Defendant offers housing providers at least two distinct criminal records screening products as part of its tenant screening services: Registry CrimCHECK, which provides housing providers with copies of criminal records to interpret on their own, and Registry CrimSAFE, which automatically interprets criminal histories and provides housing providers with a decision generated by a computer algorithm on whether the applicant qualifies for housing but does not provide  the criminal histories themselves.

34.      Defendant markets CrimSAFE as rendering a decision on an applicant's suitability for tenancy based on their criminal history so that housing providers do not have to make this

---

[6] *See* CoreLogic Rental Property Solutions Resident Screening,
https://www.corelogic.com/products/resident-screening.aspx#home-ProductDetails (last visited Apr. 3, 2018).

determination.

35.     Defendant describes CrimSAFE as an "automated tool [that] processes and interprets criminal records and notifies leasing staff when criminal records are found that do not meet the criteria you establish for your community."[7]  Its marketing materials state that CrimSAFE "automate[s] the evaluation of criminal records, relieving your staff from the burden of interpreting criminal search results."[8]  Defendant describes the removal of "human bias or judgment" as a "benefit" of its CrimSAFE product.[9]

36.     Upon information, a housing provider that contracts with Defendant for CrimSAFE fills out a short electronic form, generated by Defendant, that lists general categories of crimes Defendant's CrimSAFE algorithm should screen applicants for.  When a housing provider subsequently receives a rental application, it provides basic identifying information about the applicant to Defendant.  Defendant in turn delivers a one-page "CrimSAFE Report" to the housing provider that lists a "CrimSAFE Result," indicating whether or not disqualifying criminal records were found.

37.     The CrimSAFE result either states "Accept" or states that there is a "Disqualifying Record."  The cover page of the full tenant screening report further lists a "Crim Decision," which tracks the "CrimeSAFE Result."

_____

[7] *Id.* (select "Registry CrimSAFE").

[8] *See* CoreLogic Rental Property Solutions – Criminal Screening, https://www.corelogic.com/products/criminal-screening.aspx (select "Registry CrimSAFE") (last visited Apr. 3, 2018); CoreLogic Registry CrimSAFE, http://corporate.corelogic.com/landing-pages/asset_upload_file691_14887.pdf (last visited Mar. 14, 2018).

[9] *Id.*, CoreLogic Registry CrimSafe.

38.    The CrimSAFE report does not disclose the criminal record, the nature of the alleged crime, the date of the offense, the outcome of the case (if any), or information sufficient for the housing provider or applicant to locate the "disqualifying record."  The report merely states whether or not the applicant's purported criminal record disqualifies the applicant.

39.    When the CrimSAFE report states that a "disqualifying record" has been found, Defendant also provides the housing provider an adverse action letter addressed to the applicant that states "At this time we are unable to approve your application" and that the decision was based on "Information contained in consumer report(s) obtained from or through CoreLogic SafeRent, LLC."  Again, the adverse action letter does not disclose the criminal record, the nature of the crime, or information sufficient to locate the criminal record.

40.    Upon information, Defendant does not make information about the criminal record or the nature of the crime available to the housing provider through its CrimSAFE service, even if the housing provider requests it.

41.    When Defendant, through CrimSAFE, processes and interprets an applicant's criminal record, notifies a housing provider that the applicant should be accepted or is disqualified, and generates an adverse action letter, it provides a service in connection with housing subject to the Fair Housing Act.

42.    Defendant additionally markets CrimSAFE as "improv[ing]" or "optimiz[ing]" "Fair Housing compliance," yet CrimSAFE fails to take into account an individualized assessment of relevant mitigating information beyond that contained in an individual's criminal record when

it determines that an applicant's criminal record is disqualifying.[10]

43.     Since CrimSAFE provides no information to housing providers about the disqualifying criminal record, Defendant also prevents housing providers from themselves making an individualized assessment of relevant mitigating information.

**B.  Plaintiff Mikhail Arroyo**

44.     Mikhail Arroyo is a Hispanic[11] male.

45.     Mr. Arroyo is a person with disabilities who has a traumatic brain injury and is substantially limited in the major life activities of walking, speaking, and caring for himself.

46.     As a result of his disabilities, Mr. Arroyo is incapable of caring for himself or managing his affairs, and he lacks the capacity to enter into a contract or designate a power of attorney.

47.     Mr. Arroyo's disabilities were caused by an accident in July 2015 that left him in a coma for nearly six months.  Mr. Arroyo was hospitalized until around March 2016 when he was transferred to a nursing home to continue to recover from his injuries.

48.     On August 12, 2015, the Windham-Colchester Probate Court of the State of Connecticut ordered an involuntary conservatorship over Mr. Arroyo's person and estate in a case styled *In the Matter of Mikhail J. Arroyo*, Docket No. 15-00319.  The Court appointed Mr. Arroyo's mother, Carmen Arroyo, as Mr. Arroyo's fiduciary and conservator and gave her broad decision-making authority over Mr. Arroyo's affairs.   Pursuant to Connecticut law, the

---

[10] *See* CoreLogic Rental Property Solutions – Criminal Screening and CoreLogic Registry CrimSafe, *supra* note 8.

[11] The terms "Hispanic" and "Latino" are used interchangeably herein.

appointment of the conservator revoked any powers of attorney executed by Mr. Arroyo and rendered Mr. Arroyo presumptively incapable of entering into contracts or designating a power of attorney.

49.    Mr. Arroyo's conservatorship was affirmed by the Windham-Colchester Probate Court on August 5, 2016.  Mr. Arroyo remains conserved as of the date of this complaint.

## C.  <u>Defendant Disqualified Mr. Arroyo from Tenancy Based on an Undisclosed Criminal Record</u>

50.    At all times relevant to this Complaint, Ms. Arroyo resided at ArtSpace Windham, an apartment complex managed at the time of the events alleged herein by WinnResidential.

51.    WinnResidential contracted with Defendant to provide tenant screening services using Defendant's automated CrimSAFE criminal background screening product and another of Defendant's automated decision-making products that assesses an applicant's credit, RegistrySCOREx.

52.    In or around April 2016, the nursing home told Ms. Arroyo that Mr. Arroyo was ready to be discharged to a caregiver.  Ms. Arroyo was his primary caregiver, and she and Mr. Arroyo both desired that he live with her.  Ms. Arroyo therefore asked WinnResidential to transfer her to a two-bedroom unit and permit Mr. Arroyo to move in with her.

53.    WinnResidential required that Mr. Arroyo pass a tenant screening check conducted by Defendant before it would allow him to move in.  As his conservator, Ms. Arroyo consented to Defendant conducting a tenant screening report on Mr. Arroyo, and she paid WinnResidential a fee for Defendant's report.

54.     Defendant prepared a tenant screening report on Mr. Arroyo using its automated CrimSAFE criminal background screening product and its credit screening product, which it provided to WinnResidential on or around April 26, 2016.  Defendant's report included a "Lease

14

Decision" regarding Mr. Arroyo's credit-worthiness and a "Crim Decision" regarding his suitability as a tenant based on his criminal background.

55.     Defendant's tenant screening report disqualified Mr. Arroyo from tenancy based on unspecified criminal records.

56.     The first page of the Defendant's report on Mr. Arroyo lists a "Crim Decision" that states "Record(s) Found" but provides no other information.

57.     The fourth page of the Defendant's report consists of a single-page "CrimSAFE Report" that lists a "CrimSAFE result," which states that "disqualifying records were found."

58.     By reporting "disqualifying records were found" rather than "accept" as the "CrimSAFE result," Defendant determined that Mr. Arroyo's criminal background disqualified him from tenancy at ArtSpace Windham.

59.     However, Defendant did not provide any information in the report or to WinnResidential about the nature of the criminal record or the reasons Mr. Arroyo was disqualified.

60.     The only information the CrimSAFE Report or tenant screening report list about Mr. Arroyo's supposed "disqualifying" criminal record is his name, his date of birth, and the cryptic entry "000000033501.PA" under the field "jurisdiction."

61.     Defendant's tenant screening report did not disclose any additional information about the purported criminal record, the nature or seriousness of the alleged crime, the date of the offense, the outcome of the case (if any), the reasons the record disqualified Mr. Arroyo from tenancy, or information sufficient for WinnResidential, Mr. Arroyo, or Ms. Arroyo to locate the purported "disqualifying record."

62.     Upon information, Mr. Arroyo's sole criminal record is a single charge in

Pennsylvania for "grade S" retail theft under 18 Pa. C.S.A. § 3929(a)(1) filed on July 18, 2014, when he was twenty years old and prior to his accident.  "Grade S" in Pennsylvania means "summary offense," which is below the level of a misdemeanor and is often called a non-traffic citation.  A charge for summary offense retail theft indicates that this was his first offense and the value of the merchandise he allegedly stole was under $150.  18 Pa. C.S.A. § 3929(b)(1).  On April 20, 2017, the charge against Mr. Arroyo was withdrawn.

63.    In determining that Mr. Arroyo's criminal background disqualified him from tenancy, Defendant did not take into consideration relevant mitigating circumstance, including the facts or circumstances surrounding the criminal conduct, his age at the time of the conduct, evidence of rehabilitation efforts, evidence that Mr. Arroyo was highly unlikely to engage in criminal activity or endanger the community given his significant disabilities, or evidence that he had maintained a good tenant history before and after the criminal conduct.

