# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

**CONNECTICUT FAIR HOUSING CENTER and CARMEN ARROYO, individually and as next of friend for Mikhail Arroyo,**

**Plaintiffs,**

**v.**

**CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC,**

**Defendant.**

**Case No. 3:18cv00705-VLB**

### DEFENDANT CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

Defendant, CoreLogic Rental Property Solutions, LLC ("RPS"), by and through its undersigned counsel, and pursuant to Fed. R. Civ. 12(b)(6), hereby moves to dismiss Counts I, II, III, and VI of the Complaint against it with prejudice.

### INTRODUCTION

The federal Fair Housing Act ("FHA") does not apply to RPS and Counts I through III should be dismissed.

RPS is not a landlord.  RPS is a vendor providing criminal background screening services, which helps to ensure that housing applications are processed in a timely manner for consumers, but also in a way that ensures the safety and security of housing communities.  RPS does not interact with housing applicants at the time of their applications.  It does not make housing decisions or set the criteria by which housing applications are judged.  Instead, the relationship is the exact opposite: it is the *landlord* that controls how it receives and uses RPS's services, *not* RPS that controls the landlord's decisions.

One of RPS's product offerings – CrimSAFE – permits RPS's landlord customers to provide RPS with the customers' screening criteria to assess criminal record histories, including by establishing what categories of records the landlord wishes to consider in connection with an application.  RPS has no role in setting those criteria and does not make final decisions on applications.  Instead, RPS's reports simply reflect the application of the criteria previously set by the landlords for further consideration by those landlords.

Plaintiffs contend that the CrimSAFE product violates the FHA by being "discriminatory" against minorities.  However, that claim, which seeks to impose redundant liability against RPS and its landlord customers (the latter of which _are_ indisputably FHA governed), fails on numerous grounds.  Initially, the FHA does not reach the actions of background screening companies such as RPS.  Nor could RPS's offering of the CrimSAFE product give rise to liability under the FHA even if the statute applied, as Plaintiffs acknowledge that the allegedly discriminatory policies regarding eligibility thresholds vis-à-vis criminal records were set by the identified _landlord_, and not RPS.

Plaintiffs' effort to resurrect a discrimination claim in Count VI under the Connecticut Unfair Trade Practices Act ("CUTPA") is similarly defective, including because the policies in question and alleged damages were not caused by any policy decisions made by RPS and were instead made by the landlord.

RPS also permits consumers to request a copy of their consumer files under the framework established by the federal Fair Credit Reporting Act ("FCRA").  The FCRA claims plead by Plaintiffs are not the subject of this Motion.  Plaintiffs, however, also attempt to shoehorn that FCRA-governed process into claims under

the FHA and CUTPA.  Yet, the file disclosure process at issue is too remote from any housing decision to support a claim under the FHA, and there are insufficient allegations to support any claim of "discrimination" arising out of that file disclosure policy.  The free file disclosure process under the FCRA also does not implicate any "trade or commerce" for purposes of the potential application of the CUTPA.  Fundamentally, any perceived deficiencies in RPS' policies relating to the provision of reports to someone other than the actual consumer is properly litigated under the FCRA.  Plaintiffs' attempt to create discrimination and CUTPA claims out of an alleged FCRA violation should be dismissed.

## FACTUAL ALLEGATIONS

I.    **Mr. Arroyo's housing application.**

Plaintiffs have filed this lawsuit on behalf of Mikhail Arroyo ("Mr. Arroyo"). Mr. Arroyo was disabled because of an accident in July 2015. (Compl. ¶ 5.) Carmen Arroyo ("Ms. Arroyo"), who is Mr. Arroyo's conservator, applied in April 2016 to have Mr. Arroyo approved as a tenant at an apartment complex that is managed by WinnResidential Connecticut, LLC ("WinnResidential").   (Compl. ¶¶ 52-53.) "WinnResidential required that Mr. Arroyo pass a tenant screening check conducted by [RPS] before it would allow him to move in.  As his conservator, Ms. Arroyo consented to [RPS] conducting a tenant screening report on Mr. Arroyo." (Compl. ¶ 53.)  On April 25, 2016, RPS prepared a screening report on Mr. Arroyo using the CrimSAFE product, which is detailed immediately below. (Compl. ¶ 54.) The CrimSAFE report listed Mr. Arroyo as having "Record(s) Found" that were potentially "disqualifying" based on the criteria previously established by WinnResidential.  (*See* Compl. ¶¶ 35-36, 54-55.)  That disqualifying record was

based on an arrest for retail theft in 2014.  (Compl. ¶ 62.)  There is no allegation that RPS misattributed that arrest record to Mr. Arroyo or that Mr. Arroyo was not so charged.  WinnResidential then sent Mr. Arroyo a letter, noting that his application had been rejected on the basis of the arrest record.  (Compl. ¶ 65.)

