## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **CONNECTICUT FAIR HOUSING CENTER** | Case No. 3:18-cv-00705-VLB |
| **and** | **ORAL ARGUMENT REQUESTED** |
| **CARMEN ARROYO, individually and as next friend for Mikhail Arroyo** | |
| *Plaintiffs*, <br> v. | |
| **CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC.** | |
| *Defendant*. | **October 4, 2018** |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANT CORELOGIC RENTAL PROPERTY
## SOLUTIONS, LLC.'S MOTION TO DISMISS

**Connecticut Fair Housing Center**
**Greg Kirschner (ct26888)**
**Salmun Kazerounian (ct29328)**
**Sarah White (ct29329)**
**60 Popieluszko Court**
**Hartford, CT 06106**
**Tel. (860) 263-0724/Fax (860) 247-4236**
**gkirschner@ctfairhousing.org**

**National Housing Law Project**
**Eric Dunn (phv09610)**
**919 E. Main Street, Ste. 610**
**Richmond, VA 23219**
**Tel. (415) 546-7000, ext. 3102**
**edunn@nhlp.org**

## TABLE OF CONTENTS

BACKGROUND .............................................................................. 1

ARGUMENT ................................................................................. 6

I.   Legal Standard ..................................................................... 6

II.  CoreLogic's tenant-screening activities are subject to the Fair
     Housing Act. ........................................................................ 6

     A.   The FHA prohibits any conduct that denies or makes housing
          unavailable in a discriminatory manner.................................. 7

          1.   CoreLogic is an agent to whom landlords delegate
               admission decisions.................................................... 9

          2.   CrimSAFE proximately causes a denial even if the
               landlord makes the final admission decision. ................... 11

          3.   A denial of housing is actionable even if the applicant is
               later admitted............................................................ 12

     B.   CoreLogic cites no authority denying FHA coverage for tenant-
          screening activity. ......................................................... 13

III. Count I states plausible claims for national origin and race
     discrimination under the Fair Housing Act ............................... 14

     A.   CoreLogic's criminal records screening has a disparate impact
          on African-American and Latino rental applicants. ................. 15

          1.   Plaintiffs plausibly plead a prima facie case. ................... 16

               a.   Outwardly neutral practices ................................ 16

               b.   Disproportionate adverse impact on protected
                    class ............................................................. 17

               c.   Authorship of specific rental admission policies
                    is immaterial .................................................. 19

          2.   CoreLogic's criminal records screening policy is not
               justified by a legitimate business interest and less-
               discriminatory alternatives exist. .................................. 26

**B.      Plaintiffs have sufficiently pleaded intentional discrimination based on race and national origin.** ......................................................... 29

**IV.    Counts II and III state plausible claims for disability discrimination under the FHA** ................................................................................ 33

**A.      CoreLogic refused to grant Mikhail Arroyo's reasonable accommodation request.** ...................................................... 33

**B.      Plaintiffs sufficiently plead disparate impact based on disability** ................................................................................ 36

**V.     Count VI adequately pleads CUTPA violations** ................................. 38

**A.      Defendant was a substantial factor in causing the Arroyo Plaintiffs an ascertainable loss, satisfying CUTPA's proximate cause requirements.** ........................................................... 39

**B.      CoreLogic's consumer file disclosures are in trade or commerce.** ................................................................................ 41

**C.      Plaintiffs allege unfair practices in violation of CUTPA.** .................... 43

**CONCLUSION** .............................................................................................. 46

## BACKGROUND

Plaintiffs, by counsel, submit this Memorandum in Opposition to Defendant CoreLogic Rental Property Solution, LLC's ("CoreLogic") motion to dismiss their claims for national origin and race (Count I) and disability (Counts II and III) discrimination in violation of the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.* ("FHA") and violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq.* ("CUTPA") (Count VI).

CoreLogic is a national tenant screening company that offers a product called CrimSAFE, which determines whether a landlord should accept or reject an application for tenancy by electronically evaluating an applicant's criminal records. Compl. ¶¶ 2-4, 32-33. CrimSAFE reports a "Crim Decision" to the landlord indicating whether the prospective tenant's criminal background is disqualifying. *Id.* ¶¶ 4, 38, 40. Unlike a traditional criminal history report, CrimSAFE provides no information to the housing provider about the underlying criminal history; the report merely states a decision of "Accept" or "Disqualifying Records Were Found," and the landlord is not provided the criminal record, even if they request it. *Id.* ¶¶ 3, 6, 33, 36-38. A CrimSAFE decision of "disqualifying records were found" effectively amounts to a denial of housing from the landlord. *Id.* ¶¶ 7, 40, 43, 68, 106-107, 135, 139, 140; *see also* Section II.A, *infra* at 7. CrimSAFE's determinations are made automatically, without regard for whether the criminal records indicate that the applicant presents a demonstrable risk to safety or property and without consideration of relevant mitigating information outside the criminal record itself. *Id.* ¶¶ 10, 12, 106, 107, 129-135.

Plaintiffs allege that CoreLogic's policies and practices related to CrimSAFE cause a significant and unlawful disparate impact based on race and national origin in violation of the FHA. Latinos and African Americans are arrested, convicted of crimes, and incarcerated at substantially higher rates than whites. *Id.* ¶¶ 11, 113-127. These disparities make Latino and African American rental applicants disproportionately likely to receive a CrimSAFE decision of disqualifying criminal records and be denied housing as a result. *Id.* ¶ 127. Housing practices that have a discriminatory effect violate the FHA unless they are justified by a legitimate business purpose that cannot be achieved in a less discriminatory way.[1] CoreLogic cannot meet this standard because it makes decisions to deny housing based on criminal records that do not indicate a risk to resident safety or property (e.g., records of arrests that did not lead to convictions), and does not consider information that may be germane (e.g., what the applicant has done since the conviction). *Id.* ¶¶ 12, 128-135.

At least two less discriminatory alternatives are available for dealing with potential concerns raised by housing applicants with criminal records. CoreLogic could evaluate applicants individually, considering relevant mitigating information to determine whether each particular applicant poses a realistic risk to safety or property, or CoreLogic could provide the underlying criminal records to housing providers, thus enabling them to make individual assessments; either practice

---

[1] 24 C.F.R. § 100.500; *MHANY Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016).

would have a less discriminatory effect because fewer African Americans and Latinos would be denied housing.[2] *Id.* ¶¶ 13, 136-146.

Plaintiffs also assert plausible allegations of intentional discrimination based on race and national origin. CoreLogic is aware of the discriminatory effect of CrimSAFE and of the less discriminatory alternatives, but still fails to make individual assessments—and prevents landlords from doing so by withholding underlying criminal records. *Id.* ¶¶ 144-145. Not only does CoreLogic continue to administer CrimSAFE in the same way despite knowing its discriminatory effect, it even markets CrimSAFE as optimizing fair housing compliance. *Id.* ¶ 42.

CrimSAFE disqualified Plaintiff Mikhail Arroyo, a Latino man who was incapable of criminal conduct because of his physical and intellectual disabilities, based on a criminal record believed to consist of only a low-level shoplifting charge that was ultimately withdrawn. *Id.* ¶¶ 5-8, 44-46, 54-63. CoreLogic refused to provide Mr. Arroyo's conservator with any information about the denial, preventing him from challenging the CrimSAFE decision or requesting a reasonable accommodation from his prospective landlord, which denied him housing and unnecessarily prolonged his stay in a nursing home by a year. *Id.* ¶¶ 16-17, 71-104.

---

[2] Plaintiffs' race and national origin claims are supported by guidance issued by the U.S. Department of Housing and Urban Development ("HUD") in April 2016 confirming that housing policies that restrict access based on criminal records are likely to have a disparate impact, and that any legitimate public safety interests can be achieved in a less discriminatory way by conducting individualized assessments that consider relevant mitigating information. *See* U.S. Dept. of Housing & Urban Dev., Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions (Apr. 4, 2016) (hereafter "HUD Guidance"), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF.

3

In 2015, Mr. Arroyo sustained a traumatic brain injury that left him unable to speak, walk, or care for himself, and his mother, Plaintiff Carmen Arroyo, was appointed his conservator. *Id.* ¶¶ 5, 44-48. In April 2016, Ms. Arroyo asked her property manager, WinnResidential, to let Mr. Arroyo move in with her at ArtSpace Windham because he was eligible for discharge from a nursing home. *Id.* ¶ 52. Ms. Arroyo paid a screening fee and authorized CoreLogic to prepare a report on Mr. Arroyo. *Id.* ¶¶ 51, 53. CoreLogic's tenant screening report on Mr. Arroyo stated a "Crim Decision" of "Record(s) Found" and included a single-page "CrimSAFE Report" with a "CrimSAFE result" of "disqualifying records were found." *Id.* ¶¶ 54-58. CoreLogic provided no information in its report or otherwise about the nature of the criminal records or the reasons Mr. Arroyo was disqualified, and Plaintiffs are still unsure what criminal record CrimSAFE found disqualifying. *Id.* ¶¶ 59-61, 67, 68, 95. However, the only criminal record Plaintiffs are aware of is a 2014 arrest for the "summary offense" (a grade lower than misdemeanor) of retail theft in Pennsylvania; the arrest occurred when he was 20 years old, resulted in a dismissal, and was prior to his injury. *Id.* ¶¶ 8, 62. In determining Mr. Arroyo's criminal record disqualified him from housing, CoreLogic did not take into account these or any other mitigating circumstances. *Id.* ¶¶ 58-59, 63.

