UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONNECTICUT FAIR HOUSING CENTER and CARMEN ARROYO,<br><br>Plaintiffs,<br><br>v.<br><br>CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC,<br><br>Defendant. | Case No. 3:18cv00705-VLB |

DEFENDANT CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC'S
REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

Defendant, CoreLogic Rental Property Solutions, LLC ("RPS"), by counsel, hereby submits this reply memorandum in support of its motion to dismiss.

INTRODUCTION

RPS is not a landlord, and it does not establish the criteria by which prospective tenants are evaluated. RPS also is not informed of the race or disability status of individuals at the time of their application. Yet, RPS has been sued for discrimination in the housing process on the basis of applicants' disability status and race. Those claims all fail. What is left is Plaintiffs' claim under the Fair Credit Reporting Act ("FCRA"), which is the statute that *does apply* to RPS's activities, and which can be addressed at the appropriate time.

The majority of Plaintiffs' opposition is spent addressing straw man arguments not made by RPS. Those arguments can be disregarded. In its opening brief, RPS demonstrated that the Complaint must be dismissed (in part) on multiple grounds, and those grounds are sufficient to dismiss the relevant causes of action, and thus they are all that the Court need consider at this juncture.

First, RPS noted how the statutory provisions of the federal Fair Housing Act ("FHA") and accompanying regulations do not apply to RPS, as a tenant screening company. Plaintiffs provide no support for such an attempted enlargement of the law, instead citing to cases addressing other provisions of the FHA not at issue.

Second, even if the statute did apply to RPS, it would not apply in this circumstance, where WinnResidential Connecticut, LLC ("WinnResidential") set the criteria that were technologically applied by RPS through the CrimSAFE product. In response, Plaintiff advances legally-confused notions of "proximate" causation and "agency" that are unsupported by the allegations in the Complaint.

Third, RPS noted that the FHA does not apply to Plaintiffs' "file disclosure" claim, which is a statutory right under the Fair Credit Reporting Act ("FCRA"), and which is entirely unrelated to the residential application process.

Fourth, under binding precedent, Plaintiffs cannot create an inference of discriminatory *intent* from a claim of disparate *impact*, nor have they provided any statistics showing any disparate impact with respect to their file disclosure claim.

Finally, Plaintiffs' "catchall" claim in Count VI under the Connecticut Unfair Trade Practices Act ("CUTPA") fails because the policies in question and alleged damages were not caused by any policy decisions made by RPS, and also because the free file disclosure request does not implicate trade or commerce.

## ARGUMENT

**I.  RPS is not subject to the FHA, thus requiring the dismissal of Counts I-III.**

In its opening brief, RPS demonstrated how the plain language of 42 U.S.C. §§ 3604(a), (b), and (f) apply only to those entities providing housing and/or financing its sale. RPS further provided citations to the legislative history of the

2

statute and its official regulations, which confirm that "[e]ven the most expansive interpretations of section 3604(a) do not extend liability beyond those entities that actually provide housing or those that are integrally involved in the sale or financing of real estate."  *Steptoe v. Beverly Area Planning Assoc.*, 674 F. Supp. 1313, 1319 (N.D. Ill. 1987).   That conclusion is further "strengthened by the availability of more apt federal statutory schemes" like the FCRA, which *do* govern tenant screening.  *Frederick v. Capital One Bank, et al.*, No. 14-cv-5460, 2015 U.S. Dist. LEXIS 125111, at *7 (S.D.N.Y. Sep. 17, 2015).

In contrast, Plaintiffs do not identify a *single* case or other form of on-point legislative guidance supporting their attempted stretching of the FHA to embrace screening companies.[1]  Instead, Plaintiffs rely on *United States v. Space Hunters, Inc.*, 429 F. 3d 416 (2d Cir. 2005), for the proposition that the Second Circuit has rejected the application of the FHA only to dwelling owners or their agents.  (Mem. Opp. at 7.)  But, *Space Hunters* interpreted a *different provision* of the FHA than those at issue here.  In *Space Hunters*, the court interpreted 42 U.S.C. § 3604(c), which prohibits "any notice, statement or advertisement, with respect to the sale or rental of a dwelling that indicates" a discriminatory preference.  429 F.3d at 424.

