UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CONNECTICUT FAIR HOUSING | : | |
| CENTER *et al.*, | : | |
| | : | No. 3:18-CV-705 (VLB) |
| Plaintiffs, | : | |
| | : | |
| v. | : | March 25, 2019 |
| | : | |
| CORELOGIC RENTAL PROPERTY | : | |
| SOLUTIONS, LLC, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO DISMISS [DKT. 19]

Plaintiffs Connecticut Fair Housing Center ("CFHC") and Carmen Arroyo, individually and as next friend for Mikhail Arroyo (collectively, "Plaintiffs") commenced this action against Defendant CoreLogic Rental Property Solutions, LLC ("Defendant" or "RPS") alleging that Defendant, through use of its criminal tenant screening product, violated the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA"), the Connecticut Unfair Trade Practice Act, Conn. Gen. Stat. §§ 42-110a *et seq.* ("CUTPA") and the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA"). Presently before the Court is Defendant's Motion to Dismiss Plaintiffs' claims pursuant to the FHA and CUTPA only. For the foregoing reasons, Defendant's Motion to Dismiss is DENIED.

## I.       Background

Carmen Arroyo was a tenant in ArtSpace Windham, an apartment complex managed by WinnResidential Connecticut, LLC ("WinnResidential"). Dkt. 1 at ¶ 50. Ms. Arroyo has a son named Mikhail Arroyo who was injured in an accident in July

2015 which left him unable to speak, walk or care for himself.  *Id*. at ¶ 5.  In April 2016, Ms. Arroyo learned that Mr. Arroyo, who had been living in a nursing home where he received residential treatment, would soon be ready to be discharged.  *Id*. at ¶ 52.  Ms. Arroyo is her son's conservator and primary caregiver.  *Id*. at ¶¶ 52-53. Ms. Arroyo requested that WinnResidential transfer her to a two-bedroom apartment and permit Mr. Arroyo to live with her.  *Id*. at ¶ 52.  Ms. Arroyo consented to a tenant screening check on her son's behalf.  *Id*. at ¶ 53.

Defendant conducted tenant screenings for WinnResidential.  Defendant is a consumer-reporting agency specializing in tenant screening.  *Id*. at ¶ 2.  It searches its database of public records and then sells consumer reports generated from the database.  *Id*.  Defendant offers two screening products, CrimCHECK and CrimSAFE. *Id*. at ¶ 33.  CrimCHECK gives housing providers copies of criminal records to interpret on their own while CrimSAFE uses an algorithm to interpret an applicant's criminal record and provide housing providers with a decision on whether the applicant qualifies for housing.  *Id*.  Defendant marketed CrimSAFE as an "automated tool [that] processes and interprets criminal records and notifies leasing staff when criminal records are found that do not meet the criteria you establish for your community."  *Id*. at ¶ 35.  Defendant provides housing providers with a form that lists general categories of crimes for which the algorithm should screen.  *Id*.  After Defendant conducts the screen, it returns a one-page report which indicates whether disqualifying records were found.  The report provides no additional information such as the underlying records, the nature of the alleged crime, the date of the offense or the outcome of the case, if any.  *Id*. at ¶ 38.

Defendant also generates an adverse action letter for the housing provider to send to the tenant when a disqualifying record is found. *Id.* Defendant screened Mr. Arroyo using its CrimSAFE product and informed WinnResidential that Mr. Arroyo was disqualified from tenancy based on unspecified criminal records. *Id.* at ¶¶ 54-55. The report listed a "CrimSAFE result" which stated that disqualifying records were found. *Id.* at ¶ 57. Based on these facts, the Court finds that CrimSAFE disqualifies applicants for housing if the applicant was arrested but not convicted of a crime even though many years had passed since the arrest. The only information Defendant provided to WinnResidential about Mr. Arroyo's disqualifying record is his name, date of birth and under a field labeled jurisdiction, the entry "000000033501.PA." *Id.* at ¶ 60. Defendant did not provide any information to WinnResidential about the nature of the underlying criminal record or the reasons for Mr. Arroyo's disqualification. *Id.* at ¶ 59. Defendant also did not take into consideration relevant mitigating circumstances such as the facts surrounding the criminal conduct, Mr. Arroyo's age at the time of the conduct, and the impact of Mr. Arroyo's current significant disabilities on the ability for future misconduct. *Id.* at ¶ 63.

In late April 2016, WinnResidential told Ms. Arroyo that Mr. Arroyo could not move in with her because he was not qualified for tenancy, but it did not provide any reasons for Mr. Arroyo's disqualification. *Id.* at ¶¶ 66-67. Mr. Arroyo has never been convicted of a crime. *Id.* at ¶ 8. He was charged with retail theft in 2014, but the charge was ultimately withdrawn. *Id.* Ms. Arroyo contacted Defendant, explained that she was Mr. Arroyo's conservator and asked for Mr. Arroyo's tenant

screening report on his behalf.  *Id.* at ¶¶ 71-72.  Defendant mailed Ms. Arroyo a written application form and Ms. Arroyo submitted it in May 2016.  *Id.* at ¶¶ 73-74. In September 2016, Ms. Arroyo followed up with Defendant who acknowledged that it received her completed application form but required a power of attorney from Mr. Arroyo in order to provide the tenant screening report.  *Id.* at ¶¶ 78-81.  In November 2016, Ms. Arroyo submitted another application also signed by Mr. Arroyo's co-conservator.  *Id.* at ¶ 86.  Defendant never provided the Arroyos with the tenant screening report and they still do not know with certainty the identity of the supposedly disqualifying records.  *Id.* at ¶¶ 94-95.  WinnResidential also represented to Ms. Arroyo that it does not know the details of Mr. Arroyo's disqualifying conduct.  *Id.* at ¶ 93.  In June 2017, WinnResidential allowed Mr. Arroyo to move in with Ms. Arroyo after the Arroyos filed an administrative fair housing complaint against it and ArtSpace Windham.  *Id.* at ¶ 100.  The Arroyos proved at the hearing that Mr. Arroyo's only criminal charge was retail theft and it had been withdrawn.  *Id.*  WinnResidential eventually allowed Mr. Arroyo to move in with Ms. Arroyo in June 2017, approximately one year after Ms. Arroyo's request. *Id.* at ¶¶ 100-102.

