UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CONNECTICUT FAIR HOUSING CENTER
*et al.,*
                        *Plaintiffs,*
        v.
CORELOGIC RENTAL PROPERTY
SOLUTIONS, LLC,
                        *Defendant.*

No. 3:18-CV-705 (VLB)

PLAINTIFFS' LOCAL RULE 56(a)(1) REPLY STATEMENT OF FACTS

Pursuant to Local Rule 56(a)(1), Plaintiffs submit this statement of additional undisputed facts in support of their Motion for Summary Judgment.

Plaintiffs' Additional Undisputed Facts

38.     Defendant's procedure for disclosing consumer files to third-parties acting on behalf of a consumer required a power of attorney (POA).  Barnard Dep. at 72:11-73:1, Ex. 1 hereto, and Barnard Decl. Ex. A at § 2.3.2, ARROYO 1706.

39.     While Defendant asserts that it did not necessarily require POA, because submission of alternative documents should result in escalation to someone who could consider accepting alternate documents, Arroyo's June request was *not* escalated beyond a first level supervisor, one who did not have authority to accept conservator documents, and who said that the request should be denied absent a POA.  Barnard Dep at 132:5-133:5 (notes showed "cannot accept a conservatorship court paper,"); Barnard Dep. at 134:5-136:14 (notes reflect employee asked first level supervisors who informed her not to accept conservatorship court paper, supervisor did not escalate further); 137:9-138:24 (in subsequent call Ms. Arroyo was advised "per management unable to use

1

information," although Defendant knew Mr. Arroyo was disabled and unable to speak or sign his name, and had received conservatorship papers, it continued to direct Ms. Arroyo to obtain a power of attorney before she could get file).

40.    In June, Defendant denied Arroyo's written request because it was not signed by Mikhail and Carmen did not have a POA, *not* because of missing SSN, nor because of location of signature, nor because of visibility issue around the seal on her document.  Barnard Dep. at 162:18-23, 166:23-167:11; see also Barnard Decl. Ex. B.

41.    Defendant knew that Mr. Arroyo was disabled and not able to sign documents at the time that it requested his signature or POA.  Barnard Dep. at 133:6-12

42.    November 1, 2016 was the first time Arroyo's request was escalated to the compliance team.  Barnard Dep. at 139:11-142:7.

43.    Defendant asserted it followed its stated policies and procedures throughout, though later conceded that it should have escalated the request sooner than it did.  Barnard Dep. at 119:4-12, 142:8-143:9

44.    There was no written policy governing reasonable accommodations, the only option was to escalate to a team lead, but team leads did not have authority to grant reasonable accommodation, and supervisor or manager could only approve accommodation if a similar accommodation had been approved in the past.  Otherwise, management would have to escalate to the compliance team to accept any reasonable accommodation request.  Barnard Dep at 82:13-83:24, 99:17-22.

45.     Defendant does nothing to track third-party requests, and thus there can be no accurate count of the number of such requests or how they were handled.  Barnard Dep. at 112:2-18, 120:23-121:18, 121:25-124:24.

46.     Defendant insisted that only the original conservatorship document would be acceptable.  Barnard Dep. at 152:18-24.

47.     Mr. Arroyo's application was denied when a criminal background report from Defendant CoreLogic indicated that he had disqualifying criminal history. Ex. A to C. Arroyo Decl., (Defendant's Responses to Plaintiffs' First Set of Requests for Admissions) (hereafter, "Defendant's Admissions") Nos. 36-37, 40, 44, 49-50, 54); See also Ex. 3 (Dep. of CoreLogic 30(b)(6) Designee Naeem Kayani) (hereafter, "Kayani Dep.") at 235:20-236:8;[1] Sworn Answer of WinnResidential, Ex. 4 at ¶¶ 6, 99, 22-23, 28.

48.     When Ms. Arroyo was unable to obtain information from CoreLogic about Mr. Arroyo's criminal history, she was eventually able to locate it on her own in the Spring of 2017 by directly contacting the Pennsylvania court system. CHRO Transcript at 16:19-17:13.

