# EXHIBIT 1

CONFIDENTIAL

Page 2

1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF CONNECTICUT

3

4        _____

                                    )

5        CONNECTICUT FAIR HOUSING    )

         CENTER, et al.,            )

6                                    )

                 Plaintiffs,        )

7                                    )

            vs.                     )    No. 3:18-CV-705 (VLB)

8                                    )

         CORELOGIC RENTAL PROPERTY   )

9        SOLUTIONS, LLC,            )

                                    )

10               Defendant.         )

         _____)

11

12

13

14           Deposition of ANGELA BARNARD, Volume I,

15      taken on behalf of Plaintiffs, at 550 West

16      C Street, Suite 800, San Diego, California,

17      beginning at 8:55 a.m. and ending at 4:06 p.m., on

18      Monday, September 16, 2019, before ELAINE SMITH,

19      RMR, Certified Shorthand Reporter No. 5421.

20

21

22

23

24

25

1    themselves?

2        A    Not to my knowledge specific to disabilities.

3        Q    Any training specific to handling requests from

4    individuals who had power of attorney or other legal

5    authority to act on behalf of an individual due to the

6    individual's lack of capacity?

7        A    There is training specific to power of

8    attorney.  That's more on the data entry side of the

9    house, the fulfillment side, validating the

10   documentation that we've received.

11       Q    And do you cover only power of attorney

12   documents, or do you cover other forms of legal

13   authority that can be granted such as conservatorship?

14       A    The procedure outlines specifically power of

15   attorney, which is a written procedure.  And that same

16   procedure also identifies if you have an instance of

17   another third party or some other type of request, and

18   that's not stated whether it's a conservatorship or some

19   other kind of, you know, third-party authority over

20   someone.  It's to escalate that.

21       Q    And where do escalations go?

22       A    Generally, the escalations will start with a

23   leader or a supervisor of the team, and then, depending

24   upon the situation, it could go to our internal

25   compliance team.  And then they can determine where they

CONFIDENTIAL

Page 73

1     would like to take it from there.

2          Q    Is compliance part of the operations

3     section that you're senior leader of?

4          A    No.

5          Q    Turning back to Exhibit 6, on page ARROYO 99,

6     looking at 5.1.4, when reviewing a manual authentication

7     form, you verify that that includes name, address, date

8     of birth, Social Security number, and signature; is that

9     correct?

10         A    Yes.

11         Q    And then the name and address has to be the

12    same as the name and address on the photo ID that is

13    provided?

14         A    Yes.

15         Q    What if the photo ID is a passport which

16    doesn't contain an address?

17         A    Our authentication procedure will call out the

18    acceptable proofs of identification, so we may require

19    an additional document.

20         Q    To establish the address?

21         A    Yes.

22         Q    So if an individual has moved and not gotten

23    their new driver's license yet with their new address,

24    they wouldn't be able to get a report through the manual

25    authentication process until they had obtained a new

Page 82

1      have.  So it's just any third party.

2          Q   Is there anything in Exhibit 7 that addresses

3      specifically individuals with disability?

4          A   No, I don't believe there is.

5          Q   Did you have any written procedure governing

6      requests for reasonable accommodation by individuals

7      with disability?

8              MR. ST. GEORGE:  Object to form.

9              THE WITNESS:  We did not, to my knowledge, have

10     a written procedure that covered that.  The process

11     would be to escalate those types of requests.

12     BY MS. WEBBER:

13         Q   And when you refer to escalation, would that be

14     as you did before, meaning it would go to a team lead?

15         A   It would go to a team lead, a supervisor or

16     manager, then to our compliance team.  The compliance

17     team would determine what to do with that.  It could be

18     all of those steps.  It may stop at one step if it's

19     resolved.  It just depends on the circumstance.

20         Q   Do team leads have authority to provide

21     reasonable accommodations?

22         A   A team lead would generally consult with a

23     supervisor or a manager before providing any type of

24     accommodation.

25         Q   And when you say supervisor or manager, is a

Page 83

1      manager at a higher level of authority than a

2      supervisor?

3           A    Yes.

4           Q    Okay.  Would supervisors or managers have

5      authority to approve reasonable accommodations?

6           A    Yes, they could.

7           Q    Would there be limitations on their authority

8      where they would sometimes need to seek input from

9      compliance or others?

10          A    Yes.

11          Q    What is the scope of their authority with

12     respect to reasonable accommodations?

