# EXHIBIT 2

**NANCY B. ALISBERG, J.D.**
**80 Fox Chase Lane**
**West Hartford, CT. 06117**
nancy.alisberg@gmail.com
**860-716-6713**

April 15, 2019

Salmun Kazerounian, Staff Attorney
Connecticut Fair Housing Center
60 Popieluszko Court
Hartford, CT. 06105

Dear Mr. Kazerounian:

    The following letter comprises my written report with respect to the above-titled case.

As is required by Fed. R. Civ. P. 26(a)(2)(B), this report will contain:

    (i)    a complete statement of all the opinions I will express, and the basis and reasons for those opinions;

    (ii)    The facts or data I considered in forming those opinions;

    (iii)    My qualifications are contained in the accompanying CV. I practiced law from 1983-2018 when I retired. During that time, I practiced civil rights law, including disability law. Since 2000, I practiced exclusively in the field of disability rights. In my practice I had many clients who were conserved. I was required to know the standards for conservatorship and the rights of both the conservator and the conserved person. I have authored no publications in the previous ten years;

    (iv)    I have not previously testified as an expert at trial or by deposition, so there is no accompanying list of cases; and

    (v)    I am being compensated at the rate of $200/hour for the research and writing the report. I will be compensated at the rate of $200/hour for testimony at deposition or trial. I will be reimbursed for necessary travel expenses.

    I was asked to write a report regarding the population subject to involuntary conservatorships in Connecticut to opine as to (1) whether, and to what degree, people who are involuntarily conserved are disproportionately likely to be individuals with disabilities as defined by the Fair Housing Act as compared with the general population, and (2) whether, and to what

degree, people who are involuntarily conserved are less likely than the general population to have the capacity or ability to designate an attorney-in-fact. My expert opinion is that people who are involuntarily conserved are indeed disproportionately more likely to be individuals with disabilities as defined by the Fair Housing Act as compared to the general population. It is also my opinion that people who are involuntarily conserved are less likely than the general population to have the capacity or ability to designate an attorney-in-fact, commonly known as a Power of Attorney. Finally, as the answer to these questions is merely a matter of logic as will be seen below, no statistical analysis is necessary.

The data I used to form my opinion is as follows:

1) Conn. Gen. Stat. §§ 45a-644, 649, 650, 562, 653, 655, 656, 660.

2) 2013 Connecticut General Statutes Title 45a – Probate Courts and Procedure Chapter 802e – Durable Power of Attorney Section 45a-562 – (Formerly Sec. 45-690). Power of Attorney to survive disability or incompetence.

3) Incapacity, Powers of Attorney & Adoption in Conn. § 2.7 (3d) (2019)

4) Incapacity, Powers of Attorney & Adoption in Conn. § 2.7 (3d)(2019).

5) Conn. Gen. Stat. §§ 1-350a, 350c, 350d, 350e, 350g., 350i.

6) OLR Research Report, Power of Attorney-Mental Capacity, Feb. 11, 2002, 2002-R-0094

7) Public Act No. 16-40, An Act Concerning Revisions to the Connecticut Uniform Power of Attorney Act.

8) OLR Bill analysis, 20016 SB 142, An Act Concerning Revisions to the Connecticut Uniform Power of Attorney Act and Adoption of the Connecticut Uniform Recognition of Substitute Decision-making Documents Act.

9) OLR Bill analysis, 20016 SB 142 (as amended), An Act Concerning Revisions to the Connecticut Uniform Power of Attorney Act and Adoption of the Connecticut Uniform Recognition of Substitute Decision-making Documents Act.

10) 42 U.S.C. § 3602.

11) 24 C.F.R. § 100.201, 202.

12) Connecticut Probate Courts, 2016-2017 Biennial Report.

13) Connecticut Standards of Practice for Conservators, 2018.

