**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

**CARMEN ARROYO,** *et al.*,

     **-v-**

**CORELOGIC RENTAL PROPERTY**
**SOLUTIONS, LLC,**

**Case No. 3:18-cv-00705-VLB**

**MEMORANDUM IN SUPPORT OF DEFENDANT CORELOGIC**
**RENTAL PROPERTY SOLUTIONS, LLC'S MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................... 1

STATEMENT OF UNDISPUTED FACTS ...................................... 5

    I.     RPS'S ROLE IN THE TENANT SCREENING PROCESS ......................... 5

    II.    THE APRIL 2016 APPLICATION AND DISCUSSIONS BETWEEN MS. ARROYO AND WINNRESIDENTIAL AND SUBSEQUENT LITIGATION ................................ 8

    III.   MS. ARROYO'S 2016 FILE DISCLOSURE REQUESTS TO RPS, WHERE SHE REPEATEDLY FAILS TO SUBMIT PROPER IDENTIFICATION OF THE CONSERVATORSHIP TO RPS................. 10

    IV.   THE CFHC'S CLAIMED "COMPENSATORY" DAMAGES................... 14

LEGAL STANDARD ................................................................... 15

ARGUMENT ............................................................................... 16

    I.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' RACE-BASED FHA CLAIMS IN COUNT I ............. 16

    II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' DISABILITY-BASED FHA CLAIMS IN COUNTS II AND III ................................ 27

    III.   PLAINTIFFS' FCRA CLAIM FAILS............................................. 34

    IV.   RPS IS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMED VIOLATIONS OF THE CUTPA IN COUNT VI................................ 36

    V.    THE CFHC'S COMPENSATORY DAMAGES CLAIMS MUST BE DISMISSED ................................ 38

    VI.   MS. ARROYO DOES NOT HAVE STANDING TO BRING ANY OF HER ASSERTED CLAIMS IN HER "INDIVIDUAL" CAPACITY............ 44

CONCLUSION ........................................................................... 46

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bentley v. Providian Fin. Corp.*,
No. 02 Civ. 5714, 2003 U.S. Dist. LEXIS 27769 (S.D.N.Y. Aug. 29, 2003) ................................................................................................. 10

*Bernstein v. Vill. of Wesley Hills*,
95 F. Supp. 3d 547 (S.D.N.Y. 2015) ...................................................... 17

*Byrnie v. Town of Cromwell, Bd. of Educ.*,
243 F.3d 93 (2d Cir. 2001) ..................................................................... 16

*Byrnie v. Town of Cromwell Pub. Schs.*,
73 F. Supp. 2d 204 (D. Conn. 1999) ...................................................... 23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................ 16

*Chesapeake Climate Action Network v. Export-Import Bank of the United States*,
78 F. Supp. 3d 208 (D.C. Cir. 2015) ...................................................... 39

*Chin v. Port Auth. Of New York & New Jersey*,
685 F.3d 135 (2d Cir. 2012) ................................................................... 20

*Citibank (S.D.) N.A. v. Osagie*,
No. CV106004637, 2012 Conn. Super. LEXIS 1186 (2012) .................. 37

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*,
968 F. Supp. 2d 243 (D.C. Cir. 2014) .................................................... 41

*Fair Hous. Council v. Montgomery Newspapers*,
141 F.3d 71 (3d Cir. 1998) ..................................................................... 39

*Fair Hous. of Marin v. Combs*,
No. C 97-1247, 2000 U.S. Dist. LEXIS 4737 (N.D. Cal. Mar. 29, 2000) ............... 39

*Favourite v. 55 Halley St., Inc.*,
381 F. Supp. 3d 266 (S.D.N.Y. 2019) .................................................... 17

*Glenn v. Fuji Grill Niagara Falls, LLC*,
No. 14-CV-380S, 2016 U.S. Dist. LEXIS 51618 (W.D.N.Y. Apr. 18, 2016) ................................................................................................. 25

*Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc.*,
  296 Conn. 315 (2010) .................................................. 37

*High Plains Cmty. Dev. Corp. v. Schaefer*,
  No. 4:07CV3149, 2008 U.S. Dist. LEXIS 36661 (D. Neb. May 2, 2008)................ 42

*L.C. v. LeFrak Org., Inc.*,
  987 F. Supp. 2d 391 (S.D.N.Y. 2013) ..................................... 16

*Lee v. ITT Std.*,
  268 F. Supp. 2d 315 (W.D.N.Y. Mar. 20, 2001) ...................................... 29

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)....................................................... 45

*Mandala v. NTT Data, Inc.*,
  No. 18-CV-6591 CJS, 2019 WL 3237361 (W.D.N.Y. July 18, 2019) ...................... 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)....................................................... 15

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016) ............................................. 18

*Mhany Mgmt. v. Cnty. of Nassau*,
  No. 05-cv-2301, 2017 U.S. Dist. LEXIS 153214 (E.D.N.Y. Sept. 19,
  2017)........................................................................ 27, 32

*Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*,
  No. 3:10-cv-83, 2015 U.S. Dist. LEXIS 23619 (S.D. Ohio Feb. 26,
  2015)........................................................................ 41

*Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev.*
  *ex rel. VanLoozenoord*,
  56 F.3d 1243 (10th Cir. 1995) ............................................ 22

*Ganim v. Smith & Wesson Corp.*,
  258 Conn. 313 (2001) ..................................................... 45

*Neclerio v. Trans Union, LLC*,
  983 F. Supp. 2d 199 (D. Conn. 2013)...................................... 11

*Ogbon v. Ben. Credit Servs., Inc.*,
  No. 10 Civ. 3760, 2013 U.S. Dist. LEXIS 50816 (S.D.N.Y. Apr. 8,
  2013)........................................................................ 36

*Olsen v. Stark Homes, Inc.*,
  759 F.3d 140 (2d Cir. 2014) ............................................. 32

*Phelan v. Local 305 of United Ass'n of Journeymen, & Apprentices of*
  *Plumbing & Pipefitting Indus. of U.S. & Canada,*
  973 F.2d 1050 (2d Cir. 1992) ............................................................... 43

*Reidt v. Cty. of Trempealeau,*
  975 F.2d 1336 (7th Cir. 1992) .............................................................. 30

*Robinson v. Metro-North Commuter R.R. Co.,*
  267 F.3d 147 (2d Cir. 2001) ................................................................. 19

*Rodriguez v. Bear Stearns Companies, Inc.,*
  No. 07-cv-1816, 2009 WL 5184702 (D. Conn. Dec. 22, 2009) ................... 19, 29, 30

*Safeco Ins. Of Am. v. Burr,*
  551 U.S. 47 (2007) .............................................................................. 35

*Salahuddin v. Goord,*
  467 F.3d 263 (2d Cir. 2006) ................................................................. 16

*Sch. Bd. of Nassau Cty. v. Arline,*
  480 U.S. 273 (1987) ............................................................................ 33

*Simuro v. Shedd,*
  No. 2:13-cv-0030, 2017 U.S. Dist. LEXIS 192102 (D. Vt. June 19,
  2017) ................................................................................................. 44

*Singletery v. Equifax Info. Servs.,*
  No. 2:09-cv-0489, 2012 U.S. Dist. LEXIS 132969 (N.D. Ala. Sept. 18,
  2012) ................................................................................................. 36

*Taylor v. Harbour Pointe Homeowners Ass'n,*
  690 F.3d 44 (2d Cir. 2012) ................................................................... 33

*Texas Dept. of Hous. & Cmty. Affairs v. Inclusive Communities*
  *Project, Inc.,*
  135 S. Ct. 2507 (2015) ................................................................. 19, 30, 31

*Townsend v. Nassau County Medical Center,*
  558 F.2d 117 (2d. Cir. 1997) ................................................................ 20

*Tsombanidis v. W. Haven Fire Dep't,*
  352 F.3d 565 (2d Cir. 2003) ............................................................ 19, 32

*Tuman v. VL Gem LLC,*
  No. 15Civ.7801, 2017 U.S. Dist. LEXIS 28140 (S.D.N.Y. Feb. 27,
  2017) ............................................................................................ 16, 28

*United States v. Style,*
  771 F. App'x 43 (2d Cir. 2019) ............................................................. 22

*Vaughn v. Consumer Home Mortg. Co.*,
   297 F. App'x 23 (2d Cir. 2008) ................................................................. 45

*W. R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
   549 F.3d 100 (2d Cir. 2008) ...................................................................... 46

*Wards Cove Packing Co. v. Atonio*,
   490 U.S. 642 (1989) ................................................................................. 21

*Wenning v. On-Site Manager, Inc.*,
   No. 14 Civ. 9693, 2016 U.S. Dist. LEXIS 81126 (S.D.N.Y. June 22,
   2016) ........................................................................................................ 34

*Xue Ming Wang v. Abumi Sushi, Inc.*,
   262 F. Supp. 3d 81 (S.D.N.Y. 2017) ......................................................... 32

*Zanoni v. Hudson*,
   48 Conn. App. 32 (Conn. Ct. App. 1998) .................................................. 46

*Zollicoffer v. Livingston*,
   169 F. Supp. 3d 687 (S.D. Tex. 2016) ...................................................... 25

**Statutes**

15 U.S.C. § 1681g(a) .................................................................................. 10

15 U.S.C. § 1681h(a)(1) ........................................................................ 10, 31

42 U.S.C. § 13661(c) .................................................................................. 25

Conn. Gen. Stat. § 42-110a ....................................................................... 38

Conn. Gen. Stat. § 42-110g ....................................................................... 45

Connecticut Unfair Trade Practices Act ..................................................... 4

CUTPA ........................................................................................ 36, 37, 44, 45

FCRA ................................................................................................... *passim*

federal Fair Credit Reporting Act ............................................................... 3

federal Fair Housing Act ............................................................................. 1

FHA ..................................................................................................... *passim*

**Other Authorities**

24 C.F.R. §§ 5.854, 5.856 ........................................................................... 25

**24 C.F.R. § 100.500(c)(2)** ............................................................................ **24**

**24 C.F.R. § 100.500(c)(3)** ............................................................................ **26**

**24 CFR § 100.500(c)** ................................................................................... **18**

**Fed. R. Civ. P. 56(a)** .................................................................................... **15**

**Rule 30(b)(6)** ................................................................................................. **20**

**Statement of Undisputed Material Facts** ........................................... ***passim***

Defendant, CoreLogic Rental Property Solutions, LLC ("RPS"), by counsel, files this memorandum in support of its Motion for Summary Judgment ("Motion"), seeking the dismissal of all of Plaintiffs' claims with prejudice.

