## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

**CARMEN ARROYO, et al.,**

*Plaintiffs,*

-v-

**CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC,**

*Defendant.*

Case No. 3:18-cv-00705-VLB

## DECLARATION OF JAY KACIRK

I, Jay Kacirk, the undersigned, hereby declare:

1.     I have been retained by CoreLogic Rental Property Solutions, LLC ("RPS") as an expert in this matter.

2.     On April 15, 2019, I submitted my expert report in this matter, which is attached to this declaration as <u>Exhibit A</u>.

4.     The opinions set forth in the April 15, 2019 expert report are accurate based on my knowledge, training, experience, and education.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November 11, 2019

_____
Jay Kacirk

# EXHIBIT A

# Expert Report and Opinion

## *Connecticut Fair Housing Center, et al v. CoreLogic Rental Property Solutions, LLC*

## Introduction

One of the bases for the present litigation against CoreLogic Rental Property Solutions, LLC ("RPS") is the allegation that one of the screening products it offers to its housing provider clients known as "Registry CrimSAFE©" violates the federal Fair Housing Act.

Specifically, the case implicates an application submitted by Mr. Mikhail Arroyo and processed on behalf of an RPS client, WinnResidential, with respect to a WinnResidential property known as "ArtSpace Windham LP" located in Windham, Connecticut. Mr. Arroyo's application was initially denied and then subsequently approved by WinnResidential .

The opinions that follow discuss how property management companies conduct criminal record background screenings, including the value added by products as such CrimSAFE and how such products are commonly used by property managers.

## Tasks Performed

I was retained as an expert witness for RPS to render a professional opinion on whether or not the challenged practices and services that RPS provides to its clients promote legitimate public and/or business interests, and whether those practices and services are necessary to achieve those interests. I also opine on whether those practices and services are consistent with my experience in the industry of housing providers that obtain and use background reports in qualifying residents who apply for rental housing.

Specifically, my professional opinions relate to the allegations that RPS's services allegedly violate the federal Fair Housing Act protections through a disparate impact against those in the protected classes of "Race" and/or "National Origin" for those applicants who are found to have criminal backgrounds. I do not opine on Plaintiff's claims that RPS's "file disclosure" policies allegedly violate the law.

My hourly rate charged under this retention for all services performed including the review of related documentation, formation and preparation of my professional opinions in report format and related communications is $525.00 per hour. My hourly rate for any direct participation in depositions and trial testimony would be $625.00 per hour, plus travel costs.

# Expert Qualifications

My qualifications are as described in full in my *curriculum vitae* (See Exhibit 1). To summarize, I am a Certified Property Manager® (CPM®), an industry designation earned through an extensive education program, proof of industry experience, and an ongoing agreement to abide by a comprehensive Code of Ethics designed for the field of professional property management. This designation is awarded by the Institute of Real Estate Management (IREM), which is the property management affiliate of the National Association of Realtors®. I have been a member of IREM since 1983 and earned the CPM® designation in 1985.

I currently hold the position of Executive Vice President with my present employer of over 20 years. As Executive Vice President, I have direct responsibility for the property management policies and practices that take place in our regional offices located in Nevada and California, and which encompass 91 separate properties across multiple states and 5,800 overall multifamily units. When not serving as the direct supervisor of apartments and their staff, I supervise the managers assigned to portfolios of market and subsidized apartments, including with respect to issues of criminal background screening of applicants.

Since 1988 I also have been an instructor for IREM, having taught over one hundred of their courses to thousands of students on topics of residential apartment management, leasing, maintenance, common interest management, human resources, and ethics. The courses in residential apartment management and apartment leasing both contain subject matter on complying with federal Fair Housing Laws in the operation of rental housing.

I was a member of a six-person review team for the national course "Fair Housing and Beyond", which was a joint development effort between IREM and the National Apartment Association Education Institute. This 4.5 hour course was designed to educate management professionals on federal Fair Housing Laws in a classroom setting via text materials and video demonstration.

Professionally, I have worked in the residential property management industry for more than forty years. My industry positions have included being a direct supervisor of apartments and other property types (including housing exclusively for seniors and rent subsidized properties run under programs of The Department of Housing and Urban Development ("HUD"), as well as The Department of Agriculture – Rural Development) and the owner of my own property management firm for a period of ten years (1988 through 1998). Currently, I hold the position of Executive Vice President for a property management company for which I have been an employee for more than twenty years.

Over the course of my lengthy career, I have been actively engaged in the resident application and selection process. This has encompassed the creation of Tenant Selection Plans for properties, which specifically outline the criteria for residency at apartment sites, including with respect to applicant criminal histories and how such criminal histories are to be reviewed and evaluated. For affordable sites, those Tenant Selection Plans are heavily influenced by the agencies who

administer the subsidy and sometimes even the financing programs in place (such as HUD and Rural Development). However, whether market rate or affordable housing, all such Tenant Selection Plans and other criteria for residency must follow Fair Housing laws, which are enacted at the federal and state levels, as well as at the local government level, where cities or counties have enacted ordinances expanding protected classes (*i.e.*, groups that may not be discriminated against in housing due to their inclusion in a protected class, such as gender identification or sexual orientation). Ongoing education is essential to successfully navigate the requirements of the laws and ordinances at the various levels of government, as well as judicial decisions which can affect industry practices and direct governmental guidance.

