UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CARMEN ARROYO, et al.,

*Plaintiffs*,

-v-

Case No. 3:18-cv-00705-VLB

CORELOGIC RENTAL PROPERTY
SOLUTIONS, LLC,

*Defendant*.

## DECLARATION OF TIMOTHY ST. GEORGE

I, Timothy St. George, the undersigned, hereby declare:

1.      I am admitted *pro hac vice* to the United States District Court for the District of Connecticut.  I am a member in good standing of the State Bar of Virginia, an attorney in the law firm of Troutman Sanders, LLP, and counsel for defendant CoreLogic Rental Property Solutions, LLC ("RPS") in the above captioned matter.

2.      Based on my experience as counsel for RPS in this matter, I have personal knowledge of the facts set forth in this declaration and am competent to testify as to the matters stated below.

3.      I submit this declaration in support of RPS's Motion for Summary Judgment.

4.      A true and correct copy of relevant portions of the Deposition of Carmen Arroyo, which took place on July 24, 2019, is attached as Exhibit A.

5.      A true and correct copy of relevant portions of the Deposition of Erin Kemple, which took place on July 23, 2019, is attached as Exhibit B.

6.     A true and correct copy of relevant portions of the Deposition of Christopher Wildeman, which took place on September 3, 2019, is attached as Exhibit C.

7.     A true and correct copy of the Pre-Determination Conciliation Agreement between the CFHC and WinnResidential, produced by Plaintiffs in discovery as CFHC000660-000666 is attached as Exhibit D.

8.     A true and correct copy of relevant portions of the CFHC's Objections and Responses to RPS's Requests for Admission, dated January 9, 2019, is attached as Exhibit E.

9.     The CFHC never supplemented or amended its responses to RPS's Requests for Admission.

10.     A true and correct copy of relevant portions of the CFHC's Objections and Responses to RPS's First Set of Interrogatories, dated January 31, 2019, is attached as Exhibit F.

11.     The CFHC never supplemented or amended its responses to RPS's First Set of Interrogatories.

12.     A true and correct copy of Plaintiffs' Amended Diversion Log, produced on July 11, 2019, is attached as Exhibit G.

13.     A true and correct copy of Plaintiffs' Amended Damages Analysis, produced on July 11, 2019 is attached as Exhibit H.

14.     Plaintiffs never supplemented or further amended their Amended Diversion Log or Amended Damages Analysis.

15.     A true and correct copy of U.S. Census Bureau QuickFacts for Connecticut, Bridgeport, Connecticut, Hartford, Connecticut, New Haven, Connecticut, and Willimantic, Connecticut, *available at* https://www.census.gov/quickfacts/fact/table, last visited November 9, 2019, is attached as <u>Exhibit I</u>.

16.     A true and correct copy of Bureau of Justice Statistics, 2018 Update on Prisoner Recidivism: A 9-year Follow-up Period (2005-2014), dated May 2018, is attached as <u>Exhibit J</u>.

17.     A true and correct copy of National Low Income Housing Coalition, Who Lives in Federally Assisted Housing, dated Nov. 2012, *available at* https://nlihc.org/sites/default/files/HousingSpotlight2-2.pdf, is attached as <u>Exhibit K</u>.

18.     A true and correct copy of Bureau of Justice Statistics, Location, available at https://www.bjs.gov/index.cfm?ty=tp&tid=44, is attached as <u>Exhibit L</u>.

19.     Plaintiffs took no discovery of any apartment complexes, including WinnResidential.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 11, 2019, at Richmond, Virginia.

Timothy St. George

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
 2
                         Case No. 3:18-cv-00705-VLB
 3  ─────────────────────────────────────

 4  CONNECTICUT FAIR HOUSING CENTER

 5  and

 6  CARMEN ARROYO, individually and
    as next friend for Mikhail Arroyo
 7

 8                      Plaintiffs,

 9         v.

10  CORELOGIC RENTAL PROPERTY
    SOLUTIONS, LLC
11                      Defendant.

12  ─────────────────────────────────────

13

14

15
                Deposition of Carmen Arroyo
16
               Wednesday, July 24, 2019
17
             Connecticut Fair Housing Center
18
                  60 Popieluszko Court
19
                  Hartford, Connecticut
20
                 12:06 p.m. - 4:23 p.m.
21

22

23          ----- Sharon Roy, RPR -----
                    Planet Depos
24         451 Hungerford Drive, Suite 400
                  Rockville, MD 20850
25                    888.433.3767
```

Transcript of Carmen Arroyo
Conducted on July 24, 2019                                    2

```
1    A P P E A R A N C E S:

2

3    Representing the Plaintiffs:

4    Salmun Kazerounian, Esq.
     Connecticut Fair Housing Center
5        60 Popieluszko Court
         Hartford, CT 06106
6        860.247.4400 (Fax) 860.247.4236
         swhite@ctfairhousing.org
7

8    Representing the Defendant:

9    Timothy J. St. George, Esq.
     Troutman Sanders LLP
10       Troutman Sanders Building
          1001 Haxall Point
11       Richmond, VA 23219
         804.697.1254
12       tim.st.george@troutmansanders.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Transcript of Carmen Arroyo
Conducted on July 24, 2019                    8

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10      Q.    Okay.  So, put aside that single-family
11  house.  Where did you live immediately prior to
12  that?
13      A.    480 Main Street, Windham -- Willimantic,
14  Connecticut.
15      Q.    And was there an apartment number for
16  that or is it a single-family house?
17      A.    It's an apartment.  206.
18      Q.    And is that at the ArtSpace Windham
19  apartment complex?
20      A.    Yes.
21      Q.    And that was also in Windham,
22  Connecticut?
23      A.    Willimantic, Connecticut.
24      Q.    Willimantic, Connecticut.
25      A.    Yes.
```

Transcript of Carmen Arroyo
Conducted on July 24, 2019                    9

```
1        Q.    That Apartment 206, what were the dates
2   where you resided -- the date range that you resided
3   in Apartment 206?
4        A.    November, I don't recall the actual date,
5   but it was in November, I want to say 2016, 2017.
6   Well, I think 2016.
7        Q.    Okay.  So November 2016 until the time
8   that you moved out about a month ago?
9        A.    Yes.
10       Q.    Okay.  And in November 2016, did you live
11  there by yourself?
12       A.    Yes.
13       Q.    And at some point did Mikhail Arroyo move
14  in with you?
15       A.    Shortly after.
16       Q.    Do you recall --
17       A.    Sorry.  For the record, not shortly
18  after.  It took a while.
19       Q.    Okay.  Well, what was the date,
20  approximately?
21       A.    He came home June -- June 23.  I believe
22  in 2016.  So retract that back.  I believe it was
23  the twenty-fifth of November coming in, or so.
24  I don't recall quite the date, so please forgive me
25  for that.
```

Transcript of Carmen Arroyo
Conducted on July 24, 2019                           12

1

2

3

4          All right.  Let's move back in time from

5    the 206 apartment.  What was your address

6    immediately before you lived in the 206 apartment?

7          A.    480 Main Street.

8          Q.    And what apartment number?

9          A.    Oh, gosh.  I would like to say it's 315.

10   I believe it was 315.  Oh, 314.  My mistake, sorry.

11         Q.    314?

12         A.    I believe it was 314.

13         Q.    Okay.  So we'll call that the 314

14   apartment, if that's okay.

15         Okay.  And when did you begin living in

16   the 314 apartment?

17         A.    November of 2015.

18         Q.    And that's also at the ArtSpace Windham?

19         A.    Yes.

20         Q.    It sounds like it might just be a floor

21   up.  Is that fair?

22         A.    Yes.

23

24

25

Transcript of Carmen Arroyo
Conducted on July 24, 2019                                    18

1

2

3

4

5

6

7          A.     She just wanted me to have some

8     stability.  I was between the hospital and work, so,

9     she just wanted me to have a home to pretty much

10    stay at and just rest with work and going into the

11    hospital.

12         Q.     Okay.  And when you say "going into the

13    hospital," is that in reference to the accident that

14    involved Mikhail Arroyo?

15         A.     Yes.

16         Q.     And when did that accident occur?

17         A.     July 23, 2015.

18         Q.     All right.  So he was injured in July of

19    2015 and you moved into the 314 apartment in

20    November of 2015?

21         A.     Yes.

22         Q.

23

24

25

Transcript of Carmen Arroyo
Conducted on July 24, 2019                          19

1

2

3

4

5

6        Q.    It sounds like you moved almost exactly
7   one year into the 206 apartment after you moved into
8   the 314 apartment.  Is that right?
9        A.    Sounds about right.  Again, the time
10  frame I don't recall exactly, but it seems like it
11  may be about right.
12       Q.    And did you have to wait a year to move
13  units within ArtSpace Windham?
14       A.    Yes.
15       Q.    So you had to be in one unit for a year
16  before you'd be allowed to transfer to another unit?
17       A.    Yes.
18       Q.    And did you have a one-year lease at the
19  314 unit, was that a one-year lease?
20       A.    Yes.
21       Q.    And then at the 206 apartment, were you
22  also under a lease there?
23       A.    I was not.
24       Q.    Was it month-to-month?
25       A.    Yes.

Transcript of Carmen Arroyo
Conducted on July 24, 2019                    26

1        A.    Early spring, yes.  Yes.

2        Q.    And if you can just speak up a little bit

3   for the court reporter.  Sometimes --

4        A.    Oh, sorry.  Early spring, yes, I believe

5   so.

6        Q.    Okay.  And was he discharged at that

7   time?

8        A.    No.

9        Q.    Okay.  Why not?

10       A.    Due to ArtSpace, I wasn't allowed to

11  bring him in.

12       Q.    And when you say you weren't allowed to

13  bring him in, what do you mean?  Did they say that

14  Mikhail could not join you in your apartment?

15       A.    Well, I had to get the transfer and I had

16  to do a background check for him.  And once I did

17  that, I was told that he wasn't allowed to move in

18  due to the findings.

19       Q.    Okay.  We'll certainly talk about that in

20  detail, but let me just get some basic understanding

21  as to what -- what you were looking to do at

22  ArtSpace at that time.

23            Would Mikhail have transferred into your

24  one-bedroom unit at that point in time?

25            MR. KAZEROUNIAN:  Objection.

Transcript of Carmen Arroyo
Conducted on July 24, 2019                    27

1        A.    I don't believe so.
2        Q.    So, your testimony earlier was that you
3   were required to remain in the -- let me make sure I
4   get the numbers correct.  You were required to
5   remain in the 314 unit for a year after you moved
6   in, is that right?
7        A.    Yes.
8        Q.    Okay.  So, when Mikhail was deemed
9   eligible to be discharged in April 2016, at that
10  point in time would he have moved back in with you
11  at the 314 unit?
12             MR. KAZEROUNIAN:  Objection.
13       A.    I don't believe so.
14       Q.    Would you have gone to -- I'm just trying
15  to ask something simple which may be making it
16  confusing.  If Mikhail had been discharged in April
17  of 2016, would he have joined you in the one-bedroom
18  apartment or would you have moved into another unit
19  at ArtSpace?
20       A.    I was already planning to move to a
21  different unit before the manager said that I had to
22  wait to move from ArtSpace.  So, there was already
23  an intent to move to a two-bedroom unit before
24  his -- even knowing that he was going to be
25  released.

Transcript of Carmen Arroyo
Conducted on July 24, 2019                                31

```
1        A.    It wasn't -- it was a while before he

2   moved in.  So, I don't -- I don't know the precise

3   date and year.  I mean, it's just, this has been a

4   very long haul.  But I know that he moved in in the

5   summer and we were just finishing up with getting

6   everything together for him to move in.

7        Q.    Okay.

8        A.    So, like I said, I do apologize as far as

9   time frame.

10       Q.    No, that's okay.  I understand.

11             So he moved back in with you, and at that

12  point in time when he moved back in with you, you

13  had moved into the 206 apartment, correct?

14       A.    I was there by myself before he could

15  move in.

16       Q.    So when he moved back in with you, he

17  moved into the 206 apartment, correct?

18       A.    Yes.

19       Q.    So he came and joined you in the

20  two-bedroom?

21       A.    Yes.

22       Q.    And you had been living in the

23  two-bedroom since November of 2016?

24       A.    Yes.

25
```

Transcript of Carmen Arroyo
Conducted on July 24, 2019                                    37

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15        Q.    Okay.  Did you -- did you ever sign any

16    sort of agreement with the Connecticut Fair Housing

17    Center, what we would call an engagement agreement

18    or like an attorney-client agreement; do you

19    remember?

20        A.    I signed so many paperwork; I couldn't

21    even tell you if I did at this moment.

22        Q.    Okay.  Would you agree with me that now

23    you are being represented by the Connecticut Fair

24    Housing Center in this lawsuit?

25        A.    Yes.

Transcript of Carmen Arroyo
Conducted on July 24, 2019                    38

1        Q.    Do you know if Ms. Cuerda reached out to

2    WinnResidential on your behalf?

3        A.    Yes.

4        Q.    And do you know about the conversation

5    she had with WinnResidential?

6        A.    I know that she submitted a -- what's the

7    name of that .... a recommendation, a letter,

8    accom -- a --

9        Q.    If I said reasonable accommodation, is

10   that what you're looking for?

11       A.    Yes, that's it.

12       Q.    I saw it was on the tip of your tongue.

13       A.    I was like, I know it's something like

14   accommodating.

15       Q.    No problem.  So you believe that she made

16   certain requests to WinnResidential for a reasonable

17   accommodation?

18       A.    Yes.  That was the -- when she called,

19   she said that she had sent something over to them

20   and that they were just still trying to hear back.

21       Q.    Do you know if WinnResidential ever

22   granted you a reasonable accommodation?

23       A.    If WinnResidential -- no, they -- they

24   didn't, I don't believe.  I don't think so, no.

25       Q.    So when you were denied, so when you were

Transcript of Carmen Arroyo
Conducted on July 24, 2019                    39

1    denied the ability to move Mikhail Arroyo into the

2    ArtSpace Windham, who -- did you have any

3    conversations with folks in the leasing office or

4    other people at WinnResidential at that time?

5        A.    The only thing I -- Melissa was her name

6    at the time, the office manager, and that's the only

7    one I was dealing with as far as the transfers to

8    the two-bedroom unit and providing her the money

9    that I needed to -- for the background check to

10   CoreLogic.

11           The reply was that Mikhail was not

12   allowed to come in based on what the CoreLogic

13   report came back as.  That's basically it.  It was

14   just really her.  And the nursing facility wanted to

15   know what day will Mikhail be moving home; you know,

16   he was ready to come home.

17           And I believe that it was then his case

18   manager, who's no longer a case manager at this

19   point, but in the very beginning was, and contacted

20   me with the Fair Housing, Maria.  And they were

21   submitting paperwork.

22       Q.    Okay.  So let me just make sure that I've

23   got a couple things clear.  So, with respect to the

24   application that you submitted for Mr. Arroyo, is

25   the only person that you talked to at

Transcript of Carmen Arroyo
Conducted on July 24, 2019                                   40

1    WinnResidential about the application Melissa, who

2    you mentioned?

3        A.    Yeah.

4        Q.    So you don't recall having any other

5    conversations with anyone else at WinnResidential

6    about the application?

7        A.    That -- I don't remember.

8        Q.    Okay.  Nothing that you can remember

9    sitting here today?

10       A.    I know she was just my point of --

11   because she was the manager.  Aside from the -- the

12   case manager for Mikhail, and then when I was able

13   to communicate with the housing, the people they

14   appointed me with them, fair housing.

15       Q.    Okay.  All right.

16       A.    That I recall, yeah.  That's ...

17       Q.    Did you have to fill out any sort of

18   applications in connection with your request to move

19   Mikhail Arroyo in?

20       A.    I don't remember.  I know I gave her the

21   check, and I probably might have had to, I'm not

22   quite sure.

23       Q.    And how long did it take for you to hear

24   back that he was not being granted permission to

25   move in with you?

Transcript of Carmen Arroyo
Conducted on July 24, 2019                         44

1

2

3

4

5

6        Q.    So we'll talk about that as well but, I

7   guess what I'm trying to figure out is, when did you

8   find out about his, Mikhail's, charge for retail

9   theft?

10       A.    I'd have to go back into my files.  I

11  don't really recall the dates.

12       Q.    And do you remember how you found out

13  about it?

14       A.    I called the Pennsylvania courthouse to

15  see if there was anything pending there.  And they

16  did say there was -- and then they asked me who I

17  was and I had to send documentation that I was his

18  conservator, and then the lady was able to tell me,

19  I guess the secretary, the docket numbers and who

20  the acting judge or -- I don't know how they operate

21  there, their laws.  But then I was supposed to send

22  a letter to them about Mikhail's condition, and then

23  they withdrew the case.

24       Q.    So your initial conversation was that you

25  called someone at the courthouse?

Transcript of Carmen Arroyo
Conducted on July 24, 2019                                    45

1        A.     Yes.

2        Q.     And through that conversation, during

3   that conversation were you able to confirm that he

4   had the criminal record?

5        A.     Yes, around that time frame, talking to

6   someone, making it aware to me that that's what was

7   it, yes.

8        Q.     Did you ever get any documentation about

9   the criminal record?

10       A.     I got a letter stating that it was

11  withdrawn.  Anything as far as what entailed to

12  whatever it was, I didn't get any, like, thick

13  documentations or anything.  I just got a letter

14  withdrawing the case.

15       Q.     And is it your testimony that the case

16  was withdrawn after you provided the clerk with

17  evidence about his medical condition?

18       A.     I believe so, yes.

19       Q.     So prior to that time, when you talked to

20  the clerk in the courthouse, you didn't have any

21  knowledge about the charge for retail theft?

22       A.     What was that again?

23       Q.     Retail theft?

24       A.     No, after what?

25

Transcript of Carmen Arroyo
Conducted on July 24, 2019                48

1    about the York -- the criminal charge in York

2    County, did you have any conversations with

3    CoreLogic after that time?

4         A.    I don't believe I did, no.

5         Q.    So I want to make sure that I'm

6    understanding fully all of the conversations that

7    you had with WinnResidential.  So, you told me

8    about, there was a time when you submitted the

9    transfer form, and then there was the time when you

10   heard back from Melissa that the application had

11   been declined?

12        A.    Yeah.

13        Q.    Did you have other conversations with

14   Melissa or anyone else at WinnResidential besides

15   those two conversations?

16        A.    Melissa and I, we kept in touch.  I

17   wanted to know.  And I didn't get any answer from

18   her until probably a few tries after.  Then she did

19   confirm that it wasn't the credit check, after I

20   brought the credit to her from my phone.  And then I

21   just started researching and checking and looking to

22   see what could have been.  And I checked over there

23   in Pennsylvania, York County, and there was

24   something there.  I got the paperwork.  But we had

25   already proceeded forward, so I believe that I

Transcript of Carmen Arroyo
Conducted on July 24, 2019                          49

1    contacted -- I communicated with -- I believe it was

2    Maria from here.

3         Q.    Okay.  So you had the further

4    conversation with Melissa where she confirmed that

5    it wasn't a credit related issue?

6         A.    Mm-hmm.

7         Q.    Right?

8         A.    After several attempts, yes.

9         Q.    And then it sounds like from there you --

10   you personally did not have further contact with

11   individuals at WinnResidential, is that right?

12        A.    I believe so, yes.

13        Q.    Any further contact from that point on

14   would have been done through the Connecticut Fair

15   Housing Center?

16        A.    If I remember or recall, I do think

17   that's how it went, yes.

18

19

20

21

22

23

24

25

Transcript of Carmen Arroyo
Conducted on July 24, 2019                          58

1

2

3

4

5

6

7

8

9

10

11

12        Q.    All right.  So, do you know when the

13   criminal charge for your son was withdrawn -- let me

14   make this easier.  Your testimony was that you

15   applied to ArtSpace Windham sometime in the spring

16   of 2016, right?

17        A.    In the spring, yeah.

18        Q.    And do you know whether your son's

19   criminal charge was withdrawn after the time that

20   you applied to ArtSpace Windham?

21        A.    I -- I believe it was after.

22        Q.    Okay.  All right.  So, at the time of the

23   application, is it fair to say that the criminal

24   charge at that point had not been withdrawn?

25        A.    I believe it wasn't withdrawn.  Yeah.

Transcript of Carmen Arroyo
Conducted on July 24, 2019                          59

```
1          Q.    All right.
2          A.    I mean, I wasn't even aware of it until I
3     came across it.
4          Q.    Fair.
5                So then in terms of your son's disability
6     status, is that something that you explained to
7     WinnResidential at the time that you were applying
8     to have him move back in?
9          A.    I did.
10         Q.    Okay.  Did you ever have any -- at the
11    time of that application, you hadn't had any
12    conversations with CoreLogic, correct?
13         A.    A lot of the conversations were with the
14    main manager, Melissa, based on what my rights were
15    as far as moving my son in.
16         Q.    Right. okay.
17         A.    And then once the initial transaction
18    happened where I paid for the background check,
19    background/credit check I guess is what they say it
20    is, that's when -- when he was declined that all the
21    other stuff arose.
22
23
24
25
```

Transcript of Carmen Arroyo
Conducted on July 24, 2019                                    80

1    open-ended question.

2             When you applied for Mikhail to come live

3    with you in the spring of 2016, remind me again, did

4    you fill out any paperwork in connection with that?

5         A.   I don't believe so.

6         Q.   Okay.

7         A.   Only the credit background check, when I

8    submitted the check, I believe.  I remember --

9    that's what I remember.

10        Q.   When you say "submitted the check," is

11   that the $400 check you were talking about?

12        A.   No.  There was a check that was supposed

13   to be submitted for a background check.

14        Q.   I see.  Okay.  So your testimony is that

15   the only thing that you can remember filling out was

16   an authorization for a background check and the cost

17   associated -- a check for the cost of that

18   background check?

19        A.   I believe so, yes.

20        Q.   So you authorized a background check to

21   be performed on Mr. Arroyo?

22        A.   Yes.

23        Q.   I'm going to show you another document, I

24   think this is Exhibit 4.

25             (Exhibit 4, marked)

Transcript of Carmen Arroyo
Conducted on July 24, 2019                    85

```
 1
 2
 3
 4
 5
 6
 7                    MR. ST. GEORGE:  Let's mark this
 8          Exhibit 5, please.
 9                      (Exhibit 5, marked)
10   BY MR. ST. GEORGE:
11        Q.    Ms. Arroyo, do you have Exhibit 5 in
12   front of you?
13        A.    I do.
14        Q.    Do you recognize this document?
15        A.    Yes.
16        Q.    What do you understand it to be?
17        A.    It's the transfer, the request -- the
18   transfer to one unit to another, request form.
19        Q.    And it looks like there's a signature at
20   the bottom of a woman named Melissa Desjardins?
21        A.    I don't know her last name, but, yeah, I
22   see "Melissa."
23        Q.    You see "Melissa"?
24        A.    Mm-hmm.
25        Q.    Do you understand that that's the same
```

Transcript of Carmen Arroyo
Conducted on July 24, 2019                              86

1    Melissa that you've been referencing in your

2    testimony?

3          A.    Yes.

4          Q.    Have you -- did you see this document

5    when it was filled out?

6          A.    I did not see it filled out.  I went into

7    the office to give the money when it was done and

8    processed.

9          Q.    And were you given a copy of this

10   document when you went in and provided them the

11   check?

12         A.    I don't remember.  I don't recall.  I

13   could have, I could have not, I'm not sure.

14         Q.    It says, if I'm reading this correct,

15   that the proposed -- so it's a unit transfer request

16   form and the proposed unit number is unit 206,

17   towards the middle.  Do you see that?

18         A.    Oh, yes.

19         Q.    And that's the two-bedroom apartment that

20   you ultimately moved into?

21         A.    Yes.

22         Q.    And then it says the effective date of

23   transfer is 11/15/2016.  Do you see that?

24         A.    Yes.

25         Q.    And is that the date that you moved into

Transcript of Carmen Arroyo
Conducted on July 24, 2019                    87

1    unit 206?

2        A.    Well, that's when I gave the money.  I

3    moved in around the 19th.  I had a weekend to move

4    in is what I was told.

5        Q.    Got it.  Understood.  So that's the date

6    that the apartment was made available to you?

7        A.    Yes.

8        Q.    Even if you didn't move in until a couple

9    days later.

10            But the the apartment was not -- the

11   two-bedroom and was not available to you any earlier

12   than November 15 of 2016?

13       A.    That's correct.

14       Q.    You testified earlier that you submitted

15   an application to have Mikhail come live with you

16   and that application was submitted in the spring of

17   2016, correct?

18       A.    An application?

19       Q.    Well, you're right, I shouldn't say

20   application.  There was a request for Mr. Arroyo to

21   come live with you and that you made that request to

22   WinnResidential in the spring of 2016?

23       A.    I asked, yes, if my son could move in and

24   I was told to do the background check.

25       Q.    Right.

Transcript of Carmen Arroyo
Conducted on July 24, 2019                    92

1

2

3

4

5        Q.    No, that's okay.  All right.  So, your

6   testimony is that you were informed at some point in

7   the spring of 2016 that Mikhail would not be

8   permitted to move in with you at ArtSpace Windham,

9   correct?

10       A.    Correct.

11       Q.    And that was communicated to you by

12   Melissa at WinnResidential?

13       A.    Yes.

14       Q.    Okay.  At that point in time did you

15   explore moving into any other two-bedroom apartments

16   at any other complex?

17       A.    If I applied at any other complex?

18       Q.    Yeah.

19       A.    I didn't apply at any other complex, but

20   I was looking.

21       Q.    Why didn't you apply anywhere else?

22       A.    It was tough.  You know.  Having to find

23   out if the facility would accommodate his needs.  At

24   the time he wasn't really walking, he wasn't really

25   very active, I guess.  You know.  The wheelchair

Transcript of Carmen Arroyo
Conducted on July 24, 2019                                94

1    edge of -- I don't even know how to describe it, but
2    it just wasn't a fit for him.
3         Q.    On how many -- so I take it you weren't
4    physically visiting places.  Were you looking at
5    some places online, is that typically how you were
6    trying to find another apartment?
7         A.    Well, sometimes you do, yeah.  Like I
8    like to go online.  I look at everything online.
9    You know, I read, I look -- even if I'm not moving,
10   I look up apartments, I look up jobs, things like
11   that.
12        Q.    You never submitted an application
13   anywhere else, correct?
14        A.    That I am aware of, I don't think so.
15
16
17
18
19
20
21
22
23
24
25

Transcript of Carmen Arroyo
Conducted on July 24, 2019                                    122

```
 1    BY MR. ST. GEORGE:
 2        Q.    So let me hand you a copy of this.
 3        A.    Oh, yes, okay.
 4        Q.    Do you have in front of you Exhibit 9?
 5        A.    Yes.
 6        Q.    And do you recognize this document?
 7        A.    Yes.
 8        Q.    And what do you understand it to be?
 9        A.    It is a complaint against, from my son
10    and I to WinnResidential.
11        Q.    Okay.  And do you recall the nature of
12    the claims that you are asserting against
13    WinnResidential in that complaint?
14        A.    It was the transfer for the two-bedroom
15    and they were not compliant with trying to move my
16    son in with reasonable accommodation that we had
17    requested.  I believe that's what it was for.  Yeah.
18        Q.    And so, in your understanding, claim was
19    that WinnResidential had denied the request for a
20    reasonable accommodation for your son in connection
21    with the request to have him move into the complex?
22        A.    I believe so.
23        Q.    Do you remember how this action was
24    resolved, how it ended?
25        A.    How it ended?
```

Transcript of Carmen Arroyo
Conducted on July 24, 2019                                123

```
1        Q.    Yes.
2        A.    We had to go to -- I don't even know, it
3    was something similar to this, I don't know if there
4    was a deposition.  I don't think it was a
5    deposition, but we talked with WinnResidential
6    and -- several times, I think a couple times, twice.
7    And then I guess they came with the answer that
8    Mikhail then can move in after everything had been
9    said and done.  You know, but it took a -- there was
10   a process, it just didn't happen right away.
11       Q.    So part of the process was that
12   Mr. Mikhail Arroyo was allowed to move into the
13   complex, into the two-bedroom apartment that you
14   were residing in at that time?
15       A.    Correct.
16       Q.    And that was unit 206?
17       A.    206.
18             MR. ST. GEORGE:  Let's take a look at
19        another document.  And mark this, please, as
20        Exhibit 10.
21                   (Exhibit 10, marked)
22   BY MR. ST. GEORGE:
23       Q.    Do you have in front of you what's been
24   marked as Exhibit 10?
25       A.    Yes.
```

Transcript of Carmen Arroyo
Conducted on July 24, 2019                              124

1        Q.    Take whatever time you need to look at
2   it, no worries.  Can I have you turn to page 5 of
3   the document?
4        A.    Okay.
5        Q.    And do you see that there is a signature
6   of the Complainant towards the top?
7        A.    Yes.
8        Q.    Okay.  And is that your signature?
9        A.    Yes.
10       Q.    All right.  So, do you recognize this
11  document, have an understanding of what it is?
12       A.    I believe it's giving permission on my
13  behalf.
14       Q.    So why don't we turn back to the first
15  page.  That might give us a little bit better
16  understanding.  So this is labeled as a
17  Pre-determination Conciliation Agreement.  Do you
18  see that?
19       A.    Yes.
20       Q.    And I think what normal people would say,
21  non-lawyers would say that this is a settlement
22  agreement.
23       A.    Okay.
24       Q.    Is that your understanding of what this
25  document is?

Transcript of Carmen Arroyo
Conducted on July 24, 2019                          125

1        A.    A pre-determination, right ...

2              I'm just going to read it, please.

3        Q.    Yeah, please do.

4                    (Pause)

5        A.    Yes.  Okay.

6        Q.    So now that you've read it, do you

7    recognize this document?

8        A.    Yes.

9        Q.    And what do you understand it to be?

10       A.    An agreement.

11       Q.    Is this agreement the document that

12   resolved the complaint that we just looked at in

13   Exhibit 9?

14       A.    Yes, I believe so.

15       Q.    Okay.  So, if you look at page 2 of this

16   agreement, page 2 of Exhibit 10.

17       A.    Okay.

18       Q.    You see there's a section called Terms of

19   the Agreement?

20       A.    Yes.

21       Q.    And then if you look at section D1, so

22   those two sections read that "Respondents agree upon

23   the signing of this agreement to pay Complainant

24   Carmen Arroyo the sum total of ███████ in full

25   settlement of all disputed claims between them" --

Transcript of Carmen Arroyo
Conducted on July 24, 2019                         126

```
 1        A.     Go ahead.

 2        Q.     -- "and payment shall be made in the form

 3   of certified bank check or attorney trust account,

 4   payable to Connecticut Fair Housing Center, as

 5   trustee for Carmen Arroyo, and hand-delivered or

 6   mailed to the attention of Diane Carter,

 7   Investigator, State of Connecticut Commission on

 8   Human Rights and Opportunities, 540 Columbus

 9   Boulevard, Suite 3, Hartford, Connecticut, 06103."

10            Do you see that?

11        A.     Yes.

12        Q.     So do you agree that this reflects that

13   WinnResidential paid to you, the Complainant, Carmen

14   Arroyo, the total of ████████ to resolve the

15   complaint that we looked at in Exhibit 9?

16            MR. KAZEROUNIAN:  Objection.  It's

17        been -- not exactly what it says.

18        A.     I don't quite understand the way it's

19   broken down, but, yeah.

