# EXHIBIT 32

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CONNECTICUT FAIR HOUSING CENTER
*et al.,*

                        *Plaintiffs,*

        v.                                                          No. 3:18-CV-705 (VLB)

CORELOGIC RENTAL PROPERTY
SOLUTIONS, LLC,

                        *Defendant.*

DECLARATION OF SALMUN KAZEROUNIAN

1.      I am over the age of 18 and understand the obligations of an oath.

2.      I am a staff attorney at the Connecticut Fair Housing Center and

counsel for the plaintiffs in the above-referenced matter.

3.      On June 13, 2017, I was present at a fact-finding hearing before the

Connecticut Commission on Human Rights an Opportunities ("CHRO") in the

matter of Carmen Arroyo, individually and on behalf of Mikhail Arroyo v.

ArtSpac0e Windham LP and WinnResidential, Case Nos. 1750140 and 1750141.

4.      Plaintiffs produced a recording in the present case with filename

(and bates number) CFHC001392.MP3.  CFHC001392 is a true and correct

reflection of the June 13, 2017 CHRO hearing, at which I represented Ms. Arroyo.

5.      My office provided a copy of CFHC001392.MP3 to Sheila Butch Court

Reporting Services to be transcribed.  Excerpts from the transcript prepared by

the court reporter are attached hereto as Exhibit A.  After carefully reviewing

Exhibit A, I determined it to be a true and correct reflection of portions of the

June 13, 2017 hearing to the best of my knowledge and recollection.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

**Salmun Kazerounian, Declarant.**

**Date:** November 11, 2019

**EXHIBIT A**

1

1       TRANSCRIPT OF

2       Recorded Hearing of

3       Carmen Arroyo

4       June 13th, 2017

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   is that correct?

2          MS. ARROYO:  Yes, ma'am.

3          INVESTIGATOR TREPANIER:  Now, at that time, when

4   you moved into the two bedroom, had Respondent changed their

5   mind about your son being able to reside on the property?

6          MS. ARROYO:  They just kept telling me that he

7   can't move in until I resolve the situation.

8          INVESTIGATOR TREPANIER:  And why did you decide to

9   move at that point, if your son couldn't move in with you

10  yet?

11         MS. ARROYO:  I was under the impression that I

12  could move in and that this would be resolved by then.

13         INVESTIGATOR TREPANIER:  By who?

14         MS. ARROYO:  By Windham ArtSpace and with

15  CoreLogic.

16         INVESTIGATOR TREPANIER:  And what gave you that

17  impression, was it something that somebody told you?

18         MS. ARROYO:  Well, CoreLogic said that once I sent

19  all the paperwork, they can release that to me, and then I

20  can bring it to the office, the paperwork of findings of what

21  it was.

22         INVESTIGATOR TREPANIER:  How much were you paying

23  per month in your one bedroom apartment?

24         MS. ARROYO:  It was, I want to say $875 and then

25  it went up to $900.

1           INVESTIGATOR TREPANIER:  For the one bedroom?

2           MS. ARROYO:  Yes.

3           INVESTIGATOR TREPANIER:  And how much are you

4  paying per month for the two bedroom?

5           MS. ARROYO:  $1050.

6           INVESTIGATOR TREPANIER:  Have you had any

7  additional income since you moved in to the two bedroom

8  apartment?

9           MS. ARROYO:  Just what I make.

10          INVESTIGATOR TREPANIER:  Would you receive

11  additional income if your son was living with you?

12          MS. ARROYO:  He would get additional income, yes.

13          INVESTIGATOR TREPANIER:  From where?

14          MS. ARROYO:  He gets it from a voucher from the

15  Housing, Runyan Housing Authority, I think it is, that will

16  help him with a voucher to be able to stay there, and then he

17  gets a Social Security, $300.

18          INVESTIGATOR TREPANIER:  Do you know how much rent

19  you would be responsible for if your son was living with you?

20          MS. ARROYO:  We have tried to calculate that, but

21  because this has been kind of a long going term, they, it

22  fluctuates, so, right now it's just when we resolve then they

23  would be able to give me a more dominant number.

24          INVESTIGATOR TREPANIER:  How are you able, are you

25  able to afford the rent for the two bedroom at $1050 per

1  son.

