# EXHIBIT 37

Transcript of Carmen Arroyo
Conducted on July 24, 2019

---

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Case No. 3:18-cv-00705-VLB
-------------------------------

CONNECTICUT FAIR HOUSING CENTER

and

CARMEN ARROYO, individually and
as next friend for Mikhail Arroyo

          Plaintiffs,

     v.

CORELOGIC RENTAL PROPERTY
SOLUTIONS, LLC
               Defendant.

-------------------------------

Deposition of Carmen Arroyo

Wednesday, July 24, 2019

Connecticut Fair Housing Center

60 Popieluszko Court

Hartford, Connecticut

12:06 p.m. - 4:23 p.m.

----- Sharon Roy, RPR -----
Planet Depos
451 Hungerford Drive, Suite 400
Rockville, MD 20850
888.433.3767

---

**Page 2**

A P P E A R A N C E S :

Representing the Plaintiffs:

Salmun Kazerounian, Esq.
Connecticut Fair Housing Center
60 Popieluszko Court
Hartford, CT 06106
860.247.4400 (Fax) 860.247.4236
swhite@ctfairhousing.org

Representing the Defendant:

Timothy J. St. George, Esq.
Troutman Sanders LLP
Troutman Sanders Building
1001 Haxall Point
Richmond, VA 23219
804.697.1254
tim.st.george@troutmansanders.com

---

**Page 3**

I N D E X

----------------------------------------
EXAMINATION                          PAGE
----------------------------------------

By Mr. St. George                       4

By Mr. Kazerounian                    157

EXHIBITS:                           PAGE:

1:  Plaintiff Connecticut Housing Center's
    Responses to Defendant's First Set of
    Interrogatories ......................... 66

2:  Plaintiffs' Amended Damages Analysis ........ 70

3:  Lease Contract (11/1/16) .................... 72

4:  Post-it Note; Lease Contract (11/20/15) ..... 80

5:  Unit Transfer Request Form ................. 85

6:  Lease Decision ............................ 107

7:  Consumer Disclosure Request Form with
    attachments ............................... 107

8:  Fax cover letter dated 11/15/16; Eversource
    statement; Consumer Disclosure Request Form;
    Fiduciary's Probate Certificate/
    Conservatorship ........................... 114

9:  Complaint ................................. 121

10: Pre-Determination Conciliation Agreement ... 123

11: (not marked)

12: Lease Contract (11/1/16) ................... 165

(Original exhibits returned to Attorney St. George)
-*-

---

**Page 4**

----------------------------------------

P R O C E E D I N G S
12:06 p.m.

----------------------------------------

        CARMEN ARROYO , Deponent,
having first been duly sworn by the
Notary Public, deposes and states as
follows:
                * * * * *
        EXAMINATION CONDUCTED
BY MR. ST. GEORGE:

    Q.   Good afternoon, Ms. Arroyo.  We met
briefly off the record.  My name is Timothy
St. George.  I appreciate you coming in today and
giving us your deposition.

        Do you understand that you've been placed
under oath?

    **A.   Yes.**

    Q.   Have you ever been deposed before?

    **A.   Yes.**

    Q.   Okay.  So you might be a little bit
familiar with the process, but let me just go over
some real basic ground rules that I think will help
facilitate a smooth deposition.

        So, the first is, there's a court

---

Transcript of Carmen Arroyo
Conducted on July 24, 2019

---

5

1  reporter sitting at the head of the table and she's
2  taking down your testimony.  She's very good, very
3  fast.  But she's writing it down.  And in order for
4  her to write it down, effectively, we have to have
5  verbal questions and verbal answers.  And by that I
6  mean, "yes," "no," instead of head nods or hand
7  gestures or things along those lines.  Does that
8  make sense?
9     **A.  Yes.**
10    Q.  I'll probably ask you some questions
11  today that are not clear.  If you don't understand
12  my question, please feel free to ask me to rephrase
13  it or to clarify.  I'm always happy to do that.  My
14  sole goal here is to ask clear questions and to get
15  clear answers.  But if I ask you a question and you
16  don't ask me to clarify or rephrase, is it fair for
17  me to assume that you've understood the question
18  that I've asked?
19     **A.  No.**
20    Q.  It's not fair for me to assume?
21     **A.  No.  Well, yes.  Yes.**
22    Q.  Thanks for that.
23       This deposition will likely go multiple
24  hours, sorry for that, it's just the nature of what
25  we do.  We'll try and take breaks, maybe every hour,

