**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

**CONNECTICUT FAIR HOUSING CENTER**
*et al.,*

                *Plaintiffs,*

   v.

**CORELOGIC RENTAL PROPERTY**
**SOLUTIONS, LLC,**

           *Defendant.*

**No. 3:18-CV-705 (VLB)**

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON DISPARATE IMPACT CLAIMS FOR RACE AND NATIONAL ORIGIN DISCRIMINATION AND UNFAIR PRACTICES**

# TABLE OF CONTENTS

**Page**

I.    Introduction ..................................................................................... 1

II.   Factual Background ........................................................................ 4

III.  Argument ........................................................................................ 7

    A.    Legal Standard ....................................................................... 7

        1.    Summary Judgment ..................................................... 7

        2.    Disparate Impact Claim .............................................. 7

    B.    Undisputed Facts Show Defendant, through CrimSAFE,
        Proximately Causes Housing Denials. ................................... 9

    C.    Undisputed Facts Show that Defendant's Use of Criminal
        Background Screening Has Adverse Impact on African
        American and Latino Housing Applicants ........................... 18

        1.    Plaintiffs' Expert Dr. Christopher Wildeman and Public
            Records Are Unrebutted ............................................. 19

        2.    Plaintiffs' Expert Appropriately Used General Population
            Statistics with Appropriate Qualifiers ...................... 21

    D.    Undisputed Facts Show that CrimSAFE Is Not Necessary to
        Achieve a Substantial and Legitimate Business Purpose ................. 24

        1.    Disqualification Based on Non-Conviction Records .............. 25

        2.    Disqualification Based on Old Convictions ............................. 26

    E.    Undisputed Facts Show that There Are Less Discriminatory
        Alternatives Which Satisfy Any Valid Business Need ...................... 29

    F.    Undisputed Facts Establish CUTPA Liability ...................... 32

        1.    Causing Discriminatory Housing Denials Is an Unfair
            Practice ...................................................................... 33

        2.    Facilitating Housing Providers' Discrimination is Also an
            Unfair Practice .......................................................... 39

        3.    The Arroyos Suffered an Ascertainable Loss .......................... 42

IV.   Conclusion .................................................................................... 43

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

C<span>ASES</span>

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................... 7

*Arnal v. Aspen View Condominium Ass'n, Inc.*
   245 F. Supp. 3d 1261 (D. Colo. 2017) .............................................. 15

*Artie's Auto Body v. Hartford Fire Ins. Co.,*
   317 Conn. 602 (2015) ....................................................................... 33

*Ave. 6E Invs., LLC v. City of Yuma,*
   217 F. Supp. 3d 1040 (D. Ariz. 2017) .............................................. 24

*Barletta v. Rilling,*
   973 F. Supp. 2d 132 (D. Conn. 2013) ...................................... 28, 30, 31

*Bartold v. Wells Fargo Bank,* N.A., No. 14-CV-00865 (VAB), 2015 WL
   7458504, at *6 (D. Conn. Nov. 24, 2015) ......................................... 34

*Cheshire Mortg. Serv., Inc. v. Montes,*
   223 Conn. 80 (1992) ................................................................... 33, 38

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ........................................................................... 9

*Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,*
   444 F.3d 158 (2d Cir. 2006) .............................................................. 7

*Cleveland v. Caplaw Enters.,*
   448 F.3d 518 (2d Cir. 2006) ............................................................ 15

*Comm'n on Human Rights & Opportunities v. Savin Rock Condo.*
   *Ass'n, Inc.,* 273 Conn. 373, 870 A.2d 457 (2005) ........................... 37

*Conaway v. Prestia,*
   191 Conn. 484 (1983) ....................................................................... 34

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC,*
   369 F. Supp. 3d 362 (D. Conn. 2019) ................................................ 9

*Daddona v. Liberty Mobile Home Sales, Inc.,*
   209 Conn. 243, 550 A.2d 1061 (1988) .................................. 33, 34, 37

# TABLE OF AUTHORITIES

**Page(s)**

*Dothard v. Rawlinson*,
    433 U.S. 321 (1977)..................................................................................... 21

*EEOC v. Joint Apprenticeship Comm.*,
    186 F.3d 110 (2d Cir. 1999) ................................................................. 21, 22

*Field v. Orkin Extermination Co.*,
    2002 WL 32345739 (E.D. Pa. Feb. 21, 2002) .................................... 28, 31

*Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*,
    388 F. Supp. 3d 145 (E.D.N.Y. 2019) ................................................ 22, 24

*Green v. Konover Residential Corp.*,
    No. 3:95CV1984(GLG), 1997 WL 736528 (D. Conn. Nov. 24, 1997) ..................... 34

*Green v. Mo. Pac. R.R. Co.*,
    523 F.2d 1290 (8th Cir. 1975)............................................................. 28, 31

*Gregory v. Litton Sys., Inc.*,
    316 F. Supp. 401 (C.D. Cal. 1970), *aff'd*, 472 F.2d 631 (9th Cir. 1972) .......... 25, 26

*Hazelwood Sch. Dist. v. United States*,
    433 U.S. 299 (1977)..................................................................................... 21

*Hinchliffe v. Am. Motors Corp.*,
    184 Conn. 607 (1981) ............................................................................... 42

*Hintz v. Chase*,
    No. 17-CV-02198-JCS, 2017 WL 3421979 (N.D. Cal. Aug. 9, 2017) .............. 15, 18

*Jeanty v. McKey & Poague, Inc.*,
    496 F.2d 1119 (7th Cir. 1974)............................................. 15, 16, 17, 18

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*,
    844 F.2d 926 (2d Cir. 1988) ...................................................................... 8

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977)................................................................................... 22

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005) ...................................................................... 7

*Kwong v. Bloomberg*,
    723 F.3d 160 (2d Cir. 2013) ......................................................................7

# TABLE OF AUTHORITIES

**Page(s)**

*Laufman v. Oakley Bldg. & Loan Co.*,
  408 F. Supp. 489 (S.D. Ohio 1976) ................................................... 34

*Malave v. Potter*,
  320 F.3d 321 (2d Cir. 2003) ............................................................ 22

*Marr v. Rife*,
  503 F.2d 735 (6th Cir. 1974) ............................................................ 35

*Mayers v. Ridley*,
  465 F.2d 630 (D.C. Cir. 1972) (en banc) .............................................. 36

*MHANY Mgmt., Inc. v. Cty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016) ............................................................. 8

*MHANY Mgmt., Inc. v. Cty. of Nassau*,
  No. 05CV2301ADSARL, 2017 WL 4174787 (E.D.N.Y. Sept. 19, 2017) ............... 32

*MHANY Mgmt., Inc. v. Inc. Vill. Of Garden City*,
  985 F. Supp. 2d 390 (E.D.N.Y. 2013) .................................................. 32

*Mitchell v. Shane*,
  350 F.3d 39 (2d Cir. 2003) .............................................................. 15

*Ojo v. Farmers Grp., Inc.*,
  600 F.3d 1205 (9th Cir. 2010) ....................................................*passim*

*Parris v. Pappas*,
  844 F. Supp. 2d 271 (D. Conn. 2012) ................................................. 34

*Phillips v. Cohen*,
  400 F.3d 388 (6th Cir. 2005) ........................................................... 21

*Portee v. Hastava*,
  853 F. Supp. 597 (E.D.N.Y. 1994) ..................................................... 15

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
  903 F.3d 415 (4th Cir. 2018), *cert. denied sub nom, Waples Mobile
  Home Park Ltd. P'ship v. Reyes*, 139 S. Ct. 2026 (2019) ......................... 23

*Reynolds v. Sheet Metal Workers Local 102*,
  498 F. Supp. 952 (D.D.C. 1980) ....................................................... 21

*Rivera v. Inc. Vill. of Farmingdale*,
  784 F. Supp. 2d 133 (E.D.N.Y. 2011) ................................................. 23

iv

## TABLE OF AUTHORITIES

**Page(s)**

***Schware v. Bd of Bar Exam'rs*,**
   353 U.S. 232 (1957)..................................................................... **25**

***Short v. Manhattan Apts., Inc.*,**
   916 F. Supp.2d 375 (S.D.N.Y. 2012) ...................................... **16**

***Stevenson Lumber Co.-Suffield, Inc. v. Chase Assocs.*, Inc., 284**
   **Conn. 205, 214 (2007)** ...................................................... **42, 43**

***Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,**
   135 S. Ct. 2507 (2015) ...................................................... **8, 9, 36**

***Thurmond v. Bowman*,**
   211 F. Supp. 3d 554 (W.D.N.Y. 2016) .................................... **15**

***Tsombanidis v. W. Haven Fire Dep't*,**
   352 F.3d 565 (2d Cir. 2003) ................................................ **8, 23**

***United States v. Hous. Auth. of Chickasaw*,**
   504 F. Supp. 716 (S.D. Ala. 1980) ........................................ **36**

***United States v. Hylton*,**
   944 F. Supp. 2d 176, aff'd, 590 F. App'x 13 (2d Cir. 2014) (D. Conn.
   2013)............................................................................... **15, 18**

***Viens v. Am. Empire Surplus Lines Ins. Co.*,**
   113 F. Supp. 3d 555 (D. Conn. 2015)...................................... **9**

**STATUTES**

**15 U.S.C. § 1681c(a)(2)** ............................................. **16, 17, 26, 42**

**Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*.............................*passim***

**Connecticut Constitution, Sec. 20** ........................................ **37**

**Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a) ........*passim***

**Conn. Gen. Stat. § 42-110g(a)**.............................................. **43**

**Conn. Gen. Stat. § 46a-64b, *et seq*.**........................................ **37**

**OTHER AUTHORITIES**

**24 C.F.R. § 100.7(a)**.............................................................. **18**

## TABLE OF AUTHORITIES

**Page(s)**

**24 C.F.R. § 100.70** ........................................................................................ **9**

**24 C.F.R. § 100.500** ................................................................................ **8, 23**

**Fed. R. Civ. P. 56(a)** ............................................................................... **7, 44**

**Local Rules 56(a)(1)** ................................................................................ **4, 6**

I.       **INTRODUCTION**

Defendant CoreLogic Rental Property Solutions (hereinafter "Defendant" or "CoreLogic") is a national tenant screening company that offers an automated criminal history screening product called "CrimSAFE." Multifamily rental housing providers[1] who contract with Defendant to receive CrimSAFE reports enter their criminal history screening criteria into an electronic CrimSAFE account; when a person applies for admission to a client landlord's property, CrimSAFE electronically locates any criminal records belonging to the applicant, determines whether any such records are disqualifying under the client's admission policy, and reports a simple accept/decline leasing decision. If the CrimSAFE decision is adverse (i.e., "decline," or "record(s) found"), the applicant is denied admission.

