**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **CONNECTICUT FAIR HOUSING CENTER** and **CARMEN ARROYO, individually and as next friend for Mikhail Arroyo**<br>                    *Plaintiffs,*<br>    **v.**<br><br>**CORELOGIC     RENTAL     PROPERTY SOLUTIONS, LLC**<br>                    *Defendant.* | **Case No. 3:18-cv-00705-VLB**<br><br>**ORAL ARGUMENT REQUESTED** |

<u>**PLAINTIFFS' MEMORANDUM IN RESPONSE TO**</u>
<u>**DEFENDANT CORELOGIC'S MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

**Page**

I.  Introduction .................................................................................................. 1

II. Argument ..................................................................................................... 2

   A.  CoreLogic, Through CrimSAFE, Makes Housing Unavailable ............ 2

   B.  CoreLogic's Criminal History Screening Violates Fair Housing
       Act Due to Disparate Impact on African Americans and Latinos ........ 9

       1.  Plaintiffs' Prima Facie Case is Based on Undisputed
           Facts ........................................................................................... 9

       2.  Defendant's Proffered Business Justifications are Not
           Supported by Undisputed Facts, and Do Not Address
           Plaintiffs' Allegations ............................................................... 15

           a.  Federal law only requires screening for two
               categories of offenses, not the 36 categories for
               which CrimSAFE screens ................................................. 16

           b.  Defendant has not established health and safety
               justifications, particularly not for arrests or older
               convictions. ...................................................................... 17

           c.  CoreLogic has not established the claimed
               advantages of CrimSAFE ................................................. 18

       3.  Undisputed Facts Demonstrate that Less Discriminatory
           Alternatives Exist and Are Not Being Used by Defendant ....... 21

   C.  There Are Facts from which Jury May Conclude CoreLogic
       Acted with Discriminatory Intent ........................................................ 25

   D.  CoreLogic Is Not Entitled to Summary Judgment on Any of
       Plaintiffs' Claims Based on CoreLogic's Failure to Make
       Consumer Disclosures ........................................................................ 29

       1.  CoreLogic's Failure to Disclose Mr. Arroyo's File
           Caused Actual Injuries to the Plaintiffs ................................... 30

       2.  Fully-Visible Seal Not Necessary .............................................. 33

       3.  FCRA Willfulness Claim ............................................................ 37

       4.  Disparate Impact Claim ............................................................ 39

   E.  CoreLogic Is Not Entitled to Summary Judgment on CUTPA ............ 42

       1.  Unfair Practices ....................................................................... 42

       2.  File Disclosure Claims .............................................................. 46

i

## TABLE OF CONTENTS

**Page**

F.    Connecticut Fair Housing Center's Claim for Damages Are Supported by Material Facts and Governing Law.............................. 47

G.    Ms. Arroyo has Standing in Her Individual Capacity ......................... 53

III.   Conclusion ....................................................................................... 54

# TABLE OF AUTHORITIES

**Page**

CASES

*Allmond v. Akal Sec., Inc.*,
  558 F.3d 1312 (11th Cir. 2009) .................................................................. 40

*Arnal v. Aspen View Condo. Ass'n, Inc.*
  No. 15–cv–01044–WYD–MJW, 2017 WL 1231555 (D. Colo., Mar. 28,
  2017) .......................................................................................................... 7

*Artie's Auto Body v. Hartford Fire Ins. Co.*,
  317 Conn. 602 (2015) ............................................................................... 43

*Baltimore Neighborhoods, Inc. v. Lions Gate Garden Condominiums,
  Inc.*,
  92 F. Supp. 2d 456 (D. Md. 2000) ............................................................. 52

*Bank of Am. Corp. v. City of Miami, Fla.*,
  137 S. Ct. 1296 (2017) .............................................................................. 47

*Barletta v. Rilling*,
  973 F. Supp. 2d 132 (D. Conn. 2013) ........................................................ 23

*Bernstein v. Vill. of Wesley Hills*,
  95 F. Supp. 3d 547 (S.D.N.Y. 2015) ............................................... 26, 27, 28

*Bhogaita v. Altamonte Heights Condo. Ass'n*,
  765 F.3d 1277 (11th Cir. 2014) ................................................................. 31

*Caldor, Inc. v. Heslin*,
  215 Conn. 590, 577 A.2d 1009 (1990) ....................................................... 42

*Cenatiempo v. Bank of Am., N.A.*,
  333 Conn. 769 (2019) ............................................................................... 44

*Centro de la Comunidad Hispana v. Town of Oyster Bay*,
  868 F.3d 104 (2d Cir. 2017) ...................................................................... 47

*Chen-Oster v. Goldman Sachs & Co.*,
  325 F.R.D. 55 (S.D.N.Y. 2018) .................................................................. 27

*Chin v. Port Auth. of NY & NJ*,
  685 F.3d 135 (2d Cir. 2012) ...................................................................... 12

# TABLE OF AUTHORITIES

**Page**

*Citibank (S.D.) N.A. v. Osagie*,
　No. CV106004637S, 2012 WL 1959057 (Conn. Super. Ct. May 3,
　2012)......................................................................................................... 45

*Cleveland v. Caplaw Enters.*,
　448 F.3d 518 (2d Cir. 2006) ....................................................................... 7

*Columbus Bd. of Educ. v. Penick*,
　443 U.S. 449 (1979)..................................................................................... 26

*Conaway v. Prestia*,
　191 Conn. 484, 464 A.2d 847 (1983) ....................................................... 42

*Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*,
　719 F.3d 322 (4th Cir. 2013) ...................................................................... 8

*Cripe v. City of San Jose*,
　261 F.3d 877 (9th Cir. 2001) ..................................................................... 40

*Curtis v. Loether*,
　415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974).............................. 52

*Daddona v. Liberty Mobile Home Sales, Inc.*,
　209 Conn. 243, 550 A.2d 1061 (1988)............................................. 44, 45

*Davis v. District of Columbia*,
　246 F. Supp. 3d 367 (D.D.C. 2017)........................................................... 27

*EEOC v. Enter. Ass'n Steamfitters Local No. 638*,
　542 F.2d 579 (2d Cir. 1976) ...................................................................... 52

*EEOC v. Joint Apprenticeship Comm.*,
　186 F.3d 110 (2d Cir. 1999) ...................................................................... 10

*FHJC v. Cuomo*,
　2019 WL 4805550 (S.D.N.Y. Sept. 30, 2019) ......................................... 48

*Fortune Soc'y v. Sandcastle Towers Housing Dev. Fund Corp.*,
　388 F. Supp. 3d 145 (E.D.N.Y. 2019) ............................................... 11, 13

*Gilead Cmty. Servs., Inc. v. Town of Cromwell*,
　No. 3:17-CV-627 (VAB), 2019 WL 4805032 (D. Conn. Sept. 30, 2019)................... 8

*Green v. Mo. Pac. R.R. Co.*,
　523 F.2d 1290 (8th Cir. 1975) .................................................................. 23

## TABLE OF AUTHORITIES

**Page**

*Handlin v. On-Site Manager, Inc.*,
   351 P.3d 226 (Wash. Ct. App. 2015) .................................................... 31

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ............................................................................... 47

*Hazelwood Sch. Dist. v. United States*,
   433 U.S. 299 (1977) ............................................................................... 10

*High Plains Cmty. Dev. Corp. v. Schaefer*,
   2008 U.S. Dist. LEXIS 36661 (D. Neb. May 2, 2008) (Def. Br ) ............ 49

*Hinchliffe v. Am. Motors Corp.*,
   184 Conn. 607, 440 A.2d 810 (1981) .................................................... 46

*Hintz v. Chase*,
   No. 17-CV-02198-JCS, 2017 WL 3421979 (N.D. Cal. Aug. 9, 2017) ...... 7

*Intermountain Fair Hous. Council v. CVE Falls Park, L.L.C.*,
   No. 2:10-cv-00346-BLW, 2011 WL 2945824 (D. Idaho July 20, 2011) ................ 51

*Jeanty v. McKey & Poague*, Inc., 496 F.2d 1119 (7th Cir. 1974)
   496 F.2d 1119, 1120 (7th Cir. 1974) ...................................................... 7

*Jones v. City of Bos.*,
   752 F.3d 38 (1st Cir. 2014) .............................................................. 9, 10

*L.C. v. LeFrak Org., Inc.*,
   987 F. Supp. 2d 391 (S.D.N.Y. 2013) ................................................... 26

*Laflamme v. New Horizons, Inc.*,
   605 F. Supp. 2d 378 (D. Conn. 2009)................................................... 26

*Macomber v. Travelers Prop. & Cas. Corp.*,
   261 Conn. 620 (2002) .......................................................................... 46

*Mandala v. NTT Data, Inc.*,
   2019 WL 3237361 (W.D.N.Y. July 18, 2019) ........................................ 12

*Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*,
   519 Fed. App'x 714 (2d Cir. 2013) ................................................. 48, 49

*Menton v. Experian Corp.*,
   2003 WL 941388 (S.D.N.Y. Mar. 6, 2003)........................................ 34, 35

## TABLE OF AUTHORITIES

<u>Page</u>

*MHANY Mgmt., Inc. v. Cty. of Nassau*,
   2017 WL 4174787 (E.D.N.Y. Sept. 19, 2017) ........................................ 25

*Mhany Mgmt., Inc. v. Cty. of Nassau*,
   819 F.3d 581 (2d Cir. 2016) ................................................ 7, 27, 29

*MHANY Mgmt., Inc. v. Inc. Vill. Of Garden City*,
   985 F. Supp. 2d 390 (E.D.N.Y. 2013) ....................................... 25

*Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*,
   No. 3-10-cv-83, 2015 U.S. Dist. LEXIS 23619 (S.D. Ohio Feb. 26,
   2015) ...................................................................... 49

*Millstone v. O'Hanlon Reports, Inc.*,
   383 F. Supp. 269 (E.D. Mo. 1974) .......................................... 31

*Mitchell v. Shane*,
   350 F.3d 39 (2d Cir. 2003) ................................................. 7

*Nastro v. D'Onofrio*
   263 F. Supp. 2d 446 (D. Conn. 2003) ....................................... 46

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011) ............................................... 50

*Oliver v. NY State Police*,
   2019 WL 453363 (W.D.N.Y. 2019) ........................................... 36

*Olsen v. Stark Homes, Inc.*,
   759 F.3d 140 (2d Cir. 2014) ........................................... 31, 48

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ....................................................... 27

*Ragin v. Macklowe Real Estate Co.*,
   6 F.3d 898 (2d Cir. 1993) ................................................. 48

*Reeves v. Sanderson Plumbing Products, Inc.*,
   530 U.S. 133 (2000) ....................................................... 29

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
   903 F.3d 415 (4th Cir. 2018) .............................................. 11

*Ricci v. DeStefano*,
   557 U.S. 557 (2009) ....................................................... 26

# TABLE OF AUTHORITIES

**Page**

*Rivera v. Inc. Vill. of Farmingdale,*
  784 F. Supp. 2d 133 (E.D.N.Y. 2011) ..................................................... 11

*Robinson v. 12 Lofts Realty, Inc.,*
  610 F.2d 1032 (2d Cir. 1979) .................................................................. 26

*In re Robinson v. Chase Home Fin. LLC,*
  403 B.R. 497 (Bankr. S.D. Oh. 2008) ..................................................... 36

*Safeco Ins. Co. v. Burr,*
  551 U.S. 47 (2007)............................................................................ 37, 38

*Schwab v. GMAC Mortg. Corp.,*
  333 F.3d 135 (3d Cir. 2003) .................................................................... 36

*Smith v. Nat'l Credit Sys., Inc.,*
  2015 WL 12780446 (N.D. Ga. 2015) ....................................................... 36

*So. Cal. Hous. Rights Ctr. v. Krug,*
  564 F.Supp.2d 1138 (C.D. Cal. 2007)............................................... 50, 52

*Soberal-Perez v. Heckler,*
  717 F.2d 36 (2d Cir. 1983) ............................................................... 27, 28

*Staub v. Proctor Hospital,*
  562 U.S. 411 (2011).............................................................................. 6, 7

*Stevenson Lumber Co.-Suffield, Inc. v. Chase Assocs., Inc.,*
  284 Conn. 205, 932 A.2d 401 (2007)....................................................... 47

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,*
  135 S. Ct. 2507 (2015) ............................................................................. 7

*Thurmond v. Bowman,*
  211 F. Supp. 3d 554 (W.D.N.Y. 2016) ...................................................... 7

*Townsend v. Nassau Cty. Med. Ctr.,*
  558 F.2d 117 (2d Cir. 1977) .................................................................... 12

*Trafficante v. Metro. Life Ins. Co.,*
  409 U.S. 205 (1972).................................................................................. 53

*Tsombanidis v. West Haven Fire Dep't,*
  352 F.3d 565 (2d Cir. 2003) .................................................................... 11

## TABLE OF AUTHORITIES

**Page**

*United States v. City of New York*,
  717 F.3d 72 (2d Cir. 2013) ..................................................................... 27

