# EXHIBIT 9

CONFIDENTIAL

Page 1

1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF CONNECTICUT

3

4       _____

                                   )

5       CONNECTICUT FAIR HOUSING    )

        CENTER, et al.,             )

6                                   )

                Plaintiffs,         )

7                                   )

           vs.                      )    No. 3:18-CV-705 (VLB)

8                                   )

        CORELOGIC RENTAL PROPERTY   )

9       SOLUTIONS, LLC,             )

                                    )

10               Defendant.         )

        _____)

11

12

13                     ***CONFIDENTIAL***

14              DEPOSITION OF ANGELA BARNARD

15            As 30(b)(6) Representative of

16        CoreLogic Rental Property Solutions, LLC

17                 San Diego, California

18             Monday, September 16, 2019

19                      Volume I

20

21

22      Reported by:

        ELAINE SMITH, RMR

23      CSR No. 5421

24      Job No. 3482271

25

Page 72

1       themselves?

2           A    Not to my knowledge specific to disabilities.

3           Q    Any training specific to handling requests from

4       individuals who had power of attorney or other legal

5       authority to act on behalf of an individual due to the

6       individual's lack of capacity?

7           A    There is training specific to power of

8       attorney.  That's more on the data entry side of the

9       house, the fulfillment side, validating the

10      documentation that we've received.

11          Q    And do you cover only power of attorney

12      documents, or do you cover other forms of legal

13      authority that can be granted such as conservatorship?

14          A    The procedure outlines specifically power of

15      attorney, which is a written procedure.  And that same

16      procedure also identifies if you have an instance of

17      another third party or some other type of request, and

18      that's not stated whether it's a conservatorship or some

19      other kind of, you know, third-party authority over

20      someone.  It's to escalate that.

21          Q    And where do escalations go?

22          A    Generally, the escalations will start with a

23      leader or a supervisor of the team, and then, depending

24      upon the situation, it could go to our internal

25      compliance team.  And then they can determine where they

CONFIDENTIAL

Page 73

1     would like to take it from there.

2          Q    Is compliance part of the operations

3     section that you're senior leader of?

4          A    No.

5          Q    Turning back to Exhibit 6, on page ARROYO 99,

6     looking at 5.1.4, when reviewing a manual authentication

7     form, you verify that that includes name, address, date

8     of birth, Social Security number, and signature; is that

9     correct?

10         A    Yes.

11         Q    And then the name and address has to be the

12    same as the name and address on the photo ID that is

13    provided?

14         A    Yes.

15         Q    What if the photo ID is a passport which

16    doesn't contain an address?

17         A    Our authentication procedure will call out the

18    acceptable proofs of identification, so we may require

19    an additional document.

20         Q    To establish the address?

21         A    Yes.

22         Q    So if an individual has moved and not gotten

23    their new driver's license yet with their new address,

24    they wouldn't be able to get a report through the manual

25    authentication process until they had obtained a new

Page 82

1        have.  So it's just any third party.

2             Q    Is there anything in Exhibit 7 that addresses

3        specifically individuals with disability?

4             A    No, I don't believe there is.

5             Q    Did you have any written procedure governing

6        requests for reasonable accommodation by individuals

7        with disability?

8                  MR. ST. GEORGE:  Object to form.

9                  THE WITNESS:  We did not, to my knowledge, have

10       a written procedure that covered that.  The process

11       would be to escalate those types of requests.

12       BY MS. WEBBER:

13            Q    And when you refer to escalation, would that be

14       as you did before, meaning it would go to a team lead?

15            A    It would go to a team lead, a supervisor or

16       manager, then to our compliance team.  The compliance

17       team would determine what to do with that.  It could be

18       all of those steps.  It may stop at one step if it's

19       resolved.  It just depends on the circumstance.

20            Q    Do team leads have authority to provide

21       reasonable accommodations?

22            A    A team lead would generally consult with a

23       supervisor or a manager before providing any type of

24       accommodation.

25            Q    And when you say supervisor or manager, is a

Page 83

1      manager at a higher level of authority than a

2      supervisor?

3           A    Yes.

4           Q    Okay.  Would supervisors or managers have

5      authority to approve reasonable accommodations?

6           A    Yes, they could.

7           Q    Would there be limitations on their authority

8      where they would sometimes need to seek input from

9      compliance or others?

