**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

**CARMEN ARROYO, _et al.,_**

　　　**-v-**

**CORELOGIC RENTAL PROPERTY**
**SOLUTIONS, LLC,**

**Case No. 3:18-cv-00705-VLB**

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S**
**(SECOND) MOTION FOR SUMMARY JUDGMENT**

**Troutman Sanders LLP**
**875 Third Avenue**
**New York, NY 10022**

CoreLogic Rental Property Solutions, LLC ("RPS"), by counsel, states as follows in opposition to Plaintiffs' (Second) Motion for Summary Judgment.

## INTRODUCTION

The "CrimSAFE" product is a categorization and filtering tool that housing providers use to practically help them implement their criminal screening policies. Through CrimSAFE, housing providers can input their criminal search criteria into a configuration form across 36 categories of crimes, which track those categories used by the FBI.  RPS then electronically identifies whether there is a "record found" based on the criteria previously selected by the housing provider.  That is RPS's limited role.  And, without tools such as CrimSAFE, which are widely used in the multi-family housing industry, untrained leasing agents would be left on their own to categorize millions of non-uniform criminal records from hundreds of jurisdictions nationwide, which would invariably lead to error and bias.

Plaintiffs' brief is replete with unsupported claims.  Plaintiffs' Motion: (1) lacks valid statistical proof, (2) makes factually-discredited arguments about how CrimSAFE works; (3) tries to undermine background screening generally; and (4) proffers implausible and previously-undisclosed "alternatives" for CrimSAFE. Indeed, based on the true record, only *RPS* is entitled to judgment, including for the reasons set forth in its pending cross Motion for Summary Judgment.

As lengthy as Plaintiffs' brief is, it is helpful to note at the outset that the following facts are undisputed:

- **Tools such as CrimSAFE are widely used in multi-family housing, where housing providers understand that their individualized review of any criminal records identified is encouraged by the Department of Housing and Urban Development ("HUD");**

- **RPS's customers select the criteria that they wish to have used (if any) in connection with any CrimSAFE category of crime;**

- **RPS does not tell customers which CrimSAFE settings to select, and customers can change their CrimSAFE settings at any time;**

- **There is no way for housing providers to make a "decision" via CrimSAFE's product settings. To the extent providers want to render a decision on an application, they would have to navigate to an entirely separate section of the RPS screening interface;**

- **RPS alerted its entire customer base of the existence of the April 4, 2016 HUD Memorandum regarding housing providers' use of criminal record histories mere days after its issuance – and before the screening report was requested for Mikhail Arroyo – reminding all of its customers that CrimSAFE was simply a categorization tool. That notification went to 260 individuals at WinnResidential;**

- **Within weeks of the issuance of the April 2016 HUD Memorandum, RPS hosted a training session for customers of the Memorandum;**

- **Plaintiffs have no evidence of the racial makeup of any applicant pool, and they instead rely on statewide population statistics to attempt to show disparate impact;**

- **The elevated rate of recidivism for previously-arrested and convicted offenders is a well-documented fact; and**

- **The reporting of arrest records for seven years and conviction records without time limitation is fully endorsed by federal law.**

These facts alone require the denial of Plaintiffs' Motion and judgment for RPS.

Turning to Plaintiffs' arguments, Plaintiffs <u>first</u> fail to make out a *prima facie* statistical case of disparate impact. Plaintiffs acknowledge they have no statistics regarding the applicant pool. And, from the inception of this case – and reaffirmed many times– Plaintiffs made clear that they believe statewide population statistics in Connecticut are sufficient. But that belief is contrary to binding precedent.

Statewide statistics are only appropriate in "rare" circumstances where there is no reason to believe state demographics differ from an applicant pool. But

in this case, the state demographics do in fact differ from the pool. The multi-family properties in question here are: (1) clustered in urban centers, which have much higher percentages of African American and Latino populations than the state as a whole; and (2) frequently are subsidized communities, which also have much higher populations of African American and Latino residents than Connecticut. This case thus now poses a straightforward question. Are statewide statistics acceptable based on this record? Under binding authority, the answer is no.

**Second**, summary judgment would also be inappropriate because Plaintiffs cannot prove RPS proximately caused any disparate impact. RPS's customers set the CrimSAFE criteria, which are electronically applied by RPS. What criteria to input into CrimSAFE, and what decisions to make based on a record found result, are made by the housing provider. CrimSAFE is simply a tool.

**Third**, the factual claim that RPS renders a "decision" on applications – such that it could even possibly have any "impact" – is in all regards disputed. Expert testimony establishes that housing providers do not use products like CrimSAFE as a decisioning tool. The electronic CrimSAFE interface also contains no place for customers to enter a "decision" on an application. Numerous RPS witnesses have also testified to the fact that CrimSAFE is not marketed to customers as a decisioning product. Plaintiffs addresses none of these facts. And as described more fully below, the "facts" they cite are mischaracterizations of the record.

**Fourth**, Plaintiffs' motion falters with respect to the claim that RPS has not shown a "legitimate" business interest through the CrimSAFE product and/or that Plaintiffs have shown "less discriminatory alternatives" to CrimSAFE. Background screening is endorsed by Congress, including the identification of non-conviction

4

offenses for seven years and convictions without time limitation, which is precisely how CrimSAFE works. Neither Plaintiffs nor this Court can second-guess those legislative decisions. Those decisions, however, are also well grounded in fact, as recidivism is a reality, and CrimSAFE provides distinct practical benefits that make the screening process workable. Moreover, RPS already undertakes one of the "less discriminatory alternatives" advanced by Plaintiff during this case, *i.e.*, returning the details of any underlying record identified through CrimSAFE, which ends the issue. The remaining three "alternatives" advanced all lack merit and/or are precluded from being considered due to their non-disclosure in discovery.

**Finally**, Plaintiffs' claim under the Connecticut Unfair Trade Practices Act ("CUTPA") fails, as it is simply derivative of their flawed FHA claim, and the record establishes that RPS *facilitates* housing provider compliance with the FHA.

## STATEMENT OF FACTS

### I.   RPS'S ROLE IN THE TENANT SCREENING PROCESS.

#### A.   The Process for Using the CrimSAFE Categorization Product.

RPS's products assist housing providers in evaluating prospective tenants, including by providing public criminal record reports. RPS's Additional Material Facts ¶ 1 ("AMF"). To order a report, a housing provider electronically submits personal identifying information to RPS. *Id.* at ¶ 2. That information includes the name, current address, Social Security number, and date of birth of the applicant.[1] *Id.* RPS then uses a proprietary matching process to identify criminal public records from RPS's database that match the applicant. *Id.* at ¶ 3. RPS then shares

---

[1] When such information is submitted, it does not reflect the applicant's race.

the records with the housing provider.  RPS does not interact with applicants for multi-family housing units during the application stage.  *Id*.

RPS also offers an optional product called CrimSAFE, which filters any criminal records found based on criteria set by the housing provider, and which categorizes records according to their type and severity levels.  AMF at ¶ 4. CrimSAFE then notifies the provider whether any records were found that match its criteria (*e.g.*, convictions for assault in the past five years).  Such "categorization" products are widely used within the multi-family housing industry. *Id*. at ¶ 25.

Prior to using the CrimSAFE product, housing providers are required to fill out their selection criteria on a matrix that accounts for: (1) the type or "category" of 36 types of crimes; (2) whether the offense resulted in a conviction; (3) whether the offense is a felony or non-felony; and (4) the age of the offense.  The matrix of 36 crime categories tracks the categorizations established by the FBI through the "National Incident-Based Reporting System."  AMF at ¶ 5.  Housing providers can search offenses that have not resulted in a conviction for a period of seven years, and they can search offenses that have not resulted in a conviction without a time limitation.  *Id*. at ¶ 6.

A CrimSAFE report is always accompanied by another portion of the screening report that contains the full data of any criminal record(s) identified via CrimSAFE.  AMF at ¶ 9.  Housing providers retain the option to limit the ability of individual leasing agents to view the full details of records that are found by the CrimSAFE product, and to instead make that detail available only to designated administrators.  *Id*.  That setting enables property managers to reserve decisions

6

on criminal screenings for supervisory staff, and not on-site leasing agents.  *Id*. Whether to use that administrative setting is determined by the housing provider, not RPS.  *Id*.  However, even if that administrative setting is used, the full detail of any records found by CrimSAFE is always made available to the identified supervisor(s).  *Id*.  Thus, housing providers always have the ability to log in and view the full detail of any record(s) found.  *Id*.  Housing providers are also trained on how to access that detailed version of the report, which is presented in a simply, hyperlinked format.  *Id*.

RPS does not provide any "default" settings in connection with the 36 CrimSAFE categories, nor does RPS direct housing providers as to what CrimSAFE settings they should select, instead informing customers that they should consult with legal counsel during that process.  AMF at ¶ 7.  RPS also does not draft or set any tenant selection criteria used by its customers.  *Id*. at ¶ 8.

The vast majority of CrimSAFE requests do not result in the identification of any "record found."  From 2016 to the present, only 6.6% of requests by properties in Connecticut have resulted in the identification of any record based on the criteria that the property selected.  *Id*. at ¶ 11.  For many customers, that figure is even lower.  For instance, for WinnResidential, that same period resulted in only 2.9% of applicants having any record "found" through CrimSAFE.  *Id*.

