UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **CARMEN ARROYO,** *et al.*,<br><br>        -v-<br><br>**CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC,** | Case No. 3:18-cv-00705-VLB |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

TROUTMAN SANDERS LLP
875 Third Avenue
New York, NY 10022

**Oral argument not requested**

CoreLogic Rental Property Solutions, LLC ("RPS"), by counsel, states as follows for its reply in support of its Motion for Summary Judgment. (Dkt. No. 112.)

This need for judgment here is straightforward. First, there can be no race-based disparate treatment when the race of the applicant was unknown to the defendant. In that context, there also cannot be any "inference" of racial animus.

Second, when making the claim that CrimSAFE disparately impacts minority applicants, Plaintiffs were required to develop the demographics of the applicant pool. Plaintiffs chose not to do so. Thus, under binding authority, their claim fails.

Third, tenant screening furthers legitimate and Congressionally-endorsed policies, and CrimSAFE is a tool that helps housing providers implement their screening policies. RPS also already undertakes one of Plaintiffs' proposed "less discriminatory alternatives," which defeats their disparate impact claim. Plaintiffs cannot attempt to change their legal contentions at this juncture to avoid that fact.

Fourth, Plaintiffs do not dispute that the decision to deny access to Mr. Arroyo's file was due to the defects in the documents submitted. It also is undisputed that no other conservators have been identified as being denied. While Plaintiffs disagree with the rigor with which RPS complied with the FCRA's mandate to require "proper identification," there is no basis to assert a willful violation of the FCRA, which requires the type of binding judicial/regulatory guidance that indisputably does not exist here. Also, because there is no proof that WinnResidential would have admitted Mr. Arroyo upon receipt of his file, his FCRA "negligence" and FHA "reasonable accommodation" contentions also fail.

Fifth, Plaintiffs' claim under the CUTPA fails, as it is derivative of their other flawed claims and because RPS complies with Connecticut public policy.

Finally, the CFHC's damages claims fail for lack of attributability to RPS or any proven need. Ms. Arroyo also has no standing in her individual capacity.

### RESPONSE TO COUNTER STATEMENT OF FACTS

The facts of this case on which RPS has moved for summary judgment are *not actually in dispute*. For instance, there is no dispute: (1) as to how CrimSAFE works; (2) that housing providers select the CrimSAFE criteria they wish to use; (3) that the full details of any identified record are sent to the property (just as they were for Mr. Arroyo); (4) RPS was unaware of Mr. Arroyo's race; (5) Plaintiffs have no evidence at all of the demographics of the applicant pools; (6) recidivism is a well-documented fact for prior offenders; (7) Ms. Arroyo was denied a copy of Mr. Arroyo's file ████████████████████████ based on the deficiencies in the documentation she submitted; (8) Plaintiffs have no evidence that WinnResidential would have admitted Mr. Arroyo if provided a copy of Mr. Arroyo's file; (9) the vast majority of the CFHC's claimed "diversionary" damages have nothing to do with RPS; (10) there is no proof from any housing provider that the CFHC's hypothetical advertising campaign to tell housing providers to comply with preexisting FHA law is necessary; (11) the CFHC was already compensated through grants for the damages it seeks here; or (12) all actions taken by Ms. Arroyo implicating RPS were done solely in her capacity as Mr. Arroyo's conservator. While page limits prevent a line-by-line response, the record in this regard is well documented.

Against these facts, Plaintiffs' brief is replete with attempts to claim that CrimSAFE is a "decisioning" product, such that it is governed by the FHA. While that issue is not implicated by RPS's arguments supporting summary judgment, that claim is inaccurate. For instance, if a record is identified, RPS notes that there

2

has been a "record(s) found," with the message that the housing provider should further "proceed with [its] community's screening policies." See Dkt. No. 112-3 at ¶ 8; 112-4, Ex. C at ARROYO000642. Further, when using RPS's software application on which the CrimSAFE product runs, the housing provider must navigate to another section of the application to manually enter any leasing decision. *See* Dkt. No. 128-2 (Def's Statement of Additional Material Facts ("AMF")) at ¶ 21. It cannot do so through CrimSAFE. The housing industry also does not use CrimSAFE as a decisioning tool. *Id.* at ¶ 23. All of these points are detailed at length in RPS's opposition to Plaintiffs' Motion for Summary Judgment, and RPS incorporates those citations and arguments by reference. And, the remainder of the "facts" Plaintiffs claim are disputed are addressed in the sections that follow.

