**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **CONNECTICUT FAIR HOUSING CENTER and CARMEN ARROYO, individually and as next friend for Mikhail Arroyo,** | |
| **Plaintiffs,** | **Case No. 3:18-CV-00705-VLB** |
| **v.** | |
| **CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC,** | |
| **Defendant.** | |

**DEFENDANT CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC'S
MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO EXCLUDE THE EXPERT WITNESS REPORT OF LILA KAZEMIAN**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................... 1

LEGAL STANDARD ...................................................................................... 1

ARGUMENT .................................................................................................. 2

    **I.**    Dr. Kazemian's report is not a proper rebuttal report ......................... 2

    **II.**   Dr. Kazemian's opinions regarding the utility of background
          checks and the length of time that crimes are predictive of
          future offenses cannot supplant Congress's carefully-
          balanced reporting structure. ................................................................ 5

        **A.**    Dr. Kazemian's Opinion No. 1 regarding overall violent
             crime rate trends and certain reasons for reincarceration
             are irrelevant ................................................................................ 5

        **B.**    Opinion No. 2 addressing the claimed "shortcomings"
             of the background screening process have no relevance
             to this case. ................................................................................. 6

        **C.**    Opinion No. 3 addressing the ethnic composition of the
             criminal justice system is irrelevant ........................................... 7

        **D.**    Opinion No. 4 about the claimed utility of reporting
             records beyond certain time periods is foreclosed
             Congressional policy and law. ..................................................... 8

        **E.**    Opinion No. 5 regarding the claimed "stigmatizing
             impact" of a criminal record is irrelevant to any issue in
             this case. ...................................................................................... 9

    **III.**   Dr. Kazemian's overarching conclusions about recidivism are
          not reliable ............................................................................................ 10

        **A.**    Dr. Kazemian's recidivism studies are not benchmarked
             against the general population, do not account for the
             location of crimes, and only support the CrimSAFE
             Settings selected by WinnResidential with respect to Mr.
             Arroyo's application for housing. ............................................... 11

        **B.**    Dr. Kazemain's refusal to set forth any specific
             "lookback" period that she claims RPS should have
             adopted renders her opinions unreliable .................................. 14

CONCLUSION ............................................................................................ 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Amtrak,*
    303 F.3d 256 (2d Cir. 2002) ............................................................. **2**

*Associated Elec. Gas Ins. Servs. v. Babcock & Wilcox Power*
   *Generation Group, Inc.,*
    No. 3:11cv715, 2013 U.S. Dist. LEXIS 152775 (D. Conn. Oct. 24,
    2013)............................................................................................... **4**

*Calhoun v. Yamaha Motor Corp., U.S.A.,*
    350 F.3d 316 (3d Cir. 2003) ............................................................. **7**

*Colon v. BIC USA, Inc.,*
    199 F. Supp. 2d 53 (S.D.N.Y 2001) ............................................... **14**

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC,*
    No. 3:18cv705, 2020 U.S. Dist. LEXIS 11867 (D. Conn. Jan. 24,
    2020)............................................................................................... **7**

*Crowley v. Chait,*
    322 F. Supp. 2d 530 (D.N.J. 2004) ................................................. **4**

*Daubert v. Merrell Dow Pharma.,*
    509 U.S. U.S. 579, 590 (1993)....................................................... **2, 5**

*Davidov v. Louisville Ladder Group, LLC,*
    2005 U.S. Dist. LEXIS 3117, No. 02-Civ-6652, 2005 WL 486734
    (S.D.N.Y. Mar. 1, 2005) ................................................................. **12**

*Ebbert v. Nassau Cnty.,*
    No. 5-5445, 2008 U.S. Dist. LEXIS 74213 (E.D.N.Y. Sept. 26, 2008) ...................... **4**

*Fed. Hous. Fin. Agency v. Nomura Holding Am.,*
    No. 11cv6201 ............................................................................ **12, 14**

