# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

**CONNECTICUT FAIR HOUSING CENTER**

**and**

**CARMEN ARROYO, individually and as next friend for Mikhail Arroyo**

***Plaintiffs,***

**v.**

**Case No. 3:18-cv-00705-VLB**

**CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC**

***Defendant.***

**June 10, 2019**

### PLAINTIFFS' SECOND EXPERT WITNESS DISCLOSURE

Pursuant to Fed. R. Civ. P. 26, Plaintiffs disclose the following as their expert witness for issues upon which the Defendants bear the burden of proof:

1. Plaintiffs designate Dr. Lila Kazemian to testify on their behalf.

2. Dr. Kazemian's Expert Report is attached. The Report contains a complete statement of Dr. Kazemian's opinions formulated to date to be expressed at trial and the bases and reasons therefor; the data or other information considered by Dr. Kazemian in informing the opinion; any exhibits to be used as a summary of or support for the opinions; the qualifications of Dr. Kazemian, including a list of all publications authored by her within the preceding ten years; the compensation to be paid for the study and testimony; and the listing of any other cases in

1

which she has testified as an expert at trial or by deposition within the

preceding four years.

By Counsel,

      **/s/ Greg Kirschner**
      **Greg Kirschner (ct26888)**
      **Salmun Kazerounian (ct29328)**
      **Sarah White (ct29329)**
      **Connecticut Fair Housing Center, Inc.**
      **221 Main Street, 4th Floor**
      **Hartford, CT 06106**
      **(860) 263-0724**
      **gkirschner@ctfairhousing.org**

      **/s/ Eric Dunn**
      **Eric Dunn, *Pro Hac Vice***
      **National Housing Law Project**
      **919 E. Main Street, Ste. 610**
      **Richmond, VA 23219**
      **(415) 546-7000**
      **edunn@nhlp.org**

## CERTIFICATE OF SERVICE

      **I hereby certify that on June 10, 2019 a copy of the foregoing and all attachments was sent via email and first-class mail to:**

**Daniel Cohen**
**Troutman Sanders LLP**
**875 Third Avenue**
**New York, NY 10022**
**dan.cohen@troutman.com**

**Timothy J. St. George**
**David Anthony**
**Troutman Sanders LLP**
**1001 Haxall Point**
**Richmond, VA 23219**
**timothy.st.george@troutman.com**
**david.anthony@troutman.com**

      **_____/s/_____**
      **Salmun Kazerounian**

Expert Report
Lila Kazemian, Ph.D.
John Jay College of Criminal Justice, City University of New York

Connecticut Fair Housing Center
Plaintiff,

v.

CoreLogic Rental Property Solutions
Defendant

This report presents evidence from social science research to assess the public safety risk posed by individuals with criminal histories. Specifically, this report examines whether the existing empirical evidence and official statistics provide support for the methods and criteria used by CrimSAFE, a criminal record screening tool that assesses whether housing applications should be accepted or denied on the basis of an individual's criminal record. In preparing this document, I reviewed the CoreLogic expert report, CrimSAFE's configuration instructions and configuration form, the CrimSAFE category description and details, and the complaint in this matter (No. 3:18-CV-705). The relevant empirical literature demonstrates in five fundamental ways that screening tools that may systematically ban individuals with a criminal record from access to housing are not justified on the basis of public safety concerns and may actually increase the risk of reoffending by creating significant barriers to successfully reintegrating society. In addition, empirical research suggests that there are no public safety benefits gained from lifetime bans on individuals with a criminal record. The methods privileged by the CrimSAFE screening tool are far too reductionist, promote unnecessary and unjustified discriminatory treatment of individuals with a criminal record, and make erroneous assumptions about threats to public safety that have no empirical basis.

1. **Given American criminal justice trends over the course of the past decades, it cannot be assumed that individuals with a criminal record pose a significant threat to the community.**

The United States is the world leader in incarceration with approximately 2.2 million people incarcerated in state and federal prisons and jails; these figures reflect a nearly 500% increase in the incarceration rate during the past three decades (National Research Council, 2014). It has been estimated that one in every 31 adults in the United States is under correctional control (i.e., in prison or jail, or under probation or parole). This rate is much higher among African Americans; one in every eleven African American is under correctional control (The Pew Center on the States, 2009). The dramatic increases in the number of individuals incarcerated, in the length of imposed sentences and in the average time served by prisoners in the United States since the mid-1970s is a result of "tough-on-crime" policies (i.e., Three-Strikes legislation, "truth-in-sentencing" policies, and a reduced or delayed recourse to parole; The Pew Center on the States, 2012).

As a result of these policies, there has been a growing number of Americans with a criminal record. The Sentencing Project (2014, p. 1) has estimated that between "70 million and 100 million—or as many as one in three Americans—have some type of criminal record." The negative consequences of a criminal record on housing and employment opportunities has been widely recognized, and various jurisdictions have adopted policies (e.g., Ban the Box) to counter these effects, as they have affected a growing segment of the population.

It is important to highlight that incarceration rates continued to increase despite declining crime rates during the last two decades (Rosenfeld, Terry and Chauhan, 2014; Zimring, 2012). For instance, drawing on FBI and NYPD data from 1985 onwards, Zimring (2012) reported that the crime rate per 100,000 population in New York declined by 82% for homicide, 77% for rape, 84% for robbery, and 67% for assault. The increasingly punitive trend observed in New York and in other states, illustrated by higher incarceration rates despite falling crime rates, suggests that the historically unprecedented number of individuals with a criminal record is not a result of a rise in

crime or violence rates. In other words, a criminal record does not necessarily imply persistent or violent offending.

Recidivism statistics are often cited to make the argument that most individuals who are released from prison will eventually reoffend, and thus pose a significant threat to public safety. However, most returns to prison occur as a result of technical violations (i.e., violations of the rules of parole, which include breaking curfew, changing residence without permission, or missing an appointment with a parole officer) rather than new crimes. For instance, in the state of Connecticut, among the 1,547 individuals who were released on parole in 2008, 39% returned to prison in the 3 years after release. Only about one third of all returns to prison (representing 12.9% of all parolees) occurred as a result of a new criminal offense; 59% of all returns to prison resulted from technical violations (Connecticut Office of Policy and Management, 2015). Similar trends were noted in New York. Official statistics released by the New York State Department of Corrections and Community Supervision (DOCCS) show that 41.5% of inmates released in 2010 returned to custody within three years, but 78% of these returns occurred as a result of technical violations (Kim, 2014). With the exception of some fluctuations in the late 1980s, the total return-to-custody rate has remained relatively stable in New York State at about 40% over the course of the past 30 years. However, since 1990, the return-to-custody rates for a new felony conviction have been on the decline, and the return rates for parole violations have generally been on the rise (Kim, 2014: Figure 2). Similar findings were noted in a 5-year follow-up study published by the Bureau of Justice Statistics, which drew on the population of prisoners released in 2005 in 30 states (Durose et al., 2014). Approximately 1 in 4 (25.3%) released prisoners were arrested for a violation of the conditions of post-release parole supervision or community supervision. Another 39.9% were arrested for "other public order offenses", such as the failure to appear or obstruction of justice, "which in some jurisdictions may be the legal response to probation or parole violations" (Durose et al., 2014, p. 9). Overall, these figures suggest that among individuals who are released from prison and subsequently arrested, few engage in violent crime and a significant portion are arrested for technical violations that do not compromise public safety.

