**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

**CONNECTICUT FAIR HOUSING CENTER**
*et al.,*

                    *Plaintiffs,*

    v.

**CORELOGIC RENTAL PROPERTY**
**SOLUTIONS, LLC,**

               *Defendant.*

**No. 3:18-CV-705 (VLB)**

<u>**JOINT TRIAL MEMORANDUM**</u>

# TABLE OF CONTENTS

**Page**

I.     **Trial Counsel** ..................................................................................... 1
       A.     Plaintiffs' Counsel: ................................................................ 1
       B.     Defendant's Counsel: ............................................................. 1

II.    **Jurisdiction** ......................................................................................... 2

III.   **Jury/Non-Jury** .................................................................................... 2

IV.    **Length of Trial** ................................................................................... 2

V.     **Further proceedings** .......................................................................... 3

VI.    **Nature of the Case** ............................................................................. 3
       A.     Plaintiffs' Statement ............................................................... 3
       B.     Defendant's Statement ........................................................... 8

VII.   **Trial by Magistrate Judge** ............................................................... 15

VIII.  **Evidence** ........................................................................................... 16
       A.     Witnesses .............................................................................. 16
       B.     Exhibits ................................................................................. 48
       C.     Plaintiffs' Deposition Designations ..................................... 76
       D.     Defendant's Deposition Designations ................................. 76

IX.    **Stipulations of Fact and Statement of Contested Issues** ............... 77
       A.     Stipulations of Fact .............................................................. 77
       B.     Joint Statement of Contested Issues of Fact ...................... 79
       C.     Joint Statement of Contested Issues of Law ...................... 81

X.     **Anticipated evidentiary issues** ....................................................... 82

I.    **TRIAL COUNSEL**

    A.    **Plaintiffs' Counsel:**

Christine E. Webber
Brian Corman
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave., NW, suite 500
Washington, DC  20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
cwebber@cohenmilstein.com

Salmun Kazerounian
Sarah White
Greg Kirschner
**Connecticut Fair Housing Center**
60 Popieluszko Ct.
Hartford, CT  06106
Tel.: (860) 247-4400
Fax: (860) 247-4236
skazerounian@ctfairhousing.org

Eric Dunn
**National Housing Law Project**
1663 Mission St., Suite 460
San Francisco, CA  94103
Tel.: (415) 546-7000
edunn@nhlp.org

    B.    **Defendant's Counsel:**

Victoria Woodin Chavey
**JACKSON LEWIS, P.C.**
90 State House Square
8th Floor
Hartford, CT 06103
Telephone: (860) 522-0404
Facsimile: (860) 247-1330
Email: victoria.chavey@jacksonlewis.com

Timothy J. St. George, Pro Hac Vice
Alan Wingfield, Pro Hac Vice
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-6013
Email: timothy.st.george@troutman.com
Email: alan.wingfield@troutman.com

Cindy D, Hanson, Pro Hac Vice Pending
600 Peachtree Street NE
Suite 3000
Atlanta, GA 30308
Telephone: (404) 855-3000
Facsimile: (404) 855-3900
Email: cindy.hanson@troutman.com

## II.     JURISDICTION

This Court has subject-matter jurisdiction pursuant to 15 U.S.C. § 1681p (as to the Fair Credit Reporting Act claims) and 42 U.S.C. § 3613 (as to the Fair Housing Act claims). More generally, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## III.    JURY/NON-JURY

This is a non-jury trial.

## IV.    LENGTH OF TRIAL

Plaintiffs estimate that they will need 4-5 trial days to present their case. Defendant estimates it will need 4-5 trial days to present its case.

## V.   FURTHER PROCEEDINGS

No further proceedings are needed prior to trial, other than the final pre-trial conference with the Court.

## VI.   NATURE OF THE CASE

### A.   Plaintiffs' Statement

Plaintiff Carmen Arroyo, as next friend for Mikhail Arroyo, brings claims arising under three causes of action: the Fair Housing Act (FHA), 42 U.S.C. §§3601 *et seq.*; the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681, *et seq.*; and the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. §§ 42-110a, *et seq.*  Plaintiff the Connecticut Fair Housing Center (CFHC) joins in the FHA claims, and asserts that CoreLogic's tenant screening product, Registry CrimSAFE ("CrimSAFE") disproportionately makes housing unavailable to African Americans and Latinos, and that CoreLogic's policy of refusing to disclose consumer files to conservators disproportionately harms people with disabilities, causing CFHC to divert resources to address the ongoing discrimination, and frustrating CFHC's mission of ensuring equal access to housing.

CoreLogic RPS is a national tenant screening company that offers an automated criminal history screening product called "CrimSAFE." Multifamily rental housing providers[1] that use CrimSAFE select, with CoreLogic's assistance, "lookback periods" for certain general crime categories selected by CoreLogic. When a person applies for admission to a client landlord's property, CrimSAFE

---

[1] Plaintiffs use the terms "housing provider" and "landlord" interchangeably to refer to owners and managers of residential rental housing.

3

electronically locates any criminal records belonging to the applicant, determines whether any such records are disqualifying under the selected admission policy, and reports a simple accept/decline leasing decision. If CrimSAFE reports that "disqualifying records were found," the applicant is effectively denied admission.

CoreLogic continues to market CrimSAFE to housing providers as a decision-making product that "automates the evaluation of criminal records for you, relieving your staff of the burden." Housing providers "who choose to have their rental decisions automated using … CrimSAFE" can hide the detailed criminal record from the view of leasing agents, who are only provided a "decision report" stating whether or not the applicant should be accepted, without any detail about the nature, recency, or severity of the underlying criminal history. Most housing providers follow that option, and thus cannot engage in the individualized review that HUD guidance prescribes.[2] The suppression of the detailed record is especially problematic given CoreLogic RPS's decision to configure CrimSAFE to render adverse decisions based solely on charges that have not resulted in a conviction and on convictions up to 99 years old, again contrary to HUD Guidelines (and extensive federal court precedent in the Title VII context).

Restricting access to housing based on criminal history has a known disparate impact on African American and Latino rental applicants, who, nationwide and across Connecticut, are disproportionately arrested, charged,

---

[2] Individualized assessments have long been understood as necessary in the employment context to avoid unjustifiably discriminating against job applicants. *See Green v. Mo. Pac. R.R. Co.*, 523 F.2d 1290, 1298 (8th Cir. 1975); cited with approval in *Barletta v. Rilling*, 973 F. Supp. 2d 132, 139 (D. Conn. 2013).

convicted, and incarcerated as compared with similarly situated white applicants.[3] Mr. Arroyo, a Latino man, had a charge on his record for minor shoplifting, below the level of a misdemeanor, which did not lead to a conviction. He subsequently had an accident that caused a traumatic brain injury and left him incapable of walking, talking, or caring for himself.  Nevertheless, his charge was the basis of the CrimSAFE decline decision which excluded him from housing. There was no individualized review – nor could there be, because the leasing agent who processed the application had no information about what his criminal record consisted of – and thus no consideration of the fact that Mr. Arroyo had never been convicted of a crime, that his charge was extremely minor, and most crucially, at the time of the housing application, he was totally disabled, and incapable of engaging in criminal activity. CoreLogic RPS simply reported that his record was "disqualifying" and provided a letter, pre-addressed to Mr. Arroyo, that the landlord could use to notify him of the decision.

Furthermore, when Ms. Arroyo sought a copy of Mr. Arroyo's file from CoreLogic so that she could find out the basis for the denial and advocate on his

---

[3] Availability pools "often form the initial basis of a disparate impact claim, especially in cases [where] the actual applicant pool might not reflect the potential applicant pool, due to a self-recognized inability on the part of potential applicants to meet the very standards challenged as being discriminatory." *EEOC v. Joint Apprenticeship Comm.*, 186 F.3d 110, 119 (2d Cir. 1999). See also Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308-09 n.13 (1977) (finding data which demonstrates the pool of eligible candidates is appropriate to consider where reliable applicant flow data was not available); *Malave v. Potter*, 320 F.3d 321, 327 n.4 (2d Cir. 2003) (finding that the application process might not adequately reflect the actual potential applicant pool); *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 170 (E.D.N.Y. 2019).

behalf with her landlord, CoreLogic required more than what was <u>reasonably</u> <u>necessary</u> to properly identify Mr. Arroyo and confirm Ms. Arroyo was his conservator.  CoreLogic denied her request on the grounds that a conservatorship was not acceptable, and a specific power of attorney would have to be executed by Mr. Arroyo in order for Ms. Arroyo to obtain a copy of his file, despite the fact that she informed CoreLogic that Mr. Arroyo was disabled and not capable of executing a power of attorney. CoreLogic subsequently denied Ms. Arroyo's request on behalf of Mr. Arroyo on the grounds that the seal on the copy of her conservatorship certificate sent to them was only partially visible, and the copy was not embossed with a raised seal, a requirement unsupported by law.

Plaintiffs  assert the following claims under the FHA: (a) that CrimSAFE has a disparate impact on African American and Latino tenants that cannot be justified by business necessity, and for which, in any event, less discriminatory alternatives are available; (b) that CoreLogic intentionally discriminates against African American and Latino renters, having adopted policies it knew had a disparate impact and retained those policies – even after HUD Guidance in 2016 counseled change; (c) that CoreLogic discriminated against Plaintiffs on the basis of disability by denying Mr. Arroyo's request for reasonable accommodation in obtaining a copy of his consumer file because his disabilities required that he make his request through a conservator; and (d) that CoreLogic's file disclosure practices have an adverse impact on individuals with disabilities[4] that cannot be justified by business

---

[4] Because all persons placed under conservatorship will, of necessity, meet the definition of "disabled" under the FHA, a requirement that precludes *all* such

necessity, and for which less discriminatory alternatives are available.

Plaintiffs claim that CoreLogic violated FCRA by not disclosing Mikhail Arroyo's consumer file to Carmen Arroyo, his legal conservator, and by failing to establish reasonable requirements for disclosures that would enable conserved consumers or consumers without the legal capacity to execute a power of attorney to receive a copy of their consumer file, and that both violations of FCRA were willful.  Plaintiff claims that Defendant violated CUTPA by constraining the ability of conserved consumers to access their consumer file and providing a discriminatory tenant screening product that fails to make individualized assessments of criminal history and frustrates housing providers' ability to do the same.

Plaintiffs seek as relief (a) compensatory damages for Carmen Arroyo on behalf of Mikhail Arroyo for all of claims, including economic losses, emotional distress, violation of rights and loss of housing opportunity, as well as statutory damages for the FCRA violation; (b) compensatory damages for Carmen Arroyo on her own behalf, for the Fair Housing Act claims, including economic losses, and emotional distress; (c) compensatory damages to the Connecticut Fair Housing Center for diversion of its resources and frustration of its mission with respect to the FHA claims of adverse impact on African Americans, Latinos, and persons with disabilities; (d) punitive damages; (e) declaratory relief finding Defendant's actions violate the FHA and CUTPA; (e) injunctive relief to change CoreLogic's practices

---

persons from accessing their consumer files has a disparate impact, because, by comparison, only a small fraction of individuals in the general population will be similarly precluded from accessing their file.

that are challenged here; and (f) reasonable attorneys' fees and costs under 42 U.S.C. § 3613(c); 15 U.S.C. § 1681n and § 1681o; and Conn. Gen. Stat. § 42-110g(d).

    **B.**   <u>Defendant's Statement</u>

    CoreLogic RPS's products assist housing providers in evaluating prospective tenants, including by providing public criminal record reports.  To order a report, a housing provider electronically submits personal identifying information to CoreLogic RPS.[5]  RPS then uses a proprietary matching process to identify criminal public records from CoreLogic RPS's database that match the applicant.  CoreLogic RPS does not interact with applicants for multi-family housing units during the application stage.

    CoreLogic RPS also offers an optional product called "CrimSAFE," which filters any criminal records found based on criteria set by the housing provider, and which categorizes records according to their type and severity levels. CrimSAFE then notifies the provider whether any "records found" that match its criteria (*e.g.*, convictions for assault in the past three years).

    Prior to using the CrimSAFE product, housing providers are required to fill out their selection criteria on a matrix that accounts for: (1) the type or "category" of 36 types of crimes; (2) whether the offense resulted in a conviction; (3) whether the offense is a felony or non-felony; and (4) the age of the offense.  The matrix of 36 crime categories tracks the categorizations established by the FBI through the "National Incident-Based Reporting System."  Housing providers can search offenses that have not resulted in a conviction for a period of seven years (or as

---

    [5] When such information is submitted, it does not reflect the applicant's race.

otherwise allowed by applicable law), and they can search offenses that have resulted in a conviction without a time limitation.

CrimSAFE is always accompanied by another portion of the screening report that contains the full data of any criminal record(s) identified via CrimSAFE. Thus, housing providers always can view the full detail of any record(s) found.

With this context in mind, this case arises out of Mr. Arroyo's application to rent an apartment at the ArtSpace Windham complex in Windham Connecticut, which is operated by WinnResidential. WinnResidential is indisputably governed by the FHA, and it agreed in its contract with CoreLogic RPS that WinnResidential would comply with all "applicable law." WinnResidential requested and received a tenant screening report about Mr. Arroyo from CoreLogic RPS in April 2017. WinnResidential requested that CoreLogic RPS utilize its CrimSAFE product to filter and categorize any records found relating to Mr. Arroyo, in addition to providing the detail of any such records. At the time of its request, WinnResidential had instructed CoreLogic RPS to return records of pending theft charges. Therefore, the CrimSAFE report on Mr. Arroyo accurately identified a pending charge for theft, and it reported all details of that charge to WinnResidential. CoreLogic RPS had no knowledge of Mr. Arroyo's race or his disability when it returned the CrimSAFE report to WinnResidential. After receiving the CrimSAFE report, WinnResidential denied Mr. Arroyo's application and informed his mother, Ms. Arroyo, of that denial. Years later, and only after suing and successfully settling with WinnResidential for claimed violations of the federal Fair Housing Act

9

("FHA") that are redundant of those plead here against CoreLogic RPS, Plaintiffs filed this action.

<u>Count I</u>:   Count I of Plaintiffs' Complaint is premised upon a claim that CoreLogic RPS, through its CrimSAFE product, discriminates against African Americans and Latinos in the housing application process, including as to Mr. Arroyo, in violation of 42 U.S.C. § 3604(a), (b), and (f) of the FHA.  The claim takes the form of allegations of disparate treatment and disparate impact.

***Disparate Treatment***.  To establish a case of disparate treatment, a plaintiff must establish that "animus was a significant factor" in the position taken by the decision-makers.  *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 400 (S.D.N.Y. 2013).  It is undisputed that CoreLogic RPS did not know Mr. Arroyo's race at any time prior to the filing of this lawsuit.  Thus, no claim of disparate treatment is possible.

***Disparate Impact.***  "A disparate impact analysis examines a facially-neutral policy or practice, such as a . . . hiring test, for its differential impact or effect on a particular group."  *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 52-53 (2d Cir. 2002).  "If the plaintiffs make out a prima facie case [of disparate impact], then the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their decision."  *Reg'l Econ. Cmty. Action Program, Inc.*, 294 F.3d at 49.  If the defendants satisfy that burden, "[t]he plaintiffs must then prove that the defendants intentionally discriminated against them on a prohibited ground."  *Id.*

Plaintiffs have failed to meet the required legal standard for making a *prima facie* statistical showing of disparate impact, including by failing utilize the

appropriate comparison groups.  Plaintiffs were required to: (1) develop admissible evidence of the racial composition of the relevant applicant pool at the applicable complexes, including the percentage of Latino and African American applicants; and (2) then compare those demographics to the percentage of African-American and Latino applicants for whom CrimSAFE had identified a "record found." Plaintiffs failed to develop any such statistical evidence, nor does CoreLogic RPS have that information.  Nor did they develop evidence that CoreLogic RPS's customer base in Connecticut uses CrimSAFE as a "decisioning" product as alleged, which is essential to any claim that CrimSAFE "disparately impacts" applicants.

