UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **CONNECTICUT FAIR HOUSING CENTER** *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>**CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC,**<br><br>*Defendant.* | No. 3:18-CV-705 (VLB) |

**PLAINTIFFS' MOTION TO LIMIT THE TESTIMONY OF DR. WILLIAM HUBER**

## TABLE OF CONTENTS

**Page**

I. Introduction and Background ................................................................................ 1

II. Argument ................................................................................................................. 2

    A. Legal Standard for Expert Testimony ...................................................... 2

    B. Dr. Huber Is Not Qualified to Opine on Housing Markets ..................... 3

    C. Dr. Huber Is Not Qualified to Opine on Rental Property Management ................................................................................................ 4

    D. Dr. Huber is Not Qualified to Opine on Criminal History and his Opinion on Spatial Variability with Respect to Criminal History Is Unsupported ........................................................................................ 6

    E. Dr. Huber is Not Qualified to Opine on Legal Conclusions and His Opinion is Unhelpful ........................................................................... 8

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) ............................................................................. 3

*Connecticut v. Teal*,
   457 U.S. 440 (1982) ........................................................................................ 10

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ..................................................................................... 2, 3

*Highland Capital Mgmt. L.P. v. Schneider*,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005) ............................................................. 9

*Karavitis v. Makita U.S.A., Inc.*,
   243 F. Supp. 3d 235 (D. Conn. 2017), *aff'd*, 722 F. App'x 53 (2d Cir.
   2018) ................................................................................................................ 3

*Kuhmo Tire Co., v. Carmichael*,
   526 U.S. 137 (1999) ......................................................................................... 2

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005) ............................................................................ 2

*Scott v. Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016) ..................................................................... 3, 9

*SEC v. Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013) ............................................................. 2

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir.1991) ........................................................................... 9

*United States v. Diallo*,
   40 F.3d 32 (2d Cir. 1994) ................................................................................ 3

*United States v. Tin Yat Chin*,
   371 F.3d 31 (2d Cir. 2004) .............................................................................. 3

**OTHER AUTHORITIES**

24 C.F.R. 100.500(c) .......................................................................................... 2, 9

Fed. R. Evid. 702 ............................................................................................ *passim*

I.     **INTRODUCTION AND BACKGROUND**

**Plaintiffs move, pursuant to Fed. R. Evid. 702, to exclude certain opinions of Dr. William Huber, whom Defendant has designated as an expert witness.  In this case, Plaintiffs claim that Defendant's product "CrimSAFE" provides rental housing managers automated decisions as to whether prospective tenants should be permitted to rent housing based upon the applicant's criminal history, and that CrimSAFE has an adverse impact on African American and Latino prospective renters in Connecticut.**

**Dr. William Huber has a Ph.D. in Mathematics.  Huber Dep. at 22:20-22, attached hereto as Ex. 1.  He identifies himself as an expert in statistics and data analysis who was designated by CoreLogic to identify the statistical assumptions underlying the reports of two of Plaintiff's experts, Dr. Christopher Wildeman and Dr. Allan Parnell, and assess the validity of the data analysis and statistical testing used in reaching their conclusions.  Huber Dep. at 19:11-19; Huber Report at ¶¶ 1, 9, attached hereto as Ex. 2.  Dr. Wildeman is a sociologist who has specifically studied disparities in criminal history and his report addressed the existence and extent of disparities in criminal history adverse to African Americans and Latinos, as compared to whites.  Dr. Parnell is a demographer with a substantial focus on housing issues.  His report identifies the relevant housing markets serving the zip codes where CoreLogic has revealed its clients operate, the demographics of the individuals renting in such markets, and illustrates the adverse impact that CoreLogic's CrimSAFE product has on access to housing for African Americans and Latinos in those jurisdictions.**

**In addition to opining on some statistical issues, Dr. Huber also offered**

opinions in other areas, including (a) the scope of rental markets served by CoreLogic's customers, see, e.g., Huber Report ¶¶ 4, 15.3, 15.10; (b) what factors landlords consider in renting apartments and how they use CrimSAFE, see, e.g., Huber Report ¶¶ 6, 23, 24; (c) whether racial disparities in criminal history are likely to be greater or lesser in Connecticut than nationally, see e.g., Huber Report ¶¶ 2, 4, 14, 64-66; (d) whether racial disparities in criminal history have changed over time, Huber Report ¶ 15.2; (e) whether credit or income differs for those with criminal history, Huber Report ¶¶ 15.9, 24; (f) whether Plaintiffs' satisfy their burden of proof under 24 C.F.R. 100.500(c), Huber Report ¶ 26.[1]

**II.     ARGUMENT**

   **A.     Legal Standard for Expert Testimony**

Expert testimony is permissible under Fed. R. Evid. 702 only when the expert's opinion is both reliable and relevant. *See Kuhmo Tire Co., v. Carmichael*, 526 U.S. 137, 147 (1999), citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  In evaluating with proffered expert testimony satisfies Rule 702,

> this Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based on reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact.

*SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citing *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005)).  The burden to establish these

---

[1] While Plaintiffs take issue with certain of Dr. Huber's statistical opinions as well, Plaintiffs do not contend that Dr. Huber cannot testify on statistical issues, even if his opinion should be given little weight in some areas.  This motion is limited to opinions Dr. Huber offered that roamed far beyond his area of expertise.

2

requirements is on the party seeking to admit the expert. *See Daubert*, 509 U.S. at 593.

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony*." United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004).  The fact that a witness may be qualified to testify as an expert on some matters does not mean the witness qualifies as an expert on other matters.  "The expert's qualifications ... must be relevant to the opinions she offers." *Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp. 3d 235, 242 (D. Conn. 2017), *aff'd*, 722 F. App'x 53 (2d Cir. 2018), quoting *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994).

Even with a qualified expert, the Court must engage in "rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case."  *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016) quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  Ultimately, expert testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods," and an expert must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (c) and (d).

### B. Dr. Huber Is Not Qualified to Opine on Housing Markets

Dr. Huber acknowledged that he is not an expert in the housing market or any other aspect of housing or rental management.  Huber Dep. at 19:20-20:3. Despite making assertions in his report that CoreLogic's customers served rental

3

markets that were more limited than the market areas analyzed by Dr. Parnell, Report ¶ 4, Dr. Huber conceded that he was not attempting to form an independent opinion about the relevant market since he is not a housing market expert.  Huber Dep. at 138:2-12.  Moreover, Dr. Huber acknowledged that the only basis for his conclusion that CoreLogic's customers served only specific zip codes was the fact that CoreLogic provided a list of property location by zip code.  Huber Dep. at 139:1-10.

Dr. Huber also asserted in his report that Dr. Parnell defined the relevant housing markets by county out of "convenience."  Huber Report ¶ 15.3.  However, he acknowledged that Dr. Parnell testified about beginning his analysis with HUD Fair Market Rental Areas, and admitted that he did not have any understanding of HUD's fair market rental areas or how Connecticut county boundaries differ from those areas.  Huber Dep. at 140:2-141:21.  Thus, not only does Dr. Huber lack the relevant expertise to assess the housing markets chosen by Dr. Parnell, but he did not do anything to compare the housing markets chosen by Dr. Parnell with the HUD Fair Market Rental Areas, and thus his opinion is not based on relevant facts and analysis.

      C.      <u>Dr. Huber Is Not Qualified to Opine on Rental Property Management</u>

As noted above, Dr. Huber acknowledged he is not an expert in housing or rental management.  Huber Dep. at 19:20-20:3, 121:1-3.  Nonetheless, he offered opinions on what factors he thought rental property managers would consider in deciding on tenant applications, and on how managers used CrimSAFE.  Huber Report ¶¶ 6, 23, 24.  Specifically, Dr. Huber asserted that many factors other than criminal history drive housing provider decisions (¶ 6), concluded that applicants

4

must meet other criteria in addition to criminal background checks (¶ 23), and opined that the CrimSAFE report "invites its user to consider criteria in addition to criminal screening results" (*id.*).  Dr. Huber admits he has no expertise in the areas relevant to these opinions.

Nor are these opinions based on sufficient facts or reliable methods.  His basis for concluding that property managers would consider other factors in deciding on tenants was HUD Guidance on criminal background screenings which advised that given the disparate impact that such screenings would have, that such screenings should be used only after other factors considered by the landlord had been evaluated, so that fewer individuals would be subjected to criminal screening, which implied that landlords did consider other factors.  But he acknowledged that just because HUD recommended that practice does not mean that landlords actually followed it.  Huber Dep. at 115:17-117:2.  He also asserted based on seeing the lease decision report for Mikhail Arroyo that the CrimSAFE report "invites" the "user to consider criteria in addition to criminal history." Huber Report ¶ 23, Dep. at 119:11-15.  Dr. Huber reviewed only a single example of a report from CoreLogic, out of hundreds of thousands of reports generated.  Huber Dep. at 120:20-121:6.  While he had concluded that CoreLogic encouraged consideration of other factors because one report he reviewed included both a credit score report and the CrimSAFE report for Mr. Arroyo, he acknowledged that not all customers use the credit score report product offered by CoreLogic.  Huber Dep. at 121:7-13, 136:1-7.  Dr. Huber's admissions demonstrate that the foundations of his opinions are inadequate.

