# EXHIBIT 1

Page 1

1            UNITED STATES DISTRICT COURT

2              DISTRICT OF CONNECTICUT

3

4    CONNECTICUT FAIR HOUSING        )

     CENTER, et al.                  ) No.

5                                    ) 3:18-CV-705(VLB)

            Plaintiffs              )

6                                    )

         v.                          )

7                                    )

     CORELOGIC RENTAL PROPERTY       )

8    SOLUTIONS, LLC                  )

                                     )

9            Defendant              )

     ------------------------------)

10

11                    - - -

12              FRIDAY, MAY 29, 2020

13                    - - -

14

15         REMOTE VIDEO/AUDIO Deposition of BILL HUBER,

16   PH.D., beginning at 9:01 a.m., before Nancy J. Martin,

17   a Registered Merit Reporter, Certified Shorthand

18   Reporter.  All participants appeared via Zoom

19   platform.

20

21

22

Page 2

```
 1      A P P E A R A N C E S :   (Via Zoom)
 2

 3           CONNECTICUT FAIR HOUSING CENTER
             BY:  SALMUN KAZEROUNIAN, ESQ.
             60 Popieluszko Court
 4           Hartford, Connecticut   06106
             (860) 247-4400
 5           greg@ctfairhousing.org
 6

 7           COHEN MILSTEIN SELLERS & TOLL PLLC
             BY:  CHRISTINE E. WEBBER, ESQ.
             1100 New York Avenue, N.W.
 8           Suite 500
             Washington, D.C. 20005
 9           (202) 408-4600
             cwebber@cohenmilstein.com
10

11           TROUTMAN SANDERS LLP
             BY:  ALAN D. WINGFIELD, ESQ.
12           1001 Haxall Point
             15th Floor
13           Richmond, Virginia  23219
             (804) 697-1350
14           alan.wingfield@troutman.com
15

16           ALSO PRESENT:
17           GUSTAVO BERRIZBEITIA, COHEN MILLSTEIN, PARALEGAL
18           SCOTT FOREMAN, LEGAL VIDEOGRAPHER
19

20

21

22
```

Page 3

1                        I N D E X

                                                      PAGE
2
     TESTIMONY OF WILLIAM A. HUBER, PH.D.
3
     BY MS. WEBBER                                        7
4
5                     E X H I B I T S
6    NUMBER               DESCRIPTION              MARKED
7    Exhibit 1            Rebuttal Report of William    9
                          A. Huber, Ph.D., PSTAT,
8                         May 1, 2020, 45 pages
9    Exhibit 2            Curriculum Vitae of William  18
                          A. Huber, Ph.D., PSTAT,
10                        9 pages
11   Exhibit 3            Case Listing, 1 page          37
12   Exhibit 4            Documents Received from       51
                          Counsel and Reviewed,
13                        1 page
14   Exhibit 5            Using American Community      94
                          Survey Estimates and
15                        Margins of Error, April 18,
                          2018, 69 pages
16
     Exhibit 6            Lease Decision performed     119
17                        April 26, 2016, 1 page
18   Exhibit 7            Adverse Action Letter,       132
                          Mikhail Arroyo, 6 pages
19
     Exhibit 8            Expert Report of             150
20                        Christopher Wildeman,
                          14 pages
21
22

Page 4

1                         E X H I B I T S
2                           (CONTINUED)
3      NUMBER                 DESCRIPTION                MARKED
4      Exhibit 9              Application of Fair Housing   195
                              Act Standards to the Use of
5                             Criminal Records by
                              Providers of Housing and
6                             Real Estate Related
                              Transactions, April 4,
7                             2016, 10 pages
8      Exhibit 10             NLSY79 Data through 2016,    208
                              1 page
9
       Exhibit 11            Understanding and Using      215
10                            American Community Survey
                              Data, 14 pages
11
       Exhibit 12            Parnell Table 4, 1 page      224
12
       Exhibit 13            Parnell SE.R File, 1 page    237
13
       Exhibit 14            Corrected Declaration of     254
14                            Allan M. Parnell, Ph.D.,
                              47 pages
15
16          (Exhibits attached to transcript.)
17
18
19
20
21
22

Page 5

1          WASHINGTON, D.C., FRIDAY, MAY 29, 2020; 9:01 A.M.

2                              -   -   -

3              THE VIDEOGRAPHER:  Good morning.  We're going

4     on the record at 9:01 a.m. on May 29, 2020.  Please

5     note that the microphones are sensitive and may pick

6     up whispering, private conversations, and cellular

7     interference.

8              Please turn off all cell phones or place them

9     away from the microphones as they can interfere with

10    the deposition audio.  Audio and video recording will

11    continue to take place unless all parties agree to go

12    off the record.

13             This is Media Unit 1 of the video recorded

14    deposition of William A. Huber, Ph.D., taken by

15    counsel for plaintiff in the matter of Connecticut

16    Fair Housing Center, et al., vs. CoreLogic Rental

17    Property Solutions, LLC, filed in the United States

18    District Court, District of Connecticut, Case

19    No. 3:18-CV-705.

20             This deposition is being held at the office

21    of Dr. Huber, located at 1235 Wendover Road, Rosemont,

22    Pennsylvania, 19010.

Page 6

1          My name is Scott Foreman from the firm

2      Veritext, and I'm the videographer.  The court

3      reporter is Nancy Martin from the firm Veritext.  I'm

4      not related to any party in this action, nor am I

5      financially interested in the outcome.

