# EXHIBIT 2



**ANALYSIS & INFERENCE**

1489 Baltimore Pike, Suite 305
Springfield, PA 19064

P: 610–543–0159
F: 610–543–8952

# Rebuttal Report

## Connecticut Fair Housing Center and Carmen Arroyo vs. CoreLogic Rental Property Solutions, LLC

## United States District Court District of Connecticut

## Case 3:18-cv-00705-VLB

Prepared on Behalf of CoreLogic Rental Property Solutions, LLC by

William A. Huber, PhD, PSTAT®
May 1, 2020

CONFIDENTIAL                                                          2020-05-01
ATTORNEY-CLIENT PRIVILEGED

## Introduction

1.  I was engaged by counsel for the defendant, CoreLogic Rental Property Solutions, LLC, to review

    the expert opinions of Drs. Wildeman and Parnell.  My focus is to identify the statistical

    assumptions, both explicit and implicit, that are the foundation of those opinions and to assess

    the validity of the data analysis and statistical testing used to arrive at those opinions.

2.  Dr. Wildeman reaches his conclusions using limited nationwide incarceration data (which

    originate in national surveys of individuals dating back to 1979 and 2004).  Among other issues,

    those nationwide data are not directly relevant to Connecticut demographics and even less

    relevant to the local rental markets that CoreLogic Rental Property Solutions serves within

    Connecticut.  Moreover, Dr. Wildeman presents his statistics without accounting for the

    discernable rates of statistical uncertainty that are inherent in his incarceration risk estimates.

3.  The expert report of Dr. Parnell, which incorporates the expert report of Dr. Wildeman, is

    predicated upon numerous unfounded assumptions that are compounded by outright statistical

    errors in this case, and which makes their conclusions irrelevant and statistically invalid.

4.  Dr. Parnell makes numerous implicit assumptions in his analysis that are unfounded or obviously

    false, including assuming that the national data used by Dr. Wildeman (1) apply to the eight

    counties in Connecticut and (2) that county-wide data employed by Dr. Parnell can serve as a

    proxy for the more limited rental markets that CoreLogic Rental Property Solutions services in

    certain zip codes in Connecticut.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED

2020-05-01

5. Dr. Parnell reached his conclusions regarding the "statistical significance" of his data by committing a series of basic errors.   These errors consistently create gross exaggerations in the apparent statistical significance of his results.

6. Finally, both Dr. Wildeman and Dr. Parnell rendered their statistical conclusions without any regard for how the CrimSAFE product works, how housing providers use that product, or the many other factors that drive housing provider decisions on applications that can also be independently decisive (*e.g.*, the credit information simultaneously reported by CoreLogic Rental Property Solutions).

7. Standing alone, any one of these issues would be enough to disregard the reports of Dr. Wildeman and Dr. Parnell.  Cumulatively, they conclusively demonstrate that neither individual has provided applicable or meaningful analysis to this case and that all of Dr. Parnell's conclusions are invalid.

8.  My findings are reflected in this report.  Some of the main findings are:

1. The statistical uncertainty in Dr. Wildeman's estimates of rates of "combined risk of prison and jail incarceration" is substantial.

2. Dr. Parnell creates data by combining Dr. Wildeman's estimates of national risk with estimates of population characteristics in Connecticut counties.  He analyzes these manufactured data as if they were actual observations of individuals in Connecticut.

CONFIDENTIAL                                                          2020-05-01
ATTORNEY-CLIENT PRIVILEGED

This basic mistake renders his results meaningless and means his opinions are unsupported.

3. None of Dr. Wildeman's or Dr. Parnell's opinions are relevant to rental decisions made at any housing facility in Connecticut.

9. I am Senior Statistician with Analysis & Inference, Inc. of Springfield, PA, specialists in statistics and data science. I lead projects that apply statistical analysis, data analysis, and computer programming to problems encountered in business, government, and litigation. At A&I, during the last four years, I have provided statistical expertise to plaintiffs and defendants in nine disparate impact/disparate treatment cases, usually culminating in expert reports, rebuttal reports, and testimony. With Will Fairley of A&I I have also published papers in peer-reviewed journals about applying statistics in litigation. These activities continue work I have performed as a statistical consultant since 1988. I also maintain formal ties with S.S. Papadopulos and Associates of Rockville, MD, where I provide statistical support and training for 60 consulting scientists and engineers. Since 1990 I have developed and taught many courses in statistics and data analysis at the undergraduate, graduate, and professional levels. My qualifications to perform statistical work include experience in lead roles in approximately 500 projects, a PSTAT™ certification from the American Statistical Association, peer-reviewed publications in statistical applications, theory, and foundations, and a Ph.D. in mathematics from Columbia University. A copy of my *Curriculum Vitae* is attached.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED

2020-05-01

10. My charges for work on this case are $700 per hour.  They are not conditional on my findings or the outcome of the case.

## Background

11. The Plaintiff in this case alleges "Defendant's policy of disqualifying people from rental housing based solely on the existence of a charge or conviction record has a predictable disparate impact on Latinos and African Americans" [Complaint (2018) at p. 4].  To demonstrate this impact, Plaintiff's experts Dr. Wildeman and Dr. Parnell offer statistical analyses of incarceration and demographic data.

12. Dr. Wildeman quantifies racial disparities observed in the "combined risk of prison and jail incarceration" observed in one national sample of people followed since 1979 [the NLSY79: Wildeman (2019a) at p. 1 and Table 1].   He reports the risk estimates by three categories of race/ethnicity, three "lookback periods,"[1] and four levels of individual income.  He does not provide the statistical errors of these estimates.

13. Using the results of a different survey (the SISFCF, from 2004) for qualitative support, Dr. Wildeman concludes his "cumulative risk" numbers "almost certainly *underestimate* the level of racial disproportionality in Connecticut" [*ibid.*], but he does not quantify the amount of potential underestimation.

---

[1] A "lookback period" is an interval of time, ending at the time of a rental application, during which an incarceration or jail event may be deemed relevant to the rental decision.

CONFIDENTIAL                                                                              2020-05-01
ATTORNEY-CLIENT PRIVILEGED

14. Dr. Parnell multiplies Dr. Wildeman's national risk estimates by estimated counts of people in

Connecticut counties.  He inputs these extrapolations into statistical software[2] designed to test

actual data (not estimates).  Multiplication does not change the risks: it merely re-expresses the

risks as numbers of people rather than as percentages.  But because these artificial numbers of

people are much larger than the numbers of subjects in Dr. Wildeman's analysis (most of  his

estimates are based on just a few hundred subjects each), and are subject to the combined error

errors of *two* surveys (one for estimating risks and another for estimating counts of people), the

software incorrectly determines there are "statistically significant" differences in risks.  On this

basis, and with no consideration of how rental decisions are made or how CoreLogic Rental

Property Solutions' software may be involved, Dr. Parnell views the results as statistically

significant and, based on that conclusion, opens "African American and Latino renters in every

rental housing market in Connecticut have their opportunity to rent disproportionately reduced

relative to White renters as a result of use of CoreLogic's CrimSAFE tenant screening algorithm"

[Parnell (2020a) at p. 20].

## Analysis

### Dr. Parnell

15. Let us consider what is required, logically and statistically, to arrive at Dr. Parnell's conclusion in

the framework of his approach to assessing disparate impact.  Many steps, each with their

attendant assumptions and simplifications, are necessary to establish a causal connection

---

[2] Exhibit 5 to Parnell deposition (2020b).

CONFIDENTIAL                                                                2020-05-01
ATTORNEY-CLIENT PRIVILEGED

between the CrimSAFE software and rental opportunities of Connecticut households.  Dr.

Wildeman undertook the first step and then Dr. Parnell took over and carried out the remainder[3]:

1. Dr. Wildeman uses the NLSY79 survey data to produce four kinds of "cumulative risk
   of jail/prison incarceration" numbers for individuals by race/ethnicity and income
   band [Wildeman (2020a) Table 1].  The four risks differ according to "lookback
   period."  These numbers purport[4] to be the rates at which individuals (of given
   race/ethnicity and 2015 income) have been incarcerated with the "last 4 years," "last
   7 years," "last 10 years," or "ever" [Parnell (2020a) Tables 4 – 12].  **Dr. Parnell
   assumes** (incorrectly: see ¶42 *et seq.*) **that these numbers are correct, with no
   amount of statistical error[5].**

2. **Dr. Parnell assumes experiences with incarceration are unchanged since 1979
   and—contrary to the evidence[6]—do not vary with age.**  The NLSY79 data track the

---

[3] Q. "So you take as a given Dr. Wildeman's findings of disparities and you then try to figure out whether those findings, if applied in Connecticut, can support statistically significant results?" A. "That's correct." Parnell deposition (2020b) at 71.

[4] It is unclear what these estimates mean, because the incarceration rates observed in the NLSY79 survey vary greatly with age.  Since the NLSY79 survey tracked a fixed group of people, who aged together over time, it provides no information about age distributions nationally.  These "lookback periods" must reflect some kind of rate averaged over some hypothesized but undocumented age distribution.  Because Dr. Wildeman generated these estimates without referring to Connecticut data, these estimates do not appear to be based on age distributions in Connecticut markets.

[5] Q. "If you don't know the risk that Dr. Wildeman's numbers might be incorrect, then how did the statistical tests performed incorporate that fundamental risk?"  A. "I assumed he was correct."  *Id*. at 131.