64.    Defendant generated an adverse action letter addressed to Mr. Arroyo that it included as part of the report provided to WinnResidential.

65.    Defendant's adverse action letter states that "we are unable to approve your application" and that "this decision was based on information contained in consumer report(s) obtained from or through CoreLogic SafeRent, LLC."  The adverse action letter states that Mr. Arroyo has the right of disclosure of the information contained in his consumer file.

66.    WinnResidential told Ms. Arroyo in or around late April 2016 that Mr. Arroyo could not move in with her because Defendant had disqualified him from tenancy at ArtSpace Windham, and it provided her with Defendant's adverse action letter.

67.    Defendant did not give WinnResidential any information about Mr. Arroyo's disqualifying criminal record or the reason it disqualified him.

16

68.     WinnResidential told Ms. Arroyo that it did not know and could not find out from Defendant the reasons Defendant disqualified Mr. Arroyo from tenancy at ArtSpace Windham.

69.     WinnResidential told Ms. Arroyo that she had to contact Defendant to find out the reasons Mr. Arroyo was disqualified from tenancy, and it provided Ms. Arroyo with Defendant's phone number.

70.     As a result of Defendant's disqualification of Mr. Arroyo, he was denied housing at ArtSpace Windham and remained in a nursing home.

## D.  Defendant Refused to Provide the Arroyos with Information About the "Disqualifying" Criminal Record

71.     Ms. Arroyo contacted Defendant by telephone shortly after Mr. Arroyo was denied housing at ArtSpace Windham to determine the reasons Defendant's tenant screening report had disqualified Mr. Arroyo.  Ms. Arroyo desired to obtain this information so she could request that WinnResidential override Defendant's decision and approve Mr. Arroyo's tenancy.

72.     Ms. Arroyo told Defendant that Mr. Arroyo had disabilities, could not make the request on his own, and could not speak, and that she was his conservator.  Ms. Arroyo asked Defendant to allow her to make a request on Mr. Arroyo's behalf.

73.     Defendant did not provide any information to Ms. Arroyo over the phone about Mr. Arroyo's consumer file or the reasons Defendant's tenant screening report had disqualified him. It mailed her a written application to request Mr. Arroyo's consumer file in early May 2016.

74.     In or around May 2016, Ms. Arroyo submitted the written application to Defendant requesting Mr. Arroyo's consumer file along with the documentation requested by Defendant, including documentation of her court-appointment as Mr. Arroyo's conservator.

75.     Ms. Arroyo's written application provided proper identification, triggering Defendant's obligation under the Fair Credit Reporting Act to provide Mr. Arroyo's consumer file

as either a disclosure following an adverse action or as a free annual report.

76.     Defendant did not provide Mr. Arroyo's consumer file.

77.     Ms. Arroyo did not receive any written response from Defendant regarding her request for Mr. Arroyo's consumer file or any explanation of the reasons he was disqualified from tenancy.

78.     In or around September 2016, Ms. Arroyo spoke to Defendant by telephone and again requested Mr. Arroyo's consumer file or an explanation of the reasons he was disqualified from tenancy.  Ms. Arroyo reiterated to Defendant that Mr. Arroyo had disabilities, could not make the request on his own, and that she was his conservator.

79.     During this telephone conversation, Defendant acknowledged that it had received Ms. Arroyo's prior written request for Mr. Arroyo's consumer file months earlier but had not provided it.

80.     Defendant further told Ms. Arroyo that it could not provide a consumer file to a conservator and that she needed to get a "power of attorney" from Mr. Arroyo in order to obtain information about the reasons he was disqualified from tenancy.

81.     Thereafter, Ms. Arroyo contacted Mr. Arroyo's court-appointed counsel for the conservatorship in an effort to obtain a power of attorney.  Ms. Arroyo learned that her appointment as conservator over Mr. Arroyo's estate and person granted her more authority over his financial and personal affairs than she could get through a power of attorney.

82.     Moreover, Mr. Arroyo still lacked mental capacity to designate a power of attorney as a result of his disabilities, so Ms. Arroyo could not have lawfully obtained a power of attorney from him.

83.     Ms. Arroyo contacted Defendant again via telephone and informed it that she could

not obtain a power of attorney and that the conservatorship entitled her to request Mr. Arroyo's consumer file on his behalf.  Defendant did not agree to provide Mr. Arroyo's consumer file. Defendant told Ms. Arroyo to contact a different representative of Defendant called "Tina Marie."

84.    Ms. Arroyo spoke to "Tina Marie" via telephone.  Ms. Arroyo told Tina Marie she was entitled to request Mr. Arroyo's consumer file as his conservator.  Tina Marie did not agree to provide Mr. Arroyo's consumer file.  Tina Marie told Ms. Arroyo she would have to check with Defendant's lawyers whether it could provide any information to a court-appointed conservator.

85.    Tina Marie subsequently told Ms. Arroyo to make another written request for Mr. Arroyo's consumer file.

86.    Ms. Arroyo submitted another written application to Defendant in or around November 2016, signed by both her and Mr. Arroyo's co-conservator, Tad Stimson.   Her application included a new certificate of conservatorship, a utility bill showing Ms. Arroyo's address, and mail received by Ms. Arroyo on Mr. Arroyo's behalf.

87.    Ms. Arroyo's written application provided proper identification, triggering Defendant's obligation under the Fair Credit Reporting Act to provide Mr. Arroyo's consumer file as either a disclosure following an adverse action or as a free annual report.

88.    Defendant again failed to provide Mr. Arroyo's consumer file.

89.    Ms. Arroyo did not receive any written response from Defendant to her request for Mr. Arroyo's consumer file or an explanation of the reasons he was disqualified from tenancy.

90.    In December 2016, Ms. Arroyo contacted WinnResidential to request its assistance in obtaining from Defendant either Mr. Arroyo's consumer file or an explanation of the reasons he was disqualified from tenancy.

91.    Upon information, WinnResidential spoke to Defendant and was told Ms. Arroyo

needed to submit a written request for the consumer file, which WinnResidential conveyed to Ms. Arroyo.  Defendant did not provide WinnResidential with any information concerning the disqualifying records.

92.   Upon information, Defendant does not provide housing providers with information about disqualifying criminal records reported in CrimSAFE reports, even if a housing provider requests this information.

93.   WinnResidential again acknowledged that it "wasn't privy to the details" of Defendant's disqualification of Mr. Arroyo and that it had "no knowledge of the extent of the criminal finding and what impact that might have on resident safety."  WinnResidential explained that Defendant "simply give[s] an accept or decline" for applicants and that applicants have to contact Defendant directly to learn the reasons.

94.   Defendant has never provided Mr. Arroyo or Ms. Arroyo with Mr. Arroyo's consumer file, disclosed the disqualifying criminal records, or explained the reasons Mr. Arroyo was disqualified from tenancy.

95.   To this date, Ms. Arroyo and Mr. Arroyo do not know with certainty the identity of the supposedly disqualifying criminal records or the reasons Defendant disqualified Mr. Arroyo from tenancy.

**E.  Defendant's Disqualification of Mr. Arroyo and Its Refusal to Provide Information about Its Reasons Prolonged His Stay in a Nursing Home for an Additional Year**

96.   Defendant's actions and omissions prevented and/or materially frustrated the Arroyos' ability to move Mr. Arroyo out of a nursing home and into Ms. Arroyo's apartment.

97.   Because neither the Arroyos nor WinnResidential knew the reasons Defendant had disqualified Mr. Arroyo from tenancy, Ms. Arroyo and Mr. Arroyo were prevented from challenging the accuracy or appropriateness of the Defendant's decision or formulating a request

to approve Mr. Arroyo's tenancy as a reasonable accommodation of his disabilities with enough specificity to satisfy WinnResidential.

98.     WinnResidential nevertheless granted Ms. Arroyo's transfer request, and she moved into a two-bedroom apartment in or around November 2016 in the hope that Mr. Arroyo would eventually be allowed to move in.

99.     Ms. Arroyo persisted in her efforts to move Mr. Arroyo out of the nursing home and into her home and, as a result of Defendant's actions, had to expend significant time and effort to achieve this goal.

100.     Mr. Arroyo remained in a nursing home until June 2017, when WinnResidential finally allowed him to move in with Ms. Arroyo after Ms. Arroyo and Mr. Arroyo filed an administrative fair housing complaint against it and ArtSpace Windham and provided evidence that Mr. Arroyo's retail theft charge—the only criminal record Ms. Arroyo was aware of—had been withdrawn.

101.     Had Defendant appropriately screened Mr. Arroyo or provided information to the Arroyos or WinnResidential about the disqualifying criminal record, he would have been able to move in to Ms. Arroyo's apartment in approximately May 2016.

102.     Defendant's actions thus delayed Mr. Arroyo's admission to ArtSpace Windham by approximately one year, during which time he unnecessarily remained in a nursing home. Residing in a nursing home was less desirable housing than ArtSpace Windham as it was no longer medically necessary, prevented Ms. Arroyo from acting as her son's primary caregiver, was located far away from family and friends, and was an institutional rather than a community setting.