After subsequent discussions with WinnResidential and the filing of an administrative action against WinnResidential, WinnResidential reversed its decision and granted Mr. Arroyo the requested housing.  (Compl. ¶ 100.)

Apart from RPS's application of the criteria that had been previously selected by WinnResidential and electronic transmission of the results back to WinnResidential, there is no allegation that RPS: (1) had involvement in setting WinnResidential's screening criteria that deemed the prior arrest record to be disqualifying; (2) made the decision to deny Mr. Arroyo the apartment; or (3) had any part in any subsequent discussions between WinnResidential and Ms. Arroyo about the housing decision or the eventual reversal of the initial denial.  There also is no allegation that RPS treated Mr. Arroyo any differently based on his race or *even knew his race at all at the time of his application*.

## II.    RPS's CrimSAFE product.

RPS is a "consumer reporting agency specializing in tenant screening" that "offers a tenant screening product called 'Registry CrimSAFE.'"  (Compl. ¶¶ 2-3.) CrimSAFE is an "automated tool that processes and interprets criminal records and notifies leasing staff when criminal records are found that do not meet the criteria [leasing staff] establish for [their] community."  (Compl. ¶ 35.)  "[H]ousing provider[s] that contract with [RPS] for CrimSAFE fill out a short electronic form, generated by [RPS], that lists general categories of crimes [RPS's] CrimSAFE

4

algorithm should screen applicants for." (Compl. ¶ 36.) "When a housing provider subsequently receives a rental application, it provides basic identifying information about the applicant to [RPS]. [RPS] in turn delivers a one-page 'CrimSAFE Report' to the housing provider that lists a 'CrimSAFE result,' indicating whether or not disqualifying records were found." *Id.*

To summarize, RPS allows *landlords* to inform RPS of what criminal offenses they consider to be material and to decide how those crimes should then be identified by RPS on the CrimSAFE report. (Compl. ¶¶ 35-36.) And, when a criminal record meeting the criteria established by the landlord is located for an applicant, RPS automatically informs the landlord of that fact based on the criteria that were previously provided to RPS. *Id.* Hence, for example, if a landlord determines that it wishes to potentially disqualify individuals convicted of felonies from having their applications approved, RPS will notify the landlord that when such a record is located by RPS in connection with the application. *See id.* The landlord determines what is a "disqualifying" record. *Id.*

III.   **The file disclosure request submitted on behalf of Mr. Arroyo.**

In April 2016, Ms. Arroyo contacted RPS to obtain a copy of Mr. Arroyo's consumer file, allegedly in order to "request that WinnResidential override" the prior denial of Mr. Arroyo's tenant application. (Compl. ¶ 72.) Individual consumers have a statutory right to obtain a copy of their consumer file under the Fair Credit Reporting Act (15 U.S.C. § 1681g(a)). The FCRA, however, requires that consumer reporting agencies obtain "proper identification" from the consumer prior to providing the file. 15 U.S.C. § 1681h(a)(1). Because Ms. Arroyo was requesting the file of another individual, an RPS agent allegedly informed her that RPS would need

a power of attorney executed to obtain a copy of Mr. Arroyo's file.[1]  (Compl. ¶ 80.)

Ms. Arroyo alleges that she could not secure that power of attorney and that the

consumer file was not provided.  (Compl. ¶ 80.)

## IV.    The causes of action asserted against RPS.

Based on these allegations, Plaintiffs plead six Counts against RPS:

- **Count I** **–Race Discrimination in violation of the FHA, 42 U.S.C. § 3604(a), (b);**

- **Counts II and III** **– Disability Discrimination in violation of the FHA 42 U.S.C. § 3604(f);**

- **Count IV** **– Violation of the FCRA, 15 U.S.C. § 1681g;**

- **Count V** **– Violation of the FCRA, 15 U.S.C. § 1681h; and**

- **Count VI** **– Violation of the CUTPA.**

This Motion concerns Counts I, II, III, and VI, but not the FCRA claims in IV-V.[2]

## LEGAL STANDARD

Dismissal of a claim under Fed. R. Civ. P. 12(b)(6) is appropriate if the

complaint fails to allege "enough facts to state a claim for relief that is plausible on

its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 579 (2007).  The requirement to

allege "facts" means that "bald assertions" and "merely conclusory allegations"

do not suffice to state a claim.  *Jackson v. Cnty. of Rockland*, 450 Fed. Appx. 15, 19

(2d Cir. 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is

---

[1] **Powers of attorneys are endorsed under Connecticut state law.  Their permissible uses cover many forms of business and personal issues, including seeking government assistance, document recordation, dispute resolution, and accessing communications sent to the principal.  *See* Conn. Gen. Stat. § 1-351b.**

[2] **RPS contests the attempted imposition of FCRA liability under Counts IV and V. RPS will advance those arguments at the appropriate time.**

"plausible on its face" if the facts that the plaintiff pleads "allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.   That is, the complaint must raise "more than a sheer possibility that a defendant has acted unlawfully" and must also do more than "plead facts that are merely consistent with a defendant's liability."   *Id.*; *accord ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)

"Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 678.  Counts I, II, III, and VI of the Complaint fail these tests and must be dismissed.