CoreLogic's disqualifying report on Mr. Arroyo effectively denied his rental application. *Id.* ¶¶ 9, 55, 58, 70, 97, 102. WinnResidential told Ms. Arroyo that her son could not move in because CoreLogic had disqualified him for unknown reasons that it could not find out, and instructed her to contact CoreLogic. *Id.* ¶ 66, 68, 69, 93. Ms. Arroyo repeatedly contacted CoreLogic over a period of at least

4

seven months to request an explanation for why it had disqualified Mr. Arroyo, but it would not provide her with this information. *Id.* ¶¶17, 71-89, 94, 95. She requested a copy of Mr. Arroyo's consumer file, both orally and in writing. *Id.* ¶¶71, 73-76; 78, 83, 86-88. She informed CoreLogic that Mr. Arroyo had disabilities that prevented him from making the request on his own and submitted documentation of her court appointment as his conservator, which she explained gave her legal authority to request his file. *Id.* ¶¶ 17, 48, 49, 72, 74, 78, 81, 83, 84, 86. CoreLogic refused to provide any such information to Carmen unless she provided a "power of attorney" executed by Mr. Arroyo, which was impossible as he lacked the capacity to do so. *Id.* ¶¶80-89.

As a result, neither Ms. Arroyo nor WinnResidential knew why CoreLogic had denied the application, which prevented Ms. Arroyo from challenging the accuracy or appropriateness of CoreLogic's decision or formulating a request to have Mr. Arroyo's application reconsidered as a reasonable accommodation of his disabilities, and prevented WinnResidential from meaningfully considering any such request. *Id.* ¶¶ 93, 95, 97. Only after filing an administrative fair housing complaint against WinnResidential and providing evidence that Mr. Arroyo's only known criminal record had been withdrawn was he allowed to move in. *Id.* ¶ 100. But this did not occur until June 2017—more than a year later, during which time he unnecessarily remained in the nursing home. *Id.* ¶¶ 96-104.

In addition to their claim for race and national origin discrimination, Plaintiffs contend that CoreLogic discriminated based on disability in violation of the FHA by: (1) refusing to disclose Mikhail Arroyo's consumer file to his conservator as a

5

reasonable accommodation of his disabilities and (2) maintaining policies and practices that disproportionately prevent individuals with cognitive disabilities from accessing the consumer files that CoreLogic uses to make rental admission decisions. The Arroyo Plaintiffs further allege that CoreLogic violated FCRA (which Defendant has not moved to dismiss), and that its conduct is unfair in violation of CUTPA. Plaintiffs plead cognizable claims against CoreLogic under each count, so the Motion to Dismiss should be denied.

## ARGUMENT

### I.   LEGAL STANDARD

In evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court accepts all material factual allegations in the complaint as true, and draws all reasonable inferences in the plaintiff's favor. *See Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015). The court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Velez v. Levey*, 401 F.3d 75, 80 (2d Cir. 2005). However, the factual allegations must go beyond mere speculation and assert a cause of action with "enough facts to state a claim for relief that is plausible on its face." *Biro*, 807 F.3d at 544, citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### II.   CORELOGIC'S TENANT-SCREENING ACTIVITIES ARE SUBJECT TO THE FAIR HOUSING ACT.

The goal of the FHA is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. To this end, the FHA is to be construed broadly and given "generous construction." *Trafficante v. Metro Life*

6

*Ins. Co.*, 409 U.S. 205, 209, 211-212 (1972) (FHA is "broad and inclusive" and implements a "policy that Congress considered to be of the highest priority" which can be given effect "only by a generous construction"); *Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir. 1994) (same).

A. **The FHA prohibits any conduct that denies or makes housing unavailable in a discriminatory manner.**

CoreLogic argues the FHA only applies, in the rental context, to entities that directly provide housing (i.e., landlords). This narrow interpretation, which would substantially limit the FHA's reach and permit a wide range of discriminatory practices, is at odds with the extensive case law requiring broad and generous construction. In *U.S. v. Space Hunters, Inc.,* the Second Circuit rejected the "crabbed [] reading" that the FHA "applies only to dwelling owners or their agents." *See* 429 F.3d 416, 424 (2d Cir. 2005) (reversing dismissal of discriminatory statements claim against housing information vendor because the statute "does not provide any specific exemptions or designate the persons covered, but rather applies on its face to anyone who makes prohibited statements." (internal quotation marks omitted)).

The FHA prohibits "mak[ing] unavailable or deny[ing] a dwelling" to any person because of, inter alia, race, national origin, or disability. 42 U.S.C. §§ 3604(a), 3604(f)(1). It further prohibits discrimination "in the provision of services or facilities in connection with [a] dwelling." 42 U.S.C. §§ 3604(b), 3604(f)(2). These sections are entitled to expansive interpretation. *See, e.g., Mazzocchi v. Windsor Owners Corp.,* 204 F.Supp.3d 583, 608 (S.D.N.Y. 2016) (Section 3604(f)(2) entitled to

7

broad and inclusive interpretation), citing *Cabrera*, 24 F.3d at 388 and *Trafficante*, 409 U.S. at 209, 212; *see U.S. v. City of Parma,* 494 F.Supp. 1049, 1053 (N.D.Ohio 1980) (collecting cases and holding that Section 3604(a) has long been interpreted to reach "every practice which has the effect of making housing more difficult to obtain on prohibited grounds."); *see also Viens v. America Empire Surplus Lines Ins. Co.,* 113 F.Supp.3d 555, 569 (D.Conn. 2015) (same).

FHA regulations promulgated by HUD to enforce the FHA make clear that rendering a decision to accept or reject an applicant amounts to a service connected to rental that makes housing unavailable and is therefore covered under the FHA: "It shall be unlawful, because of race, … handicap or national origin, to engage in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons." 24 C.F.R. § 100.70(b). Activities prohibited under this regulation "include… (2) Employing codes or other devices to … reject applicants … [or] (3) Denying or delaying the processing of an application made by a … renter … because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.70(d)(2)-(3). As the agency charged with enforcement of the FHA, HUD's construction of the statute is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *see Viens*, 113 F. Supp. 3d at 567 (applying *Chevron* deference and finding § 3604 prohibits discrimination in the provision of homeowner's insurance); *see also Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010), as amended (Apr. 30, 2010) (same).

Plaintiffs' allegations that CoreLogic employs an automated decision-

8

making product (CrimSAFE) to reject rental applications on behalf of its client landlords (Compl. ¶¶ 3, 36-39) establish that its conduct falls within the ambit of § 3604. That it is a tenant screening company and not a landlord is of no consequence. In arguing its activities are beyond the reach of the FHA, CoreLogic contends that adverse CrimSAFE decisions do not proximately cause housing denials because landlords could disregard the decision and accept an applicant anyway. This argument fails for three reasons.

### 1.    CoreLogic is an agent to whom landlords delegate admission decisions.

CrimSAFE's fundamental purpose is to furnish a landlord with a decision on whether an applicant should be accepted or rejected on the basis of criminal history, not to provide information to inform the landlord's own decision. Compl. ¶¶ 34-40. Since a CrimSAFE report includes a bare "Crim Decision" of either "Accept" or "disqualifying records" without any details about the underlying criminal history, a landlord has no ability to determine whether it agrees with the CrimSAFE decision, or to reconsider a denial based on additional materials an applicant might provide (such as evidence of rehabilitation or that a disability resulted in an arrest). *Id.* ¶¶ 7, 40, 43, 68, 106-107, 135, 139, 140. There is no practical reason for a landlord ever to spontaneously deviate from a CrimSAFE decision. *Id.* CoreLogic even provides the landlord a letter, pre-addressed to the applicant, to notify the applicant of the denial. *Id.* ¶¶ 39, 64-65. Not only is CoreLogic aware that landlords use CrimSAFE to make leasing decisions, but it in fact markets CrimSAFE as making decisions on applicants' criminal histories so that landlords

9

are "relieved from the burden" of interpreting criminal records and making screening decisions themselves, which it claims will enable landlords to "improve [or] optimize" their fair housing compliance. *Id.* ¶¶ 34, 35, 42.

CoreLogic's role is no different than a property manager, real estate agent, or other traditional agent to whom a landlord might entrust tenant-selection decisions. The law is clear that such agents or employees can be held liable under the FHA when they deny housing on a discriminatory basis, even though the property owner can override their decisions. *See, e.g., Cleveland v. Caplaw Enterprises,* 448 F.3d 518, 523 (2d Cir. 2006) (employee can be held liable under FHA for his own discriminatory acts), discussing *Mitchell v. Shane,* 350 F.3d 39, 49 (2d Cir. 2003) ("if Ryan is found liable for discrimination, Century 21, as Ryan's employer, may also be liable."); *U.S. v. Hylton,* 944 F.Supp.2d 176, 190, aff'd, 590 F. App'x 13 (2d Cir. 2014) (D. Conn. 2013) (agent liable for his own discriminatory actions and principals vicariously liable); *Thurmond v. Bowman,* 211 F.Supp.3d 554, 564-65 (W.D.N.Y. 2016) (agent who managed a rental property on behalf of its owner liable for discrimination); *Portee v. Hastava,* 853 F.Supp. 597 (E.D.N.Y. 1994) (real estate agent liable for discrimination in refusing to rent client's home to interracial couple); *see also Jeanty v. McKey & Poague, Inc.,* 496 F.2d 1119, 1120 (7th Cir. 1974) (property management firm liable for discrimination even "[t]hough the management agreement … states that 'Leases and tenants shall be approved by the owner'"); *Hintz v. Chase,* No. 17-CV-02198-JCS, 2017 WL 3421979, at *2-3 (N.D. Cal. Aug. 9, 2017) (collecting cases) (housing discrimination action sounds in tort and "under well-established principles of agency law, an agent who does an

act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal."), quoting *Arnal v. Aspen View Condominium Association, Inc.* No. 15–cv–01044–WYD–MJW, 2017 WL 1231555, at * 4 (D. Colo., Mar. 28, 2017). That CrimSAFE is ultimately a computer program rather than a live agent does not change the fundamental structure of the principal-agent relationship or diminish CoreLogic's duty not to discriminate.