---

[1] In their only attempt to address the statutory language or regulatory guidance, Plaintiffs cite to the HUD regulation that prohibits "employing codes or other devices to segregate or reject applicants."  That is a red herring.  "Codes," in the FHA context, refer to labels assigned to correspond to an individual's race, thereby flagging the applicant's race for consideration by the decision-maker.  *See United States v. Habersham Props, Inc.*, 319 F. Supp. 2d 1336, 1371 (N.D. Ga. 2003) (marking applicants' cards with "A" or "B" to indicate race).  The regulation does not apply to the use of a facially-neutral computer algorithm, and Plaintiffs can point to no authority supporting such an expansive application.  RPS also does not "reject" applicants.  Instead, WinnResidential does that, which underscores that the statute is meant to apply to landlords and not their background screeners.

3

Section § 3604(c) is broader in scope than §§ 3604, (a), (b) and (f), the latter of which limit their application to actors that "refuse to sell or rent," "refuse to negotiate," or discriminate in the "sale or rental" of a dwelling. Thus, courts have interpreted § 3604(c) more broadly. The Second Circuit's (unsurprising) determination that § 3604(c) applied to a company that advertised housing provides no support for Plaintiffs' attempted reading of §§ 3604(a), (b) and 3604(f).

Likewise, Plaintiffs claim *Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583 (S.D.N.Y. 2016), supports the imposition of FHA liability on background screeners. (Mme. Opp. at 7-8.) It does not. In *Mazzocchi*, liability attached to the corporation that owned the building; an entity that would fall under the purview of the FHA. *Id.* at 590. The corporation was not a screening company. The court used the "broad and inclusive" language cited by Plaintiffs in considering whether post-acquisition conduct – discrimination that occurs after the initial sale or rental of a dwelling – could give rise to FHA liability. *Id.* at 607-08. In finding it could, the court did not read the statute broadly in the context of *who* it applied to, but rather the timing of the conduct. *See id.*

Indeed, when faced with the question of *who* could be liable under the FHA, the court in *Mazzocchi* found the managing agent of the building *could not* be liable under the FHA. 204 F. Supp. 3d at 616. Because the managing agent was not "authorized to make decisions regarding the termination of [the plaintiff's] lease or the commencement of the ejectment proceeding," the court dismissed the claims against it. *Id.* Like the managing agent, RPS does not decide which criminal records will disqualify a potential tenant, and it cannot be held liable under the FHA.

4

**II.    RPS did not "cause" disqualification, which requires dismissal of Count I.**

For the reasons stated above, the FHA does not apply to the alleged activities of RPS. But, assuming *arguendo* that it does so apply, Plaintiffs must prove that RPS's conduct was the actual cause of the alleged damages in order to state a FHA claim. *See id.* Attempting to satisfy that requirement, Plaintiffs' brief is replete with statements to the effect that RPS "make[s] rental admission decisions." (*See, e.g.*, Mem. Opp. at p. 6.) But, that statement is contradicted by the actual facts alleged in the Complaint, where Plaintiffs admit – as they must – that *WinnResidential* is the entity that established the "criteria" by which criminal record histories can be "disqualifying," and that CrimSAFE is merely a "technological tool" used by those landlords "when criminal records are found that do not meet the criteria <u>you establish</u> for <u>your community</u>. (Compl. ¶¶ 35-36) (emphases added).

This is not a matter of "characterization," as claimed by Plaintiffs. (Mem. Opp. at 20.) Instead, it is the language of the documents that Plaintiffs cite to in the Complaint. (*See* Compl. ¶ 32 n.6.) "[A] party cannot amend its pleading through its opposition brief," *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 308 (S.D.N.Y. 2010), which is what Plaintiffs are now attempting.

With the factual allegations clear that WinnResidential set the "criteria" for what records would be disqualifying, and that CrimSAFE was the "technology" that displayed whether such records were found, Plaintiffs are forced to mount a series of misguided arguments.

First, they claim that RPS's is "no different" than an "agent to whom a landlord might entrust tenant-selection decisions." (Mem. Opp. at 10.) Plaintiffs then cite cases holding that "employers" can be liable for discrimination by their

5

employees and that and "real estate agents" can give rise to liability against their principals.  *See id.*  Those cases are unlike the allegations here.  RPS is plainly not an "employee" of WinnResidential.  RPS also did not allegedly agree to "control" any tenancy decisions at the request of WinnResidential, which would be required for agency status.  *See* RESTATEMENT (SECOND), 1 Agency § 1, comment b (1958).