## II.    Legal Standard

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sarmiento v. U.S.*, 678 F.3d 147, 152 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the

4

elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (internal citation and quotation omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

### III.     Standing

Under Article III of the Constitution, federal courts have jurisdiction over cases and controversies only.  *See* U.S. Const. art. III, § 2; *see also Valley Forge Christian C. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464,

471 (1982).  One element of this jurisdictional inquiry is standing which "focuses on whether the plaintiff is the proper party to bring this suit."  *See Raines v. Byrd*, 521 U.S. 811, 818  (1997) (citation omitted).  To establish standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or  imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000). Carmen Arroyo and Mikhail Arroyo (the "Arroyo Plaintiffs") were directly harmed by Defendant's policies and meet the requirements for constitutional standing. For example, the Arroyo Plaintiffs allege that as a result of Defendant's actions Mr. Arroyo remained in a nursing home for an additional year and the Arroyo Plaintiffs suffered emotional distress along with additional medical, travel, and housing expenses.

Plaintiff CFHC is an organization and was not directly harmed.  However, in *Havens Realty Corp. v. Coleman*, the Supreme Court held that, where an organizational plaintiff had alleged it "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices," "there can be no question that the organization has suffered injury in fact," and thus the organization had Article III standing to sue.  455 U.S. 363, 379 (1982).  CFHC alleged that it "diverted resources from other activities to investigate Defendant's conduct" and "spent a significant amount of time helping Mr. Arroyo obtain

permission to live in [Ms. Arroyo's apartment]."  Dkt. 1 at ¶ 20.  Therefore, CFHC has sufficiently pled an injury in fact and has Article III standing.

### IV.    Analysis

Defendant moves to dismiss Counts I, II, III and VI of Plaintiffs' Complaint.  In Counts I through III, Plaintiffs allege that Defendant discriminated against them on the basis of national origin, race and disability in violation of the FHA.[1]  In Count VI, the Arroyo Plaintiffs allege that Defendant violated CUTPA by *inter alia* failing to make an individual assessment of Mr. Arroyo's criminal record before reporting him as disqualified and failing to provide the Arroyos with the information underlying Mr. Arroyo's tenant screening report.  *Id.* at ¶ 226.

Plaintiffs bring their FHA claim for race and national origin discrimination under several distinct theories.  First, Plaintiffs allege that Defendant's policies have a disparate impact on Latinos and African Americans.  *Id.* at ¶ 194. Second, Plaintiffs allege that Defendant intentionally discriminates against Latinos and African Americans. *Id.* at ¶ 195.  Lastly, Plaintiff alleges that Defendant intentionally encourages housing providers to discriminate by offering a tenant screening product that does not provide an individualized assessment of each prospective tenant.  *Id.* at ¶ 196.

In Count II, Plaintiffs allege that Defendant's policies of refusing to allow conservators to receive the tenant screening report of wards without a power of attorney executed by the proposed tenant have a disparate impact on handicapped

---

[1] Count III, disability discrimination in violation of the FHA, for Defendant's refusal to provide the documents underlying Mr. Arroyo's tenant screening report to Ms. Arroyo, is brought by the Arroyo Plaintiffs only.

individuals. *Id.* at ¶ 201. Plaintiffs also allege that Defendant intentionally discriminated against Mr. Arroyo by refusing to provide him with his tenant screening report because of his disability.  *Id.* at ¶ 203. In Count III, the Arroyo Plaintiffs allege that Defendant refused to grant Mr. Arroyo a reasonable accommodation when it declined to grant Ms. Arroyo's request for a copy of his tenant screening report.

Lastly, Plaintiff alleges that Defendant violated CUTPA by engaging in various allegedly unfair practices, including: failing to make an individual assessment of Mr. Arroyo's criminal record before reporting him as disqualified, reporting Mr. Arroyo as disqualified to WinnResidential without disclosing his underlying record, encouraging WinnResidential's failure to make an individualized assessment, failing to provide the Arroyos with the information underlying Mr. Arroyo's tenant screening report, requiring power of attorney from Ms. Arroyo instead of accepting her conservatorship, and discriminating against Mr. Arroyo because of his race and/or disability.  *Id.* at ¶ 226.

In its Motion to Dismiss, Defendant makes several threshold arguments covering multiple claims.  First, it claims that Plaintiffs' FHA claims must fail because the FHA applies only to housing providers, not screening companies. Even assuming the FHA does apply, Defendant argues that it cannot be liable because its policies and actions do not have a sufficient nexus to the denial of housing.  Defendant also argues that Plaintiffs' claims fail on the merits because they cannot state a claim for disparate treatment or disparate impact.  With regard to Plaintiffs' CUTPA claims, Defendant repeats its nexus argument and claims its

failure to provide Mr. Arroyo's screening report does not meet CUTPA's "trade or commerce" requirement.

### A.    Fair Housing Act Claims

The FHA was enacted in 1968 to eradicate discriminatory housing policies and practices to afford members of protected classes fair housing opportunity throughout the United States.  *See* 42 U.S.C. § 3601.  In recognition of the pervasive and insidious problem of housing discrimination, the Supreme Court found that the "language of the Act is broad and inclusive," and Congress's priority can only be carried out "by a generous construction."  *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209, 212 (1972); *see also Cabrera v. Jakabovitz*, 24 F.3d 372, 388 (2nd Cir. 1994) ("The provisions of 42 U.S.C. § 3604 are to be given broad and liberal construction.") (quoting *Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982)).  "The Fair Housing Act itself focuses on prohibited acts."  *Meyer v. Holley*, 537 U.S. 280, 285 (2003). By drafting the FHA in the passive voice, Congress "bann[ed] an outcome while not saying who the actor is."  *N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 298 (7th Cir. 1992), *cert. denied*, 508 U.S. 907 (1993).