49.     After Plaintiffs provided information to WinnResidential about Mikhail Arroyo's criminal record that they obtained on their own directly from the Commonwealth of Pennsylvania, WinnResidential agreed to overlook Mikhail Arroyo's criminal record and accept him as a tenant. CHRO Transcript at 16:19-17:13, 68:5-71:10, 50:16-21, 52:17-24; Arroyo Dep.[2] at 123:2-10.

---

[1] Ex. 3 also includes a page cited to in Plaintiffs' Motion, but inadvertently excluded from the exhibit filed with Plaintiffs' Motion.
[2] All references to the Arroyo Dep. are to Ex. 1 to Defendant's Opposition.

<u>PLAINTIFFS' RESPONSE TO DEFENDANT'S</u>
<u>STATEMENT OF ADDITIONAL MATERIAL FACTS</u>

1.      A consumer may obtain his or her consumer file from RPS for free.

*See* Barnard Decl. at ¶ 5.

<u>Response</u>:

        Admitted.


2.      The file disclosure process is unrelated to any prior reporting by

RPS. Any consumer can request access to the criminal record data maintained by

RPS at the time of the request, regardless of whether they have been the subject

of a prior screening by RPS. *See id.* at ¶ 6.

<u>Response</u>:

        Admitted that a consumer can request access regardless of prior

screening, but this is irrelevant because consumer would not have reason to

know that RPS maintains such files or that they could request access in the

absence of having been notified by an entity that relied upon that screening.


3.      At the time Plaintiff Ms. Arroyo's file disclosure requests were made

in 2016, RPS maintained policies and procedures for granting consumers access

to their consumer file. *See id.* at ¶ 7.

<u>Response</u>:

        Admitted.

4.      To satisfy the statutory requirement under the Fair Credit Reporting Act that consumers submit "proper identification" as a "condition" of being granted access to their consumer file, and in order to protect consumer privacy based on the private and sensitive information that can be contained in those files, RPS maintains written protocols for consumer authentication. To gain access to their files, those authentication procedures generally require consumers to provide personal identifying information, government documentation, and/or to answer a series of personal security questions. *See id.* at ¶ 8.

<u>Response</u>:

Admit that RPS maintains written protocols, but deny that FCRA requires that RPS maintain protocols as demanding as they do, a legal question that is addressed in Plaintiffs' Reply brief.

5.      In addition to regularly disclosing consumer files directly to the requesting consumer, RPS actively facilitates the disclosure of consumer files to third-party legal guardians acting on the consumer's behalf. To protect consumer privacy in that situation, however, if a third party is seeking a copy of a consumer's file, RPS's written policies generally require a notarized power of attorney, the consumer's name, proof of the address to where the disclosure should be mailed, and confirmation of the last four digits of the consumer's Social Security number. *See id.* at ¶ 9, Ex. A at § 2.3.

<u>Response</u>:

Admitted

6.      However, that default procedure for third-party authentication is not inflexible and can be adjusted when those requirements cannot practically be met by the consumer and his or her third-party representative. As stated in RPS's policies and procedures, "for any scenarios not covered" in that section of the authentication policy, RPS employees are directed to "reach out to a supervisor" for further guidance and how to handle the request. *Id.*

**Response**:

Admit that the policy states "for any scenarios not covered" in that section "reach out to a supervisor."  However, the policy does address what to do with third-party requests, and directs RPS employees to require a notarized power of attorney.  Barnard Dep. Ex. A at ARROYO001706.  That is what was done with Ms. Arroyo's June 2016 request.  See PAUF ¶¶ 39-40.

7.      Situations "not covered" by the written policy include would the situation where a consumer is disabled and unable to execute a power of attorney, as occurred with respect to the claims in this case. *Id.*

**Response**:

Disputed that such escalation occurred with respect to the claims in this case.  Ms. Arroyo's June 2016 request was denied and she was instructed a POA was required.  PAUF ¶¶ 39-40, 42.

8.      On April 27, 2016, a woman identifying herself as Carmen Arroyo

called RPS to request Mikhail Arroyo's consumer file. *See id.* at ¶ 10.