13          A    It would be instances in which they have had a

14     situation occur in the past.  So something that was new,

15     we've never seen it before, we're not familiar with what

16     to do with this process, nor what it means from a legal

17     perspective, we would escalate those.

18          Q    And is the ultimate authority the compliance

19     department, or is there some higher-level authority?

20          A    We would -- we would escalate it to the

21     compliance team, and then there is internal counsel,

22     potentially external counsel, that could be consulted.

23     It just depends on how that compliance individual

24     escalates that.

25          Q    Turning back to Exhibit 7, the procedure guide

CONFIDENTIAL

Page 99

1      A   I believe she was.  It was around '15, '16 that

2   she joined the team.

3      Q   And is currently the supervisor of that team?

4      A   Yes.

Page 112

1          A    Yes.

2          Q    And would those requests that you track include

3     tracking any requests made by somebody on behalf of the

4     consumer or the third party-type requests we've talked

5     about?

6          A    Yes.  Can I clarify that?

7          Q    Sure.

8          A    So the tracking would just consist of whatever

9     we received from that third party.  We don't categorize

10    or identify third-party requests in a way to be able to

11    produce a report, if that was your question.  I just

12    want to clarify that.  We do have notes and things, but

13    we don't have a tracking mechanism by which, say, here's

14    all of the third-party requests.

15         Q    Got it.  When you're recording data, there's

16    not, like, a checkbox that would designate this is a

17    third party on behalf of the consumer?

18         A    Correct.  Not for my team, no.

19         Q    Got it.  Okay.  Other than requests from

20    consumers for disclosure of their file and requests from

21    landlords or properties through the CrimSAFE or other

22    product that they may use, are there any other

23    individuals outside of CoreLogic itself who would have

24    the ability to get access to the consumer files that you

25    maintain?

Page 119

1          MR. ST. GEORGE:  We can go off the record.

2          (Recess 12:08 p.m. to 12:50 p.m.)

3    BY MS. WEBBER:

4       Q   In preparation for the deposition today, did

5    you review the record of contacts between persons

6    reaching out to CoreLogic on behalf of Mikhail Arroyo

7    and the consumer relations department?

8       A   Yes.

9       Q   Based on your review, was the Arroyo request

10   handled correctly within the established procedures in

11   effect in 2016?

12      A   Yes.

13      Q   In light of what you've learned in the course

14   of reviewing these materials, would you change any of

15   your procedures or guidance that you give to CSRs or DE

16   employees?

17

18

19

20

21

22

23

24      Q   My question is just, as the senior leader over

25   operations, having recently reviewed the events

CONFIDENTIAL

Page 120

1    surrounding Arroyo's consumer file, is there any change

2    that you would like to see take place in either the

3    written procedures or training and guidance that's given

4    to employees in consumer relations?

5    ▌           ██████████████████████

6    ████████████████████████████████

7    ███████████     ████████████████████████

8    ████████████████████████████████

9        ██████████████████████

10       Q    Do you think that having something in writing

11   identifying conservatorships and other recognized legal

12   authorities in addition to power of attorney would be

13   appropriate?

14            MR. ST. GEORGE:  Object to form.

15       ██████████   ████████████████████

16   ██████████████   ████████████████████

17   ███████████████████████████     █

18   ████████████████████████████████

19   ██████████████████████

20   ██████████████████████████

21   ██████████████████████

22   BY MS. WEBBER:

23       Q    Excuse me.  When you say this is the only

24   request based on conservatorship that you're aware of,

25   did you do anything to attempt to determine if there had

CONFIDENTIAL

Page 121

1    been any other requests made by conservators to

2    CoreLogic's consumer relations department at any time in

3    the last several years?

4    ▮ ████████████████████████████

5    ██████████████████████████████████

6    ████████████████████████████

7    ██████████████████████████████

8    ████████████  ██████████  ██████████████

9    ██████████████████████████████

10   ██████████████████████  ████████████████████

11   ████████████████████████████

12   ████████████████

13        Q    And I think you said that Ms. Fahn became

14   supervisor in 2015 or '16.

15        A    Yes.

16        Q    So if it happened before 2015, she would not

17   have any reason to be aware of it?