1) <u>Whether, and to what degree, are people who are involuntarily conserved disproportionately more likely to be individuals with disabilities as defined by the Fair Housing Act as compared to the general population?</u>

The simple answer to this question is an unqualified yes. People who are involuntarily conserved are all more likely to be individuals with disabilities as defined by the Fair Housing Act as compared to the general population. A person who is found by a Connecticut probate court to require that a conservator of estate be appointed is someone who is "incapable of managing his or her own affairs." Conn. Gen. Stat. § 45a-644 (a). Similarly, a person who is found by a Connecticut probate court to require a conservator of person is an individual who is "incapable of caring for himself or herself." Conn. Gen. Stat. § 45a-644(b). A person is incapable of caring for one's self if the "person has a mental, emotional or physical condition that results in such person being unable to receive and evaluate information or make or communicate decisions to such an extent that the person is unable, with the appropriate assistance, to meet essential requirements for personal needs." The person is incapable of managing his or her affairs if that person "has a mental, emotional or physical condition that results in such person being unable to receive and evaluate information or make or communicate decisions to such an extent that the person is unable, even with appropriate assistance, to perform the functions inherent in managing his or her affairs." Conn. Gen. Stat. 45a-644(c) and (d).

The definition of disability[1] under the Federal Fair Housing Act is (1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

---

[1] The Fair Housing Act uses the term "handicap" rather than disability. The term "disability" is the preferred term of those with disabilities, and this report shall use that term exclusively.

3

(2) a record of having such an impairment, or (3) being regarded as having such an impairment. 42 U.S.C. § 3602(h). The regulations that enforce the Federal Fair Housing Act provide a further definition of the terms used in the statute.

> (a) Physical or mental impairment includes:
>
> (1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine; or
>
> (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. The term physical or mental impairment includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.
>
> (b) Major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.
>
> (c) Has a record of such an impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.
>
> (d) Is regarded as having an impairment means:
>
> (1) Has a physical or mental impairment that does not substantially limit one or more major life activities but that is treated by another person as constituting such a limitation;
>
> (2) Has a physical or mental impairment that substantially limits one or more major life activities only as a result of the attitudes of other toward such impairment; or
>
> (3) Has none of the impairments defined in paragraph (a) of this definition but is treated by another person as having such an impairment.

Clearly, not all individuals who have a disability under the Fair Housing Act would also be considered incapable of caring for themselves or managing their affairs and thus require a conservator under Connecticut law. Many thousands of people have different forms of

4

disabilities and are more than able to care for themselves and manage their affairs. Conversely, however, all individuals who are found to be incapable under Connecticut law and thus require a conservator, would meet the definition of disability under the Fair Housing Act. This is particularly clear because under the conservatorship statutes in Connecticut, an individual must be found to have a "mental, emotional or physical condition." Similarly, the Fair Housing Act also requires that the individual have a "physical or mental impairment." For the purposes of this report, the term "general population" means all people, both with and without disabilities. In the United States in general, only 12.7% of the general population is comprised of individuals with disabilities. In Connecticut, the figure is approximately 11%[2]  Thus, the remaining 87.3% of the general population are people who do not have disabilities, and these people would be neither conserved nor covered under the disability provisions of the Fair Housing Act. Therefore, the answer to the first question is an unequivocal "Yes." It is my opinion that people who are involuntarily conserved are disproportionately likely to be individuals with disabilities as defined by the Fair Housing Act.

2) <u>Whether, and to what degree, are people who are involuntarily conserved less likely than the general population to have the capacity or ability to designate an attorney-in-fact?</u>

Both the conservatorship statutes and the statutes governing power of attorney agreements provide significant guidance as to the effect of a subsequent conservatorship on a power of attorney. However, there is little guidance as to the ability of a conserved person to enter into a power of attorney agreement. Therefore, to answer this second question, one must look at the obligations of the conservator and then determine whether the conserved person retains any

---

[2] *See* Erickson, W., Lee, C., von Schrader, S. (2017). Disability Statistics from the American Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute (YTI). Retrieved from Cornell University Disability Statistics website: www.disabilitystatistics.org

5

rights that will permit them to enter into a contract - for a power of attorney is in effect just that – a contract for one person to act as a principal and another person to be delegated the authority to act as an agent.  Conn. Gen. Stat. § 1-350a.