## INTRODUCTION

This case arises out of the denial of Mr. Arroyo's housing application by a housing provider, WinnResidential.  WinnResidential requested and received a tenant screening report about Mr. Arroyo from RPS.  The report included RPS's "CrimSAFE" product.  The CrimSAFE product filters and categorizes criminal records according to parameters set by housing providers, and identifies a "record found" to the housing provider if a criminal record is located that meets its criteria. At the time of its request, WinnResidential had instructed RPS to return records of pending theft charges.  Therefore, the CrimSAFE report on Mr. Arroyo accurately identified[1] a pending charge for theft, and it reported all details of that charge to WinnResidential.  After receiving the CrimSAFE report, WinnResidential denied Mr. Arroyo's application and informed his mother, Ms. Arroyo, of that denial.

Years later, after suing and settling with WinnResidential, Plaintiffs filed this action, alleging that RPS discriminated against Mr. Arroyo on the basis of his race and disability in violation of the federal Fair Housing Act ("FHA"), and that RPS also violated certain other provisions of state and federal law.  All of those claims must now be dismissed based on the undisputed factual record, and also due to Plaintiffs' lack of proof on numerous elements of their claims.

---

[1] There is no allegation or proof the RPS report was in any way inaccurate or that it miscategorized the record with respect to the CrimSAFE criteria previously selected by WinnResidential (detailed further below).

1

Counts I and II of Plaintiffs' Complaint are premised upon a claim that RPS, through its CrimSAFE product, discriminates against African Americans and Latinos and disabled individuals in the housing application process, including as to Mr. Arroyo.  Yet, it is undisputed that RPS never knows the race of any housing applicant during the screening process, and that RPS did not know Mr. Arroyo's race at any time prior to the filing of this lawsuit.  These undisputed facts negate any claim of racial "disparate treatment."

Plaintiffs have further alleged that CrimSAFE "disparately impacts" African American and Latino applicants.  However, after more than a year of fact and expert discovery – which included more than a dozen depositions and the production of thousands of pages of documents by RPS – Plaintiffs have failed to meet the required legal standard for making a *prima facie* statistical showing of disparate impact.  To make out a *prima facie* case of "disparate impact," Plaintiffs were required to: (1) develop admissible evidence of the racial composition of the applicant pool at the applicable complexes, including the percentage of Latino and African American applicants; and (2) then compare those demographics to the percentage of African-American and Latino applicants for whom CrimSAFE had identified a "record found."  Plaintiffs failed to develop any such evidence, choosing instead to rely exclusively on general population statistics to support their claim of disparate impact.  Pursuant to established and binding precedent, their approach is insufficient as a matter of law.  As there is no legally competent evidence of disparate impact resulting from the CrimSAFE product, Counts I and II must be dismissed.

Even more, the lynchpin factual assertion in Plaintiffs' Complaint with respect to their claim of racial disparate impact has been conclusively disproven. Plaintiffs alleged that RPS's CrimSAFE product does not return any details of the criminal records found in a screening report to the housing provider. They highlighted the significance of this allegation by specifically pleading that, as a "less discriminatory alternative" to avoid the asserted liability under the FHA, RPS should "provide sufficient information about the underlying criminal offense to allow housing providers to do individualized assessments."  (Compl., ¶ 107.)  That "less discriminatory alternative" was premised on the allegation that "CrimSAFE only reports" that a record has been "found" and "does not provide any information about the record itself or information sufficient for the housing provider to locate the record."  (Compl., ¶ 4.)  It is now firmly established that RPS does return the details of any criminal "record(s) found" to the housing provider in connection with every CrimSAFE report, and that it did so to WinnResidential with respect to Mr. Arroyo.  That routine practice is, by Plaintiffs' own *admission*, a "less discriminatory alternative" that negates their disparate impact claim.

This same disproven factual allegation – that RPS did not return Mr. Arroyo's record to WinnResidential at the time of his screening – forms the basis for Plaintiffs' claim for actual damages in Count V under the federal Fair Credit Reporting Act ("FCRA").  Plaintiffs speculate that if RPS had provided the report to Ms. Arroyo, she might have used it to "persuade" WinnResidential to reverse its decision and then admit Mr. Arroyo to the complex.  Even setting aside (for now) the entirely-speculative nature of that assertion, the record reflects that WinnResidential had in its possession the criminal record about the theft the entire

time.  Thus, lack of access to the record detail could not have contributed to its refusal to admit Mr. Arroyo.  There is, therefore, no basis to contend that RPS's failure to provide Ms. Arroyo with a copy of Mr. Arroyo's file caused any damages.

Plaintiffs further allege in Counts II, III, and V that RPS's procedures for responding to consumer file disclosure requests disparately impacts and explicitly discriminates against disabled individuals who are subject to a conservatorship in violation of the FHA (Counts II and III), and that RPS impermissibly denies conservators statutory access to consumer files under the FCRA (Count V).  Yet, Plaintiffs admit that they are aware of no other conserved individual apart from Mr. Arroyo who has ever requested a file disclosure from RPS.  RPS is also unaware of any other such occurrence.  It is well settled that one isolated incident cannot support a claim of disparate impact under the FHA.  Additionally, the basis for Plaintiffs' FHA disparate treatment claim and their FCRA claim, is an assertion that RPS has a corporate "policy" of refusing file disclosures to disabled consumers who are under a conservatorship.  But it is undisputed that no such policy has ever existed.  Instead, consistent with the FCRA's _requirement_ that RPS receive "proper identification" of a consumer before transmitting a sensitive consumer file, RPS provides consumer files to third-party legal guardians who submit appropriate documentation of the current status of their guardianship.  Ms. Arroyo did not submit such documentation when she requested her son's consumer file.  This was the sole reason for the denial of her requests.

Plaintiffs' claim in Count VI under the Connecticut Unfair Trade Practices Act ("CUTPA") also must be dismissed, as it is derivative of the faulty statutory claims

discussed above, and there also is no basis to suggest that RPS somehow acted in way that was "unfair" or "deceptive."

Finally, the compensatory damages claimed by the Connecticut Fair Housing Center ("CFHC") are entirely deficient as a matter of proof and have, in any event, already been compensated by a third party.  Also, Ms. Arroyo improperly asserts her claims in this case on an "individual" basis, but she has no standing to sue in that capacity.

## STATEMENT OF UNDISPUTED FACTS

### I.   RPS'S ROLE IN THE TENANT SCREENING PROCESS.

#### A.   The Process for Using the CrimSAFE Categorization Product

RPS's products assist housing providers in evaluating prospective tenants, including by providing public criminal record reports.  To order a report, a housing provider electronically submits personal identifying information to RPS.  *See* Def's Local 56(a)1 Statement of Undisputed Material Facts, ¶ 1 ("SUMF").   That information includes the full name, current address, Social Security number, and date of birth of the applicant.[2]  *Id.*  RPS then uses a proprietary and electronic matching process to identify criminal public records and all associated data from RPS's database that are associated with the applicant.  *Id.* at ¶ 4.  RPS then shares the matching records with the housing provider.  *Id.*

RPS also offers an optional screening product called "CrimSAFE," which filters any criminal records found based on criteria set by the housing provider, and which categorizes criminal records according to their type and severity levels

---

[2] When such personal identifying information is submitted to RPS, it contains no reference to the race or disability status of the applicant.

under applicable state and federal law. SUMF at ¶ 5. CrimSAFE then notifies the housing provider whether any records were found that match its criteria (*e.g.*, convictions for assault within the past five years). *Id.* at ¶ 8. Such "categorization" products are widely used within the multi-family housing industry. *Id.* at ¶ 6.

Prior to using the CrimSAFE product, housing providers are required to fill out their criminal record selection criteria on a matrix that accounts for: (1) the type or "category" of 36 types of crimes (*e.g.*, "crimes against persons," "crimes against property," or "crimes against society"); (2) whether the offense resulted in a conviction; (3) whether the offense is a felony or non-felony; and (4) the age of the offense. SUMF at ¶ 7. The matrix of 36 crime categories tracks the criminal categorizations that were established by the FBI through the "National Incident-Based Reporting System." *Id.* Through an automated process, RPS informs the housing provider whether there is a "record found" that corresponds to the criteria set by the housing provider across the foregoing four categories. *Id.* at 8.