To assist with such compliance, I participate in annual Fair Housing training webinars and continuously monitor and read industry websites and publications on current developments and changes in the applicable laws. For instance, after the release of the April 4, 2016 HUD Memorandum on the "Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions," ("the April 2016 HUD Memorandum") which is discussed further below, I was part of a team in our company that worked with our tenant screening vendor to review and update our criminal records screening policies to make sure we were following the newly published guidance. This included the review of policies regarding the age of criminal records (i.e., how far back in time we wanted our screening vendor to look for criminal records for a given applicant), as well as making sure there was a relationship between a crime and the potential risk of allowing a person who had been charged and/or convicted of a crime to reside in our properties.

I also have expertise from the property management side of the industry working on Fair Housing complaints involving management, a property, or a client. The filing of the claim is a fairly simple matter, as HUD maintains an online link to an automated complaint form. Typically, local or state agencies then handle such claims. The ability for a person who feels their housing rights have been violated to record a legitimate complaint after exhausting other avenues of communication is highly important and basic to the broad enforcement of Fair Housing laws. In my experience, regular and focused education of all staff members who are involved in dealing with applicants and residents is critical to properly responding to such complaints.

I also served for approximately seven years as a member of the Poway Housing Commission. In that capacity, I worked with city staff and obtained approval from the City Council to hold an annual event during Fair Housing month to promote education to the city's residents. We invited the general public to an early evening session at City Hall where we conducted a "mock trial" format devoted to Fair Housing issues and the steps to take in the event of a variety of circumstances.

I have substantial experience working with criminal background screening providers, including providers that apply a housing provider's set criteria to criminal records matched to applicants to ensure compliance with the housing provider's criminal record policies, much like the CrimSAFE product at issue in this case. I have been personally involved in setting such criteria, as well as in

training individual property managers in working with such products.  I have also discussed the use of such products with other industry professionals and gained an understanding of how such products are commonly used in the industry.

As a result of this experience, I have been privileged to receive many industry awards during my career.  Those accolades include IREM's Professional Achievement Award, Certified Property Manager of the Year, and a Lifetime Achievement Award from the San Diego IREM chapter.

# Materials Reviewed

In preparing this report, I reviewed the materials as described in Exhibit 2 attached.  I also participated in personal interviews with RPS personnel, including Naeem Kayani, to gain additional knowledge regarding the operation and purpose of the CrimSAFE product.

# Summary of Facts and Opinions

## I.      The Tenant Screening Market

To ensure the adequate supply of quality housing to the public, housing providers frequently look to many third-party vendors, which offer a wide variety of services and products.  Examples of these include insurance brokers, building supply outlets, and software providers, just to name a few.  Those vendors also often include companies offering tenant screening services, including criminal history reports.

The tenant screening industry is composed of companies that are focused on assisting owners, landlords and managers of residential properties in evaluating prospective tenants and assessing the risks associated with potential tenancies.  Significantly, the utility of a tenant screening report is not limited to the assessment of a prospective tenant's creditworthiness or ability to pay.  Tenant screening reports also play an increasingly important role in ensuring public safety.

### A.      The Significance of Criminal Record Histories in Tenant Screening

When our society was less mobile, we relied on the direct knowledge of our relatives, neighbors and business associates to assist us in assessing certain risks and making personal decisions.  Those readily accessible resources helped us as consumers of rental housing to decide where to rent an apartment and, as property owners, to decide whom to invite into a rental community.  Today, people can easily move from one side of the country to the other with few barriers.[1]  As a result, assessing risks and making personal decisions based on old, familiar sources of information is more challenging.

One tool to address the anonymity created by mobility is the criminal history report provided by background screening companies, such as RPS.  Those reports contain relevant information on an

---

[1] According to the U.S. Census Bureau, approximately 1 in 5 renters (or 21.7% of renters) move every year.  *See* https://www.census.gov/newsroom/press-releases/2017/mover-rates.html.

applicant's criminal history (if any), and they provide properties with insight into whether an applicant has the propensity for criminal behavior that could pose a threat to the property and/or its residents.

The high stakes involved in protecting residential communities and preventing life-altering incidents make review of an applicant's criminal history essential in today's societal climate. With the wide availability of criminal history reports, there is simply no excuse for "taking chances" with the lives of innocent residents and community members. This is especially true as the tragic consequences of failing to perform criminal background checks on prospective tenants and other members of the community have been borne out time and again in devastating incidents across the country.

### B.    Federal Requirements/Policies for Criminal Background Screening

The federal government recognizes the clear benefits of tenant screening, as evidenced by the requirement that criminal history reports be used in the tenant screening process for public housing across certain categories.[2]  Public housing authorities have discretion to develop more stringent screening policies and to accept or deny prospective renters with records of other crimes.  Federal guidelines instruct that public housing authorities may reject applicants who have engaged in any of the following activities within a reasonable time before submitting their application:

1.    Drug-related criminal activity;

2.    Violent criminal activity; or

3.    Other criminal activity that would adversely affect the health, safety, or right to peaceful enjoyment of the premises by other residents, the owner, or public housing-agency employees.[3]

To assess these criteria, criminal history reports are mandated for public housing to determine whether an applicant is qualified to live in federally-assisted housing.