20        Q.     Well, let me ask you a basic question.

21   As part of this agreement do you acknowledge that

22   WinnResidential paid to you as the complainant,

23   Carmen Arroyo, the sum total ████████████

24        A.     They paid the amount, yes, as documented

25   there.
```

Transcript of Carmen Arroyo
Conducted on July 24, 2019                          127

1    ██   ████████████████████████████

2    ████████████████████████

3        A.    Um, I don't know.  It's basically the

4    complaint that we filed about ... (witness reading).

5            I believe it was just what they had --

6    what we had been dealing with with them.

7        Q.    Okay.  So, and by that, do you mean

8    the -- their refusal to allow Mikhail to move into

9    the two-bedroom apartment with you?

10       A.    It seems like that's what it is, yes.

11   ██   ████████████████   meant to compensate

12   you for the damages that you claimed in connection

13   with their denial of Mikhail Arroyo's request to

14   move in with you?

15       A.    I don't -- can you repeat that again?

16       Q.    Sure.   ███████████   then, that was

17   meant to compensate you for the damages that you

18   were claiming in connection with their refusal to

19   allow Mikhail Arroyo to move in with you to the

20   two-bedroom apartment, correct?

21       A.    It would appear like that, yes.

22       Q.    All right.  You can put that document

23   away as well.

24            All right.  I want to go back to one of

25   the exhibits we first looked at, Exhibit 2.  Can you

# EXHIBIT B

1                   UNITED STATES DISTRICT COURT
2                     DISTRICT OF CONNECTICUT

3                          Case No. 3:18-cv-00705-VLB
4    _____

CONNECTICUT FAIR HOUSING CENTER
5
     and
6
     CARMEN ARROYO, individually and
7    as next friend for Mikhail Arroyo

8                          Plaintiffs,

9            v.

10   CORELOGIC RENTAL PROPERTY
     SOLUTIONS, LLC
11                         Defendant.

12   _____

13

14                 Deposition of Erin Kemple

15                 Tuesday, July 23, 2019

16             Connecticut Fair Housing Center

17                 60 Popieluszko Court

18                 Hartford, Connecticut

19                 10:09 a.m. - 5:20 p.m.

20

21

22

23             ----- Sharon Roy, RPR -----
                       Planet Depos
24             451 Hungerford Drive, Suite 400
                     Rockville, MD 20850
25                     888.433.3767

Transcript of Erin Kemple
Conducted on July 23, 2019                                        2

```
 1    A P P E A R A N C E S:

 2

 3    Representing the Plaintiffs:

 4    Sarah White, Esq.
      Connecticut Fair Housing Center
 5         60 Popieluszko Court
           Hartford, CT 06106
 6         860.247.4400 (Fax) 860.247.4236
           swhite@ctfairhousing.org
 7

 8    Representing the Defendant:

 9    Timothy J. St. George, Esq.
      Troutman Sanders LLP
10         Troutman Sanders Building
           1001 Haxall Point
11         Richmond, VA 23219
           804.697.1254
12         tim.st.george@troutmansanders.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Transcript of Erin Kemple
Conducted on July 23, 2019                    43

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21      Q.    All right.  Let's start really high level

22   before we look at the log.  Diversion Resources is

23   the first category of compensatory damages that I

24   see on page one.  Do you see that?

25      A.    Yes.

Transcript of Erin Kemple
Conducted on July 23, 2019                          44

```
1        Q.    So describe to me generally what this
2   means in terms of diversion of resources and what's
3   being claimed.
4        A.    So, under the case of Haydens versus
5   Coleman, the Supreme Court articulated two types of
6   damages that fair housing organizations can suffer
7   as a result of work on a particular case.
8              One is diversion of resources which means
9   that instead of doing what it had planned to do or
10  what it needed to do, the organization diverted its
11  resources, went from one type of work to another
12  type of work.
13             In this particular case there are, I
14  believe, four types of diversion.  One is casework,
15  not necessarily on this case but on other cases.
16  The second is education and outreach.  The third is
17  -- maybe there's only three -- the fundraising that
18  we did or didn't do as a result of this work.  So
19  that's, sort of, the high level.
20       Q.    Okay. All right.  Let's talk about this
21  still on just a high level.  This diversion of
22  resources, as you've described it, it's more than
23  individuals simply working on this matter, correct?
24  So, actually litigating this case?
25       A.    It is not any of the litigation on this
```

```
1    case.

2         Q.    Okay.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Transcript of Erin Kemple
Conducted on July 23, 2019                    122

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17          MR. ST. GEORGE:  I have the final
18      exhibit of this variety.  Let's have this
19      marked, please, as Exhibit 8.
20               (Exhibit 8, marked)
21  BY MR. ST. GEORGE:
22      Q.   I'll represent to you this is an
23  electronic printout of the tab from the spreadsheet
24  produced by the Connecticut Fair Housing Center that
25  is labeled as grant writing.  Does that accurate to
```

Transcript of Erin Kemple
Conducted on July 23, 2019                      123

1    you?

2         A.    That's correct.

3         Q.    Do you recognize this document?

4         A.    Yes, I do.

5         Q.    Describe for me generally what the

6    entries on this tab reflect.

7         A.    So these are mostly my work but some also

8    of Shannon Houston in writing two grants that we

9    ended up applying for in order to be able to expand

10   our work with people who could not find housing as a

11   result of criminal records.

12               MR. ST. GEORGE:  Again, I'd ask for the

13        production of those grant proposals.

14   BY MR. ST. GEORGE:

15        Q.    Okay.  So, these grants, were they

16   successful?

17        A.    Yes.

18        Q.    So both grants were awarded?

19        A.    Yes.

20        Q.    What was the amount of the awards?

21        A.    The Hartford Foundation grant was

22   $260,000 spread out over three years and the BOA, or

23   Bank of America, grant was $500,000 spread out over

24   three years.

25        Q.    Congratulations.  Those are some good

Transcript of Erin Kemple
Conducted on July 23, 2019                    124

1    grants.

2             Okay.  So these efforts, grant writing

3    efforts, they're all concentrated in it looks like

4    the spring essentially through the summer of 2017,

5    is that right?

6         A.    That is correct.

7         Q.    So I have April 2017 through October

8    2017.

9         A.    Yes.

10        Q.    And the grants that you were awarded, was

11   any of that grant money specifically earmarked

12   towards studying the effective criminal background

13   screening and housing accessibility?

14        A.    So it was criminal background screening

15   and access to housing for people with criminal

16   records, but it wasn't really studying, it was

17   really trying to determine the extent to which

18   people's abilities to get housing was affected by

19   their criminal records.

20        Q.    And what percentage of the grants would

21   you say were specific to those efforts?

22        A.    50 percent of each grant.  So the time

23   records that you see in front of you are only half

24   of what was actually spent.

25        Q.    Mm-hmm.  Right, because I see, if you

Transcript of Erin Kemple
Conducted on July 23, 2019                                   125

1    turn to the very last -- I should say the

2    second-to-last page, there's a 69.3 hours and then

3    that's actually divided in half.

4         A.    Right.

5         Q.    And is that what you're referencing, the

6    figures here for these grant proposals were actually

7    taken in half because it's your position that only

8    half of the grant was related to the criminal

9    background screening issues?

10        A.    That is correct.

11        Q.    And has the Connecticut Fair Housing

12   Center -- I take it this was in 2017, has it

13   received this money, or at least a portion of it?

14        A.    So they were each three-year grants and

15   so we were paid yearly.

16        Q.    So you received money in 2018 and 2019?

17        A.    I think our first payment for both grants

18   was in October of 2017, and we received payments

19   every six months.

20        Q.    Okay.  Got it.  And what -- again, I want

21   to be specific to the criminal background portion.

22   What efforts have you made -- what have you done

23   with that money for that portion of the grant?  What

24   activities has the Connecticut Fair Housing Center

25   been undertaking?

Transcript of Erin Kemple
Conducted on July 23, 2019                              126

```
1        A.      Everything in our diversion log.  Some of
2   it is paid for by the grants, some of it is not paid
3   for by the grants because we are required to use
4   money other than money paid for by the grants in
5   order to do the work.  But what you're seeing is a
6   summary of all of the work we've done on criminal
7   records over the past -- since 2017.
8        Q.      Okay.  Understood.  All right.  So is it
9   fair to say that the diversion logs have generally
10  been -- those efforts of the Connecticut Fair
11  Housing Center, those efforts have generally been
12  funded by these grants that were received by the
13  Connecticut Fair Housing Center?
14       A.      They have been partially funded.
15       Q.      Okay.  Do you have an understanding of
16  what percentage has been funded by these grants?
17       A.      So, currently, we have a $340,000 deficit
18  in our budget.  So, it's that kind of -- that's
19  about -- what is that.  That's about a quarter of
20  our budget that's unfunded, or maybe even a little
21  more.  And so I would say that is about a quarter to
22  a third is what is unfunded or is funded by things
23  other than these grants.
24       Q.      Okay.  So these grants, these grants have
25  funded the efforts, the criminal background
```

Transcript of Erin Kemple
Conducted on July 23, 2019                    127

1    screening efforts under the diversion log, is it

2    fair to say that these grants have funded between 66

3    and 75 percent of those efforts?

4         A.    That's an approximate number but, again,

5    remember, in diversion we're not saying that we

6    spent money that we didn't have.  Part of what we're

7    saying is that we spent money on an effort on things

8    that we would not have spent had it not been for

9    this.

10            So, yes, some of it is covered by grants

11   but it's the fact that we ended up having to divert

12   our time.  So if you'll see on the log you just gave

13   me, I think I have a memo from April of 2017 that

14   says here's what we're going to apply for, and then

15   you'll see that on 20 -- on April 19 of 2017, I

16   heard from staff members that we should really be

17   working on criminal records and why.  And so we

18   completely changed what we were going to do for both

19   grants.

20        Q.    Okay.  All right.  And so in these

21   grants, at least 50 percent of the grants that were

22   focused on the criminal background screening issues,

23   these grants were -- 50 percent of these grants were

24   awarded to fund activities on those issues, is that

25   fair?

Transcript of Erin Kemple
Conducted on July 23, 2019                    128

1        A.    Yes.

2        Q.    And these grants, did you at all mention

3   Corelogic or CrimSAFE?

4        A.    Yes.  I don't -- let me be clear.  I do

5   not know that we mentioned Crimsafe.  We mentioned

6   Corelogic, I believe.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcript of Erin Kemple
Conducted on July 23, 2019                    129

1

2

3

4

5

6

7

8

9

10

11

12

13        Q.    I want to have you turn back to Exhibit

14   2, which was the Plaintiffs' Amended Damages

15   Analysis.

16            So we talked about the diversion of

17   resources, and we went through that spreadsheet.  I

18   want to ask you about the next category of damages

19   claimed by the Connecticut Fair Housing Center in

20   terms of compensatory damages, and that's

21   Frustration of Mission.  Do you see that?

22        A.    Yes.

23        Q.    I don't intend for you to read this

24   document or recite it, I can read it just as well as

25   you can, but what I want to have you do is summarize

1    for me what is meant by "frustration of mission"

2    and, you know, your testimony as to how the mission

3    has been frustrated.

4         A.    So, as I said earlier, the case of

5    Higgins vs. Coleman articulated two standards of

6    damages for fair housing organizations and the

7    second was frustration of mission.

8              Frustration of mission is a category of

9    damages that in a tort case would really correspond

10   to emotional distress or damages that are not tied

11   to a specific economic loss.  And in this case what

12   fair housing organizations are designed to do is

13   both counteract individual cases of discrimination

14   as well as try to ensure that the fair housing laws

15   are being followed by everyone who is obligated to

16   comply with the fair housing laws.

17             And so the Connecticut Fair Housing

18   Center's mission is to ensure that all of

19   Connecticut residents have access to the housing of

20   their choice and that's certainly something we put

21   out in the world as something we say whenever we are

22   testifying, or in front of a legislative committee,

23   or a meeting with a potential funder, as well as

24   doing education and outreach.

25

Transcript of Erin Kemple
Conducted on July 23, 2019                    146

1

2

3

4      Q.    Right.  So I think we're saying the same

5   thing.  But -- so what I'm asking is, is it your

6   position that the messages that are reflected in

7   Exhibit A, is it your position that that type of use

8   of criminal background screening results is what's

9   required under the law?

10      A.    Yes.

11      Q.    Okay.  So basically your message would be

12   to reinforce compliance with the law?

13      A.    Given that it's not clear to me that

14   anybody is complying with the law, I think it would

15   be telling them how to comply with the law.

16      Q.    But, in any event, it would be compliance

17   with the law as it exists today for housing

18   providers?

19      A.    Yes.

20      Q.    This comprehensive advertising campaign,

21   you mentioned prior campaigns like buses, bus

22   shelters and things like that, do you have any idea

23   as to what the substance of this advertising

24   campaign would be for where the messages would be

25   displayed?

1        A.     So, one was online on public --

2    advertising on online publications that are directed

3    toward the housing provider community.  So, if there

4    were industry newsletters or newsletters put out by,

5    for instance, the National Association of Housing

6    and Redevelopment Officer, NAHRO, buying advertising

7    there, advertising at conferences and places where

8    people in the industry would be likely to go, so I

9    know that a lot of people attended various

10   conferences in Connecticut and elsewhere, where they

11   are -- where fair housing is taught or they're just

12   hearing about industry practices.  So that was, I

13   think, the majority of it.  I think that the rest of

14   it would be having individual media buys in specific

15   places.  So I think they said probably not a -- like

16   a Hartford Courant or any kind of newspaper of

17   general circulation but other kinds of media that is

18   specifically directed -- print media that is

19   specifically directed toward the housing provider

20   community.

21        Q.     Okay.  Understood.

22             All right.  Has the Connecticut Fair

23   Housing Center done anything beyond accepting this

24   written estimate; have you moved forward in any way

25   with this advertising campaign?

Transcript of Erin Kemple
Conducted on July 23, 2019                148

1          A.     No.   We don't have the money to do that.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcript of Erin Kemple
Conducted on July 23, 2019                                    235

1

2

3

4          Q.    Okay.  So what happened in this case?

5     There was the fact-finding hearing, correct?

6          A.    And I believe that there was a

7     preconciliation determination, which means that CHRO

8     made certain factual determinations that it then

9     applied to the law which said that, you know, all

10    things being true as alleged here, this should go to

11    hearing in order to determine if there's liability

12    by the respondents.

13         Q.    Do you know if the hearing ever occurred?

14         A.    The hearing did not occur.

15         Q.    The case resolved?

16         A.    The case resolved.

17         Q.    And it settled?

18         A.    Yes.

19         Q.    And my understanding of the settlement

20    was there was at least a monetary component to the

21    settlement?

22         A.    Yes, there was.

23         Q.    ██████████████████████████████████

24         A.    Yes.

25         Q.    Did that payment go directly to

```
 1    Mr. Arroyo or was it split with the Connecticut Fair

 2    Housing Center?

 3         A.    So, there were actually three components

 4    to the agreement.  The first was that Mikhail could

 5    move in, which he did shortly -- I think it happened

 6    relatively quickly after the predetermination

 7    decision was made.  So, the second was the monetary.

 8    And then the third was that they had to change their

 9    policies and practices and undergo fair housing

10    training.

11              With regards to the money, I believe that

12    the client, Mr. Arroyo, and his mother received ██

13    ████████████████████████████████████████████████

14

15

16

17

18

19

20

21

22

23

24

25
```

Transcript of Erin Kemple
Conducted on July 23, 2019                    256

1        Q.    Okay.  I think we were turning to

2   Interrogatory No. 10, which is on page 13 of the

3   responses.  Do you see that?

4        A.    Yes.

5        Q.    Okay.  So, in this interrogatory we asked

6   for "the factual basis for your allegation in the

7   Complaint that RPS's policies and procedures

8   discriminate against black and Latino applicants."

9   Include the basis for any such claim under a theory

10  of disparate impact and disparate treatment.

11            The answer to this response was generally

12  an objection.  But if you turn the page and go to

13  the second paragraph, do you see the sentence that

14  says "The Complaint already explains the factual

15  basis for these allegations in detail, supported

16  with citations to statistical evidence, scientific

17  studies, and the defendant's marketing materials,

18  and explains the Plaintiff's legal theory in

19  detail."

20            Do you see that?

21       A.    Yes.

22       Q.    So, am I to take it from this response

23  that the relevant statistics for purposes of

24  establishing the claim of disparate impact are set

25  forth in the Complaint?

Transcript of Erin Kemple
Conducted on July 23, 2019                    257

1          A.      Yes.

2          Q.      Okay.   The same with the factual bases

3    for the claim of disparate impact and disparate

4    treatment?

5          A.      Correct.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF CONNECTICUT

3              CASE NO. 3:18cv00705VLB

4    _____

5    CONNECTICUT FAIR HOUSING CENTER and

6    CARMEN ARROYO, individually and as next

7    of friend for Mikhail Arroyo,

8

9                       Plaintiffs,

10              vs.

11

12   CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC,

13

14                     Defendant.

15   _____

16

17       This is the Examination Before Trial of

18               CHRISTOPHER WILDEMAN

19       held on the 3rd day of September, 2019,

20       held at the Courtyard by Marriott, 29

21       Thornwood Drive, Ithaca, New York.

22

23       REPORTED BY:  CAITLYN A. SHAYLOR

24                     Shorthand Reporter

25

Transcript of Christopher Wildeman
Conducted on September 3, 2019                          2

1                  A P P E A R A N C E S

2

3         CONNECTICUT FAIR HOUSING CENTER

4              60 Popieuszko Court

5              Hartford, Connecticut 06106

6              Attorneys for Plaintiffs

7              BY:  SALMUN KAZEROUNIAN, ESQUIRE

8

9    (PRESENT VIA VIDEO CONFERENCING EQUIPMENT.)

10         TROUTMAN SANDERS LLP

11              1001 Haxall Point

12              Richmond, Virginia 23219

13              Attorneys for Defendant

14              BY:  ALAN WINGFIELD, ESQUIRE

15

16

17                  S T I P U L A T I O N S

18

19         It is stipulated by and between the

20         parties hereto that the filing of the

21         deposition is waived; that the deposition

22         may be signed before any Notary Public;

23         and that all objections except as to the

24         form of the question are reserved to the

25         time of the trial.

Transcript of Christopher Wildeman
Conducted on September 3, 2019                    62

1    never been available to me.

2        Q     Are you aware that this case involves

3    background checks for applicants for housing at

4    Artspace Windham in Willimantic, Connecticut?

5        A     I -- I wouldn't know that level of

6    specificity about the properties, but I know that

7    it's on background checks around criminal justice

8    contact.

9        Q     Do you know if it has something to do

10   with applicants for affordable housing in

11   Willimantic, Connecticut?

12       A     I did know that.

13       Q     If you were going to determine whether

14   there was disparities based on race or ethnicity

15   of applicants for affordable housing in

16   Willimantic, Connecticut, how would you go about

17   studying that?

18       A     So I'd need to know about the applicant

19   pool, and I'd need to know about the rejection

20   rate, and I'd need to know about the reasons for

21   the rejection, and I'd need to know all of those

22   things by race, ethnicity.

23       Q     Were you asked to do such an analysis?

24       A     No, I wouldn't have the data to do an

25   analysis like that.

# EXHIBIT D
# FILED UNDER SEAL

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **CONNECTICUT FAIR HOUSING CENTER** | **Case No. 3:18-cv-00705-VLB** |
| **and** | |
| **CARMEN ARROYO, individually and as next friend for Mikhail Arroyo** | |
| *Plaintiffs*, | |
| v. | |
| **CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC.** | |
| *Defendant*. | **JANUARY 9, 2019** |

### PLAINTIFF CONNECTICUT FAIR HOUSING CENTER'S RESPONSES TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSIONS

Plaintiff Connecticut Fair Housing Center ("CFHC") submits the following answers and objections in response to Defendant CoreLogic Rental Property Solutions, LLC's ("RPS" or "CoreLogic") First Set of Requests for Admission to CFHC.

**Request for Admission No. 1:**

Admit that Plaintiffs have no evidence that RPS made any decisions with respect to Mikhail Arroyo's application for residency at the ArtSpace Windham.

**Response:**

Deny.

**Request for Admission No. 2:**

Admit that Plaintiffs have no evidence that RPS determined for the ArtSpace Windham or WinnResidential what public records would be

1

Plaintiffs have no evidence that CoreLogic advised ArtSpace Windham or WinnResidential that the criminal records implicated by the CrimSAFE report at issue in this action should be disqualifying, CFHC responds as follows:

Deny.

### Request for Admission No. 4:

Admit that the ArtSpace Windham and/or WinnResidential set the standard for what public records would be "disqualifying" with respect to any criminal records implicated by the CrimSAFE report at issue in this action.

### Response:

CFHC objects to this request on the ground that it is vague and ambiguous as to the phrase "set the standard," and as to the phrase "as to what public records would be 'disqualifying' with respect to any criminal records implicated by the CrimSAFE report at issue in this action."  Subject to and without waiving the foregoing objection, and understanding this as requesting an admission that ArtSpace Windham or WinnResidential determined that the criminal records implicated by the CrimSAFE report at issue in this action were disqualifying, CFHC responds as follows:

Deny.

### Request for Admission No. 5:

Admit that Mikhali Arroyo was charged with retail theft under 18 Pa. C.S.A. § 3929(a)(1) on July 18, 2014.

### Response:

CFHC admits that Mikhail Arroyo was charged with summary offense retail

3

theft under 18 Pa. C.S.A. § 3929(a)(1) on July 18, 2014.

Request for Admission No. 6:

Admit that the retail theft charge referenced in Request for Admission No. 4 was still pending at the time Mikhail Arroyo applied for residency at the ArtSpace Windham in April 2016.

Response:

CFHC is unable to truthfully admit or deny this request because no retail theft charge is referenced in Request for Admission No. 4. Assuming this is intended to refer to the charge referenced in Request for Admission No. 5, CFHC responds as follows:

Admit.

Request for Admission No. 7:

Admit that nothing in RPS's CrimSAFE report at issue in this action is alleged by Plaintiffs to be inaccurate.

Response:

Deny.

Request for Admission No. 8:

Admit that Plaintiffs were aware of the retail theft charge referenced in Request for Admission No. 4 at the time that Mikhail Arroyo applied for residency at the ArtSpace Windham in April 2016.

Response:

CFHC is unable to truthfully admit or deny this request because no retail theft charge is referenced in Request for Admission No. 4. Assuming this is

4

intended to refer to the charge referenced in Request for Admission No. 5, CFHC responds as follows:

Deny as to CFHC and Carmen Arroyo.  CFHC has made reasonable inquiry, but the information it knows or can readily obtain is insufficient to enable it to admit or deny this request as to Mikhail Arroyo's knowledge in April 2016.

<u>Request for Admission No. 9:</u>

Admit that Mikhail Arroyo secured housing at the ArtSpace Windham after April 2016.

<u>Response:</u>

CFHC admits that Mikhail Arroyo secured housing at ArtSpace Windham more than a year after his application was submitted in April 2016.

<u>Request for Admission No. 10:</u>

Admit that Plaintiffs did not pay any money with respect to any File Disclosure request to RPS.

<u>Response:</u>

Admit.

<u>Request for Admission No. 11:</u>

Admit that Plaintiffs not aware of any other disabled individual who has been unable to access a copy of his or her consumer file from RPS.

<u>Response:</u>

Admit.

<u>Request for Admission No. 12:</u>

5

Deny.

**Request for Admission No. 25:**

Admit that Mikhail Arroyo's application to the ArtSpace Windham was denied for reasons other than the content of any CrimSAFE report at issue in this action.

**Response:**

Deny.

**Request for Admission No. 26:**

Admit that Plaintiffs have no evidence that Mikhail Arroyo's application to the ArtSpace Windham would have been approved despite the "disqualifying record" stated on the CrimSAFE report at issue in this action.

**Response:**

Deny.

By Counsel,

**/s/ Greg Kirschner**
**Greg Kirschner (ct26888)**
**Salmun Kazerounian (ct29328)**
**Sarah White (ct29329)**
**Connecticut Fair Housing Center, Inc.**
**60 Popieluszko Court**
**Hartford, CT 06106**
**(860) 263-0724**
**gkirschner@ctfairhousing.org**

**/s/ Eric Dunn**
**Eric Dunn, *Pro Hac Vice***
**National Housing Law Project**
**919 E. Main Street, Ste. 610**
**Richmond, VA 23219**
**(415) 546-7000**
**edunn@nhlp.org**

10

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 9, 2019 a copy of the foregoing was sent via email to:

Daniel Cohen
Troutman Sanders LLP
875 Third Avenue
New York, NY 10022
dan.cohen@troutman.com


Timothy J. St. George
David Anthony
Troutman Sanders LLP
1001 Haxall Point
Richmond, VA 23219
timothy.st.george@troutman.com
david.anthony@troutman.com


*/s/ Salmun Kazerounian*
Salmun Kazerounian

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **CONNECTICUT FAIR HOUSING CENTER** | **Case No. 3:18-cv-00705-VLB** |
| **and** | |
| **CARMEN ARROYO, individually and as next friend for Mikhail Arroyo** | |
| *Plaintiffs*, | |
| **v.** | |
| **CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC.** | |
| | **January 31, 2019** |
| *Defendant*. | |

**PLAINTIFF CONNECTICUT FAIR HOUSING CENTER'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

**Interrogatory No. 1**: State Mikhail Arroyo's full name (complete first name, middle name, and last name), Social Security number, date of birth, nicknames, former names, and/or aliases that he has used and the periods during which each alias was used.

**Answer**:

**Mikhail Jesus Arroyo**
**SSN:** ████8831
**DOB:** ████94
**Nicknames:  Casper, Suso, Mickey**
**Former Names/Aliases: None**

**Interrogatory No. 2**: Identify all individuals providing information contained in the responses to these Interrogatories, including each person who has prepared or assisted in the preparation of the Responses to these Interrogatories.

a. **A statewide advertising campaign to inform landlords, tenants and tenant screening providers that criminal records screening policies that impose blanket bans are illegal, housing providers must make individualized assessment of criminal records, and disabled tenants may be able to request a reasonable accommodation of a landlord's criminal records screening policy.  A comprehensive four week advertising campaign directed at people of color and people with disabilities that would disseminate the necessary information via television, radio, print media and the internet would cost at least $250,000.**

b. **A three year testing program to gauge the level of discrimination occurring and to determine whether the CFHC's efforts to combat this discrimination is effective.  The cost of the testing program over three years would be $30,000.**

c. **A two year outreach plan to educate landlords through seminars and trainings to counteract the effect of the defendant's discrimination. Conducting three trainings per year for two years will cost approximately $20,000.**

**The CFHC reserves the right to amend and update these estimates based on information about the extent of the defendant's discrimination that may be revealed through discovery.**

**This contention is based on:**

- **Testimony of Erin Kemple**
- **Diversion Log, produced in response to RFP 11.**

**Interrogatory No. 10**: Describe specifically, and in detail, the factual basis of your allegation in the Complaint that RPS's policies and procedures discriminate against black and Latino applicants. Include in your response the basis for any such claim under a theory of: (1) disparate impact; and (2) disparate treatment. Also identify in your response all documents, testimony, or other forms of proof on which you base that contention.

**Answer**:

**OBJECTION: The interrogatory is overly broad and unduly burdensome. Interrogatories that seek "every fact, every piece of evidence, every witness, and every application of law to fact—rather than, for example, certain principal or material facts, pieces of evidence, witnesses and legal applications—supporting**

13

**the identified allegations, are overly broad and unduly burdensome … [C]ontention interrogatories 'must be specific, intelligible, and narrowly tailored for the case.'[]** **Similarly Plaintiffs should not be "required to parse through documents that have already been produced to defendants, which defendants are in a position to review themselves, in order to explain the obvious."** *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC,* **273 F.R.D. 367, 369 (S.D.N.Y. 2010) (internal citations omitted). Moreover, even narrowly tailored contention interrogatories are more suited for the close of discovery in order to narrow the issues of trial, not as a primary means of discovering new information. See** *Pasternak v. Dow Kim,* **No. 10 CIV. 5045 LTS JLC, 2011 WL 4552389, at \*3 (S.D.N.Y. Sept. 28, 2011) and Fed. R. Civ. P. 33(a)(2) (" court may order that the [contention] interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time").**

**The interrogatory is overly broad and unduly burdensome in that it would require the Plaintiff to describe the factual and legal basis of at least 177 paragraphs of the 234 paragraph, 56-page long Complaint, the gravamen of which is that Defendant's CrimSAFE product unlawfully discriminates against black and Latino applicants. In essence, the interrogatory requires the Plaintiff to recite, in narrative form, the Plaintiff's entire case at trial, and to update this narrative as discovery progresses. The Complaint already explains the factual basis for these allegations in detail, supported with citations to statistical evidence, scientific studies, and the defendant's marketing materials, and explains the Plaintiff's legal theory in detail. Answering this interrogatory would require the Plaintiff to explain the factual basis for all of these allegations as well as comb through all the discovery produced by both parties and publicly available information to compile all evidence supporting these numerous factual allegations.**

**Interrogatory No. 11**: Describe specifically, and in detail, the factual basis of

your allegation in the Complaint that RPS's policies and procedures discriminate

against disabled individuals.  Include in your response the basis for any such claim

under a theory of: (1) disparate impact; and (2) disparate treatment. Also identify in

your response all documents, testimony, or other forms of proof on which you base

that contention.

**Answer**:

**OBJECTION: The interrogatory is overly broad and unduly burdensome. Interrogatories that seek "every fact, every piece of evidence, every witness, and every application of law to fact—rather than, for example, certain principal or material facts, pieces of evidence, witnesses and legal applications—supporting the identified allegations, are overly broad and unduly burdensome … [C]ontention**

interrogatories 'must be specific, intelligible, and narrowly tailored for the case.'[] Similarly Plaintiffs should not be "required to parse through documents that have already been produced to defendants, which defendants are in a position to review themselves, in order to explain the obvious." *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 273 F.R.D. 367, 369 (S.D.N.Y. 2010) (internal citations omitted). Moreover, even narrowly tailored contention interrogatories are more suited for the close of discovery in order to narrow the issues of trial, not as a primary means of discovering new information.  See *Pasternak v. Dow Kim*, No. 10 CIV. 5045 LTS JLC, 2011 WL 4552389, at *3 (S.D.N.Y. Sept. 28, 2011) and Fed. R. Civ. P. 33(a)(2) (" court may order that the [contention] interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time").

The interrogatory is overly broad and unduly burdensome in that it would require the Plaintiff to describe the factual and legal basis of it entire claim that the Defendant's policies and procedures related to consumer file disclosures discriminate on the basis of disability.  In essence, the interrogatory requires the Plaintiff to recite, in narrative form, the Plaintiff's entire case for disability discrimination at trial, and to continually update this narrative as discovery progresses.  The Complaint already explains the factual basis for these allegations in detail, supported with citations to statistical evidence, scientific studies, and public information, and explains the Plaintiff's legal theory.  Answering this interrogatory would require the Plaintiff to explain the factual basis for at least 50 paragraphs of allegations as well as comb through all the discovery produced by both parties and publicly available information to compile all evidence supporting these numerous factual allegations.

**Interrogatory No. 12**: Describe specifically, and in detail, the factual basis of

your allegation that there exist "less discriminatory alternatives" with respect to

RPS's offering of the CrimSAFE product, as alleged in the Complaint.

**Answer**:

Defendant has available to it the less discriminatory alternative of evaluating each criminal record on an individualized basis to determine the actual risk to safety before reporting to a housing provider that the applicant is disqualified. Such individualized review may include consideration of such factors as the type of crime and its relevance (if any) to rental housing, the outcome or disposition of the case, the amount of time since the criminal activity occurred, the age of the applicant at the time of the offense, mitigating circumstance surrounding the criminal activity, evidence of rehabilitation or changed circumstances, or any other information outside the record which may tend to show whether the criminal record is, or is not, predictive of the applicant's likely performance in a future residential tenancy.  Upon information and belief, Defendant is capable of undertaking this individualized assessment.

Defendant has available to it the less discriminatory alternative of supplying the underlying information about the criminal record to the housing provider rather than making or reporting the disqualification decision itself so that the housing provider can do an individualized assessment on its own and make a case-by-case assessment of the actual risk to safety or property presented by each applicant. Defendant is capable of providing this information to housing providers as demonstrated by the fact that it provides it to housing providers in connection with other tenant screening products it offers.

Either alternative would achieve the goal of screening applicants whose criminal records demonstrate a realistic threat to other residents or property but would be less discriminatory because it would deny housing to fewer Latino and African-American applicants when they do not represent a realistic risk to safety or property.

As discovery pertaining to RPS's CrimSafe is not yet complete and Defendant has not disclosed any substantial and legitimate business interest related to CrimSafe, the Plaintiff reserves the right to supplement its response.

Interrogatory No. 13: Describe specifically, and in detail, the factual basis of your allegation that there exist "less discriminatory alternatives" with respect to RPS's File Disclosure practices, as alleged in the Complaint.

Answer:

Defendant has available to it the less discriminatory alternative of providing consumer files at the request of a court-appointed conservator or guardian without requiring the conserved consumer to designate this individual as their attorney in fact. Doing so would be less discriminatory because it would enable disabled individuals subject to a conservatorship or guardianship who lack the capacity to execute a power of attorney to receive their consumer file and learn the basis of Defendant's tenant screening decisions on an equal footing with other consumers, while simultaneously protecting the Defendant's interest in ensuring that an individual is authorized to request or receive a consumer file.

Defendant is capable of accepting documentation of a conservatorship or guardianship in connection with a consumer file request. This is demonstrated by the Defendant's policy of accepting and determining the validity of powers of attorney in connection with consumer file requests. Powers of attorney are similarly subject to varying legal requirements state-by-state, showing that Defendant is capable of making a determination as to the validity of a conservatorship or guardianship, which, in actuality, is likely to be far easier for Defendant. This is because powers of attorney are far more susceptible to fraud in that they are executed without judicial oversight, may easily be forged or obtained

16

## PLAINTIFF'S CERTIFICATION

I, Erin Kemple, hereby certify that I have reviewed the above Interrogatories and responses thereto and they are true and accurate to the best of my knowledge and belief.