2          INVESTIGATOR TREPANIER:  And what's your Social

3  Worker's name?

4          MS. ARROYO:  Her name was, they just changed them

5  over, so, what was her name, Paulette.  She's the one that

6  works with my son's, money, follows the person for the TBI's,

7  and so she then, I told her what was happening and so she

8  said that she would get someone on the case for me, to see

9  what's taking them so long.

10          INVESTIGATOR TREPANIER:  And had you or she been

11  told that the rejection was based on credit problems?

12          MS. ARROYO:  They, I don't think that they spoken

13  with her, I mean, it was just me.  Whatever they said to me

14  was what I was bringing over to her.

15          INVESTIGATOR TREPANIER:  And, you had, you did not

16  know the reason, but you assumed it was from credit problems,

17  initially?

18          MS. ARROYO:  Yes.

19          INVESTIGATOR TREPANIER:  Did you ever find out

20  what criminal history CoreLogic was basing its denial

21  recommendation on?

22          MS. ARROYO:  After doing a lot of foot work, yes.

23          INVESTIGATOR TREPANIER:  So, what was, what was

24  that criminal history?

25          MS. ARROYO:  They said it was a minor theft, or

1   something to that nature.  It wasn't through CoreLogic, I

2   called the State of Pennsylvania and contacted the Court

3   House there to see if there was anything pending for my son,

4   and in that, I found out that there was and the Judge wrote

5   it off and I submitted the letter to Salmun, after.

6           INVESTIGATOR TREPANIER:  Now, was that information

7   ever provided to the Respondent?

8           MS. ARROYO:  On the day that we came in for the

9   first, I guess.

10          INVESTIGATOR TREPANIER:  So, during the mediation?

11          MS. ARROYO:  Because I just received it not too

12  long after.  I didn't have it on hand until a week or two

13  prior, something like that.

14          INVESTIGATOR TREPANIER:  After they received that

15  information, did the Respondent allow your son to move in, or

16  make an exception to their policy?

17          MS. ARROYO:  No.

18          INVESTIGATOR TREPANIER:  So, to date, your son has

19  not been allowed to move in.  What's your understanding as to

20  why not?

21          MS. ARROYO:  It's his background check.

22          INVESTIGATOR TREPANIER:  Would it benefit your son

23  to live with you?

24          MS. ARROYO:  Yes.

25          INVESTIGATOR TREPANIER:  And can you explain to me

1  in what ways?

2          MS. ARROYO:  He's comfortable in his surroundings

3  at home with us, his family is always around, my daughters

4  come, my mom comes, you know, he has me to be able to watch

5  over him and take care of him.  He'll have workers with him,

6  but during the evening he'll, more at home with family.

7          INVESTIGATOR TREPANIER:  How do you believe you've

8  been damaged by not being allowed to have your son move in

9  with you?

10          MS. ARROYO:  It's been a long haul.  I've had to

11  pay additional fees for him to be where he's at.

12  Emotionally, he is distressed, he wants to come home, he

13  can't come home, so, the weekends I do have with him, it

14  makes it very hard, emotionally he doesn't understand why.

15  Emotionally, I am distressed, I don't understand what's the

16  hold up, I mean, I've done everything I could possibly do to,

17  you know, get him in, you know, get him in a comfortable

18  setting for himself and be comfortable.  I want him to be

19  able to heal better, I think that with him being home, that

20  healing process will continue and much better.  When you're

21  in your own surroundings and your sick, being home is kind of

22  the best way to be, you know.

23          INVESTIGATOR TREPANIER:  And how does your son

24  feel about living in a nursing home?

25          MS. ARROYO:  He doesn't like it.  He puts up with

1  mediation.

2          MR. KAZEROUNIAN:  It is.

3          MR. CHESTNUT:  Yes, it is the one that we got

4  during it.

5          INVESTIGATOR TREPANIER:  Okay.  I'll pass it back.

6  Is there any criminal activity that your son was charged with

7  or convicted of due to his injury?

8          MS. ARROYO:  No.  Like, only when I just received

9  that, because I did some work on trying to find out why he

10 wasn't able to come in.  But due to his injury, he had none.