---

6

1  hour and a half, but, of course, if at any point you
2  need a break, please just let me know and we're
3  happy to take a break, go off the record.  The only
4  thing I'll ask is if we're in a specific question
5  and answer sequence, that maybe we can finish that
6  up before we take a break.
7     **A.  Yes.**
8    Q.  Is there any reason why your ability to
9  testify or to recollect events would be impaired
10  today, either through any sort of medical condition
11  or any substances that you may have consumed?
12     **A.  No.**
13    Q.  Okay.  Great.
14       All right.  Ms. Arroyo, can you please
15  tell me your full name for the court reporter for
16  the record?
17     **A.  My full name is Carmen Mercedes Arroyo.**
18    Q.  And how old are you, Ms. Arroyo?
19     **A.  I don't want to say.  I'm 47, going on**
20  **48.**
21    Q.  47.  Okay.  Great.
22       And what is your current address?
23     **A.  315 Ballamahack Road.**
24    Q.  And how long have you lived at that
25  address?

---

7

1     **A.  Just moved in this month.**
2    Q.  Okay.  What town is that in?
3     **A.  Windham.**
4    Q.  Is that a house or is it an apartment?
5     **A.  It's a house.**
6    Q.  Do you own that house or do you rent it?
7     **A.  We rent.**
8    Q.  Okay.  When you say "we," do you live
9  there with Mikhail Arroyo?
10     **A.  Yes, sir.**
11    Q.  Am I saying that right?  Is it Mikhail or
12  Mikell (phonetic)?
13     **A.  Mikhail.**
14    Q.  Mikhail.  Okay.
15       So you live there with Mikhail Arroyo.
16  Anyone else?
17     **A.  No.**
18    Q.  Tell me a little bit about that house in
19  terms of how many bedrooms does it have?
20     **A.  Two bedrooms.**
21    Q.  And how much rent do you pay per month?
22     **A.  Currently, 1,200.**
23    Q.  And that $1,200 per month, is that -- is
24  any portion of that subsidized to the extent where
25  you don't have to pay the full 1,200?

---

8

1     **A.  Not currently.**
2    Q.  So you pay the full 1,200 every month?
3     **A.  Yes.**
4    Q.  And you said you just moved in about a
5  month ago?
6     **A.  July, like end of June/July.**
7    Q.  I also just moved a month ago.  It's a
8  terrible experience.  Still living out of boxes.
9     **A.  Yes.**
10    Q.  Okay.  So, put aside that single-family
11  house.  Where did you live immediately prior to
12  that?
13     **A.  480 Main Street, Windham -- Willimantic,**
14  **Connecticut.**
15    Q.  And was there an apartment number for
16  that or is it a single-family house?
17     **A.  It's an apartment.  206.**
18    Q.  And is that at the ArtSpace Windham
19  apartment complex?
20     **A.  Yes.**
21    Q.  And that was also in Windham,
22  Connecticut?
23     **A.  Willimantic, Connecticut.**
24    Q.  Willimantic, Connecticut.
25     **A.  Yes.**

---

9

1  Q.  That Apartment 206, what were the dates
2  where you resided -- the date range that you resided
3  in Apartment 206?
4  **A.  November, I don't recall the actual date,**
5  **but it was in November, I want to say 2016, 2017.**
6  **Well, I think 2016.**
7  Q.  Okay.  So November 2016 until the time
8  that you moved out about a month ago?
9  **A.  Yes.**
10  Q.  Okay.  And in November 2016, did you live
11  there by yourself?
12  **A.  Yes.**
13  Q.  And at some point did Mikhail Arroyo move
14  in with you?
15  **A.  Shortly after.**
16  Q.  Do you recall --
17  **A.  Sorry.  For the record, not shortly**
18  **after.  It took a while.**
19  Q.  Okay.  Well, what was the date,
20  approximately?
21  **A.  He came home June -- June 23.  I believe**
22  **in 2016.  So retract that back.  I believe it was**
23  **the twenty-fifteenth of November coming in, or so.**
24  **I don't recall quite the date, so please forgive me**
25  **for that.**