The use of criminal history screening in rental admissions tends to have significant disparate impacts based on race and national origin because Latinos and African Americans are arrested, convicted of crimes, and incarcerated at substantially higher rates than whites. This does not make all such criminal history screening unlawful. But to avoid violating the Fair Housing Act (FHA), 42 U.S.C. §§ 3601 *et seq.,* a criminal history screening practice must generally be evidence-based and designed to achieve a legitimate business purposes, such as protecting property or safety, and the practice must not be broader than necessary to accomplish that purpose.

Defendant's policies and practices related to CrimSAFE do not meet this

---

[1] The terms "housing provider" and "landlord" are used interchangeably herein to refer to owners and managers of residential rental housing.

standard in Connecticut, where Latinos and African Americans are overrepresented in criminal justice involvement and thus more likely to be denied housing based on disqualifying criminal records reported by CrimSAFE. Defendant does not limit CrimSAFE use to evidence-based criminal history screening policies, but rather will screen applicants according to whatever criteria a housing provider may choose (generally in collaboration with Defendant), regardless of whether such criteria contribute to making a landlord's property safer or other residents more secure. As a result, automated CrimSAFE decisions are prone to declining applicants unnecessarily—such as in this case, where CrimSAFE reported a denial result for a man literally incapable of engaging in criminal activity due to physical and intellectual disabilities, based on nothing but a low-level shoplifting charge for which he was never convicted. While some such applicants may be able to secure admission through subsequent interactions with the landlords, not all can, and Defendant does nothing to ensure its client landlords have or follow policies for reviewing or reconsidering applicants CrimSAFE rejects.

Defendant could require client landlords to adopt evidence-based criminal screening policies as a condition of using CrimSAFE—or could at least configure CrimSAFE not to apply screening policies already known to be overbroad, such as the one applied to Mr. Arroyo (which reported a denial based on a non-conviction record, a practice HUD has said cannot be justified as necessary to protect property or safety). Defendant could also retrieve, sort, and provide client landlords with any potentially disqualifying records and direct them to conduct individualized reviews before denying admission, rather than just making automated decisions

for the landlords. But that is not how CrimSAFE is currently designed: once it locates a criminal record and matches it to a category of disqualifying criminal records under the client landlord's admission policy, the program reports a decline decision to the on-site leasing staff, who are purposefully denied (by CrimSAFE's configuration) access to any underlying information about the criminal records, and who are trained by Defendant to notify the applicant of the denial upon receiving the adverse CrimSAFE result.

The ongoing and widespread use of CrimSAFE throughout Connecticut produces hundreds of criminal history denials each month. Yet the undisputed facts of this case show (i) that CrimSAFE causes a disparate impact on Latino and African American rental applicants, who are disproportionately likely to be matched with disqualifying criminal records, (ii) that Defendant provides automated CrimSAFE decisions, including denials, based on whatever criminal screening criteria landlords choose—without regard to whether those policies actually protect resident safety or property, and (iii) that CoreLogic has ignored less discriminatory alternatives by which it could provide criminal history screening products that categorize, sort, and filter criminal records for landlords. In summary, CrimSAFE and its current implementation produce a discriminatory effect on Latinos and African Americans that is neither evidence-based nor necessary to achieve a legitimate business purpose, despite the availability of less discriminatory alternatives. The Court should therefore enter summary judgment against Defendant for denying or making housing unavailable on a discriminatory basis in violation of the FHA and enjoin Defendant from continuing to report denial

decisions through CrimSAFE until necessary corrective measures are implemented.[2]

Likewise, the Court should enter summary judgment in favor of the Plaintiffs on their CUTPA claims, for the undisputed facts also establish that Defendant's CrimSAFE product is unfair because it predictably causes discrimination against housing applicants, both directly and by facilitating or encouraging housing providers' violations of the FHA, a violation of public policy that causes substantial injury to consumers.

II.    <u>FACTUAL BACKGROUND</u>

Defendant CoreLogic Rental Property Solutions, LLC is a national tenant screening company that offers a product called "Registry CrimSAFE" (hereinafter, "CrimSAFE"), which automatically retrieves, categorizes, and filters a rental housing applicant's criminal records, determines whether the applicant qualifies for admission under the client housing provider's policy, and reports an automated accept or decline decision to the housing provider. Plaintiffs' Local Rules 56(a)(1) Statement of Undisputed Facts ¶¶ 1-12, 14-21 ("SOF").

CrimSAFE reports a "Crim Decision"[3] to the landlord indicating whether the prospective tenant's criminal background is "disqualifying." *Id.* ¶¶ 18-22. Unlike with a traditional background check, which provides information about an

_____

[2] Plaintiffs are not moving for summary judgment on their disparate treatment claims.

[3] Subsequent to Defendant's screening of Plaintiff Mikahil Arroyo's rental application, Defendant replaced the term "Crim Decision" with "CrimSAFE Recommendation." SOF ¶ 20 fn. 6. No additional changes were made to either the operation of CrimSAFE or the terminology used in CrimSAFE reports. *Id.*

4

applicant's criminal history that a landlord can use to make its own admission decision, the "Crim Decision" and corresponding "CrimSAFE Report" does not include information about an applicant's criminal history, just the determination (*Id.* ¶¶ 18-22, 48), as CrimSAFE is intended to "automate the evaluation of criminal records for you, relieving your staff from the burden of interpreting criminal search results." *Id.* ¶ 3. To this end, Defendant allows housing providers "who choose to have their rental decisions automated using … CrimSAFE" the ability to hide the detailed criminal record from the view of leasing agents, who are only provided a "decision report" stating whether or not disqualifying records were found. *Id.* ¶ 35. The ability to suppress detailed background information in CrimSAFE in favor of receiving an automated decision is a major draw for housing providers. *Id.* ¶ 7.

 For most housing providers, a CrimSAFE decision of "disqualifying records were found" effectively amounts to a denial of housing from the landlord. *Id.* ¶¶ 20-22, 24, 38. CrimSAFE decisions are made automatically, without regard for whether the criminal records indicate that the applicant presents a demonstrable risk to safety or property and without consideration of relevant mitigating information outside the criminal record itself. *Id.* ¶¶ 91-99. Defendant routinely disqualifies applicants based on records of criminal charges that did not lead to convictions and based on old convictions (up to 99 years) that do not indicate an increased likelihood of re-offending. *Id.* ¶¶ 11-12, 93-94.

Corelogic markets CrimSAFE on a nationwide basis, and the product is popular among large, multifamily rental housing providers—some with hundreds

of properties in multiple states, and with tens of thousands of dwelling units. *Id*. ¶ 1, 29-30, 100.

Plaintiffs' unrebutted expert reports establish that Latinos and African Americans are arrested, convicted of crimes, and incarcerated at substantially higher rates than whites. *Id.* ¶¶ 66-88. These criminal records populate Defendant's national database of public records and form the basis of CrimSAFE's disqualification decisions. *Id*. ¶ 65.

CrimSAFE disqualified Plaintiff Mikhail Arroyo, a Latino man who was incapable of criminal conduct because of his physical and intellectual disabilities, based on a criminal record consisting of only a low-level shoplifting charge that was ultimately withdrawn. *Id.* ¶¶ 39-60. Mr. Arroyo's prospective landlord, WinnResidential, like most of Defendant's customers, followed the CrimSAFE settings under which the decisionmakers did not receive the full criminal record, but only the CrimSAFE decision. *Id.* ¶¶ 25-27, 35-36. WinnResidential rejected Mr. Arroyo as a tenant because Defendant had returned a decline decision for unknown reasons. *Id.* ¶¶ 47, 57-60. As a result, Mr. Arroyo unnecessarily remained in a nursing home for an additional year.[4] *Id.* ¶¶ 60-61. Defendant's disqualifying report on Mr. Arroyo effectively denied his rental application. *Id.* ¶¶

---

[4] WinnResidential instructed Mr. Arroyo's mother, Ms. Arroyo, to contact Defendant for additional information. *Id.* ¶ 59. Despite her repeated requests for information, including multiple written file disclosure requests, Defendant refused to provide any information about the basis for its decision. Doc. 87-2 (Plaintiffs' Rule 56(a)(1) Statement of Undisputed Material Facts) at ¶¶ 6-26. Only after filing an administrative fair housing complaint against WinnResidential and providing evidence of Mr. Arroyo's only known criminal record was he allowed to move in. *Id.* ¶ 62. But this did not occur until June 2017—more than a year later, during which time he unnecessarily remained in the nursing home. *Id.* ¶ 62.