*United States v. City of Yonkers*,
  96 F.3d 600 (2d Cir. 1996) ...................................................................... 27

*United States v. Hylton*,
  944 F. Supp. 2d 176 (D. Conn. 2013), aff'd, 590 F. App'x 13 (2d Cir.
  2014) ................................................................................................... 7, 49

*United States v. Space Hunters, Inc.*,
  No. 00 Civ 1781, 2004 WL 2674608 (S.D.N.Y. Nov. 23, 2004) .............................. 50

*United States v. Yonkers Bd. of Educ.*,
  837 F.2d 1181 (2d Cir. 1987) ................................................................... 29

*United States v. Youritan Constr. Co.*,
  370 F. Supp. 643 (N.D. Cal. 1973), aff'd in part, remanded in part
  on other grounds, 509 F.2d 623 (9th Cir. 1975) ....................................... 7

*Valley Hous. LP v. City of Derby*,
  2011 WL 2144633 (D. Conn. 2011) ......................................................... 52

*Valley Hous. LP v. City of Derby*,
  802 F. Supp. 2d 359 (D. Conn. 2011).................................................... 52

*Viens v. Am. Empire Surplus Lines Ins.*,
  113 F. Supp. 3d 555 (D. Conn. 2015)................................................... 47

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1976)................................................................................ 27

*Wards Cove Packing Co. v. Atonio*,
  490 U.S. 642 (1989)................................................................................ 11

*Warfield v. Byron*,
  137 Fed. App'x 651 (5th Cir. 2005) ...................................................... 36

*Washington v. Davis*,
  426 U.S. 229 (1976)................................................................................ 27

*Web Press Servs. Corp. v. New London Motors, Inc.*,
  203 Conn. 342, 525 A.2d 57 (1987)...................................................... 45

# TABLE OF AUTHORITIES

**Page**

STATUTES

15 U.S.C. § 1681 .......................................................................... 30, 31, 34, 35, 37

42 U.S.C. § 3602 .......................................................................................... 53

42 U.S.C. § 3604 .................................................................................. 7, 31, 54

Fair Credit Reporting Act .................................................................. 30, 31, 34

Conn. Gen. Stat. § 42-110g(a) ................................................................... 47

Connecticut Unfair Trade Practices Act (CUTPA) ............................................ *passim*

REGULATIONS

12 C.F.R. § 1022.123 ................................................................................. 34, 35

12 C.F.R. § 1022.137 ........................................................................... 35, 36, 42

24 C.F.R. § 5.603 ...................................................................................... 14, 15

24 C.F.R. § 5.653 ...................................................................................... 14, 15

24 C.F.R. § 5.854 ...................................................................................... 16, 17

24 C.F.R. § 5.856 .......................................................................................... 16

24 C.F.R. § 100.500 ................................................................................... 9, 41

24 C.F.R. § 100.65 ......................................................................................... 54

## I.      INTRODUCTION

Extensive discovery has confirmed that CoreLogic's automated criminal history screening product, CrimSAFE, does what Plaintiffs alleged: it determines whether a rental applicant qualifies for admission under a client landlord's criminal history policy, and reports only the bare result ("accept" or "records found") to the client's leasing staff. When the CrimSAFE result is unfavorable, the applicant is denied housing. These automated criminal history determinations have a disparate impact on African Americans and Latinos, as confirmed by expert analysis and decision statistics from CoreLogic. CoreLogic did not retain a statistical expert and presents no alternative calculations showing the absence of disparate impact.

Because CrimSAFE causes this disparate impact, the Fair Housing Act ("FHA") requires that its use be justified by legitimate business purposes, and that CoreLogic not ignore less discriminatory alternatives for implementation of CrimSAFE. There may be utility in the ability to rapidly retrieve, sort, and filter rental applicants' criminal records. But CrimSAFE does not simply forward sorted and filtered results to landlords to review and consider in making an admission decision. Rather, CrimSAFE makes and reports its own determination on admission of a tenant—functionally making the leasing decision. CoreLogic markets CrimSAFE as a decision-making product and it is understood and used as such by its client landlords, who routinely abide by the CrimSAFE results. There is no business necessity to use CrimSAFE in that manner, and less discriminatory alternatives have been ignored.

CoreLogic's decision to sell CrimSAFE with full knowledge of the

discriminatory features built into its design is also evidence of intent to discriminate. Plaintiffs can establish materials facts at trial that CoreLogic's conduct violates the FHA for both the discriminatory harm experienced by prospective renters of color, but also for the adverse impact CoreLogic's consumer file disclosure policies have on disabled individuals and its failure to accommodate Mr. Arroyo in obtaining access to his file. Similarly, undisputed material facts establish that CoreLogic's conduct in denying Mr. Arroyo a copy of his file through his conservator, Carmen Arroyo, also violated the Fair Credit Reporting Act (FCRA). Collectively, this conduct also violates the Connecticut Unfair Trade Practices Act (CUTPA). The Court should deny this motion. See Fed.R.Civ.P. 56(a).

## II.    ARGUMENT

### A.    CoreLogic, Through CrimSAFE, Makes Housing Unavailable

CoreLogic offers landlords an automated screening product called CrimSAFE that retrieves and categorizes a rental housing applicant's criminal records, determines whether the applicant qualifies for admission under the policy associated with the housing provider, and provides an accept or decline leasing decision. Pltf's Stmt. of Addt'l Facts (PSAF) ¶ 68-69. CoreLogic's motion is premised on a series of mischaracterizations of CrimSAFE that are belied by overwhelming evidence. CoreLogic repeatedly describes CrimSAFE as a "categorization product" (see, e.g., Dkt. 112-2 ("Mot.") at 5) but this description conceals the product's fundamental purpose: to furnish housing providers with an accept/decline leasing decision based on an applicant's criminal history. Since 2006, CoreLogic has marketed CrimSAFE as providing "a clear accept/decline leasing decision" based on an "automate[d] evaluation." CrimSAFE "relieves"

2

housing providers of the "burden" of evaluating criminal records on their own.[1] *Id.* Much of this language remains verbatim on CoreLogic's website and marketing materials. *Id.*

In August of 2015, Defendant recommended that WinnResidential ("WinnRes") use CrimSAFE, describing it as a product that "relieves your staff from the burden of interpreting criminal search results" and that with CrimSAFE, "criminal record search results are evaluated using our own advanced, proprietary technology and an accept/decline leasing decision is delivered to your staff." PSAF ¶ 70. WinnRes understood this to mean what it says: that CrimSAFE delivers an accept/decline leasing decision. *Id.* "This is why we choose them … Because they provide … a means by which to screen the applicant through all of these searches and then provide an 'accept' and 'decline.'" *Id.*

That same proposal describes CrimSAFE not as a "categorization product" but rather a "decision product," consistent with decades of marketing, internal training materials, CrimSAFE configuration instructions, the CrimSAFE configuration web page, the CrimSAFE patent application, and the sworn testimony of long-time executives and employees. PSAF ¶ 69-70. CoreLogic knows landlords treat CrimSAFE as a provider of leasing decisions (*Id.* ¶ 70), and encourages this use through marketing and training materials, and through features of CrimSAFE designed to facilitate reflexive implementation of the CrimSAFE decisions. CoreLogic's proposal to WinnRes explains that "[u]sers who choose to have their

---

[1] CoreLogic contrasts CrimSAFE with another of its criminal record search products, Registry CrimCHECK, which "gives you the data to make your own leasing decisions." *Id.* ¶ 2.

rental decisions automated using ScorePLUS® and CrimSAFE® may suppress the full reports from the view of their on-site staff. WinnRes currently uses this option and the site managers view a decision report." *Id.* ¶ 70. In other words, WinnRes's "leasing and property managers only have access to the decision that is returned from the CoreLogic screening." *Id.*

CrimSAFE does not have this feature, as CoreLogic claims, in order to "enable[] property managers to reserve decisions on criminal screenings for supervisory staff, not leasing agents" (Mot. at 6) but rather to enable "users … to have their rental decisions automated," as it wrote to WinnRes (PSAF ¶ 70), which thereafter continued, like most CrimSAFE users (*Id.* ¶ 72), to have its rental decisions automated using CrimSAFE and to suppress the detailed report from the view of their onsite staff who implemented leasing decisions. *Id.* ¶ 70.

The "Lease Decision" report on Mr. Arroyo that CoreLogic transmitted to WinnRes included, from CrimSAFE, a decision of "Record(s) Found," branded them "disqualifying records," and generated a letter addressed to Mr. Arroyo stating "we are unable to accept your application at this time." *Id.* ¶ 74. But for this conduct, Mr. Arroyo would not have been rejected as a tenant. *Id.* ¶ 86.

CoreLogic begins its motion with the fallacious claim that "the CrimSAFE report on Mr. Arroyo accurately identified a pending charge for theft, and it reported all details of that charge to WinnResidential." Mot. at 1. In fact, a CrimSAFE Report *never* includes such details. Rather, a CrimSAFE report is occasionally accompanied by a separate Multistate Criminal Search Report that includes additional information (*Id.* ¶ 76), but for most housing providers those details are

suppressed. *Id*. ¶ 70. The sole evidence CoreLogic cites for its claim that it provided *any* details to WinnRes relating to Mr. Arroyo's minor shoplifting charge is a screening report dated more than two years after his application was screened and declined – and even that report failed to indicate whether the offense was a charge or conviction (it was a charge) or the offense severity (it was "summary process," below a misdemeanor). *Id.* ¶ 73; P's Resp. to D's SOF (RSOF) ¶ 25. CoreLogic similarly falsely asserts that a "CrimSAFE report is always accompanied by another portion of the report that displays the full public data of any record(s) identified via CrimSAFE." SOF ¶ 9. Not only was the full public data omitted from the Lease Decision Report CoreLogic generated for WinnRes, but CoreLogic allows housing providers to suppress the details of an applicant's criminal records from *all* staff, including administrators, by simply unchecking a box on the CrimSAFE configuration page. PSAF ¶ 72.

Regardless, CoreLogic never includes information about the CrimSAFE categorization in the screening report it produces for the housing provider. *Id*. at ¶ 73. Even in situations where it provides to a supervisory employee a version of the screening report that includes details about an applicant's criminal record, the CrimSAFE category is omitted, as are the severity and status. *Id.* Thus to the extent a housing provider actually uses the product in the manner CoreLogic describes in its memorandum – i.e. by reserving decisions on criminal screenings for designated supervisors, who review the underlying record and conduct an individualized assessment before rendering a rental decision – said supervisor is left to re-categorize the record on her own, without any assistance from the

supposed categorization product for which the company paid. Further undermining CoreLogic's claim that identified supervisors are to conduct such assessments, any time CrimSAFE returns an adverse decision, in a report that includes no information about the underlying record, it generates a letter addressed to the applicant that states that his or her rental application has been denied. PSAF ¶ 71. It even offers the option of automating the delivery of the adverse action letters it generates, *Id.*, in which case leasing agents simply submit applicants' names and dates of birth to CoreLogic. Then, CoreLogic determines whether or not they have disqualifying criminal records and transmits a letter to the applicant via email notifying them of a denial regardless of whether *any* version of the report has ever been opened by the housing provider. *Id.*

CoreLogic erroneously identifies as the "lynchpin factual assertion … with respect to [Plaintiffs'] claim of racial disparate impact" the fact that the "CrimSAFE product does not return any details of the criminal records found." Mot. at 3. To the contrary, CoreLogic would be liable for its own conduct that proximately causes discriminatory housing denials regardless of whether or not it provides sufficient underlying details to the housing provider to allow it to exercise its own judgment and override the "clear accept/decline leasing decision" it provides. As the U.S. Supreme Court held in *Staub v. Proctor Hospital*, 562 U.S. 411, 419 (2011), an act of discrimination may have multiple proximate causes, and the possibility that a subordinate may be overridden by a higher decisionmaker does not "automatically render[] the link to the [subordinate's] bias 'remote' or 'purely contingent'" for proximate cause purposes. This is true even if the final decisionmaker conducts a

6

separate investigation and exercises her own judgment. *Id*. at 419. "[I]t is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm." *Id*. Likewise, in *Jeanty v. McKey & Poague*, Inc., 496 F.2d 1119, 1120 (7th Cir. 1974), a property management firm was held liable for discrimination even "[t]hough the management agreement … states that 'Leases and tenants shall be approved by the owner.'"[2]

The FHA prohibits discriminatory conduct that "make[s] unavailable or den[ies]" rental housing. 42 U.S.C. § 3604(a) and (f)(1). The phrase "otherwise make unavailable" is a "catchall phrase" that "look[s] to consequences, not intent," *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2519 (2015), and reaches "a wide variety of discriminatory housing practices." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016).[3]

---

[2] *See also Cleveland v. Caplaw Enters.*, 448 F.3d 518, 523 (2d Cir. 2006) (employee can be held liable under FHA for his own discriminatory acts), discussing *Mitchell v. Shane*, 350 F.3d 39, 49 (2d Cir. 2003); *United States v. Hylton*, 944 F. Supp. 2d 176, 190 (D. Conn. 2013), aff'd, 590 F. App'x 13 (2d Cir. 2014) (agent liable for his own discriminatory actions and principals vicariously liable); *Thurmond v. Bowman*, 211 F. Supp. 3d 554, 564-65 (W.D.N.Y. 2016) (agent who managed a rental property on behalf of its owner liable for discrimination); *see also Hintz v. Chase*, No. 17-CV-02198-JCS, 2017 WL 3421979, at *2-3 (N.D. Cal. Aug. 9, 2017) (collecting cases) (housing discrimination action sounds in tort and "under well-established principles of agency law, '[a]n agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal.'"), quoting *Arnal v. Aspen View Condo. Ass'n, Inc.* No. 15–cv–01044–WYD–MJW, 2017 WL 1231555, at * 4 (D. Colo., Mar. 28, 2017).