10          A    Yes.

11          Q    What is the scope of their authority with

12     respect to reasonable accommodations?

13          A    It would be instances in which they have had a

14     situation occur in the past.  So something that was new,

15     we've never seen it before, we're not familiar with what

16     to do with this process, nor what it means from a legal

17     perspective, we would escalate those.

18          Q    And is the ultimate authority the compliance

19     department, or is there some higher-level authority?

20          A    We would -- we would escalate it to the

21     compliance team, and then there is internal counsel,

22     potentially external counsel, that could be consulted.

23     It just depends on how that compliance individual

24     escalates that.

25          Q    Turning back to Exhibit 7, the procedure guide

Page 99

1        A    I believe she was.  It was around '15, '16 that

2    she joined the team.

3        Q    And is currently the supervisor of that team?

4        A    Yes.

5        Q    And so any questions about whether

6    documentation was adequate should go to Jessica?

7        A    It could go to Jessica.  It could go to the

8    team lead.  It just depends on the individuals that were

9    there that day and the call, if the call was

10   transferred.  It depends on the circumstance.

11       Q    Okay.  Who would be the team lead who would be

12   reviewing these documents?

13       A    The team lead -- at the time, there was no team

14   lead under Jessica.  The team lead for the consumer

15   relations side, the call side of the house, was Tina

16   Santos.

17       Q    So nothing in the written documentation,

18   including the procedure set forth in Exhibit 7,

19   addresses how to handle the circumstances where the

20   consumer is incapacitated in some way; is that right?

21       A    Other than the escalation and then seeking

22   additional advice through escalation channels.

23       Q    Turning to page ARROYO 1708 and specifically

24   Procedure 2.4.3, this covers the circumstances where a

25   manual authentication form is received and is not

Page 112

1        A    Yes.

2        Q    And would those requests that you track include

3    tracking any requests made by somebody on behalf of the

4    consumer or the third party-type requests we've talked

5    about?

6        A    Yes.  Can I clarify that?

7        Q    Sure.

8        A    So the tracking would just consist of whatever

9    we received from that third party.  We don't categorize

10   or identify third-party requests in a way to be able to

11   produce a report, if that was your question.  I just

12   want to clarify that.  We do have notes and things, but

13   we don't have a tracking mechanism by which, say, here's

14   all of the third-party requests.

15       Q    Got it.  When you're recording data, there's

16   not, like, a checkbox that would designate this is a

17   third party on behalf of the consumer?

18       A    Correct.  Not for my team, no.

19       Q    Got it.  Okay.  Other than requests from

20   consumers for disclosure of their file and requests from

21   landlords or properties through the CrimSAFE or other

22   product that they may use, are there any other

23   individuals outside of CoreLogic itself who would have

24   the ability to get access to the consumer files that you

25   maintain?

Page 119

1          MR. ST. GEORGE:  We can go off the record.

2          (Recess 12:08 p.m. to 12:50 p.m.)

3    BY MS. WEBBER:

4          Q    In preparation for the deposition today, did

5    you review the record of contacts between persons

6    reaching out to CoreLogic on behalf of Mikhail Arroyo

7    and the consumer relations department?

8          A    Yes.

9          Q    Based on your review, was the Arroyo request

10   handled correctly within the established procedures in

11   effect in 2016?

12         A    Yes.

13         Q    In light of what you've learned in the course

14   of reviewing these materials, would you change any of

15   your procedures or guidance that you give to CSRs or DE

16   employees?

17         A    This was from 2016, and our procedures are

18   evolving and ever-changing based on, you know,

19   circumstances that we see with consumers, the industry,

20   changes in compliance and legislature.  So I'm sure

21   there would be changes.  At this point today, I don't

22   know if that was specific to this case or not.  But we

23   are evolving as a business.

24         Q    My question is just, as the senior leader over

25   operations, having recently reviewed the events

CONFIDENTIAL

                                                    Page 120

1    surrounding Arroyo's consumer file, is there any change

2    that you would like to see take place in either the

3    written procedures or training and guidance that's given

4    to employees in consumer relations?

5         A    Perhaps we could evaluate the escalation

6    process and just make sure that we have the critical

7    points covered.  The escalation process was used in this

8    case, but it wasn't thoroughly documented in all cases,

9    so I think we could improve upon that.

10        Q    Do you think that having something in writing

11   identifying conservatorships and other recognized legal

12   authorities in addition to power of attorney would be

13   appropriate?