### B.   RPS Does Not Make Housing Providers' Decisions.

CrimSAFE is not a tool that makes "decisions" on applications.  If a record is identified through CrimSAFE, RPS notes that there has been a "record(s) found," with the message that the housing provider should "proceed with [its] community's screening policies."  AMF at ¶ 10.  CrimSAFE does not tell a housing provider to

"Accept" or "Disqualify" applications, as alleged.  (Compl., at ¶ 37.)  Indeed, there is no way for housing providers to automate a "decision" based on their CrimSAFE use.  *Id.* at ¶ 21.  When using RPS's software application on which the CrimSAFE product runs, the housing provider must navigate to another section of the application to manually enter any leasing decision.  *Id*.  Housing providers thus have the full ability to "accept" an applicant even when a record is identified by CrimSAFE.[2]  *Id*. at ¶ 22.  RPS also is not informed of any decision that is rendered by housing providers on applicants, including when a record has been "found" through CrimSAFE.  *Id*. at ¶ 24.

Furthermore, as RPS's retained expert (Jay Kacirk) – who has decades of experience working in the multi-family housing industry as an executive and thought leader – testified it is standard practice that, when criminal record data is identified through products such as CrimSAFE, property staff will have a process for referring final decisions to a supervisor or experienced staff member who undertakes a further, case-by-case review of the matter.  AMF at ¶ 25.

Given these issues – all of which are ignored by Plaintiffs – it is remarkable that Plaintiffs still claim it to be "undisputed" that CrimSAFE renders "decisions" on applications.  CrimSAFE simply does not do so.

C.     **The Legitimate, Non-Discriminatory Interests Furthered by CrimSAFE.**

---

[2] **If a record is "found," RPS will make available to the housing provider a template adverse action letter, which the customer would be required under the federal Fair Credit Reporting Act ("FCRA") to send to an applicant that it rejected by the housing provider based on the contents of RPS's report (*e.g.*, the credit or criminal portion of the report).  That template is made available to help *facilitate* housing provider FCRA compliance, but RPS does not make the decision of whether to send the template adverse action notice.  Indeed, the template adverse action letter itself affirms that RPS "did not make the decision to take adverse action."**

The CrimSAFE product offers a number of important benefits to its users. First, CrimSAFE takes a housing provider's selected criminal criteria and informs the housing provider of whether a record exists that meets their criteria. That objective characterization of criminal records helps to remove potential explicit or implicit bias at the property manager level and promotes non-discrimination in the interpretation of the severity of criminal records. AMF at ¶ 15.

Second, absent products such as CrimSAFE, there would exist unnecessary delays in the background verification process that would hinder those who need immediate access to housing. In particular, individual property managers (who are generally non-legal professionals) would be tasked with attempting to research the severity level of any identified criminal record to then determine how to review such a record in the context of the leasing criteria set by the provider. AMF at ¶ 16. That would be unworkable, primarily because there are hundreds of different agencies all keeping accessible records with no standard of consistency in describing offenses.[3]

Third, the failure of companies like RPS to categorize criminal records and apply the housing provider's set criteria to those criminal records could also lead to a mistake by leasing agents in interpreting a record, as leasing agents or property managers could misinterpret a serious criminal offense as insubstantial and approve the application when their criteria would dictate otherwise, or *vice*

---

[3] The RPS database contains records obtained from more than 800 different jurisdictions, for a total of more than 579 million records spanning more than 10 million unique offense descriptions. AMF at ¶ 17. RPS has decades of experience in standardizing and integrating the disparate data into its database.

*versa*.  **AMF at ¶ 18.  Such mistakes could lead to substantial liability for housing providers.**  *Id*.

Finally, CrimSAFE allows housing providers to customize their criteria for what is acceptable at each property, as well as to quickly and consistently adjust their settings to account for policy changes with respect to the consideration of criminal histories (including with respect to their FHA policies).  AMF at ¶ 20.

**II.**     **THE APRIL 2016 HUD GUIDANCE AND RPS'S QUICK REACTION CONFIRM THAT HOUSING PROVIDERS INDIVIDUALLY REVIEW ANY IDENTIFIED CRIMINAL HISTORY BEFORE MAKING ANY HOUSING DECISION.**

RPS's housing provider customers are indisputably governed by the FHA. As such, because FHA compliance is important to those customers, RPS took steps to quickly ensure that its customer base was aware of the April 4, 2016 HUD Memorandum regarding the use of criminal record by housing providers, including as to how that guidance could apply to their use of CrimSAFE.

For instance, on April 14, 2016 – just 10 days after the HUD Memorandum was issued, and approximately two weeks *before* Mikhail Arroyo was screened by – RPS sent out a bulletin to all of its customers, including to 260 separate contacts at WinnResidential.  AMF at ¶ 29.  That bulletin hyperlinked and summarized the HUD guidance, including that HUD had emphasized the need for "individualized assessment" of criminal histories.  RPS also noted as follows:

> The Registry CrimSAFE® tool can help with categorization of criminal records, but it is the responsibility of each customer to set their own criteria for making tenancy decisions.  CoreLogic recommends that our customers work with their legal counsel to review their eligibility requirements and related policies around the use of criminal background data to ensure compliance with all federal and state laws.

*See* **AMF at ¶ 31.**

Additionally, just a few weeks later, RPS sponsored a training presentation for customers – including WinnResidential – about the April 2016 HUD Memorandum.  That training was led by outside compliance counsel from Hudson Cook, LLP.  AMF at ¶ 29.  In that training presentation, among other points, RPS noted that the April 2016 HUD Memorandum: (1) indicates that housing providers should "consider the nature, severity, and recency of convictions"; (2) that housing providers should conduct "individualized assessments where a criminal record exists"; and (3) warned against a "blanket policy to deny any applicants with a criminal record."  *Id.* f

III.   **THE RELATIONSHIP BETWEEN RPS AND WINNRESIDENTIAL.**

WinnResidential manages tens of thousands of units of property.  AMF at ¶ 30.  The majority of WinnResidential's units are subsidized/affordable properties.  *Id.*  WinnResidential has been a customer of RPS since 2006.  *Id.* at ¶ 31.

Prior to receiving screening services from RPS, WinnResidential signed RPS's standard "screening services agreement," wherein WinnResidential agreed to comply with all applicable law, including the FHA.  AMF at ¶ 31.  The parties further agreed that their relationship was one of "independent contractors," which further confirms that RPS has no authority to make "decisions" for WinnResidential.  *Id.*

WinnResidential acknowledges the applicability of the FHA to its business and takes the FHA very "seriously," including through a dedicated legal and compliance department.  AMF at ¶ 32.  WinnResidential maintains detailed policy and procedure documents setting forth consideration of criminal record criteria at

11

each property.  *Id*. at ¶ 33.  RPS had no role in formulating those tenant selection policies.  *Id*.

When it first purchased CrimSAFE, WinnResidential made the decision as to what criteria to use within the 36 FBI criminal categories.  AMF at ¶ 34.  After the April 2016 HUD Memorandum was issued, and after consulting extensively with its own legal department and members of its executive team, WinnResidential made the decision to revise its CrimSAFE criteria in May 2016, with further revisions made in July 2016.[4]  *Id*.  Those changes were made by WinnResidential after receiving the April 14, 2016 bulletin from RPS and the other RPS training mentioned above.  *Id*.  RPS was not involved in those internal discussions at WinnResidential.  RPS's role was to implement those changes only once determined by WinnResidential.  *Id*.

RPS has no visibility into what decisions are made by WinnResidential on housing applications.  AMF at ¶ 24.  RPS also has no authority or ability to reverse or alter any housing decision made by WinnResidential.  *Id*. at ¶ 35.

## IV.   THE APRIL 2016 APPLICATION AND DISCUSSIONS BETWEEN MS. ARROYO AND WINNRESIDENTIAL AND SUBSEQUENT LITIGATION.

Carmen Arroyo applied for housing at WinnResidential on behalf of Mr. Arroyo on April 26, 2016 at the Artspace Windham property, which is a federally-subsidized property in Willimantic, Connecticut.  AMF at ¶ 36.  WinnResidential requested from RPS a tenant screening report on Mr. Arroyo.  *Id*.  The tenant screening report returned by RPS that same day accurately identified that Mr. Arroyo had a pending charge for retail theft in York County, Pennsylvania.  *Id*. at ¶

---

[4] **WinnResidential also made more changes in 2019.**

37. As of April 2016, WinnResidential's CrimSAFE settings included all charges for "theft" occurring within the prior three years.  *Id*.   Thus, based on WinnResidential's CrimSAFE settings at that time, RPS noted within the CrimSAFE portion of the report that there was a "record found."

Because WinnResidential had chosen to apply the administrative setting limiting the distribution of records to identified supervisory staff, RPS made available two versions of the screening report to WinnResidential.  AMF at ¶ 38. One version, which went to the on-site leasing agent, identified the existence of the pending charge, but it did not identify the full detail of the underlying offense.  *Id*. The second version was simultaneously made available to WinnResidential's designated supervisory staff, and that version both identified the offense and provided all details about the theft offense that RPS had in its file, including the nature of the offense, the offender, the date it was committed, where it was pending, and the current status of the proceeding.  *Id*.

WinnResidential rejected the application.  AMF at ¶ 39.  Ms. Arroyo then had numerous contacts with WinnResidential in 2016 and 2017, where she explained that Mr. Arroyo was disabled and asked for further details on the denial. WinnResidential would not reverse its housing decision.  *Id*.