## ARGUMENT

**I.   PLAINTIFFS' RACE-BASED FHA CLAIMS IN COUNT I MUST BE DISMISSED.**

**A.   There can be no "Circumstantial Case" of Disparate Treatment.**

"Proof of discriminatory animus is crucial for a disparate treatment claim." *Tuman v. VL Gem LLC*, No. 15cv7801, 2017 U.S. Dist. LEXIS 28140, at *8-9 (S.D.N.Y. Feb. 27, 2017). RPS did not know Mr. Arroyo's race before this lawsuit was filed. Thus, it could not have formed an intent to discriminate against him based on race.

In response, Plaintiffs argue that the Court can "infer" animus based on "circumstantial" proof, including because RPS's policies cause a "disparate impact." (Pltfs' Opp. at p. 27.) For the reasons below, Plaintiffs have not proven any disparate impact. In any event, that attempted conflation of disparate impact and disparate treatment has been uniformly rejected. *See, e.g.*, *Zawacki v. Realogy Corp.*, 628 F. Supp. 2d 274, 281 n.4 (D. Conn. 2009) (rejecting such conflation

3

"because it provides a means for the Plaintiff to avoid establishing the subjective intent requirement for her disparate treatment claim").

      B.     **Statewide Data Cannot be Used as Plaintiffs' *Prima Facie* Case.**

"In a typical disparate impact case *the proper population for analysis is the applicant pool*." *Chin v. Port Auth. Of N.Y, & N.J.*, 685 F.3d 135, 152 (2d Cir. 2012) (emphasis added). Plaintiffs were thus required to develop statistical evidence of the applicant pool. But they have not done so. Instead, they made the decision to rely on statewide data, which has no relation to the applicant pool, and to then advance that statewide data as their proof. *See* Dkt. No. 128-2 (Def's AMF) at ¶ 44.

The Second Circuit has *unequivocally rejected* Plaintiffs' approach, holding that evidence of the applicant pool is essential in the housing context. *Ungar v. N.Y. City Hous. Auth.*, 363 Fed. Appx. 53, 56 (2d. Cir. 2010) (affirming summary judgment: "To know whether [the regulation] has disparate impact on Hasidic Jews, we would need to know, at a minimum, the percentage of the approximately 80,000 people who apply for public housing each year that is Hasidic. Because plaintiffs have not provided this information, they failed to establish a *prima facie* case of discrimination."). While Plaintiffs cite inapposite and out-of-circuit cases to avoid this requirement, *Ungar* is on directly point.

The three arguments that Plaintiffs make to try and avoid that statistical requirement are unavailing. **First**, they cite authority where a defendant did not have the applicant pool data and where the defendant's "external communications . . . discouraged [applicants] from applying due to an awareness of the policy in question." *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund*, 388 F. Supp. 3d 145, 170 (E.D.N.Y. 2019). However, Plaintiffs present *no evidence* from anyone

4

(including Mr. Arroyo) to support the notion that anyone was "discouraged" from applying to WinnResidential, or any other property, due to an awareness of RPS's screening practices.  Moreover, it is undisputed that CrimSAFE ████████ ██████████████████████, which further undercuts any notion that it would "deter" applicants.  *Paige v. N.Y. City Hous. Auth.*, No. 17cv7481, 2018 U.S. Dist. LEXIS 39168, at *10 (S.D.N.Y. Mar. 9, 2018) ("Plaintiffs offer no evidence that families with young children . . . were dissuaded from renting with NYCHA.").[1]

<u>Second</u>, Plaintiffs attempt to mischaracterize the <u>many</u> cases where general population statistics were deemed insufficient, arguing that "rental units" are "unlike specialized jobs" where proof of the applicant pool would be necessary. (Pltfs' Opp. at p. 11.)  That is incorrect.  In *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650-51 (1989), the job was a cannery operation employing manual laborers.  Also, in *Ungar*, the Second Circuit considered a regulation in the context of housing available to the public, but it refused to allow use of statistics regarding the Jewish population in Brooklyn on the whole.  363 Fed. Appx. at 56.  Both cases addressed opportunities available to the public without specialized requirements.