*Frederick v. Deco Salon Furniture, Inc.,*
    No. 3:16cv60.................................................................................. **5**

*Glenn v. Fuji Grill Niagara Falls, LLC,*
    No. 14cv380S, 2016 U.S. Dist. LEXIS 51618 (W.D.N.Y. Apr. 18,
    2016)............................................................................................... **9**

*Negrete v. Allianz Life Ins. Co.*,
   No. 05-6838, 2013 U.S. Dist. LEXIS 176313 (C.D. Ca. Dec. 9, 2013)...................... 4

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
   135 S. Ct. 2507 (2015) ................................................................................... 8

*Travelers Property & Cas. Corp. v. Gen. Elec. Co.*,
   150 F. Supp. 2d 360 (D. Conn. 2001)............................................................. 2

*In re Trusts Established under the Pooling & Servicing Agreements*,
   No. 1998, 2020 U.S. Dist. LEXIS 47847 (S.D.N.Y. Mar. 19, 2020)..................... 6, 14

*Tsombanidis v. W. Haven Fire Dep't*,
   352 F.3d 565 (2d Cir. 2003) ........................................................................... 8

*Wills v. Amerada Hess Corp.*,
   379 F.3d 32 (2d Cir. 2004) ............................................................................. 14

**Statutes**

15 U.S.C. § 1681c(a)(2) ...................................................................................... 9

42 U.S.C. § 13661(c) .......................................................................................... 8

**Other Authorities**

Fed. R. Civ. P. 702 ............................................................................................. 11

Fed. R. Evid. 702................................................................................................ 2, 11

Rule 26(a)(2)(C)(ii) ............................................................................................. 4

Rule 26(a)(2)(D)(ii) ............................................................................................. 4

Rule 26(f)........................................................................................................... 3

CoreLogic Rental Property Solutions, LLC ("RPS"), by counsel, submits this memorandum of law in support of its Motion to Exclude the Expert Witness Report of Dr. Lila Kazemian.

## INTRODUCTION

Dr. Lila Kazemian served a "rebuttal" expert report in this case.  Yet, she did not rebut any of the expert opinions of RPS's expert witness (Jay Kacirk).  In fact, she did not even mention Mr. Kacirk's opinion in her rebuttal report, let alone address his contentions regarding the intent behind CrimSAFE's use, the structure of the application process and how it works, CrimSAFE's numerous categorization and filtering benefits, or how housing providers customarily providers use CrimSAFE and like products.  Nor could Dr. Kazemian have done so, as she has no experience in the multi-family housing industry.  Hence, her report was not, in fact, a rebuttal report and must be excluded as untimely.

With respect to the report itself, Dr. Kazemian claims to "present evidence from social science research to assess the public safety risk posed by individuals with criminal histories."  See Exhibit A, Expert Report of Dr. Lila Kazemian, at p. 1.  Yet, that "research" – which is completely divorced from any documents, testimony, or facts in this case – is irrelevant to the claims asserted, has no relation to the housing industry, takes positions that are contrary to binding Congressional statutes and policies regarding criminal background screening, and/or is so unreliable as to warrant exclusion.  For the reasons below, each of the opinions offered by Dr. Kazemian must be excluded.

## LEGAL STANDARD

The Federal Rules of Evidence assign to the trial court the task of performing

a "gatekeeping" function with respect to the admission of expert testimony.  *See, e.g.*, Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 (trial judges have "the responsibility of acting as gatekeepers to exclude unreliable expert testimony").  Rule 702, in turn, "establishes a standard of evidentiary reliability" and "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility."  *Daubert v. Merrell Dow Pharma.*, 509 U.S. U.S. 579, 590 (1993).

In determining the admissibility of expert testimony, the Supreme Court has adopted a two-step inquiry under which trial judges must determine "whether the reasoning or methodology underlying the [expert's] testimony is . . . valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue."  *Id.* at 592-93.  Specifically, the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597; *accord Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002).