In short, because of criminal justice trends in the United States in recent decades, a criminal record is no longer a robust indicator of the level of risk posed by an individual. Screening procedures that block access to housing for individuals with a criminal record cannot be justified on the basis of public safety concerns.

## 2. Limitations of criminal background checks

The potential for misuse, labeling, and discrimination has increased with the widespread online availability of criminal records information (Lageson and Maruna, 2001). Criminal background checks are not infallible, and they have several shortcomings (Day, 2018). First, these records often include erroneous information. Many screening tools conduct searches using only an applicant's name and date of birth, which can be problematic because different individuals may share similar information. It has been estimated that at least 30% of criminal history reports contain inaccuracies (Legal Action Center, 2013). Second, in the context of employment, we know that employers are unlikely to be trained to correctly interpret criminal records (ACLU, 2017; Smith, 2014). The American Civil Liberties Union (ACLU, 2017, p. 13) noted that "most human

resources professionals are not equipped to assess how a prior conviction might or might not interfere with an individual's capacity to do the job." Under these circumstances, a criminal record can result in an automatic disqualification of an applicant based on inaccurate presumptions (Pager, 2003). These observations are highly relevant to the context of housing and they extend to landlords and property managers, who may choose to solely rely on assessments made by criminal records screening companies.

### 3.   The criminal justice system is heavily skewed towards ethnic and racial minorities.

Sentencing laws have disproportionately affected racial and ethnic minorities, especially the poorest, and led to racially disparate sentencing practices that resulted in the notable over-representation of African American and Hispanic individuals in the criminal justice system (Blumstein, 2004; National Research Council, 2014). Racial and ethnic minorities are more likely to be arrested (Mueller, Gebeloff, and Chinoy, 2018), detained prior to trial (Kutateladze and Andiloro, 2014), convicted of the most serious charge against them (Berdejo, 2018), fare worse in plea deals, get heavier sentences and serve longer terms in prison (United States Sentencing Commission, 2017; Nellis, 2013) when compared with non-minorities in comparable circumstances. Put simply, racial and ethnic minorities are more likely to have a criminal record (Uggen, Manza and Thompson, 2006; Alexander, 2010). These discriminatory practices impact racial minorities at various stages of the criminal justice process. Wooldredge et al. (2015) found that the higher pretrial detention rate of African American defendants (especially young males) indirectly led to more unfavorable sentencing outcomes. In addition, the stigma of a criminal record is more substantial for minorities. In the context of employment, Pager (2003) found that the likelihood of securing employment was lower among black males *without* a criminal record (14%) than among white males *with* a criminal record (17%). White males without a criminal record were most likely to be called back by employers (30% of cases), whereas black males with a criminal record were least likely to be called back (5% of cases).

Importantly, while racial differences in arrests corresponded with racial disparities in incarceration in the 1980s and 1990s, at least for serious violent crimes, this was no longer the case in the 2000s. A systematic review conducted by a panel of prominent experts concluded that "relative to arrest patterns, racial disparities in imprisonment became much worse in the twenty-first century" when compared to previous decades (National Research Council, 2014, p. 96). This observation suggests that the higher rate of incarceration of minorities is not a result of increased criminal offending (measured through arrests) by individuals belonging to these groups.

These conclusions are consistent with the conclusions set forth in paragraphs 113 through 127 of the complaint in this matter. I have reviewed these paragraphs and the material cited in support of the arguments. In my opinion, these paragraphs are both accurate and consistent with credible official statistics and research in my field of expertise.

Given the racial and ethnic disparities noted in arrest rates in the United States, the possibility of considering non-convictions (i.e., offenses that did not ultimately result in a conviction) for a period of up to 7 years in CrimSAFE's configuration instrument is particularly problematic. This

criterion is likely to result in the unnecessary exclusion of ethnic and racial minorities from housing opportunities.

To summarize, sentencing policies adopted in the United States in recent decades have resulted in a greater number of African American and Hispanic males with a criminal record, who may not have acquired such records if they were not part of a minority group. Banning individuals with a criminal record from securing safe and affordable housing has a disproportionately adverse effect on African American and Latinos males.

### 4. Not all criminal records are equal. Criminal histories have a diminished ability to accurately predict offending behavior over time.

Research has shown that the mere existence of a criminal record is not sufficient to predict the risk of reoffending. There are various features of criminal histories that must be considered in order to make an assessment of risk. These include the time since the last offense and the number of past crimes.

First, the amount of time elapsed since the last offense is an important feature of criminal histories. There is no compelling empirical evidence to suggest that old criminal records are predictive of future offending. Kurlychek et al. (2006; 2007) estimated that the future arrest risk of individuals who remain arrest-free for approximately 7 years becomes nearly indistinguishable from that of nonoffenders. Because exact estimates vary across different studies and samples, this specific figure should not be used as a guideline for policy. Other studies that have explored this issue have reached a similar conclusion. Blumstein and Nakamura (2009) also concluded that the risk of reoffending, and thus the threat to public safety, declined with time 'clean'. Kazemian and Farrington (2006) found a negative association between the number of future offenses committed and the time lag since the last offense (see also Kazemian and Farrington, 2018), that is, the more times passes since the last crime, the less likely it is that the individual will engage in crime in the future.

The conclusion drawn from this body of research is clear: it is important to consider the recency of past crimes in order to determine whether an individual with a criminal record poses a threat to public safety. The risk of a new crime declines significantly as the amount of time since the last offense increases. In this regard, the potential reporting of felony convictions up to 99 years old in CrimSAFE's configuration instrument, effectively resulting in a lifetime ban, has no empirical basis, and this criterion is highly unlikely to have any crime reduction benefits.

It is essential for analyses estimating the recency of past crimes to document the date of the offense, and not the date of criminal justice processing. Given the overburdened criminal justice system, the date of the offense and the date of processing may be years apart. The instructions for the CrimSAFE screening tool detail the following steps to determine the date of the offense:

*The age of the offense is determined by the disposition date when that date is available. If a disposition date is not provided, the sentence date, custody date, or arrest date will be used, in that order of availability.*

The "age of the offense", as determined by the CrimSAFE screening tool, may be very different from the date when the crime occurred. Of the four measures employed by CrimSAFE, the arrest date would be closest to the actual date of a given crime, but this indicator is only used if disposition, sentence, and custody dates are unavailable. The rationale for this sequence is unknown, but it will inevitably lead to the erroneous assumptions that crimes occurred more recently than they actually did. This is a prime example of a common misinterpretation of a criminal history record.

The degree of involvement in crime (i.e., the total number of crimes committed) is also an important factor in the assessment of risk. A higher frequency of past crimes is more likely to be indicative of a pattern of persistent offending (Moffitt, 1993; Piquero et al., 2003). One-time offenders pose a reduced risk of reoffending when compared with individuals who have committed a higher number of crimes in the past. One-time offenders are likely to initiate their offending at later ages compared to recidivists, and they are less likely to be sentenced to prison (Zara and Farrington, 2016). One-time offenders are also characterized by significantly fewer childhood risk factors for offending in comparison to individuals who established a pattern of criminal behavior (Zara and Farrington, 2006). These findings suggest that one-time offenders pose a significantly lower risk of future offending when compared with individuals who have engaged in crime on a more consistent basis. There is no empirical basis to conclude that one-time offenders should be excluded from housing or employment opportunities due to heightened risks for criminal offending.