CrimSAFE also furthers numerous, legitimate interests of housing providers in the Congressionally-endorsed criminal background screening process, including efficiency, consistency, and accuracy.  Accordingly, Plaintiffs proposed two "less discriminatory" alternatives for CoreLogic RPS in connection with the CrimSAFE product: (1) that CoreLogic RPS should return the underlying criminal record(s) with the CrimSAFE result; or (2) that CoreLogic RPS should conduct an "individualized assessment" of the applicant's situation in connection with any "record(s) found" through CrimSAFE.  As to the first suggestion, CoreLogic RPS already makes available the underlying criminal record with every CrimSAFE result, just as it did for Mr. Arroyo.  Plaintiffs' second suggestion is impractical and hypothetical.  CoreLogic RPS does not have insight into the majority of the information that would lead to an individualized assessment and housing decision.

There also is no evidence that properties would allow CoreLogic RPS to act in the manner advanced by Plaintiffs.

**Counts II and III**:  Counts II and III of Plaintiffs' Complaint are premised upon a claim that that CoreLogic RPS's procedures for responding to consumer file disclosure requests disparately impacts and explicitly discriminates against disabled individuals who are subject to a conservatorship in violation of the FHA. Plaintiffs again assert claims of disparate impact and disparate treatment.

***Disparate Treatment***.  Plaintiffs' have not put forward any evidence of disparate treatment on the basis of disability.  CoreLogic RPS maintains policies and procedures to release consumer files to third parties with guardianship authority.  Here, however, the decision to not release Mr. Arroyo's consumer file to Ms. Arroyo was indisputably based on the insufficiency of the documentation supplied by Ms. Arroyo, and not due to any animus toward Mr. Arroyo's based on his disability.

***Disparate Impact***.  Plaintiffs admit that they are aware of no other conserved individual apart from Mr. Arroyo who has ever requested a file disclosure from CoreLogic RPS.  CoreLogic RPS is also unaware of any other such occurrence.  It is well settled that one isolated incident cannot support a claim of disparate impact under the FHA.

**Counts IV and V**:   The allegation that CoreLogic RPS did not return Mr. Arroyo's record to WinnResidential at the time of his screening forms the basis for Plaintiffs' claim for actual damages in Count V under 15 U.S.C. §§ 1681g(a) and 1691h of federal Fair Credit Reporting Act ("FCRA").  Section 1681g(a) of the FCRA

requires a "consumer reporting agency" to supply a consumer with "all information in the consumer's file," provided the consumer furnishes "proper identification," which is not itself a defined term. *See* 15 U.S.C. § 1681h.

Plaintiffs' claim that CoreLogic RPS has a corporate "policy" of refusing file disclosures to disabled consumers who are under a conservatorship. But no such policy has ever existed. Instead, consistent with the FCRA's requirement that CoreLogic RPS receive "proper identification" of a consumer before transmitting a sensitive consumer file, CoreLogic RPS provides consumer files to third-party legal guardians who submit appropriate documentation of the current status of their guardianship. Ms. Arroyo did not submit such documentation when she requested her son's consumer file.

Count VI: Plaintiffs' claim in Count VI under the Connecticut Unfair Trade Practices Act ("CUTPA") is derivative of the statutory claims discussed above. To prevail on the CUTPA claim plead in Count VI of the Complaint, Plaintiffs must prove two elements: "(1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; [and] (2) [Plaintiffs have] suffered an ascertainable loss of money or property as a result of the defendants acts." *Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc*., 296 Conn. 315, 350 (2010). CoreLogic RPS did not act in way that was "unfair" or "deceptive" through the CrimSAFE product. CoreLogic RPS also did not "facilitate" any discriminatory conduct by housing providers, as claimed. Instead, the record supports only the opposite conclusion. CoreLogic RPS requires its customers to comply with the FHA under the terms of its contracts. Also, in the immediate aftermath of the April

13

2016 HUD Memorandum, CoreLogic RPS took numerous, proactive steps to inform its customer base of the guidance, summarize the guidance, and encourage legal review.

**Damages**:   Plaintiffs must establish their claimed damages by a preponderance of the evidence and further show that such damages were proximately caused by CoreLogic RPS.

CoreLogic RPS contests Plaintiffs' entitlement to the damages sought, including any proposed injunctive relief.  Such damages are not supported by competent evidence, not mitigated, not proximately caused by CoreLogic RPS, and/or already compensated by payments made by third parties for the same relief sought.

**Affirmative Defenses**:

1.     Plaintiffs have failed to state a claim upon which relief can be granted under the FHA, because the statutory provisions of the FHA and accompanying regulations do not apply to CoreLogic RPS, which is not a housing provider, and which provided a software tool through CrimSAFE for housing providers to format and then use at their discretion.

2.     Ms. Arroyo lacks standing to sue in her individual capacity.  While being a conservator allows her to bring suit on behalf of Mr. Arroyo, it does not confer his legal rights and claims onto her.

3.     The FCRA claim asserted by Mr. Arroyo fails because there is no question that CoreLogic RPS accurately reported his pending criminal proceeding, which precludes claims under 15 U.S.C. §§ 1681g(a) and 1691h.

14

## VII.   **TRIAL BY MAGISTRATE JUDGE**

**The parties have not consented to trial by a Magistrate Judge.**

VIII.   **EVIDENCE**

A.   **Witnesses**

1.   **Plaintiffs' Witness List**

**Will Call:**

a.   **Nancy B. Alisberg**
**80 Fox Chase Lane**
**West Hartford, CT 06117**

Nancy Alisberg will opine that people with court-ordered conservatorships in Connecticut are disproportionately likely to be individuals with disabilities as defined by the Fair Housing Act and to lack the capacity or ability to designate an attorney-in-fact. Specifically, Ms. Alisberg will testify that every person with a court-ordered conservatorship in Connecticut has or is regarded as having a physical or mental impairment that substantially limits a major life activity, and thus has a cognizable disability for Fair Housing Act purposes. Consequently, a policy of refusing to make disclosures to conservators and requiring that the conserved individual execute a power of attorney has an overwhelmingly disproportionate impact on people with disabilities, who are its exclusive targets given that people without disabilities do not meet the criteria for an involuntary conservatorship.

Ms. Alisberg's opinion is based on an analysis of the relevant statutes, regulations, and treatises regarding conservatorships and powers of attorney in Connecticut. She specifically relied on the following documents:

- **Conn. Gen. Stat. §§ 45a-644, 649, 650, 562, 653, 655, 656, 660.**
- **2013 Connecticut General Statutes Title 45a – Probate Courts and Procedure Chapter**
- **802e – Durable Power of Attorney Section 45a-562 – (Formerly Sec. 45-690). Power of Attorney to survive disability or incompetence.**

16

- **Incapacity, Powers of Attorney & Adoption in Conn. § 2.7 (3d) (2019)**
- **Incapacity, Powers of Attorney & Adoption in Conn. § 2.7 (3d)(2019).**
- **Conn. Gen. Stat. §§ 1-350a, 350c, 350d, 350e, 350g., 350i.**
- **OLR Research Report, Power of Attorney-Mental Capacity, Feb. 11, 2002, 2002-R0094**
- **Public Act No. 16-40, An Act Concerning Revisions to the Connecticut Uniform**
- **Power of Attorney Act.**
- **OLR Bill analysis, 20016 SB 142, An Act Concerning Revisions to the Connecticut**
- **Uniform Power of Attorney Act and Adoption of the Connecticut Uniform**
- **Recognition of Substitute Decision-making Documents Act.**
- **OLR Bill analysis, 20016 SB 142 (as amended), An Act Concerning Revisions to the**
- **Connecticut Uniform Power of Attorney Act and Adoption of the Connecticut**
- **Uniform Recognition of Substitute Decision-making Documents Act.**
- **42 U.S.C. § 3602.**

**Ms. Alisberg's expertise is in the legal rights of people with disabilities in Connecticut. She is a founder of Disability Rights Connecticut, designated by the state to be the protection and advocacy system in Connecticut. Before that, she worked for 17 years in the State of Connecticut Office of Protection and Advocacy for Persons with Disabilities, where she oversaw the Legal Unit of the state agency that advocated for the rights of people with disabilities.  In her work, she was had many clients who were conserved, and was required to know the standards for conservatorship and the rights of both the conservator and the conserved person.**

**A copy of Ms. Alisberg's report and CV is identified as Plaintiffs' Exhibit 89, and is attached here as Att. C.  Her testimony, including cross, is estimated to be 1.5 hours.**

> **b.     Carmen Arroyo**
> **315 Ballamahack Road**
> **Windham, CT 06280**

**Carmen Arroyo is the plaintiff in this action, individually and as next friend for Mikhail Arroyo. She will offer testimony regarding her efforts to obtain housing**

that her son, Mikhail, could move into with her, her efforts to obtain Mikhail's consumer file from CoreLogic, Mikhail's criminal history record, and the impact that the denial of housing and denial of the consumer file had on her and Mikhail. Her testimony, including cross, is estimated to be 3 hours.

> c.    Angela Barnard
>        10277 Scripps Ranch Blvd
>        San Diego, CA 92131

Angela Barnard, who was a Rule 30(b)(6) designee for CoreLogic, will testify by deposition on CoreLogic's file disclosure policies and practices, including how requests from third parties acting on behalf of a consumer are handled, and specifically the interactions between Carmen Arroyo and CoreLogic regarding her attempts to obtain Mikhail Arroyo's consumer file. Her testimony, including counter-designations, is estimated to be 1.4 hours.

> d.    Bagrat Bayburtian
>        5639 Bent Branch Rd,
>        Bethesda, MD 20816

Bagrat Bayburtian, a former CoreLogic employee who was involved in the development of the CrimSAFE product when he was Vice President of Technology will testify by deposition on the development of the CrimSAFE product, including its mechanism of operation, and the intent behind its features. His testimony, including counter-designations, is estimated to be 0.6 hours.

> e.    Lynn Bora
>        c/o WinnCompanies
>        6 Faneuil Hall Marketplace
>        Boston, MA 02109

Lynn Bora is an executive with WinnResidential.  She will testify on the purported benefits and intended uses of the CrimSAFE product.  Ms. Bora will also

testify on CoreLogic's past and current business relationship with WinnResidential, specifically the provision of residential tenant-screening services and how WinnResidential worked with CoreLogic and used CrimSAFE.[6]   Her testimony, including cross or counterdesignations, is estimated to be 0.75 hours.

>    **f.   Stacie Dachtler**
>         **3001 Hackberry Road**
>         **Irving, TX 75063**

Ms. Dachtler is a relationship manager with CoreLogic, and was a Rule 30(b)(6) designee.  She will testify by deposition regarding CoreLogic's training of housing providers on the operation, use, purpose, and benefits of CrimSAFE, and CoreLogic's marketing of any and all residential tenant-screening products and services, particularly criminal background screening products such as CrimSAFE and "Registry CrimCHECK."   She will also testify regarding CoreLogic's communications with WinnResidential regarding CrimSAFE configuration, including specifically for ArtSpace Windham in April 2016, and communications with WinnResidential regarding Mikhail Arroyo's rental application and associated screening report. Her testimony, including counter-designations, is expected to be 4 hours.

---

[6] **Based on Ms. Bora providing a home address within 100 miles of the courthouse, Plaintiffs intend to subpoena her to testify.  If for any reason she is unavailable at the time of trial, Plaintiffs reserve the right provide her testimony by deposition instead of in person.**

g.    Naeem Kayani
3001 Hackberry Road
Irving, TX 75062

Naeem Kayani is now the Executive for CoreLogic's Rental Property Solutions, a general manager role, and recently held the position of Executive of Product Management for CoreLogic RPS.  He was a designee under Rule 30(b)(6). He will testify by deposition on the CrimSAFE product, including its manner of operation, how it was marketed, and how it was used by landlords.  Mr. Kayani will further testify regarding CrimSAFE reporting options, and specifically regarding a number of CrimSAFE reports produced on Mikhail Arroyo, including when and how they were created.  Mr. Kayani will also testify on the purported benefits CrimSAFE allegedly provides to clients, CoreLogic's knowledge of, and past and current efforts to asses, the effects of criminal background screening on public safety, the performance or outcomes of residential tenancies, the racial and/or ethnic disparities among people with criminal offense records stored in CoreLogic's criminal records database, and racial and/or ethnic disparities among people who have received adverse CrimSAFE decisions. His testimony, including counter-designations, is expected to be 1.4 hours.

h.    Lila Kazemian
Department of Sociology, John Jay College of Criminal Justice
524 West 59th St, Haaren Hall Room 520.13
New York, NY 10019

Dr. Lila Kazemian will testify as an expert on whether existing empirical evidence and official statistics provide support for the methods and criteria used by CrimSAFE, specifically whether there is evidence supporting any business necessity for CrimSAFE's manner of operating.  Her testimony also rebuts that of

20

Mr. Kacirk.  She concludes that CrimSAFE, as currently structured, promotes unnecessary and unjustified adverse treatment of individuals with a criminal record, and makes erroneous assumptions about threats to public safety that have no empirical basis. She will opine that criminal background screening has serious limitations as a mechanism for evaluating whether an applicant presents a safety risk because, inter alia, (a) in recent decades the number of people incarcerated has increased even as crime rates have declined, (b) recidivism data indicates that most returns to prison are for technical violations (e.g. missing parole appointments), not violent or technical offenses, (c) criminal background checks sometimes include errors, and (d) while African Americans and Latinos are significantly more likely to have criminal records, these differences do not appear to be a result of increased criminal offending by these groups. She will also testify that certain aspects of CrimSAFE have no justification, including the possibility of using CrimSAFE to reject applicants with non-conviction records (arrests, acquittals, etc.) and for convictions up to 99 years old, even though the empirical evidence suggests that after 5-9 years without arrest, an individual's future risk of offending becomes nearly indistinguishable from someone with no criminal record. Dr. Kazemian will also testify that even if one considers the recency and disposition of a criminal record, a number of other factors need to be examined to evaluate whether the applicant presents a threat, including the frequency of past crimes and the amount of social support.

Dr. Kazemian's opinion is based on an examination of the relevant empirical evidence and official statistics relevant to the methods and criteria used by

CrimSAFE as described in CrimSAFE configuration materials. She specifically relied on the following materials:   the CrimSAFE configuration instructions, configuration form, and category description and details produced by CoreLogic in this case, the complaint in this matter (No. 3:18-CV-705), and the relevant academic literature and official data as listed in her report.

Dr. Kazemian is an expert in criminology, and specifically changes that occur in criminal offending patterns, desistance from crime, the process of desistance from crime, the experience of long-term incarceration, prisoner reentry, and comparative criminology.

A copy of her report and CV is identified as Plaintiffs' Exhibit 80, and is attached here as Att. D. Her testimony, including cross, is expected to be 2.25 hours.

> i.    Erin Kemple
>       60 Popieluszko Court
>       Hartford, CT 06106

Ms. Kemple is the Executive Director of the Connecticut Fair Housing Center. She will testify regarding CFHC's mission, how CoreLogic's actions interfered with that mission, and the actions CFHC had to take to counteract CoreLogic's frustration of CFHC's mission, and the diversion of resources required to undertake those steps. Her testimony, including cross, is expected to be 2.5 hours.