5

**Finally, Dr. Huber speculated that individuals with criminal history might be screened out by other factors considered by property managers, and thus their failure to pass the criminal history screen should not count in assessing disparate impact. Huber Report ¶ 24. However, he acknowledged that he cited nothing in his report to support the conclusion that considering creditworthiness or income would eliminate applicants with criminal backgrounds disproportionately from the applicant pool. Huber Dep. at 118:15-20. Further, while raising income as a potential factor to be considered, he did not recall that CoreLogic asserts a large share of its business is in affordable housing and he did not consider that factor in reaching his conclusions. Huber Dep. at 118:21-119:10. Thus, Dr. Huber admitted a lack of facts or analysis supporting his speculation.**

**D.      Dr. Huber is Not Qualified to Opine on Criminal History and his Opinion on Spatial Variability with Respect to Criminal History Is Unsupported**

**Dr. Huber does not hold himself out as an expert in criminology or demography. Huber Dep. at 20:4-12, 21:3-5. He identified only one other case in which he has served as an expert witness involving allegations of a disparate impact caused by a criminal history screen. Huber Dep. at 35:18-36:13. Nonetheless, a central tenet of Dr. Huber's critique of Drs. Wildeman's and Parnell's analyses is his expectation that Connecticut statewide or county-level disparities would differ meaningfully from the national estimates Plaintiffs' experts relied upon. Huber Dep. at 197:7-12. Not only is Dr. Huber unqualified to render such an opinion, but he collected no data and conducted no analyses to establish that Connecticut would differ from national averages.**

6

**Dr. Huber admitted that it is a "well-established fact that, nationally, African Americans and Hispanics have been jailed and incarcerated at higher rates than Whites." Huber Report ¶ 20; Dep. at 150:1-6. And he further conceded that if there were sufficiently reliable data demonstrating that Connecticut disparities were greater than national disparities, he would conclude it was a well-established fact that African Americans and Hispanics were jailed and incarcerated at higher rates than whites in Connecticut. Huber Dep. at 150:7-14. Dr. Wildeman provided just such reliable data demonstrating Connecticut disparities were greater than the national disparities, and Dr. Huber did not consider it in his report. Wildeman Report at 7-8 & Table 3; Huber Dep. at 131:5-132:1, 151:3-156:1.**

**Dr. Huber admitted he was not aware of any data specific to Connecticut that would allow him to determine whether, as he speculated, that Connecticut disparities would vary from and be less than the national averages. Huber Dep. at 124:9-13; 131:1-4, 202:20-203:9, 204:11-15. Dr. Huber could not point to any literature supporting his claim of meaningful variability from state to state in criminal history disparities, and acknowledged he had not studied that question. Huber Dep. at 124:14-19. The closest Dr. Huber came to studying Connecticut was to look at regional breakdowns of the NLSY data analyzed by Dr. Wildeman, although Dr. Huber did not discuss this analysis in his report. Huber Dep. at 124:20-125:8, 207:21-208:4. In fact, Dr. Huber's analysis illustrated that the racial disparities in the northeast region (which includes Connecticut) were greater than any of the other regions he studied. Huber Dep. at 214:3-18 (conceding that**

7

nothing in his examination of the regional breakdown of data supports the conclusion that disparities in Connecticut are likely to be smaller than the national average, since the northeast region had higher ratios than other regions).

Dr. Huber acknowledged that his opinion that Connecticut and counties therein might have disparities smaller than the national average was premised on his view that there was large "spatial variability,"[2] but that his assertion about there being greater variation from county to county than from state to state required testing, and he had done no such testing.  Huber Dep. at 126:12-127:9.

Dr. Huber's opinion that racial disparities in criminal history have changed over time, which may make reliance on the NLSY survey data inaccurate, Huber Report ¶ 15.2, is similarly unsupported by sufficient facts or data.  In fact, Dr. Huber conceded that racial disparities got worse from 1979 through 2010.  He suggested that disparities began to narrow starting on 2010, but did not cite sources in his report and stated that was not part of his opinion in this case.  Huber Dep. at 189:6-190:21.

    E.    **Dr. Huber is Not Qualified to Opine on Legal Conclusions and His Opinion is Unhelpful**

Dr. Huber ends the main body of his report with his conclusion that

---

[2] "Spatial variability" is a concept that is widely used in describing environmental or soil conditions, areas in which Dr. Huber has considerable experience.  Huber Dep. at 122:18-124:19. He asserted that demographic data also shows spatial variability, but has admitted he is not a demographic or criminology expert, and is not aware of literature demonstrating variability from state to state in criminal history.  Huber Dep. at 20:4-12, 21:3-5, 124:14-19.  Racial disparities in criminal history and contamination of soil might not show the same patterns in variation as Dr. Huber presumed.