6          Counsel will now state their appearances and

7      affiliations for the record.

8          MS. WEBBER:  Christine Webber, Cohen,

9      Milstein for the plaintiff.

10         MR. WINGFIELD:  Allen Wingfield with the law

11     firm of Troutman Sanders, for the defendant.

12         THE VIDEOGRAPHER:  Would you please introduce

13     everybody else who is present as well, please.

14         MS. WEBBER:  Yeah, I think there's some

15     individuals who are muted, Salmun Kazerounin from the

16     Connecticut Fair Housing Center, and Gustavo

17     Berrizbeitia, paralegal with the firm of Cohen

18     Millstein.  They're also participating in the call.

19         THE VIDEOGRAPHER:  Thank you very much.

20         Will the court reporter please swear in the

21     witness.

22     ///

1              WILLIAM A. HUBER, PH.D,

2          having been first duly sworn/affirmed,

3          was examined and testified as follows:

4

5          THE VIDEOGRAPHER:  You may proceed.

6

7                      EXAMINATION

8    BY MS. WEBBER:

9          Q.   Dr. Huber, you understand that the oath

10   you've just taken means that your testimony here today

11   is going to be under penalty of perjury just as if you

12   were testifying in a court?

13         A.   I do.

14           MS. WEBBER:  Okay.  And I also want to ask

15   your counsel -- or counsel for CoreLogic,

16   Mr. Wingfield, do you agree to the deposition that

17   we're taking here today is going to be under oath and

18   subject to penalty of perjury and can be used the same

19   as if we were all together in person?

20           MR. WINGFIELD:  So stipulated.

21   BY MS. WEBBER:

22         Q.   Now, Dr. Huber, you've been deposed before, I

1    I'll stipulate that this looks like one of my CVs for

2    Analysis & Inference.

3         Q.   Okay.  Is everything that you rely upon to

4    establish your qualifications as an expert reflected

5    on this CV?

6         A.   No, definitely not.  There's quite -- I mean

7    I have performed literally hundreds of projects that I

8    think of as being part of my background and experience

9    that are not on here, but I think that there's enough

10   in here to establish my qualifications.

11        Q.   In what field do you hold yourself out as an

12   expert?

13        A.   In several closely aligned fields.  One of

14   them is statistical analysis.  Another is geographic

15   analysis and geographic information systems.  Another

16   is mathematics generally, and specifically, it's an

17   application to statistics and scientific modeling.

18        Q.   Anything else?

19        A.   Those are my core areas of expertise.

20        Q.   Okay.  Do you hold yourself out as an expert

21   in the housing market?

22        A.   No.

Page 20

1          Q.   Any other aspect of housing, rental

2     management, anything like that?

3          A.   No.

4          Q.   Do you consider yourself an expert in

5     demography?

6          A.   I'm sorry.  Could you repeat that word?

7          Q.   Demography, demographics.

8          A.   I do have quite a lot of experience in

9     demography, but I don't have formal training.

10         Q.   Do you have sufficient experience that you

11    would hold yourself out as an expert in demography?

12         A.   Not as a demographer as such.

13         Q.   What's the distinction you're drawing?

14         A.   The distinction, I think, is an important

15    one.  It's that a statistician, like myself, gets

16    involved in a very wide variety of different

17    disciplines.  So it's -- statisticians recognize the

18    virtues of being well enough versed in the application

19    domain to be able to collaborate effectively with

20    others who are subject matter experts.

21              But as a statistician, I do not presume,

22    despite having some experience in those areas and

Page 21

1    those collaborations, to be such a subject matter

2    expert.

3          Q.  Do you consider yourself an expert in

4    criminology?

5          A.  No.

6          Q.  Do you consider yourself an expert in law?

7          A.  No.

8          Q.  And did you collaborate with anybody else in

9    the work that you've done in this matter?

10         A.  Let me answer that as a qualified no, and

11    I'll explain.  Is an analysis an inference?  I have a

12    partner, William Fairley, who has performed a peer

13    review of an earlier draft of my report.

14         Q.  And is it Mr. Fairley, Dr. Fairley?

15         A.  Doctor.

16         Q.  Is Dr. Fairley also a statistician?

17         A.  Yes.

18         Q.  And what feedback did he give you on the

19    first draft of your report?

20         A.  It was primarily stylistic.  Dr. Fairley's

21    experience, over more than 40 years, is in applying

22    statistics in legal situations like this one and in

Page 22

1      disputes and has a very good understanding of its role

2      and especially of how statistical language can be read

3      and perceived and is perceived.

4              So he did no analysis in this case but read

5      over my report and provided editorial advice about how

6      to clarify what I was writing about.

7          Q.  So you did not, in the end, work with any

8      other experts with expertise in criminology or housing

9      or demography; is that correct?

10         A.  (Inaudible.)

11         Q.  Now --

12             REPORTER MARTIN:  I'm sorry.  This is the

13     reporter.  I did not hear an answer.

14             Did you give an answer, Doctor?

15             THE WITNESS:  Yes, I did.  It was

16     simultaneously with Ms. Webber.  We both said, "That's

17     correct."