[6] Note the large variation in "Cumulative Risk" by age in Wildeman (2019a) Table 2.  Regardless of race or ethnicity, Dr. Wildeman's estimates range by a factor of three to four from ages 18 – 24 up to 55 – 59.

CONFIDENTIAL                                                           2020-05-01
ATTORNEY-CLIENT PRIVILEGED

experiences of people, who were young in 1979, throughout their lives (through

2016).  This creates an acute extrapolation problem when Dr. Parnell analyzes

estimates by income band.  The incomes are those of subjects *in calendar year 2015*,

when they were aged 51 to 58 years[7].  They scarcely reflect the incomes of most

renters, who will range in age from 18 to well over 65.  Dr. Wildeman's NLSY79

estimates cannot produce information about the incarceration experiences of would-

be renters according to their *current income* at their *present age*.

3. **Dr. Parnell assumes individual Connecticut counties constitute local housing

   markets** [Parnell (2020a) at 7].  This assumption is made for the convenience[8] of

   being able to execute step #4 below: it is not based on a specific analysis of the

   housing markets.

4. Dr. Parnell adopts county-level estimates of the numbers of renting households by

   ethnic composition from the American Community Survey [Parnell (2020a) Table 2

---

[7] Q. "… here at the bottom, … there is a description of what he [Dr. Wildeman] did as calculating the risk of incarceration, quote, "ten years prior to the last interview, seven years prior to ·the last interview, and four years prior to the last interview," end quote. … [Can] you tell me what your understanding was of the phrase "last interview"?"  A.· "…the NLSY is a longitudinal survey. They follow people over time and have a series of interviews. I believe the most recent interview -- I may be wrong, but I believe it was 2015. And so it's the cumulative risk of incarceration up to 2015.  **And these lookback periods would be relative to that interview date**."  *Id.* at 72, emphasis added.

[8] See Parnell deposition *id.* pp. 118 line 2 through 121 line 1.

CONFIDENTIAL                                                                                                        2020-05-01
ATTORNEY-CLIENT PRIVILEGED

and Table 3] and **assumes, contrary to fact, that these households constitute a**

**random sample for the purposes of statistical testing**[9].

5. Dr. Parnell assumes, with no evidence and contrary to expectations, that the NLSY79

risk estimates apply to each Connecticut county, without change[10].  This means the

county risks equal the national averages and it implies there is no variation of risk

from one county to another.  It also assumes that the experiences of the NLSY79

subjects—all of them born between 1957 and 1964, of whom a small number were

incarcerated over 20 or more years ago and extremely few since then—accurately

reflect the *current* experiences of potential renters in Connecticut, regardless of their

ages.

---

[9] Dr. Parnell acknowledges a "random sample" is required for applying his test:  Q.  "Would it be fair to say that a proper use of this tool needs to be based on these two requirements [of which one is a "random sample:" see Parnell deposition exhibit 3] as stated here in this requirements category?"  A.  "Yes." However, he subsequently is unable to distinguish a sample from a population; he is unable to characterize the intended meaning of "random sample;" and he confuses the size of a sample for the size of the population it samples: Q. "What does n1 mean?"  A.  "That's the size of the … first population."  *Id.* at 87.  The "n1" of the question is the size of a *simple random sample*. See footnote 12 (*infra*) for a definition of a simple random sample and ¶56-¶59 for further discussion.

This assumption that estimated data can be used as if they were a random sample is a flawed effort to recast Dr. Wildeman's national-level results as market specific: Q [by plaintiff's attorney Christine Webber].  "So one thing your analysis does that Dr. Wildeman's does not is apply an analysis that's specific to the markets you and confirms that the disparities you found exist in each market as well as statewide?"  A.  "Yes."  *Id.* at 152 – 53.

[10] Q. "Did you do anything to confirm whether the table 1 national statistics Dr. Wildeman presented would hold true at the Connecticut and county level?"  A.· "That's outside the scope of my expertise and my employment."  Parnell deposition (2020b) at 131.

CONFIDENTIAL                                                        2020-05-01
ATTORNEY-CLIENT PRIVILEGED

6.  In each county, Dr. Parnell attempts to determine the number of households with

    incarceration records by multiplying[11] the estimated individual risks (#1) by the

    estimated household counts (#4).  **This assumes the characteristics of individuals are**

    **those of households; in particular, that *individual* risk translates unchanged to**

    ***household* risk.**  Regardless of the accuracy of this assumption, the multiplication

    incorporates and magnifies the sampling errors from *both* the NLSY79 and ACS

    surveys.

7.  **Dr. Parnell assumes the households (as counted in #4) are a simple random**

    **sample[12]** of some large population.  It is unclear what that population might be or

    how Dr. Parnell can align his creation of data with the concept of sampling a

    population[13].  Regardless, this assumption is incorrect because, unlike with a real

---

[11] This is not explicitly stated but is implied by the narrative in [Parnell (2020a)] at pp 11 *et seq* as well as by Dr. Parnell's deposition testimony: "The disparities are based on Dr. Wildeman's estimates of disparities. … I applied those levels of disparity … at these different income levels and lookback periods." *Id.* at 69.  The only way Dr. Parnell could have produced the numbers in his Tables 4 – 12 [Parnell (2020a)] would be by multiplying Dr. Wildeman's risk estimates by estimated numbers of households.  See ¶3258.

[12] A simple random sample is one obtained by a mechanism that functions like drawing beans from a pot. Each bean represents a potential subject.  The pot's contents represent the entire population.  The beans are thoroughly stirred and then a desired number of them—the sample—are blindly withdrawn.  Other more complex sampling methods are used.  The NLSY79 and SISFCF surveys on which Dr. Wildeman relies are two such samples.  However, the software employed by Dr. Parnell does not produce valid results in the absence of an explicit sampling procedure that emulates drawing beans from a pot, or articulation of a probability model that is equivalent to drawing beans from a pot.  Dr. Parnell has done neither.

[13] Dr. Parnell's testimony bears no resemblance to the statistical concept of a random sample relevant to the application of his test, nor does it reflect any appreciation of the fundamental importance of random sampling to the validity of that test.  "Q. So what is your understanding of the meaning of the phrase "random sample"? A.  It's designed so it's proportionally representative, like the American Community Survey is, like the NLSY is.  Q.  Is your opinion that the NLSY data is a random sample? A.  Yes.  It's my understanding.  Q.  You phrase that as your understanding.  Would I need to ask Dr. Wildeman that or ---

CONFIDENTIAL                                                          2020-05-01
ATTORNEY-CLIENT PRIVILEGED

sample (random or not), Dr. Parnell does not precisely know the number of households and their counts were not obtained by sampling any population of households.

8. **Dr. Parnell assumes the counts of households with incarceration records created in #6 were actually observed in the sample (#7).**  This is incorrect because these counts are estimated and not perfectly known.  Dr. Parnell did not obtain any actual sample of anything, nor are any of his counts those of any definite sample.

9. **Dr. Parnell assumes the risks (#1) associated with incarceration exactly equal the chances of being denied rental opportunities through use of CoreLogic Rental Property Solutions' "CrimSAFE" software.**  This comprises many dubious assumptions including

---

A. ... I used these data late in graduate school.  I haven't used them since.  Q.· So who would know whether the NLSY data was a random sample?  A.  I'd ask Dr. Wildeman, or you can go to the people at Ohio State and they can tell you.  Q.  Did anyone tell you that the NLSY data was a random sample?  A.  I don't recall.  Q.  So you're just assuming that the NLSY data was a random sample, right?  A.· Yes.  Q.  If it turns out that the NLSY data was not a random sample, then it would not have been correct to use the Social Science Statistics application, right?  A.  No, I don't think that's correct at all.  I think it's a fairly rigorous test.  You use population data as well.  Q.  Well, doesn't the Social Science Statistics [Web page] that describes the use of the application say that a requirement for the use of the application is having a random sample?  Isn't that true?  A.  That's what it says.  Q.  And I think you agreed with me that the validity of the use of this tool depended on satisfying the requirements set for use of the tool by the application.  A.  I don't say the validity; that's the requirements they lay out here, the optimal requirements.  Q.  If you learned that the NLSY data does not qualify as a random sample, would that change your opinions rendered in your report?  A. No.  Q.  Why wouldn't it change your opinion?  A.  I think I had valid proportions based on Dr. Wildeman's estimates.  What is the basis for using, quote, "valid proportions," end quote, as opposed to a random sample of data in the use of this calculator?  A.  The proportions are based from the sample in the NLSY."  Parnell deposition (2020b) 81 – 83.

CONFIDENTIAL                                                                    2020-05-01
ATTORNEY-CLIENT PRIVILEGED

    i. The software unilaterally makes the criminal components of the rental

       decision without control or intervention by the rental facility[14].

    ii. Every housing facility configures the software in the same way[15].

    iii. Incarceration risk does not vary with the type or severity of the crime[16]. Dr.

       Parnell does not know whether his analyses account for that[17] (they do not).

    iv. That every criminal record for any applicant implicated by Dr. Parnell's

       analysis would be disqualifying.  On the contrary, the software is a filtering

       tool: as usually configured[18], it can be expected to identify fewer criminal

---

[14] "[Any] result the CrimSAFE product provides is not a final decision since the housing provider is still obligated to conduct an individualized review and make the final decision on the application." Kacirk (2019) at 12.  Dr. Parnell assumed the opposite: Q. "In this engagement did you do anything to learn about how CrimSAFE operates?"  A. "No."  Q. "Did you do anything to learn how CrimSAFE is used by property managers?"  A. "No." Q. "Would it be fair to say that everything you know about CrimSAFE is something you learned from reading the complaint?"  A.· "Yes."  Parnell deposition (2020b) 105-6.