103.     As a result of Defendant's actions, Ms. Arroyo and Mr. Arroyo also had additional medical, travel, and housing expenses, and Ms. Arroyo paid increased rent on her two-bedroom

apartment without Mr. Arroyo's additional household income or housing subsidy.

104.    As a result of Defendant's actions, Ms. Arroyo and Mr. Arroyo suffered loss of a housing opportunity, emotional distress, humiliation, embarrassment, and damage to reputation.

**F.   Defendant's Criminal Records Screening Policy Has an Unlawful Disparate Impact on the Basis of Race and National Origin**

105.    A facially neutral policy or practice that has a disparate impact based on race or national origin violates the Fair Housing Act unless it is necessary to satisfy a substantial, legitimate, non-discriminatory business interest and there is no less discriminatory alternative that would achieve that interest.

106.    Defendant has a policy or practice of contracting with owners and managers of rental housing to screen applicants by: (i) searching its national database to locate applicants' criminal records; (ii) determining that applicants' criminal records, including but not limited to arrests and/or charges that do not lead to convictions, disqualify them from tenancy based on an automated evaluation; (iii) making these determinations without individualized assessments that examine relevant mitigating information outside the criminal records themselves; (iv) reporting to housing providers that applicants' criminal records are "disqualifying"; and (v) not providing to housing providers any information about the nature, recency, or seriousness of the offense, or information sufficient to locate the criminal record ("Defendant's Automated Criminal Records Screening Policy").

107.    As set forth below, Defendant's Automated Criminal Records Screening Policy has an unjustified disproportionate adverse impact on African Americans and Latinos in violation of the Fair Housing Act.  Defendant's policy is not necessary to achieve a legitimate interest because it does not accurately distinguish between criminal conduct that indicates a demonstrable risk to safety and/or property.  Defendant has available to it at least two obvious less discriminatory

alternatives: conduct an individualized assessment of each prospective tenant with a criminal record by considering relevant mitigating information beyond what is contained in the applicant's criminal record, or provide sufficient information about the underlying criminal offense to allow housing providers to do individualized assessments on their own.

108.    Defendant's discriminatory intent can be inferred because, upon information, it is aware of the overwhelming racial and ethnic disparity among those with criminal records, and of the obvious less discriminatory alternatives.  Defendant nevertheless persists in offering a product that unjustifiably results in denial of housing to Latino and African-American applicants, like Mr. Arroyo, who present no risk to other residents or property.

     i.     <u>Defendant's Criminal Records Screening Policy has a Clear Discriminatory Effect</u>

109.    In April 2016, the U.S. Department of Housing and Urban Development (HUD) issued guidance on the application of Fair Housing Act standards to the use of criminal records in housing-related activities.  Specifically, the guidance addresses disparate impact liability when an individual's criminal history forms the basis for an adverse housing action, such as a refusal to rent.

110.    HUD determined by analyzing national criminal records data that a policy that restricts access to housing solely because of a criminal record has a discriminatory effect because it disproportionately harms Latino and African-American applicants.[12]

111.    Defendant's Automated Criminal Records Screening Policy relies on data from a national database of criminal records that Defendant aggregates from multiple sources, including state departments of corrections and administrative offices of the courts.  Defendant's database

---

[12] HUD Guidance at 2-4.

includes incarceration records and court records of criminal cases.  Upon information, the database also includes individuals who are arrested and/or charged with a crime but never convicted.

112.    Upon information, Defendant's national database contains more than 400 million individual criminal records.

113.    African Americans and Latinos are more likely than whites to be arrested, charged with a crime, convicted, and incarcerated.[13]  Defendant's national database is therefore comprised disproportionately of criminal records of African-Americans and Latinos and, consequently, Defendant's Automated Criminal Records Screening Policy disproportionately reports to housing providers that African Americans and Latinos applicants are disqualified by their criminal records.

114.    As HUD notes, more than 100 million people are estimated to have a criminal record of some kind,[14] and more than 2.2 million people are currently incarcerated, with an average of 650,000 people released each year.[15]  These individuals are disproportionately African-American and Latino.

115.    Nationally, African Americans are incarcerated at more than five times the rate of

---

[13] *Id.* at 2-3.

[14] *Id.* at 1 (citing Bureau of Justice Statistics, U.S. Dep't of Justice, *Survey of State Criminal History Information Systems*, 2012, at 3 (Jan. 2014), https://www.ncjrs.gov/pdffiles1/bjs/grants/244563.pdf).

[15]  *Id.* (citing E. Ann Carson, Bureau of Justice Statistics, U.S. Dep't of Justice, *Prisoners in 2014* (Sept.  2015) at 29, Appendix tbls. 1 and 2, http://www.bjs.gov/index.cfm?ty=pbdetail&iid=5387).

whites, [16] while Latinos are incarcerated at 1.4 times the rate of whites.[17]

116.    African Americans comprise 36% of U.S. prisoners but only 12% of the total population, while Latinos were 22% of prisoners and only 17% of the total population.  By contrast, 34% of prisoners are white even though whites represent 62% of the total U.S. population.[18]

117.    Racial and ethnic disparities among prisoners are even more pronounced in Connecticut, where CFHC operates and Mr. Arroyo lives, and in Pennsylvania, where Mr. Arroyo was charged with a crime.

118.    In Connecticut, African Americans are incarcerated at 9.4 times the rate of whites and Latinos are incarcerated at 3.9 times the rate of whites.  African Americans comprise 41.6% of Connecticut's prison population but only 9.7% of the total population.  Latinos comprise 26.2% of the prison population but only 14.7% of the overall population.[19]

119.    In Pennsylvania, African Americans are incarcerated in state prisons at 8.9 times the rate of whites and Latinos are incarcerated at 3.3 times the rate of whites.  Forty-nine percent of Pennsylvania's prison population is African-American, but only 10.6% of its total population is African-American.  Latinos comprise 10.7% of its prison population, but only 6.3% of its total

---

[16] The term "white" is used herein to describe non-Hispanic whites.

[17] Ashley Nellis, The Sentencing Project, *The Color of Justice: Racial and Ethnic Disparity in State Prisons* (June 14, 2016) https://www.sentencingproject.org/publications/color-of-justice-racial-and-ethnic-disparity-in-state-prisons.

[18]  *See supra* note 12.

[19] The Sentencing Project, *supra* note 17.

population.[20]

120.    One out of every three African-American males in the U.S. can expect to go to prison at some point in his lifetime, as can one of every six Latino males.  By contrast, only one in 17 white males can expect the same fate.[21]  In other words, African-American males are six times more likely than white males to be incarcerated, and Latino males are three times more likely than white males.

121.    Over 95 percent of inmates are eventually released.[22]  As HUD notes, when these individuals, who are disproportionately African-American and Latino, are released from prisons and jails, their ability to access safe and affordable housing is critical to their successfully re-entry, yet they encounter significant barriers to securing housing because of their criminal histories.[23]

122.    HUD further explains that individuals who are convicted of crimes but never incarcerated, and even those who are arrested and/or charged but never convicted, also face significant barriers to securing housing.[24]  These individuals are also disproportionately African-American and Latino.

---

[20] *Id*.

[21] The Sentencing Project, *Report of The Sentencing Project to the United Nations Human Rights Committee Regarding Racial Disparities in the United States Criminal Justice System*, at __ (Aug. 2013), http://sentencingproject.org/wp-content/uploads/2015/12/Race-and-Justice-Shadow-Report-ICCPR.pdf.

[22] Bureau of Justice Statistics, U.S. Dep't of Justice, *Reentry Trends in the United States*, at 1, http://www.bjs.gov/content/pub/pdf/reentry.pdf.

[23] HUD Guidance at 1-2.

[24] *Id.*

123.    Nationally, African Americans and Latinos are arrested at a rate that is two to three times their proportion of the general population.[25]  Overall, African Americans are arrested at a rate of more than double their share of the general population.[26]  African American comprise 30% of all arrestees in Connecticut but only 9.9% of the total population.[27]  African Americans comprise 31% of all arrestees in Pennsylvania but only 10.6% of its total population.[28]

124.    Latinos comprised 42% of federal drug arrests made in 2014, nearly three times their share of the population.  In total, 64% of federal drug arrests were of Latinos and African Americans, who comprised 29% of the total population.  Only 31% of federal drug arrestees were of whites, less than half their share of the population.[29]  African Americans and Latinos are more

---

[25] *See* U.S. Equal Employment Opportunity Commission, *EEOC Enforcement Guidance*, Number 915.002 (Apr. 25, 2012), http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm [hereinafter EEOC Guidance].

[26] *See* HUD Guidance at 3 (citing See FBI Criminal Justice Information Services Division, *Crime in the United States*, 2013, tbl.43A, available at https://www.fbi.gov/about-us/cjis/ucr/ucr-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-43 (Fall 2014)).