## ARGUMENT

**I.     RPS is not subject to the FHA, thus requiring the dismissal of Counts I-III.**

Plaintiffs' claims in Counts I-III under the FHA fail because liability under the FHA does not apply to the type of background screening activities at issue in this action.   Plaintiffs' attempt to stretch the limits of the FHA to encompass the CrimSAFE product has no basis in the statute, case law, or the legislative intent of the statute.

### A.     The language of the FHA confirms that it applies to entities engaged in the provision or financing of housing, and not background screeners such as RPS.

To start, the FHA provisions invoked by Plaintiffs cannot be plausibly read to encompass screening companies, and instead embrace landlords such as WinnResidential.  Sections 3604(a) and (b) of the FHA make it unlawful to "refuse to sell or rent after the making of a *bona fide* offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person"

or to "discriminate against any person in terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" on the basis of race.  42 U.S.C. § 3604(a), (b).  The FHA also prohibits discrimination on the basis of disability under § 3604(f) by making it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter" or to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with such dwellings" because of a disability.  *Id.* § 3604(f).

A plain reading of these provisions indicates that it encompasses those entities providing housing and/or financing its sale.  By focusing on entities that "refuse to sell or rent," "refuse to negotiate," or discriminate in the "sale or rental" or "terms, conditions, or privileges of sale or rental of a dwelling," it is evident that the FHA applies to individuals who deal directly with prospective buyers or tenants and are in control of the housing-related decisions.[3]

Based on these provisions, in the context of an alleged act of discrimination in the renting of housing (*i.e.*, the claim here), the clear target of the statute is the

---

[3] Plaintiffs' attempt to stretch the terms "otherwise make unavailable or deny" housing or "the provision of services or facilities" therewith to encompass the identified tenant screening activities would eviscerate this context and is contrary to settled principles of statutory construction.  *Yates v. United States*, 135 S. Ct. 1074, 1085 (1995) ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress."); *Wash. State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) ("Where general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.").

landlord itself.  "The purpose of the [FHA] . . . is to provide a remedy against those individuals who are guilty of unlawful discrimination *in the rental or sale of housing* and is not directed at those who merely are responsible for putting the violator in the position in which he can act improperly."  *Hollins v. Kraas*, 369 F. Supp. 1355, 1358 (N.D. Ill. 1973) (emphasis added).  Indeed, based on the statutory text, courts have held that "[e]ven the most expansive interpretations of section 3604(a) do not extend coverage beyond entities that directly provide housing or those that are integrally involved in the sale or financing of real estate."  *Steptoe v. Beverly Area Planning Assoc.*, 674 F. Supp. 1313 (N.D. Ill. 1987) (dismissing claim against housing information service because it "did not engage in the provision of housing and therefore could not have made housing unavailable").[4]

The most on-point case factually is contrary to the Plaintiffs' argument.  In *Frederick v. Capital One Bank, et al.*, No. 14-cv-5460, 2015 U.S. Dist. LEXIS 125111 (S.D.N.Y. Sep. 17, 2015), the plaintiff filed an action against numerous defendants alleging fraudulent credit reporting practices that injured his credit score and hampered his ability to purchase real estate, which he then attempted to claim violated the FHA due to the credit reporting's detrimental impact on his housing opportunities.  The court rejected that attempt to expand the reach of the FHA beyond those providing housing, including to credit furnishers that are already regulated by the FCRA.  Dismissing the FHA claims against the credit reporting

---

[4] **Other legislative history also confirms that the FHA was aimed at combating discrimination in the "*private housing and home finance industry* [that] restricts the availability of housing on a discriminatory basis."  90th Cong., First Session on S.1358, S. 2114, and S. 2280, p. 80 (Aug. 21, 22, and 23, 1967) (comments of Franklin M. Freeman, Member, U.S. Commission on Civil Rights) (emphasis added).**

agencies, the court determined that credit reporting was "not subject to the FHA," because the FHA "primarily concerns the 'sale or rental' of housing."  2015 U.S. Dist. LEXIS 125111, at *7.  The Court held that its conclusion "that credit reporting practices do not fall within the ambit of the FHA is strengthened by the availability of more apt federal statutory schemes" like the FCRA.  *Id.*

Like the defendants in *Frederick*, RPS is not involved in the sale or rental of housing, and its practices are more aptly regulated by the FCRA, not the FHA.