### 2.   CrimSAFE proximately causes a denial even if the landlord makes the final admission decision.

The U.S. Supreme Court held in *Staub v. Proctor Hospital,* 562 U.S. 411, 419 (2011), that an act of discrimination may have multiple proximate causes, and the possibility that a subordinate may be overridden by a higher decisionmaker does not "automatically render the link to the [subordinate's] bias 'remote' or 'purely contingent'" for proximate cause purposes.[3] This is true even if the decisionmaker conducts a separate investigation and exercises her own judgment. *Id.* at 419. "[I]t is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm." *Id.*

*Staub* involved a claim by a hospital employee who was fired for violating a rule he alleged was created and enforced against him by his supervisors for discriminatory reasons. *Id.* at 414-15. The decision to terminate the employee was made not by the supervisors, but a vice president who conducted her own review

---

[3] *Staub* involved a claim under the Uniformed Services Employment and Reemployment Rights Act, which prohibits employment based on participation in the military reserves. *See id.* at 415; *see also* 38 U.S.C. § 4301 *et seq.*

and exercised independent judgment. *Id.* at 415. The hospital argued it could be liable for discrimination only if the supervisors exercised "such 'singular influence' over the decisionmaker that the decision to terminate was the product of 'blind reliance.'" *Id.* at 415-16. The court rejected this contention, however, holding the vice president's independent investigation and exercise of judgment did not negate the effect of the prior discrimination because the supervisors' actions could still "be a causal factor of the ultimate employment action." *Staub* at 420.

Of course, CoreLogic will typically have singular influence over a landlord's decision because it determines whether there are "disqualifying" records, provides a preprinted denial letter, and withholds the underlying criminal history or information sufficient to locate it; landlords must therefore blindly rely on the "Crim Decision." But as *Staub* instructs, even this is immaterial: a CrimSAFE report of "disqualifying record(s) were found" can proximately cause a denial of rental housing by serving as a causal factor, even if the landlord were to conduct a separate investigation and exercise independent judgment. *See Staub* at 420.

3.    <u>A denial of housing is actionable even if the applicant is later admitted.</u>

Even if a landlord may overturn a CoreLogic decision later, a rental applicant for whom CrimSAFE reports that disqualifying records are found still experiences at least a "preliminary denial." A preliminary denial of housing is sufficient to bring conduct within the ambit of Section 3604(a). *See Lowman v. Platinum Property Mngmt. Services, Inc.,* 166 F.Supp.3d 1356, 1358-60 (N.D. Ga. 2016) (preliminary denial actionable under FHA even though the plaintiff was later admitted, noting "the Court can find [no case] standing for the proposition that the subsequent

approval of an application negates a prior denial for the purposes of the [FHA]").[4]
Attaching liability at the initial denial stage is important because an applicant may
sustain an injury before admission is granted, *id.* at 1361, as in this case, where Mr.
Arroyo remained in a nursing home for more than a year after the initial denial. *See*
Compl., ¶¶ 96-101.

    **B.** <u>**CoreLogic cites no authority denying FHA coverage for tenant-screening
activity.**</u>

      **None of the cases CoreLogic cites in its motion to dismiss support its
contention that the FHA does not reach its conduct. The case it claims is most on
point, *Frederick v. Capital One Bank,* 2015 WL 5521769, at \*1 (S.D.N.Y., Sept. 17,
2015), was a 36-count pro se complaint against at least thirteen defendants, whom
the plaintiff alleged "engaged in a conspiracy to report false information to credit
reporting agencies and threaten him with injury to his credit score if he does not
pay allegedly invalid debts." The Court rejected the plaintiff's theory that "any
injury to one's credit score 'otherwise make[s] unavailable' housing within the
meaning of the FHA," as such a rule "would make credit reporting disputes
potential FHA violations regardless of the subject matter of the underlying
transaction." *Frederick* at \*2. Accordingly, the court ruled that "credit reporting
practices <u>as alleged in the complaint</u> are not subject to the FHA." *Frederick* at \*3
(emphasis added). The case did not establish that credit-reporting practices can**

---

[4] **Notably, in addition to outright denials, the FHA also prohibits "various forms of
discouragement." *U.S v. Youritan Construction Co.*, 370 F.Supp. 643, 648 (N.D. Cal.
1973) (finding that failing to provide a minority applicant "with necessary and
correct information . . . discourages and impedes his application" and violates the
FHA).**

*never* be subject to a Section 3604(a) claim. And in the instant case, both the type of credit reporting (residential tenant-screening) and the nature of the transaction (a decision-making product, rather than a mere informational report) combined to cause a denial of housing.

CoreLogic also relies on *Steptoe v. Beverly Area Planning Association,* 674 F. Supp. 1313, 1315 (N.D. Ill. 1987), which involved a housing agency that promoted residential integration by providing information on available housing only to "white persons moving into already integrated areas, or … blacks and other minority persons moving into predominantly white (nonintegrated) areas." Taking a quote out of context, CoreLogic suggests *Steptoe* stands for the proposition that since the agency "did not engage in the provision of housing [it] therefore could not have made housing unavailable." Mot. to Dismiss at 9. In fact, the opposite is true. The *Steptoe* court observed that while the housing agency did not own real estate itself and was "not involved in the actual mechanics of sale or rental transactions," the agency could still have made housing unavailable by "steering" prospective buyers away from the area based on race. *See Steptoe* at 1319 (but concluding the agency did not engage in illegal steering in that case). *Steptoe* is thus an example of one way in which an entity other than a landlord can make housing unavailable; making leasing decisions on the landlord's behalf is another. *See, e.g., Jeanty* at 1120.

III.   **COUNT I STATES PLAUSIBLE CLAIMS FOR NATIONAL ORIGIN AND RACE DISCRIMINATION UNDER THE FAIR HOUSING ACT**

Section 3604(a) of the FHA prohibits a person or entity from "mak[ing]

14

unavailable or deny[ing] a dwelling to any person because of race [or] national origin." 42 U.S.C. § 3604(a). Section 3604(b) prohibits discrimination in the "in the terms, conditions, or privileges" of rental. Plaintiffs state plausible claims against CoreLogic under Sections 3604(a) and (b) on both disparate treatment and discriminatory effects (a.k.a. "disparate impact") theories.

**A. CoreLogic's criminal records screening has a disparate impact on African-American and Latino rental applicants.**

The U.S. Supreme Court has expressly reaffirmed that disparate impact claims are cognizable under the FHA, which means housing practices that disproportionately harm racial and ethnic minorities violate the FHA when there is no legitimate justification for those practices. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2525 (2015); *see also Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir. 1988). FHA disparate impact claims are analyzed under a procedure set forth in HUD's discriminatory effects rule, 24 C.F.R. § 100.500. *See MHANY Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016) (adopting the rule). This is a three-step burden-shifting framework, under which:

> First, a plaintiff … must come forward with a prima facie case; and second, the defendant … may rebut the prima facie case by proving that the "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests[.]" [Third,] if the defendant meets its burden, the burden of proof shifts back to the plaintiff to show that the "substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect."

*MHANY Mgmt.* at 617, quoting 24 C.F.R. § 100.500(c).

Plaintiffs allege facts that plausibly establish CoreLogic's liability for

15

discrimination under this three-step analysis. *See Christiansen v. Omnicron Group,* 852 F.3d 195. 199 (2d Cir. 2017) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."), quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2002).

1.    <u>Plaintiffs plausibly plead a prima facie case.</u>

Establishing a prima facie case requires showing "that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1). The Second Circuit breaks this standard into three parts: (i) "certain outwardly neutral practices," (ii) "a significantly adverse or disproportionate impact on persons of a particular type," and (iii) "a causal connection" between the facially neutral practices and the discriminatory effect. *MHANY Mgmt.,* 819 F.3d at 617, *see also Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565, 575 (2d Cir. 2003). At the motion to dismiss stage, Plaintiffs need only allege facts that plausibly establish such a prima facie case. *See Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 87 (2d Cir. 2015); *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510; 122 S.Ct. 992 (2002).

a.  <u>Outwardly neutral practices</u>

The Complaint alleges that Defendant CoreLogic has a series of policies and practices, collectively referred to as its "Automated Criminal Records Screening Policy," through which it contracts with residential landlords to screen applicants by searching its national database of criminal records, make automated determinations using a computer algorithm that certain applicants' criminal

16

records disqualify them from tenancy, and report only decisions ("accept" or "record(s) found") to landlords without providing the underlying criminal history information—all without conducting any individualized assessment of applicants, and without excluding any particular types of criminal records (such as arrests or charges that did not lead to conviction) from consideration. Compl. ¶ 106. The Automated Criminal Records Screening Policy and its components are outwardly neutral practices, applied to all applicants irrespective of race or national origin. *See, c.f.*, *Lowe v. Mansfield Planning & Zoning Comm'n*, 2018 WL 379010, at *6 (D.Conn. Jan. 10, 2018).