Second, Plaintiffs assert that "CrimSAFE proximately causes a denial even if the landlord makes the final admission decision." (Mem. Opp. at 11.) That "causation" argument misses the mark.  Curiously, Plaintiffs do not mention the Supreme Court's most recent statements in *Bank of Am. Corp. v. City of Miami*, 197 L. Ed. 2d 678 (2014), regarding the standard for "proximate causation" under the FHA, instead citing to dated cases in other statutory contexts.  In reversing and remanding the lower court's finding of proximate cause, the Supreme Court in *City of Miami* held that "proximate cause under the FHA requires some *direct relation between* the injury asserted and the injurious conduct alleged," and that "foreseeability" of damages from challenged conduct is not sufficient." *Id.* at 690.[2]

Here, WinnResidential's policies were the *direct* cause of the denial.  RPS is not alleged to have set those policies or to have exercised discretion with respect to those policies.  Instead, the Complaint confirms the opposite.  The requirement of a "direct relation" to the alleged injury to ground proximate cause is also

---

[2] Plaintiffs cite to *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), which considered the actions of an "agent" employee and his direct supervisor, and which stood for the common-sense proposition that an employee could discriminate in the exercise of his discretion, even if his discrimination was also later independently ratified by the supervisor.  *Id.* at 419.  That case is wholly inapposite, as RPS is not an "employee" of WinnResidential, and RPS simply implemented the specifications selected by WinnResidential; it did not exercise its own discretion in any "discriminatory" way like the subordinate employee in *Staub*.

6

consistent with the regulatory scope of the FHA, which applies to persons who have "control" over landlord and home financers. 24 C.F.R. § 100.7(a)(iii). Indeed, a "disparate impact" could only plausibly be caused by the entities making housing decisions (*i.e.*, landlords), and it can only be remedied by those entities, which underscores the limits of causation under the FHA, as affirmed in *City of Miami*. Accordingly, proximate cause is lacking, and Plaintiffs' attempts to create redundant FHA liability against a screening company must be rejected.[3]

III.  Plaintiffs' claims of an FHA violation in Counts II and III must be dismissed.

Plaintiffs' FCRA-governed file disclosure request to RPS stands totally independent from Mr. Arroyo's earlier application for housing, both in time and in substance. Nonetheless, in Counts II and III, Plaintiffs attempt to shorehorn their FCRA claim regarding file disclosures into a claim under the FHA, arguing that RPS discriminates against disabled individuals by requiring conservators to submit a power of attorney to receive a consumer file. (*See* Compl. ¶¶ 201, 207.)

In an attempt to link the file disclosure process to housing, Plaintiffs again posit the hypothetical that, if they had obtained a copy of Mr. Arroyo's consumer <u>after</u> the initial housing decision was made, they could have presented the file to WinnResidential to "reconsider [the] application." (Mem. Opp. at p. 35.) Plaintiffs do not plead that Mr. Arroyo was not charged with theft or that WinnResidential

---

[3] **Contrary to Plaintiffs' argument, this case bears close resemblance to the facts in *Wheatley Heights Neighborhood Coal v. Jenna Resales Co.*, 447 F. Supp. 838 (E.D.N.Y. 1978). There, the plaintiffs attempted to vicariously assign FHA liability to MLS, which functioned "as a clearinghouse for information regarding residential properties listed with participating brokers." *Id.* at 840. The court found MLS could not be held liable under the FHA. Similarly, here, RPS acts as a clearinghouse for information regarding criminal records and cannot be held liable under the FHA.**

would have changed its decision through such attempted negotiations. Indeed, every indication was to the contrary, as Plaintiffs allege they had to initiate administrative action against WinnResidential in order to obtain such a reversal more than a year later. (Compl. ¶ 100.) That later reversal also only confirms that WinnResidential is in charge of housing decisions, further refuting any "agency" theory as to the activities of RPS.

In their brief, Plaintiffs identify <u>no case</u> supporting the viability of an FHA claim in this attenuated context. Indeed, "[c]ountless private and official decisions may affect housing in some remote and indirect manner, but the Fair Housing Act requires a closer causal link between housing and the disputed action." *Jersey Heights Neighborhood Assoc. v. Glendening*, 174 F.3d 180, 192 (4th Cir. 1999).

IV.    <u>Plaintiffs' claims of disparate treatment must be dismissed.</u>

"The Supreme Court has held unequivocally that discriminatory intent may not be inferred solely from the disproportionate impact of a particular measure upon one race." *Dowell v. Board of Educ.*, 778 F. Supp. 1144, 1192 (W.D. Ok. 1991) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977)). Yet, that is all Plaintiffs have alleged here with respect to their claims for race discrimination under Count I. (*See* Compl. ¶ 108) ("Defendant's discriminatory intent can be inferred because of the overwhelming racial and ethnic disparity among those with criminal records."). Plaintiffs are bound to the theories advanced in their pleadings.