Plaintiffs bring claims under the FHA's prohibitions against discrimination based on race, national origin and disability alleging that he was wrongfully denied housing based on his arrest record and disability. The FHA declares that it is unlawful to "make unavailable or deny, a dwelling to any person because of race, color religion, sex, familial status, or national origin."  42 U.S.C. § 3604(a).  The FHA also declares that is unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of

services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." *Id.* at § 3604(b).   An identical provision prohibits discrimination because of a handicap. *Id.* at §§ 3604(f)(1), (f)(2). Lastly, disability discrimination under the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  *Id.* at §3604(f)(3)(B).

"The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States,* 156 U.S. 432, 453, 15 S.Ct. 394, 403, 39 L.Ed. 481 (1895).   The United States Department of Housing and Urban Development ("HUD") recently issued two documents relevant to Plaintiffs' claim that Defendant unlawfully discriminated against Mr. Arroyo based on his screening report which included a prior arrest. The first was a Notice issued by the Office of Public and Indian Housing in November 2015, entitled Guidance of Public Housing Agencies ("PHAs") and Owners of Federally-Assisted Housing on Excluding the Use of Arrest Records in Housing Decisions.[2]   The Notice "inform[ed] PHAs and owners of other federally-assisted housing that arrest records may not be the basis for denying admission." *Id.*  HUD concluded that "the fact that there has been an arrest for a crime is not a basis for the requisite determination that the relevant individual engaged in

---

[2]  *See* HUD Notice PIH 2015-19, (Nov. 2, 2015), *available at* http://portal.hud.gov/hudportal/documents/huddoc?id=PIH2015-19.pdf.

criminal activity warranting denial of admission, termination of assistance or eviction." *Id*. at 3.

In April 2016, HUD issued a document entitled "Office of General Counsel Guidance on Application of Fair Housing Act Standards to Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions."[3] The Guidance noted that "criminal history-based restrictions on access to housing are likely disproportionately to burden African Americans and Hispanics." *Id*. It concluded that "a discriminatory effect resulting from a policy or practice that denies housing to anyone with a prior arrest or any kind of criminal conviction cannot be justified, and therefore such a practice would violate the Fair Housing Act." *Id*.  The only court to address this Guidance deemed it "an interpretive rule" which clarifies how disparate impact claims under 24 C.F.R. § 100.500 apply to situations where a housing provider takes an adverse action based on an individual's criminal history. *See, e.g., Jackson v. Tryon Park Apartments, Inc.*, No. 18CV6238, 2019 WL 331635, at *4 (W.D.N.Y. Jan. 25, 2019).  With this legislative history and recent interpretation as a guide, the Court turns to Defendant's Motion to Dismiss.

       1.     Applicability of FHA to Screening Companies

Plaintiffs allege that Defendant is directly and vicariously liable for misconduct under the FHA.  Specifically, they allege that Defendant is directly liable for its own discriminatory housing practices and/or vicariously liable for

---

[3] *See* HUD Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-related Transactions, (Apr. 4, 2016), *available at* https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF.

assisting housing providers in discriminating by offering a product that prevents landlords from conducting an individualized assessment of potential tenants. Plaintiffs also allege that Defendant knew that requiring a power of attorney before disclosing records and refusing to accept Ms. Arroyo's conservatorship would deny incompetent housing applicants like Plaintiff equal access to his tenant screening report. Defendant refused to modify its own policies to correct a discriminatory practice.

Section 100.7 of the HUD regulations governs direct and vicarious liability for discriminatory housing practices.  A person is directly liable  for its own conduct that results in a discriminatory housing practice, its knowing failure to correct and end a discriminatory housing practice by that person's agent or employee and its knowing failure to correct and end a discriminatory housing practice by a third-party where the person had the power to correct it.  *See* 24 C.F.R. § 100.7(a).  "A person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law."  *Id.* at § 100.7(b).

Defendant argues that these HUD regulations limit FHA liability to entities with control over a housing provider or "other legal responsibility" to correct the landlord's behavior.  *See* 24 C.F.R. § 100.7(a)(iii).  Defendant claims that Plaintiffs failed to allege that it controlled the behavior of WinnResidential in setting the screening criteria and this is a necessary element to establish liability.  However, as explained above, HUD regulations also create liability for a person's "own

12

conduct that results in a discriminatory housing practice" and "a discriminatory housing practice by the person's agent or employee."  *Id.* at §§ 100.7(a)(1)(i), (b).

The Court finds that Plaintiffs sufficiently allege Defendant's liability under both theories. Defendant held itself out as a company with the knowledge and ingenuity to screen housing applicants by interpreting criminal records and specifically advertised its ability to improve "Fair Housing compliance."  Plaintiffs allege it failed to do so by categorizing as disqualified a qualified applicant. Defendant had a duty not to sell a product to a customer which would unwittingly cause its customer to violate federal housing law and regulations.

By the same token, Defendant would be liable if it sold a product designed to allow its customer to circumvent the fair housing laws intentionally.  Allowing a screening company to facilitate discrimination by disqualifying qualified applicants on an impermissible basis or by allowing a customer to set impermissible qualification standards with impunity would subvert the purpose of the FHA.  Defendants advocate for a constrained reading.  Interpreting the law in the manner proposed by Defendant is too restrictive a reading of the Fair Housing Act. Such a limited reading is inimical to its purpose and inconsistent with the Supreme Court's instruction to liberally construe the Act to achieve the important remedial purpose of eradicating insidious housing discrimination.