<u>Response</u>:

    **Admitted**

9.    A number of Ms. Arroyo's interactions with RPS were logged in RPS's internal system tracking interactions with consumers. *See id.* at ¶ 11, Ex. B at pp. 1, 3-5.

<u>Response</u>:

    **Admitted**

10.    During the April 27, 2016 telephone call initiated by Ms. Arroyo, RPS informed Ms. Arroyo of the process for obtaining Mikhail Arroyo's consumer file in a third-party capacity, including the fact that Ms. Arroyo would have to submit a manual authorization form, also called a consumer disclosure request form, because she was seeking a copy of the file in a third-party capacity. *See id.* at ¶ 12.

<u>Response</u>:

    **Admitted**

11.    On April 29, 2016, RPS mailed Ms. Arroyo a consumer disclosure request form and instructions on how to complete the form. *See id.* at ¶ 13.

<u>Response</u>:

    **Admitted**

12.     Ms. Arroyo then filled out the consumer disclosure request form on behalf of Mikhail Arroyo and sent it back to RPS by mail (the "First Disclosure Request"). RPS received that letter on June 27, 2016. *See id.* at ¶ 14, Ex. C at pp. 1, 6.

Response:

   Admitted

13.     The First Disclosure Request was incomplete based on the policies maintained by RPS. It did not include: (1) any proof of address documentation with respect to the address to which Ms. Arroyo requested that the disclosure be mailed; or (2) Mikhail Arroyo's Social Security number, which was instead left completely blank. The form was also not signed in the designated. *See id.* at ¶ 15, Ex. C at p. 1.

Response:

   Admitted that under RPS policies the request was incomplete, but denied that FCRA requires those elements, as set forth in Plaintiffs' Reply.  In addition, disputed that the reason the First Disclosure Request was denied was due to these issues; the request was denied for lack of a power of attorney.  PAUF ¶¶ 39-40.

14.     Ms. Arroyo also attached a certificate of conservatorship to the First Disclosure Request, which itself stated that it was "not valid without court of probate seal impressed." The form submitted, however, lacked a visible or

embossed. *See id.* at ¶ 16, Ex. C at p.3.

**Response**:

Admitted that Ms. Arroyo attached a certificate.  Denied that the seal was not visible; it is visible though not entirely readable.  Barnard Decl., Ex. C at ARROYO000461.

15.    RPS had never previously encountered a request for a copy of a consumer file from an individual claiming to be the court-appointed conservator of a consumer. Ms. Arroyo's request is the only instance identified by RPS where RPS received a file disclosure request from an individual claiming to be a court-appointed conservator. *Id.* at ¶ 17.

**Response**:

Disputed.  RPS does not track whether a request is from a third party or the basis of the third party's request, and thus does not know how often this has happened before.  PAUF ¶45.

16.    Pursuant to RPS's written policy, because the request from Ms. Arroyo was "not covered" by the standard scenario for third-party authentication,  the matter was escalated to two members of the supervisory staff at RPS. *See id.* at ¶ 18.

**Response**:

Admitted that Ms. Arroyo's first request was discussed with two supervisors, who instructed that a power of attorney was required, along with

Mikhail's signature, and that a conservatorship would not be accepted.  PAUF ¶¶
39-40; see also Barnard Decl. Ex. B at ARROYO000453


17.     After those discussions occurred, Ms. Arroyo was mailed a "call back
letter" on June 30, 2016 to the mailing address that had previously identified to
RPS on the First Disclosure Request, with the letter asking Ms. Arroyo to contact
RPS to discuss the file disclosure request further. *See id.* at ¶ 19, Ex. D at p.3.
<u>Response</u>:

      Admitted that letter was mailed to Mikhail Arroyo, at the address listed as
his current address; that letter was returned undeliverable to RPS.  Barnard Decl.
Ex. D at ARROYO000478.