18        A    Correct.

19        Q    Aside from -- or I mean -- I don't mean aside

20   from.  But one of the topics on which you were

21   designated, Topic 15, concerned any instances in the

22   past five years where a consumer substitute

23   decision-maker, which could include the conservator but

24   could include power of attorney or other legal forms,

25   requested the consumer file.  What did you determine

Page 122

```
 1        about how many instances in the past five years have

 2        included requests from somebody with legal authority to

 3        act on behalf of the consumer?

 4             A    Is that a question of how many?

 5             Q    Uh-huh.

 6             A    To this -- my knowledge, this is the only one

 7        that I'm aware of.

 8             Q    Well, this is the only one that you're aware of

 9        with a conservator?

10             A    Yes.

11             Q    But you understand there's other legal

12        mechanisms through which somebody can obtain authority

13        to act on behalf of somebody else?

14             A    Yes.

15             Q    One of those is power of attorney?

16             A    Uh-huh.

17             Q    There are others as well.  How many of any of

18        these -- whether it's conservator, power of attorney or

19        some other legal formulation, how many of those requests

20        have been made to CoreLogic in the past five years?

21        ██ ████████████████████████    ██████████████

22        ███████████████████████████

23             Q    Did you -- did you ask anybody -- as you did

24        about conservatorship, did you ask anybody about how

25        often power of attorney or other similar authority is
```

CONFIDENTIAL

Page 123

1    the basis of a request for a consumer file?

2        A   I did.

3        Q   And what were you told about that?

4        ▋ ████████████████████████████████

5    ██████████████████████████████████████

6    ███████████████████   ███████████████████

7    ████████████████████████████████████

8    ████████████████

9        Q   And so you also haven't reviewed the specific

10   process that was used in handling such requests?

11       A   The process would be the process that we have

12   ██████████   ██████████████████████████

13   ████████████████████████████

14   ████████████

15   ▋ ██████████████████████████

16   ██████████████████████████

17   ██████████████████████████

18   ████████   ████████████████████

19   But you haven't been able to review anything to identify

20   what actually happened to see if that process was

21   followed in the specific instances where a POA or

22   similar legal authority was the basis of a request?

23       A   No.

24       Q   Excuse me.  And you also are not prepared today

25   to testify as to the outcome of such requests?

CONFIDENTIAL

Page 124

1        A    No.  Other than the outcome would either be

2    providing a consumer file disclosure or not.

3        Q    Other than talking to Jessica Fahn, is there

4    anything else you did to attempt to obtain information

5    about instances in which a third party with legal

6    authority such as a power of attorney or conservator

7    requested a consumer file?

8    █ ████████████████████████████████████

9    ████████████████████

10       Q    Can you spell that?

11       A    E-L-I-E-L M-O-L-I-N-A.

12   █ ████████████████████████

13   A ████████████████████████ ██████████

14   ██████████ ████████████████████████████

15   ████████████ ████████████████████████

16   ██████████████████████████████ ██████████

17   ██████████ ██████████████████████████

18   ██████████████████████████████████

19   ████████████████████████

20   █ ████████████████████████████████

21   ████████████████████████

22   █ ████████████████████

23       Q    So about 2017?

24       A    Yeah.

25       Q    Is that the position that was previously held

Page 132

1        A    No.   This is the -- looks like the receipt of

2    documentation.   Whereas Hope, the previous DE person,

3    was just mailing out a letter, this is reviewing

4    documents and sending a letter.

5        Q    It appears that Mr. Thevenot determined that

6    the documents submitted were not sufficient, because it

7    says not authenticated?

8        A    That's the note that he entered, yes.

9        Q    On what basis did he decide that that was not

10   sufficient?

11       A    Based on the notes, we -- it looks like we

12   asked for the power of attorney and the son's signature.

13   We cannot accept a conservatorship court paper.

14       Q    And how would Mr. Thevenot have determined that

15   you cannot accept a conservatorship court paper?

16

17

18

19

20       Q    He doesn't refer to talking to anybody;

21   correct?

22       A    No.

23

24

25

Page 133

1  

2  

3  

4  

5       A   Not from the note.

6       Q   And by June 30th, CoreLogic had already been

7 informed that Mr. Arroyo was handicapped and not able to

8 sign anything; correct?

9       A   Yes.

10       Q   Nonetheless, Mr. Thevenot sent a letter back

11 saying the son's signature was required; correct?

12       A   Yes.

13       Q   Is that following proper procedure?

14  

15  

16       Q   Turning to the next note, this is from a user

17 S-C-H-A.  Do you know who that is?

18       A   Yes.

19       Q   Who is that?

20       A   Seng, S-E-N-G C-H-A.  Seng Cha.

21       Q   I forgot to ask.  Is Mr. Thevenot still

22 employed?