While the conserved person does retain a certain amount of autonomy[3], the probate court requires that when an application for the appointment of a conservator is filed, the respondent receive notice stating that "if the [probate] application is granted and a conservator is appointed for you, *you will lose some of your rights*…. While the purpose of a conservator is to help you, you should be aware that *the appointment of a conservator limits your rights.*  Among the areas that may be affected are: Accessing and budgeting your money; Deciding where you live; Making medical decisions for you; Paying your bills; Managing your real and personal property." 45a-649(b) (emphasis added).  These are the very areas that impact upon the capacity of a conserved person to enter into a power of attorney.

---

[3] Conn. Gen. Stat. § 45a-656(b).  This autonomy is also described by the Connecticut Standards of Practice for Conservators 2018 at 4.

When making decisions on behalf of the conserved person, the conservator shall:

A. Seek a clear understanding of the issue, the available alternatives and the expected outcomes, risks and benefits of each alternative;
B. Encourage the conserved person to participate in the decision-making process; and
C. Follow the conserved person's preferences unless adherence would cause substantial harm.
Conserved Person's Current Preferences
The conservator shall seek to determine the conserved person's current preferences by asking the conserved person what he or she wants. The conservator shall arrange appropriate assistance if the conserved person has difficulty expressing what he or she wants.
Substituted Judgment
If the conserved person is unable to express current preferences, the conservator shall use substituted judgment to determine what the conserved person's preferences would have been if the conserved person currently had capacity. When using substituted judgment, the conservator shall look to the conserved person's past practices and past expressions of preferences and shall seek input from family, friends, professionals and others who are familiar with the conserved person.

The legislature has made clear that a conservator may not "be appointed if the respondent's personal needs and property management are being met adequately by an agency or *individual appointed pursuant to the provisions of sections 1-350g….*" Conn. Gen. Stat. § 45a-650(f)(3) (emphasis added).  Therefore, if an individual had entered into a power of attorney agreement prior to a petition for conservatorship, and if the court found that the individual's needs were being met, the court would deny the conservatorship petition.  The legislature also laid out nine factors for the courts to use to determine whether a conservator should be appointed.  The seventh of these factors requires the court to determine "whether the respondent had previously made adequate alternative arrangements for the care of his or her person or for the management of his or her affairs, including, but not limited to, the execution of a durable power of attorney, springing power of attorney…or the execution of any other similar document." Conn. Gen. Stat. § 45a-650(g).  Again, if the probate court found that a power of attorney provided "adequate alternative arrangements" then the court would deny the conservatorship petition.

More directly with respect to the question posed, the conservatorship statutes also provide that if an application for appointment of conservatorship is filed with the town clerk where the respondent owns real property, any contract entered into by the respondent between the time the application is filed and the ruling by the court on the conservatorship petition "shall not be valid without the approval of the court." Conn. Gen. Stat. § 45a-653(a).  Thus, if the respondent entered into a power of attorney agreement while a conservatorship application was pending, that power of attorney agreement would not be valid without approval of the court.  Furthermore, the probate court would still have to make an adequacy determination of the power of attorney when ruling on the application for conservatorship. If even a respondent to a conservatorship petition does not have authority to enter into a contract without court approval, it is reasonable to assume

7

that a person under a conservatorship similarly does not have such authority. Simply put, since the conservator of person has the "duty and responsibility for the general custody of the conserved person," that "general custody" can be read to include the ability to enter into a contract like a power of attorney. Conn. Gen. Stat. § 45a-656(a)(1).

If the conserved person had entered into a power of attorney agreement prior to the appointment of the conservator, when that conservatorship is terminated the court "shall order the reinstatement of any authority of any agent under a power of attorney that was previously limited of suspended by the court because of the conservatorship." Conn. Gen. Stat. § 45a-660(a)(1). Additionally, if after a power of attorney has been entered into before a court appoints a conservator, "the court may continue, limit, suspend or terminate the power of attorney…If the power of attorney is suspended pursuant to this subsection, then the power of attorney shall be reinstated upon termination of the conservatorship as a result of the principal regarding capacity." Conn. Gen. Stat. § 1-350g(b). Neither of these sections address the specific question as to whether a person under a conservator can enter into a power of attorney. However, given the scope of authority the conservator has over the conserved person, and given the necessity that the court determine whether a previously entered into power of attorney may continue, it would defy logic to believe that a person under a conservatorship can enter into a power of attorney. [4]

---

[4] There has been discussion in the literature regarding the effect of a conservatorship on the ability of a conserved person to contract. *See* Incapacity, Powers of Attorney & Adoption in Conn. § 2.6 (3d ed.) 2019.