A CrimSAFE report is always accompanied by another portion of the screening report that contains the full RPS data of any criminal record(s) identified via CrimSAFE. SUMF at ¶ 9. Housing providers retain the option to limit the ability of individual leasing agents to view the full details of records that are found by the CrimSAFE product, and to instead make that detail available only to designated administrators. *Id.* That setting enables property managers to reserve decisions on criminal screenings for supervisory staff, and not on-site leasing agents. *Id.* at ¶ 10. Whether to use that administrative setting is determined by the housing provider, not RPS. *Id.* at ¶ 9. However, even if that administrative setting is used,

6

the full detail of any records found by CrimSAFE is always made available to the identified supervisor(s).  *Id.* at ¶ 10.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

B.      <u>The Legitimate, Non-Discriminatory Interests Furthered by CrimSAFE.</u>

The CrimSAFE product offers a number of important benefits to its users. First, CrimSAFE takes a housing provider's selected criminal criteria and informs the housing provider of whether a record exists that meets their criteria for potential disqualification.  SUMF at ¶ 12.  That objective characterization of criminal records helps to remove potential explicit or implicit bias at the property manager level and promotes non-discrimination in the interpretation of the severity of criminal records.  *Id.*

Second, absent products such as CrimSAFE, there would exist unnecessary delays in the background verification process that would hinder those who need immediate access to housing.  SUMF at ¶ 13.  In particular, individual property managers (who are generally non-legal professionals) would be tasked with attempting to research the severity level of any identified criminal record to then determine how to review such a record in the context of the leasing criteria set by the housing provider.  *Id.* at ¶ 14.  That would be unworkable, including because there are hundreds of different law enforcement agencies all keeping accessible

records with no standard of consistency in describing offenses. *Id.* at ¶ 15. Indeed, the RPS database reflects records obtained from ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

Third, the failure of companies like RPS to categorize criminal records and apply the housing provider's set criteria to those criminal records could also lead to a mistake by leasing agents in interpreting a record, as leasing agents or property managers could misinterpret a serious criminal offense as insubstantial and approve the application when their criteria would dictate otherwise, or *vice versa*. SUMF at ¶¶ 16, 17.

Finally, CrimSAFE allows housing providers to customize their criteria for what is acceptable at each property, as well as to quickly and consistently adjust their settings to account for policy changes with respect to the consideration of criminal histories (including with respect to their FHA policies). SUMF at ¶ 18.

## II.   THE APRIL 2016 APPLICATION AND DISCUSSIONS BETWEEN MS. ARROYO AND WINNRESIDENTIAL AND SUBSEQUENT LITIGATION.

WinnResidential uses CrimSAFE.   SUMF at ¶¶ 19-20.   ███████████



Ms. Arroyo applied for housing at WinnResidential on behalf of Mr. Arroyo on April 26, 2016 at the Artspace Windham property, which is a federally-subsidized property located in Willimantic, Connecticut.   SUMF at ¶ 24.   WinnResidential requested from RPS a tenant screening report on Mr. Arroyo.  The tenant screening

report returned by RPS that same day accurately identified that Mr. Arroyo had a pending charge for retail theft in York County, Pennsylvania. *Id.* at ¶¶ 26-27. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████  ████████████

████████████████████████████████████████████████████████

Because WinnResidential had chosen to apply the administrative setting limiting the distribution of records to identified supervisory staff, RPS simultaneously made available two versions of the screening report to WinnResidential. SUMF at ¶ 29. One version, which went to the on-site leasing agent, identified the existence of the pending charge, but it did not identify the full detail of the underlying offense. *Id.* The second version was made available to WinnResidential's designated supervisory staff, and that version both identified the offense and provided all details about the theft offense that RPS had in its file, including the nature of the offense, the offender, the date it was committed, where it was pending, and the current status of the proceeding. *Id.* at ¶¶ 28-29.

WinnResidential rejected the application. SUMF at ¶ 30. Ms. Arroyo then had numerous contacts with WinnResidential in 2016 and 2017, where she explained that Mr. Arroyo was disabled and asked for further details on the denial. *Id.* at ¶ 31. WinnResidential would not reverse its housing decision. *Id.*

---

[3] ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

After numerous conversations, Ms. Arroyo retained counsel at the CFHC in 2017 to bring an administrative complaint against WinnResidential for failing to reasonably accommodate his disability by refusing to admit Mr. Arroyo to the complex.  SUMF at ¶ 32.  WinnResidential litigated the matter through the day of the scheduled administrative hearing, at which time a settlement was reached that allowed Mr. Arroyo to move into the complex.  *Id.* at ¶ 34.  The action settled for $50,000, with the CFHC receiving $12,500 as a part of the $50,000 settlement.  *Id.* at ¶ 64.  RPS was not involved in these proceedings.  *Id.* at ¶ 33.

From April 2016 until 2017, when WinnResidential admitted Mr. Arroyo, Ms. Arroyo did not apply for admission to any other apartment.  SUMF at ¶ 35.

III.    <u>MS. ARROYO'S 2016 FILE DISCLOSURE REQUESTS TO RPS, WHERE SHE REPEATEDLY FAILS TO SUBMIT PROPER IDENTIFICATION OF THE CONSERVATORSHIP TO RPS.</u>

Mr. Arroyo claims that RPS violated 15 U.S.C. § 1681g(a) of the federal FCRA, which provides that a consumer reporting agency "shall, upon request, and subject to section 1681h(a)(1) of this title, clearly and accurately disclose to the consumer . . . all information in the consumer's file at the time of the request."[4]  Section 1681h(a)(1) in turn provides that "a consumer reporting agency shall require, as a condition of making the disclosures required under section 1681g of this title, that the consumer furnish proper identification."

As this Court has recognized, "[o]n its face section 1681g(a) does not give Plaintiff a right to receive information from a third party's file."  *Neclerio v. Trans*

---

[4] **The FCRA does not define what constitutes "proper identification."** *Bentley v. Providian Fin. Corp.*, No. 02 Civ. 5714, 2003 U.S. Dist. LEXIS 27769, at *17 (S.D.N.Y. Aug. 29, 2003).

*Union, LLC*, 983 F. Supp. 2d 199, 219 (D. Conn. 2013).  The FCRA imposes no obligations on the receiving party to independently gather such information. Instead, the obligation remains entirely on "*the consumer* to furnish proper identification."  *Id.* (emphasis added).

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████

Ms. Arroyo first contacted RPS on April 27, 2016 to request Mr. Arroyo's consumer file. SUMF at ¶ 40. RPS informed Ms. Arroyo of the process for seeking to obtain the file in a third-party capacity, which requires the submission of a disclosure request form and authenticating documentation. *Id.* at ¶ 41. On April 29, 2016, RPS mailed Ms. Arroyo a consumer disclosure request form and instructions on how to complete that form. *Id.* at ¶ 42.

Ms. Arroyo signed and mailed the first consumer disclosure request form (the "First Disclosure Request") to RPS on June 14, 2016, which RPS received on June 27, 2016. SUMF at ¶ 43. However, the First Disclosure Request did not list Mr. Arroyo's Social Security number, it did not contain his complete previous address information, and it was not signed in the designated location. *Id.* at ¶ 44. The documents submitted in support of the request were also incomplete. For instance, the certificate of conservatorship, which itself stated it was "NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED," did not reflect a visible or impressed seal and, therefore, was not valid on its face. *Id.*

Moreover, RPS had never before dealt with a request for a copy of a consumer file from an individual claiming to be a court-appointed conservator (nor has it dealt with this issue ever since). SUMF at ¶ 45. Accordingly, despite the evident defects in the documents provided, based on RPS's established written policies and procedures requiring escalation in such atypical situations, the First

Disclosure Request was elevated to two supervisors.  *Id.* at ¶ 46.  Following that review, on June 30, 2016, RPS mailed Ms. Arroyo a letter asking her to contact RPS to discuss the First Disclosure Request.  *Id.*

Months passed.  RPS finally received another call from Ms. Arroyo on September 7, 2016.  SUMF at ¶ 47.  Ms. Arroyo failed to submit any additional documents to RPS after that call.  *Id.*

RPS's next contact with Ms. Arroyo did not occur until November 1, 2016 when she called to inquire as to why RPS had not yet provided her with Mr. Arroyo's file.  SUMF at ¶ 48.  RPS again escalated the matter to its consumer relations department and then to its compliance department.  *Id.* at 49.  RPS also sought review by its internal legal department and two experienced, outside attorneys at Foley & Lardner, LLP and Hudson Cook, LLP.  *Id.* at ¶ 50.  During that process RPS consistently informed Ms. Arroyo of the status of her request.  *Id.*  Based on that escalated legal review, RPS determined it would need a new certificate of conservatorship with the court seal visible, as well as proof of current address documentation.  *Id.*

On November 15, 2016, Ms. Arroyo faxed the additional documentation and a new consumer disclosure form (the "Second Disclosure Request") to RPS. SUMF at ¶ 51.  The certificate of conservatorship was again missing an impressed and visible seal.  *Id.*  The Second Disclosure Request and supporting documentation was escalated to RPS's compliance and legal departments, which again included consultation with outside counsel.  *Id.* at ¶ 52.  Ultimately, the documentation was not regarded as sufficient.  *Id.*

On November 16 and November 18, 2016, RPS attempted to contact Ms. Arroyo by telephone.  SUMF at ¶ 53.  Ms. Arroyo did not return these calls.  *Id.*

In mid-December 2016, a paralegal at the CFHC contacted RPS and stated the CFHC was assisting Ms. Arroyo in the file disclosure process.  SUMF at ¶ 54. RPS requested additional documentation from the CFHC in the form of a power of attorney to establish that the CFHC was representing Ms. Arroyo.  *Id.*  RPS then mailed and emailed the CFHC a consumer disclosure request form and instructions on the documents the CFHC should submit.  *Id.*  RPS did not receive any documentation from the CFHC in response.  RPS had no further contact with the CFHC or Ms. Arroyo until this lawsuit was filed.  SUMF at ¶ 55.

## IV.     THE CFHC'S CLAIMED "COMPENSATORY" DAMAGES.

The CFHC claims to have suffered damages in the "form of diversion of resources and frustration of mission."  SUMF at ¶ 63.  With respect to the first category of claimed damages, the CFHC claims to have "diverted financial reserves and staff time to counteract [RPS's] discrimination."  Those damages claims were itemized on a "diversion log" produced by the CFHC in discovery, where the hours "diverted" were listed across six discrete categories: "CoreLogic," "education and outreach," "testing," "testing costs," "client work," and "grant writing."  *Id.*  The diversion of resource damages claimed total $82,639.93.  Only the "CoreLogic" tab relates to any work performed by the CFHC specific to RPS.  The CFHC likewise acknowledged in discovery that these damages are sought for any work performed by the CFHC of any kind on any housing matter implicating the issue of criminal screening, regardless of RPS's involvement.