Public policy thus strongly favors full disclosure of relevant criminal records belonging to a prospective tenant.  In fact, as HUD itself noted in the April 2016 HUD Memorandum, "[e]nsuring resident safety and protecting property are often considered to be among the fundamental responsibilities of a housing provider, and courts may consider such interests to be both substantial and legitimate."[4]

---

[2] 24 C.F.R. § 960.204; 42 U.S.C. § 1437n(f); 42 U.S.C. § 13661; 42 U.S.C. § 13663.

[3] 42 U.S.C. § 13661(c).

[4] "Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions," https://www.hud.gov/sites/documents/HUD_OGC GuidAppFHAStandCR.pdf at pp. 4-5 (April 4, 2016).

### C.    Tenant Screening is Also Necessary to Protect Property and the Assets of Property Management Companies, Thereby Ensuring A Supply of Adequate Housing

Criminal record screening is also an important component of a housing provider's duties to ensure a safe environment for tenants. The failure to conduct such screenings can lead to substantial liability that can threaten the financial viability of properties. In that regard, I also researched specific cases wherein housing operators were found liable for failure to adequately exercise a duty of care to protect their property and residents from those with criminal background history that would have indicated a likelihood of continued criminal behavior. While courtroom outcomes cannot always be accurately predicted, substantial liability can be imposed for housing providers for failure to conduct adequate screening.[5]

Liability of this magnitude can affect the ability of property management companies to continue offering safe and stable housing and/or to obtain insurance at reasonable rates. Criminal record screening is thus an important step in ensuring that housing communities can remain solvent and provide quality housing to the public at large.

### II.    The Legitimate Interests Served by "Categorization" Products Like CrimSAFE

Criminal screening companies like RPS can provide a list of criminal records that are associated with an applicant. To order such a report, the property management company submits personal identifying information about the applicant to the screening company, which generally includes full names, addresses, and the date of birth of the applicant.[6] The April 2016 background screening report at issue here reflects that type of arrangement in the "Multi-State Criminal Search Report," where I understand that Mikhail Arroyo was accurately identified as having a prior criminal record for theft, with substantial details of that criminal history also prominently displayed for the housing provider to review.

In addition to the return of criminal records, criminal screening companies also often make available a product that automatically "categorizes" any such identified criminal records according to their severity levels under applicable state and federal law, as well as the type of crime, and then apply the leasing criteria set by the housing provider to that type of record and severity level. In offering such products, the background screening companies have researched the nature of the crime and its severity level under applicable law, such that the nature of the crime and its severity level can then be applied to the criminal record leasing criteria that have been independently and

---

[5] One such example I reviewed was *Peterson v. Kings Gate Partners - Omaha I, L.P.*, 290 Neb. 658, 660 (Neb. 2015), which implicated a tenant's negligence claim against housing provider for failure to exercise reasonable care in performing a criminal background check on a fellow tenant.

[6] When such personal identifying information is submitted to RPS, it contains no reference to the race or disability status of the applicant. Indeed, RPS does not offer a field for such information to be input by the property manager.

previously set by the property manager customer. That type of service is provided by RPS through the CrimSAFE product.

The CrimSAFE product is an optional product offered by RPS in connection with customer requests for criminal background screening. Prior to using the product, housing providers are required to fill out their criminal record selection criteria on a matrix that accounts for the type or "category" of crime (*e.g.*, crimes against persons, crimes against property, or crimes against society),[7] whether the offense resulted in a conviction, and the period of time elapsed since the date. Those criteria are input on a form offered by RPS, and the criteria selected are entirely left to the discretion of the property management company. Through an automated and electronic system, RPS then populates one of two notations in connection with the CrimSAFE product: "Record Found" or "No Record Found." The property management company is also able to select further phrasing that can appear in the CrimSAFE section of the report after RPS's systems apply the housing provider's categorization criteria to locate any record(s) correlating to those criteria.[8] The CrimSAFE product does not render a decision on an application for tenancy. There also is no automated way for property management companies to automate a decision based on the CrimSAFE categorization using the criteria selected by the property management company. Instead, when using RPS's software application on which the CrimSAFE product runs, the property management company must navigate to another section of the software application to manually enter a leasing decision after reviewing the application as a whole, and the property management company has full control over the decision at that stage with no input or guidance from RPS. For that reason, property management companies have the full ability to "accept" an applicant even when a record is identified by the CrimSAFE product.

Property management companies are also trained by RPS on how to use the CrimSAFE product, including the fact that the CrimSAFE categorization product does not render a decision on applicants and that such decisioning must be done at the property-level based on policies of the property, with the decision further manually input into the software.

The CrimSAFE product will always be accompanied by another portion of the report that is generated by RPS, which is labeled the "Multi-State Criminal Search Report" section. In that Multi-State Criminal Search Report section, RPS displays the full data of any underlying record(s) that are implicated by the purchase of the CrimSAFE product, with the CrimSAFE section of the report explicitly referring the property management company for details of any record that was located by RPS based on the CrimSAFE settings selected by the property. Property management companies do retain the option to limit the ability of individual leasing agents to view the full details of records that are found by the CrimSAFE product. If such a setting is applied, however, the version of the report with the full details of any records found by the CrimSAFE product is

---

[7] These categories reflect the types of crimes that pose a great risk to tenant and property safety.