Executed on January 31, 2019.

Erin Kemple
Executive Director
Connecticut Fair Housing Center

Sworn to and subscribed based on personal knowledge before me this 31st day of January, 2019.

Notary Public or Commissioner of the Superior Court
My Commission Expires:

## **CERTIFICATE OF SERVICE**

**I hereby certify that on January 31, 2019 a copy of the foregoing was sent via email and first-class mail to:**

**Daniel Cohen**
**Troutman Sanders LLP**
**875 Third Avenue**
**New York, NY 10022**
**dan.cohen@troutman.com**


**Timothy J. St. George**
**David Anthony**
**Troutman Sanders LLP**
**1001 Haxall Point**
**Richmond, VA 23219**
**timothy.st.george@troutman.com**
**david.anthony@troutman.com**



**_____/s/_____**
**Sarah White**

**30**

# EXHIBIT G

|   | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Summary of all diversion costs** | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | Staff member | Rate/hour | No. of hours | Total | check from workbooks | |
| 6 | | | | | | |
| 7 | Dresser, B | $ 10.00 | 0.2 | $ 2.00 | $ 2.00 | |
| 8 | Aleman, C | $ 150.00 | 4.2 | $ 630.00 | $ 630.00 | |
| 9 | Lavery, D | $ 200.00 | 1.7 | $ 340.00 | $ 340.00 | |
| 10 | Kemple, E | $ 400.00 | 74.03 | $ 29,612.00 | $ 29,612.00 | |
| 11 | Darby-Hudgens, F | $ 175.00 | 30.5 | $ 5,337.50 | $ 5,337.50 | |
| 12 | Kirschner, G | $ 350.00 | 1.3 | $ 455.00 | $ 455.00 | |
| 13 | Dresser, J | $ 150.00 | 7.3 | $ 1,095.00 | $ 1,095.00 | |
| 14 | Labrencis, J | $ 250.00 | 8.1 | $ 2,025.00 | $ 2,025.00 | |
| 15 | Ortiz, L | $ 100.00 | 2.5 | $ 250.00 | $ 250.00 | |
| 16 | Cuerda, M | $ 150.00 | 95.3 | $ 14,295.00 | $ 14,295.00 | |
| 17 | Heller, P | $ 250.00 | 2.1 | $ 525.00 | $ 525.00 | |
| 18 | Kazerounian, S | $ 200.00 | 111.8 | $ 22,360.00 | $ 22,360.00 | |
| 19 | Houston, S | $ 175.00 | 16.95 | $ 2,966.25 | $ 2,966.25 | |
| 20 | White, S | $ 200.00 | 0 | $ - | $ - | |
| 21 | Gentes, J | $ 325.00 | 0.5 | $ 162.50 | $ 162.50 | |
| 22 | | | | | | |
| 23 | | | 356.48 | $ 80,055.25 | $ 80,055.25 | |
| 24 | | | | | | |
| 25 | | | | | | |
| 26 | | | Hour Totals | Cost Totals | | |
| 27 | **CoreLogic Investigation** | | 42.4 | $ 9,447.50 | | |
| 28 | **Education and Outreach** | | 185.63 | $ 43,444.50 | | |
| 29 | **Testing** | | 48.1 | $ 8,165.00 | | |
| 30 | **Testing stipends** | | | $ 2,584.68 | | |
| 31 | **Client work** | | 45.7 | $ 7,737.00 | | |
| 32 | **Grant writing** | | 34.65 | $ 11,261.25 | | |
| 33 | | | | | | |
| 34 | | | | | | |
| 35 | | | | | | |
| 36 | | | | | | |
| 37 | **Total Diversion** | | 356.48 | $ 82,639.93 | | |

|   | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Date | Employee | Activity | Description | Time | Intake # | |
| 2 | 11/28/2016 | Cuerda, Maria | Case Work: Client intake interview | REDACTED - SEE PRIVILEGE LOG | 1 | 2428 | |
| 3 | 11/28/2016 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | 1.3 | 2428 | |
| 4 | 11/28/2016 | Cuerda, Maria | Case Work: Requested reasonable accommodation | sent letter to Winn and cc'd to Deanna. | 0.1 | 2428 | |
| 5 | 11/30/2016 | Cuerda, Maria | Consultation with: CFHC Staff | REDACTED - SEE PRIVILEGE LOG | 0.2 | 2428 | |
| 6 | 11/30/2016 | Cuerda, Maria | Case Work: Requested reasonable accommodation | wrote new RA and emailed to Michael Cunningham. | 0.6 | 2428 | |
| 7 | 12/5/2016 | Cuerda, Maria | Case Work: Correspondence | email from M. Cunningham of Winn Properties. He wants to speak with me but he needs a release. Call to Deanna R and then to Carmen, the client's mother and guardian. LM. | 0.4 | 2428 | |
| 8 | 12/6/2016 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | 1.5 | 2428 | |
| 9 | 12/7/2016 | Cuerda, Maria | Case Work: Work on Client case | called MD's office and asked for letter. Emailed them info on how to write it. | 1.2 | 2428 | |
| 10 | 12/9/2016 | Cuerda, Maria | Case Work: Work on Client case | email from doctor's office. I sent them some language for a letter for Mr. Arroyo. | 0.3 | 2428 | |
| 11 | 12/12/2016 | Cuerda, Maria | Case Work: Correspondence | email to dr's office asking if they can get us a letter... again. | 0.1 | 2428 | |
| 12 | 12/12/2016 | Cuerda, Maria | Case Work: Requested reasonable accommodation | Requested 3rd RA. | 1.3 | 2428 | |
| 13 | 12/13/2016 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | 0.2 | 2428 | |
| 14 | 12/13/2016 | Cuerda, Maria | Case Work: Work on Client case | client sent retainer | 0.1 | | |
| 15 | 12/14/2016 | Cuerda, Maria | Case Work: Correspondence | email back from  Michael C of Winn saying that they cannot respond to our RA request without the info from the screening which they don't have. Talked with EK and SK about this. Called CoreLogic and LM for Lisa Marie - 619-938-6876. arghhh; | 1 | 2428 | |
| 16 | 12/15/2016 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | 0.6 | 2428 | |
| 17 | 12/19/2016 | Cuerda, Maria | Consultation with: CFHC Staff | REDACTED - SEE PRIVILEGE LOG | 0.2 | 2428 | |
| 18 | 12/19/2016 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | 1.1 | 2428 | |
| 19 | 12/19/2016 | Cuerda, Maria | Consultation with: CFHC Staff | REDACTED - SEE PRIVILEGE LOG | 0.5 | 2428 | |

|  | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 20 | 12/20/2016 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG I called Core Logic and spoke with Tina Marie. She said she will mail me the disclosure form. I sent her my address. I asked her to write on the form that we need to get a POA in order to get this information. She said she would ask her supervisor. I suggested that she do this ASAP. I passed this along to SK. | 1 | 2428 |  |
| 21 | 1/9/2017 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | 0.4 | 2428 |  |
| 22 | 1/9/2017 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | 1.3 | 2428 |  |
| 23 | 1/9/2017 | Cuerda, Maria | Case Work: Work on Client case | investigate client housing denial as the result of CoreLogic info | 1.3 | 2428 |  |
| 24 | 1/10/2017 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | 0.7 | 2428 |  |
| 25 | 1/19/2017 | Cuerda, Maria | Case Work: Phone call on behalf of client | REDACTED - SEE PRIVILEGE LOG | 0.3 | 2428 |  |
| 26 | 1/25/2017 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | 0.2 | 2428 |  |
| 27 | 1/25/2017 | Cuerda, Maria | Case Work: Work on Client case | talk with deanna who called saying that she told Carmen that she should just bring Mikhail to live with her. It's possible that his RAP will expire on Feb 3. Also, Deanna is getting a lot of pressure from the nursing home to get Mikhail out of there. | 0.6 | 2428 |  |
| 28 | 2/2/2017 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | 0.2 | 2428 |  |
| 29 | 2/8/2017 | Cuerda, Maria | Case Work: Phone call to client | REDACTED - SEE PRIVILEGE LOG | 0.1 | 2428 |  |
| 30 | 2/15/2017 | Cuerda, Maria | Case Work: Work on Client case | talk with Deanna about Mikhail. An employee of Artspace told Carmen that M could not live there b/c he's violent. Deanna wanted to know why he can't just move in with her. Also, no one at artspace is returning Deanna's emails. I passed this along to SK. I got back to Deanna. | 0.6 | 2428 |  |
| 31 | 2/21/2017 | Cuerda, Maria | Case Work: Work on Client case | forwarding emails to SK | 0.4 | 2428 |  |
| 32 | 3/2/2017 | Cuerda, Maria | Administrative | updating correct info in client file | 0.2 | 2428 |  |
| 33 | 4/19/2017 | Cuerda, Maria | Case Work: Work on Client case | looking for emails for SK and looking through notes. | 0.3 | 2428 |  |
| 34 | 4/30/2018 | Cuerda, Maria | Case Work: Work on Client case | saving fax of retainer in file and letting SK know | 0.2 | 2428 |  |
| 35 | 9/28/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | 0.6 | 2705 |  |

|    | A | B | C | D | E | F | G |
|----|---|---|---|---|---|---|---|
| 36 | 12/4/2018 | Cuerda, Maria | Case Work: Work on Client case | copying emails into folder | 0.3 | 2705 | |
| 37 | 1/23/2019 | Cuerda, Maria | Case Work: Work on Client case | work on discovery for SK | 0.4 | 2705 | |
| 38 | 8/31/2018 | Gentes, Jeff | Case Work: Legal Research | research CUTPA re: CoreLogic | 0.3 | 2705 | |
| 39 | 9/4/2018 | Gentes, Jeff | Case Work: Legal Research | review prior pleadings; discuss with SK | 0.1 | 2705 | |
| 40 | 9/28/2018 | Gentes, Jeff | Case Work: Pleadings and motions | pulled MTD opp language for use in CoreLogic case | 0.1 | 2705 | |
| 41 | 6/6/2018 | Houston, Shannon | Outreach: Writing press release | Discuss press release with SK | 0.6 | no intake # | |
| 42 | 6/20/2018 | Houston, Shannon | Consultation with: CFHC Staff | discussion media outreach | 0.4 | no intake # | |
| 43 | 6/20/2018 | Houston, Shannon | Administrative: Internet Research | research reporters | 0.4 | no intake # | |
| 44 | 6/26/2018 | Houston, Shannon | Administrative: Internet Research | research best practices re: press release | 0.6 | no intake # | |
| 45 | 6/27/2018 | Houston, Shannon | Consultation with: CFHC Staff | Discuss media strategy with SK | 0.4 | no intake # | |
| 46 | 6/29/2018 | Houston, Shannon | Outreach: Preparing for outreach | REDACTED - SEE PRIVILEGE LOG | 1 | no intake # | |
| 47 | 7/13/2018 | Houston, Shannon | Outreach: Preparing for outreach | Discuss media updates w/SK and EK (CoreLogic update, EK interview w/author) | 0.2 | no intake # | |
| 48 | 8/22/2018 | Houston, Shannon | Outreach: Writing press release | Write press release on CoreLogic case & send to SK and GK for review | 1.3 | no intake # | |
| 49 | 8/23/2018 | Houston, Shannon | Outreach: Preparing for outreach | Research reporters for CoreLogic press release. | 0.5 | no intake # | |
| 50 | 5/10/2018 | Kazerounian, Salmun | Consultation with: outside colleague | REDACTED - SEE PRIVILEGE LOG | 0.6 | 2705 | |
| 51 | 5/16/2018 | Kazerounian, Salmun | Consultation with: outside colleague | REDACTED - SEE PRIVILEGE LOG | 0.7 | 2705 | |
| 52 | 5/17/2018 | Kazerounian, Salmun | Consultation with: outside colleague | REDACTED - SEE PRIVILEGE LOG | 0.8 | 2705 | |
| 53 | 7/26/2017 | Kazerounian, Salmun | Case Work: Phone call on behalf of client | call with Diane Carter to discuss Chesson's proposed changes | 0.5 | 2705 | |
| 54 | 8/25/2017 | Kazerounian, Salmun | Case Work: Client meeting | Discuss closing eviction case with client | 1 | 2705 | |
| 55 | 11/30/2016 | Kemple, Erin | Consultation with: CFHC Staff | discussion with Greg re: case of someone who was denied based on corelogic info | 0.3 | no intake # | |
| 56 | 12/14/2016 | Kemple, Erin | Consultation with: CFHC Staff | REDACTED - SEE PRIVILEGE LOG; discussion with Maria re: case involving CoreLogic | 0.3 | no intake # | |
| 57 | 4/12/2017 | Kemple, Erin | Consultation with: CFHC Staff | discussion with GK and SK re: CoreLogic | 0.3 | no intake # | |
| 58 | 5/11/2017 | Kemple, Erin | Consultation with: CFHC Staff | discussion with SK re: CoreLogic and eviction case | 0.6 | no intake # | |
| 59 | 7/26/2017 | Kemple, Erin | Consultation with: CFHC Staff | discussion with SK re: CoreLogic case; eviction records case; discussion re: expert | 0.3 | no intake # | |
| 60 | 4/24/2018 | Kemple, Erin | Consultation with: CFHC Staff | REDACTED - SEE PRIVILEGE LOG | 0.2 | no intake # | |

|  | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 61 | 4/25/2018 | Kemple, Erin | Consultation with: CFHC Staff | REDACTED - SEE PRIVILEGE LOG | 0.2 | no intake # | |
| 62 | 5/23/2018 | Kemple, Erin | Consultation with: CFHC Staff | REDACTED - SEE PRIVILEGE LOG | 0.2 | no intake # | |
| 63 | 9/26/2018 | Kemple, Erin | Administrative: Research | work on diversion log | 1.2 | 2705 | |
| 64 | 9/27/2018 | Kemple, Erin | Administrative: Research | work on diversion log for damages | 3 | 2705 | |
| 65 | 7/11/2019 | Kemple, Erin | Administrative: Research | work on diversion log for damages | 3.8 | 2705 | |
| 66 | 3/16/2018 | Lavery, David | Administrative | Discussion w- SK Re: server update; corelogic case; Emails & listservs; advance decisions | 0.4 | no intake # | |
| 67 | 3/16/2018 | Lavery, David | Administrative | Corelogic arrests data; other arrest data; ECOA; emails with SW and SK re same | 1.3 | no intake # | |
| 68 | | | | | 42.4 | | |
| 69 | | | | | | | |
| 70 | | | | | | | |
| 71 | | | Rate per hour | Hours | Total Cost | | |
| 72 | | Dresser, B | $          10 | 0.0 | $        - | | |
| 73 | | Aleman, C | $         150 | 0.0 | $        - | | |
| 74 | | Lavery, D | $      200.00 | 1.7 | $     340.00 | | |
| 75 | | Kemple, E | $         400 | 10.4 | $   4,160.00 | | |
| 76 | | Darby-Hudgens, F | $         175 | 0.0 | $        - | | |
| 77 | | Kirschner, G | $         350 | 0.0 | $        - | | |
| 78 | | Dresser, J | $         150 | 0.0 | $        - | | |
| 79 | | Labrencis, J | $         250 | 0.0 | $        - | | |
| 80 | | Ortiz, L | $         100 | 0.0 | $        - | | |
| 81 | | Cuerda, M | $         150 | 20.8 | $   3,120.00 | | |
| 82 | | Heller, P | $         250 | 0.0 | $        - | | |
| 83 | | Kazerounian, S | $         200 | 3.6 | $     720.00 | | |
| 84 | | Houston, S | $         175 | 5.4 | $     945.00 | | |
| 85 | | White, S | $         200 | 0 | $        - | | |
| 86 | | Gentes, J | $         325 | 0.5 | 162.5 | | |
| 87 | | | | | | | |
| 88 | | Total Cost | | 42.4 | $   9,447.50 | | |

|   | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Date | Employee | Activity | Description | Time |
| 2 |  |  |  |  |  |
| 3 | 6/7/2017 | Aleman, Cesar | Education: Setting up education/outreach | Setting up intern lunch- will do a general overview of outreach/education and tie in topics discussed in previous trainings (criminal records, immigration, etc.) | 0.1 |
| 4 | 8/2/2017 | Aleman, Cesar | Outreach: Organizing coalition | Met with Barry Williams from Save Our Sons Inc about partnering for their SOS Fest and looking at long term partnerships- they work on reentry issues with clients from across the state. Check in with EK about this and follow up accordingly. | 1.3 |
| 5 | 8/18/2017 | Aleman, Cesar | Outreach: Mailing Materials | Mailing guides to CT Collaborative on Reentry and also requests- | 0.3 |
| 6 | 8/18/2017 | Aleman, Cesar | Outreach: Organizing coalition | Sending emails to CCR (CT Collaborative on Reentry) about distributing copies of our renters' guide and also the possibility of doing trainings. | 0.2 |
| 7 | 1/10/2017 | Cuerda, Maria | Outreach: Preparing for outreach | setting up outreach to people with criminal records in March. | 0.2 |
| 8 | 3/1/2017 | Cuerda, Maria | Outreach: Preparing for outreach | logistics re outreach to people with criminal records. talking to pam, talking to tracy miller, etc. | 0.3 |
| 9 | 8/2/2017 | Cuerda, Maria | Administrative: Respond to inquiries | setting up time to talk about criminal records testing with colleague | 0.2 |
| 10 | 8/3/2017 | Cuerda, Maria | Education: preparing for training | prep for call on criminal records testing | 0.2 |

|   | A | B | C | D | E |
|---|---|---|---|---|---|
| 11 | 9/19/2017 | Cuerda, Maria | Education: Setting up education/outreach | invitation to GHREC meeting to discuss criminal records and housing. conversation about what she'd like to me to talk about. | 0.5 |
| 12 | 10/4/2017 | Cuerda, Maria | Education: preparing for training | finishing presentation on criminal records issues for talk tomorrow | 1.5 |
| 13 | 10/5/2017 | Cuerda, Maria | Education: Training for agency personnel | Training on criminal records issues for Greater Hartford Re-entry Coalition | 2.3 |
| 14 | 4/23/2018 | Cuerda, Maria | Administrative: Respond to inquiries | email about criminal records issues from MFP advocate. emailed back. | 0.2 |
| 15 | 7/6/2018 | Cuerda, Maria | Administrative: Respond to inquiries | setting up outreach to waterbury reentry meeting | 0.4 |
| 16 | 7/10/2018 | Cuerda, Maria | Education: Provider training | outreach - presentation on finding housing with a criminal record at Waterbury Reentry coalition | 3.4 |
| 17 | 7/20/2018 | Cuerda, Maria | Administrative: Respond to inquiries | call from Earl Bloodworth from a re-entry program in New haven about working with them on reentry stuff. I told him what we are doing and he will be in touch with me about me coming down to do some outreach there. | 0.4 |
| 18 | 8/24/2018 | Cuerda, Maria | Administrative | sending fdh info on ghrec event opening their reentry center in hartford | 0.2 |
| 19 | 12/6/2018 | Cuerda, Maria | Administrative: Respond to inquiries | call from housing advocate I met yesterday at the training saying that she has a client denied a place b/c of her criminal record. | 0.3 |

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 20 | 3/8/2018 | Darby-Hudgens, Fionnuala | Administrative | Spoke with MC RE: clients with criminal records; Coordinated efforts for third outreach event | 0.5 |
| 21 | 5/1/2018 | Darby-Hudgens, Fionnuala | Education: preparing for training | CRT Reentry Training | 1 |
| 22 | 5/1/2018 | Darby-Hudgens, Fionnuala | Education: Training for agency personnel | Reentry program... 16 clients facing housing discrimination as a result of criminal history | 2 |
| 23 | 9/5/2018 | Darby-Hudgens, Fionnuala | Administrative: Legislative Advocacy | CEO Reentry work group | 2.5 |
| 24 | 9/17/2018 | Darby-Hudgens, Fionnuala | Administrative: Legislative Advocacy | CEO - Re-Entry Committee review of notes | 0.4 |
| 25 | 9/28/2018 | Darby-Hudgens, Fionnuala | Administrative: Internet Research | Re-entry Center in Hartford | 0.6 |
| 26 | 11/9/2018 | Darby-Hudgens, Fionnuala | Administrative: Legislative Advocacy | CEO re-entry work | 0.5 |
| 27 | 11/13/2018 | Darby-Hudgens, Fionnuala | Education: Training for agency personnel | CEO Conference at Eastern - Participation in panel about barriers to housing for re-entry pop. 150 in attendance | 6 |
| 28 | 11/15/2018 | Darby-Hudgens, Fionnuala | Administrative: Legislative Advocacy | Call with Soto and CEO to set up listening tour for Re-Entry | 0.5 |
| 29 | 12/3/2018 | Darby-Hudgens, Fionnuala | Education: General prep | Organization of listening tour and recruiting participants | 4 |
| 30 | 12/4/2018 | Darby-Hudgens, Fionnuala | Education: General prep | Emails with confirmed speakers | 0.5 |
| 31 | 12/6/2018 | Darby-Hudgens, Fionnuala | Education: General prep | Finalized agenda for CEO event on Wednesday for Re-Entry listening tour. Email to agenda speakers explaining everything I have done. | 0.8 |
| 32 | 12/10/2018 | Darby-Hudgens, Fionnuala | Education: General prep | CEO Re-Entry Event - back and forth on agenda, press release, food etc. | 1 |

|   | A | B | C | D | E |
|---|---|---|---|---|---|
| 33 | 12/12/2018 | Darby-Hudgens, Fionnuala | Outreach: Networking | CEO Re-Entry listening tour; The re-entry population isn't recognizing housing discrimination. I will need to do some outreach. | 4 |
| 34 | 12/13/2018 | Darby-Hudgens, Fionnuala | Outreach: Preparing for outreach | Re-Entry Listening Tour Coordination Efforts | 1.4 |
| 35 | 1/16/2019 | Darby-Hudgens, Fionnuala | Administrative: Legislative Advocacy | Review of bills about re-entry | 0.1 |
| 36 | 12/7/2017 | Dresser, James | Administrative: Respond to inquiries | Danbury HA is interested in learning about requirements for criminal records and HCV under the HUD guidance. | 0.2 |
| 37 | 12/21/2017 | Dresser, James | Administrative: Planning | I worked on my Power Point for FH and Reentry After Incarceration. | 1 |
| 38 | 3/7/2017 | Heller, Pamela | Outreach: Preparing for outreach | Review materials regarding criminal records, etc. Discuss with JL. | 0.3 |
| 39 | 12/13/2017 | Heller, Pamela | Consultation with: outside colleague | Receive call from Marissa Holm at CCA. She wanted to talk about juvenile justice issues related to reentry and housing. Do additional research and send it to her. | 1.5 |
| 40 | 11/19/2018 | Kazerounian, Salmun | Administrative: Legislative Advocacy | Re-entry working group subcommittee meeting | 2 |
| 41 | 11/20/2018 | Kazerounian, Salmun | Administrative: Conference call | Legislative & Advocacy subcommittee of Re-entry working group (conference call) | 2 |
| 42 | 12/5/2018 | Kazerounian, Salmun | Administrative: Legislative Advocacy | Attend Re-entry task force meeting | 2.5 |
| 43 | 7/24/2018 | Kemple, Erin | Education: preparing for training | prep for New Neighborhoods training; research New Neighborhoods; need to test based on residency preference, source of income, familial status, criminal records | 0.4 |

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 44 | 8/1/2018 | Kemple, Erin | Consultation with: CFHC Staff | discussion with FDH re: reentry task force | 0.2 |
| 45 | 3/7/2017 | Labrencis, Jessica | Consultation with: CFHC Staff | Discuss HUD guidance on criminal records w/ PH and email her powerpoint presentation used in panel presentation last year. | 0.1 |
| 46 | 6/16/2017 | Labrencis, Jessica | Education: preparing for training | Prep for presentation on criminal records; review old powerpoint; prepare materials to pass out; research re: criminal records and reasonable accommodations. | 1.5 |
| 47 | 6/19/2017 | Labrencis, Jessica | Administrative: Staff Meeting | Presentation on criminal records and fair housing. | 1.8 |
| 48 | 9/19/2017 | Labrencis, Jessica | Consultation with: CFHC Staff | Discuss criminal records presentation w/ MC; provide her w/ copy of powerpoint. | 0.2 |
| 49 | 10/24/2017 | Labrencis, Jessica | Administrative: Staff Meeting | Attend meeting re: criminal records and eviction records. | 1 |
| 50 | 5/17/2019 | Darby-Hudgens, Fionnuala | Education: General prep | Updated FH training to include more informaiton on criminal records | 0.8 |
| 51 | 1/16/2019 | Darby-Hudgens, Fionnuala | Administrative: Legislative Advocacy | Discussion re: SB 54 on criminal records | 0.3 |
| 52 | 2/4/2019 | Darby-Hudgens, Fionnuala | Administrative: Legislative Advocacy | Assist in writing testimony on SB 54 and HB 5713 re: criminal records | 1.6 |
| 53 | 2/25/2019 | Darby-Hudgens, Fionnuala | Administrative: Legislative Advocacy | Assist with client testimony re: HB 5713, SB 54 | 2 |
| 54 | 4/3/2019 | Kazerounian, Salmun | Education: Provider training | Prep and present at panel discussion re: criminal records at LOB | 4.3 |
| 55 | 6/16/2019 | Kazerounian, Salmun | Education: preparing for training | Prep for panel discussion re: criminal records at Shriver Center convening | 3.5 |
| 56 | 6/17/2019 | Kazerounian, Salmun | Administrative: Attend Training | Prep for panel discussion re: criminal records at Shriver Center convening | 8 |

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 57 | 6/18/2019 | Kazerounian, Salmun | Administrative: Attend Training | Present at panel discussion re: criminal records at Shriver Center convening | 11 |
| 58 | 6/19/2019 | Kazerounian, Salmun | Administrative: Attend Training | Present at panel discussion re: criminal records at Shriver Center convening | 12 |
| 59 | 4/3/2019 | Kazerounian, Salmun | Education: Provider training | Prep and present at panel discussion re: criminal records at LOB | 4.3 |
| 60 | 6/16/2019 | Kazerounian, Salmun | Education: preparing for training | Prep for panel discussion re: criminal records at Shriver Center convening | 3.5 |
| 61 | 6/17/2019 | Kazerounian, Salmun | Administrative: Attend Training | Prep for panel discussion re: criminal records at Shriver Center convening | 8 |
| 62 | 6/18/2019 | Kazerounian, Salmun | Administrative: Attend Training | Present at panel discussion re: criminal records at Shriver Center convening | 11 |
| 63 | 6/19/2019 | Kazerounian, Salmun | Administrative: Attend Training | Present at panel discussion re: criminal records at Shriver Center convening | 12 |
| 64 | 1/23/2019 | Kazerounian, Salmun | Administrative: Legislative Advocacy | Analyze criminal records bills | 1 |
| 65 | 1/25/2019 | Kazerounian, Salmun | Administrative: Legislative Advocacy | Working with colleagues on criminal records bills | 5.5 |
| 66 | 2/26/2019 | Kazerounian, Salmun | Administrative: Legislative Advocacy | Assist with client testimony on HB 5713, SB 54 | 0.5 |
| 67 | 3/11/2019 | Kazerounian, Salmun | Administrative: Legislative Advocacy | Analyze criminal records bills | 1.6 |
| 68 | 3/14/2019 | Kazerounian, Salmun | Administrative: Legislative Advocacy | Prep for meeting re: criminal records bills | 1.2 |
| 69 | 3/19/2019 | Kazerounian, Salmun | Administrative: Legislative Advocacy | Meeting re: criminal records bills | 2 |
| 70 | 4/1/2019 | Kazerounian, Salmun | Administrative: Legislative Advocacy | Analyze criminal records bills | 0.8 |
| 71 | 4/22/2019 | Kemple, Erin | Administrative: Research | Review Tenant Selection Policies for Fairfield County | 0.10 |
| 72 | 5/8/2019 | Kemple, Erin | Administrative: Research | Review Tenant Selection Policies for Fairfield County | 0.43 |

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 73 | 5/29/2019 | Kemple, Erin | Administrative: Research | Review Tenant Selection Policies for Fairfield County | 0.53 |
| 74 | 6/6/2019 | Kemple, Erin | Administrative: Research | Review Tenant Selection Policies for Fairfield County | 0.99 |
| 75 | 6/7/2019 | Kemple, Erin | Administrative: Research | Review Tenant Selection Policies for Fairfield County | 0.26 |
| 76 | 6/11/2019 | Kemple, Erin | Administrative: Research | Review Tenant Selection Policies for Fairfield County | 0.40 |
| 77 | 6/12/2019 | Kemple, Erin | Administrative: Research | Review Tenant Selection Policies for Fairfield County | 0.43 |
| 78 | 6/13/2019 | Kemple, Erin | Administrative: Research | Review Tenant Selection Policies for Fairfield County | 1.22 |
| 79 | 6/14/2019 | Kemple, Erin | Administrative: Research | Review Tenant Selection Policies for Fairfield County | 0.43 |
| 80 | 6/17/2019 | Kemple, Erin | Administrative: Research | Review Tenant Selection Policies for Fairfield County | 0.20 |
| 81 | 6/17/2019 | Kemple, Erin | Administrative: Research | Review Tenant Selection Policies for Fairfield County | 0.50 |
| 82 | 7/9/2019 | Kemple, Erin | Administrative: Research | Review Tenant Selection Policies for Fairfield County | 0.13 |
| 83 | 7/10/2019 | Kemple, Erin | Administrative: Research | Review Tenant Selection Policies for Fairfield County | 1.32 |
| 84 | 1/4/2019 | Kemple, Erin | Education: preparing for training | Prep for training for Bridgeport HA re: RA and criminal records | 0.76 |
| 85 | 1/9/2019 | Kemple, Erin | Education: preparing for training | Prep for training for Bridgeport HA re: RA and criminal records | 0.10 |
| 86 | 1/28/2019 | Kemple, Erin | Education: preparing for training | Prep for training for Bridgeport HA re: RA and criminal records | 0.43 |
| 87 | 1/31/2019 | Kemple, Erin | Education: preparing for training | Prep for training for Bridgeport HA re: RA and criminal records | 0.40 |

|     | A | B | C | D | E |
|-----|---|---|---|---|---|
| 88 | 2/4/2019 | Kemple, Erin | Education: preparing for training | Prep for training for Bridgeport HA re: RA and criminal records | 0.83 |
| 89 | 2/19/2019 | Kemple, Erin | Education: preparing for training | FHA training for new landlord | 0.10 |
| 90 | 2/20/2019 | Kemple, Erin | Education: Provider training | FHA training for new landlord | 2.15 |
| 91 | 2/25/2019 | Kemple, Erin | Education: preparing for training | Prep for presentation on how CFHC uses data in fair housing work | 0.50 |
| 92 | 2/26/2019 | Kemple, Erin | Education: preparing for training | Prep for presentation on how CFHC uses data in fair housing work | 0.59 |
| 93 | 3/1/2019 | Kemple, Erin | Education: Training for agency personnel | Prep for presentation on how CFHC uses data in fair housing work | 0.83 |
| 94 | 3/18/2019 | Kemple, Erin | Education: preparing for training | Prep for training for Bridgeport HA re: RA and criminal records | 0.13 |
| 95 | 3/20/2019 | Kemple, Erin | Education: Provider training | Training for Bridgeport HA re: RA and criminal records | 1.98 |
| 96 | 3/26/2019 | Kemple, Erin | Education: preparing for training | Prep for training for Bridgeport HA re: RA and criminal records | 0.10 |
| 97 | 3/27/2019 | Kemple, Erin | Education: Provider training | Training for Bridgeport HA re: RA and criminal records | 1.91 |
| 98 | 4/22/2019 | Kemple, Erin | Education: preparing for training | Prep for training for Danbury fair housing office | 1.42 |
| 99 | 4/23/2019 | Kemple, Erin | Education: preparing for training | Prep for training for Danbury fair housing office | 1.65 |
| 100 | 4/24/2019 | Kemple, Erin | Education: preparing for training | Prep for training for Danbury fair housing office | 0.26 |
| 101 | 4/24/2019 | Kemple, Erin | Education: Training for agency personnel | Training for Danbury fair housing office | 1.98 |
| 102 | 5/7/2019 | Kemple, Erin | Education: preparing for training | Prep for FH training for Willimantic | 0.40 |
| 103 | 5/7/2019 | Kemple, Erin | Education: preparing for training | Prep for FH training for Willimantic | 0.36 |
| 104 | 5/8/2019 | Kemple, Erin | Education: Provider training | FH training for Willimantic | 1.49 |