11         INVESTIGATOR TREPANIER:  Anything else?  I'm going

12 to pause.

13                          (PAUSE AUDIO)

14                          (RESUME AUDIO)

15         INVESTIGATOR TREPANIER:  Will you please state

16 your name for the record?

17         MS. DESJARDINS:  Yeah.  My name is Melissa

18 Desjardins.

19         INVESTIGATOR TREPANIER:  What company are you an

20 employee of?

21         MS. DESJARDINS:  WinnResidential.

22         INVESTIGATOR TREPANIER:  What's your job title?

23         MS. DESJARDINS:  I'm an Assistant Manager.

24         INVESTIGATOR TREPANIER:  What do your job

25 responsibilities include?

1            MS. DESJARDINS:  Everything.  Leasing, marketing,

2    rent collection, walking the property, answering phones,

3    everything.

4            INVESTIGATOR TREPANIER:  Do you only work at

5    ArtSpace Windham or do other; do you also manage other

6    properties as well?

7            MS. DESJARDINS:  Other properties as well.

8            INVESTIGATOR TREPANIER:  How many other

9    properties?

10           MS. DESJARDINS:  There's three in total.

11           INVESTIGATOR TREPANIER:  Is there an onsite office

12   at ArtSpace at Windham?

13           MS. DESJARDINS:  Yes.

14           INVESTIGATOR TREPANIER:  And how often do you work

15   out of that office?

16           MS. DESJARDINS:  It's Tuesday, as of right now.

17           INVESIGATOR TREPANIER:  Is there somebody, you're

18   there on Tuesdays, is there somebody there every other day of

19   the week or?

20           MS. DESJARDINS:  No, we were at two days a week

21   for a while but it's just Tuesday as of right now.

22           INVESTIGATOR TREPANIER:  How long have you had

23   your position at WinnResidential?

1          MS. DESJARDINS:  Just at that building or?

2          INVESTIGATOR TREPANIER:  Yes.

3          MS. DESJARDINS:  All.  At that building, five to

4    ten.

5          INVESTIGATOR TREPANIER:  And is there a

6    requirement that individuals fill out your forms or if they

7    provide their own medical documentation, is that sufficient?

8          MS. DESJARDINS:  If they provide their medical

9    documentation, we usually follow it up saying can you have

10   them complete it on our form as well.

11         INVESTIGATOR TREPANIER:  What is ArtSpace

12   Windham's policy in terms of accepting applicants who have a

13   criminal history or background?

14         MS. DESJARDINS:  For everyone in the building, the

15   criteria that I have to follow is we just enter them in to

16   the system for CoreLogic and whatever it says, if it says, if

17   it says accept, accept with conditions, meaning two months

18   security or decline, whatever it says is how I have to

19   proceed.

20         INVESTIGATOR TREPANIER:  So, tell me the process

21   when someone applies, do they fill out an actual application,

22   how it goes?

23         MS. DESJARDINS:  Yeah.  So, they complete an

24   application, once they complete an application then we run

25   the background and credit check through CoreLogic.  From

1  there, if it gets accepted, then they come back to do income

2  verification, because it's TaxCred Property with landlord

3  reference, we do look for a satisfactory landlord reference.

4  If it's declined, then we send the adverse letter, action

5  letter and then we always let them know that if they wish to,

6  you know, if there's something they objected to, then they

7  can bring that up with CoreLogic, and if it's something they

8  can get removed then they can have it removed and we can have

9  them come back and re-apply, and once it gets accepted in our

10  system, then we can accept that.

11           INVESTIGATOR TREPANIER:  Who inputs the

12  information into CoreLogic?

13           MS. DESJARDINS:  I do, or whoever's on staff.

14           INVESTIGATOR TREPANIER:  And how are the results

15  given to you from CoreLogic?

16           MS. DESJARDINS:  How are the results given?  I

17  just hit submit and then it pops back says accept, accept

18  with conditions or decline.

19           INVESTIGATOR TREPANIER:  Have you had any

20  situations before in which an individual was denied because

21  of credit or criminal history and they asked ArtSpace for

22  more information?

23           MS. DESJARDINS:  And they asked us for more

24  information?