10

1  Q.  Okay.  That's fine.  And we'll probably
2  look at some documents that I think will jog some
3  memory on this.  I'm not trying to trick you up or
4  anything.
5  **A.  Okay.**
6  Q.  But whatever year you moved in, you moved
7  into Apartment 206 in November, and your son,
8  Mikhail, would have joined you in June of the
9  following year, is that fair?
10  **A.  I believe so.**
11  Q.  Apartment 206, is that a two-bedroom
12  apartment?
13  **A.  Yes.**
14  Q.  And do you recall the amount of monthly
15  rent that you were paying when you first moved in
16  November of 2016?
17  **A.  1,050.**
18  Q.  And was that amount of rent consistent
19  for the entire time that you were in Apartment 206?
20  **A.  Yes.**
21  Q.  And was any portion of that rent
22  subsidized, or did you pay the entire $1,050
23  yourself each month?
24  **A.  I paid the entire amount each month.**
25  Q.  And was that true even after your son

11

1  moved in with you?
2  **A.  Negative.  When he moved in, there were**
3  **some subsidized programs that took effect on and**
4  **off.  So it fluctuates the rent.**
5  Q.  So there was some subsidy that you
6  received, maybe on an irregular basis, after your
7  son moved in in June?
8  **A.  Yes.**
9  Q.  Okay.  Do you recall what portion of your
10  rent was being paid through those subsidies, how
11  much?
12  **A.  I don't know.  I don't recall that.**
13  Q.  And it sounded like you said off and on,
14  I think in terms of the subsidies.  Why was that?
15  Why weren't they regular?
16  **A.  At the beginning, they had to make**
17  **adjustment based on what income he was receiving, I**
18  **believe, from the Social Security.  Also as what I**
19  **was making.  And they had to put some figures**
20  **together and send that over and then adjust the rent**
21  **accordingly.  It changed for a couple months until**
22  **it became a little more stable.**
23  Q.  So there was a period of time, I guess it
24  sounds like towards the beginning, where the
25  specific amount of the subsidy was being figured out

12

1  and then it stabilized?
2  **A.  Yes.**
3  Q.  Okay.
4  All right.  Let's move back in time from
5  the 206 apartment.  What was your address
6  immediately before you lived in the 206 apartment?
7  **A.  480 Main Street.**
8  Q.  And what apartment number?
9  **A.  Oh, gosh.  I would like to say it's 315.**
10  **I believe it was 315.  Oh, 314.  My mistake, sorry.**
11  Q.  314?
12  **A.  I believe it was 314.**
13  Q.  Okay.  So we'll call that the 314
14  apartment, if that's okay.
15  Okay.  And when did you begin living in
16  the 314 apartment?
17  **A.  November of 2015.**
18  Q.  And that's also at the ArtSpace Windham?
19  **A.  Yes.**
20  Q.  It sounds like it might just be a floor
21  up.  Is that fair?
22  **A.  Yes.**
23  Q.  Tell me a little bit about the ArtSpace
24  Windham apartment complex.  Do you have a sense of
25  how many units there are, roughly, in it?