44-62.

III.   **ARGUMENT**

    A.   **Legal Standard**

        1.   **Summary Judgment**

Summary judgment is appropriate when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Kwong v. Bloomberg*, 723 F.3d 160, 164-65 (2d Cir. 2013). The Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005); *Anderson*, 477 U.S. at 252.

        2.   **Disparate Impact Claim**

Section 3604(a) of the FHA prohibits a person or entity from "mak[ing] unavailable or deny[ing] a dwelling to any person because of race [or] national origin." 42 U.S.C. § 3604(a). Section 3604(b) prohibits discrimination "in the terms, conditions, or privileges" of a rental. The Supreme Court has expressly reaffirmed that disparate impact claims are cognizable under the FHA, which means housing practices that disproportionately harm racial and ethnic minorities violate the FHA when there is no legitimate justification for those practices. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2525 (2015) ("ICP");

*see also Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir. 1988).

FHA disparate impact claims are analyzed under the framework set forth in HUD's discriminatory effects rule, 24 C.F.R. § 100.500; *see MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016) (adopting the rule). This is a three-step burden-shifting analysis, under which:

> First, a plaintiff … must come forward with a prima facie case; and second, the defendant … may rebut the prima facie case by proving that the "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests[.]" [Third,] if the defendant meets its burden, the burden of proof shifts back to the plaintiff to show that the "substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect."

*MHANY Mgmt.* 819 F.3d at 617, quoting 24 C.F.R. § 100.500(c); *see also ICP* at 2514-2515, 2522-2523.

Establishing a prima facie case requires showing "that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1). The Second Circuit breaks this standard into three parts: (i) "certain outwardly neutral practices," (ii) "a significantly adverse or disproportionate impact on persons of a particular type," and (iii) "a causal connection" between the facially neutral [practices] and the [] discriminatory effect." *MHANY Mgmt.*, 819 F.3d at 617; *see also Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565, 575 (2d Cir. 2003); *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 369 F. Supp. 3d 362, 377-78 (D. Conn. 2019). This showing generally requires statistical evidence. *ICP* at 2523.

**B.**     **Undisputed Facts Show Defendant, through CrimSAFE, Proximately Causes Housing Denials.**

FHA regulations promulgated by HUD to enforce the FHA make clear that rendering a decision to accept or reject an applicant amounts to a service connected to rental that makes housing unavailable and is therefore covered by the FHA: "It shall be unlawful, because of race, … handicap …, or national origin, to engage in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons." 24 C.F.R. § 100.70(b). Activities prohibited under this regulation "include… (2) Employing codes or other devices to … reject applicants … [or] (3) Denying or delaying the processing of an application made by a … renter … because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.70(d)(2)-(3). As the agency charged with enforcement of the FHA, HUD's construction of the statute is entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *see Viens v. Am. Empire Surplus Lines Ins. Co*., 113 F. Supp. 3d 555, 567 (D. Conn. 2015) (applying *Chevron* deference and finding § 3604 prohibits discrimination in the provision of homeowner's insurance); *see also Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010), as amended (Apr. 30, 2010) (same).

The undisputed evidence establishes that Defendant employs an automated decision-making product (CrimSAFE) to decline rental applications on behalf of its client landlords. *Id*. ¶¶ 2-7, 17-28, 31-36, 38, 44-62. This conduct falls within the ambit of § 3604. That it is a tenant screening company and not a

landlord is of no consequence, as CrimSAFE decisions proximately cause housing denials.

The undisputed evidence shows that CrimSAFE's fundamental purpose is to furnish a housing provider with an accept/decline decision on the basis of an applicant's criminal history, not to provide information to inform the landlord's own decision. *Id.* Defendant has consistently marketed CrimSAFE since 2005 as providing housing providers' staff with "a clear accept/decline leasing decision" which is the result of an "automate[d] evaluation," thereby "relieving" housing providers of the "burden" of interpreting criminal records on their own.[5] *Id.* ¶ 5-6. Most of this language remains verbatim to this day on Defendant's website and in other marketing materials. *Id.* ¶ 5-6.[6] Identical language was also used in Defendant's August 2015 offer of screening services to WinnResidential, which it submitted in response to a request for proposals. In that offer, Defendant recommended that WinnResidential use CrimSAFE (*Id.* ¶ 32), which it described as a product that "ensures consistent lease decisions … and relieves your staff from the burden of interpreting criminal search results." With CrimSAFE, "criminal record search results are evaluated using our own advanced, proprietary technology and an accept/decline leasing decision is delivered to

---

[5] Defendant contrasts CrimSAFE with another of its criminal record search products, Registry CrimCHECK, which "gives you the data to make your own leasing decisions." *Id.* ¶ 2.

[6] *See also* Rental Property Solutions Criminal Screening, https://www.corelogic.com/products/criminal-screening.aspx (click "Registry CrimSAFE") (last visited November 12, 2019) (stating "Automate the evaluation of criminal records for you, relieving your staff from the burden of interpreting criminal search results and ensuring consistency in your decision process.")

your staff." *Id.* ¶ 33. WinnResidential understood this to mean that CrimSAFE delivers an accept/decline leasing decision. *Id.* ¶ 34. Indeed, "[t]his is why we choose them … Because they provide … a means by which to screen the applicant through all of these searches and then provide an 'accept' and 'decline.'" *Id.*

Not only is Defendant aware that housing providers use CrimSAFE to make leasing decisions (*Id.* ¶ 38), but it encourages them to use the product in this manner in its marketing and training materials, and through features of the product designed to facilitate housing providers' reflexive implementation of the CrimSAFE outcomes. *Id.* ¶¶ 5-6, 24-28. Defendant's proposal to WinnResidential explains that "[u]sers who choose to have their rental decisions automated using ScorePLUS® and CrimSAFE® may suppress the full reports from the view of their on-site staff. WinnResidential currently uses this option and the site managers view a decision report." *Id.* ¶ 35. After receiving the August 2015 proposal, WinnResidential continued to choose to have its rental decisions automated using CrimSAFE and to suppress the detailed report from the view of their onsite staff, who were empowered to make leasing decisions. *Id.* ¶ 36. In other words, WinnResidential's "leasing and property managers only have access to the decision that is returned from the CoreLogic screening." *Id.* In fact, Defendant allows housing providers to suppress the details of an applicant's criminal records not only from onsite leasing staff but from *all* staff, including administrators, by simply unchecking a box on the CrimSAFE configuration page. *Id.* ¶ 25. Withholding the details of an applicant's criminal record greatly reduces

a housing provider's ability to determine whether it agrees with the CrimSAFE decision, or to reconsider a denial based on additional materials an applicant might provide (such as evidence of rehabilitation or that a disability resulted in an arrest). *Id*. ¶¶ 25-28. There is no practical reason for a housing provider ever to spontaneously deviate from a CrimSAFE decision. *Id.* WinnResidential, for instance, follows the CrimSAFE decision for every applicant (*Id.* ¶ 38). Between January 2016 and July 2019, CrimSAFE declined more than 3,000 WinnResidential applicants, of which more than 500 were declined based on non-conviction records. *Id.* ¶¶ 37, 94.

In conjunction with an adverse CrimSAFE decision, Defendant even provides the landlord a letter, pre-addressed to the applicant, stating that "we are unable to approve your application" and that "this decision was based on information contained in consumer report(s) obtained from or through CoreLogic SafeRent, LLC." *Id.* ¶ 22. CoreLogic trains housing providers' leasing staff to send this notice to applicants for whom CrimSAFE reports disqualifying records*. Id*. ¶ 23. Housing providers even have the option of having Defendant automatically deliver adverse action letters directly to applicants when CrimSAFE has found disqualifying records to notify them that their applications have been declined. *Id.* ¶ 24. A leasing agent simply initiates the screening process, leaving Defendant to determine whether the applicant should be accepted or rejected and to notify the applicant of the decision. *Id*. In other words, Defendant has control over every aspect of the screening process, from determining the lookback

policies, rendering the disqualification decision, and notifying the applicant of the rejection.

Robert Thomas, who served as Defendant's Director of Product Solutions until his 2017 retirement,[7] testified: "I mean, we know what [CrimSAFE's] purpose is, right? Everybody agrees it's to automate a screening decision based on the client's criteria." *Id.* ¶ 5. Robert Lindenfelzer, the former CoreLogic sales executive who landed and managed the WinnResidential account and an author of the response to the WinnResidential requests for proposals, agreed that "Yeah, [CrimSAFE] delivers a decision." *Id.* This understanding was shared by the WinnResidential executive responsible for overseeing CrimSAFE, Lynn Bora (*Id.* ¶ 34) and the leasing agents and property managers who utilized the product to process applications. *Id.* ¶ 50. Indeed, CrimSAFE was designed for this very purpose, as confirmed by the original developer who filed the product's patent application before assigning it to Defendant. *Id.* ¶ 5.[8] These witnesses' understanding of the nature and purpose of CrimSAFE is consistent with the way Defendant has marketed the product since at least 2005.[9] *Id.* ¶ 5-6.