[3] *See also Thurmond*, 211 F. Supp. 3d at 564 (the "otherwise make available" provision "has been construed to reach every practice which has the effect of making housing more difficult to obtain on prohibited grounds"); *United States v. Youritan Constr. Co.*, 370 F. Supp. 643, 648 (N.D. Cal. 1973), (stating that the phrase

A defendant makes housing unavailable under the FHA "when [it] engages in a series of actions that imposes burdens on … a protected class of residents or intended residents, making it more difficult for the members of the protected class to obtain housing or conveying a sense that the members of the protected class are unwanted." *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, No. 3:17-CV-627 (VAB), 2019 WL 4805032, at * 20 (D. Conn. Sept. 30, 2019) (citing, inter alia, *Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*, 719 F.3d 322, 327 (4th Cir. 2013) (stating that "by imposing more burdensome application procedures and generally discouraging the … application" of a woman and her brother who lived with autism, the defendant "'otherwise ma[de] [the property] unavailable'"). Through CrimSAFE, CoreLogic determines whether or not an applicant has disqualifying criminal records and returns a leasing decision. When CoreLogic reports that an applicant is disqualified and generates a letter to the applicant stating that his application is denied, as it did for Mr. Arroyo, it makes housing unavailable – regardless of whether it provides a separate report to the landlord with additional information about the applicant. The fact that a core CrimSAFE feature is its ability to hide an applicant's criminal record and distill an applicant's criminal record into a "decision report" is not Plaintiffs' "lynchpin factual assertion," but it offers yet more evidence that the nature and purpose of the product is to make rental decisions.

---

"otherwise make unavailable" "appears to be as broad as Congress could have made it, and all practices which have the effect of denying dwellings on prohibited grounds are therefore unlawful"), aff'd in part, remanded in part on other grounds, 509 F.2d 623 (9th Cir. 1975).

**B.** **CoreLogic's Criminal History Screening Violates Fair Housing Act Due to Disparate Impact on African Americans and Latinos**

**1.** **Plaintiffs' Prima Facie Case is Based on Undisputed Facts**

The only element of the prima facie case[4] that CoreLogic disputes is the disparate impact. Its reasons for disputing that a disparate impact has been demonstrated are baseless as it does not dispute the accuracy of Dr. Wildeman's Expert Report, any of the other studies and sources cited by Plaintiffs illustrating both national and Connecticut-specific disparities in criminal history adverse to African Americans and Latinos or Dr. Wildeman's further analyses which demonstrated disparate impacts persisted regardless of income level, age of the individual, or how far back in time criminal history was considered. Nor does CoreLogic offer an expert of its own with contradictory information on disparities.

Instead, CoreLogic's argument rests on one red herring,[5] a significant mis-statement of the law, and a failure to recognize how Dr. Wildeman tailored his analyses to apply to the facts presented here. CoreLogic has misstated the law in arguing that disparate impact must be shown based on the actual applicants to apartments covered by CoreLogic; and it has misstated facts in describing Dr. Wildeman's analysis as "general population statistics."

---

[4] Defendant misstates the third element of the prima facie case (Mot. at 17-18) as it is that the neutral policy causes disparity, not that it is "harmful." 24 C.F.R. 100.500(c); *MHANY Mgmt.*, 819 F.3d at 617.

[5] Defendant argues that only 7% of applicants it evaluates for Connecticut rentals are disqualified by criminal records. Mot. at 18-19. Unsurprisingly, Defendant cites no case authority that this diminishes concerns about disparate impact. Courts have recognized the validity of disparate impact claims, even when a relatively small percentage of individuals are affected. *See, e.g., Jones v. City of Bos.*, 752 F.3d 38, 44-45, 52-53 (1st Cir. 2014) (disparate impact was established even though less than 1% were affected by neutral rule).

9

First, there is ample case authority recognizing that data on the eligible population is equal to, or preferred over, actual applicant flow. The potentially relevant factors here are income level (as different properties might have different rent levels) and geographic scope from which apartments draw their tenants. Second, in demonstrating that disparities in criminal history rates persisted regardless of income level, Dr. Wildeman established that no matter what rental rates were, and thus the income level of the likely applicant pool, there was a disparate impact. Third, CoreLogic serves over 120 properties throughout Connecticut, and has refused to identify the location of those properties.[6] Statewide statistics are appropriate for a case examining this many properties in a state which is only 110 miles by 70 miles.

### Eligible Population vs. Applicant Flow

No case authority requires evaluation of disparate impact based upon actual applicants only, rather than the eligible population, and many cases to the contrary. *EEOC v. Joint Apprenticeship Comm.*, 186 F.3d 110, 119 (2d Cir. 1999) (statistics based on general population data and potential applicant data are accepted, and may be better when "the actual applicant pool might not reflect the potential applicant pool, due to a self-recognized inability on the part of potential applicants to meet the very standards challenged as being discriminatory."); *Hazelwood Sch.*

---

[6] Plaintiffs' motion to compel (Dkt. 65) encompassed RFP 49, which sought "the address, management company, and CrimSAFE configuration for each CrimSAFE user in Connecticut." Dkt. 66-2 at RFP 49. In producing the CrimSAFE configurations, CoreLogic only identified the users by account number and refused to provide property addresses, saying "Plaintiffs' claims do not implicate a specific geographic region." *Id*.

*Dist. v. United States*, 433 U.S. 299, 308-09 n.13 (1977) (finding data demonstrating pool of eligible candidates is appropriate to consider where reliable applicant flow data was not available); *Fortune Soc'y v. Sandcastle Towers Housing Dev. Fund Corp.*, 388 F. Supp. 3d 145, 170-71 (E.D.N.Y. 2019) (availability pool appropriate to use instead of applicant flow, because defendant did not retain application information for rejected applicants).[7]

CoreLogic's cases are not to the contrary. Contrary to CoreLogic's claim, Mot. at 21, *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650 (1989) holds that the best comparison starts with the "qualified persons in the labor market," and only if such market statistics would be difficult or impossible to ascertain, would "otherwise-qualified applicants" be the starting point. The point, in *Wards Cove* and other cases CoreLogic cites, is that the population statistics must be narrowed to consider those eligible. While in some cases that would be the entire general population, *Wards Cove* at n.6, in others, there are relevant qualifications that must be considered.[8] For rental units, unlike some specialized jobs, the only factor that

---

[7] *See also Rivera v. Inc. Vill. of Farmingdale*, 784 F. Supp. 2d 133, 144-45 (E.D.N.Y. 2011) (disparate impact shown by difference in percentage of Hispanic vs. non-Hispanic populations living in area slated for redevelopment or difference in percentage of Hispanic vs. non-Hispanic low income renters, given that redevelopment would reduce the number of affordable rental units, not showing specific individuals who lost housing); *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 421 (4th Cir. 2018) (disparate impact established where undocumented immigrants constitute 36.4% of the Latino population in Virginia compared with 3.6% of the non-Latino population, demonstrating that Latinos are ten times more likely than non-Latinos to be adversely affected by the policy, not limiting analysis to those living in or applying to live in defendant's property).

[8] *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 576-77 (2d Cir. 2003) speaks to the need for statistical evidence comparing those affected to those not, in a case where no statistical evidence was offered. Here, the policy challenged

need be considered is income level, which Dr. Wildeman accounted for in his analysis. The cases CoreLogic relies upon generally involved specialized jobs which made general population statistics, which had not been narrowed to consider relevant qualifications, inappropriate. For example, *Mandala v. NTT Data, Inc.*, 2019 WL 3237361 (W.D.N.Y. July 18, 2019) involved technical developer jobs, such that broad population statistics were not sufficiently targeted to reflect the qualified labor market. *Townsend v. Nassau Cty. Med. Ctr.*, 558 F.2d 117, 119-20 (2d Cir. 1977), involved the position of a medical center blood bank technician for which a B.S. degree was required, making the relevant comparison between those with and without a B.S. degree, not those with and without any college degree. Finally, in *Chin v. Port Auth. of NY & NJ*, 685 F.3d 135, 152 (2d Cir. 2012), plaintiffs challenged promotion decisions, rather than hiring decisions, and did not challenge the screening test used for promotion, only decisions made among those who passed the test; thus, in that case, only those who had passed the test constituted the qualified market.

In short, CoreLogic has submitted no authority for the proposition that actual applicants must be considered rather than the qualified members of the housing market. With respect to qualifications, CoreLogic has identified only two factors: income level, addressed in Dr. Wildeman's report, and the geographic area from which individuals are likely to apply for one of the properties served by CoreLogic. The geographic scope argument is discussed below.

---

applied to all potential renters; indeed, knowledge of the policy may have deterred many from even applying for housing.

## CoreLogic Operates Statewide so Statewide Statistics are Appropriate

CoreLogic operates throughout the relatively small state of Connecticut, serving over 120 different properties during the time period for which it produced information. PSAF ¶ 69. Given the consistency of racial and ethnic disparities in criminal history, Dr. Wildeman's expert opinion, and the complete lack of any contrary evidence from CoreLogic, there is no basis to find that the racial disparities in criminal history will be present in some parts of the state and absent in others; indeed, all of the evidence points to finding a racial disparity in criminal history no matter how the population is sliced. CoreLogic has posited that the share of the population who are African-American or Latino may vary from city to city. Mot. at 22-23.[9] However, that does nothing to suggest any lesser disparity in criminal history between those populations and the white population in those cities.[10] Thus, while the percentage of applicants to individual properties who are African American or Latino may vary from property to property, the disparity

---

[9] The numbers CoreLogic reports are not relevant as the housing market for a given property does not correspond to the city limits. Indeed, the housing market for a single property can encompass much larger areas. *See Fortune Society*, 388 F. Supp. 3d at 169 (housing market included 8 surrounding counties).

[10] CoreLogic argues, based on a hypothetical to Dr. Wildeman about how to study disparities among applicants of affordable housing in Willimantic, Mot. at 23-24, that Plaintiffs were required to complete such analysis for each CrimSAFE-using property. But Plaintiffs' claims here are not limited to one property in Willimantic, but apply to all properties using CrimSAFE throughout the entire state. Thus, the question of how to analyze Willimantic standing alone is irrelevant here. Moreover, to the best of Plaintiffs' knowledge WinnRes no longer manages ArtSpace Windham. Given CoreLogic's refusal to produce the list of the 120+ properties using the product in Connecticut (*see infra,* 14) it is unclear whether any properties in Willimantic use CrimSAFE.

between the share of those applicants rejected due to criminal history and the share of white applicants rejected on that ground would *not* vary based on the number of African-American and Latino applicants.

Moreover, CoreLogic has already taken the position that the addresses of the specific properties in Connecticut that used CrimSAFE are irrelevant, because "Plaintiffs' claims do not implicate a specific geographic region." Dkt. 66-2 at RFP 49. Plaintiffs' motion to compel such addresses is pending, and if granted, Plaintiffs will supplement the record. Given its position that such information is irrelevant, CoreLogic cannot argue that such information is vital, such that the statistical analysis can take into account the particular market served by each of the more than 120 Connecticut properties that have used CrimSAFE.

CoreLogic has also argued that an unspecified "many" of its CrimSAFE customers operate subsidized housing, Mot. at 23, but Dr. Wildeman's analysis looked at disparities by income and established that racial disparities in criminal history persist whether income would qualify an individual for subsidized housing or a high cost rent. In HUD project-based Section 8 housing, for instance, which CoreLogic specifically discusses, 40% of households admitted each year must have household income that does not exceed 30% of the median family income (MFI). 24 C.F.R. §§ 5.653(c); 5.603(b). In the Hartford-West Hartford-East Hartford HUD Metro FMR area, the 2019 MFI is $97,900 (PSAF ¶ 100), so households must earn $29,370 or less to qualify for 40% of the units. Most of the remaining households admitted to such housing must have income of less than 50% MFI ($48,950 or less in the Hartford area). 24 C.F.R. §§ 5.653(d)(1)-(2); 5.603(b) Dr.