14             MR. ST. GEORGE:  Object to form.

15             THE WITNESS:  I think we already have that with

16   the escalation process.  So without being attorneys, we

17   try to handle the majority of requests we receive.  So

18   this being the only request of conservatorship that I'm

19   personally aware of, I don't know that we would

20   specifically carve out a situation for this, but it

21   would be escalated, and we did escalate this case.

22   BY MS. WEBBER:

23        Q    Excuse me.  When you say this is the only

24   request based on conservatorship that you're aware of,

25   did you do anything to attempt to determine if there had

Page 121

1    been any other requests made by conservators to

2    CoreLogic's consumer relations department at any time in

3    the last several years?

4        A    I reviewed with the direct supervisor, Jessica

5    Fahn, asked her as part of this case and research on the

6    case if this is a common practice, have you ever seen

7    this before, how often is this occurring, do we have a

8    way to track it?  We don't.  She told me, matter of

9    factly, that she doesn't see these and has never seen

10   one except for this case.  And we don't track it, like I

11   previously stated, in a manner that we could easily,

12   systemically pull reports.

13       Q    And I think you said that Ms. Fahn became

14   supervisor in 2015 or '16.

15       A    Yes.

16       Q    So if it happened before 2015, she would not

17   have any reason to be aware of it?

18       A    Correct.

19       Q    Aside from -- or I mean -- I don't mean aside

20   from.  But one of the topics on which you were

21   designated, Topic 15, concerned any instances in the

22   past five years where a consumer substitute

23   decision-maker, which could include the conservator but

24   could include power of attorney or other legal forms,

25   requested the consumer file.  What did you determine

CONFIDENTIAL

Page 122

1      about how many instances in the past five years have

2      included requests from somebody with legal authority to

3      act on behalf of the consumer?

4          A    Is that a question of how many?

5          Q    Uh-huh.

6          A    To this -- my knowledge, this is the only one

7      that I'm aware of.

8          Q    Well, this is the only one that you're aware of

9      with a conservator?

10         A    Yes.

11         Q    But you understand there's other legal

12     mechanisms through which somebody can obtain authority

13     to act on behalf of somebody else?

14         A    Yes.

15         Q    One of those is power of attorney?

16         A    Uh-huh.

17         Q    There are others as well.  How many of any of

18     these -- whether it's conservator, power of attorney or

19     some other legal formulation, how many of those requests

20     have been made to CoreLogic in the past five years?

21         A    I couldn't tell you the number.  I don't have a

22     way to track that or make a count.

23         Q    Did you -- did you ask anybody -- as you did

24     about conservatorship, did you ask anybody about how

25     often power of attorney or other similar authority is

Page 123

1      the basis of a request for a consumer file?

2          A    I did.

3          Q    And what were you told about that?

4          A    I was told that it is rare to none for Rental

5      Property Solutions and that it would only be documented

6      via notes within the system.  There's not a recording or

7      an ability for us to be able to retrieve the count or

8      number of those.

9          Q    And so you also haven't reviewed the specific

10     process that was used in handling such requests?

11         A    The process would be the process that we have

12     outlined.  We don't have specific documents related to

13     third-party requests that are outside of what we

14     provided here.

15         Q    And you haven't reviewed any notes or other

16     documentation that would allow you to confirm what

17     actually happened, what the process was that was

18     followed?  I understand you have the written process.

19     But you haven't been able to review anything to identify

20     what actually happened to see if that process was

21     followed in the specific instances where a POA or

22     similar legal authority was the basis of a request?

23         A    No.

24         Q    Excuse me.  And you also are not prepared today

25     to testify as to the outcome of such requests?

Page 124

1        A    No.   Other than the outcome would either be

2    providing a consumer file disclosure or not.

3        Q    Other than talking to Jessica Fahn, is there

4    anything else you did to attempt to obtain information

5    about instances in which a third party with legal

6    authority such as a power of attorney or conservator

7    requested a consumer file?

8        A    I talked to the customer service supervisor.

9    His name is Eliel Molina.

10       Q    Can you spell that?

11       A    E-L-I-E-L M-O-L-I-N-A.

12       Q    He's the customer service supervisor?

13       A    He's a consumer relations supervisor.   Sorry.

14    I misspoke.  His team handles incoming calls for Rental

15    Property Solutions.  I asked how often do these calls

16    come in that are specific to power of attorney?  He said

17    very rare.  It's generally a family member or someone

18    who wants another person just to talk on their behalf

19    but is requesting it on their own.