After numerous conversations, Ms. Arroyo retained counsel at the CFHC in 2017 to bring an administrative complaint against WinnResidential for failing to accommodate his disability despite the criminal history.   AMF at ¶ 40. WinnResidential litigated the matter through the day of the hearing, at which time a settlement was reached that allowed Mr. Arroyo to move into the complex.  The action settled for $50,000.  RPS was not involved in those proceedings.  *Id*.

From April 2016 until 2017, when WinnResidential admitted Mr. Arroyo, Ms. Arroyo did not apply for admission to any other apartment complex.  AMF at ¶ 41.

## LEGAL STANDARD

In seeking summary judgment, "the burden [is] on the moving party to demonstrate the absence of any material issue genuinely in dispute."  *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985). "Summary judgment is appropriate only where the parties' submissions show that there is no genuine issue as to any material fact." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 129 (2d Cir. 2008).

## ARGUMENT

### I.     PLAINTIFFS HAVE NO STATISTICAL PROOF OF DISPARATE IMPACT.

Plaintiffs move for judgment on Count I, claiming CrimSAFE has a "disparate impact" on African American and Latino applicants, in violation of the FHA.[5]  To carry their burden, Plaintiffs must show that: (1) there is a facially neutral policy or practice; (2) that was harmful; and (3) that had a disparate impact on a protected class.  24 C.F.R. § 100.500(c).  Even assuming RPS is subject to the FHA and that Plaintiffs satisfied the first and second elements, they have not satisfied the third element, *i.e.*, showing CrimSAFE statistically has a disparate impact.

### A.     This Court Must Scrutinize Plaintiffs' Statistical Evidence.

As the Supreme Court has admonished, scrutiny of disparate impact claims is "necessary to protect potential defendants against abusive disparate-impact claims" that "might displace valid governmental and private priorities, rather than

---

[5] **As noted in its Motion to Dismiss, RPS disputes the applicability of the FHA to CrimSAFE product and file disclosure practices at issue.  The resolution of that threshold legal argument, however, is not needed to deny Plaintiffs' Motion.**

solely 'remov[ing] . . . artificial, arbitrary, and unnecessary barriers.'"  *Texas Dept. of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2523 (2015).  "A disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."  *Id.*  With the specific policy being challenged in mind, the plaintiff then must meet a "robust causality requirement . . . [that] protects defendants from being held liable for racial disparities they did not create."  *Id.*

As Plaintiffs admit, disparate impact requires them to show "a significantly adverse or disproportionate impact on persons of a particular type" caused by the identified policy.  (Pltfs' Mem. at p. 8.)  They also note that "this showing generally requires statistical evidence," *see id.*, but that grudging admission significantly understates their burden.  In fact, "[a] plaintiff who fails to . . . produce statistical evidence demonstrating a causal connection" between the challenged practice and the identified protected groups "cannot make out a *prima facie* case of disparate impact" as a matter of law.  *Inclusive Communities Project, Inc.*, 135 S. Ct. at 2523; *accord Rodriguez v. Bear Stearns Companies, Inc.*, No. 7cv1816, 2009 WL 5184702, at *11 (D. Conn. Dec. 22, 2009).  Indeed, the _sole_ form of evidence submitted by Plaintiffs here to show disparate impact are statistics.  So, Plaintiffs' disparate impact case succeeds or fails based on the quality of their statistical case.

At the threshold, Plaintiffs did not offer any statistical evidence measuring the real-world impact that this case is all about: access to housing.  If the whole point of this litigation is the theory that protected groups are being disqualified from housing, then one might think that the critical piece of evidence would be the actual comparison of the racial composition of the applicants who have a

**15**

"record(s) found" through CrimSAFE, as compared to the racial composition of the pool of applicants as a whole. *See, e.g.*, *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650-51 (1989) (the "proper comparison" in a disparate impact case is "between the racial composition of the [at issue jobs] and the racial composition of the qualified population in the relevant labor market"). Put in terms of a formula, Plaintiffs need to show that the percentage of protected group members whose applications were "denied" due to records found via CrimSAFE is greater than the percentage of non-protected group members who were similarly "denied" due to records "found." *See id.* Plaintiffs, however, have not presented any evidence of that comparison, admitting they did nothing to develop proof of the applicant pool.

### B.  Plaintiffs' Statistics Fall Far Short of Meeting Their Burden of Proof.

"A plaintiff has not met its burden if it merely raises an inference of discriminatory impact." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003); *accord Rodriguez,* 2009 WL 5184702 at *10 (same). And, in case after case, courts have "consistently denied" disparate impact claims based on inadequate statistical evidence. *Rodriguez,* 2009 WL 5184702 at *15. This Court should do so here, as Plaintiffs' statistical evidence falls far, far short of the bar.

Lacking direct evidence of the proper comparison, Plaintiffs' first gambit is to try an end-run around the required statistical proof by relying on a tower of inferences. In particular, Plaintiffs start with an isolated fact that is well established and then build a story from there. That isolated fact is that statewide data indicates that African Americans and Latinos tend to have higher rates of contact (convictions and arrests) with the criminal justice system than other groups.

Based on this fact, Plaintiffs assume, without any proof, that the records identified through CrimSAFE also are skewed as a matter of fact toward reporting more arrests and convictions for African Americans and Latinos than other groups when compared to their respective populations in the applicant pools. But that is simply speculation and inference. What Plaintiffs need to have is direct statistical evidence of a disparate impact in terms of the applicant pool. But all they have are suppositions, assumptions, and inferences.

C.   **Plaintiffs' Statistical Case is Based on the Unsupported Assumption That State Statistics Reflect the Composition of the Applicant Pool.**

Plaintiffs' second gambit, therefore, is to pivot and try and build a statistical case by reference by statewide statistics, which they claim can serve as their proxy for the applicant pool for complexes using CrimSAFE. By going on and on in their brief trying to preemptively excuse their failure to have proper statistical evidence, Plaintiffs tacitly acknowledge the problematic nature of using statewide data to show disparate impact and are thus forced into making a number of preemptive arguments. Yet, each argument they preemptively make in that regard is flawed.

i.   **Plaintiffs Ignore the Applicant Pool Requirement.**

First, Plaintiffs overlook the obvious: to prove disparate impact in outcomes in applications the Plaintiffs need evidence of outcomes in actual applications. *See Tsombanidis*, 352 F.3d at 574. To make out a *prima facie* case of disparate impact, "plaintiffs must utilize the appropriate comparison groups. They must first identify members of a protected group that are affected by the neutral policy and then identify similarly situated persons who are unaffected by the policy." *Id.* at 576-77. "In the typical disparate impact case the proper population for [initial] analysis is

17

the applicant pool." *Chin v. Port Auth. Of New York & New Jersey*, 685 F.3d 135, 152 (2d Cir. 2012).  Here, that "applicant pool" would be the African American and Latino applicants for housing at the complexes using CrimSAFE.  *See id.*

RPS has no record of the racial composition of the applicant pool at any apartment complex.  And, Plaintiffs failed to take discovery of any property in this case, including WinnResidential, to even try and gather that information.  AMF at ¶ 42.  This should end the case.  Instead, Plaintiffs seek to go forward relying solely upon statewide population rates for African Americans and Latinos, which Plaintiffs assert to be representative of the applicant pools for RPS's customers. *Id.* at ¶ 44.  Those state statistics are what Plaintiffs plead in the Complaint, and those same statistics are what they confirmed during discovery and Rule 30(b)(6) depositions constituted their statistical baseline for purposes of allegedly measuring the "disparate impact" of CrimSAFE.  *Id.*  Yet, those types of generalized statistics – divorced from the relevant applicant pool – have been consistently rejected for purposes of claiming disparate impact.  *See, e.g., Mountain Side Mobile Estates Partnership v. Sec'y of Hous. and Urban Dev.,* 56 F.3d 1243 (10th Cir. 1995) (general data is "so removed from local arena that it is of little weight in our analysis," and permissible use of national/statewide data is the "rare exception").

For instance, in *Townsend v. Nassau County Medical Center*, 558 F.2d 117 (2d. Cir. 1997), the Second Circuit addressed a claim that the requirement of a college degree resulted in a disparate impact on African American employees.  In support of her claimed statistical *prima facie* case, the plaintiff presented general population statistics regarding the percentage of minorities holding college degrees, which was lower than their white counterparts.  *Id.* at 120.  In rejecting the

18

proposed *prima facie* showing of statistical disparate impact and reversing the district court, the Second Circuit held that "a statistic relating only to the general population, and not to the employment practices of the particular defendant," was insufficient to support a *prima facie* case of disparate impact, with the Second Circuit further holding that "statistical evidence concerning only the general population" was not sufficient to demonstrate that a job prerequisite "operates to exclude" minorities. *Id.* at 119-20.