Regardless, Plaintiffs again fail to appreciate the narrow nature of RPS's business and its customers' operations.  To have been "affected" by CrimSAFE, the individual must: (1) be applying for rental housing; (2) at a large, multi-family rental complex served by RPS; (3) the rental complex to which the individual

---

[1] The cases cited by Plaintiffs are easily distinguishable.  For example, in in *EEOC v. Joint Apprenticeship Comm.*, 186 F.3d 110 (2d Cir. 1999), the employer's "recruitment announcements stated in bold capital letters that 'ALL APPLICANTS MUST MEET THE FOLLOWING MINIMUM QUALIFICATIONS IN ORDER TO QUALIFY,' with age and education being the first two qualifications listed."  *Id.* at 119.  Nothing of the sort is present here.

5

applied must have elected to purchase CrimSAFE; and (4) in many instances the applicant must further meet the income requirements for subsidized housing.

Given that context, Plaintiffs do not address the facts that demonstrate that statewide data is not representative of the relevant (and narrow) applicant pools, including that: (1) less than one-third of Connecticut citizens rent their homes, let alone rent in the small percentage of multi-family communities that use RPS's services; (2) approximately only one million citizens of Connecticut's 3.57 million citizens live outside of even its 10 most populous cites,[2] which is where RPS's customers generally operate, and which have much higher percentages of African Americans and Latinos than the state as a whole; and (3) despite making up a large portion of RPS's client base, only 5.4% of all housing units in Connecticut are affordable, where the percentage of African American and Latino occupants are much higher than state averages (*e.g.*, 44% or higher). *See* Def's Add. Facts at ¶¶ 68-69, attached hereto; Dkt. No. 128-2 (Def's AMF) at ¶ 46. Indeed, the percentages of the African American/Latino populations in the major Connecticut cities and in affordable housing both are *higher* than the ▮▮▮ figure identified by Plaintiffs as their percentage of "records found" through CrimSAFE. Dkt. No. 128-6, Ex. D at pp. 1-2. These more relevant figures suggest that *there is no disparate impact*.

---

[2] **Plaintiffs appear to suggest that RPS should have identified the specific geographic locations of complexes using CrimSAFE. (Pltfs' Opp. at p. 10 n. 6.) But, Plaintiffs made clear at all points in discovery – including in verified Interrogatory responses and a Rule 30(b)(6) deposition – that they were relying on statewide statistics. *See* Dkt. No. 112-7, Ex. B at 256:22-251:1 ("Q: [So] the relevant [state and national] statistics for purposes of establishing the claim for disparate impact are set forth in the Complaint.  A:  Yes."). Further, Plaintiffs *moved for summary judgment* on the basis of their statewide data, which belies their attempt to now claim they were litigating a case on the basis of any geographic-specific theories.**

6

**Third**, Plaintiffs assert that RPS "operates statewide so statewide statistics are appropriate." (Pltfs' Opp. at p. 13.) But the Second Circuit has rejected attempts to use even <u>citywide</u> statistics in lieu of applicant pool data. *E.g.*, *Brown v. Coach Stores*, 163 F.3d 706, 713 (2d Cir. 1999) (New York City "statistics shed no light" on the disparity); *Ungar*, 363 Fed. Appx. at 56.

### C. CrimSAFE Advances Numerous Legitimate Interests

███████████████████████████████████████████████████████████

███████████████████████████████████████████████ *See* Dkt. No. 112-3 at ¶¶ 15-16. Without a product like CrimSAFE, the categorization and filtering of those records would be left to individual leasing agents; a subjective task that would be rife with error. *Id.* at ¶ 17.

Plaintiffs do not dispute these basic points, instead arguing that CrimSAFE does not further legitimate interests in three ways. <u>First</u>, Plaintiffs state that they are not barred from arguing against the legitimacy of CrimSAFE because "federal law only requires screening for two categories of offenses." (Pltfs' Opp. at p. 2.) But criminal screening is permitted to detect <u>any</u> activity that could affect the "health, safety, or right to peaceful enjoyment of the premises." 42 U.S.C. § 13661(c). CrimSAFE is entirely consistent with these Congressionally-endorsed policies. *Millea v. Metro-North R.R.*, 658 F.3d 154, 167 (2d Cir. 2011).