The admissibility of an expert's proposed opinion "must be established by a preponderance of the evidence . . . and the burden of demonstrating that the testimony is competent, relevant, and reliable rests with the proponent of the testimony."  *Travelers Property & Cas. Corp. v. Gen. Elec. Co.*, 150 F. Supp. 2d 360, 363 (D. Conn. 2001).

## ARGUMENT

### I.  Dr. Kazemian's report is not a proper rebuttal report.

Dr. Kazemian was identified as a "rebuttal" expert by Plaintiffs, and her report was served three months after the agreed-upon deadline for the exchange of opening reports.  Her report, however, does not rebut Mr. Kacirk's opinions.  In

fact, Mr. Kacirk's report is *not even mentioned* within Dr. Kazemian's report.

The parties' Rule 26(f) Report, which the Court adopted in its September 27, 2018 Scheduling Order, directed the parties to designate trial experts and produce corresponding reports on any issues on which they "bore the burden of proof" by January 15, 2019.  (Dkt. No. 22.)  The Parties subsequently agreed to an extension of that deadline until April 15, 2019.  Rebuttal reports were agreed to be exchanged in July, which is when Plaintiffs served Dr. Kazemian's report.

On April 15, 2019, RPS served the expert report of Mr. Kacirk.  In that report, Mr. Kacirk described how the multi-family housing industry customarily uses CrimSAFE, as well as the many practical benefits that are provided by CrimSAFE during the screening process.  He also described the non-discriminatory intent behind why housing providers use CrimSAFE and products like it.

In his fourteen-page report, Mr. Kacirk mentioned that federal regulations, HUD guidance, and industry customs favor criminal background screening due to concerns of tenant property and physical "safety," *see* <u>Exhibit B</u>, Expert Report of Jay Kacirk, but those few statements about safety were made to provide the context for industry use and intent.  He did not opine about statistical recidivism, the ethnic composition of the criminal justice system, the accuracy of screening reports, recidivism trends, national crime rates, or national housing policy, *i.e.*, the divergent subjects that comprise Dr. Kazemian's report.

Dr. Kazemian has no experience in the tenant screening or multi-family housing industry. *See* <u>Exhibit C</u>, Deposition of Dr. Lila Kazemian, September 23, 2019, 8:5-8.  Therefore, she has no experience by which to "rebut" any of Mr. Kacirk's opinions.  And, due to total that lack of experience, *none* of Dr. Kazemian's

3

opinions are responsive to Mr. Kacirk's opinions about industry customs, industry intent, or the practical benefits of CrimSAFE.

The proper scope of a "rebuttal" report is limited to an actual rebuttal of the opinions offered by an opening expert. *See, e.g., Ebbert v. Nassau Cnty.*, No. 5-5445, 2008 U.S. Dist. LEXIS 74213, at \*40 (E.D.N.Y. Sept. 26, 2008) ("Rule 26(a)(2)(C)(ii) allows the admission of rebuttal [expert] testimony that is intended *solely to contradict or rebut evidence on the same subject matter identified by another party* . . . . A rebuttal expert report is not the proper place for presenting new arguments.") (emphasis added); *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (rebuttal expert testimony "is not an opportunity for the correction of any oversights in the plaintiff's case in chief."). If a party strays beyond those limits, then the report must be excluded. *Associated Elec. Gas Ins. Servs. v. Babcock & Wilcox Power Generation Group, Inc.*, No. 3:11cv715, 2013 U.S. Dist. LEXIS 152775, \*17 (D. Conn. Oct. 24, 2013) ("Dr. Cammett's report is not proper rebuttal under Rule 26(a)(2)(D)(ii), as it appears to introduce a new theory into the case, namely that shot may fracture into grit. This theory does not rebut statements made in any of defendant's experts' reports."); *Negrete v. Allianz Life Ins. Co.*, No. 05-6838, 2013 U.S. Dist. LEXIS 176313, \*74 (C.D. Ca. Dec. 9, 2013) (excluding "rebuttal" reports on the grounds that they "do not rebut the testimony of any Allianz experts").