To summarize, the extant empirical research has demonstrated that screening procedures that indiscriminatingly disqualify all individuals with a criminal record cannot be justified on the basis of public safety concerns. The past offending rate and the time since the last offense are variables that must be jointly considered in order to determine whether a criminal record is predictive of future offending and whether the individual is likely to pose a threat to the community. Screening procedures that fail to consider these factors and that assess risk on the mere presence of a criminal record are misleading, and likely to lead to discriminatory practices based on incomplete information.

5. **The inability to secure safe and affordable housing constitutes a major barrier to prisoner reentry and increases the risk of reoffending.**

Individuals with a criminal record, particularly formerly incarcerated individuals, face significant challenges in their efforts to reintegrate society. Housing is one of the most crucial barriers to a successful reintegration. Stable housing is widely recognized as an integral component of personal and family well-being (Bratt, 2001; Lee, Tyler, and Wright 2010; Visher and Courtney, 2007). The ability to secure housing after release from prison has been associated with lower rates of recidivism (Makarios, Steiner, and Travis, 2010; Petersilia, 2009). Geller and Curtis (2011) found that individuals with a history of incarceration were twice as likely to face housing insecurity, and this was particularly true for individuals who had been recently incarcerated.

Access to housing also impacts other barriers to a successful reintegration into the community. Housing security is a key factor in both securing and maintaining employment (Bradley et al. 2001). Housing provides an environment where the individual can reconnect with his/her family after a prison sentence. One of the major challenges facing formerly incarcerated individuals is the attempt to reconnect with family members upon release (Hairston, 2003; Richie, 2001). Returning prisoners who report a strong social network and more positive family relationships have been found to be less likely to reoffend (Hairston, 2003; Sullivan, Mino, Nelson, & Pope, 2002; Visher & Courtney, 2007).

The stigmatizing impact of a criminal record, as well as its negative effects on offending behavior, has been well documented. The stigma of a criminal history is known to persist regardless of the nature, intensity, or recency of past offenses. Blocking access to housing and employment opportunities increases the odds of reoffending (National Research Council, 2014).

## 6. Conclusion

**There is no empirical basis to justify the recourse to blanket bans against all individuals with a criminal record. This type of policy is not only failing to promote public safety, it is actually detrimental to it and increases the likelihood of reoffending among individuals with a criminal record by creating substantial barriers to leading a crime-free life.**

Not all criminal records are equal. The existence of a criminal record alone is not sufficient to predict the risk of a new crime. A host of factors need to be considered to determine whether a criminal record constitutes an adequate predictor of the level of threat posed to the community. The most salient factors emerging from criminological research include time elapsed since the last crime, the number of prior crimes, and the strength of the support network. Kurlychek et al. (2007, p. 80) concluded that it is unlikely that "blanket decision rules based exclusively on whether someone has a criminal record will provide useful information for behavioral predictions." By blocking access to housing, blanket bans increase the likelihood of reoffending and further injury caused to the community. Moreover, these policies disproportionately and adversely impact racial and ethnic minorities.

The approach adopted by the CrimSAFE screening tool is reckless, reductionist, detrimental to public safety, and it promotes discriminatory practices. Based on the features of the CrimSAFE screening tool, there appears to be a poor understanding of the characteristics of a criminal record that are indicative of a risk of reoffending. Because of the lack of qualification in this area, it is unwise for tenant screening companies to use decision-making language that automatically disqualifies applicants in the reports provided to landlords and property managers. The complexities of a criminal record cannot be summarized in a dichotomous (yes/no) decision. There is no empirical basis to justify the consideration of criminal records up to 99 years old. Criminal histories lose their ability to accurately predict offending behavior over time. Screening tools such as CrimSAFE are a prime example of risk assessment tools that have simply gone too far.

## Qualifications and Prior Testimony

I am an Associate Professor at John Jay College of Criminal Justice, City University of New York. I earned my Ph.D. from the Institute of Criminology, University of Cambridge, in 2005, where I also completed a one-year post-doctoral fellowship. My research work has focused on changes that occur in offending patterns across the life course, the process of desistance from crime, the experience of long-term incarceration, prisoner reentry, and comparative criminology. More recently, I investigated the process of positive transformation among prisoners serving long sentences. My work has been published in various peer-reviewed journals, including the Journal of Quantitative Criminology, the Journal of Research in Crime and Delinquency, Punishment & Society, and the European Journal of Criminology.

My *curriculum vitae* is attached. It identifies all my publications and other scholarly contributions.

I have not testified as an expert at trial or by deposition in any other case in the previous 4 years, but I have produced expert reports in several other legal cases.


## Compensation

I am being compensated at the rate of $250 per hour for my report and testimony in this case.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


_____
Signature

Lila Kazemian

June 3, 2019

# References

Alexander M (2010). *The new Jim Crow: Incarceration in the age of colorblindness*. New York: The New Press.

American Civil Liberties Union (2017). Back to business: How hiring formerly incarcerated job seekers benefits your company. Retrieved from https://www.aclu.org/sites/default/files/field_document/060917-trone-reportweb_0.pdf

Berdejó, C. (2018). Criminalizing race: Racial disparities in plea bargaining. *Boston College Law Review*, 59(4), 1187-1249.

Blumstein, A. (2004). Restoring rationality in punishment policy. In M. Tonry (Ed.), *The future of imprisonment* (pp. 61-80). New York: Oxford University Press.

Blumstein, A. & Nakamura, K. (2009). Redemption in the presence of widespread criminal background checks. *Criminology*, *47*, 327–60.

Bradley, K.H., Oliver, R.B.M., Richardson, N.C. and Slayter, E.M. (2001). *No place like home: Housing and the ex- prisoner*. Boston: Community Resources for Justice.

Bratt, R.G. (2002). Housing and family well-being. *Housing Studies*, *17(1)*, 13–26.

Connecticut Office of Policy and Management (2015). *Recidivism in CT, 2008 releases*. Hartford, CT: Criminal Justice Policy & Planning Division.

Day, R. (2018). A study of factors influencing hiring decisions in the context of Ban the Box policies. Ph.D. dissertation, City University of New York.

Durose, M. R., Cooper, A.D. & Snyder, H.N. (2014). *Recidivism of prisoners released in 30 states in 2005: Patterns from 2005 to 2010*. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics.

Geller, A. & Curtis, M.A. (2011). A sort of homecoming: Incarceration and the housing security of urban men. *Social Science Research*, *40(4)*, 1196–1213.

Hairston, C.F. (1998). The forgotten parent: Understanding the forces that influence incarcerated fathers' relationships with their children. *Child Welfare, 77(5)*, 617-639.

Kazemian, L. & Farrington, D.P. (2018). Advancing knowledge about residual criminal careers: A follow-up to age 56 from the Cambridge Study in Delinquent Development. *Journal of Criminal Justice*, *57*, 1-10.

Kazemian, L., & Farrington, D. P. (2006). Exploring residual career length and residual number of offenses for two generations of repeat offenders. *Journal of Research in Crime and Delinquency, 43(1)*, 89-113.

Kim, R.H. (2014). *2010 inmate releases: Three year post release follow-up*. New York: State of New York Department of Corrections and Community Supervision.

Kurlychek, M.C., Brame, R. & Bushway, S.D. (2006). Scarlet letters and recidivism: Does an old criminal record predict future offending? *Criminology & Public Policy*, *5*, 483–522.