> j.    David Lavery
>       60 Popieluszko Court
>       Hartford, CT 06106

David Lavery will testify pursuant to Fed. R. Ev. 1006 regarding the HUD database on properties receiving multifamily assistance or Section 8 contracts,

and extracts of that database submitted as an exhibit to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Dkt. 125-5).  He will explain how the he downloaded the HUD database and modified it to show only Connecticut properties, thus creating Plaintiffs' Exhibits 81 and 82.  His testimony, including cross, is expected to be 0.5 hours.

k.    Robert Lindenfelzer
74 Dixwell Avenue
Quincy, MA 02169

Mr. Lindenfelzer was a senior sales executive with CoreLogic through December 2018.  He will testify on the CrimSAFE product, including configuration options available to clients, CoreLogic's communications of purported benefits of CrimSafe, how CrimSAFE was marketed to clients, recommendations and assistance provided regarding configuration of CrimSAFE, and CoreLogic's communications with WinnResidential.[7]  His testimony, including cross or counterdesignations, is expected to be 0.6 hours.

l.    Allan Parnell
Cedar Grove Institute for Sustainable Communities,
McMillan and Moss Research, Inc.
6919 Lee Street
Mebane, North Carolina 27302

Dr. Parnell will opine that in each of the eight rental housing markets in Connecticut in which CoreLogic has clients using CrimSAFE, as well as for the state as a whole, the risks of ever being incarcerated and risk of incarceration in

---

[7] Based on Mr. Lindenfelzer providing a home address within 100 miles of the courthouse, Plaintiffs intend to subpoena him to testify.  If for any reason he is unavailable at the time of trial, Plaintiffs reserve the right provide his testimony by deposition instead of in person.

23

the past ten years, seven years, or four years, are significantly higher for African American and Latino renter households relative to Whites. He will also testify that these substantial disparities persist and are statistically significant at most income levels, subjecting African American and Latino renters to a heightened risk of housing denial because of their criminal histories.

Dr. Parnell's opinion is based on an analysis of the locations of properties using CrimSAFE provided by CoreLogic, and consideration of HUD Fair Market Rental Areas which were used to identify the rental markets in which the product is used. He then applied Dr. Wildeman's calculation of risks of incarceration by race (a proxy for convictions) to renter household demographics within those markets. He relied upon the expert report of Dr. Christopher Wildeman, the zip code data produced by CoreLogic of where its clients employ CrimSAFE in Connecticut, and publicly available demographic data from the census bureau, as set forth in his report which has been marked as Plaintiffs' Exhibit 88.

Dr. Parnell has expertise in demography and in housing policy, and a Ph.D. in Sociology. A copy of his report and CV is identified as Plaintiffs' Exhibit 88, and is attached here as Att. E.  His testimony, including cross, is expected to be 3 hours.

> m.    Yvonne Rosario
> 2906 Monika Lane
> Taylor, Texas 76574

Ms. Rosario is a former employee of CoreLogic's Criminal Research Department.  She will testify by deposition on the CrimSAFE product, particularly the manual process by which CoreLogic assigns crimes to categories.   Her testimony, including counter-designations, is expected to be 1.25 hours.

           **n.**     **Evelyn Solla**
                  **423 Windham Road**
                  **Windham, CT 06223**

       **Evelyn Solla is Ms. Arroyo's mother and will testify regarding the Arroyos'**

**emotional distress. Her testimony, including cross, is expected to be 0.5 hours.**

           **o.**     **Robert Thomas**
                  **12832 Bethpage Lane**
                  **Silver Spring, MD 20906-3203**

       **Mr. Thomas is the former Director of Product Solutions for CoreLogic**

**(through 2017).  He will testify by deposition on the CrimSAFE product, including**

**the reasons for and purposes of CoreLogic's configuration options, how the**

**product was developed and marketed, including communications of CrimSAFE's**

**purported benefits, and how most housing providers typically used the CrimSAFE**

**product.  His testimony, including counter-designations, is expected to be 0.25**

**hours.**

           **p.**     **Betzy Torres**
                  **30 South Prospect Street**
                  **Groton, CT 06340**

       **Betzy Juarez is Carmen Arroyo's friend and will testify regarding the**

**Arroyo's emotional distress, and Mikhail Arroyo's disabilities, his stay in the**

**nursing home, and his transition to Artspace Windham.  Her testimony, including**

**cross, is expected to be 0.5 hours.**

           **q.**     **Christopher Wildeman**
                  **105 Eastwood Avenue**
                  **Ithaca, NY 14850**

       **Dr. Wildeman will opine that African Americans in the United States are more**

**than 4 times as likely as whites, and Latinos 2.5 times as likely as whites, to have**

been either jailed or incarcerated at some point in their lifetime, and that these disparities adverse to African Americans and Latinos exists in arrests, convictions, and incarcerations. These disparities also persist among individuals regardless of their income or the age of the criminal record. He will further testify that disparities exist regardless of the age cohort considered.  Dr. Wildeman also plans to testify that in Connecticut, African Americans and Latinos face arrest, conviction, and incarceration at rates that are significantly more disproportionate than nationwide, and accordingly the national estimates of racial and ethnic disparities in criminal justice contact significantly underestimate those in Connecticut.

Dr. Wildeman's opinion is based on an analysis of data from the National Longitudinal Survey of Youth, from which he was able to generate estimates of the cumulative risk of incarceration by race at any time, or within the past 4, 7, or 10 years, and within several income bands (0-30K, $30-50K, $50-70K, and $70-100K). Dr. Wildeman also used information on first-time imprisonment by age group and race obtained from the from the 2004 Survey of Inmates in State and Federal Correctional Facilities (SISFCF) to estimate the proportion of White, Latino, and African American individuals could expect to experience imprisonment by any given age. Finally, he compared point-of-time incarceration data nationwide and in CT to determine that the level of disproportionality in Connecticut is more than twice that for the country as a whole.

Dr. Wildeman relied upon the following materials:

- **Bureau of Justice Statistics. 2015a. Data Collection: Survey of Inmates in State Correctional  Facilities (SISCF). Washington, DC: Bureau of Justice Statistics. Available online at: http://www.bjs.gov/index.cfm?ty=dcdetail&iid=275.**

- **Bureau of Justice Statistics. 2015b. Data Collection: Survey of Inmates in Federal Correctional Facilities (SIFCF). Washington, DC: Bureau of Justice Statistics. Available online at: http://www.bjs.gov/index.cfm?ty=dcdetail&iid=273.**

- **Bureau of Justice Statistics. 2015c. Data Collection: National Corrections Reporting Program  (NCRP). Washington, DC: Bureau of Justice Statistics. Available online at: http://www.bjs.gov/index.cfm?ty=dcdetail&iid=268.**

- **Bureau of Labor Statistics. 2015a. National Longitudinal Surveys: The NLSY79. Available online at: https://www.nlsinfo.org/content/cohorts/nlsy79**

- **Bureau of Labor Statistics. 2015b. National Longitudinal Surveys: The NLSY97. Available  online at: https://www.nlsinfo.org/content/cohorts/nlsy97**

- **Mauer, Marc, and Ryan S. King. 2007. Uneven Justice: State Rates of Incarceration by Race and  Ethnicity. Washington, DC: The Sentencing Project.**

Dr. Wildeman is a sociologist and demographer who has expertise in using life tables to estimate the cumulative risks of life events, such as being arrested, being convicted of a crime, and being incarcerated. He is a Professor of Policy Analysis and Management and Sociology (by courtesy) at Cornell University, where he is also the Associate Vice Provost for the Social Sciences and the Director of the Bronfenbrenner Center for Translational Research.

A copy of Dr. Wildeman's report and CV is identified as Plaintiffs' Exhibit 81, and is attached here as Att. F.  His testimony, including cross, is expected to be 3 hours.

**May call**

      a.      **Maria Cuerda**
              **60 Popieluszko Court**
              **Hartford, CT 06106**

      Maria Cuerda is a Fair Housing Specialist at the Connecticut Fair Housing Center. She may testify regarding her communications with ArtSpace Windham and WinnResidential regarding Mr. Arroyo's request for tenancy and with Defendant about the Arroyos' request for Mr. Arroyo's consumer file and the disqualifying information in the tenant screening report.  Her testimony, if called, is expected to be 0.5 hours, including cross.

      b.      **Michael Cunningham**
              **WinnResidential**
              **35 Chestnut St**
              **Norwich, CT 06360**

      Michael Cunningham was a Senior Property Manager employed by WinnResidential and may testify regarding Mikhail Arroyo's request for tenancy and the CHRO complaint, Defendant's tenant screening report on Mikhail Arroyo; WinnResidential's use of CrimSAFE, the Arroyos' tenancy; and the Arroyos' CHRO complaint.  His testimony, if called, is expected to be 0.5 hours, including cross.

      c.      **Melissa Desjardins**
              **ArtSpace Windham**
              **480 Main St**
              **Willimantic, CT 06226**

      Melissa Desjardins was the Assistant Property Manager at ArtSpace Windham, the Arroyos' housing provider.  She may testify regarding her use of CoreLogic's CrimSAFE to perform tenant screening and Mikhail Arroyo's request for tenancy.  Her testimony, if called, is expected to be 0.5 hours, including cross.

28

    d.     **Custodian of Records from CoreLogic RPS or any other witness required to resolve disputes as to authenticity or admissibility of documents**

    e.     **Any witnesses needed for impeachment purposes only**

    2.     <u>**Defendant's Objections to Plaintiffs' Proposed Witnesses**</u>

| Plaintiff's Designated Witness | Defendant's Objection | Plaintiffs' Response |
|---|---|---|
| N. Alisberg | FRE 401; 403; 702 - CoreLogic RPS incorporates its Motion in Limine regarding this witness. Ms. Alisberg's opinions are composed entirely of legal conclusions based on citations to statutes, regulations, case law, and legal treatises, coupled with a small number of readily-available statistics—none of which are appropriate subjects for expert testimony. *See United States v. Hoskins*, No. 3:12cr238, 2019 WL 5556092 (D. Conn. Oct. 28. 2019). Moreover, Ms. Alisberg's mere summarization and interpretation of statutes is not the proper subject of an expert report, and courts have consistently rejected such "expert" testimony. *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1998). | Ms. Alisberg opines that people with court-ordered conservatorships in Connecticut are disproportionately likely to be individuals with disabilities as defined by the Fair Housing Act and to lack the capacity or ability to designate an attorney-in-fact. Ms. Alisberg only addressed legal questions as a step in identifying the relevant groups to compare to determine that there is a disparate impact caused by the challenged file disclosure policy which does not recognize conservatorship as conveying authority to request a consumer file. Plainly, to the extent the Court disagrees with Ms. Alisberg's understanding of conservatorship requirements or FHA coverage, the Court can easily disregard the evidence of disparate impact. In the absence of a jury that could be unduly swayed by Ms. Alisberg's expertise, there is no reason to exclude her testimony. |

| | | |
|---|---|---|
| **B. Bayburtian** | FRE 401, 403, 602 – Mr. Bayburtian is a former employee of CoreLogic, having left the company in 2013. Mr. Bayburtian had no experience interacting with CoreLogic RPS's clients, and therefore, has no insight regarding how the CrimSAFE product was used, and objections were lodged on that basis where he lacked foundation. CoreLogic RPS's further objections are set forth in its objections to deposition designations. Moreover, Ex. AW is simply the FBI's categories of crimes, which track CrimSAFE's categorizations, and has nothing to do with the type of testimony to which RPS has objected with respect to Plaintiff's deposition designations. | Mr. Bayburtian is a VP of Technology and VP of Product Development for CoreLogic who was personally involved in developing CrimSAFE, and actually held the patent on it for a time. His testimony regarding the design and function of the product is relevant and admissible. He also provided testimony that undermines arguments Defendant has proffered in support of its business justification for CrimSAFE. Moreover, Defendant has argued for the relevancy of material related to CrimSAFE's development in proffering Ex. AW. |
| **L. Kazemian** | FRE 401; 403; 702 - CoreLogic RPS incorporates its Motion in Limine regarding this witness. Dr. Kazemian's report is untimely because it is not a proper rebuttal report to Defendant's expert witness, Jay Kacirk, and Dr. Kazemian's report was not served until three months after the agreed-upon deadline for the exchange of opening reports. To the extent the report is timely, it should still be excluded because the report's findings and conclusions are irrelevant to the claims asserted, have no relation to | Dr. Kazemian is an expert in criminology, and her testimony regarding the likelihood of individuals with criminal history to be arrested or convicted again, and how that likelihood decreases over time is directly relevant to rebut Defendant's assertion that criminal history screens are necessary to protect resident safety, and specifically to show that there are less discriminatory alternatives than permitting exclusion from housing based on convictions up to 99 years old. Further, her report is timely. The parties agreed on a separate deadline for reports on which the part did not bear the burden of proof, and business necessity is |

| | | |
|---|---|---|
| | the housing industry, takes positions that are contrary to binding Congressional statutes and policies regarding criminal background screening, and/or are unreliable. | Defendant's burden to establish. The parties originally agreed on a May 15, 2019 deadline for such reports, but that was extended by consent to June 10, 2019, and Dr. Kazemian's report was submitted on June 3, 2019.  Further, Dr. Kazemian's opinions provide scientifically grounded rebuttal to Mr. Kacirk's reliance on "common sense" to support his claims about the necessity and efficacy of background screening, and are thus timely as the deadline for rebuttal reports was July 1, 2019. |
| D. Lavery | FRE 401; 403; FRCP 37(c) - Mr. Lavery was not disclosed during the discovery period. The records Mr. Lavery included in his declaration are not probative because they postdate the time period that Plaintiff Carmen Arroyo applied at ArtSpace Windham and is not probative of the status of ArtSpace Windham as of April 2016. | Defendant raised a new allegation in its Motion for Summary Judgment that ArtSpace Windham received Project Based Section 8 funding or was a subsidized/affordable project, and was thus required to conduct certain background screenings. Mr. Lavery is an employee of CFHC who would summarize voluminous public records pursuant to FRE 1006, and establish that the apartment complex was not project based section 8 or otherwise subject to criminal screening requirements. His declaration was served with Plaintiffs' response to Defendant's newly raised argument and summarizes publicly available records. Plaintiffs cite to documents both pre- and post-April 2016, and thus provide probative evidence as to the status as of April 2016. |
| R. Lindenfelzer | FRE 401; 403; 602 – Mr. Lindenfelzer is a former employee of CoreLogic RPS. To the extent his testimony is offered regarding his interpretation of marketing | Mr. Lindenfelzer was the sales executive for CoreLogic for all of New England and was responsible for marketing CrimSAFE. He worked with defendant for 16 years, through |

| | | |
|---|---|---|
| | materials, the business practices of CoreLogic RPS's customers, his testimony lacks foundation is irrelevant and/or is hearsay. His testimony in that regard also is irrelevant to any showing of actual customer use. CoreLogic RPS's further objections are set forth in its objections to deposition designations. | December 2018. His testimony is based on personal knowledge of marketing of the product, and of customers' use of the product based on his frequent communications with them. |
| A. Parnell | FRE 401; 403; 702 - CoreLogic RPS incorporates its Motion in Limine regarding this witness. Dr. Parnell's "statistical significance" analysis is unreliable because it is based on Dr. Wildeman's flawed data along with Dr. Parnell's own flawed statistical analysis. Dr. Parnell also improperly used statewide statistics when the record confirms that CoreLogic RPS does not even remotely operate in all zip codes across the state. Dr. Parnell's opinion that CrimSAFE has a disparate impact is based solely on statistics, which is not a proper method of inference, and is based on inadequate and erroneous analysis. | Dr. Parnell is a demographer with substantial experience with housing discrimination issues. His analysis illustrates the impact that disparities testified to by Dr. Wildeman would have in the relevant housing markets in Connecticut, as well as statewide. Statistical evidence of disparities are the most accepted manner of establishing disparate impact. |
| E. Solla | FRE 401; 403; 602 - Ms. Solla's testimony is speculative and cumulative of Ms. Arroyo's and Ms. Torres' testimony. Ms. Solla's testimony is not probative because Ms. Arroyo has no statutory | Ms. Solla, mother of Carmen Arroyo and grandmother of Mikhail Arroyo is offered to testify on the injury caused to both Arroyos' and their damages, as well as the timeline of what happened re: Mr. Arroyo seeking to move out of nursing home and |

| | | |
|---|---|---|
| | standing to sue in her individual capacity, including as set forth in CoreLogic RPS's pending motion for summary judgment.  Plaintiffs' Article III analysis has no application | into apartment with Ms. Arroyo, and Ms. Arroyo's efforts to secure alternate housing.  She personally observed both Mr. and Ms. Arroyo.  Further, Ms. Arroyo indisputably has standing to sue in her in individual capacity. The FHA broadly defines an "aggrieved person" to include "any person who claims to have been injured by a discriminatory housing practice. ..." 42 U.S.C. 3602(i)(1), and FHA standing is "as broad[] as is permitted by Article III of the Constitution." *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972) (citations omitted). Ms. Arroyo suffered emotional distress and financial injuries because of CoreLogic's discriminatory housing practice and thus has standing. *See* 24 C.F.R. § 100.65 (providing that FHA protections extend to a "person associated with" the individual whose use of a dwelling is limited on a prohibited basis; *see also* 42 U.S.C. § 3604(f)(1)-(2) (prohibiting discrimination in the sale or rental, or in the terms, conditions, or privileges of sale or rental, "because of a handicap of … (B) a person … intending to reside in that dwelling after it is … rented or made available; or (C) any person associated with that buyer or renter.").[8] |