8

**Plaintiffs do not meet their burden under 24 C.F.R. 100.500(c) to establish disparate impact. Huber Report ¶ 26. But Dr. Huber has no education, training, or expertise in the legal requirements to establish a disparate impact violation of the Fair Housing Act, and admits he is not expert in law. Huber CV, attached hereto as Ex. 3; Huber Dep. at 21:6-7. And his opinion on the ultimate legal conclusion is inadmissible. "As a general rule an expert's testimony on issues of law is inadmissible."** *United States v. Bilzerian,* **926 F.2d 1285, 1294 (2d Cir.1991) ("an expert may opine on an issue of fact within the jury's province [but] may not give testimony stating ultimate legal conclusions based on those facts."). This rule reflects that the proper purpose of expert testimony is to "help the trier of fact to understand the evidence or to determine a fact in issue," not resolve legal questions. Fed. R. Evid. 702(a). The rule also ensures that "no expert may 'supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence.'"** *Scott,* **315 F.R.D. at 48 (citation omitted). "Accordingly, courts exclude expert testimony that 'provide[s] legal opinions, legal conclusions, or interpret[s] legal terms; those roles fall solely within the province of the court.'"** *Id.* **at 48, quoting** *Highland Capital Mgmt. L.P. v. Schneider,* **379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005);** *see also Bilzerian*, **926 F.2d at 1295 (expert "testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice."). Indeed, Dr. Huber acknowledged that it is the responsibility of the court to weigh evidence and interpret the law, not the role of an expert to do so. Huber Dep. at 76:1-10.**

9

**Illustrating Dr. Huber's lack of understanding of disparate impact analysis, Dr. Huber endorsed a "bottom line" analysis inconsistent with *Connecticut v. Teal*, 457 U.S. 440, 451 (1982). In that case, the Supreme Court held that there is no "bottom line defense" to disparate impact claims; this means that even if the net result is proportionate, if there are individual steps along the way where one group is disadvantaged by disparate impact, plaintiffs are permitted to isolate and challenge that step, and not be limited to examining "bottom line" numbers. Nonetheless Dr. Huber asserted that Dr. Parnell erred in concluding that if there was a disparate impact in a criminal history screen, that there would necessarily be disparate impact in access to housing, because other factors could have also excluded those applicants. Huber Dep. at 114:15-115:9. But this focus on the bottom line of the demographics of tenants who obtained apartments ignores that at one step in the process – the criminal history screen – African Americans and Latinos were disproportionately excluded. Specifically, Dr. Huber was asked, "Q. And you think the only thing that matters is the bottom line, who gets the apartment and not whether one of the specific factors considered has an adverse impact on a group of would-be tenants?" and he responded, "A. I'm not sure I'd say that's the only thing that matters, but clearly the outcome itself and the rates of the outcomes in the report." Huber Dep. at 115:10-16.**

## III. <u>CONCLUSION</u>

**For the foregoing reasons, Dr. Huber should not be permitted to offer opinions on the topics discussed herein.**

10

Dated:  June 15, 2020                              Respectfully submitted,


                                                              **/s/  *Christine E. Webber***
                                                              **Joseph M. Sellers (*PHV*)**
                                                              **Christine E. Webber (*PHV*)**
                                                              **Brian C. Corman (*PHV*)**
                                                              **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                                              **1100 New York Ave., N.W.**
                                                              **Suite 500**
                                                              **Washington, D.C.  20005**
                                                              **Tel.:  (202) 408-4600**
                                                              **jsellers@cohenmilstein.com**
                                                             **cwebber@cohenmilstein.com**
                                                             **bcorman@cohenmilstein.com**

                                                             **Eric Dunn**
                                                             **NATIONAL HOUSING LAW PROJECT**
                                                             **1663 Mission St., Suite 460**
                                                             **San Francisco, CA  94103**
                                                             **Tel.:  (415) 546-7000**
                                                             **edunn@nhlp.org**

                                                             **Greg Kirschner**
                                                             **Salmun Kazerounian**
                                                             **Sarah White**
                                                             **CONNECTICUT FAIR HOUSING CENTER**
                                                            **60 Popieluszko Ct.**
                                                            **Hartford, CT  06106**
                                                            **Tel.:  (860) 247-4400**
                                                            **greg@ctfairhousing.org**

**CERTIFICATE OF SERVICE**

      I hereby certify that on June 15, 2020 a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Christine E. Webber*
Christine E. Webber (PHV)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., N.W.
Suite 500
Washington, D.C.  20005
(202) 408-4600
cwebber@cohenmilstein.com