18             REPORTER MARTIN:  Thank you.

19     BY MS. WEBBER:

20         Q.  Dr. Huber, per your CV, your education, your

21     degree is in mathematics; correct?

22         A.  Yes.

1    analyses of disparate impact claims?

2         A.   No.

3         Q.   Or anything to do with criminology?

4         A.   No.

5         Q.   How about housing?

6         A.   The reason I'm pausing here is I have to

7    think over my experience and put it into these

8    different compartments of Fiscal Associates and so on.

9    But so independently as Quantitative Decisions, I

10   think the answer is no.

11        Q.   And how about at Analysis & Inference?  Has

12   any of your work there involved statistical analysis

13   of disparate impact claims?

14        A.   Yes.

15        Q.   Has any of your work there involved

16   criminology?

17        A.   Yes.

18        Q.   And in what matters have you been involved

19   with at Analysis & Inference that involved

20   criminology?

21        A.   Most recently, in the Alexander case in the

22   District of Columbia.

1      Q.  Do you agree that it's the responsibility of

2   the court to weigh evidence, interpret the law, and

3   arrive at a decision?

4      A.  Yes.

5      Q.  And not the role of the expert?

6      A.  Correct.

7      Q.  In particular, that you, as a statistical

8   expert, are not in a position to decide what the law

9   requires; correct?

10      A.  Correct.

11      Q.  You used the word "estimate" from time to

12   time in your report, and that's another word that can

13   be used technically and can be used colloquially.

14         When you use the word "estimate" as a

15   statistician, what do you mean?

16      A.  That's a good question because "estimate" is

17   a very important term of art.  Now, what -- there are

18   a range of possible meanings, but they all derive from

19   the concept of attempting to make an educated guess,

20   if you will, in an effort to find a synonym for

21   "estimate," about some quantitative property of a

22   population based on observing a sample of that

1    would screen for anything independent of criminal

2    history, so something else that caused someone to be

3    rejected for an apartment; correct?

4         A.  Yes.

5         Q.  And he testified that there were -- that he

6    could think of one other factor, which was income --

7    or lack of income that could separately impact the

8    decision to rent; correct?

9         A.  Correct.

10        Q.  So nowhere in there did Dr. Parnell agree

11   that individuals with a criminal history will have

12   different creditworthiness for income than individuals

13   without a criminal history; correct?

14        A.  Correct.

15        Q.  So why did you cite that testimony and say

16   that that was testimony showing that people who are

17   incarcerated would have differences from people who

18   are not incarcerated with respect to creditworthiness?

19        A.  That's not the implication that was intended.

20   The -- what I'm stating there is that, if you read the

21   conclusions, which I'm sure you have in Dr. Parnell's

22   report, he essentially says that because these are

Page 115

1    disparities that Dr. Wildeman finds in the NLSY79

2    hold, that, therefore, there is disparate impact

3    against African Americans and Hispanics in Connecticut

4    and in Connecticut housing markets.

5              And in drawing that conclusion from those

6    numbers, he is utterly neglecting the fact that other

7    factors are in play and that these disparities do not

8    necessarily translate directly, or even at all, to

9    outcomes in housing applications.

10        Q.   And you think the only thing that matters is

11   the bottom line, who gets the apartment and not

12   whether one of the specific factors considered has an

13   adverse impact on a group of would-be tenants?

14        A.   I'm not sure I'd say that's the only thing

15   that matters, but clearly the outcome itself and the

16   rates of the outcomes in the report.

17        Q.   In your Paragraph 23, you make this point

18   that tenants or would-be tenants must meet some other

19   criteria in addition to the criminal screen, but you

20   cite the HUD 2016 guidance for that.

21             Do you recall that?

22        A.   I do.

Page 118

1    or the law particularly about that.  I'm not an expert

2    in the law.

3         Q.  Okay.  And if you're incorrect and there is

4    no requirement that all property managers conduct

5    criminal background screening, would that impact your

6    opinions?

7         A.  In this case, it would not.  And the reason

8    why is even absent such a law, it's clearly a matter

9    of good business practice and public safety to do a

10   certain amount of screening.

11        Q.  Do you know if CrimSAFE is run before or

12   after or simultaneous with any other screening done by

13   CoreLogic?

14        A.  I do not know that.

15        Q.  And you cite nothing in your report that

16   would allow anybody to conclude that other factors,

17   such as creditworthiness or income, would eliminate

18   applicants with criminal backgrounds

19   disproportionately from the applicant pool; correct?

20        A.  Correct.

21        Q.  Are you aware that CoreLogic has asserted in

22   this case that a large share of their business is

Page 120

1          A.  This is not the only document I was looking

2     at.  It's only one page out of the six pages I saw.

3               MS. WEBBER:  You're right.  That is not the

4     full report.  We're going to have to come back to

5     this.

6               But, Gustavo, could you please -- I think you

7     loaded only the first page of the report.

8               Could you -- well, starting now, let me know

9     when it's up.

10              MR. BERRIZBEITIA:  Yep.  I can upload it now.

11    BY MS. WEBBER:

12         Q.  While we're waiting on that, let me just ask,

13    that was the only -- that was the only lease decision

14    report that you received; correct?