[15] "CrimSAFE also allows housing providers to customize the desired criteria and parameters for what is acceptable at each property." Kayani (2019) at 4.  Dr. Parnell was unaware of this [Parnell deposition (2020b) at 111].

[16] [Carson (2015)] Appendix Table 4 (part of a federal Bureau of Prisons report) presents data showing that discrepancies in relative numbers of sentenced prisoners (nationally in 2014) under state jurisdiction vary greatly by type of offense.  For example, African Americans were imprisoned at 9 – 16 times the rates of Whites for robbery, weapons offenses, and murders; the ratio drops to 1 – 3 for fraud, motor vehicle theft, rape, other property offenses, and driving under the influence.

[17] "Q. If it turned out that the property managers as a group made selections in CrimSAFE that exclude consideration, in assessing rental applications, of certain types of offenses, wouldn't that mean you would need to look at the specific types of offenses in the applicant pool to assess wealth disparities?  A. That's more of a question for Professor Wildeman in terms of the criminal records and -- so I can't answer that. I don't know.  It's beyond the scope of my report."  Parnell deposition (2020b) 113.

[18] The meaning of "usually configured" is based on the CrimSAFE configuration parameters for 284 CoreLogic Rental Property Solutions accounts documented in exhibit Arroyo000690-865.  Over half of

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED

2020-05-01

records to housing providers than would be the case in a traditional comprehensive criminal background check, and thus decreases the numbers of records identified and any associated claimed impact.

v. Other factors associated with rental qualifications, such as the experience of the previous landlord, credit worthiness, and any other elements of a housing facility's Tenant Selection Plan, are exactly the same for people who were incarcerated as for people who were not, regardless of the lookback period. Dr. Parnell has provided testimony to the contrary[19].

10. **Dr. Parnell assumes the generic conclusions about individual counties apply, without change, to any facility using the CoreLogic CrimSAFE product.** This assumption ignores the possibility that each facility's market characteristics may differ from those of its county. This is a real possibility. For instance, the NLSY79 survey shows that incarceration experiences differ between subjects originally living in rural areas and those in urban areas. Many Connecticut counties comprise both urban and rural areas, suggesting the criminal backgrounds of rental applicants may differ according to whether a facility is in an urban setting or not.

---

those accounts either explicitly ignore one or more of the four categories of criminal offenses or set a lookback period of four years or less.

[19] "Q. You earlier testified that you had expertise in housing.· Based on that expertise, would you think it reasonable to assume that there are components to that screening that could independently cause an application to be rejected, independently, that is, of the criminal background check? A. Oh, I'm sure income or something like that or lack of income." *Id.* 113.

CONFIDENTIAL                                                    2020-05-01
ATTORNEY-CLIENT PRIVILEGED

16. The failure of just one of the foregoing assumptions (shown in bold type in the preceding list) would make Dr. Parnell's conclusions unreliable.  Since every one of these assumptions is incorrect, and they collectively have an enormous effect on indications of statistical significance, Dr. Parnell's statistical test results are invalid and misleading, and his opinions based on those supports therefore are wholly unsupported.  Neither the test results nor his opinions have any probative value.

17. It is instructive to compare this to the more familiar situation of political opinion polls.  In this analogy, Dr. Wildeman functions as a poll aggregator by combining the results of a few national surveys which inquire about the incarceration experiences of people.  For the purpose of understanding Dr. Parnell's statistical method, the surveys could just as well deal with any other question, such as political affiliation.  To be concrete, suppose Dr. Wildeman had estimated that nationally 2.39% of Whites and 10.61% of African-Americans identify as Libertarians [see Parnell (2020a) Table 4 at top].   Dr. Parnell assumes those estimates apply exactly to subgroups in Connecticut, such as the approximately 28,201 African American households in New Haven that rent, deducing that 2,992.1 of those households are Libertarian[20].  He proceeds as if he had really obtained a sample of 28,201 African American renting households and, after interviewing every one of them, found that 2,992.1 of them identified as Libertarian.  Doing the same thing for White renting households in New Haven, he obtains estimated counts of 58,216 and 1391.4 [*id.*]

---

[20] The 28,201 value comes from the American Community Survey, which would have included a few thousand of those households among its respondents and then extrapolated that information to produce this estimate.  The 2,992.1 value is 10.61% of 28,201.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED

and again pretends he had really interviewed 58,216 households and counted 1391.4 Libertarian responses.  He then concludes, by analogy, that African American renters in New Haven are significantly more likely to identify as Libertarian then White renters.   All that this exercise accomplishes is to propagate the original 2.39% and 10.61% rates furnished by Dr. Wildeman through a convoluted statistical algorithm.  This analysis adds nothing to Dr. Wildeman's estimates and reveals nothing about actual ethnic disparities in New Haven.

18. The "results" section that constitutes half of Dr. Parnell's report merely recites[21] the output of the software he uses[22],  as applied to 144 sets[23] of such artificial data.  It is useless and irrelevant.

### Dr. Wildeman

19. Deviating from his usual publication practice (see ¶34), Dr. Wildeman does not analyze or report on the statistical errors inherent in his incarceration risk estimates.

20. It is possible to compute the statistical uncertainties in Dr. Wildeman's estimates (see ¶42 *et seq.*).  At the level of national averages, these uncertainties are relatively small: as such, Dr. Wildeman has re-demonstrated the well-established fact that, nationally, African Americans and Hispanics have been jailed and incarcerated and higher rates than Whites.  But at the more

---

[21] It errs in many places.  For example, in Tables 4, 6, 7, and 11 the household counts by income band do not always sum to the overall count.

[22] The "Z Score Calculator for 2 Population Proportions" Web applet accessible at https://www.socscistatistics.com/tests/ztest/.

[23] Eight counties (plus all of Connecticut) and two racial/ethnic comparisons are repeated for four income bands, three lookback periods, and overall, for 9 × 2 × 8 = 144 test results.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED

2020-05-01

detailed levels of individual age groups or income brackets, broken down into the three racial/ethnic categories, these uncertainties are so large that many of Dr. Wildeman's individual results are inconclusive and therefore unreliable for any follow-on analysis by Dr. Parnell.

21. The least reliable of Dr. Wildeman's estimates are those for Hispanics, especially for the shortest lookback period of four years.  The reliability of a statistical estimate is partly[24] expressed by its standard error (¶40).  By "least reliable" I mean that the estimated racial disparities for Hispanics in most of the groups determined by Dr. Wildeman have such large standard errors that they are not usable for making reliable (that is, statistically significant) decisions about the existence of a disparity.  Consider, for example, the entire NLSY79 cohort with a lookback period of four years.  See Table 2 at the end of this report.   The values in that table reveal, as explained below (at ¶45 *et seq.*), that the estimated racial disparity of Hispanics of 1.56 (with a standard error of 0.98) can reasonably be attributed to the operation of chance when the NLSY79 subjects were randomly sampled[25].  In statistical terminology, *a racial disparity of 1.56 $\pm$ 0.98 is not significant*.

---

[24] Many considerations enter into the reliability of an estimate, such as the quality and provenance of the data, their currency, their appropriateness to address the substantive question, and much more.  The standard error addresses only the extent to which the chance elements of the sampling procedure may cause the estimate to differ from its estimand—the population parameter.  As such, the standard error sets a lower bound on the degree to which an estimate may be trusted

[25] Dr. Wildeman estimates the risk for Whites is 0.25% (and I compute a standard error of 0.10%) and the risk for Hispanics is 0.39% (and I compute a standard error of 0.19%): see Table 1.  The "racial disparity" for Hispanics thereby equals 0.39% divided by 0.25%, or 1.56: Table 2 shows this value.  At its right in Table 2 is the standard error, 0.98, which is determined by Dr. Wildeman's risk estimates and their standard errors.  The racial disparity of 1.56 is only 0.57 standard errors away from 1 (0.57 × 0.98 = 1.56 − 1).  Since survey estimates, like 1.56, *often* differ by one standard error or more from the population parameters they are intended to estimate (see ¶40), Dr. Wildeman's estimated racial disparity is not statistically distinguishable from 1: namely, *no disparity at all*.

CONFIDENTIAL                                                                2020-05-01
ATTORNEY-CLIENT PRIVILEGED

22. Thus, *even as a national average* (where potential disparities are easier to detect than in smaller

regions)*,* there is no statistically significant evidence that a criminal screen based on incarceration

or imprisonment in the last four years could have[26] a disparate impact on Hispanics.  I understand

that the background screen at issue in this case involved a three-year old criminal charge (not a

conviction) for Mikhail Arroyo (Complaint at paragraph 8), who is classified as having Hispanic

ethnicity and had no previous criminal convictions.  This situates him within the group of Hispanic

renters screened with a four-year lookback period.  At no geographical level of analysis (national,

state, or county) conducted by Dr. Wildeman and Parnell is there statistically significant evidence

that Hispanics have disparities in arrests or in criminal records over a four-year lookback period

generally.  Thus, the analyses of these experts provide no evidence of disparate impact to Mr.