[27] State of Connecticut Department of Emergency Services and Public Protection, *Crime in Connecticut, 2016*, http://www.dpsdata.ct.gov/dps/ucr/data/2016/Crime%20in%20Connecticut%202016.pdf; U.S. Census Bureau, *2016 American Community Survey 1-year Estimates*, Table DP05: ACS Demographic and Housing Estimates, https://factfinder.census.gov [hereinafter ACS 1-year Demographic Estimates].

[28] Commonwealth of Pennsylvania, Crime in Pennsylvania, *Annual Uniform Crime Report (2015)*, http://www.paucrs.pa.gov/UCR/Reporting/Annual/AnnualFrames.asp?year=2015; 2015 ACS 1-year Demographic Estimates, *supra* note 27.

[29] Mark Motivans, Bureau of Justice Statistics, U.S. Department of Justice, *Federal Justice Statistics, 2013-14*, at 10 (March 2017), https://www.bjs.gov/content/pub/pdf/fjs1314.pdf; 2014 ACS 1-year Demographic Estimates, *supra* note 27; *see also* EEOC Guidance, *supra* note 25 at n. 67.  As noted by the EEOC,

likely than whites to be arrested, convicted, and sentenced for drug offenses even though their rates of drug use are comparable to those of whites.[30]

125.    More than half (55%) of individuals charged with crimes in U.S. district courts are Latino, even though Latinos comprise only 17.1% of the total population.  African Americans comprise 19% of those charged in federal court, but only 12% of the population.  By contrast, only 22% of federal defendants are white, even though whites comprise 61% of the population.[31] Similar disparities persist among those convicted of federal crimes, as 53.3% are Latino and 20.4% are African-American, while 22.3% are white.[32]

126.    One of the most common ways that the public interacts with police is during traffic stops, with an estimated 20 million Americans stopped each year for traffic violations.[33] Nationally, African-American drivers are stopped at nearly 1.5 times the rate of white drivers. While Latino drivers nationwide are stopped at rates similar to whites, both Latino and African-

―――――――――――――――――

accurate data on overall arrests of Latinos is limited.  In its analogous guidance on the use of criminal records in employment screening, the EEOC relies on federal drug arrests because the DEA disaggregates arrests by ethnicity.  *Id.*  Neither Connecticut nor Pennsylvania track arrests by ethnicity.  *See* Urban Institute, *The Alarming Lack of Data on Latinos in the Criminal Justice System*, http://apps.urban.org/features/latino-criminal-justice-data/ (last visited Apr. 3, 2018).

    [30] *See, e.g.,* EEOC Guidance, *supra* note 25, at n. 68.

    [31] Motivans, *supra* note 29.

    [32] U.S. Sentencing Commission, *Overview of Federal Criminal Cases*, Fiscal Year 2016, at 3 (May 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/FY16_Overview_Federal_Criminal_Cases.pdf.

    [33] Emma Pierson, et al., *A Large-Scale Analysis of Racial Disparities in Police Stops across the United States*, at 1 (2017), https://5harad.com/papers/traffic-stops.pdf.

American drivers are approximately twice as likely as white drivers to be searched and arrested during traffic stops.[34]  Similar disparities exist in both Connecticut and Pennsylvania.[35]

127.    As a result of these clear racial and ethnic disparities, Latinos and African Americans are much more likely than whites to have criminal records that appear in Defendant's national database.  Consequently, they are disproportionately likely to be denied housing when Defendant reports to housing providers that their criminal records are disqualifying.

ii.    Defendant's Automated Criminal Records Screening Policy is Not Necessary to Achieve a Substantial and Legitimate Business Purpose

128.    Defendant's Automated Criminal Records Screening Policy is not necessary to achieve a legitimate, non-discriminatory business interest, and two obvious less discriminatory alternatives are available.

129.    Defendant states that the purpose underlying its criminal records screening products is to protect safety and property in a housing complex because "[c]riminals can disrupt – and even endanger – the entire neighborhood."[36]  Protecting resident safety may be a legitimate interest, but a policy of making housing decisions based on criminal history must be justified with proof that it actually assists in protecting resident safety or property.  As explained in HUD's guidance memo,

---

[34] *Id.*

[35] *See* Robin Shepard Engel, et al., *Project on Police-Citizen Contacts*, at 295 (Feb. 2, 2004), https://www.uc.edu/content/dam/uc/ccjr/docs/reports/project_reports/PApolicecitizenscontact020 3.pdf; TrendCT, Black and Hispanic Drivers Searched Twice as Often as White Drivers in Connecticut (June 22, 2016), http://trafficstops.trendct.org/story/black-hispanic-drivers-searched-twice-as-often-as-white-drivers-in-connecticut.

[36] *See* CoreLogic Rental Property Solutions – Criminal Screening, *supra* note 8.

"[b]ald assertions based on generalizations or stereotypes that any individual with an arrest or conviction record poses a greater risk than any individual without such a record are not sufficient to satisfy this burden."[37]  Defendant's policy does not meet this burden.

130.  Defendant's use of arrest and charge records that do not lead to convictions to determine and report to housing providers that applicants, including Mr. Arroyo, are disqualified from rental housing cannot be justified as necessary to achieve the goal of improving safety.

131.  HUD's guidance provides that a policy of excluding individuals based on prior arrest, without conviction, cannot be justified as necessary to achieve a legitimate, nondiscriminatory interest because, "arrest records do not constitute proof of past unlawful conduct and are often incomplete (e.g., by failing to indicate whether the individual was prosecuted, convicted, or acquitted)."  Accordingly, "the fact of an arrest is not a reliable basis upon which to assess the potential risk to resident safety or property posed by a particular individual."[38]

132.  In the employment context, a federal court concluded that an employer's policy of excluding from employment people with arrests without convictions constituted unlawful discrimination against African-American applicants because there "was no evidence to support a claim that persons who have suffered no criminal convictions but have been arrested on a number

---

[37] HUD Guidance at 5.

[38] *Id.* (citing *Schware v. Bd of Bar Examiners*, 353 U.S. at 241 (stating "[t]he mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense.")).

of occasions can be expected, when employed, to perform less efficiently or less honestly than other employees," adding that "information concerning a … record of arrests without conviction, is irrelevant to [an applicant's] suitability or qualification for employment."[39]

133.   Defendant's automated disqualification decisions based on prior convictions are also not necessary to achieve the goal of improving safety.  A policy of excluding individuals from housing based on the existence of any conviction record – "no matter when the conviction occurred, what the underlying conduct entailed, or what the convicted person has done since then" – cannot be justified as necessary to achieve a legitimate, nondiscriminatory interest.  Even a more tailored policy that considers the type of the offense and its recency does not satisfy this burden if it does not "accurately distinguish between criminal conduct that indicates a demonstrable risk to resident safety/property and that which does not."[40]

134.   Defendant's policy fails to meet this standard because it does not consider the nature, seriousness, or recency of a criminal record, the circumstances surrounding a criminal offense, or what the applicant has done since the offense, before determining and reporting to a housing provider that the criminal record is disqualifying.

135.   In addition to citing protection of safety and property as the goal of its automated criminal screening product, Defendant claims that it serves the business purposes of ensuring consistency across criminal records screening decisions and improving a housing provider's fair housing compliance.  Ensuring consistency across criminal records screening decisions is not a

--------

[39] *Gregory v. Litton Systems, Inc.*, 316 F. Supp. 401, 403 (C.D. Cal. 1970), *aff'd*, 472 F.2d 631 (9th Cir. 1972).

[40] HUD Guidance at 5.

legitimate, nondiscriminatory business purpose when those decisions have an unjustified discriminatory effect.  As discussed *supra,* these automatic disqualifications undermine, rather than improve, fair housing compliance because they do not allow housing providers to conduct the type of individualized assessment required by the Fair Housing Act.  Defendant's automated criminal records screening product therefore facilitates or encourages other housing providers' violation of the Fair Housing Act, in addition to violating the Fair Housing Act itself.

iii.   <u>Defendant Has Available At Least Two Obvious Less Discriminatory Alternatives to its Automated Criminal Records Screening Policy</u>

136.   To the extent protecting safety and property are legitimate business goals, HUD outlines an obvious less discriminatory alternative: individualized assessment of relevant mitigating information beyond what is contained in the applicant's criminal record.  Specifically, HUD prescribes examining the facts or circumstances surrounding the alleged criminal conduct, the age of the individual at the time of the conduct, evidence of good tenant history before and/or after the record, and any other evidence of rehabilitation.[41]

137.   Consistent with HUD's prescription, Defendant has available to it at least two obvious less discriminatory alternatives for dealing with any potential concerns presented by applicants with criminal records.

138.   First, Defendant could evaluate each criminal record on an individualized basis by considering relevant mitigating circumstance outside the record itself to determine the actual risk to safety before reporting to a housing provider that the applicant is disqualified.

139.   Alternatively, rather than making the disqualification decision on its own,

---

[41] *Id.* at 7.

Defendant could simply supply the underlying information about the criminal history to the housing provider so it can do an individualized assessment on its own, as some of Defendant's other tenant screening products already do.  By failing to provide housing providers with information about the criminal record, the nature of the underlying conduct, the recency of the offense, and the disposition of the case, Defendant makes it impossible or at least impracticable for them to do a case-by-case assessment of the actual risk to safety or property presented by each applicant.  Without this information, housing providers have no information or basis upon which to override Defendant's "Crim Decision."