Moreover, by regulation, the U.S. Department of Housing and Urban Development ("HUD") has addressed what parties can be held liable under the FHA.  Even if its broad agency view is accepted, it would not encompass RPS.  A person is liable under the FHA for:

> Failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it. The power to take prompt action to correct and end a discriminatory housing practice by a third-party depends upon the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party.

24 C.F.R. § 100.7(a)(iii).  The regulation limits the FHA to persons who have "control" or "other legal responsibility" for the landlord.  Here, the Complaint wholly fails to allege that RPS legal control the behavior of landlords in setting the screening criteria – the necessary element to establishing liability under the regulation.  Indeed, the Complaint pleads the opposite.  (Compl. ¶ 36.)

The Plaintiffs do not cite to the regulation.  They instead rely on 2016 official guidance from HUD ("HUD Guidance") on the use of criminal records in housing decisions to mistakenly imply that the FHA regulates tenant background screening.

That HUD Guidance, however, actually supports dismissal.[5]  The HUD Guidance speaks to the potential for FHA discrimination in using criminal histories for housing decisions, but it focuses on when a "*housing provider* justifies an adverse housing action" and a "*housing provider's* use of criminal history to deny housing opportunities."  HUD Guidance at pp. 1-2 (emphases added).  That "provider" is <u>*WinnResidential*</u>, not RPS.

At bottom, Plaintiffs' theory of FHA liability contravenes the text of the statute, courts' interpretation of the statute, HUD's interpretation of the statute, and the legislative intent behind the statute.  Counts I-III should be dismissed.

II.     <u>RPS did not set the criteria regarding whether a criminal record would disqualify an applicant for housing with WinnResidential, which requires the dismissal of the FHA claims in Count I.</u>

Even assuming *arguendo* the potential application of the FHA to the limited role of RPS here, Count I must be dismissed.

Despite conceding in the factual section of the Complaint that WinnResidential is the entity that established the "criteria" by which criminal record histories can be "disqualifying," and that CrimSAFE is merely a "technological tool" used by those landlords, *see* Compl. ¶¶ 35-36, the remainder of Plaintiffs' Complaint attempts to blur the distinction between RPS and WinnResidential for purposes of claiming who established the policies that are challenged here.  A simple review of those straightforward factual allegations, however, confirms that Count I must be dismissed.

---

[5] **U.S. Dep't of Housing & Urban Dev., Office of General Counsel, *Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions* (Apr. 4, 2016), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF.**

In determining whether to allow potential FHA liability, "[t]he critical determination is whether *defendant's conduct* could hinder the ability of members of a minority group to acquire a dwelling." *Tyus v. Robin Const. Corp.*, No. 92C2423, 1992 U.S. Dist. LEXIS 16736, at *25 (N.D. Ill. Nov. 2, 1992) (emphasis added); *see also Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. Sonoma Bay Cmty. Homeowners Ass'n*, 682 Fed. Appx. 768, 799 (11th Cir. 2017) ("proximate cause" is a "required element" of a claim under the FHA"). Yet, the housing-related policies that Plaintiffs challenge here are not attributable to RPS.

The matter of *Sabal Palm Condominiums of Pine Island Ridge Ass'n, Inc. v. Fischer*, 6 F. Supp. 3d 1272 (S.D. Fla. 2014), is instructive as to which entities can potentially be subject to FHA liability on the basis of housing-related decisions. In *Sabal Palm*, the plaintiff alleged FHA violations jointly against the condominium association where she resided, the president of its board of directors, and its attorney, for the associations' refusal to relax its no-pet policy for a service dog that the plaintiff had acquired as a result of a disability. *Id.* Because the president had voted against the plaintiff's request and also voted to sue her, he had "personally contributed" to the violation. *Id.* Conversely, the court held that condominium association's attorney <u>could not</u> be held liable under the FHA because he "ha[d] no authority to vote – and did not in fact vote – on [the] decision" to deny her request. *Id.* The court reached that conclusion despite the fact that the attorney had advised the association that the plaintiff was not entitled to an accommodation. *Id.*

Other courts have concurred with that reasoning under the FHA. *See, e.g.*, *Wheatley Heights Neighborhood Coal. v. Jenna Resales Co.*, 447 F. Supp. 838, 841

12

(dismissing FHA claim:  "[P]laintiffs point to no facts which would support the existence of a causal nexus between the way in which [the Multiple Listing Service] obtains and disseminates listing information and the alleged steering activities of the other defendants in this action."); *see also Dixon v. Margolis*, 765 F. Supp. 454, 460 (N.D. Il. 1991) (dismissing adverse impact claims when the co-defendant "Merit Board has the exclusive responsibility for selecting, administering and evaluating the written examination.  That inference can only be drawn as to the members of the Merit Board."); *see also Short v. Allstate Credit Bureau*, 370 F. Supp. 2d 1173, 1184 (M.D. Ala. 2005) (dismissing ECOA claim at the pleading stage against the consumer reporting agency defendant where the defendant had not denied the plaintiff's loan but, instead, the entity to which plaintiff had applied for a loan had denied the loan).