### b. Disproportionate adverse impact on protected class

Plaintiffs allege that the Automated Criminal Records Screening Policy has a significant adverse and disproportionate impact on African Americans and Latinos. The Complaint cites numerous statistics demonstrating that both nationally and in Connecticut, African Americans and Latinos are significantly more likely than whites to be arrested, charged, convicted, and incarcerated. Compl. ¶¶ 109-126. "Nationally, African Americans and Latinos are arrested at a rate that is two to three times their proportion of the general population," and "African-American males are six times more likely than white males to be incarcerated, and Latino males are three times more likely than white males." *Id.* ¶¶ 120, 123. Similar disproportionalities exist in Connecticut, where "African Americans are incarcerated at 9.4 times the rate of whites and Latinos are

17

incarcerated at 3.9 times the rate of whites." *Id.* ¶ 118.[5]

CrimSAFE reports are based on data that CoreLogic aggregates from multiple sources, including state departments of correction and judicial offices, into a national database of criminal records. *Id.* ¶ 111. The database includes incarceration records, conviction records, and records of arrests and charges that do not result in convictions. *Id.* Because of the large racial and ethnic disparities in criminal justice involvement, African Americans and Latinos are significantly more likely than whites to have criminal records that appear in CoreLogic's database. *Id.* ¶ 113. CoreLogic's Automated Criminal Records Screening Policy matches criminal records to African American and Latino rental applicants at substantially higher rates than whites, resulting in disparate housing denials when CrimSAFE determines and reports to landlords a decision of "disqualifying records were found" (as opposed to "Accept"). *Id.* ¶¶ 113, 127.

Plaintiffs' allegations are supported by guidance issued by the U.S. Department of Housing & Urban Development in April 2016, which confirmed that policies restricting access to rental housing based on an applicant's criminal history are likely to have a disproportionate adverse effect on African Americans and Latinos because of significant racial and ethnic disparities in the criminal justice system. HUD Guidance at 1.

CoreLogic's Automated Criminal Records Screening Policy caused the denial of Mr. Arroyo's application for tenancy at ArtSpace Windham. Upon

---

[5] CoreLogic does not challenge the sufficiency of these statistics, so only a small sample of the Complaint's statistical allegations are included in this brief.

detecting that Mr. Arroyo, who is Latino, had no convictions and had only a withdrawn charge for retail theft, rather than reporting a "Crim Decision" of "Accept," CoreLogic determined and notified WinnResidential that "disqualifying record(s) were found." Compl. ¶¶ 44, 55, 58, 62. Because of CoreLogic's determination, Mr. Arroyo was denied access to housing at ArtSpace Windham and remained in a nursing home for more than a year. *Id.* ¶ 70. Because the landlord does not receive the underlying criminal record under the Automated Criminal Records Screening Policy, Mr. Arroyo was unable to seek meaningful reconsideration or review of the denial. *Id.* ¶¶ 93, 95, 97. Had CoreLogic either reported a "Crim Decision" of "Accept" or provided the underlying information to the landlord, Mr. Arroyo would not have been denied housing (*Id.* ¶¶ 9, 101), and its Automatic Criminal Records Screening Policy was accordingly the proximate cause of the denial.

### c.   Authorship of specific rental admission policies is immaterial

Challenging both the outwardly neutral practices and causation elements, CoreLogic asserts that the "polic[ies] to categorically deny housing to individuals with criminal records," including "[WinnResidential's] policy of disqualifying residents with the type of record attributable to Mr. Arroyo," are not attributable to CoreLogic, but to its client landlords. Mot. to Dismiss at 19. This argument relies on facts not alleged in the Complaint and should not be considered. But even if this were alleged, it would not absolve CoreLogic; CoreLogic bears liability for its own actions in applying discriminatory rental admission policies, no matter where they originate. *See Short v. Manhattan Apts., Inc.,* 916 F.Supp.2d 375, 399 (S.D.N.Y.

19

2012) ("fair housing doctrine is well established that agents will be liable for their own unlawful conduct, even where their actions were at the behest of the principal."), quoting *Jeanty*, 496 F.2d at 1120-21.

>        (i)        Plaintiffs do not allege that CrimSAFE merely applies
>                    screening criteria established by landlords.

CoreLogic's argument relies on facts not alleged in the Complaint and misidentifies the policy Plaintiffs are challenging and should therefore be disregarded. CoreLogic claims that Plaintiffs "acknowledge that the allegedly discriminatory policies regarding eligibility thresholds vis-à-vis criminal records were set by the identified landlord, and not [CoreLogic]," and that CoreLogic "has no role in setting those criteria." Mot. to Dismiss 2. The Complaint makes no such concessions. On the contrary, the Complaint alleges that CoreLogic plays at least some role in establishing landlords' admission policies—first by providing landlords with a form to specify which general categories of crimes the CrimSAFE algorithm should screen for (meaning CoreLogic both establishes the categories of crimes from which landlords can choose and determines which offenses belong in each category), and second by determining whether particular criminal records disqualify applicants.[6] Compl. ¶¶ 4-5, 7, 35-37, 57, 106.

---

[6] CoreLogic mischaracterizes ¶ 35 of the Complaint, which quotes CoreLogic's marketing materials: "<u>Defendant describes CrimSAFE as</u> an 'automated tool [that] processes and interprets criminal records and notifies leasing staff when criminal records are found that do not meet the criteria you establish for your community…" (emphasis added). CoreLogic's brief truncates the allegation to omit "Defendant describes" and repeatedly attributes its own statements to Plaintiffs, calling it a "concession." The Court must accept as true on a motion to dismiss that this is how CoreLogic describes it product, not that Plaintiffs assert that this characterization is correct.

CoreLogic also misstates the policies Plaintiffs are challenging. Plaintiffs are not challenging individual landlords' admission policies, but rather, all aspects of the broader CrimSAFE decision-making structure created by CoreLogic alone. *Id.* ¶ 106. These include CoreLogic's policies of rendering automated decisions on rental applicants' criminal history without individualized assessments and reporting the outcomes of those decisions without providing the underlying information. *Id.* This set of policies is clearly identified in the Complaint as "Defendant's Automated Criminal Records Screening Policy," and this is the policy that Plaintiffs allege cause discriminatory outcomes. CoreLogic must therefore demonstrate that the alleged policy, not another one it has selected, does not violate the FHA.

(ii) <u>CoreLogic is liable for its own discriminatory conduct regardless where the discriminatory policy originates.</u>

Even if CoreLogic could establish that it truly has "no role" in establishing landlord's screening criteria, it would still be liable for discrimination. In *Jeanty*, the Court of Appeals reversed the trial court's dismissal of claims against a rental management company it found were carrying out the racially discriminatory policy of the owner, holding that "whoever decided not to rent to the plaintiffs, the discriminatory acts alleged were performed by [the agent defendants]. It is well established that agents will be liable for their own unlawful conduct, <u>even where their actions were at the behest of the principal</u>." *Jeanty*, 496 F.2d at 1120-21 (emphasis added). Consistent with *Jeanty*, *U.S. v. Hylton* held that a property management firm was liable for the discriminatory acts of its employee—even

21

though that employee was also the co-owner of the premises at issue. *See Hylton,* **944 F.Supp.2d at 192-93. Many other cases from around the country have similarly held.** *See, e.g., Hintz,* **2017 WL 3421979, at \*2-3 (collecting cases).[7] HUD regulations likewise provide that a "person is directly liable for: (1) the person's own conduct that results in a discriminatory housing practice." 24 C.F.R. § 100.7(a). CoreLogic cannot therefore escape liability by arguing that it was merely carrying out a landlord's discriminatory scheme.** *See also* **Section II.A.1,** *supra* **at 9 (discussing applicability of FHA to CoreLogic as an agent to whom landlords delegate admission decisions).**

CoreLogic is additionally liable for "[f]ailing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it," which HUD regulations proscribe as unlawful. 24 C.F.R. § 100.7(a)(3). If, as CoreLogic claims, landlords submit criteria to CoreLogic for application through CrimSAFE, CoreLogic knows (or should know) when a client landlord has

---

**[7] Cases mentioned in** *Hintz* **include "***Willborn v. Sabbia***, No. 10 C 5382, 2011 WL 1900455, at \*4 (N.D. Ill. May 19, 2011) (denying motion to dismiss by real estate agent who sought dismissal of FHA claim on the basis that he merely conveyed to the plaintiffs the owner's decision not to sell to them because they were African-American);** *Moore v. Townsend***, 525 F.2d 482, 485 (7th Cir. 1975) (finding that a real estate agent could be liable for assisting the owner in racial discrimination where owner told real estate agent after learning race of plaintiffs that she no longer wished to sell her house and real estate agent passed that information on to the plaintiffs and suggested they look for a house in a different neighborhood);** *Dillon v. AFBIC Development* **Corp., 597 F.2d 556, 562 (5th Cir. 1979) (holding that real estate agent could be liable for housing discrimination under the FHA even though he was carrying out the wishes of the owner, who did not wish to sell his house to an African-American couple[.])."** *Hintz* **at \*2-3.**

unjustifiable criminal history criteria (e.g., disqualifying based on non-conviction records – *see* Section III.A.2, *infra* at 26), and has the power to correct that discrimination by refusing to disqualify applicants under such criteria (as CoreLogic is separately obligated not to do by 24 C.F.R. § 100.7(a)(1)). Landlords who rely on CoreLogic's promise to "improve" or "optimize" FHA compliance (see Compl. ¶ 42) may even expect CoreLogic to prevent them from screening applicants under unjustifiable policies, rather than blindly apply whatever rules the landlord comes up with. CoreLogic is therefore liable under the FHA even if it is only passively applying landlord's screening criteria (again, this is not what Plaintiffs allege).