The *many* pages Plaintiffs now spend in their opposition brief seeking to infer intent from the alleged disparate impact fails under hornbook law. (Mem. Opp. at 30-32.) All of the alleged "evidence" of intent stems from the claimed disparate

impact. *See id.* And, that "interference-from-impact" is all Plaintiffs could possibly muster, as there is no allegation that RPS treated Mr. Arroyo differently from any other applicant vis-à-vis the CrimSAFE product based on his race, or that RPS *even knew Ms. Arroyo's race at all* (which it did not). Further, because RPS did not implement the policy disqualifying applicants with criminal records, it cannot be said to have developed any intent with respect to that policy.

Additionally, as to the disability discrimination claims in Counts II and III, there is no allegation that RPS treated any non-disabled individuals any differently with respect to its alleged requirement that consumers supply an executed power of attorney when requesting a copy of another consumer's file. Hence, there is no basis to allege disparate treatment on the basis of disability.

V.     <u>Plaintiffs' claims of disparate impact must be dismissed.</u>

Plaintiffs' race-based disparate impact claim under Count I fails for lack of a policy attributable to RPS sufficient to ground proximate causation. Claims of disparate impact carry a "robust causality requirement." *Texas Dept. of Housing and Comm. Affairs v. Inclusive Comm. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015). And, for the reasons above, all of Plaintiffs' arguments claiming that RPS "proximately" caused any housing-related injury for Mr. Arroyo lack merit.

Plaintiffs' disability-related disparate impact claims under Counts II and III also fail because Plaintiffs have not provided statistical support for their claims. Plaintiffs still present no evidence to plausibly show that the policy affected <u>*any other*</u> disabled individual apart from Mr. Arroyo. The generalized statements that permeate Plaintiff's opposition brief regarding the number of adults in Connecticut subject to a conservatorship, see Mem. Opp. at p. 37, are insufficient.

**VI.      Plaintiffs' claims under the CUTPA must be dismissed.**

Plaintiffs misstate RPS's arguments regarding why the CUTPA claims must fail, with Plaintiffs instead making wide-ranging "policy" arguments. Plaintiffs bring CUTPA claims for: (1) RPS' provision of the CrimSAFE product; and (2) RPS' file disclosure policy. (Compl. ¶ 226.) Each iteration of the CUTPA claim fails.

First, with regard to the file disclosure claim, CUTPA requires a plaintiff to prove "that the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce . . . and plaintiff suffered ascertainable loss of money or property as a result of the defendant's acts or practices." *Parola v. Citibank, S.D.*, 894 F. Supp. 2d 188, 2014 (D. Conn. 2012). A *free* FCRA file disclosure does not implicate the types of commercial transaction contemplated by the statute.[4] And, the cases cited by Plaintiffs stating that a "consumer relationship" is not required still support the proposition that the conduct must occur in some form of commercial context. *Nastro v. D'Onofrio*, 263 F. Supp. 2d 446 (D. Conn. 2003) (transfer of stock certificates); *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480 (1995) (fraud between real estate brokerage firms).

Second, with respect to the provision of the CrimSAFE product, Plaintiffs cannot prove causation. To state a claim under the CUTPA, a plaintiff "must prove that the ascertainable loss was caused by . . . the prohibited act." *Id.* at 205. For the reasons set forth above, any ascertainable loss of housing was only possibly caused by the actions of WinnResidential, not RPS.

---

[4] Plaintiffs' claim that "numerous" CUTPA file-disclosure cases have been brought is incorrect. (Mem. Opp. at 42.) In both cases cited, the court did not consider whether a file disclosure was made in connection with "trade or commerce."

10

**Respectfully submitted,**

By: **/s/ Daniel W. Cohen**
      **Daniel W. Cohen (Bar No. CT 30467)**
      **TROUTMAN SANDERS LLP**
      **875 Third Avenue**
      **New York, NY 10022**
      **Telephone:  (212) 704-6000**
      **Facsimile:  (202) 704-6288**
      **Email:  dan.cohen@troutman.com**

      *Counsel for Defendant CoreLogic Rental Property Solutions, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: **/s/ Daniel W. Cohen**

**Daniel W. Cohen (Bar No. ct 30467)**
**TROUTMAN SANDERS LLP**
**875 Third Avenue**
**New York, NY  10022**
**Telephone: (212) 704-6000**
**Facsimile:   (212) 704-5901**
**Email:  dan.cohen@troutman.com**

36684949