Defendant next argues that it cannot be liable under the FHA because § 3604 applies only to "individuals who deal directly with prospective buyers or tenants and are in control of the housing-related decisions."  Defendant cites no authority to support the notion that the FHA applies exclusively to housing providers.  It cites

*Frederick v. Capital One Bank (USA), N.A. et al.*, claiming that the case rejected an "attempt to expand the reach of the FHA beyond those providing housing."  No. 14CV5460, 2015 WL 5521769, at *3 (S.D.N.Y. Sept. 17, 2015).  In *Frederick*, plaintiff brought thirty-six claims against thirteen defendants claiming that they "engaged in a conspiracy to report false information to credit reporting agencies and threaten him with injury to his credit score if he does not pay allegedly invalid debts."  *Id.* at *1.  Specific to his FHA claims, plaintiff claimed defendants' credit reporting scheme injured his credit score and thus made various housing opportunities unavailable to him.  *Id.* at *2. The Court held that credit reporting practices as alleged in the complaint were not sufficiently related to the rental of housing to fall within the scope of the FHA.  *Id.* at *2-3.

*Frederick* is distinguishable from the case at bar.  The *Frederick* Court reasoned  that "[t]he relationship between the challenged practice and real estate transactions is essential because the FHA prohibits discrimination in the 'sale or rental' of housing."  *Id.* at *2.  Here, the challenged practice is directly related to the real estate transaction because it determined who was qualified to occupy a housing unit.  Plaintiffs allege that Defendant's practice of automatically screening potential tenants on an impermissible basis – an arrest record – and disqualifying them for tenancy on that reason without conducting an individualized assessment of the tenant or providing the underlying documentation caused Mr. Arroyo to be denied housing.  Because there is a clear relationship between the challenged practice and the attempted property rental, the Court is not persuaded by Defendant's argument.

14

Defendant's claim that only housing providers can be held liable under the FHA is further belied by the cases cited by Plaintiff. For example, in *Mitchell v. Shane*, prospective homebuyers brought discrimination claims under § 3604 against the sellers, their listing agent and their listing agent's employer. 350 F.3d 39, 41-42 (2d Cir. 2003). The Second Circuit affirmed the district court's grant of summary judgment for the sellers because there was no evidence they knew the plaintiffs' race, but vacated the grant of summary judgment as to the agent and his employer. *Id.* at 49-50. The agent was not the housing provider, but the Court found that he could be liable under § 3604 because he was aware of the plaintiffs' race and did not solicit a counter-offer from them after they were outbid. *Id.* The Court also vacated summary judgment for the agent's employer because if the agent was found liable for discrimination, then his employer may also be liable in accordance with traditional agency principles. *Id.* Like the agent in *Mitchell*, the Defendant can be held liable under the FHA despite the fact that it is not the direct housing provider.

Defendant can also be vicariously liable for WinnResidential's actions. In *United States v. Hylton*, this Court found that a husband and wife were both liable for the husband's discriminatory refusal to rent an apartment to an African-American woman on the grounds that the wife employed the husband as her agent. 944 F. Supp. 2d 176, 191 (D. Conn. 2013). "To prove agency, three elements must be proven: "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking." *Id.* at 190 (citing

*Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006)).  The Court found that the wife owned the rental property at issue and gave her husband authority to act on her behalf which he accepted.  *Id.* at 191.  The Court also found that the final prong, understanding of the principal's control, was met because the wife signed the leases and the husband discussed the actions he took with her.  *Id.*

The same reasoning applies here. Plaintiff alleged that WinnResidential engaged Defendant to act on its behalf by conducting tenant screenings, determining whether prospective tenants meet the requirements for tenancy and sending adverse action letters. Dkt. 1 at ¶¶ 36-40, 51, 54-58, 64-65.  Defendant provided these services to WinnResidential.  *Id.*  Thus, WinnResidential gave Defendant authority to act and Defendant accepted it.  As to the final element, the Court finds that WinnResidential was ultimately in control of the final housing decision.  WinnResidential chose the criteria for tenancy from Defendant's form. *Id.* at ¶ 36. WinnResidential initially accepted Defendant's conclusion, but eventually disregarded Defendant's conclusion that Mr. Arroyo was disqualified and allowed him to move in with Ms. Arroyo.  *Id.* at ¶ 100.  For these reasons, the Court finds that Defendant can be held liable under the FHA as an agent of WinnResidential.

A recent decision from the Second Circuit supports the Court's conclusions. In *Francis v. Kings Park Manor, Inc.*, the Circuit considered "whether a landlord may be liable under the FHA for failing to take prompt action to address a racially hostile housing environment created by one tenant targeting another, where the landlord knew of the discriminatory conduct and had the power to correct it."  917

F.3d 109, 114 (2d Cir. 2019).  Relying on the statutory text, the history of expansive readings of the FHA and relevant HUD regulations, the Circuit found that "a landlord may be liable under the FHA for failing to intervene in tenant-on-tenant racial harassment of which it knew or reasonably should have known and had the power to address."  *Id.* at 120-21.  It acknowledged that the FHA does not explicitly endorse landlord liability for tenant-on-tenant harassment, but explained that it has "never required every last detail of a legislative scheme to be spelled out in a statute itself—especially a civil rights statute."  *Id.* at 120.  The Circuit also rejected the defendant's argument that HUD regulation § 100.7 rests on the false premise that an agency relationship exists between landlords and tenants.  *Id.* at 121.  It found that there was no risk that landlords would be liable where they lacked control over tenants because the HUD regulation only imposes liability where a landlord knew of misconduct by an agent or employee and failed to intervene or failed to intervene despite an obligation to do so under the FHA.  *Id.* at 121-22.