18.     Ms. Arroyo called RPS on September 7, 2016 to discuss the defects
identified with the First Disclosure Request. No further documentation was
provided by Ms. Arroyo coming out of that call. *See id.* at ¶ 20, Ex. B at p3.
<u>Response</u>:

      Admitted that Ms. Arroyo called RPS on September 7, and that she did not
submit additional documents on that day.  On that day, she was instructed that
she had to provide a notarized power of attorney.  Barnard Decl. Ex. B at
ARROYO000454


19.     Approximately two months passed without any contact from Ms.
Arroyo. Ms. Arroyo then made contact with RPS on November 1, 2016 to inquire as

to why the file had not been disclosed based on the form that she sent to RPS in June 2016. At that time, Ms. Arroyo noted that she had spoken to her "attorney" about the conservatorship document she previously submitted. *See id.* at ¶ 21, Ex. B at p. 3.

<u>Response</u>:

Admit that two additional months passed without RPS providing Ms. Arroyo the requested disclosure, without RPS escalating the issue to anyone with authority to consider the conservatorship issue, and without RPS providing any reasonable accommodation to Mr. Arroyo.  PAUF ¶¶ 39-44.  Admit that Ms. Arroyo made contact with RPS on November 1, and that she informed RPS that her attorney confirmed that conservatorship gave her greater power than a POA. Barnard Decl. Ex. B at ARROYO000454.


20.    Given that Ms. Arroyo had not submitted any additional documentation to RPS since June 2016, the matter was then again escalated internally within the consumer relations department and then to RPS's compliance department. Due to the previously-unseen nature of the request and nature of the documentation submitted, the compliance department then further escalated the issue to RPS's internal legal department, which in turn, sought the legal advice of two outside attorneys at prominent law firms (Foley & Lardner and Hudson Cook). *See id.* at ¶ 22.

<u>Response</u>:

Disputed that this was a "previously-unseen" type of request, see above at

¶ 15.  Otherwise, admitted.


21.    During that escalation process, Ms. Arroyo was kept updated as to the status of the review by the compliance/legal department. *See id.* at ¶ 23, Ex. B at pp. 3.

**Response**:

Admitted that Ms. Arroyo called RPS and RPS called Ms. Arroyo approximately five times between November 1 and November 18.  Barnard Decl. Ex. B at ARROYO000455-457.


22.    Ultimately, the legal and compliance departments at RPS did not authorize the release of the file disclosure.  Instead, RPS internally determined that it needed a "new conservatorship with court seal visible" and proof of current address (e.g., a piece of mail showing residence at the location where the file disclosure was requested to be mailed) to process the file disclosure. *See id.* at ¶ 24, Ex. B at 5.

**Response**:

Admitted that RPS never authorized disclosure.  Admitted that on November 14 RPS demanded additional documentation, including new copies of documents Ms. Arroyo had previously submitted.  Barnard Decl. Ex. B at ARROYO000456


23.    Ms. Arroyo then faxed in additional documentation and a newly-

completed file disclosure form (the "Second Disclosure Request") to RPS on

November 15, 2016, which RPS received on November 16, 2016. *See id.* at ¶ 25, Ex.

E at p. 1.

<u>Response</u>:

     **Admitted**


     24.     The attached to the Second Disclosure Request included the

requested proof of address. The new documentation, however, still did not include

a copy of the conservatorship certificate with a visible or impressed seal. *See id.*

at ¶ 26, Ex. E at pp. 2, 5.

<u>Response</u>:

     **Disputed, the seal is at least partially visible.  Barnard Decl. Ex. E at

ARROYO000484.**


     25.     The Second File Disclosure submitted by Ms. Arroyo was thus again

escalated to compliance for further review, including a discussion of the lack of

a "court seal" for the new conservatorship form. *See id.* at ¶ 27, Ex. F at pp. 1-2.

<u>Response</u>:

     **Admitted that the request was escalated for further review; disputed that

the document lacked a court seal.  Barnard Decl. Ex. E at ARROYO000484**


     26.     RPS's compliance department then further escalated the issue to

RPS's internal legal department, which in turn again consulted with outside

counsel at Hudson Cook. *See id.* at ¶ 28.