23       A   No.

24       Q   Do you know when he left?

25       A   2017.

CONFIDENTIAL

Page 134

1          Q    Is Seng Cha still employed?

2          A    No.

3          Q    And when did Seng Cha leave?

4          A    The beginning of 2019.

5          Q    What was Seng Cha's position in 2016?

6          A    She was a data entry and mostly handled letters

7     and incoming requests from consumers.

8          Q    Okay.  Her note ends with a comment that "Per

9     Jessica and Mike, we cannot accept conservatorship court

10    paper."  Is Jessica Jessica Fahn?

11         A    Yes.

12         Q    And is Mike Mike Scully?

13         A    Yes.

14         Q    Did you talk to Jessica about this note in

15    particular?

16         A    No.

17         Q    Did you talk to Mike about this note?

18         A    No.

19    █ ███████████████████████████████████████

20    ████████████████████████████████████

21    ██████████████

22         A    I did.

23         Q    What did she say?

24         A    She said I need to look at the notes.  And she

25    looked at the notes and said, yes, I remember this

Page 135

1    consumer but could not give me any details about the

2    case because it was so long ago.  She just referred back

3    to the notes that were here.

4        Q   Did she say anything suggesting the note was

5    inaccurate when it attributed to her the position that

6    she could not accept or that CoreLogic could not accept

7    the conservatorship as authorization?

8        A   No.  Sorry.

9            (Telephonic interruption.)

10           MR. ST. GEORGE:  Hold on one second.

11           (Recess.)

12   BY MS. WEBBER:

13       Q   Okay.  Did you talk to Mike Scully about what

14   he recalled regarding the Arroyo consumer file?

15       A   I did not.

16       Q   Would Jessica have had authority in 2016 to

17   determine that CoreLogic would not accept

18   conservatorship court papers?

19   ██  ██████████████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████████

22   ██  ████████████████████████████████████████

23   ██████████████████████████████████

24   ██  ████████████████████████████████████

25   ████████████████████████████████████████

Page 136



13      A    She couldn't recall because it was quite a

14   while ago.

15      Q    When did you speak to her about it?

16      A    I spoke to her about it last week after I

17   talked to the attorney about the case.

18      Q    It appears that Seng Cha entered her note on

19   the same day as Drew Thevenot entered his note.  Do you

20   know why both individuals would be dealing with the same

21   request on the same day?

22      A    So it looks like Seng received the request from

23   

24   was a determination to mail the call-back letter to the

25   consumer, and the ticket to send the call-back letter

Page 137

```
 1      was submitted, and that's what Drew processed.  So Seng

 2      is making a note of received disclosure form, and Drew

 3      is making a note that he mailed the call-back letter.

 4           Q    Do you know why -- the other screenshots sort

 5      of appear in the order in which things occurred.  Do you

 6      know why Drew's note would appear before Seng Cha's

 7      note?

 8           A    No, I don't.

 9           Q    Turning to the next page of Exhibit 11, the

10      note dated September 7th, 2016, do you see that?

11           A    Yes.

12           Q    This has a user of Mon Johnson.  Do you know

13      who Mon Johnson is?

14           A    Yes.

15           Q    Who is that?

16           A    Monica Johnson.

17           Q    What was her position?

18

19

20           Q    Is Ms. Johnson still employed?

21           A    Yes.

22           Q    And in the same position?

23           A    Yes.

24           Q    Did you talk to her about this note?

25           A    No.
```

Page 138

1    Q   Or anything else about the Arroyo matter?

2    A   No.

3    Q   And this note reports that -- that the

4    consumer's mother, Ms. Arroyo, was calling about the

5    documents that she faxed from June of 2016.  And the

6    note states, "Advised yes and per management unable to

7    use information."  Do you know who -- who does

8    management refer to in this group?  Are there certain

9    individuals who are deemed management?

10   ▌   ███████████████████████████████████████████████

11   ███████████████████████████████████████

12   Q   And so you don't know if Ms. Johnson spoke to

13   Ms. Fahn or Mike Scully or somebody else?

14   A   I don't know.

15   Q   And so as of September 2016, you had been

16   informed that Mr. Arroyo was disabled and unable to

17   speak or sign his name and been presented with papers

18   from a court saying that Ms. Arroyo was authorized to

19   act on his behalf, but you continued to direct the --

20   Ms. Arroyo to get a power of attorney signed by Mikhail

21   Arroyo; correct?

22   A   I don't know if it was directing a power of

23   attorney signed by him, but a power of attorney based on

24   these notes, yes.