> When a conservator has been appointed by the Probate Court following an adjudication that a person in incapable of managing his or her affairs, the effect of that appointment is to…render…him or her conclusively incapable of making valid contracts or conveyances while the conservatorship continues….In other words, the contracts of the incapable person are not simply voidable but absolutely void."

*Id.* (internal citations deleted). *See also* Incapacity, Powers of Attorney & Adoption in Conn. § 2.6 (3d ed.) 2019. "The appointment of a conservator deprives the conserved person 'of substantially all power over his estate.'" (Internal citations deleted"). Therefore, in 1969 the Connecticut Appellate Division of the Connecticut Circuit held that "someone who is not in a mental condition to contract and conduct his business is not in a condition to appoint an agent for that purpose. *Beaucar v. Bristol Fed. Sav. & Loan Assn.*, 6 Conn. Cir. Ct. 148 (1969).

This second question also asks me to opine on whether people who are involuntarily conserved are "less likely than the general population to have the capacity or ability to designate an attorney-in-fact." In the prior section, I determined that the term "general population" means both people who do and do not have disabilities and that 87.2% of this population comprise the sector that do not have disabilities.[5] Given that this group of individuals without disabilities would not have lost any of their rights to contract or to enter into a power of attorney, it is clear that at most only some segment of the 12.7% of the population with disabilities may have been found to be incapable and in need of a conservator and will therefore be unable to enter into a power of attorney and designate an attorney-in-fact. Again, the answer to the second question is an unequivocal yes. It is my opinion that people who are involuntarily conserved are less likely than the general population to have the capacity or ability to designate an attorney-in-fact.

Very truly yours,

_____
Nancy B. Alisberg, J.D.

Signed under the pains and penalties of perjury

Enclosed is a true and correct copy of my resume

---

[5] *See supra* at 5.

9

# NANCY B. ALISBERG
80 Fox Chase Lane
West Hartford, CT  06117
(h) 860 561-3310 (c) 860 716-6713 Nancy.alisberg@gmail.com

**EMPLOYMENT**

2017-18   **DISABILITY RIGHTS CONNECTICUT**                                                             Hartford, CT

*Founder* – One of the founders of the non-profit legal agency designated by Governor Malloy to be the protection and advocacy system for the State of Connecticut.  Instrumental in writing new agency by-laws and in selecting original board members.
*Legal Director* - Responsible for supervision of Legal Unit of agency that advocates for the civil rights of persons with disabilities within Connecticut.  Participated in hiring decisions.  Supervised staff attorneys and legal interns.  Worked extensively with Titles I, II, III and V of the Americans with Disabilities Act, § 504 of the Rehabilitation Act, and state anti-discrimination laws.  Lead attorney on all federal court litigation within agency, including individual cases and systemic class actions.  Advised Executive Director on disability related legal issues.  Collaborated with other civil rights and disability rights public and private agencies.

2000 -     **STATE OF CONNECTICUT OFFICE OF PROTECTION AND ADVOCACY FOR PERSONS**
2017       **WITH DISABILITIES**                                                                          Hartford, CT

MANAGING ATTORNEY – Responsible for supervision of Legal Unit of State agency that advocated for the civil rights of persons with disabilities within the state until 2017.  Supervised staff attorneys and legal interns.  Supervised Program Directors in Case Services Unit (2000-2008). Supervised Education Unit (2012-2014).  Supervised unit secretary. Worked extensively with Titles I, II, III and V of the Americans with Disabilities Act, § 504 of the Rehabilitation Act, and state anti-discrimination laws.  Provided legal support to advocates in case services unit. Participated in PPT meetings and mediations.  Lead attorney on all federal court litigation within agency, including individual cases and systemic class actions.  Drafted complaints, conducted discovery, wrote briefs and argued before administrative agencies, trial and appellate courts.  Freedom of Information Officer.  Advised Executive Director on disability related legal issues.  Wrote amicus briefs in state and federal courts.  Drafted testimony and testify at legislative public hearings.  Drafted comments on proposed state and federal regulations.  Collaborated with other civil rights and disability rights public and private agencies.