The "frustration of mission" damages are claimed due to RPS allegedly frustrating the "CFHC's mission to eliminate illegal housing discrimination in Connecticut." SUMF at ¶ 63. Because "discovery [was] ongoing," the CHFC admitted in that same pleading that they were "not fully knowledgeable of the extent and effect of the defendant's conduct but believes it to be significant." The damages analysis, however, was never supplemented. *Id.* Regardless, the CFHC contends that, based on customer use of the CrimSAFE product, the CFHC needs to conduct a future "advertising campaign," "testing program," and "outreach plan," which would be targeted towards housing providers to educate them about the FHA, regardless of whether any of those unidentified landlords use CrimSAFE in any way. That campaign is estimated to cost between $300,000-$350,000.

Finally, while the CFHC claims both of these compensatory damages in a combined amount of $432,639.93, the CFHC admitted in discovery that it received $380,000 in grants to address criminal record screening in the housing application process. SUMF at ¶ 65. Those were grants that the CFHC received based on the same "grant writing" proposals that it now claims as compensatory damages. *Id.*

## LEGAL STANDARD

Under Fed. R. Civ. P. 56(a), the court "shall" grant summary judgment if there is no genuine issue as to any material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

Where the movant shows a *prima facie* entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). "Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001).

## ARGUMENT

**I.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' RACE-BASED FHA CLAIMS IN COUNT I.**

In Count I, Plaintiffs claim that the CrimSAFE product violates the FHA by resulting in both "disparate treatment" and "disparate impact" by RPS of African American and Latino housing applicants at properties using the CrimSAFE product. Both iterations of that claim must be dismissed with prejudice. There was no racial animus towards Mr. Arroyo. There also is no statistical *prima facie* case of disparate impact, and – even if there were – it is factually undisputed that RPS already undertakes the "less discriminatory alternate" that is advanced by Plaintiffs in this case.

**A.     There can be no Disparate Treatment Claim Because RPS was Never Aware of Mr. Arroyo's Race.**

Plaintiffs' disparate treatment claim on the basis of race in Count I under the FHA must fail because there is no evidence of racial animus.

To establish a case of disparate treatment, a plaintiff must establish that "animus was a significant factor" in the position taken by the decision-makers. *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 400 (S.D.N.Y. 2013). "Proof of discriminatory animus is crucial for a disparate treatment claim." *Tuman v. VL*

*Gem LLC*, No. 15Civ.7801, 2017 U.S. Dist. LEXIS 28140, at *8-9 (S.D.N.Y. Feb. 27, 2017).  Hence, a plaintiff cannot rest on evidence of disparate impact to establish discriminatory intent.  *Bernstein v. Vill. of Wesley Hills*, 95 F. Supp. 3d 547, 576 (S.D.N.Y. 2015) (quoting *Soberal-Perez v. Heckler*, 717 F.2d 36, 42 (2d Cir. 2015)).

Plaintiffs' disparate treatment claim fails because they cannot produce <u>any</u> evidence that Mr. Arroyo's race, or the race of <u>*any*</u> applicant, was a factor in RPS's actions or the operation of CrimSAFE.  RPS does not consider an applicant's race when it conducts tenant screenings.  SUMF at ¶¶ 2, 28.  It does not request or obtain such race data from its customers, and it does not consider an applicant's race in connection with any aspect of its products.  *Id.*  Indeed, RPS was never even aware of Mr. Arroyo's race until this lawsuit was filed.  *Id.* at 28.  Plaintiffs also cannot point to any evidence that RPS treated African American or Latino applicants differently with respect to the CrimSAFE product.  For this reason, the Court should grant summary judgment in favor of RPS and dismiss Plaintiffs' racial disparate treatment claim.  *See, e.g.*, *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 280 (S.D.N.Y. 2019) (granting summary judgment on disparate treatment claim when there was no evidence of racial animus, and where "the issue of race was first introduced [to the defendants] upon filing this action").

### B.   RPS is Entitled to Judgment on Plaintiffs' Disparate Impact Claim in Count I, as Plaintiffs Have no Statistical Basis to Make That Claim.

Plaintiffs also plead in Count I that CrimSAFE has had a "disparate impact" on African American and Latino applicants, in violation of the FHA.

To carry their burden, Plaintiffs must show that: (1) there is a facially neutral policy or practice; (2) that was harmful; and (3) that had a disparate impact on a

protected class.  24 CFR § 100.500(c); *accord Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016).  Even assuming RPS is subject to the FHA[5] and that Plaintiffs had satisfied the first and second elements, they have not satisfied the third element, *i.e.*, showing that CrimSAFE has a disparate impact.

Furthermore, even taking the analysis through the burden shifting, RPS has established a legitimate business interest for the policy or practice, thus shifting the burden back to Plaintiffs to present a less discriminatory alternative.  As set forth below, the "alternatives" presented by Plaintiffs, however, are either already done by RPS or implausible/speculative.

     1.    <u>There is no *Prima Facie* Statistical Showing of Disparate Impact.</u>

Plaintiffs have failed to meet their statistical burden to show any disparate impact of CrimSAFE on African American and Latino applicants, which is alone dispositive of their disparate impact claim.

     a.    <u>CrimSAFE Identifies "Record(s) Found" for Very Few Applicants.</u>

Plaintiffs began this case more than a year ago by alleging that the CrimSAFE product makes it "substantially more difficult for Connecticut residents with criminal records . . . to find safe and affordable housing."  (Compl., ¶ 186.)  Yet the factual record demonstrates no such "substantial" impact.  Putting aside the fact that the CrimSAFE product is not a product that renders a "decision" on applications, discovery has demonstrated that the CrimSAFE product affects very few applicants at all.  ██████████████████████████████████

---

[5] As noted in its Motion to Dismiss, RPS disputes the applicability of the FHA to CrimSAFE product and file disclosure practices at issue.  That threshold legal argument, however, is not the subject of this Motion.

██████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

### b.   Plaintiffs' Generic, Statewide Statistical Proof is Plainly Deficient.

"A plaintiff who fails to . . . produce statistical evidence demonstrating a causal connection" between the challenged practice and the identified protected groups "cannot make out a *prima facie* case of disparate impact." *Texas Dept. of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2523 (2015).  "A plaintiff has not met its burden if it merely raises an inference of discriminatory impact." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003).  Therefore, "statistical proof almost always occupies center stage in a *prima facie* showing of a disparate impact claim," *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001), and "FHA claims that survive summary judgment almost invariably include statistical support."  *Rodriguez v. Bear Stearns Companies, Inc.*, No. 07-cv-1816, 2009 WL 5184702, at *11 (D. Conn. Dec. 22, 2009).

To make out a *prima facie* case of disparate impact, "plaintiffs must utilize the appropriate comparison groups.  They must first identify members of a protected group that are affected by the neutral policy and then identify similarly situated persons who are unaffected by the policy." *Tsombanidis*, 352 F.3d at 576-77.  "In the typical disparate impact case the proper population for [initial] analysis

19

is the applicant pool." *Chin v. Port Auth. Of New York & New Jersey*, 685 F.3d 135, 152 (2d Cir. 2012). Here, that "applicant pool" would be the African American and Latino applicants for housing at the complexes using CrimSAFE. *See id.*

RPS has no record of the racial composition of the applicant pool at any apartment complex. SUMF at ¶ 58. And, Plaintiffs failed to take discovery of *any property* in this case to try and even potentially gather that information.[6] *Id.* at ¶ 62. Instead, Plaintiffs have relied solely upon national and statewide population rates for African Americans and Latinos, which Plaintiffs assert to be representative of the applicant pools. *Id.* at ¶ 61; (Compl. ¶¶ 116-19.) Those state and national statistics are what Plaintiffs plead in the Complaint, and those same statistics are what they confirmed during discovery and Rule 30(b)(6) depositions constituted their statistical baseline for purposes of allegedly measuring the "disparate impact" of CrimSAFE. SUMF at ¶ 61. Yet, those types of generalized statistics – divorced from the practices of a defendant and the relevant applicant pool – have been consistently rejected for purposes of claiming disparate impact.

For instance, in *Townsend v. Nassau County Medical Center*, 558 F.2d 117 (2d. Cir. 1997), the Second Circuit addressed a claim that the requirement of a college degree resulted in a disparate impact on African American employees. In support of her claimed statistical *prima facie* case, the plaintiff presented general population statistics regarding the percentage of minorities holding college degrees, which was lower than their white counterparts. *Id.* at 120. In rejecting the proposed *prima facie* showing of statistical disparate impact and reversing the

---

[6] Plaintiffs failed to even take any discovery of WinnResidential. SUMF at ¶ 62.

district court, the Second Circuit held that "a statistic relating only to the general population, and not to the employment practices of the particular defendant," was insufficient to support a *prima facie* case of disparate impact, with the Second Circuit further holding that "statistical evidence concerning only the general population" was not sufficient to demonstrate that a job prerequisite "operates to exclude" minorities. *Id.* at 119-20. This binding authority is very clear: general population statistics, which Plaintiffs admit is all they have to rely upon, are legally insufficient to support a *prima facie* case of disparate impact.

The requirement to present statistics of the actual applicant pool, as opposed to generalized population statistics, has also been confirmed by the Supreme Court and scores of lower court decisions. *See, e.g., Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650-51 (1989) (statistics showing a high percentage of minority employees in low-level cannery jobs and a small percentage in non-cannery jobs were insufficient to establish a *prima facie* case of disparate impact because the percentage of the "the cannery work force" was not probative of the "pool of qualified job applicants," and further holding that the general population pool "cannot be used as a surrogate for the class of qualified job applicants, because it contains many persons who have not (and would not) be" applying for a job with the defendant); *Mandala v. NTT Data, Inc.*, No. 18-CV-6591 CJS, 2019 WL 3237361, at *4 (W.D.N.Y. July 18, 2019) (finding that national statistics of conviction and arrest rates for African-Americans were insufficient statistical proof to show a disparate impact for the applicant pool in question) (citations omitted).

c.   Any Attempted Use of General Population Statistics is Especially Inappropriate in the Housing Context and The Facts of This Case.