[8] It is not my understanding that Mr. Arroyo disputes that he was the subject of the criminal record reported by RPS or that RPS somehow committed an error in electronically applying the criteria that had been previously input by RPS.

transmitted to an identified supervisor(s) at the property. Those supervisors then review the full record in the Multi-State Criminal Search Report section – along with the CrimSAFE portion of the report and they may then manually enter the decision for the applicant based on the policies set by the property management company. RPS also trains its customers on this "escalation" process when that setting is selected by the property management company.

It is my opinion that it is an industry best practice to utilize such categorization products to assess applications. However, before discussing the valid and legitimate interests such criminal-record categorization products facilitate, further context is warranted regarding the employees of property management companies that initiate and receive the results of criminal record screening requests. In our industry the role of "Leasing Agent" or "Assistant Manager" frequently is the first and most common point of contact with applicants for housing through the marketing process, as well as the steps in verifying information on the resulting applications. The position of Leasing Agent is one that is generally regarded in our industry as "entry level". Individuals who are hired for this position are usually fairly new in their careers and many times need to develop skills and knowledge that are specific to our industry. I have hired many individuals over my career who have previously worked and received training from the retail sales or other customer services industries. While this background of training is quite useful in marketing rental property for lease, it needs to be augmented by the classification of criminal record information provided by or for prospective residents.

With that context in mind, that categorization of criminal records through products such as CrimSAFE has various benefits that promote a number of legitimate business interests of property managers and applicants alike.

First, the service provided by the CrimSAFE product, which takes a wide variety of criminal records from a large number of sources and objectively classifies those records to apply the housing provider's (WinnResidential in this matter) selected leasing criteria is an important tool for treating prospects on an equal basis and preventing discrimination. CrimSAFE takes a housing provider's selected criminal criteria and applies it to potentially hundreds of databases and informs the housing provider of whether a record exists that meets their criteria for potential disqualification. The objective characterization of criminal records removes potential explicit or implicit bias at the property manager level and promotes non-discrimination in the interpretation of the severity of criminal records. In other words, products such as CrimSAFE promote an even level of understanding among different property managers in a single housing provider company as well as across the thousands of individual property managers who work in this area nationwide. Fundamentally, the potential for unintended discrimination would be much higher absent products such as CrimSAFE because the interpretation of criminal records would be left to entry-level leasing staff or others without the compilation and reporting performed by RPS and its fellow background check providers.

Second, absent products such as CrimSAFE, there would exist unnecessary delays in the background verification process that would hinder those who need immediate access to housing.

In particular, individual property managers (who are generally non-legal professionals) would be tasked with attempting to research the severity level of any identified criminal record to then determine how to review such a record in the context of the comprehensive leasing criteria set by the property.

Third, the failure of companies like RPS to categorize criminal records and apply the housing provider's set criteria to those criminal records could also lead to harm to tenants or the property, as leasing agents or property managers could misinterpret a serious criminal offense as insubstantial and approve the application when a duty of care would dictate otherwise. Conversely, the failure to categorize offenses could lead a property manager to misinterpret an offense as serious that is otherwise minor and thereby, inappropriately deny housing to an otherwise qualified applicant. There are potentially hundreds of different law enforcement agencies all keeping accessible records, but there is no standard of continuity when it comes to what they call certain offenses, what abbreviations or codes in the records mean, or easily understood conclusions as to the status or disposition of the offense. Indeed, Plaintiffs' complaint asserts that RPS's database contains more ███████████████████████████████ ███████████████████████████████████████████████ . Perhaps one day our society will function with a universal database across all reporting entities that will not require third party categorization or interpretation, but that day is not here now. Thus, it is my opinion that housing providers could not accomplish this categorization and interpretation efficiently or accurately absent products such as CrimSAFE. Simply put, products like CrimSAFE actually allow for safer communities while at the same time leveling the playing field for all prospective tenants. An alternative method of providing raw criminal records to leasing staff to decipher, with no assistance as to what the records are indicating or how the records apply to the housing provider's criminal history criteria, presents unacceptable risk to tenant and property safety.

Fourth, products such as CrimSAFE allow property management companies to customize the desired criteria and parameters for what is acceptable at each property, as well as to quickly and consistently adjust their settings to account for policy changes at the property management company with respect to the consideration of criminal record histories (including with respect to their Fair Housing policies). The criminal criteria of housing providers who use the services of companies such as RPS change over time. This can be seen in the actions taken by WinnResidential after the publication of the HUD memorandum of 2016, where WinnResidential modified its self-selected CrimSAFE criteria. This was also my own experience as a manager at or around that same time. When property management companies choose to modify their criminal record screening criteria in response to legal advice or regulatory guidance, tools such as the CrimSAFE product allow them to implement such changes quickly and consistently across all individual properties, minimizing individual error and inefficiencies.

### III. The Accepted Role of Housing Providers Versus Screening Companies

Plaintiffs repeatedly allege throughout the Complaint that the CrimSAFE product disproportionately "results in the denial of housing to Latinos and African Americans." In my professional experience, that statement is not consistent with the way that the larger property management industry uses categorization products such as CrimSAFE in their efforts to comply with Fair Housing laws. Nor do companies like RPS make housing decisions for property management companies, such that products like CrimSAFE could be said to result in a disparate impact against applicants. These conclusions, as mentioned elsewhere in my report, are based on several factors.