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 105 | 5/14/2019 | Kemple, Erin | Education: preparing for training | Prep for training for BNT on new FH issues | 0.56 |
| 106 | 5/14/2019 | Kemple, Erin | Education: preparing for training | Prep for training for BNT on new FH issues | 0.33 |
| 107 | 5/15/2019 | Kemple, Erin | Education: Provider training | Training for BNT on new FH issues | 1.72 |
| 108 | 5/16/2019 | Kemple, Erin | Education: Provider training | Training for CHP on new FH issues | 1.65 |
| 109 | 6/6/2019 | Kemple, Erin | Education: preparing for training | Prep for training for Millenium Realty on new FH issues | 0.33 |
| 110 | 6/7/2019 | Kemple, Erin | Education: Provider training | Training for Millenium Realty on new FH issues | 1.25 |
| 111 | 6/24/2019 | Kemple, Erin | Education: preparing for training | Prep for training for COC on new FH issues | 0.33 |
| 112 | 6/25/2019 | Kemple, Erin | Education: Provider training | Training for COC on new FH issues | 1.98 |
| 113 | 2/5/2019 | Kemple, Erin | Administrative: Legislative Advocacy | Analyze criminal records bills | 1.5 |
| 114 | 2/25/2019 | Kemple, Erin | Administrative: Legislative Advocacy | Work on testimony re: HB 5713, SB 54 | 0.6 |
| 115 | 2/25/2019 | Kemple, Erin | Administrative: Legislative Advocacy | Redo testimony money re: criminal records bills | 0.4 |
| 116 | 2/25/2019 | Kirschner, Greg | Administrative: Legislative Advocacy | Assist staff in preparing testimony on criminal records bills | 0.8 |
| 117 | 2/5/2019 | Labrencis, Jessica | Administrative: Legislative Advocacy | Review and edit testimony on HB 5713, SB 54 | 1.5 |
| 118 | | | | | |
| 119 | **Total** | | | | **185.63** |
| 120 | | | | | |
| 121 | | | | | |
| 122 | | **Staff member** | **Rate per hour** | **Hours** | **Total Cost** |
| 123 | | Dresser, B | $ 10 | 0 | $ - |
| 124 | | Aleman, C | $ 150 | 1.9 | $ 285.00 |
| 125 | | Lavery, D | $ - | 0 | $ - |
| 126 | | Kemple, E | $ 400 | 36.53 | $14,612.00 |
| 127 | | Darby-Hudgens, F | $ 175 | 30.5 | $ 5,337.50 |
| 128 | | Kirschner, G | $ 350 | 0 | $ - |
| 129 | | Dresser, J | $ 150 | 1.2 | $ 180.00 |
| 130 | | Labrencis, J | $ 250 | 6.9 | $ 1,725.00 |
| 131 | | Ortiz, L | $ 100 | 0 | $ - |
| 132 | | Cuerda, M | $ 150 | 10.1 | $ 1,515.00 |
| 133 | | Heller, P | $ 250 | 1.8 | $ 450.00 |
| 134 | | Kazerounian, S | $ 200 | 96.7 | $19,340.00 |

|  | A | B | C | D | E |
|---|---|---|---|---|---|
| 135 |  | Houston, S | $ 175 | 0 | $ - |
| 136 |  |  |  |  |  |
| 137 |  | **Total Cost** |  | **185.63** | **$ 43,445** |

|   | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Date | Employee | Activity | Description | Time | | |
| 2 | 1/20/2017 | Cuerda, Maria | Testing: Work on test assignments | REDACTED - SEE PRIVILEGE LOG | 0.7 | | |
| 3 | 1/23/2017 | Cuerda, Maria | Testing: Test coordination | REDACTED - SEE PRIVILEGE LOG | 0.2 | | |
| 4 | 1/24/2017 | Cuerda, Maria | Testing: Test coordination | going over audits - criminal records/race. | 0.3 | | |
| 5 | 1/24/2017 | Cuerda, Maria | Testing: Debriefing | REDACTED - SEE PRIVILEGE LOG | 0.4 | | |
| 6 | 1/30/2017 | Cuerda, Maria | Testing: Test analysis | paying tester, analyzing test. criminal records test | 0.4 | | |
| 7 | 1/31/2017 | Cuerda, Maria | Testing: Test coordination | criminal records tests. | 0.3 | | |
| 8 | 2/1/2017 | Cuerda, Maria | Testing: Test analysis | REDACTED - SEE PRIVILEGE LOG | 0.3 | | |
| 9 | 2/1/2017 | Cuerda, Maria | Testing: Test coordination | REDACTED - SEE PRIVILEGE LOG | 0.4 | | |
| 10 | 2/2/2017 | Cuerda, Maria | Testing: Test coordination | REDACTED - SEE PRIVILEGE LOG | 0.2 | | |
| 11 | 2/6/2017 | Cuerda, Maria | Testing: Test coordination | researching and making up new test for criminal records/race testing. | 0.8 | | |
| 12 | 3/31/2017 | Aleman, Cesar | Testing | Spoke to SK about test coordinating assignments- set up meeting with MC to talk about Criminal Records Testing and discuss next steps- | 0.2 | | |
| 13 | 3/31/2017 | Kazerounian, Salmun | Testing | Discuss criminal records testing with MC and CA | 1 | | |
| 14 | 4/6/2017 | Aleman, Cesar | Testing: Test analysis | reviewing the tests that have been done (criminal records) | 1.1 | | |
| 15 | 4/7/2017 | Aleman, Cesar | Testing: Test coordination | REDACTED - SEE PRIVILEGE LOG | 0.5 | | |
| 16 | 4/18/2017 | Cuerda, Maria | Testing: Debriefing | DB'd test - audit/criminal records | 0.4 | | |
| 17 | 5/8/2017 | Kemple, Erin | Consultation with: CFHC Staff | discussion with MC re: paying tester; criminal records testing | 0.2 | | |
| 18 | 5/9/2017 | Kazerounian, Salmun | Testing | Meet with MC,CD,EK to discuss criminal records testing | 1.5 | | |
| 19 | 5/10/2017 | Kemple, Erin | Administrative: Staff Meeting | meeting re: criminal records testing | 0.8 | | |
| 20 | 5/11/2017 | Cuerda, Maria | Testing: Work on test assignments | new test assignment for criminal records tests. | 0.5 | | |
| 21 | 5/12/2017 | Cuerda, Maria | Testing: Assign test | REDACTED - SEE PRIVILEGE LOG | 0.7 | | |
| 22 | 5/19/2017 | Cuerda, Maria | Testing: Assign test | finished test and assigned to tester - criminal records | 0.3 | | |
| 23 | 6/9/2017 | Aleman, Cesar | Testing: Debriefing | REDACTED - SEE PRIVILEGE LOG | 0.2 | | |
| 24 | 6/13/2017 | Aleman, Cesar | Testing: Test coordination | Updating tests for Race/Criminal Records- (unassigned) | 0.4 | | |
| 25 | 7/27/2017 | Aleman, Cesar | Testing: Test analysis | Finished test analysis for all the race/criminal records audits | 1.2 | | |

|  | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 26 | 3/20/2018 | Dresser, James | Testing: Test coordination | REDACTED - SEE PRIVILEGE LOG | 1.5 | | |
| 27 | 3/22/2018 | Dresser, James | Testing | REDACTED - SEE PRIVILEGE LOG | 1 | | |
| 28 | 7/2/2018 | Dresser, James | Administrative: Staff Meeting | REDACTED - SEE PRIVILEGE LOG | 2 | | |
| 29 | 7/19/2018 | Dresser, James | Administrative: Staff Meeting | REDACTED - SEE PRIVILEGE LOG | 1.5 | | |
| 30 | 7/24/2018 | Kemple, Erin | Consultation with: CFHC Staff | REDACTED - SEE PRIVILEGE LOG | 0.2 | | |
| 31 | 8/3/2018 | Dresser, James | Testing: Training testers | REDACTED - SEE PRIVILEGE LOG | 1.5 | | |
| 32 | 10/1/2018 | Cuerda, Maria | Testing: Work on test assignments | working on audit tests | 3 | | |
| 33 | 10/3/2018 | Cuerda, Maria | Testing: Test coordination | reviewing audits done to be sure all inf | 0.4 | | |
| 34 | 10/3/2018 | Cuerda, Maria | Testing: Test coordination | working on audit test. email to tester a | 0.5 | | |
| 35 | 10/4/2018 | Cuerda, Maria | Testing: Assign test | assigned new audit test to tester | 0.2 | | |
| 36 | 10/10/2018 | Cuerda, Maria | Testing: Test coordination | working on audit test with tester | 0.4 | | |
| 37 | 10/12/2018 | Cuerda, Maria | Testing | finishing up audit test | 1.1 | | |
| 38 | 10/15/2018 | Cuerda, Maria | Testing | working on audit test. new message an | 0.2 | | |
| 39 | 10/16/2018 | Cuerda, Maria | Testing: Test coordination | REDACTED - SEE PRIVILEGE LOG | 1 | | 1 |
| 40 | 10/17/2018 | Cuerda, Maria | Testing: Work on test assignments | finished new audit test. sent to tester | 0.2 | | |
| 41 | 10/17/2018 | Cuerda, Maria | Testing: Test coordination | talking with sk about what to do with a | 0.3 | | |
| 42 | 10/18/2018 | Cuerda, Maria | Testing | talking with sk about audit tests and ho | 1 | | |
| 43 | 10/24/2018 | Cuerda, Maria | Testing: Test coordination | working on audit tests | 0.5 | | |
| 44 | 10/24/2018 | Cuerda, Maria | Testing: Work on test assignments | working on audit tests | 2 | | |
| 45 | 10/25/2018 | Cuerda, Maria | Testing: Test coordination | working on audit tests | 3 | | |
| 46 | 10/25/2018 | Cuerda, Maria | Testing: Debriefing | two audit tests | 0.3 | | |
| 47 | 10/26/2018 | Cuerda, Maria | Testing: Test analysis | working on audit tests. | 1.5 | | |
| 48 | 10/29/2018 | Cuerda, Maria | Testing: Test coordination | REDACTED - SEE PRIVILEGE LOG | 0.2 | | |
| 49 | 10/30/2018 | Cuerda, Maria | Testing: Test coordination | working on two audit tests. Email to sk with question | 0.7 | | |
| 50 | 10/31/2018 | Cuerda, Maria | Testing: Work on test assignments | trying to get answer on audit test from ek. Emails | 0.2 | | |
| 51 | 10/31/2018 | Cuerda, Maria | Testing | REDACTED - SEE PRIVILEGE LOG | 1.3 | | |
| 52 | 11/6/2018 | Cuerda, Maria | Testing | working on audit tests, paying testers, organizing files, figuring out what tests need to go out | 1 | | |
| 53 | 11/6/2018 | Cuerda, Maria | Testing: Test coordination | REDACTED - SEE PRIVILEGE LOG | 1 | | |
| 54 | 11/8/2018 | Cuerda, Maria | Testing | REDACTED - SEE PRIVILEGE LOG | 0.8 | | |

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 55 | 11/13/2018 | Cuerda, Maria | Testing: Test coordination | working on audit tests | 1.5 | | |
| 56 | 11/15/2018 | Cuerda, Maria | Testing: Test coordination | talking about audit test and testing in general. updating test results in DB | 0.5 | | |
| 57 | 11/19/2018 | Cuerda, Maria | Testing | db'd one tester and sent instructions to antoher tester. audits. | 0.4 | | |
| 58 | 11/20/2018 | Cuerda, Maria | Testing | working on audits with tester | 0.4 | | |
| 59 | 11/21/2018 | Cuerda, Maria | Testing: Test coordination | audit | 0.2 | | |
| 60 | 11/27/2018 | Cuerda, Maria | Testing: Test coordination | working on audit tests. emails with tester. | 0.5 | | |
| 61 | 11/28/2018 | Cuerda, Maria | Testing: Test coordination | working on audit test with tester. | 0.3 | | |
| 62 | 11/30/2018 | Cuerda, Maria | Testing: Test coordination | finishing up test and paying tester. Audit | 0.4 | | |
| 63 | 12/3/2018 | Cuerda, Maria | Testing: Test coordination | audits | 0.2 | | |
| 64 | 12/7/2018 | Cuerda, Maria | Testing: Test coordination | REDACTED - SEE PRIVILEGE LOG | 0.2 | | |
| 65 | 12/10/2018 | Cuerda, Maria | Testing: Debriefing | REDACTED - SEE PRIVILEGE LOG | 0.3 | | |
| 66 | 12/17/2018 | Cuerda, Maria | Testing | finishing up audit tests. | 1.5 | | |
| 67 | 12/19/2018 | Cuerda, Maria | Testing: Test analysis | talking to sk about test result. finishing audit test | 0.2 | | |
| 68 | | | | | 48.1 | | |
| 69 | | | | | | | |
| 70 | | | | | | | |
| 71 | | | | | | | |
| 72 | | | | | | | |
| 73 | | | | | | | |
| 74 | | | | | | | |
| 75 | | | | | | | |
| 76 | | | | | | | |
| 77 | | | | | | | |
| 78 | Total | | | | | | |
| 79 | | | | | | | |
| 80 | | | Rate per hour | Hours | Total Cost | | |
| 81 | | Dresser, B | $          10 | 0 | $          - | | |
| 82 | | Aleman, C | $          150 | 2.3 | $          345.00 | | |
| 83 | | Lavery, D | $          - | 0 | $          - | | |
| 84 | | Kemple, E | $          400 | 3.2 | $          1,280.00 | | |
| 85 | | Darby-Hudgens, F | $          175 | 0 | $          - | | |
| 86 | | Kirschner, G | $          350 | 0 | $          - | | |
| 87 | | Dresser, J | $          150 | 3.6 | $          540.00 | | |
| 88 | | Labrencis, J | $          250 | 0 | $          - | | |
| 89 | | Ortiz, L | $          100 | 0 | $          - | | |
| 90 | | Cuerda, M | $          150 | 36 | $          5,400.00 | | |
| 91 | | Heller, P | $          250 | 0 | $          - | | |
| 92 | | Kazerounian, S | $          200 | 3 | $          600.00 | | |
| 93 | | Houston, S | $          175 | 0 | $          - | | |
| 94 | | | | | | | |

|  | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 95 |  | **Total Cost** |  | **48.1** | **$      8,165** |  |  |

|   | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 |  |  |  |  |  |
| 2 |  |  |  |  |  |
| 3 | Test Group Number | Test Part Number | Test Type | Test Date (MM/YY) | Amt. Pd to Tester |
| 4 | 1015 | 1710 | Rental-Audit (Race/Black) | 01/2017 | $          42.35 |
| 5 | 1016 | 1711 | Rental-Audit (Race/Black) | 02/2017 | $          40.47 |
| 6 | 1019 | 1715 | Rental-Audit (Race/Black) | 02/2017 | $          77.88 |
| 7 | 1020 | 1779 | Rental-Audit (Race/Black) | 02/2017 | $          40.00 |
| 8 | 1021 | 1778 | Rental-Audit (Race/Black) | 02/2017 | $          40.00 |
| 9 | 1033 | 1768 | Rental-Audit (Race/Black) | 04/2017 | $        145.31 |
| 10 | 1034 | 1728 | Rental-Audit (Race/Black) | 04/2017 | $        126.84 |
| 11 | 1052 | 1759 | Rental-Audit (Race/Black) | 04/2017 | $          40.00 |
| 12 | 1053 | 1760 | Rental-Audit (Race/Black) | 04/2017 | $          40.94 |
| 13 | 1058 | 1761 | Rental-Audit (Race/Black) | 04/2017 | $          40.00 |
| 14 | 1058 | 1767 | Rental-Audit (Race/Black) | 04/2017 | $          40.47 |
| 15 | 1071 | 1781 | Rental-Audit (Race/Black) | 05/2017 | $          40.00 |
| 16 | 1071 | 1788 | Rental-Audit (Race/Black) | 05/2017 | $          91.10 |
| 17 | 1078 | 1787 | Rental-Audit (Race/Black) | 05/2017 |  |
| 18 | 1078 | 1810 | Rental-Audit (Race/Black) | 06/2017 |  |
| 19 | 1079 | 2046 | Rental-Audit (Race/Black) | 06/2017 |  |
| 20 | 1079 | 2047 | Rental-Audit (Race/Black) | 06/2017 | $          81.90 |
| 21 | 1095 | 1823 | Rental-Audit (Race/Black) | 06/2017 | $        150.93 |
| 22 | 1095 | 1811 | Rental-Audit (Race/Black) | 06/2017 | $        153.84 |
| 23 | 1104 | 1820 | Rental-Audit (Race/Black) | 06/2017 | $        157.41 |
| 24 | 1192 | 1957 | Rental-Audit (Race/Black) | 07/2018 | $          56.71 |

|    | A    | B    | C                        | D       | E    |         |
|----|------|------|--------------------------|---------|------|---------|
| 25 | 1202 | 1973 | Rental-Audit (Race/Black) | 10/2018 | $    | 75.47   |
| 26 | 1202 | 2030 | Rental-Audit (Race/Black) | 10/2018 | $    | 75.47   |
| 27 | 1203 | 1980 | Rental-Audit (Race/Black) | 10/2018 | $    | 75.47   |
| 28 | 1203 | 1964 | Rental-Audit (Race/Black) | 10/2018 | $    | 75.00   |
| 29 | 1206 | 1977 | Rental-Audit (Race/Black) | 10/2018 | $    | 75.47   |
| 30 | 1206 | 1974 | Rental-Audit (Race/Black) | 10/2018 | $    | 75.71   |
| 31 | 1207 | 1983 | Rental-Audit (Race/Black) | 10/2018 | $    | 75.47   |
| 32 | 1207 | 1982 | Rental-Audit (Race/Black) | 10/2018 | $    | 75.00   |
| 33 | 1208 | 2024 | Rental-Audit (Race/Black) | 10/2018 | $    | 75.00   |
| 34 | 1208 | 2025 | Rental-Audit (Race/Black) | 12/2018 | $    | 75.00   |
| 35 | 1214 | 1981 | Rental-Audit (Race/Black) | 06/4862 | $    | 75.00   |
| 36 | 1214 | 2026 | Rental-Audit (Race/Black) | 12/2018 | $    | 75.00   |
| 37 | 1216 | 1985 | Rental-Audit (Race/Black) | 10/2018 | $    | 75.00   |
| 38 | 1216 | 2023 | Rental-Audit (Race/Black) | 11/2018 | $    | 75.00   |
| 39 | 1219 | 1993 | Rental-Audit (Race/Black) | 10/2018 | $    | 50.47   |
| 40 | 1219 | 1994 | Rental-Audit (Race/Black) | 11/2018 | $    | 75.00   |
| 41 |      |      |                          |         | $    | 2,584.68 |

|   | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Date | Employee | Activity | Client | Description | Time |
| 2 | | | | | | |
| 3 | 12/6/2016 | Kazerounian, Salmun | Case Work: Phone call on behalf of client | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1 |
| 4 | 5/22/2017 | Cuerda, Maria | Case Work: Client intake interview | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.7 |
| 5 | 2/16/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1 |
| 6 | 3/8/2018 | Cuerda, Maria | Case Work: Review case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1.2 |
| 7 | 10/23/2018 | Cuerda, Maria | Case Work: Analyze client file for legal claims | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.4 |
| 8 | 10/25/2018 | Cuerda, Maria | Case Work: Analyze client file for legal claims | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.5 |
| 9 | 10/26/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 10 | 10/26/2018 | Cuerda, Maria | Case Work: Phone call to client | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1 |
| 11 | 11/8/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.4 |
| 12 | 11/9/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1.6 |
| 13 | 11/15/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1 |
| 14 | 11/16/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.5 |
| 15 | 11/20/2018 | Cuerda, Maria | Case Work: Phone call on behalf of client | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 16 | 11/26/2018 | Cuerda, Maria | Consultation with: CFHC Staff | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.4 |
| 17 | 11/26/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.6 |
| 18 | 11/29/2018 | Cuerda, Maria | Case Work: Phone call to client | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.1 |
| 19 | 11/30/2018 | Cuerda, Maria | Case Work: Phone call to client | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.1 |
| 20 | 12/4/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 21 | 11/27/2018 | Cuerda, Maria | Case Work: Client intake interview | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1.3 |
| 22 | 11/27/2018 | Cuerda, Maria | Testing | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 23 | 11/28/2018 | Cuerda, Maria | Testing: Work on test assignments | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1 |
| 24 | 11/29/2018 | Cuerda, Maria | Testing: Test coordination | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 25 | 11/29/2018 | Cuerda, Maria | Testing | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 26 | 11/29/2018 | Cuerda, Maria | Testing: Debriefing | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 27 | 11/30/2018 | Cuerda, Maria | Testing: Debriefing | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 28 | 11/30/2018 | Cuerda, Maria | Testing | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.1 |
| 29 | 12/3/2018 | Cuerda, Maria | Testing: Test coordination | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.1 |
| 30 | 12/6/2018 | Cuerda, Maria | Testing | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 31 | 12/7/2018 | Cuerda, Maria | Testing | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1 |
| 32 | 12/7/2018 | Cuerda, Maria | Testing | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.1 |
| 33 | 12/7/2018 | Cuerda, Maria | Testing: Debriefing | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 34 | 12/13/2018 | Cuerda, Maria | Testing: Test analysis | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.7 |
| 35 | 12/6/2018 | Cuerda, Maria | Case Work: Client intake interview | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1.6 |
| 36 | 12/6/2018 | Cuerda, Maria | Testing: Work on test assignments | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.4 |
| 37 | 12/6/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1 |
| 38 | 12/7/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.6 |
| 39 | 12/7/2018 | Cuerda, Maria | Testing | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.4 |
| 40 | 12/7/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.4 |
| 41 | 12/10/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 42 | 12/10/2018 | Cuerda, Maria | Testing | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.4 |
| 43 | 12/17/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 44 | 12/18/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.4 |
| 45 | 12/27/2018 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.7 |
| 46 | 8/14/2018 | Dresser, Bea | Case Work: Intake | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 47 | 9/22/2017 | Dresser, James | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1 |
| 48 | 11/28/2017 | Dresser, James | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1.5 |
| 49 | 8/16/2018 | Heller, Pamela | Case Work: Phone call to client | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 50 | 12/6/2016 | Kazerounian, Salmun | Consultation with: CFHC Staff | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.5 |
| 51 | 2/16/2018 | Kazerounian, Salmun | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 3 |

|    | A | B | C | D | E | F |
|----|---|---|---|---|---|---|
| 52 | 10/25/2018 | Kazerounian, Salmun | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 2.2 |
| 53 | 9/18/2017 | Kemple, Erin | Case Work: Review case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.8 |
| 54 | 4/19/2017 | Kirschner, Greg | Case Work: Case supervision | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 55 | 1/12/2018 | Kirschner, Greg | Case Work: Review case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.4 |
| 56 | 3/8/2018 | Kirschner, Greg | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.5 |
| 57 | 6/18/2018 | Kirschner, Greg | Case Work: Review case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 58 | 3/20/2018 | Labrencis, Jessica | Consultation with: CFHC Staff | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.1 |
| 59 | 3/6/2018 | Ortiz, Letty | Case Work: Intake | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 60 | 9/11/2018 | Ortiz, Letty | Case Work: Intake | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 61 | 2/8/2019 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 62 | 3/26/2019 | Cuerda, Maria | Case Work: Client intake interview | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1 |
| 63 | 4/30/2019 | Cuerda, Maria | Case Work: Review case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.5 |
| 64 | 5/3/2019 | Cuerda, Maria | Case Work: Client intake interview | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1 |
| 65 | 5/7/2019 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.6 |
| 66 | 5/8/2019 | Cuerda, Maria | Testing | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 67 | 6/6/2019 | Cuerda, Maria | Case Work: Client intake interview | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1.3 |
| 68 | 6/7/2019 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 69 | 6/21/2019 | Cuerda, Maria | Administrative: Respond to emails | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 70 | 6/27/2019 | Cuerda, Maria | Case Work: Phone call to client | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 71 | 7/11/2019 | Cuerda, Maria | Case Work: Work on Client case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 72 | 3/11/2019 | Labrencis, Jessica | Case Work: Phone call to client | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 73 | 4/15/2019 | Labrencis, Jessica | Case Work: Phone call to client | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.6 |
| 74 | 5/13/2019 | Labrencis, Jessica | Case Work: Review case | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 75 | 4/4/2019 | Kazerounian, Salmun | Administrative: Internet Research | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 1.2 |
| 76 | 5/9/2019 | Kazerounian, Salmun | Testing | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.6 |
| 77 | 2/14/2019 | Ortiz, Letty | Case Work: Intake | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 78 | 3/13/2019 | Ortiz, Letty | Case Work: Intake | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 79 | 3/20/2019 | Ortiz, Letty | Case Work: Intake | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 80 | 3/20/2019 | Ortiz, Letty | Case Work: Intake | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 81 | 4/30/2019 | Ortiz, Letty | Case Work: Intake | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.2 |
| 82 | 5/3/2019 | Ortiz, Letty | Case Work: Intake | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 83 | 5/9/2019 | Ortiz, Letty | Case Work: Intake | REDACTED - SEE PRIVILEGE LOG | REDACTED - SEE PRIVILEGE LOG | 0.3 |
| 84 | | | | | | |
| 85 | | | | | | |
| 86 | | | | | | |
| 87 | | | | | | |
| 88 | | | | | Total hours | 45.70 |
| 89 | | | | | | |
| 90 | | | | | | |
| 91 | | | | | | |
| 92 | | | Rate per hour | Hours | Total Cost | |
| 93 | | Dresser, B | $ 10 | 0.2 | $ 2.00 | |
| 94 | | Aleman, C | $ 150 | 0 | $ - | |
| 95 | | Lavery, D | $ - | 0 | $ - | |
| 96 | | Kemple, E | $ 400 | 0.8 | $ 320.00 | |
| 97 | | Darby-Hudgens, F | $ 175 | 0 | $ - | |
| 98 | | Kirschner, G | $ 350 | 1.3 | $ 455.00 | |
| 99 | | Dresser, J | $ 150 | 2.5 | $ 375.00 | |
| 100 | | Labrencis, J | $ 250 | 1.2 | $ 300.00 | |
| 101 | | Ortiz, L | $ 100 | 2.5 | $ 250.00 | |
| 102 | | Cuerda, M | $ 150 | 28.4 | $ 4,260.00 | |
| 103 | | Heller, P | $ 250 | 0.3 | $ 75.00 | |
| 104 | | Kazerounian, S | $ 200 | 8.5 | $ 1,700.00 | |
| 105 | | Houston, S | $ 175 | 0 | $ - | |
| 106 | | | | | | |
| 107 | | | | | | |
| 108 | | | | | | |
| 109 | | | | | | |
| 110 | | | | | | |
| 111 | | Total Cost | | 45.7 | $ 7,737.00 | |

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Date | Employee | Activity | Description | Time | | | | | | |
| 2 | 4/5/2017 | Houston, Shannon | Administrative: Grant writing | Emails w/EK and CA re: HFPG plans; review HFPG guidelines on website; emails w/Erika Frank at HFPG about timing of our app and scheduling call to discuss. | 0.7 | | | | | | |
| 3 | 4/6/2017 | Houston, Shannon | Administrative: Grant writing | Emails w/Erika Frank of HFPG re: scheduling call to discuss next grant application. | 0.2 | | | | | | |
| 4 | 4/19/2017 | Houston, Shannon | Administrative: Grant writing | Review EK plans for new HFPG grant & make notes; meet w/EK to discuss. | 0.8 | | | | | | |
| 5 | 4/19/2017 | Houston, Shannon | Administrative: Grant reporting | Call w/HFPG re: ideas & process for next grant application + send confirmation email before call + follow up email after call. | 1 | | | | | | |
| 6 | 4/19/2017 | Kemple, Erin | Administrative: Grant writing | work on suggestions for new HFPG grant; met with SH re: meeting with HFPG; discussion with SK and SW; email to foreclosure folks; review information | 1.5 | | | | | | |
| 7 | 4/20/2017 | Kemple, Erin | Administrative: Grant writing | email to staff re: HFPG grant | 0.3 | | | | | | |
| 8 | 4/26/2017 | Kemple, Erin | Administrative: Grant writing | work on HFPG pre app; emailing re: BOA grant | 0.8 | | | | | | |
| 9 | 4/28/2017 | Kemple, Erin | Administrative: Grant writing | work on HFPG pre app | 0.4 | | | | | | |
| 10 | 5/2/2017 | Kemple, Erin | Administrative: Grant writing | work on BOA and HFPG grant; emails with staff re adding criminal records into the grants | 1.7 | | | | | | |
| 11 | 5/3/2017 | Kemple, Erin | Administrative: Grant writing | work on BOA application | 1.5 | | | | | | |
| 12 | 5/4/2017 | Kemple, Erin | Administrative: Grant writing | work on BOA grant application | 1.2 | | | | | | |
| 13 | 5/8/2017 | Kemple, Erin | Administrative: Grant writing | prep for HFPG meeting on 5/10 | 0.3 | | | | | | |
| 14 | 5/8/2017 | Kemple, Erin | Administrative: Grant writing | review emails from GK and SW re: BOA grant | 0.2 | | | | | | |
| 15 | 5/9/2017 | Houston, Shannon | Administrative: Grant writing | Review notes on HFPG proposal; prep for Wednesday meeting | 0.3 | | | | | | |
| 16 | 5/9/2017 | Kemple, Erin | Administrative: Grant writing | work on HFPG grant; prep for meeting with HFPG tomorrow | 1.3 | | | | | | |
| 17 | 5/10/2017 | Houston, Shannon | Administrative: Grant writing | Meet with EK and program officer from HFPG re: next grant application; + prep notes before meeting + debrief w/EK after meeting. | 1.3 | | | | | | |
| 18 | 5/10/2017 | Kemple, Erin | Administrative: Grant writing | prep for HFPG meeting | 0.2 | | | | | | |
| 19 | 5/10/2017 | Kemple, Erin | Administrative: Grant writing | meeting with HFPG Pete Rosa; debrief with SH | 1 | | | | | | |
| 20 | 5/16/2017 | Kemple, Erin | Administrative: Grant writing | BOA grant | 3 | | | | | | |
| 21 | 5/17/2017 | Kemple, Erin | Administrative: Grant writing | work on BOA grant | 1.5 | | | | | | |
| 22 | 5/18/2017 | Kemple, Erin | Administrative: Grant writing | finish BOA grant; email to GK, JG, SW, SK, SH for review | 1.4 | | | | | | |
| 23 | 5/22/2017 | Houston, Shannon | Administrative: Grant writing | Continue reviewing BOA/CBF | 0.5 | | | | | | |