25           INVESTIGATOR TREPANIER:  Yes, asked you for more

1    application and?

2           MS. DESJARDINS:  Yeah.

3           INVESTIGATOR TREPANIER:  So, you heard the

4    Complainant testify earlier, that after the application was

5    denied, she had a conversation with you.  Can you tell me

6    about that conversation?

7           MS. DESJARDINS:  It was a long time ago.  I

8    believe she went to work right after she dropped the

9    application so, I, I don't remember what happened after that,

10   whether I gave her the adverse letter, action letter or if I

11   put it under her door, but I do remember she came in a couple

12   times after, and I did write it on a post-it note, to give

13   her the number as well, because she had misplaced the number.

14   So, I don't remember the, the exact, it was a long time ago.

15          INVESTIGATOR TREPANIER:  Did you tell Complainant

16   that her son was denied because of his credit?

17          MS. DESJARDINS:  No.  I always say the same thing,

18   it could be due to the credit or the background and then I

19   provide the phone number and let them know they can reach out

20   to CoreLogic to get more information, and if there is an

21   issue, they can, if it's something they can fix, they can

22   resolve it and then come back and run it again.

23          INVESTIGATOR TREPANIER:  Does CoreLogic tell you

24   whether the denial is based on criminal or credit?

25          MS. DESJARDINS:  It says accept, accept with

1  conditions, it says credit or background, I believe.

2          INVESTIGATOR TREPANIER:  What's your understanding

3  to date as to why the exception has not been made to accept

4  Mikhail Arroyo?

5          MS. DESJARDINS:  Because it didn't pass through

6  CoreLogic.

7          INVESTIGATOR TREPANIER:  So, provided with the

8  answer filed in this case, were some reports from the

9  background check…

10          MS. DESJARDINS:  Um-huh.

11          INVESTIGATOR TREPANIER:  And I'm just going to ask

12  you to explain what some of those mean, to me.  So, I'm going

13  to show you the first one and I'm going to ask for it back so

14  I can ask questions about it.

15          MS. DESJARDINS:  Sure.  Okay.

16          INVESTIGATOR TREPANIER:  So, pass that back guys.

17  I'm sure you're probably familiar with it, these.  So, the

18  first on is call Lease Decision.

19          MS. DESJARDINS:  Um-huh.

20          INVESTIGATOR TREPANIER:  It says it was performed

21  by Melissa Curry, is that you?

22          MS. DESJARDINS:  That was my maiden name, yes.

23          INVESTIGATOR TREPANIER:  So, this is the Lease

24  Decision for Mr. Arroyo, and it says 145 accept with

1 conditions.  So, tell me the difference between a denial,

2 accept with conditions, or an accept?

3          MS. DESJARDINS:  Um-huh, yeah.   An accept is an

4 accept with just one month's security, accept with

5 conditions, accept with two month's security and a denial is

6 just a denial.

7          INVESTIGATOR TREPANIER:  So, underneath that, it

8 says criminal decision…

9          MS. DESJARDINS:  Um-huh.

10          INVESTIGATOR TREPANIER:  Records found.

11          MS. DESJARDINS:  Um-huh.

12          INVESTIGATOR TREPANIER:  So, because it says

13 criminal decision, and it doesn't say deny, so, explain to

14 me…

15          MS. DESJARDINS:  It prints out on the letter, if

16 it says accept or deny.  So, when I go in there, we look at

17 the letter, it'll say, at this time, your application has

18 been declined due to this, or due to, I don't know what the

19 exact words.

20          INVESTIGATOR TREPANIER:  Is this the adverse

21 action letter, you mean?

22          MS. DESJARDINS:  Um-huh, yes.

23          INVESTIGATOR TREPANIER:  So, do you, does that

24 automatically generate from CoreLogic?

25          MS. DESJARDINS:  Yes.

33

1          INVESTIGATOR TREPANIER:  So, because of the

2   criminal record, this adverse letter…

3          MS. DESJARDINS:  Because of the letter, what it

4   says, yeah, that's how I proceed.

5          INVESTIGATOR TREPANIER:  Now, underneath that

6   where it says accept with conditions, it says records found

7   under criminal decision, it says, please verify the

8   applicability of these records to your applicant and pursue

9   with your community screening policies.