---

**Page 29**

1  A.   They were available -- she showed them to
2  me and they were available whenever I was ready to
3  put the deposit for the transfer.
4  Q.   So your testimony was that you had to
5  live in the 314 unit for a period of a year,
6  correct?
7  A.   I believe that's after the fact, yes.  At
8  the time I thought that once you moved in and you
9  want to transfer, that you could transfer out to
10  another unit.  Later I learned that I wasn't -- I
11  was supposed to have been there a year before
12  moving.
13  Q.   Okay.
14  A.   So I was preparing to get my son home
15  within that time frame.
16  Q.   But later you learned that you could not
17  actually move into the two-bedroom unit until
18  November of 2016?
19  A.   Yes.
20  Q.   So you mentioned that you applied to
21  bring your son to ArtSpace Windham in April of 2016,
22  is that right?
23  A.   I applied, yes.
24       MR. KAZEROUNIAN:  Objection.  I think
25    that mischaracterizes her testimony.  I'm

---

**Page 30**

1    not sure she said the exact date.
2  A.   Oh, I didn't say a date.  I just said,
3  "the spring."
4  Q.   Okay.  That's fine.  Does April 2016
5  sound right to you in terms of when you applied?
6  A.   I don't remember.  I just know it was
7  early spring.
8  Q.   We'll look at some documents that will
9  probably have the specific date.
10  A.   Okay.
11  Q.   And you were not allowed to -- Mikhail
12  was not allowed to come live with you, correct?
13  A.   Yes.
14  Q.   All right.  So, then, given that he
15  wasn't allowed to move in with you at ArtSpace
16  Windham, did he remain at Riverside?
17  A.   Yes.
18  Q.   And when did he finally come to live with
19  you at ArtSpace Windham?
20  A.   June 23rd -- 22nd, 23rd, June of 2016.
21  Q.   Now, your testimony is your testimony,
22  but if he was ready to be discharged in 2016, it's
23  your testimony that he, in April, or the spring of
24  2016, it's your testimony that he moved in two
25  months later with you?

---

**Page 31**

1  A.   It wasn't -- it was a while before he
2  moved in.  So, I don't -- I don't know the precise
3  date and year.  I mean, it's just, this has been a
4  very long haul.  But I know that he moved in in the
5  summer and we were just finishing up with getting
6  everything together for him to move in.
7  Q.   Okay.
8  A.   So, like I said, I do apologize as far as
9  time frame.
10  Q.   No, that's okay.  I understand.
11      So he moved back in with you, and at that
12  point in time when he moved back in with you, you
13  had moved into the 206 apartment, correct?
14  A.   I was there by myself before he could
15  move in.
16  Q.   So when he moved back in with you, he
17  moved into the 206 apartment, correct?
18  A.   Yes.
19  Q.   So he came and joined you in the
20  two-bedroom?
21  A.   Yes.
22  Q.   And you had been living in the
23  two-bedroom since November of 2016?
24  A.   Yes.
25  Q.   Okay.  And then Mikhail lived with you in

---

**Page 32**

1  the 206 unit until you all just recently moved about
2  a month ago?
3  A.   Yeah, not even a month.  Yes.
4  Q.   And what is Mikhail's current condition
5  in terms of his speech and his cognitive abilities?
6      MR. KAZEROUNIAN:  Objection.
7  A.   He's, you know -- can you rephrase that?
8  Q.   How's he doing medically at this point in
9  terms of his medical condition?
10  A.   It's hard to say.
11  Q.   Is he able to communicate with you?
12  Through speech?
13  A.   He does not talk very well.  As you and I
14  talk right here, he can't do that.
15  Q.   And how about writing, is he able to
16  write at all?
17  A.   Not really.
18  Q.   Okay.  Let's turn back to just some
19  issues, go back to another area of questioning.
20      You mentioned that you had previously
21  been deposed, previously sat for a deposition like
22  you're doing right now, today?
23  A.   I've been to one.  Not previously, I
24  didn't say previously.  I just said I was -- I sat.
25  You asked if I had been to one.