---

[7] Mr. Thomas worked for Defendant and predecessor companies for approximately 29 years. He served as Director, and before that Vice President, of Sales Operations for 14 years before becoming Director of Product Solutions in 2015. In that role he developed a training program to help "our sales and account management understand our products," including CrimSAFE. SOF ¶ 5 fn. 2

[8] The patent application describes CrimSAFE as "generat[ing] an accept decision or a decline decision." SOF ¶ 5.

[9] Defendant has further consistently marketed CrimSAFE as ensuring or optimizing landlords' fair housing compliance, and it even provides landlords with a certificate of their fair housing compliance when they sign up for CrimSAFE. SOF ¶¶ 6, 31. These statements further encourage housing providers to use CrimSAFE as marketed, e.g. as a decision-making product.

Decision-making language also appears throughout an internal training presentation Defendant developed in 2016 intended to teach its account managers and sales staff about "what CrimSAFE is, what it does, how it's configured, and how it's used," repeatedly using such phrases as "the CrimSAFE decision would be decline." *Id.* ¶¶ 5 fn. 2, 12, 17. Similarly, the "Manage CrimSAFE" webpage where housing providers configure the product instructs users to enter the maximum number of years they want CrimSAFE to look back in order "to decline an applicant for specified type of crime." *Id.* ¶ 8. The configuration instructions that tell housing providers how to use CrimSAFE is no different, offering the following succinct summary of the product:

> A criminal record generally contains information on the type of crime, degree and level of crime, and date of offense. With CrimSAFE, this public record information is evaluated and used to provide a decision based on the client's pre-determined criminal decision policy.

*Id.* ¶ 9.

There exists no genuine dispute that CrimSAFE provides landlords with leasing decisions based on an applicant's criminal history that proximately cause housing denials. Defendant's role is no different than a property manager, real estate agent, or other traditional agent to whom a landlord might entrust tenant-selection decisions. The law is clear that such agents or employees can be held liable under the FHA when they deny housing on a discriminatory basis, even though the property owner can override their decisions. *See, e.g.*, *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 523 (2d Cir. 2006) (employee can be held liable

under FHA for his own discriminatory acts), discussing *Mitchell v. Shane,* 350 F.3d 39, 50 (2d Cir. 2003) ("if Ryan is found liable for discrimination, Century 21, as Ryan's employer, may also be liable."); *United States v. Hylton,* 944 F. Supp. 2d 176, 190, aff'd, 590 F. App'x 13 (2d Cir. 2014) (D. Conn. 2013) (agent liable for his own discriminatory actions and principals vicariously liable); *Thurmond v. Bowman,* 211 F. Supp. 3d 554, 564-65 (W.D.N.Y. 2016) (agent who managed a rental property on behalf of its owner liable for discrimination); *Portee v. Hastava,* 853 F. Supp. 597 (E.D.N.Y. 1994) (real estate agent liable for discrimination in refusing to rent client's home to interracial couple); *see also Jeanty v. McKey & Poague, Inc.*, 496 F.2d 1119, 1120 (7th Cir. 1974) (property management firm liable for discrimination even "[t]hough the management agreement … states that 'Leases and tenants shall be approved by the owner'"); *Hintz v. Chase,* No. 17-CV-02198-JCS, 2017 WL 3421979, at *2-3 (N.D. Cal. Aug. 9, 2017) (collecting cases) (housing discrimination action sounds in tort and "under well-established principles of agency law, an agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal."), quoting *Arnal v. Aspen View Condominium Ass'n, Inc.* 245 F. Supp. 3d 1261, 1267 (D. Colo. 2017). That CrimSAFE is primarily a computer program[10] rather than a live agent does not change the fundamental

---

[10] If a criminal offense has been assigned a CrimSAFE category in the past and the categorization has been appended to a master offense table, CrimSAFE renders a fully automated decision. If the offense's category has not been appended to the master table, it is placed in a queue to be manually categorized. SOF ¶ 16. All offenses whose categorizations are in the master offense table have been manually processed by employees and/or contractors of CoreLogic. *Id.*

structure of the principal-agent relationship or diminish Defendant's duty not to discriminate.

Defendant may point to housing providers' role in establishing configuration settings for CrimSAFE to argue that whatever decisions CrimSAFE reports are merely implementing the landlord's choices. But Defendant bears liability for its own actions in applying discriminatory rental admission policies, no matter where they originate. *See Short v. Manhattan Apts., Inc.*, 916 F. Supp.2d 375, 399 (S.D.N.Y. 2012) (fair housing doctrine "is well established that agents will be liable for their own unlawful conduct, even where their actions were at the behest of the principal."), quoting *Jeanty*, 496 F.2d at 1120-21.[11]

The Court may note here that Defendant is hardly a powerless bystander with no ability to influence or limit the contents of landlord screening policies. Defendant already imposes some limits on screening policies, including for criminal history, that are required by the Fair Credit Reporting Act or by state credit reporting laws. See SOF ¶ 11-12; *see also* 15 U.S.C. § 1681c(a)(2). Defendant could similarly implement restrictions based on fair housing laws but has inexplicably failed to do so.

Even short of imposing actual limitations, Defendant participates heavily in helping client landlords establish their criminal history screening policies,

---

[11] In fact, Defendant plays a significant role in establishing the configurations that it applies in producing CrimSAFE decisions for its clients. Defendant presents landlords with default configurations that set the maximum lookback period for every category and level of crime. SOF ¶ 13. Defendant's staff then advise the landlord on settings, and engage in ongoing review and update their recommendations on settings. *Id.* However, Defendant is liable regardless of the extent of its involvement in establishing the configurations.

including through regular meetings and other communications from Defendant's account specialists. *Id.* ¶ 13. Defendant has held itself out to landlords as having expertise both in criminal record screening and in fair housing compliance, and landlords have asked Defendant for assistance in establishing their CrimSAFE settings. *Id.* ¶ 6. Yet Corelogic has limited such assistance to helping landlords determine their lookback periods solely by comparing a particular housing provider's lookback periods with those of others in the industry. *Id.* ¶ 13. Defendant incorporates no criminology data or other information that might relate to protecting safety or property into these consultations, which are provided by sales staff, not data analysts or people with expertise in public safety or other relevant fields. *Id.* Defendant does not require, recommend, or even inquire into client landlords' practices (if any) for reviewing or reconsidering rejected applications. *Id.*

Even if Defendant had no role in establishing landlord's screening criteria, it would still be liable for discrimination. In *Jeanty*, the Court of Appeals reversed the trial court's dismissal of claims against a rental management company it found were carrying out the racially discriminatory policy of the owner, holding that "whoever decided not to rent to the plaintiffs, the discriminatory acts alleged were performed by [the agent defendants]. It is well established that agents will be liable for their own unlawful conduct, even where their actions were at the behest of the principal." *Jeanty*, 496 F.2d at 1120-21 (emphasis added) (citations omitted). Consistent with *Jeanty*, *United States v. Hylton* held that a property management firm was liable for the discriminatory acts of its employee—even

17

though that employee was also the co-owner of the premises at issue. *See Hylton*, 944 F. Supp. 2d at 192-93. Many other cases from around the country have similarly held. *See, e.g.*, *Hintz*, 2017 WL 3421979, at *2-3 (collecting cases). HUD regulations likewise provide that a "person is directly liable for: (1) the person's own conduct that results in a discriminatory housing practice." 24 C.F.R. § 100.7(a). Defendant cannot therefore escape liability by arguing that it was merely carrying out a landlord's discriminatory scheme.

### C. Undisputed Facts Show that Defendant's Use of Criminal Background Screening Has Adverse Impact on African American and Latino Housing Applicants

CrimSAFE decisions are based on information about criminal charges, convictions, and incarcerations that is stored in a database maintained by Defendant. SOF ¶ 65. This database is populated with public criminal records Defendant acquires from departments of corrections and administrative offices of courts across the country. Id. Accordingly, the racial and ethnic composition of the offenses contained within the database reflect the demographics of the individuals arrested, charged, convicted, and/or incarcerated. Id. at ¶ 66.

The undisputed evidence establishes that there exist significant racial and ethnic disparities at every level of criminal justice contact, with African Americans and Latinos facing disproportionate rates of arrests, charges, convictions, and incarcerations. *Id.* ¶¶ 66-88. Consequently, CoreLogic's database is disproportionately comprised of criminal records belonging to African Americans and Latinos and screening decisions based on those records have a predictable and actual disparate impact. These disparities persist regardless of the income of the alleged offender, how long ago it occurred, the severity of the offense (i.e.

misdemeanor vs. felony), and whether or not it resulted in a conviction. *Id.* ¶¶ 73-79, 86, 88.

       1.    <u>Plaintiffs' Expert Dr. Christopher Wildeman and Public Records Are Unrebutted</u>

      Plaintiffs have submitted an expert report from Dr. Christopher Wildeman who analyzed available data and concluded that any decision made based upon whether an individual has a criminal history record will have a disproportionate impact on African Americans and Latinos. SOF ¶¶ 72-88. This is true regardless of income level, age of the individual, how far back in the person's history you look, whether the criminal history was a felony conviction or a lesser offense, and whether considering arrests or convictions. SOF ¶¶ 73-79, 86, 88. Among those earning more than $70,000 a year, for instance, the lifetime risk of incarceration is 16 times greater for African Americans than similarly situated whites, and three times greater for Latinos than whites. *Id.* ¶ 74. Among those earning less than $30,000 per year, the lifetime risk of incarceration is 3.2 times higher for African Americans than whites, and 2.1 times higher for Latinos than whites. *Id.* ¶ 77. Disparities are larger for Connecticut than for the country as a whole, with African American/white disparities more than double the national figures and Latino/white disparities over three times as high. *Id.* ¶ 80. Dr. Wildeman's findings are consistent with official statistics and extensive academic research. Id. ¶ 66-71, 83-84.