Wildeman separately analyzed racial disparities among those earning $30,000 or less and those earning between $30,000 and $50,000, which corresponds to the Section 8 income levels and found that within both income ranges African-Americans and Latinos are significantly likelier to have criminal records than similarly situated Whites.[11] Accordingly, Plaintiffs' evidence establishes that whether or not the housing in question is subsidized, significant racial and ethnic disparities exist in the relative likelihoods that eligible potential applicants have criminal records.

In sum, CoreLogic has not provided any basis to dispute the accuracy of Dr. Wildeman's opinions regarding the racial disparities in criminal justice history within the qualified rental market at issue here – the entire state of Connecticut.

2.    **Defendant's Proffered Business Justifications are Not Supported by Undisputed Facts, and Do Not Address Plaintiffs' Allegations**

CoreLogic claims three business justifications support its CrimSAFE product: (a) some screening is required by law for federally subsidized properties; (b) screening is permitted to protect health and safety; and (c) CrimSAFE performs the screening functions better than alternatives based on the accuracy and consistency of categorizing criminal history. The first two justifications merely support the legitimacy of some criminal background screening, not the specific practices built into CrimSAFE and challenged by Plaintiffs here. The third justification is not supported by the evidence, and still fails to address specific

---

[11] Dr. Wildeman also analyzed those with income between $50-70K and $70-100K and similarly found significant racial and ethnic disparities.

features of CrimSAFE challenged by Plaintiffs. In particular, nothing in this claimed business justifications support (a) including arrests that do not result in a conviction; (b) including convictions that are more than 9 years old; (c) informing leasing agents only that "disqualifying records were found" instead of providing the full history in a way that would encourage the individualized consideration HUD guidance calls for.

   a.   *Federal law only requires screening for two categories of offenses, not the 36 categories for which CrimSAFE screens*

As CoreLogic concedes, the only criminal screening *required* by law is for registered sex offenders in certain federally subsidized housing. 24 C.F.R. §5.856; Mot. at 25.[12] That requirement cannot support the screening for other types of criminal records. Further, for subsidized housing, landlords are required to exclude those evicted from federally assisted housing due to drug activity within the past three years, or who are currently engaged in such activity. 24 C.F.R. §5.854; Mot. at 25.[13] Such narrowly targeted requirements, limited to two categories of crime, and with respect to the drug category, limited to events no more than three years old, cannot serve to justify screening for all categories of crime for up to 99 years, and for arrests for up to 7 years, in all properties.

---

[12] Not all forms of federal subsidy result in subjecting a property to these screening requirements. The Low-Income Housing Tax Credit, for example, which covered the ArtSpace property Mr. Arroyo applied to, does not subject a property to these requirements. RSOF ¶ 24.

[13] Even with respect to such drug related history, federal regulations require consideration of individualized factors, such as whether the individual who engaged in drug activity has completed a rehabilitation program, or no longer resides with the household members seeking housing. 24 C.F.R. § 5.854(a).

      **b.**    ***Defendant has not established health and safety justifications, particularly not for arrests or older convictions.***

The only evidence CoreLogic cites in support of its claim that criminal background screens protect the health and safety of other residents, is one Bureau of Justice Statistics (BJS) report (Mot. at 25-26) which fails to support its claim of business necessity in several respects.[14] First, the report addressed only those released from prison – i.e. those who had been convicted of a crime, not those who had been arrested and never incarcerated. PSAF ¶ 75. Thus, it provides no support for a screen that considers arrests, as CrimSAFE does. Indeed, CoreLogic's proffered expert Jay Kacirk conceded that there was no justification to include arrests that did not result in convictions in criminal background screens. PSAF ¶ 74. Second, CoreLogic relies on BJS for the finding that 83% of prisoners are arrested again within 9 years. Mot. at 25. But these are simply arrests, which are not relevant per Kacirk, *supra*. Third, the likelihood of someone re-offending decreases dramatically over time until the risk of committing a new offense is the same as for someone with no criminal record (somewhere between years five and nine). PSAF ¶ 84. Indeed, consistent with the findings of Plaintiffs' expert Lila Kazemian, the BJS analysis CoreLogic relies on found that while 83.4% of released prisoners were re-arrested *at some point in the 15-year follow-up period*, 77% of arrests occurred within the first five years, with most of those in the first year following release. PSAF ¶ 84. In year 6, only 2.3% were arrested, in year 7 only 1.7%,

---

[14] Notably, despite its insistence that statewide statistics are insufficient to establish disparate impact, the Defendant relies on nationwide BJS data that do not even include Connecticut.

and in year 9, 1.0%. *Id.* Thus, permitting screens in all crime categories to extend to 99 years cannot be justified as necessary for public safety. Indeed, CoreLogic's expert testified that industry practice was to look at shorter time periods now. PSAF ¶ 101. Grasping at straws, CoreLogic notes that most crimes happen near the homes of the victims, and infers a link between background screens and resident safety. Mot. at 26. However, the location of the crime tells us nothing about the residential address of the criminal. Thus, this argument also fails.

Plaintiffs have not argued that no criminal screening can be done, only that criminal screening done in the manner that CrimSAFE does – including arrests, including crimes up to 99 years old, and excluding individualized review – has a substantial disparate impact that CoreLogic cannot justify.

### c.   *CoreLogic has not established the claimed advantages of CrimSAFE*

CoreLogic's only argument in favor of the CrimSAFE product, rather than criminal background checks in the abstract, is that categorizing offense records into the 36 categories used by the FBI reduces the chance a record will be misinterpreted, and that consistent rules will be applied to categorizing offense records, thus reducing the potential for implicit bias.[15] Once again, its argument misses the mark. Plaintiffs have not alleged that CrimSAFE's sorting of offense

---

[15] Defendant also claims a reduction in the prospect of explicit bias, but since the property managers likely see the applicants and become aware of race prior to running a CrimSAFE report, and since the CrimSAFE report, if records are found, will explicitly state the applicant's race, there is no basis for Defendant's speculation that this could decrease explicit bias.

records into categories causes adverse impact.[16] CrimSAFE could continue to sort and categorize records, but exclude those that contain arrests without convictions and those that are too distant in time to be probative, and produce a report suitable for individualized review. This rationale simply does not respond to the three ways in which Plaintiffs' allege the disparate impact caused by CrimSAFE is unjustified.

Notably, while virtually the entirety of CoreLogic's rational for CrimSAFE providing benefits rests on its placing offenses into categories, CrimSAFE reports--even the rare reports which provide the full criminal history instead of a simple denial--do not contain any of that categorization information that CrimSAFE claims as its main benefit. PSAF ¶ 73. For example, even if Winn had seen the full criminal history report for Mr. Arroyo, that report would not have identified whether the record was for an arrest or conviction, whether it was for a misdemeanor or felony, or which of the 36 categories of crime to which it had been assigned by CoreLogic. PSAF ¶ 73. While CrimSAFE considers the landlord's configuration of exclusion periods for each criminal category in determining that there was a "disqualifying" record, it does not include such information in the report it provides to the landlord. *Id*. Use of CrimSAFE blurs the lines between arrest and conviction, felony and misdemeanor, recent crimes and youthful indiscretions rather than clarifies them

---

[16] Nonetheless, CrimSAFE's claim that use of their categorization system will reduce the chance of a criminal record being mis-interpreted by leasing staff who lack legal research training is unfounded. Mot. at 26. There is no evidence that anyone with relevant legal research training was involved in categorizing records for Defendant. Mr. Bayburtian testified that a large number of individuals with unknown training did the initial matching of crimes to categories, and Ms. Rosario testified that for any crimes without an assigned category, the manual review was completed by herself or other employees who have no more training than leasing staff. Bayburtian Dep. at 76:8-78:5; Rosario Dep. at 59:23-65:9.

by the reports provided. *Id*. Given the reports that CrimSAFE provides, the only way that the consistency which CoreLogic touts can be ensured is by eliminating individual review and uniformly following the CrimSAFE decision or recommendation. PSAF ¶¶ 69-72. It is not surprising therefore that the undisputed evidence overwhelmingly confirms that leasing agents who make decisions do not have access to the full criminal history reports. *Id.* But individual review is not only mandated by HUD guidance,[17] it is the only way to consider relevant circumstances.

CoreLogic's final assertion, that categorization will reduce implicit bias, is unfounded. Mot. at 26. SUMF ¶ 12, which CoreLogic cites in support such assertion, relies solely on (i) a conclusory opinion from CoreLogic senior employee Naeem Kayani, who is not qualified to offer such an expert opinion and cites no factual basis for that conclusion; and (ii) a statement in Mr. Kacirk's report, which he disavowed in his deposition. Mr. Kacirk explained in his deposition that when he referred to eliminating bias, he was not referring to bias based on protected classes under the FHA, but biases based upon individual experience as a crime victim, which might lead one leasing agent to be harsher than others with applicants whose criminal record parallels in some way a crime to which the leasing agent was subjected. RSOF ¶ 12.

---

[17] *See* U.S. Dept. of Housing & Urban Dev., Office of Gen. Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions (Apr. 4, 2016) at 7-8 (hereafter "HUD Guid."), *available at* https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF.

### 3.    Undisputed Facts Demonstrate that Less Discriminatory Alternatives Exist and Are Not Being Used by Defendant

Even if the Court were to find it possible that Defendant could establish a business necessity for conducting certain criminal background screenings, Plaintiffs still prevail if there are less discriminatory alternatives that satisfy a substantial, legitimate need. Mot. at 26-27. Here, CoreLogic addresses only the possibility of individualized review, ignoring all the other steps Plaintiffs identified it could take to reduce CrimSAFE's disparate impact: excluding arrests not resulting in convictions; placing a cap on the age of convictions substantially lower than the current 99 year maximum; and narrowing the categories of crimes for which applicants can be screened to those relevant to the safety of other residents. Dkt. 116 (Pl's MSJ) at 29-31. Defendant has not addressed *any* of these alternatives, each of which would reduce the adverse impact of CrimSAFE while satisfying any legitimate need.

Eliminating arrests without conviction from the CrimSAFE review would significantly reduce the number of applicants excluded, and completely eliminate the disparate impact due to arrests, without providing a less satisfactory screening. Setting an evidence-based cap on the lookback period would reduce the disparate impact from consideration of long ago convictions not relevant to current risk.[18] For instance, capping the lookback period at seven years would significantly

---

[18] For federally subsidized properties that are required under federal law to permanently exclude applicants with certain convictions for sex offenses or drug manufacturing, Defendant could (1) create a CrimSAFE category with a longer lookback period just for these crimes and (2) apply this CrimSAFE category just at properties subject to these requirements.

reduce the number of African American and Latino applicants excluded: 10.61% of African Americans had criminal records over the course of their lifetime, but only 2.77% of African Americans had a criminal record in the past seven years, while for Latinos the figures are 5.99% and 1.19%. PSAF ¶ 83.[19] In other words, 7.84% of African Americans and 4.8% of Latinos have criminal records *older* than seven years, which would no longer be disqualifying with the proposed cap on the lookback period. *Id.* By comparison, only 1.81% of whites have criminal records older than seven years. *Id.* As such, if Defendant were to implement Plaintiffs' proposed alternative of capping the lookback period and selecting a seven-year cap, that would eliminate a significant source of the adverse impact on African-American and Latino applicants (permitting the longer lookback periods means African-American housing seekers are 4.33 times more likely to be declined and Latino housing seekers 2.65 times more likely to be declined for convictions that are over seven years old, than are white housing seekers). *Id.* Capping the lookback period would achieve any safety-related objectives, as evidenced by the extensive body of research showing that old criminal records have limited or no probative value as to the likelihood that an individual presents an increased risk.[20]

---

[19] Such sharp reductions occur when examining various earning levels as well. For example, among those earning $30,000 or less, 14.34% of African Americans had a criminal record in their lifetime, but only 3.99% did in the last seven years; for Latinos, a 9.38% exclusion rate if looking at total lifetime chance is reduced to 2.26% if looking only at the last seven years. Wildeman Table 1.

[20] The undisputed evidence further establishes that even the fact that a person has a *recent* conviction, of any type and severity, is insufficient to conclude that a person presents an increased risk without consideration of other factors. PSAF ¶ 76. One-time offenders for instance, are substantially less likely to recidivate than repeat offenders, as are people who committed an offense at a younger age. *Id.* As

In addition to these readily implementable adjustments to CrimSAFE's settings, CoreLogic could reduce the disparate impact caused by the *automatic* exclusion of individuals by evaluating each criminal record on an individualized basis by considering the record and relevant mitigating circumstances outside the criminal record itself to determine the actual risk to safety before reporting to a housing provider that the applicant is disqualified. *See* HUD Guid. at 7 (proper factors for individualized assessment include "the facts or circumstances surrounding the criminal conduct; the age of the individual at the time of the conduct; evidence that the individual has maintained a good tenant history before and/or after the conviction or conduct; and evidence of rehabilitation efforts.").[21] CoreLogic suggests it is unknown if its clients would permit it to play this role, and does not currently receive the additional mitigating information. Mot. at 27 n.10. However, CoreLogic sets the requirements for what applicant information its clients must provide in order to run a search. SUMF at ¶ 1. And CoreLogic

---

such, although estimates as to precisely when the risk of recidivism for someone with a criminal approximates that of someone without are generally within the five-to-nine year range, the appropriate lookback window would be lower (or zero) for one-time and younger offenders. *Id*. Additionally, people with criminal records who are able to secure housing and employment are less likely to recidivate. This is because "[w]hen basic needs are not met … when structural barriers prevent them from getting their lives back on track, that essentially promotes recidivism." PSAF ¶ 84. And regardless of the appropriateness of the lookback window, individualized review is still necessary to evaluate whether a specific applicant presents an actual risk. *See infra* at 32.