20       Q    How long has Mr. Molina been in that position

21    of supervising consumer relations?

22       A    I believe two years.

23       Q    So about 2017?

24       A    Yeah.

25       Q    Is that the position that was previously held

CONFIDENTIAL

Page 132

1        A    No.  This is the -- looks like the receipt of

2    documentation.  Whereas Hope, the previous DE person,

3    was just mailing out a letter, this is reviewing

4    documents and sending a letter.

5        Q    It appears that Mr. Thevenot determined that

6    the documents submitted were not sufficient, because it

7    says not authenticated?

8        A    That's the note that he entered, yes.

9        Q    On what basis did he decide that that was not

10   sufficient?

11       A    Based on the notes, we -- it looks like we

12   asked for the power of attorney and the son's signature.

13   We cannot accept a conservatorship court paper.

14       Q    And how would Mr. Thevenot have determined that

15   you cannot accept a conservatorship court paper?

16       A    I believe he referred to the documentation, the

17   standard operating procedures, and he could have even

18   talked to someone about this.  I don't know.  The note

19   just states as is.

20       Q    He doesn't refer to talking to anybody;

21   correct?

22       A    No.

23       Q    And from what you testified to earlier, because

24   conservatorship is not mentioned in the procedures,

25   something that was unrecognized should have been

Page 133

1        escalated to a supervisor; correct?

2            A    Based on the procedure, yes.

3            Q    But there is no evidence from this note that

4        Mr. Thevenot did escalate to a supervisor; correct?

5            A    Not from the note.

6            Q    And by June 30th, CoreLogic had already been

7        informed that Mr. Arroyo was handicapped and not able to

8        sign anything; correct?

9            A    Yes.

10           Q    Nonetheless, Mr. Thevenot sent a letter back

11       saying the son's signature was required; correct?

12           A    Yes.

13           Q    Is that following proper procedure?

14           A    The procedure should have been to escalate the

15       request.

16           Q    Turning to the next note, this is from a user

17       S-C-H-A.  Do you know who that is?

18           A    Yes.

19           Q    Who is that?

20           A    Seng, S-E-N-G C-H-A.  Seng Cha.

21           Q    I forgot to ask.  Is Mr. Thevenot still

22       employed?

23           A    No.

24           Q    Do you know when he left?

25           A    2017.

Page 134

1          Q    Is Seng Cha still employed?

2          A    No.

3          Q    And when did Seng Cha leave?

4          A    The beginning of 2019.

5          Q    What was Seng Cha's position in 2016?

6          A    She was a data entry and mostly handled letters

7     and incoming requests from consumers.

8          Q    Okay.  Her note ends with a comment that "Per

9     Jessica and Mike, we cannot accept conservatorship court

10    paper."  Is Jessica Jessica Fahn?

11         A    Yes.

12         Q    And is Mike Mike Scully?

13         A    Yes.

14         Q    Did you talk to Jessica about this note in

15    particular?

16         A    No.

17         Q    Did you talk to Mike about this note?

18         A    No.

19         Q    Aside from the note, did you ask Jessica if she

20    recalled ever having anybody escalate the Arroyo

21    situation to her?

22         A    I did.

23         Q    What did she say?

24         A    She said I need to look at the notes.  And she

25    looked at the notes and said, yes, I remember this

Page 135

1    consumer but could not give me any details about the

2    case because it was so long ago.  She just referred back

3    to the notes that were here.

4        Q    Did she say anything suggesting the note was

5    inaccurate when it attributed to her the position that

6    she could not accept or that CoreLogic could not accept

7    the conservatorship as authorization?

8        A    No.  Sorry.

9            (Telephonic interruption.)

10           MR. ST. GEORGE:  Hold on one second.

11           (Recess.)

12   BY MS. WEBBER:

13       Q    Okay.  Did you talk to Mike Scully about what

14   he recalled regarding the Arroyo consumer file?

15       A    I did not.

16       Q    Would Jessica have had authority in 2016 to

17   determine that CoreLogic would not accept

18   conservatorship court papers?

19       A    She could have made a decision based on the

20   standard operating procedures that we had at the time

21   that didn't allow that or could have escalated this.