The requirement to present statistics of the actual applicant pool, as opposed to generalized population statistics, has also been confirmed by the Supreme Court and scores of lower court decisions. *See, e.g.*, *Wards Cove Packing Co.*, 490 U.S. at 650-51 (holding that the general population pool "cannot be used as a surrogate for the class of qualified job applicants, because it contains many persons who have not (and would not) be" applying for a job with the defendant); *Mandala v. NTT Data, Inc.*, No. 18-CV-6591, 2019 WL 3237361, at *4 (W.D.N.Y. July 18, 2019) (national statistics of conviction and arrest rates for African-Americans were insufficient proof to show a disparate impact for the applicant pool).

ii.     <u>Plaintiffs Have Presented No Evidence to Suggest that RPS Discouraged Anyone from Applying for Housing.</u>

After failing to acknowledge the basic rule that applicant pool data is required, the Plaintiffs' next stratagem is to argue that state data can be used under a "discouragement" theory. Plaintiffs assert that protected groups in relevant market may have been "discouraged" from applying at all because the housing providers' policy of denying applications was generally known. (Pltfs' Mem. at p. 22.) However, they have presented *no evidence* to support their "discouragement"

19

theory.  They have pointed to no public statements by WinnResidential or anyone else that would discourage applicants with records of contacts with the criminal justice system from applying.  They present no evidence that any applicant knew about RPS or CrimSAFE before applying.  They have presented no testimony from anyone that they were discouraged, including based on the use of CrimSAFE.  In fact, the only applicant's evidence we have, Ms. Arroyo, shows no discouragement.  Quite the contrary, she vigorously pursued a housing opportunity for Mr. Arroyo.  *See* AMF at ¶ 39.  Moreover, the facts show that CrimSAFE locates records in very small percentages of searches, which further undercuts any notion that it would "deter" applicants.  *Id*. at ¶ 26.  Plaintiffs' discouragement theory is thus another example of use of speculation and conjecture to try and paper over a complete lack of proof.

The cases cited by the Plaintiffs as allowing consideration of a broader applicant pool based on this theory also are easily distinguishable and only confirm the need for judgment to RPS here.  In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), for instance, the Court expressly conditioned use of the discouragement theory on actual proof: "If an employer should announce his policy of discrimination . . .  his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs."  *Id.* at 365.  In that case, the Supreme Court considered testimony of individuals who recounted over 40 specific instances of discrimination.  *Id.*  No such testimony is present here to prove "discouragement."

As a further example of such evidence, in *EEOC v. Joint Apprenticeship Comm.*, 186 F.3d 110 (2d Cir. 1999), the employer's advertisement showed

discouragement in that "the recruitment announcements also stated in bold capital letters that 'ALL APPLICANTS MUST MEET THE FOLLOWING MINIMUM QUALIFICATIONS IN ORDER TO QUALIFY,' with age and education being the first two qualifications listed."  *Id.* at 119.  Again, nothing of the sort is present here.

      iii.    **Statewide Data is an Invalid Proxy for the Applicant Pool Here.**

The final flaw in Plaintiffs' assertion that state statistics are representative is that it is contradicted by the facts of this case.  First, statewide statistics have no relation to applicant pools for multifamily housing in the specific geographic locales where RPS's customers are located.  It should come as no surprise that the demographics of cities where RPS's customers operate can differ dramatically from statewide population statistics, as well as in the percentage of citizens who own homes and those who rent.  For instance, the U.S. Census Bureau reports that, as of July 1, 2018, 29% of the population of Connecticut was African American (12%) or Latino (17%), and that 67% of citizens owned a home.[6]  SUMF at ¶ 56. When looking at the U.S. Census Bureau's demographics of the largest cities in Connecticut where RPS's customers operate, as well as where the Artspace Windham complex where Mr. Arroyo applied is located (Willimantic), however, those figures change substantially:

| City | Percentage of Population: African American | Percentage of Population: Latino/Hispanic | Percentage of Population: Home Owners |
|---|---|---|---|
| Hartford | 38% | 44% | 24% |
| New Haven | 33% | 30% | 27% |

---

[6] This Court can take judicial notice of these Census Bureau figures.  *See, e.g., United States v. Style*, 771 F. App'x 43, 44 (2d Cir. 2019).

| | | | |
|---|---|---|---|
| **Bridgeport** | **35%** | **39%** | **42%** |
| **Willimantic** | **7%** | **44%** | **34%** |

AMF at ¶ 45.  Given these stark disparities by locality, and the fact that RPS's housing provider customers and WinnResidential generally operate their multi-family complexes in these urban centers in Connecticut, there is no credible basis for using statewide population data as a baseline to establish the applicant pool. *See id*. at ¶ 43.

Second, and compounding the first issue, the statewide statistics proffered by Plaintiffs do not account for the fact that RPS serves <u>*many*</u> customers who operate affordable/subsidized housing, such as the Artspace Windham where Mr. Arroyo applied.  *See* AMF at ¶ 30.  In Project Based Section 8 housing, HUD has reported (on a nationwide basis) that 33% of occupants are African American and 13% are Latino.  *Id*. at ¶ 46.  For voucher programs, that figure rises to 45% for African Americans and 16% for Latinos.  *Id*.  Those figures are much higher than the state averages in Connecticut.  Moreover, HUD has reported 35% of all voucher recipients in Connecticut are African American and 43% are Latino.  *Id*.  Those statistics again are much higher than Connecticut state averages.

These illustrative factors "point out the unreliability of simply pointing to a bottom-line imbalance . . . compared to statewide statistics in support of a claim of disparate impact."  *Byrnie v. Town of Cromwell Pub. Schs.*, 73 F. Supp. 2d 204, 221-22 (D. Conn. 1999).  Indeed, Plaintiffs claim that they have proven a disparate impact because CrimSAFE "found" records associated with African American

offenders[7] 32.7% of the time, which is higher than their state population average. (Pltfs' Mem. at p. 20.)  But, the statistics above show that the percentage of African Americans in the urban areas in Connecticut where RPS's customers are located and in the affordable communities that RPS's customers serve are *underline: higher than the 32.7% figure identified by Plaintiffs as their proof of disparate impact, meaning that would be no disparate impact at all if these more relevant population figures were used as a proxy for the applicant pool*.  Simply put, Plaintiffs have no valid statistical proof, and especially not in the face of evidence that more on-point comparison groups would show no disparate impact.

Plaintiffs' failings of furnishing valid, statistical proof in this regard are also summed up by their own statistical expert, Christopher Wildeman, who Plaintiffs retained to make statements regarding the percentage of African American and Latino applicants with criminal records in Connecticut.[8]  Mr. Wildeman testified that population demographics, including rates of incarceration, differ significantly by locality within a particular state.  Thus, when asked what he would look at to study whether there were disparities based on race for applicants of affordable housing in Willimantic, Connecticut, he stated that he would first "need to know about the applicant pool" for that city and the relevant complexes.  Plaintiffs, however, never developed that data, meaning that "plaintiff[s] [have] failed to carry [their] *prima facie* burden of showing disparate impact."  *Byrnie*, 73 F. Supp. 2d at 221-22.

---

[7] **Plaintiffs say nothing about Latinos in this regard, *see id.*, apparently recognizing that the percentage of CrimSAFE "record(s) found" for Latino offenders identified by Plaintiffs is itself lower than their state population in Connecticut.  Therefore, the claimed "disparate impact" for Latinos is not viable under any statistical theory.**
[8] **Mr. Wildeman's report did not address RPS or the its customers' applicant pools.**

II.     **RPS DID NOT PROXIMATELY CAUSE ANY CLAIMED DISPARATE IMPACT.**

Even accepting for the sake of argument that CrimSAFE is a software tool that housing provider use to render "decisions" on applications (which it is not, including for the reasons set forth below), Plaintiffs still cannot prove that RPS proximately caused any alleged disparate impact, as required for any FHA claim.

A.     **There is no Proximate Cause of any Injury by RPS.**

"[P]laintiffs' asserted disparate impact must satisfy a 'robust causality requirement.'" *Inclusive Communities Project, Inc.*, 135 S. Ct. at 2152. That includes a showing of "proximate cause," which has also been specifically addressed by the Supreme Court under the FHA. *Bank of Am. v. City of Miami*, 197 L. Ed. 2d 678 (2014), where the plaintiff its claimed lost tax revenue and extra municipal expenses due to from the banks' alleged discriminatory practices in loan underwriting.[9]   In reversing the lower court's finding of proximate cause, the Supreme Court held that "proximate cause under the FHA requires some *direct relation between* the injury asserted and the injurious conduct alleged." *Id.* at 690. The Supreme Court rejected "foreseeability" as sufficient to establish proximate cause. *Id.* That high standard is consistent with that in the Second Circuit, where "a link that is too remote, purely contingent, or indirec[t] is insufficient." *Empire Merchs., LLC v. Reliable Churchill LLP*, 902 F.3d 132, 141 (2d Cir. 2018).

---

[9] This binding authority is notably absent from Plaintiffs' briefing.  On remand, the Eleventh Circuit found that proximate cause was present where the defendant's conduct was "necessarily and directly connected to the Banks' conduct in redlining and reverse-redlining throughout much of the City," *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1264 (11th Cir. 2019), which is a standard Plaintiffs cannot meet, even assuming the Eleventh Circuit's standard applied here.