<u>Second</u>, Plaintiffs argue that CrimSAFE does not serve legitimate interests with respect to its categorization of "arrests" or "older convictions." (Pltfs' Opp. at p. 17.) But federal law permits RPS to allow its customers to view seven-year old non-conviction records and conviction records of unlimited age. 15 U.S.C. § 1681c. Federal courts "are not at liberty to second-guess congressional

7

determinations and policy judgments," even if Plaintiffs claim them as "arguably unwise." *Torraco v. Port Auth.*, 615 F.3d 129, 145 (2d Cir. 2009) (quoting *Eldred v. Ashcroft*, 537 U.S. 186, 208 (2003)).

To be clear, however, there is abundant research supporting the benefits of allowing housing providers to choose to view non-conviction offenses for seven years and conviction offenses without time limitation. Plaintiffs' expert testified that, even based on a limited review of the few/dated studies in her report, there is a significant difference in the rate of re-arrest during a seven-year period (or more) after the time of a prior arrest. *See* Dkt. No. 128-2 (Def's AMF) at ¶ 14. Furthermore, the U.S. Department of Justice recently released in 2018 a nationwide, nine-year study on 400,000 individuals who were previously convicted. Among other recidivism findings, the 2018 study concluded that 83% of all released convicts were rearrested and that "25% of released prisoners were still actively involved in criminal activity and were arrested during year 9." *See* Dkt. No. 112-3 at ¶ 59.

Plaintiffs' focus on statistics also is itself too narrow. Statistics alone fail to illuminate the dramatic consequences of even one crime and its effect on the well-being of residents of a community. Moreover, Plaintiffs ignore the "<u>business</u>" prong of the test. For example, Plaintiffs fail to acknowledge that "ignoring criminal history . . . exposes [housing providers] to potential liability for criminal and fraudulent acts" on their premises. *EEOC v. Freeman*, No. 09cv2573, 2013 U.S. Dist. LEXIS 112368, at *3, *53 (D. Md. Aug. 9, 2013).

<u>Third</u>, Plaintiffs argue that RPS's claimed interests are not legitimate because CrimSAFE reports do not contain any of the "categorization information that CrimSAFE claims as its main benefit." (Pltfs' Opp. at p. 20.) That argument is

8

a *non-sequitur* with respect to the benefits identified by RPS. RPS does not have to explicitly display the CrimSAFE category that a record falls into in order to achieve the benefits described above. A CrimSAFE category is only triggered when a record meets the providers' objective criteria for identification, which is a benefit of the product. *See* Dkt. No. 112-3 at ¶¶ 5, 8, 12, 13, 17. Plaintiffs' argument also completely misses the *filtering* aspect of CrimSAFE. ███████████ ████████████████████████████████████████████████ ████████ which means that CrimSAFE saves landlords time and also *reduces any impact* of criminal record screening.

        D.      **Plaintiffs Have Not Proven any Less Discriminatory Alternatives.**

        i.      **Plaintiffs' Disclosed Alternatives**

Plaintiffs offered in discovery only two "less discriminatory" alternatives: (1) RPS should "suppl[y] the underlying criminal record to the housing provider" with a CrimSAFE result; or (2) RPS should conduct an "individualized assessment" of the applicant. *See* Dkt. No. 112-3 at ¶ 66. Plaintiffs do not seriously dispute that the first "alternative" is already in place,[3] but they nonetheless have been intent on pursuing this claim. They now appear to contend that RPS should "supply the underlying information, *along with any helpful categorization information*." (Pltfs' Opp. at p. 24) (emphasis added). But that is a brand-new argument, and they

---

[3] Because discovery has conclusively disproven this contention, Plaintiffs only briefly mention this fact to claim that "by limiting access to this information [to an administrator], [RPS] makes it impossible or at least impracticable for housing providers to do a case-by-case assessment." (Pltfs' Opp. at p. 24.) Incorrect. Many CrimSAFE users do not at all limit the detail of the underlying record(s) to on-site leasing staff. And, even those providers that do enact such an administrative setting have access to the full version of the report through a simple hyperlink.

cannot alter their factual liability theories at this juncture. *Agence France Presse v. Morel*, 293 F.R.D. 682, 686 (S.D.N.Y. 2013). As noted above, stating the category also is not necessary to achieve the many benefits of the product. And in any event, it is unstated how stating the category would reduce any "disparate impact."