Dr. Kazemian did not submit a rebuttal report because she did not address any of the industry-based conclusions reached by Mr. Kacirk and did not mention Mr. Kacirk's opinions in her own expert report. Accordingly. Dr. Kazemian's report should be excluded.

II.    **Dr. Kazemian's opinions regarding the utility of background checks and the length of time that crimes are predictive of future offenses cannot supplant Congress's carefully-balanced reporting structure.**

Dr. Kazemian's report not only fails to rebut Mr. Kacirk's, it also does not constitute proper expert testimony.  The "fit" prong of *Daubert* requires that the proffered expert opinion logically advance a material aspect of the proponent's case.  *Frederick v. Deco Salon Furniture, Inc.*, No. 3:16cv60; 2018 WL 2750319, at *3 (D. Conn. Mar. 27, 2018) ("Relevance can be expressed as a question of "fit"— whether . . . it will aid the jury in resolving a factual dispute.").  The opinions offered by Dr. Kazemian do not meet that standard.

A.    **Dr. Kazemian's Opinion No. 1 regarding overall violent crime rate trends and certain reasons for reincarceration are irrelevant.**

In Opinion No. 1, Dr. Kazemian opines about the overall rate of violent crime in the United States and certain reasons why offenders can be reincarcerated.  Ex. A, at p. 2.  None of that policy testimony is relevant to any issue in this case.

Principally, Dr. Kazemian states that many offenses are non-violent.  On that basis, she contends that a criminal history does "not necessarily imply persistent or violent offending." *Id.*  That conclusion is not linked to any aspect of CrimSAFE's "records found" reporting, the structure of which accounts for distinctions that housing providers wish to make between categories of crimes (both non-violent and violent) within the FBI's National Incident Based Reporting System categories.  Dr. Kazemian's opinions regarding "violent" offenses also are too narrow, as non-violent property offenses also are relevant to a housing provider's maintenance of a peaceful community that is a desirable place for tenants to live.  As HUD has noted, "[e]nsuring resident safety *and protecting property* are often considered to

5

be among the fundamental responsibilities of a housing provider, and courts may consider such interests to be both substantial and legitimate."[1]

Regardless, Dr. Kazemian's opinions are not tied to any CrimSAFE metrics, structure, or use.  For instance, she admits that she did not review any of the reporting metrics produced by RPS regarding its customers' CrimSAFE settings or the output of the numerous data queries that Plaintiffs requested from RPS in discovery, which detail the historical rates of "records found" through CrimSAFE across offenders, property locations, and crimes. <u>Ex. C</u>, 23:18-24:18.   Dr. Kazemian's abstract and theoretical policy conclusions are irrelevant to this case. *In re Trusts Established under the Pooling & Servicing Agreements*, No. 1998, 2020 U.S. Dist. LEXIS 47847, *108 (S.D.N.Y. Mar. 19, 2020) ("Hartzmark's opinions are legally irrelevant because he offers only abstract theoretical opinions that are untethered to the actual evidence in this case.").

    **B.**    <u>**Opinion No. 2 addressing the claimed "shortcomings" of the background screening process have no relevance to this case.**</u>

In Opinion No. 2, Dr. Kazemian identified the claimed "error" rates of criminal screenings, which is a field that Dr. Kazemian has no actual experience in, and with respect to a "study" by a private plaintiff's law firm that was not peer reviewed and that did not even address RPS's products.  <u>Ex. A</u>, at pp. 2-3.