Kurlychek, M.C., Brame, R. & Bushway, S.D. (2007). Enduring risk: Old criminal records and prediction of future criminal involvement. *Crime and Delinquency*, *53*, 64–83.

Kutateladze, B.L. & Andiloro, N.R. (2014). *Prosecution and racial justice in New York county*: Technical report (Technical Report 247227). https://www.ncjrs.gov/pdffiles1/nij/grants/247227.pdf

Lageson, S. and Maruna, S. (2018). Digital degradation: Stigma management in the internet age. *Punishment & Society, 20(1)*, 113-133.

Lee, B.A., Tyler, K.A. & Wright, J.D. (2010). The new homelessness revisited. *Annual Review of Sociology*, *36(1)*, 501–521.

Legal Action Center (2013). The problem of rap sheet errors: An analysis by the Legal Action Center. Retrieved from https://lac.org/wp-content/uploads/2014/07/LAC_rap_sheet_report_final_2013.pdf.

Makarios, M., Steiner, B. & Travis, L.F. (2010). Examining the predictors of recidivism among men and women released From prison in Ohio. *Criminal Justice and Behavior*, *37(12)*, 1377-1391.

Moffitt, T.E. (1993). 'Life-course persistent' and 'adolescence-limited' antisocial behavior: A developmental taxonomy. *Psychological Review, 100*, 674-701.

Mueller, B., Gebeloff, R. & Chinoy, S. (2018, May 13). Surest way to face marijuana charges in New York: Be black or hispanic. *New York Times*. https://www.nytimes.com/2018/05/13/nyregion/marijuana-arrests-nyc-race.html

National Research Council (2014). *The growth of incarceration in the United States: Exploring causes and consequences*. Washington, DC: The National Academies Press. https://doi.org/10.17226/18613.

Nellis, A. (2013). *Life goes on: The historic rise in life sentences in America*. Washington, DC: The Sentencing Project.

Pager, D. (2003). The mark of a criminal record. *American Journal of Sociology*, *108*, 937-975.

Petersilia, J. (2009). *When prisoners come home: Parole and prisoner reentry*. New York: Oxford University Press.

Pew Center on the States. (2012). *Time served: The high cost, low return of longer prison terms*. Washington, DC: The Pew Center on the States.

Pew Center on the States. (2009). *One in 31: The long reach of American corrections*. Washington, D.C.: Pew Center on the States.

Piquero, A., Farrington, D. P., & Blumstein, A. (2003). The criminal career paradigm. In M. Tonry (Ed.), *Crime and Justice* (Vol. 30, pp. 359-506). Chicago: University of Chicago Press.

Richie, B. E. (2001). Challenges incarcerated women face as they return to their communities: Findings from life history interviews. *Crime and Delinquency, 47*(3), 368-389.

Rosenfeld, R., Terry, K.J. & Chauhan, P. (2014) New York's Crime Drop Puzzle: Introduction to the Special Issue. *Justice Quarterly*, *31(1)*, 1-4.

Sentencing Project (2014). *Half in ten: Americans with criminal records*. Washington, DC: The Sentencing Project.

Smith, J. (2014). Banning the Box but keeping the discrimination?: Disparate impact and employers' overreliance on criminal background checks. *Harvard Civil Rights—Civil Liberties Law Review*, *49*, 197–228.

Sullivan, E., Mino, M., Nelson, K., & Pope, J. (2002). *Families as a resource in recovery from drug abuse: An evaluation of La Bodega de la Familia*. New York: Vera Institute of Justice.

Uggen, C., Manza, J., & Thompson, M. (2006). Citizenship, democracy, and the civic reintegration of criminal offenders. *Annals of American Academy of Political and Social Science, 605(1)*, 281–310.

United States Sentencing Commission. (2017). Demographic differences in sentencing: An update to the 2012 Booker Report. Retrieved from https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171114_Demographics.pdf

Visher, C. & Courtney, S.M.E. (2007). *One year out: Experiences of prisoners returning to Cleveland*. Washington, D.C.: The Urban Institute.

9

Wooldredge, J., Frank, J., Goulette, N. & Travis III, L. (in press). Is the impact of cumulative disadvantage on sentencing greater for Black defendants? *Criminology & Public Policy*.

Zara, G. & Farrinton, D.P. (2016). *Criminal recidivism: Explanation, prediction and prevention*. Abingdon, Oxon: Routledge.

Zimring, F.E. (2012). *The city that became safe: New York's lessons for urban crime and its control*. New York: Oxford University Press.

*Updated May 2019*

## Lila Kazemian

John Jay College of Criminal Justice
Department of Sociology
524 West 59th Street, Haareen Hall Room 520.13
New York, NY 10019
(212) 484-1301
e-mail: **lkazemian@jjay.cuny.edu**

## Education

2002-2005   Ph.D., Criminology
University of Cambridge, Institute of Criminology, Cambridge, England
Dissertation: *A Comparative Analysis of the Duration of Criminal Careers and Desistance from Crime*

2001-2002   M.Sc., Criminology
Université de Montréal, Canada
Thesis: *Le passage à l'acte criminel: étude des caractéristiques et trajectoires de modus operandi entre l'adolescence et l'âge adulte* [*Characteristics and Trajectories of Modus Operandi between Adolescence and Adulthood*]

1998-2001   B.Sc., Criminology
Université de Montréal, Canada

## Academic Appointments

2011 –   Associate Professor, Department of Sociology
John Jay College of Criminal Justice, City University of New York

2007 –   Faculty Member, Doctoral Program in Criminal Justice
Graduate Center, City University of New York

2006-10   Assistant Professor, Department of Sociology
John Jay College of Criminal Justice, City University of New York

2005-06   Postdoctoral Fellow
University of Cambridge, Institute of Criminology
Funded by the Economic and Social Research Council (ESRC)

## Awards and Distinctions

2014   Faculty Mid-Career Research Support Program, John Jay College of Criminal Justice

| | |
|---|---|
| 2013 | Visiting scholar, École normale supérieure, Centre Maurice Halbwachs, Paris |
| 2012 2007 | Faculty Scholarly Excellence Award, John Jay College of Criminal Justice |
| 2011 | Collaborative Research Award, John Jay College of Criminal Justice |
| 2008 | Donald E.J. MacNamara Award for Outstanding Research by a Junior Faculty, John Jay College of Criminal Justice |

## Research Interests

Long-term imprisonment; desistance from crime; life-course and criminal career research; prisoner reentry; international comparative research.

## Publications

* Denotes collaborations with students.

### Monograph

Kazemian, L. (forthcoming). *Positive Growth within our Prisons*. Under contract with Routledge.

### Edited volumes

Farrington, D.P., Kazemian, L. and Piquero, A. (2019, Eds.). *The Oxford Handbook on Developmental and Life-Course Criminology*. New York: Oxford University Press.

Morizot, J. & Kazemian, L. (2015, Eds.). *The Development of Criminal and Antisocial Behavior: Theory, Research and Practical Applications*. New York: Springer.

Kazemian, L. & Farrington, D.P. (2007, Eds.). Special issue on desistance from crime. *Journal of Contemporary Criminal Justice*, 23 (1).

### Peer-reviewed articles

Kazemian, L. & Farrington, D.P. (2018). Advancing knowledge about residual criminal careers: A follow-up to age 56 from the Cambridge Study in Delinquent Development. *Journal of Criminal Justice*, *57*, 1-10.