---

[8] **Ms. Arroyo's standing under CUTPA and FCRA are not addressed here because her FHA standing suffices to establish the relevance of Ms. Solla's testimony.**

| | | |
|---|---|---|
| R. Thomas | FRE 401, 403, 602 - Mr. Thomas is a former employee of CoreLogic RPS. Mr. Thomas lacks foundation to testify regarding how the CrimSAFE product was used or interpreted by clients. His testimony in that regard also is irrelevant to any showing of actual customer use. CoreLogic RPS's further objections are set forth in its objections to deposition designations. | Mr. Thomas is a former Director of Product Solutions for CoreLogic (through 2017), who worked with the CrimSAFE product and can testify based on his personal knowledge. |
| B. Torres | FRE 401; 403; 602 - Ms. Torres' testimony is speculative and cumulative of Ms. Arroyo's and Ms. Solla's testimony. Ms. Torres' testimony is not probative because Ms. Arroyo has no statutory standing to sue in her individual capacity, including as set forth in CoreLogic RPS's pending motion for summary judgment. Plaintiffs' Article III analysis has no application. | Ms. Torres is a friend of Carmen Arroyo. She visited Mikhail Arroyo in the nursing home by herself and can testify based on her observation as to Mikhail's and Carmen's emotional distress. |
| C. Wildeman | FRE 401; 403; 702 - CoreLogic RPS incorporates its Motion in Limine regarding this witness. Dr. Wildeman's statistical findings only purport to present national statistics, but statistics more directly bearing upon the actual Connecticut applicant pools are required. Therefore, Dr. Wildeman's report is not relevant to any issue in this case. Further, Dr. Wildeman | Dr. Wildeman is a sociologist who has studied the impact of racial disparities in criminal histories. His report establishes significant racial disparities in criminal history nationally and in Connecticut, including when stratifying by income level or considering different lookback periods. Dr. Huber agreed that many of the disparities he reported are statistically significant, and his rebuttal report |

| | | |
|---|---|---|
| | fails to provide meaningful analysis of standard error in his survey numbers, which make his findings unreliable and untestable, thus requiring exclusion. Dr. Huber did not find any of Dr. Wildeman's results to be statistically significant based on the limited data provided by Dr. Wildeman, as somehow claimed. | provided further evidence on that point. |
| M. Cunningham | FRE 401; 403; 602 - Mr. Cunningham did not request or receive the screening report at issue in this matter. Mr. Cunningham's testimony is speculative, not probative, and cumulative. | Mr. Cunningham is a WinnResidential employee who was directly involved in Ms. Arroyo's attempt to obtain housing where her son Mikhail could reside with her. He exchanged many emails with CFHC and was involved in the administrative hearing against Winn. As a mid-level employee, he has a different exposure to CrimSAFE than more senior executives. |

3.      **Defendant's Witness List**

CoreLogic RPS will call the following witnesses to testify at trial:

a.      Naeem Kayani:  3001 Hackberry Road Irving, TX 75063.

Mr. Kayani will testify about how CrimSAFE functions as a screening tool. Naeem Kayani will testify about the utility of CrimSAFE.  Mr. Kayani will also testify about steps CoreLogic RPS took in informing their customers in response to the April 2016 HUD Memorandum, including WinnResidential.   Mr. Kayani will also testify about the facts and circumstances surrounding the screening of Mikhail Arroyo at the request of WinnResidential on April 26, 2016.  Mr. Kayani will testify

35

as to various search queries produced in this litigation regarding CrimSAFE usage by customers in Connecticut and the settings of Connecticut-based customers.

CoreLogic RPS anticipates that Mr. Kayani will testify in person for half a day.

         **b.**    **Stacie Dachtler:  3001 Hackberry Road Irving, TX 75063.**

Ms. Dachtler will testify about how CrimSAFE functions as a screening tool. Ms. Dachtler will testify about the utility of CrimSAFE.  Ms. Dachtler will testify about CoreLogic RPS's offering of the CrimSAFE product to customers and customer training, including WinnResidential.  Ms Dachtler will testify about the composition of its customer base.  Ms. Dachtler will testify about CoreLogic RPS's business relationship with WinnResidential and communications with WinnResidenial.  Ms. Dachtler will testify about the CrimSAFE settings chosen by WinnResidential and changes thereto.  Ms. Dachtler will testify to the contents of various internal reports generated by CoreLogic RPS regarding CrimSAFE usage.

CoreLogic RPS anticipates that Ms. Dachtler will testify for half a day.

         **c.**    **Angela Barnard:  10277 Scripps Ranch Blvd, San Diego, CA 92131.**

Ms. Barnard will testify about CoreLogic RPS's file disclosure policies and procedures, including with respect to consumer file disclosures requested by third parties.  Angela Barnard will also testify about Carmen Arroyo's disclosure requests on behalf of Mikhail Arroyo.  Ms. Barnard will also testify about the lack of any prior file disclosure request by a "conserved" individual.  Ms. Barnard will testify about the percentage of disputes received by CoreLogic RPS based on its criminal record reporting activities.

CoreLogic RPS anticipates that Ms. Barnard will testify for half a day.

        d.      Jay Kacirk:  6366 Commerce Boulevard, Suite 270, Rohnert Park, CA 94928.

Mr. Kacirk is an expert in the residential property management industry and will testify about the significance of criminal records in a housing provider making screening decisions in order to protect rental communities.

Mr. Kacirk has over 40 years of experience working in the multi-family housing industry.  For the last 20 years he has served as Executive Vice President of a large multi-family property management company, which manages more than 90 separate properties with approximately 6,000 apartment units in multiple states. In that executive role, he has authority over all policies and procedures used at those complexes, and he also supervises the managers that are assigned to portfolios of both market rate and subsidized apartments.  Over the course of his lengthy career he has been actively engaged in the resident application and selection process, including with respect to the screening of applicant criminal histories and understanding how such criminal histories are reviewed by housing providers that request such histories.  Mr. Kacirk also has substantial nationwide experience in developing, understanding, and teaching industry practices and customs with respect to issues of tenant screening and fair housing.

He also served for approximately seven years as a member of the Poway Housing Commission in San Diego County, California dealing with fair housing issues and claims.

Mr. Kacirk will opine on: (1) how the multi-family housing industry customarily uses categorization and filtering products like CrimSAFE, which is to

individually review of the specific nature, relationship, time periods and changed circumstances involved in each matter identified, including due to the widely-publicized April 2016 HUD Memorandum; (2) the many practical benefits that are provided by products like CrimSAFE during the tenant screening process in light of how the industry is structured, including how such widely-used categorization and filtering products promote an accurate, objective, and effective screening process; and (3) the customary intentions of housing providers in requesting criminal background screening based on liability and property/tenant safety concerns.

A true and correct copy of Mr. Kacirk's served expert report, which includes his curriculum vitae as an exhibit and the materials on which he relied in formulating his expert opinions, is attached.

CoreLogic RPS anticipates that Mr. Kacirk will testify for half a day.

> e. Lynn Bora:  c/o WinnCompanies, 6 Faneuil Hall
> Marketplace, Boston, MA 02109.

Ms. Bora is the Senior Vice-President of Operations Support Services with WinnResidential and will testify by deposition about WinnResidential's compliance with the Fair Housing Act and WinnResidential's receipt of HUD's screening guidance in April 2016.  She will also testify that WinnResidential sets the screening criteria used by its properties, and CoreLogic RPS would not alter WinnResidential's chosen screening criteria without permission from WinnResidential.  Ms. Bora will testify about the size and composition of WinnResidential's portfolio of apartment units.  Ms. Bora will testify about CoreLogic RPS's limited and constrained role in the screening process.

Ms. Bora will testify by deposition designations, which CoreLogic RPS will present to the Court. Thus, trial time will not be impacted by her testimony.

        f.      **Yvonne Rosario: 2906 Monika Lane, Taylor, TX 76574.**

Ms. Rosario is a former employee of CoreLogic RPS and will testify by deposition about the procedure for classification of criminal offenses in the CrimSAFE product and the training received in connection with that undertaking.

Ms. Bora will testify by deposition designations, which CoreLogic RPS will present to the Court. Thus, trial time will not be impacted by her testimony.

        g.      **Bagrat Bayburtian: 5639 Bent Branch Road, Bethesda, MD 20816.**

Mr. Bayburtian is a former Vice-President of Products at CoreLogic RPS, who left the position in 2013. Mr. Bayburtian will testify by deposition about the development of CrimSAFE. He will also testify about the process for categorizing offenses and its technological sophistication.

Ms. Bora will testify by deposition designations, which CoreLogic RPS will present to the Court. Thus, trial time will not be impacted by her testimony.

        h.      **Carmen Arroyo: 315 Ballamahack Road, Windham, CT 06280.**

Carmen Arroyo is the plaintiff in this action, individually and as next friend for Mikhail Arroyo. Ms. Arroyo will testify by deposition about her interactions with WinnResidential and CoreLogic RPS regarding the background screening report at issue, her efforts to obtain housing after WinnResidential denied her request to have Mikhail Arroyo join her at ArtSpace, her alleged damages, and Mikhail Arroyo's alleged damages.

CoreLogic RPS anticipates that Ms. Arroyo may also testify live for 2-3 hours.

          i.       **Erin Kemple: 60 Popieluszko Court, Hartford, CT 06106.**

**Erin Kemple is the executive director of the Connecticut Fair Housing Center and was Plaintiffs' Rule 30(b)(6) designee. Ms. Kemple will testify by deposition about the Connecticut Fair Housing Center's damages in this action, including the alleged frustration of mission and diversion of resources claims.**

**CoreLogic RPS anticipates that Ms. Arroyo may also testify live for 2-3 hours.**

          j.       **Dr. William Huber - 1489 Baltimore Pike, Suite 305, Springfield, PA 19064**

**Dr. Huber is an expert in statistics who will testify as to his bases for rebutting the opinions rendered by Dr. Christopher Wildeman and Dr. Alan Parnell, as set forth in Dr. Huber's expert report.  Among other matters, Dr. Huber will testify that Dr. Wildeman's presentation of national statistics from the NLYS79 survey failed to adhere to statistical norms because Dr. Wildeman failed to assess the standard error of the statistics.  Dr. Huber was able to calculate the minimum standard error for Dr. Wildeman's numbers, and many of Dr. Wildeman's numbers are not statistically significant.  Dr. Huber also will testify that there is no sufficient basis shown by Dr. Wildeman or Dr. Parnell to assume that the national statistics presented by Dr. Wildeman apply to Connecticut.  Dr. Huber will testify that Dr. Parnell's application of Dr. Wildeman's national statistics to Connecticut and the eight counties of Connecticut is fundamentally flawed in concept and in execution, and no conclusions can be based on Dr. Parnell's analysis. In sum, Dr. Huber will testify that his analysis and statistics presented by Dr. Wildeman and Dr. Parnell do not provided an adequate statistical basis for drawing any inferences as to the**

conditions in Connecticut, the eight counties of Connecticut, any housing market in Connecticut, or in any applicant pool for any housing facility in Connecticut.

A true and correct copy of Dr. Hubers' served expert report, which includes his curriculum vitae as an exhibit and the materials on which he relied in formulating his expert opinions, is attached. CoreLogic RPS anticipates that Mr. Huber will testify live for half a day.

> k.  Custodian of Records from CoreLogic RPS or any other witness required to resolve disputes as to authenticity or admissibility of documents.

> l.  Any witnesses needed for impeachment purposes only.

### PLAINTIFFS' OBJECTIONS TO DEFENDANTS' WITNESSES

| Defendant's Designated Witness | Plaintiffs' Objection | Defendant's Response |
|---|---|---|
| N. Kayani | See objections to deposition designations. Mr. Kayani joined CoreLogic in 2017, and he lacked foundation to testify as to some facts pre-dating his tenure with the company. | Mr. Kayani is the chief executive and former head of product for CoreLogic RPS. Mr. Kayani has personal knowledge regarding how CrimSAFE is structured, how it operates, and how it is used. Thus, he has the foundation to testify as to all of the testimony designated in response to the questions posed by Plaintiffs' own counsel. Mr. Kayani oversaw the execution of numerous search queries posed by Plaintiffs in this case. Mr. Kayani also has extensive industry experience in background screening and working with housing providers. With respect to the deposition designations, Mr. Kayani |

| | | |
|---|---|---|
| | | was responding to the questions passed by Plaintiffs' counsel on the topics identified in their own Rule 30(b)(6) notice.  Mr. Kayani will attend trial, and his designations will be used if he is unavailable at that time. |
| S. Dachtler | See objections to deposition designations.  Defendant designated some irrelevant testimony about unspecified clients of CoreLogic, and hearsay. | Ms. Dachtler has been employed by CoreLogic RPS for more than a decade and is responsible for management and sales of screening products for customers located in Connecticut and the northeast, including WinnResidential.  Ms. Dachtler has personal knowledge regarding how CrimSAFE operates, how CoreLogic RPS engages with customers, how CrimSAFE is used by those customers, and various internal metrics regarding customer CrimSAFE use.  Thus, he has the foundation to testify as to all of the testimony designated in response to the questions posed by Plaintiffs' own counsel.   With respect to the deposition designations, Ms. Dachtler was responding to the questions passed by Plaintiffs' counsel on the topics identified in their own Rule 30(b)(6) notice.  Ms. Dachtler will attend trial, and her designations will be used if she is unavailable at that time. |

| | | |
|---|---|---|
| A. Barnard | See objections to deposition designations. The witness provided some non-responsive testimony and Defendant lead its witness during redirect at the end of deposition. | Ms. Barnard has been employed by CoreLogic RPS for more than a decade and is responsible for management of the file disclosure policies and processes at CoreLogic RPS. Ms. Dachtler has personal knowledge regarding those policies and processes, and she has reviewed the business records relating to Ms. Arroyo's file disclosure requests and CoreLogic RPS's responses. Ms. Barnard also conducted independent investigation into the facts of this case and whether any other prior conserved individual had previously made a file disclosure request of RPS. Thus, she has the foundation to testify as to all of the testimony designated in response to questions posed by Plaintiffs' own counsel. With respect to the deposition designations, Ms. Barnard was responding to the questions passed by Plaintiffs' counsel on the topics identified in their own Rule 30(b)(6) notice. Ms. Barnard will attend trial, and her designations will be used if it is unavailable at that time. |
| J. Kacirk | FRE 702; Mr. Kacirk is not qualified and his opinions do not satisfy standards for expert testimony. His experience in | CoreLogic RPS incorporates by reference its opposition to Plaintiffs' motion to exclude Mr. |