15         A.  I'm sorry.  I'm having a hard time hearing

16    you.  The audio --

17              THE VIDEOGRAPHER:  Gustavo, can you turn off

18    your microphone, please.  Thanks.

19    BY MS. WEBBER:

20         Q.  That was the only lease decision that you

21    reviewed; correct?

22         A.  I believe so.

Page 121

1      Q.   Okay.  And you don't have any expertise in

2   rental property management; correct?

3      A.   Correct.

4      Q.   And are you aware that CrimSAFE generates

5   hundreds of thousands of reports?

6      A.   Yes.

7      Q.   Do you have any information about how reports

8   might differ or whether they can differ?

9      A.   Yes, I do have some.

10      Q.   And what's that?

11      A.   I understand that the inclusion of the credit

12   portion may be an option, and so it doesn't

13   necessarily always appear.

14      Q.   Trying again.  It should be loading.  Hold

15   on.  Well, I'm getting a gray circle going round and

16   round.  So I'm not sure it's getting loaded yet.

17   Yeah.  It's a much larger document.  So it just might

18   be taking a while to load.

19           Let me come back to this so we don't waste

20   time on the record.

21           In your report, in Paragraph 64 through 66,

22   you state that characteristics of people change

Page 122

1   depending on where they live; correct?

2          A.   Correct.

3          Q.   Now, an individual's characteristic doesn't

4   necessarily change because they change where they

5   live; right?

6          A.   Right.  So that was not intended

7   interpretation.

8          Q.   And so if somebody moves to another state,

9   you know, obviously, that doesn't change their race.

10  It doesn't change their age, and it doesn't change

11  their criminal history; right?

12         A.   Right.

13         Q.   So you meant that the average characteristics

14  of the population may vary from place to place?

15         A.   I meant that even individual characteristics,

16  understanding that the individuals in different

17  locations are different individuals.

18         Q.   Okay.  Now, you use the phrase "spatial

19  variability."  That's a concept that you used in your

20  prior work involving environmental and soil

21  contamination and so on; correct?

22         A.   Yes.

1          Q.   Well --

2          A.   I want to add to that answer.  I consulted

3      not only the papers.  I looked for spatial variability

4      in the NLSY79 data themselves.

5          Q.   You didn't mention that in your report

6      though; correct?

7          A.   I may have mentioned it in passing, but I did

8      not produce any statistics or graphics.

9          Q.   Okay.  Are you aware of any data specific to

10     Connecticut that would allow you to determine whether

11     there is -- whether Connecticut varied from national

12     statistics?

13         A.   No.

14         Q.   Was there literature that you found that

15     specifically discussed the degree of variability from

16     state to state in criminal history disparity?

17         A.   Are you saying "from state to state"?  No.

18     I'm not aware of literature, and I haven't studied

19     that myself.

20         Q.   Okay.  When you said you consulted literature

21     to support your view that there would be spatial

22     variability, what literature did you consult?

Page 125

1      A.   Two things.  I mentioned the NLSY79 data,

2   which gives me data about what I might call regional

3   variability, because to mere mortal researchers like

4   myself and Dr. Wildeman, who are not privileged to

5   look at the original data, we can look at slightly

6   sanitized data.  But even so, we can analyze the

7   NLSY79 data by four general U.S. geographic regions,

8   which I did.

9        We can also analyze the data according to

10   whether the participant in the survey originated from

11   an urban or a rural background when they were young,

12   which is additional information about spatial

13   variability.  As far as the literature goes, what

14   caught my attention was a paper about county-to-county

15   variability in Arkansas that Dr. Wildeman was asked

16   about in his deposition.

17      Q.   And other than that one study in Arkansas and

18   your own view of the regional NLSY data or regional

19   breakdown, I should say, of NLSY data, did you have

20   any other basis to conclude that Connecticut

21   disparities in criminal histories would vary from the

22   national numbers?

1          A.   I think a good way to answer that would be to

2     suggest that the question is a little backwards.   The

3     default operating hypothesis, one that would require

4     data to disprove is that there exists spatial

5     variability.   So having found sufficient information

6     to indicate that that variability exists, I think the

7     burden of the demonstration would be on the person who

8     would want to demonstrate -- in fact, you cannot

9     demonstrate the absence of variability.

10          What you need to do is you need to quantify

11     how much variability there is.

12          Q.   So you think it's okay to start from the

13     premise that there is substantial spatial variability?

14     I think you said, "large spatial variability."

15          A.   The premise would be that there exists

16     variability.   The question is how much.

17          Q.   But your report is premised on large spatial

18     variability; correct?

19          A.   Part of it might be, but the vast majority of

20     it makes no such assumption.

21          Q.   I'm just referring specifically to the

22     section on spatial variability.

Page 131

1       Q.   Are you aware of any publicly available

2   county level data regarding rates in criminal records

3   in Connecticut?

4       A.   No.

5       Q.   Are you aware of analyses comparing

6   Connecticut, as a state, to national data on criminal

7   history disparities by race?

8       A.   No.

9       Q.   Did you review Table 3 of Dr. Wildeman's

10  report?

11      A.   Yes.

12      Q.   And that contains information of a study that

13  was done comparing criminal history disparities in

14  Connecticut to national numbers; correct?

15      A.   I would have to look at that.  I remember

16  that he was using that to try to draw some -- at least

17  some qualitative conclusions about Connecticut.