Arroyo.

23. Neither Dr. Wildeman's results nor Dr. Parnell's results (even assuming they were meaningful)

imply that criminal background screening creates racial disparities in rental opportunities.  Rental

*screening is a series of filters: applicants must meet other criteria in addition to criminal*

*background checks.*  See [HUD (2016)].  To confirm this conclusion, I obtained an example of a

"Lease Decision" report produced by the CrimSAFE software for an applicant to the ArtSpace

Windham housing facility [Arroyo0000652 (2016)].  Its summary page presents a "score decision"

("accept with conditions") and a "crim decision" ("Record(s) Found").  This is followed by detailed

information about the screening, including a "Credit Alert," a reference to searching Sex Offender

---

[26] Regardless of the tenability of the many other dubious assumptions needed to apply this information, as related at ¶1515.9 above.

CONFIDENTIAL                                                          2020-05-01
ATTORNEY-CLIENT PRIVILEGED

registrants, and a one-page "RegistryScoreEX Report" referring to credit history and other

financial information.  This output thereby invites its user to consider criteria in addition to

criminal screening results.

24. Neither Dr. Wildeman nor Dr. Parnell consider this setting in which criminal screening occurs as

part of a more extensive filtering process[27].  The result of any multi-factor screening will likely

differ from the results of any of the single-factor screens of which it is comprised.  If

(hypothetically) other factors already eliminate all or most applicants with criminal backgrounds,

then criminal background is not a direct cause of denial of rental opportunities.   Therefore, racial

disparities in criminal backgrounds will not necessarily translate into racial disparities in rental

decisions.

## Conclusions

25. Dr. Wildeman's conclusions are not directly relevant to the issues of disparate treatment and

disparate impact in this case.  It was Dr. Parnell's job to use Dr. Wildeman's information to draw

inferences about possible effects on renters, or would-be renters, within Connecticut housing

markets.  To do so, Dr. Parnell engaged in a convoluted logical and statistical process that ignores

the statistical error in all the survey data adduced by him and Dr. Wildeman; required him to

---

[27] In his deposition, Dr. Wildeman initially was careful to qualify his "main conclusion" as concerning the
"rejection rate … on the criminal justice contact."  This limited his opinion to differences in the rates at
which housing applicants would be rejected *if criminal checks were the* only *basis for "rejection."*
[Wildeman (2020b) at p. 80].   Dr. Parnell rashly states his conclusions without any qualifications at all (see
[Parnell (2020a) at p. 20]).

create data although he only had estimates available; and led him to use those artificial data

incorrectly in statistical tests.  Dr. Parnell fails to establish necessary connections between the

data, which originate in national surveys of individuals dating back to 1979 and 2004, and his

conclusions concerning households currently in Connecticut markets.  Neither expert advances

any valid or complete argument to support Dr. Parnell's implicit assumption that Wildeman's

"racial disproportionality" creates the same disproportionality (or, indeed, any disproportionality

whatsoever) in rental opportunities within Connecticut markets.

26. Plaintiff's experts have not met "plaintiff's burden to show the challenged practice caused or

predictably will cause a discriminatory effect" [24 CFR 100.500(c)].  Indeed, they have not even

met any of the much weaker thresholds of establishing the existence of a discriminatory effect,

associating it with the tenant selection policies of any rental housing facility, or of associating it

with defendant's CrimSAFE software.

# Appendix

## Introduction

27. This Appendix reviews the testimony of Plaintiff's experts in more detail.  It comprises four

sections.  "What constitutes a valid statistical analysis" sets forth nationally and internationally

accepted standards of statistical analysis and establishes that these standards are applicable to

evaluating the work of Plaintiff's experts.  "Dr. Wildeman's Analysis" describes the salient

features of Dr. Wildeman's testimony, including a detailed examination of his principal source of

CONFIDENTIAL                                                        2020-05-01
ATTORNEY-CLIENT PRIVILEGED

data, the NLSY79 study.  "Dr. Parnell's Analysis" fills gaps in Dr. Parnell's expert report and

describes its results.  "Additional considerations of spatial variability" addresses a problem

inherent in the approaches of both experts in their attempts to apply national data to individual

Connecticut housing markets.

## What constitutes a valid statistical analysis

28. "Statistical analysis is more than a set of computations" [Kass *et al.* (2016) at p. 4].  The world's

foremost professional statistical associations agree that statisticians

> "Employ … analytic approaches appropriate and valid for the specific question to be
> addressed" [ASA (2018) at p. 2].

> "Report the limitations of statistical inference and possible sources of error" [*id.* at p. 3].

> "Alert potential users of the results to the limits of their reliability and applicability"
> [ISI (2010) at p. 5].

29. These organizations adopt an expansive understanding of who is a statistician: "the definition of

who is a statistician goes well beyond those with formal degrees in the field, to include a wide

array of creators and users of statistical data and tools" [ISI (2010) *op. cit.* at p. 1].  "The term

"statistician" includes all practitioners of statistics and quantitative sciences—regardless of job

title or field of degree—comprising statisticians at all levels of the profession and members of

other professions who utilize and report statistical analyses and their implications" [ASA (2018)

*op. cit.* at p. 1].  In this sense both Dr. Wildeman and Dr. Parnell are practicing statistics and

implicitly claiming statistical expertise.

CONFIDENTIAL                                                                                      2020-05-01
ATTORNEY-CLIENT PRIVILEGED

30. It is standard to quantify the "limits" and "error" of statistical analyses using ranges, standard deviations, confidence limits, standard errors, p-values and significance.  Ranges and standard deviations are *descriptive*: they present characteristics of the data.  The confidence limits, standard errors, and so on, result from the probabilistic reasoning used to draw inferences about populations from samples.  "Statisticians … regard data as being realizations of random variables, and they assume that they know an appropriate specification for these random variables.  This allows them to use forms of argument involving probability and likelihood" [Mallows (1998)].

31. The requirements of an adequate statistical study include reporting the error and uncertainty in its results:

> *Provide assessments of variability* [Kass *et al*. (*op. cit*.)].

> *When reporting results, it is essential to supply some notion of statistical uncertainty* [*id*.].

> *Confidence intervals for key effects should always be included* [Harrell (2019)].

32. An expert opinion gains weight by claiming to use statistical procedures.  "The special language of statistics is desired to lend an air of scientific respectability to the positions of the participants in [debates concerning a great variety of social, political, economic, and environmental problems]" [Gibbons (1973)].  An opinion, however, deserves such weight only insofar as it is based on procedures and principles conforming to professional statistical standards.  "The statistician's interpretation of the results of the study should be officially limited to statistically valid procedures…" [*id*.].

CONFIDENTIAL                                                    2020-05-01
ATTORNEY-CLIENT PRIVILEGED

33. The reliability of the opinions advanced by Drs. Wildeman and Parnell depends on their expertise in performing statistical analyses.  Dr. Wildeman characterizes his professional work as statistical: "estimating racial disparities in incarceration using a bunch of different stats and a bunch of different demographic techniques is probably my core area of specialty within my field" [Wildeman (2019b) at p. 69].   Estimation generally is a statistical activity.  The "synthetic cohort life table methods" Dr. Wildeman employs are statistical [Wildeman (2020a) at 5].  Using and interpreting the results of a complex survey, like the NYSL79 or SISFCF, is statistical work.

34. Dr. Wildeman's own research and publications outside the courtroom consistently conform with the characterization of statistical analysis in ¶28.  Without exception[28], whenever he presents data or estimates that might be uncertain or subject to error, he uses one or more of the techniques of ¶30 to quantify the uncertainty.

35. Dr. Parnell characterizes his work in this case in explicitly statistical language: "are there differences between Whites and African Americans and between Whites and Latinos in their opportunities to rent from the clients of CoreLogic Rental Property Solutions due to differences in the risks of incarceration? If there are differences in the opportunities to rent, are they statistically significant?"  [Parnell (2020a) at p. 2.]  To provide reliable answers, Dr. Parnell must use statistical methods reliably.

---

[28] Based on a review of the first 15 papers by Dr. Wildeman identified by in a Google Scholar search on April 14, 2020.  [Wildeman (2010a), Wildeman (2010b), Wildeman (2009), Wildeman (Undated), Kim et al (2017), Lee et al. (2014), Papachristos et al. (2014), Turney & Wildeman (2015), Turney et al. (2015), Wakefield & Wildeman (2011), Wildeman & Emanuel (2014), Wildeman et al. (2014), Wildeman & Muller (2012), Wildeman et al. (2012), Wildeman & Wang (2017).]

CONFIDENTIAL                                                2020-05-01
ATTORNEY-CLIENT PRIVILEGED

36. By virtue of ¶29 and ¶32, it is legitimate and appropriate to hold the opinions of Drs. Wildeman and Parnell[29] to professional statistical standards (¶28, ¶30, and ¶31).  As is shown in the next two sections, they both fall short by neglecting to evaluate or report major sources of uncertainty that should be expected to—and do—affect their conclusions.