140.    Providing information about the underlying criminal record to the housing provider would also help ensure that applicants are not denied housing because of inaccurate, sealed, or expunged criminal records.  The criminal history reports that Defendant sells to housing providers sometimes include errors, including attributing criminal records to the wrong person[42] and reporting records that are vacated and/or sealed.[43]  There is no conceivable legitimate business justification for denying housing to an individual based on a criminal record that is not accurate.  Although Defendant states that a consumer may request a copy of their consumer file and dispute

---

[42] *See Williams v. Corelogic Rental Prop. Sols., LLC*, No. CV PX 16-58, 2016 WL 6277675, at *1 (D. Md. Oct. 26, 2016) (stating the reports Defendant provides to landlords and management companies "sometimes contain errors" such as falsely attributing criminal records to the wrong person).

[43] *See Wilson v. Corelogic SafeRent, LLC*, No. 14-CV-2477 (JPO), 2017 WL 4357568, at *2 (S.D.N.Y. Sept. 29, 2017) (stating applicant was denied housing because Defendant reported to a housing provider he had been convicted of a crime even though the conviction had been vacated and sealed).

its accuracy, Defendant acknowledges that this process can take 35 days,[44] by which time the housing unit sought by an applicant is likely to have already been leased to another person.  Giving the underlying information about the alleged offense to the housing provider would allow the applicant a chance to explain directly to the housing provider why it is inaccurate, or more generally, why it should not be a bar to tenancy.

141.    Indeed, no legitimate business interest justifies Defendant's policy or practice of not providing basic information to housing providers about an applicant's criminal record when it reports that the record is disqualifying.  Defendant maintains in its database information about whether the applicant's record consists of an arrest, pending charge, dismissal, or a conviction, the date of the incident, the nature of the alleged offense, and the jurisdiction.  Defendant locates this information each time it renders an automatic disqualification determination.  Defendant simply elects not to provide this information to housing provider after it renders its automatic determination, reporting only that the record is "disqualifying."

142.    An individualized assessment of Mr. Arroyo's criminal record would have revealed that he did not actually present a risk to other residents or property.  Upon information, he had only a single charge of the lowest level of shoplifting; this was his first and only offense; he was never convicted of any crime; and he was extraordinarily unlikely to commit another crime because of the significant mental and physical disabilities he developed after the alleged criminal offense.

143.    An individualized assessment – whether conducted by Defendant or housing

_____

[44] *See* CoreLogic Rental Property Solutions – Consumer Assistance, https://www.corelogic.com/solutions/rental-property-solutions-consumer-assistance.aspx (select "How long does it take to receive my CoreLogic Rental Property Solutions Consumer File" and "The information in my file is not correct, how do I dispute it?") (last visited Apr. 3, 2018).

providers themselves – would achieve the goal of screening applicants whose criminal records demonstrate a realistic threat to other residents or property.  It would be less discriminatory because it would deny housing to fewer Latino and African-American applicants when, like Mr. Arroyo, they do not represent a realistic risk to safety or property.

  iv. <u>Defendant's Criminal Records Screening Policy Constitutes Intentional Discrimination in Violation of the Fair Housing Act</u>

 144. Upon information, Defendant is aware of the HUD guidance on the use of the criminal records in tenant screening decisions; of the overwhelming racial and ethnic disparities in the criminal justice system and consequently the discriminatory effect of automatic disqualification; and of the obvious less discriminatory alternatives of doing individualized assessments or providing sufficient information to housing providers to allow them to do so. Defendant's discriminatory intent can be inferred from the fact that, despite this knowledge, it continues to offer a screening service to housing providers that, without justification, adversely harms Latinos and African Americans.

 145. Defendant also intentionally encourages, facilitates, and assists housing providers' unlawful discrimination in violation of the Fair Housing Act by offering and marketing a product for screening tenants with criminal records that prevents them from conducting an individualized assessment of relevant mitigating information.  Defendant encourages housing providers not to conduct an individualized assessment by advertising that CrimSAFE "relieves" them of the "burden" of individually evaluating applicants' criminal records, even though it knows that individual consideration would be less discriminatory than automatic decision-making.

  v. <u>Defendant's Automated Criminal Records Screening Policy Has Caused, and Continues to Cause, Significant Harm</u>

 146. Defendant's discriminatory criminal records screening causes significant harm both

in the sheer number of people affected and in terms of the consequences for individuals reentering society and the well-being of our communities.

147.    At the same time as the number of individuals with criminal records has skyrocketed, it has become significantly easier to identify and ban people with criminal records because of companies, like CoreLogic, which provide near-instant background checks based on databases from multiple data sources.[45]   Indeed, in 2005, 80% of members of the National Multi-Housing Council, which is comprised of large rental companies, reported that they screen prospective tenants for criminal history,[46] and that number is likely even higher today.

148.    Defendant is one of the leading companies providing commercial tenant screening services.   In 2010, Defendant boasted that it is the "leading screening and risk management provider for the multifamily industry, with 30+% [market] share in [the] U.S.," and that it conducts 75+ million applicant screening transactions annually, more than three times its largest competitor.[47]   Its customers include some of the largest rental companies in the country, such as WinnResidential, which manages more than 100,000 units.[48]

---

[45] *See* Rebecca Oyama, *Do Not (Re)enter: The Rise of Criminal Background Tenant Screening As A Violation of the Fair Housing Act*, 15 Mich. J. Race & L. 181, 187 (2009)(explaining that people with criminal records now face "unprecedented stigmatization" because of technological advances in commercial background checks).

[46] David Thacher, *The Rise of Criminal Background Screening in Rental Housing*, 33 Law & Soc. Inquiry 5, 12 (2008).

[47] Anand Nallathambi, CoreLogic, Inc. Investor Day, at 67 (May 11, 2010), https://www.scribd.com/document/51691119/CoreLogic-investor-day-May-2010 (last visited Apr. 3, 2018).

[48] *See* WinnResidential, https://www.winncompanies.com/winnresidential (last visited Apr. 3, 2018).

149.   As a consequence of the scale of its tenant screening services, Defendant's screening policies as outlined *supra* result in a wholesale disparate impact that, without justification, denies housing to a significant number of African Americans and Latinos.

150.   The harm to these individuals, their families, and the well-being of our society cannot be overstated.  As HUD has recognized, "[w]hen individuals are released from prisons and jails, their ability to access safe, secure, and affordable housing is critical to their successful reentry to society."[49]

151.   Researchers have explained "how the increasing numbers of people leaving carceral institutions face an increased risk for homelessness and, conversely, how people experiencing homelessness are vulnerable to incarceration."[50]  Research has also found a causal link between a former prisoner's ability to find stable housing and the likelihood of reoffending.[51]

**G.   Defendant Discriminated Against Mr. Arroyo on the Basis of Disability by Refusing to Grant His Reasonable Accommodation Request**

152.   Under the Fair Housing Act, it is unlawful disability discrimination for any person or entity to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford ... person(s) [with disabilities] equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(2) & (f)(3)(B).

---

[49] HUD Guidance at 1.

[50] Stephen Metraux, et al., *Incarceration and Homelessness*, 2007 National Symposium on Homelessness Research, at __, https://www.huduser.gov/portal//publications/pdf/p9.pdf.

[51] Caterina Gouvis Roman and Jeremy Travis, The Urban Inst., *Taking Stock: Housing, Homelessness, and Prisoner Reentry*, at 7-10 (Mar. 8, 2004), *available at* http://www.urban.org/publications/411096.html.

153.    Defendant was aware that Mr. Arroyo was a person with disabilities that prevented him from being able to request his consumer file through Defendant's ordinary procedures.

154.    Ms. Arroyo requested, as a reasonable accommodation of Mr. Arroyo's disabilities, that Defendant permit her, in her capacity as conservator, to request and receive Mr. Arroyo's consumer file on his behalf.

155.    Defendant failed to make the requested accommodation in violation of the Fair Housing Act.

**H.     Defendant's Policy Regarding Requests by Conservators for Information about Tenant Screening Reports Has an Unlawful Disparate Impact on the Basis of Disability**

156.    When Defendant's tenant screening report disqualifies an applicant, neither the housing provider nor the applicant will likely know the reasons for the disqualification.  The applicant will thus need to obtain this information from Defendant in order to dispute a denial from housing or less favorable terms in housing, from either this or future housing providers that may use Defendant's tenant screening services.

157.    If the Defendant fails to promptly provide information about the reasons for the disqualification to the applicant, or provide it at all, then there is a likelihood the housing provider will rent the unit to another person, even if the applicant should have qualified for it.

158.    Defendant's actions on requests for information that form the basis for tenant screening reports from individuals subject to these reports therefore impacts the availability of housing and the terms and conditions of housing.

159.    Defendant provides a service in connection with housing subject to the Fair Housing Act when it receives and acts on requests from individuals subject to Defendant's tenant screening reports for their consumer file or the information that forms the basis for Defendant's

report.

      i.      <u>Defendant's Policies or Practices Prevent Conservators from Obtaining Information about Wards' Tenant Screening Reports</u>

160.    Upon information, Defendant maintains a policy or practice of refusing to provide court-appointed conservators or guardians with the consumer file of the ward or information that forms the basis for Defendant's tenant screening report on a ward.