Here, Plaintiffs' claim concerns the application of tenant screening criteria to certain criminal offenses.  But, as the Complaint acknowledges, WinnResidential – not RPS – set those criteria.  Plaintiffs admit that WinnResidential establishes which crimes and "criteria" are disqualifying.  (Compl. ¶ 36.)  RPS then merely informs WinnResidential "whether or not disqualifying records were found" on an applicant based on those criteria.  (Compl. ¶¶ 35-36.).  And, unlike the attorney in *Sabal Palm*, there is no allegation that RPS even rendered any advice as to the adjudication criteria selected by WinnResidential.

Indeed, under Plaintiffs' theory, any number of entities could be swept into a FHA proceeding.  For instance, reference check companies, drug screeners, and entities supplying credit checks to a landlord would all be subject to suit based on

Plaintiffs' liability theories.  The Court should not set that policy, which is contrary to the law set forth above.

**III.**     **Plaintiffs' claims of an FHA violation in Counts II and III based on the alleged failure to obtain a copy of his consumer file must be dismissed, as such a claim lacks a sufficient nexus to the alleged denial of housing.**

In Counts II and III, Plaintiffs argue that RPS discriminates against disabled individuals by requiring conservators acting on their behalf to submit a power of attorney to receive a consumer file.  (*See* Compl. ¶¶ 201, 207.)  However, those allegations regarding RPS's file disclosure processes are too far removed from any housing decision for purposes of potential liability under § 3604(f) of the FHA.

"[I]t is not true that the tentacles of [FHA] extend beyond the availability of housing or related services."  *South Camden Citizens in Action v. New Jersey Dept. of Environ. Prot.*, 254 F. Supp. 2d 486, 500 (D.N.J. 2003).  Instead, "to have a cognizable claim under § 3604(a),[6] plaintiffs must establish a . . . clos[e] nexus between housing availability and the challenged action."  *Id.* at 501.  Courts "have been reluctant to extend the reach of Title VIII" when "there is only a remote connection between housing availability and the disputed action."  *Id.* at 501.

Against that standard, Plaintiffs allege in Counts II and III that RPS's refusal to provide Ms. Arroyo with a copy of Mr. Arroyo's consumer file prevented him from: (1) reviewing his consumer file; (2) *then* providing it to WinnResidential "to dispute [the] denial"; and *then* (3) further attempting to convince WinnResidential to change its housing decision.  (Compl. ¶ 201.)  Plaintiffs do not plead that RPS's reporting was inaccurate, or that WinnResidential would have then changed its

---

**6** **Plaintiffs' claim in Count III under § 3604(f), which uses identical statutory language to § 3604(a), is the same as the claim in Count II under § 3604(a).**

decision and policies with respect to criminal histories through such attempted negotiations.[7]

Courts have consistently rejected such attenuated claims under the FHA.  In *South Camden Citizens*, for example, the plaintiffs, residents of a minority community sued the New Jersey Department of Environmental Protection ("NJDEP") for violations of the FHA for granting permits to a cement grinding facility close to the neighborhood.  254 F. Supp. 2d at 489.  The plaintiffs alleged by granting the permits, it rendered their neighborhood uninhabitable.  *Id.* at 500. However, the court determined "the NJDEP's actions at most had an indirect effect on the availability of housing" in the community, which was not actionable under the FHA.  *Id.*  And, that "indirect" effect on housing was insufficient to state a claim.

Likewise, in *Jersey Heights Neighborhood Assoc. v. Glendening*, 174 F.3d 180 (4th Cir. 1999), the Fourth Circuit held that the FHA did not extend to the siting of a highway, which allegedly had a discriminatory effect on an adjacent minority neighborhood.  Despite the plaintiff's "claims that [the FHA] reaches every practice having the effect of making housing more difficult to obtain, the text of the statute does not extend so far . . . .  Countless private and official decisions may affect housing in some remote and indirect manner, but the Fair Housing Act requires a closer causal link between housing and the disputed action."  *Id.* at 192.