(iii)      **<u>None of the cases CoreLogic cites support that it may avoid liability.</u>**

CoreLogic cites *Wheatley Hts. Neighborhood Coalition v. Jenna Resales Co.,* which held that a multiple listing service was not liable for discriminatory acts of brokers who listed properties with that service. *See* 447 F.Supp. 838, 843 (E.D.N.Y. 1978). Likening itself to the multiple listing service in *Wheatley Heights*, CoreLogic argues it merely provides a "technological tool" and cannot be liable if landlords use that tool to discriminate. But the *Wheatley Heights* ruling was based on the finding that the participating brokers, who engaged in the discrimination, "[did] not act on behalf, at the behest, or for the benefit of MLS." *Wheatley Hts.* at 843. Unlike the multiple listing service in *Wheatley Heights,* CoreLogic makes discriminatory decisions itself, and makes those decisions through contractual agency relationships for and at the behest of its client landlords.

23

CoreLogic's reliance on *Sabal Palm Condo Ass'n v. Fischer,* 6 F. Supp. 3d 1272 (S.D. Fla. 2014), is also misplaced. *Sabal Palm* held that a lawyer could not be held liable under the FHA for incorrectly advising a condo association that a person was not entitled to a reasonable accommodation. *Id.* at 1294. But that holding was based on the lawyer's non-participation in the actual decision—i.e., he "ha[d] no authority to vote—and did not in fact vote." *Id.* In contrast, CoreLogic actually makes rental decisions on applicants; indeed, it is more closely analogous to the board president in *Sabal Palm,* who did participate in the decision and was subject to liability because "[i]individual board members or agents such as property managers can be held liable when they have 'personally committed or contributed to a Fair Housing Act violation.'" *Id.* at 1293-94.

*Short v. Allstate Credit Bureau,* 370 F.Supp.2d 1173 (M.D.Ala. 2005), does not contain enough description of the plaintiffs' discrimination theory to assess its relevance here. But the claim was brought under the Equal Credit Opportunity Act, a statute that applies only to "creditors." *See id.* at 1184 (discussing 15 U.S.C. § 1691a(e)). The court dismissed the ECOA claim because the plaintiffs did not allege that the defendant, Allstate (whom the plaintiffs had separately alleged was a "credit reporting agency"), was a creditor. *Id.* at 1184. This makes *Short* plainly irrelevant to this FHA case where CoreLogic is alleged to have made unavailable and denied housing, including to the Arroyos.

Finally, CoreLogic erroneously identifies *Dixon v. Margolis*, 765 F.Supp. 454 (N.D. Ill. 1991), as a disparate impact case, when in fact it was an intentional discrimination case under the Equal Protection Clause against police officials for

using methods to award promotions that were alleged to have a discriminatory adverse impact. The court found no evidence to support an inference of discriminatory intent as to certain defendants, but made no determination regarding their liability under a disparate impact theory for their role in enforcing the policy alleged to cause discriminatory outcomes, as disparate impact claims are unavailable under the Equal Protection Clause. *See id.* at 455, 460. On the other hand, the court found that an inference of discriminatory intent *could* be drawn as to the defendant whose role was most analogous to CoreLogic's – i.e., the entity responsible for "creating, administering, and evaluating" the policy alleged to have a disparate impact. *Id.* at 460.

(iv)     <u>CrimSAFE has an adverse discriminatory effect, regardless of what screening criteria are applied.</u>

Finally, the Complaint pleads facts establishing a prima facie discrimination claim irrespective of any particular landlord's screening criteria, and this is sufficient to survive a motion to dismiss. African Americans and Latinos disproportionately have *every type* of criminal record–arrest, charge, conviction, and incarceration–and consequently a discriminatory effect is present no matter what specific records are deemed "disqualifying." Compl. ¶¶ 109-124. *See also* HUD Guidance at 2. The specific criteria applied relate only to the question of whether the discriminatory effect is justified by a substantial, legitimate, non-discriminatory interest – which is not Plaintiffs' burden to establish in a Complaint. *See Winfield v. City of New York,* No. 15-CV-5236, 2016 WL 6208564, at *6 (S.D.N.Y. Oct. 24, 2016) ("plausibility standard for pleading … requires only the plaintiff plead

25

allegations that plausibly give rise to an inference that the challenged policy causes a disparate impact"), citing V*ega.,* 801 F.2d at 87. At any rate, as set forth below, CoreLogic cannot satisfy its burden.

> **2.    CoreLogic's criminal records screening policy is not justified by a legitimate business interest and less-discriminatory alternatives exist.**

Because of its discriminatory effect, criminal records screening is lawful only when justified by a substantial, legitimate business interest. *See* 24 C.F.R. § 100.500; *MHANY Mgmt.* at 617. CoreLogic's marketing materials state that the interest underlying CrimSAFE is to protect safety and property in a housing complex because "[c]riminals can disrupt – and even endanger – the entire neighborhood." *See* Compl. ¶ 129. Protecting resident safety may be a legitimate interest, but a policy of making housing decisions based on criminal history must be justified with proof that it actually assists in protecting resident safety or property. *See* HUD Guidance at 5-6. CoreLogic cannot satisfy this burden.

CoreLogic's use of arrest and charge records that do not lead to convictions to disqualify rental applicants cannot be justified as necessary to achieve the goal of improving safety. "The mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense." *Schware v. Bd. of Bar Exam. of State of N.M.,* 353 U.S. 232, 241 (1957); *see also* HUD Guidance at 5 ("arrest records do not constitute proof of past unlawful conduct and are often incomplete (e.g., by failing to indicate whether the individual was prosecuted, convicted, or acquitted)."). Accordingly,

26

"information concerning a … record of arrests without conviction, is irrelevant to [an applicant's] suitability or qualification for employment." *Gregory v. Litton Systems, Inc.,* 316 F. Supp. 401, 403 (C.D. Cal. 1970), *aff'd*, 472 F.2d 631 (9th Cir. 1972). Likewise, screening policies based on convictions cannot be justified under this standard unless the criminal conduct indicates that the applicant presents an actual increased risk. *See* HUD Guidance at 6. "Blanket prohibitions" and other policies that fail to consider the nature, severity, and recency of a conviction cannot meet this standard. *Id.* at 6-7.

Furthermore, to the extent CoreLogic's criminal records screening policies are justified as necessary to protect safety and property, obvious less discriminatory alternatives are available. As HUD prescribes, CoreLogic could evaluate each criminal record on an individualized basis by considering relevant mitigating circumstance outside the criminal record itself to determine the actual risk to safety before reporting to a housing provider that the applicant is disqualified. *See* HUD Guidance at 7 (proper factors for individualized assessment include "the facts or circumstances surrounding the criminal conduct; the age of the individual at the time of the conduct; evidence that the individual has maintained a good tenant history before and/or after the conviction or conduct; and evidence of rehabilitation efforts.").[8] Or, rather than making the disqualification

---

[8] The duty to make individualized assessments, rather than deny applicants categorically, has long existed in the employment context (to reduce the effects of similar disparate impacts among job seekers). *See, e.g., Green v. Missouri Pacific R. Co.,* 523 F.2d 1290, 1298 (8th Cir. 1975) ("We cannot conceive of any business

decision on its own, CoreLogic could simply supply the underlying information about the criminal history to the housing provider so it can do an individualized assessment, as some of CoreLogic's other tenant screening products already do.

No legitimate business interest justifies CoreLogic's policy or practice of not providing basic information to housing providers about an applicant's criminal record when it reports that the record is disqualifying. CoreLogic maintains in its database information about whether the applicant's record consists of an arrest, pending charge, dismissal, conviction, or incarceration, the date of the incident, the nature of the alleged offense, and the jurisdiction. Compl. ¶ 141. CoreLogic locates this information each time it renders an automatic disqualification determination, but elects not to provide this information to landlords after it renders its automatic determination, reporting only that the record is "disqualifying." Compl. ¶ 141. By withholding this information, CoreLogic makes it impossible or at least impracticable for landlords to do a case-by-case assessment of the actual risk to safety or property presented by each applicant since they have no information or basis upon which to override CoreLogic's "Crim Decision."

---

necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed. This is particularly true for blacks who have suffered and still suffer from the burdens of discrimination in our society. To deny job opportunities to these individuals because of some conduct which may be remote in time or does not significantly bear upon the particular job requirements is an unnecessarily harsh and unjust burden."); cited with approval in *Barletta v. Rilling*, 973 F.Supp.2d 132, 139 (D.Conn. 2013) (striking down as irrational statute prohibiting convicted felons from obtaining licenses to trade in precious metals that did not allow "consideration of the nature and severity of the crime, the nature and circumstances of an applicant's involvement in the crime, the time elapsed since conviction, and the degree of the applicant's rehabilitation").

Providing information about the underlying criminal record to the housing provider would also help ensure that applicants are not denied housing because of inaccurate, sealed, or expunged criminal records.