The *Francis* decision supports the Court's finding that screening companies can be held liable under the FHA.  First, the absence of language specifically providing for screening company liability under the FHA is not determinative.  Second, screening companies can be liable under § 100.7 where they knew of and had the power to correct and end a discriminatory housing practice.  Here, Plaintiffs allege that Defendant knew that its CrimSAFE policies discriminated against minorities and disabled individuals but continued to offer them.  Defendant had the power to end its discriminatory practice by modifying or discontinuing its CrimSAFE product and offering only its CrimCHECK product, but it refused to do

so.  For example, Defendant could have omitted arrest records from the list of screening criteria or altered its algorithm to search only for arrests which resulted in a conviction.

The Court acknowledges that housing providers are often the target of FHA claims.  However, as discussed herein, other entities are frequently held liable under the FHA.  Nothing in the language of the statute precludes Defendant's liability and the Second Circuit has extended liability beyond direct housing providers.  These are logical extensions which effectuate the purpose of the FHA. As explained above, without them, a housing provider could simply use an intermediary to take discriminatory and prohibited actions on its behalf and defeat the purpose of the FHA.

### 2.   Nexus Between Defendant's Conduct and Housing Denial

Defendant argues that Plaintiffs' FHA claims must be dismissed because FHA liability only exists where an individual's conduct restricts minorities' access to housing.  It further claims that the relevant conduct, setting the housing-related policies, is attributable to WinnResidential only.  Defendant argues that *Sabal Palm Condominiums of Pine Island Ridge Association, Inc. v. Fischer* supports the notion that it cannot be liable because it did not set the policies at issue.  6 F. Supp. 3d 1272 (S.D. Fla. 2014).  In *Sabal Palm*, the Court granted summary judgment against a condominium association for failing to allow a disabled resident a reasonable accommodation in violation of the FHA, but it granted summary judgment in favor of the association's lawyer because he did not participate in or

have authority over that decision.  *Id.* at 1280, 1294.  Defendant claims its role is akin to that of the lawyer.   Defendant understates its role.

In contrast, the Court finds that Defendant is similar to the board member in *Sabal Palm* who voted against the accommodation and was held liable on summary judgment.  *Id.*   The Southern District of Florida found that "[i]ndividual board members or agents such as property managers can be held liable when they have personally committed or contributed to a Fair Housing Act violation."  *Id.* at 1293 (internal citation and quotation marks omitted).   Here, Plaintiffs allege that Defendant's automatic tenant screening process, which fails to individually assess applicants, discriminates against Plaintiffs in the provision of housing on the basis of race and disability.   Since WinnResidential's decision to deny Mr. Arroyo tenancy was based on Defendant's screening process, it follows that Defendant personally contributed to the alleged FHA violation.  Therefore, the Court finds that Defendant can be held liable under the FHA under the reasoning of *Sabal Palm*.

Defendant argues that it did not select the screening criteria. Although WinnResidential may have selected a subset of the criteria listed on the form, Defendant drafted the form and thereby provided *all* the criteria available for WinnResidential to select.   Defendant cannot downplay its role in the screening process.   It was Defendant's form, Defendant's screening process and Defendant's adverse action letter that contributed to the denial of Mr. Arroyo's application. Indeed, Plaintiff alleges that Defendant's adverse action letter was effectively the final decision on Mr. Arroyo's tenancy because Defendant did not provide WinnResidential any information concerning disqualifying records or any other

details for the tenancy decision.  Defendant was closely involved in the tenancy process unlike the defendants in the cases it cites. For example, the Multiple Listing Service ("MLS") in *Wheatley Heights Neighborhood Coalition v. Jenna Resales Co.* was sued in addition to brokerage firms and their employees by a group of residents who alleged that they engaged in racial steering in violation of the FHA.  447 F. Supp. 838, 839 (E.D.N.Y. 1987).  The Court found that the MLS was not liable under the FHA because participating brokers did not act on its behalf or for its benefit and the control exercised by MLS was not related to the sales activities of brokers.  *Id.* at 842.  In contrast, there is a sufficient causal nexus here because Defendant's activities were directly related to WinnResidential's tenancy decisions.

These arguments similarly fail as to Plaintiffs' disability discrimination claim. Defendant argues that its requirement for a conservator to submit a power of attorney before receiving another individual's tenant screening report is too far removed from any housing decision for purposes of the FHA.  The Court disagrees. Plaintiffs allege that Ms. Arroyo submitted an application for Mr. Arroyo's screening report which she signed along with Mr. Arroyo's co-conservator, a certificate of conservatorship, a utility bill showing her address and mail received by her on Mr. Arroyo's behalf.  Defendant still did not provide the tenant screening report.  Meanwhile, WinnResidential told Ms. Arroyo that it had no knowledge of the criminal finding in Mr. Arroyo's screening report and the impact that the finding may have on resident safety.  If Ms. Arroyo had the underlying information, she would have been able to make a specific accommodation request to

WinnResidential.   The Court finds Defendant's decision to require a power of attorney from Ms. Arroyo in addition to the documents she allegedly submitted has a sufficiently close nexus to housing availability and is wholly distinct from cases cited by Defendant involving the effect of cement grinding facilities and highways on adjacent neighborhoods.   *See, e.g., Jersey Heights Neighborhood Assoc. v. Glendening*, 174 F.3d 180 (4th Cir. 1999).