**Response**:

      **Admitted**

27.     On November 16 and November 18, 2016, RPS left Ms. Arroyo a message seeking to discuss the Second Disclosure Request. *See id.* at ¶ 29, Ex. B. at pp. 5-6

**Response**:

      **Admitted**

28.     Ultimately, permission was not granted by RPS's compliance or legal departments to release Mikhail Arroyo's consumer file disclosure based on the documents submitted on November 16, 2016 with the Second Disclosure Request. *Id.* at ¶ 30.

**Response**:

      **Admitted**

29.     In mid-December 2016, RPS was contacted by an individual claiming to be paralegal at the Connecticut Fair Housing Center ("CFHC") who stated that the CFHC was representing Ms. Arroyo in the file disclosure process. *See id.* at ¶ 31, Ex. B at pp. 7-8.

**Response**:

      **Admitted**

30.     Because an additional third-party was now claiming to represent Ms. Arroyo, RPS requested documentation from the CFHC in the form of a power of attorney establishing that they were formally representing the Arroyos. *See id.* at ¶ 32, Ex. B at pp. 7-8.

**Response**:

Disputed that the POA was requested because an additional third-party was representing Ms. Arroyo, the demand for a POA is RPS' standard procedure whenever anyone requests a consumer's file on behalf of the consumer.  See above at ¶ 5; PAUF ¶¶38-40.

31.     RPS then mailed the CFHC an additional file disclosure request form on December 20, 2016. That form was never returned. *See id.* at ¶ 33, Ex. G at p.1.

**Response**:

Admitted

32.     RPS never heard further from the CFHC or Ms. Arroyo until this lawsuit was filed. *See id.* at ¶ 34.

**Response**:

Admitted

33.     In April 2019, RPS provided Mikhail Arroyo's consumer file to counsel for Plaintiffs. That was done after request by Plaintiffs' counsel for that file in

discovery, Plaintiffs' counsel's representation of the status of the conservatorship, and submission of additional documentation. *See id.* at ¶ 35.

<u>Response</u>:

Admitted that in April 2019, CoreLogic provided Mikhail Arroyo's consumer file to Plaintiffs' counsel and that Plaintiff requested the consumer file in its October 2018 Requests for Production of Documents.  Disputed that Defendant relied on "Plaintiffs' counsel's representation of the status of the conservatorship."  Rather, Defendant's counsel in January 2019 requested an up-to-date conservatorship certificate because the ones CoreLogic received in the 2016 file disclosure requests had expired, and processed the file disclosure solely based on its receipt of the updated certificate.  Ex. 5 (Email receipt of the updated certificate, Plaintiffs' counsel provided an email attachment on February 6, 2019.  Ex. 6 (Email and letter summarizing parties' Rule 37 discovery conference) at 2; Ex. 7 (Email attaching conservatorship certificate) at 1, 6.

34.    With respect to the background screening report at issue in this case, WinnResidential, per its administrative settings, had available to it at least two versions of the report including a version of the report that contained full information about the criminal offense record RPS found for Mikhail Arroyo using WinnResidential's CrimSAFE criteria, including the case number, the file date for the offense, a description of the type of offense, and the state code section for the offense, and the date the offense occurred. *See* Kayani Decl., ¶ 5, Ex. B at p. 6; see also Kayani Dep. 236:20-237:3; 239:8-15.

**Response**:

Plaintiffs object to the admissibility of Exhibit B to the Kayani Declaration, which claims in ¶ 5 that Ex. B is a "true and correct" copy of a screening report that was made available to WinnResidential on April 26, 2016. Exhibit B is dated (and was generated on) May 3, 2018, more than two years later, and thus cannot be an authentic copy of a report provided to WinnResidential in 2016. *See* Kayani Declaration (Ex. 3 to Def. Mem.), Ex. B at 2-8 (date at top-right corner of each page after the first). Further, the Kayani Declaration (Ex. 3) is not signed. Disputed that the full criminal record was provided to WinnResidential on April 26, 2016. *See* Sworn Answer of WinnResidential, Ex. 4 at ¶¶ 9, 22-23, 28-29 (stating, *inter alia*, WinnResidential was "not privy to the specifics of the denial, however the person who the background check was run on would be able to obtain this information from CoreLogic" (¶ 9) and does "not know the facts behind the criminal background findings" (¶ 28); CHRO Transcript at ▊▊ (attached as Ex. A to Kazerounian Decl, Ex. 8 hereto); Ex. 9 (Email from WinnResidential regional manager to CoreLogic account executive asking if there's "a way for us to determine if the records related to this denial [of Mikhail Arroyo's application] are the same as the charges referenced in the attached docs from the Commonwealth of Pennsylvania?").