25   Q   Are you aware of what would be required to

Page 139

1    obtain a power of attorney?

2         A    No, I'm not.

3         Q    So you don't know whether or not it's legally

4    possible for somebody who has been found to lack legal

5    capacity to give anybody else a power of attorney?

6         A    I'm sorry.  I don't understand your question.

7         Q    You don't know if it's even legally possible

8    for somebody who is incapacitated to provide somebody

9    else a power of attorney?

10        A    No, I don't.

11        Q    Turning to the next note, dated November 1st,

12   2016, this one has the user B Salazar.  Who is that?

13        A    Bertha Salazar.

14        Q    And what position did Ms. Salazar hold in 2016?

15        ██    ████████████████████████████████████████

16        Q    Is she still there?

17        A    Yes.

18        Q    Same position?

19        A    Yes.

20        Q    And her comment was "CCI checking."  What is

21   CCI?

22        A    I don't know what the acronym stands for.

23        Q    Did you talk to Ms. Salazar about this note?

24        A    No.

25        Q    Did you ask anybody else what CCI stood for?

Page 140

1        A    No.

2        Q    This note ends with "Transferring call to Tina

3   Marie."  Is that referring to Tina Marie Santos?

4        A    Yes.

5        Q    And under what circumstances would a customer

6   service -- wait.  I'm sorry.  CSR.

7        A    That's fine.

8        Q    Okay.  Under what circumstances would a CSR

9   associate transfer a call to Ms. Santos, who I think you

10   ████████████████████████████

11        A    In the situation where they -- the consumer may

12   ███████████████████████████████████████████████████

13   ███████████████████████████████████████████████████████

14   It depends on the circumstance, if the person just

15   doesn't know how to handle the request.

16        Q    Turning to the next note, also dated

17   November 1st, this shows a user of T Santos.  So that

18   would be Tina Marie?

19        A    Yes.

20           █   ██████████████████████████   ████████████

21   ██████████████████████

22           █   ████████████████████████

23           █   █████████████████████████████████████████

24   ██████████████████████████████

25           █   ████████   ████████████████████████

Page 141

1          Q     Now, this note says that "We have to get



25          Q     So with the first call being on April 27th

Page 142

1    mentioning that her son's disabled and she's his

2    conservator, the first time that the issue of how to

3    ████████████████████████████████████████████████

4    November 1st of 2016?

5         A    Based on the notes and then based on

6    information I could get from individuals' recollection

7    of two-plus years ago, yes.

8         Q    As somebody with authority over the customer

9    relations department, are you satisfied with that length

10   of time between being provided information about

11   Mr. Arroyo's disability and conservatorship and when the

12   issue was actually escalated to compliance?

13            MR. ST. GEORGE:  Object to form.

14            THE WITNESS:  We would like to get things done

15   as quickly as possible for consumers.  This was a unique

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████████

19   ████████████████████████████████████████████████

20   believe, some requests that we sent to the consumer that

21   are not noted here, perhaps, where she wasn't

22   communicating back with us.  But this is a large amount

23   of time.

24   BY MS. WEBBER:

25        Q    Over six months; right?

CONFIDENTIAL

Page 143

1        A   Yes.

2        Q   And given how unique and unusual it was,

3   wouldn't it have behooved Mr. Salgado or Ms. Silva to

4   ███████████████████████████████████████████████████

5   untangle what to do with a conservatorship in the first

6   instance rather than continuing to request the POA and

7   other documents instead?

8            MR. ST. GEORGE:  Object to form.

9            THE WITNESS:  That's reasonable, yes.

10  BY MS. WEBBER:

11       Q   The next note is dated November 4th, another

12  call from Ms. Santos to -- she says consumer's mother,

13  to Ms. Arroyo, letting her know "We are still waiting

14  ████████████████████████     ██████████████████████████

15  provided.  Is that the phone number she would have been

16  calling?

17       A   I believe so, yes.

18       Q   We talked before about incoming phone calls

19  being recorded.  Are outgoing phone calls also recorded?