- *Served on Legal Committee of National Disability Rights Network 2008-2014. Chair from 2013-2014.*
- *Conduct trainings at NDRN annual meetings, speak at Disability Rights classes at UConn and Yale Law Schools, organized training with Connecticut Hospital Association on forced medications.*
- *Member of Connecticut Cross Disability Lifespan Alliance and 2020 Coalition.*
- *Certificate of Recognition for Outstanding Service and Performance from the United States Attorney's Office, District of Connecticut, 2015.*
- *Counsel in OPA v. Choinski, litigation against the Connecticut Department of Correction for failure to provide adequate mental health treatment in Supermax and mental health prisons.*
- *Counsel in OPA v. CT, Olmstead action on behalf of individuals with mental illness residing in nursing homes.*
- *Counsel in Blick v. Office of the Division of Criminal Justice opposing physician assisted suicide.*
- *Counsel in numerous actions opposing Do Not Resuscitate orders.*
- *Extensive work with Connecticut's Deaf Community.*
- *Award from Connecticut Association of the Deaf.*
- *Member of the Disability Rights Bar Association.*

1990 – 2000      **NEW YORK CITY COMMISSION ON HUMAN RIGHTS**                    New York, NY

SUPERVISING ATTORNEY 1996 – 2000:  Supervised Staff Attorneys and Human Rights Investigators.  Reviewed investigations and probable cause determinations for sufficiency.  Provided support to staff attorneys at mediations and public hearings.  Maintained caseload.

Nancy B. Alisberg

STAFF ATTORNEY 1990 – 1996: Responsible for cases alleging employment, housing or public accommodation discrimination at agency responsible for enforcing the City Human Rights Law. Mediated cases before agency mediation division. Tried cases after probable cause determinations. Significant disability discrimination caseload.

1993-1995        **NEW YORK LAW SCHOOL**                                         New York, NY

LEGAL WRITING INSTRUCTOR – Taught first year class on legal writing. Judged moot court.

1983- 1990       **NEIGHBORHOOD LEGAL SERVICES**                                 Hartford, CT

STAFF ATTORNEY 1985-1990: As a member of the Civil Rights Unit, litigated systemic and individual cases of employment discrimination, wrongful termination and police misconduct before public agencies, state and federal courts. As Director of Farmworker Unit (1987-1990) conducted outreach to migrant farmworkers and litigated a federal class action on behalf of minor tobacco workers. As Director of Hispanic Advocacy Project (1988-1990) conducted outreach to the community on immigration law (IRCA). Attorney in Sheff v. O'Neill on behalf of Hispanic children.

REGINALD HEBER SMITH COMMUNITY LAWYER FELLOW 1983-1985: Two-year fellowship to work with community groups within the City of Hartford. Provided assistance with non-profit incorporation. Advised groups regarding civil rights including employment discrimination and police misconduct. Maintained caseload of civil rights cases before Commission on Human Rights and Opportunities and cases within state and federal courts.

## BAR ADMISSIONS

- State of Connecticut
- New York State
- District Courts of Connecticut, Southern District of New York and Eastern District of New York
- Second Circuit Court of Appeals
- Supreme Court of the United States

## EDUCATION

**Beloit College, BA**
Beloit, WI

**Western New England School of Law, JD**
Springfield, MA

> Honors
> Law Review
>
> Note: Disability Law – The Developmentally Disabled Assistance and Bill of Rights Act is Alive and Well in New Hampshire – Developmental Disabilities Advocacy Ctr. v. Melton, 689 F.2d 281 (1st Cir. 1982), 5 WNEC L. Rev. 537 (1983)
>
> Note:  Family Law – In re Dept. of Publ. Welfare, 421 N.E.2d 28 (1981), 6 WNEC L. Rev. 447 (1983)
>
> Clinical Experience
>
> Disability Rights Clinic at the Center for Public Representation, Northampton, MA.

**LANGUAGES**

Conversational Spanish