Plaintiffs inevitably will respond that they are entitled to rely on general population statistics because RPS does not have information regarding the racial composition of its customers' applicant pool.  SUMF at ¶ 58.  But, such a reliance on general population statistics is only justified in the "rare exception," *Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev. ex rel. VanLoozenoord*, 56 F.3d 1243, 1253 (10th Cir. 1995), and only then "when there is no reason to believe" that "local statistics" would differ from "national statistics."  U.S. DEPT. OF HOUSING AND URBAN DEVELOPMENT, April 4, 2016 Office of General Counsel Guidance.  There is no basis to make such a "rare exception" here for multiple reasons.

First, statewide statistics have no necessary relation to applicant pools for multifamily housing in the specific geographic locales where RPS's customers are located.  It should come as no surprise that the demographics of cities where RPS's customers operate can differ dramatically from statewide population statistics, as well as in the percentage of citizens who own homes and those who rent.  For instance, the U.S. Census Bureau reports that, as of July 1, 2018, 29% of the population of Connecticut was African American (12%) or Latino (17%), and that 67% of citizens owned a home.[7]  SUMF at ¶ 56.   When looking at the U.S. Census Bureau's demographics of the largest cities in Connecticut where RPS's customers

---

[7] This Court can take judicial notice of these figures.  *See, e.g., United States v. Style*, 771 F. App'x 43, 44 (2d Cir. 2019) "We take judicial notice of the fact that the United States Census Bureau estimates that 11.9 percent of Connecticut's population identified as black or African American as of July 2018.").

operate, as well as where the Artspace Windham complex where Mr. Arroyo applied is located (Willimantic), however, those figures change substantially:

| City | Percentage of Population: African American | Percentage of Population: Latino/Hispanic | Percentage of Population: Home Owners |
|------|------|------|------|
| Hartford | 38% | 44% | 24% |
| New Haven | 33% | 30% | 27% |
| Bridgeport | 35% | 39% | 42% |
| Willimantic | 7% | 44% | 34% |

*Id.* at ¶¶ 21, 56.  Given these stark disparities by locality, there is no credible basis for using statewide population data as a baseline to establish disparate impact.

Second, and compounding the first issue, the statewide statistics proffered by Plaintiffs do not account for the fact that RPS serves *many* customers who operate affordable/subsidized housing, such as the Artspace Windham where Mr. Arroyo applied.  SUMF at ¶¶ 22, 24.  In Project Based Section 8 housing, HUD has reported (on a nationwide basis) that 33% of occupants are African American and 13% are Latino.   For voucher programs, that figure rises to 45% for African Americans and 16% for Latino occupants.  *Id.* at ¶ 57.  Those figures are much higher than the national average and the average for the State of Connecticut.

These illustrative factors "point out the unreliability of simply pointing to a bottom-line imbalance . . . compared to statewide statistics in support of a claim of disparate impact."  *Byrnie v. Town of Cromwell Pub. Schs.*, 73 F. Supp. 2d 204, 221-22 (D. Conn. 1999).  Plaintiffs' failings of statistical proof in this regard are perhaps best summed up by their own statistical expert, Christopher Wildeman, who Plaintiffs retained to make statements regarding the percentage of African

American and Latino applicants with criminal records in Connecticut.[8]  Wildeman testified that population demographics, including rates of incarceration, differ significantly by locality within a particular state.  Wildeman further testified about what type of baseline data an expert would need to prove disparate impact for even one type of complex in one city.  When asked what he would look at to study whether there were disparities based on race for applicants of affordable housing in Willimantic, Connecticut, he stated that he would first "need to know about the applicant pool" for that city and the relevant complexes.  See Declaration of Timothy St. George, ¶ 6, Ex. C ("St. George Decl.").  Plaintiffs, however, never developed that data, meaning that "plaintiff[s] [have] failed to carry [their] *prima facie* burden of showing disparate impact."  *Byrnie*, 73 F. Supp. 2d at 221-22.

       2.    <u>RPS Has Shown Many Legitimate Interests Advanced by CrimSAFE.</u>

As set forth above, Plaintiffs have not met their burden to establish a *prima facie* case of disparate impact.  But even if the burden were to shift back to RPS to show a legitimate interest in the operation of CrimSAFE, then RPS has met that burden.

If a statistical disparate impact is shown, the "defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."  24 C.F.R. § 100.500(c)(2). RPS has shown multiple legitimate, non-discriminatory interests advanced by the CrimSAFE product.

---

[8] **Mr. Wildeman's report only considered the percentage of individuals in the criminal justice system who are African American or Latino.  His report did not address RPS or the relevant applicant pools of RPS's customers.**

As a threshold matter, _requires_ landlords of federally-assisted housing to reject applicants who were previously evicted for drug activity or who are registered sex offenders, and to perform "necessary criminal history background checks in the State where the housing is located and in other States where the household members are known to have resided."  _See_ **24 C.F.R. §§ 5.854, 5.856.** Criminal background screening is also permitted to detect any other criminal activity that would adversely affect the "health, safety, or right to peaceful enjoyment of the premises by other residents, the owner, or public housing-agency employees."  **42 U.S.C. § 13661(c).**  These Congressionally-endorsed policies conclusively establish the legitimate nature of RPS's business and the public policy goals advanced by criminal tenant screening.  _See, e.g._, _Glenn v. Fuji Grill Niagara Falls, LLC_, **No. 14-CV-380S, 2016 U.S. Dist. LEXIS 51618, at \*21 (W.D.N.Y. Apr. 18, 2016)** (a court "cannot second-guess" a "legislative policy decision").

These legitimate interests, however, are more than a matter of legislative decree.  They are well grounded in fact.  The safety of the residents of the properties and personal property contained therein is an important business justification behind the policy, and recidivism is one of the most predictive characteristics available to determine the risk of criminal behavior.  The federal Bureau of Justice Statistics ("BJS") conducted a nine-year study that found that 83% of released prisoners are arrested again within nine years, with an average of five rearrests per released prisoner.  SUMF at ¶ 59.[9]  BJS, 2018 Update on Prisoner

---

[9] The Court can take judicial notice of these federal studies.  _Zollicoffer v. Livingston_, **169 F. Supp. 3d 687, 691 (S.D. Tex. 2016)** ("The Court takes judicial notice of the BJS reports and other government reports and websites cited in this Order.").  These figures are also, of course, _underinclusive_, as specific recidivism

Recidivism: A nine-year Follow-up Period (2005-2014) (May 2018).  That study also found that property crimes had the highest recidivism rate.  *Id.*  In fact, not only is criminal history predictive of criminal behavior, studies have shown that people are victimized most often at or near their homes.  The BJS found that between 2004 and 2008, 18% of violent victimizations took place in the home, another 16% took place near the home, and an additional 9% took place at a friend's, neighbor's, or relative's home.  BJS – Location (2008).  SUMF at ¶ 60.

Within this broader context, RPS's CrimSAFE product provides numerous benefits to help property managers implement their criminal screening processes in an efficient, objective, and workable manner.  CrimSAFE filters and categorizes thousands of unique criminal offenses into the substantive categories designated by the FBI, thereby lessening the chance that a criminal record is misinterpreted by on-site leasing staff, who generally lack training to perform such legal research tasks.  SUMF at ¶¶ 7,10, 14, 17.  CrimSAFE also ensures that applicants with similar histories have their offenses categorized in the same way using objective criteria, thereby reducing the prospect for explicit or implicit discrimination.  *Id.* at ¶ 12.

### 3.    Plaintiffs' Suggested "Less Discriminatory Alternative" is, in Fact, RPS's Standard Practice.

After a defendant has shown a legitimate business interest for their facially neutral practice, the burden shifts to the Plaintiffs to show that there is a less discriminatory alternative.  24 C.F.R. § 100.500(c)(3).  "[A] less discriminatory alternative must serve the respondent's or defendant's substantial, legitimate

---

rates of prior offenders can only be tracked for crimes that: (1) are reported; *and* (2) are then definitively linked back to a specific prior offender.  However, as these studies also recognize, many crimes are never reported and/or not solved.

nondiscriminatory interests, must be supported by evidence, and may not be hypothetical or speculative." *Mhany Mgmt. v. Cnty. of Nassau*, No. 05-cv-2301, 2017 U.S. Dist. LEXIS 153214, at *8 (E.D.N.Y. Sept. 19, 2017).

Plaintiffs have proposed two "less discriminatory" alternatives for RPS in connection with the CrimSAFE product: (1) that RPS should return the underlying criminal record(s) with the CrimSAFE result; or (2) that RPS should conduct an "individualized assessment" of the applicant's situation in connection with any "record(s) found" through CrimSAFE.  SUMF at ¶ 66.  The Court can end its inquiry with the first suggestion, because RPS *already makes available* the underlying criminal record with every CrimSAFE result, just as it did for Mr. Arroyo.  *Id.* at ¶¶ 5, 9.  Since this supposed less discriminatory alternative is already in place (and has been since before this case), Plaintiffs' disparate impact claim is moot.[10]

## II.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' DISABILITY-BASED FHA CLAIMS IN COUNTS II AND III.

In Counts II and III, Plaintiffs plead two causes of action under the FHA on the basis of Mr. Arroyo's disability, both of which arise out of Ms. Arroyo's request to receive a copy of Mr. Arroyo's consumer file from RPS.