### A. Housing Providers Conduct an Individualized Review of Applicants to Comply with the Fair Housing Act, and RPS Facilitates These Compliance Efforts

The April 2016 HUD Memorandum addressed the importance of housing provider compliance with the federal Fair Housing Act when using criminal record background checks, including "individualized" review of applications of the type advocated by Plaintiffs. In contrast to Plaintiffs' allegations, however, it is my opinion that RPS ensures and reinforces customer compliance with the federal Fair Housing Act (and other applicable laws) in numerous ways, thus encouraging individualized review by its property manager customers. Those compliance efforts by RPS include provisions mandating legal compliance in the terms of its contracts with housing providers; statements on the criminal screening report requiring individualized review of any records returned; training sessions for housing providers; the distribution of literature to housing providers regarding federal Fair Housing Act compliance; and recommendations for housing providers to review their settings with legal counsel to ensure compliance.

For example, RPS's contracts with WinnResidential required WinnResidential to use the information received from RPS in compliance with the Fair Housing Act and all other applicable laws. There is also a statement on the CrimSAFE section of the report noting that that it is up to the client to review the contents and proceed in accordance with property/company policies, which would themselves generally account for compliance the federal Fair Housing Act.

Moreover, less than two weeks after the publication of the April 2016 HUD Memorandum,[9] RPS also issued a "Client Notification" to its customer base informing them of the HUD guidance, summarizing its contents/mandates, and instructing those customers to conduct a further compliance review of their practices with legal counsel. In that Client Notification, RPS: (1) hyperlinked to the April 2016 HUD Memorandum; (2) noted that the HUD memorandum recognized "legitimate and non-discriminatory interests in protecting residents and property"; (2) noted that the April 2016 HUD Memorandum (among other things) requires property management companies to individually "consider the nature, severity, and recency of convictions" and "not

---

[9] The April 2016 HUD Memorandum was the subject of significant discussion in the property management community and discussed at length in various industry publications and conferences. Its contents are, therefore, likely familiar to property management companies.

reject applicants on arrest records; and (3) reminded customers that while the "CrimSAFE tool can help with categorization of criminal records . . . it is the responsibility of each customer to set their own criteria for making tenancy." Thus, RPS took a number of steps to ensure that its customers reviewed this guidance and worked with their legal counsel to review customer compliance.

Plaintiffs contend that the federal Fair Housing Act requires individualized review of criminal histories to assure compliance. If so, RPS's contracts and its communications with its customers would thus only reinforce that type of individualized review.

### B. RPS and the CrimSAFE Product Do Not Make Any "Decision" Regarding a Tenant's Application for Housing

It also is my opinion that the offering of the CrimSAFE product does not result in a disparate impact because it is well established in the industry that the duty to approve or decline an application has always, and continues to, rest with the housing provider, not their background screening company.

Based on my experience, it is common and accepted practice in the industry that, when criminal record data is returned and/or a screening company applies criteria selected by the property to identify criminal records, the property staff will have a process for referring final decisions to a supervisor or other experienced staff member who can provide the case-by-case, individualized review of the specific nature, relationship, time periods and changed circumstances involved in each matter. That is not a function delegated to third party vendors such as RPS, but it is instead the responsibility of housing providers. Indeed, if property management companies were to simply accept or deny applicants without individualized review, they would expose themselves to liability under well-known interpretative guidance of the federal Fair Housing Act, such as the April 2016 HUD Memorandum. Such actions by housing providers would also call into question their duty of care to their residents, which could lead to substantial liability.

One reason for my opinion that RPS does not make housing-related decisions due to the obvious control the client has in setting parameters for what criminal record categories it wants to be made aware of, the time frame of such records. Another is in view of what messages (fully customizable) the customers want incorporated in to the report that goes back to their leasing agents and related site staff who are working with applicants. The role of RPS in this area through the CrimSAFE product is similar to other firms providing similar screening products throughout the country. RPS obtains records and information and organizes that information in a standardized way, thus making the results uniform and easy for the housing provider and their employees to understand, while also reminding them to use the contents of the report in accordance with property and/or company policies.

I also believe Plaintiffs misunderstand the CrimSAFE reporting process. Plaintiffs allege that with CrimSAFE, the client only receives a report with a notation of "accept" or "disqualifying record"[10], without reference to the underlying record that triggered that statement based on the criteria selected by the property management company.[11] The documents I reviewed are not consistent with that contention. Towards the end of Mr. Arroyo's report, in the Multi-State Criminal Search Report section, is a description of the Pennsylvania criminal record, including the date of the offense, the nature of the crime, and the matter's current standing, which in this case appears to have been unresolved at the time application was submitted.[12] Even if the Multi-State Criminal Search Report section of the report was not provided to the individual leasing agent due to the setting selected by WinnResidential,[13] pursuant to the processes described above, that full criminal record detail was provided to the identified supervisors at WinnResidential, who would have then been able to access the portion of the software that allowed them to manually input the decision on Mr. Arroyo's application. Thus, if "discrimination" occurred in the case of Mr. Arroyo's application due to extenuating factors that were not reviewed, it did not happen by the design of CrimSAFE or actions by RPS, but would have been from the manner in which this report/information was used by the client/housing provider.