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 | 5/24/2017 | Kemple, Erin | Administrative: Grant writing | work on response to questions from Hartford Foundation | 1 | | | | | | |
| 25 | 5/25/2017 | Houston, Shannon | Administrative: Grant writing | Review & edit responses to questions from HFPG; discuss w/EK | 1 | | | | | | |
| 26 | 5/30/2017 | Kemple, Erin | Administrative: Grant writing | incorporating comments from SH, JG, and GK re: BOA application into current draft | 1 | | | | | | |
| 27 | 6/5/2017 | Houston, Shannon | Administrative: Grant writing | Review latest HFPG grant details & budget put together by EK | 0.7 | | | | | | |
| 28 | 6/6/2017 | Houston, Shannon | Administrative: Grant writing | Talk w/EK re: HFPG questions & budget | 0.4 | | | | | | |
| 29 | 6/6/2017 | Kemple, Erin | Administrative: Grant writing | work on budget narrative for HFPG grant | 2 | | | | | | |
| 30 | 6/6/2017 | Kemple, Erin | Administrative: Grant writing | discussion with Pete Rosa--if budget is $250,000 it won't have to go before the full Board; will get an answer sooner; will be reviewed by 3 people. next full Board meeting is in October; won't make the meeting in July b/c application not done; explain why all these people are needed on the grant; overhead looks really high | 0.4 | | | | | | |
| 31 | 6/7/2017 | Houston, Shannon | Administrative: Grant writing | Look up details of recent HFPG grants over past 2 years, look up info on organizations' budgets and other info; compile into spreadsheet & send to EK for comparison to our HFPG proposal. | 1.5 | | | | | | |
| 32 | 6/7/2017 | Kemple, Erin | Administrative: Grant writing | working on HFPG budget; discussion with SH re: cutting grant request to $250,000; | 4.8 | | | | | | |
| 33 | 6/8/2017 | Houston, Shannon | Administrative: Grant writing | Review revised budget & budget narrative for HFPG & talk w/EK about it, & send her my edits/thoughts. | 0.8 | | | | | | |
| 34 | 6/8/2017 | Kemple, Erin | Administrative: Grant writing | finish up HFPG budget and budget narrative | 0.4 | | | | | | |
| 35 | 6/8/2017 | Kemple, Erin | Administrative: Grant writing | work on budget for BOA grant | 0.5 | | | | | | |
| 36 | 6/12/2017 | Kemple, Erin | Administrative: Grant writing | work on BOA application; review budget; send to SW and SK | 1.5 | | | | | | |
| 37 | 6/15/2017 | Kemple, Erin | Administrative: Grant writing | editing BOA grant | 0.5 | | | | | | |
| 38 | 6/19/2017 | Kemple, Erin | Administrative: Grant writing | call from Pete Rosa from the Hartford Foundation; we have been approved to move on to the next phase--grant application; sent him an email with strategic plan, etc. | 0.5 | | | | | | |
| 39 | 6/19/2017 | Kemple, Erin | Administrative: Grant writing | work on BOA application including updating BOD list | 1 | | | | | | |
| 40 | 6/20/2017 | Houston, Shannon | Administrative: Grant writing | Review HFPG full application, download templates/forms to S drive. Review final BOA grant app & send feedback to EK. | 0.7 | | | | | | |

|    | A | B | C | D | E | F | G | H | I | J | K |
|----|---|---|---|---|---|---|---|---|---|---|---|
| 41 | 6/20/2017 | Houston, Shannon | Administrative: Grant writing | Review HFPG full application, download templates/forms to S drive. Review final BOA grant app & send feedback to EK. | 0.7 | | | | | | |
| 42 | 6/20/2017 | Kemple, Erin | Administrative: Grant writing | sign into HFPG system and review info | 0.2 | | | | | | |
| 43 | 6/20/2017 | Kemple, Erin | Administrative: Grant writing | made small changes to BOA grant and send to Shannon; finalize and email to CBF | 0.6 | | | | | | |
| 44 | 6/27/2017 | Houston, Shannon | Administrative: Grant writing | Meet briefly w/ EK to review plans for working on upcoming grants especially HFPG. Review HFPG application questions and notes/plans for grant. | 0.8 | | | | | | |
| 45 | 6/27/2017 | Kemple, Erin | Administrative: Grant writing | review of materials for HFPG grant; discussion with SH to divide up responsibilities | 0.5 | | | | | | |
| 46 | 6/28/2017 | Houston, Shannon | Administrative: Grant writing | Start intro questions for HFPG grant. | 2 | | | | | | |
| 47 | 6/29/2017 | Houston, Shannon | Administrative: Grant writing | Work on HFPG grant app | 2 | | | | | | |
| 48 | 7/3/2017 | Houston, Shannon | Administrative: Grant writing | Work on HFPG grant questions | 1 | | | | | | |
| 49 | 7/6/2017 | Houston, Shannon | Administrative: Grant writing | Work on HFPG app questions. | 1 | | | | | | |
| 50 | 7/7/2017 | Houston, Shannon | Administrative: Grant writing | Work on HFPG grant questions | 0.5 | | | | | | |
| 51 | 7/10/2017 | Houston, Shannon | Administrative: Grant writing | Work on HFPG questions. Send draft responses to EK. | 2 | | | | | | |
| 52 | 7/14/2017 | Kemple, Erin | Administrative: Grant writing | work on Hartford Foundation grant | 0.5 | | | | | | |
| 53 | 7/17/2017 | Kemple, Erin | Administrative: Grant writing | work on HFPG grant | 1 | | | | | | |
| 54 | 7/18/2017 | Houston, Shannon | Administrative: Grant writing | Start reviewing HFPG grant draft | 0.7 | | | | | | |
| 55 | 7/18/2017 | Kemple, Erin | Administrative: Grant writing | research of reverse mortgages for HFPG grant; work on grant writingreview PPT from SW; writing answers to questions; editing, etc.; filling on requred papaerwork | 4.5 | | | | | | |
| 56 | 7/19/2017 | Houston, Shannon | Administrative: Grant writing | | 0.9 | | | | | | |
| 57 | 7/20/2017 | Houston, Shannon | Administrative: Grant writing | Edits to HFPG grant narrative & send to EK | 3 | | | | | | |
| 58 | 7/23/2017 | Kemple, Erin | Administrative: Grant writing | work on HFPG grant | 0.8 | | | | | | |
| 59 | 7/24/2017 | Kemple, Erin | Administrative: Grant writing | work on HFPG application; do workplan; review demographics; review what needs to be done to finish | 1 | | | | | | |
| 60 | 7/25/2017 | Kemple, Erin | Administrative: Grant writing | work on HFPG grant; update proposal narrative; send cover page to Christian for signing; update peripherals | 1 | | | | | | |
| 61 | 7/27/2017 | Kemple, Erin | Administrative: Grant writing | finalizing HFPG grant; comparing application with workplan; checking other info to ensure everything matches; | 0.8 | | | | | | |
| 62 | 8/9/2017 | Kemple, Erin | Administrative: Grant writing | work on HFPG grant | 1 | | | | | | |

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 63 | 8/14/2017 | Kemple, Erin | Administrative: Grant writing | review grant writing schedule; review HFPG grant; upload all documents; waiting on signed cover sheet; writing purpose of grant piece | 1.5 | | | | | | |
| 64 | 8/15/2017 | Kemple, Erin | Administrative: Grant writing | review and rework HFPG grant; submit | 0.5 | | | | | | |
| 65 | 9/12/2017 | Kemple, Erin | Administrative: Grant writing | response to questions asked by Pete Rosa re: HFPG application | 0.4 | | | | | | |
| 66 | 9/13/2017 | Kemple, Erin | Administrative: Grant writing | respond to questions from HFPG; | 0.2 | | | | | | |
| 67 | 9/14/2017 | Kemple, Erin | Administrative: Grant writing | emails re: HFPG funding and request for additional information | 0.2 | | | | | | |
| 68 | 10/4/2017 | Kemple, Erin | Administrative: Grant writing | signing various grant documents for  HFPG | 0.2 | | | | | | |
| 69 | | | | | | | | | | | |
| 70 | | | | | | | | | | | |
| 71 | | | | | | | | | | | |
| 72 | | | | | | | | | | | |
| 73 | Total | | | | 69.30 | | | | | | |
| 74 | | | | | **34.65** | **divided in half b/c grants dealt with more than criminal records** | | | | | |
| 75 | | | | | | | | | | | |
| 76 | | | | | | | | | | | |
| 77 | | Dresser, B | $          10 | 0 | $          - | | | | | | |
| 78 | | Aleman, C | $        150 | 0 | $          - | | | | | | |
| 79 | | Lavery, D | $        200 | | | | | | | | |
| 80 | | Kemple, E | $        400 | 23.1 | $   9,240.00 | | | | | | |
| 81 | | Darby-Hudgens, F | $        175 | 0 | $          - | | | | | | |
| 82 | | Kirschner, G | $        350 | 0 | $          - | | | | | | |
| 83 | | Dresser, J | $        150 | 0 | $          - | | | | | | |
| 84 | | Labrencis, J | $        250 | 0 | $          - | | | | | | |
| 85 | | Ortiz, L | $        100 | 0 | $          - | | | | | | |
| 86 | | Cuerda, M | $        150 | 0 | $          - | | | | | | |
| 87 | | Heller, P | $        250 | 0 | $          - | | | | | | |
| 88 | | Kazerounian, S | $        200 | 0 | $          - | | | | | | |
| 89 | | Houston, S | $        175 | 11.55 | $   2,021.25 | | | | | | |
| 90 | | | | | | | | | | | |
| 91 | | | | **34.65** | **$   11,261.25** | | | | | | |
| 92 | | Total | | | | | | | | | |

# EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **CONNECTICUT FAIR HOUSING CENTER** | **Case No. 3:18-cv-00705-VLB** |
| **and** | |
| **CARMEN ARROYO, individually and as next friend for Mikhail Arroyo** | |
| **Plaintiffs,** | |
| **v.** | |
| **CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC.** | |
| **Defendant.** | **July 11, 2019** |

**PLAINTIFFS' AMENDED DAMAGES ANALYSIS**

The Plaintiffs, Connecticut Fair Housing Center ("CFHC") and Carmen Arroyo, individually and on behalf of Mikhail Arroyo, make the following amended disclosure regarding damages for which they seek relief in this action.  As discovery is ongoing, Plaintiffs reserve the right to amend this damages analysis as they become aware of additional facts.

**CFHC**

**Compensatory Damages:**

CFHC has suffered damages as a direct result of CoreLogic's discriminatory policies and practices in the form of diversion of resources and frustration of mission.

**Diversion of Resources:** Specifically, CFHC diverted financial reserves and staff time to counteract Defendant's discrimination in tenant screening based on national origin, race, and disability in the housing marketplace and open advertisement to housing providers that they can improve their fair housing compliance by **not** giving individualized consideration to applicants with criminal records, which Defendant has consistently engaged in from 2005 until the present.  Such diversion includes staff time to investigate Defendant's conduct and assist individuals who have been

1

denied housing as a result of its actions, including Mr. Arroyo; creating publications and performing education and outreach directed at people of color and people with disabilities to educate them about the use of criminal records to screen applicants; testing to determine how landlords were using criminal records to screen tenants; and writing grants to address the issues raised by the improper use of criminal records.  As a result of the time diverted to investigate and counteract Defendant's conduct, CFHC was unable to promote the creation of affordable housing in areas with few people of color, monitor applications for affordable housing that were denied for illegal discriminatory reasons, and advocate with state and local governments to expand the supply of affordable housing and promote integration.  In all, CHFC has diverted more than 356 hours of its staff time at a cost of more than $82,639.93

Frustration of Mission: Defendant's national origin, race, and disability discrimination in the marketplace frustrates and undermines CFHC's mission to eliminate illegal housing discrimination in Connecticut.  As discovery is ongoing, CFHC is not fully knowledgeable of the extent and effect of the defendant's conduct but believes it to be significant.

For example, since at least 2005 and continuing through the present, Defendant has openly advertised in Connecticut that housing providers can improve their fair housing compliance by not giving individualized consideration to applicants with criminal records.  Since at least 2005 up through the present, Defendant has offered a tenant screening product to Connecticut housing providers that predictably results in race and national origin discrimination because it facilitates "blanket bans" on housing applicants with criminal records, denies housing based on non-conviction data or old convictions, and denies housing without considering mitigating circumstances.  Since at least 2009 up through the present, Defendant's automated criminal records screening product has been used by multiple, large Connecticut landlords and has resulted in race, national origin, and disability discrimination.  In 2018, Defendant's automated criminal records screening product was used at 146 rental housing complexes in Connecticut and disqualified 1,941 applications to these complexes.  Defendant's file disclosure policies have additionally prevented people with disabilities from challenging housing denials caused by all of Defendant's tenant screening products, thereby compounding the persistence of race, national origin, and disability discrimination in the state.

CFHC has in the past devoted much time and many resources to combatting discrimination based on national origin and race related to landlords' criminal records screening policies and educating landlords and tenants as to the rights of disabled tenants to request reasonable accommodations of criminal records screening policies.  Because Defendant's conduct has promoted discrimination on these bases, CFHC

believes the following remedial plan will be necessary to address the effects of Defendant's discrimination:

    a. A statewide advertising campaign to inform landlords, tenants and tenant screening providers that: criminal records screening policies that impose blanket bans are illegal; housing providers must make individualized assessment of criminal records; and disabled tenants may be able to request a reasonable accommodation of a landlord's criminal records screening policy. A comprehensive four-week advertising campaign would cost an estimated $250,000 to $300,000.

    b. A three-year testing program to gauge the level of discrimination occurring and to determine whether CFHC's efforts to combat this discrimination are effective. The cost of the testing program over three years would be $30,000.

    c. A two-year outreach plan to educate landlords through seminars and trainings to counteract the effect of the defendant's discrimination. Conducting three trainings per year for two years will cost approximately $20,000.

CFHC reserves the right to amend and update these estimates based on information about the extent of Defendant's discrimination that may be revealed through discovery.

**Mikhail Arroyo**

**Compensatory Damages:**

    **Economic Damages:** As a consequence of Defendant's discriminatory policies and practices, Mikhail Arroyo incurred increased medical expenses resulting from his prolonged stay in the nursing home from approximately May 2016 until June 2017. The nursing home expenses were at least $2,460; Plaintiffs are awaiting additional billing records and reserve the right to amend this estimate.

    **Emotional Distress:** As a consequence of Defendant's discriminatory policies and practices, Mikhail Arroyo suffered significant emotional distress. For 13 months, Mr. Arroyo was stuck in a nursing home, unable to move into his mother's apartment. During that time, he suffered anxiety and sadness that was proximately caused by Defendant's discriminatory role in the denial of his housing application and compounded by Defendant's discriminatory refusal to produce his consumer file to his conservator and mother. Mr. Arroyo also suffered a fall in the nursing home that resulted in a week-long hospitalization and significant additional pain and suffering.

In this District, Courts have indicated that emotional distress coupled with physical suffering that can be corroborated with medical documentation warrant damages over $100,000.  Based on the circumstances Mikhail Arroyo endured, Plaintiffs believe an award well over that baseline would be warranted.

**Deprivation of Rights and Housing Opportunity**:  Defendants' conduct deprived Plaintiffs of their civil rights as well as full and equal enjoyment of their home.

### Carmen Arroyo

**Compensatory Damages:**

**Economic Damages**:  As a result of Defendant's discriminatory conduct, Carmen Arroyo increased travel, medical, and other losses and expenses resulting from Mr. Arroyo's prolonged stay in the nursing home from approximately May 2016 until June 2017.  The nursing home expenses were at least $2,460, which Ms. Arroyo paid out of pocket; Plaintiffs are awaiting additional billing records and reserve the right to amend this estimate.

Ms. Arroyo traveled round-trip daily between her home in Windham, CT and the nursing home in East Hartford, CT to visit her son during the time he was unable to move in with her because of Defendant's conduct.  Plaintiffs estimate the travel costs associated with driving 54 miles per day for 13 months to be roughly $11,000.

Ms. Arroyo also incurred increased rent for a two-bedroom apartment ($1050 / mo.) compared to her previous one-bedroom apartment ($900 / mo.) at ArtSpace Windham from approximately November 19, 2016 until June 2017, totaling approximately $995.  Mr. Arroyo moved into her apartment with a Rental Assistance Program (RAP) voucher from the State of Connecticut, which limits the household's rent obligation to 30% of the total household income.  She lost the benefit of that voucher between the May 2016, when Mikhail Arroyo would have moved in but for Defendant's conduct, and June 2017, when he finally moved in.  Plaintiffs are awaiting records relating to the value of the voucher during that time period and reserve the right to amend this as necessary.

**Emotional Distress**: As a consequence of Defendant's discriminatory policies and practices, Carmen Arroyo suffered significant emotional distress.  Ms. Arroyo experienced significant fear, anxiety, and sadness while her son was confined to a nursing home.  She visited him daily, but left heartbroken and distressed every time because she couldn't bring him home to take care of him.  Ms. Arroyo's emotional distress was caused by Defendant's discriminatory role in the denial of Mikhail Arroyo's housing

application and compounded by Defendant's discriminatory refusal to produce his consumer file to her as his conservator.

Courts in this Circuit typically award damages in the range of $25,000 to $125,000 for garden variety emotional distress.  Based on the circumstances Carmen Arroyo endured, Plaintiffs believe an award at the high end of that range will be warranted.

<u>Deprivation of Rights and Housing Opportunity</u>:  Defendants' conduct deprived Plaintiffs of their civil rights as well as full and equal enjoyment of their home.

<u>All Plaintiffs</u>

<u>Punitive Damages</u>:  The Fair Housing Act, 42 U.S.C. § 3613(c), the Connecticut Unfair Trade Practices Act, § 42-110g(a), and the Fair Credit Reporting Act, 15 U.S.C. § 1681n(a)(2), provide for punitive damages.  Plaintiffs believe punitive damages are warranted as Defendant's violations of these laws were knowing and willful, and Defendant has persisted in its unlawful conduct even after being notified of its potential liability for its violations.  As Plaintiffs have yet to complete discovery on this issue, Plaintiffs have not yet been able to quantify appropriate punitive damages and reserve the right to supplement this analysis.

By counsel: */s/ Sarah White*
            **Greg Kirschner (ct26888)**
            **Salmun Kazerounian (ct29328)**
            **Sarah White (ct29329)**
            **Connecticut Fair Housing Center**
            **60 Popieluszko Court**
            **Hartford, CT 06106**
            **Tel: (860) 263-0726**
            **Fax: (860) 247-4236**
            **swhite@ctfairhousing.org**

            */s/ Christine Webber*
            **Christine Webber, *Pro Hac Vice***
            **Joseph Sellers, *Pro Hac Vice***
            **Brian Corman, *Pro Hac Vice***
            **Cohen Milstein Sellers & Toll PLLC**
            **1100 New York Ave. NW, Fifth Floor**
            **Washington, DC  20005**
            **(202) 408-4600**
            **cwebber@cohenmilstein.com**

*/s/ Eric Dunn*
**Eric Dunn (phv09610)**
**National Housing Law Project**
**919 E. Main Street, Ste. 610**
**Richmond, VA 23219**
**Tel. (415) 546-7000, ext. 3102**
**edunn@nhlp.org**

5

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 11, 2019 a copy of the foregoing was sent via email to:

Daniel Cohen
Troutman Sanders LLP
875 Third Avenue
New York, NY 10022
dan.cohen@troutman.com


Timothy J. St. George
David Anthony
Troutman Sanders LLP
1001 Haxall Point
Richmond, VA 23219
timothy.st.george@troutman.com
david.anthony@troutman.com

_____/s/_____
Sarah White

# EXHIBIT I

 United States Census Bureau

## QuickFacts

**Willimantic CDP, Connecticut; New Haven city, Connecticut; Hartford city, Connecticut; Bridgeport city, Connecticut; Connecticut**

QuickFacts provides statistics for all states and counties, and for cities and towns with a *population of 5,000 or more*.

### Table

| All Topics ▼ | Willimantic CDP, Connecticut | New Haven city, Connecticut | Hartford city, Connecticut | Bridgeport city, Connecticut | Connecticut |
|---|---|---|---|---|---|
| **Population estimates, July 1, 2018, (V2018)** | X | 130,418 | 122,587 | 144,900 | 3,572,665 |
| 👤 **PEOPLE** | | | | | |
| **Population** | | | | | |
| Population estimates, July 1, 2018, (V2018) | X | 130,418 | 122,587 | 144,900 | 3,572,665 |
| Population estimates base, April 1, 2010, (V2018) | X | 129,884 | 124,770 | 144,239 | 3,574,147 |
| Population, percent change - April 1, 2010 (estimates base) to July 1, 2018, (V2018) | X | 0.4% | -1.7% | 0.5% | Z |
| Population, Census, April 1, 2010 | 17,737 | 129,779 | 124,775 | 144,229 | 3,574,097 |
| **Age and Sex** | | | | | |
| Persons under 5 years, percent | ⚠ 5.4% | ⚠ 6.2% | ⚠ 6.6% | ⚠ 6.8% | ⚠ 5.1% |
| Persons under 18 years, percent | ⚠ 18.5% | ⚠ 22.1% | ⚠ 24.4% | ⚠ 23.7% | ⚠ 20.6% |
| Persons 65 years and over, percent | ⚠ 8.9% | ⚠ 10.5% | ⚠ 10.3% | ⚠ 10.7% | ⚠ 17.2% |
| Female persons, percent | ⚠ 53.3% | ⚠ 52.7% | ⚠ 52.0% | ⚠ 51.1% | ⚠ 51.2% |
| **Race and Hispanic Origin** | | | | | |
| White alone, percent | ⚠ 65.1% | ⚠ 43.0% | ⚠ 33.1% | ⚠ 40.4% | ⚠ 80.0% |
| Black or African American alone, percent   (a) | ⚠ 6.6% | ⚠ 33.0% | ⚠ 37.9% | ⚠ 35.3% | ⚠ 12.0% |
| American Indian and Alaska Native alone, percent   (a) | ⚠ 3.4% | ⚠ 0.3% | ⚠ 0.3% | ⚠ 0.6% | ⚠ 0.6% |
| Asian alone, percent   (a) | ⚠ 2.8% | ⚠ 4.7% | ⚠ 3.0% | ⚠ 3.1% | ⚠ 4.9% |
| Native Hawaiian and Other Pacific Islander alone, percent   (a) | ⚠ 0.0% | ⚠ 0.0% | ⚠ 0.0% | ⚠ 0.0% | ⚠ 0.1% |
| Two or More Races, percent | ⚠ 6.6% | ⚠ 3.9% | ⚠ 6.1% | ⚠ 4.6% | ⚠ 2.4% |
| Hispanic or Latino, percent   (b) | ⚠ 43.5% | ⚠ 30.4% | ⚠ 44.3% | ⚠ 39.2% | ⚠ 16.5% |
| White alone, not Hispanic or Latino, percent | ⚠ 47.0% | ⚠ 30.3% | ⚠ 14.8% | ⚠ 21.4% | ⚠ 66.5% |
| **Population Characteristics** | | | | | |
| Veterans, 2013-2017 | 497 | 3,518 | 2,489 | 4,142 | 180,111 |
| Foreign born persons, percent, 2013-2017 | 14.0% | 16.4% | 21.8% | 29.6% | 14.2% |
| **Housing** | | | | | |
| Housing units, July 1, 2018, (V2018) | X | X | X | X | 1,521,117 |
| Owner-occupied housing unit rate, 2013-2017 | 33.9% | 27.8% | 23.8% | 42.0% | 66.6% |
| Median value of owner-occupied housing units, 2013-2017 | $140,400 | $189,400 | $162,300 | $170,300 | $270,100 |
| Median selected monthly owner costs -with a mortgage, 2013-2017 | $1,590 | $1,864 | $1,588 | $1,972 | $2,065 |
| Median selected monthly owner costs -without a mortgage, 2013-2017 | $711 | $835 | $696 | $863 | $851 |
| Median gross rent, 2013-2017 | $815 | $1,137 | $935 | $1,142 | $1,123 |
| Building permits, 2018 | X | X | X | X | 4,815 |
| **Families & Living Arrangements** | | | | | |
| Households, 2013-2017 | 5,644 | 49,987 | 45,822 | 50,341 | 1,361,755 |
| Persons per household, 2013-2017 | 2.53 | 2.43 | 2.54 | 2.84 | 2.55 |
| Living in same house 1 year ago, percent of persons age 1 year+, 2013-2017 | 79.8% | 80.6% | 79.0% | 82.0% | 87.9% |
| Language other than English spoken at home, percent of persons age 5 years+, 2013-2017 | 42.0% | 34.9% | 44.3% | 47.5% | 22.1% |
| **Computer and Internet Use** | | | | | |
| Households with a computer, percent, 2013-2017 | 84.3% | 80.2% | 77.8% | 83.4% | 88.2% |
| Households with a broadband Internet subscription, percent, 2013-2017 | 72.0% | 71.1% | 64.0% | 74.6% | 82.1% |
| **Education** | | | | | |
| High school graduate or higher, percent of persons age 25 years+, 2013-2017 | 78.4% | 84.6% | 72.7% | 75.6% | 90.2% |
| Bachelor's degree or higher, percent of persons age 25 years+, 2013-2017 | 17.7% | 33.9% | 16.6% | 18.1% | 38.4% |
| **Health** | | | | | |
| With a disability, under age 65 years, percent, 2013-2017 | 11.4% | 7.7% | 11.4% | 9.7% | 7.3% |
| Persons without health insurance, under age 65 years, percent | ⚠ 9.0% | ⚠ 11.4% | ⚠ 12.2% | ⚠ 17.7% | ⚠ 6.2% |
| **Economy** | | | | | |
| In civilian labor force, total, percent of population age 16 years+, 2013-2017 | 64.3% | 63.6% | 61.5% | 67.8% | 66.5% |
| In civilian labor force, female, percent of population age 16 years+, 2013-2017 | 60.4% | 62.9% | 59.9% | 64.6% | 62.2% |
| Total accommodation and food services sales, 2012 ($1,000) (c) | 0 | 284,434 | 297,188 | 148,380 | 9,542,068 |

| | | | | | |
|---|---|---|---|---|---|
| Total health care and social assistance receipts/revenue, 2012 ($1,000)   (c) | | 1,797,659 | 741,126 | 1,163,937 | 29,573,119 |
| Total manufacturers shipments, 2012 ($1,000)   (c) | 0 | 510,508 | 207,614 | 1,063,279 | 55,160,095 |
| Total merchant wholesaler sales, 2012 ($1,000)   (c) | 0 | D | 1,317,678 | D | 161,962,244 |
| Total retail sales, 2012 ($1,000)   (c) | 0 | 835,591 | 1,813,725 | 900,700 | 51,632,467 |
| Total retail sales per capita, 2012   (c) | NA | $6,391 | $14,522 | $6,151 | $14,381 |
| **Transportation** | | | | | |
| Mean travel time to work (minutes), workers age 16 years+, 2013-2017 | 18.7 | 22.9 | 23.0 | 28.4 | 26.0 |
| **Income & Poverty** | | | | | |
| Median household income (in 2017 dollars), 2013-2017 | $33,564 | $39,191 | $33,841 | $44,841 | $73,781 |
| Per capita income in past 12 months (in 2017 dollars), 2013-2017 | $16,372 | $24,688 | $19,220 | $22,806 | $41,365 |
| Persons in poverty, percent | ▲ 29.9% | ▲ 25.6% | ▲ 30.5% | ▲ 20.8% | ▲ 10.4% |
| **📊 BUSINESSES** | | | | | |
| **Businesses** | | | | | |
| Total employer establishments, 2016 | X | X | X | X | 89,416[1] |
| Total employment, 2016 | X | X | X | X | 1,533,879[1] |
| Total annual payroll, 2016 ($1,000) | X | X | X | X | 94,658,647[1] |
| Total employment, percent change, 2015-2016 | X | X | X | X | 2.0%[1] |
| Total nonemployer establishments, 2017 | X | X | X | X | 281,453 |
| All firms, 2012 | F | 8,976 | 7,841 | 10,452 | 326,693 |
| Men-owned firms, 2012 | F | 4,614 | 3,619 | 5,149 | 187,845 |
| Women-owned firms, 2012 | F | 3,261 | 3,224 | 4,352 | 106,678 |
| Minority-owned firms, 2012 | F | 3,343 | 4,376 | 5,505 | 56,113 |
| Nonminority-owned firms, 2012 | F | 5,060 | 2,795 | 4,349 | 259,614 |
| Veteran-owned firms, 2012 | F | 791 | 521 | 692 | 31,056 |
| Nonveteran-owned firms, 2012 | F | 7,589 | 6,557 | 9,152 | 281,182 |
| **🌐 GEOGRAPHY** | | | | | |
| **Geography** | | | | | |
| Population per square mile, 2010 | 4,033.0 | 6,947.9 | 7,178.8 | 9,029.0 | 738.1 |
| Land area in square miles, 2010 | 4,40 | 18,68 | 17,38 | 15,97 | 4,842.36 |
| FIPS Code | 0985810 | 0952000 | 0937000 | 0908000 | 09 |

About datasets used in this table

**Value Notes**

1. Includes data not distributed by county.

⚠ Estimates are not comparable to other geographic levels due to methodology differences that may exist between different data sources.

Some estimates presented here come from sample data, and thus have sampling errors that may render some apparent differences between geographies statistically indistinguishable. Click the Quick Info ℹ icon to the left of each row in TABLE view to learn about sampling error.

The vintage year (e.g., V2018) refers to the final year of the series (2010 thru 2018). *Different vintage years of estimates are not comparable.*

**Fact Notes**

    **(a)**   Includes persons reporting only one race
    **(b)**   Hispanics may be of any race, so also are included in applicable race categories
    **(c)**   Economic Census - Puerto Rico data are not comparable to U.S. Economic Census data

**Value Flags**

    **-**    Either no or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest or upper interval of an open ended distribution.
    **D**   Suppressed to avoid disclosure of confidential information
    **F**    Fewer than 25 firms
    **FN**  Footnote on this item in place of data
    **NA**  Not available
    **S**    Suppressed; does not meet publication standards
    **X**    Not applicable
    **Z**    Value greater than zero but less than half unit of measure shown

QuickFacts data are derived from: Population Estimates, American Community Survey, Census of Population and Housing, Current Population Survey, Small Area Health Insurance Estimates, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits.

**ABOUT US**
Are You in a Survey?
FAQs
Director's Corner
Regional Offices
History
Research
Scientific Integrity
Census Careers
Diversity @ Census
Business Opportunities
Congressional and
Intergovernmental
Contact Us

**FIND DATA**
QuickFacts
American FactFinder
2010 Census
Economic Census
Interactive Maps
Training & Workshops
Data Tools
Developers
Catalogs
Publications

**BUSINESS & INDUSTRY**
Help With Your Forms
Economic Indicators
Economic Census
E-Stats
International Trade
Export Codes
NAICS
Governments
Longitudinal Employer-
Household Dynamics (LEHD)
Survey of Business Owners

**PEOPLE & HOUSEHOLDS**
2020 Census
2010 Census
American Community
Survey
Income
Poverty
Population Estimates
Population Projections
Health Insurance
Housing
International
Genealogy

**SPECIAL TOPICS**
Advisors, Centers and
Research Programs
Statistics in Schools
Tribal Resources (AIAN)
Statistical Abstract
Special Census Program
Emergency Preparedness
Data Linkage Infrastructure
Fraudulent Activity & Scams
USA.gov

**NEWSROOM**
News Releases
Release Schedule
Facts for Features
Stats for Stories
Blogs

**CONNECT WITH US**
·   ✕

Accessibility | Information Quality | FOIA | Data Protection and Privacy Policy | U.S. Department of Commerce

# EXHIBIT J



**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*

SPECIAL REPORT

MAY 2018                                                                                                          NCJ 250975

# 2018 Update on Prisoner Recidivism: A 9-Year Follow-up Period (2005-2014)

Mariel Alper, Ph.D., and Matthew R. Durose, *BJS Statisticians*
Joshua Markman, *former BJS Statistician*

Five in 6 (83%) state prisoners released in 2005 across 30 states were arrested at least once during the 9 years following their release. The remaining 17% were not arrested after release during the 9-year follow-up period.

About 4 in 9 (44%) prisoners released in 2005 were arrested at least once during their first year after release (**figure 1**). About 1 in 3 (34%) were arrested during their third year after release, and nearly 1 in 4 (24%) were arrested during their ninth year.

This report examines the post-release offending patterns of former prisoners and their involvement in criminal activity both within and outside of the state where they were imprisoned. The Bureau of Justice Statistics analyzed the offending patterns of 67,966 prisoners who were randomly sampled to represent the 401,288 state prisoners released in 2005 in 30 states. This sample is representative of the 30 states, both individually and collectively, included in the study (see *Methodology*). In 2005, these 30 states



**FIGURE 1**
**Annual arrest percentage of prisoners released in 30 states in 2005**

Percent of released prisoners

Note: The denominator for annual percent is 401,288 (total state prisoners released in 30 states in 2005). See table 5 for estimates and appendix table 7 standard errors.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

## HIGHLIGHTS

- The 401,288 state prisoners released in 2005 had an estimated 1,994,000 arrests during the 9-year period, an average of 5 arrests per released prisoner. Sixty percent of these arrests occurred during years 4 through 9.

- An estimated 68% of released prisoners were arrested within 3 years, 79% within 6 years, and 83% within 9 years.

- Almost half (47%) of prisoners who did not have an arrest within 3 years of release were arrested during years 4 through 9.

- More than three-quarters (77%) of released drug offenders were arrested for a non-drug crime within 9 years.

- Forty-four percent of released prisoners were arrested during the first year following release, while 24% were arrested during year-9.

- Eighty-two percent of prisoners arrested during the 9-year period were arrested within the first 3 years.

- Five percent of prisoners were arrested during the first year after release and not arrested again during the 9-year follow-up period.

- During each year and cumulatively in the 9-year follow-up period, released property offenders were more likely to be arrested than released violent offenders.

- Eight percent of prisoners arrested during the first year after release were arrested outside the state that released them, compared to 14% of prisoners arrested during year-9.



were responsible for 77% of all persons released from state prisons nationwide. The findings are based on prisoner records obtained from the state departments of corrections through BJS's National Corrections Reporting Program and criminal history records obtained through requests to the FBI's Interstate Identification Index and state repositories via the International Justice and Public Safety Network (Nlets).

BJS first collected the criminal history records of this same sample of prisoners to analyze their recidivism patterns for 5 years following release.[1] In 2015, BJS re-collected the criminal history records on the same sample of prisoners to extend the original 5-year follow-up period to 9 years. This report presents the offending patterns for the full 9-year period. Both studies excluded prisoners who died during the respective follow-up periods. Because additional individuals in the sample died during the 9-year follow-up period, the overall universe of released prisoners declined from 404,638 during the 5-year follow-up study to 401,288 during the 9-year follow-up study. Since those 3,350 prisoners were not included in this longer study, recidivism estimates on the first 5 years following release in this report may differ slightly from previously published estimates on the 2005 release cohort.