10          MS. DESJARDINS:  Um-huh.

11          INVESTIGATOR TREPANIER:  It also says decision

12   message, oops, never mind, I'm going too fast.  So, it says,

13   please verify the applicability of these records to your

14   applicant and pursue with your community screening policies.

15   So, what does that mean?  What is your community screening

16   policies in terms of?

17          MS. DESJARDINS:  So, our policy is just that if it

18   gets declined to have them go to CoreLogic and if it's

19   something that can be resolved, then they resolve it and we

20   run it again and if it comes back accept on the letter, then

21   we accept them.

22          INVESTIGATOR TREPANIER:  So, the second document

23   I'm going to hand you is called the Registry X, Score Entry

24   Card, are you familiar with that?

25          MS. DESJARDINS:  Um-huh.

1  point, she and I went back and forth on the phone a couple of

2  times and I explained that there appeared to be a

3  miscommunication, it was the background that was the main

4  factor, so she amended her request and then at that point,

5  we, we consulted on our end, and then that's when the request

6  began from us to them to find additional information on the

7  factors that they were looking to have been waived.

8         INVESTIGATOR TREPANIER:  Did you personally

9  contact a representative from CoreLogic about Mr. Arroyo?

10        MR. CUNNINGHAM:  No.

11        INVESTIGATOR TREPANIER:  Do you know if anybody

12  from WinnResidential did?

13        MR. CUNNINGHAM:  I know that no one on the site

14  level, I know that Melissa or myself did not, I can't speak

15  to upper management.

16        INVESTIGATOR TREPANIER:  Were you provided with

17  any additional information about Mikhail Arroyo's criminal

18  history?

19        MR. CUNNINGHAM:  I was at the hearing, the

20  mediation hearing, Ms. Arroyo and her Attorney provided us

21  with the paperwork from the State of Pennsylvania.

22        INVESTIGATOR TREPANIER:  Other than that, or

23  previously to that, had you received any additional

24  information?

25        MR. CUNNINGHAM:  No.

52

1          INVESTIGATOR TREPANIER:  And can I, do you have a

2   printed response?

3          MR. CUNNINGHAM:  Sure.

4          UNIDENTIFIED MALE:  Just a point of clarification,

5   that letter from Mr. Cunningham came before the, the December

6   20th letter from the Connecticut Fair Housing Center.

7          UNIDENTIFIED MALE:  Just a point of clarification,

8   he's not a factor in this.

9          INVESTIGATOR TREPANIER:  I understand that.  Did

10  this letter is addressed to Maria Cuerda, is there a letter

11  that you responded back to Attorney Kazerounian?

12         MR. CUNNINGHAM:  I believe at that point; we

13  engaged our Attorney.  Forgive me if I'm missing it.

14         INVESTIGATOR TREPANIER:  To date, what's your

15  understanding as to why Mikhail Arroyo has not been allowed

16  to move in to ArtSpace at Windham?

17         MR. CUNNINGHAM:  The, the crux of the issue is

18  that we were not provided information related to what they

19  were attempting to have waived, in this case.  Subsequent to

20  that, at the mediation, we received information, additional

21  information related to those records, and I know there have

22  been conversations that have taken place between now and then

23  related to allowing Mr. Arroyo to move into the property, but

24  I have not been privy to the specifics of those.

25         INVESTIGATOR TREPANIER:  I was provided with the

68

1    is, and what we've requested, which is the specific reason, I

2    think that the first request, like you said before, was based

3    on credit, we said well, it doesn't apply to the situation,

4    so there was another issue requested for, you know, whatever

5    it is, to waive it.  To be able to evaluate the

6    accommodation, we wanted to understand the specifics of what

7    the ask was, and that's the information that we were

8    requesting.  That's the basis for us to not approve the

9    request.

10          INVESTIGATOR TREPANIER:  Then at some point after

11   the CHRO Complaint was filed, my understanding is that at the

12   mediation the criminal history was provided.  Did you receive

13   that information or are you aware of that information?

14          MR. LUND:  I'm aware of the information, yes.

15          INVESTIGATOR TREPANIER:  And do you know why to

16   date the exception hasn't been made for Mr. Arroyo to live

17   there?