Transcript of Carmen Arroyo
Conducted on July 24, 2019

---

85

1     Q.   If you compare that with Exhibit 3, it
2   looks like Exhibit 4 is the lease that you signed
3   approximately a year before you signed Exhibit 3?
4     **A.   Yes.**
5     Q.   Okay.  Okay.  I'll show you another
6   document.
7           MR. ST. GEORGE:  Let's mark this
8     Exhibit 5, please.
9           (Exhibit 5, marked)
10  BY MR. ST. GEORGE:
11    Q.   Ms. Arroyo, do you have Exhibit 5 in
12  front of you?
13    **A.   I do.**
14    Q.   Do you recognize this document?
15    **A.   Yes.**
16    Q.   What do you understand it to be?
17    **A.   It's the transfer, the request -- the**
18  **transfer to one unit to another, request form.**
19    Q.   And it looks like there's a signature at
20  the bottom of a woman named Melissa Desjardins?
21    **A.   I don't know her last name, but, yeah, I**
22  **see "Melissa."**
23    Q.   You see "Melissa"?
24    **A.   Mm-hmm.**
25    Q.   Do you understand that that's the same

---

86

1   Melissa that you've been referencing in your
2   testimony?
3     **A.   Yes.**
4     Q.   Have you -- did you see this document
5   when it was filled out?
6     **A.   I did not see it filled out.  I went into**
7   **the office to give the money when it was done and**
8   **processed.**
9     Q.   And were you given a copy of this
10  document when you went in and provided them the
11  check?
12    **A.   I don't remember.  I don't recall.  I**
13  **could have, I could have not, I'm not sure.**
14    Q.   It says, if I'm reading this correct,
15  that the proposed -- so it's a unit transfer request
16  form and the proposed unit number is unit 206,
17  towards the middle.  Do you see that?
18    **A.   Oh, yes.**
19    Q.   And that's the two-bedroom apartment that
20  you ultimately moved into?
21    **A.   Yes.**
22    Q.   And then it says the effective date of
23  transfer is 11/15/2016.  Do you see that?
24    **A.   Yes.**
25    Q.   And is that the date that you moved into

---

87

1   unit 206?
2     **A.   Well, that's when I gave the money.  I**
3   **moved in around the 19th.  I had a weekend to move**
4   **in is what I was told.**
5     Q.   Got it.  Understood.  So that's the date
6   that the apartment was made available to you?
7     **A.   Yes.**
8     Q.   Even if you didn't move in until a couple
9   days later.
10    **A.** But the the apartment was not -- the
11  two-bedroom and was not available to you any earlier
12  than November 15 of 2016?
13    **A.   That's correct.**
14    Q.   You testified earlier that you submitted
15  an application to have Mikhail come live with you
16  and that application was submitted in the spring of
17  2016, correct?
18    **A.   An application?**
19    Q.   Well, you're right, I shouldn't say
20  application.  There was a request for Mr. Arroyo to
21  come live with you and that you made that request to
22  WinnResidential in the spring of 2016?
23    **A.   I asked, yes, if my son could move in and**
24  **I was told to do the background check.**
25    Q.   Right.

---

88

1     **A.   Yes.**
2     Q.   So my question is, why were you asking in
3   the spring of 2016 if you were not able to move into
4   the two-bedroom unit with your son until November of
5   2016?
6     **A.   Because I was told through residents that**
7   **you can move in as a transfer.  So I said, oh, okay.**
8   **And people have said, "Oh, yeah, I transferred here**
9   **and there."**
10    **So I said, "Oh, that's good to know."  So**
11  **I went personally to ask what was my time frame.**
12  **Yes.  And Melissa was able to express to me that you**
13  **have to be in the unit within a year before you can**
14  **do a transfer.**
15    Q.   Okay.
16    **A.   So I'm just, I guess basically preparing**
17  **myself for my son's transition.**
18    Q.   Okay.  So you understood at that point in
19  time that your son could not come live with you in
20  the two-bedroom until November of 2016, correct?
21    **A.   In the two-bedroom he could come in.  I**
22  **mean, but because of the background, he wasn't**
23  **allowed to.**
24    Q.   So I guess what I'm trying to ask is, you
25  understood that you could not move into the --