      Defendant has offered no expert testimony that contradicts Dr. Wildeman's findings. Furthermore, despite the fact that Defendant routinely collects, stores, and reports the races of the individuals with criminal records in its database (SOF ¶ 83-84), it has produced limited data, and none regarding the racial breakdown of

the applicants it has screened in Connecticut.[12] Nevertheless, the limited data Defendant has produced, which shows the racial composition of the subset of applicants found to have "disqualifying records" when screened for properties in Connecticut (and separately for individuals who provided an address in Connecticut, regardless of what property they sought to live in), demonstrates that African American applicants make up a higher proportion of those disqualified from apartments than they do of the population of Connecticut overall: over 32% of individuals disqualified are African American, but only about 9.9% of the Connecticut population is African American. *Id.* ¶¶ 83-84. Even Defendant's 30(b)(6) witness Naeem Kayani acknowledged that some of the limited data Defendant had produced shows disqualification of African American applicants at rates substantially exceeding their population. Ex. 24 at 220:2-222:8 (43% of applicants disqualified nationally were African American, much higher than the percentage of the corresponding population that is African American).

This unrebutted evidence establishes disparate impact from multiple elements of Defendant's operations: (a) disparities from excluding applicants based on arrests that do not result in convictions; (b) disparities from excluding applicants based on convictions that are from a long time ago; and (c) disparities from the exclusion of individuals based on a record of an arrest or conviction, whether recent or not, without any individualized review.

---

[12] *See* Plaintiffs' Motion to Compel (Doc. 65).

### 2.   Plaintiffs' Expert Appropriately Used General Population Statistics with Appropriate Qualifiers

As the Second Circuit has recognized, statistics based on general population data and potential applicant data "often form the initial basis of a disparate impact claim, especially in cases [where] the actual applicant pool might not reflect the potential applicant pool, due to a self-recognized inability on the part of potential applicants to meet the very standards challenged as being discriminatory." *EEOC v. Joint Apprenticeship Comm.,* 186 F.3d 110, 119 (2d Cir. 1999). *See also Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308-09 n.13 (1977) (finding data which demonstrates the pool of eligible candidates is appropriate to consider where reliable applicant flow data was not available); *Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) (finding use of national and regional population data appropriate means of establishing a prima facie case); *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (directing comparison between those hired and those in the qualified local labor force, and only if labor force data is unavailable, using the applicant pool); *Reynolds v. Sheet Metal Workers Local 102*, 498 F. Supp. 952, 960 (D.D.C. 1980) (finding pre-employment arrest record inquiry adversely impacted African Americans based on, *inter alia*, nationwide arrest rate demographics).

Case authority supports using statistics about the pool of potential applicants for two reasons: (a) there might be no record of actual applicants—or, as here, there is no record of the race of actual applicants *except* when the

application was denied;[13] and (b) actual application statistics can be misleading because the fact that a housing provider uses criminal background checks will deter some people with criminal records from even applying.[14] General population statistics or a potential applicant pool (that includes both people who applied and those who were deterred from applying) more accurately reflects the adverse impact in cases of this nature. *See Joint Apprenticeship Comm.,* 186 F.3d at 120 (analysis based on actual applicants is inappropriate when the number of applicants is affected by the qualification requirements). Moreover, Defendant refused to produce any more detailed statistical data.[15]

Relying on statistics based on potential, rather than actual, applicants is also

---

[13] Disparate impact analysis must compare the rate of excluding individuals in the protected class (here, African Americans and Latinos) with the rate of exclusion for individuals not in the protected class. In order to calculate the rate of exclusion, one needs to know the number of applicants (or pool of potential applicants) in each demographic category, as well as the number of individuals with disqualifying criminal records in each demographic category. But Defendant has only produced information about the numerator (e.g., the number of African Americans excluded) not the denominator (the number of African American applicants). Thus, Plaintiffs should be permitted to instead rely upon the number of African Americans in the pool of potential applicants, and the number of African Americans for whom disqualifying criminal records would likely be found, which can be calculated based on data requested from Defendant's criminal record database.

[14] *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977) ("If an employer should announce his policy of discrimination ... his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs."); *Malave v. Potter*, 320 F.3d 321, 327 n.4 (2d Cir. 2003) (finding that the application process might not adequately reflect the actual potential applicant pool); *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 170 (E.D.N.Y. 2019).

[15] *Fortune Soc'y*, 388 F. Supp. 3d at 170-71 (availability pool was appropriate to use instead of applicant flow, because defendant did not retain application information for rejected applicants).

appropriate because disparate impact liability applies where a discriminatory policy "actually *or predictably* results in a disparate impact on a [protected] group…" 24 C.F.R. § 100.500(a) (emphasis added). The statistics from potential applicants provide evidence of the "predictable result" of the challenged policy. In addition, this is consistent with how numerous courts have analyzed the relevant statistical evidence, including the Second Circuit:

> In this case, plaintiffs might have been able to meet their burden by providing statistical evidence (1) that *x*% of all of the [members of protected class] in West Haven need (or have good reason) to live in the "group settings" prohibited by the facially neutral fire regulations at issue, (2) that *y*% of all of the [similarly situated persons outside the protected class] in West Haven need (or have good reason) to live in such group settings prohibited by the fire regulations, and, crucially, (3) that *x* is significantly greater than *y*.

*Tsombanidis*, 352 F.3d at 577; *see also Rivera v. Inc. Vill. of Farmingdale*, 784 F. Supp. 2d 133, 144–45 (E.D.N.Y. 2011) (disparate impact shown by difference in percentage of Hispanic vs. non-Hispanic populations living in area slated for redevelopment or difference in percentage of Hispanic vs. non-Hispanic renters who were low income, given that redevelopment would reduce the number of affordable rental units – not showing specific individuals who lost housing); *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 421 (4th Cir. 2018), *cert. denied sub nom, Waples Mobile Home Park Ltd. P'ship v. Reyes*, 139 S. Ct. 2026 (2019) (disparate impact established where undocumented immigrants constitute 36.4% of the Latino population in Virginia compared with only 3.6% of the non-Latino population, demonstrating that Latinos are ten times more likely than non-Latinos to be adversely affected by the policy).

Defendant provides its services to more than 120 properties throughout Connecticut.[16] SOF ¶ 100. Here, Dr. Wildeman analyzed the available data for criminal justice contact in Connecticut and found that statewide racial and ethnic disparities were substantially greater than national disparities. *Id.* ¶ 87. He reasonably relied upon national data which permitted him to separately analyze various income levels, so that to the extent some of the properties Defendant serves tend to receive applications from individuals of higher or lower income, that is accounted for in his analysis. *Cf. Fortune Society*, 388 F. Supp. 3d at 171; *Ave. 6E Invs., LLC v. City of Yuma*, 217 F. Supp. 3d 1040, 1050 (D. Ariz. 2017).

There is no basis on which to dispute that the challenged practices are the direct cause of adverse impact on African American and Latino applicants.

### D.   Undisputed Facts Show that CrimSAFE Is Not Necessary to Achieve a Substantial and Legitimate Business Purpose

Defendant's Rule 30(b)(6) designee identified safety for residents and avoiding liability for landlords as purposes served by CrimSAFE and its policies. SOF ¶ 89. A policy of making housing decisions based on criminal history must be justified with proof that it actually assists in protecting resident safety or property. *See* U.S. Dept. of Housing & Urban Dev., Office of Gen. Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions (Apr. 4, 2016) at 5 (hereafter "HUD Guidance").[17] As explained in the HUD Guidance, "[b]ald

---

[16] Accurate as of May 2019.

[17] Available at https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF.

assertions based on generalizations or stereotypes that any individual with an arrest or conviction record poses a greater risk than any individual without such a record are not sufficient to satisfy this burden." *Id.* The undisputed facts establish that Defendant cannot meet this burden.

### 1.    Disqualification Based on Non-Conviction Records

A policy of excluding individuals based on a prior arrest, without conviction, cannot be justified as necessary to achieve a legitimate, nondiscriminatory interest because, as HUD notes, "arrest records do not constitute proof of past unlawful conduct and are often incomplete (e.g., by failing to indicate whether the individual was prosecuted, convicted, or acquitted)." HUD Guidance at 5. Accordingly, "the fact of an arrest is not a reliable basis upon which to assess the potential risk to resident safety or property posed by a particular individual." *Id.* (citing *Schware v. Bd of Bar Exam'rs*, 353 U.S. 232, 241 (1957) (stating "[t]he mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense.")). In the employment context, a federal court concluded that an employer's policy of excluding from employment people with arrests without convictions constituted unlawful discrimination against African-American applicants because there "was no evidence to support a claim that persons who have suffered no criminal convictions but have been arrested on a number of occasions can be expected, when employed, to perform less efficiently or less honestly than other employees," adding that "information concerning a … record of arrests without conviction, is irrelevant to [an applicant's] suitability or qualification for employment." *Gregory v. Litton Sys.,*

*Inc.*, 316 F. Supp. 401, 403 (C.D. Cal. 1970), *aff'd*, 472 F.2d 631 (9th Cir. 1972).