[21] The duty to make individualized assessments, rather than deny applicants categorically, has long existed in the employment context (to reduce the effects of similar disparate impacts among job seekers). *See, e.g.*, *Green v. Mo. Pac. R.R. Co.*, 523 F.2d 1290, 1298 (8th Cir. 1975), cited with approval in *Barletta v. Rilling*, 973 F. Supp. 2d 132, 139 (D. Conn. 2013).

previously offered precisely such a screening system to its clients. PSAF ¶ 92. Moreover, Defendant already has a process by which denied applicants can request information about the contents of their files that were relied upon to deny their applications. SUMF at ¶ 36. This process could be expanded to permit applicants to submit mitigating information for consideration.

Finally, as to the one less-discriminatory alternative that Defendant has addressed, CoreLogic could supply the underlying information about the criminal history to the housing provider, along with any helpful categorization information, but without providing a leasing decision. The housing provider would then do an individualized assessment. *See* RSOF ¶ 65. By limiting access to complete information, Defendant makes it impossible or at least impracticable for housing providers to do a case-by-case assessment of the actual risk presented by each applicant since the leasing agent charged with making the decision has no information upon which to override the "Crim Decision." Providing information about the underlying criminal record to the relevant decisionmakers at the housing provider – instead of limiting access to a single high-level executive who is not involved in day-to-day decision-making – would also help ensure that applicants are not denied housing because of inaccurate criminal records, which Defendant's database sometimes include. PSAF ¶ 99.

Defendant's claim that it already provides the underlying criminal record to the decisionmakers is false. Mot. at 27 citing SUMF ¶ 5, 9. SUMF ¶5 simply describes the categorization, and provides no evidence about the report that goes to the leasing agent. SUMF ¶ 9 cites only to Mr. Kayani's declaration that this

information is "always" provided. But there is a difference between always available and always provided. CoreLogic permits landlords to configure their settings so that they never receive the full criminal history report, and even when that setting is not selected, it permits other settings which limit access to the full criminal history report to high level executives who are not involved in the leasing decisions. PSAF ¶¶ 69-73. Most landlords choose settings so the leasing agent implements the decision provided by CrimSAFE without any opportunity to see the full history. *Id.* ¶ 72. Mr. Kayani admitted as much with respect to WinnRes., testifying "this is the exact value that CrimSAFE provides." *Id.*

Individualized review would exclude fewer persons than an automatic ban, and as such permit more African American and Latino applicants – who are disproportionately excluded under the current system – to obtain apartments. *MHANY Mgmt., Inc. v. Inc. Vill. Of Garden City*, 985 F. Supp. 2d 390, 426 (E.D.N.Y. 2013); *MHANY Mgmt., Inc. v. Cty. of Nassau*, 2017 WL 4174787, at *4-5 (E.D.N.Y. Sept. 19, 2017) (alternative which would permit creation of more affordable housing units would be a less discriminatory alternative). Individualized review of Mikhail Arroyo's application would have revealed that he presented no risk to safety or property given his significant disabilities, that he has never been convicted of a crime, and that his criminal record was so minor that it should not have barred him from housing.

C.    **There Are Facts from which Jury May Conclude CoreLogic Acted with Discriminatory Intent**

To establish intentional discrimination under the FHA, a plaintiff need only show that protected class status was a motivating factor in the defendant's action.

25

*See Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1042 (2d Cir. 1979) ("[D]enial violates §3604(a) if race is even one of the motivating factors."). CoreLogic's use of "animus" in place of "intent" does not change the actual standard, which requires only that the decision be made, in part, because of race, not because of hatred or animus towards a race. *See Laflamme v. New Horizons, Inc.*, 605 F. Supp. 2d 378, 394 (D. Conn. 2009) (finding Defendants' justification "that they did not act with any discriminatory animus . . . misapprehends the nature of direct discrimination . . . they cannot avoid liability for disability discrimination by claiming benevolence.").[22]

It is well established that "[d]iscriminatory intent may be inferred from the totality of the circumstances." *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 400 (S.D.N.Y. 2013) (citation omitted). Indeed, the cases Defendant relies upon, *LeFrak, supra*, and *Bernstein v. Vill. of Wesley Hills*, 95 F. Supp. 3d 547, 577 (S.D.N.Y. 2015) both acknowledge as much. Among the circumstances that the Supreme Court has established must be considered in determining whether an action was taken with discriminatory intent is whether the action was selected with knowledge of its adverse impact.

The Supreme Court has held, "[a]dherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance … may be considered by a court in determining whether an inference of segregative intent should be drawn." *Columbus Bd. of Educ. v. Penick*, 443 U.S.

---

[22] *See also Ricci v. DeStefano*, 557 U.S. 557, 579-80 (2009) ("Whatever the City's ultimate aim—however well intentioned or benevolent it might have seemed—the City made its employment decision because of race.")

449, 464-65 (1979) (internal citation omitted); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.25 (1979) ("[W]hen the adverse consequences of a law upon an identifiable group are as inevitable as the gender-based consequences [here], a strong inference that the adverse effects were desired can reasonably be drawn.").[23]

Defendant's claim that Plaintiffs may not rely upon evidence of disparate impact in establishing discriminatory intent cannot stand in the face of even one of the cases cited above (and in n.23), let alone all of them. Moreover, Defendant supports this claim with citation to *Bernstein*, 95 F. Supp. 3d at 576, quoting *Soberal-Perez*, but *Soberal-Perez* says: "the fact that a particular action has a foreseeable adverse impact may be relevant evidence in proving an equal protection claim." *Soberal-Perez v. Heckler*, 717 F.2d 36, 42 (2d Cir. 1983).[24]

---

[23] *See also Washington v. Davis*, 426 U.S. 229, 241-42 (1976) (discriminatory impact alone does not show discriminatory intent but it is a relevant factor to consider along with the totality of relevant facts); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 264-68 (1976) (same); *United States v. City of New York*, 717 F.3d 72, 93-95 (2d Cir. 2013) ("The principal evidence of a course of action arguably undertaken for the purpose of discrimination is the decision to continue using the results of the Exams with awareness of their disparate impact."); *United States v. City of Yonkers*, 96 F.3d 600, 612 (2d Cir. 1996) ("[t]he foreseeability of a segregative effect, or adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance, is a factor that may be taken into account in determining whether acts were undertaken with segregative intent.") (citation and internal quotation marks omitted); *MHANY Mgmt.*, 819 F.3d at 606 (in evaluating intentional discrimination claim, "the impact of the … action whether it bears more heavily on one race than another may provide an important starting point'") (citation omitted); see also *Chen-Oster v. Goldman Sachs & Co.*, 325 F.R.D. 55, 73 (S.D.N.Y. 2018) ("evidence of intent can be circumstantial, including evidence that is entirely statistical in nature"), quoting *Davis v. District of Columbia*, 246 F. Supp. 3d 367, 393 (D.D.C. 2017).

[24] Defendant's knowledge of the disparate impact is essential to establishing

Here, Defendant acted with full knowledge of the disparate impact that criminal background screenings it performed had, and with full knowledge of HUD's guidance on that issue specifically, and nonetheless chose to go forward without any of the precautionary steps that HUD advised. PSAF ¶ 89. Thus, whether Defendant knew of the race of an individual prospective tenant is entirely irrelevant. Defendant did know that African American and Latino applicants would be disproportionately affected by its screenings. *Id*.

The record is replete with evidence that CoreLogic's role is not limited to that of a neutral referee calling balls and strikes, but that it invented the game and controls the rules. CoreLogic is aware that no justification exists for rejections based on arrests (*Id.*), yet it not only permits housing providers to use such criteria but it established default settings to decline arrest records to the maximum extent permitted. *Id.* ¶ 74, 89. It knows that blanket bans cannot serve any justification (*Id.* ¶ 88) yet configured CrimSAFE with default settings under which "basically any criminal record will cause a decline," (*Id.* ¶ 89), thereby maximizing the discriminatory harm it causes. CoreLogic knows that individualized assessments are necessary to evaluate the actual risk an applicant presents yet it actively encourages housing providers to automate their criminal record screening decisions and offers features that suppress the information needed to conduct such assessments. *See* Section II(A), *supra*. This conduct is yet more egregious because CoreLogic holds itself out as a fair housing expert, all but guaranteeing

---

intent, and in *Bernstein* the court found there was no evidence that defendant had knowledge of plaintiff suffering greater adverse impact than other proposed developments. *Bernstein*, 95 F. Supp. 3d at 571-73.

fair housing compliance if they use CrimSAFE (PSAF ¶ 68), when it clearly knows better.

CoreLogic is liable under a disparate treatment theory if race or national origin was a motivating factor in its decision to adhere to a policy that causes discriminatory housing denials, as Plaintiffs allege. *See, e.g., United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1184 (2d Cir. 1987)(city's facially neutral practice of confining subsidized housing to a specific area had intentionally enhanced racial segregation in violation of § 3604(a)); *MHANY Mgmt.*, 819 F.3d at 605 (city violated § 3604(a) based on disparate treatment theory where its facially neutral zoning decision was made with discriminatory intent). Given the evidence that CoreLogic knew of the disparate impact, knew of the HUD guidance, and proceeded to act as it did, the fact finder may infer that CoreLogic acted with the requisite intent. At summary judgment, all reasonable inferences must be drawn in favor of the party opposing summary judgment, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000), and thus, summary judgment is inappropriate on the claim of disparate treatment.

### D.   CoreLogic Is Not Entitled to Summary Judgment on Any of Plaintiffs' Claims Based on CoreLogic's Failure to Make Consumer Disclosures

Carmen Arroyo asked CoreLogic to disclose Mikhail Arroyo's consumer file so she could use it in attempting to persuade WinnRes to override the denial of his application to Artspace Windham. Dkt. 87-2 at ¶ 6. CoreLogic impeded this effort by failing to disclose the file. *Id*. at ¶ 11. These essential facts support plaintiffs' claims for violation of the Fair Credit Reporting Act disclosure provisions (actionable under 15 U.S.C. § 1681n (willful violations) or alternatively under §

29

1681n (negligent violations) as well as their failure-to-make-reasonable-accommodation claim under the FHA.

### 1. CoreLogic's Failure to Disclose Mr. Arroyo's File Caused Actual Injuries to the Plaintiffs.

CoreLogic contends that WinnRes would not have overridden the denial of Mr. Arroyo's admission to Artspace even if Ms. Arroyo had a copy of his consumer file. CoreLogic thus contends plaintiffs can neither establish an actual injury to support their FCRA negligence claim, nor show that an accommodation (in CoreLogic's policy of requiring a notarized power-of-attorney before disclosing consumer files to persons other than named consumers) may have been necessary to afford Mr. Arroyo equal opportunity to use or enjoy a dwelling. The Court should reject these arguments.

There is no claim that the Arroyos were not ultimately entitled to receive the file requested. FCRA guarantees every consumer a right to access the information that consumer reporting agencies gather about them. See 15 U.S.C. § 1681g(a). To exercise that right, a consumer need only make a request and provide proper identification. See 15 U.S.C. §§ 1681g(a), 1681h(a). "A CRA may not add conditions not set out in the FCRA and related rules as a prerequisite to the required disclosure." FTC Staff Summary, § 610-2 (July 2011).[25] Thus, CoreLogic's duty to make the disclosure arose when it received Ms. Arroyo's request and sufficient identification material. By failing to make the disclosure at that time, CoreLogic

---

[25] The FTC Staff Summary to the Fair Credit Reporting Act is available on-line at: https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf

obliged her to repeatedly follow up and supplement her initial request with gratuitous additional documentation—and still did not produce the file. The time, costs, mental annoyance, and related burdens suffice as a cognizable injury to support an FCRA claim. See, e.g., *Millstone v. O'Hanlon Reports, Inc.*, 383 F. Supp. 269, 275 (E.D. Mo. 1974) (consumer injured by CRA's failure to make required disclosures, which forced the consumer to return to CRA's offices repeatedly to obtain information); see also *Handlin v. On-Site Manager, Inc.*, 351 P.3d 226, 230 (Wash. Ct. App. 2015) (tenant-screening company's failure to make FCRA disclosures injured consumers by "depriv[ing] [them] of their right to obtain information that has commercial utility for them.").