22       Q    So the standard operating procedures you had at

23   the time did not allow conservatorship?

24       A    The operating procedure doesn't call that out.

25   It says to escalate it but doesn't specifically call out

CONFIDENTIAL

Page 136

1    the conservatorship.

2        Q  I understand it doesn't specifically say

3    conservatorship is allowed, but I thought you had

4    testified previously that when something unfamiliar and

5    not explicitly covered by the procedures came up, that

6    the proper thing to do was to escalate.

7        A  That's correct.

8        Q  Is there any evidence that Jessica or Mike

9    escalated this question to somebody who actually knew

10   what a conservatorship was?

11       A  I don't see any notes on that.

12       Q  And Jessica did not say that she had escalated?

13       A  She couldn't recall because it was quite a

14   while ago.

15       Q  When did you speak to her about it?

16       A  I spoke to her about it last week after I

17   talked to the attorney about the case.

18       Q  It appears that Seng Cha entered her note on

19   the same day as Drew Thevenot entered his note.  Do you

20   know why both individuals would be dealing with the same

21   request on the same day?

22       A  So it looks like Seng received the request from

23   the consumer, escalated it to Mike and Jessica.  There

24   was a determination to mail the call-back letter to the

25   consumer, and the ticket to send the call-back letter

Page 137

```
 1      was submitted, and that's what Drew processed.  So Seng

 2      is making a note of received disclosure form, and Drew

 3      is making a note that he mailed the call-back letter.

 4           Q    Do you know why -- the other screenshots sort

 5      of appear in the order in which things occurred.  Do you

 6      know why Drew's note would appear before Seng Cha's

 7      note?

 8           A    No, I don't.

 9           Q    Turning to the next page of Exhibit 11, the

10      note dated September 7th, 2016, do you see that?

11           A    Yes.

12           Q    This has a user of Mon Johnson.  Do you know

13      who Mon Johnson is?

14           A    Yes.

15           Q    Who is that?

16           A    Monica Johnson.

17           Q    What was her position?

18           A    Call consumer relations associate, call center

19      agent.

20           Q    Is Ms. Johnson still employed?

21           A    Yes.

22           Q    And in the same position?

23           A    Yes.

24           Q    Did you talk to her about this note?

25           A    No.
```

Page 138

1      Q   Or anything else about the Arroyo matter?

2      A   No.

3      Q   And this note reports that -- that the

4      consumer's mother, Ms. Arroyo, was calling about the

5      documents that she faxed from June of 2016.  And the

6      note states, "Advised yes and per management unable to

7      use information."  Do you know who -- who does

8      management refer to in this group?  Are there certain

9      individuals who are deemed management?

10     A   It would be anybody who holds a supervisor or

11     above title, supervisor or manager.

12     Q   And so you don't know if Ms. Johnson spoke to

13     Ms. Fahn or Mike Scully or somebody else?

14     A   I don't know.

15     Q   And so as of September 2016, you had been

16     informed that Mr. Arroyo was disabled and unable to

17     speak or sign his name and been presented with papers

18     from a court saying that Ms. Arroyo was authorized to

19     act on his behalf, but you continued to direct the --

20     Ms. Arroyo to get a power of attorney signed by Mikhail

21     Arroyo; correct?

22     A   I don't know if it was directing a power of

23     attorney signed by him, but a power of attorney based on

24     these notes, yes.

25     Q   Are you aware of what would be required to

Page 139

1       obtain a power of attorney?

2            A   No, I'm not.

3            Q   So you don't know whether or not it's legally

4       possible for somebody who has been found to lack legal

5       capacity to give anybody else a power of attorney?

6            A   I'm sorry.  I don't understand your question.

7            Q   You don't know if it's even legally possible

8       for somebody who is incapacitated to provide somebody

9       else a power of attorney?

10           A   No, I don't.

11           Q   Turning to the next note, dated November 1st,

12      2016, this one has the user B Salazar.  Who is that?