These principles have been applied in analogous cases, both under the FHA and other federal statutes.  For instance, in *Zabriskie v. Fannie Mae*, 912 F.3d 1192 (9th Cir. 2019), the Ninth Circuit considered whether an entity that provided a software interface that "automatically applies [underwriting] guidelines and requirements" to consumer credit information input by a potential lender to assess "a loan's eligibility for purchase" could be held liable under the FCRA.  *Id.* at 1195. In finding that the defendant could not be held liable because it did not "evaluate" applications, the Ninth Circuit stated the "commonsense principle" that "when a person uses a tool to perform an act, the person is engaging in the act; the tool's maker is not."  *Id.* at 1197.  The same is true here, where CrimSAFE is a tool whose use and reach is determined solely by housing providers.[10]

Further, in *National Fair Housing Alliance v. Deutsche Bank*, No. 18CV0839, 2018 U.S. Dist. LEXIS 196636 (N.D. Il. Nov. 19, 2018), the court addressed an FHA claim that "Defendants' [maintenance] delegation practice resulted in poorly-executed property [property] maintenance, which led to racially-disparate effects." In finding that "climbing this chain requires more steps than the FHA permits," the court dismissed this "chain-link causation" for lack of proximate cause, including because "Plaintiffs experience[d] harm only after (impermissible) intermediate steps."  *Id.* at *38-39.  That would also be true here.  To the extent Plaintiffs claim harm from CrimSAFE, it was only after a housing provider's failure to individually

---

[10] Indeed, housing providers here exercise even greater control than the lenders in *Zabriskie*, as the housing providers select the specific criteria they wish to use, unlike the criteria dictated by the lender in *Zabriskie*.  *Id.*

consider any "record(s) found" by CrimSAFE, in contravention of what Plaintiffs claim to be required of housing providers after the April 2016 HUD Memorandum.

Likewise, in *Republic of Iraq v. ABB* AG, 920 F. Supp. 2d 517 (S.D.N.Y. 2013), the court considered a RICO claim against a bank that had set up and serviced an escrow account. *Id.* at 550. The plaintiff alleged that money was transferred out of the escrow account by a fraudulent actor (the U.N.). *Id.* In rejecting the case for lack of proximate cause, the court held that "because BNP released and accepted funds into the U.N. escrow account *at the UN's direction*, however, BNP's servicing of that account cannot have been the proximate cause of Iraq's injury . . . . Contingent relationships of this sort are too indirect to support [any] recovery." *Id.* (emphasis added). That is also true here, where RPS applied the CrimSAFE criteria selected by housing providers. AMF at ¶ 4.

Based on these standards, there can be no FHA liability, and certainly no liability as a matter of law, based on a lack of proximate cause. RPS did not "directly" cause any injury to Mr. Arroyo (or anyone else). Consider the following chain of "causation." CrimSAFE is an optional tool selected by housing providers that enables providers to input their criteria (*if any*) across the FBI's criminal categories. AMF at ¶ 4. Those providers then make any further decisions (*if any*) in light of the CrimSAFE report based on their leasing policies, which RPS did not create. *Id*. at ¶ 8. Any such decisions also are made only after the housing provider contractually pledged compliance with the FHA and was informed of the April 2016 HUD Guidance by RPS. AMF at ¶¶ 29, 31. There is no basis to claim that RPS's offering of the CrimSAFE software tool was the "direct" cause of any injury to applicants.

**B.**     <u>RPS is not an Agent of Housing Providers.</u>

Plaintiffs also weakly assert that RPS's "role is no different than a . . . traditional agent to whom a landlord might entrust tenant-selection decisions." (Pltfs' Mem. at p. 14.)  "The party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence."  RESTATEMENT (THIRD) OF AGENCY § 1.02(d).  Plaintiffs, however, do not present <u>any</u> factual support to establish that RPS is an agent of any customer.

As initial matter, a "relationship of agency always contemplates three parties – the principal, the agent, and the third party with whom the agent is to deal." RESTATEMENT (THIRD) OF AGENCY § 1.01(c).  There is, however, no "third-party with whom" RPS dealt.  Screening requests come from housing providers, and RPS responds directly to the housing provider.  RPS has no contact with applicants (*i.e.*, the "third party").  For this reason alone, any claim of alleged agency fails.

In addition to that threshold element, the three elements required to show the existence of an agency relationship include: "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking."  *Wesley v. Schaller Subaru, Inc.*, 277 Conn. 526 (2006).  All three elements are required for an agency relationship to exist.  *Id.*

With respect to the first element, there was no understanding that RPS would act on behalf of its housing provider customers with respect to any applications submitted.  There is no proof that any housing provider ever told any applicant that RPS was in control of the process.  Nor does such proof exist.  RPS screens for what is requested by housing providers.  RPS cannot take any decision on

applications submitted to providers or change any decision once made.  AMF at ¶ 35.  RPS also is not involved in formulating the leasing criteria used by its customers (*e.g.*, the Tenant Selection Policy used by WinnResidential).  *Id.* at ¶ 8. *Harlem River Consumers Co-op., Inc. v. Associated Grocers of Harlem, Inc.*, 408 F. Supp. 1251, 1271 (S.D.N.Y. 1976) (no evidence of the alleged principal intending to have another act as agent).

The second element of the agency analysis – a requirement that RPS agree to act as agent for its customers – fails as well.  RPS never accepted any agency status.  To the contrary, it was disclaimed.  RPS sets forth in its contracts that its relationship with housing providers is that of an "independent contractor."  AMF at ¶ 31.  *Kyung Sup Ahn v. Rooney, Pace Inc.*, 624 F. Supp. 368, 371 (S.D.N.Y. 1985) (finding that the principal disavowed an agency relationship and thus no agency existed).

The third element of an agency relationship – that RPS have agreed that housing providers can control its actions – is likewise absent.  WinnResidential has no input into the manner RPS collects data or categorizes the criminal records it collects.  AMF at ¶ 27.  RPS is a vendor to WinnResidential.[11]  That is all.

III.   **CRIMSAFE IS NOT A DECISIONING PRODUCT, MEANING THAT IT COULD NOT HAVE CAUSED ANY DISPARATE IMPACT.**

---

[11] There also would be no basis for a claim of "apparent authority."  "[T]o create apparent authority, the principal must manifest to the third party that he 'consents to have the act done on his behalf by the person purporting to act for him.'"  *Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir. 1989).  There is no allegation, let alone proof, that WinnResidential – or any other housing provider – made any claim that RPS was acting on the providers' behalf, whether to Mr. Arroyo or anyone else.

Plaintiffs also cite numerous cases involving real estate agents, property managers, and employers/employees.  (Pltfs' Mem. at pp. 14-16.)  Those situations have no analogue to the factual record here.

Statistical and causation failings aside, Plaintiffs' FHA claim is predicated on the premise that "if the CrimSAFE decision is adverse (*i.e.*, "record(s) found"), the applicant is denied admission." (Pltfs' Mem. at p. 1.)  That factual contention is critical to Plaintiffs' disparate impact theory, as without such a "decision" via CrimSAFE, the product would not generate any "impact" at all.  Plaintiffs, however, have fallen well short of proving that factual conclusion as a matter of law.

A.    <u>CrimSAFE is not Used to Make Automated Decisions, as Claimed.</u>

CrimSAFE is not designed to be used by housing providers as a decision-making tool.  That is true for numerous reasons.  First, the product was designed to not allow that functionality, as there is no way within the CrimSAFE product application to enter in a decision for an applicant.  AMF at ¶ 21.   Second, RPS's employees do not instruct housing provider customers to use CrimSAFE in this manner, instead consistently informing them that they need to consult with their own legal counsel as to how they should use the product.  *Id*. at ¶ 23.  Third, just days after the April 2016 HUD Memorandum was issued, RPS reminded its customers that CrimSAFE was a "categorization" tool and that HUD had emphasized the need to make criminal-record decisions on an individualized basis. *Id*. at ¶ 29.

Even more, despite sweeping generalizations about to how RPS's customers allegedly use the product, Plaintiffs generally failed to develop any evidence that providers in the market use CrimSAFE (or products like it) to make decisions on applications.  Instead, the unrebutted evidence demonstrates that the industry uses such products for a categorization and filtering function *and not decisioning*. AMF at ¶ 25.  For instance, based on his decades of experience, Mr. Kacirk testified:

> **Based on my experience, it is common and accepted practice in the industry that, when criminal record data is returned and/or a screening company applies criteria selected by the property to identify criminal records, the property staff will have a process for referring final decisions to a supervisor or other experienced staff member who can provide the case-by-case, individualized review of the specific nature, relationship, time periods and changed circumstances involved in each matter.  That is not a function delegated to third party vendors such as RPS, but it is instead the responsibility of housing providers. Indeed, if property management companies were to simply accept or deny applicants without individualized review, they would expose themselves to liability under well-known interpretative guidance of the federal Fair Housing Act, such as the April 2016 HUD Memorandum.[12]**

*Id*.  Accordingly, Mr. Kacirk opined that "RPS simply delivers a preliminary statement based on criteria selected by the property management company by comparing the criminal records against client-provided criteria.  That preliminary step does not alter the fact the housing decision is the responsibility of, and made by, the housing provider, not RPS.  The allocation of responsibility is a widely-accepted practice within the property management industry, including with respect to the use of categorization products such as CrimSAFE."  *Id*.

### B.    Plaintiffs' Memorandum Mischaracterized the Record.

Despite this ample record, Plaintiffs assert that the "undisputed evidence" shows that CrimSAFE is an "automated decision-making product to decline rental applications on behalf of its landlord clients."  (Pltfs' Mem. at p. 9.)  To make that claim, Plaintiffs generally cite to: (1) RPS marketing materials; (2) deposition testimony of former RPS employees; and (3) the testimony of WinnResidential.