Plaintiffs' second suggestion is impractical. RPS only electronically receives basic identifying information on applicants. *See* Dkt. No. 112-3 at ¶ 1. RPS does not receive any other information about the applicant and has no insight into an applicant's personal story or circumstances, such that RPS could then undertake the type of subjective review proposed by Plaintiffs. *Id.* at ¶¶ 2-3. Plaintiffs do not even try to practically explain how their proposal – which would radically reposition the screening industry in a way not envisioned by the April 2016 HUD Memorandum – would work. Plaintiffs have provided no evidence that properties would allow RPS to act in the manner they suggest. *Allen v. City of Chicago*, 351 F.3d 306, 313-14 (7th Cir. 2003) ("Without any evidence that the officers' alternative of increasing merit promotions would lead to a workforce substantially equally qualified, we cannot accept the officers' alternative.").

  ii. <u>**Plaintiffs' Undisclosed Alternatives**</u>

As noted above, Plaintiffs proffered the two less discriminatory alternatives set forth above in discovery. Now, however, Plaintiffs also argue: (1) RPS should not report "non-conviction" information; or (2) RPS should place a "reasonable, evidence-based cap on the lookback period." (Pltfs' Opp. at pp. 21-22.)

Initially, those new factual claims are precluded under Fed. R. Civ. P. 37(c), which provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or

10

**witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." There is no "substantial justification" for such a clear violation of the rules.** *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004).

**Further, these new assertions are belied by facts.** <u>First</u>, **Plaintiffs' assertion that "making decisions on arrests . . . has no business justification" is false. (Pltfs' Opp. at p. 25.) Even Plaintiffs' expert admitted that prior arrests are statistically meaningful to assess recidivism for seven years (or longer).** *See* **Dkt. No. 128-2 (Def's AMF) at ¶ 14; Dkt. No. 128-6, Ex. I at pp. 228-29.**

<u>Second</u>, **Plaintiffs assert that because "old" convictions "are not relevant to current risk," Pltfs' Opp. at p. 21, RPS should impose an "evidence-based cap on the lookback period" for convictions.** *Id.* **Ironically, Plaintiffs propose no such "caps." Their proposal, however, runs counter to the seminal nine-year study on recidivism, where 25% of offenders were still committing crimes in year nine.** *See* **Dkt. No. 112-6, Ex. E at p. 1. A seven-year period would not capture these crimes.**

<u>Finally</u>, **as noted above, Plaintiffs' "alternatives" fail to account for legitimate business considerations. Plaintiffs say nothing about the practical, legal risk to housing providers of negligent screening lawsuits in such contexts by willfully ignoring criminal history, regardless of its nature, frequency, etc. or the fact that housing providers would likely cease business with RPS if it were to simply impose limitations not undertaken by its many competitors and not required by law.**

**II.    <u>PLAINTIFFS' DISABILITY-BASED FHA CLAIMS IN COUNTS II AND III FAIL.</u>**

**A.    <u>There is no Proof of Disability Animus</u>**

**RPS has provided voluminous documentation showing that the decision not to provide Mr. Arroyo's file to Ms. Arroyo was due to the "proper identification"**

11

requirement under the FCRA and the deficiencies in the documents she submitted. Dkt. No. 112-3 at ¶¶ 44-46, 49-52.  Plaintiffs never addressed their claim of disparate treatment, thus conceding there was no animus.  *Velez v. GE Health & Disability Ben. Ctr.*, No. 98cv1159, 2000 U.S. Dist. LEXIS 803, at *22 (S.D.N.Y. Jan. 31, 2000).

### B. There Cannot be a Discriminatory Impact of One Person.

Plaintiffs cannot identify a single other individual under a conservatorship that was allegedly denied a consumer file from RPS.  Dkt. No. 112-3 at ¶ 45.  That is fatal to their claim, as there cannot be a disparate impact of one.  *Reidt v. Cty. of Trempealeau*, 975 F.2d 1336, 1341 (7th Cir. 1992).  Plaintiffs argue that disparate impact is still possible because RPS's file disclosure "policy" of denying file disclosure requests to conservators will "predictably result" in a disparate impact. (Pltfs' Opp. at p. 40.)  But, there is no such policy.  *Id.* at ¶¶ 37-39. Moreover, as to the "potential" future occurrences, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████.  *Id.* at ¶ 39.