Regardless, as this Court held in denying Plaintiffs' motion to compel information regarding the accuracy of RPS's matching logic, assertions about the

---

[1] **"Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions," https://www.hud.gov/sites/documents/HUD_OGC GuidAppFHAStandCR.pdf at pp. 4-5 (April 4, 2016) (emphasis added).**

accuracy of screening reports have no relevance here.  *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, No. 3:18cv705, 2020 U.S. Dist. LEXIS 11867, \*12-13 (D. Conn. Jan. 24, 2020) ("The accuracy of [RPS's] algorithm's matching of criminal records to rental applicants is not at issue. The reported criminal offense record for Mr. Arroyo was accurate: the record was Mr. Arroyo's, and the record contained an accurate criminal proceeding status.  The accuracy of the algorithm's matching of criminal records is not relevant to the claims.").

The remainder of Opinion No. 2 focuses on "inaccurate presumptions" that "landlords and property managers . . . may choose to solely rely on" with respect to criminal records identified by RPS.  <u>Ex. A</u>, at p. 3.  Dr. Kazemian, however, has no qualifications to testify to those irrelevant "presumptions," having no experience in the screening or housing industry. <u>Ex. C</u>, 8:5-8.  *See, e.g., Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322–23 (3d Cir. 2003) (witness was not qualified to testify about relative safety of jet ski models, because he had no education or experience in those matters).

    **C.**    <u>**Opinion No. 3 addressing the ethnic composition of the criminal justice system is irrelevant.**</u>

In Opinion No. 3, Dr. Kazemian provided certain statistics about the ethnic composition of the national justice system, which lead her to opine that "banning individuals with a criminal record from securing safe and affordable housing has a disproportionately adverse effect on African American and Latinos males." <u>Ex. A</u>, at p. 4.

CrimSAFE does not "ban" applicants.  Regardless, this opinion – which has no relation whatsoever to Mr. Kacirk's testimony – is untimely, as Plaintiffs

indisputably bear the burden of proof on any *prima facie* showing of disparate impact, *see, e.g., Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574-75 (2d Cir. 2003), meaning that any expert testimony in this regard was due by April 15, 2019 and her testimony in this regard must be excluded as untimely.

Moreover, even if timely, none of the data Dr. Kazemian cites in Opinion No. 3 originates from Connecticut, which is the only state relevant to Plaintiffs' claim of disparate impact.  Even more, she made no effort to link that national data to the facts of RPS's reporting, the relevant applicant pools, or any of the limited markets in Connecticut where RPS operates.

These fatal failings are addressed at length in the simultaneously-filed motion to exclude the statistical testimony of Dr. Parnell and Dr. Wildeman, which RPS incorporates by reference here.

D. <u>Opinion No. 4 about the claimed utility of reporting records beyond certain time periods is foreclosed Congressional policy and law.</u>

As the Supreme Court has admonished, absent careful supervision by courts, "disparate-impact liability might displace valid governmental and private priorities, rather than solely removing artificial, arbitrary, and unnecessary barriers."  *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2524 (2015).  Those valid governmental priorities are clear here.

Criminal screening has been expressly endorsed by Congress in numerous ways.  For example, for affordable housing, federal law permits screening to detect any other activity that would adversely affect the "health, safety, or right to peaceful enjoyment of the premises."  42 U.S.C. § 13661(c).

Moreover, under the Fair Credit Reporting Act ("FCRA"), companies can

report non-conviction offenses in tenant screening reports for up to seven years, as well as records of criminal convictions without any time limitation.  *See* 15 U.S.C. § 1681c(a)(2).  Connecticut has not shortened that statutory allowance.  Instead, a 2019 legislative proposal to "limi[t] criminal records lookback period that a landlord may use when evaluating the housing application of a prospective tenant," was defeated in the Connecticut state legislature.  CT. S.B. No. 54 (2019).