* Andersson, C. & Kazemian, L. (2018). Reliability and validity of cross-national homicide data: A comparison of UN and WHO data. *International Journal of Comparative and Applied Criminal Justice*, 42(4), 287-302.

* Walker, A., Kazemian, L., Lussier, P. & Na, C. (2017). The role of family support in the explanation of patterns of desistance among individuals convicted of a sexual offense. *Journal of Interpersonal Violence* (published online, awaiting print publication).

Kazemian, L. & Travis, J. (2015). Forgotten prisoners: Imperative for inclusion of long termers and lifers in research and policy. *Criminology & Public Policy*, *14(2)*, 355-395.

Kazemian, L. (2015). Conducting prison research in a foreign setting. *International Journal for Crime, Justice and Social Democracy*, *4(1)*, 113-127.

* Kazemian, L., McCoy, C. & Sacks, M. (2012). Does law matter? An old bail law confronts the New Penology. *Punishment & Society*, 15(1), 43-70.

* Piquero, A.R., Carriaga, M., Diamond, B., Kazemian, L. & Farrington, D.P. (2012). Stability in aggression revisited. *Aggression and Violent Behavior*, 17, 365-372.

Kazemian, L., Pease, K., & Farrington, D.P. (2011). DNA retention policies: The potential contribution of criminal career research. *European Journal of Criminology*, 8(1), 48-64.

Kazemian, L., Widom, C.S. & Farrington, D.P. (2011). A prospective examination of the relationship between childhood neglect and juvenile delinquency in the Cambridge Study in Delinquent Development. *International Journal of Child, Youth areand Family Studies*, 2(1-2), 65-82.

Kazemian, L., Cusson, M., & Le Blanc, M. (2011). Des jeunes délinquants devenus meurtriers: Une étude des carrières criminelles des délinquants homicidaires. *Revue internationale de criminologie et de police technique et scientifique*, *LXIV (4)*, 413-430.

Kazemian, L., Farrington, D.P., & Le Blanc, M. (2009). Can we make accurate long-term predictions about patterns of de-escalation in offending behavior? *Journal of Youth and Adolescence*, 38(3), 384-400.

* Eisner, M., Ribeaud, D., Murray, J., Kazemian, L., & Topcuoglu, T. (2009). The event history calendar as an instrument for longitudinal criminological research. *Monatsschrift für Kriminologie und Strafrechtsreform,* 92(2/3), 137-159.

Kazemian, L. (2007). Desistance from crime: Theoretical, empirical, methodological, and policy considerations. *Journal of Contemporary Criminal Justice*, 23(1), 5-27.

Kazemian, L. & Le Blanc, M. (2007). Successful criminal careers: Random occurrences or distinctive characteristics? *Crime and Delinquency,* 53(1), 38-63.

Kazemian, L., Le Blanc, M., Farrington, D.P., & Pease, K. (2007). Patterns of residual criminal careers among a sample of adjudicated French-Canadian males. *Canadian Journal of Criminology and Criminal Justice*, 49(3), 307-340.

Kazemian, L. & Farrington, D.P. (2006). Exploring residual career length and residual number of offenses for two generations of repeat offenders. *Journal of Research in Crime and Delinquency*, 43(1), 89-113.

Kazemian, L. & Farrington, D.P. (2005). Comparing the validity of prospective, retrospective, and official onset for different offending categories. *Journal of Quantitative Criminology*, 21(2), 127-147.

Kazemian, L. & Le Blanc, M. (2004). Exploring patterns of perpetration of crime across the life course: Offense and offender-based viewpoints. *Journal of Contemporary Criminal Justice*, 20(4), 393-415.

Morselli, C. & Kazemian, L. (2004). Scrutinizing RICO. *Critical Criminology*, 12(3), 351-369.

Kazemian, L. & Le Blanc, M. (2003). Le passage à l'acte criminel de l'adolescence à l'âge adulte: Analyse des formes et des trajectoires de *modus operandi. Revue internationale de criminologie et de police scientifique*, LVI(4), 417-450.

### Book chapters

\* Kazemian, L., Walker, A. (2019). Effects of incarceration. In Farrington, D.P., Kazemian, L. and Piquero, A.R. (Eds.), *The Oxford Handbook of Developmental and Life-Course Criminology* (pp. 576-599). New York: Oxford University Press.

Kazemian, L., Farrington, D.P. and Piquero, A.R. (2019). Developmental and life-course criminology. In Farrington, D.P., Kazemian, L. and Piquero, A.R. (Eds.), *The Oxford Handbook of Developmental and Life-Course Criminology* (pp. 3-10). New York: Oxford University Press.

Farrington, D.P., Kazemian, L., and Piquero, A.R. (2019). Conclusions and implications for developmental and life-course criminology. In Farrington, D.P., Kazemian, L. and Piquero, A.R. (Eds.), *The Oxford Handbook of Developmental and Life-Course Criminology* (pp. 750-756). New York: Oxford University Press.

Kazemian, L. (2015). Desistance from crime and antisocial behavior. In Morizot, J. & Kazemian, L. (Eds.), *The Development of Criminal and Antisocial Behavior: Theory, Research and Practical Applications* (pp. 295-312). New York: Springer.

Morizot, J. & Kazemian, L. (2015). Introduction. In Morizot, J. & Kazemian, L. (Eds.), *The Development of Criminal and Antisocial Behavior: Theory, Research and Practical Applications* (pp. 1-16). New York: Springer.

4

Kazemian, L. and Farrington, D. P. (2014). The developmental evidence base: Desistance. In Towl, G. & Crighton, D. (Eds.) *Forensic Psychology (2nd ed.)*. Oxford: Blackwell.

Kazemian, L. (2012). Pushing back the frontiers of knowledge on desistance from crime: Current and future directions. In R. Loeber & B. Welsh (Eds.), *The Future of Criminology* (pp. 134-140). New York: Oxford University Press.

Piquero, A., Hawkins, J.D. & Kazemian, L. (2012). Criminal career patterns. In R. Loeber & D.P. Farrington (Eds.), *From Juvenile Delinquency to Adult Crime: Criminal Careers, Justice Policy, and Prevention* (pp. 14-46).  New York: Oxford University Press.

Kazemian, L. & LeBel, T. (2012). Réinsertion et sorties de délinquance *[Desistance and reintegration]*. In M. Mohammed (Ed.), *Les sorties de délinquance: Théories, méthodes, enquêtes* (pp. 229-254)*.* Paris: La Découverte.

Kazemian, L. & Farrington, D.P. (2012). Recherches sur les sorties de délinquance: Quelques limites et questions non résolues *[Limitations and unresolved issues in desistance research]*. In M. Mohammed (Ed.), *Les sorties de délinquance: Théories, méthodes, enquêtes* (pp. 61-86)*.* Paris: La Découverte.

Kazemian, L. & Maruna, S. (2009). Desistance from crime. In M. Krohn, A.J. Lizotte, & G.P. Hall (Eds.), *Handbook on Crime and Deviance* (pp. 277-295). New York: Springer.

von Hirsch, A. & Kazemian, L. (2009). Predictive sentencing and selective incapacitation. In A. von Hirsch, A. Ashworth, & J. Roberts (Eds.), *Principled Sentencing: Readings on Theory and Policy, 3rd edition* (pp. 95-101). Oxford, England: Hart.