| | property management does not qualify him to opine on legal conclusions, which are, in any event not proper subjects for expert testimony.  He is similarly not qualified to opine on whether CrimSAFE reduces landlord's risk of tort liability, or whether CrimSAFE increases the safety of residents or property.  His opinion that CrimSAFE users conduct individualized assessments of full criminal history is not supported by facts or analysis.  His testimony on the value of sorting and filtering functions is irrelevant, as such functions could be provided without the objectionable features of CrimSAFE.  See separate motion to exclude his testimony which has been fully briefed. | Kacirk.  Mr. Kacirk has decades of relevant experience, and his opinions regarding customary industry use, the benefits of CrimSAFE in light of how the multi-family housing industry operates, and the intentions of housing providers are well grounded in his experience and the record and implicate areas of expert testimony that are well accepted in the Second Circuit. |
|---|---|---|
| L. Bora | See objections to deposition designations.  Defendant designated some irrelevant testimony, and some lacking foundation.  In addition, Plaintiffs object to testimony by deposition as Ms. Bora is not unavailable, Fed. R. Evid. 804.  The address provided at her deposition is within 100 miles of the courthouse, and the parties have agreed she may testify by video instead of in person. | Ms. Bora is an executive with WinnResidential who described the nature of the relationship between CoreLogic RPS and WinnResidential and WinnResidential's control over its screening settings.  Her testimony was based on personal knowledge and is relevant to issues in this case regarding agency, proximate cause, and damages. |
| Lindenfelzer | See objections to deposition designations.  Defendant designated some irrelevant testimony, and some lacking foundation.  In addition, Plaintiffs object to testimony by deposition as Mr. Lindenfelzer is not unavailable, Fed. R. Evid. 804.  The address provided at her | The challenged portions of Mr. Lindenfelzer's testimony designed by CoreLogic RPS is relevant to issues in this case regarding agency and Plaintiffs' proffered less discriminatory alternatives to the CrimSAFE product. |

| | deposition is within 100 miles of the courthouse, and the parties have agreed she may testify by video instead of in person. | |
|---|---|---|
| Y. Rosario | See objection to deposition designations. Defendant designated one portion which was not relevant and called for speculation. | Ms. Rosario was involved in the manual process of record categorization at CoreLogic RPS. She testified about that process, the training provided, and the method by which such categorization was accomplished. She also previously worked for a property management company. Thus, she has the foundation to testify as to all of the testimony designated in response to questions posed by Plaintiffs' own counsel. |
| R. Bayburtian | See objections to deposition designations. Defendants designated portions where Mr. Bayburtian speculated, or provided hearsay responses. | Mr. Bayburtian previously worked at CoreLogic RPS and on the CrimSAFE product. He testified as to how the product was designed and the categorization process. Thus, he has the foundation to testify as to all of the testimony designated in response to questions posed by Plaintiffs' own counsel. |
| C. Arroyo | See objections to deposition designations. Defendant designated portions that are irrelevant and one calling for a legal conclusion. | Ms. Arroyo is a party to this lawsuit and was deposed regarding the facts of this case, her liability theories and related claims of public policy violations, and her damages claims. All of the testimony designated was within her personal |

45

| | | |
|---|---|---|
| | | knowledge and is a party admission. |
| E. Kemple | See objections to deposition designations. | Ms. Kemple was the corporate representative for the CFHC in response to the deposition notice served by CoreLogic RPS.  She was deposed regarding the facts of this case, the CFHC's operations, the CFHC's liability theories and related claims of public policy violations, and the CFHC's damages claims.  All of the testimony designated was in her capacity as the designated corporate representative and is a party admission. |
| W. Huber | FRE 702; Dr. Huber is a statistician and his rebuttal testimony does not satisfy *Daubert* standards with respect to several areas in which he admits he is not an expert, including his opinions on housing markets, factors landlords consider in renting apartments and how they use CrimSAFE, criminology, demography, specifically, whether racial disparities in criminal history are likely to be greater or lesser in Connecticut than nationally, whether racial disparities in criminal history have changed over time, whether credit or income differs for those with criminal history, and a legal conclusion as to whether Plaintiffs' satisfy their burden of proof under 24 C.F.R. 100.500(c). In addition, his opinion on spatial variability and the likelihood that Connecticut will have smaller racial disparities than the national | Dr. Huber is Ph.D statistician with decades of experience and peer-reviewed research who rebutted the statically claims asserted by Plaintiffs in the manners set forth above.  His testimony was based on an independent review of Plaintiffs' statistical claims and independent calculations rebutting those claims, as well as his independent review of the record. |

| | average is not supported by facts or analysis.  See Plaintiffs' Motion in Limine to limit his testimony. | |
|---|---|---|

B.   **Exhibits**

**See list attached as Att. A.**

1.   **Plaintiffs' Exhibits to which objections have been made:**

**Ex. 7 – Proposal to Winn incl. attachments, Aug 2015 (aka Response to Winn RFP) – ARROYO000264-309**

- **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that WinnResidential viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Further, this document predates the background screening report at issue in this case and there is no evidence it influenced any decision making on behalf of WinnResidential. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum and related training to its customers.  In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.**

- **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, what its purpose and advantages are, and recommendations specific to WinnResidential are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  Moreover, this is not a general marketing document, but one specific to WinnResidential.  CoreLogic's former employee testified to presenting this document to WinnResidential in the year before WinnResidential was provided a lease decision by CoreLogic with respect to the Arroyos. The procedure described in the document is consistent with the testimony of multiple individuals.  CoreLogic's alert to WinnResidential and other clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated.**

**Ex. 9 – CoreLogic RPS's 2018 training provided to WinnResidential – ARROYO000343-379**

- **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This training document is not probative because there is no proof that WinnResidential relied on these materials in conducting its criminal background screenings. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion.**

- **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, what its purpose and advantages are, and training specific to**

WinnResidential are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  Moreover, witnesses will testify that WinnResidential did act in conformity with the training provided to it by CoreLogic in its use of CrimSAFE.

**Ex. 10 – CoreLogic RPS's 2017 training provided to WinnResidential – ARROYO000380-408**

- **Objection: FRE 401; 403 -CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This training document is not probative because there is no proof that WinnResidential relied on these materials in conducting its criminal background screenings. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion.**

- **Response:  CoreLogic's representations regarding what CrimSAFE does, how it works, what its purpose and advantages are, and training specific to WinnResidential are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  Moreover, witnesses will testify that WinnResidential did act in conformity with the training provided to it by CoreLogic in its use of CrimSAFE.**

**Ex. 11 – 2016 CrimSAFE marketing Registry CrimSAFE product sheet – ARROYO000418**

- **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that WinnResidential viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Further, this document predates the background screening report at issue in this case and there is no evidence it influenced any decision making on behalf of WinnResidential. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum and related training to its customers.  In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.**

- **Response:  CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  CrimSAFE's use throughout Connecticut is at issue, and thus it is irrelevant if WinnResidential ever saw this particular document. CoreLogic's alert to**

49

WinnResidential and other clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated.

**Ex. 12 – 2016 CrimSAFE marketing Criminal Search Services packet – ARROYO000419-424**

- **Objection: FRE 401; 403 -** CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that WinnResidential viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Further, this document predates the background screening report at issue in this case and there is no evidence it influenced any decision making on behalf of WinnResidential. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum and related training to its customers.  In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.

- **Response:** CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  CrimSAFE's use throughout Connecticut is at issue, and thus it is irrelevant if WinnResidential ever saw this particular document. CoreLogic's alert to WinnResidential and other clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated.

**Ex. 35 –CrimSAFE "Record(s) Found" decisions where race was associated with record, July 2016-April 2019 – ARROYO000677-687**

- **Objection: FRE 401; 403 -** This document is not relevant as it does not reflect the relevant applicant pools. The relevant target group is the applicant pool, and CoreLogic RPS objects to any evidence other than the applicant pool. Assuming Plaintiffs are not restricted to the applicant pool, and exceptions exist to the necessity of proof of the applicant pool, Plaintiffs cannot show requisite preconditions for attempting to show conditions in the "availability pool" as proof of their *prima facie* case because there is no evidence that the advertisement of criminal background check policies at issue here discouraged any applications or that applicant pool data is not available.

- **Response:** These documents provide evidence of disparate impact, and CoreLogic's knowledge of same.  The relevant comparison is the available, eligible population of prospective tenants, not actual applicants.

CoreLogic did not produce data on actual applicants, and in any event prospective applicants with criminal history would likely be deterred from applying given the screening process, making the use of availability pools rather than applicant flow even more appropriate.  Availability pools "often form the initial basis of a disparate impact claim, especially in cases [where] the actual applicant pool might not reflect the potential applicant pool, due to a self-recognized inability on the part of potential applicants to meet the very standards challenged as being discriminatory." *EEOC v. Joint Apprenticeship Comm.*, 186 F.3d 110, 119 (2d Cir. 1999). See also Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308-09 n.13 (1977) (finding data which demonstrates the pool of eligible candidates is appropriate to consider where reliable applicant flow data was not available); *Malave v. Potter*, 320 F.3d 321, 327 n.4 (2d Cir. 2003) (finding that the application process might not adequately reflect the actual potential applicant pool); *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 170 (E.D.N.Y. 2019).

**Ex. 37 – Full Lease Agreement Between Carmen Arroyo and ArtSpace Windham – CFHC000053-85**

- **Objection: FRE 401; 403 (to pages CFHC000059-60 only) - CoreLogic RPS has already supplied the applicable 2015 lease agreement. The additional pages attached by Plaintiffs at CFHC000059-60 do not contain any material terms that would modify the 2015 lease, including because the condition of the one-bedroom apartment is not at issue in this action. Therefore, this document is not relevant.**

- **Response: Plaintiffs withdraw pages 59-60. The remainder is relevant.**

**Ex. 38 –CrimSAFE Decisions Reports Subject to Decline, 1/1/16 to 7/9/2019 at multiple properties – ARROYO000875-1364**

- **Objection: FRE 401; 403 - This document is not relevant as it does not reflect the relevant applicant pools.  The "amended decisions" rationale offered by Plaintiffs also disregards the deposition testimony about the fact that WinnResidential's systems simply are not linked to CoreLogic RPS's systems where such a notation would be shared.**

- **Response: This document is relevant to show zero agent-amended decisions by WinnResidential – that WinnResidential always followed the CrimSAFE decision.**

**Ex. 39 –CrimSAFE Decline Decisions by Race, July 2016 to July 2019, CT Residents – ARROYO001365-1372**

- **Objection: FRE 401; 403 - This document is not relevant as it does not reflect the relevant applicant pools. The relevant target group is the applicant pool, and CoreLogic RPS objects to any evidence other than the applicant pool. Assuming Plaintiffs are not restricted to the applicant pool, and exceptions exist to the necessity of proof of the applicant pool, Plaintiffs cannot show requisite preconditions for attempting to show conditions in the "availability pool" as proof of their *prima facie* case because there is no evidence that the advertisement of criminal background check policies at issue here discouraged any applications or that applicant pool data is not available.**

- **Response: These documents provide evidence of disparate impact, and CoreLogic's knowledge of same.  The relevant comparison is the available, eligible population of prospective tenants, not actual applicants. CoreLogic did not produce data on actual applicants, and in any event prospective applicants with criminal history would likely be deterred from applying given the screening process, making the use of availability pools rather than applicant flow even more appropriate.  See also response on Ex. 35.**

**Ex. 40 –CrimSAFE Decline Decisions by Race, July 2016 to July 2019, CT Properties – ARROYO001373-1381**

- **Objection: FRE 401; 403 - This document is not relevant as it does not reflect the relevant applicant pools. The relevant target group is the applicant pool, and CoreLogic RPS objects to any evidence other than the applicant pool. Assuming Plaintiffs are not restricted to the applicant pool, and exceptions exist to the necessity of proof of the applicant pool, Plaintiffs cannot show requisite preconditions for attempting to show conditions in the "availability pool" as proof of their *prima facie* case because there is no evidence that the advertisement of criminal background check policies at issue here discouraged any applications or that applicant pool data is not available.**

- **Response: These documents provide evidence of disparate impact, and CoreLogic's knowledge of same.  The relevant comparison is the available, eligible population of prospective tenants, not actual applicants. CoreLogic did not produce data on actual applicants, and in any event prospective applicants with criminal history would likely be deterred from applying given the screening process, making the use of availability pools rather than applicant flow even more appropriate.  See also response on Ex. 35.**

**Ex. 41 – CoreLogic RPS staff email to WinnResidential staff re "CoreLogic: Meeting Follow-up" with attachments, 8/27/2017 – ARROYO001459-001525**

- **Objection: FRE 401; 403 - This document is not probative of the issues in this case. In addition, this document contains vast amount of information on screening products and CoreLogic RPS's policies that are not at issue or relevant to this action. This document also has no bearing on how WinnResidential, in fact, used the CrimSAFE product.**

- **Response: This exhibit is relevant to show CoreLogic's involvement in client settings for CrimSAFE; whether there is a substantial business reason for the challenged practice; whether there are less discriminatory alternatives.**

**Ex. 42 – CoreLogic RPS certificate alleging "Fair Credit Reporting Act compliance" and "Fair Housing Act compliance" – ARROYO001477/1690**

- **Objection: FRE 401; 403 - This "certificate" is not probative of the issues in this case, as it does not relate to the use of the product. The undisputed facts in this case reflect that the housing managers made all decisions regarding filtering, tenant screening policies, and actions on applications. There also is no testimony from any customer regarding the use of this "certificate." To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice.**

- **Response. CoreLogic's representations to its clients regarding FHA and FCRA – the claims made in this case – are relevant. Defendant's 30(b)(6) designee Stacy Dachtler testified that these fair housing compliance certificates were included in the "welcome packets" given to new clients in order to convey that because they now use CoreLogic screening services, they are FHA compliant.[9] This further induces property managers to rely on CoreLogic's purported fair housing expertise and reflexively implement CrimSAFE decisions without individualized review. *See, e.g., Connecticut Fair Hous. Ctr. v. Corelogic Rental Prop. Sols.*, LLC, 369 F. Supp. 3d 362, 372 (D. Conn. 2019) (stating "Defendant held itself out as a company with the knowledge and ingenuity to screen housing applicants by interpreting criminal records and specifically advertised its ability to improve "Fair Housing compliance.")**

**Ex. 43 – Stacie Dachtler email to WinnResidential staff, re "CoreLogic Meeting Recap and Follow-up" with attachments, 2/3/2019 – ARROYO001526-1539**

- **Objection: FRE 401; 403 - This document is not probative of the issues in this case. In addition, this document contains vast amount of information on screening products and CoreLogic RPS's policies that are not at issue**

---

[9] **WinnResidential received such a certificate, per CoreLogic's 2015 proposal for screening services.**

or relevant to this action. This document also has no bearing on how WinnResidential, in fact, used the CrimSAFE product.

- **Response: This exhibit is relevant to show CoreLogic's involvement in client settings for CrimSAFE; whether there is a substantial business reason for the challenged practice; whether there are less discriminatory alternatives**

**Ex. 44 – 2005 Registry CrimSAFE product sheet – CFHC001614**

- **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Further, this document is outdated, was developed by a predecessor company, and cannot be argued to have influenced any decision making on behalf of any housing provider with respect to that provider's background screening processes. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.**

- **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  CoreLogic's alert to clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated.**

**Ex. 46 – CoreLogic RPS Criminal Searching Training for sales and account managers – ARROYO001714-1775**

- **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This training document is not probative because there is no proof any housing provider relied on these materials in conducting criminal background screenings. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. It is also not probative to the extent intervening events occurred following the creation of this document; namely, CoreLogic RPS's client alert and training programs regarding the 2016 HUD Memorandum. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.**

- **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  CoreLogic's alert to clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated.**

**Ex. 50 – Screenshot taken 3/12/2018 of CoreLogic RPS webpage "Resident Screening" – CFHC000833-838**

- **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.**

- **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  This is further relevant to demonstrate that CoreLogic marketed "automated" decisionmaking even after the 2016 HUD Guidance.**

**Ex. 51 – Sample CrimSAFE Report and Lease Decision – CFHC000833-838**

- **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.**

- **Response: This document is evidence of how CoreLogic has presented CrimSAFE decisions, and directly contradicts CoreLogic's denial that it presents decisions.**

**Ex. 52 – March 2011 article  "Are You Gambling With the Consistency of Your Criminal Screening Decisions?" by Gary Goodrich, Regional Sales Manager, CoreLogic SafeRent –CFHC000949-956**

- **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative**

because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Further, this document is outdated, was developed by a predecessor company, and cannot be argued to have influenced any decision making on behalf of any housing provider with respect to that provider's background screening processes. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.