18      Q.   You don't recall reading that Connecticut, as

19  a state, had disparities that were two to three times

20  the size of the disparities shown in the national

21  longitudinal survey view?

22      A.   I don't recall the two to three.  I do recall

1    him mentioning that they were higher in the average.

2        Q.   And there's only eight counties in

3    Connecticut; right?

4        A.   That's my understanding.

5        Q.   If the only study we've seen is correct and

6    Connecticut disparities are two to three times the

7    national disparities, which were already -- for the

8    longer look-back periods, which were already

9    significant, it would be hard to construct a

10   county-by-county breakdown in which some counties in

11   Connecticut don't show any disparity by rate; is that

12   right?

13       A.   No, that's not right.

14           MS. WEBBER:  We now have what was -- I don't

15   know how to unmark Exhibit 6.  So we're just going to

16   go with Exhibit 7, which you should now have.

17           (Deposition Exhibit 7 was marked for

18            identification.)

19   BY MS. WEBBER:

20       Q.   It's the lease decision report, which the way

21   it was Bates numbered, or paginated, starts with

22   Page 6.  I apologize.  I realize that's confusing, but

1          Q.   Uh-huh.  So when you said that the user was

2     invited to consider criteria in addition to criminal

3     screening results, you're referring to the automated

4     credit score system; correct?

5          A.   It's referring specifically to the score

6     decision evidently related to some non-criminal

7     factors.

8               MS. WEBBER:  Okay.  All right.  It's just

9     about 12:30.  Why don't we go off the record and take

10    our lunch break.

11              THE VIDEOGRAPHER:  We're going off the

12    record.  The time is 12:27 p.m.

13              (A recess was taken from 12:27 p.m.

14              to 1:06 p.m.)

15              THE VIDEOGRAPHER:  We're back on the record.

16    The time is 1:06 p.m.

17    BY MS. WEBBER:

18         Q.   Dr. Huber, in this report, what do you mean

19    by the term "housing market"?

20         A.   Let me take a look at the instances.  The

21    reason why I'm asking is I'm sure in many places I'm

22    just using it however Dr. Parnell intended it, but

1    services in certain zip codes in Connecticut."

2          So my question starts with the second

3    paragraph there where you refer to CoreLogic surveying

4    limited rental markets than the county.  What was the

5    basis for forming any opinion as to what markets

6    CoreLogic served?

7          A.  I'm not attempting to form an independent

8    opinion about those markets because I'm not the

9    marketing expert.  So I'm attempting to adopt, to the

10   extent possible, Dr. Parnell's analysis and

11   assumptions about that just for the sake of evaluating

12   what he did.

13         Q.  But you specifically say that CoreLogic

14   Rental Property Solutions serves more limited rental

15   market than the countywide market Dr. Parnell used.

16         A.  I do, and that is present in Dr. Parnell's

17   report.  That begins with a list of zip codes of

18   CoreLogic client facilities in Connecticut.  I

19   confirmed that list and made my own map of those and

20   saw, as Dr. Parnell presented in one of his early

21   figures, that they don't exactly comprise all the

22   counties in Connecticut.

1      Q.  Dr. Parnell never said that the market served

2   by a particular apartment complex was limited to the

3   zip code in which that complex resides; correct?

4      A.  I don't believe he did.  That's correct.

5      Q.  So was there any other basis, other than that

6   list of zip codes, that led you to assert in your

7   report that CoreLogic Rental Property Solutions served

8   a more limited rental market than what Dr. Parnell

9   concluded in using counties in his report?

10     A.  No.

11     Q.  Okay.  And you also state in your report at

12  Paragraph 15, Point 3, which -- here on Page 7 of your

13  record --

14     A.  I'm there.

15     Q.  Are you there?

16     A.  Yes.

17     Q.  You state, "Dr. Parnell assumes individual

18  Connecticut counties constitute local housing

19  markets," and that "This assumption is made for the

20  convenience of being able to execute step #4 below,

21  not based on a specific analysis of the housing

22  markets."  That's your conclusion; correct?

1        A.   Yes.

2        Q.   Now, you listened in on Dr. Parnell's

3   deposition; correct?

4        A.   Correct.

5        Q.   And you received a copy of his deposition

6   transcript; correct?

7        A.   Correct.

8        Q.   And you recall he testified about HUD fair

9   market rental areas?

10       A.   I do vaguely recall that.

11       Q.   Do you have any understanding of HUD's fair

12   market rental areas?

13       A.   No, I don't.

14       Q.   So you're unaware that HUD has determined

15   that rental units within that area are within the same

16   market for purposes of setting rent?

17       A.   What do you mean by "that area" specifically?

18       Q.   The area delineated by HUD's fair market

19   rental area.  They define those areas as ones in which

20   the apartments in this area, the fair market rental

21   area, are apartments which should have the same market

22   rent.

Page 141

1           A.   That was my general sense, but this is not

2      anything I've studied and I'm not giving an opinion

3      about it.

4           Q.   Okay.  Would you agree that the experts at

5      HUD are in a better position to define appropriate

6      housing markets than you are?