## Dr. Wildeman's Analysis

37. Dr. Wildeman's conclusions derive from two survey databases, the NLSY79 and SISFCF [Wildeman (2019a) at p. 1].  These provide the data underlying the numbers in Dr. Wildeman's Table 1 (based on the NLSY79) and Table 2 (based on the SISFCF together with auxiliary data).  His conclusions are *inferences* about people in the United States based on limited survey data which were obtained through random selection.   These inferences consequently are subject to statistical uncertainty.   Because all of Dr. Parnell's opinions concern the "statistical significance" of the comparisons he makes, and any assertion of statistical significance is always a statement about the size of an observed difference *relative to its uncertainty*, the amount of this uncertainty is critical to understanding Dr. Parnell's attempts to apply Dr. Wildeman's conclusions to Connecticut renters (or would-be renters).  It is essential to quantify this uncertainty and to use it correctly in its subsequent application.

---

[29] "Q. Would you consider yourself a statistician?  A: No, but I have expertise in using statistical methods – training and expertise and experience."  Parnell deposition (2020b) at 42.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED                                      2020-05-01

38. Ultimately, Dr. Parnell uses only the results of Dr. Wildeman's analysis of the NLSY79 survey.  I

   will therefore analyze only Dr. Wildeman's NLSY79 estimates in detail.  However, I have

   investigated the standard errors in the other major database Dr. Wildeman relies on (the SISFCF)

   and find them to be larger[30] than in the NLSY79.

39. The NLSY79 database documents an ongoing "national survey of 12,686 young people

   throughout the United States" [Frankel *et al*. (1983) at p. 5].  Dr. Wildeman's analysis of NLSY79 is

   embodied in Table 1 of his expert report[31] [Wildeman (2019a) at p. 10], "Cumulative Risk of

   Jail/Prison Incarceration … National Longitudinal Survey of Youth 1979 (NLSY79)."  My Table 1

   and Table 2 (both appearing at the end of this report) reproduce all the values in Dr. Wildeman's

   Table 1.

40. Subjects of the NLSY79 survey were selected randomly according to a complex "multi-stage"

   design[32] [Frankel *et al.* (1983) at pp 17 – 34].  Consequently, any numerical characteristic of the

   *data*, termed a "statistic," will differ randomly from the corresponding characteristic of the

   *population* ("young people" c. 1979), termed a "parameter."  To draw any valid inference about a

   population parameter, it is essential to assess the amount by which the statistic is likely to differ

---

[30] This is predictable, because the SISFCF has only about 60% as many current subjects as the NLSY79 and smaller surveys usually result in larger standard errors.

[31] Table 1 presents raw counts of respondents, percentages of those in jail or incarcerated, and ratios of percentages by race/ethnicity, earnings in 2015, and time since jail or incarceration.

[32] This is also true of the SISFCF.

CONFIDENTIAL                                                                2020-05-01
ATTORNEY-CLIENT PRIVILEGED

from its parameter.  This amount is usually expressed as a standard error,[33] also known as an SE

or "sigma."  "A [statistic] is likely to be around its expected value, but to be off by a chance error

similar in size to the standard error" [Freedman *et al.* at p. 291].

41. Departing from his standard publication practice (¶34), Dr. Wildeman does not report standard

errors or any other quantitative information about the reliability of his estimates.  Concerning his

Table 1,

> *[All] I do to generate estimates of the cumulative risk of incarceration by race, is see*
> *what proportion of the population still in the sample in 2015 has ever said that they*
> *were living in a prison or jail at any survey wave (see especially Pettit and Western 2004*
> *for discussion). I then limit the sample to those in specific income bands in 2015 for some*
> *of the analyses.*  [Wildeman (2019a) at p. 5.]

42. Nevertheless, Dr. Wildeman's Table 1 contains enough information[34] to compute standard errors

as described in the NLSY79 documentation.   All that is needed to carry out this computation for a

group of people are (a) a count of a group[35]; (b) the percentage of the members "experiencing

---

[33] A confidence interval can also be used for this purpose.  I use them in the figures below to depict
uncertainty in the estimates.  There are close mathematical relationships between confidence intervals
and standard errors.  For many statistical procedures, the width of the confidence interval is proportional
to the SE.

[34] But not his Table 2, because no group counts are reported.  The "weighted number of observations"
mentioned in the note to his Table 2 are irrelevant: using the weighted numbers as if they were the actual
numbers would grossly underestimate the standard errors.

[35] Called the "unweighted sample size" in the DEFT documentation at
https://www.nlsinfo.org/content/cohorts/nlsy79/using-and-understanding-the-data/standard-errors-
design-effects.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED

the event" (jail or incarceration) in question; and (c) the race, gender, and survey year for that

group (to identify a number called the "DEFT factor"[36]).

43. Table 1 (below) displays the standard errors for Dr. Wildeman's risk estimates.  They are large

enough to affect analyses based on the estimates.

44. Figure 1 graphically depicts Dr. Wildeman's risk estimates.  The heights of the solid colored bars

depict the risk values (as a percent of the total).  To depict their uncertainties, I construct

confidence intervals from the standard errors[37] [Freedman *et al.* (1998) chapter 21].   The vertical

black line at the tip of each bar extends from the lower confidence limit to the upper confidence

limit of that estimate.  In an ideal survey, a confidence interval has a 95% chance of including its

---

[36] The standard errors for percentages computed with NLSY79 data are usually larger than textbook formulas indicate.  The textbook value must be multiplied by a "design effect factor," or DEFT.  For the NLSY79 data, the DEFT factor depends on the gender and race/ethnicity of the respondent [Frankel et al. (1983)] and it varies from one wave of the survey to another.  "Because the samples are multi-stage, stratified random samples instead of simple random samples, respondents tend to come in geographic clusters and clusters of persons tend to be alike in a variety of ways for a variety of reasons. … For example, there may be cultural differences by locality or ecological differences in labor market conditions. Depending upon the degree of this homogeneity, the conventionally computed standard deviations for the variables, which assume a simple random sample, may be too small. … The ratio of the correct standard error to the standard error computed under the assumption of a simple random sample is known as the design effect. The technical sampling report for the NLSY79 (Frankel, Williams, and Spencer 1983) and its addendum (CHRR) provide design effects for the various strata ." https://www.nlsinfo.org/content/cohorts/nlsy79/using-and-understanding-the-data/standard-errors-design-effects.  Accessed April 15, 2020.

[37] The limits of a confidence interval for a proportion are placed a multiple $Z$ of the standard error above and below the estimated value of that proportion (but are constrained to be nonnegative and not to exceed 100%).  $Z$ is determined by the level of confidence using a Normal approximation to the sampling distribution of the estimate [Freedman *et al. id.*].  Although the Normal approximation will be poor for extreme proportions (close to 0% or 100%), the length of the confidence interval is still a useful representation of the sampling uncertainty in the estimate.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED

2020-05-01

corresponding population parameter—the value it is trying to estimate.  The confidence intervals shown in Figure 1 thereby present a useful picture of how much these estimates could differ from the true (but unknown) parameters they are estimating.  Long lines reflect large uncertainties and short lines reflect smaller uncertainties.

45. Dr. Wildeman forms ratios of his risk estimates to compute "racial disparity" indexes.  The first row of his Table 1, for example, presents his estimates of three "cumulative risks:" 2.39% for Whites, 10.61% for African Americans, and 5.99% for Hispanics.  The African American : White risk ratio of 10.61 : 2.39 is 4.44, the value given for the African American/White racial disparity.  Similarly, the Hispanic : White risk ratio of 5.99 : 2.39 is 2.51, the value given for the Hispanic/White racial disparity.  Because these numbers differ from 1, Dr. Wildeman concludes there are "racial disparities in incarceration" [Wildeman (2019a) at p. 7].  This, however, is not an adequate conclusion because it is uninformed by any quantifiable sense of the sampling error in the racial disparity indexes.

46. The standard errors in my Table 1 (below) indicate the racial disparity index of 10.61% has a standard error of 0.73%.  That means we should expect the value of 10.61%, which is an *estimate*, is likely to differ from the *true risk in the population* by some small[38] multiple of 0.73%.  Likewise, the estimate of 2.39% has a standard error of 0.31%.  Although these standard errors might seem small, consider the effects of changing each estimate by just one standard error.  If

---

[38] "Small" typically means up to two or three times the standard error above or below the estimate.

CONFIDENTIAL                                                        2020-05-01
ATTORNEY-CLIENT PRIVILEGED

the true risk to African Americans is really one standard error higher than the estimate, it will be

10.61 + 0.73 = 11.34%.  If the true risk to Whites is really one standard error less than the

estimate, it will be 2.39 − 0.31 = 2.08%.  The ratio 11:34 : 2.08 equals 5.45.  On the other hand, If

the true risk to African Americans is really one standard error lower than the estimate, it will be

10.61 - 0.73 = 9.88%.  If the true risk to Whites is really one standard error greater than the

estimate, it will be 2.39 + 0.31 = 2.70%.  The ratio 9.88 : 2.70 equals 3.66.  By altering two

estimates within limits consistent with the data, we have arrived at a range from 3.66 to 5.45 for

this racial disparity index.  Evidently, the index is subject to appreciable uncertainty.  This, too,

can be expressed with a standard error.

47. Probability theory provides a mechanism to compute an approximate standard error for the ratio

    of two independent random quantities in terms of their standard errors [Stuart & Ord (1987) at

    sections 10.5-10.6, "Standard errors of functions of random variables"].  Table 2 (below) applies

    this formula to the standard errors in Table 1 to show the standard errors of Dr. Wildeman's

    racial disparity indexes.