161.    Defendant's policy or practice is evidenced by its statements to Ms. Arroyo and its refusal to provide her with Mr. Arroyo's consumer file despite her repeated explanation and documentation of the conservatorship.

162.    Upon information, Defendant maintains a policy or practice of requiring or preferring that third parties, including court-appointed conservators or guardians, submit a power of attorney executed by the consumer in order to request and receive the consumer file or information that forms the basis for Defendant's tenant screening report.

163.    Defendant's policy or practice is evidenced by its instructions to Ms. Arroyo to submit a "power of attorney" executed by Mr. Arroyo to obtain his consumer file, even though Defendant was aware that she was his court-appointed conservator, and its statements to Ms. Arroyo that implied that acceptance of documentation of a conservatorship rather than a power of attorney would deviate from its standard policies and require individualized approval from its counsel.

164.    Upon information, Defendant maintains a policy or practice of requiring that court-appointed conservators or guardians provide more onerous documentation of their authority than a power of attorney designated by a consumer in order to request and receive the consumer file, which impedes, delays, or entirely prevents wards from accessing their consumer file or information that forms the basis for Defendant's tenant screening report. Defendant's policy or

practice is evidenced by its statements and actions towards Ms. Arroyo, as described herein.

165.     A facially neutral policy or practice that has a disparate impact based on disability violates the Fair Housing Act unless it is necessary to satisfy a legitimate business interest and there is no less discriminatory alternative that would achieve that interest.  Defendant's policies and practices of (1) refusing to allow court-appointed conservators or guardians to receive the consumer file of the individual subject to the conservatorship or guardianship; (2) requiring that third-parties, including court-appointed conservators or guardians, submit a "power of attorney" executed by the consumer in order to receive the consumer file; and/or (3) requiring that court-appointed conservators or guardians provide more onerous documentation of their authority than an individual holding a power of attorney designated by a consumer in order to request and receive a consumer file constitute unlawful discrimination under this standard.

ii.     <u>Defendant's Policies Have a Clear Discriminatory Effect That Serves No Legitimate Business Interest</u>

166.     Most states offer a court procedure to appoint a surrogate decision-maker for an adult who is found incapacitated, typically as a result of an intellectual disability, mental illness, or cognitive impairment.  Once a surrogate decision-maker has been appointed, the incapacitated adult loses his or her right to make basic life decisions, a condition that has been referred to as "civil death."   States varyingly refer to this court procedure as a guardianship or a conservatorship.[52]

---

[52] *See generally,* Rebekah Diller, *Legal Capacity for All: Including Older Persons in the Shift from Adult Guardianship to Supported Decision-Making*, 43 Fordham Urb. L.J. 495(2016), *available at* https://ir.lawnet.fordham.edu/ulj/vol43/iss3/2.

167.    Because a guardianship or conservatorship requires a court finding of functional incapacity, meaning a lack of cognitive ability to understand and appreciate decisions, they mostly affect persons with cognitive impairments or stroke-related conditions, intellectual disabilities, or psychosocial disabilities.[53]   Adults subject to a conservatorship or guardianship are thus significantly more likely to be persons with disabilities, particularly cognitive disabilities,[54] than the general population.[55]

168.    In Connecticut, adults subject to an involuntary conservatorship over the person and the estate are all or nearly all persons with disabilities, since a person must have a disability

---

[53] *Id.  See also* Kristin Booth Glen, *Changing Paradigms: Mental Capacity, Legal Capacity, Guardianship, and Beyond,* 44 Colum. Hum. Rts. L. Rev. 93, 94 (2012) (describing history of guardianship and "functional incapacity" model in use today).

[54] Most states do not track demographic data or the underlying reason for a conservatorship or guardianship, but studies support high rates of cognitive disabilities among wards.  In Indiana, a review of guardianship petitions found allegations of dementia (26%), cognitive impairment (22%), severe mental illness (10.5%), stroke-related conditions (5.4%), and acquired brain injuries (5%).  In New York, a review of 2,400 adult guardianship cases listed dementia (41%) and mental illness (20%).  A survey of public guardianship programs found similarly high rates of cognitive disabilities; for instance, Hawaii reported that all of its wards had cognitive disabilities (55% developmental disabilities, 34% dementia, 9% mental illness, and 1% head injury).  *See* Michael J. Jenuwine, *The State of Adult Guardianship in Indiana* (2012), http://www.in.gov/judiciary/admin/files/ad-guard-2012-full-report.pdf;  Jean Callahan et al., *Guardianship Proceedings in New York State: Findings and Recommendations*, Bifocal, Vol. 37, No. 4, at 83 (Mar.-Apr. 2016), https://www.americanbar.org/content/dam/aba/publications/bifocal/BIFOCALMar-Apr2016.authcheckdam.pdf; Pamela B. Teasteret al., *Wards of the State: A National Study of Public Guardianship,* (Apr. 2005) https://www.americanbar.org/content/dam/aba/administrative/law_aging/wardofstatefinal.authcheckdam.pdf.

[55] An estimated 12.8% of the U.S. population have disabilities and 5.2% have cognitive disabilities.  William Erickson et al, *Disability Statistics from the American Community Survey* (ACS), Cornell University Yang-Tan Institute (YTI) (2017), www.disabilitystatistics.org.

within the meaning of the Fair Housing Act in order to meet the more stringent legal standard for imposing a conservatorship, which removes the individual's legal right to make decisions and imposes a substitute decision-maker.[56]  In contrast, only an estimated 12.8% of the general adult population of Connecticut have disabilities, and only 4.4% have cognitive disabilities.[57]

169.    Because Connecticut's involuntary conservatorship law only applies to a sub-set of individuals with disabilities who also lack the cognitive capacity to care for themselves or their personal affairs, an adult subject to an involuntary conservatorship over the person and the estate necessarily meets the Fair Housing Act's much broader definition of a person with a disability.

170.    In order for a probate court to order an involuntary conservatorship over the estate, it must find by clear and convincing evidence that the person is "incapable of managing his or her affairs," meaning the "person has a mental, emotional or physical condition that results in such person being unable to receive and evaluate information or make or communicate decisions to such an extent that the person is unable, even with appropriate assistance, to perform the functions inherent in managing his or her affairs…"  Conn. Gen. Stat. §§ 45a-644(d); 45a-650.

171.    In order for a probate court to order an involuntary conservatorship over the person, it must find by clear and convincing evidence that he or she is "incapable of caring for one's self,"

---

[56] Connecticut's probate courts do not track the demographics of conserved persons or the underlying disability resulting in a conservatorship, just the number and type of conservatorship.  There were approximately 1,744 involuntary conservatorships over the person and estate in Fiscal Year 2014 and 1,798 in Fiscal Year 2015.  *See* Connecticut Probate Courts, *2014-2015 Biennial Report of the Probate Court Administrator*, at 16, http://www.ctprobate.gov/Documents/2014%20-%202015%20Biennial%20Report.pdf.  Based on Connecticut's legal standard for imposing an involuntary conservatorship, it can be inferred that all or nearly all of the conserved persons in these cases have a disability as defined under the Fair Housing Act.

[57] *See* Erickson, *supra* note 55.

meaning the "person has a mental, emotional or physical condition that results in such person being unable to receive and evaluate information or make or communicate decisions to such an extent that the person is unable, even with appropriate assistance, to meet essential requirements for personal needs."  Conn. Gen. Stat. §§ 45a-644(c); 45a-650.  "Personal needs" include, but are not limited to "the need for food, clothing, shelter, health care and safety."  Conn. Gen. Stat. § 45a-644(i).

172.    Thus, in order for a probate court to order an involuntary conservatorship over the person and the estate, the conserved person must by definition also have "a physical or mental impairment which substantially limits one or more of [a] person's major life activities," the definition of a disability under the Fair Housing Act.  *See* 42 U.S.C. § 3602(h).

173.    Connecticut adults subject to an involuntary conservatorship over the person and the estate are thus significantly more likely to be persons with disabilities, particularly cognitive disabilities, than the general adult population of the state.

174.    Individuals who are subject to an involuntary conservatorship over the person and the estate also lack the mental capacity to execute a power of attorney.[58]  This is because a probate court may only order an involuntary conservatorship if it is the least restrictive means of intervention to assist the individual in managing his or her affairs and caring for him or herself.  Conn Gen. Stat. § 45a-650.  Because a power of attorney is significantly less restrictive than a conservatorship, a person with the mental capacity to execute a power of attorney should not be involuntarily conserved.

---

[58] Prior to October 1, 2016, a conservatorship automatically revoked any power of attorney executed by the conserved individual, even if it was durable, meaning it survived incapacity of the principal.  See Conn. Gen. Stat. § 45a-562(b) (2015).

175.    Individuals who lack the mental capacity to execute a power of attorney are more likely to be persons with disabilities than the general adult population of Connecticut.  This is because the legal definition of mental incapacity for purposes of designating a power of attorney—an inability to understand in a reasonable manner the nature of the transaction and its consequences and effects upon their rights and interests—only applies to a sub-set of disabled individuals who also meet the Fair Housing Act's much broader definition of a person with a disability.