Here, RPS allegedly requires an individual requesting a report on behalf of someone else to submit a power of attorney.  (Compl. ¶ 162.)  Plaintiffs argue that administrative requirement prevented them from securing a copy of Mr. Arroyo's

---

[7]  In fact, Plaintiffs plead that administrative action was required against WinnResidential to obtain a reversal of the housing decision.  (Compl. ¶ 100.)

file and then attempting to challenge the housing decision or formulating a request for a reasonable accommodation.  (Compl. ¶ 97.)[8]  However, the many steps between the disputed conduct – requiring a power of attorney to obtain a file of consumer information – and the possible, hypothetical review of a prior housing decision by WinnResidential, renders RPS's actions with respect to the consumer file too "remote and indirect" to impose liability under the FHA.  In contrast, the FCRA directly regulates the right of a consumer to obtain his file from a consumer reporting agency and provides a private cause of action for a consumer to enforce the consumer's rights.  Plaintiffs' claim, if any, should thus be found there. *Frederick*, 2015 U.S. Dist. LEXIS 125111, at *7.

**IV.**   **Plaintiffs' claims of disparate treatment must be dismissed, as Plaintiffs identify no discriminatory intent.**

Assuming that each of the above hurdles could be overcome, Plaintiffs' FHA claims in Counts I-III also fail as a matter of substance.

Plaintiffs seemingly bring their claims under both a disparate treatment and disparate impact theory of liability.  For both theories, "[p]laintiffs may establish a *prima facie* case of housing discrimination by showing (1) that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4)  that the housing opportunity remained available to other renters or purchasers."  *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003).  As discussed below, all three counts fail to support their theory of liability.

---

[8] Indeed, Plaintiffs admit that Mr. Arroyo was subject of the prior criminal action for theft, and they do not allege any impediment to their presenting the circumstances of the offense and its disposition to WinnResidential independent of any file disclosure.

**A.     There are no allegations establishing disparate treatment under Counts I, II, or III.**[9]

To establish a *prima facie* case for disparate treatment, a plaintiff must establish that "animus was a significant factor" in the position taken by the decision-makers. *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 400 (S.D.N.Y. 2013). A plaintiff must "set forth the circumstances under which [he] was treated differently, and include an allegation that this differential treatment was on the basis of [his] protected status." *Id.* at 401. "A claim is appropriately dismissed where a complaint's factual allegations do not permit the conclusion that the complained-of conduct occurred because of discriminatory animus." *Logan v. Matveesvskii*, 175 F. Supp. 3d 209, 226 (S.D.N.Y. 2016).

Here, any disparate treatment claims based on alleged racial discrimination in Count I fail on at least two grounds. First, the claim fails because Plaintiffs have not alleged they were treated differently on the basis of their race. For their race-discrimination claim under Count I, they have not alleged that any non-Latino or African-American applicants with the same criminal history as Mr. Arroyo were allowed to rent an apartment. Nor have they alleged facts sufficient to conclude a racial animus. Instead, Plaintiffs' disparate treatment claim relies on an inference evidently borne entirely out of their disparate impact claim. (*See* Compl. ¶ 108) ("Defendant's discriminatory intent can be inferred because, upon information, it

---

[9] It is not entirely clear whether Plaintiffs, in fact, purport to bring claims under Counts I-III relating to RPS's alleged "disparate treatment" of Mr. Arroyo. The bulk of the Complaint contains statistical evidence designed to support a disparate impact claim (detailed below). However, Plaintiffs do allege in numerous instances that RPS's conduct was "intentional." Therefore, out of an abundance of caution, RPS addresses the theory of disparate treatment, which has no factual support.

is aware of the overwhelming racial and ethnic disparity among those with criminal records."). That is insufficient. *Bernstein v. Vill. of Wesley Hills*, 95 F. Supp. 3d 547, 576 (S.D.N.Y. 2015) ("[T]he fact that a particular action has a foreseeable adverse impact is insufficient to establish discriminatory intent.") (quoting *Soberal-Perez v. Heckler*, 717 F.2d 36, 42 (2d Cir. 2015)); *see also Dowell v. Board of Educ.*, 778 F. Supp. 1144, 1192 (W.D. Ok. 1991) ("The Supreme Court has held unequivocally that discriminatory intent may not be inferred solely from the disproportionate impact of a particular measure upon one race.") (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977).

Second, because RPS did not implement the policy disqualifying applicants with criminal records, it necessarily lacks *any* intent with respect to that policy. *Sabal Palm*, 6 F. Supp. 3d 1at 1274.

Furthermore, for their disability discrimination claims in Counts II and III, Plaintiffs have not alleged they were treated differently than non-disabled individuals. Plaintiffs' disability discrimination claims are based on RPS requiring a power of attorney to obtain a report on behalf of another individual, but the Complaint does not allege that RPS applied this policy differently to any non-disabled individual. Moreover, Plaintiffs' allegations lack any basis to conclude that its decision not to provide Ms. Arroyo with a copy of Mr. Arroyo's complaint was based on any discriminatory intent. As such, these claims must be dismissed. *See, e.g., Logan*, 175 F. Supp. 3d at 226.