No legitimate interest justified the denial of Mr. Arroyo's application because his criminal record consists solely of a low-level shoplifting charge that was ultimately withdrawn, which was irrelevant to his qualifications for tenancy. An individualized assessment would have further revealed that Mr. Arroyo did not present a risk to other residents or property both because of nature of his criminal record and because of the significant mental and physical disabilities he developed after the alleged criminal offense made it extraordinarily unlikely he could commit another crime. Had CoreLogic appropriately screened Mr. Arroyo or provided the Arroyos or WinnResidential with information about the underlying criminal record, his application would have been approved more than a year earlier. *Id.* ¶¶ 9, 70.

### B. Plaintiffs have sufficiently pleaded intentional discrimination based on race and national origin.

To establish intentional discrimination under the FHA, a plaintiff need only show that protected class status was a motivating factor in the defendant's action. *See Robinson,* 610 F.2d 1032, 1042 (2d Cir. 1979) ("[D]enial violates §3604(a) if race is even one of the motivating factors."). "At the pleadings stage … a plaintiff must allege that the [defendant] took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging … facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega*, 801 F.3d at 87 (internal quotation marks omitted).

29

The Complaint sets forth allegations that plausibly support an inference that CoreLogic intentionally discriminates based on race and national origin. In summary, these allegations are that CoreLogic: (i) has actual knowledge of the overwhelming racial and ethnic disparities in the criminal justice system and the discriminatory effects that automatic denial of housing based on criminal records tends to have, (ii) is aware of less discriminatory methods it could use (i.e., excluding from its database non-conviction records and possibly other records that do not indicate that an applicant poses an increased risk to property or safety, and either conducting individualized assessments before making CrimSAFE decisions or providing landlords with sufficient information about applicants' criminal records to enable them to conduct individualized assessments), yet (iii) continues to administer its Automated Criminal Records Screening Policy and deny rental applicants through CrimSAFE without implementing any of the less-discriminatory alternatives. Compl. ¶ 144. These allegations are sufficient to raise an inference of discrimination because "[t]he foreseeability of a segregative effect, or adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance, is a factor that may be taken into account in determining whether acts were undertaken with segregative intent." *United States v. City of Yonkers*, 96 F.3d 600, 612 (2d Cir. 1996) (internal quotation marks omitted); *MHANY Mgmt.*, 819 F.3d at 606 (in evaluating intentional discrimination claim, "the impact of the … action whether it bears more heavily on one race than another may provide an important starting point'"), quoting *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266

30

(1977); *see also Chen-Oster v. Goldman Sachs & Co.*, 325 F.R.D. 55, 73 (S.D.N.Y. 2018) ("evidence of intent can be circumstantial, including evidence that is entirely statistical in nature"), quoting *Davis v. District of Columbia,* 246 F.Supp.3d 367, 393 (D.D.C. 2017); *see also Dixon,* 765 F. Supp. at 460 (holding plaintiffs presented sufficient evidence to support inference of discriminatory intent based on the defendants' continued use of a policy for awarding promotions it knew had a discriminatory effect and their failure to investigate whether policy validly related to job performance).

The Complaint also contains additional allegations that bolster the inference of intentional discrimination. First, by withholding the information necessary for housing providers to consider the nature, seriousness, or recency of a criminal record in determining whether an applicant presents an actual risk, CoreLogic actively facilitates housing providers' unlawful discrimination. Compl. ¶ 145. Second, CoreLogic further discourages housing providers from conducting individualized assessments of applicants' criminal history by advertising that CrimSAFE "relieves" them of that "burden." *Id.* Third, CoreLogic is familiar with the HUD Guidance but has made no attempt to bring its product or marketing into compliance with its prescriptions. *Id.* ¶ 144. These facts are relevant because an inference of discriminatory intent may draw support from such indicia as historical background, specific departures from the normal procedural or substantive standards, contemporaneous statements, and the totality of the circumstances. *See Arlington Heights*, 429 U.S. at 267; *see also Tsombanidis,* 352 F.3d at 580.

CoreLogic argues that Plaintiffs' disparate treatment claim should be

31

dismissed because they "have [not] alleged facts sufficient to conclude a racial <u>animus</u>." Mot. to Dismiss at 17 (underline added). But animus is not necessary; indeed, the very case Defendant cites for the notion that animus is required explains that a plaintiff "not need allege discriminatory animus for her disparate treatment claim to be sufficiently pleaded." *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 401 (S.D.N.Y. 2013) (quoting *Boykin v. KeyCorp,* 521 F.3d 202, 213 (2d Cir. 2008)). Rather, at the pleading stage, Plaintiffs "need only give plausible support to a minimal inference of discriminatory motivation." *Vega*, 801 F.3d at 84, citing *Littlejohn v. City of New York*, 795 F.3d 297, 306, 311 (2d Cir. 2015). This initial burden is "minimal" and may be met by offering "bits and pieces of information to support an inference of discrimination, i.e., a mosaic of intentional discrimination." *Id.*, 86-87, quoting *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998). Simply put, CoreLogic knows full well that its CrimSAFE screening product produces discriminatory outcomes, knows several ways in which it can reduce that discriminatory effect, and yet ignores those alternatives, while encouraging landlords to rely blindly on the CrimSAFE determination. A reasonable person could easily infer discriminatory intent from those alleged facts, and such an inference is all that is needed. *Vega*, 801 F.3d at 84. Whether that intent derives from animus or some other cause matters not. *See Laflamme v. New Horizons Village, Inc.*, 605 F. Supp. 2d 378, 394 (D. Conn. 2009) (finding Defendants' justification "that they did not act with any discriminatory animus . . . misapprehends the nature of direct discrimination . . . they cannot avoid liability for disability discrimination by claiming benevolence.").

CoreLogic also argues that the disparate treatment claim should be dismissed because "Plaintiffs have not alleged that they were treated differently on the basis of their race" as "they have not alleged that any non-Latino or African-American applicants with the same criminal history as Mr. Arroyo were allowed to rent an apartment." Mot. to Dismiss at 17. But Plaintiffs need not allege this: CoreLogic is liable under a disparate treatment theory if race or national origin was a motivating factor in its decision to adhere to a policy that causes discriminatory housing denials, as Plaintiffs allege. *See, e.g., Yonkers*, 837 F.2d at 1184 (city's facially neutral practice of confining subsidized housing to a specific area had intentionally enhanced racial segregation in violation of § 3604(a)); *MHANY Mgmt.*, 819 F.3d at 605 (city violated § 3604(a) based on disparate treatment theory where its facially neutral zoning decision was made with discriminatory intent).

## IV. COUNTS II AND III STATE PLAUSIBLE CLAIMS FOR DISABILITY DISCRIMINATION UNDER THE FHA

Plaintiffs state plausible claims that CoreLogic discriminated based on disability in violation of the FHA by: (1) refusing to disclose Mr. Arroyo's consumer file to his conservator as a reasonable accommodation of his disabilities, and (2) maintaining policies and practices that disproportionately prevent individuals with cognitive disabilities from accessing the consumer files CoreLogic uses to make rental admission decisions. *See* 42 U.S.C. § 3604(f)(2)-(3)(B).

### A. CoreLogic refused to grant Mikhail Arroyo's reasonable accommodation request.

The FHA prohibits discrimination "in the provision of services or facilities in connection with [a] dwelling" based on a disability, including "a refusal to make

reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604(f)(2) & (3)(B). The elements of a failure-to-accommodate claim are: (1) the plaintiff had a "handicap," (2) the defendant knew or reasonably should have been known of the handicap; (3) an accommodation was likely necessary to afford the handicapped person an equal opportunity to use and enjoy a dwelling; (4) the accommodation requested was reasonable; and (5) the defendant refused to make the accommodation. *Olsen v. Stark Homes, Inc.,* 759 F.3d 140, 156 (2d Cir. 2014). Plaintiffs can satisfy these five elements.

Mr. Arroyo has a physical condition that substantially limits his abilities to speak, walk, and care for himself—clearly a disability (or "handicap") as defined in 42 U.S.C. § 3602(h) ("handicap" includes "a physical or mental impairment which substantially limits one or more of such person's major life activities"). CoreLogic knew of this disability, as Ms. Arroyo notified it about Mikhail's condition on multiple occasions. Compl. ¶¶ 71-72, 74, 78, 83-84, 86.

Under the FCRA, a consumer has the right to obtain, on request, disclosure of substantially all information that a "consumer reporting agency," such as CoreLogic, has on file about him at the time of the request. *See* 15 U.S.C. § 1681g(a); Compl. ¶¶ 53-54. CoreLogic's disclosure policies, however, allowed disclosures to be given to a person other than the named consumer only if the requesting person presented a "power of attorney." Compl. ¶¶ 80, 160-164. Accordingly, Ms. Arroyo sought as a reasonable accommodation that CoreLogic provide Mr. Arroyo's consumer reporting disclosures to her as his conservator,

34

rather than to Mr. Arroyo himself or to a person he gave "power of attorney." *Id.* ¶¶ 72, 78, 83-84, 154.

The requested accommodation was "reasonable" because disclosing Mr. Arroyo's consumer file to his conservator would not have been any more burdensome on CoreLogic than sending the disclosures directly to him or to a person with "power of attorney," and because Ms. Arroyo's conservatorship appointment carried adequate authority over Mr. Arroyo's affairs to receive the disclosure. *Id.* ¶¶ 48, 81; *see Olsen*, 759 F.3d at 156 (accommodations are reasonable where "they do not pose an undue hardship or a substantial burden" and "cost is modest").