### 3.    Disparate Treatment Claim

Plaintiffs bring a claim of disparate treatment based on race under §3604.[4] This claim is analyzed under the familiar *McDonnell Douglas* burden-shifting framework.   *See Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003) ("We evaluate claims of housing discrimination under the *McDonnell Douglas* burden-shifting framework.").   However, in *Swierkiewicz v. Sorema N.A.*, the Supreme Court held that a plaintiff asserting disparate treatment claims under Title VII and the Age Discrimination in Employment Act need not allege specific facts establishing a prima facie case of discrimination to survive a motion to dismiss because "[t]he prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement."   534 U.S. 506, 510, 514-15 (2002).   Subsequently, the Second Circuit held that "[t]he *Swierkiewicz* holding applies with equal force to any claim . . . that the *McDonnell Douglas* framework covers."   *See Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 72 (2d Cir. 2006); s*ee also Palmer v. Fannie Mae*, No. 17-2867, 2018 WL 5830504, at *1 n.1 (2d Cir. Nov. 7, 2018).   Therefore, the holding in

---

[4] In its Motion to Dismiss, Defendant briefly addresses a disparate treatment claim based on Mr. Arroyo's disability.  In their Opposition to the Motion to Dismiss, Plaintiffs classify their disability discrimination allegations as failure to accommodate and disparate impact only.  *See* Dkt. 31 [Mem. in Opp'n to Mot. to Dismiss] at 6.

*Swierkiewicz* applies to Plaintiffs' disparate treatment claim and they do not need to allege facts sufficient to establish a prima facie claim under *McDonnell Douglas* to survive a motion to dismiss. *See Boykin v. KeyCorp*, 521 F.3d 202, 212-13 (2d Cir. 2008); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) ("[A] plaintiff is not required to plead a *prima facie* case under *McDonnell Douglas*, at least as the test was originally formulated, to defeat a motion to dismiss.").

In contrast, "a plaintiff can survive a motion to dismiss if the plaintiff can allege facts that support a plausible claim that the plaintiff was 'a member of a protected class,' suffered relevant 'adverse' treatment, and 'can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation.'" *Palmer*, 2018 WL 5830504, at *1 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)). Here, Plaintiffs sufficiently allege that Defendant discriminated against them on the basis of race. They allege that they are members of a protected class who suffered adverse treatment when Defendant used its automated CrimSAFE product to determine that Mr. Arroyo was disqualified for tenancy without conducting an individual assessment or providing him with the underlying documentation supporting its conclusion. Lastly, Plaintiffs meet their minimal burden to show facts suggesting an inference of discriminatory intent. Plaintiffs allege that Defendant was aware of HUD regulations that govern the use of criminal records in tenant screening decisions, the racial and ethnic disparities in the criminal justice system, the effects that the automatic denial of housing based on criminal records have on minorities and less discriminatory alternatives

22

to its current practices.  Despite this knowledge, Defendant continued to offer its automated CrimSAFE product which it advertised as "automat[ing] the evaluation of criminal records, reliving your staff from the burden of interpreting criminal search results."  Dkt. 1 at ¶ 35.

Defendant incorrectly suggests that Plaintiffs need to show discriminatory animus by blurring the important distinction between Plaintiffs' burden at the pleading stage and their ultimate burden of proof. Defendant's argument is contrary to clearly established law.  *L.C. v. LeFrak Org., Inc.*, cited by Defendant, states that "a plaintiff need not allege animus at the pleading stage." 987 F. Supp. 2d 391, 402 n.3 (S.D.N.Y. 2013); *see also Khodeir v. Sayyed*, No. 15CV8763, 2016 WL 5817003, at *6 (S.D.N.Y. Sept. 28, 2016) (quoting *Boykin*, 521 F.3d at 215). Moreover, this is not a case where Plaintiffs' factual allegations do not allow a conclusion that the Defendant acted out of discriminatory animus.  *See Logan v. Matveevskii*, 175 F. Supp. 3d 209, 226-27 (S.D.N.Y. 2016) (granting motion to dismiss on FHA claim where plaintiff did not allege "sufficient facts to conclude that he was in any way directly discriminated against on the basis of race, family status, age, or disability").  Plaintiffs' factual allegations meet the minimal burden to suggest an inference of discriminatory motivation. Lastly, Defendant's remaining argument that Plaintiffs failed to show they were treated differently on the basis of a protected characteristic fails on similar grounds.  As explained above, Plaintiffs burden at the pleading stage is minimal.  Plaintiffs do not have to show that they were treated differently on the basis of race to survive a motion to dismiss.

4.     **Disparate Impact Claims**

The Supreme Court recently held that the FHA encompasses disparate impact discrimination. *See Tex. Dep't of Hous. & Cmty. Aff. v. Inclusive Communities Project, Inc.*, 135 S.Ct. 2507, 2518 (2015). The Court held that "[a]t the pleading stage, a plaintiff must 'allege facts . . . or produce statistical evidence demonstrating a causal connection' between the challenged policy and the discriminatory effect." *Paige v. New York City Hous. Auth.*, No. 17CV7481, 2018 WL 3863451, at *3-4 (S.D.N.Y. Aug. 14, 2018) (quoting *Inclusive Communities Project, Inc.*, 135 S.Ct. at 2523). In the Second Circuit, a plaintiff establishes a prima facie case of disparate impact by showing "the occurrence of certain outwardly neutral practices" and "a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 587-88, 619 (2d Cir. 2016) (internal citation and quotation marks omitted).

With regards to its racial disparate impact claims, Plaintiffs alleged that Defendant has a facially neutral policy, through its CrimSAFE product, of making automated determinations of an applicant's eligibility for tenancy without providing the underlying documentation or conducting an individualized assessment of the applicant. Plaintiffs further allege that this policy has a disproportionate impact on minorities because they are significantly more likely to be arrested, charged, and indicted. Plaintiffs allege that this combination results in a disproportionate number of housing denials for minorities. Lastly on April 2016, HUD issued a document entitled "Office of General Counsel Guidance on Application of Fair

Housing Act Standards to Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions. One court in this circuit  deemed it "an interpretive rule" which clarifies how disparate impact claims under 24 C.F.R. § 100.500 apply to situations where a housing provider takes an adverse action based on an individual's criminal history. See, e.g., *Jackson v. Tryon Park Apartments, Inc.*, No. 18CV6238, 2019 WL 331635, at *4 (W.D.N.Y. Jan. 25, 2019).