35.    With respect to the adverse action letter at issue in this action, attached as the first page of Exhibit A to the Kayani Decl., this letter is a template that was made available by RPS to WinnResidential. *Id.* at ¶ 6.

**Response**:

Admitted that the first page of Exhibit A to the Kayani Declaration is the adverse action letter at issue in this action, and that CoreLogic provided this letter to WinnResidential.  Disputed that the letter was a "template," as CoreLogic had filled in all blank lines before providing it to WinnResidential, including Mikhail Arroyo's name, address, partial Social Security Number, the name of the housing complex to which he applied, and the general basis of the decision.  *See* Adverse Action Letter, Kayani Decl. (Ex. 3 to Defendants' Memorandum in Opposition) Ex. A at 1.

36.     RPS did not mail the first page of Exhibit A to Mikhail Arroyo and lacks knowledge as to whether that letter was sent by WinnResidential. *Id.*

**Response**:

Admit that Defendant did not mail the first page of Exhibit A to Mikhail Arroyo, but have insufficient information to admit or deny that Defendant lacks knowledge as to whether that letter was sent by WinnResidential.


37.     Any decision on the application and/or a decision of whether to send the adverse action letter was made by WinnResidential. *Id.*

**Response**:

Disputed that "any decision on the application … was made by WinnResidential" as Defendant provided a decision as to Mr. Arroyo's credit and financial qualifications through its Registry ScoreX and ScorePlus decision-making product and a decision on whether Mr. Arroyo's criminal history was

disqualifying through its CrimSAFE decision-making product.  *See*, e.g., Ex. 10 (CoreLogic response to WinnResidential's Request for Proposals) at 12 (stating, *inter alia*, that with CrimSAFE, "criminal record search results are evaluated using our own advanced, proprietary technology and *an accept/decline leasing decision is delivered to your staff*" (emphasis added)); Ex. 11, Thomas Dep. at 82:14-19 (testimony from CoreLogic's former Director of Product Solutions and Vice President of Sales stating "I mean, we know what [CrimSAFE's] purpose is, right? Everybody agrees it's to automate a screening decision based on the clients' criteria."); Ex. A to Ex. 8, CHRO Transcript at 63:17-20 (discussing the "initial decision made by CoreLogic" as to the Arroyo application) and 71:5-8 (testimony from WinnResidential stating that CoreLogic provides a decision).  Admitted that the decision to send the Adverse Action Letter was made by WinnResidential.

38.    In connection with Ms. Arroyo's request to have Mikhail move into her household, on April 26, 2016, WinnResidential electronically requested from RPS a tenant screening report on Mikhail Arroyo. *See id.*, Ex. B at p. 1.

**Response**:

Plaintiffs object to the admissibility of Exhibit B to the Kayani Declaration, which claims in ¶ 5 that Ex. B is a "true and correct" copy of a screening report that was available to WinnResidential on April 26, 2016.  Exhibit B is dated (and was generated on) May 3, 2018, more than two years later, and thus could not be an authentic copy of a report provided to WinnResidential in 2016.  *See* Kayani Declaration (Ex. 3 to Def. Mem.) Ex. B at 2-8 (date at top-right corner of each page after the first).  Further, the Kayani declaration is not signed.  Nevertheless,

admitted that in connection with Ms. Arroyo's request to have Mikhail move into her household, on April 26, 2016, WinnResidential electronically requested from CoreLogic a tenant screening report on Mikhail Arroyo.

39.    That tenant screening report accurately identified that Mikhail Arroyo had a pending charge for retail theft in York County, Pennsylvania. *See* Arroyo Dep. 42:25-43:3; 58:22-25; *see also* Plaintiffs' Responses to Defendant's First Set of Requests for Admission ("Pls' Resp. to RFAs"), Response to Request No. 5, January 9, 2019, attached as Exhibit 5.