20         ██  ████████████████████████████████████████████

21  ██████████████████████

22       Q   Is it possible -- not possible.  When a team

23  lead like Ms. Santos was making outgoing phone calls to

24  consumers, would you expect her to do those from a queue

25  that would lead to the call being recorded?

Page 152

1           MS. WEBBER:  I'm not asking about her

2     response -- I'm not asking her about communications with

3     legal.  I'm asking, as a matter of fact, if CoreLogic's

4     determination as of November 16, 2016, was that it had

5     an acceptable conservatorship document.  And then I'm

6     going to ask what -- you know, what more was needed in

7     order to produce the report.

8     BY MS. WEBBER:

9           Q    But can you answer the preliminary question

10    first?

11          A    No.

12          Q    It was not acceptable?

13          A    Correct.

14          Q    What was unacceptable about it?

15          A    The seal was not visible, and the document

16    stated that this is not valid unless the seal is

17    present.

18          Q    Did CoreLogic ever receive a copy of the

19    conservatorship document that it believed had an

20    acceptable seal?

21          A    No.

22          Q    What was considered to be an acceptable seal?

23          A    It would need to be the original document with

24    the embossed seal on it.

25          Q    Turning back to the notes that are Exhibit 11,

Page 162

1    international, you know, tax number or tax

2    identification number.  So if a consumer doesn't have a

3    ████████████████████████████████████████████████████

4    ██████████████████████████████████████████

5         Q    ITN is an individual tax identification number?

6         A    Yes.

7         Q    If you had -- a foreign national wouldn't have

8    a Social Security number and is in the United States

9    studying, attending school, and, therefore, no income,

10   is not a taxpayer, they wouldn't have either SSN or ITN;

11   correct?

12        A    That sounds reasonable.

13        Q    So they can't get a copy of a consumer report?

14             MR. ST. GEORGE:  Object to form.

15   ███████████████████    ████████████████████████████████████

16   ██████████████████████

17   BY MS. WEBBER:

18        Q    None of the notes we saw indicated that there

19   was a problem with the form submitted by Ms. Arroyo

20   because she failed to include a Social Security number;

21   correct?

22             MR. ST. GEORGE:  Object to form.

23             THE WITNESS:  Not that I saw.

24   BY MS. WEBBER:

25        Q    Okay.  Turning to the second page of

Page 166

1 ███████████

2      Q   Do you know if there was ever a determination

3 as to whether the seal was adequate?

4      A   Yes.  I do know that there was a determination

5 that it was not.

6      Q   But the one specifically on 577 or a different

7 iteration?

8      A   I couldn't tell you which iteration.

9      Q   Okay.  The following page of Exhibit 14

10 includes copies of a driver's license for both

11 Mr. Arroyo and Ms. Arroyo.  Was that sufficient for your

12 needs in terms of having copies of ID?

13      A   Yes.

14      Q   So based on the notes that we reviewed in

15 Exhibit 11, it would have been Seng Cha who reviewed

16 what's been marked as Exhibit 14 and determined that

17 that was not adequate?

18      A   Yes, Jessica -- Seng Cha.  There's a note that

19 references Jessica and Mike as well.

20      Q   Do you know if Jessica and Mike actually

21 reviewed the documentation or just --

22      A   I don't know.

23      Q   Okay.  And the note doesn't say anything about

24 missing Social Security number, does it?

25      A   No.

Page 167

1          Q   And it doesn't say anything about the seal;

2     correct?

3          A   No.

4          Q   And it doesn't say anything about where she

5     signed, only that you wanted her son to sign; correct?

6          A   Correct.

7          Q   So based on the notes on June 30th, no reason

8     to believe that anyone ever informed Ms. Arroyo that she

9     needed to provide the Social Security number; correct?

10              MR. ST. GEORGE:  Object to form.

11              THE WITNESS:  Not specifically, no.

12     BY MS. WEBBER:

13          Q   And do you know what, if anything, was sent to

14     Ms. Arroyo following the June 30th note?

15          A   The notes indicate that she was sent a

16     call-back letter.

17          Q   And what's a call-back letter?

18          A   A call-back letter is a letter that we would

19     mail out to the consumer stating that we need to speak

20     to you regarding your request, please contact us.

21              MS. WEBBER:  Exhibit 15.

22              (Exhibit 15 was marked for identification by

23          the court reporter and is attached hereto.)

24     BY MS. WEBBER:

25          Q   Do you recognize what's been marked as