---

[10] **Plaintiffs' second suggestion is impractical and hypothetical.  RPS does not receive any information about the applicant beyond basic personal identifying information and has no insight into an applicant's personal story or circumstances, such that RPS could then undertake the type of subjective review proposed by Plaintiffs.  SUMF at ¶¶ 1, 3.  There also is no evidence that properties would allow RPS to act in the manner advanced by Plaintiffs. Thus, the claimed benefits are entirely speculative.**

**Furthermore, to show a less discriminatory alternative, Plaintiffs would have to present some evidence to show that the proposed second alternative would address the racial disparity they allege.  Plaintiffs have failed to do so.  They have no evidence such a practice would, in effect, reduce any claimed disparate impact. Thus, the second alternative also fails.**

First, in Count II, Plaintiffs claim that RPS intentionally discriminated against Mr. Arroyo on the basis of his disability, and that RPS's file disclosure "policy" of refusing to provide disclosures to conservators also has a disparate impact on disabled individuals.  Then, in Count III, Plaintiffs claim that RPS violated the FHA by refusing to make a "reasonable accommodation" to allow Ms. Arroyo access to Mr. Arroyo's consumer file.  Those Counts must both be dismissed.

A.   RPS Refused the File Requests Based Only on the Deficient Proffered Documentation, not a Discriminatory Animus Towards the Disabled.

As with Plaintiffs' claims of discriminatory treatment on the basis of race, "[p]roof of discriminatory animus" is essential to their claim of disparate treatment based on Mr. Arroyo's disabilities.  *Tuman*, 2017 U.S. Dist. LEXIS 28140, at *8-9. There is no evidence of any such discriminatory animus here.

RPS has in place written policies and procedures for processing consumer file disclosure made by third parties.  SUMF at ¶¶ 37-39.  Here, the record also establishes that the decision to deny Ms. Arroyo access to Mr. Arroyo's consumer file was based on the documentation submitted, and that the decision was made after multiple levels of review by the legal and compliance teams at RPS.  *Id.* at ¶¶ 44, 46, 49-50, 52.  While Plaintiffs evidently disagree with the standards imposed by RPS in terms of what documentation is sufficient to request confidential information in a third-party capacity, there can be no question that RPS's decisions were based on the documents presented, and not based on any animus towards disabled consumers.  *See, e.g., Lee v. ITT Std.*, 268 F. Supp. 2d 315, 346 (W.D.N.Y. Mar. 20, 2001) (granting judgment on disparate treatment claim because neither

28

plaintiff "submitted any evidence demonstrating that the non-discriminatory reasons articulated by ITT for such discharges were mere pretexts.").

      **B.**    <u>RPS is Entitled to Summary Judgment on Plaintiffs' Disparate Impact File Disclosure Claim in Count II, as no Others Were Affected.</u>

      RPS is entitled to judgment on Plaintiffs' claim of "disparate impact" on the basis of disability, which is asserted in Count II of the Complaint.

      Plaintiffs have not made out a *prima facie* case of disparate impact because they have not demonstrated a discriminatory effect, and also because they have not actually identified a "policy" that causes the claimed discriminatory effect.

      **1.**    <u>Plaintiffs have failed to show any disparate "impact" on anyone else.</u>

      Plaintiffs' disparate impact claim fails because a "policy" cannot have a disparate impact on a single affected individual, which is all that is identified here. Plaintiffs have presented no evidence that RPS's authentication policy has affected any other conserved individual apart from Mr. Arroyo.

      "Where plaintiffs have failed to support their disparate impact claims with statistical evidence, courts have consistently denied those claims." *Rodriguez*, 2009 U.S. Dist. LEXIS 119942, at *50. Plaintiffs have adduced no statistical evidence regarding their disability claim. They have cited only to general disability rates in Connecticut. But the disabled population in Connecticut is not the relevant group. The relevant benchmark is those disabled individuals under a conservatorship who made a disclosure request of RPS versus all persons who received a disclosure. Plaintiffs admit that they are not aware of any other conserved individual who has requested a file disclosure from RPS. *See* St. George Decl. ¶ 8, Ex. E at p. 4 ("St. George Decl."). RPS likewise has no record of *<u>any</u>* other conserved individual

requesting a file disclosure.  SUMF at ¶ 45.  Thus, the claim fails.  *Reidt v. Cty. of Trempealeau*, 975 F.2d 1336, 1341 (7th Cir. 1992) ("Discriminatory impact cannot be established where you have just one isolated decision.") (quoting *Coe v. Yellow Freight Sys., Inc.*, 646 F.2d 444, 451 (10th Cir. 1981)).

    **2.**    <u>**Plaintiffs Have Not Identified a Discriminatory Policy, as the File Disclosure Policy Claimed to be Discriminatory Does not Exist.**</u>

Plaintiffs' disparate impact claim also rests on a mischaracterization of RPS's third-party authentication policy.  In analyzing disparate impact claims, courts require "that plaintiffs identify the targeted practice with sufficient particularity" to identify "precisely what actions" are at issue. *Rodriguez*, 2009 U.S. Dist. LEXIS 119942, at *20.  A disparate impact claim must fail "if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. at 2523.

Here, the "policy" Plaintiffs point to as creating the asserted "disparate impact" does not exist.  Plaintiffs' characterization of RPS's authentication process is as follows: (1) RPS refuses to disclose consumer files to people with court-appointed conservators; and (2) RPS requires a power of attorney to disclose a consumer file.  (Compl., at ¶ 165.)  Those allegations have been disproven by facts.

RPS's policy is to assess a request on an individual basis when an executed power of attorney cannot be provided.  SUMF at ¶¶ 37-39.  Such requests are elevated to supervisors, as well as the compliance and legal departments on an as-needed basis. *Id.* at ¶ 39.  Plaintiffs' own requests demonstrate that escalation policy in action. *Id.* at ¶¶ 46, 49-50, 52.  Ms. Arroyo's file disclosure request was not denied because she was a court-appointed conservator.  Instead, after multiple

levels of supervisory, compliance, and legal review, RPS denied the request because RPS determined that she did not submit valid proof that she was a court-appointed conservator.  Because Plaintiffs have not identified a targeted practice that actually exists, their disparate impact claim fails.  *Inclusive Cmty's Project, Inc.*, 135 S. Ct. at 2523.

### 3. RPS's Third-Party Authentication Policy Serves the Legitimate and Statutorily-Required Interest of Safeguarding Consumer Privacy.

Even if Plaintiffs could show some sort of disparate impact through a defined policy (they cannot), RPS's authentication policy serves a legitimate purpose.

RPS's authentication policy ensures that a consumer's information is not disclosed to an unauthorized recipient.  Not only does that practice further legitimate consumer privacy interests, authentication is *mandated* by Congress. 15 U.S.C. § 1681h(a)(1).  Congress enacted the FCRA, including the proper identification requirement, to protect consumer privacy, going go far as to "condition" access to consumer files on proper authentication of the consumer. *See id.*  RPS's policy is designed to ensure that it adheres to that mandate.

Moreover, Plaintiffs cannot point to a less discriminatory alternative to this legitimate process.  RPS requires a conservator to submit a valid certificate of conservatorship, which Ms. Arroyo did not do.  Allowing someone who claims to be a conservator to obtain a disclosure without providing valid documentation could amount to RPS violating its statutory duty under the FCRA.  That is not a valid alternative.  *Mhany Mgmt.*, 2017 U.S. Dist. LEXIS 153214, at *23 (explaining that a less discriminatory practice "must serve a defendant's legitimate interests").

31

**C.    RPS is Entitled to Summary Judgment on Plaintiffs' "Reasonable Accommodation" in Count III Claim on Multiple Grounds.**

In Count III, Plaintiffs allege that RPS failed to "reasonably accommodate" Mr. Arroyo's disability when his consumer file was requested from RPS.

To prove a failure to reasonably accommodate claim, a plaintiff must prove that: (1) the plaintiff had a handicap; (2) the defendant knew of the handicap; (3) the requested accommodation was likely necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) the accommodation was reasonable; and (5) the defendant refused to make the accommodation.  *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 156 (2d Cir. 2014).  Plaintiffs cannot establish that the accommodation was likely necessary to afford Mr. Arroyo an equal opportunity to use and enjoy the dwelling, that the accommodation was reasonable, or that RPS refused to make the requested accommodation.

**1.    The Accommodation was not Likely Necessary to Afford Mr. Arroyo an Equal Opportunity to use and Enjoy Housing.**

"Plaintiffs must show that, but for the accommodation, they likely [were] denied an equal opportunity to enjoy the housing of their choice."  *Tsombanidis*, 352 F.3d at 578.  Plaintiffs have no evidence to support that element of their claim. RPS has no authority to override any housing decision by WinnResidential.  Hence, it is axiomatic that Plaintiffs must support a claim regarding what WinnResidential would have done *with testimony from WinnResidential*.  *See Xue Ming Wang v. Abumi Sushi, Inc.*, 262 F. Supp. 3d 81, 92 (S.D.N.Y. 2017) ("A party may not rely on conclusory allegations or unsubstantiated speculation on summary judgment."). Yet, Plaintiffs took *no discovery* from WinnResidential.  SUMF at ¶ 62.  The record contains no evidence – either through documents or testimony – as to what

32

WinnResidential allegedly would have done upon presentment of Mr. Arroyo's file disclosure.

In fact, far from showing that WinnResidential would likely have granted an accommodation, every plausible inference in the record is that the presentment of the file disclosure would have had no effect on WinnResidential's decision to deny Mr. Arroyo housing.  WinnResidential possessed Mr. Arroyo's criminal record from the very moment it ran the report, yet WinnResidential still did not reverse the housing decision for over a year.  SUMF at ¶¶ 29-31.  Even more, WinnResidential did not change its decision on admitting Mr. Arroyo until it was served with an administrative complaint for failing to reasonably accommodate Mr. Arroyo based on his disability, which was settled on the eve of the hearing.  Id. at ¶¶ 32-34.  In sum, there is no factual basis to claim that the requested accommodation was the cause of the denial of a housing opportunity by WinnResidential to Mr. Arroyo.