Given the above considerations, RPS cannot be said to have created any disparate "impact" because any result the CrimSAFE product provides is not a final decision since the housing provider is still obligated to conduct an individualized review and make the final decision on the application. In other words, the CrimSAFE product is just one portion of the housing provider's individualized review process for a prospective tenant. As such, it not accurate to say that CrimSAFE has any disparate "impact" as a stand-alone screening product.

In summation, housing providers are regulated under the federal Fair Housing Act, as well as more stringent state and local laws that may apply in areas where they operate housing. It is common in our industry to screen applicants for this housing to be able to make an informed decisions not

---

[10] Although the results of a CrimSAFE search may be conveyed on a report with certain verbiage, those messages or terms are customizable and set by the housing provider. This phrasing does not reflect any "decision" of the background screening company.

[11] To use one example of this contention from the Complaint, Plaintiffs allege that, "rather than making the disqualification decision on its own, Defendant could simply supply the underlying information about the criminal history to the housing provider so it can do an individualized assessment on its own . . . . [b]y failing to provide housing providers with information about the criminal record, the nature of the underlying conduct, . . . recency, and . . . disposition, Defendant makes it impossible . . . for them to do a case-by-case assessment of the actual risk to safety or property . . . ." Complaint, ¶ 139.

[12] The criminal matter appears to have been officially closed after Mr. Arroyo's mother applied to the court for withdrawal of the charge a year or so after the application to ArtSpace Windham.

[13] The report reflects that the background screening was requested by "Melissa Curry" with WinnResidential.

only about a prospective tenant's ability to meet the financial requirements of fulfilling the lease, but also whether those applicants have a criminal background that could reasonably endanger the property and/or its existing residents. Many firms offer background screening services to allow housing providers to make informed decisions, but ultimately background screening companies do not make leasing decisions for housing providers, as that responsibility falls to housing providers themselves and cannot, and should not, be delegated away to others.

RPS simply delivers a preliminary statement based on criteria selected by the property management company by comparing the criminal records against client-provided criteria. That preliminary step does not alter the fact the housing decision is the responsibility of, and made by, the housing provider, not RPS. The allocation of responsibility is a widely-accepted practice within the property management industry, including with respect to the use of categorization products such as CrimSAFE.

## **CONCLUSION**

RPS is a supplier of information to its housing provider clients to assist them in the fair and non-discriminatory process of obtaining needed criminal history data to make informed decisions on whether the applications from the public should be denied or approved. That ultimate decision rests with the housing provider, not any agency they contract with to provide criminal record data.

With the evolution of technology for the return of criminal record reports for tenant applications came the ever-increasing standards of care and non-discrimination that housing providers are held to for the purposes of keeping existing residents, guests and others at our properties safe from those who have demonstrated a relevant history of criminal activity that could jeopardize such safety. Navigating compliance with our duty to secure the safety of our residents and properties, as well as staying in compliance with the letter of Fair Housing laws at the federal, state, and local levels has been a challenge that the industry has embraced. Attempting to impose legal liability on an important screening service provider, such as RPS's CrimSAFE product, will not further the legitimate and valid interests of tenant safety and non-discrimination. To the contrary, it will erode those interests. Products such as CrimSAFE are necessary to ensure the timely, objective, and accurate categorization of criminal records in today's environment of mobility where there are large volumes of electronic applications and large number of unique crimes across federal, state, and local ordinances. This categorization is then subject to review by the property management company for purposes of the ultimate decision. If a housing provider maintains steps in place to comply with the advised methodologies for compliance, such as those described in HUD's memorandum of 2016, which the industry is well aware of, including due to the proactive efforts of well-established screening companies such as RPS with large customer bases, the system will work fairly. If systems such as CrimSAFE are removed from our process, I believe it will be to the detriment of not only the background screening agencies, but to the housing industry, residents of rental property across the country, and those applying for rental housing, regardless of their race or national origin. If additional information relevant to the formation of my conclusions and this report is obtained at a later date, I reserve the right to modify these contents, if applicable.

Respectfully submitted,

Jay Kacirk, CPM® Emeritus
6366 Commerce Boulevard, Suite 270
Rohnert Park, CA 94928

14

**EXHIBIT 1 to Expert Report of Jay Kacirk: April 15, 2019**
**C.V. FOR JAY KACIRK, CPM® EMERITUS, CCAM®**
**EXECUTIVE VICE PRESIDENT OF PROPERTY AND**
**ASSET MANAGEMENT**

Property Management Expert Witness For:

> Single Family Homes / Condominium Units
> Multi Family Apartments
> Community Interest Developments (CIDs)
> Ethics Matters
> Fair Housing Issues
> Landlord Standard of Care

**INDUSTRY HIGHLIGHTS**

Jay Kacirk, CERTIFIED PROPERTY MANAGER® (key no. 10303), is the Executive Vice President of Eugene Burger Management Corporation, AMO® in Rohnert Park, California. Prior to joining EBMC in 1998, he was the co-owner of Coastside Property Management, Inc., having acquired the firm in 1988.