### About 1 in 4 state prisoners released in the 30 states in 2005 were in prison for a violent offense

Among the 401,288 prisoners released in 30 states in 2005, an estimated 9 in 10 (89%) were male **(table 1)**. Eighteen percent were age 24 or younger at time of release, 51% were ages 25 to 39, and 31% were age 40 or older. The percentage of non-Hispanic black and non-Hispanic white prisoners were similar (40% each). Thirty-two percent of released prisoners were in prison for a drug offense, compared to 30% who were in prison for a property offense, 26% for a violent offense, and 13% for a public order offense.

[1]See *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010*, NCJ 244205, BJS web, April 2014.

### TABLE 1
### Characteristics of prisoners released in 30 states in 2005

| Characteristic | Percent |
|---|---|
| All released prisoners | 100% |
| **Sex** | |
| Male | 89.3% |
| Female | 10.7 |
| **Race/Hispanic origin[a]** | |
| White | 39.7% |
| Black/African American | 40.1 |
| Hispanic/Latino | 17.7 |
| Other[b] | 2.4 |
| America Indian or Alaska Native | 1.2 |
| Asian, Native Hawaiian, or Other Pacific Islander | 0.8 |
| **Age at release** | |
| 24 or younger | 17.7% |
| 25–29 | 19.4 |
| 30–34 | 16.0 |
| 35–39 | 15.7 |
| 40 or older | 31.2 |
| **Most serious commitment offense** | |
| Violent | 25.7% |
| Property | 29.7 |
| Drug | 31.9 |
| Public order[c] | 12.7 |
| **Number of released prisoners** | 401,288 |

Note: Data on prisoners' sex and age at release were known for 100% of cases and race and Hispanic origin for nearly 100%. Detail may not sum to total due to rounding. See appendix table 2 for standard errors.
[a]Excludes persons of Hispanic or Latino origin, unless specified.
[b]Includes persons of two or more races or other unspecified races.
[c]Includes 0.8% of cases in which the prisoner's most serious offense was unspecified.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

ARROYO001397

## Measuring recidivism

Recidivism measures require three characteristics:

1. a starting event, such as a release from prison

2. a measure of failure following the starting event, such as a subsequent arrest, conviction, or return to prison

3. an observation or follow-up period that generally extends from the date of the starting event to a predefined end date (e.g., 6 months, 1 year, 3 years, 5 years, or 9 years).

This study used four outcome measures to examine the recidivism patterns of former state prisoners. Arrest data were used because they provided the offense details needed to produce these four measures for prisoners from all 30 states in the study.

1. Cumulative arrest percentage is the percentage of prisoners who had been arrested at least once at various points in the follow-up period. For example, the cumulative arrest percentage for year-5 is the percentage of all released prisoners who had at least one arrest during the 5-year period. BJS previously examined the cumulative percentage of prisoners who had a subsequent conviction or returned to prison within 5 years following release.[2] The return-to-prison analysis for the 5-year follow-up study was limited to 23 of the study's 30 states with the data needed to identify returns to prison during the entire observation period.

2. Annual percentage of first arrests is the percentage of prisoners who had their first arrest following release during a specific year in the follow-up period. The denominator for each annual first-arrest percentage from years 1 through 9 is the total number of prisoners released in the 30 states during 2005. The numerators are the number of prisoners arrested for the first time during each of those years (i.e., they had not been arrested during a prior year in the follow-up period). The sum of the annual first-arrest percentages during a follow-up period equals the cumulative arrest percentage for the same period.

3. Annual arrest percentage of released prisoners includes those who were arrested at least once during a particular year within the follow-up

period. The denominator for each percentage from years 1 through 9 is the total number of prisoners released in the 30 states during 2005. The numerators are the number of prisoners arrested during the particular year, regardless of whether they had been arrested during a prior year.

4. Annual volume of arrests is the total number of arrests of released prisoners during a particular year in the follow-up period. The total volume of arrests is the sum of each annual volume of arrests during the entire follow-up period. A prisoner may have had multiple arrests during a year or in the follow-up period, and a single arrest may have involved charges for more than one crime.

## Measuring desistance

**Desistance** is measured as the percentage of prisoners who, after a particular year, had no subsequent arrests during the remainder of the 9-year follow-up period. For example, if a prisoner was arrested during year-3 but was not arrested during years 4 through 9, the prisoner would be classified as having desisted during year-3. While recidivism is a measure of arrest at any point during the follow-up period, desistance is a measure of the absence of arrest between a particular point within the follow-up period and the end of the follow-up period.

## Importance of recidivism and desistance measures

Measures of recidivism and desistance provide information relevant to a deeper understanding of criminal behavior and the administration of justice in a wide range of policy areas. For example, law enforcement officials interested in the amount of crime committed by released prisoners can turn to statistics on the annual volume of arrests.  Parole and probation agencies interested in the involvement of various types of former prisoners in criminal activities after release may focus on variations in cumulative arrest percentages. Treatment providers looking for measures of program effectiveness will be interested in desistance patterns. Additionally, task forces and policymakers examining the movement of criminals across state borders will be interested in the types of released prisoners most likely to commit new crimes (i.e., recidivate) in other states.

---

[2]See *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010*, NCJ 244205, BJS web, April 2014.

ARROYO001398

## Extending the follow-up period from 3 to 9 years increased recidivism of prisoners by 15 percentage points

The cumulative arrest percentage among released prisoners increased 15 percentage points when the follow-up period was extended from 3 years to 9 years. Sixty-eight percent of prisoners had been arrested for a new crime 3 years after release, while 79% of prisoners were arrested after 6 years following release (**table 2**). At the end of the 9-year follow-up period, the percentage of prisoners arrested after release increased to 83% (**figure 2**).

The cumulative out-of-state arrest percentage among released prisoners doubled when the follow-up period was extended from 3 years to 9 years. Three years after release, 7.7% of prisoners had been arrested outside the state of release. At the end of the 9-year follow-up period, the percentage of prisoners arrested outside of the state of release increased to 15.4%.

### FIGURE 2
**Percent of prisoners released in 30 states in 2005 who were arrested since release, by year after release**



Percent of released prisoners

Note: See table 2 for estimates and appendix table 3 for standard errors.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

### TABLE 2
**Cumulative percent of prisoners released in 30 states in 2005 who were arrested within or outside the state of release, by year after release**

| Year after release | Within or outside the state of release | | | Outside the state of release* | | |
|---|---|---|---|---|---|---|
| | Total | Percent arrested | Percent not arrested | Total | Percent arrested | Percent not arrested |
| 1 | 100% | 43.9% | 56.1% | 100% | 3.3% | 96.7% |
| 2 | 100% | 60.1 | 39.9 | 100% | 5.7 | 94.3 |
| 3 | 100% | 68.4 | 31.6 | 100% | 7.7 | 92.3 |
| 4 | 100% | 73.5 | 26.5 | 100% | 9.3 | 90.7 |
| 5 | 100% | 77.0 | 23.0 | 100% | 10.9 | 89.1 |
| 6 | 100% | 79.4 | 20.6 | 100% | 12.2 | 87.8 |
| 7 | 100% | 81.1 | 18.9 | 100% | 13.4 | 86.6 |
| 8 | 100% | 82.4 | 17.6 | 100% | 14.4 | 85.6 |
| 9 | 100% | 83.4 | 16.6 | 100% | 15.4 | 84.6 |

Note: Detail may not sum to total due to rounding. See appendix table 3 for standard errors.
*Prisoners arrested outside the state of release could have also been arrested within the state of release.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

Forty-four percent of prisoners released in 2005 were arrested during the first year following release (**figure 3**). Sixteen percent of released prisoners were arrested for the first time during the second year after release, and 8% were arrested for the first time during the third year. Fifteen percent of released prisoners were arrested for the first time during years 4 through 9, including 11% arrested for the first time during years 4 through 6 and 4% arrested for the first time during years 7 through 9.

Of the released prisoners who were arrested for a new crime during the 9-year follow-up period, the majority of the prisoners' first post-release arrests occurred during the first 3 years of the follow-up period. More than half (53%) of all prisoners released in the 30 states in 2005 who were arrested during the 9-year follow-up period were arrested for the first time during the first year (not shown). Among all released prisoners arrested within 9 years, about 5 in 6 prisoners (82%) were arrested within the 3-year follow-up period (not shown).

## FIGURE 3
**Percent of prisoners released in 30 states in 2005 who were arrested after release, by year of first arrest**

Percent of released prisoners

[bar chart showing percentages by year of first arrest: 1st ≈44, 2nd ≈16, 3rd ≈8, 4th ≈5, 5th ≈4, 6th ≈2, 7th ≈2, 8th ≈1, 9th ≈1]

Year of first arrest

Note: The denominator for the annual percentage was 401,288 (total state prisoners released in 30 states in 2005). See appendix table 4 for estimates and standard errors.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

## Longer follow-up periods show substantial declines in apparent desistance

This study examined the extent to which released prisoners appeared to have desisted from criminal activity using various follow-up periods. Thirty-two percent of released prisoners had not been arrested within 3 years, compared to 21% within 6 years (**figure 4**). Within 9 years following release in 2005, the percentage of prisoners without a new arrest following release declined to 17%. That is, almost half (47%) of prisoners with no arrest within 3 years of release had an arrest during years 4 through 9.

## FIGURE 4
**Percent of prisoners released in 30 states in 2005 who were not arrested since release, by year following release**

Percent of released prisoners



Year after release

Note: See table 2 for estimates and appendix table 3 for standard errors.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

ARROYO001400

## After year-1 the annual percentages of males and females arrested for the first time were similar

The difference in the percentage of male and female prisoners who were arrested for the first time each year following release narrowed after the first year. In the first year after release, 45% of male prisoners were arrested, compared to 35% of female prisoners (figure 5). However, during each of the following years, the percentages of males and females arrested for the first time following release were similar. During the 9-year follow-up period, 84% of male prisoners were arrested and 77% of female prisoners were arrested.

A smaller percentage of white prisoners than black or Hispanic prisoners recidivated during the first year after release. During the first year after release, 40% of white prisoners were arrested for the first time, compared to 47% of Hispanic and 46% of black prisoners (table 3). During year-2 after release, 16% of white prisoners were arrested for the first time, compared to 17% of black and 14% of Hispanic prisoners. During the ninth year after release, about 1% of each sex, race, Hispanic origin, and age group were arrested for the first time. During the 9-year follow-up period, 87% of black prisoners and 81% of white and Hispanic prisoners were arrested.

**FIGURE 5**

**Percent of prisoners released in 30 states in 2005 who were arrested following release, by sex of prisoner and year of first arrest**

Percent of released prisoners



Note: See table 3 for estimates and appendix table 5 for standard errors.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

**TABLE 3**

**Percent of prisoners released in 30 states in 2005 who were arrested after release, by prisoner characteristics and year of first arrest**

| Characteristic | Total arrested within 9 years | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| All released prisoners | 83.4% | 43.9% | 16.2% | 8.3% | 5.1% | 3.5% | 2.3% | 1.7% | 1.3% | 1.0% |
| **Sex** | | | | | | | | | | |
| Male | 84.2% | 44.9% | 16.3% | 8.3% | 5.1% | 3.4% | 2.3% | 1.7% | 1.3% | 0.9% |
| Female | 76.8 | 35.1 | 15.7 | 8.5 | 5.5 | 4.2 | 2.5 | 2.2 | 1.7 | 1.4 |
| **Age at release** | | | | | | | | | | |
| 24 or younger | 90.1% | 51.8% | 17.0% | 7.7% | 4.8% | 3.4% | 2.0% | 1.7% | 1.0% | 0.7% |
| 25–39 | 85.3 | 44.9 | 16.7 | 8.6 | 5.2 | 3.6 | 2.3 | 1.7 | 1.4 | 0.9 |
| 25–29 | 87.0 | 45.9 | 16.8 | 8.8 | 5.5 | 3.8 | 2.5 | 1.5 | 1.3 | 0.9 |
| 30–34 | 84.3 | 43.9 | 16.5 | 8.2 | 5.3 | 3.5 | 2.3 | 1.9 | 1.7 | 1.0 |
| 35–39 | 84.3 | 44.6 | 16.8 | 8.7 | 4.9 | 3.4 | 2.2 | 1.7 | 1.2 | 0.9 |
| 40 or older | 76.5 | 37.8 | 15.1 | 8.1 | 5.1 | 3.5 | 2.5 | 1.9 | 1.4 | 1.2 |
| **Race/Hispanic origin[a]** | | | | | | | | | | |
| White | 80.9% | 40.2% | 15.8% | 8.4% | 5.2% | 3.8% | 2.6% | 2.2% | 1.5% | 1.2% |
| Black/African American | 86.9 | 46.0 | 17.4 | 8.6 | 5.5 | 3.4 | 2.3 | 1.6 | 1.2 | 0.9 |
| Hispanic/Latino | 81.3 | 47.3 | 14.3 | 7.2 | 4.2 | 3.1 | 2.2 | 0.9 | 1.3 | 0.7 |
| Other[b] | 82.4 | 44.1 | 16.4 | 8.8 | 4.5 | 3.0 | 1.3 | 2.1 | 1.3 | 1.1 |
| American Indian or Alaska Native | 85.0 | 43.5 | 16.3 | 9.5 | 4.8 | 3.6 | 1.6 | 2.7 | 1.6 | 1.4 |
| Asian, Native Hawaiian, or Other Pacific Islander | 79.4 | 45.0 | 16.0 | 8.3 | 4.0 | 1.3 | 1.3 | 1.3 | 1.2 | 1.0 |

Note: Data on prisoners' sex and age at release were known for 100% of cases and race and Hispanic origin for nearly 100%. Detail may not sum to total due to rounding. See appendix table 5 for standard errors.
[a]Excludes persons of Hispanic or Latino origin, unless specified.
[b]Includes persons of two or more races or other unspecified races.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

The difference in the percentage of prisoners in each age group who were arrested for the first time each year following release narrowed after the first year. During the first year after release, 52% of prisoners age 24 or younger at time of release were arrested, compared to 38% of prisoners age 40 or older (**figure 6**). During the second year, an estimated 17% of prisoners age 24 or younger were arrested for the first time following release, compared to 15% of prisoners age 40 or older. During the 9-year follow-up period, 90% of prisoners age 24 or younger at release were arrested, 77% of prisoners age 40 or older at release were arrested, and 43% (not shown) of prisoners age 60 or older were arrested.

**FIGURE 6**
**Percent of prisoners released in 30 states in 2005 who were arrested after release, by age at release and year of first arrest**

Percent of released prisoners



Note: See table 3 for estimates and appendix table 5 for standard errors.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

### Prisoners released in 30 states in 2005 were arrested nearly 2 million times during the 9 years following release

The 401,288 state prisoners released in 2005 had an estimated 1,994,000 arrests during the 9-year period, an average of 5 arrests per released prisoner (**table 4**). Extending the follow-up period to 9 years captured more than double the number of post-release arrests observed in a 3-year follow-up period and increased the number of arrests observed during a 5-year follow-up period by 38%. Six in 10 (60%) of the 1,994,000 arrests during the 9-year period occurred from years 4 through 9.

An estimated 23% of released prisoners were responsible for half of the nearly 1,994,000 arrests that occurred during the 9-year follow-up period (not shown). A similar percentage of prisoners were responsible for half of the arrests during the 3-year follow-up period (also 23%) (not shown).

**TABLE 4**
**Post-release arrests of prisoners released in 30 states in 2005, by year after arrest**

| Year after arrest | Number of arrests during year/period | Percent of arrests during year/period | Cumulative number of all arrests since release | Cumulative percent of all arrests since release |
|---|---|---|---|---|
| Total | 1,994,000 | 100% | ~ | ~ |
| Years 1–3 | 804,000 | 40.3% | ~ | ~ |
| 1 | 306,000 | 15.4 | 306,000 | 15.4 |
| 2 | 260,000 | 13.0 | 567,000 | 28.4 |
| 3 | 238,000 | 11.9 | 804,000 | 40.3 |
| Years 4–6 | 620,000 | 31.1% | ~ | ~ |
| 4 | 219,000 | 11.0 | 1,024,000 | 51.3 |
| 5 | 210,000 | 10.6 | 1,234,000 | 61.9 |
| 6 | 190,000 | 9.6 | 1,425,000 | 71.4 |
| Years 7–9 | 570,000 | 28.6% | ~ | ~ |
| 7 | 196,000 | 9.8 | 1,620,000 | 81.2 |
| 8 | 194,000 | 9.7 | 1,814,000 | 91.0 |
| 9 | 180,000 | 9.0 | 1,994,000 | 100 |

Note: Number of post-release arrests was rounded to the nearest 1,000. Detail may not sum to total due to rounding. See appendix table 6 for standard errors.
~Not applicable.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

## Male and younger prisoners were more likely to be arrested each year than female and older prisoners

Patterns of the annual arrest percentages differ from patterns of the year of first arrest. Thirty-four percent of all released prisoners were arrested during their third year after release, compared to 24% during their ninth year (table 5). Nearly a quarter (24%) of the released prisoners who were arrested during year-3 had not previously been arrested following release (not shown). Four percent of the released prisoners who were arrested during year-9 had not previously been arrested following release (not shown).

Forty-five percent of male prisoners were arrested during the first year after release, compared to 35% of female prisoners (figure 7). During year-9, the difference between males and females narrowed with 24% of male prisoners arrested compared to 21% of female prisoners. While the difference in percentage

### FIGURE 7
**Annual arrest percentage of prisoners released in 30 states in 2005, by sex of prisoner**



Note: See table 5 for estimates and appendix table 7 for standard errors.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

### TABLE 5
**Annual arrest percentage of prisoners released in 30 states in 2005, by prisoner characteristics**

| Characteristic | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
|---|---|---|---|---|---|---|---|---|---|
| All released prisoners | 43.9% | 37.7% | 34.3% | 31.9% | 30.1% | 28.0% | 27.4% | 25.9% | 24.0% |
| **Sex** | | | | | | | | | |
| Male | 44.9% | 38.2% | 34.7% | 32.3% | 30.5% | 28.4% | 27.8% | 26.4% | 24.3% |
| Female | 35.1 | 33.2 | 30.7 | 28.0 | 26.6 | 24.3 | 23.8 | 21.9 | 21.3 |
| **Age at release** | | | | | | | | | |
| 24 or younger | 51.8% | 42.3% | 36.7% | 34.4% | 34.3% | 31.3% | 31.9% | 30.3% | 27.6% |
| 25–39 | 44.9 | 38.9 | 35.7 | 33.4 | 31.1 | 29.3 | 28.9 | 27.5 | 25.6 |
| 25–29 | 45.9 | 39.2 | 36.3 | 33.2 | 31.7 | 30.3 | 29.3 | 28.3 | 26.4 |
| 30–34 | 43.9 | 38.1 | 34.4 | 32.8 | 30.3 | 28.2 | 28.1 | 27.2 | 24.1 |
| 35–39 | 44.6 | 39.3 | 36.3 | 34.1 | 31.3 | 29.3 | 29.4 | 27.1 | 26.1 |
| 40 or older | 37.8 | 33.1 | 30.5 | 28.1 | 25.9 | 23.8 | 22.2 | 20.7 | 19.4 |
| **Race/Hispanic origin[a]** | | | | | | | | | |
| White | 40.2% | 35.0% | 32.2% | 29.9% | 28.7% | 26.8% | 26.2% | 25.0% | 22.9% |
| Black/African American | 46.0 | 40.6 | 36.5 | 34.1 | 31.9 | 29.5 | 29.1 | 27.3 | 25.3 |
| Hispanic/Latino | 47.3 | 36.9 | 33.6 | 31.4 | 29.3 | 26.8 | 25.7 | 24.0 | 23.4 |
| Other[b] | 44.1 | 37.8 | 35.3 | 32.0 | 27.8 | 28.7 | 29.9 | 29.2 | 24.6 |
| American Indian or Alaska Native | 43.5 | 37.8 | 38.8 | 32.3 | 29.9 | 31.3 | 34.7 | 31.0 | 26.0 |
| Asian, Native Hawaiian, or Other Pacific Islander | 45.0 | 39.1 | 29.7 | 31.3 | 25.2 | 25.4 | 26.2 | 27.5 | 21.2 |

Note: Data on prisoners' sex and age at release were known for 100% of cases, and race and Hispanic origin were known for nearly 100% of cases. See appendix table 7 for standard errors.
[a]Excludes persons of Hispanic or Latino origin, unless specified.
[b]Includes persons of two or more races or other specified races.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

ARROYO001403

points narrowed from 10% during year-1 to 3% during year-9, the difference between male and female prisoners decreased proportionally. During year-1, the percentage of female prisoners who were arrested following release was 78% of that for male prisoners, while during year-9 the percentage of female prisoners was 87% of that for male prisoners (not shown).

Younger prisoners (those age 24 or younger) were more likely to be arrested than older prisoners (those age 40 or older) during each year following release. For example, 28% of prisoners released at age 24 or younger were arrested during year-9, compared to 19% of those age 40 or older **(figure 8)**.

## During the 9 years after release, prisoners released for a property offense were most likely to be arrested

During the first year following release, the percentage of prisoners released for a property offense who were arrested for any type of offense (including violent, property, drug, or public order offenses) was higher than the percentage of prisoners released for a drug or violent offense. This general pattern was maintained across the 9-year follow-up period. It should be noted that persons could have been serving time in prison for more than one offense and were categorized for this report by the most serious offense for which they were imprisoned: a violent, property, drug, or public order crime.

**FIGURE 8**
**Annual arrest percentage of prisoners released in 30 states in 2005, by age of prisoner at release**

Percent of released prisoners

Note: See table 5 for estimates and appendix table 7 for standard errors.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

**FIGURE 9**
**Annual percentage of prisoners released in 30 states in 2005 who were arrested for any type of offense, by most serious commitment offense**



Percent of released prisoners arrested*

Note: Public order includes 0.8% of cases in which prisoners' most serious offense was unspecified. See table 6 for estimates and appendix table 8 for standard errors.
*Persons could have been in prison for more than one offense; the most serious one is reported in this figure.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

Thirty-nine percent of prisoners released in 2005 who were serving time for a violent offense were arrested for any type of offense during the first year following release, compared to 51% of those released after serving time for a property offense (**table 6, figure 9**). By year-9 these percentages fell to 21% for those released

for a violent offense and 28% for those released for a property offense. However, similar to year-1, the percentage of prisoners released for a violent offense who were arrested following release was about three-quarters of the percentage for those released for a property offense.

**TABLE 6**

**Annual arrest percentage of prisoners released in 30 states in 2005, by most serious commitment offense and type of post-release arrest offense**

| Most serious commitment offense | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
|---|---|---|---|---|---|---|---|---|---|
| Any arrest after release | | | | | | | | | |
| All released prisoners | 43.9% | 37.7% | 34.3% | 31.9% | 30.1% | 28.0% | 27.4% | 25.9% | 24.0% |
| Violent* | 38.9 | 33.7 | 30.4 | 28.1 | 27.2 | 25.0 | 25.2 | 24.1 | 21.4 |
| Property | 50.8† | 41.6† | 38.3† | 36.5† | 33.2† | 31.3† | 30.6† | 29.3† | 27.6† |
| Drug | 42.8† | 38.5† | 34.9† | 31.8† | 30.2† | 27.6† | 26.7† | 25.0 | 23.4† |
| Public order | 40.5 | 34.3 | 31.2 | 28.9 | 28.0 | 27.0† | 25.8 | 23.8 | 22.5 |
| Violent arrest after release | | | | | | | | | |
| All released prisoners | 9.0% | 8.3% | 7.6% | 7.6% | 7.2% | 6.5% | 6.6% | 6.0% | 5.2% |
| Violent* | 11.0 | 10.2 | 8.4 | 8.8 | 8.9 | 6.8 | 6.9 | 6.5 | 5.8 |
| Property | 9.3† | 7.8† | 7.7 | 7.8† | 6.9† | 7.1 | 7.2 | 6.2 | 5.7 |
| Drug | 6.8† | 7.2† | 6.7† | 6.2† | 6.2† | 5.3† | 5.7† | 5.4† | 4.4† |
| Public order | 9.7 | 8.6† | 8.3 | 8.1 | 7.3† | 7.2 | 6.6 | 6.4 | 5.3 |
| Arrest after release for same type as most serious commitment offense[a] | | | | | | | | | |
| All released prisoners | 21.0% | 18.0% | 15.6% | 14.5% | 13.7% | 12.2% | 11.8% | 11.5% | 10.6% |
| Violent | 11.0 | 10.2 | 8.4 | 8.8 | 8.9 | 6.8 | 6.9 | 6.5 | 5.8 |
| Property | 25.0 | 20.6 | 17.6 | 16.9 | 15.6 | 14.2 | 14.1 | 13.9 | 12.6 |
| Drug | 22.0 | 19.6 | 17.2 | 15.0 | 13.8 | 12.2 | 11.5 | 11.4 | 11.0 |
| Public order | 29.2 | 23.8 | 21.1 | 19.2 | 18.4 | 18.2 | 17.0 | 16.0 | 14.5 |
| Arrested after release for different type of offense than most serious commitment offense[b] | | | | | | | | | |
| All released prisoners | 36.1% | 30.9% | 28.0% | 26.3% | 24.6% | 23.1% | 22.8% | 21.5% | 20.0% |
| Violent | 35.2 | 30.4 | 27.6 | 25.1 | 23.9 | 22.7 | 22.8 | 22.0 | 19.5 |
| Property | 42.4 | 34.4 | 31.6 | 30.6 | 27.6 | 26.0 | 25.6 | 24.1 | 23.0 |
| Drug | 34.8 | 31.3 | 27.9 | 26.0 | 24.6 | 22.7 | 22.2 | 20.7 | 19.1 |
| Public order | 26.3 | 22.6 | 20.7 | 19.8 | 18.7 | 17.9 | 18.0 | 16.6 | 16.0 |

Note: Persons could have been in prison for more than one offense; the most serious one is reported in this table. Each arrest may include more than one type of offense. 'Type of offense' refers to the categories of violent, property, drug, and public order. Public order includes 0.8% of cases in which prisoners' most serious offense was unspecified. See appendix table 8 for standard errors.

*Comparison group.

†Difference with comparison group is significant at the 95% confidence level.

[a,b]Percentages in these two categories do not sum to the 'any arrest after release' category because categories overlap.

Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

ARROYO001405

At the end of the 9-year follow-up period, 79% of prisoners released for a violent offense had been arrested for any type of crime (table 7). Prisoners released for a violent offense were less likely to have been arrested for any type of crime than prisoners released for a property (88%) or drug (84%) offense but were more likely to have been arrested for a violent offense.

## TABLE 7
**Cumulative percent of prisoners released in 30 states in 2005 who were arrested following release, by most serious commitment offense and type of post-release arrest offense**

| Most serious commitment offense | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
|---|---|---|---|---|---|---|---|---|---|
| **Any arrest after release** | | | | | | | | | |
| All released prisoners | 43.9% | 60.1% | 68.4% | 73.5% | 77.0% | 79.4% | 81.1% | 82.4% | 83.4% |
| Violent* | 38.9 | 54.2 | 62.2 | 67.6 | 71.6 | 74.2 | 76.1 | 77.7 | 78.7 |
| Property | 50.8 † | 67.1 † | 75.0 † | 79.6 † | 82.4 † | 84.4 † | 85.8 † | 86.9 † | 87.8 † |
| Drug | 42.8 † | 59.9 † | 68.6 † | 73.9 † | 77.5 † | 79.8 † | 81.5 † | 82.7 † | 83.8 † |
| Public order | 40.5 | 55.9 | 65.0 † | 70.2 † | 74.1 † | 76.9 † | 79.2 † | 80.6 † | 81.9 † |
| **Violent arrest after release** | | | | | | | | | |
| All released prisoners | 9.0% | 15.8% | 20.9% | 25.4% | 29.3% | 32.3% | 35.0% | 37.3% | 39.1% |
| Violent* | 11.0 | 19.1 | 24.5 | 29.6 | 34.0 | 36.9 | 39.5 | 41.7 | 43.4 |
| Property | 9.3 † | 15.8 † | 20.9 † | 25.7 † | 29.3 † | 32.9 † | 36.0 † | 38.5 † | 40.4 † |
| Drug | 6.8 † | 12.7 † | 17.5 † | 21.3 † | 25.1 † | 27.7 † | 30.1 † | 32.1 † | 34.0 † |
| Public order | 9.7 | 16.4 † | 21.8 † | 26.6 † | 30.0 † | 32.9 † | 35.7 † | 38.1 † | 39.8 † |
| **Arrest after release for same type as most serious commitment offense[a]** | | | | | | | | | |
| All released prisoners | 21.0% | 32.5% | 39.6% | 45.0% | 49.1% | 52.1% | 54.5% | 56.5% | 58.2% |
| Violent | 11.0 | 19.1 | 24.5 | 29.6 | 34.0 | 36.9 | 39.5 | 41.7 | 43.4 |
| Property | 25.0 | 37.5 | 45.0 | 50.4 | 54.6 | 57.6 | 60.0 | 61.9 | 63.5 |
| Drug | 22.0 | 34.7 | 42.5 | 47.9 | 51.8 | 54.4 | 56.7 | 58.6 | 60.4 |
| Public order | 29.2 | 42.4 | 50.4 | 56.1 | 60.3 | 63.8 | 66.6 | 68.6 | 70.3 |
| **Arrested after release for different type of offense than most serious commitment offense[b]** | | | | | | | | | |
| All released prisoners | 36.1% | 51.0% | 59.4% | 65.0% | 68.9% | 71.7% | 73.9% | 75.6% | 76.9% |
| Violent | 35.2 | 49.6 | 57.5 | 63.0 | 67.1 | 69.9 | 72.1 | 73.7 | 74.8 |
| Property | 42.4 | 58.0 | 66.4 | 71.8 | 75.3 | 77.9 | 79.8 | 81.4 | 82.6 |
| Drug | 34.8 | 50.2 | 58.8 | 64.6 | 68.6 | 71.4 | 73.6 | 75.3 | 76.7 |
| Public order | 26.3 | 39.7 | 48.2 | 54.3 | 58.4 | 61.6 | 64.6 | 66.5 | 68.2 |

Note: Persons could have been in prison for more than one offense; the most serious one is reported in this table. Each arrest may include more than one type of offense. 'Type of offense' refers to the categories of violent, property, drug, and public order. Public order includes 0.8% of cases in which prisoners' most serious offense was unspecified. See appendix table 9 for standard errors.
*Comparison group.
†Difference with comparison group is significant at the 95% confidence level.
[a,b]Percentages in these two categories do not sum to the 'any arrest after release' category because categories overlap.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

## By the sixth year after release, prisoners released for a violent or property crime were similarly likely to be arrested for a violent crime

During the first year of the follow-up period, a larger percentage of prisoners released for a violent offense were arrested for a violent crime than those released for a property or drug offense. Eleven percent of prisoners released for a violent offense were arrested during year-1 for a violent offense, compared to 9% of those released for a property offense and 7% of prisoners released for a drug offense (**figure 10**). However, beginning in year-6, prisoners released for a violent offense were similarly likely to be arrested for a violent crime as those released for a property or public order offense. Throughout the 9-year follow-up period, prisoners released for a drug offense were less likely to be arrested for a violent crime than prisoners released for a violent offense.

## Among prisoners arrested following release, the percentage of arrests in another state increased each year after release

The likelihood of former prisoners being arrested outside the state where they were released increased with a longer follow-up period. During each of the 9 years following release, fewer than 4% of prisoners were arrested outside the state (**table 8**). However, among prisoners arrested within a given year following release, the percentage of prisoners arrested in another state increased as the length of time from release in 2005 increased. Eight percent of prisoners arrested during year-1 were arrested outside of the state from which they were released. Fourteen percent of prisoners who were arrested during year-9 were arrested outside of the state of release.

## FIGURE 10
**Annual percentage of prisoners released in 30 states in 2005 who were arrested for a violent crime, by most serious commitment offense**



Note: Public order includes 0.8% of cases in which prisoners' most serious offense was unspecified. See table 6 for estimates and appendix table 8 for standard errors.

*Persons could have been in prison for more than one offense; the most serious one is reported in this figure.

Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

## TABLE 8
**Annual arrest percentage of prisoners released in 30 states in 2005, by whether arrested within or outside the state of release**

| Year after arrest | All released prisoners | | Among released prisoners arrested during the year, percent arrested outside state of release |
|---|---|---|---|
| | Outside state of release | Within or outside state of release | |
| 1 | 3.3% | 43.9% | 7.5% |
| 2 | 3.4 | 37.7 | 9.0 |
| 3 | 3.4 | 34.3 | 10.0 |
| 4 | 3.5 | 31.9 | 10.9 |
| 5 | 3.6 | 30.1 | 12.0 |
| 6 | 3.5 | 28.0 | 12.6 |
| 7 | 3.6 | 27.4 | 13.3 |
| 8 | 3.5 | 25.9 | 13.6 |
| 9 | 3.4 | 24.0 | 14.2 |
| Arrested anytime in follow-up period | 15.4% | 83.4% | ~ |

Note: Detail may not sum to total due to rounding. See appendix table 10 for standard errors.

~Not applicable.

Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

## Five percent of prisoners were arrested during year-1 following release and not arrested again during years 2 through 9

Thirty-nine percent of all released prisoners were arrested during the first year after release and were also subsequently arrested at least once during years 2 through 9 (figure 11). Five percent of prisoners were arrested during the first year after release and were not arrested again during years 2 though 9. Among prisoners arrested during the first year following release, nearly 9 in 10 (89%) were arrested again during the next 8 years (not shown).

During the second year after release, 38% of prisoners were arrested. A third (33%) of all released prisoners were arrested during the second year and also arrested again at least once during years 3 through 9. The remaining 5% were not arrested again during the follow-up period.

The percentage who were not arrested during a subsequent year increased during the later years of the follow-up period. However, there are fewer observable years in which to capture a subsequent arrest during later years of the follow-up period. (For example, in year-8 there is only one subsequent year.)

## FIGURE 11
**Percent of prisoners released in 30 states in 2005 who were arrested after release, by year after arrest and whether arrested during subsequent years**



Note: The denominator for the annual percentage was 401,288 (total state prisoners released in 30 states in 2005). See appendix table 11 for estimates and standard errors.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

## Forty-four percent of released prisoners were not arrested after year-5

Twenty-two percent of released prisoners were not arrested after year-1 of the follow-up period (figure 12). In other words, when measured by a new arrest, 22% of prisoners appeared to desist by year-1 because they were not arrested during years 2 through 9. Some released prisoners may not have been arrested because they were incarcerated at certain times during the follow-up period. Thirty-one percent of prisoners appeared to have desisted by year-3 and 44% by year-5. This percentage eclipsed 52% in year-6, at which point two-thirds of the observable years had elapsed.

## FIGURE 12
**Prisoners released in 30 states in 2005 who were not arrested in the remainder of the follow-up period, by year after release**



Note: Estimates after year-6 are not presented as 3 years of subsequent arrests could not be measured. See appendix table 12 for estimates and standard errors.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

ARROYO001408

# Longer follow-up periods provide additional data on the nature of criminal careers, but take time

Research on the criminal activities of persons released from prison has employed different follow-up periods. A 3-year follow-up period has been common, but other time periods (e.g., 1-year, 5-year, and 9-year, as in this report) have been used. Which follow-up period is employed is often driven by the availability of data or the need to study a specific cohort (e.g., those released 3 years ago). Independent of these constraints, deciding which follow-up period to use is closely linked to the competing concerns of accuracy and immediacy.

This study provides empirical evidence that may be used to inform which follow-up period is preferred for various research efforts and policy applications. For example, comparing the 3-year and 9-year follow-up periods showed that the basic recidivism percentage (defined as the cumulative arrest percentage following release) was underestimated by an average of 15 percentage points using the 3-year window. Similarly, the 9-year follow-up period showed that the percentage of released prisoners arrested in states outside the state that released them was twice as high as that observed in a study with a 3-year follow-up period.

With a follow-up period of 3 years, researchers and policymakers would not have observed more than half of the arrests of prisoners after their release. This study's 9-year follow-up period showed that 60% of all arrests of released prisoners occurred more than 3 years after their release.

A longer follow-up period enables researchers and policymakers to better explore the attributes of desistance. This study found that 32% of released prisoners had no arrests following release during the 3-year follow-up period (and appeared to have desisted from criminal activity), but almost half of those (15%) were arrested during the subsequent 6 years, leaving 17% who had no arrests during the 9-year follow-up period (see table 2). In addition, the study found that 24% of released prisoners were still actively involved in criminal activity and were arrested during year-9, which could be viewed as inviting an even longer period of review. The longer period also enables researchers to understand more complex patterns of desistance. For example, of the 44% of released prisoners who were arrested during their first year after release, 1 in 9 (5% of all released prisoners) had no additional arrests during the 9-year follow-up period.

Counterbalancing the value of a longer follow-up period is the need for up-to-date information. Offending patterns may change with time and the offending patterns of prisoners released 10 years ago may be different than those of prisoners released in recent years. In addition, policymakers and practitioners have a need for timely information and may not have time for a recidivism study with a long observation period to be completed to assess the value of a rehabilitation program for released prisoners or a policy change affecting sentencing.

There is no standard length for follow-up periods used in studies of the criminal careers of released prisoners or any other cohort of offenders. This study shows how recidivism and desistance measures change when longer or shorter follow-up periods are used. With these additional data, designers and users of recidivism and desistance studies have more information to determine which follow-up period is best for their needs.

# Methodology

## Sampling

This study estimates the recidivism patterns of persons released in 2005 from state prisons in 30 states. States were included in this study if the state departments of corrections could provide the prisoner records and the FBI or state identification numbers on persons released from prison during 2005. The fingerprint-based identification numbers were required to obtain the criminal history records on released prisoners. The prisoner records—obtained from the state departments of corrections through the Bureau of Justice Statistics' (BJS) National Corrections Reporting Program (NCRP)—also included each prisoner's sex, race, Hispanic origin, date of birth, confinement offenses, sentence length, type of prison release, and date of release. The 30 states whose departments of corrections submitted the NCRP data on prisoners released in 2005 included Alaska, Arkansas, California, Colorado, Florida, Georgia, Hawaii, Iowa, Louisiana, Maryland, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, and West Virginia (map 1).

Across the 30 states in 2005, a total of 412,731 prisoners were released and were eligible for this study (see appendix table 1). That number excludes 131,997 prisoners (for a total of 544,728) who were sentenced to less than one year, transferred to the custody of another authority, died in prison, were released on bond, were released to seek or participate in an appeal of a case, or escaped from prison or were absent without official leave. The first release during 2005 was used for those prisoners released multiple times during the year.

From the universe of persons released from prison in the 30 states in 2005 in this study, all males and females who were in prison for homicide were selected with certainty into the study. Analyses were done to determine the number of non-homicide prisoners that would be needed from each state's universe of released prisoners to yield a statistically sound estimate of that state's recidivism and desistance rates. As a result, states contributed different numbers of records to the final sample. To achieve the desired state-level samples, lists of all males and females imprisoned for a non-homicide offense were sorted separately by the county in which the sentence was imposed, race, Hispanic origin, age, and most serious

**MAP 1**
**States included in the BJS recidivism study of prisoners released in 2005**



Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

commitment offense. The within-state sampling rate for female prisoners was double that of males to improve the precision of female recidivism and desistance estimates. The combined number of persons in the 30 state samples totaled 70,878 individuals who were representative of all state prisoners released in those states during 2005. (This number dropped to 67,966 after accounting for those who died during the subsequent 9 years, lacked criminal history records, or had invalid release records.) Each prisoner in the sample was assigned a weight based on the probability of selection within the state.

## Collecting and processing criminal records for recidivism research

In 2008, BJS entered into a data-sharing agreement with the FBI's Criminal Justice Information Services Division and the International Justice and Public Safety Network (Nlets) to allow BJS access to criminal history records through the FBI's Interstate Identification Index (III). Additionally, a data security agreement was executed between BJS, the FBI, and Nlets to define the operational and technical practices used to protect the confidentiality and integrity of the criminal history data during data exchange, processing, and storage.

The FBI's III is an automated pointer system that allows authorized agencies to determine whether any state repository has criminal history records on an individual. Nlets is a computer-based network that is responsible for interstate transmissions of federal and state criminal history records. It allows authorized users to query III and send requests to states holding criminal history records on an individual. The FBI also

maintains criminal history records for which it has sole responsibility for disseminating, such as information on federal arrests. The identification bureaus that operate the central repositories in each state respond automatically to requests over the Nlets network with an individual's criminal history record. Put together, these requests represent the individual's national criminal history record.

Once BJS received approval from the FBI's Institutional Review Board to conduct this recidivism study on prisoners released in 2005, Nlets transmitted the state and FBI identification numbers on the sampled prisoners to the FBI's III system to collect the criminal history records on behalf of BJS. The criminal history records include information from the state of release and all other states in which the sampled prisoners had been arrested both prior to the release in 2005 and afterwards.

Nlets parsed the fields from individual criminal history records into a relational database consisting of state- and federal-specific numeric codes and text descriptions (e.g., criminal statutes and case outcome information) into a uniform record layout. NORC at the University of Chicago assisted BJS with standardizing the content of the relational database into a uniform coding structure to support national-level recidivism research.

BJS conducted a series of data-quality checks on the criminal history records to assess the accuracy and completeness of the information, including an examination of the response messages and the identification numbers that failed to match a record in III. To ensure that the correct records were received on the released prisoners using their fingerprint-based identification numbers, BJS compared other individual identifiers in the NCRP data to those reported in the criminal history records. For 98% of cases, a released prisoner's date of birth in the NCRP data exactly matched the prisoner's birthdate in the criminal history records. Nearly 100% (99.9%) of the NCRP and criminal history records matched prisoner sex, race, and Hispanic origin.

BJS reviewed the criminal history records for differences and inconsistencies in reporting practices and noticed some variations across states. During data processing and analysis, steps were taken to standardize the information and to minimize the impact these variations had on the overall recidivism and desistance estimates. For example, administrative (e.g., a criminal registration or the issuance of a warrant) and procedural (e.g., transferring a suspect to another jurisdiction) records embedded in the criminal history data that did not refer to an actual arrest were identified and removed. Traffic offenses (except for vehicular manslaughter, driving while intoxicated, and hit-and-run) were also excluded because the reporting of these events in the criminal history records varied widely by state.

### Deaths during the follow-up period

BJS documented that 2,173 of the 70,878 sampled prisoners died during the 9-year follow-up period, and BJS removed these cases from the recidivism and desistance analysis along with four additional cases that were determined to be invalid release records. The fingerprint-verified death notices obtained through the FBI's III system were used to identify some of the sampled prisoners who died within the 9 years following release in 2005. Additional deaths were identified through the Social Security Administration's (SSA) public Death Master File (DMF). While the public DMF provided a more complete source of death information than the FBI's III system, the public DMF provided death information only for the years 2005 to 2011. Therefore, the identification of those who died between 2012 and 2014 was limited to the FBI's III data, which included only fingerprint-verified deaths.

The number of released prisoners who were identified as dead between 2005 and 2011 in the public DMF is an undercount of the actual number of deaths within the sample. Due to state disclosure laws, the public DMF does not include information on certain protected state death records received via SSA's contracts with the states. Beginning in 2011, the SSA removed more than 4 million state-reported death records from the public DMF and began adding fewer records to the public DMF. As a result, the public DMF contains an undercount of annual deaths.

The extent to which the public DMF undercounts the annual number of deaths is not exactly known. Analyses of deaths in the public DMF compared to those reported by the Centers for Disease Control and Prevention's (CDC) mortality counts suggest that the public DMF undercounted the overall number of deaths in the United States by about 10% in 2005. The undercount increased during succeeding years, and as of 2010, the public DMF contained less than half (45%) of the deaths reported by the CDC. If the number of released prisoners who died during the follow-up

ARROYO001411

period and were removed from the recidivism and desistance analysis were adjusted to account for this undercount, the estimated cumulative recidivism rate would likely increase by about one percentage point.

## Missing criminal history records

Among the 68,701 sampled prisoners not identified as deceased during the follow-up period, BJS did not receive criminal history records on 735 prisoners, either because the state departments of correction were unable to provide their FBI or state identification number or because the prisoner had an identification number that did not link to a criminal history record either in the FBI or state record repositories. To account for the missing criminal history records and to ensure the recidivism and desistance statistics were representative of all 68,701 prisoners in the analysis, BJS developed weighting class adjustments to account for those prisoners without criminal history information to reduce nonresponse bias.

To create the statistical adjustments, the 68,701 sampled prisoners were stratified into groups by crossing the two categories of sex (male or female), five categories of age at release (24 or younger, 25 to 29, 30 to 34, 35 to 39, or 40 or older), four categories of race/Hispanic origin (non-Hispanic white, non-Hispanic black, Hispanic, or other race), and four categories of the most serious commitment offense (violent, property, drug, or public order). Within each of the subgroups, statistical weights were applied to the data of the 67,966 prisoners with criminal history information to allow their data to represent the 735 prisoners without criminal history information.

## Conducting tests of statistical significance

This study was based on a sample, not a complete enumeration, so the estimates are subject to sampling error. One measure of the sampling error associated with an estimate is the standard error. The standard error can vary from one estimate to the next. In general, an estimate with a smaller standard error provides a more reliable approximation of the true value than an estimate with a larger standard error. Estimates with relatively large standard errors should be interpreted with caution. BJS conducted tests to determine whether differences in the estimates were statistically significant once sampling error was taken into account.

All differences discussed in this report are statistically significant at the 95% confidence interval level. Standard errors were generated using Stata, a statistical software package that calculates sampling errors for data from complex sample surveys.

## Offense definitions

**Violent offenses** include homicide, rape or sexual assault, robbery, assault, and other miscellaneous or unspecified violent offenses.

**Property offenses** include burglary, fraud or forgery, larceny, motor vehicle theft, and other miscellaneous or unspecified property offenses.

**Drug offenses** include possession, trafficking, and other miscellaneous or unspecified drug offenses.

**Public order offenses** include violations of the peace or order of the community or threats to the public health or safety through unacceptable conduct, interference with a governmental authority, or the violation of civil rights or liberties. This category includes weapons offenses, driving under the influence, probation and parole violation, obstruction of justice, commercialized vice, disorderly conduct, and other miscellaneous or unspecified offenses.

## Arrests for probation and parole violations

In this report, arrests for probation and parole violations were included as public order offenses. Excluding arrests for probation and parole violations from the analysis would have had only a small impact on the recidivism rates. Excluding probation and parole violations from the annual arrest percentages, 39.5% of prisoners released in 30 states in 2005 were arrested in year-1, 34.3% were arrested in year-2, 31.5% in year-3, 29.7% in year-4, 28.2% in year-5, 25.9% in year-6, 25.9% in year-7, 24.6% in year-8, and 23.0% in year-9. Overall, excluding probation and parole violations, 82.4% of prisoners released in 30 states in 2005 were arrested within 9 years. In other words, 99% of prisoners who were arrested during the 9-year follow-up period were arrested for an offense other than a probation or parole violation.

ARROYO001412

**APPENDIX TABLE 1**
**Number of prisoners released in 30 states in 2005**

| State | Number of released prisoners[a] | Number of sample cases | Released prisoners included in the study[b] | | Criminal history record collected | |
|---|---|---|---|---|---|---|
| | | | Weighted total | Sample size | Number | Percent |
| All released prisoners | 412,731 | 70,878 | 401,288 | 68,701 | 67,966 | 98.9% |
| Alaska | 1,827 | 1,158 | 1,707 | 1,082 | 1,062 | 98.2 |
| Arkansas | 10,844 | 2,785 | 10,426 | 2,675 | 2,618 | 97.9 |
| California | 107,633 | 4,604 | 105,392 | 4,511 | 4,510 | 100 |
| Colorado | 8,277 | 2,351 | 7,942 | 2,254 | 2,247 | 99.7 |
| Florida | 31,537 | 3,350 | 30,636 | 3,253 | 3,240 | 99.6 |
| Georgia | 12,321 | 2,763 | 12,011 | 2,687 | 2,592 | 96.5 |
| Hawaii | 1,041 | 793 | 1,016 | 774 | 767 | 99.1 |
| Iowa | 4,607 | 1,897 | 4,406 | 1,816 | 1,810 | 99.7 |
| Louisiana | 12,876 | 2,806 | 12,422 | 2,712 | 2,697 | 99.4 |
| Maryland | 10,200 | 2,597 | 9,769 | 2,488 | 2,468 | 99.2 |
| Michigan | 12,177 | 2,603 | 11,633 | 2,490 | 2,471 | 99.2 |
| Minnesota | 4,619 | 1,897 | 4,570 | 1,877 | 1,873 | 99.8 |
| Missouri | 15,997 | 2,919 | 15,404 | 2,810 | 2,805 | 99.8 |
| Nebraska | 1,386 | 966 | 1,364 | 951 | 951 | 100 |
| Nevada | 5,022 | 1,973 | 4,930 | 1,935 | 1,787 | 92.4 |
| New Jersey | 13,097 | 2,697 | 12,964 | 2,666 | 2,622 | 98.3 |
| New York | 23,963 | 3,532 | 23,226 | 3,433 | 3,433 | 100 |
| North Carolina | 11,743 | 2,748 | 11,229 | 2,626 | 2,616 | 99.6 |
| North Dakota | 884 | 686 | 865 | 671 | 663 | 98.8 |
| Ohio | 15,832 | 3,070 | 15,555 | 3,015 | 2,927 | 97.1 |
| Oklahoma | 7,768 | 2,345 | 7,424 | 2,240 | 2,169 | 96.8 |
| Oregon | 4,731 | 1,955 | 4,595 | 1,900 | 1,898 | 99.9 |
| Pennsylvania | 12,452 | 2,840 | 11,884 | 2,712 | 2,685 | 99.0 |
| South Carolina | 10,046 | 2,537 | 9,971 | 2,516 | 2,500 | 99.4 |
| South Dakota | 2,159 | 1,285 | 2,142 | 1,275 | 1,268 | 99.5 |
| Texas | 43,532 | 3,779 | 42,770 | 3,713 | 3,713 | 100 |
| Utah | 3,000 | 1,569 | 2,951 | 1,543 | 1,534 | 99.4 |
| Virginia | 12,776 | 2,719 | 12,148 | 2,585 | 2,574 | 99.6 |
| Washington | 8,439 | 2,443 | 8,093 | 2,343 | 2,341 | 99.9 |
| West Virginia | 1,945 | 1,211 | 1,842 | 1,148 | 1,125 | 98.0 |

[a]Excludes released prisoners whose sentence was less than one year; releases to custody, detainer, or warrant; releases due to death; escapes or absent without leave; transfers; administrative releases; and releases on appeal. The first release was selected for persons released multiple times during 2005.
[b]Excludes 2,173 sampled prisoners (when weighted representing 11,443 individuals) who died during the follow-up period and four cases determined to be invalid release records.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

ARROYO001413 **18**

## APPENDIX TABLE 2
**Standard errors for table 1: Characteristics of prisoners released in 30 states in 2005**

| Characteristic | Standard error |
|---|---|
| **Sex** | |
| Male | 0.003% |
| Female | 0.003 |
| **Race/Hispanic origin** | |
| White | 0.28% |
| Black/African American | 0.27 |
| Hispanic/Latino | 0.27 |
| Other | 0.09 |
| American Indian or Alaska Native | 0.05 |
| Asian, Native Hawaiian, or Other Pacific Islander | 0.06 |
| **Age at release** | |
| 24 or younger | 0.22% |
| 25–29 | 0.24 |
| 30–34 | 0.22 |
| 35–39 | 0.22 |
| 40 or older | 0.28 |
| **Most serious commitment offense** | |
| Violent | 0.26% |
| Property | 0.28 |
| Drug | 0.28 |
| Public order | 0.18 |

Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

## APPENDIX TABLE 4
**Standard errors for figure 3: Percent of prisoners released in 30 states in 2005 who were arrested after release, by year after release**

| Year of first arrest | Estimate | Standard error |
|---|---|---|
| 1 | 43.9% | 0.29% |
| 2 | 16.2 | 0.21 |
| 3 | 8.3 | 0.15 |
| 4 | 5.1 | 0.11 |
| 5 | 3.5 | 0.09 |
| 6 | 2.3 | 0.07 |
| 7 | 1.7 | 0.06 |
| 8 | 1.3 | 0.05 |
| 9 | 1.0 | 0.05 |

Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

## APPENDIX TABLE 3
**Standard errors for table 2, figure 2, and figure 4: Cumulative percent of prisoners released in 30 states in 2005 who were arrested within or outside the state of release, by year after release**

| Year after release | Within or outside the state of release | | Outside the state of release | |
| | Percent arrested | Percent not arrested | Percent arrested | Percent not arrested |
|---|---|---|---|---|
| 1 | 0.29% | 0.29% | 0.09% | 0.11% |
| 2 | 0.27 | 0.21 | 0.11 | 0.09 |
| 3 | 0.25 | 0.15 | 0.13 | 0.09 |
| 4 | 0.23 | 0.11 | 0.15 | 0.08 |
| 5 | 0.22 | 0.09 | 0.16 | 0.08 |
| 6 | 0.21 | 0.07 | 0.17 | 0.08 |
| 7 | 0.21 | 0.06 | 0.18 | 0.07 |
| 8 | 0.20 | 0.05 | 0.19 | 0.07 |
| 9 | 0.20 | 0.05 | 0.19 | 0.07 |

Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

## APPENDIX TABLE 5
**Standard errors for table 3, figure 5, and figure 6: Percent of prisoners released in 30 states in 2005 who were arrested after release, by prisoner characteristics and year of first arrest**

| Characteristic | Total arrested within 9 years | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| All released prisoners | 0.20% | 0.29% | 0.21% | 0.15% | 0.11% | 0.09% | 0.07% | 0.06% | 0.05% | 0.05% |
| **Sex** | | | | | | | | | | |
| Male | 0.22% | 0.32% | 0.23% | 0.16% | 0.12% | 0.10% | 0.08% | 0.07% | 0.06% | 0.05% |
| Female | 0.39 | 0.49 | 0.37 | 0.26 | 0.22 | 0.19 | 0.14 | 0.13 | 0.11 | 0.12 |
| **Age at release** | | | | | | | | | | |
| 24 or younger | 0.36% | 0.68% | 0.50% | 0.32% | 0.26% | 0.23% | 0.14% | 0.15% | 0.10% | 0.07% |
| 25–39 | 0.27 | 0.41 | 0.30 | 0.22 | 0.16 | 0.13 | 0.10 | 0.08 | 0.08 | 0.06 |
| 25–29 | 0.40 | 0.68 | 0.48 | 0.36 | 0.26 | 0.20 | 0.16 | 0.12 | 0.14 | 0.10 |
| 30–34 | 0.52 | 0.76 | 0.53 | 0.35 | 0.30 | 0.23 | 0.19 | 0.15 | 0.18 | 0.12 |
| 35–39 | 0.51 | 0.77 | 0.54 | 0.41 | 0.28 | 0.24 | 0.17 | 0.15 | 0.12 | 0.11 |
| 40 or older | 0.42 | 0.54 | 0.38 | 0.27 | 0.21 | 0.18 | 0.15 | 0.11 | 0.09 | 0.12 |
| **Race/Hispanic origin** | | | | | | | | | | |
| White | 0.31% | 0.44% | 0.31% | 0.23% | 0.17% | 0.14% | 0.10% | 0.11% | 0.08% | 0.08% |
| Black/African American | 0.25 | 0.42 | 0.31 | 0.21 | 0.18 | 0.14 | 0.11 | 0.09 | 0.07 | 0.07 |
| Hispanic/Latino | 0.67 | 0.93 | 0.64 | 0.45 | 0.33 | 0.29 | 0.24 | 0.12 | 0.19 | 0.14 |
| Other | 1.37 | 1.98 | 1.55 | 1.00 | 0.55 | 0.48 | 0.16 | 0.33 | 0.20 | 0.20 |
| American Indian or Alaska Native | 1.49 | 2.21 | 1.65 | 0.79 | 0.46 | 0.41 | 0.22 | 0.41 | 0.26 | 0.28 |
| Asian, Native Hawaiian, or Other Pacific Islander | 2.58 | 3.77 | 2.99 | 2.09 | 0.70 | 0.22 | 0.34 | 0.54 | 0.33 | 0.39 |

Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

## APPENDIX TABLE 6
**Standard errors for table 4: Post-release arrests of prisoners released in 30 states in 2005, by year after arrest**

| Year after arrest | Number of arrests during year/period | Percent of arrests during year/period | Cumulative number of all arrests since release | Cumulative percent of all arrests since release |
|---|---|---|---|---|
| Total | 15,295 | ~ | ~ | ~ |
| Years 1–3 | 6,173 | 0.22% | ~ | ~ |
| 1 | 2,941 | 0.13 | 2,941 | 0.13 |
| 2 | 2,910 | 0.13 | 4,675 | 0.19 |
| 3 | 2,819 | 0.12 | 6,173 | 0.22 |
| Years 4–6 | 6,223 | 0.19% | ~ | ~ |
| 4 | 2,838 | 0.11 | 7,704 | 0.24 |
| 5 | 3,009 | 0.12 | 9,317 | 0.24 |
| 6 | 2,613 | 0.11 | 10,530 | 0.23 |
| Years 7–9 | 7,295 | 0.23% | ~ | ~ |
| 7 | 2,982 | 0.12 | 12,006 | 0.20 |
| 8 | 3,212 | 0.13 | 13,570 | 0.14 |
| 9 | 3,333 | 0.14 | 15,295 | ~ |

~Not applicable.
Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

ARROYO001415

## APPENDIX TABLE 7
**Standard errors for table 5, figure 1, figure 7, and figure 8: Annual arrest percentage of prisoners released in 30 states in 2005, by prisoner characteristics**

| Characteristic | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
|---|---|---|---|---|---|---|---|---|---|
| All released prisoners | 0.29% | 0.29% | 0.29% | 0.29% | 0.28% | 0.28% | 0.28% | 0.27% | 0.27% |
| **Sex** | | | | | | | | | |
| Male | 0.32% | 0.32% | 0.32% | 0.32% | 0.31% | 0.31% | 0.31% | 0.30% | 0.30% |
| Female | 0.49 | 0.50 | 0.49 | 0.48 | 0.47 | 0.46 | 0.45 | 0.44 | 0.44 |
| **Age at release** | | | | | | | | | |
| 24 or younger | 0.68% | 0.69% | 0.68% | 0.67% | 0.68% | 0.66% | 0.67% | 0.65% | 0.64% |
| 25–39 | 0.41 | 0.42 | 0.41 | 0.41 | 0.40 | 0.40 | 0.40 | 0.39 | 0.39 |
| 25–29 | 0.68 | 0.68 | 0.68 | 0.67 | 0.65 | 0.65 | 0.65 | 0.64 | 0.63 |
| 30–34 | 0.76 | 0.75 | 0.73 | 0.73 | 0.72 | 0.71 | 0.70 | 0.70 | 0.67 |
| 35–39 | 0.77 | 0.76 | 0.76 | 0.75 | 0.74 | 0.73 | 0.74 | 0.71 | 0.72 |
| 40 or older | 0.54 | 0.53 | 0.52 | 0.52 | 0.51 | 0.49 | 0.48 | 0.47 | 0.47 |
| **Race/Hispanic origin** | | | | | | | | | |
| White | 0.44% | 0.44% | 0.43% | 0.43% | 0.42% | 0.41% | 0.41% | 0.40% | 0.40% |
| Black/African American | 0.42 | 0.43 | 0.42 | 0.42 | 0.41 | 0.40 | 0.41 | 0.40 | 0.39 |
| Hispanic/Latino | 0.93 | 0.92 | 0.91 | 0.90 | 0.88 | 0.86 | 0.85 | 0.83 | 0.83 |
| Other | 1.98 | 1.99 | 1.94 | 1.87 | 1.83 | 1.90 | 1.86 | 1.90 | 1.70 |
| American Indian or Alaska Native | 2.21 | 2.22 | 2.22 | 2.01 | 2.06 | 2.18 | 2.21 | 2.13 | 1.83 |
| Asian, Native Hawaiian, or Other Pacific Islander | 3.77 | 3.86 | 3.50 | 3.64 | 3.49 | 3.58 | 3.50 | 3.66 | 3.14 |

Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

## APPENDIX TABLE 8
**Standard errors for table 6, figure 9, and figure 10: Annual arrest percentage of prisoners released in 30 states in 2005, by most serious commitment offense and type of post-release offense**

| Most serious commitment offense | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
|---|---|---|---|---|---|---|---|---|---|
| **Any arrest after release** | | | | | | | | | |
| All released prisoners | 0.29% | 0.29% | 0.29% | 0.29% | 0.28% | 0.28% | 0.28% | 0.27% | 0.27% |
| Violent | 0.60 | 0.59 | 0.58 | 0.56 | 0.56 | 0.54 | 0.55 | 0.55 | 0.53 |
| Property | 0.55 | 0.56 | 0.56 | 0.56 | 0.55 | 0.54 | 0.54 | 0.53 | 0.52 |
| Drug | 0.53 | 0.53 | 0.53 | 0.51 | 0.51 | 0.49 | 0.49 | 0.48 | 0.47 |
| Public order | 0.78 | 0.77 | 0.74 | 0.73 | 0.73 | 0.72 | 0.71 | 0.69 | 0.69 |
| **Violent arrest after release** | | | | | | | | | |
| All released prisoners | 0.18% | 0.17% | 0.17% | 0.17% | 0.16% | 0.15% | 0.16% | 0.15% | 0.14% |
| Violent | 0.39 | 0.37 | 0.34 | 0.36 | 0.37 | 0.30 | 0.31 | 0.31 | 0.29 |
| Property | 0.34 | 0.29 | 0.30 | 0.32 | 0.30 | 0.31 | 0.32 | 0.28 | 0.28 |
| Drug | 0.27 | 0.29 | 0.28 | 0.27 | 0.27 | 0.23 | 0.25 | 0.25 | 0.22 |
| Public order | 0.49 | 0.45 | 0.44 | 0.46 | 0.43 | 0.42 | 0.40 | 0.40 | 0.36 |
| **Arrest after release for same type as most serious commitment offense** | | | | | | | | | |
| All released prisoners | 0.26% | 0.24% | 0.23% | 0.22% | 0.22% | 0.21% | 0.20% | 0.20% | 0.20% |
| Violent | 0.39 | 0.37 | 0.34 | 0.36 | 0.37 | 0.30 | 0.31 | 0.31 | 0.29 |
| Property | 0.51 | 0.45 | 0.43 | 0.44 | 0.42 | 0.40 | 0.39 | 0.40 | 0.39 |
| Drug | 0.48 | 0.45 | 0.43 | 0.41 | 0.39 | 0.38 | 0.36 | 0.36 | 0.37 |
| Public order | 0.77 | 0.73 | 0.70 | 0.67 | 0.66 | 0.66 | 0.63 | 0.63 | 0.60 |
| **Arrested after release for different type of offense than most serious commitment offense** | | | | | | | | | |
| All released prisoners | 0.29% | 0.29% | 0.28% | 0.28% | 0.27% | 0.27% | 0.27% | 0.26% | 0.26% |
| Violent | 0.60 | 0.58 | 0.57 | 0.55 | 0.54 | 0.53 | 0.54 | 0.54 | 0.52 |
| Property | 0.56 | 0.55 | 0.55 | 0.55 | 0.53 | 0.52 | 0.52 | 0.51 | 0.51 |
| Drug | 0.53 | 0.52 | 0.51 | 0.50 | 0.49 | 0.47 | 0.47 | 0.45 | 0.44 |
| Public order | 0.72 | 0.67 | 0.64 | 0.64 | 0.65 | 0.62 | 0.63 | 0.61 | 0.62 |

Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

**APPENDIX TABLE 9**

**Standard errors for table 7: Cumulative percent of prisoners released in 30 states in 2005 who were arrested following release, by most serious commitment offense and type of post-release arrest offense**

| Most serious commitment offense | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
|---|---|---|---|---|---|---|---|---|---|
| Any arrest after release | | | | | | | | | |
| All released prisoners | 0.29% | 0.27% | 0.25% | 0.23% | 0.22% | 0.21% | 0.21% | 0.20% | 0.20% |
| Violent | 0.60 | 0.57 | 0.54 | 0.52 | 0.49 | 0.47 | 0.46 | 0.45 | 0.45 |
| Property | 0.55 | 0.49 | 0.44 | 0.40 | 0.38 | 0.36 | 0.35 | 0.34 | 0.33 |
| Drug | 0.53 | 0.49 | 0.45 | 0.42 | 0.40 | 0.38 | 0.37 | 0.36 | 0.35 |
| Public order | 0.78 | 0.75 | 0.70 | 0.66 | 0.63 | 0.61 | 0.58 | 0.57 | 0.56 |
| Violent arrest after release | | | | | | | | | |
| All released prisoners | 0.18% | 0.22% | 0.25% | 0.27% | 0.28% | 0.28% | 0.29% | 0.29% | 0.29% |
| Violent | 0.39 | 0.49 | 0.53 | 0.56 | 0.58 | 0.59 | 0.59 | 0.59 | 0.59 |
| Property | 0.34 | 0.41 | 0.46 | 0.49 | 0.52 | 0.53 | 0.55 | 0.55 | 0.56 |
| Drug | 0.27 | 0.36 | 0.42 | 0.45 | 0.47 | 0.48 | 0.49 | 0.50 | 0.51 |
| Public order | 0.49 | 0.60 | 0.66 | 0.71 | 0.73 | 0.74 | 0.75 | 0.76 | 0.76 |
| Arrest after release for same type as most serious commitment offense | | | | | | | | | |
| All released prisoners | 0.26% | 0.29% | 0.30% | 0.30% | 0.30% | 0.30% | 0.29% | 0.29% | 0.29% |
| Violent | 0.39 | 0.49 | 0.53 | 0.56 | 0.58 | 0.59 | 0.59 | 0.59 | 0.59 |
| Property | 0.50 | 0.55 | 0.56 | 0.56 | 0.56 | 0.55 | 0.55 | 0.54 | 0.54 |
| Drug | 0.48 | 0.52 | 0.53 | 0.53 | 0.53 | 0.52 | 0.52 | 0.51 | 0.51 |
| Public order | 0.77 | 0.78 | 0.76 | 0.74 | 0.72 | 0.70 | 0.68 | 0.67 | 0.65 |
| Arrested after release for different type of offense than most serious commitment offense | | | | | | | | | |
| All released prisoners | 0.29% | 0.28% | 0.26% | 0.25% | 0.25% | 0.24% | 0.23% | 0.23% | 0.22% |
| Violent | 0.60 | 0.59 | 0.56 | 0.54 | 0.52 | 0.50 | 0.49 | 0.48 | 0.47 |
| Property | 0.56 | 0.52 | 0.48 | 0.45 | 0.43 | 0.41 | 0.40 | 0.39 | 0.38 |
| Drug | 0.53 | 0.52 | 0.49 | 0.46 | 0.45 | 0.43 | 0.42 | 0.41 | 0.41 |
| Public order | 0.72 | 0.77 | 0.77 | 0.76 | 0.75 | 0.74 | 0.72 | 0.71 | 0.70 |

Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

**APPENDIX TABLE 10**

**Standard errors for table 8: Annual arrest percentage of prisoners released in 30 states in 2005, by whether arrested within or outside the state of release**

| | All released prisoners | | Among released prisoners arrested during the year, percent arrested outside of state of release |
|---|---|---|---|
| Year after release | Outside state of release | Within or outside state of release | |
| 1 | 0.09% | 0.29% | 0.20% |
| 2 | 0.09 | 0.29 | 0.23 |
| 3 | 0.09 | 0.29 | 0.27 |
| 4 | 0.09 | 0.29 | 0.29 |
| 5 | 0.09 | 0.28 | 0.31 |
| 6 | 0.10 | 0.28 | 0.33 |
| 7 | 0.10 | 0.28 | 0.35 |
| 8 | 0.09 | 0.27 | 0.36 |
| 9 | 0.10 | 0.27 | 0.40 |
| Arrested anytime in follow-up period | 0.19% | 0.20% | ~ |

~Not applicable.

Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

ARROYO001417

**APPENDIX TABLE 11**

**Estimates and standard errors for figure 11: Percent of prisoners released in 30 states in 2005 who were arrested after release, by year of arrest and whether arrested during subsequent years**

| Year after release | Total | | Arrested again during a subsequent year | | Not arrested during a subsequent year | |
|---|---|---|---|---|---|---|
| | Estimate | Standard error | Estimate | Standard error | Estimate | Standard error |
| 1 | 43.9% | 0.29% | 38.9% | 0.29% | 4.9% | 0.14% |
| 2 | 37.7 | 0.29 | 33.0 | 0.29 | 4.7 | 0.12 |
| 3 | 34.3 | 0.29 | 29.1 | 0.28 | 5.2 | 0.13 |
| 4 | 31.9 | 0.29 | 26.0 | 0.28 | 5.9 | 0.14 |
| 5 | 30.1 | 0.28 | 23.2 | 0.27 | 6.9 | 0.15 |
| 6 | 28.0 | 0.28 | 20.1 | 0.26 | 7.8 | 0.16 |
| 7 | 27.4 | 0.28 | 17.2 | 0.25 | 10.2 | 0.18 |
| 8 | 25.9 | 0.27 | 12.2 | 0.22 | 13.7 | 0.20 |

Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.

**APPENDIX TABLE 12**

**Estimates and standard errors for figure 12: Prisoners released in 30 states in 2005 who were not arrested in the remainder of the follow-up period, by year after release**

| Year after release | Number | | Percent | |
|---|---|---|---|---|
| | Estimate | Standard error | Estimate | Standard error |
| 1 | 86,000 | 927 | 21.5% | 0.23% |
| 2 | 105,000 | 1,000 | 26.2 | 0.25 |
| 3 | 126,000 | 1,069 | 31.4 | 0.27 |
| 4 | 150,000 | 1,129 | 37.3 | 0.28 |
| 5 | 178,000 | 1,173 | 44.3 | 0.29 |
| 6 | 209,000 | 1,193 | 52.1 | 0.30 |

Source: Bureau of Justice Statistics, Recidivism of State Prisoners Released in 2005 data collection, 2005–2014.



The Bureau of Justice Statistics of the U.S. Department of Justice is the principal federal agency responsible for measuring crime, criminal victimization, criminal offenders, victims of crime, correlates of crime, and the operation of criminal and civil justice systems at the federal, state, tribal, and local levels. BJS collects, analyzes, and disseminates reliable and valid statistics on crime and justice systems in the United States, supports improvements to state and local criminal justice information systems, and participates with national and international organizations to develop and recommend national standards for justice statistics. Jeffrey H. Anderson is director.

This report was written by Mariel Alper, Joshua Markman, and Matthew R. Durose. Stephanie Mueller and Matthew R. Durose verified the report.

Brigitte Coulton and Jill Thomas edited the report. Steven Grudziecki produced the report.

May 2018, NCJ 250975





NCJ250975

**Office of Justice Programs**
**Building Solutions • Supporting Communities • Advancing Justice**
**www.ojp.usdoj.gov**

ARROYO001419

# EXHIBIT K

# HOUSING SPOTLIGHT

National Low Income Housing Coalition

Volume 2, Issue 2  |  November 2012

# WHO LIVES *in* FEDERALLY ASSISTED HOUSING?

## *Characteristics of Households Assisted by HUD programs*

Approximately 4.8 million households in the United States receive housing assistance through programs of the U.S. Department of Housing and Urban Development (HUD). Up-to-date data about who these tenants are have been hard to come by for many years, helping to fuel misconceptions and misinformation about who lives in federally assisted low income housing.

Fortunately, HUD has made available a new household-level Public Use Microdata Sample (PUMS) that provides an in-depth look at the characteristics of tenants participating in major federally assisted housing programs. The new dataset complements HUD's periodic report, *A Picture of Subsidized Households*, which was last published in 2009. *Picture* provides the same type of data reported here, aggregated to either the property level or to a certain geographic level. The new PUMS data offer a closer look at households that received federal housing assistance in 2009, based on a 5% randomly selected sample of all households participating in the Housing Choice Voucher, public housing, Project-Based Section 8, Section 202 and Section 811 programs (See program definitions on page 4).

Approximately 4% of all households in the United States and 12% of all U.S. renter households receive federal housing assistance. About 1.1 million households live in public housing, and 2.1 million households utilize housing vouchers. An additional 1.3 million households live in apartments subsidized through the Project-Based Section 8 program, and 140,000 households live in units subsidized through the Section 202 and Section 811 programs, programs that serve people who are elderly and people with disabilities, respectively.

Unfortunately, the number of low income households who receive housing assistance from these HUD programs is far fewer than those who need it and are eligible for it. Only 1 in 4 households eligible for assistance are actually assisted.[1] As of 2010, there were 9.8 million extremely low income[2] (ELI) renter households in the United States, and 7.4 million of these households faced a severe housing cost burden, spending at least half of their income on the costs of rent and utilities alone.[3]

In this issue of *Housing Spotlight*, NLIHC provides an overview of tenant demographic characteristics, covering race, gender, income and family type. In addition, we look at the poverty level of the neighborhoods where tenants reside. Our findings affirm that housing assistance goes to those who need it the most: extremely low income households, many of which include seniors, children and people with disabilities.

The vast majority of households living in subsidized housing earn less than $20,000 a year. This ranges from 86% of those who live in public housing to 96% and 98% of those receiving assistance from the Section 202 and Section 811 programs. Close to two-thirds (63%) of households living in Project-Based Section 8 units and 51% of those in public housing are composed of people who are elderly or have at least one member who has a disability.

> Our findings affirm that **housing assistance goes to those who need it the most: EXTREMELY LOW INCOME HOUSEHOLDS,** many of which include **SENIORS, CHILDREN and PEOPLE WITH DISABILITIES.**

[1] Steffan, B. et al. (2011). *Worst case housing needs 2009: report to congress*. Washington, D.C.: HUD.
[2] Extremely low income households are those with incomes at or below 30% of the area median income.
[3] National Low Income Housing Coalition tabulations of 2010 American Community Survey Public Use Microdata Sample (PUMS) Housing and Population files.

ARROYO001424

## HOUSEHOLD TYPE

Elderly households (those including a household head or spouse who is at least 62) are a large part of the tenant population across all programs. Nearly a third (30%) of public housing residents are elderly, as are nearly half (46%) of residents in Project-Based Section 8 housing. Households including a member with disabilities are also a sizeable group, composing one-fifth (21%) of those living in public housing, and over a quarter (28%) of voucher recipients (See Table 1). Both of these household types are very likely to be living on a fixed income such as Supplemental Security Income or Social Security and thus will need housing assistance for most of the rest of their lives.

A little more than a third (35%) of public housing households include children under the age of 18, and 43% of households with vouchers have children (See Table 1).

| _table 1_ HOUSEHOLD TYPE BY HOUSING PROGRAM | | | | |
|---|---|---|---|---|
| | Household with disability* | Elderly* | Non-elderly, non-disabled, with children | Non-elderly, non-disabled, without children |
| Project-Based Section 8 | 17% | 46% | 28% | 9% |
| Public Housing | 21% | 30% | 35% | 13% |
| Section 202 | 1% | 99% | 0% | 0% |
| Section 811 | 84% | 15% | 0% | 1% |
| Vouchers | 28% | 19% | 43% | 10% |

*Elderly households and household with at least one member with a disability include some households with children.
Source: NLIHC tabulations of Public Use Microdata Sample. www.huduser.org/portal/pumd/index.html.

## INCOME

On the whole, assisted housing tenants are among the lowest income people in the U.S. Almost all (93%) tenants living in Project-Based Section 8 units have incomes less than $20,000 a year, and 87% of households with vouchers also have incomes of less than $20,000. Public housing is no different, with 86% having incomes under $20,000. This pattern does not vary widely by race; most households have extremely low incomes across racial groups. These data confirm that these housing programs are serving households who are most in need of affordable housing (See Table 2).

| _table 2_ HOUSEHOLDS WITH INCOMES BELOW $20,000 BY HOUSING PROGRAM AND RACE* | | | | | |
|---|---|---|---|---|---|
| | Black | Hispanic | White | Other | All |
| Project-Based Section 8 | 93% | 90% | 95% | 94% | 93% |
| Public Housing | 85% | 84% | 91% | 86% | 86% |
| Section 202 | 95% | 98% | 97% | 98% | 96% |
| Section 811 | 98% | 100% | 98% | 100% | 98% |
| Vouchers | 84% | 85% | 92% | 85% | 87% |

*These calculations exclude households for which data on race are not available.
Source: NLIHC tabulations of Public Use Microdata Sample. www.huduser.org/portal/pumd/index.html.

## GENDER

Across all housing assistance programs, female-headed households are disproportionately common. Female-headed households include any household where the primary applicant for housing assistance was female.

As shown in Chart 1, three-quarters of households living in public housing and in Project-Based Section 8 housing are female-headed, and over 83% of voucher-holding households are headed by women. A large proportion (72%) of Section 202 housing units are also home to female-headed households.



_chart 1_ PERCENTAGE OF FEMALE-HEADED HOUSEHOLDS BY HOUSING PROGRAM

| | |
|---|---|
| Project-Based Section 8 | 75% |
| Public Housing | 75% |
| Section 202 | 72% |
| Section 811 | 47% |
| Vouchers | 83% |

Source: NLIHC tabulations of Public Use Microdata Sample. www.huduser.org/portal/pumd/index.html.

ARROYO001425

## RACE[4]

According to the 2010 American Community Survey (ACS), non-Hispanic whites make up 71% of all households in the U.S., 56% of renters and 47% of ELI renter households. While black households compose 12% of all households, and 19% of renters, they are overrepresented among ELI renter households (26%). Hispanics compose another 12% of all households, 18% of renters and 19% of ELI renters.

The distribution of residents living in Project-Based Section 8 housing units is similar to the racial composition of ELI renters. About half (49%) of Project-Based Section 8 residents are white, about a third (33%) are black and 13% are Hispanic (See Chart 2).

Across all public housing, about 45% of residents are black while another third (32%) are white and a little over 20% are Hispanic. The residents utilizing housing vouchers resemble those of public housing, with a slightly higher proportion (35%) of white tenants and a slightly lower proportion (16%) of Hispanic tenants. Black households are 45% of voucher holders (See Chart 2).

## POVERTY RATES BY CENSUS TRACT

Public housing tenants tend to be clustered in census tracts with high poverty rates, and black and Hispanic residents of public housing are the most likely to live in census tracts with poverty rates over 40%. Chart 3 shows that black and Hispanic public housing residents are four times more likely than white public housing residents to live in high poverty neighborhoods, and black and Hispanic voucher recipients are about three times as likely as their white counterparts to live in high poverty neighborhoods. Census tracts with a poverty rate of 40% or more fell into the highest poverty concentration category within the dataset. The 40% threshold is commonly used as a measure of extremely high poverty.[5]

[4]All 2010 American Community Survey data in this section are from National Low Income Housing Coalition tabulations of Public Use Microdata Sample (PUMS) Housing and Population files.
[5]Kneebone, E., et al. (November 2011). *The re-emergence of concentrated poverty*. Washington, D.C.: Brookings Institution.



chart 2 | HOUSEHOLDS BY RACE, ACROSS HOUSING PROGRAMS*

*These calculations exclude households for which data on race are not available.
Source: NLIHC tabulations of Public Use Microdata Sample. www.huduser.org/portal/pumd/index.html.



chart 3 | HOUSEHOLDS LIVING IN HIGH POVERTY NEIGHBORHOODS (40% +) BY RACE, ACROSS HOUSING PROGRAMS*

*These calculations exclude households for which data on race are not available.
Source: NLIHC tabulations of Public Use Microdata Sample. www.huduser.org/portal/pumd/index.html.

ARROYO001426

Voucher recipients are not as likely as public housing residents to live in census tracts with the highest poverty rates, although this pattern varies by race. As indicated in Table 3, a substantial proportion (28%) of white voucher recipients live in the lowest poverty neighborhoods (with poverty rates of 0-9%), while just 16% of black and 14% of Hispanic residents live in similarly low poverty communities. Both black and Hispanic voucher recipients are less likely than their counterparts in public housing to live in the highest poverty census tracts.

| table 3 | CENSUS TRACT POVERTY RATES BY HOUSING PROGRAM AND RACE* | | | | |
|---|---|---|---|---|---|
| Census Tract Poverty Rates*: | 0 - 9% | 10 - 19% | 20 - 29% | 30 - 39% | 40% + |
| **Project-Based Section 8** | | | | | |
| Black | 6% | 18% | 25% | 22% | 29% |
| Hispanic | 8% | 25% | 25% | 21% | 21% |
| White | 25% | 37% | 22% | 10% | 7% |
| Other | 21% | 28% | 27% | 12% | 12% |
| **Public Housing** | | | | | |
| Black | 4% | 13% | 21% | 21% | 41% |
| Hispanic | 4% | 13% | 20% | 24% | 40% |
| White | 15% | 36% | 27% | 13% | 10% |
| Other | 11% | 20% | 23% | 21% | 25% |
| **Section 202** | | | | | |
| Black | 10% | 23% | 30% | 19% | 18% |
| Hispanic | 16% | 27% | 26% | 17% | 13% |
| White | 37% | 37% | 19% | 5% | 2% |
| Other | 22% | 39% | 26% | 6% | 7% |
| **Section 811** | | | | | |
| Black | 14% | 25% | 26% | 20% | 15% |
| Hispanic | 28% | 33% | 5% | 13% | 21% |
| White | 35% | 31% | 21% | 9% | 4% |
| Other | 59% | 27% | 15% | 0% | 0% |
| **Vouchers** | | | | | |
| Black | 16% | 29% | 27% | 17% | 12% |
| Hispanic | 14% | 31% | 26% | 17% | 11% |
| White | 28% | 40% | 21% | 7% | 4% |
| Other | 25% | 41% | 23% | 8% | 3% |

*These calculations exclude households for which census tract poverty rate data and data on race were not available.
Source: NLIHC tabulations of Public Use Microdata Sample. www.huduser.org/portal/pumd/index.html.

## PROGRAM DEFINITIONS

### PROJECT-BASED SECTION 8

*This housing is subsidized through long-term contacts between HUD and private property owners. The owner agrees to provide housing to eligible tenants in exchange for a long-term subsidy from HUD. Project-based assistance limits tenant contributions to 30% of a household's income. Assistance is attached to the unit, and stays with the housing when the tenant moves.*

### PUBLIC HOUSING

*Public housing is housing that is owned and operated by local public housing agencies. HUD provides federal funds to local housing agencies that manage the properties and rent units to eligible low income households. Rents are restricted to 30% of a household's income.*

### SECTION 202

*This HUD program provides government loans or grants to nonprofits to develop housing for low income people who are elderly. The program provides both capital grants and rental assistance contracts.*

### SECTION 811

*This HUD program provides funding to nonprofits to develop housing with supportive services for very low income adults with disabilities. The program provides rent subsidies to the projects, making them affordable.*

### VOUCHERS

*Administered by state and local housing authorities, Housing Choice Vouchers are allocated to households and provide a rental subsidy, limiting the tenant's contribution to 30% of their income. Vouchers help low income households find affordable housing in the private housing market by reimbursing the landlord for the difference between the household's portion of the rent and the fair market rent for that area as determined by HUD.*

ARROYO001427

## CONCLUSION

HUD's new publicly accessible database helps residents, researchers and advocates understand the characteristics of the households that rely on federal housing assistance programs. The data reveal that households served by housing assistance programs are extremely low income; many are elderly or contain members with a disability, and many are led by women and include children. These demographic characteristics are not surprising. They closely parallel recent findings from the 2011 Current Population Survey Annual Social and Economic Supplement.

In 2011, the U.S. Census Bureau counted 46.2 million Americans living in poverty in the United States, a poverty rate of 15% (U.S. Census Bureau, 2012).[6] The poverty rate for 2011 is much higher among women and children; nearly half of children under age 18 living in a female-headed household live in poverty. In all, demographic groups disproportionately affected by poverty are also more likely to be served by federal housing assistance programs.

The HUD microdata also provide important insight into the geographic distribution of housing assistance by race. The data suggest that receipt of housing assistance alone is not an indicator of the poverty level of the neighborhood in which a household lives. However, race and, to a lesser extent, the specific housing program, seem to play a role. Black households living in public housing are four times more likely than their white counterparts to live in census tracts where the poverty rate exceeds 40%. Among voucher holders, the story is different: just 12% of black households live in high poverty census tracts compared to 4% of white households.

Improvements to existing housing assistance programs can shift these consequences of federal housing policy. For example, the revitalization of public housing through current efforts like the Rental Assistance Demonstration and the Choice Neighborhoods Initiative should provide public housing residents with more choices in their housing. As neighborhoods and properties improve, residents may wish to stay in or close to their communities. And some residents may wish to use a voucher to move to other neighborhoods. Both options should be provided to public housing residents.[7]

Improvements to the voucher program itself can also help increase renter choice. NLIHC supports HUD's efforts to better match the value of rental assistance provided by a voucher with the actual rents in a particular neighborhood. This shifting from a single, metropolitan-wide assistance value to rental assistance tied to the local cost of renting in a neighborhood, by ZIP code, will give voucher-assisted households greater opportunity to live in neighborhoods of their choosing.

NLIHC also supports more regional approaches to voucher administration and protection against housing discrimination based on income source.

However, these reforms will not end the shortage of housing that the lowest income households in the U.S. can afford. That requires new investments in affordable housing such as the National Housing Trust Fund.

*For more information on the National Housing Trust Fund, go to www.nhtf.org.*

## ABOUT THE DATA

The Public Use Microdata Sample is available to researchers upon request. Although public, prospective users must provide their names, institutions and email addresses and certify that they will use the data for legitimate research purposes and will in no way use the data to try to identify households. One of HUD's primary concerns is the privacy of the tenants served by these programs. HUD used strategies in the data to ensure that no personally identifiable information is revealed with this release. HUD's goal is to update this database annually.

To request access, please visit HUD's website at www.huduser.org/portal/pumd/index.html.

[6] DeNavas-Walt, C., Proctor, B.D., and Smith, J.C. (September 2012). *Income, poverty, and health insurance coverage in the united states, 2011*. www.census.gov/prod/2012pubs/p60-243.pdf.
[7] Crowley, S. and Pelletiere, D. (2012). *Affordable housing dilemma: the preservation vs. mobility debate*. Washington, D.C.: National Low Income Housing Coalition. http://nlihc.org/sites/default/files/Affordable_Housing_Dilemma_Report_May-2012.pdf.

ARROYO001428

*Housing Spotlight* is a series of occasional research briefs from the National Low Income Housing Coalition that use data from different sources to highlight a variety of housing issues.

## MEMBER BENEFITS

*Housing Spotlight* is among the valuable reports produced by NLIHC. An increased supply of housing data in the past few years means it can be difficult to know what data to use and when. One of the benefits of being an NLIHC member is that our Research Team is here to help you understand the data and identify the statistics you really need to become a more effective advocate. This assistance is provided at no additional charge.

To take advantage of this great membership benefit, contact NLIHC Research Director Megan Bolton.

Join NLIHC and become eligible for research assistance and other benefits at www.nlihc.org/join.

## FOR MORE INFORMATION

If you are interested in learning more about the datasets mentioned in this edition of *Housing Spotlight,* have questions on the methodology used, or have any other comments or questions, please contact NLIHC's Research Team.

### MEGAN BOLTON
Research Director
Megan@nlihc.org
202.662.1530 x245

### ELINA BRAVVE
Research Analyst
Elina@nlihc.org
202.662.1530 x244



**NATIONAL LOW INCOME
HOUSING COALITION**

*The National Low Income Housing Coalition is dedicated solely to achieving socially just public policy that assures people with the lowest incomes in the United States have affordable and decent homes.*

727 15th Street NW, 6th Floor, Washington, D.C. 20005 | 202.662.1530 | www.nlihc.org

ARROYO001429

# EXHIBIT L

## Location

### About this Topic

The National Crime Victimization Survey (NCVS) obtains information from a household sample about victim's experiences and characteristics of the
The survey measures the violent crimes of rape, sexual assault, robbery, aggravated and simple assault as well as personal theft (purse snatching a
picking). It includes the property crimes of household burglary, motor vehicle theft and property theft. Crimes that occur in commercial places such
banks, office buildings, parking garages and other locations are measured only if the victim(s) or household members in the survey experienced cri
locations.

#### Summary findings

Between 2004 and 2008 --
- About 1 in 3 violent crimes occurred in or near the victim's own home.
- During this time period almost 1 in 5 violent crimes took place in open areas such as yards, playgrounds, fields, on the street or in other sim
- Almost two thirds of all property crimes took place in or near the home of the household members.
- More than 1 in 10 property crimes occurred in parking lots or garages.
- Purse snatchings and pocket pickings typically occur away from home. The most common places of occurrence were in commercial places su
  restaurants, bars and other commercial buildings (39.1%) and open areas such as the street or on public transportation (28.2%). About 10%
  thefts occurred in or near the victim's home or the home of a friend or neighbor.

#### School crime

In 2007 --
- Students ages 12 to 18 were victims of about 1.5 million non-fatal crimes when they were at school compared to about 1.1 million non-fatal
  they were away from school.
- About a third (32%) of public and private school students ages 12-18 reported that they have been bullied at school within the past six mon
- Among high school students in grades 9-12, about 12% said they got into a fight on school property.
- Ten percent of male students and 5% of female students reported experiencing a threat or injury with a weapon on school property.
- The percentage of students ages 12 to 18 victimized by violence and theft at school decreased between 1995 and 2005, and remained uncha
  2005 and 2007. In 1995 about 10 percent of students were victims of violence or theft, compared to 4 percent in 2005 and 2007.

#### Workplace violence

Between 1993 and 1999--
- Of selected occupations examined, police officers were the most vulnerable to be victims of workplace violence, as well as correctional office
  drivers, private security workers, and bartenders.
- While working or on duty, U.S. residents experienced 1.7 million violent victimizations annually including 1.3 million simple assaults, 325,00
  assaults, 36,500 rapes and sexual assaults, 70,000 robberies, and 900 homicides.
- Workplace violence accounted for 18% of all violent crime.
- Police officers were victims of a nonfatal violent crime while they were working or on duty at a rate of 261 per 1,000 officers.

| Detailed place of occurrence for violent and property crimes, average annual 2004-2008 | Average annual 2004-2008 | | | |
| --- | --- | --- | --- | --- |
| | Violent victimizations[a] | | Property victimizations[b] | |
| | Number | Percent | Number | Percent |
| **Total** | 5,507,130 | 100.0% | 18,004,640 | 100.0% |
| **Total in own home or lodging** | 990,900 | 18.0 | 4,801,740 | 26.7 |
| **In own dwelling, own attached garage, or enclosed porch** | 969,010 | 17.6 | 4,076,310 | 22.6 |
| **In detached building on own property** | 8,910 | 0.2 | 599,590 | 3.3 |
| **In vacation home/second home** | 5,140 | 0.1* | 79,930 | 0.4 |
| **Hotel or motel room** | 7,840 | 0.1 | 45,910 | 0.3 |
| **Total near own home** | 866,230 | 15.7% | 6,716,440 | 37.3% |
| **Own yard, sidewalk, driveway, carport** | 550,890 | 10.0 | 5,486,250 | 30.5 |
| **Apartment hall, storage area, laundry room** | 52,540 | 1.0 | 176,150 | 1.0 |
| **On street immediately adjacent to own home** | 262,790 | 4.8 | 1,054,040 | 5.9 |
| **Total at or near friend's, neighbor's or relative's home** | 504,010 | 9.2% | 652,640 | 3.6% |
| **At or in friends/relatives/neighbor's home** | 262,330 | 4.8 | 277,630 | 1.5 |
| **Friend/relatives/neighbors yard, sidewalk, driveway** | 158,780 | 2.9 | 239,400 | 1.3 |
| **Friends/relatives/neighbor's apartment hall, storage area, laundry room** | 13,960 | 0.3 | 6,980 | 0.0 |
| **On street adjacent to friend's/relative's/neighbor's home** | 68,940 | 1.3 | 128,630 | 0.7 |
| **Total in commercial places[c]** | 664,700 | 12.1% | 933,270 | 5.2% |
| **Commercial restaurant, bar, nightclub** | 244,000 | 4.4 | 209,350 | 1.2 |
| **Inside office** | 74,900 | 1.4 | 157,720 | 0.9 |
| **Bank** | 9,100 | 0.2 | 10,820 | 0.1 |
| **Gas station** | 63,530 | 1.2 | 58,860 | 0.3 |
| **Other commercial building** | 230,210 | 4.2 | 438,840 | 2.4 |

ARROYO001420

| | | | | |
|---|---|---|---|---|
| Factory/warehouse | 42,960 | 0.8 | 57,680 | 0.3 |
| **Total in parking lots or garages[c]** | 401,920 | 7.3% | 2,018,180 | 11.2% |
| Commercial parking lot/garage | 110,620 | 2.0 | 413,050 | 2.3 |
| Noncommercial parking lot/garage | 213,540 | 3.9 | 864,190 | 4.8 |
| Apartment/townhouse parking lot/garage | 77,760 | 1.4 | 740,950 | 4.1 |
| **Total in school or on school property** | 714,860 | 13.0% | 1,272,570 | 7.1% |
| Inside school building | 464,540 | 8.4 | 1,004,890 | 5.6 |
| On school property | 250,320 | 4.5 | 267,670 | 1.5 |
| **Total in open areas, on street or public transportation** | 967,800 | 17.6% | 748,150 | 4.2% |
| In apartment yard, park, field, playground | 130,270 | 2.4 | 158,360 | 0.9 |
| On street other than near own or friend/neighbor/ relative's house | 787,640 | 14.3 | 457,590 | 2.5 |
| On public transportation or in station | 49,910 | 0.9 | 132,190 | 0.7 |
| **Other** | 396,700 | 7.2% | 861,660 | 4.8% |

*Based on 10 or fewer cases.
[a]Violent crimes exclude murder and include rape, sexual assault, robbery, and aggravated or simple assault.
[b]Property crimes include household burglary, motor vehicle theft, and property theft.
[c]All victimizations occurred at these locations to persons or members of households that were interviewed.
Crimes which occurred to commercial or business facilities are not measured.

## Publications & Products

**Indicators of School Crime and Safety, 2012** Presents data on crime and safety at school from the perspectives of students, teachers, and prin
annual report, a joint effort by the Bureau of Justice Statistics and the National Center for Education Statistics (NCES), provides the most current d
information on the nature of crime in schools.
   PDF (1.7M) | Comma-delimited format (CSV) (Zip format 352K)
   *Part of the Indicators of School Crime and Safety Series*

**Workplace Violence Against Government Employees, 1994-2011** Presents information on both nonfatal and fatal forms of violence in the wo
government employees, based on the Bureau of Justice Statistics' National Crime Victimization Survey and the Bureau of Labor Statistics' Census o
Occupational Injuries.
   Press Release | PDF (1.3M) | ASCII file (37K) | Comma-delimited format (CSV) (Zip format 25K)
   *Part of the Violence in the Workplace Series*

**Workplace Violence Against Government Employees, 1994-2011** RATES OF WORKPLACE VIOLENCE HIGHER FOR GOVERNMENT EMPLOYEES
   Press Release
   *Part of the Violence in the Workplace Series*

**Jails in Indian Country, 2011** 2,239 INMATES IN INDIAN COUNTRY JAILS IN 2011, UP 5.7 PERCENT FROM 2010
   Press Release
   *Part of the Jails in Indian Country Series*

**Methods for Counting High-Frequency Repeat Victimizations in the National Crime Victimization Survey** Examines the nature and extent
victimization in the National Crime Victimization Survey (NCVS).
   PDF (2.39M) | ASCII file (101K) | Spreadsheets (Zip format 40K)

**Workplace Violence, 1993-2009** Presents information on violence in the workplace against employed persons based on the Bureau of Justice Sta
Crime Victimization Survey and the Bureau of Labor Statistics' Census of Fatal Occupational Injuries.
   Press Release | PDF (640K) | ASCII file (29K) | Spreadsheet (Zip format 31K)
   *Part of the Violence in the Workplace Series*

**Jails in Indian Country, 2009** INMATE POPULATION IN INDIAN COUNTRY JAILS INCREASED 1.9 PERCENT IN 2009
   Press Release
   *Part of the Jails in Indian Country Series*

**Indicators of School Crime and Safety: 2010 (Revised)** Presents data on crime and safety at school from the perspectives of students, teache
principals. A joint effort by the Bureau of Justice Statistics and the National Center for Education Statistics, this annual report examines crime occu
well as on the way to and from school.
   PDF (3.8MB) | ASCII file (357K) | Spreadsheets (Zip format 375K)
   *Part of the Indicators of School Crime and Safety Series*

**Indicators of School Crime and Safety: 2009** Presents data on crime and safety at school from the perspectives of students, teachers, and prin
effort by the Bureau of Justice Statistics and the National Center for Education Statistics, this annual report examines crime occurring in school as w
way to and from school.
   Acrobat file (PDF 2M) | ASCII file (204K) | Zip format (124K)
   *Part of the Indicators of School Crime and Safety Series*

**Indicators of School Crime and Safety, 2003** Presents data on crime at school from the perspectives of students, teachers, principals, and the
population.
   Press Release | ASCII file (150K) | Spreadsheet (Zip format 127K) | Full Report (PDF 825K) | Indicators 1-19 (PDF 374K) | Supplemental tables (
   Standard error tables (PDF 188K) | Appendices (PDF 173K) | Codebooks and Datasets
   *Part of the Indicators of School Crime and Safety Series*

ARROYO001421

ARROYO001422