18          MR. LUND:  It's been discussed, and Robert, if I

19   may.

20          INVESTIGATOR TREPANIER:  So, let me just preface

21   this by saying…

22          MR. LUND:  Sure.

23          INVESTIGATOR TREPANIER:  Don't tell me anything

24   that counsel has told you or discussed with you.

25          MR. LUND:  Sure.

1              INVESTIGATOR TREPANIER:  Just tell me what your

2     understanding is as to why it hasn't been granted yet?

3              MR. LUND:  We've had several internal discussions

4     and were prepared to issue a response to that.

5              INVESTIGATOR TREPANIER:  You're going to issue a

6     response?

7              MR. LUND:  Yes.

8              INVESTIGATOR TREPANIER:  Do you know when or have

9     an estimate of when that response will be provided?

10             MR. LUND:  Today.

11             INVESTIGATOR TREPANIER:  Now, are you familiar

12    with the Tenant Selection Plan for ArtSpace at Windham?

13             MR. LUND:  Generally, yes, yep.

14             INVESTIGATOR TREPANIER:  So, in that Tenant

15    Selection Plan, there's certain criteria that it says that

16    the property will take into account for criminal offenses,

17    such as when the crime occurred, the seriousness of the

18    offense, do you know whether there's settings in CoreLogic

19    that are considering all those factors for applicants?

20             MR. LUND:  Yes, I believe so.

21             INVESTIGATOR TREPANIER:  Who would have the best,

22    who would be able to answer best what that criteria is and

23    what CoreLogic has?

24             MR. LUND:  Don't have a specific name of the

25    person, but the department that I referenced earlier,

1   Operations Support Services Department…

2           INVESTIGATOR TREPANIER:  Is that also the

3   Compliance Department?

4           MR. LUND:  Yeah, it's part of it, yep.  They, they

5   would certainly have the, the exact specifics of that.

6           INVESTIGATOR TREPANIER:  I also understand that

7   the criteria has recently been changed in the last year or

8   so, in terms of criminal background, is that correct?

9           MR. LUND:  Yes.

10          INVESTIGATOR TREPANIER:  And do you know what

11  changes have been made?

12          MR. LUND:  Some changes have been made related to

13  some HUD guidance that came out in the last fourteen months.

14          INVESTIGATOR TREPANIER:  Do you know any of the

15  specifics of what changes were made?

16          MR. LUND:  Some changes were made related to the

17  parameters set around criminal activity.

18          INVESTIGATOR TREPANIER:  Do you have any questions

19  you want to pass me down?  Do different properties have

20  different Tenant Selection Plans?

21          MR. LUND:  No, I don't believe so.

22          INVESTIGATOR TREPANIER:  So…

23          MR. LUND:  Let me rephrase that.  I don't know the

24  answer to that question, specifically I don't.

25          INVESTIGATOR TREPANIER:  Do you know whether

1  CoreLogic is provided with a separate criteria for each

2  complex?

3          MR. LUND:  I don't know the answer to that

4  question.

5          INVESTIGATOR TREPANIER:  To the best of your

6  understanding, does CoreLogic provide a decision or a

7  recommendation?

8          MR. LUND:  To my understanding, it's a decision.

9          INVESTIGATOR TREPANIER:  Did you have a question?

10 Did you follow the screening criteria that existed when,

11 actually, do you know whether the screening criteria that

12 existed was followed when Ms. Arroyo applied to ArtSpace?

13         MR. LUND:  Yes.

14         INVESTIGATOR TREPANIER:  Prior to the mediation in

15 this matter, had you received any of the specifics of the

16 background situation from Ms. Arroyo or her son so you can

17 consider their reasonable accommodation request?

18         MR. LUND:  No.

19         INVESTIGATOR TREPANIER:  Did you want to pass me?

20         UNIDENTIFIED MALE:  Yeah, just one second.

21         INVESTIGATOR TREPANIER:  When Ms. Arroyo, when

22 Mr. Arroyo's application was denied, did WinnResidential know

23 if he was a risk to other tenants or the property?

24         MR. LUND:  WinnResidential knew that he didn't fit

25 the criteria at the time of the application.