Transcript of Carmen Arroyo
Conducted on July 24, 2019

121

1  of conservatorship on Exhibit 7, would that also
2  have been a copy of the certificate of
3  conservatorship?
4      A.  I believe so, yes.
5      Q.  You can put those documents aside.
6          All right.  We're going to move into
7  another line of questioning.  So, is it correct or
8  do you understand that you previously on behalf of
9  your son filed an administrative action against
10 WinnResidential?
11     A.  Come again?  I'm sorry.
12     Q.  Okay.  So do you recall previously filing
13 an administrative action with the State of
14 Connecticut against WinnResidential relating to the
15 background, the application for an apartment with
16 WinnResidential?
17     A.  If I -- I want to understand the question
18 I'm sorry.
19     Q.  Let me just show you a document.  I think
20 that's going to make life easier.
21         So this was previously marked as
22 Kemple 11.  So we'll introduce it in this deposition
23 as well.
24             (Exhibit 9, marked)
25

122

1  BY MR. ST. GEORGE:
2      Q.  So let me hand you a copy of this.
3      A.  Oh, yes, okay.
4      Q.  Do you have in front of you Exhibit 9?
5      A.  Yes.
6      Q.  And do you recognize this document?
7      A.  Yes.
8      Q.  And what do you understand it to be?
9      A.  It is a complaint against, from my son
10 and I to WinnResidential.
11     Q.  Okay.  And do you recall the nature of
12 the claims that you are asserting against
13 WinnResidential in that complaint?
14     A.  It was the transfer for the two-bedroom
15 and they were not compliant with trying to move my
16 son in with reasonable accommodation that we had
17 requested.  I believe that's what it was for.  Yeah.
18     Q.  And so, in your understanding, claim was
19 that WinnResidential had denied the request for a
20 reasonable accommodation for your son in connection
21 with the request to have him move into the complex?
22     A.  I believe so.
23     Q.  Do you remember how this action was
24 resolved, how it ended?
25     A.  How it ended?

123

1      Q.  Yes.
2      A.  We had to go to -- I don't even know, it
3  was something similar to this, I don't know if there
4  was a deposition.  I don't think it was a
5  deposition, but we talked with WinnResidential
6  and -- several times, I think a couple times, twice.
7  And then I guess they came with the answer that
8  Mikhail then can move in after everything had been
9  said and done.  You know, but it took a -- there was
10 a process, it just didn't happen right away.
11     Q.  So part of the process was that
12 Mr. Mikhail Arroyo was allowed to move into the
13 complex, into the two-bedroom apartment that you
14 were residing in at that time?
15     A.  Correct.
16     Q.  And that was unit 206?
17     A.  206.
18         MR. ST. GEORGE:  Let's take a look at
19     another document.  And mark this, please, as
20     Exhibit 10.
21             (Exhibit 10, marked)
22 BY MR. ST. GEORGE:
23     Q.  Do you have in front of you what's been
24 marked as Exhibit 10?
25     A.  Yes.

124

1      Q.  Take whatever time you need to look at
2  it, no worries.  Can I have you turn to page 5 of
3  the document?
4      A.  Okay.
5      Q.  And do you see that there is a signature
6  of the Complainant towards the top?
7      A.  Yes.
8      Q.  Okay.  And is that your signature?
9      A.  Yes.
10     Q.  All right.  So, do you recognize this
11 document, have an understanding of what it is?
12     A.  I believe it's giving permission on my
13 behalf.
14     Q.  So why don't we turn back to the first
15 page.  That might give us a little bit better
16 understanding.  So this is labeled as a
17 Pre-determination Conciliation Agreement.  Do you
18 see that?
19     A.  Yes.
20     Q.  And I think what normal people would say,
21 non-lawyers would say that this is a settlement
22 agreement.
23     A.  Okay.
24     Q.  Is that your understanding of what this
25 document is?