Defendant's proffered expert witness, whom it retained to render an opinion on whether the challenged policies are necessary to serve legitimate business interests, concurs with HUD, the U.S. Supreme Court, and the *Gregory* court and asserts that "arrest records would not be considered relevant in my view" to "the decision as to whether the person would qualify to have their application approved and move into the property." SOF ¶ 92. He adds that non-conviction records "wouldn't be relevant to [a housing provider's] decision as to whether [it is] going to proceed with the rental or not approve the rental." *Id*. Nevertheless, Defendant routinely uses non-conviction records to determine and report to housing providers that applicants, including Mr. Arroyo, have disqualifying criminal records. *Id.* ¶¶ 54, 93. In fact, Defendant has configured CrimSAFE's default settings to decline applicants with any criminal charge within the past seven years, the maximum permitted by federal law. *Id*. ¶ 12; *see* 15 U.S.C. § 1681c(a)(2). Nearly all Connecticut properties currently using CrimSAFE have it configured to decline applicants who have no criminal convictions, but only charges. SOF ¶ 93. Between January 1, 2016 and July 9, 2019, for WinnResidential alone, CrimSAFE rendered 539 decline decisions based on applicants' non-conviction records (felony and "other"). *Id.* ¶ 94.

## 2.    Disqualification Based on Old Convictions

Undisputed facts also establish that Defendant cannot justify its automated disqualification decisions based on old prior convictions. Plaintiffs have submitted an expert report from Dr. Lila Kazemian, an Associate Professor at the John Jay College of Criminal Justice at City University of New York. Dr. Kazemian reviewed

the relevant academic literature and concluded that "[t]here is no compelling empirical evidence to suggest that old criminal records are predictive of future offending" because "the more time that passes since the last crime, the less likely it is that the individual will engage in crime in the future." SOF ¶ 95. As time passes, the likelihood that someone with a criminal record commits a repeat offense becomes comparable to someone with no criminal history at all. *Id.* ¶ 96. While estimates vary as to the point at which a former offender is no longer any more likely to recidivate than the average person, most estimates are within the five-to-nine year range. *Id.* ¶¶ 96, 99. But Defendant, through CrimSAFE, disqualifies applicants using lookback periods of up to 99 years, which if selected means "that any crime … will be declined" (*Id.* ¶ 11) – in other words, a blanket ban against any applicant with a criminal conviction regardless of the recency of the offense. Defendant not only implements blanket policies on behalf of client housing providers (including a number of Connecticut-based landlords) (*Id.* ¶ 93), but it makes 99 years the default setting for convictions for all categories of misdemeanor and felony convictions, despite its recognition that this policy means that "basically any criminal record would cause a decline." *Id.* ¶ 12. Dr. Kazemian concludes that "the potential reporting of convictions up to 99 years old in CrimSAFE's configuration instrument, effectively resulting in a lifetime ban, has no empirical basis, and this criterion is highly unlikely to have any crime reduction benefits." *Id.* ¶ 97.

This principle has long been recognized in the employment context. One circuit court wrote in 1975:

> **We cannot conceive of any business necessity that would automatically place every individual convicted of any offense … in the permanent ranks of the unemployed. This is particularly true for blacks who have suffered and still suffer from the burdens of discrimination in our society. To deny job opportunities to these individuals because of some conduct which may be remote in time or does not significantly bear upon the particular job requirements is an unnecessarily harsh and unjust burden.**

*Green v. Mo. Pac. R.R. Co.*, 523 F.2d 1290, 1298 (8th Cir. 1975); cited with approval in *Barletta v. Rilling*, 973 F. Supp. 2d 132, 139 (D. Conn. 2013) (striking down as irrational statute prohibiting convicted felons from obtaining licenses to trade in precious metals that did not allow "consideration of the nature and severity of the crime, the nature and circumstances of an applicant's involvement in the crime, the time elapsed since conviction, and the degree of the applicant's rehabilitation").[18] The undisputed evidence establishes that Defendant's policy of disqualifying applicants from rental housing based on criminal convictions as old as 99 years serves no legitimate business purpose.

There are additional aspects of Defendant's CrimSAFE product which cause disparate impact without a supporting business necessity, but for which there may be disputes of fact. Even for such other aspects of CrimSAFE, however, there are less discriminatory alternatives available, as discussed in section E, below.

---

[18] *See also* EEOC Guidance Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII, available at https://www.eeoc.gov/laws/guidance/arrest_conviction.cfm#sdendnote120sym (same); *Field v. Orkin Extermination Co.,* 2002 WL 32345739, at *1 (E.D. Pa. Feb. 21, 2002) ("[A] blanket policy of denying employment to any person having a criminal conviction is a [per se] violation of Title VII.").

**E.    Undisputed Facts Show that There Are Less Discriminatory Alternatives Which Satisfy Any Valid Business Need**

To the extent Defendant's criminal records screening policies are justified as necessary to protect safety and property, obvious less discriminatory alternatives are available.

First, to remove the disparate impact caused by excluding applicants based on arrests, Defendant could cease considering arrests that do not result in conviction. Its current system permits exclusion based on arrests within seven years of the application. Making decisions based on arrests, rather than convictions, has been held to have *no* business justification. *See* Section III.D.1, *supra* at 25-26. Eliminating arrests without conviction from the CrimSAFE review entirely would significantly reduce the number of applicants excluded, of whom a disproportionate number would be African American and Latino, without providing a less satisfactory screening. Excluding arrests would entirely eliminate the disparate impact due to arrests.

Second, to reduce the disparate impact from consideration of convictions that are from long ago, and thus not relevant to current risk, Defendant could set a reasonable, evidence-based cap on the lookback period.[19] For instance, capping the lookback period at seven years would significantly reduce the number of African American and Latino applicants excluded; 10.61% of African Americans

---

[19] For federally subsidized properties that are required under federal law to permanently exclude applicants with certain convictions for sex offenses or drug manufacturing, Defendant could (1) create a CrimSAFE category with a longer lookback period just for these crimes and (2) apply this CrimSAFE category just at properties subject to these requirements.

had criminal records over the course of their lifetime, but only 2.77% of African Americans had a criminal record in the past seven years, while for Latinos the figures are 5.99% and 1.19%. SOF ¶78.[20] In other words, 7.84% of African Americans and 4.8% of Latinos have criminal records *older* than seven years, which would no longer be disqualifying with the proposed cap on the lookback period. Id. By comparison, only 1.81% of whites have criminal records older than seven years. *Id.* As such, if Defendant were to implement Plaintiffs' proposed alternative of capping the lookback period and selecting a seven-year cap, that would eliminate a significant source of the adverse impact on African American and Latino applicants (permitting the longer lookback periods means African American housing seekers are 4.33 times more likely to be declined and Latino housing seekers 2.65 times more likely to be declined for convictions that are over seven years old, than are white housing seekers). *Id.* Capping the lookback period would achieve any safety-related objectives, as evidenced by the extensive body of research showing that old criminal records have limited – or no – probative value as to the likelihood that an individual presents an increased risk.[21]

---

[20] Such sharp reductions occur when examining various earning levels as well. For example, among those earning $30,000 or less, 14.34% of African Americans had a criminal record in their lifetime, but only 3.99% did in the last seven years; for Latinos a 9.38% exclusion rate if looking at total lifetime chance is reduced to 2.26% being excluded from apartments if looking only at the last seven years. Wildeman Table 1.

[21] The undisputed evidence further establishes that even the fact that a person has a *recent* conviction, of any type and severity, is insufficient to conclude that a person presents an increased risk without consideration of other factors. SOF ¶ 98-99. One-time offenders for instance, are substantially less likely to recidivate than repeat offenders, as are people who committed an offense at a younger age. *Id.* ¶ 99. As such, although estimates as to precisely when the risk

**Third, to reduce the disparate impact caused by the *automatic* exclusion of individuals, whether based on arrest or conviction, recent or not, Defendant could evaluate each criminal record on an individualized basis by considering the record and relevant mitigating circumstances outside the criminal record itself to determine the actual risk to safety before reporting to a housing provider that the applicant is disqualified. *See* HUD Guidance at 7 (proper factors for individualized assessment include "the facts or circumstances surrounding the criminal conduct; the age of the individual at the time of the conduct; evidence that the individual has maintained a good tenant history before and/or after the conviction or conduct; and evidence of rehabilitation efforts.").[22] Or, rather than making the disqualification decision on its own, Defendant could supply the underlying information about the criminal history to the housing provider without providing a leasing decision so the landlord can do an individualized assessment, as some of Defendant's other tenant screening products already do. *See* SOF ¶ 2. By limiting access to this information, Defendant makes it impossible or at least impracticable for housing**

---

of recidivism for someone with a criminal approximates that of someone without are generally within the five-to-nine year range, the appropriate lookback window would be lower (or zero) for one-time and younger offenders. *Id.* Additionally, people with criminal records who are able to secure housing and employment are less likely to recidivate. This is because "[w]hen basic needs are not met … when structural barriers prevent them from getting their lives back on track, that essentially promotes recidivism." *See* Ex. 51, Kazemian Dep. at 91:15-92:15 And regardless of the appropriateness of the lookback window, individualized review is still necessary to evaluate whether a specific applicant presents an actual risk. *See infra* at 32.