Similarly, the FHA requires a provider of housing or related services to make reasonable accommodations in its policies or practices when such an accommodation may be necessary to afford a person with a disability equal opportunity to access housing. See 42 U.S.C. § 3604(f)(3)(B); *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 156 (2d Cir. 2014). In this context, that equal opportunity meant enabling Mr. Arroyo to have the same chance at persuading WinnRes to reconsider his application (after rejecting him) that a non-disabled person would have had. See *Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1288 (11th Cir. 2014) ("Under the FHA, the comparator is a person without a disability, and an accommodation extends an equal opportunity when it addresses the needs the disability creates.").

Details about a criminal record may persuade a housing provider to reconsider a denial of admission; access to one's criminal history at least enables

a rejected applicant to best frame his or her request for review. Thus, a rejected applicant with access to his criminal history has a better *opportunity* to seek reconsideration of a denial than one without access. Mr. Arroyo's disability denied him this equal opportunity by making him unable to contact CoreLogic directly to request his criminal history file or execute a power-of-attorney authorizing the disclosure to someone else, as a person without his disabilities could do. The accommodation (i.e., disclosure to Ms. Arroyo) was therefore needed to prevent the disability from denying him equal o*pportunity t*o pursue admission to Artspace. Whether this equal opportunity would have resulted in him being admitted sooner does not matter for the necessity element.

Nevertheless, the record contains ample evidence from which the Court could ultimately conclude that WinnRes likely would have overturned the denial of Mr. Arroyo's admission much earlier had CoreLogic disclosed his file.[26] Indeed, when Plaintiffs located Mr. Arroyo's criminal record on their own and presented that information to WinnRes, it reversed the decision and permitted him to move in. PSAF ¶ 87. This reversal was not – as CoreLogic claims (Dkt. 99-2 at ¶¶ 43-44) – part of a settlement agreement negotiated to resolve an administrative complaint, but rather a decision WinnRes made on its own after finally learning the contents

---

[26] Though at the time of his application (April 27, 2016) Mr. Arroyo's criminal record was disqualifying under WinnRes' CrimSAFE settings, by May 23, 2016 (PSAF ¶ 90), WinnRes had changed those settings to no longer disqualify applicants based on most non-conviction records—including Mr. Arroyo's shoplifting arrest. Id. Had she been given a copy of Mikhail's file, Carmen could have provided WinnRes with proof that the non-conviction record for which Mr. Arroyo had been rejected was not disqualifying under these new settings.This probably would have resulted in the denial being overturned.

of Mr. Arroyo's record. PSAF ¶ 87; RSOF ¶ 33.

CoreLogic suggests that since WinnRes already had access to the full report, Ms. Arroyo presenting another copy would have simply been duplicative. But none of the relevant decisionmakers at WinnRes had access to it; the full report was suppressed from the Artspace management staff (PSAF ¶ 70, 91), and even months after the denial WinnRes executives reached out to CoreLogic sales personnel trying to obtain it. *Id*. That *someone* at WinnRes might have had access to the full report says nothing about what decision WinnRes would have made had Ms. Arroyo been able to provide a copy to the relevant decisionmakers.

Finally, even if WinnRes would not have admitted Mr. Arroyo to Artspace absent further fair housing advocacy – which was not the case – that advocacy may have secured his admission more quickly had CoreLogic disclosed the file to Ms. Arroyo. For example, WinnRes may have responded favorably to a demand letter enclosing the criminal history report (which showed no convictions) and pointing out that the denial of housing "on the basis of arrests not resulting in conviction cannot [be proven to] actually assist in protecting resident safety and/or property," HUD Guid. at p. 5. Accordingly, viewed in the light most favorable to the plaintiffs, the evidence shows not only that CoreLogic's failure to disclose Mr. Arroyo's report caused an informational injury that impaired Ms. Arroyo's ability to advocate for his admission—but that her lack of access to the report actually prevented his admission to Artspace at a much earlier time.

### 2.   Fully-Visible Seal Not Necessary

Next, CoreLogic argues that disclosing Mr. Arroyo's consumer file to Ms.

Arroyo without a conservatorship certificate bearing a fully-visible embossed seal would have violated the Fair Credit Reporting Act—a contention that, if true, would both preclude finding any violation of the FCRA disclosure provisions and simultaneously render the requested disability accommodation unreasonable. But neither FCRA nor any other law authorized CoreLogic to withhold Mr. Arroyo's file for lack of a copy with a fully-visible embossed seal.[27]

A consumer seeking disclosure of his or her consumer file must provide "proper identification." See 15 U.S.C. § 1681h(a). But "proper identification" has been interpreted to mean enough information to identify the consumer and disclose the file. See *Menton v. Experian Corp.,* 2003 WL 941388 at *3 (S.D.N.Y. Mar. 6, 2003); see also 12 C.F.R. § 1022.123(a). Regulation V, which implements FCRA, requires consumer identification to be sufficient to match the right consumer with the correct file and "commensurate with an identifiable risk of harm arising from misidentif[ication];" for a nationwide specialty consumer reporting agency (such as CoreLogic), file disclosures must be available through a streamlined process which "[c]ollects only as much personal information as is reasonably necessary to properly identify the consumer." 12 C.F.R. §§ 1022.123(a), 1022.137(a)(2)(ii). Similarly, the FCRA authorizes a third party to "accompany" a consumer to receive disclosures provided that person provides "reasonable identification," which may

---

[27] Indeed, CoreLogic acknowledged as much when, after initially withholding the consumer file in discovery because the conservatorship certificate CoreLogic had on file had expired, it ultimately disclosed the file upon receipt of an up-to-date certificate – even though it did not have a legible seal. PSAF ¶ 94.

include a written statement granting permission to share the disclosure. See 15 U.S.C. § 1681h(d). These provisions reflect a need for balance in the amount of identification material required. 12 C.F.R. § 1022.123(a)(2). Consumer reporting agencies need enough personally-identifying information to isolate the consumer's records and not improperly disclose material belonging to others. But requiring more identification material than needed prevents consumers from obtaining disclosures they are entitled to.

Ms. Arroyo first requested disclosure of Mr. Arroyo's consumer file by phone on April 27, 2016 and followed up with a written request on June 14 that included his name, date of birth, previous addresses, and copies of both of their driver's licenses and her conservatorship certificate. PSAF ¶ 94. She explained that Mikhail was non-verbal and unable to request his file on his own and that the file was needed to pursue his admission to Artspace. *Id.* These materials fulfilled the FCRA identification requirements because they provided CoreLogic sufficient information to identify the consumer (Mr. Arroyo) and the third-party (Ms. Arroyo) and showed that Ms. Arroyo was authorized to receive the file. See 12 C.F.R. § 1022.137(a)(2)(ii); see *Menton* at *3. These communications also put CoreLogic on notice of Mr. Arroyo's disability and need for accommodation.

CoreLogic argues the conservatorship certificate copy Ms. Arroyo provided *did not* sufficiently establish her authority to receive Mr. Arroyo's consumer file because the embossed court seal was not visible. Yet there is no evidence that CoreLogic genuinely doubted Ms. Arroyo had been appointed as Mr. Arroyo's conservator or otherwise had a sincere need to view the embossed seal as part of

the identification process. If any such doubt did exist, the certificate contained ample information CoreLogic could have used to verify her conservatorship, like the name of the court, case number, and caption (RSOF ¶ 42).

Numerous courts have held that the absence of a visible embossed seal on a copy of a document does not affect its validity.[28] Here there is no contention that the original conservatorship certificate did not have an embossed seal--in fact, the seal is partially visible on the copy Ms. Arroyo provided. RSOF ¶43; PSAF ¶ 93. CoreLogic offers no authority in support of its contrary position, which conflicts with the FCRA prerogative of balancing the needs for accurate identification and consumer privacy with expedient access to credit files.

Accordingly, this Court should reject CoreLogic's argument and hold that neither the "proper identification" requirement in 15 U.S.C. § 1681h(a) nor the "reasonable identification" requirement in 15 U.S.C. § 1681h(d) precluded CoreLogic from disclosing Mikhail's file to Carmen in reliance on the conservatorship certificate she provided. And, being permissible under the FCRA, making such a disclosure would not have imposed an undue burden on CoreLogic rendering such an accommodation unreasonable for FHA purposes.

---

[28] *See, e.g., In re Robinson v. Chase Home Fin. LLC*, 403 B.R. 497, 503 (Bankr. S.D. Oh. 2008) (mortgage valid despite "inability to detect the notary public's raised seal on the image of the mortgage available in the public records"); *Schwab v. GMAC Mortg. Corp.*, 333 F.3d 135, 138 (3d Cir. 2003) (lack of visible notary seal on recorded copy of mortgage did not impair validity of mortgage); *Warfield v. Byron*, 137 Fed. App'x 651, 655 (5th Cir. 2005) (absence of visible court seal on photocopy of summons did not affect its validity); *Oliver v. NY State Police*, 2019 WL 453363, at * 6 (W.D.N.Y. 2019) (same); *Smith v. Nat'l Credit Sys., Inc.*, 2015 WL 12780446, at *2 (N.D. Ga. 2015) (lack of visible embossed notary seal on copy of affidavit filed with court did not affect validity of affidavit).

### 3.   FCRA Willfulness Claim

CoreLogic's last refuge is a contention that failing to disclose Mr. Arroyo's consumer file for lack of a fully-visible seal was not an objectively unreasonable position, hence precluding a finding of willfulness to establish liability under 15 U.S.C. § 1681n. See *Safeco Ins. Co. v. Burr,* 551 U.S. 47, 69 (2007). But a reasonable, fair-minded person trying to balance accurate identification and consumer privacy against expedient access to consumer files would have accepted the copy Carmen provided—particularly combined with the other information CoreLogic had confirming the Arroyos' identities, the absence of any suspicion of identity theft, and the fact that Ms. Arroyo sought the file in connection with Mr. Arroyo's application to move into her own residence.

CoreLogic characterizes Ms. Arroyo's conservatorship certificate as "clearly indicat[ing] that [it was] not to be accepted without a visible seal," and complains there was no legal guidance suggesting the certificate should have been accepted without a visible seal. But as noted above, what legal authority that exists on the significance of embossed seals establishes that as long as the <u>original</u> document carries the seal, the inability to view that seal on a <u>copy</u> of the document is irrelevant. See FN 28. Had CoreLogic reviewed this authority, they could only have concluded that the lack of an embossed seal on a copy of the certificate was immaterial. CoreLogic's opposite determination, supported by no legal authority, was not objectively reasonable.

CoreLogic further asserts that its failure to produce the disclosure was the product of reasonable practices and procedures, which supposedly entailed

"escalating" Carmen's disclosure request to "multiple levels of review by management, internal legal, and outside counsel." Yet the escalation to supervisors in June merely gave rise to a categorical rejection of conservatorship certificates and instruction that a power of attorney was required. PSAF ¶ 94. Despite additional calls by Ms. Arroyo, there was no further escalation until November 2016--months after a fully supported written request had been made. *Id.* That is hardly a reasonable procedure. Moreover, CoreLogic's multiple levels of review still ended with a refusal to disclose. CoreLogic's decision not to disclose did not become objectively reasonable simply because many managers and legal personnel may have contributed to it.

Accordingly, the plaintiffs separately moved for summary judgment on their willfulness claim—which assumes, arguendo, that protecting Mr. Arroyo's consumer information against improper disclosure was CoreLogic's sincere reason for insisting on a fully-visible seal. But CoreLogic categorically denied Ms. Arroyo's initial disclosure requests in June 2016 because it was not signed by Mr. Arroyo and Ms. Arroyo did not have a POA, not because of any visibility issue around the certificate seal. PSAF ¶ 94. Even after Ms. Arroyo resumed her efforts to obtain the file, a CoreLogic supervisor demanded in November 2016 that she first provide Mr. Arroyo's Social Security Number, "proof of address," and a second copy of CoreLogic's file disclosure request form (because Ms. Arroyo had supposedly signed the form in the wrong place earlier). PSAF ¶ 95. None of these additional items were necessary, or even related, to properly identifying the Arroyos or confirming Ms. Arroyo's conservatorship, and still CoreLogic did not

38

produce the disclosure upon receiving them. CoreLogic's treatment of Ms. Arroyo has all the hallmarks of a classic customer service runaround that constitutes willful misconduct when viewed in the light most favorable to the plaintiffs.

### 4.   Disparate Impact Claim

Finally, despite having declined to make consumer disclosures to the conservator of a conserved person after receiving copious identification materials over a prolonged period of time, and despite standing by that denial of disclosures as proper and consistent with its policies and procedures, CoreLogic ironically maintains that its file disclosure practices do not have the effect of denying conserved persons access to their consumer files and has moved for summary judgment on the plaintiffs' disparate impact claim related to file disclosures. CoreLogic's claim that it has no policy of denying file disclosure requests to conservators is belied by its admission that it "generally require[s] a notarized power of attorney" before making disclosures to a person seeking information on a consumer's behalf. Mot. at 11. This policy effectively makes disclosures unavailable to conservators because a conserved person cannot execute a power-of-attorney. PSAF ¶ 98. Moreover, that a power-of-attorney was a requirement is exactly what supervisors instructed customer service employees to tell Ms. Arroyo in denying her first written request. PSAF ¶ 94.