13           A   Bertha Salazar.

14           Q   And what position did Ms. Salazar hold in 2016?

15           A   Consumer relations associate, call center.

16           Q   Is she still there?

17           A   Yes.

18           Q   Same position?

19           A   Yes.

20           Q   And her comment was "CCI checking."  What is

21      CCI?

22           A   I don't know what the acronym stands for.

23           Q   Did you talk to Ms. Salazar about this note?

24           A   No.

25           Q   Did you ask anybody else what CCI stood for?

CONFIDENTIAL

Page 140

1         A    No.

2         Q    This note ends with "Transferring call to Tina

3    Marie."  Is that referring to Tina Marie Santos?

4         A    Yes.

5         Q    And under what circumstances would a customer

6    service -- wait.  I'm sorry.  CSR.

7         A    That's fine.

8         Q    Okay.  Under what circumstances would a CSR

9    associate transfer a call to Ms. Santos, who I think you

10   said was a team lead?

11        A    In the situation where they -- the consumer may

12   have called in multiple times, the call is escalated,

13   the person's, you know, defensive, escalated, agitated.

14   It depends on the circumstance, if the person just

15   doesn't know how to handle the request.

16        Q    Turning to the next note, also dated

17   November 1st, this shows a user of T Santos.  So that

18   would be Tina Marie?

19        A    Yes.

20        Q    Her comment begins "SUP call."  Do you know

21   what SUP refers to?

22        A    Sup call, supervisor call.

23        Q    So that's just indicating that she's calling --

24   she as supervisor is handling the call?

25        A    Right.  Yes, that it's an escalation call.

Page 141

1       Q   Now, this note says that "We have to get

2   legal's approval before we can send out the report."

3   Who has authority to decide that a question needs to go

4   to legal?

5       A   It would -- it could be our authority where we

6   escalate it to legal.  Generally, the practice is to

7   contact the compliance team directly, and the compliance

8   team would have determined the next course of action.

9       Q   Would Tina Marie have authority to contact the

10  compliance team?

11      A   Yes.

12      Q   Or would she go through Jessica or Mike?

13      A   It could be either/or.  So she could have

14  spoken to Mike or Jessica in this case or contacted the

15  compliance team on her own.

16      Q   Would Tina Santos have had authority to decide

17  on her own that something needed to go to legal?

18      A   I believe, when she uses the word "legal,"

19  she's referring to compliance in this note.

20      Q   And what's the basis of that belief?

21      A   We don't escalate directly to legal, nor did

22  I -- would I think or did I know that Jessica had

23  contact -- sorry, Tina had contacts to legal.  So our

24  immediate escalation was through our compliance team.

25      Q   So with the first call being on April 27th

Page 142

1    mentioning that her son's disabled and she's his

2    conservator, the first time that the issue of how to

3    handle this was calculated to compliance was apparently

4    November 1st of 2016?

5         A   Based on the notes and then based on

6    information I could get from individuals' recollection

7    of two-plus years ago, yes.

8         Q   As somebody with authority over the customer

9    relations department, are you satisfied with that length

10   of time between being provided information about

11   Mr. Arroyo's disability and conservatorship and when the

12   issue was actually escalated to compliance?

13            MR. ST. GEORGE:  Object to form.

14            THE WITNESS:  We would like to get things done

15   as quickly as possible for consumers.  This was a unique

16   situation, something that we have never handled before,

17   to my knowledge, and just not understanding what a

18   conservatorship is versus a power of attorney and

19   getting this escalated to the legal team, there were, I

20   believe, some requests that we sent to the consumer that

21   are not noted here, perhaps, where she wasn't

22   communicating back with us.  But this is a large amount

23   of time.

24   BY MS. WEBBER:

25        Q   Over six months; right?

Page 143

1      A    Yes.

2      Q    And given how unique and unusual it was,

3  wouldn't it have behooved Mr. Salgado or Ms. Silva to

4  have escalated this to somebody who might be able to

5  untangle what to do with a conservatorship in the first

6  instance rather than continuing to request the POA and

7  other documents instead?

8           MR. ST. GEORGE:  Object to form.

9           THE WITNESS:  That's reasonable, yes.

10  BY MS. WEBBER:

11     Q    The next note is dated November 4th, another

12  call from Ms. Santos to -- she says consumer's mother,

13  to Ms. Arroyo, letting her know "We are still waiting

14  for response from legal."  And then a phone number is

15  provided.  Is that the phone number she would have been

16  calling?

17     A    I believe so, yes.

18     Q    We talked before about incoming phone calls

19  being recorded.  Are outgoing phone calls also recorded?

20     A    They are recorded as long as they're done on a

21  certain queue.