---

[12] Plaintiffs assert that there is "no practical reason for a housing provider to ever spontaneously deviate from a CrimSAFE decision."  (Pltfs' Mem. at p. 12.)  Not so. Mr. Kacirk, for instance, articulates many such practical reasons.

**First**, with respect to marketing materials, Plaintiffs badly distort the record, taking highly-dated passages out of context and ignoring other passages.  Initially, Plaintiffs point to certain passages discussing how CrimSAFE "interprets" criminal records and "ensures consistent lease decisions."  *Id.* at 10.  As RPS's witnesses have consistently explained, that "interpretation" and "consistency" lies in the fact that CrimSAFE categorizes comparable records the same; it does not mean that every applicant with the same criminal history receives the same decision after further review.[13]   AMF at ¶ 22. The references in Plaintiffs' brief to a claimed "accept/decline" leasing decision via CrimSAFE, *see* Pltfs' Mem. at p. 10, also do not even track the language of the product or how it was used for Mr. Arroyo, stating only "record(s) found," while then also explicitly instructing providers to proceed with their "community's screening policies"; an express indication of the non-final nature of the application at that time.  *Id.* at ¶ 10.

The fact that RPS also provides a template adverse action letter to help facilitate housing provider compliance with the FCRA also does not mean that a decision has been reached through CrimSAFE.  (Pltfs' Mem. at p. 12.)  Whether the adverse action letter is eventually sent out is determined solely by the housing provider and not RPS.  AMF at ¶ 28.   Notably, the adverse action letter for Mr. Arroyo used by WinnResidential made clear that RPS "*did not* make the decision to take adverse action and [is] unable to provide specific reasons why adverse action was taken."  *Id.*

---

[13] The marketing materials cited by Plaintiffs were authored *before* the April 2016 HUD Memorandum and RPS's multiple subsequent follow ups to its customers, including specific follow up about CrimSAFE.

**Second**, with respect to the deposition testimony of former RPS employees, Plaintiffs present a slanted and partial view of the record.  Plaintiffs cite testimony from former RPS employees (Robert Thomas and Bagrat Bayburtian[14]).  *See* RPS's Local Rule 56(a)2 Statement of Facts Opp. Pls.' Mot. for Partial Summ. J. ¶ 4 ("OPMSJ").  Neither witness, however, had insight into how housing providers actually use the product.  *See* OPMSJ at ¶¶ 4, 7,  Plaintiffs also cite to the testimony of former employee Robert Lindenfelzer to state that CrimSAFE renders a "decision."  But, Plaintiffs then omit Mr. Lindenfelzer's testimony where he noted that his statement about a "decision" meant that "a record has been found by CrimSAFE that meets the criteria set up by the property," but that "ultimately the property is the one who makes the final decision."  OPMSJ at ¶ 4.

**Third**, Plaintiffs cite to the testimony of an employee of WinnResidential (Lynn Bora) who testified that she viewed the CrimSAFE product as rendering a "decision."  To begin, Plaintiffs have no testimony from any other customer to support their wide-ranging contention that RPS's customer base, *as a whole*, uses CrimSAFE in that manner.  It is pure speculation, whereas the record evidence of RPS regarding the market as a whole substantiates the conclusion that housing providers do not use categorization products like CrimSAFE in that way.  AMF at ¶ 25.  And, to the extent WinnResidential operated in that manner, that was *WinnResidential's* decision to do so in view of its interpretation of the contractual terms with RPS and its review of April 2016 HUD Memorandum, the corresponding

---

[14] Mr. Bayburtian left the company six years ago, well before the April 2016 HUD Memorandum and all subsequent bulletins, commentary, and training by RPS.

RPS bulletin sent to 260 of its employees, and the RPS training session led by Hudson Cook, LLP.[15]  AMF at ¶¶ 29, 31.

## IV.    CRIMSAFE FURTHERS NUMEROUS LEGITIMATE INTERESTS.

If a *prima facie* statistical disparate impact is shown, the "defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."  24 C.F.R. § 100.500(c)(2).  To qualify as such, the challenged practice need not be "essential" or "indispensable" to the defendant's business.  *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650-51 (1989).  And, when a practice implicates "public safety, [a court should] accord greater latitude to the employer's showing of job-relatedness and business necessity."  *Johnson v. City of Memphis*, 770 F.3d 464, 478 (6th Cir. 2014).

As set forth above, Plaintiffs have not met their burden to establish a *prima facie* case of disparate impact.  But even if the burden were to shift back to RPS to show a legitimate interest in the operation of CrimSAFE, RPS has met that burden.

### A.    The Legitimate Interests Advanced by CrimSAFE.

As a threshold matter, federal law _requires_ providers of subsidized housing to reject applicants previously evicted for drug activity or who are registered sex offenders, and to perform "necessary criminal history background checks in the State where the housing is located and in other States where the household

---

[15] To the extent that Plaintiffs wish to focus on WinnResidential, RPS welcomes that inquiry, as the defects in their statistical case are brought to the fore. WinnResidential operates their properties in large urban centers in Connecticut, where the percentage of the population that is African American or Latino is much higher than the state average.  Further, WinnResidential confirmed in discovery that the majority of its properties are subsidized/affordable, where the rates of African American and Latino occupancy are much higher than state population statistics.

members are known to have resided."  24 C.F.R. §§ 5.854, 5.856.  Criminal screening

is also expressly permitted to detect any other activity that would adversely affect

the "health, safety, or right to peaceful enjoyment of the premises."  42 U.S.C. §

13661(c).  These Congressionally-endorsed policies establish the legitimate nature

of RPS's business and the policy goals advanced by criminal screening.  *See, e.g.*,

*Glenn v. Fuji Grill Niagara Falls, LLC*, No. 14-CV-380S, 2016 U.S. Dist. LEXIS 51618,

at *21 (W.D.N.Y. Apr. 18, 2016) (a court "cannot second-guess" a "legislative policy

decision") (quoting *Millea v. Metro-North R.R.*, 658 F.3d 154, 167 (2d Cir. 2011)).

These legitimate interests, however, are more than a matter of legislative

pronouncement.  They are well grounded in fact.  The safety of the residents and

their personal property is an important business justification behind the policy, and

prior contact with the justice system is one of the most predictive characteristics

available.  The federal Bureau of Justice Statistics ("BJS") conducted a nine-year

study that found that 83% of released prisoners are arrested again within nine

years, with an average of five rearrests per released prisoner.[16]  AMF at ¶ 12;

OPMSJ at ¶¶ 95, 97; BJS, 2018 Update on Prisoner Recidivism: A nine-year Follow-

up Period (2005-2014) (May 2018).  Moreover, not only is criminal history predictive

of criminal behavior, studies have shown that people are victimized most often at

or near their homes.  The BJS found that between 2004 and 2008, 18% of violent

---

[16] The Court can take judicial notice of these studies.  *Zollicoffer v. Livingston*, 169
F. Supp. 3d 687, 691 (S.D. Tex. 2016) ("The Court takes judicial notice of the BJS
reports and other government reports and websites cited in this Order.").
    These figures are also, of course, *underinclusive*, as specific recidivism
rates of prior offenders can only be tracked for crimes that: (1) are reported; *and*
(2) are then definitively linked back to a specific prior offender.  However, as these
studies also recognize, many crimes are never reported and/or not solved.

victimizations took place in the home, another 16% took place near the home, and an additional 9% took place at a friend's, neighbor's, or relative's home.  AMF at ¶ 13;  BJS – Location (2008).

Within this broader context, RPS's CrimSAFE product provides numerous benefits to help property managers implement their criminal screening processes in an efficient, objective, and workable manner.  CrimSAFE filters and categorizes thousands of unique criminal offenses into the substantive categories designated by the FBI, thereby lessening the chance that a criminal record is misinterpreted by on-site leasing staff, who generally lack training to perform such legal research tasks.  AMF at ¶ 16.  CrimSAFE also ensures that applicants with similar criminal histories have offenses categorized in the same way using objective criteria, thereby reducing the prospect for explicit or implicit discrimination.  *Id*. at ¶ 15.

B.    <u>Plaintiffs' Attacks on These Legitimate Purposes Lack Merit.</u>

Plaintiffs cannot dispute that background screening is favored as a matter of policy or that CrimSAFE offers many practical benefits for housing providers. Instead, Plaintiffs are left to claim that RPS has not set forth a legitimate business purpose because CrimSAFE allows for "non-conviction" records to be identified for up to seven years, and also because CrimSAFE allows for providers to search for conviction records without time limitation.  (Pltfs' Mem. at p. 26.)

As an initial matter, Plaintiffs' attack on the legitimacy of the product – like all of its arguments – hinges on the contention that CrimSAFE "bans" individuals. *Id*. at 25, 27.  For the reasons set forth above, that is not how the product is designed, how the industry uses these types of products, or consistent with the contractual terms, training, and bulletins sent to RPS to its customer base.