### C. Plaintiffs' "Reasonable Accommodation" Claim Fails.

Plaintiffs' "reasonable accommodation" claim fails because there is no proof that WinnResidential would have admitted Mr. Arroyo if RPS gave his consumer file to Ms. Arroyo, and also because Ms. Arroyo's request was not reasonable.

As to the first issue, Plaintiffs claim that there is "ample evidence" to conclude that WinnResidential would have admitted Mr. Arroyo upon access to his file. (Pltfs' Opp. at p. 32).  But that statement has no foundation.  There is absolutely no evidence from WinnResidential to support such a claim.  *See* Dkt. No. 112-3 at ¶ 62.  The *only* discovery taken of WinnResidential was a deposition of one

corporate executive that was *noticed by RPS* on other topics, where the witness knew nothing about Mr. Arroyo's situation.  All inferences also indicate that the disclosure would have made no difference.  See *id.* at ¶ 29.

Second, for the reasons set forth in Section III.B below, there was nothing reasonable about the request to accept the legally-deficient documentation.

III.   RPS IS ENTITLED TO JUDGMENT ON THE ASSERTED FCRA CLAIMS.

  A.   Plaintiffs have Shown no Damages Based on RPS's Conduct.

Without proof that RPS's refusal to provide Ms. Arroyo with a copy of Mr. Arroyo's file caused Mr. Arroyo damages, Mr. Arroyo's claim under the FCRA must fail.  Mr. Arroyo has stated that his damages in this regard are predicated on the contention that he "was [un]able to use that [file disclosure] information to persuade [WinnResidential] to overlook [Mr. Arroyo's] criminal history," Dkt. No. 87 at p. 17, which is explicit speculation that cannot survive summary judgment.

In light of that lack of proof, Plaintiffs now attempt to shift their focus, stating that the "time" spent by Ms. Arroyo in seeking the file and her related "mental annoyance" constitutes "her" injuries.  (Pltfs' Opp. at p. 30.)  But, the FCRA claim is plead only by *Mr. Arroyo*.  Ms. Arroyo did not assert this claim and she cannot claim damages now.  Moreover, no damages relating to claimed time expenditures and emotional distress are actionable under the FCRA when there is no proof that the outcome sought by the consumer would have materialized.  See, e.g., *Dutta v. State Farm*, 895 F.3d 1166, 1176 (9th Cir. 2018) ("[The] Beasley Declaration makes clear that the existence of the [undisputed negative credit information] . . . alone disqualified Dutta from continuing in the [employment] program.  That fact made

13

all of the inaccuracies or explanations Dutta wanted to present to State Farm [regarding the disputed aspects of his consumer credit report] immaterial.").

### B. No "Willful" Violation of the FCRA in Counts IV and V is Possible.

As set forth in RPS's opening brief, a defendant's interpretation of the FCRA can only be a "willful" violation when the relevant FCRA text is nothing short of "pellucid," or else when binding "courts of appeal" or the overseeing agencies have offered "authoritative guidance" that "might have warned it away from the view it took." *Safeco Ins. Of Am. v. Burr*, 551 U.S. 47, 69 (2007). Those are the <u>only</u> proper guideposts for a willfulness determination; none of which would have placed RPS "on notice" that it supposedly must provide a copy of a consumer's file to a third party based upon a facially-deficient conservatorship certificate.

Plaintiffs point to dated and out-of-circuit mortgage cases where the lack of a seal was not held to be dispositive. (Pltfs' Opp. at p. 36 n.28.) That inapposite, non-binding precedent cannot support a claim for willfulness. *Safeco*, 551 U.S. at 69. It also has no application in this case, where the face of the conservatorship form states that the impressed seal is required for validity. Finally, that authority is itself debatable. *See, e.g.*, *Friedrich v. APAC-Georgia, Inc.*, 595 S.E.2d 620, 622 (Ga. Ct. App. 2004) ("[T]he notary's purported attestation of the genuineness of the signatures was not valid, if for no other reason, because the guaranty did not contain a notary's seal.").[4] Further, even if a court did deem the certificate valid, that does not mean that RPS's employees acted with "reckless disregard" here.

---

[4] Mr. Arroyo also asserts that RPS "could have used [the incomplete certificate's contents] to verify her conservatorship," *see* Pltfs' Opp. at p. 36, but it is not RPS's statutory responsibility to unearth "proper identification." *See Ogbon v. Beneficial Credit Servs., Inc.*, No. 10 Civ. 3760, 2013 WL 1430467, at *9 (S.D.N.Y. Apr. 8, 2013).