Those legislatively-endorsed policies conclusively establish the permitted parameters for criminal screening.  Courts – and *certainly not expert witnesses* – "cannot second-guess" a "legislative policy decision."  *See, e.g.*, *Glenn v. Fuji Grill Niagara Falls, LLC*, No. 14cv380S, 2016 U.S. Dist. LEXIS 51618, at *21 (W.D.N.Y. Apr. 18, 2016) (quoting *Millea v. Metro-North R.R.*, 658 F.3d 154, 167 (2d Cir. 2011)).

Yet that is what Dr. Kazemian attempts to do here.  Opinion No. 4 regards the length of time that Dr. Kazemian believes criminal records should be considered by housing providers and the corresponding (unstated) limitations that she believes RPS should impose on CrimSAFE's criminal categories.  <u>Ex. A</u>, at p. 4. Because those opinions are inconsistent with the balanced parameters established by Congress for reporting criminal records – limitations that CrimSAFE is structured to require housing providers to observe – those opinions have no legal relevance to this case.

E. <u>Opinion No. 5 regarding the claimed "stigmatizing impact" of a criminal record is irrelevant to any issue in this case.</u>

In Opinion 5, Dr. Kazemian opines about the fact that "individuals with a history of incarceration were twice as likely to face housing insecurity," and that "[h]ousing provides an environment where the individual can reconnect with

9

his/her family after a prison sentence." <u>Ex. A</u>, at p. 6.  She then concludes that "[t]he stigmatizing impact of a criminal record, as well as its negative effects on offending behavior, has been well documented."  *Id*.  Dr. Kazemian does not mention CrimSAFE in that section of her expert report, where she provides a sociological opinion that has no relevance to the functions of CrimSAFE.  That seeming policy argument against criminal screening also is displaced by the Congressional policy set forth above endorsing screening, as well as federal law allowing the identification of criminal records consistent with the time limits specified under the FCRA.

III.    <u>Dr. Kazemian's overarching conclusions about recidivism are not reliable.</u>

The gravamen of Dr. Kazemian's expert opinion is that "[t]he existence of a criminal record alone is not sufficient to predict the risk of a new crime."  *Id*.  However, the factual foundation for Dr. Kazemian's opinion is so flawed as to require its exclusion on multiple grounds.  In particular, the studies she cites in reaching her conclusions about recidivism present a combination of: (1) dated/limited cohorts of offenders;[2] (2) who are located outside of Connecticut; (3) who are compared against each other for purposes of assessing recidivism and not against the general population.  She further admits that she did not even know

---

[2] **The studies she cites in this regard considered: (1) criminal history from Philadelphia males born in 1958 (<u>Exhibit D</u>, Kurlychek, *et al*., "Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?" 5 Criminology and Pub. Pol'Y 483 (2006)); (2) criminal history from New York arrestees from 1980 (<u>Exhibit E</u>, Blumstein and Nakamura, "Redemption in the Presence of Widespread Criminal Background Checks," 47 Crimonology 327 (2009)); and (3) "411 males from a working-class area of London, England" (<u>Exhibit F</u>, Kazemian and Farrington"Exploring the Residual Career Length and Residual Number of Offenses of Two Generations of Repeat Offenders," 43 J. of Crime and Delinquency 89 (2006)).**

about – let alone account for – the seminal nationwide study on recidivism that was recently conducted by the Department of Justice.  **Ex. C**, 169:18-170:23.  Finally, because Dr. Kazemian has not offered – and has refused to offer – any specific "lookback" limitations for any category of crime, her testimony is not testable and is therefore unreliable.

> A.  **Dr. Kazemian's recidivism studies are not benchmarked against the general population, do not account for the location of crimes, and only support the CrimSAFE Settings selected by WinnResidential with respect to Mr. Arroyo's application for housing.**

**First**, "reliability" is controlled by whether "the [expert's] testimony is based upon sufficient facts or data."  Fed. R. Evid. 702.  In Opinion No. 4 – which is the only opinion that focuses on CrimSAFE in any substantive way – Dr. Kazemian opines that "one-time offenders pose a significantly lower risk of future offending *when compared with individuals who have engaged in crime on a more consistent basis*."  **Ex. A**, at p. 5.  She further opines in the other section Opinion 4 that "the risk of a new crime declines significantly *as the amount of time since the last offense* increases."  *Id.* at p. 4.  That emphasized language highlights a core failing across both of those opinions: Dr. Kazemian has explicitly premised her opinions *on a comparison of individuals with criminal histories*, rather than the rates of offense for relevant applicant pool, the latter of which is the relevant control group for housing providers assessing risk in connection with applications for tenancy.