Kazemian, L. & Piquero, A. (2009). David P. Farrington. In K. Hayward, S. Maruna, & J. Mooney (Eds.), *Fifty Key Thinkers in Criminology* (pp. 267-272). New York: Routledge.

Martin López, M.T., Le Blanc, M., Espuny, F.D., Curto Fortuno, R., & Kazemian, L. (2004). Medidas de adaptación social y personal para adolescentes españoles: Análisis de su coherencia interna, fiabilidad y validez. In F. Pérez Álvarez (Ed.), *Serta: In Memoriam Alexandri Baratta [*Methods of social and personal adjustment among Spanish adolescents: Analysis of consistency, reliability, and validity*]* (pp. 465-488). Salamanca: Acquilafuente.

### *Other publications*

Lents, N.H. and Kazemian, L. (2017). What biology can teach us about crime and justice. *Skeptic Magazine*, *22(4)*, 12-19.

* Butts, J.A., Pelletier, E. and Kazemian, L. (2017). *Positive Outcomes: Strategies for Assessing the Progress of Youth Involved in the Justice System*. New York, NY: Research and Evaluation Center, John Jay College of Criminal Justice, City University of New York.

Kazemian, L. (2015). Straight lives: The Balance between Human Dignity, Public Safety, and Desistance from Crime. New York, NY: Research & Evaluation Center, John Jay College of Criminal Justice.

* Kazemian, L. & Andersson, C. (2012). *The French Prison System: Comparative Insights for Policy and Practice in New York and the United States*. New York, NY: Research and Evaluation Center, John Jay College of Criminal Justice, City University of New York.

Kazemian, L. (2009). Desistance. In R. Rosenfeld (Ed.), *Oxford Bibliography Online*. Oxford University Press.

Kazemian, L. (2009). Criminal Career Research. In R. Rosenfeld (Ed.), *Oxford Bibliography Online*. Oxford University Press.

Kazemian, L. (2009). Developmental and Life-Course Criminology. In R. Rosenfeld (Ed.), *Oxford Bibliography Online*. Oxford University Press.

Kazemian, L. (2009). Contributions to the Sage Glossary of the Social and Behavioral Sciences, edited by Larry E. Sullivan. Thousand Oaks, CA: Sage Publications.

Kazemian, L. (2008). The criminal career paradigm. In L. Kontos & D.C. Brotherton (Eds.), *Encyclopedia of Gangs* (pp. 34-38). New York: Routledge.

## Funding

2016    *Long-Term Incarceration and Desistance from Crime*
        Principal Investigator, PSC-CUNY, City University of New York; $11,997.

2013    *Quality of Life, Desistance and Reentry in Parisian Correctional Facilities*
        Principal Investigator, City of Paris Research Fellowship, France; €18,000.

2013    *Understanding Desistance from Crime in Adult Sex Offenders: A Prospective Longitudinal Study*
        Co-Principal Investigator, Social Sciences and Humanities Research Council of Canada; $79,000.

2010    *Le devenir des adolescents: Trajectoires de comportement antisocial, d'adaptation sociale et de personnalité jusqu'à la cinquantaine*

[*Trajectories of Antisocial Behavior, Social Adjustment and Personality Up to Age 50*]
Research Collaborator, Social Sciences and Humanities Research Council of Canada; $101,910.

2010   *The Relationship between Social Integration and Victimization among Immigrant Groups*
Principal Investigator, PSC-CUNY, City University of New York; $1,330.

2009   *Testing the Accuracy of Offender Typologies in Self-Reports and Official Records*
Principal Investigator, PSC-CUNY, City University of New York; $4,390.

2007   *Linking up Qualitative Accounts and Quantitative Measures of Desistance*
Principal Investigator, PSC-CUNY, City University of New York; $5,100.

2005   *Desistance from Crime*
Co-Principal Investigator with David Farrington, National Consortium on Violence Research, NSF, Washington, DC; $15,000.

2003   Doctoral Research Grant
*Fonds de recherche sur la société et la culture* (Quebec, Canada); $46,600.

Doctoral Research Grant
Overseas Research Student Award; £10,000 GBP.

Doctoral Research Grant
Wakefield Scholarship; £10,000 GBP.

2002   Doctoral Research Grant
Cambridge Commonwealth Trust; £4,500 GBP.


## Data Collection

2016   *Long-Term Incarceration and Desistance from Crime*
France

2013   *Quality of Life, Desistance and Reentry in Parisian Correctional Facilities*
Paris, France

2006-07   *Collaborative Family Initiative* (CFI) Program
John Jay Research and Evaluation Centre & Department of Juvenile Justice

2005-06     *Zurich Project on the Social Development of Children*
            University of Cambridge, Institute of Criminology

2003        *Peterborough Youth Study* (PYS)
            University of Cambridge, Institute of Criminology

2001-02     Research project on applications of anti-racketeering legislation
            Université de Montréal, School of Criminology

2000        Program evaluation of a high-school dropout prevention program
            among high-risk adolescents.
            Université de Montréal, School of Criminology

1999-2002   *Montreal Two Samples Longitudinal Study*
            Université de Montréal, School of Criminology

## Invited Presentations

Kazemian, L. (2019, February). *Desistance and adaptation: The case of long-term prisoners.* Prisons Research Centre, University of Cambridge.

Kazemian, L. (2019, February). *Desisting in prison.* University of Glasgow & University of Belfast.

Kazemian, L. (2017, December). *Le désistement des jeunes placés sous main de justice* [*Desistance of justice-involved youth*]. *École nationale de protection judiciaire de la jeunesse*, Roubaix, France.

Kazemian, L. (2016, December). *How can desistance research inform our understanding of child trajectories into and out of non-state armed groups*? United Nations University, New York, NY.

Kazemian, L. (2016, December). *L'évolution des modèles d'intervention auprès des populations judiciarisées* [*The evolution of intervention models with adjudicated populations*]. *École nationale d'administration pénitentiaire*, Agen, France.

Kazemian, L. (2016, May). *Les enjeux pratiques de la recherche sur le désistement pour les agents de probation* [*Practical applications of desistance research for probation officers*]. Belgian Ministry of Justice, Brussels, Belgium.

Kazemian, L. (2015, December). *The role of social bonds in the explanation of desistance from crime*. Paper presented at a conference funded by the Portugal Justice Ministry, Lisbon, Portugal.

Kazemian, L. (2014, September). *Les perceptions de la qualité de vie en détention et les obstacles au désistement : résultats d'une recherche menée à la maison centrale de Poissy* [*Perceived quality of life in prison and obstacles to desistance : Results*

from a research conducted in a French prison]. Université Paris 1, Panthéon-Sorbonne, Paris, France.

Kazemian, L. (2014, September). *La recherche en milieu carcéral* [*Prison research*]. L'Observatoire international des prisons, Paris, France.

Kazemian, L. (2014, September). *La prison, le désistement et la réinsertion* [*Prison, desistance and reentry*]. Direction de l'administration pénitentiaire, Ministère de la justice (Correctional administration, Ministry of Justice, France).

Kazemian, L. (2014, September). *Le climat carcéral : Impact sur le personnel pénitentiaire et les détenus [Prison climate : Impact on staff and inmates*]. Paper presented to prison staff at Poissy correctional facility.

Kazemian, L. (2014, September). *Le rôle de la prison dans la préparation à la sortie [The role of prison in reentry planning*]. Paper presented to prisoners at the Poissy correctional facility.