- **Response:** CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity. CoreLogic's alert to clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated. Finally, Defendant has argued for the relevancy of material related to CrimSAFE's earliest development in proffering Ex. AW.

**Ex. 53 – Screenshot taken 2/26/2018 of CoreLogic RPS website "Criminal Screening" – CFHC000961**

- **Objection: FRE 401; 403** - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.

- **Response:** CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity. This is further relevant to demonstrate that CoreLogic marketed "automated" decisionmaking even after the 2016 HUD Guidance.

**Ex. 54 – Screenshot of 2002 SafeRent webpage "SafeRent Criminal Recommendation" – CFHC001399**

- **Objection: FRE 401; 403** - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair

prejudice and confusion. Further, this document is outdated, was developed by a predecessor company, and cannot be argued to have influenced any decision making on behalf of any housing provider with respect to that provider's background screening processes. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.

- Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity. CoreLogic's alert to clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated. Finally, Defendant has argued for the relevancy of material related to CrimSAFE's earliest development in proffering Ex. AW.

**Ex. 55 – Registry SafeRent Criminal Search Services E-Brochure, (c) 2004 – CFHC001405-1410**

- Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Further, this document is outdated, was developed by a predecessor company, and cannot be argued to have influenced any decision making on behalf of any housing provider with respect to that provider's background screening processes. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.

- Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity. CoreLogic's alert to clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated. Finally, Defendant has argued for the relevancy of material related to CrimSAFE's earliest development in proffering Ex. AW.

**Ex. 56 – Screenshots of 2006 CoreLogic RPS websites "Registry Criminal Search Services," "Registry CrimCHECK," and "Registry CrimSAFE" – CFHC001424-1426**

- **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Further, this document is outdated, was developed by a predecessor company, and cannot be argued to have influenced any decision making on behalf of any housing provider with respect to that provider's background screening processes. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.**

- **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity. CoreLogic's alert to clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated. Finally, Defendant has argued for the relevancy of material related to CrimSAFE's earliest development in proffering Ex. AW.**

**Ex. 57 – 2006 Brochure "Registry Criminal Search Services" – CFHC001427-1432**

- **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Further, this document is outdated, was developed by a predecessor company, and cannot be argued to have influenced any decision making on behalf of any housing provider with respect to that provider's background screening processes. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.**

- **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity. CoreLogic's alert to clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated. Finally, Defendant has argued for the relevancy of material related to CrimSAFE's earliest development in proffering Ex. AW.**

**Ex. 58 – Screenshots of 2008 CoreLogic RPS websites "Registry CrimCHECK" and "Registry CrimSAFE" – CFHC001446-1448**

-   **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Further, this document is outdated, was developed by a predecessor company, and cannot be argued to have influenced any decision making on behalf of any housing provider with respect to that provider's background screening processes. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.**

-   **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  CoreLogic's alert to clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated.  Finally, Defendant has argued for the relevancy of material related to CrimSAFE's earliest development in proffering Ex. AW.**

**Ex. 59 – Screenshots of 2009 CoreLogic RPS websites "Registry Criminal Search Services," "Registry CrimCHECK," and "Registry CrimSAFE" – CFHC001463-1465**

-   **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Further, this document is outdated, was developed by a predecessor company, and cannot be argued to have influenced any decision making on behalf of any housing provider with respect to that provider's background screening processes. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.**

-   **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  CoreLogic's alert to clients regarding 2016 HUD Guidance post-dated the denial of housing**

to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated.  Finally, Defendant has argued for the relevancy of material related to CrimSAFE's earliest development in proffering Ex. AW.

**Ex. 60 – 2011 article  "Are You Gambling With the Consistency of Your Criminal Screening Decisions?" by Nevel DeHart, Executive Vice President of CoreLogic SafeRent – CFHC001512**

- **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Further, this document is outdated, was developed by a predecessor company, and cannot be argued to have influenced any decision making on behalf of any housing provider with respect to that provider's background screening processes. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.**

- **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  CoreLogic's alert to clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated.  Finally, Defendant has argued for the relevancy of material related to CrimSAFE's earliest development in proffering Ex. AW.**

**Ex. 61 – CrimSAFE Tri-State Maryland-DC-Virginia product sheet – CFHC001523**

- **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Further, this document is outdated, was developed by a predecessor company, and cannot be argued to have influenced any decision making on behalf of any housing provider with respect to that provider's background screening processes. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum. In the alternative, this and the other exhibits described in the Motion in Limine are cumulative.**

- **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  CoreLogic's alert to clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated.**

**Ex. 62 – Screenshot of 2014 CoreLogic RPS website "SafeRent Criminal Screening" – CFHC001530-1531**

- **Objection: FRE 401; 403 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit. This marketing-style document is not probative because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Further, this document is outdated, was developed by a predecessor company, and cannot be argued to have influenced any decision making on behalf of any housing provider with respect to that provider's background screening processes. It is also not probative based on intervening events; namely, CoreLogic RPS's client alert regarding the 2016 HUD Memorandum.**

- **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  CoreLogic's alert to clients regarding 2016 HUD Guidance post-dated the denial of housing to the Arroyos, and moreover did nothing to change the manner in which CrimSAFE operated.**

**Ex. 63 – United States Patent Application, "Internet-Based System and Method for Leasing Rental Property to a Prospective Tenant Based on Criminal History," 2006 – CFHC001560-1572**

- **Objection: FRE 401; 403 - This document is not probative of the issues in this case because it has no relevance as to how customers use the product. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Numerous other documents in this case describe the operation of the product.**

- **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  This patent**

application is the first official description of CrimSAFE's operation. Further, Defendant has argued for the relevancy of material related to CrimSAFE's earliest development in proffering Ex. AW.

**Ex. 64 – Trademark Renewal for "Registry CrimSAFE," registered 05/06/2008 – CFHC001582-1599**

- **Objection: FRE 401; 403 -** This document is not probative of the issues in this case because it has no relevance as to how customers use the product.  To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion. Numerous other documents in this case describe the operation of the product.

- **Response:** CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  Further, Defendant has argued for the relevancy of material related to CrimSAFE's earliest development in proffering Ex. AW.

**Ex. 80 – Expert Report and curriculum vitae of Dr. Lila Kazemian**

- **Objection: FRE 401; 403; 702 -** CoreLogic RPS incorporates its Motion in Limine regarding this exhibit and witness. Dr. Kazemian's report is untimely because it is not a proper rebuttal report to Defendant's expert witness, Jay Kacirk, and Dr. Kazemian's report was not served until three months after the agreed-upon deadline for the exchange of opening reports. To the extent the report is timely, it should still be excluded because the report's findings and conclusions are irrelevant to the claims asserted, have no relation to the housing industry, takes positions that are contrary to binding Congressional statutes and policies regarding criminal background screening, and/or are unreliable.

- **Response:** Dr. Kazemian is an expert in criminology, and her testimony regarding the likelihood of individuals with criminal history to be arrested or convicted again, and how that likelihood decreases over time is directly relevant to rebut Defendant's assertion that criminal history screens are necessary to protect resident safety, and specifically to show that there are less discriminatory alternatives than permitting exclusion from housing based on convictions up to 99 years old.   Further, her report is timely. The parties agreed on a separate deadline for reports on which the party did not bear the burden of proof, and business necessity is Defendant's burden to establish.  The parties originally agreed on a May 15, 2019 deadline for such reports, but that was extended by consent to June 10, 2019, and Dr. Kazemian's report was submitted on June 3, 2019. Further, Dr. Kazemian's opinions provide scientifically grounded rebuttal to Mr.

Kacirk's reliance on "common sense" to support his claims about the necessity and efficacy of background screening, and are thus timely as the deadline for rebuttal reports was July 1, 2019.

-

**Ex. 81 – Expert Report and curriculum vitae of Christopher Wildeman**

- **Objection: FRE 401; 403; 702 -** CoreLogic RPS incorporates its Motion in Limine regarding this exhibit and witness. Dr. Wildeman's statistical findings only purport to present national statistics, but statistics more directly bearing upon the actual Connecticut applicant pools are required. The relevant target group is the applicant pool, and CoreLogic RPS objects to any evidence other than the applicant pool. Assuming Plaintiffs are not restricted to the applicant pool, and exceptions exist to the necessity of proof of the applicant pool, Plaintiffs cannot show requisite preconditions for attempting to show conditions in the "availability pool" as proof of their *prima facie* case because there is no evidence that the advertisement of criminal background check policies at issue here discouraged any applications or that applicant pool data is not available. Therefore, Dr. Wildeman's report is not relevant to any issue in this case. Dr. Huber did not find any of Dr. Wildeman's results to be statistically significant based on the limited data provided by Dr. Wildeman.  Further, Dr. Wildeman fails to provide meaningful analysis of standard error in his survey numbers, which make his findings unreliable.

- **Response:** Dr. Wildeman explicitly presents Connecticut statistics as well as national statistics, and demonstrates that Connecticut disparities are 2-3 times worse than national disparities. His findings are based on reliable data and methodology.  Even Dr. Huber, Defendant's expert, confirmed that many of his findings are statistically significant.  As to CoreLogic's assertion that applicant pools are required, many cases recognize the appropriateness of using availability pools instead; CoreLogic did not produce data on actual applicants, and in any event prospective applicants with criminal history would likely be deterred from applying given the screening process, making the use of availability pools rather than applicant flow even more appropriate.  Availability pools "often form the initial basis of a disparate impact claim, especially in cases [where] the actual applicant pool might not reflect the potential applicant pool, due to a self-recognized inability on the part of potential applicants to meet the very standards challenged as being discriminatory." *EEOC v. Joint Apprenticeship Comm.*, 186 F.3d 110, 119 (2d Cir. 1999). See also *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308-09 n.13 (1977) (finding data which demonstrates the pool of eligible candidates is appropriate to consider where reliable applicant flow data was not available); *Malave v. Potter*, 320 F.3d 321, 327 n.4 (2d Cir. 2003) (finding that the application process might not adequately reflect the actual potential

applicant pool); *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 170 (E.D.N.Y. 2019).

**Ex. 82 – Connecticut Housing Finance Authority, "CHFA-Financed and State-Sponsored Housing Portfolios' Multifamily Rental Housing Units"**

- **Objection: FRE 401; 403 - Document is not probative because it predates the time period that Plaintiff Carmen Arroyo applied for the two-bedroom apartment at ArtSpace Windham by almost a full year and is not probative of the status of ArtSpace Windham as of April 2016.**

- **Response: Defendant asserted in its summary judgment motion that the ArtSpace Windham was subject to certain criminal screening requirements because it was covered by specific rules for *certain* types of government subsidized housing.  This is relevant to show the apartment complex in question was not covered by one of the government programs that could have subjected it to any screening requirements.  Plaintiffs have presented evidence both before and after the precise date in question, both of which presents evidence relevant to resolve the dispute of fact.**

**Ex. 83 – HUD webpage providing access Multifamily Assistance & Section 8 Database**

- **Objection: FRE 401; 403 - Document is not probative because it postdates the time period that Plaintiff Carmen Arroyo applied at ArtSpace Windham and is not probative of the status of ArtSpace Windham as of April 2016.**

- **Response: Defendant asserted in its summary judgment motion that the ArtSpace Windham was subject to certain criminal screening requirements because it was covered by specific rules for *certain* types of government subsidized housing.  This is relevant to show the apartment complex in question was not covered by one of the government programs that could have subjected it to any screening requirements.  Plaintiffs have presented evidence both before and after the precise date in question, both of which presents evidence relevant to resolve the dispute of fact.**

**Ex. 84 – HUD Multifamily assistance & Section 8 database (filtered for Connecticut)**

- **Objection: FRE 401; 403 - Document is not probative because it postdates the time period that Plaintiff Carmen Arroyo applied at ArtSpace Windham and is not probative of the status of ArtSpace Windham as of April 2016.**

- **Response: Defendant asserted in its summary judgment motion that the ArtSpace Windham was subject to certain criminal screening requirements because it was covered by specific rules for *certain* types of government**

subsidized housing.  This is relevant to show the apartment complex in question was not covered by one of the government programs that could have subjected it to any screening requirements.  Plaintiffs have presented evidence both before and after the precise date in question, both of which presents evidence relevant to resolve the dispute of fact.

**Ex. 86 – Printout taken 12/06/2019 of Huduser.gov website "FY 2019 Income Limits Documentation System"**

- **Objection: 401; 403 - This document not relevant to the claim of disparate impact as it does not reflect the relevant applicant pools.**

- **Response: Defendant asserted for the first time in its summary judgment motion that many of its customers provide affordable housing, and thus the relevant comparison had to take this into account.  This document establishes the income levels relevant to some different types of subsidized housing, to permit better evaluation of Dr. Wildeman's breakout of disparities by income levels, which illustrate that Plaintiffs have evidence of disparities specific to the rental markets CoreLogic alleges it serves.**

**Ex. 87 – Screenshot taken 12/19/2019 of CoreLogic RPS webpage "Rental Property Solutions Criminal Screening"**

- **Objection: FRE 401; 403 - This marketing-style document is not probative of the issue of whether CrimSAFE is/was used as a "decision-making product" because there is no proof that any customer in any relevant rental market ever viewed or relied on these materials. To the extent this document does have probative value, any value is outweighed by the possibility of unfair prejudice and confusion.**

- **Response: CoreLogic's representations regarding what CrimSAFE does, how it works, and what its purpose and advantages are, are all relevant to establish CoreLogic's role in making housing unavailable, and identify CoreLogic's past claims regarding business necessity.  This is further relevant to demonstrate that CoreLogic marketed "automated" decisionmaking even after the 2016 HUD Guidance.**

**Ex. 88 – Expert Report and curriculum vitae of Allen Parnell**

- **Objection: FRE 401; 403; 702 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit and witness. Dr. Parnell's "statistical significance" analysis is unreliable because it is based on Dr. Wildeman's flawed data along with Dr. Parnell's own flawed statistical analysis. Dr. Parnell's opinion that CrimSAFE has a disparate impact is based solely on**

statistics, which is not a proper method of inference, and is based on inadequate and erroneous analysis.

- **Response: Dr. Parnell is a demographer with substantial experience with housing discrimination issues.  His analysis illustrates the impact that disparities testified to by Dr. Wildeman would have in the relevant housing markets in Connecticut, as well as statewide.  Statistical evidence of disparities are the most accepted manner of establishing disparate impact.**

**Ex. 89 – Expert Report and curriculum vitae of Nancy B. Alisberg**

- **Objection: FRE 401; 403; 702 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit and witness. Ms. Alisberg's opinions are composed entirely of legal conclusions based on citations to statutes, regulations, case law, and legal treatises, coupled with a small number of readily-available statistics—none of which are appropriate subjects for expert testimony.**

- **Response: Ms. Alisberg opines that people with court-ordered conservatorships in Connecticut are disproportionately likely to be individuals with disabilities as defined by the Fair Housing Act and to lack the capacity or ability to designate an attorney-in-fact.   Ms. Alisberg only addressed legal questions as a step in identifying the relevant groups to compare to determine that there is a disparate impact caused by the challenged file disclosure policy which does not recognize conservatorship as conveying authority to request a consumer file.  Plainly, to the extent the Court disagrees with Ms. Alisberg's understanding of conservatorship requirements or FHA coverage, the Court can easily disregard the evidence of disparate impact.  In the absence of a jury that could be unduly swayed by Ms. Alisberg's expertise, there is no reason to exclude her testimony.**

**Ex. 93 – Rebuttal Declaration of Christopher Wildeman**

- **Objection: FRE 702 - CoreLogic RPS incorporates its Motion in Limine regarding this exhibit and witness. Dr. Wildeman's statistical findings only purport to present national statistics, but statistics more directly bearing upon the actual Connecticut applicant pools are required. Therefore, Dr. Wildeman's report is not relevant to any issue in this case. Further, Dr. Wildeman fails to provide meaningful analysis of standard error in his survey numbers, which make his findings unreliable.**

- **Response: Dr. Wildeman's rebuttal report must be read in conjunction with his opening report (Ex. 81), which addressed both national and Connecticut specific statistical disparities, and established that Connecticut disparities are 2-3 times worse than national disparities.  This rebuttal report addresses a couple narrow issues raised by Dr. Huber, and includes**

confidence intervals and attests to statistical significance.  His findings are reliable, and indeed Defendant's expert Dr. Huber conceded many of his comparisons are statistically significant.