7           A.   Yes.

8           Q.   And do you recall Dr. Parnell testifying that

9      he started off in constructing the rental markets he

10     used here by looking at the HUD fair market rental

11     areas?

12          A.   I don't specifically recall that, but I'm

13     willing to accept that.  It sounds right.

14          Q.   Okay.  And so did you consider or examine

15     whether there was -- or how much difference there was

16     between HUD fair market rental areas and the counties

17     that Dr. Parnell ended up using for his analysis?

18          A.   No, I did not look at the HUD fair market

19     rental areas.

20          Q.   Or compare them to the county boundaries?

21          A.   I did not.

22          Q.   Okay.  So it's actually possible that

Page 150

1           You acknowledge, at Paragraph 20 of your

2     report, that it's a "well-established fact that,

3     nationally, African Americans and Hispanics have been

4     jailed and incarcerated" at "higher rates than

5     Whites"; correct?

6           A.   Correct.

7           Q.   Then if there were reliable data

8     demonstrating that Connecticut disparities are greater

9     than national disparities, then it would also be a

10    well-established fact that African Americans and

11    Hispanics are jailed and incarcerated at higher rates

12    than whites in Connecticut?

13          A.   Assuming they were sufficiently reliable,

14    yes.

15          Q.   You had, obviously, Dr. Wildeman's report;

16    correct?

17          A.   Correct.

18          MS. WEBBER:   I'll mark a copy.  That will be

19    our Exhibit 8.

20          (Deposition Exhibit 8 was marked for

21          identification.)

22    BY MS. WEBBER:

1          Q.  And do you have Exhibit 8?

2          A.  I do.

3          Q.  I want to ask you to turn to Page 12, which

4     has Dr. Wildeman's Table 3.

5          A.  I'm looking at it.

6          Q.  Okay.  And he cites that these results are

7     based on analyses presented in Mauer and King in an

8     article published in 2007.  Do you see that?

9          A.  I do.

10         Q.  And this compares incarceration rates by race

11    and ethnicity between the United States and the state

12    of Connecticut.  Do you see that?

13         A.  I do.

14         Q.  And the national disparity between whites and

15    African Americans is shown as 5.56.

16              Do you see that?

17         A.  I do.

18         Q.  So that the rate of incarceration for African

19    Americans is more than 5-1/2 times the rate for whites

20    nationwide?

21         A.  Yeah.  It says it's Mauer and King's estimate

22    of the rate.  5.56 times.

Page 152

1      Q.  Okay.  Whereas, in Connecticut, the disparity
2    in the estimate of the rate of incarceration was 12;
3    correct?
4      A.  Yes.  Between African Americans and whites.
5      Q.  So that's more than twice the national
6    disparity that Mauer and King found; right?
7      A.  Correct.
8      Q.  And for Hispanics, the national disparity
9    that they found between Hispanics and whites for risk
10   of incarceration -- or incarceration rates was 1.8 --
11   right? -- that Hispanics had 1.8 times the
12   incarceration rate as whites nationwide; right?
13     A.  That's what is reported here, yes.
14     Q.  And the state of Connecticut, however, that
15   disparity was 6.64 --
16     A.  That's right.
17     Q.  -- is that right?
18         And so that's more than three times the
19   national disparity found in the same analysis;
20   correct?
21     A.  Yes.  The number is more than three times
22   greater.

1          Q.   So depending on whether we're looking at

2     African Americans or Hispanics, the only data we've

3     seen comparing Connecticut to the national average has

4     Connecticut being two to three times greater disparity

5     than the national average; correct?

6          A.   I wouldn't put it like that.  I don't want to

7     sound like I'm quibbling, but this is an important

8     feature of the analysis.  What's missing here is any

9     indication of the uncertainties in these estimates,

10    and I don't -- I haven't looked at the Mauer and King

11    paper, in part because Dr. Wildeman only relied on

12    these numbers insofar as they're qualitative, that

13    Connecticut's ratio seemed to be larger than national,

14    and Dr. Parnell appears not to have relied on them at

15    all.  So I've not investigated that in any detail.

16         But the concern I have is that certainly

17    there are some kind of statistical uncertainties

18    attached to these numbers.  According to the general

19    proposition I gave earlier this morning, likely that

20    the data for Connecticut are smaller than the national

21    data.  So there will be higher standard errors for the

22    Connecticut estimates, and I don't know whether these

1    ratios were computed by Dr. Wildeman or they're there

2    in the original.

3         But however they were computed -- another

4    principal is that when you take a ratio of uncertain

5    numbers, typically the amount of uncertainty in the

6    denominator, that number on the bottom, plays a larger

7    role, a disproportionate role in amplifying the

8    uncertainty of the whole ratio.

9         So I'm not denying that these differences

10   exist in the estimates, but what I find myself as a

11   statistical expert in consuming numbers like this is I

12   find myself wondering just what are the standard

13   errors for these ratios.  So when you say two to

14   three, the immediate question that comes to my mind is

15   well, maybe it's two to five.  Maybe it's one to

16   three.  Where are some reasonable end points of a

17   confidence interval around these rations that would

18   help me evaluate the degree of uncertainty in these

19   estimates so that I can weigh them appropriately when

20   drawing conclusions based on these data.