48. "Racial disparity" is indicated by a racial disparity index that differs from 1.  I characterize a racial

    disparity index as *wholly unreliable* when it differs from 1 by an amount less than its standard

    error.  This means there is no basis to conclude any disparity exists.  Table 2 displays the wholly

    unreliable racial disparity indexes in red**.  Eleven of the 27 indexes are wholly unreliable.**  Among

    these are the indexes applicable to the plaintiff Mr. Arroyo: nationally and in every income band,

    the estimated disparity indexes for Hispanics with a lookback period of four years (Mr. Arroyo's

    group, ¶16) are wholly unreliable.

CONFIDENTIAL                                                                                           2020-05-01
ATTORNEY-CLIENT PRIVILEGED

49. This unreliability is also apparent in the bottom row of Figure 1, which shows that no significant disparities exist for African Americans or Hispanics in the four year lookback group. Figure 1 also makes clear that even if such disparities could be shown to be significant[39] (*arguendo*), they would be very small, because 98% or more of all people, regardless of race or ethnicity, would be unaffected by a criminal screen with a four-year lookback period. Neither Dr. Wildeman nor Dr. Parnell analyze the sizes of the disparities they estimate or provide opinions about how many people might be affected by them (under the assumptions of ¶15).

50. Measures of statistical significance can be obtained from standard errors. Table 2 uses italicized gray text to display racial disparities that do not differ significantly from 1. The lack of statistical significance means one might *suspect* a disparity exists, but there is insufficient evidence to draw that conclusion with 95% confidence. Together with the wholly unreliable results (which *a fortiori* are not statistically significant), this shows that **a majority–17 of Dr. Wildeman's 27 racial disparity indexes–do not differ significantly from 1.** Figure 1 (below) employs bold colors to depict the remaining 10 risks in Dr. Wildeman's Table 1 that differ significantly from 1 and subdued, semi-transparent colors to depict the risks that do not differ significantly from 1.

51. Standard errors express only part of the uncertainties in estimates made from the NLSY79 (or other survey) data. Over time, many people have dropped out of the NLSY79 study: Dr. Wildeman's Table 1 reflects information from fewer than 6,000 people (less than half the original

---

[39] Such a demonstration would require additional data not in evidence.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED                                          2020-05-01

sample size and quite a few less than the "9,964" claimed by Dr. Wildeman [Wildeman (2019a) at

p. 3]).   The reasons are many: some subjects have died; some have been consistently difficult to

interview; some provide incorrect or misleading responses; and so on.   Although it is impossible

to quantify the effects of such "non-response" and "missingness" on the racial disparity indexes,

those indexes should (as a result) be considered *more uncertain* than indicated by their standard

errors.

## Dr. Parnell's Analysis

52. Dr. Parnell's opinions stand or fall with the validity and reliability of his statistical tests.  In an

answer to the question to "Would you agree that your opinions given in this case only deserve

the weight that -- to the extent they are supported by … correctly using statistical methods and

techniques?" Dr. Parnell volunteered, "My opinions are based on the statistical tests."  [Parnell

deposition (2020b) at 43.]

53. Dr. Parnell's report [Parnell (2020a)] does not describe the calculations he uses to assess

statistical significance[40], but they can be deduced from his Tables 4 through 12 and his narrative

of their contents [*id.* at pp 11 – 20]:

---

[40] Dr. Parnell was unable to describe the calculations the software is doing.  For instance, when asked to
explain the difference between a "Z distribution" and the Normal distribution (a concept known and
understood by everyone who conducts statistical tests), Dr. Parnell responded, "I haven't looked at --
since -- it's been 40 years since I looked at the different test distributions … I apply these statistics.  I didn't
develop the tests.  I'm sorry if I … haven't taught statistics in years, so I apologize for being less than
articulate about the difference between the two."  Parnell deposition (2020b) at 97.  *There is no
difference*: the test employed by Dr. Parnell uses the Normal distribution to compute the p values.  It is

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED

2020-05-01

*Tables 4 through 12 show the risks of incarceration described above and the number of households that rent for each risk of incarceration for the eight rental housing markets specified above and for the entire state.* [*Id.* at 10.]

54. For example, Dr. Parnell writes

*Table 4 shows the results for New Haven County rental market. For this rental market, there are 58,216 White households that rent, 28,201 African American households that rent, and 36,775 Latino households that rent. The number of White, African American, and Latino households in each income category are also shown. 2.39% of Whites have ever been incarcerated. 10.61% of all African Americans have ever been incarcerated. 5.99% of Latinos have ever been incarcerated.* [*Id.* at 11.]

55. His objective is to assess whether the use of CoreLogic Rental Property Solutions' CrimSAFE product "disproportionately disqualifies African Americans and Latinos from securing rental housing in the Connecticut markets" [Parnell (2020a) at 1]. To do this, he relies on tests of statistical significance:

*[Are] there differences between Whites and African Americans and between Whites and Latinos in their opportunity to rent from the clients of CoreLogic due to differences in the risks of incarceration? If there are differences in the opportunities to rent, are they statistically significant?* [*Id.* at 6.]

56. Dr. Parnell does not describe his testing method, but he does provide a reference to a Web application[41]. It implements a "Z test of a difference of proportions." This is a special case[42] of

---

essential to know this, because the Normal distribution is an approximation that applies only under certain conditions *which need to be verified by the statistician*.

[41] https://www.socscistatistics.com/tests/ztest/. The only apparent documentation for this Web app is a formula on the same page that employs an undefined term, $\bar{p}$. My account of what this app does (*infra*) is based on comparing the app's outputs with results computed by reliable statistical software.

[42] The proportion of people with a given characteristic in a group is the average of the characteristic's "indicator function," which equals 1 for anyone with the characteristic and 0 for all others. This observation (that a proportion is a kind of average) reduces the problem of comparing two proportions to that of comparing two averages. When comparing two proportions, the "SDs" (*infra*) can computed from the sample sizes and averages: they do not have to be supplied as separate inputs. All the assumptions

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED

2020-05-01

the method to compare two sample averages described in any elementary statistical textbook. The software computes a "z-statistic" and converts that to a "p-value" using a table of the standard Normal distribution.  Freedman *et al.* (1998) write [at p. 507, emphasis added],

> *The two-sample z-statistic is computed from –*
>
> - *The sizes of the two samples,*
>
> - *The averages of the two samples,*
>
> - *The SDs [standard deviations] of the two samples.*
>
> **The test assumes two independent simple random samples.**

57. The foregoing assumptions enable the software to estimate a standard error for the observed difference in the sample proportions.  The z-statistic expresses the difference in proportions as a multiple of its standard error.  For instance, the Z value of 51.62 in Dr. Parnell's Table 4 (comparing "Blacks" to "Whites" among all renting households in the New Haven Market) means the difference in proportions, 10.61% - 2.39%, is more than 51 times the estimated standard error of that difference.

58. I have confirmed this characterization of Dr. Parnell's calculations by using standard statistical software [R Core Team (2019)] to reproduce[43] the 16 z-values and 16 p-values in his Table 4, as well as by applying his Web application to values in his Table 4.

---

needed to apply the test to averages also apply to proportions.  In particular, the test of proportions assumes its inputs describe two independent simple random samples.

[43] Table 4 contains some errors.  For instance, its Z value of "7.84" for the "Risk-$50,000-$69,999" group of African Americans compared to Whites should be 3.74.  But in the great majority of cases my calculations agree with Table 4 exactly.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED                                          2020-05-01

59. Dr. Parnell's method is inapplicable to any of his data and consistently produces grossly wrong results.  His method is inapplicable because he does not have[44] simple random samples of households in Connecticut housing markets (recall the textbook caution at the end of ¶56).  Instead, Dr. Parnell manufactures sample data by multiplying *uncertain estimates of the market sizes* by the *uncertain risk estimates* of Dr. Wildeman's Table 1.  Although that produces numbers the Web application can compute with, the process is incorrect because the software computes the standard error incorrectly: it is not aware that all its inputs are extrapolated from estimates and that they are not based on actual random samples.   Consequently, the values of Z are erroneous and the "p" values in Dr. Parnell's Tables 4 – 12 are meaningless.

60. The inaccurate treatment of uncertainty in the data extends to the census reports on which Dr. Parnell relies.   He uses *estimates* from the American Community Survey [Parnell (2020a) at p. 4].  These are not actual counts from the decennial census.  They originate in an ongoing survey that reaches less than 3% of all households every year [US Census (2017)].  The Census Bureau is clear that these estimates are imprecise: when using ACS datasets, "you must think about the balance between currency and sample size/reliability/precision" [US Census (2020)].  "ACS estimates are based on a sample of the population – Creates uncertainty in the data" [Fuller (2018) at p. 4].  The Census Bureau makes its "Margins of Error" (MoEs) available with ACS data downloads.  The

---

[44] Dr. Parnell was unable to describe correctly what a "random sample" means in this context or even to characterize how a simple random sample differs from a population, a complex survey sample, or a sample obtained without any randomization.  See his testimony quoted in footnotes 9 and 13 *infra*.

CONFIDENTIAL                                                    2020-05-01
ATTORNEY-CLIENT PRIVILEGED

MoEs are fixed multiples of the standard errors.  By ignoring[45] the MoEs and treating the ACS

data as perfectly precise, Dr. Parnell compounds his errors in analyzing Dr. Wildeman's risk

estimates.