176.    As a result of these clear disparities in Connecticut and on a national basis in the number of people with disabilities who are subject to a conservatorship or guardianship or lack the mental capacity to execute a power of attorney, Defendant's policies that deny conservators or guardians access to wards' consumer files, require powers of attorney, and impose more onerous requirements on persons subject to a conservatorship or guardianship are much more likely to deny or restrict individuals with cognitive disabilities from accessing the consumer files Defendant uses to make tenant screening decisions.

177.    Defendant's policies have a disproportionate adverse effect on disabled individuals as they prevent them from timely obtaining, or obtaining at all, the information that forms the basis of Defendant's tenant screening reports, which may be necessary to challenge the accuracy of Defendant's report, challenge the appropriateness of a housing provider's decisions to approve or deny a tenancy or set the terms of a tenancy based on Defendant's report, or to request as a reasonable accommodation that a housing provider deviate from its ordinary tenant screening policies.

178.    Defendant's policies and practices of preventing conservators from obtaining wards' consumer files, requiring or preferring a power of attorney for requests by third parties, and imposing more onerous requirements on conserved individuals do not serve any legitimate

business purpose.

    iii.    Defendant Intentionally Discriminated against Mr. Arroyo

179.    Defendant states that it provides the consumer file that forms the basis of its tenant screening report within 5 days of receiving a written request from a consumer.[59]

180.    Upon information, Defendant promptly provides consumer files to individuals who lack serious cognitive disabilities that result in conservatorship upon their written request or the request of their power of attorney, with minimal documentation.

181.    Defendant knew Mr. Arroyo was a person with disabilities.

182.    Defendant also knew that, as a result of Mr. Arroyo's disabilities, he was conserved and unable to directly request information about his tenant screening report or designate a power of attorney.

183.    Upon information, Defendant knew that adults subject to conservatorships or guardianships are disproportionately likely to be persons with disabilities and lack the mental capacity to designate a power of attorney.

184.    Defendant intentionally discriminated against Mr. Arroyo by failing to provide him with equal access to his consumer file as compared to non-disabled individuals because of his disabilities.  Defendant required more onerous documentation from Mr. Arroyo and did not timely provide, or provide at all, his consumer file or any information about the reasons Defendant disqualified him from tenancy.

---

[59] *See* CoreLogic Rental Property Solutions – Consumer Assistance, *supra* note 44.

**I.   Defendant's Actions Have Frustrated CFHC Mission and Diverted Its Scarce Resources**

185.   Defendant's discriminatory tenant screening product, including its disqualification of housing applicants with criminal records without individualized consideration, its restrictions on providing information to conserved applicants who lack the mental capacity to designate a power of attorney, and the disparate impact its policies and practices have on African-American and Latino applicants and applicants with disabilities frustrate CFHC's mission of eliminating housing discrimination and ensuring that all people have equal access to the housing of their choice.

186.   Defendant's Automated Criminal Records Screening Policy has made it substantially more difficult for Connecticut residents with criminal records, who are disproportionately African American and Latino, to find safe and affordable housing, directly and significantly frustrating CFHC's mission of eliminating discriminatory barriers and ensuring equal housing opportunities for all.

187.   Defendant has further frustrated CFHC's mission by openly advertising to housing providers that they can improve their fair housing compliance by *not* giving individualized consideration to applicants with criminal records, long after HUD has made clear that individualized consideration is less discriminatory.

188.   To counteract this frustration of its mission, CFHC has had to divert its scarce resources to confront Defendant's discriminatory actions.

189.   As a direct result of Defendant's actions, CFHC diverted resources from other activities in order to investigate Defendant's conduct and assist individuals who have been denied housing as a result of its actions, including Mr. Arroyo.  CFHC staff spent more than 100 hours helping Mr. Arroyo obtain permission to move into his mother's apartment after his application

was denied because of Defendant's discriminatory actions.

190.     CFHC has also diverted resources towards education and outreach efforts aimed at rebutting the impression amongst housing providers, applicants, and advocates that automated criminal record screening products that do not allow for individualized consideration, like Defendant's, are permissible under the Fair Housing Act.  CFHC has developed and distributed materials to assist housing applicants with criminal records, including applicants with disabilities, in avoiding unlawful discrimination in their housing search; investigated dozens of housing providers' criminal background policies that impose blanket bans rather than make individualized assessments; and investigated numerous complaints from people with criminal records who have been denied housing.

191.     As a result of diverting its resources to address Defendant's discriminatory conduct, CFHC has been unable to devote as much time and resources to other activities, including education and outreach aimed at other protected classes and direct assistance to individuals who experience housing discrimination.

192.     Until Defendant's unlawful, discriminatory conduct permanently ceases, its actions with continue to injure CFHC by, *inter alia*:

a.     interfering with its efforts intended to ensure equal access to housing;

b.     requiring the commitment of its scarce resources, including staff time and funding, to investigate and counteract Defendant's discriminatory conduct, thus diverting those resources away from CFHC's other activities and services; and

c.     frustrating CFHC's mission to ensure that all residents have access to the housing of their choice, free from discrimination.

## V.  CAUSES OF ACTION

**COUNT I: National Origin and Race Discrimination in Violation of the
Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*
(on behalf of all Plaintiffs)**

193.    Plaintiffs repeat and re-allege the foregoing paragraphs of the Complaint as though fully set forth herein.

194.    Defendant's policies and practices have a disproportionate adverse impact on Latinos and African Americans as compared to similarly situated whites.  This disproportionate impact is the direct result of Defendant's tenant screening product that automatically and without an individualized assessment determines and reports to a housing provider that an applicant is disqualified for rental housing based on the existence of a criminal record.  This policy is not necessary to achieve any substantial, legitimate, nondiscriminatory interest.  There are at least two alternatives that would have a less discriminatory effect: conducting an individualized assessment or providing sufficient information to housing providers to allow them to do so.

195.    Defendant's policies and practices have the intention to discriminate based on national origin and race.  Defendant is aware of the overwhelming disparate impact of automatic disqualification of applicants with criminal records and of the less discriminatory alternatives, yet it continues to provide and market a product that unjustifiably results in the denial housing to Latinos and African Americans.

196.    Defendant also intentionally encourages, facilitates, and assists housing providers' unlawful discrimination in violation of the Fair Housing Act by offering and marketing a product for screening tenants with criminal records that prevents them from conducting an individualized assessment of relevant mitigating information, and by encouraging housing providers not to conduct an individualized assessment.

197.    Defendant's policies and practices constitute unlawful discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604, by:

     a.     making housing unavailable on the basis of race and national origin in violation of 42 U.S.C. § 3604(a); and

     b.     providing different terms and conditions and discriminating in the provision of services in connection with housing on the basis of race and national origin in violation of 42 U.S.C. § 3604(b).

198.    Plaintiffs have been injured by Defendant's discriminatory conduct and suffered damages as a result.

199.    Defendant's conduct was intentional, willful, and made in reckless disregard for the known rights of others.

**COUNT II: Disability Discrimination in Violation of the
Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*
(on behalf of all Plaintiffs)**

200.    Plaintiffs repeat and re-allege the foregoing paragraphs of the Complaint as though fully set forth herein.

201.    Defendant's policy and practice of refusing to allow court-appointed conservators or guardians to receive the consumer file of wards; requiring or preferring that third parties, including court-appointed conservators or guardians, submit a "power of attorney" executed by the consumer in order to request and receive the consumer file; and requiring that court-appointed conservators or guardians provide more onerous documentation of their authority than a person holding a power of attorney discriminates in the provision of services or facilities in connection with a dwelling because of handicap in violation of the Fair Housing Act, 42 U.S.C. § 3604(f).

202.    Defendant's policy and practice prevents individuals with disabilities from

obtaining the information that forms the basis of Defendant's tenant screening reports, which they may need to challenge the accuracy of Defendant's report; challenge the appropriateness of a housing provider's decision to approve or deny their tenancy or set the terms of the tenancy based on Defendant's report; or to request as a reasonable accommodation that a housing provider deviate from its ordinary tenant screening policies.  Defendant's policy and practice thus makes housing unavailable, denies rental housing, and discriminates in the terms, conditions, or privileges of sale or rental of a dwelling because of handicap in violation of the Fair Housing Act, 42 U.S.C. § 3604(f).

203.    Defendant further intentionally discriminated against Mr. Arroyo on the basis of disability by failing to provide him with equal access to his consumer file as compared to non-disabled individuals because his cognitive disabilities required he be conserved.

204.    Plaintiffs have been injured by Defendant's discriminatory conduct and suffered damages as a result.

205.    Defendant's conduct was intentional, willful, and made in reckless disregard for the known rights of others.

### COUNT III: Disability Discrimination in Violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* (on behalf of Arroyo Plaintiffs)

206.    Plaintiffs repeat and re-allege the foregoing paragraphs of the Complaint as though fully set forth herein.

207.    Defendant unlawfully discriminated against Plaintiff Mikhail Arroyo on the basis of disability in violation of 42 U.S.C. § 3604(f)(2) and (f)(3)(B) by refusing to grant Plaintiff Carmen Arroyo's request that, as a reasonable accommodation of Mr. Arroyo's disabilities, Defendant permit her, in her capacity as conservator, to request and receive Mr. Arroyo's consumer file on his behalf.