B.   Plaintiffs' claims of disparate impact must be dismissed.

"In order to make out a *prima facie* case under the FHA on a theory of disparate impact, a plaintiff must demonstrate that an outwardly neutral practice

actually or predictably has a discriminatory effect." *Fair Housing in Huntington Comm. v. Town of Huntington*, 316 F.3d 357, 366 (2d Cir. 2003).  Plaintiffs' disparate impact claims also fail that test.

> i.     Plaintiffs cannot state a claim for disparate impact under Count I because the allegedly-discriminatory policy was not developed by RPS.

Plaintiffs' race-based disparate impact claim under Count I fails for lack of a policy that is actually attributable to RPS.  Although the policy of disqualifying residents with the type of record attributable to Mr. Arroyo is facially neutral, that policy is WinnResidential's, and not a policy established by RPS.

In analyzing disparate impact claims, courts require "that plaintiffs identify the targeted practice with sufficient particularity" to show "precisely what actions" are at issue.  *Rodriquez v. Bear Stearns*, No. 07cv1816, 2009 U.S. Dist. LEXIS 119942, at \*20 (D. Conn. Dec. 22, 2009).  The focus on the policy manifests itself in a "robust causality requirement" that "protects defendants from being held liable for racial disparities that they did not create."  *Texas Dept. of Housing and Community Affairs v. Inclusive Comm. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015).  "[A] disparate impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."  *Id.*

Plaintiffs complain of the policy to categorically deny housing to individuals with criminal records.  (Compl. ¶ 194.)  Plaintiffs spend page after page of their Complaint attempting to describe the discriminatory impact of criminal record considerations on housing.  (*See* Compl. ¶¶ 105-127.)  Fundamentally, however, the allegations reflect what Plaintiffs must concede, *i.e.*, that WinnResidential made the decision as to what screening criteria to apply, whereas RPS merely reflects the

outputs of those criteria.  (*See* Compl. ¶¶ 35-36.)  RPS's role was to provide a technological product reflecting WinnResidential's policy.  As such, without any policy that is actually attributable to RPS, the claim of disparate impact based on racial discrimination necessarily fails.  *Inclusive Communities*, 135 S. Ct. at 2523.

> ii.  <u>Plaintiffs cannot state a claim for disparate impact under Counts II and III because they have provided insufficient statistical support for such claims across the relevant groups.</u>

Plaintiffs' disability-related disparate impact claims under Counts II and III also fail because they have not provided sufficient statistical support for their claims across the relevant groups implicated by those claims.

"Where plaintiffs have failed to support their disparate impact claims with statistical evidence, courts have consistently denied those claims."  *Rodriguez*, 2009 U.S. Dist. LEXIS 119942, at *51; *see also Graoch Associates #33, L.P. v. Louisville/Jefferson County*, 508 F.3d 366, 378 (6th Cir. 2007) (with respect to proving a discriminatory effect under the FHA, "a plaintiff must present statistical evidence . . . to state a *prima facie* case").

The proper comparison for purposes of providing those required statistics is how the challenged policy affects: (1) the group protected under the FHA; and (2) unprotected groups that are otherwise similarly situated.  *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir. 2008).  The failure to provide such statistics requires the dismissal of the case at the motion to dismiss stage.  *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014); *Boykin v. Gray*, 895 F. Supp. 2d 199, 215 (D.D.C. 2012) (dismissing plaintiffs' disparate impact claim based on disability under the FHA because the allegations could not support a finding that the defendant's actions "had a disproportionate effect on the disabled").

The policy at issue is RPS's alleged policy to require the execution of a power of attorney to request a consumer file on behalf of another individual. Thus, Plaintiffs must present statistics beyond their own circumstances as to how that policy allegedly affects: (1) the ability of consumers with disabilities to ultimately obtain a copy of their file from RPS; and (2) the ability of consumers without disabilities to obtain a copy of their file from RPS. *See id.*

Beyond providing certain statistics regarding general disability rates in Connecticut, *see* Compl. ¶¶ 167-68, Plaintiffs' Complaint contains no statistics for either group or discusses how the challenged policies ultimately affected or did not affect the protected group, which defeats their claim. *Adams*, 742 F.3d at 733 (affirming dismissal of disparate impact claim on a motion to dismiss: There are no allegations about the number of applicants and the racial makeup of the applicant pool as compared to the candidates promoted or as compared to the police or fire department as a whole. There are no allegations about the racial makeup of the relevant workforce in the Indianapolis metropolitan area or the supervisory ranks in the police and fire departments. There are no factual allegations tending to show a causal link between the challenged testing protocols and a statistically significant racial imbalance in the ranks of sergeant, lieutenant, or captain in the police department or battalion chief, lieutenant, or captain in the fire department.").