Finally, disclosing Mr. Arroyo's consumer file to his conservator was necessary to afford him equal access to housing because that file disclosure was needed to ask WinnResidential to reconsider his application. *Id.* ¶¶ 97, 177. In fact, the disqualification was improper: Mr. Arroyo's criminal history consisted of a withdrawn charge that has no nexus to his suitability for his tenancy, and his significant disabilities rendered him extremely unlikely to commit a crime. Had it not been for Mr. Arroyo's disability, he could have requested (and presumably obtained) the file disclosure himself and used the contents to challenge the determination that his file contained "disqualifying" records. Since his disability prevented him from doing so, CoreLogic's refusal to make that disclosure to Mikhail's conservator prevented him from having the same chance to have his application reconsidered as a non-disabled person would have, and in fact delayed his admission to housing by a year. Compl. ¶¶ 9, 101. Thus, the accommodation

35

(providing the file disclosure to his conservator) was necessary to afford him equal opportunity to use and enjoy a dwelling, and thus required by the FHA.

CoreLogic argues sweepingly that tenant-screening services do not constitute a service or facility in connection with housing, and that disclosing consumer files to rental applicants CoreLogic has rejected is "too 'remote and indirect' to impose liability under the FHA." Mot. to Dismiss at 16. But Congress has granted consumer reporting agencies no such blanket exemption, and none should be judicially implied. Disclosing tenant-screening reports to consumers who need them to pursue admission to rental housing is in no way "remote and indirect"—and when people with disabilities require accommodations to access those reports, CoreLogic should be expected to make those accommodations if reasonable. *See* Section II, *supra* at 7 (discussing applicability of FHA to CoreLogic's conduct).

### B. Plaintiffs sufficiently plead disparate impact based on disability

The Complaint also states a disparate impact disability claim, asserting that CoreLogic maintains policies or practices of: (1) refusing to allow court-appointed conservators or guardians to receive consumer files for individuals subject to the conservatorships or guardianships and (2) requiring that all third parties, including court-appointed conservators or guardians, submit a "power of attorney" executed by the consumer, in order to receive a consumer file. Compl. ¶¶ 160-164. These policies are outwardly neutral because they apply to all consumers.

The Complaint establishes a disparate impact on people with disabilities; CoreLogic is simply mistaken in asserting that the Complaint "provides no

36

statistics or discussion showing how [its] policy affects the ability of people with and without disabilities to obtain copies of their consumer files." Mot. to Dismiss at 21. Nearly all of the more than 1,500 Connecticut adults subject to an involuntary conservatorship over the person and estate are persons with disabilities who also lack the capacity to designate a power of attorney.[9] Compl. ¶¶ 168-173. Individuals subject to conservatorships are significantly more likely to be persons with disabilities than the general population of the state. *Id.* ¶ 174. This is also true nationally of individuals subject to court-ordered surrogate decision-making. *Id.* ¶¶ 166-167. In other words, a person with capacity to execute a power of attorney should not be involuntarily conserved—and a person who is involuntarily conserved must also have a disability.

Finally, there is a direct causal link between CoreLogic's policies and a disproportionate adverse effect on people with disabilities. Individuals subject to conservatorships or guardianships lack the capacity to execute a power of attorney, and so CoreLogic's policies render them effectively unable to request or obtain their consumer disclosures. *Id.* ¶¶ 174-177. The challenged policies thus disproportionately prevent individuals with cognitive disabilities from accessing the consumer files that CoreLogic uses to make rental admission decisions. *Id.* ¶

---

[9] This is self-evident because a probate court may not order an involuntary conservatorship without finding by clear and convincing evidence that: (1) the individual cannot care for themselves or manage their affairs, i.e., they have a disability, and (2) no less restrictive means of intervention, like a power of attorney, is available to assist them in managing their affairs. *See* Conn. Gen. Stat. §§ 45a-644, 45a-650; *see also* Conn. Gen. Stat. § 54a-5629(b) (2015) (prior to October 1, 2016, conservatorship automatically revoked any power of attorney, even a durable one).

176. *See* Section IV.A, *supra* at 33 (discussing the causal nexus between disclosure of consumer files and rejected applicants' ability to obtain housing).

## V.     COUNT VI ADEQUATELY PLEADS CUTPA VIOLATIONS

The Arroyo Plaintiffs allege that CoreLogic engaged in unfair practices in violation of CUTPA related to both CrimSAFE and its provision of consumer files to rental applicants with disabilities. *See* Compl. ¶ 256. Because they allege facts establishing that the challenged practices were unfair, occurred in trade or commerce, and caused the Arroyo Plaintiffs an ascertainable loss of money or property, their CUTPA count should not be dismissed.

CUTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b. CUTPA has broad, remedial goals of "eliminating or discouraging… unfair acts or practices" by empowering individual consumers to act as private attorneys general to protect the public. *Bailey Employment Sys., Inc. v. Hahn*, 545 F. Supp. 62, 73 (D. Conn. 1982). CUTPA is thus "remedial in character ... and must be liberally construed in favor of those whom the legislature intended to benefit." *Fairchild Hts. Residents Ass'n., Inc. v. Fairchild Heights, Inc.*, 310 Conn. 797, 817 (2014); Conn. Gen. Stat. § 42-110b(d) ("It is the intention of the legislature that this chapter be remedial and be so construed."). "Any person who suffers any ascertainable loss of money or property" as a result of a CUTPA violation may bring an action to enforce the Act. *See* Conn. Gen. Stat. § 42-110g(a).

38

**A.** **Defendant was a substantial factor in causing the Arroyo Plaintiffs an ascertainable loss, satisfying CUTPA's proximate cause requirements.**

CoreLogic argues that the Plaintiffs' allegations related to CrimSAFE insufficiently allege it proximately caused their damages, providing only a bare citation to an otherwise inapposite case reciting the proximate cause standard for CUTPA. *Riverview E. Windsor, LLC v. CWCapital LLC*, No. 3:10-CV-872 RNC, 2012 WL 90152, at *8 (D. Conn. Jan. 10, 2012) (indirectly injured party may not sue without showing it is better positioned than directly injured party to sue). But "causation generally is a question reserved for the trier of fact…the issue becomes one of law when the mind of a fair and reasonable person could reach only one conclusion." *Abrahams v. Young & Rubicam, Inc.*, 240 Conn. 300, 307, 692 A.2d 709, 712 (1997). Because a reasonable fact-finder could conclude that CoreLogic proximately caused the Plaintiffs a foreseeable "ascertainable loss," all that CUTPA requires, the CUTPA claims related to CrimSAFE should not be dismissed.

Plaintiffs need not allege that CoreLogic proximately caused *all* their damages, just an "ascertainable loss of money or property." "Ascertainable loss of money or property" is a wider category than recoverable damages, encompassing a deprivation, detriment, or injury that need not be measurable by a dollar amount. *Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 614-619 (1981) (ascertainable loss of purchase of vehicle advertised as four-wheel drive that in actuality was something else). If the defendant proximately caused any ascertainable loss, i.e., if its actions are a substantial factor in producing the loss and "the harm which occurred was of the same general nature as the foreseeable

39

risk created by the defendant's act," then the plaintiff may prevail under CUTPA, even if there are no recoverable damages. *Stevenson Lumber Co.-Suffield v. Chase Assocs.*, Inc., 284 Conn. 205, 214 (2007).

The Complaint lists many ascertainable losses the Arroyo Plaintiffs suffered as a result of CoreLogic's unfair practices: the Arroyos paid a fee for the tenant screening report; CoreLogic's report resulted in Mr. Arroyo's denial of housing and increased expenses for both Arroyos; and CoreLogic denied the Arroyos access to Mr. Arroyo's consumer file. *See* Compl. ¶¶ 53, 70, 94, 101-103, 230, 231. Any of these is sufficient to confer standing under CUTPA. *See, e.g., Josey v. Filene's, Inc.*, 187 F. Supp. 2d 9, 15 (D. Conn. 2002) (store security guard's confiscation of personal property for 45 minutes while plaintiff was detained was ascertainable loss); *Wise v. Cavalry Portfolio Servs., LLC*, No. 3:09-CV-86CSH, 2010 WL 1286884, at *5 (D. Conn. Mar. 30, 2010) (negative credit reporting); *Serv. Rd. Corp. v. Quinn*, 241 Conn. 630, 643 (1997) (potential loss of customers).

CoreLogic argues that, as a matter of law, its practices could not have proximately caused any one of these losses simply because of the involvement of the landlord. CoreLogic again relies on a misstatement of Plaintiffs' allegations, as explained previously in Section III.A.1.c.i, *supra* at 20, and it omits that the Plaintiffs paid a fee for CoreLogic's disqualifying report—an ascertainable loss that cannot be displaced onto the landlord. But it is also black-letter law that a defendant need not be the sole or predominate cause of a loss to be its proximate cause; it need only contribute in more than a de minimus way. *See* Restatement Second of Torts, § 432(2) (1965). Because the other losses were foreseeable—CoreLogic knew that

40

its adverse CrimSAFE decision would result in Mikhail's denial of housing (it even wrote him an adverse action letter that said this), and could have foreseen that it would result in financial hardships for his family and a prolonged nursing home stay—it was also a substantial factor in causing these other losses, and the Plaintiffs have adequately plead proximate cause.

### B. CoreLogic's consumer file disclosures are in trade or commerce.

CoreLogic next argues that unfair practices related to its consumer file disclosures are outside of "trade or commerce" and therefore not actionable under CUTPA. In actuality, CoreLogic's tenant screening activities, including its provision of information to the subjects of its tenant screening reports, an inextricable part of that business, are within the "conduct of ... trade or commerce" in Connecticut and therefore subject to CUTPA.