With regards to its disability disparate impact claim, Plaintiffs alleged that Defendant has two facially neutral policies: (1) refusing to allow conservators to receive consumer files for individuals subject to the conservatorship and (2) requiring all third parties, including conservators, to submit a power of attorney executed by the individual in order to receive her consumer file.  Plaintiffs further allege that Defendant's policies disproportionately impact disabled individuals because they are more likely to be subject to a conservatorship than non-disabled individuals.  Plaintiff also alleges that these individuals lack the ability to execute a power of attorney.  Finally, Plaintiff alleges that the result of these policies is that disabled individuals have a more difficult time requesting or obtaining the results of Defendant's screening reports.  These allegations satisfy Plaintiffs' prima facie burden at the motion to dismiss stage.

District courts in this circuit have held that allegations similar to Plaintiffs survive a motion to dismiss.  *See, e.g., Jackson,* 2019 WL 331635, at *3 (denying motion to dismiss where plaintiff alleged that automatically excluding a person with a felony conviction from tenancy has a disparate racial impact); *see also Paige*, 2018 WL 3863451, at *3-4 (denying motion to dismiss where plaintiffs alleged

that housing authority's failure to comply with lead paint inspection laws had a disproportionate impact on children); *see also Khodeir v. Sayyed*, No. 15CV8763, 2016 WL 5817003, at *7 (S.D.N.Y. 2016 Sept. 28, 2016) (denying motion to dismiss disparate impact claim where plaintiff alleged two facially neutral policies had a disproportionate impact on Arab residents); *see also Gashi v. Grubb & Ellis Prop. Mgmt. Servs*, No. 9CV1037, 2010 WL 2977143, at *5 (D. Conn. July 21, 2010) (denying motion to dismiss disparate impact claim where plaintiff alleged facially neutral policy had a disparate impact on families).

The Court finds Defendant's response unavailing.  First, Defendant argues that Plaintiffs' racial disparate impact claim fails because the housing-related policies at issue are not attributable to Defendant.  Second, Defendant argues that Plaintiffs' disability disparate impact claim fails because it is not supported by statistical evidence.  For the reasons articulated above, the Court is not persuaded by Defendant's argument that the relevant housing policies are not attributable to it. Defendant created and provided the automated screening process to WinnResidential.  It suggested the categories for which WinnResidential could screen potential tenants, made eligibility determinations and sent out letters to potential tenants notifying them of the eligibility determination.

Defendant's second argument fails because, although it is not required, Plaintiffs alleged sufficient statistical support for their claims.  As explained above, Plaintiffs must "'allege facts . . . or produce statistical evidence demonstrating a causal connection' between the challenged policy and the discriminatory effect." *Paige*, 2018 WL 3863451, at *3-4.  Plaintiffs have satisfied their burden on a motion

to dismiss by alleging that Defendant's policies have a disparate impact on disabled individuals because they are more likely to be conserved and unable to execute a power of attorney.  Defendant's claim that dismissal is required unless Plaintiffs allege statistical evidence of how the policy affects the protected and unprotected group again sets Plaintiffs' bar too high.  In the case Defendant cites for this proposition, the Seventh Circuit provided this context before affirming the dismissal of the disparate impact claim, "Disparate-impact plaintiffs are permitted to rely on a variety of statistical methods and comparisons to support their claims. At the pleading stage, some basic allegations of this sort will suffice. But the amended complaint contains no allegations of the kind, nor any other factual material to move the disparate-impact claims over the plausibility threshold." *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014).  The same cannot be said for the case at bar.  Consistent with the other district courts in this circuit, the Court finds that Defendant's stated a claim for disparate impact based on disability.

### 5.    Failure to Accommodate

Plaintiffs allege that Defendant violated the FHA by failing to accommodate Mr. Arroyo's disability.   Ms. Arroyo requested the documents underlying Mr. Arroyo's tenant screening report and provided proof of her status as Mr. Arroyo's conservator.  Defendant refused to accept this document and required a power of attorney even though Ms. Arroyo explained that Mr. Arroyo is conserved and does not have the ability to execute a power of attorney.  To state a claim for failure to accommodate, "a plaintiff must show (1) that the plaintiff or a person who would

live with the plaintiff had a handicap within the meaning of § 3602(h); (2) that the defendant knew or reasonably should have been expected to know of the handicap; (3) that the accommodation was likely necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that the defendant refused to make the requested accommodation." *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 156 (2d Cir. 2014).

Plaintiffs allege sufficient facts to support each factor. Mr. Arroyo has significant disabilities within the meaning of § 3602(h) and Ms. Arroyo notified Defendant of Mr. Arroyo's disabilities. The requested accommodation was necessary because Ms. Arroyo was trying to convince WinnResidential to reexamine Defendant's decision to disqualify Mr. Arroyo. Without proof that Defendant's report revealed a limited and dated criminal history for Mr. Arroyo, WinnResidential was unlikely to override Defendant's decision. Indeed, WinnResidential refused to do so. The accommodation was reasonable because Ms. Arroyo's role as co-conservator gave her significantly more power over Mr. Arroyo's affairs than a power of attorney. Nevertheless, Defendant refused to provide Ms. Arroyo with the records underlying Mr. Arroyo's tenant screening report.

Defendant does not address these factors in its Motion to Dismiss. It states that Plaintiffs' claim must fail because they do not allege that Defendant applied its policy differently to any non-disabled individual. Defendant cites no support that this allegation is required at the pleading stage. Defendant next argues that there

is an insufficient nexus between its failure to provide the tenant screening report and housing availability. However, the Court disagrees as explained in detail above and finds that Plaintiffs stated a claim for failure to accommodate Mr. Arroyo's disability.