<u>Response</u>:

Admitted that Mikhail Arroyo was charged with retail theft in York County, Pennsylvania.  No materials cited by Defendant support its claim that the "tenant screening report accurately identified" that Mikhail Arroyo had that charge. To the extent a response is required despite the lack of support, disputed that the tenant screening report identified the crime with which Mr. Arroyo was charged or that it was pending.  *See* Arroyo Tenant Screening Report, Ex. __ to Plaintiffs' Statement of Facts (Doc. __) at __; Sworn Answer of WinnResidential, Ex. 4 at ¶¶ 9, 22-23, 28-29 (stating, *inter alia*, WinnResidential was "not privy to the specifics of the denial, however the person who the background check was run on would be able to obtain this information from CoreLogic" (¶ 9) and does "not know the facts behind the criminal background findings" (¶ 28); Ex. A to Ex. 8, CHRO Transcript at 50:16-25, 68:5-14; Ex. 9 (Email from WinnResidential regional manager to CoreLogic account executive asking if there's "a way for us to determine if the

records related to this denial [of Mikhail Arroyo's application] are the same as the charges referenced in the attached docs from the Commonwealth of Pennsylvania?").

40.     **WinnResidential made the decision to reject the application for tenancy.** *See* **Arroyo Dep. 26:10-18; 92:5-13.**

<u>Response</u>:

Deny that WinnResidential was the sole decision-maker because CoreLogic, through its CrimSAFE product, made the initial decision. *See*, e.g., Ex. 10 (CoreLogic response to WinnResidential's Request for Proposals) at 12 (stating, *inter alia*, that with CrimSAFE, "criminal record search results are evaluated using our own advanced, proprietary technology and *an accept/decline leasing decision is delivered to your staff*" (emphasis added)); Ex. 11, Thomas Dep. at 82:14-19 (testimony from CoreLogic's former Director of Product Solutions and Vice President of Sales stating "I mean, we know what [CrimSAFE's] purpose is, right?  Everybody agrees it's to automate a screening decision based on the clients' criteria."); Ex. A to Ex. 8, CHRO Transcript at 63:17-20 (discussing the "initial decision made by CoreLogic" as to the Arroyo application) and 71:5-8 (testimony from WinnResidential stating that CoreLogic provides a decision).

41.     Ms. Arroyo claims that WinnResidential did not provide that detail to her, which was available to WinnResidential from the time the report was run. *See*

Arroyo Dep. 41:22-42:3; *see also* Kayani Decl. at ¶ 5.

<u>Response</u>:

Admitted that Ms. Arroyo claims WinnResidential did not provide that detail

to her.   Defendants present no admissible evidence to support its claim that the

details about Mr. Arroyo's criminal record "was available to WinnResidential from

the time the report was run."   The paragraph cited from Mr. Kayani's declaration

claims that Exhibit B is "a true and accurate copy" of "another report" – this one

containing the detailed criminal record – that CoreLogic made available to

WinnResidential on April 26, 2016.  Plaintiffs object to Defendant's reliance on

Exhibit B to the Kayani Declaration because it is dated (and was generated) more

than two years later – May 3, 2018 – and thus could not be an authentic copy of a

report provided to WinnResidential in 2016.  Further, the Kayani Declaration is not

signed.  To the extent a response is required, Disputed that the details about Mr.

Arroyo were provided to WinnResidential on April 26, 2016.   *See* Arroyo Tenant

Screening Report, Ex. __ to Plaintiffs' Statement of Facts (Doc. __) at __; Sworn

Answer of WinnResidential, Ex. 4 at ¶¶ 9, 22-23, 28-29 (stating, *inter alia*,

WinnResidential was "not privy to the specifics of the denial, however the person

who the background check was run on would be able to obtain this information

from CoreLogic" (¶ 9) and does "not know the facts behind the criminal

background findings" (¶ 28); Ex. A to Ex. 8, CHRO Transcript at __; Ex. 9 (Email

from WinnResidential regional manager to CoreLogic account executive asking if

there's "a way for us to determine if the records related to this denial [of Mikhail

Arroyo's application] are the same as the charges referenced in the attached

docs from the Commonwealth of Pennsylvania?").