2.    <u>Plaintiffs Did Not Actually Request a Reasonable Accommodation.</u>

Plaintiffs' refusal to accommodate claim also independently fails for lack of a reasonable request.  A failure to accommodate claim requires a plaintiff to give the defendant an opportunity to provide a reasonable accommodation.  *See, e.g.*, *Taylor v. Harbour Pointe Homeowners Ass'n*, 690 F.3d 44, 49 (2d Cir. 2012).  An accommodation is not reasonable if it "requires a fundamental alteration in the nature of the program."  *See Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 288 n.17 (1987).  Mr. Arroyo's request that RPS ignore the requirement of a visible seal on the conservatorship form is not reasonable.  Those authenticating features are there for the protection of the conserved person.  RPS was willing to provide Ms.

Arroyo a file disclosure upon receipt of a properly-authenticated conservatorship certificate.  That document never came.

## III.   PLAINTIFFS' FCRA CLAIM FAILS

In Counts IV and V, Mr. Arroyo alleges that RPS violated the FCRA through the failure to provide the requested file disclosure, and that such a violation was both negligent and "willful."  Both contentions fail.  There can be no negligent violation of the FCRA because Mr. Arroyo suffered no damages as a result of file disclosure process.  And, any contention of a "willful" violation of the FCRA is belied by the undisputed facts of this case.

### A.   Plaintiffs Have Shown No Damages Based on RPS's Conduct.

"Causation is a necessary element of an award of actual damages in an FCRA negligence claim."  *Wenning v. On-Site Manager, Inc.*, No. 14 Civ. 9693, 2016 U.S. Dist. LEXIS 81126, at *72 (S.D.N.Y. June 22, 2016) (citing 15 U.S.C. § 1681o). The crux of Mr. Arroyo's damages claim in Counts IV and V is that "Ms. Arroyo was able to use that [file disclosure] information to persuade her landlord to overlook [Mr. Arroyo's] criminal history."  (Dkt. No. 87 at p. 17.)  Yet, Mr. Arroyo has presented no evidence from WinnResidential that the failure to disclose the file was the cause of his difficulty in finding housing.  He developed no testimony from WinnResidential, which outright precludes any finding of causation.  Nor could any such showing have plausibly been made, as WinnResidential already had the criminal record yet refused to grant access to housing until it was sued and settled on the eve of trial.  SUMF at ¶¶ 29-34.  Mr. Arroyo thus cannot show that RPS caused his claimed injuries.

**B.**     **No "Willful" Violation of the FCRA in Counts IV and V is Possible Based on the Record, Which Shows Diligent and Good-Faith Review of the Requests by RPS.**

Mr. Arroyo also seeks punitive damages for a "willful" violation of the FCRA. There is no factual basis for such a claim based on the record here.

To establish a willful violation of the FCRA, "a company subject to the FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."   *Safeco Ins. Of Am. v. Burr*, 551 U.S. 47, 69 (2007).  A company's interpretation of the statute is objectively unreasonable when courts or the overseeing regulatory agencies have offered guidance that "might have warned it away from the view it took."  *Id*. at 70.

Mr. Arroyo has the burden to prove that by not accepting Ms. Arroyo's conservatorship certificate, RPS not only violated the FCRA as a matter of law, but that RPS's alleged violation arose from an "objectively unreasonable" reading of the statute.  Put plainly, not accepting deficient certificates of conservatorship that clearly indicate that they are not to be accepted without a visible seal cannot be considered "willful."  The term "proper identification" is not defined in the FCRA, and there is no authority from the Second Circuit, the Supreme Court, or the FTC/CFPB which would have placed RPS on notice that they must accept a conservatorship certificate that was deficient on its face.

Moreover, RPS's policy is to escalate situations that are outside of normal experience of more routine third party disclosure requests made on behalf of those who cannot request disclosure themselves, which here included multiple levels of

review by management, internal legal, and outside counsel.  SUMF at ¶¶ 46, 49-50, 52.  Yet, throughout the process, Ms. Arroyo continuously submitted insufficient documentation, lacking the requisite detail and authentication, as required by the conservatorship form itself.  *Id.* at ¶ 44.

RPS's policy and practices in this case were reasonable – and certainly not "objectively unreasonable" – in light of the statutory requirement that RPS maintain the confidentiality of consumers' information.  *See, e.g., Singletery v. Equifax Info. Servs.*, No. 2:09-cv-0489, 2012 U.S. Dist. LEXIS 132969, at *29-31 (N.D. Ala. Sept. 18, 2012) (no willful violation of similar free annual credit disclosure provision to third party based on identification procedures because "[i]t represents a reasonable compromise between sending the report and verifying the consumer's identity"); *accord Ogbon v. Ben. Credit Servs., Inc.*, No. 10 Civ. 3760, 2013 U.S. Dist. LEXIS 50816, at *28-30 (S.D.N.Y. Apr. 8, 2013).  Therefore, summary judgment is required as to Mr. Arroyo's alleged willful violation of the FCRA.

## IV.    RPS IS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMED VIOLATIONS OF THE CUTPA IN COUNT VI.

To prevail on the CUTPA claim plead in Count VI of the Complaint, Plaintiffs must prove two elements: "(1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; [and] (2) [Plaintiffs have] suffered an ascertainable loss of money or property as a result of the defendants acts."  *Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc.*, 296 Conn. 315, 350 (2010).  None of those standards are met here.

A.    **RPS has not in Any Way Engaged in "Unfair" or "Deceptive" Acts.**

Plaintiffs' CUTPA claim fails because there is no factual basis to claim that RPS acted unfairly or deceptively towards Plaintiffs.  There is no allegation that RPS in any way "deceived" Plaintiffs in connection with the identified file disclosure request or how the CrimSAFE product operates, or that RPS treated Mr. Arroyo "unfairly" in the tenant screening process when compared to any other similarly-situated consumers, all of whom would have been subject to the same CrimSAFE categorization process and file disclosure requirements.  The CrimSAFE categories track the FBI's categorizations, and they are objectively applied.  SUMF at ¶ 7.  The pending offense identified for Mr. Arroyo also was in every way accurate.  *Id.* at ¶¶ 26-27.  As set forth above, there also is no factual basis for any claim of disparate treatment in this case, either on the basis of race or disability.

To the extent Plaintiff alleges RPS's CrimSAFE categories or authentication process were too restrictive or should have somehow been structured differently, such a claim does not provide a cause of action under the CUTPA.  *See, e.g.*, *Citibank (S.D.) N.A. v. Osagie*, No. CV106004637, 2012 Conn. Super. LEXIS 1186, at *9 (2012) ("CUTPA does not prohibit businesses within this state from making decisions as to how they conduct business.  CUTPA simply prohibits the use of unfair or deceptive practices in the operation of those businesses.").

B.    **A File Disclosure is not Part of "Trade" or "Commerce," and There is no Evidence of any Damages Allegedly Caused by RPS.**

In addition to the foregoing deficiencies, the CUTPA claims addressing RPS's file disclosure policies also fail on the additional bases that: (1) the file

disclosure mandated under the FCRA is not a part of trade or commerce; and (2) Plaintiffs cannot prove damages arising out of the file disclosure process.

With respect to the first issue, the CUTPA defines "trade and commerce" as, "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42-110a. Discovery has confirmed that a file disclosure is not a part of commerce, has no connection to any of RPS's customer relationships, and is completely free of charge to consumers. Indeed, file disclosures are not linked to any prior screening and can be requested by consumers at any time, even if the consumer has not been the subject of any prior RPS screening report. In short, there is nothing "commercial" about the file disclosure process.

Furthermore, as noted above in connection with Plaintiffs' claimed negligent violation of the FCRA, Plaintiffs have presented no evidence from WinnResidential that the failure to disclose the file was the cause of Mr. Arroyo's inability to obtain the reversal of the housing decision by WinnResidential.

V.     THE CFHC'S COMPENSATORY DAMAGES CLAIMS MUST BE DISMISSED.

The CFHC seeks compensatory damages consisting of "frustration of mission" and "diversion of resources." If any of the above claims survive summary judgment, then those damages must independently be dismissed.

A.     The CFHC's Prospective "Frustration of Mission" Damages are not Recoverable.

Based on vague claims of "frustration of mission," the CFHC states it will need to undertake a $300,000-$350,000 educational campaign to educate housing

providers in Connecticut that they must comply with the law in connection with their request and assessment of criminal background screenings. SUMF at ¶ 63.

As a threshold matter, these claimed damages are not compensable because this contemplated campaign remains entirely prospective and undeveloped.  It is undisputed that the CFHC has not yet implemented the campaign or retained any organization to implement that campaign and/or develop the content.  It is well established that such frustration of mission damages are not compensable when no such "educational effort was ever implemented" by the plaintiff.  *Fair Hous. Council v. Montgomery Newspapers*, 141 F.3d 71, 77 (3d Cir. 1998) (addressing a claimed $400,000 educational and mailing campaign based on frustration of mission).  "[I]nchoate plans for future programs are insufficient to demonstrate injury" from a claimed "frustration of mission."  *Id.*  That is all that is present here. *See, e.g.*, *Chesapeake Climate Action Network v. Export-Import Bank of the United States*, 78 F. Supp. 3d 208, 232 (D.C. Cir. 2015) (dismissing such damages when there was no proof that "the organization has in fact had to reallocate resources.").

Moreover, to recover such damages, "a fair housing organization must establish as a matter of fact that expenditures in education, counseling and/or outreach are necessary to counterbalance the effects of a defendant's discriminatory practices."  *See, e.g.*, *Fair Hous. of Marin v. Combs*, No. C 97-1247, 2000 U.S. Dist. LEXIS 4737, at *12-13 (N.D. Cal. Mar. 29, 2000) (citing *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 28-29 (D.C. Cir. 1990)).  There is no such proof in this case.  In claiming these damages, the CFHC admitted that it was "not fully knowledgeable of the extent and effect of the defendant's conduct but *believes* it to be significant."  That "belief" was never developed or supported.  SUMF at ¶ 67.