Mr. Kacirk is an active participant at the local and national levels in the Institute of Real Estate Management (IREM), where he served as 1992 San Diego Chapter President (see list of national and regional assignments in **Exhibit 'A' attached).** He was selected by the chapter as recipient of the "CERTIFIED PROPERTY MANAGER® of the Year" award for 1989. He is past chairman of the Ethics Committee for the local chapter, and is certified and regularly instructs several national courses and seminars**.** These include:

"Successful Site Management"
"Ethics for the Real Estate Manager"
"Human Resource Essentials for Real Estate Managers"
"Marketing and Leasing: Multifamily Properties"
"Introduction to Managing Residential Property"
"Introduction to Managing Small Business Properties"
"Introduction to Managing Community Associations"

Through formal teaching programs and in-house sessions, Mr. Kacirk has provided training in property management for over 700 residential managers. He has also taught property management for the UCSD Extension in La Jolla, California. Mr. Kacirk served a two-year term as IREM Regional Vice President of Region 11 (California and Hawaii) in 1998-1999. In this capacity he oversaw the activities of the 10 IREM chapters located in these 2 states.

As a past member of the Board of Directors of Resident Relations of California, a landlord-tenant mediation firm, Mr. Kacirk has been involved in a variety of programs to provide education and improve landlord-tenant relations in San Diego. In 1999, he was appointed by the Mayor of Poway to the Poway Housing Commission, where he served for 7 years as Housing Commissioner and Vice Chairman.

Mr. Kacirk was a Director of a non-profit foundation. He is formerly the president of the Bobby Jo Lewis Foundation, headquartered in San Diego and a former Board member of the IREM Foundation, headquartered in Chicago, Illinois.

**EDUCATIONAL BACKGROUND AND CERTIFICATIONS**

Mr. Kacirk holds a Bachelor of Business Administration degree with an emphasis in Computer Information Systems from National University (October 1987).

Awarded the Certified Property Manager designation by the Institute of Real Estate Management (IREM) in October 1985.

Became a manager member of the California Association of Community Managers (CACM) in 2014. Earned the CCAM (Certified Community Association Manager) in July 2014.

Holds a California Real Estate Broker License since 1981 and a Washington state Broker license from 2014 to 2018.

**INDUSTRY AWARDS**

In 1989, he was selected by the San Diego chapter as recipient of the "CERTIFIED PROPERTY MANAGER® of the Year" award.
In 2000, he was awarded the "Professional Achievement Award" from IREM National.
In 2005, Mr. Kacirk was honored by the local IREM chapter as recipient of the "Presidential Achievement Award".

**CONTACT INFORMATION**

Jay Kacirk
6366 Commerce Boulevard, Suite 270
Rohnert Park, CA 94928
(415) 596-1639
cpm58@roadrunner.com

Update: March 2019

| | | |
|---|---|---|
| RES201 Instructors | 7/15/2016 - | Member |
| Education Committee | 11/1/2012 - 10/31/2013 | Member |
| Continous Learning Advisory Board | 11/1/2012 - 10/31/2013 | Member |
| PROCTORS | 12/27/2011 - 12/31/2016 | Member |
| Independent Contractor Administration Advisory Board | 11/1/2011 - 10/31/2013 | Member |
| Faculty | 3/18/2011 - | Member |
| Diversity Advisory Board | 11/1/2008 - 10/31/2009 | Member |
| Ethics and Discipline Committee | 11/1/2008 - 11/1/2009 | Member |
| Ethics Hearing & Discipline Board | 11/1/2007 - 10/31/2010 | Member |
| Ethics and Discipline Committee | 10/20/2007 - 10/16/2008 | Member |
| Success Series Advisory Board | 10/20/2007 - 10/16/2008 | Member |
| 75th Anniversary Work Group | 10/20/2007 - 10/16/2008 | Member |
| NAA Fair Housing Review Team | 6/18/2007 - 6/19/2007 | Member |
| 75th Anniversary Work Group | 10/19/2006 - 10/18/2007 | Member |
| Business Meeting Advisory Board | 10/19/2006 - 10/18/2007 | Member |
| MKL405 Review Team | 3/20/2006 - 12/31/2006 | Chair |
| Governing Council | 1/1/2005 - 12/31/2005 | Ex Officio Member |
| Executive Committee | 1/1/2005 - 12/31/2005 | Member |
| Education Conference Advisory Board | 1/1/2005 - 12/31/2005 | Member |
| Faculty Selection Advisory | 1/1/2004 - 12/31/2004 | Member |
| Executive Committee | 1/1/2004 - 12/31/2004 | Member |