Transcript of Carmen Arroyo
Conducted on July 24, 2019

153

1  breathe. So it was just a waiting game to see if
2  the pneumonia and the blood clots would relieve and
3  the back -- and, you know, being backed up.
4      Q.  Okay. And so I take it he was eventually
5  discharged?
6      A.  He was.
7      Q.  How long did that take?
8      A.  It was a week, I took off work that whole
9  week. I had to call my doctor and say, "I'm sorry,
10  I can't come to work."
11      Q.  And what was the cause of the injuries --
12  or cause of the pneumonia?
13      A.  I don't quite know. I think the report
14  was something -- there's a word for it. Nursing
15  home -- there's a word for it. I don't remember the
16  word.
17      Q.  So I asked you about the pneumonia. You
18  don't know what caused the blood clots?
19      A.  They said that it was him sitting so long
20  on his wheelchair. But when I explained to the
21  doctor that he does get physical therapy and he does
22  move a little, not quite as we would move, but he
23  does get that, they really couldn't find any
24  thrombosis or anything in the legs that would have
25  caused it. They -- basically they couldn't really

154

1  give me a pinpoint where it started, but the lungs
2  were filled with clots and they were very afraid of
3  it going to the main artery of the heart.
4      Q.  How about the constipation, any ... ?
5      A.  That he was backed up. They, they didn't
6  know he was backed up like that.
7      Q.  Do you know why he was constipated?
8      A.  You know, he takes a lot of medication,
9  so he takes medication for his seizures, he takes
10  medication for his spasms in his right side, the arm
11  and leg. So, you know, certain medications can
12  cause constipation. He does take medicine to
13  relieve that so he can try to go a little bit
14  regular. It could be a number of things.
15      Q.  If you were to, I noticed during one of
16  your answers you started to sign. Do you sign with
17  Mikhail?
18      A.  I took up a sign language with him for a
19  little bit. It was like $10 a week. At a little
20  place that they opened up in Willimantic. I just
21  learned the basics and then I had a friend who gave
22  me her book from college and I was just reading it
23  slowly. We do try to sign as much as we can,
24  because he doesn't really talk. It doesn't always,
25  because, again, with the traumatic brain injury, the

155

1  acquired brain injury, he can't always remember, so
2  sometimes he does his own sign. So I kind of have
3  to figure it out. Yeah.
4      Q.  The sentence above, the one talking about
5  his fall, reads, "During that time, he," meaning
6  Mikhail Arroyo, "suffered anxiety and sadness that
7  was proximately caused by defendant's discriminatory
8  role in the denial of his housing application."
9          Then the sentence goes on.
10          Has Mikhail communicated that to you?
11      A.  Yeah. Not verbally. We had him on a
12  weekend and we said, "Okay, we have to go." It was
13  like we would take him out on a day, but the weekend
14  we had taken him out, brought him back, take him
15  out. And he just put his hands out and he was
16  nodding no.
17          And I said, "Mikhail, we have to go
18  back." And he started to cry. And I said, "Honey,
19  we have to go back. You can't stay here. You know,
20  we're still working on that, for you to come home,
21  but right now, you know, you have to go back."
22          And he was very, like, adamant about he
23  didn't want to go back. And I just hugged him. I
24  said, "Hey, let's go get some ice cream or something
25  and we'll just take our time going back." And he

156

1  was okay.
2          There were times I wouldn't pick him up
3  to come home, I'd just take him out to a movie or
4  dinner so it wouldn't really make him feel that bad
5  again, you know.
6      Q.  The final questions I have for you, if
7  you were to fill out a census form or something
8  along those lines, would you identify as Latino or
9  of Hispanic origin?
10      A.  I am Hispanic, yes.
11      Q.  Would you identify in any way as black or
12  African-American?
13      A.  As a Latina from Puerto Rico. My family
14  is from Puerto Rico, even though I was born and
15  raised here. We have what they call Africano, which
16  is African. We have Lahino. And we also have the
17  origin, so you may -- my skin complexion, I have
18  some Spaniard in me as well. I'm considered a white
19  Latina, Hispanic. Mikhail as well. If you see my
20  mother, she would be considered a darker version of
21  the Latina, yes.
22      Q.  So you would consider both yourself and
23  Mikhail as white Hispanic, is that right?
24      A.  Well, because of our complexion, but
25  we are technically Hispanic; we are just, from my