[22] The duty to make individualized assessments, rather than deny applicants categorically, has long existed in the employment context (to reduce the effects of similar disparate impacts among job seekers). *See, e.g., Green,* 523 F.2d at 1298; cited with approval in *Barletta*, 973 F. Supp.2d at 139.

providers to do a case-by-case assessment of the actual risk to safety or property presented by each applicant since the leasing agent charged with making the decision has no information or basis upon which to override Defendant's "Crim Decision." Providing information about the underlying criminal record to the relevant decisionmakers at the housing provider – instead of limiting access to a single high-level executive who is not involved in day-to-day decision-making – would also help ensure that applicants are not denied housing because of inaccurate, sealed, or expunged criminal records, which Defendant's database sometimes include. *See id.* ¶ 15.

Individualized review would exclude fewer persons than an automatic ban, and as such permit more African American and Latino applicants – who are disproportionately excluded under the current system – to obtain apartments. *MHANY Mgmt., Inc. v. Inc. Vill. Of Garden City*, 985 F. Supp. 2d 390, 426 (E.D.N.Y. 2013); *MHANY Mgmt., Inc. v. Cty. of Nassau*, No. 05CV2301ADSARL, 2017 WL 4174787, at *4-5 (E.D.N.Y. Sept. 19, 2017) (alternative which would permit creation of more affordable housing units would be a less discriminatory alternative). Individualized review of Mikhail Arroyo's application would have revealed that he presented no risk to safety or property given his significant disabilities, that he has never been convicted of a crime, and that his criminal record was so minor that it should not have barred him from housing.

F.   **Undisputed Facts Establish CUTPA Liability**

The undisputed facts also establish that Defendant's CrimSAFE product constitutes an unfair practice in violation of the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110b(a), both because it proximately causes

discriminatory housing denials, as explained *supra,* and because it facilitates or encourages housing providers' violations of the FHA.

CUTPA is a broad remedial statute. *Artie's Auto Body v. Hartford Fire Ins. Co.*, 317 Conn. 602, 623 (2015). It prohibits unfair acts or practices in the conduct of any trade or commerce. Conn. Gen. Stat. § 42-110b(a). A trade practice is unfair under CUTPA if it violates the "cigarette rule," i.e., it (1) offends public policy as established by statutes, the common law, or otherwise, (2) is immoral, unethical, oppressive, or unscrupulous, or (3) causes substantial injury to consumers. *Artie's Auto Body*, 317 Conn. at 609, n.9. All three criteria do not have to be met in order to satisfy the cigarette rule. *Id.* "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 106 (1992).

### 1.    Causing Discriminatory Housing Denials Is an Unfair Practice

Because the undisputed facts establish that CrimSAFE has a discriminatory effect and less discriminatory alternatives are available, Defendant has also engaged in an unfair practice in violation of CUTPA. This conduct is unfair under the cigarette rule as it is undisputed that it offends public policy and causes substantial injury to consumers.[23]

---

[23] Plaintiffs do not contend that there is no genuine issue of material fact as to the second prong, whether the practice is immoral, unethical, oppressive, or unscrupulous, but summary judgment may be granted based just on Defendant's violation of the other two prongs. *See, e.g., Daddona v. Liberty Mobile Home Sales, Inc.,* 209 Conn. 243, 258, 550 A.2d 1061, 1068 (1988) (upholding judgment defendant violated CUTPA based only on the public policy prong).

*Public Policy Prong*

Conduct that violates another statute offends public policy and is actionable under CUTPA. *See Green v. Konover Residential Corp.*, No. 3:95CV1984(GLG), 1997 WL 736528, at *7 (D. Conn. Nov. 24, 1997) (violation of FHA as a predicate ground for CUTPA claim); *see also Parris v. Pappas*, 844 F. Supp. 2d 271, 284 (D. Conn. 2012) (collecting rent while violating FHA against public policy in violation of CUTPA). Even when conduct does not violate a statute or regulation, it may still be unfair in violation of CUTPA if it runs afoul of the public policy embodied by a statute or regulation. *See, e.g., Conaway v. Prestia*, 191 Conn. 484, 492-93 (1983) (landlord's receipt of rent from uninhabitable properties not illegal under housing habitability statutes but unfair in violation of public policy of these statutes); *Bartold v. Wells Fargo Bank*, N.A., No. 14-CV-00865 (VAB), 2015 WL 7458504, at *6 (D. Conn. Nov. 24, 2015) (conduct inconsistent with public policy embodied by federal mortgage regulations). A violation of the public policy prong <u>alone</u> is sufficient to establish CUTPA liability. *See Daddona*, 209 Conn. at 258-59.

The history of the FHA demonstrates that CoreLogic's actions violated the public policy of this statute and Connecticut's analogous FHA. The federal FHA was passed in response to the civil unrest in the wake of Dr. Martin Luther King's assassination and the publication of the Kerner Commission's report, which concluded that the United States was "moving toward two societies, one black, one white—separate and unequal" and documented widespread housing discrimination that prevented even African Americans with means from moving into white neighborhoods. *See Laufman v. Oakley Bldg. & Loan Co.,* 408 F. Supp.

34

489, 496 (S.D. Ohio 1976) (acknowledging that context of FHA's passage is important part of its legislative history and purpose). With respect to race and national origin discrimination, the FHA has twin goals: to ensure individual housing choice, and to replace segregated neighborhoods with "truly integrated and balanced living patterns." *See* Statement of Senator Mondale, 114 Cong. Rec. 2276, 3422 (1968).

The FHA begins by declaring that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Its goal is to "eliminate all traces of discrimination within the housing field." *Marr v. Rife*, 503 F.2d 735, 740 (6th Cir. 1974). "Congress was aware that the measure would have a very broad reach, and indeed the legislation was seen as an attempt to alter the whole character of the housing market." *Mayers v. Ridley*, 465 F.2d 630, 652 (D.C. Cir. 1972) (en banc) (Wilkey, J., concurring). Congress reaffirmed its commitment to these public policy goals in its passage of the 1988 amendments to the FHA, which expanded the coverage of the FHA, strengthened enforcement mechanisms, provided new protections from interference and intimidation, and required HUD to annually report to Congress its progress in ending housing segregation and discrimination. *See* Pub. L. No. 100-430, 102 Stat. 1619-39 (1988)*.*

These broad, remedial public policy goals of the FHA are achieved through its sweeping provisions that outlaw practices that make unavailable or deny housing to individuals based on their race and national origin or expose them to different terms and conditions in housing on a discriminatory basis. "This

provision is as broad as Congress could have made it and it reaches every private and public practice that makes housing more difficult to obtain on prohibited grounds." *United States v. Hous. Auth. of Chickasaw*, 504 F. Supp. 716, 726 (S.D. Ala. 1980) (citations omitted). These public policy goals are also furthered by the FHA's multiple standards for proving liability, including the disparate impact standard that specifically addresses outwardly neutral policies or practices that have the effect of causing discrimination or perpetuating segregation. *See ICP* at 2521-2522 (disparate impact consistent with public policy goals of the FHA and "prevent[s] segregated housing patterns that might otherwise result from covert and illicit stereotyping").

Connecticut has adopted the same public policy goals of the FHA, including to provide for fair housing, ensure individual housing choice regardless of race or national origin, and to create an integrated society. In its Constitution, Connecticut provides that "no person shall be… subjected to segregation or discrimination in the exercise or enjoyment of his civil … rights because of … race, color, ancestry or national origin." Connecticut Constitution, Sec. 20. Connecticut's first legislative prohibition against housing discrimination was enacted before the FHA, in 1959. *See* Public Acts 1959, No. 113. And in 1990, Connecticut passed comprehensive fair housing legislation modelled after the FHA, see Conn. Gen. Stat. § 46a-64b, *et seq*; *see also* Statement of Senator Blumenthal, "[t]his is landmark legislation ... that sets out a separate fair housing act with all the standards and assurances that exist under Federal law. Indeed, it incorporates the federal standards into our state statute ...." 33 S. Proc., Pt. 11, 1990 Sess., p. 3494. Connecticut's FHA is

constructed consistently with the federal courts' interpretation of the analogous provisions of the FHA. *Comm'n on Human Rights & Opportunities v. Savin Rock Condo. Ass'n, Inc.,* 273 Conn. 373, 384-85, 870 A.2d 457, 463 (2005). Additionally, Connecticut has publicly committed itself to affirmatively furthering fair housing, specifically identifies racial and ethnic segregation within the state as a matter of public concern that has a detrimental impact on individuals and the state as a whole,[24] and has established an agency, the Connecticut Commission on Human Rights and Opportunities, to investigate and prosecute complaints of housing discrimination whose mission is to "to eliminate discrimination" and "establish equal opportunity."[25]

For the reasons set forth *supra,* CoreLogic violated the FHA because it is undisputed that CrimSAFE has a discriminatory effect in denying African Americans and Latinos housing, including Mr. Arroyo, and there are less discriminatory alternatives available. CrimSAFE offends Connecticut's public policy because it causes illegal discrimination based on race and national origin, thereby limiting housing opportunities based on race and national origin and causing or perpetuating segregated housing patterns the state has sought to eliminate. CoreLogic's conduct is therefore unfair in violation of CUTPA. *See Daddona*, 209 Conn. at 258-59.

---

[24] *See* Connecticut Department of Housing, Analysis of Impediments to Fair Housing Choice 2015, available at https://portal.ct.gov/-/media/DOH/AnalysisofImpediments2015pdf.pdf?la=en

[25] *See* CHRO Agency Mission, available at https://www.ct.gov/chro/site/default.asp

### Substantial Injury Prong

Although CoreLogic is liable for CUTPA based just on its violation of public policy, is also undisputed that it has violated the substantial injury prong.