CoreLogic claims this effect is relieved by a separate requirement that its staff "escalate a file disclosure request for 'individualized consideration' when a third-party requester cannot provide a POA. But there is no guarantee that such individualized consideration will result in disclosure of a requested file—in this

case it did not, and CoreLogic has not established additional procedures governing such individualized consideration that are reasonably calculated to ensure disclosures are made to conservators on a consistent basis.

Even the mere escalation of third-party requests is not consistently carried out. The process for how a CoreLogic agent determines that a third-party requester cannot provide a POA appears murky at best, and in this case Ms. Arroyo's request was not escalated above the supervisors who enforced the categorical POA policy until November 2016 (PSAF ¶ 95), more than four months after her initial disclosure request. CoreLogic blames this delay on Ms. Arroyo, suggesting she did not follow up sufficiently. But the materials she had provided by June 2016 should have triggered such an "escalation" and disclosure of the file. Viewed in the light most favorable to plaintiffs, the evidence plainly shows that CoreLogic's file disclosure policies were simply not constructed to reliably make consumer disclosures available to conservators.

CoreLogic next argues that the Arroyos were the only people affected by the policy and that a disparate impact claim may not be based on a single decision alone. Here, CoreLogic conflates two concepts. Whether CoreLogic's file disclosure policies have actually prevented other conservators from obtaining consumer disclosures is unknown, but also irrelevant because the policy predictably results in a disparate impact on all conserved persons. See 24 C.F.R. § 100.500(a). Statistical evidence is not necessary when a challenged policy categorically applies to all members of the relevant protected class. See *Cripe v. City of San Jose,* 261 F.3d 877, 889-90 (9th Cir. 2001); *Allmond v. Akal Sec., Inc.,*

558 F.3d 1312, 1317 (11th Cir. 2009). CoreLogic's file disclosure policies predictably result in a disparate impact on conserved persons because they are categorically unable to execute powers-of-attorney, as CoreLogic's policy calls for. This means all conservators must rely on CoreLogic's alternatives: their disclosure requests must be escalated to supervisors, and the supervisors must decide, based on individual review, to make the disclosures. Such requests may effectively be frustrated through a failure to escalate. Others may be denied because a supervisor decides, upon escalation, not to disclose the file. Still others may have outcomes similar to this case, where CoreLogic imposed superfluous additional documentation requirements, which a conservator may fail to meet or may deter the conservator from further pursuing the request.

At the very least, CoreLogic's policies make obtaining a conserved person's file uncertain and substantially more difficult—and CoreLogic reports having no record of ever disclosing a conserved person's file to a conservator. Thus, the policy predictably results in a disparate impact on conserved persons, all of whom are persons with disabilities. PSAF ¶ 98. That policy is not a "single decision" because it comes into play any time a conservator requests a conserved person's file from CoreLogic. And even though CoreLogic denies that anyone other than Ms. Arroyo has made such a request, their Rule 30b6 designee acknowledged they did not look and had no method for tracking such requests (PSAF ¶ 94); even if there were, in fact, no other past requests, there could still be future requests. Dkt. 105-1, ¶ 15 (Pl's Reply SOF in Support of Partial MSJ).

Finally, CoreLogic asserts its supposed FCRA duty to withhold consumer

files from conservators unless they provide conservatorship certificates with fully visible seals as a business necessity excusing the disparate impact of this policy on conserved persons. But as set forth above, the FCRA imposes no requirement for fully visible seal and CoreLogic could not reasonably conclude otherwise. Apart from being arbitrary, CoreLogic has not even made the fully-visible-seal requirement part of a clear a documentation policy or readily communicated that requirement to conservators—relying instead on inscrutable "escalation" and ad hoc "individualized review." Not only would this be a less-discriminatory way of satisfying CoreLogic's demand for perfect documentation, it is also consistent with Regulation V's command that CoreLogic provide consumers who cannot obtain disclosures through ordinary process with "directions on how to complete the request, including what additional information or documentation will be required" and to anticipate and implement "contingency plans to address circumstances that are reasonably likely to occur and that may materially and adversely impact the operation of … a request method[.[" 12 C.F.R. § 1022.137(b).

### E. CoreLogic Is Not Entitled to Summary Judgment on CUTPA

#### 1. Unfair Practices

CoreLogic argues there is no factual basis for the Arroyos' CUTPA claim because it did not "deceive" the Arroyos or treat Mr. Arroyo "unfairly" compared to similarly situated consumers. CoreLogic misstates both the legal standards for proving a CUTPA violation as well as material facts supporting a CUTPA violation under the unfairness standard. Consumers may prove a CUTPA violation using <u>either</u> the unfairness standard or the deception standard. *See, e.g., Caldor, Inc. v. Heslin,* 215 Conn. 590, 577 A.2d 1009 (1990) (deception); *Conaway v. Prestia*, 191

Conn. 484, 493, 464 A.2d 847, 852 (1983) (unfairness). A CUTPA violation based on unfairness, as the Arroyos allege, does not require evidence of deception or disparate treatment but rather weighs the three prongs of the cigarette rule: whether the practice (1) offends public policy as established by statutes, the common law, or otherwise, (2) is immoral, unethical, oppressive, or unscrupulous, or (3) causes substantial injury to consumers. *Artie's Auto Body v. Hartford Fire Ins. Co.*, 317 Conn. 602, 609, n.9 (2015). All three criteria do not be met to satisfy the rule. *Id.*

The evidence supports that CoreLogic engaged in unfair practices with respect to both its design, marketing, and use of CrimSAFE and its file disclosure practices, as set forth more fully in Plaintiffs' memorandums in support of their motions for partial summary judgment (Doc No. 87-1, pgs. 18-19 and Doc. No. 116-1, pgs. 32-43). For instance, CoreLogic markets CrimSAFE as an automated decision-making product that improves fair housing compliance and it encourages housing providers to reflexively implement CrimSAFE decisions, even though CoreLogic is aware of the HUD Guidance and the necessity to perform an individual review of criminal records to avoid an unlawful disparate impact under the FHA. PSAF ¶ 89. As explained *supra*, CoreLogic has itself discriminated on the basis of race and national origin, and it has additionally made design, marketing, and training decisions that enable and even encourage housing providers to discriminate on the basis of race and national origin. PSAF ¶¶ 68-73; *see also* Sections (II)(A),(C) *supra*. Moreover, CoreLogic refuses to disclose consumer files to court-appointed conservators and does not have a mechanism to provide

reasonable accommodations to applicants with disabilities in the file disclosure process. PSAF ¶ 94; *see also* Section II(C), *supra*.

These practices are unfair under each prong of the cigarette rule. First, they frustrate public policy in that they violate both the letter and spirit of the state and federal fair housing laws and, with respect to file disclosure practices, FCRA. A finding of unfairness under the public policy prong alone can support a CUTPA violation. See, e.g., *Daddona v. Liberty Mobile Home Sales, Inc.*, 209 Conn. 243, 258, 550 A.2d 1061, 1068 (1988). Second, there is a genuine issue of material fact as to whether these practices are immoral, unethical, oppressive, or unscrupulous. For example, CoreLogic knew of the requirements of the FHA and the 2016 HUD Guidance, yet it intentionally, or at least recklessly, engaged in practices almost certain result in unlawful race and national origin discrimination and improper housing denials, either by CoreLogic or by housing providers that use CrimSAFE, and it repeatedly misrepresented that CrimSAFE would improve fair housing compliance when it would in fact frustrate it. PSAF ¶ 68, 89. CoreLogic's conduct was widespread, persisted over more than a dozen years, and was designed to maximize CoreLogic's profits at the expense of consumers' rights. PSAF ¶¶ 68-73, 74; *see also* Section II(A), *supra*. *See Cenatiempo v. Bank of Am., N.A.,* 333 Conn. 769, 796 (2019) (second prong satisfied by widespread practices, pattern of misrepresentations, failure to correct errors, pursuing profit at the expense of consumer rights, or conscious decision not to perform known obligation). Third, CoreLogic's practices cause substantial injury, which is one that is not outweighed by any countervailing benefits to consumers and that consumers could not

reasonably have avoided. *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 113 (1992). (excess finance charge of $490 substantial injury). CoreLogic's practices result in civil rights violations and housing denials, for the reasons explains *supra,* with no countervailing benefits and that consumers are utterly powerless to avoid.

CoreLogic's arguments are unavailing. The fact that the Arroyos were not deceived by CoreLogic's marketing materials *aimed at housing providers* (who were deceived), is irrelevant and does not relieve CoreLogic of liability given that its practices violate the cigarette rule. And the fact that CoreLogic may have mistreated Mr. Arroyo similarly to other Latino or African-American applicants in actuality supports CUTPA liability since this demonstrates that CoreLogic's practices were intentional, not negligent; widespread, rather than isolated; and caused significant injuries to many consumers, supporting a finding of unfairness under the second and third prongs of the cigarette rule. CUTPA simply does not require intentional animus directed at an individual consumer or a finding of bad faith, as CoreLogic seems to suggest. *See Web Press Servs. Corp. v. New London Motors, Inc*., 203 Conn. 342, 363, 525 A.2d 57, 68 (1987) (intent or knowledge not required)*; Daddona*, 209 Conn. at 258 (good faith not a defense). The sole legal authority cited by CoreLogic—a Superior Court decision dismissing a CUTPA counterclaim in a credit card collections case based on the creditor's decision not to extend him additional credit--is inapposite. *See Citibank (S.D.) N.A. v. Osagie,* No. CV106004637S, 2012 WL 1959057, at *3 (Conn. Super. Ct. May 3, 2012). Unlike in that case, the evidence demonstrates that CoreLogic engaged in unfair practices.

### 2.      File Disclosure Claims

CoreLogic additionally argues for summary judgment on the Arroyos' CUTPA claims related to its file disclosure practices because it claims its actions are not a part of trade or commerce, an argument identical to one this Court considered--and rejected—in denying CoreLogic's motion to dismiss, explaining:

> Defendant had a business relationship with WinnResidential. It agreed to provide screening services and to send potential tenants a letter with the tenancy decision. The letter states that the tenant can request a copy of his screening report. Defendant's disclosure policy stems from its commercial relationship with WinnResidential and the services Defendant provides to WinnResidential's consumers on its behalf. Here, like in *Nastro v. D'Onofrio*, cited by Plaintiffs, Defendant's conduct is sufficiently related to their business to establish a relationship to trade or commerce. 263 F. Supp. 2d 446, 457-58 (D. Conn. 2003) (denying motion to dismiss CUTPA claim where defendants' property transfers were sufficiently related to their underlying business to establish a relationship to trade or commerce); see also *Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 643 (2002) (explaining that CUTPA does not require a consumer relationship).

Doc. No. 41 at 32-33. Discovery has confirmed the facts alleged in the complaint that the Court relied on in finding the disclosure practices were within trade of commerce (PSAF ¶¶ 68-73), and CoreLogic's argument should be rejected again.

Finally, CoreLogic argues the Arroyos have no "damages," even though there is abundant evidence the Arroyos suffered an ascertainable loss as a result of CoreLogic's file disclosure practices—CUTPA's actual requirement. *See* Conn. Gen. Stat. § 42-110g(a). "Ascertainable loss of money or property" is a wider category than recoverable damages, encompassing a deprivation, detriment, or injury that need not be measurable by a dollar amount. *Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 614-19, 440 A.2d 810, 814-17 (1981). If the defendant proximately caused any ascertainable loss, i.e., if its actions are a substantial

factor in producing the loss and "the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's act," then the plaintiff may prevail under CUTPA, even if there are no recoverable damages. *Stevenson Lumber Co.-Suffield, Inc. v. Chase Assocs., Inc.,* 284 Conn. 205, 214, 932 A.2d 401, 406-07 (2007) (citation omitted). As explained *supra* in Section II(D)(1), CoreLogic's file disclosure policies prevented the Arroyos from timely disputing the housing denial or requesting a reasonable accommodation since neither they nor WinnRes knew the reason for the denial, causing, or at the very least prolonging, Mr. Arroyo's denial from housing, his unnecessary stay in a nursing home, and increased monetary costs for both Arroyos. PSAF ¶ 102. These are ascertainable losses.

### F.   Connecticut Fair Housing Center's Claim for Damages Are Supported by Material Facts and Governing Law

CoreLogic asserts without any basis in fact or law that CFHC's claims for damages should be dismissed.[29] CFHC has established some of its damages; to the extent the full amount of its damages is not yet known, that is due to CoreLogic withholding necessary information. Nonetheless, since there are facts in the record

---

[29] CoreLogic has not challenged CFHC's standing to pursue claims in this case, nor could it under controlling authority. See, e.g., *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 365, 379 (1982) (a fair housing organization suffers a cognizable injury where a defendant's conduct "perceptibly impairs" the organization's activities by creating a "drain on the organization's resources."); *Centro de la Comunidad Hispana v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017) ("where an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing.") (citing *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017)). CFHC has been found to have standing in similar circumstances to here. *See Viens v. Am. Empire Surplus Lines Ins.*, 113 F. Supp. 3d 555, 562 (D. Conn. 2015).

sufficient to establish at least some compensatory damages, summary judgment is entirely inappropriate.