22     Q    Is it possible -- not possible.  When a team

23  lead like Ms. Santos was making outgoing phone calls to

24  consumers, would you expect her to do those from a queue

25  that would lead to the call being recorded?

Page 162

1    international, you know, tax number or tax

2    identification number.  So if a consumer doesn't have a

3    Social Security number, then that would be escalated.

4    There have been instances, but very, very rare.

5        Q    ITN is an individual tax identification number?

6        A    Yes.

7        Q    If you had -- a foreign national wouldn't have

8    a Social Security number and is in the United States

9    studying, attending school, and, therefore, no income,

10   is not a taxpayer, they wouldn't have either SSN or ITN;

11   correct?

12       A    That sounds reasonable.

13       Q    So they can't get a copy of a consumer report?

14            MR. ST. GEORGE:  Object to form.

15            THE WITNESS:  They could, but it would be in an

16   escalated situation.

17   BY MS. WEBBER:

18       Q    None of the notes we saw indicated that there

19   was a problem with the form submitted by Ms. Arroyo

20   because she failed to include a Social Security number;

21   correct?

22            MR. ST. GEORGE:  Object to form.

23            THE WITNESS:  Not that I saw.

24   BY MS. WEBBER:

25       Q    Okay.  Turning to the second page of

Page 166

1     escalation.

2          Q    Do you know if there was ever a determination

3     as to whether the seal was adequate?

4          A    Yes.  I do know that there was a determination

5     that it was not.

6          Q    But the one specifically on 577 or a different

7     iteration?

8          A    I couldn't tell you which iteration.

9          Q    Okay.  The following page of Exhibit 14

10    includes copies of a driver's license for both

11    Mr. Arroyo and Ms. Arroyo.  Was that sufficient for your

12    needs in terms of having copies of ID?

13         A    Yes.

14         Q    So based on the notes that we reviewed in

15    Exhibit 11, it would have been Seng Cha who reviewed

16    what's been marked as Exhibit 14 and determined that

17    that was not adequate?

18         A    Yes, Jessica -- Seng Cha.  There's a note that

19    references Jessica and Mike as well.

20         Q    Do you know if Jessica and Mike actually

21    reviewed the documentation or just --

22         A    I don't know.

23         Q    Okay.  And the note doesn't say anything about

24    missing Social Security number, does it?

25         A    No.

Page 167

1          Q   And it doesn't say anything about the seal;

2      correct?

3          A   No.

4          Q   And it doesn't say anything about where she

5      signed, only that you wanted her son to sign; correct?

6          A   Correct.

7          Q   So based on the notes on June 30th, no reason

8      to believe that anyone ever informed Ms. Arroyo that she

9      needed to provide the Social Security number; correct?

10              MR. ST. GEORGE:  Object to form.

11              THE WITNESS:  Not specifically, no.

12      BY MS. WEBBER:

13          Q   And do you know what, if anything, was sent to

14      Ms. Arroyo following the June 30th note?

15          A   The notes indicate that she was sent a

16      call-back letter.

17          Q   And what's a call-back letter?

18          A   A call-back letter is a letter that we would

19      mail out to the consumer stating that we need to speak

20      to you regarding your request, please contact us.

21              MS. WEBBER:  Exhibit 15.

22              (Exhibit 15 was marked for identification by

23          the court reporter and is attached hereto.)

24      BY MS. WEBBER:

25          Q   Do you recognize what's been marked as

CONFIDENTIAL

Page 245

1              I, the undersigned, a Certified Shorthand

2       Reporter of the State of California, do hereby certify:

3              That the foregoing proceedings were taken before

4       me at the time and place herein set forth; that any

5       witnesses in the foregoing proceedings, prior to

6       testifying, were administered an oath; that a record of

7       the proceedings was made by me using machine shorthand

8       which was thereafter transcribed under my direction; that

9       the foregoing transcript is a true record of the testimony

10      given.

11             Further, that if the foregoing pertains to the

12      original transcript of a deposition in a federal case,

13      before completion of the proceedings, a review of the

14      transcript was requested.

15             I further certify I am neither financially

16      interested in the action nor a relative or employee of any

17      attorney or any party to this action.

18             IN WITNESS WHEREOF, I have this date subscribed

19      my name.

20

21      Dated: 9/30/2019

22                      *Elaine Smith*

23

24              ELAINE SMITH, RMR

                CSR No. 5421

25