Turning to the arguments themselves, the claim that it is "illegitimate" for RPS to identify non-conviction records for seven years and conviction records without limitation is foreclosed by statute.  15 U.S.C. § 1681c – which is the federal statute addressing criminal reporting for tenancy – permits screening reports to reflect criminal records during these precise time periods: seven years for non-convictions and no time limit for convictions.  Congress considered this exact issue, and it made the decision to permit the very limitations Plaintiffs now challenge.  Plaintiffs cannot use litigation to claim as "illegitimate" the reporting procedures endorsed by the United States Code.  Federal courts "are not at liberty to second-guess congressional determinations and policy judgments," even if Plaintiffs claim them as "debatable or arguably unwise."  *Torraco v. Port Auth.*, 615 F.3d 129, 145 (2d Cir. 2009) (quoting *Eldred v. Ashcroft*, 537 U.S. 186, 208 (2003)).[17]

To be clear, however, there is abundant research supporting CrimSAFE's return of non-conviction offenses for seven years and conviction offenses without time limitation.[18]  Plaintiffs' own "expert" testified that, even based on a limited review of the few/narrow/dated studies cited in her report, there is a statistically significant difference in the rate of re-arrest during a seven-year period (or more) after the time of a prior arrest.  AMF at ¶ 14; OPMSJ at ¶ 96.  Notably, Mikhail

---

[17] Plaintiffs attempt to mount an attack on these provisions by citing to federal cases invalidating *state* statutes on *Constitutional* grounds.  (Pltfs' Mem. at pp. 27-28.)  15 U.S.C. § 1681c is a federal statute and there is no claim it is unconstitutional.
[18] Again, despite this concession by their own expert, Plaintiffs try and distort the record by saying Mr. Kacirk stated arrest records have no value, *see* Pltfs' Mem. at p. 26, including by omitting his testimony that providers have an interest in seeing "pending charges" because "it could affect the tenancy of someone on the verge of incarceration" and that non-convictions "could be reviewed as part of the process" to assess risk, so long as they were then individually reviewed by the housing provider, as is standard in the industry.  OPMSJ at ¶ 92.

Arroyo's pending charge was less than two years old at the time he applied, putting it well within the timeframe recognized even by Plaintiffs' expert. *See* OPMSJ at ¶ 51.

Furthermore, the U.S. Department of Justice recently released in 2018 a nationwide, nine-year study on 400,000 individuals who were previously convicted. Among other things the 2018 study concluded follows:

- 83% of all released convicts were rearrested within nine years;

- 47% of prisoners who did not have an arrest within three years were rearrested within years four through nine;

- "Longer follow up periods show substantial declines in apparent desistance";

- "99% of prisoners who were arrested during the 9-year follow-up period were arrested for an offense other than a probation or parole violation," including high percentages of prior offenders that were rearrested for violent, property, and drug crimes; and

- "25% of released prisoners were still actively involved in criminal activity and were arrested during year 9, which could be viewed as inviting an even longer period of review."[19]

---

[19] **Notably, Plaintiffs' expert further admitted at her deposition that this was the most comprehensive and national study of recidivism that knew of, but that she had not reviewed this study when authoring her report because she was not aware of it until it was identified to her by her counsel the night before the deposition.**

**This nationwide federal study also stands in _marked contrast_ to the far-more-limited and dated studies cited by Plaintiffs' expert, which involved: (1) a review of arrest data from New York state only for individuals arrested in 1980 and then re-arrested in state (Blumstein, *et al.*, 2009); (2) males born in Philadelphia in 1958 and re-arrested in Philadelphia (Kurlycheck, *et al.* 2006); (3) a study of 411 males in London who were first interviewed in 1961-62 (Farrington, *et al.*, 2018). Plaintiffs' expert also conceded that nationwide data on recidivism is preferred and superior.**

**Finally, to be clear, Plaintiffs' "exert" report is flawed, unpersuasive, and will be the subject of a forthcoming Daubert motion if this case persists. For now, however, detailing certain admissions from the report are sufficient.**

AMF at ¶ 12; OPMSJ at ¶¶ 95-99.  Recidivism is a well-documented with no identified end point.

Further, Plaintiffs' focus on statistics is itself too narrow.  Statistics alone fail to illuminate the dramatic consequences of, for instance, even one violent crime and its effect on the well-being of residents of a community.  Plaintiffs' expert also admitted that companies are justified in taking precautions against even low probability events when the consequences can be so serious,[20] as is the case when discussing personal safety in people's homes.  *See* AMF at ¶ 13; OPMSJ ¶¶ 95-99.

Moreover, Plaintiffs ignore the "*business*" prong of the substantial business justification.  *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1261-62 (6th Cir. 1981) (the identified practice should "promote the proficient operation of the business").  For example, Plaintiffs fail to acknowledge that "ignoring criminal history . . . exposes [housing providers] to potential liability for criminal and fraudulent acts" on their premises.  *EEOC v. Freeman*, 2013 U.S. Dist. LEXIS 112368, at *3, 53 (D. Md. Aug. 9, 2013); *see also e.g.*, *Peterson v. Kings Gate Partners - Omaha I, L.P.*, 290 Neb. 658, 660 (Neb. 2015).  As RPS's expert noted, the "failure to conduct such screenings can lead to substantial liability that can threaten the financial viability of properties . . . . Criminal record screening is thus an important step in ensuring that housing communities can remain solvent and provide quality housing to the public at large."  The materials cited by Plaintiffs' own expert also note that entities "conduct background checks on applicants . . . to minimize loss and legal liability from negligent [screening]."  *See* OPMSJ at ¶¶

---

[20] This is, of course, the whole premise behind the insurance market.

95-99.  Plaintiffs' expert further conceded that she is aware of no law that would protect housing providers from lawsuits for failing to review for criminal history beyond a certain date.  AMF at ¶ 19.

V.    **PLAINTIFFS HAVE NOT PROVEN ANY LESS DISCRIMINATORY ALTERNATIVES, INCLUDING BECAUSE RPS ALREADY ACTS IN A MANNER PROPOSED BY PLAINTIFF AS "LESS DISCRIMINATORY."**

After a defendant has shown a legitimate business interest for their facially neutral practice, the burden shifts to the Plaintiffs to show that there is a "less discriminatory alternative."  24 C.F.R. § 100.500(c)(3).  "[A] less discriminatory alternative must serve the respondent's or defendant's substantial, legitimate nondiscriminatory interests, must be supported by evidence, and may not be hypothetical or speculative."  *Mhany Mgmt. v. Cnty. of Nassau*, No. 05-cv-2301, 2017 U.S. Dist. LEXIS 153214, at *8 (E.D.N.Y. Sept. 19, 2017).  Plaintiffs fail that test.

A.    **The Less Discriminatory Alternatives Identified in Discovery Warrant Judgment in Favor of RPS.**

Plaintiffs offered in discovery (and then repeatedly reaffirmed) only two "less discriminatory" alternatives for RPS in connection with CrimSAFE: (1) that RPS should return the underlying criminal record(s) with a CrimSAFE result; or (2) that RPS should conduct an "individualized assessment" of the applicant's situation in connection with any "record(s) found" through CrimSAFE.  The Court can end its inquiry with the first suggestion,[21] because RPS *already makes available* the

_____

[21] Because discovery has conclusively disproven this contention, Plaintiffs only briefly mention this alternative to claim that "by limiting access to this information [to an administrator], [RPS] makes it impossible or at least impracticable for housing providers to do a case-by-case assessment."  (Pltfs' Mem. at p. 32.)  Not so.  Many CrimSAFE users do not at all limit the detail of the underlying record(s) to on-site leasing staff.  And, even those providers that do enact that such an administrative setting have access to the full version of the report through a simple

underlying criminal record with every CrimSAFE result, just as it did for Mr. Arroyo. AMF at ¶¶ 9, 38.  Since this supposed "less discriminatory alternative" is already in place (and has been since before this case), Plaintiffs' disparate impact claim is moot.

Plaintiffs' second suggestion is equally impractical and hypothetical.  The suggestion is impractical because RPS does not have insight into the majority of the information that would lead to a leasing decision.  RPS receives an applicant's identifying information. AMF at ¶ 2.  RPS then returns data about the offense to the housing provider, which includes data regarding the date the offense was committed, its severity level, and its current status, so that the provider can make an assessment.  *Id*. at ¶¶ 5, 10.  But, RPS does not receive any other information about the applicant and has no insight into an applicant's personal story or circumstances, such that RPS could then undertake the type of subjective review proposed by Plaintiffs.  *Id*. at ¶ 2.  Plaintiffs do not even try and practically explain how their proposal – which would radically reposition the background screening industry in a way not envisioned by the April 2016 HUD Memorandum – would work.

There also is no evidence that properties would even allow RPS to act in the manner advanced by Plaintiffs.  Hence, the claimed "alternative" is entirely speculative and thus insufficient. *E.g.*, *Allen v. City of Chicago*, 351 F.3d 306, 313-14 (7th Cir. 2003) ("Without any evidence that the officers' alternative of increasing

---

hyperlink sent to the designated administrator at the time of reporting.  It is instantly accessible.  RPS also places no restrictions on who that designated administrator further shares the report with at the property.

merit promotions would lead to a workforce substantially equally qualified, we cannot accept the officers' alternative as substantially equally valid.").

    **B.**    <u>**Plaintiffs' Newly-Proposed Alternatives Are Precluded Under Rule 37(c) and Are Without Merit.**</u>

As noted above, Plaintiffs proffered two less discriminatory alternatives mentioned above during discovery and in their Rule 30(b)(6) deposition.  Those responses were never amended or supplemented and discovery closed months ago.  Now, however, for the very first time, Plaintiffs attempt to introduce in their brief two brand new theories of what they consider to be less-discriminatory alternatives: (1) that RPS should not consider non-conviction information; and (2) that it should place a "reasonable, evidence-based cap on the lookback period," except for subsidized properties where such a cap would not be allowed under federal law.  (Pltfs' Mem. at p. 29.)  Those previously-undisclosed theories are precluded at this juncture under Rule 37(c), and they also lack merit.