14

## VI. THE DERIVATIVE CUTPA CLAIM FAILS.

Plaintiffs' CUTPA claims are derivative of their failed claims above, meaning they must also be dismissed.  Additionally, while Plaintiffs contend that RPS has violated the "public policy" of Connecticut through the way CrimSAFE operates, including based on the proffered "less discriminatory alternatives" set forth above, Plaintiffs fail to acknowledge that a 2019 legislative proposal to "limi[t] criminal records lookback period that a landlord may use when evaluating the housing application of a prospective tenant," was defeated in the Connecticut state legislature.  CT. S.B. No. 54 (2019).  Thus, RPS complies with Connecticut policy.

Further, with respect to its file disclosure practices, the undisputed record shows that there is no policy to deny file disclosures to court-appointed guardian and file disclosures also have no connection to "trade or commerce." *See* Dkt. No. 128-3 at ¶¶ 38-39. Instead of engaging in any analysis, Plaintiffs requote this Court's motion to dismiss, where the Court did not dismiss the CUTPA claim on the basis of the *allegations* that RPS's "[file] disclosure policy stems from its relationship with WinnResidential."  (Pltfs' Opp. at p. 46.)  *Discovery* has proven that to be false. The file disclosure claim is a function of statute independent from any commercial relationship maintained by RPS, including with WinnResidential.  It is also entirely free.  And, for the reasons set forth above in Section III(A), Mr. Arroyo also has no provable damages as to his file disclosure claim, which defeats his CUTPA claim.

## V. THE CFHC'S COMPENSATORY DAMAGES CLAIMS MUST BE DISMISSED.

### A. The CFHC's "Frustration of Mission" Damages are not Recoverable.

The proposed $300,000-$350,000 campaign to educate housing providers about the FHA fails on multiple grounds.  Initially, frustration of mission damages

15

are not compensable when no "educational effort was ever implemented." *Fair Hous. Concl. v. Montgomery Newspapers*, 141 F.3d 71, 77 (3d Cir. 1998). And, while Plaintiffs vaguely claim to have "consulted with an advertising agency to cost out a marketing campaign," Pltfs' Opp. at p. 50, such generalized statements of future action are deficient. *Vaughn v. Consumer Home Mortg. Co.*, 297 Fed. Appx. 23, 26 (2d Cir. 2008) (future injury under the FHA requires "concrete plans").[5] Indeed, allowing such unsubstantiated claims to proceed would deprive RPS of its due process rights to examine the validity of such damages before trial. *See, e.g.*, *Shalomi v. Western Techs., Inc.*, 2:04cv168, 2007 U.S. Dist. LEXIS 30232, at *13 (D. Nev. Apr. 24, 2007) ("[Plaintiffs'] failure to provide a damages calculation and supporting documentation precludes admission of this type of evidence at trial.").

Moreover, such damages are not recoverable absent actual proof that a campaign is actually "necessary to counterbalance the effects of a defendant's discriminatory practices." *See, e.g.*, *Fair Hous. of Marin v. Combs*, No. 97-1247, 2000 U.S. Dist. LEXIS 4737, at *12-13 (N.D. Cal. Mar. 29, 2000). That is utterly lacking here. <u>There is no proof from any customer at all</u>. The only discovery taken of any RPS customer by Plaintiffs was their passive participation in the deposition of one WinnResidential employee. But, even WinnResidential's testimony underscores the *lack* of any such need. More than 250 individuals at WinnResidential already received RPS's bulletin about the 2016 HUD Memorandum, and WinnResidential also already received the related training that was provided by RPS about that

---

[5] The one case cited by Plaintiffs in support of their contention that such future campaigns are recoverable, *S. Cal. Hous. Rights Ctr. v. Krug*, 564 F. Supp. 2d 1138, 1153 (C.D. Ca. 2007), contains no analysis and simply references testimony from trial not detailed in the opinion. It is thus not possible to compare it to this case.

Memorandum.  *See* Dkt. No. 128-3 at ¶ 19. WinnResidential also has its own legal and compliance department and testified it takes FHA compliance very seriously.