In the absence of data comparing the recidivism rates of offenders with the likelihood of a crime committed by a member of the applicant pool, Plaintiffs cannot demonstrate that Dr. Kazemian's report is "based upon sufficient facts or data."  Fed. R. Civ. P. 702.  In fact, a failure to use the relevant "control group" in rendering

a statistical comparison is "so fundamental that, unsurprisingly, there are few cases in which a court has been forced to exclude an expert" on that basis. *Fed. Hous. Fin. Agency v. Nomura Holding Am.*, No. 11cv6201, Inc., 2015 U.S. Dist. LEXIS 16034, *1 (S.D.N.Y. Feb. 10. 2014). When that error does occur, however, as it has here, exclusion is required. *See id.* (collecting cases).[3]

Second, that fundamental error was compounded by a series of additional flaws in Dr. Kazemian's analysis. For example, Dr. Kazemian admitted at her deposition that nationwide recidivism data is more informative than localized data, and that recidivism data compiled by the federal government is authoritative and preferred. Ex. C, 43:2-23; 57:16-58:4; 159:23-160:2. Yet, Dr. Kazemian conceded that she did not even know about, let alone account for, the seminal national study on recidivism that was recently conducted by the Department of Justice. Ex. C, 169:19-170:23. In 2018, the U.S. Department of Justice released a nine-year study on 400,000 criminal offenders[4] that was assessed by the federal Bureau of Justice Statistics ("BJS"). Exhibit G, 2018 Update on Prisoner Recidivism: A 9-Year

---

[3] Indeed, in one of the only studies cited by Dr. Kazemian in her report that compared offenders to the general population regarded prior arrestees, Dr. Kazemian noted that the study "estimated that the future arrest risk of individuals who remain arrest-free for approximately 7 years becomes nearly indistinguishable from that of nonoffenders." Ex. A, at p. 4.

That opinion, however, only underscores the value of CrimSAFE, *which reports records of non-convictions for only seven years*. Put another way, the study cited by Dr. Kazemian using the relevant comparable groups does not at all support her conclusions regarding CrimSAFE and instead only undermines them. *See, e.g., Davidov v. Louisville Ladder Group, LLC*, 2005 U.S. Dist. LEXIS 3117, No. 02-Civ-6652, 2005 WL 486734 at *2 (S.D.N.Y. Mar. 1, 2005) (excluding report that was inconsistent with facts of case).

[4] This comprehensive, national study by a federal agency dwarfs the limited and highly-dated academic studies cited by Dr. Kazemian in her report.

Follow-up Period (2005-2014).  Among other findings, that BJS study concluded that 83% of released offenders were rearrested during that nine-year period and that "25% of released prisoners were still actively involved in criminal activity and were arrested during year 9," which the BJS stated "invite[d] an even longer period of review" based on elevated levels of recidivism during the entire duration of the national study.  The BJS further noted that: (1) each criminal offender averaged five subsequent arrests over that nine-year period, for a total of almost 2 million crimes; (2) approximately 50% of those offenders who were not arrested in years 0-3 were arrested in years 4-9; and (3) that "99% of prisoners who were arrested during the 9-year follow up period were arrested for an offense other than a probative or parole violation," which belies Dr. Kazemian's unfounded Opinion No. 1 that "most returns to prison occur as a result of technical violations (*i.e.*, violations of the rules of parole, which include breaking curfew, changing residence without permission, or missing an appointment with a parole officer) rather than new crimes."  <u>Ex. A</u>, at p. 2.