Kazemian, L. (2014, March). *The French prison system*. Beyond the bars: Breaking through. Columbia University, New York.

Kazemian, L. (2013, June). *La réinsertion sociale et le désistement : Le rôle des services d'insertion et de probation* [*Reentry and desistance : The role of probation staff and services*]. Angers, France.

Kazemian, L. (2013, June). *Les enjeux de la recherche sur les carrières criminelles pour le travail des praticiens dans les champs judiciaire et pénitentiaire* [*Practical implications of criminal career research for practitioners in the judicial and correctional fields*]. Event organized by associations of judges, probation and attorneys (*Tribunal de grande instance de Pontoise, le Service pénitentiaire d'insertion et de probation du Val d'Oise et l'Ordre des avocats de Pontoise*), Maison de l'avocat, Pontoise, France.

Kazemian, L. (2013, April). *Probation, contrainte pénale communautaire, désistement* [*Probation, community sanctions, desistance*]. L'Institut national des hautes études de la sécurité et de la justice, Paris, France.

Kazemian, L. (2013, February). *Que sait-on des facteurs qui préconisent la récidive* [*What do we know about factors that promote recidivism?*]. Invited expert at a conference organized by the French Ministry of Justice (*Conférence de consensus sur la prévention de la récidive*), Paris, France.

Kazemian, L. (2013, February). *À propos des études sur la désistance (ou désistement)* [*Issues in desistance research*]. Paper presented at Université Paris 1, Panthéon-Sorbonne, Paris, France.

Kazemian, L. (2012, May). *État des lieux de la recherche empirique sur le désistement* [*Empirical research on desistance: Current state of knowledge*]. Plenary

presentation at the meeting of the Association internationale des criminologues de langue française (AICLF, International Association of French-Speaking Criminologists), Montreal, Canada.

Kazemian, L. (2011, December). *Le rôle de l'état dans l'administration pénitentiaire : L'exemple des États-Unis* [*The role of the state in correctional administration : The example of the United States*]. École nationale d'administration pénitentiaire, Agen, France.

Kazemian, L. (2011, July). *Le système pénitentiaire américain* [*The American correctional system*]. École nationale d'administration pénitentiaire, Agen, France.

Kazemian, L. (2011, July). *Désistement et réinsertion sociale aux États-Unis* [*Desistance and social reintegration in the United States*]. École nationale d'administration pénitentiaire, Agen, France.

Kazemian, L. (2009, April). *Assessing the impact of a recidivist sentencing premium on crime & recidivism rates*. Paper presented at a meeting on sentencing policy, University of Oxford.

Kazemian, L. (2008, April). *Crime prevention and criminal history*. Paper presented at a meeting on sentencing practices for repeat offenders, University of Cambridge.

Kazemian, L. & Farrington, D.P.  (2006, June). *Final report on desistance workshop.* NCOVR workshop, La Romana, Dominican Republic.

Kazemian, L. (2006, May). *Desistance from crime: Theoretical, empirical, methodological, and policy issues.* NCOVR-funded workshop on desistance from crime, Washington, DC.

Kazemian, L. (2005, November). *Desistance from crime: Some recent findings.* School of Criminal Justice, State University of New York, Albany.

Kazemian, L. (2005, October). *Event history analysis using the Zurich Study Data.* Meeting for the Zurich study on the social development of children, Switzerland.

Kazemian, L. (2005, June). *Chronic and persistent offending: Causes and solutions*. Institute of Criminology, University of Cambridge.

Kazemian, L. (2005, March). *Assessing residual criminal career estimates*. Workshop on criminal career research and sentencing policy, Washington, DC.

Kazemian, L. (2003, March). Delegate in a roundtable on Canadian development aid policies, London, England.

## Conference Presentations

* Denotes collaborations with students.

Kazemian, L. (2018, June). *Les mécanismes d'adaptation au milieu carcéral* [Mechanisms of adaptation in prison]. Paper presented at the meeting of the Association internationale des criminologues de langue française (AICLF, International Association of French-Speaking Criminologists), Lausanne, Switzerland.

Kazemian, L. (2017, November). Exploring change and prison adaptation in French prisons. American Society of Criminology Annual Meeting, Philadelphia.

* Andersson, C. & Kazemian, L. (2017, November). An examination of cross-national crime trends and American exceptionalism. American Society of Criminology Annual Meeting, Philadelphia.

* Fera, B. & Kazemian, L. (2017, November). Reliability and Validity of Cross-National Homicide Data: A Comparison of UN and WHO Data. American Society of Criminology Annual Meeting, Philadelphia.

Kazemian, L. (2016, November). *How different are lifers from other long-term prisoners?* American Society of Criminology Annual Meeting, New Orleans.

Kazemian, L. (2016, November). *Mapping the "life course" of developmental and life course theory: A discussion-based session reflecting on the past and charting pathways for the future.* American Society of Criminology Annual Meeting, New Orleans.

Kazemian, L. (2016, May). *L'étude du désistement en prison* [Findings on desistance in prisons]. Paper presented at the meeting of the Association internationale des criminologues de langue française (AICLF, International Association of French-Speaking Criminologists), Versailles, France.

Kazemian, L. (2015, November). *Studying desistance in prisons*. American Society of Criminology Annual Meeting, Washington, DC.

* Andersson, C. & Kazemian, L. (2015, November). *Evaluating cultural variations in cross-national homicide and suicide rates using multilevel analyses*. American Society of Criminology Annual Meeting, Washington, DC.

* Walker Franklin, A., Kazemian, L. and Lussier, P. (2015, November). *Exploring the criminal career patterns of two types of adult sex offenders*. American Society of Criminology Annual Meeting, Washington, DC.

Kazemian, L. & Travis, J. (2014, November). *The forgotten prisoners: The imperative for inclusion of long termers and lifers in research and policy*. American Society of Criminology Annual Meeting, San Francisco.

* Andersson, C. & Kazemian, L. (2014, November). *A cross-national and multilevel investigation of homicide rates using strain and frustration-aggression frameworks*. American Society of Criminology Annual Meeting, San Francisco.

* Andersson, C. & Kazemian, L. (2013, November). *A cross-national investigation of the stream analogy model of violence.* American Society of Criminology Annual Meeting, Atlanta.

Kazemian, L. (2013, June). *Pushing back the frontiers of knowledge on desistance from crime: Current and future directions*. Stockholm Criminology Symposium, Stockholm, Sweden.

* Andersson, C. & Kazemian, L. (2012, November). *The operationalization of anomie in a cross-national comparison of homicide rates.* American Society of Criminology Annual Meeting, Chicago.

* Lee, D. & Kazemian, L. (2012, November). *Is Canada adopting the U.S.' tough-on-crime approach?: Testing a harbinger of mass incarceration.* American Society of Criminology Annual Meeting, Chicago.

Kazemian, L., Widom, C.S. & Farrington, D.P. (2011, November). *Childhood neglect & adult life outcomes: Findings from the Cambridge Study in Delinquent Development*. American Society of Criminology Annual Meeting, Washington, DC.

* Andersson, C. & Kazemian, L. (2011, November). *The association between crime and other indicators of social malaise: A cross-national comparison*. American Society of Criminology Annual Meeting, Washington, DC.