**Ex. 95 - Transcript of Connecticut Commission on Human Rights and Opportunities hearing, Arroyo et al v. Artspace Windham LP (June 13, 2017)**

- **Objection: FRE 801; 803 - This transcript before an investigative officer is hearsay and fails to meet the standard for admission under FRE 801(d) or FRCP 32**

- **Response: This exhibit may be used to refresh the memory of a testifying witness, or may be used under FRE 801(d)(1)(A) if a witness changes his or her testimony from what was offered during prior testimony under oath. Two witnesses who testified at this hearing are also on Plaintiffs' witness list.**

**Ex. 98 - HUD Guidance on Application of FHA Standards to Use of Criminal Records by Housing Providers**

- **Objection: FRE 401; 403 - This memorandum is not an official agency interpretation of the requirements of the FHA and is not entitled to Chevron deference.  *AmBase Corp. v. United States*, 731 F.3d 109, 121 m. 12 (2d Cir. 2013).  Any probative value is also outweighed by the subsequently-issues notice of proposed rulemaking by HUD in 2019, which is reflected on CoreLogic RPS's exhibit list.  Plaintiffs also cannot use this memorandum to supplant Congressionally-expressed priorities on screening and related allowances to housing providers.**

- **Response: CoreLogic has specifically asserted it provided an email alert and offered training to its clients with respect to this HUD Guidance; Defendant's expert Dr. Huber relied upon this document for portions of his report.  The level of legal deference it is entitled to on questions of law is irrelevant to its admissibility as evidence, and it is equally probative as various Bureau of Justice Statistics reports proffered by Defendant.  As Defendant has noted, the Court can take judicial notice of federal studies and reports.  *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 691 (S.D. Tex. 2016).**

2. **Defendant's Exhibits to which objections have been made:**

**Ex. D - CrimSAFE Terms & Conditions (ARROYO000021)**

- **Objection:  FRE 801-803 (no objection if not offered for the truth of the assertions included in the document).  This exhibit does not satisfy the requirements of a business record.  The document includes assertions that**

are not mere records of observable information, some assertions are not even as to facts, but as to legal requirements or liability.  There is no evidence that these documents were created by a person with knowledge. See Plaintiffs' Motion in Limine.

- **Response: Verbal acts that give rise to legal consequences are not considered hearsay. A contract is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay. In the alternative, business records exception to hearsay, FRE 803(6). Business records exception to hearsay, FRE 803(6). This record was kept in the ordinary course of CoreLogic RPS's business by its personnel and was generated as part of its regular business activity.  This document demonstrates the terms by which CoreLogic RPS's customers must agree in order to purchase CrimSAFE.**

**Ex. G - April 2016 email from Lynn Bora to Stacie Dachtler (ARROYO000191-196)**

- **Objection: FRE 801-803. There is no evidence that these emails were kept in the course of a regularly conducted activity by someone who had an obligation or regular practice to record such matters, particularly as to the emails drafted by third-parties.  See Plaintiffs' Motion in Limine.**

- **Response : Business records exception to hearsay, FRE 803(6).  This email between CoreLogic RPS and WinnResidential personnel was kept in the ordinary course of CoreLogic RPS's business by its personnel and was generated as part of its regular business activity. This email also will be used for the non-hearsay purpose to show the functionality of the product and the control of housing providers over their selected settings, which is relevant to issues of proximate cause and to rebut plaintiffs' argument that the FHA applies to CrimSAFE.**

**Ex. H - May 2016 Email from Lynn Bora to Stacie Dachtler with Attachment (ARRYOYO000203-205)**

- **Objection: FRE 801-803. There is no evidence that these emails were kept in the course of a regularly conducted activity by someone who had an obligation or regular practice to record such matters, particularly as to the emails drafted by third-parties.  See Plaintiffs' Motion in Limine.**

- **Response : Business records exception to hearsay, FRE 803(6). This email between CoreLogic RPS staff and WinnResidential was kept in the ordinary course of CoreLogic RPS's business by its personnel and was generated as part of its regular business activity. This email also will be used for the non-hearsay purpose to show the functionality of the product and the control of housing providers over their selected settings, which is relevant to issues of proximate cause.**

68

**Ex. I - Screening Service Agreement between RPS and WinnResidential – Policies and Procedures Applicable to End Users (ARROYO000223-233)**

- **Objection: FRE 801-803 (no objection if not offered for the truth of the assertions included in the document).  This exhibit does not satisfy the requirements of a business record.  The document includes assertions that are not mere records of observable information, some assertions are not even as to facts, but as to legal requirements or liability.  Contracts between private parties do not dictate whether federal law applies, and for that purpose it is irrelevant under FRE 401. There is no evidence that these documents were created by a person with knowledge.  See Plaintiffs' Motion in Limine.**

- **Response: Verbal acts that give rise to legal consequences are not considered hearsay. A contract is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay. In the alternative, business records exception to hearsay, FRE 803(6). This contract between CoreLogic RPS staff and WinnResidential was kept in the ordinary course of CoreLogic RPS's business by its personnel and was generated as part of its regular business activity. The contract will also be used for the non-hearsay purpose regarding WinnResidential's acknowledgement of its FHA obligations and nature of the agreed-upon understanding of the independent contractor relationship between the parties.**

**Ex. J - Screening Service Agreement between RPS and WinnResidential (ARROYO000256-260)**

- **Objection: FRE 801-803 (no objection if not offered for the truth of the assertions included in the document).  This exhibit does not satisfy the requirements of a business record.  The document includes assertions that are not mere records of observable information, some assertions are not even as to facts, but as to legal requirements or liability.  Contracts between private parties do not dictate whether federal law applies, and for that purpose it is irrelevant under FRE 401. There is no evidence that these documents were created by a person with knowledge.  See Plaintiffs' Motion in Limine.**

- **Response: Verbal acts that give rise to legal consequences are not considered hearsay. A contract is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay. In the alternative, business records exception to hearsay, FRE 803(6). This contract between CoreLogic RPS staff and WinnResidential was kept in the ordinary course of CoreLogic RPS's business by its personnel and was generated as part of its regular business activity. The contract will also be**

used for the non-hearsay purpose regarding WinnResidential's acknowledgement of its FHA obligations and agreed-upon understanding of the independent contractor nature of the relationship between the parties, and is relevant to issues of proximate cause and to rebut plaintiffs' argument that the FHA applies to CrimSAFE.

**Ex. L - WinnResidential 2013-2016 CrimSAFE Settings (ARROYO000341)**

- **Objection: FRE 801-803. This exhibit has not been shown to satisfy the requirements of a business record, there is no evidence of who made the record or based on what information. The document includes an assertion that is inconsistent with testimony from multiple people with personal knowledge.  See Plaintiffs' Motion in Limine.**

- **Response: Business records exception to hearsay, FRE 803(6). This record reflecting the CrimSAFE settings selected by WinnResidential at various points in time was kept in the ordinary course of CoreLogic RPS's business by its personnel and was generated as part of its regular business activity. This record also will be used for the non-hearsay purpose to show the functionality of the product and the control of housing providers over their selected settings, which is relevant to issues of proximate cause and to rebut plaintiffs' argument that the FHA applies to CrimSAFE.**

**Ex. X - November-December RPS Email Chain (ARROYO000650-651)**

- **Objection:  FRE 801-804.  There is no evidence that these emails were kept in the course of a regularly conducted activity by someone who had an obligation or regular practice to record such matters.  While the drafter is deceased, the email messages do not fall within the exceptions of FRE 804(b).**

- **Response: Declarant (Tina Marie Santos) unavailable as deceased, FRE 804. Business records exception to hearsay, FRE 803(6).  This email exchange was kept in the ordinary course of CoreLogic RPS's business by its personnel and was generated as part of its regular business activity. This email is also relevant to the non-hearsay purpose of negating negligence and intent, showing the actions taken by CoreLogic RPS to assess the validity of the file disclosure documentation submitted by Ms. Arroyo, including to refute Plaintiffs' claim of a negligent or "willful" violation of the FCRA.**

**Ex. AB - Manage CrimSAFE (ARROYO001382-1383)**

70

- **Objection: FRE 401, 403.  This appears to show the settings for an unidentified WinnResidential property, not necessarily the one at which the Arroyos sought an apartment, and are from 2019, and thus long after the specific incident involving the Arroyos.  Defendant has not explained why this would be relevant.**

- **Response: This business record shows the functionality of the product and the control of housing providers over their selected settings, which is relevant to issues of proximate cause and to rebut plaintiffs' argument that the FHA applies to CrimSAFE. Other testimony in the case also establishes that WinnResidential used the same settings throughout their properties. The document also is relevant to show the ongoing and total control that customers have over the CrimSAFE settings, which rebuts any "agent" theory, as well as the fact that such settings vary over time, which is a variable that Plaintiffs have not considered in connection with their claimed prima facie statistical case.**

**Ex. AD - Bureau of Justice Statistics – Location (ARROYO001420-001422)**

- **Objection: FRE 401, 403. This report examines the frequency with which individuals are subjected to violent crime in their homes or nearby.  It does not consider at all where perpetrators live in relation to the location of the crimes committed, and thus does not, as Defendant suggested, provide any support for its claim that there are legitimate business reasons to screen criminal backgrounds to increase safety within an apartment complex.  See Plaintiffs' Motion in Limine.**

- **Response: Relevant to support one of Defendant's proffered legitimate business interests for criminal background screening.  Relevant to show the housing-related variables not considered by Plaintiffs' experts in connection with their statistical and recidivism analysis, including to counter the other BJS studies explicitly cited by one of Plaintiffs' own expert in her report (Dr. Kazemian).**

**Ex. AE - Housing Spotlight: Who Lives in Federally Assisted Housing? (ARROYO001424-001429)**

- **Objection: FRE 401, 403.  CoreLogic has produced no evidence regarding what proportion of the properties it serves in Connecticut are "federally assisted" as used in this report, and thus any information about characteristics of residents of such housing are not relevant.**

- **Response: Relevant to CoreLogic RPS's rebuttal of Plaintiffs' statistical showing of disparate impact based on race/ethnicity, including to show the variations in racial compositions of African Americans and Latinos in**

**affordable housing that Plaintiffs do not account for in their prima facie statistical claims of disparate impact.**

**Ex. AG - December 20, 2016 Email from Tina-Marie Santos to M. Cuerda**

- **Objection:  FRE 801-804.  There is no evidence that these emails were kept in the course of a regularly conducted activity by someone who had an obligation or regular practice to record such matters.  While the drafter is deceased, the email messages do not fall within the exceptions of FRE 804(b).**

- **Response : Declarant (Tina Marie Santos) unavailable as deceased, FRE 804. A portion of the email, authored by CFHC employee Maria Cuerda, is admissible as a party admission. Business records exception to hearsay, FRE 803(6).  This email exchange was kept in the ordinary course of CoreLogic RPS's business by its personnel and was generated as part of its regular business activity.**

**Ex. AH - Sticky note from ArtSpace to C. Arroyo (CFHC000052)**

- **Objection: FRE 801-803.  This appears to be a document written by someone at WinnResidential, and thus is hearsay.**

- **Response: Document contemporaneously reflecting the substance of Ms. Arroyo's conversation with WinnResidential constitutes a present sense impression, FRE 803(1).  Residual exception to hearsay, FRE 807.  There is no dispute as to the authenticity of the document, produced by Plaintiffs' counsel, reflecting certain aspects of her conversation with WinnResidential.  FRE 801. Also introduced to show the non-hearsay purpose of WinnResidential's intent to not allow Ms. Arroyo to move apartments until at least November 2016.**

**Ex. AI - C. Arroyo's lease for the one bedroom apartment (CFHC000053-58)**

- **Objection: FRE 401, 403. (1)  Defendant's claim that Ms. Arroyo was precluded from moving to a larger apartment within the same complex under the terms of her lease is misleading because (a) she could have requested to move sooner as a reasonable accommodation, and (b) the lease contains various buyout and early termination provisions.  Further, WinnResidential's awareness of fair housing laws is not relevant to whether the FHA also applies to CoreLogic and its CrimSAFE product. (2) This document omits nearly 30 pages of the contract (CFHC 59-85), which include the buyout provision that renders this document even less relevant for the intended purpose**

72

- **Response : Relevant to damages. Provides the date Carmen Arroyo moved into the one-bedroom apartment at ArtSpace Windham and her ineligibility to move to the desired two-bedroom until November 2016.  Relevant to contest Ms. Aroyo's damages claims, which implicate claimed distress and failure to obtain a housing subsidiary before November 2016.  Also relevant to non-hearsay purpose of showing WinnResidential's awareness of fair housing laws, which rebuts plaintiffs' contention that the FHA applies to CrimSAFE.**

**Ex. AN - ArtSpace Windham Tenant Selection Plan (CFHC000584-596)**

- **Objection: FRE 401, 403, 801-803.  This is a document created by WinnResidential, no evidence has been offered establishing it qualifies as a business record and thus is hearsay.  Further, there is no evidence that this plan was actually followed by ArtSpace Windham.**

- **Response: Business records exception to hearsay, FRE 803(6). Business record of WinnResidential authenticated during deposition of Lynn Bora, and as produced by WinnResidential during litigation with Ms. Arroyo, reflecting the tenant selection and screening policies in place at ArtSpace Windham.  Also used for the non-hearsay purpose to show WinnResidential's control over the tenant screening process, selection of criminal record admission criteria, and knowledge of obligations under the FHA, which all rebut plaintiffs' contention that the FHA applies to CrimSAFE. Also relevant to damages and related claim of proximate cause by showing that any refusal to allow Mr. Arroyo to move in was based on policies set by WinnResidential in connection with its consideration of criminal records identified during the application process, over which RPS did not have control.**

**Ex. AT - Expert report of Jay Kacirk with cover declaration**

- **Objection: FRE 702. Mr. Kacirk does not satisfy Rule 702 requirements for providing expert testimony.  See Plaintiffs' motion to exclude his testimony, which has been fully briefed.**

- **Response: Relevant to support Defendant's proffered legitimate business interests, housing provider intent, industry customs, and causation, and satisfies FRE 702.  Report speaks for itself, and the issue has been briefed for the court.**

**Ex. AU - Rebuttal expert report of Dr. William Huber**

- **Objection: FRE 702.  Dr. Huber includes opinions on several subjects that tread well beyond his statistical expertise.  He also offers opinions lacking adequate factual or analytical support.  Plaintiffs have therefore moved to**

strictly limit his testimony and exclude various portions of his report.  See Plaintiffs' motion to limit his testimony.