21        And what I read from them is because

22   Dr. Wildeman seems to be reluctant to draw any kind of

1    quantitative conclusions.  That strongly suggested to

2    me that the standard errors might be fairly large.

3         Q.  Wouldn't it have been simpler to look at the

4    Mauer and King paper rather than characterize whether

5    Dr. Wildeman was reluctant or not and draw conclusions

6    from that?

7         A.  No.

8         Q.  Okay.  If, in fact, these are not like the

9    national longitudinal surveys, these are not samples

10   but these are actually official counts from the Bureau

11   of Justice statistics of actual -- like we're counted

12   all the bodies, like a census rather than a sample.

13   If that is the case, would that change your opinion?

14        A.  It certainly would modify it because I would

15   give more credence to the Connecticut numbers.  I

16   would suppose they have smaller standard errors.  They

17   would still have errors associated with them for

18   various reasons.  I'm trying to suggest that I'll be

19   skeptical of any kind of numbers.

20            So I am agreeing, essentially, that under the

21   hypothetical that you gave me, that that would be

22   stronger evidence that there are higher ratios in

1    Connecticut than nationally.

2         Q.  Now, you also said in your Paragraph 20, when

3    we started this section, that if you look at

4    individual age groups or income brackets, the

5    estimates will be less certain; correct?

6         A.  Correct.

7         Q.  Now, one reason for that would be, you know,

8    when you get smaller samples, then you're going to

9    have greater uncertainty?

10        A.  That's correct.

11        Q.  And a disparity that might be statistically

12   significant, when observed in a large group, might be

13   unknown as to whether -- or you can't tell that it's

14   significant when you're looking at it in a small

15   sample; correct?

16        A.  Right.

17        Q.  So you mentioned age groups, but there aren't

18   age groups in Table 1.  There are in Table 2 --

19   correct? -- of Dr. Wildeman's report?

20        A.  I'm not looking at the report, but yes,

21   that's my recollection.

22        Q.  I actually do want to ask you to turn to

Page 189

1    not vary with age."

2         Q.  No.  I'm reading before that.  "Dr. Parnell

3    assumes experience with incarceration are unchanged

4    since 1979."  Do you see that?

5         A.  Yes, I do.

6         Q.  Okay.  So you are asserting that Dr. Parnell

7    assumed experience with incarceration was unchanged

8    since 1979; correct?

9         A.  Correct.

10        Q.  Okay.  And you claim that that's his

11   assumption because he uses data from the NLSY79 study

12   as the basis of his calculation?

13        A.  Yes.

14        Q.  Now, that doesn't mean he assumed that

15   disparities have not changed.  In fact, Dr. Kavinian,

16   who I realize you didn't read her report, but

17   Dr. Kavinian actually talked about how disparities

18   have gotten worse over time, which would mean using

19   the NLSY numbers was taking a more conservative

20   approach; correct?

21        A.  My analysis of that Bureau of Prisons report

22   to other reports that I undertook in the Alexander

1    case suggested to me that, in the year 2010, she would

2    have been correct, but since then, the disparities

3    seem to have been starting to grow closer.

4         Q.   What are the forces in -- I assume listed in

5    the references to your report that would support a

6    conclusion that disparities are getting smaller?

7         A.   That's not part of my opinion in the report.

8    I can't remember what those sources were in Alexander.

9         Q.   Okay.  So you didn't include it in your

10   report, and you haven't cited any sources for it;

11   correct?

12        A.   That is correct.  But I want to add that part

13   of the basis for this opinion is observing those

14   evolutions of disparities in the NLSY79 database.

15        Q.   And you agree that the disparities got worse

16   up through 2010; correct?

17        A.   That is my recollection.

18        Q.   All right.  And you think the disparities

19   have started to narrow in the 10 years since 2010?

20        A.   At least for African Americans.  I was not

21   studying Hispanics.

22        Q.   Okay.  And but have the disparities gotten as

Page 197

1      A.  Based on what it says here and on my general
2   reading in the news, I do.
3      Q.  Okay.  And that, consequently, criminal
4   records-based barriers to housing are likely to have a
5   disproportionate impact on minority home seekers?
6      A.  That does seem reasonable.
7      Q.  Okay.  So turning to Page 3, it seems to me
8   that a central concern that runs through a lot of your
9   report is the concern that the disparities, if any, in
10   Connecticut might not be as significant as the
11   disparities that we see nationwide.  Is that fair?
12      A.  That's a big part of it.
13      Q.  Okay.  So looking at the second paragraph on
14   Page 3 of Exhibit 9, the HUD guidance, HUD addresses
15   the question of whether national or local statistical
16   evidence should be used to evaluate a disparate impact
17   claim, and --
18          MR. WINGFIELD:  Objection to the form.
19          Go ahead.  Complete your question.
20          MS. WEBBER:  That's fine.
21      Q.  Can you just review that paragraph for me?
22      A.  I have.  I've done it.

Page 202

1        A.  They offered a lot of extensive computer

2    printouts from their system of various counts of

3    different uses of their software by different

4    facilities.

5        Q.  Did that have information about -- when you

6    say, "they," you mean CoreLogic?  Do you mean

7    CoreLogic's counsel?

8        A.  CoreLogics -- it may have been CoreLogic via

9    their counsel.  I'm not sure of the origin.