61. As an example of how wrong Dr. Parnell's results are, consider his test of disparities for Hispanics

in Connecticut (overall[46]) with a four-year lookback period.  This is a group to which plaintiff

Mikhail Arroyo belongs (see ¶22).  Based on Dr. Wildeman's estimated risks of 0.25% for Whites

and 0.39% for Hispanic with a four-year lookback period, together with estimated counts of

White and Latino "Renting Households" in Connecticut, Dr. Parnell's Table 12 reports a Z value of

10.20 and a p value of 0.001.  The latter is a basis of his conclusion "All differences in the risk of

incarceration …  between White and Latino households that rent are statistically significant at the

.0001 level" [Parnell (2020a) at 20][47].

62. In fact, these statistics reflect a cascade of errors that exaggerate Dr. Parnell's results by

astronomical amounts.  The standard error in the difference 0.39% - 0.25% of Dr. Wildeman's

---

[45] Data tables supplied by Dr. Parnell appear to contain the PUMS and ACS data he used in his analyses. They also contain, systematically, margins of error.  (These data are produced by the Census Bureau which reports a "Margin of Error" equal to 1.645 times a standard error.)

[46] I selected this example because the uncertainties in the Connecticut demographic data are smaller than in the county-level data, allowing me to ignore them for this illustration.  For the county-level tests it would be important to incorporate the demographic uncertainties.  That would make the discrepancies between Dr. Parnell's results and the correct values even larger.

[47] The discrepancy between the "0.001" in Table 12 and "0.0001" in the text is present in the original.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED

2020-05-01

estimates[48] implies the Z value should be 0.65, far below Dr. Parnell's value[49] of 10.2 (which is incorrectly reported: the Web applet he uses reports it should be 7.3).  The correct Z value of 0.65 leads to a p value of 0.51, which indicates the difference in White and Hispanic risks is completely insignificant: indeed, it is slightly *smaller* than the differences one would expect to observe purely though chance[50].  The p value corresponding to Dr. Parnell's Z value of 10.2 is astronomically small (2 in one trillion trillion)[51].  Through this succession of conceptual, computational, and statistical errors, Dr. Parnell has turned a wholly insignificant difference into an unbelievably strong level of "statistical significance."

63. Every one of Dr. Parnell's results is subject to errors of a similar magnitude for the same reasons – and they are all in the same direction, providing incorrectly large indications of statistical significance.

---

[48] It is reasonable to assume these estimates are statistically independent.  In such circumstances the standard error of the difference equals the root mean square of the standard errors of the estimates, equal to $\sqrt{(0.10\%^2 + 0.19\%^2)} = 0.215\%$.

[49] This value is the ratio of the risk difference, $0.14\% = 0.39\% - 0.25\%$, to the standard error of that difference.  Combined with Z = 10.2, algebra permits recovery of the standard error as $0.14\% / 10.2 = 0.0137\%$.  This is far less than any of the NLSY79 standard errors.

[50] Figure 2 illustrates this: the plot in the bottom left corner presents Dr. Wildeman's risk estimates for Hispanics (green) and Whites (blue) for the four-year lookback period.  The confidence limits (shown by the vertical black bars) overlap and are much larger than the difference in bar heights, showing that the nominal difference in bar heights is tiny compared to the uncertainties in those heights.

[51] The p-value for the smaller Z of 7.3, as actually reported by Dr. Parnell's software, would still be less than one in a trillion.

CONFIDENTIAL                                                    2020-05-01
ATTORNEY-CLIENT PRIVILEGED

## Additional considerations of spatial variability

64. "Spatial variability" occurs when some characteristic of people changes according to where they live.  It can refer to differences *between* two states, housing markets, or neighborhoods; and it can refer to differences *within* any specified region.  Spatial variability is an important consideration in applying national (or state) estimates to smaller geographic units like counties or housing markets: large spatial variability implies the conditions in those markets may differ greatly from each other and from the national average.

65. Variation between states and counties in the US is relevant to the question, "how much could incarceration risks for identifiable groups of people in Connecticut (or its counties) differ from the average national risks?"  Statistical characteristics for large regions tend to vary less among themselves than for smaller regions, because variability within large regions gets "averaged out." Consequently, we should expect *greater* variability in racial disparity to exist over *smaller* spatial distances, such as between neighborhoods in a city or adjacent housing markets in Connecticut. Dr. Wildeman's academic research supports this expectation at the county level in Arkansas [Eason *et al.* (2017), as discussed in Dr. Wildeman's deposition (2019b) at pp. 49 *et seq.*].

66. This reasonable expectation of high spatial variability in racial disparity over short distances implies it is not valid to assume *national estimates* (as in Dr. Wildeman's Table 1) or even extrapolations of them to *an entire state* (such as Connecticut or Arkansas) are applicable to particular neighborhoods or local housing markets.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED

2020-05-01

## References

American Statistical Association (ASA) (2018).  *Ethical Guidelines for Statistical Practice*.  April 14, 2018.

Arroyo000642 (2016). Safe Rent / Lease Decision.  Copy of software output for Transaction No. 0046398130, Property M6360 – ArtSpace Windham – Willimantic CT 06226.  April 26, 2016.

Carson, E. Ann Ph.D (2015). *Prisoners in 2014*. U. S. Department of Justice, September 2015.

CHRR (1997).  *NLSY Techincal* [sic] *Sampling Report Addendum*. *Standard Errors and Deft Factors for Rounds IV through XVI*.  March 1997.

Complaint (2018).  *Connecticut Fair Housing Center and Carmen Arroyo, individually and as next friend for Mikhail Arroyo v. CoreLogic Rental Property Solutions, LLC*, April 24, 2018.  Filed in the United States District Court District of Connecticut.  Case 3:18-cv-00705-VLB.

Frankel, M.R., H.A. McWilliams, and B.D. Spencer (1983).  *National Longitudinal Survey of Labor Force Behavior, Youth Survey (NLS) Technical Sampling Report*.  August 1983.  Available through NLS User Services, usersvc@ postoffice.chrr .ohio-state.edu.

Freedman, David, Robert Pisani, and Roger Purves (1998).  *Statistics*.  3rd Edition, W. W. Norton & Company.

Fuller, Sirius (2017).  *Using American Community Survey Estimates and Margins of Error. Decennial Statistical Studies Division*, U. S. Census Bureau, April 18, 2018.  Webinar slides available online at https://www.census.gov/programs-surveys/acs/guidance/training-presentations/acs-moe.html (accessed April 17, 2020).

Gibbons, Jean D. (1973). *A Question of Ethics*, The American Statistician, 27:2, 72-76.

Harrell, Frank (2019).  *Statistical Problems to Document and to Avoid*.  Vanderbilt University, Nov 28 2019.  http://biostat.mc.vanderbilt.edu/wiki/Main/ManuscriptChecklist.

HUD (2016).  *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions*.  April 4, 2016.

International Statistical Institute (ISI) (2010). *Declaration on Professional Ethics*.  22 & 23 July 2010.

Kacirk, Jay (2019).  *Expert Report and Opinion*.  Connecticut Fair Housing Center, *et al v*. CoreLogic Rental Property Solutions, LLC.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED

2020-05-01

Kass, Robert E., Brian S. Caffo, Marie Davidian, Xiao-Li Meng, Bin Yu, Nancy Reid (2016). *Ten Simple Rules for Effective Statistical Practice*.  PLOS Computational Biology, June 9, 2016.  https://doi.org/10.1371/journal.pcbi.1004961.

Kayani, Naeem (2019).  *Declaration of Naeem Kayani*.  November 11, 2019.

Mallows, Colin (1998).  *The Zeroth Problem*.  The American Statistician 52:1, pp 1 – 9.

Parnell, Allan M (2020a).  *Declaration of Allan M. Parnell, Ph.D.*  March 20, 2020.  US District Court, District of Connecticut, Case No. 3:18-CV-705 (VLB).

Parnell, Allan M (2020b).  *Deposition of Allan McMillan Parnell, Ph.D.*.  April 24, 2020.  US District Court, District of Connecticut, Case No. 3:18-CV-705 (VLB).

R Core Team (2019).  *R: A Language and Environment for Statistical Computing*.  R Foundation for Statistical Computing.  https://www.R-project.org

Stuart, Alan and J. Keith Ord (1987).  *Kendall's Advanced Theory of Statistics.  Volume I Distribution Theory*.  Fifth Edition, Oxford University Press.

U.S. Census Bureau (2020).  When to Use 1-year, 3-year, or 5-year Estimates.  https://www.census.gov/programs-surveys/acs/guidance/estimates.html (accessed April 17, 2020).

U.S. Census Bureau (2017).  *American Community Survey Information Guide*.  October 2017.

Wildeman, Christopher (2019a).  Expert Report of Christopher Wildeman.  December 19, 2018.  US District Court, District of Connecticut, Case No. 3:18-CV-705 (VLB).

Wildeman, Christopher (2019b).  Transcript of Christopher Wildeman. September 3, 2019.  Connecticut Fair Housing Center -v- CoreLogic Rental Property Solutions, LLC.

### Publications by Dr. Wildeman and co-authors

Eason, J.M., D. Zucker, and C. Wildeman (2017).  *Mass Imprisonment across the Rural-Urban Interface*.  Annals, AAPSS, 672, July 2017.

Kim, H., C. Wildeman, M. Jonson-Reid, and B. Drake (2017). *Lifetime Prevalence of Investigating Child Maltreatment Among US Children*.  AJPH February 2017, Vol 107, No. 2.