208.    Plaintiffs have been injured by Defendant's discriminatory conduct and suffered damages as a result.

209.    Defendant's conduct was intentional, willful, and made in reckless disregard for the known rights of others.

### COUNT IV: Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681g
### (on behalf of Plaintiff Mikhail Arroyo only)

210.    Plaintiffs repeat and re-allege the foregoing paragraphs of the Complaint as though fully set forth herein.

211.    Plaintiff Mikhail Arroyo requested his consumer file from Defendant, through his conservator.

212.    Defendant had knowledge that Mr. Arroyo was a person with disabilities, who, as a result of those disabilities, was subject to a conservatorship of his person and his estate and was unable to directly request his consumer file from Defendant.

213.    Plaintiff provided Defendant with proper identification, including documentation of the conservatorship.

214.    Defendant violated 15 U.S.C. § 1681g by failing to disclose Mr. Arroyo's consumer file to the Arroyo Plaintiffs.

215.    As a result of Defendant's conduct, Mr. Arroyo was unable to obtain his consumer file or learn the nature, source, or accuracy of the "disqualifying record" reported on the April 26, 2016 Safe Rent report as the "CrimSafe Decision."

216.    As a result of Defendant's conduct, Mr. Arroyo suffered actual damages including but not limited to: denial of housing; frustration of his right under the Fair Housing Act to request a reasonable accommodation from a prospective housing provider; a prolonged stay in a nursing home, which was less desirable housing and was not medically necessary; increased medical costs

as a result of his prolonged stay in a nursing home; damage to reputation; embarrassment; humiliation; and other mental and emotional distress.

217.    Defendant's conduct, actions and inactions were willful, or in the alternative, negligent.

### COUNT V: Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681h (on behalf of Plaintiff Mikhail Arroyo only)

218.    Plaintiffs repeat and re-allege the foregoing paragraphs of the Complaint as though fully set forth herein.

219.    Defendant violated 15 U.S.C. § 1681h by failing to establish reasonable requirements for proper identification so as to enable consumers subject to a conservatorship or guardianships and/or consumers with disabilities without the legal capacity to execute a power of attorney to receive a copy of their consumer file.

220.    Defendant further violated 15 U.S.C. §§ 1681g and § 1681h by placing unreasonable preconditions on the disclosure of consumer files to consumers subject to a conservatorship or guardianship and/or consumers with disabilities without the legal capacity to execute a power of attorney.

221.    As a result of Defendant's conduct, Mr. Arroyo was unable to obtain his consumer file or learn the nature, source, or accuracy of the "disqualifying record" reported on the April 26, 2016 Safe Rent report as the "CrimSafe Decision."

222.    As a result of Defendant's conduct, Mr. Arroyo suffered actual damages including but not limited to: denial of housing; frustration of his right under the Fair Housing Act to request a reasonable accommodation from a prospective housing provider; a prolonged stay in a nursing home, which was less desirable housing and was not medically necessary; increased medical costs as a result of his prolonged stay in a nursing home; damage to reputation; embarrassment;

humiliation; and other mental and emotional distress.

223.   Defendant's conduct, actions and inactions were willful, or in the alternative, negligent.

### COUNT VI: Violation of the Connecticut Unfair Trade Practices Act
### (on behalf of Arroyo Plaintiffs)

224.   The actions of Defendant were done in the conduct of trade or commerce.

225.   Defendant is a "person" within the meaning of Conn. Gen. Stat. § 42-110b, as defined in § 42-110a(3).

226.   Defendant has engaged in unfair and/or deceptive acts or practices within the meaning of Conn. Gen. Stat. § 42-110b(a) including, but not limited to:

a.   Disqualifying Mr. Arroyo based on his criminal record without making an individualized assessment of his record;

b.   Reporting to WinnResidential that Mr. Arroyo was disqualified based on his criminal record without disclosing the record itself or information sufficient for WinnResidential to locate the record;

c.   Facilitating or encouraging WinnResidential's failure to make an individualized assessment of Mr. Arroyo's criminal record;

d.   Failing to provide the Arroyos with information concerning the criminal record that was the basis of Defendant's tenant screening report;

e.   Failing to accept documentation of Mr. Arroyo's conservatorship, and requiring that Mr. Arroyo execute a power of attorney;

f.   Discriminating against Mr. Arroyo on the basis of his disability and/or national origin;

g.   Through its CrimSAFE product, violating the Fair Housing Act and/or facilitating

or encouraging housing providers' predictable violation of the Fair Housing Act to the detriment of housing applicants with criminal records, who are disproportionately likely to be African American or Hispanic;

h.    Inaccurately marketing the CrimSAFE product to housing providers as improving Fair Housing Act compliance when it in fact violates the Fair Housing Act and/or predictably results in housing providers' violation of the Fair Housing Act to the detriment of housing applicants with criminal records, who are disproportionately likely to be African-American or Hispanic; and

i.    Maintaining policies and/or practices that frustrate the ability of conserved consumers or consumers who lack the capacity to execute a power of attorney, who are disproportionately likely to have disabilities, to access information that forms the basis of a tenant screening report.

227.    Defendant's actions have offended public policy, including the policies set forth in the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*; Connecticut's fair housing laws, Conn. Gen. Stat. § 46a-64b *et seq.*; Connecticut's laws prohibiting discrimination by places of public accommodation, Conn. Gen. Stat. §46a-63 *et seq.*; the HUD Guidance; the Fair Credit Reporting Act and its implementing regulations, 15 U.S.C. § 1681, *et seq*; and Connecticut's conservatorship laws, Conn. Gen. Stat. § 45a-644 *et seq*.

228.    Defendant's actions were willful, immoral, unscrupulous, unethical, and oppressive, and cause substantial injury to consumers like Ms. Arroyo and Mr. Arroyo. Defendant's actions and failures to act were willful, and exhibit a blatant disregard for Ms. Arroyo's and Mr. Arroyo's well-being.

229.    Defendant's actions caused Ms. Arroyo and Mr. Arroyo injury that they could not

have reasonably avoided. This injury was not outweighed by any countervailing benefits to consumers that the conduct produced.

230. As a result of Defendant's actions, Mr. Arroyo has suffered an ascertainable loss as that term is used in Conn. Gen. Stat. § 42-110g(a) including, without limitation, denial of housing, increased expenses as a result of the denial of housing, and an unnecessarily prolonged stay in a nursing home.

231. As a result of Defendant's actions, Ms. Arroyo has suffered an ascertainable loss as that term is used in Conn. Gen. Stat. § 42-110g(a) including, without limitation, payment of an application fee, increased rent and expenses as a result of Mr. Arroyo's denial of housing, and increased medical and travel expenses as a result of Mr. Arroyo's prolonged stay in the nursing home.

232. The foregoing conduct of the Defendant was calculated, deceitful, and unfair and demonstrated reckless indifference to Ms. Arroyo's and Mr. Arroyo's rights. Accordingly, the Plaintiffs are entitled to punitive damages under Conn. Gen. Stat. § 42-110g(a).

233. As a result of its violation of CUTPA, Defendant is liable to Ms. Arroyo and Mr. Arroyo for actual and consequential damages, costs, and attorney's fees pursuant to Conn. Gen. Stat. § 42-110g(d).

234. A copy of this pleading has been electronically delivered to the Attorney General and the Commissioner of Consumer Protection pursuant to Conn. Gen. Stat. § 42-100g(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendant as follows:

      a. Declaring that the Defendant's actions violate the Fair Housing Act and the

Connecticut Unfair Trade Practices Act;

b. Permanently enjoining Defendant from engaging in the conduct described herein and directing Defendant to take all affirmative steps necessary to remedy the effects of the conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future, including, but not limited to appointment of a monitor;

c. Awarding all available damages to Plaintiffs including compensatory damages for economic losses, emotional distress, violation of their rights, and loss of housing opportunity;

d. Awarding punitive damages in an amount that would punish Defendant for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

e. Awarding punitive damages for violation of the Connecticut Unfair Trade Practices Act, pursuant to Conn. Gen. Stat. § 42-110g(a);

f. Awarding actual damages and/or statutory damages and punitive damages to Plaintiff Mikhail Arroyo for violation of the Fair Credit Reporting Act pursuant to 15 U.S.C. § 1681n and § 1681o;

g. Awarding reasonable attorneys' fees and costs under 42 U.S.C. § 3613(c); 15 U.S.C. § 1681n and 1681o; and Conn. Gen. Stat. § 42-110g(d); and

h. Awarding such other and further relief as this Court may deem just and proper.

Dated:  April 24, 2018

PLAINTIFFS
By Counsel:   _____/s/_____
              Greg Kirschner (ct26888)
              Salmun Kazerounian (ct29328)
              Sarah White (ct29329)
              Connecticut Fair Housing Center
              60 Popieluszko Court
              Hartford, CT 06106
              Tel: (860) 263-0724/Fax: (860) 247-4236
              gkirschner@ctfairhousing.org