Indeed, Plaintiffs present no evidence to plausibly show that this policy affected any other disabled individual apart from Mr. Arroyo. Thus, the claim fails. *Reidt v. Cty. of Trempealeau*, 975 F.2d 1336, 1341 (7th Cir. 1992) ("Discriminatory

impact cannot be established where you have just one isolated decision.") (quoting *Coe v. Yellow Freight System, Inc.*, 646 F.2d 444, 451 (10th Cir. 1981)).

## V.   Plaintiffs' claims under the CUTPA must be dismissed.

In an omnibus and unwieldy attempt to create another claim based on the alleged FHA violations and FCRA-governed file disclosure processes, Plaintiffs allege in Count IV that RPS's offering of the CrimSAFE product, and its policies regarding file disclosures, "were immoral, unscrupulous, unethical, and oppressive," and thus in violation of the CUTPA, Conn. Gen. Stat. § 42110a, *et seq.* (Compl. ¶¶ 226-229.)

The CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42110b.  Whether an alleged practice violates CUTPA is determined by the so-called "cigarette rule":

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise - whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;  (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes injury to consumers [competitors or other businessmen].

*Cheshire Mortgage Serv., Inc. v. Montes*, 223 Conn. 80, 105-06 (1992).  Plaintiffs' "catch all" CUTPA claim, however, fails to actually identify any such conduct, and it must be dismissed for the reasons that follow.

First, there can be no CUTPA claim against RPS relating to the CrimSAFE product.  The CrimSAFE product is a tool used by landlords to assist landlords in the evaluation of criminal records based on the criteria set by landlords.  The policy decisions regarding the consideration of criminal records that Plaintiffs claim are

"discriminatory" under CUTPA were made by WinnResidential, not RPS.  Thus, no claim against RPS is possible.  *Riverview East Windsor, LLC v. CWCapital LLC*, No.10cv872, 2012 U.S. Dist. LEXIS 3311, at \*8 (D. Conn. Jan. 10, 2012) ("A claim under CUTPA requires that the defendant's conduct be the proximate cause of harm to the plaintiff.").

Second, Plaintiffs' CUTPA claim regarding RPS's alleged failure to process his file disclosure request also must be dismissed.  Plaintiffs' request for a copy of his consumer file was not done in connection with "trade or commerce" for purposes of the CUTPA.  "Trade or commerce" under the CUTPA is defined as, "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."  *Id.* § 42-110a(4).  Consumer file disclosure requests, which are provided free of charge to consumers under the FCRA (15 U.S.C. § 1681g(a)),[10] do not meet that test.  There is no allegation that RPS advertised, sold, or performed any "services" for Plaintiff.  Instead, it is alleged that Mr. Arroyo, through his conservator, reached out to RPS to exercise his statutory right to a free file disclosure under the FCRA.  Because there is no commercial transaction in that context the claim fails.  *See, e.g., Omega S.A. v. Omega Eng'g, Inc.*, No. 3:01cv2104, 2005 U.S. Dist. LEXIS 33480, at \*2 (D. Conn. Dec. 6, 2005) (filing domain name registration and trademark applications that were contested by the plaintiff, but which were never used, did not constitute

---

[10] Given that the FCRA explicitly creates this file disclosure processes and governs its execution, any such claim should be brought under the FCRA.

"trade or commerce" for purposes of the CUTPA because such actions were not ultimately done to "promote or sell any products or services").

<u>CONCLUSION</u>

WHEREFORE, Defendant, CoreLogic Rental Property Solutions, LLC, respectfully requests that the Court: (1) grant its Motion, thereby dismissing Counts I, II, III, and VI of the Complaint against it with prejudice; and (2) grant it such other and further relief as may be appropriate.

Respectfully submitted,

By: <u>/s/ Daniel W. Cohen</u>
Daniel W. Cohen (Bar No. CT 30467)
TROUTMAN SANDERS LLP
875 Third Avenue
New York, NY 10022
Telephone:  (212) 704-6000
Facsimile:  (202) 704-6288
Email:  dan.cohen@troutman.com

*Counsel for Defendant CoreLogic Rental Property Solutions, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 23, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

By: <u>/s/ Daniel W. Cohen</u>

Daniel W. Cohen (Bar No. ct 30467)
TROUTMAN SANDERS LLP
875 Third Avenue
New York, NY  10022
Telephone: (212) 704-6000
Facsimile:   (212) 704-5901
Email:  dan.cohen@troutman.com