Trade or commerce is defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42-110a(4). CUTPA has no privity requirement, and "a consumer relationship is not a prerequisite to having standing to assert a CUTPA violation." *Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 643 (2002) (no contractual or consumer relationship between parties); 1979 P.A. 210, § 1(a) (eliminating privity requirement). "It is not the type of relationship between the two parties but rather the defendant's actual conduct that is dispositive of whether the actions took place in the course of a trade or business." *Nastro v. D'Onofrio*, 263 F. Supp. 2d 446, 457-58 (D. Conn. 2003).

41

Given CUTPA's expansive definition of "trade or commerce" and the requirement that it be liberally construed, CUTPA "applies to a broad spectrum of commercial activity." *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 492 (1995). This includes credit reporting, and numerous CUTPA cases have been brought against credit reporting agencies by the consumers on whom they maintain files. *See, e.g., Spector v. Equifax Info. Servs.*, 338 F. Supp. 2d 378, 379 (D. Conn. 2004) (failure to disclose consumer file); *Spector v. Trans Union LLC First USA Bank, N.A.*, 301 F. Supp. 2d 231, 237 (D. Conn. 2004) (inaccuracy).

The sole case that Defendant cites, *Omega S.A. v. Omega Eng'g, Inc.*, No. 3:01 CV 2104 SRU, 2005 WL 3307277 (D. Conn. Dec. 6, 2005), does not support Defendant's argument that any aspect of its tenant screening business falls outside "trade or commerce." *Omega S.A.* is a dispute over trademark applications and registrations for domain names which were "never used to promote or sell any products or services." *Id.* at *5-6. Because there was no evidence that these trademarks or websites were ever used, and there was only speculation that they might be, one day, the court granted summary judgment in favor of the defendant. *Id.* In contrast, the Defendant's tenant screening business is active, not speculative, and this is a motion to dismiss, not a motion for summary judgment. It is irrelevant that Defendant does not (and cannot) charge consumers for their consumer file; CUTPA does not require privity or a consumer relationship.

The Complaint sufficiently alleges that all aspects of CoreLogic's tenant screening business are subject to CUTPA liability. CoreLogic advertises, distributes, and sells tenant screening reports in Connecticut, including one on Mr.

Arroyo for which Ms. Arroyo paid a fee, and is a credit reporting agency subject to FCRA, which requires that it disclose the files it maintains on consumers who request them. *See* Compl. ¶¶ 2, 30, 32-35, 53, 224; *see* 15 U.S.C. § 1681g(a). CoreLogic distributes consumer files to individuals on whom in collects data, which is also within trade or commerce. *Id.* ¶¶ 159, 179, 180. Negative tenant screening reports, including Mr. Arroyo's, contain a letter from CoreLogic instructing the consumer to request their consumer file, showing that even CoreLogic considers file disclosures part of tenant screening. *Id.* ¶¶ 64-65.

   C. <u>Plaintiffs allege unfair practices in violation of CUTPA.</u>

   Finally, CoreLogic declares that the alleged facts do not amount to unfair practices, but it provides no explanation or analysis. The Defendant thus fails to identify a basis for dismissal. Nevertheless, the alleged unfair practices are actionable under CUTPA. To determine whether a practice is unfair in violation of CUTPA, the Court applies the "cigarette rule," which examines whether the practice: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. *See Harris v. Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 350 (2010). "All three criteria do not need to be satisfied to support a finding of unfairness." *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 82 (2005). "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Cheshire Mortgage Serv., Inc. v. Montes*, 223 Conn. 80, 106 (1992).

   CoreLogic's unfair practices related to CrimSAFE violate the public policy prong, regardless of whether or not they also violate the FHA. Plaintiffs allege that

43

CoreLogic's disqualification of Mr. Arroyo's rental application without an individualized review and based on a non-conviction record was unlawful under the FHA. *See* Compl. ¶ 226. Conduct that violates another statute offends public policy and is actionable under CUTPA. *See Green v. Konover Residential Corp.*, No. 3:95CV1984(GLG), 1997 WL 736528, at *7 (D. Conn. Nov. 24, 1997) (violation of FHA as a predicate ground for CUTPA claim); *see also Parris v. Pappas*, 844 F. Supp. 2d 271, 284 (D. Conn. 2012) (collecting rent while violating FHA against public policy in violation of CUTPA). But even when conduct does not violate a statute or regulation, it may still be unfair in violation of CUTPA if it runs afoul of the public policy embodied by a statute or regulation. *See, e.g., Conaway v. Prestia*, 191 Conn. 484, 492-93 (1983) (landlord's receipt of rent from uninhabitable properties not illegal under housing habitability statutes but unfair in violation of public policy of these statutes); *Bartold v. Wells Fargo Bank*, N.A., No. 14-CV-00865 (VAB), 2015 WL 7458504, at *6 (D. Conn. Nov. 24, 2015) (conduct inconsistent with public policy embodied by federal mortgage regulations). CoreLogic's denial of Mikhail Arroyo's rental application without an individualized review and its failure to provide landlords with information about criminal records certainly run afoul of public policy reflected by the FHA and HUD Guidance. Its actions encourage landlords to deny housing opportunities based on criminal records that have no bearing on fitness for tenancy, and it deceptively markets CrimSAFE as improving Fair Housing compliance, which misleads housing providers and the public as to their actual rights and responsibility under the FHA.

CoreLogic's unfair practices related to consumer file disclosures also violate

44

the public policy prong. Since Connecticut provides conservators ample legal authority to obtain consumer file disclosures, and since a conserved person has no legal capacity to execute a power of attorney, CoreLogic's policy of requiring conservators to submit a power of attorney has no purpose but to deny conserved persons equal access to the personal information CoreLogic collects on them and uses to generate tenant screening reports, contrary to the public policy of Connecticut's conservatorship statute. *See* Conn. Gen. Stat. §§ 45a-644 *et seq.* CoreLogic's unnecessary documentation requirements for conservators also frustrates the objectives behind the FCRA disclosure requirements, which is to provide consumers with open access to their personal data collected and used by credit agencies.[10] *See* 15 U.S.C. § 1681g. These violations of FCRA's public policy also give rise to a CUTPA claim. *See Spector*, 301 F. Supp. 2d at 237; *see also Rosenberg v. Cavalry Investments, LLC*, No. 3:03CV1087(RNC), 2005 WL 2490353, at *5 (D. Conn. Sept. 30, 2005) (CUTPA claim for conduct that would violate FCRA against Defendant not covered by FCRA).

A violation of the public policy prong alone is sufficient to establish a CUTPA claim. *See Daddona v. Liberty Mobile Home Sales, Inc.*, 209 Conn. at 258-59 (1988). But the Plaintiffs' allegations also satisfy the other prongs of the cigarette rule. CoreLogic's practices cause substantial injury to consumers. A disqualifying

---

[10] Its actions are also inconsistent with FCRA's Regulation V, which directs consumer reporting agencies to "develop and implement reasonable requirements for what information consumers shall provide to constitute proof of identity," and adjust those policies "to be commensurate with an identifiable risk of harm" from misidentification. *See* 12 C.F.R. § 1022.123(a). Requiring a conserved person to grant a power of attorney is an impossibility and unreasonable by any standard.

criminal background report leads to the denial of housing, and a refusal to provide information about disqualifying decisions prevents individuals from challenging such denials, which may cause them to end up in unsafe, undesirable or segregated housing, or even leave them trapped unnecessarily in an institutional setting (as Mr. Arroyo experienced). This is a substantial injury both to individual consumers and to the community at large. *See, e.g., Cheshire Mortgage Serv., Inc. v. Montes*, 223 Conn. at 107-114 (1992) (excess finance charge of $490 constituted substantial injury to consumers). These practices were also unscrupulous and unethical—CoreLogic knew of the discriminatory effects of CrimSAFE and disregarded less discriminatory alternatives; deceptively marketed CrimSAFE as improving fair housing compliance; and understood the stakes of its misconduct— that CrimSAFE would cause the denial of housing, especially for people of color and people with criminal records seeking a second chance. Its refusal to make consumer disclosures to conservators is oppressive in that it makes FCRA-mandated disclosures practically unavailable to conserved individuals, preventing them from ever learning the basis of tenant screening decisions. Because their allegations satisfy all three prongs of the cigarette rule, the Plaintiffs adequately plead that CoreLogic's conduct is unfair.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be DENIED.

46

Respectfully Submitted this 4th day of October, 2018,

| | |
|---|---|
| **Connecticut Fair Housing Center** | **National Housing Law Project** |
| **By:** */s/ Greg Kirschner* | **By:** */s/ Eric Dunn* |
| **Greg Kirschner (ct26888)** | **Eric Dunn (phv09610)** |
| **Salmun Kazerounian (ct29328)** | **919 E. Main Street, Ste. 610** |
| **Sarah White (ct29329)** | **Richmond, VA 23219** |
| **60 Popieluszko Court** | **Tel. (415) 546-7000, ext. 3102** |
| **Hartford, CT 06106** | **edunn@nhlp.org** |
| **Tel: (860) 263-0724/Fax: (860) 247-4236** | |
| **gkirschner@ctfairhousing.org** | |

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2018 a copy of the foregoing was filed and served electronically. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

**By:**     **/s/ Salmun Kazerounian**
            **Salmun Kazerounian**