###   B.   Connecticut Unfair Trade Practices Act Claim

Plaintiffs merge the allegations supporting their FHA claims into one omnibus CUTPA claim focusing on Defendant's use of the CrimSAFE product and its file disclosure policies.  CUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *See* Conn. Gen. Stat. § 42-110b.  CUTPA is "remedial in character . . . and must be liberally construed in favor of those whom the legislature intended to benefit."  *Fink v. Golenbock*, 238 Conn. 183, 213 (1996); *see also* Conn. Gen. Stat. § 42-110g(a).  A CUTPA claim may be brought by "[a]ny person who suffers any ascertainable loss of money or property."  *See* Conn. Gen. Stat. § 42-110g(a).

"To prevail on a CUTPA claim, the plaintiffs must prove that (1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce . . . [and] (2) [they have] suffered an ascertainable loss of money or property as a result of the defendant's acts or practices."  *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.,* 287 Conn. 208, 217 (2008).  When analyzing the first element, whether plaintiffs alleged an unfair act, the Court must apply the "cigarette rule" which considers whether the act: (1) "offends public policy as it has been established by statutes, the common law, or otherwise"; (2) is "immoral, unethical, oppressive, or unscrupulous"; or (3) "causes substantial injury to

consumers." *See Harris v. Bradley Memorial Hosp. and Health Ctr., Inc.*, 296 Conn. 315, 351 (2010).  "All three criteria do not need to be satisfied to support a finding of unfairness.  A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy." *Caires v. JP Morgan Chase Bank, N.A.*, 880 F. Supp. 2d 288, 299 (D. Conn. 2012) (internal citation and quotation marks omitted).

The second element, ascertainable loss, "is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief . . . to be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an ascertainable loss due to a CUTPA violation." *Artie's Auto Body, Inc.*, 287 Conn. at 217-18.  "An ascertainable loss is a loss that is capable of being discovered, observed or established. The term loss . . . has been held synonymous with deprivation, detriment and injury. To establish an ascertainable loss, a plaintiff is not required to prove actual damages of a specific dollar amount."  *Id.* at 218.  However, the loss must still be "measurable even though the precise amount of the loss is not known."  *Id.* (internal citation and quotation marks omitted).  "A plaintiff also must prove that the ascertainable loss was caused by, or a result of, the prohibited act."  *Id.* (quoting Conn. Gen. Stat. § 42-110g(a)).  "When plaintiffs seek money damages, the language as a result of in § 42–110g (a) requires a showing that the prohibited act was the proximate cause of a harm to the plaintiff . . . [P]roximate cause is [a]n actual cause that is a

substantial factor in the resulting harm . . . The question to be asked in ascertaining whether proximate cause exists is whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's act." *Id.* (internal citations omitted).

Here, Plaintiffs have sufficiently alleged unfair or deceptive practices that violate the cigarette rule.  Plaintiffs allege that Defendant's actions offend the public policy set forth in the FHA and related HUD Guidance, the FCRA and Connecticut's conservatorship statute.  Because they alleged practices amounting to public policy violations, the Court finds that Plaintiffs have sufficiently pled an unfair or deceptive practice. *See Green v. Konover Residential Corp.*, No. 95CV1984, 1997 WL 736528, at *7 (D. Conn. Nov. 24, 1997) ("The Connecticut courts have read CUTPA broadly enough to encompass the claims of plaintiffs, which include . . . violations of the Fair Housing Act by virtue of defendants' discriminatory repair practices.").  Plaintiffs also alleged that Defendant's actions were unethical and unscrupulous because it claimed its CrimSAFE product would improve fair housing compliance when it knew CrimSAFE had a discriminatory effect on people of color.  Lastly, Plaintiffs alleged that Defendant's actions cause substantial injury because they leave consumers without housing and without sufficient information to challenge housing decisions.

Defendant argues that it cannot be liable because CUTPA requires that Defendant's actions were the proximate cause of Plaintiffs' harm and the alleged discriminatory decisions at issue here were made by WinnResidential. As explained above, a plaintiff alleging CUTPA violations must allege ascertainable

loss proximately caused by the prohibited act.  Here, Plaintiffs allege a series of ascertainable losses caused by Defendant.  It is foreseeable that (1) Defendant's denial of Mr. Arroyo's housing application would result in increased expenses for the Arroyos and (2) Defendant's refusal to provide the tenant screening report would result in a deprivation of Mr. Arroyo's rights under the FCRA to a copy of his consumer report.

Defendant next claims that Plaintiffs' CUTPA claim based on its file disclosure policies fails because consumer file disclosure requests are provided free of charge under the FCRA and therefore are not in connection with trade or commerce.  Trade or commerce is defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42-110a(4).  Defendant claims that the facts at issue here are most analogous to *Omega S.A. v. Omega Engineering, Inc.*, where the Court found that filing a trademark application or registering a domain name does not involve trade or commerce under CUTPA where the trademark and name were never used.  No. 1CV2104, 2005 WL 3307277, at *8 (D. Conn. Dec. 6, 2005).  The Court disagrees.  Unlike in *Omega*, Defendant had a business relationship with WinnResidential.  It agreed to provide screening services and to send potential tenants a letter with the tenancy decision.  The letter states that the tenant can request a copy of his screening report.  Defendant's disclosure policy stems from its commercial relationship with WinnResidential and the services Defendant provides to WinnResidential's consumers on its behalf.

Here, like in *Nastro v. D'Onofrio*, cited by Plaintiffs, Defendant's conduct is sufficiently related to their business to establish a relationship to trade or commerce.  263 F. Supp. 2d 446, 457-58 (D. Conn. 2003) (denying motion to dismiss CUTPA claim where defendants' property transfers were sufficiently related to their underlying business to establish a relationship to trade or commerce); *see also Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 643 (2002) (explaining that CUTPA does not require a consumer relationship).

## V.      Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss Counts I, II, III and VI is DENIED.

IT IS SO ORDERED.

*Vanessa Lynne Bryant*   Vanessa Bryant
                          2019.03.25 19:37:23 -04'00'

**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut.**