42.     Ms. Arroyo had numerous contacts with WinnResidential in 2016 and 2017, where she explained that Mikhail Arroyo was disabled and asked for further details on the denial but WinnResidential decided not to reverse its housing decision. *See* Arroyo Dep. 38:21-24; 90:16-91:7.

   Response:

   Admitted that Ms. Arroyo had numerous contacts with both WinnResidential and CoreLogic where she explained that Mikhail Arroyo was disabled and asked for further details on the denial.  Deny that WinnResidential decided not to reverse its housing decision because after Plaintiffs provided information to WinnResidential about Mikhail Arroyo's criminal record that they obtained on their own directly from the Commonwealth of Pennsylvania, WinnResidential agreed to overlook Mikhail Arroyo's criminal record and accept him as a tenant.  Ex. A to Ex. 8, CHRO Transcript at 16:19-17:13, 68:5-71:10, 52:17-24; Arroyo Dep. at 123:2-10.

43.     Ms. Arroyo, with the help of the Connecticut Fair Housing Center, sued WinnResidential in an administrative proceeding for failing to reasonably accommodate Mikhail Arroyo's disability by refusing to admit him to WinnResidential. *See* Arroyo Dep. 122:9-17.

   Response:

   Admitted.

23

44.     As a result of the administrative action, a settlement was reached that allowed Mikhail Arroyo to move into the complex. *See* Arroyo Dep. 123:2-10.

Response:

Admitted that at some point during the pendency of the administrative action, WinnResidential allowed Mikhail Arroyo to move into the complex.  The materials cited by Defendant do not support the claim that Mr. Arroyo was allowed to move in because of "a settlement."  Disputed that Mr. Arroyo was allowed to move in as part of a settlement.  Rather, WinnResidential allowed him to move in as a reasonable accommodation after Plaintiffs provided them with details about Mr. Arroyo's criminal history that they had located on their own Ex. A to Ex. 8, CHRO Transcript at 16:19-17:13, 68:5-71:10, 52:17-24; Arroyo Dep. at 123:2-10.


45.     Plaintiffs admit they are not aware of any other conserved individual who has requested a file disclosure from RPS. *See* Pls' Resp. to RFAs, Response to Request No. 11.

Response:

Admitted.


46.     During the litigation process for this case, Ms. Arroyo was provided with a copy of the file disclosure, and she has now moved into a single-family home where she intends to remain. *See* Arroyo Dep. at 6:22-7:7; *see also* Barnard Decl.

at ¶ 35.

<u>Response</u>:

     Admitted that Defendant provided Plaintiffs' counsel with a copy of Mr. Arroyo's consumer file after requesting and receiving an up-to-date conservatorship certificate, even though the seal was illegible on the scanned duplication of the certificate that Plaintiffs provided. *See* Plaintiffs' Response to Defendants' Addition Material Fact No. 33, *supra* at ¶ 33.


Dated:  October 18, 2019, 2019          Respectfully submitted,


*/s/  Greg Kirschner*
Greg Kirschner (ct26888)
Salmun Kazerounian
Sarah White
CONNECTICUT FAIR HOUSING CENTER
60 Popieluszko Ct.
Hartford, CT  06106
Tel.:  (860) 247-4400
greg@ctfairhousing.org

Eric Dunn (*PHV*)
NATIONAL HOUSING LAW PROJECT
1663 Mission St., Suite 460
San Francisco, CA  94103
Tel.:  (415) 546-7000
edunn@nhlp.org

Joseph M. Sellers (*PHV*)
Christine E. Webber (*PHV*)
Brian C. Corman (*PHV*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., N.W.
Suite 500
Washington, D.C.  20005
Tel.:  (202) 408-4600
jsellers@cohenmilstein.com

**cwebber@cohenmilstein.com**
**bcorman@cohenmilstein.com**