While the CFHC's corporate designee testified that the CFHC has had conversations with customers who use "CoreLogic's" products,[11] no such customer was ever the subject of any third-party discovery. *Id.* at ¶ 62. The record is devoid of any evidence showing that any such campaign is necessary, especially when the admitted aim of the campaign would be to instruct housing providers to simply follow the law. Indeed, RPS has already undertaken affirmative steps to educate its customer base about the content of the April 4, 2016 HUD memorandum through affirmative outreach and training programs, which makes the proposed campaign especially unnecessary. *Id.* at ¶ 19.

> **B.   The CFHC's Claimed "Diversion of Resources" Damages Are Insufficient, Having Virtually Nothing to do With RPS.**

Plaintiffs' claim of diversion of resources also fails on multiple grounds. Plaintiffs have attributed tens of thousands of dollars of expenses to RPS, but has offered no evidence to support this claim. Indeed, the vast majority of those expenses are wholly unrelated to RPS and/or this case.

"Although a fair housing organization may recover damages based on . . . diversion of resources, there must be evidence directly tying these damages to the defendant's alleged wrongdoing. Absent evidence that the fair housing organization diverted its resources in response to specific wrongdoing by a particular defendant, there is no legal basis for imposing liability on that defendant." *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, No. 3:10-cv-83, 2015 U.S. Dist. LEXIS 23619, *9 (S.D. Ohio Feb. 26, 2015) (citing *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898 (2d Cir. 1993)). Moreover, an organizational plaintiff

---

[11] Any such conversations are, of course, inadmissible hearsay.

"cannot convert an ordinary program cost—advocating for and educating about its interests—into an injury in fact." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 968 F. Supp. 2d 243, 245 (D.C. Cir. 2014).

The itemized summary of diversion costs submitted by the CFHC falls well below these standards for recovery.  Plaintiffs itemize a total of $82,639 over 208.85 "diverted" hours allegedly due to RPS's conduct.  The log, however, is replete with generic entries such as organizing an "intern lunch," which is a byproduct of the fact that the CFHC has admitted that log simply reflects any instance where the CFHC worked on *any* housing matter involving *any* criminal record issues, regardless of whether RPS was in any way involved with the client being served by the CFHC, *i.e.*, "a summary of all the work [the CFHC has] done on criminal records." St. George Decl. ¶ 8, Ex. B at p. 10.

Specifically, the diversion log contains six tabs: "CoreLogic," "education and outreach," "testing," "testing costs," "client work," and "grant writing."[12]  Only the "CoreLogic" tab is in any way related to RPS or this case.  The remaining tabs implicate work voluntarily undertaken by the CFHC without any tie to RPS.  Those types of "damages," which are both at the core of the CFHC's mission and unrelated to RPS, are not recoverable.  *See, e.g.*, *High Plains Cmty. Dev. Corp. v. Schaefer*, No. 4:07CV3149, 2008 U.S. Dist. LEXIS 36661, at *7 (D. Neb. May 2, 2008) (granting summary judgment on claimed diverted resources: "High Plains cannot

---

[12] While space constraints prevent a full review of these narratives on the "education and outreach," "testing," "testing costs," "client work," and "grant writing" tabs, RPS urges careful review, as the Court can determine that these claimed activities do not relate to RPS and instead are generally consistent with the outreach, testing, and grant writing of a non-profit housing organization.

specify how much of this staff time or expenditure of funds may be attributable to the alleged conduct in the Amended Complaint, because much of the time staff spent with Lame related to other issues that had nothing to do with the named Defendants or their alleged discriminatory conduct.").

The "CoreLogic" tab, which is the only tab in way in any way relating to RPS, totals $9,447 across 42.4 hours, with 33.8 those hours occurring in 2016 and 2017 when the CFHC was working with Mr. Arroyo in suing WinnResidential.  Those time entries are attributable to conduct of *WinnResidential*. ████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████  Of the remaining 8.6 hours from 2018 on the CoreLogic tab, 7.4 of those hours consist of putting together the defective diversion log, with the remaining 1.2 hours consisting of entries that are vague regarding work on the "Corelogic case" and "emails" and/or entries that are redacted under a claim of privilege, and which are insufficiently specific to support any claim of damages. *See High Plains Cmty. Dev. Corp.*, 2008 U.S. Dist. LEXIS 36661, at *7.

C.   **The CFHC's Claimed Compensatory Damages Have Been Almost Entirely Offset by Other Third-Party Awards.**

The CFHC is seeking damages for the work spent on background screening issues, yet it already requested and received $380,000 in grant money for the purpose of funding the same activities that it claims have "diverted" its attention to address in connection with this case.  In particular, the CFHC received $260,000 over three years and $500,000 over three years from two separate grants to look at

issues relating to "people who could not find housing as a result of criminal records."  SUMF at ¶65; *see also* St. George Decl. ¶ 5, Ex. B at p. 7.  The CFHC stated that "half" of those grants were directly "related to the criminal background screening issues" that comprise CFHC's claimed compensatory damages, with those grant proposals specifically referencing the need to fun additional work the CFHC claims was being diverted due to challenged practices of "CoreLogic."  St. George Decl. ¶5, Ex. B at pp. 8-9, 12.  In fact, the grant awards are for the same grants that appear on the "grant writing" tab of the diversion log that are claimed as damages, and the CFHC's witness testified that these $380,000 in grants have been used to "fund" "everything in [the] diversion log."  *Id.* ¶at pp. 9-10; SUMF at ¶ 65.

Put another way, the CFHC admits that these grant requests were made for the purposes of funding the activities they claim were "diverted" due to RPS, and that the successful grant proposals have, in practice, funded almost the entirety of the damages listed on the diversion log.

The Second Circuit has embraced the general rule against double recovery of damages for the same injury.  *See, e.g., Phelan v. Local 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada*, 973 F.2d 1050, 1063 (2d Cir. 1992).  "That rule clearly applies where the concern over double recovery centers on compensatory damages, which are intended to make a plaintiff whole for the injury he suffered."  *Simuro v. Shedd*, No. 2:13-cv-0030, 2017 U.S. Dist. LEXIS 192102, at *24 (D. Vt. June 19, 2017).  Thus, to the extent that any of these "diversion" damages are recoverable, any such award would need to be reduced by the $380,000 in awarded grants that stem from the same grant writing

activities the CFHC also claims as damages, and which have funded the exact same testing, education, and client work initiatives that the CFHC claims was diverted to focus on criminal tenant screening issues.

**VI.** **MS. ARROYO DOES NOT HAVE STANDING TO BRING ANY OF HER ASSERTED CLAIMS IN HER "INDIVIDUAL" CAPACITY.**

Ms. Arroyo has brought claims in her "individual" capacity with respect to Counts I, II, and III under the FHA and Count VI under CUTPA.  However, Ms. Arroyo does not have standing to individually bring these claims, and her status as conservator likewise precludes her from suing in an individual capacity.

From a Constitutional perspective, "the irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  Ms. Arroyo fails these requirements.

Ms. Arroyo cannot allege an "injury in fact" required for standing under any of her claims for the simple fact that *she was not denied housing at any point*.  She experienced no "concrete and particularized" injury.  The policy at the center of the claim of disparate impact based on race would not impact her based on the facts in the record.  She has not claimed, alleged, nor provided any evidence in the

44

record that she received a positive "record(s) found" result based on any criminal history.  In fact, at all relevant times during this dispute, not only was she not denied housing at ArtSpace Windham – she was living there.  FHA standing extends "only to those persons who are personally denied equal treatment by the challenged discriminatory conduct."  *Vaughn v. Consumer Home Mortg. Co.*, 297 F. App'x 23, 26 (2d Cir. 2008).  Ms. Arroyo was never "denied equal treatment" by RPS (or WinnResidential for that matter), and she thus has suffered no injury from those procedures.

Ms. Arroyo also does not have standing to sue under the CUTPA.  Suits under CUTPA are limited to a "person who suffers any ascertainable loss of money or property . . . ."  Conn. Gen. Stat. § 42-110g.  Ms. Arroyo cannot point to any such loss as a result of RPS.  She did not suffer an adverse housing decision and can point to no "ascertainable loss."  Indeed, her claimed injuries are entirely derivative of the application submitted by *Mr. Arroyo* and the file disclosure made on behalf of *Mr. Arroyo*.  *Ganim v. Smith & Wesson Corp.*, 258 Conn. 313, 365 (2001) ("Plaintiffs lack standing because the harms they claim are too remote from the defendants' misconduct, and are too derivative of the injuries of others.").

Finally, Ms. Arroyo's only relation to this lawsuit is that she applied for housing as the conservator of Mr. Arroyo, and that she then later requested a copy of Mr. Arroyo's consumer file based on her status as a conservator.  While being a conservator allows her to bring suit on behalf of Mr. Arroyo, it does not confer his legal rights and claims onto her.  *See Zanoni v. Hudson*, 48 Conn. App. 32, 38 (Conn. Ct. App. 1998) ("There is no standing for a conservator to sue or be sued in his individual capacity."); *see also W. R. Huff Asset Mgmt. Co., LLC v. Deloitte &*

*Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008) ("[S]tanding alone, a power of attorney does not enable the grantee to bring suit in his own name.").

## CONCLUSION

For the foregoing reasons, Defendant, CoreLogic Rental Property Solutions, LLC, respectfully requests that the Court: (1) grant it summary judgment, dismissing all claims against it with prejudice; and (2) grant it such other and further relief as may be appropriate.

Respectfully submitted,

/s/ Daniel W. Cohen
Daniel W. Cohen (Bar No. CT 30467)
TROUTMAN SANDERS LLP
875 Third Avenue
New York, NY 10022
Telephone:  (212) 704-6000
Facsimile:  (202) 704-6288
Email:  dan.cohen@troutman.com

Timothy J. St. George, *Pro Hac Vice*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
Telephone:  (804) 697-1254
Facsimile:  (804) 698-6013
Email:  timothy.st.george@troutman.com