| | | |
|---|---|---|
| Governing Council | 1/1/2004 - 12/31/2004 | Ex Officio Member |
| MKL402 Review Team | 7/1/2003 - 12/31/2003 | Member |
| Faculty Selection Advisory | 1/1/2003 - 12/31/2003 | Member |
| Education Conference Advisory Board | 1/1/2003 - 12/31/2003 | Member |
| Ethics and Discipline Committee | 1/1/2003 - 12/31/2003 | Member |
| Faculty All National Courses | 1/1/2003 - 12/31/2003 | Instructor |
| Ethics Appeal Board | 1/1/2003 - 12/31/2005 | Member |
| Faculty Selection Advisory | 7/1/2002 - 12/31/2002 | Member |
| Foundation Board of Directors | 1/1/2002 - 12/31/2004 | Member |
| Faculty All National Courses | 1/1/2002 - 12/31/2002 | Instructor |
| Governing Council | 1/1/2002 - 12/31/2004 | Governing Councillor |
| Bylaws and Regulations | 1/1/2002 - 12/31/2002 | Chair |
| Faculty Selection | 1/1/2001 - 12/31/2001 | Member |
| Faculty All National Courses | 1/1/2001 - 12/31/2001 | Instructor |
| Bylaws and Regulations | 1/1/2001 - 12/31/2001 | Chair |
| Education Policy | 1/1/2001 - 12/31/2001 | Member Subcommittee |
| Bylaws and Regulations | 1/1/2000 - 12/31/2000 | Vice Chair |
| Industry Partners | 1/1/2000 - 12/31/2000 | Vice Chair |
| Faculty All National Courses | 1/1/2000 - 12/31/2000 | Instructor |
| Faculty 200 Series | 1/1/2000 - 12/31/2000 | Instructor |
| Faculty 200 Series | 1/1/1999 - 12/31/1999 | Instructor |
| Faculty Intermediate Courses | 1/1/1999 - 12/31/1999 | Instructor |
| Faculty Fundamental Courses | 1/1/1999 - 12/31/1999 | Instructor |
| Bylaws and Regulations | 1/1/1999 - 12/31/1999 | Ex Officio Member |
| Regional Vice Presidents Committee | 1/1/1999 - 12/31/2000 | Ex Officio Member |
| Marketing and Public Relations | 1/1/1999 - 12/31/1999 | Ex Officio Member |
| Minority Outreach | 1/1/1999 - 12/31/1999 | Ex Officio Member |
| Education Policy | 1/1/1999 - 12/31/1999 | Member |
| Governing Council | 1/1/1999 - 12/31/2001 | Governing Councillor |
| Chapter Activities | 1/1/1999 - 12/31/1999 | Vice Chair |
| Faculty Fundamental Courses | 1/1/1998 - 12/31/1998 | Instructor |
| Faculty Intermediate Courses | 1/1/1998 - 12/31/1998 | Instructor |
| Faculty 200 Series | 1/1/1998 - 12/31/1998 | Instructor |

**Exhibit 2 to Expert Report of Jay Kacirk: April 15, 2019**
**Materials Reviewed**

| Litigation Sources |
|---|
| Complaint: April 24, 2018 |
| Memorandum in Support of RPS's Motion to Dismiss: August 23, 2018 |
| Memorandum in Opposition to RPS's Motion to Dismiss: October 4, 2018 |
| Reply in Support of RPS's Motion to Dismiss: October 18, 2018 |
| RPS's Responses to Plaintiffs' Discovery Requests and Privilege Log: December 17, 2018 |
| Plaintiffs' Responses to RPS's Discovery Requests and Privilege Log: January 31, 2019 |
| RPS's Document Production (ARROYO000001-000654) |
| Plaintiffs' Document Production (CFHC000001-001393) |
| Standing Protective Order: April 24, 2018 |
| Memorandum of Decision on Defendant's Motion to Dismiss: March 25, 2019 |
| **Additional Sources** |
| 24 C.F.R. § 960.204 |
| 42 U.S.C. § 1437n(f) |
| 42 U.S.C. § 13661 |
| 42 U.S.C. § 13663 |
| 42 U.S.C. § 3604 |
| U.S. Dept. of Housing & Urban Dev., Office of General Counsel, Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions, https://www.hud.gov/sites/documents/HUD_OGC GuidAppFHAStandCR.pdf at pp. 4-5 (April 4, 2016) |
| https://www.census.gov/newsroom/press-releases/2017/mover-rates.html. |
| *Peterson v. Kings Gate Partners - Omaha I, L.P.*, 290 Neb. 658, 660 (Neb. 2015) |

**Jay Kacirk, CPM, CCAM – List of Cases Pursuant to Fed. R. Civ. P. 26(a)(2)(B)(v)**

| Case Name | Start Date | End Date | Party Retained By | Deposition | Trial Testimony |
|-----------|-----------|----------|-------------------|------------|-----------------|
| Radell v. Wilshire HOA | 6/1/2014 | 8/1/2014 | Defendant | Yes | No |
| Williamson v. DeRouff Trust | 9/1/2014 | 4/5/2015 | Defendant | Yes | No |
| Sempra Energy Class Action | 6/30/2015 | 8/11/2015 | Defendant | No | No |
| McDonald v. Bennett/Prop. Advantage | 11/7/2016 | 6/3/2017 | Defendant | Yes | No |
| Bedard v. Lundberg | 12/23/2016 | 1/19/2017 | Defendant | No | No |
| Perez v. JC Gates | 3/30/2017 | 5/31/2017 | Defendant | No | No |
| King v. Tesar | 5/25/2017 | 6/9/2018 | Plaintiff | No | No |
| Rayburn v. Polk | 9/19/2017 | 3/10/2018 | Plaintiff | No | No |
| Jones v. Sutherlin | 11/12/2017 | 2/6/2018 | Defendant | No | No |
| Narbutas v. Premier Realty | 2/9/2018 | 6/1/2018 | Plaintiff | No | No |
| Remington v. Thill | 11/12/2018 | 3/1/2019 | Plaintiff | No | No |