157

1  family is descendants from the Islands.
2      Q.  Okay.  I don't have anything further.
3      MR. ST. GEORGE:  Solomon, do you have
4  any?
5      MR. KAZEROUNIAN:  Yes.
6          * * * * *
7      EXAMINATION CONDUCTED
8  BY MR. KAZEROUNIAN:
9      Q.  I just want to clarify a few things, and
10 I think we'll start where we just were.
11     **A.  Okay.**
12     Q.  You were just a second ago trying to
13 think of a term that describes the type of pneumonia
14 Mikhail got?
15     **A.  Yes.**
16     Q.  And was that term "nursing home acquired
17 pneumonia"?
18     **A.  I believe it was, yes.**
19     MR. ST. GEORGE:  I'm going to object to
20 form.
21 BY MR. KAZEROUNIAN:
22     Q.  And based on your understanding, is that
23 defined as pneumonia that's acquired in a long-term
24 care facility or a nursing home?
25     MR. ST. GEORGE:  Object to form as

158

1  well.
2      **A.  Yes.**
3      Q.  Would Mikhail have acquired this type of
4  nursing home acquired pneumonia had he not been
5  living in a nursing home?
6      MR. ST. GEORGE:  Object to form.
7      **A.  It's hard to say.  I don't know.**
8      Q.  But he got it from being there?
9      **A.  Yes.  Yes, he did.**
10     MR. ST. GEORGE:  Object to form.  He
11 got it while being there, right?
12 BY MR. KAZEROUNIAN:
13     Q.  He got it while being there?
14     **A.  Yes.**
15     Q.  And he wouldn't have been there had he,
16 had his application not been rejected, correct?
17     **A.  Yes.**
18     Q.  And the --
19     MR. ST. GEORGE:  I'll put a standing
20 objection.  She's your witness, you can't
21 lead.  I mean, you should be asking
22 open-ended questions of your own witness.  I
23 think every question so far has been
24 leading.
25     MR. KAZEROUNIAN:  So I'm asking the

159

1  questions --
2      MR. ST. GEORGE:  Right.  So I'll put
3  a --
4      MR. KAZEROUNIAN:  -- better designed to
5  -- so, for example, is that term "nursing
6  home acquired," she said, "nursing home" --
7  blank --
8      MR. ST. GEORGE:  You fed it to her, you
9  led it to her.  You're not allowed to lead
10 your own witness.  So I can put a standing
11 objection to every question you asked as
12 leading, but I would just ask that we use
13 the type of open-ended questions that you
14 have to use for your own witness.
15     MR. KAZEROUNIAN:  I will do that.
16 Yeah.  I will ask open-ended questions,
17 but --
18     MR. ST. GEORGE:  That's all I'm saying.
19     MR. KAZEROUNIAN:  Sure.
20 BY MR. KAZEROUNIAN:
21     Q.  Would Mikhail have been able to fall in
22 the nursing home if he wasn't stuck in the nursing
23 home?
24     MR. ST. GEORGE:  Object to form.
25     **A.  (No response.)**

160

1  BY MR. KAZEROUNIAN:
2      Q.  If he wasn't in the nursing home, would
3  Mikhail have been able to fall and experience the
4  injuries that he incurred as a result of that fall?
5      MR. ST. GEORGE:  Object to form.
6      **A.  I guess not.  I don't know.**
7      Q.  You were asked what you, why the
8  defendant in this case, CoreLogic, was responsible
9  for your emotional distress.  And you described, I'm
10 going to paraphrase, and correct me if I'm
11 mischaracterizing, but you described the frustration
12 that you experienced when they wouldn't give you a
13 definitive answer about why Mikhail's application
14 was denied, you couldn't get the paperwork or an
15 explanation?
16     **A.  Yes.**
17     Q.  In addition to that, what role, to your
18 knowledge, did CoreLogic play in the initial denial
19 of the application and your son being rejected to
20 begin with?
21     **A.  Being that they were a third party,**
22 **according to WinnResidential, they were just only**
23 **able to give me what CoreLogic stated that was why**
24 **he couldn't.  You know, like the answer was no, he**
25 **was not allowed to move in.**