A substantial injury is one that is not outweighed by any countervailing benefits to consumers and that consumers could not reasonably have avoided. *Cheshire Mortg.*, 223 Conn. at 113. First, the injuries the Arroyos suffered were substantial—a violation of their civil rights and a discriminatory denial of housing that resulted in Mr. Arroyo remaining in a nursing home for many months, at a financial and emotional cost to both Arroyos. No reasonable fact-finder could conclude that this injury was insubstantial. *Id.* (excess finance charge of $490 constituted substantial injury to consumers). Second, this injury was not outweighed by any countervailing benefits to consumers provided by CoreLogic's discriminatory practice; the injury was caused by illegal national origin discrimination, and, as a matter of law, cannot be outweighed by any incidental benefit to others given the broad mandate of the FHA to root out all traces of housing discrimination. Third, consumers cannot reasonably avoid this injury. The Arroyos had no say in what screening product ArtSpace Windham used or how CrimSAFE operated, and no forewarning that CoreLogic would deny or make unavailable housing until the injury had already occurred. Their only hypothetical means to avoid this injury would have been to somehow intuit that CrimSAFE was going to discriminate against Mikhail and to apply for housing at a different complex that did not use CrimSAFE. No fact-finder could conclude this is a reasonable alternative—requiring a Latino applicant to flee an apartment complex

to avoid being discriminated against offends public policy and is inherently unreasonable.

The undisputed facts thus show CoreLogic also violated the substantial injury prong, further warranting a finding that, as a matter of law, it has engaged in an unfair practice in violation of CUTPA.

### 2. Facilitating Housing Providers' Discrimination is Also an Unfair Practice

Additionally, CoreLogic engaged in an unfair practice by facilitating or encouraging housing providers' illegal housing discrimination against applicants through (1) its marketing and communications to housing providers and (2) its design of CrimSAFE.

Because of the known disparities in African Americans' and Latinos' rates of arrest, conviction, and incarceration, the FHA requires that housing providers limit how criminal records are used to disqualify applicants, such as by (1) not using arrest records, (2) limiting their lookback period for convictions, and (3) consider an individual's mitigating circumstances before denying housing. *See, e.g.,* HUD Guidance.

CoreLogic holds itself out as an expert on fair housing by marketing CrimSAFE as "improving" or "optimizing" "fair housing compliance." SOF ¶ 6. CoreLogic tells housing providers that they are in compliance with the FHA merely by signing up for CrimSAFE, and it even issues them a certificate of fair housing compliance at sign-up. *Id.* ¶ 31 and n.7. Yet CoreLogic's marketing and design of CrimSAFE distorts the requirements of the FHA and facilitates unlawful housing discrimination.

CoreLogic markets CrimSAFE as "automat[ing]" rental decisions and the evaluation of criminal records, and "relieving … staff from the burden of interpreting criminal search results," statements that are incompatible with the requirement that housing providers consider the actual criminal record, including its nature, recency, and any of mitigating circumstances so as to comply with the FHA. *Id.* ¶¶ 2-3; *see* HUD Guidance and discussion of discriminatory impact of criminal record screening and less discriminatory alternatives, *supra,* Secs. C, D, and E. CoreLogic further trains housing providers that CrimSAFE provides an "accept/decline" "leasing decision," erroneously communicating that a housing provider can lawfully decline an applicant for a criminal record based on the CrimSAFE result without considering the actual record or relevant mitigating circumstances. SOF ¶¶ 4-6, 33, 34. CoreLogic's marketing of CrimSAFE thus inaccurately communicates to housing providers that they can comply with the FHA by automating criminal record screening decisions through CrimSAFE and without individualizing considering the record or the applicant. And for most housing providers, a CrimSAFE decision of "disqualifying records were found" effectively amounts to a denial of housing from the landlord. *Id.* ¶¶ 7, 26, 38.

CoreLogic's design of CrimSAFE further discourages housing providers from complying with the FHA. For example, CoreLogic allows housing providers "who choose to have their rental decisions automated using … CrimSAFE" the ability to hide the detailed criminal record from the view of leasing agents, who are only provided a "decision report" stating whether or not disqualifying records were found, resulting in reflexive denials. *Id.* ¶¶ 25-28, 35, 36, 38. CrimSAFE may even

40

be configured such that none of the housing provider's staff has access to the underlying record, information staff need to comply with the FHA. *Id.* ¶ 25. CoreLogic's decision to permit housing providers to suppress the underlying criminal record from all or some staff inhibits housing providers' ability to comply with the FHA since decisionmakers will not have the information necessary to consider the nature, recency, and mitigating circumstances related to the criminal record. CoreLogic further automatically generates adverse action letters when CrimSAFE finds disqualifying records, and even offers to send them to applicants automatically, further inhibiting housing providers' incentive or practical ability to comply with the FHA. *Id.* ¶¶ 22-24. CoreLogic also sets default lookback settings for CrimSAFE that amount to blanket bans on applicants with criminal records and allows housing providers in conjunction with CoreLogic to intentionally configure CrimSAFE to facilitate a blanket ban, practices that violate the FHA. *Id.* ¶¶ 11-13. CoreLogic sets the default setting for convictions at 99 years and for arrest records at 7 years (the maximum under the FCRA). *Id.* ¶ 12; *see also* 15 U.S.C. § 1681c(a)(2). CoreLogic also allows CrimSAFE to return a denial decision based just on an arrest that has not led to a conviction, as with Mr. Arroyo. *Id.* ¶¶ 51, 52, 92-94.

CoreLogic's statements and practices facilitate housing providers' discrimination against African American and Latino applicants: by automating housing denials based on criminal records, effectuating blanket bans on housing to applicants with criminal records (including as its default setting), denying housing based solely on arrest records, and inhibiting housing providers' incentive or ability to perform an individualized review before denying housing,

41

all of which have an unlawful disparate impact based on race and national origin. CoreLogic further misrepresents that housing providers who engage in these practices through CrimSAFE are in compliance with the FHA.

CoreLogic's practices are unfair as a matter of law because they offend state and federal public policies, discussed *supra,* to eliminate discrimination and segregation based on race and national origin and ensure individual choice in housing. They also cause substantial injury to applicants, including Mr. Arroyo, that cannot reasonably be avoided, including violations of their civil rights and housing denials. *Id.* ¶¶ 100-101. These practices are thus also unfair in violation of CUTPA.

### 3.     The Arroyos Suffered an Ascertainable Loss

Finally, it is undisputed that the Arroyos suffered an ascertainable loss as a result of Defendant's unfair practices related to CrimSAFE, meaning they have standing under CUTPA. A CUTPA claim may be brought by "[a]ny person who suffers any ascertainable loss of money or property." *See* **Conn. Gen. Stat. § 42-110g(a).** "Ascertainable loss of money or property" is a wider category than recoverable damages, encompassing a deprivation, detriment, or injury that need not be measurable by a dollar amount. *Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 614-19 (1981) (ascertainable loss of purchase of vehicle advertised as four-wheel drive that in actuality was something else). If the defendant proximately caused any ascertainable loss, i.e., if its actions are a substantial factor in producing the loss and "the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's act," then the plaintiff may prevail under CUTPA, even if there are no recoverable damages. *Stevenson*

*Lumber Co.-Suffield, Inc. v. Chase Assocs.*, Inc., 284 Conn. 205, 214 (2007) (citation omitted).

The undisputed facts show that, as a result of Defendant's practices, Mikhail Arroyo was denied housing and remained living in a nursing home, resulting in increased medical, housing, and travel expenses for both him and his mother. SOF ¶¶ 60-64. Defendant was a substantial factor in causing these losses, and the type of harm they suffered—denial from housing, and the expenses related thereto—was foreseeable. These losses are ascertainable, so CoreLogic has violated CUTPA as a matter of law.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court should enter judgment under Fed. R. Civ. P. 56(a) in favor of the Plaintiffs as to liability on Counts I and VI of their Complaint, reserving for trial the amount of damages and other relief to award. The Court should also enter an order permanently enjoining the Defendant from engaging in the discriminatory practices and unfair practices discussed herein.

Dated: November 12, 2019                    Respectfully submitted,


*/s/ Greg Kirschner*
Greg Kirschner
Salmun Kazerounian
Sarah White
CONNECTICUT FAIR HOUSING CENTER
60 Popieluszko Ct.
Hartford, CT 06106
Tel.: (860) 247-4400
greg@ctfairhousing.org

Eric Dunn
NATIONAL HOUSING LAW PROJECT
919 E. Main St., Ste. 610

Richmond, VA 23219
Tel.: (415) 546-7000
edunn@nhlp.org

Joseph M. Sellers (*PHV*)
Christine E. Webber (*PHV*)
Brian C. Corman (*PHV*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., N.W.
Suite 500
Washington, D.C. 20005
Tel.: (202) 408-4600
jsellers@cohenmilstein.com
cwebber@cohenmilstein.com
bcorman@cohenmilstein.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2019, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

_/s/ Greg Kirschner_____
Greg Kirschner
Salmun Kazerounian
Sarah White
CONNECTICUT FAIR HOUSING CENTER
60 Popieluszko Ct.
Hartford, CT 06106
Tel.: (860) 247-4400
greg@ctfairhousing.org