Diversion of resources from other tasks a fair housing organization may undertake in order to investigate a claim of discrimination and engage in advocacy is a "concrete and particularized injury." *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014); *Ragin v. Macklowe Real Estate Co.*, 6 F.3d 898, 904 (2d Cir. 1993) (investigation and efforts to remedy discrimination conferred standing). The Second Circuit has specifically and repeatedly held that litigation expenses constitute diversion of resources. *See Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 Fed. App'x 714, 717 (2d Cir. 2013) (rejecting more limited view on standing in other circuits). CoreLogic offers no justification for ignoring controlling Second Circuit authority in favor of contrary out-of-circuit decisions that are "inapposite" because those courts "are not bound by the standards announced in the Second Circuit's decision in *Ragin* and its progeny." *FHJC v. Cuomo*, 2019 WL 4805550, at *8 (S.D.N.Y. Sept. 30, 2019).

Here, CFHC has presented evidence, including time records and a fair estimate of the value of that time, establishing diversion of resources to advocate on behalf of the Arroyos, both with CoreLogic, to obtain the file, and more extensively, advocacy with WinnRes to get the Arroyos into the requested apartment. PSAF ¶ 96-97. The need to advocate for the Arroyos with WinnRes, including through an administrative complaint process and hearing was directly caused by CoreLogic's product, which WinnRes used in the manner and with the configurations that CoreLogic had recommended. PSAF ¶ 70. Contrary to

CoreLogic's claims otherwise, and in contrast to cases cited it its brief[30] the record contains ample evidence that CFHC's damages flow from CoreLogic's conduct. PSAF ¶ 96-97.[31] The advocacy required for the Arroyos diverted CFHC resources. In addition, an enormous amount of CHFC resources have been expended in litigating this case, which are recoverable damages. *Hogan*, 519 Fed.Appx. at 717. To date, the record reflects at least $200,000, though that is growing and will continue to do so until this case is resolved.[32]

In addition, CFHC has suffered damages, which it may recover in this litigation, from the need to fund future work to counteract the effects of discriminatory conduct. *See United States v. Hylton*, 944 F. Supp. 2d 176 (D. Conn. 2013) (noting "'Section 3613(c)(1) authorizes the court to award … such affirmative action as may be appropriate'"). Such relief should be tailored to vindicate "the statute's goals of preventing future violations and removing lingering effects of

---

[30] In *High Plains Cmty. Dev. Corp. v. Schaefer,* 2008 U.S. Dist. LEXIS 36661 (D. Neb. May 2, 2008) (Def. Br at 41), the plaintiff did not contest the defendant's statement of facts, provided no evidence of conducting a fair housing investigation and did identify work done on behalf of its client relating to housing discrimination as opposed to other issues.

[31] CFHC has also offered expert testimony about the impact of criminal records screening on Connecticut's citizens of color. PSAF ¶ 78. Any inability by CFHC establish the full extent of the impact of CoreLogic's conduct is traceable to CoreLogic's refusal to disclose the names of its customers and data about the racial impact of CrimSAFE, both subject to a pending motion to compel.

[32] Instructive in this regard is *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, No. 3-10-cv-83, 2015 U.S. Dist. LEXIS 23619 (S.D. Ohio Feb. 26, 2015), cited in CoreLogic's brief. In that case, the jury found a fair housing violation but awarded no damages; the court ordered a new trial on damages finding that the failure to award them in light of the testimony of MVFH staff about the diversion of their resources was against the weight of the evidence. *Id.* at *20.

past discriminations." *United States v. Space Hunters, Inc.*, No. 00 Civ 1781, 2004 WL 2674608, at \*8 (S.D.N.Y. Nov. 23, 2004). This includes damages to pay for advertising and education to counteract the effects of discrimination. *See, e.g., So. Cal. Hous. Rights Ctr. v. Krug*, 564 F.Supp.2d 1138, 1153 (C.D. Cal. 2007) (awarding $29,065.32 for frustration of mission "for the costs that HRC will incur to counteract Defendants' discriminatory actions . . . includ[ing] [fair housing education] … and future advertising costs[.]"). Consistent with this authority, CFHC has already consulted with an advertising agency to cost out a marketing campaign to more fully address the impact of CoreLogic's conduct on the housing marketplace. PSAF ¶ 96.[33] This is no mere speculative plan; CFHC has already implemented steps to educate the public to counteract the effects of CoreLogic's conduct and policies. *Id*. That time, through July 11, 2019, was 356.48 hours, which represents $82,639. *Id.*

CoreLogic challenges the basis of CFHC's conclusion that such a campaign is needed to counteract the effects of decades of CoreLogic marketing to landlords in favor of automated screening. But there is an ample record both of CoreLogic's marketing efforts that need to be counteracted, and of landlords accepting and following those recommendations to let CoreLogic automate decisionmaking.[34]

---

[33] Even less availing is CoreLogic's reliance on *Chesapeake Climate Action Network* and *Elec. Privacy Info. Ctr.* (Mot. at 39) as those decisions out of the DC Circuit rely on a standard for standing the Second Circuit has repeatedly rejected. *See Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (identifying both the Third Circuit and D.C. Circuit as declining to follow its standing jurisprudence).

[34] CoreLogic's attempt to minimize this record by claiming that use of CoreLogic's products "was never the subject of any third-party discovery" (Mot. at 40) is simply false. Plaintiffs participated in the deposition of WinnRes, and

PSAF ¶¶ 68-73 (including testimony from former CoreLogic executives who testified "[y]eah, [CrimSAFE] delivers a decision," "most" landlords "actually follow the decision that CrimSAFE would issue" and "I mean, we know what it's purpose is, right? Everybody agrees it's to automate a screening decision based on the client's criteria.").

Finally, CoreLogic's suggestion that, because the exact amount of damages CFHC may ultimately recover is in flux as resources continue to be diverted, the very existence of damages is speculative and unproven and entitles defendant to summary judgment, is completely unfounded. Rather, this demonstrates the existence of disputed material facts rather than their absence. *See Intermountain Fair Hous. Council v. CVE Falls Park, L.L.C.*, No. 2:10-cv-00346-BLW, 2011 WL 2945824, at *7 (D. Idaho July 20, 2011) (denying summary judgment where plaintiff offered affidavit that organization "will necessarily incur additional expenses in the future to counteract the lingering effects of the Defendant's conduct through the monitoring of the Defendant's activities, publication and advertising costs, and the sponsorship of educational activities."). See PSAF ¶ 97.

CoreLogic's separate argument that CFHC cannot seek damages because it receives grants to fund its operations is incorrect. Those grants were not a remedy for the specific misconduct challenged in this litigation but to fund a broad range of activities related to individuals denied housing due to criminal records. The work to be done is hardly limited to remedying CoreLogic's violations, and diverting

---

obtained extensive sworn testimony and affidavits about its policies, its relationship with CoreLogic, and about CoreLogic's products. PSAF ¶ 61.

these resources to remedying CoreLogic's misconduct, instead of addressing other concerns, is precisely the sort of damages organizations are entitled to receive.

The proper analysis is conducted under the collateral source rule rather than the supposed "general rule against double recovery" proposed by CoreLogic. Mot. at 43. In *Valley Hous. LP v. City of Derby*, 802 F. Supp. 2d 359 (D. Conn. 2011), the court found Derby liable for disability discrimination for obstructing construction of housing for individuals with disabilities. Judge Melancon rejected Derby's argument that the damages award should be offset by payments the plaintiff received from a state agency and tax credits, finding that these "were collateral sources and that the defendants are not entitled to a set off of those amounts in the event of an award of damages by the Court in plaintiffs' favor." *Valley Hous. LP v. City of Derby*, 2011 WL 2144633, at * 3 (D. Conn. 2011). The court further noted that the "Second Circuit has stated that '[t]he weight of common law authority is that collateral sources are not deductible from a tort damage award.'" *Id.* at *2 *quoting EEOC v. Enter. Ass'n Steamfitters Local No. 638*, 542 F.2d 579, 591 (2d Cir. 1976).[35] Because CoreLogic's legal arguments are based on inapposite law that

---

[35] *See also, So. Cal. Hous. Rights Ctr.*, 564 F.Supp.2d at 1152 (holding that fair housing organization's "damages for Defendants' discrimination should not be offset by government grants received by the plaintiff-organization to fulfill its mission of educating public about fair housing laws, because 'the grant was not awarded to compensate [the fair housing organization] for the costs it incurred counteracting defendant's discriminatory practices' and a 'tort award should not be offset by compensation that a plaintiff receives from another source.' *Baltimore Neighborhoods, Inc. v. Lions Gate Garden Condominiums, Inc.*, 92 F. Supp. 2d 456, 465 n. 9 (D. Md. 2000), *quoting Curtis v. Loether*, 415 U.S. 189, 195, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974).").

fails to follow Second Circuit precedent and because CFHC has produced evidence of diversion of its resources there are disputed facts requiring CFHC's damages claims to proceed to trial.

G.    Ms. Arroyo has Standing in Her Individual Capacity

CoreLogic asserts that "Ms. Arroyo cannot allege an "injury in fact" required for standing under any of her claims for the simple fact that *she was not denied housing at any point*." Mot. at 44 (emphasis in original). No such requirement exists to establish Article III standing under the FHA, which broadly defines an "aggrieved person" to include "any person who claims to have been injured by a discriminatory housing practice. ..." 42 U.S.C. § 3602(i)(1). Standing under the FHA is "as broad[] as is permitted by Article III of the Constitution." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) (citations omitted). In *Trafficante*, two tenants (one white and one black) pursued FHA claims alleging their landlord racially discriminated against rental applicants, depriving them of social and professional benefits of living in an integrated community. *Id.* at 205. Like Ms. Arroyo, the aggrieved tenants were already living in the complex, but contrary to CoreLogic's argument, the Supreme Court held that this fact *affords* her standing under the FHA, explaining: "we can give vitality to [the FHA definition of 'person aggrieved'] only by a generous construction which gives standing to sue to all in the same housing unit who are injured by racial discrimination in the management of those facilities within the coverage of the statute." *Id.*

Discriminatory housing practices include conduct that "limit[s] the use of privileges, services or facilities associated with a dwelling because of race, color,

religion, sex, handicap, familial status, or national origin of an owner, tenant *or a person associated with him or her."* 24 C.F.R. § 100.65 (emphasis added); *see also* 42 U.S.C. § 3604(f)(1)-(2) (prohibiting discrimination in the sale or rental, or in the terms, conditions, or privileges of sale or rental, "because of a handicap of … (B) a person … intending to reside in that dwelling after it is … rented or made available; or (C) any person associated with that buyer or renter."

As set forth *supra* in Section (II)(E)*,* Ms. Arroyo suffered financial and emotional injuries as a result of CoreLogic's unlawful conduct that made housing unavailable to her son on a discriminatory basis. PSAF ¶ 85. That conduct limited her use of privileges associated with her dwelling – i.e. her ability to live with whom she pleased – because of the disability and national origin of a person with whom she is associated (as a mother, conservator, and co-tenant).

III.   **CONCLUSION**

For all of the foregoing reasons, the Court should deny CoreLogic's Motion for Summary Judgment.

 Dated: December 6, 2019                          Respectfully submitted,


                                                 */s/ Greg Kirschner*
                                                 Greg Kirschner
                                                 Salmun Kazerounian
                                                 Sarah White
                                                 CONNECTICUT FAIR HOUSING CENTER
                                                 60 Popieluszko Ct.
                                                 Hartford, CT 06106
                                                 Tel.: (860) 247-4400
                                                 greg@ctfairhousing.org

                                                 Eric Dunn
                                                 NATIONAL HOUSING LAW PROJECT

**919 E. Main St., Ste. 610**
**Richmond, VA 23219**
**Tel.: (415) 546-7000**
**edunn@nhlp.org**

**Joseph M. Sellers (*PHV*)**
**Christine E. Webber (*PHV*)**
**Brian C. Corman (*PHV*)**
**COHEN MILSTEIN SELLERS & TOLL PLLC**
**1100 New York Ave., N.W.**
**Suite 500**
**Washington, D.C. 20005**
**Tel.: (202) 408-4600**
**jsellers@cohenmilstein.com**
**cwebber@cohenmilstein.com**
**bcorman@cohenmilstein.com**

### CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2019, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Greg Kirschner*
**Greg Kirschner**
**Salmun Kazerounian**
**Sarah White**
**CONNECTICUT FAIR HOUSING CENTER**
**60 Popieluszko Ct.**
**Hartford, CT 06106**
**Tel.: (860) 247-4400**
**greg@ctfairhousing.org**