    **i.**    <u>**Plaintiffs Cannot Advance Their New, Undisclosed Theories.**</u>

Rule 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Rule 26(e)(1) states:

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response in a timely manner . . . .

That burden applies to a party's failure to disclose "information," as well as any related legal "theories" and argument based on those facts, including responses

to contention interrogatories.[22]  *See, e.g., Agence France Presse v. Morel*, 293 F.R.D. 682, 686 (S.D.N.Y. 2013) (granting motion to strike: "Unaware of the damage theory Plaintiff is newly asserting now, Defendants would have had no reason to conduct discovery sufficient to defend against that theory.").

Plaintiffs never disclosed these new "alternatives" during the discovery process, and they instead confirmed the two theories they were relying on at multiple points during discovery.  AMF at ¶ 47.  Hence, this is worse than non-disclosure.  This is attempted *misdirection*.  There is no "substantial justification" for such a violation of the rules, and the fact that the two disclosed "alternatives" were either already undertaken by RPS or undeveloped in discovery does not allow Plaintiffs to try and change position at the eleventh hour.  *See, e.g., Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004) (the purpose of the Federal Rules "is to prevent the practice of 'sandbagging' an opposing party").

### ii.   Plaintiffs' New Alternatives Lack Merit.

If the two new "alternatives" advanced by Plaintiffs could even be properly considered at this stage, they would still falter on numerous grounds.

First, Plaintiffs' assertion that "making decisions on arrests . . . has no business justification" is false.  (Pltfs' Mem. at p. 25.)  Even Plaintiffs' expert admitted based on her review of select studies that prior arrests are statistically meaningful to assess recidivism for seven years (or longer), which is consistent with Congress's seven-year allowance. AMF at ¶ 14; OPMSJ at ¶ 95. Plaintiffs also

---

[22] "While a continuance is always theoretically possible to reopen discovery on these new theories, the closure of discovery weighs against a continuance." *Henderson v. Wells Fargo Bank, N.A.*, No., 05-cv-2301, 2017 U.S. Dist. LEXIS 24083, *13 (D. Conn. Feb. 21, 2017).  The parties are months past the close of discovery.

rely on the April 2016 HUD memorandum to argue that arrest information is not a "reliable basis upon which to assess potential risk," but their own expert admits to the contrary.[23]

Second, Plaintiffs assert that because "old" convictions "are not relevant to current risk," Pltfs' Mem. at p. 26, RPS should impose a "reasonable, evidence-based cap on the lookback period" for convictions. *Id.* Ironically, Plaintiffs do not provide any "evidence-based" specificity across any of the CrimSAFE categories of crimes, instead simply proposing to categorically limit reporting any conviction for a period of only seven years. (Pltfs' Mem. at p. 29.) That proposal, however, runs counter to the seminal nine-year study on recidivism, where the BJS found that "longer follow up periods show substantial declines in apparent desistance" and that "25% of released prisoners were still actively involved in criminal activity and were arrested <u>during year 9</u>, which could be viewed as inviting an even longer period of review." AMF at ¶ 12. A seven-year period would not capture these crimes. Plaintiffs expert also was unable to specify what she thought was an "evidence-based" lookback period for any particular CrimSAFE category of crime, which only underscores the flimsy nature of this "alternative." AMF at ¶ 14..

Finally, as noted above, Plaintiffs' "alternatives" fail to account for legitimate business considerations at RPS. Plaintiffs would require RPS to take an unquantified risk of reoffending for arrestees and prior convicts when the fact of

---

[23] This "General Counsel Memorandum" is not entitled to *Chevron* deference, and is only entitled to deference "to the extent that [it is] persuasive." *AmBase Corp. v. United States*, 731 F.3d 109, 121 m. 12 (2d Cir. 2013). The April 2016 HUD Memorandum does not provide any statistical basis for this statement. Therefore, the April 2016 HUD Memorandum has no such persuasive value on this point.

recidivism is clear.  Under Plaintiffs' view, therefore, RPS could never identify to a potential landlord a pending offense for an individual who may be shortly incarcerated and unable to pay rent.  RPS also could not identify any conviction beyond a seven-year period, despite nationwide criminology studies that show a longer period of heightened recidivism with no established end point.  AMF at ¶ 12; OPMSJ at ¶¶ 95-99.  Plaintiffs also continue to say nothing about the practical, legal risk to housing providers of negligent screening lawsuits in such contexts by willfully ignoring criminal history, regardless of its nature, frequency, etc.  And, Plaintiffs fail to present *any evidence* that any customer would continue to do business with RPS if RPS were to implement these tight proposed reporting limits. Indeed, common sense dictates that they would likely sever business ties with RPS and use another provider.

Simply put, Plaintiffs' hypothetical, discredited, and business-destroying proposals – which are also contrary to Congressional policy on criminal record reporting – are in no way legitimate "alternatives" to RPS's current practices.

## VI.   THE DERIVATIVE CUTPA CLAIM FAILS, INCLUDING BECAUSE RPS ENCOURAGES FHA COMPLIANCE BY ITS CUSTOMERS.

Plaintiffs' CUTPA claim in Count VI is generally derivative of their FHA claim, and it thus fails for the reasons set forth above.  (Pltfs' Mem. at pp. 32-39.)  Plaintiffs also assert that RPS has violated the CUTPA by "facilitating housing providers' discrimination," *id.* at 39, when the record actually supports the opposite conclusion based on RPS's encouragement of FHA compliance.

To prevail on the CUTPA claim Plaintiffs must prove that RPS "engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce."

*Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc.*, 296 Conn. 315, 350 (2010).  "A claim under CUTPA requires that the defendant's conduct be the proximate cause of harm to the plaintiff."  *Riverview East Windsor, LLC v. CWCapital LLC*, No.10cv872, 2012 U.S. Dist. LEXIS 3311, at *8 (D. Conn. Jan. 10, 2012).

Plaintiffs' CUTPA claim first fails because there is no factual basis to claim that RPS acted unfairly or deceptively towards Plaintiffs.  There is no allegation that RPS "deceived" Plaintiffs in connection with the identified file disclosure request or how the CrimSAFE product operates, or that RPS treated Mr. Arroyo "unfairly" in the tenant screening process when compared to any other similarly-situated consumers.  The pending offense identified for Mr. Arroyo also was in every way accurate.  OPMSJ at ¶ 51.  To the extent Plaintiff alleges RPS's CrimSAFE categories were too restrictive or should have somehow been structured differently, such a claim does not provide a cause of action under the CUTPA.  *See, e.g., Citibank (S.D.) N.A. v. Osagie*, No. CV106004637, 2012 Conn. Super. LEXIS 1186, at *9 (2012) ("CUTPA does not prohibit businesses within this state from making decisions as to how they conduct business.").  In fact, even Plaintiffs admit they have no basis to claim that CrimSAFE is somehow "immoral, unethical or oppressive" – factors in proving "unfairness" or "deception" – which alone precludes their ability to seek judgment on this claim.  (*See* Pltfs' Mem. at p. 33 n. 23.)

Second, while Plaintiffs contend that RPS has violated the "policy" of the State of Connecticut through the way that CrimSAFE operates, including based on the proffered "less discriminatory alternatives" set forth above, Plaintiffs fail to acknowledge that a 2019 legislative proposal to "limi[t] criminal records lookback

45

period that a landlord may use when evaluating the housing application of a prospective tenant," was defeated in the Connecticut state legislature.  CT. S.B. No. 54 (2019).  Thus, it is _not Connecticut's policy_ to restrict screening in the manners proposed by Plaintiffs.  It is _Plaintiffs'_ position that has been rejected.

Third, for the many reasons set forth above, Plaintiffs cannot prove a violation of the FHA.  Thus, their derivative CUTPA claims necessarily fail.

Fourth, the factual record demonstrates that RPS does not "facilitate" any discriminatory conduct by housing providers.  Instead, the record supports only the opposite conclusion.  RPS requires its customers to comply with the FHA under the terms of its contracts.  AMF at ¶ 31.  Also, in the immediate aftermath of the April 2016 HUD Memorandum, RPS took numerous, proactive steps to inform its customer base of the guidance, summarize the guidance, and encourage legal review.  _Id._ at ¶ 29.

Finally, for the reasons above in Section II.A, Plaintiffs cannot establish proximate cause, which also independently defeats their CUTPA claims.  *Riverview East Windsor, LLC*, 2012 U.S. Dist. LEXIS 3311, at *8.

## CONCLUSION

For the foregoing reasons, Defendant, CoreLogic Rental Property Solutions, LLC, requests that the Court deny Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,


**/s/ Daniel W. Cohen**
**Daniel W. Cohen (Bar No. CT 30467)**
**TROUTMAN SANDERS LLP**
**875 Third Avenue**
**New York, NY 10022**
**Telephone:  (212) 704-6000**
**Facsimile:  (202) 704-6288**
**Email:  dan.cohen@troutman.com**

**Timothy J. St. George,** *Pro Hac Vice*
**TROUTMAN SANDERS LLP**
**1001 Haxall Point**
**Richmond, VA 23219**
**Telephone:  (804) 697-1254**
**Facsimile:  (804) 698-6013**
**Email:  timothy.st.george@troutman.com**

**47**