      **B.**    <u>**The CFHC's "Diversion of Resources" Damages Are Insufficient.**</u>

In its opening memorandum, RPS identified that the vast majority of the $82,639 in claimed "diversion of resource" damages have nothing to do with RPS. The CFHC does not substantively respond, stating only that the "CFHC has established some of its damages," which it claims makes summary judgment premature.  (Pltfs' Opp. at p. 47.)  In making that argument, the CFHC limits its response to the $9,447 in claimed damages on the "CoreLogic" tab, thus effectively conceding judgment as to the other five tabs.  Yet, even as to the CoreLogic tab, the CFHC does not address that the $9,447 in identified damages relate principally to its litigation against WinnResidential or the fact that it already received a more-than-offsetting recovery of ████ through the settlement of that action.

      **C.**    <u>**The CFHC's Claimed Compensatory Damages Have Been Offset.**</u>

The CFHC admits it sought out grants to counteract the claimed effect of CrimSAFE, that the grant proposals identified RPS as the need for more resources, that the CFHC claims the time spent seeking those grants as damages, and that it was awarded $380,000.  The CFHC, however, argues that this recovery was from a "collateral source."  (Pltfs' Opp. at p. 52.)  The CHFC's argument misunderstands the effect of those grants.  The basis of the CFHC's compensatory damages claims is that it has had to "divert its scant resources to confront [RPS's] discriminatory actions." (Compl. ¶ 19.)  But the issue is not that the grants came from a "collateral source."  The import of the grants is that they disprove the factual predicate upon which the CFHC's damages are based.  No CFHC resources have actually been

17

diverted to "confront" RPS's conduct, at the alleged expense of other endeavors. Instead, those activities have been fully funded. Therefore, the claim fails.[6]

## VI. MS. ARROYO DOES NOT HAVE STANDING TO SUE INDIVIDUALLY.

Ms. Arroyo has brought four claims in her "individual" capacity. In their opposition, Plaintiffs said nothing about Ms. Arroyo's inability to serve as a Plaintiff under the CUTPA, conceding the point. Instead, Plaintiffs focus their opposition only on the claim that she qualifies as an "aggrieved person" under the FHA because Mr. Arroyo incurred costs by not being allowed to move in with Ms. Arroyo and because of her inability "to live with whom she pleased." (Plts' Opp. at p. 53.)

To have standing under the FHA, a plaintiff must have "suffered an actual injury," and that injury must be within the "zone of interests" that the FHA protects. *Eastampton Ctr., LLC v. Twp. of Eastampton*, 155 F. Supp. 2d 102, 114 (D.N.J. 2001). The monetary costs identified were incurred by <u>Mr. Arroyo</u>,[7] who also seeks those same damages, even if Ms. Arroyo paid them voluntarily on his behalf. Thus, they do not provide standing. *Mobile Med Support Servs. v. United States*, No. 3:98cv1029, 2000 U.S. Dist. LEXIS 15564, at *7 (D. Conn. Sept. 12, 2000) ("[W]here a party voluntarily pays the money, he is without remedy"). Moreover, courts have rejected a "lack of companionship" and related emotional distress damages as falling outside of the zone of interests protected by the FHA. *Wartluft v. Milton Hershey Sch. & Sch. Trust*, 400 F. Supp. 3d 91, 102-03 (M.D. Pa. 2019).

---

[6] *Valley Housing LP v. City of Derby*, No. 06cv1319, 2011 U.S. Dist. LEXIS 57714 (D. Conn. 2011), which is cited by Plaintiffs, does not alter this conclusion. In that case, the "collateral source" was a loan that had to be repaid. *Id.* at *7.

[7] For that same reason, Ms. Arroyo does not have standing under the CUTPA, which requires an "ascertainable loss of money." Conn. Gen. Stat. § 42-110g.

18

**Respectfully submitted,**


**/s/ Daniel W. Cohen**
**Daniel W. Cohen (Bar No. CT 30467)**
**TROUTMAN SANDERS LLP**
**875 Third Avenue**
**New York, NY 10022**
**Telephone: (212) 704-6000**
**Facsimile: (202) 704-6288**
**Email: dan.cohen@troutman.com**

**Timothy J. St. George,** *Pro Hac Vice*
**TROUTMAN SANDERS LLP**
**1001 Haxall Point**
**Richmond, VA 23219**
**Telephone: (804) 697-1254**
**Facsimile: (804) 698-6013**
**Email: timothy.st.george@troutman.com**