Third, Dr. Kazemian's highly-dated and very-limited academic recidivism papers further failed to consider the location where crimes are most often committed: in and around the home.  The BJS's authoritative analysis again shows how significant that error is with respect to this housing case.  The BJS, for instance, found that between 2004 and 2008, 18% of violent victimizations took place in the home, another 16% took place near the home, and an additional 9% took place at a friend's, neighbor's, or relative's home.  <u>Exhibit H</u>, BJS – Location (2008).  Dr. Kazemian failed to account for that key location variable in her analysis.  Her data about recidivism is thus unreliable in view of the exclusive housing-

13

related focus of this case.  *See, e.g., Wills v. Amerada Hess Corp.*, 379 F.3d 32, 50 (2d Cir. 2004) ("failure to account for [variables] strongly indicated that [expert]'s conclusions were not grounded in reliable scientific methods" and warranted exclusion).

**B.      Dr. Kazemain's refusal to set forth any specific "lookback" period that she claims RPS should have adopted renders her opinions unreliable.**

Through all five of her opinions, Dr. Kazemian barely references CrimSAFE, addressing the functionality of the product only twice.  First, she claims that "the potential reporting of felony convictions up to 99 years old in CrimSAFE's configuration instrument . . . has no empirical basis."  Ex. A, at p. 4.  Second, she states that "the possibility of considering non-convictions (*i.e.*, offenses that did not ultimately result in a conviction) for a period of up to 7 years in CrimSAFE's configuration instrument is particularly problematic" for certain ethnic minorities. *Id.* at p. 3.  In both instances, Dr. Kazemian opines that CrimSAFE should be structured in an alternate way to account for "empirical" limitations on risk.  But she never says how.

By failing to set forth any alternative "lookback" period for *any* CrimSAFE category of crime, Dr. Kazemian's testimony is so hypothetical as to lack relevance or reliability.  In fact, when asked at her deposition as to what lookback limitations RPS should have allegedly adopted, Dr. Kazemian had no response and could not provide a single example.  Ex. C, 124:18-125:11; 126:7-16. Thus, her testimony cannot be reliably applied to any actual issue in this case and should be excluded. *See, e.g., In re Trusts Established*, 2020 U.S. Dist. LEXIS 47847, *108 ("abstract theoretical opinions" are "legally irrelevant"); *Colon v. BIC USA, Inc.*, 199 F. Supp.

2d 53, 78 (S.D.N.Y 2001) (excluding testimony where the expert "offer[ed] no 'testable' methodology" in support of his claims for an alternative design for the product at issue).

## CONCLUSION

For the reasons stated herein, RPS respectfully requests that the Court exclude the expert report of Lila Kazemian.

Respectfully submitted,

By:  */s/ Daniel W. Cohen*
     **Timothy St. George (*pro hac vice*)**
     **tim.st.george@troutmansanders.com**
     **TROUTMAN SANDERS LLP**
     **1001 Haxall Point**
     **Richmond, Virginia 23219**
     **Telephone: 804.697.1200**
     **Facsimile: 804.697.1339**

     **Daniel W. Cohen (CT Bar No. 30467)**
     **dan.cohen@troutman.com**
     **TROUTMAN SANDERS LLP**
     **875 Third Avenue**
     **New York, New York 10022**
     **Telephone: 212.704.6000**
     **Facsimile: 212.704.6288**

     ***Counsel for Defendant***
     ***CoreLogic Rental Property Solutions, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

By:  /s/ Daniel W. Cohen
Daniel W. Cohen (Bar No. CT 30467)
TROUTMAN SANDERS LLP
875 Third Avenue
New York, NY  10022
Telephone: (212) 704-6000
Facsimile:  (212) 704-5901
Email:  dan.cohen@troutman.com

16

42317569