Kazemian, L., Cusson, M. & Le Blanc, M. (2010, November). *Criminal careers of homicide offenders*. American Society of Criminology Annual Meeting, San Francisco.

Kazemian, L. (2010, June). *Pitfalls of enhanced sentences for repeat offenders*. John Jay College International Conference, Marrakech, Morocco.

Kazemian, L. (2010, May). *Influence de la nouvelle pénologie dans les décisions portant sur la libération sous caution* [*The role of the New Penology in bail decisions*]. Meeting of the Association internationale des criminologues de langue française (AICLF, International Association of French-Speaking Criminologists), Fribourg, Switzerland.

* Kazemian, L., Curtis, R. & Bribiesca, M. (2009, November). *A study of victimization among a sample of immigrants in Hempstead, NY*. American Society of Criminology Annual Meeting, Philadelphia.

* Edwards, C. & Kazemian, L. (2009, November). *The challenges of successful reintegration: Identifying the needs of formerly incarcerated individuals after their release from prison*. American Society of Criminology Annual Meeting, Philadelphia.

* Sacks, M., Kazemian, L. & McCoy, C. (2009, November). *Does law matter? Bail as danger control*. American Society of Criminology Annual Meeting, Philadelphia.

Kazemian, L. & Le Blanc, M. (2009, September). *Revisiting the relationship between substance use and desistance*. European Society of Criminology Annual Meeting, Ljubljana, Slovenia.

Kazemian, L. & Le Blanc, M. (2008, November). *Qualitative and quantitative measures of desistance*. American Society of Criminology Annual Meeting, St. Louis.

Kazemian, L. (2008, May). *Une évaluation critique de l'état des connaissances sur le désistement* [*A critical assessment of the state of knowledge on desistance*]. Association internationale des criminologues de langue française (AICLF, International Association of French-Speaking Criminologists), Rabat, Morocco.

Kazemian, L. (2007, November). *Author-meets-critic session: Wikstrom & Butterworth (2006). Adolescent crime: Individual differences and lifestyles*. American Society of Criminology Annual Meeting, Atlanta.

Kazemian, L., Farrington, D.P. & Le Blanc, M. (2007, July). *A comparison of the profiles of desisters, persisters, and non-offenders in self-reports and official records*. Law and Society Annual Meeting, Berlin, Germany.

Kazemian, L. & Le Blanc, M. (2006, November). *Differential cost avoidance and successful criminal careers: Random or rational?* American Society of Criminology Annual Meeting, Los Angeles.

Kazemian, L., Farrington, D.P. & Le Blanc, M. (2005, November). *Predicting termination and desistance from crime: A comparative analysis*. American Society of Criminology Annual Meeting, Toronto, Canada.

Kazemian, L. & Farrington, D.P. (2004, November). *Exploring residual career length and residual number of offenses for two generations of repeat offenders*. American Society of Criminology Annual Meeting, Nashville.

Kazemian, L. & Farrington, D.P. (2003, November). *Age of onset of offending: Exploring the validity of self-reports across time*. American Society of Criminology Annual Meeting, Denver.

Kazemian, L. & Le Blanc, M. (2002, November). *Adjudicated males' modus operandi trajectories up to age 30*. American Society of Criminology Annual Meeting, Chicago.

## Teaching
*Undergraduate Courses*
   Criminology (including in the Prison-to-College Pipeline program)
   Principles and Methods of Statistics
   Advanced Social Statistics

*MA Courses*
> Sociology of Crime
> Issues in Criminal Justice
> Computer Applications for Social Sciences

*Doctoral Seminars*
> Criminological Theory
> Life-Course Criminology and Criminal Career Research
> Quantitative Methods in Criminal Justice

## Dissertation and Thesis Advising

### Doctoral Dissertation Committees

*Chair*
> Beth Fera (current)
> Ronald Day (completed in January 2019)
> Allyson Walker (completed in summer 2017)
> Catrin Andersson (completed in summer 2015)

*Committee member*
> Ntasha Bhardwaj (current), Rutgers University
> Celina Cuevas (current), CUNY Criminal Justice Program
> Kwan-Lamar Blount-Hill (current), CUNY Criminal Justice Program
> Jennifer Peirce (current), CUNY Criminal Justice Program
> Jackie Scott (current), CUNY Criminal Justice Program
> Maurice Vann (current), CUNY Social Work Program
> William Parkin (completed in summer 2012), CUNY Criminal Justice Program
> Brenda Vollman (completed in summer 2010), CUNY Criminal Justice Program
> Meghan Sacks (completed in fall 2010), CUNY Criminal Justice Program
> Frédéric Ouellet (completed in fall 2010), Université de Montréal

*MA Thesis Committees*
> Cavwell Edwards (chair, completed spring 2009), John Jay Criminal Justice MA

## Academic Service

### *International Service*

2010 –     *Prix Fernand Boulan*, International committee assessing the most distinguished doctoral dissertation (*AICLF*, International Association of French-Speaking Criminologists)

2016 –     United Nations University, consultant on a project examining exits from armed conflict

14

2017 –    Steering committee, *AICLF* (International Association of French-Speaking Criminologists)

### National Service

2015 –    Expert in 4 separate legal cases involving housing and employment discrimination against individuals with a criminal record

2012-15   American Society of Criminology, Developmental and life-course Awards Committee

2014-17   American Society of Criminology Program Committee
2009
2007

2012      Sellin-Glueck Committee, American Society of Criminology

2010      Academy of Criminal Justice Sciences Program Committee

### Manuscript reviews

*Canadian Journal of Criminology and Criminal Justice*
*Child Abuse & Neglect*
*Crime and Delinquency*
*Criminal Justice and Behavior*
*Criminal Justice Review*
*Criminologie*
*Criminology*
*European Journal of Criminology*
*European Journal on Criminal Policy and Research*
*Feminist Criminology*
*International Journal of Offender Therapy and Comparative Criminology*
*Journal of Contemporary Criminal Justice*
*Journal of Developmental and Life-Course Criminology*
*Journal of Offender Rehabilitation*
*Journal of Quantitative Criminology*
*Journal of Research in Crime and Delinquency*
*Justice Quarterly*
*National Institute of Justice*
*Psychology, Crime and Law*
*Punishment and Society*
*Research Ethics*
*Revista Española de Investigación Criminológica (REIC)*
*Revue canadienne de criminologie et de justice pénale*
*Social Problems*
*Social Science Research*
*Social Sciences and Humanities Research Council of Canada*

15

### Other Professional Service

2014 –       Editorial Board, *Journal of Developmental and Life-Course Criminology*

2017 –       Editorial Board, *Criminologie*

2010 –       Invited collaborator-member of the *International Centre for Comparative Criminology* (ICCC)

2015-19      Editorial Board, *Criminal Justice and Behavior*

2017-18
2015-16      Review panel member for all federal research funding applications pertaining to Law and Criminology, Social Sciences and Humanities Research Council of Canada

2011-14      Editorial Board, *Journal of Quantitative Criminology*

2009         Editorial Board, Oxford Bibliographies Online Series in Criminology

### Service to the Community

2014 –       Volunteer work with *Network in Prisons* program, program facilitator

2011-2012    Volunteer work with City Harvest's food rescue and distribution program

2007-2008    Volunteer work with *Episcopal Social Services*, a New York-based organization assisting with the reentry needs of incarcerated and formerly incarcerated individuals

## Languages
English (fluent), French (fluent), Farsi (fluent), Spanish

16