- **Response: Relevant to rebut Plaintiffs' claims of disparate impact based on race/ethnicity, and satisfies FRE 702.  Report speaks for itself.**

**Ex. AV - Legislative history of CT. S.B. No. 54 (2019).**

- **Objection: FRE 401, 403.  This shows only a specific bill that did not pass, which does not establish anything about public policy in Connecticut or otherwise tend to prove or disprove any fact at issue.**

- **Response: Supports CoreLogic RPS's contention that Connecticut does not have a specific "public policy" that restricts background screening in the manners proposed by Plaintiffs and is relevant for defense of Plaintiffs' CUTPA claims and business justifications under the FHA.**

**Ex. AW - National Incident-Based Reporting System FAQ webpage**
- **Objection: FRE 401, 403. Plaintiffs are not challenging the FBI's system for categorizes criminal offenses. The fact that CoreLogic modeled CrimSAFE on the FBI's NIBRS system has no bearing on that categorization system's relevance to a housing applicant's suitability for tenancy.**

- **Response : Relevant to explain how the CrimSAFE product was structured using verbatim the FBI's categories of crimes.  Relevant to support legitimate interests served by CrimSAFE through use of those established categories, why the product is structured in the manner that it was, and to rebut any claim that the categories selected are contrary to the "public policy" of Connecticut under the CUTPA.**

**Ex. BC - Ex. 2 to Def's Reply Supp. MSJ**
- **Objection: FRE 401, 801-03.  CoreLogic has produced no evidence regarding what proportion of the properties it serves in Connecticut are "affordable" as used in this set of documents (indeed, it repeatedly refused to produce additional information about the specific properties it serves, beyond the bare zip code); there is no connection to any fact at issue in this case.  In addition, while some portions appear to be government reports, other annotations and the final page in particular are hearsay.**

- **Response: Document is from publicly-available website official government agency and subject to judicial notice for purposes of authentication.  The document meets the hearsay exception under FRE 803(8), as well as the residual exception under FRE 807.  It is relevant to show the composition of affordable housing in Connecticut, incuding the failure to account for variables as to why statewide demographics are insufficient to make a prima facie statistical showing of disparate impact, which is Plaintiffs'**

**burden of proof.  CoreLogic RPS can also present the number of specific affordable properties operating in Connecticut at trial.**

**Ex. BD - 2019 HUD notice of proposed rulemaking**

- **Objection: FRE 401, 403.  This is merely a proposed rule, not one that is in effect, and thus is irrelevant.**

- **Response: The proposed rule is HUD's most recent statement of agency guidance.  It is more official, recent, and authoritative than the April 2016 HUD Memorandum on which Plaintiff relies, which is given no Chevron deference or persuasive effect.  It is well established that proposed rules are to be given "respectful consideration" by courts.  *Wis. Dept. of Health & Family Servs. v. Blumer*, 534 U.S. 473, 497, 122 S. Ct. 962, 151 L. Ed. 2d 935 (2002) (agency's position, even if only presented in a proposed rule, "warrants respectful consideration.").**

C.   **Plaintiffs' Deposition Designations**

**See spreadsheets attached as Att. B, reflecting Plaintiffs' Designations, Defendant's objections and counter-designations, and Plaintiffs' objections and further counter-designations.**

**Plaintiffs note a large portion of Defendant's deposition designations are duplicative of Plaintiffs' designations, and thus are cumulative.  Based on the understanding that Defendant will not offer any testimony already placed in the record during Plaintiffs' case in chief, Plaintiffs have not noted individual objections.**

D.   **Defendant's Deposition Designations**

**See spreadsheets attached as Att. B, which includes Defendant's Designations, Plaintiffs' objections and counter-designations, and Defendants' objections and further counter-designations.**

## IX.   STIPULATIONS OF FACT AND STATEMENT OF CONTESTED ISSUES

### A.   Stipulations of Fact

1.   CoreLogic RPS is a tenant screening company that offers a number of tenant screening products.

2.   CoreLogic RPS is a consumer reporting agency.

3.   CoreLogic RPS provides screening services to more than 120 properties in Connecticut for 20 different customers, assisting housing providers in evaluating prospective tenants.

4.   CoreLogic RPS offers a suite of services to multi-family housing providers, including tenant screening reports.  In addition to the identification of the criminal history of an applicant (if any) on a tenant screening report, CoreLogic RPS offers a product called "CrimSAFE."

5.   CrimSAFE classifies crimes into "Crimes Against Property," "Crimes Against Persons," and "Crimes Against Society."  Each category reflects certain types of offenses across an overall total of 36 categories of offenses.

6.   When a housing provider requests a tenant screening report, it provides CoreLogic RPS with the applicant's first and last name, date of birth, and current address (and optionally the middle name).

7.   CoreLogic RPS uses a proprietary matching process to identify criminal public records and associated data from CoreLogic RPS's database that are associated with the applicant.

8.   CoreLogic RPS does not interact with applicants for multi-family housing units during the application stage.

9.   WinnResidential has been a customer of CoreLogic RPS since 2006 and has used screening products from 2008 until 2020.

10.   WinnResidential managed, during the relevant timeframe, the Artspace Windham complex in Willimantic, Connecticut.

11.   WinnResidential manages sixteen properties in Connecticut.

12.   WinnResidential made changes to its CrimSAFE settings in May of 2016, as well as in July of 2016.  WinnResidential also made additional changes to its CrimSAFE settings in 2019.

13.   Mikhail Arroyo is a Latino male.

14.     Mikhail Arroyo is a person with significant disabilities that substantially limit his ability to walk, think, communicate, and care for himself.

15.     As a result of his disabilities, Mr. Arroyo is incapable of caring for himself or managing his affairs, and he lacks the capacity to enter into a contract or designate a power of attorney.

16.     Mr. Arroyo's disabilities were caused by an accident in July 2015 that caused a traumatic brain injury and left him completely unable to walk or talk, and he needs assistance with all activities of daily living and mobility.

17.     Mr. Arroyo's disabilities precluded him from engaging in criminal activity.

18.     Plaintiff Carmen Arroyo was appointed conservator for her son as a result of his accident

19.     In early 2016, Mr. Arroyo was transferred to a nursing home to continue to recover from his injuries.

20.     In April 2016, Mr. Arroyo was medically cleared and ready to be discharged from the nursing home to continue his recovery at home, with Ms. Arroyo as his primary caregiver.

21.     In April 2016, Carmen Arroyo submitted a rental application to her property manager, WinnResidential, on Mr. Arroyo's behalf for the ArtSpace Windham, where they intended to reside together.

22.     CoreLogic RPS was not aware of Mr. Arroyo's disability status or any of his injuries at the time of the application.

23.     CoreLogic RPS was not aware of Mr. Arroyo's race/ethnicity at the time it issued its background report.

24.     CoreLogic RPS generated a template adverse action letter, which it filled in with Mr. Arroyo's name and address as the recipient and included with the report provided to WinnResidential. The template adverse action letter states "we are unable to approve your application," and CoreLogic RPS checked a box to indicate that "this decision was based on information contained in consumer report(s) obtained from or through CoreLogic RPS SafeRent, LLC," adding that Mr. Arroyo has the right of disclosure of the information contained in his consumer file. The template adverse action letter also states that CoreLogic RPS "did not make the decision to take adverse action."

25.     Any decision of whether to send the adverse action letter was made by WinnResidential.

26.    After being informed of the denial, Ms. Arroyo had numerous contacts with WinnResidential in 2016 and 2017, where she explained that Mr. Arroyo was disabled and asked for further details on the denial.  WinnResidential did not reverse its decision at that time.

27.    On April 20, 2017, approximately a year after RPS provided a tenant screening report on Mr. Arroyo, the charge against him for retail theft was withdrawn.

28.    Mr. Arroyo remained in the nursing home until June 2017.

29.    In 2017, Ms. Arroyo filed an administrative complaint against WinnResidential for failing to reasonably accommodate Mr. Arroyo's disability by refusing to admit him and for national origin discrimination, asserting claims under the federal Fair Housing Act and the Connecticut Fair Housing Statute.

30.    During the pendency of the administrative action, WinnResidential gave Mikhail Arroyo permission to move into the complex.

31.    Mr. Arroyo had been approved for a Rental Assistance Program (RAP) certificate that could be used when he left the nursing home to subsidize any eligible rental unit, including Ms. Arroyo's apartment at ArtSpace Windham. RAP is a state-funded program that helps eligible low-income families afford to rent in the private market by limiting a participant household's rent obligation to 30% of the household's adjusted income.

32.    When Mr. Arroyo was finally permitted to be added to Ms. Arroyo's lease, the portion of the rent for which the Arroyos were responsible was reduced to 30% of their adjusted household income.

33.    A consumer may obtain his or her consumer file from CoreLogic RPS for free.

34.    CoreLogic RPS processes requests from consumers for their files and maintains a consumer relations department that handles such requests. CoreLogic RPS maintained written policies and procedures for granting consumers access to their consumer file, including specific policies governing third parties acting on behalf of consumers.

B.    Joint Statement of Contested Issues of Fact

1.    The Parties dispute whether CoreLogic RPS's product CrimSAFE serves to make housing unavailable to some applicants.

2.    The Parties dispute how CoreLogic RPS has marketed the CrimSAFE product.

79

3.     The Parties dispute the extent and import of the information provided by CoreLogic RPS to CrimSAFE users on their CrimSAFE settings, including whether default settings are provided.

4.     The Parties dispute how CrimSAFE can be configured by housing providers to limit access to that details of criminal records identified to designated administrators.

5.     The Parties dispute whether CoreLogic RPS's conduct proximately caused Plaintiffs any injuries with respect to their FHA and CUTPA claims.

6.     The Parties dispute whether CoreLogic RPS acted as an agent of WinnResidential with respect to Mr. Arroyo's application for housing.

7.     The Parties dispute whether CoreLogic RPS intentionally discriminated against Mr. Arroyo on the basis of his race.

8.     The Parties dispute whether CoreLogic RPS intentionally discriminated against Mr. Arroyo on the basis of his disability.

9.     The Parties dispute whether CrimSAFE causes a disparate impact with respect to race under the FHA.

10.     The Parties dispute whether CoreLogic RPS' file disclosure policies cause a disparate impact with respect to disability under the FHA.

11.     The Parties dispute whether, assuming the application of the FHA to CoreLogic RPS's activities, CoreLogic RPS has identified one or more valid interests served by the CrimSAFE product and, if so, whether Plaintiffs have identified that any such valid interests could be served by another practice that has a "less discriminatory effect."

12.     The Parties dispute whether CoreLogic RPS's actions delayed Mr. Arroyo's admission to ArtSpace Windham.

13.     The Parties dispute whether Plaintiff Connecticut Fair Housing Center has suffered any recoverable damages.

14.     The Parties dispute whether the documentation that Ms. Arroyo submitted to CoreLogic RPS as a part of her consumer file disclosure requests satisfied her statutory requirement to provide reasonable "proper identification" before CoreLogic RPS could release Mr. Arroyo's consumer file, including whether any such unwillingness by CoreLogic RPS to produce the file could be deemed a "willful" violation of the FCRA and/or a failure to make a "reasonable accommodation" for Mr. Arroyo's disability under the FHA.

15.     The Parties dispute whether CoreLogic RPS's file disclosure practices constitute "trade or commerce" for purposes of the application of the CUTPA.

16.     The parties dispute whether Mr. Arroyo suffered any damages proximately caused by CoreLogic RPS with respect to his FCRA claim.

C.     Joint Statement of Contested Issues of Law

1.     Whether Ms. Arroyo has standing to sue CoreLogic RPS in her individual capacity.

2.     Whether CoreLogic RPS's conduct made housing "unavailable" to Mr. Arroyo, within the meaning of 42 U.S.C. § 3604(a).

3.     Whether CoreLogic RPS's conduct disproportionately makes housing "unavailable" to potential eligible African American and Latino tenants in Connecticut.

4.     Whether CoreLogic RPS's conduct qualified it as an "agent" of WinnResidential.

5.     Whether CoreLogic RPS's conduct qualifies it as an "agent" of its client housing providers who use CrimSAFE for properties in Connecticut.

6.     Whether CoreLogic RPS, through its CrimSAFE product, is a proximate cause of housing denials for rental applicants seeking admission to Connecticut properties.

7.     Whether CoreLogic RPS's CrimSAFE product has a disparate impact on African American and Latino applicants for housing.

8.     Whether Plaintiffs have presented a *prima facie* statistical case of disparate impact with respect to the CrimSAFE product.

9.     Whether the aspects of CoreLogic RPS's CrimSAFE product that Plaintiffs are challenging are necessary to achieve a substantial and legitimate business need.

10.     Whether there are less discriminatory alternatives available to satisfy any legitimate business need.

11.     Whether CoreLogic RPS engaged in intentional discrimination with respect to the use of CrimSAFE.

12.     Whether CoreLogic RPS's conduct with respect to the CrimSAFE product constitutes an "unfair or deceptive" practice under CUTPA.

13.     Whether CoreLogic RPS's consumer file disclosures are activities in "trade or commerce," as defined by CUTPA.

81

14.     Whether the Arroyos suffered an "ascertainable loss" under the CUTPA.

15.     Whether the information and documentation provided by Ms. Arroyo to CoreLogic RPS constituted "proper identification" under the FCRA.

16.     Whether CoreLogic RPS's unwillingness to disclose Mr. Arroyo's consumer file was "objectively unreasonable" and thus a willful violation of the FCRA.

17.     Whether CoreLogic RPS failed to provide a "reasonable accommodation" to Mr. Arroyo by not accepting the documentation submitted by Ms. Arroyo in seeking his consumer file.

18.     Whether CoreLogic RPS intentionally discriminated against Mr. Arroyo on the basis of his disability with respect to its file disclosure practices.

19.     Whether CoreLogic RPS's file disclosure policies have a disparate impact on conserved consumers.

20.     Whether Plaintiffs have presented a prima facie statistical case of disparate impact on disabled individuals with respect to CoreLogic RPS's file disclosure practices.

21.     Whether CoreLogic RPS's file disclosure practices serve a legitimate business need.

22.     Whether there are less discriminatory alternatives to serve any legitimate business need.

23.     Whether Plaintiffs have satisfied the standards for obtaining injunctive relief.

24.     Whether Plaintiffs have sufficiently proven their damages or claim for injunctive relief, including whether the CHFC's asserted damages should be reduced based on prior grants received.

X.     __ANTICIPATED EVIDENTIARY ISSUES__

A.     Admissibility of the proffered expert witnesses' testimony.

B.     Whether proffered non-expert testimony is relevant and whether it is more prejudicial than probative.

C.     Whether proffered non-expert testimony is supported by adequate foundation.

D.     Whether proffered evidence is inadmissible hearsay.

E.     Whether certain documents are authentic.

F.     Whether certain documents are admissible as business records.

G.     Whether certain documents are relevant and/or their probative value is outweighed by their potential for prejudice.

Dated: June 15, 2020

Respectfully submitted,


/s/ Christine E. Webber

/s/ Daniel W. Cohen

**Greg Kirschner**
**Salmun Kazerounian**
**Sarah White**
**CONNECTICUT FAIR HOUSING CENTER**
**60 Popieluszko Ct.**
**Hartford, CT  06106**
**Tel.:  (860) 247-4400**
**greg@ctfairhousing.org**

**Daniel W. Cohen (Bar No. CT 30467)**
**TROUTMAN SANDERS LLP**
**875 Third Avenue**
**New York, NY 10022**
**Telephone: (212) 704-6000**
**Facsimile: (202) 704-6288**
**Email: dan.cohen@troutman.com**

**Eric Dunn**
**NATIONAL HOUSING LAW PROJECT**
**1663 Mission St., Suite 460**
**San Francisco, CA  94103**
**Tel.:  (415) 546-7000**
**edunn@nhlp.org**

**Timothy J. St. George, Pro Hac Vice**
**TROUTMAN SANDERS LLP**
**1001 Haxall Point**
**Richmond, VA 23219**
**Telephone: (804) 697-1254**
**Facsimile: (804) 698-6013**
**Email:**
**timothy.st.george@troutman.com**

**Joseph M. Sellers (*PHV*)**
**Christine E. Webber (*PHV*)**
**Brian C. Corman (*PHV*)**
**COHEN MILSTEIN SELLERS & TOLL PLLC**
**1100 New York Ave., N.W.**
**Suite 500**
**Washington, D.C.  20005**
**Tel.:  (202) 408-4600**
**jsellers@cohenmilstein.com**
**cwebber@cohenmilstein.com**
**bcorman@cohenmilstein.com**

*Counsel for Defendant*


*Counsel for Plaintiffs*

84

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2020, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

*/s/  Christine E. Webber*