10       Q.  And did they have information on the race of

11   all the applicants?

12       A.  Therein lies the rub.  I think that that

13   information is more difficult to get.

14       Q.  Uh-huh.  And you can't do a disparate impact

15   analysis to see if there's differential treatment --

16   or different -- excuse me, differential impact by race

17   if you don't know the race of the people in your data;

18   correct?

19       A.  Correct.

20       Q.  Okay.  Any other sources you can think of

21   that would have provided Connecticut-specific data to

22   examine as to disparities in criminal history?

1          A.   I'm trying to think how to answer that

2     because I did not see that as being directly relevant

3     to the disparate impact theory, but to directly answer

4     your question, if I were looking for sources of such

5     data simply about exposure to the criminal justice

6     system, the answer is no, I'm not aware of others.

7          Q.   How about sources of data showing risk of

8     incarceration over time that are Connecticut specific?

9          A.   I am not specifically aware of any.

10         Q.   Okay.  It's your opinion that the national

11    information is not relevant at all to Connecticut; is

12    that right?

13         A.   No.  The national information is slightly

14    relevant to Connecticut, but I don't view it as being

15    directly relevant to Connecticut and even less

16    relevant to a particular housing market or particular

17    housing facility in Connecticut.

18         Q.   You did state in your Paragraph 2 that the

19    national data is not directly relevant to Connecticut?

20         A.   Yes.

21         Q.   And you do understand that Connecticut is

22    part of the United States?

Page 204

1          A.  Yes.

2          Q.  So the U.S. numbers do include Connecticut?

3          A.  I think Connecticut comprises about 1 percent

4      of the U.S. numbers.

5          Q.  And we reviewed earlier the Table 3 from

6      Dr. Wildeman's report showing that Connecticut

7      measured, through incarceration rates, had disparities

8      that were two to three times the national disparities

9      for risk of incarceration from NLSY; correct?

10         A.  Yes, we reviewed that.

11         Q.  Okay.  And you don't have any specific

12     evidence to point to to show that Connecticut has

13     disparities that are less than the national average;

14     correct?

15         A.  Correct.

16         Q.  You state in your Paragraph 13 that

17     Dr. Wildeman did not quantify the comparison between

18     Connecticut and U.S. numbers; correct?

19         A.  Correct.

20         Q.  But the Table 3 is -- it shows the exact

21     numerical comparison between Connecticut and U.S.

22     numbers; correct?

1          THE WITNESS:  I'm not saying anything of the

2     sort.

3     BY MS. WEBBER:

4          Q.  Well, you said that because Dr. Parnell

5     didn't do something like that, you felt free to ignore

6     Dr. Wildeman's Table 3; right?

7          A.  That was one of several reasons.  There's

8     another one here preceding the paragraph you just

9     quoted in Exhibit 8.  Dr. Wildeman begins by

10    qualifying as being somewhat dated.  He does go on, I

11    admit, to say, well, he's willing to rely on them

12    anyway.

13         Q.  Specifically, he says there's "no indication

14    for more recent data that the levels of racial" and

15    "ethnic disproportionality in Connecticut have changed

16    relative to those in the nation as a whole in recent

17    years?

18         A.  That's right, and for that reason, I looked

19    for those recent data in his report, and I did not

20    find them.

21         Q.  Now, you also -- you also relied, in support

22    of your objection, to the use of national numbers for

Page 208

1      Connecticut on something not discussed at all in your

2      report, but some work that you said you did looking at

3      the NLSY data by region; correct?

4              A.   Correct.

5              Q.   So I'm marking Exhibit 10 a document produced

6      to us from your backup that I believe looked at risk

7      of incarceration by region; is that right?

8              A.   Yes.

9                   (Deposition Exhibit 10 was marked for

10                  identification.)

11     BY MS. WEBBER:

12             Q.   It says, "Proportion in jail," but I assume

13     that that was jail or prison?

14             A.   Yes.   That's just an abbreviation.

15             Q.   Okay.  And it appears that, for African

16     Americans in the northeast -- I don't want to be too

17     presumptuous here, but Connecticut is in the northeast

18     in NLSY data; correct?

19             A.   I would presume so.

20             Q.   Okay.  So that would be the region of

21     particular interest here, and it looks like this shows

22     something like, I don't know, 11 percent of African

1      background are, and I'm sure there are places in the

2      northeast where you might have a hard time.

3           Q.  Understanding that you are hoping to

4      illustrate some degree of regional variation, it's

5      also true that, when you look at the northeast region,

6      that's one -- it looks like this divides the

7      United States into four quadrants, and that is instead

8      of looking at the entire nation, it's looking at one

9      fourth of it, and in that particular quarter, the

10     quarter which Connecticut is part of, we do have wider

11     ratios than we do in other regions -- correct? -- for

12     both African Americans and Latinos?

13          A.  Yes, that's correct.

14          Q.  And from that, you wouldn't -- there's

15     nothing in that that would allow you to conclude that

16     the disparities in Connecticut are likely to be

17     smaller than the national average?

18          A.  That's correct.

19          Q.  So if Dr. Wildeman had followed your example

20     of looking at the regional data available in the NLSY,

21     he could have reported even larger disparities for

22     Dr. Parnell to use than he did in his report; correct?