Lee, H., C. Wildeman, E.A. Wang, N. Matusko and J.S. Jackson (2014). *A Heavy Burden: The Cardiovascular Health Consequences of Having a Family Member Incarcerated*.  March 2014, Vol 104, No. 3 | American Journal of Public Health.

CONFIDENTIAL                                                                          2020-05-01
ATTORNEY-CLIENT PRIVILEGED

Papachristos, A. V., C. Wildeman, and E. Roberto (2014). *Tragic, but not random: The social contagion of nonfatal gunshot injuries.*  Social Science & Medicine xxx (2014) 1e12.

Turney K. and C. Wildeman (2015). *Detrimental for Some? Heterogeneous Effects of Maternal Incarceration on Child Wellbeing*. Criminology & Public Policy Volume 14 Issue 1 (2015). Pp 125-156.

Turney K., C. Wildeman, and J. Schnittker (2012).  *As Fathers and Felons: Explaining the Effects of Current and Recent Incarceration on Major Depression*.  Journal of Health and Social Behavior 53(4) 465–481 DOI: 10.1177/0022146512462400.

Wakefield, S. and C.  Wildeman (2011). *Mass imprisonment and racial disparities in childhood behavioral problems*. Criminology & Public Policy Volume 10 Issue 3 pp 793-217 (2011).

Wildeman, Christopher (Undated).  Parental Incarceration, Child Homelessness, and the Invisible Consequences of Mass Imprisonment.  Fragile Families Working Paper: WP09-19-FF.

Wildeman, Christopher (2009).  Parental Imprisonment, the Prison Boom, and the Concentration of Childhood Disadvantage.   Demography. 2009 May; 46(2): 265–280

Wildeman, Christopher (2010a).  Imprisonment and Infant Mortality.  Population Studies Center, U. Michigan ISR.  Report 09-692 November 2009; Revised May 2010.

Wildeman, Christopher (2010b).  Paternal Incarceration and Children's Physically Aggressive Behaviors: Evidence from the Fragile Families and Child Wellbeing Study.  Social Forces 89(1) 285–310, September 2010.

Wildeman, C. and C.  Muller (2012). *Mass Imprisonment and Inequality in Health and Family Life*. Annu. Rev. Law Soc. Sci. 2012. 8:11–30.

Wildeman, C., J. Schnittker, and K. Turney (2012). *Despair by Association? The Mental Health of Mothers with Children by Recently Incarcerated Fathers*.  Psychology, 2012. DOI:10.1177/0003122411436234.

Wildeman, C. and N.  Emanuel (2014). *Cumulative Risks of Foster Care Placement by Age 18 for U.S. Children, 2000–2011*.  PLOS ONE 1 March 2014 | Volume 9 | Issue 3 | e92785.

Wildeman, C., N. Emanuel, J.M. Leventhal, MD; E. Putnam-Hornstein, J. Waldfogel, and H. Lee (2014). *The Prevalence of Confirmed Maltreatment Among US Children, 2004 to 2011*. JAMA Pediatr. 2014;168(8):706-713. doi:10.1001/jamapediatrics.2014.410.

Wildeman, C. and E. A. Wang (2017). *Mass incarceration, public health, and widening inequality in the USA*.  The Lancet Vol 389 April 8, 2017.  Pp 1464-74.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED                                    2020-05-01

## Others

A list of documents provided to me by counsel for CoreLogic Rental Property Solutions is attached.

CONFIDENTIAL                                                                    2020-05-01
ATTORNEY-CLIENT PRIVILEGED

## Tables

*Table 1 Dr. Wildeman's Table 1 with Standard Errors Added*

| | Percentage experiencing the event | | | | | |
|---|---|---|---|---|---|---|
| | White | | African American | | Hispanic | |
| | % | SE % | % | SE % | % | SE % |
| **Entire NLSY97 Cohort** | | | | | | |
| Ever | 2.39 | (0.31) | 10.61 | (0.73) | 5.99 | (0.73) |
| Last ten years | 1.04 | (0.21) | 6.05 | (0.57) | 3.07 | (0.53) |
| Last seven years | 0.58 | (0.16) | 2.77 | (0.39) | 1.19 | (0.33) |
| Last four years | 0.25 | (0.10) | 1.27 | (0.27) | 0.39 | (0.19) |
| | | | | | | |
| **Those earning >70K in 2015** | | | | | | |
| Ever | 0.22 | (0.20) | 3.53 | (1.45) | 0.67 | (0.68) |
| Last ten years | --- | | 0.71 | (0.66) | --- | |
| Last seven years | --- | | --- | | --- | |
| Last four years | --- | | --- | | --- | |
| | | | | | | |
| **Those earning 50K-70K in 2015** | | | | | | |
| Ever | 1.83 | (0.74) | 2.85 | (1.22) | 3.59 | (1.55) |
| Last ten years | 0.51 | (0.39) | 0.77 | (0.64) | 1.34 | (0.96) |
| Last seven years | --- | | 0.77 | (0.64) | --- | |
| Last four years | --- | | 0.26 | (0.37) | --- | |
| | | | | | | |
| **Those earning 30K-50K in 2015** | | | | | | |
| Ever | 1.06 | (0.46) | 5.93 | (1.35) | 2.54 | (1.14) |
| Last ten years | 0.42 | (0.29) | 2.94 | (0.96) | 0.64 | (0.58) |
| Last seven years | 0.32 | (0.26) | 1.15 | (0.61) | --- | |
| Last four years | --- | | --- | | --- | |
| | | | | | | |
| **Those earning <30K in 2015** | | | | | | |
| Ever | 4.45 | (0.65) | 14.34 | (1.05) | 9.38 | (1.22) |
| Last ten years | 2.10 | (0.45) | 8.65 | (0.84) | 5.27 | (0.93) |
| Last seven years | 1.23 | (0.35) | 3.99 | (0.58) | 2.26 | (0.62) |
| Last four years | 0.58 | (0.24) | 2.00 | (0.42) | 0.75 | (0.36) |

**Sources**: estimates are from [Wildeman (2019a)].  Standard errors were computed as explained at ¶42.  Dashes (---) are from the original, indicating there were insufficient data to make an estimate.

CONFIDENTIAL                                                              2020-05-01
ATTORNEY-CLIENT PRIVILEGED

*Table 2 Dr. Wildeman's Table 1 "Racial Disparities" with Standard Errors Added*

| | Racial disparity | | | |
| | African American/White | | Hispanic/White | |
| | Ratio | SE | Ratio | SE |
|---|---|---|---|---|
| **Entire NLSY97 Cohort** | | | | |
| Ever | **4.44** | **(0.65)** | **2.51** | **(0.45)** |
| Last ten years | **5.82** | **(1.30)** | **2.95** | **(0.78)** |
| Last seven years | **4.78** | **(1.48)** | *2.05* | *(0.80)* |
| Last four years | *5.08* | *(2.30)* | 1.56 | (0.98) |
| | | | | |
| **Those earning >70K in 2015** | | | | |
| Ever | 16.05 | (16.01) | 3.05 | (4.15) |
| Last ten years | --- | | --- | |
| Last seven years | --- | | --- | |
| Last four years | --- | | --- | |
| | | | | |
| **Those earning 50K-70K in 2015** | | | | |
| Ever | 1.56 | (0.92) | 1.96 | (1.16) |
| Last ten years | 1.51 | (1.71) | 2.63 | (2.75) |
| Last seven years | --- | | --- | |
| Last four years | --- | | --- | |
| | | | | |
| **Those earning 30K-50K in 2015** | | | | |
| Ever | *5.59* | *(2.74)* | 2.40 | (1.50) |
| Last ten years | *7.00* | *(5.35)* | 1.52 | (1.74) |
| Last seven years | 3.59 | (3.49) | --- | |
| Last four years | --- | | --- | |
| | | | | |
| **Those earning <30K in 2015** | | | | |
| Ever | **3.22** | **(0.53)** | **2.11** | **(0.41)** |
| Last ten years | **4.12** | **(0.97)** | **2.51** | **(0.70)** |
| Last seven years | **3.24** | **(1.04)** | *1.84* | *(0.73)* |
| Last four years | *3.45* | *(1.60)* | 1.29 | (0.82) |

**Notes:**
Red numbers indicate ratios that are wholly unreliable (¶48).
Gray italicized numbers indicate ratios not significantly different from 1:1.
Dashes (---) are from the original, indicating there were insufficient data to make an estimate.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED                                                2020-05-01

# Figures

*Figure 1 Lifetime risk of jail (according to Dr. Wildeman's Table 1)*



## Notes

**Only the bold bars indicate significant racial disparities.**  The intensity of any bar depicting risks for African Americans (red color) or Hispanics (green color) is reduced whenever the corresponding "racial disparity" index (in comparison with Whites in the same group, shown in blue) is not significantly different from 1.  The intensity of the bars depicting risks for Whites is reduced whenever *both* of the comparisons to African Americans and Hispanics in the same group are not significant.

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGED

2020-05-01

*Figure 2 Lifetime risk of jail (according to Dr. Wildeman's Table 1), Detail*



CONFIDENTIAL                                                               2020-05-01
ATTORNEY-CLIENT PRIVILEGED


**NB** The purpose of Figure 2 is to display the estimates and standard errors shown in Figure 1 more clearly.  To this end, (a) the vertical scales vary from row to row and (b) the colors of the bars are not altered to indicate lack of significant disparities.