## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CONNECTICUT FAIR HOUSING CENTER *et al.*, | : | |
| | : | |
| | : | No. 3:18-CV-705 (VLB) |
| Plaintiffs, | : | |
| | : | |
| v. | : | August 7, 2020 |
| | : | |
| CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC, | : | |
| Defendant. | : | |
| | : | |

## Memorandum of Decision on Motions for Summary Judgment [Dkts. 87, 112, 116]

Plaintiffs Connecticut Fair Housing Center ("CFHC") and Carmen Arroyo ("Ms. Arroyo"), individually and as next friend for Mikhail Arroyo ("Mr. Arroyo") (collectively, "Plaintiffs") bring the instant litigation against Defendant CoreLogic Rental Property Solutions, LLC ("Defendant" or "RPS") alleging that RPS violated the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA"), the Connecticut Unfair Trade Practice Act, Conn. Gen. Stat. §§ 42-110a *et seq.* ("CUTPA") and the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA").

In April of 2016, Carmen Arroyo attempted to move her disabled son, Mikhail Arroyo, for whom she was conservator, into her apartment complex ArtSpace Windham, but his application was rejected. Two separate actions by defendant CoreLogic Rental Property Solutions, LLC regarding that incident motivate the instant lawsuit: first, CoreLogic RPS, through its CrimSAFE product, notified apartment manager WinnResidential that "disqualifying records" were found for Mr. Arroyo; second, RPS did not disclose Mr. Arroyo's criminal records to Ms.

1

Arroyo on behalf of Mr. Arroyo until the start of this litigation, despite her numerous requests and provision of many documents.

RPS has filed a Motion for Summary Judgment as to the entirety of the action. [Dkts. 112 (Redacted Version) and 114 (Unredacted Version)]. Plaintiffs have filed two separate Motions for Partial Summary Judgment: one as to their file disclosure claims [Dkt. 87], and one to their race and national origin discrimination FHA and CUTPA claims. [Dkts. 116 (Redacted Version) and 118 (Unredacted Version)]. The parties have filed oppositions and replies for each motion. For the following reasons, the Court grants in part and denies in part RPS's motion for summary judgment and denies Plaintiffs' motions for partial summary judgment.

I.     **Material Facts[1]**

A. *Parties*

Mikhail Arroyo is a Latino man. [Dkt. 118-1 (Pl.'s 56(a)1 Statement) ¶39]. Mr. Arroyo is significantly disabled.   *Id.* ¶40.   His disabilities were caused by an accident in July 2015. *Id.* ¶40. Mr. Arroyo was hospitalized until early 2016, when he was transferred to a nursing home to continue to recover from his injuries. *Ibid.*

---

[1] **All facts are taken from the parties' unredacted statements of undisputed facts for the purposes of deciding these motions only. If a fact stated in one party's 56(a)1 statement is admitted by the other party in its 56(a)2 statement and is supported by the underlying exhibits, the Court cites to the statement in which the fact first appeared. D. Conn. L. Civ. R. 56(a). For all other facts, the Court cites to the underlying exhibit. The Court will issue an order on the parties' motions to seal in short order.**

The Connecticut Probate Court appointed Carmen Arroyo Mikhail Arroyo's conservator in August of 2015.[2],[3].

The Connecticut Fair Housing Center ("CFHC") is a housing advocacy non-profit. RPS is a national tenant screening company that offers tenant screening products under the rubric of "Rental Property Solutions," which it has described

---

[2] In Connecticut, a conservator may only be appointed in the following circumstances:

> (f) (1) If the court finds by clear and convincing evidence that the respondent is incapable of managing the respondent's affairs, that the respondent's affairs cannot be managed adequately without the appointment of a conservator and that the appointment of a conservator is the least restrictive means of intervention available to assist the respondent in managing the respondent's affairs, the court may appoint a conservator of his or her estate after considering the factors set forth in subsection (g) of this section.

> (2) If the court finds by clear and convincing evidence that the respondent is incapable of caring for himself or herself, that the respondent cannot be cared for adequately without the appointment of a conservator and that the appointment of a conservator is the least restrictive means of intervention available to assist the respondent in caring for himself or herself, the court may appoint a conservator of his or her person after considering the factors set forth in subsection (g) of this section.

> (3) No conservator may be appointed if the respondent's personal needs and property management are being met adequately by an agency or individual appointed pursuant to section 1-43, 19a-575a, 19a-577, 19a-580e or 19a-580g.

Conn. Gen. Stat. § 45a-650 (2015).

[3] See [Dkt. 125-10 (Pls.' Opp. to Def.'s Mot. Summ. J. Ex. 8: 6/14/16 Arroyo File Disclosure) at 3]; [Dkt. 125-12  (Pls.' Opp. to Def.'s Mot. Summ. J. Ex. 8: 11/15/16 Arroyo File Disclosure) at 5]. The Court finds that these documents themselves would not be admissible evidence as they are not authenticated per Federal Rule Evidence 901 and 902, but, per Federal Rule 56(c), they might point to the existence of documents that would be admissible. Further, RPS has not disputed for the purposes of this motion that Carmen Arroyo is Mikhail Arroyo's conservator.

as a "comprehensive leasing decision service to the single and multifamily housing industry." [Dkt. 114-1 (Def's 56(a)1 Statement of Material Facts) ¶1]. One of those products is "Registry CrimSAFE" ("CrimSAFE"). *Id.* ¶5. RPS provides this service to managers of more than 120 properties in Connecticut. [Dkt. 118-1 ¶ 100].

Though not a party, WinnResidential also plays a central role in this litigation. It is one of the largest property management companies in the country. [Dkt. 118-1 ¶29]. WinnResidential has used RPS's screening products since 2008. *Id.* ¶30. In 2016, WinnResidential managed ArtSpace Windham, an apartment complex in Connecticut where Carmen Arroyo resided and applied for housing on behalf of Mikhail Arroyo. *Id.* ¶41.

### B. *CrimSAFE's Role in Rental Housing Application Evaluations*

For each housing applicant, CrimSAFE filters and then categorizes any identified crimes according to their severity levels under varying state and federal law, as well as the type of crime. *Id.* ¶5. CrimSAFE then applies the leasing criteria chosen by the housing provider from the menu offered by CrimSAFE to any records found and informs the housing provider whether "disqualifying" records are found. *Id.* ¶5. Disqualifying records consist of both convictions and other charges, including arrests which have not led to a conviction. *See* [Dkt. 118-4 (Ex. 22 to Pl.'s Mot. Summ. J.].

To use CrimSAFE, a landlord fills out a short electronic form, generated by RPS, that lists general categories of crimes for which CrimSAFE can screen. [Dkt. 118-1 ¶8]. A landlord establishes the leasing criteria by selecting from the list the crimes which it wants CrimSAFE to screen. *Id.* These criminal categories track

verbatim those created by the FBI's National Incident Based Reporting System. [Dkt. 129-1 (Def.'s 56(a)2 Statement of Facts) ¶8]. For each criminal category, the landlord enters the maximum number of years back CrimSAFE should look "to decline an applicant for the specified type of crime" (hereinafter, "lookback period"). [Dkt. 118-1 ¶8]. The CrimSAFE configuration webpage explains that "applicants whose criminal record[s] are older than the number of years for the specified crime will result in an accept for your community." *Id.* The maximum lookback periods are 99 years for convictions and 7 years for non-convictions. *Id.* ¶ 11.

When a landlord receives a rental application, it provides RPS the applicant's first and last name, date of birth, and current address (and optionally the middle name). [Dkt. 118-1 ¶14]. RPS then searches its database for criminal records that match the applicant. *Ibid.* If a criminal record is matched to the applicant, RPS determines the category, if the record is felony or not, and if conviction or not. *Id.* ¶16.[4] After locating and categorizing a record that has been matched to the applicant, RPS compares the age of the record with the lookback period for the given category. *Id.* ¶17. If the applicant has a record within the landlord's chosen

---

[4] If the offense has been categorized in the past and appended to a master offense table, this process is fully automated. *Ibid.* If the offense's category has not been appended to the master table, it is placed in a queue to be manually categorized. *Ibid.* All offenses categorized in the master offense table have been manually processed by employees and/or contractors of CoreLogic. *Ibid.* The RPS database reflects records obtained from more than 800 different jurisdictions/sources, for a total of more than 579 million records spanning more than 10 million unique offense descriptions, which RPS has decades of experience in standardizing and integrating into its database. [Dkt. 114-1 at ¶16].

category and lookback period, CrimSAFE notifies the leasing agent of disqualifying "record(s) found," and directs the housing provider to "proceed with their communities screening policies." *Id.* ¶19.

In 2016, the period at issue here, the cover page of the RPS's screening report for leasing agents was titled "Lease Decision," and listed a "Crim Decision," which tracked the CrimSAFE result, and stated "Record(s) Found" if disqualifying records were found. *Id.* ¶ 20; *see* [Dkt. 114-2 (Kayani Decl.) at Ex. C (Leasing Agent Version of Arroyo Background Screening Report)].

RPS has marketed and sold CrimSAFE as rendering a decision on an applicant's suitability for tenancy based on their criminal history. [Dkt. 118-1 at ¶5]. It has described the removal of "human bias or judgment" as a "benefit" of its CrimSAFE product. *Id.* at ¶6. In configuration instructions it has provided, it states, "A criminal record generally contains information on the type of crime, degree and level of crime, and date of offense. With CrimSAFE, this public record information is evaluated and used to provide a decision based on the client's pre-determined criminal decision policy." *Id.* at ¶9.

RPS allows CrimSAFE customers to disclose or suppress information underlying disqualification from its staff and housing applicants. *Id.* ¶ 26.  If a customer chooses to suppress disclosure of the underlying criminal record from its onsite leasing staff, they see only whether disqualifying records are found or not. *Id.* ¶ 26. Landlords have the option of having adverse action letters automatically delivered to applicants via email when CrimSAFE has found

disqualifying records in order to notify them that their applications have been declined. *Id.* at ¶24.

CrimSAFE is only one of RPS's screening products: RPS also offers separate tenant screening products which simply identify and return criminal public records of a housing applicant to the housing provider, but which do not themselves filter or categorize the results in any way. [Dkt. 114-2 (Kayani Decl.) ¶¶4-5].

The parties provide conflicting evidence on whether CrimSAFE always returns a copy of the underlying report that displays the full public data of an applicant's criminal record to someone at the client housing provider. RPS's executive Naeem Kayani declares that it does. [Dkt. 114-2 (Kayani Decl.) ¶7]. Plaintiffs point to a 2016 training which states that, if a housing provider unchecks a box on the CrimSAFE configuration page, none of its users have access to the reports containing the full public records. [Dkt. 118-3 (Ex. 13 to Pl.'s Mot. Summ. J.: 2016 Training) at 37]; [Dkt. 118-4 [Ex. 22 to Pl.'s Mot. Summ. J.:  2016 Configuration Page Example)], [Dkt. 116-18 (Ex. 15 to Pl.'s Mot. Summ. J.: Thomas Dep.) at 71-72].

In its proposal to WinnResidential, RPS wrote that, with CrimSAFE, "criminal record search results are evaluated using our own advanced, proprietary technology and an accept/decline leasing decision is delivered to your staff." *Id.* at ¶33]. RPS's proposal to WinnResidential explains that "[u]sers who choose to have their rental decisions automated using ScorePLUS® and CrimSAFE® may suppress the full reports from the view of their on-site staff. WinnResidential

currently uses this option and the site managers view a decision report." *Id.*at ¶ 36.[5]  WinnResidential also does not disclose the basis for an applicant's denial to the applicant, except to inform them that the denial is based on RPS's screening report. *See* [Dkt. 114-2]. RPS serves many customers with affordable/subsidized properties. [Dkt. 114-4 (Dachtler Decl.) ¶5]. For instance, the majority of Winn Residential's rental units are federally-subsidized/affordable properties. *Id.*

Fewer than 7% of all rental housing applicants in Connecticut between 2016 and the present have had any "record found" through CrimSAFE. [Dkt. 118-1 ¶11].

### C. *CrimSAFE, Race and Ethnicity, and Criminal Records*

CrimSAFE uses data from a national database of criminal records that RPS aggregates from multiple sources, including incarceration records and court records of criminal cases for both charges and convictions obtained from state departments of corrections and administrative offices of the courts. [Dkt. 118-1 ¶65]. RPS receives and records the race and ethnic background for close to 80% of housing applicants who did match with a criminal record.  [Dkt. 118-15 (Ex. 47 to Pl.'s Mot. Summ. J.: RPS Documentation of Race)]). But RPS is not aware of the of the race or ethnicity of housing applicants who *did not match* with such a criminal record. [Dkt. 126-2 (Ex. 1 to Pl.'s Opp: Kayani Dep.) at 207:14-25].

---

[5] As previously detailed, the parties dispute whether the full criminal records are always delivered to someone at the client.

Data reveal that disparities adverse to African Americans and Latinos[6] and in favor of whites[7] exist at all stages of the criminal justice process: in arrest rates, in jail detention rates, and in prison incarceration rates. *Id.* ¶73. African Americans in the United States are more than four times as likely as whites, and Latinos two-and-a-half times as likely as whites, to have been either jailed or incarcerated at some point in their lifetimes. [Dkt. 118-1 ¶72]. National data from 2015 demonstrate that African Americans and Latinos are more likely to experience jail or prison incarceration than Whites, regardless of income level. *Id.* ¶¶ 74-77. The disparity in incarceration rates for African Americans in Connecticut is just over twice the disparity at the national level, while for Latinos in Connecticut, the disparity is three times the disparity at the national level. *Id.* ¶ 80. Overall, 10.61% of African Americans nationally experience either jail or prison during their lifetime. *Id.* ¶ 81. Among African Americans who were earning less than $30,000 in 2015, 14.34% nationally had been in jail or prison in their lifetime. *Id.* ¶ 82.

The above data do not distinguish between innocent individuals who have been charged but not convicted of a crime and guilty individuals who have been convicted of committing a crime. The Court takes judicial notice of shorter-term data that confirm that disparities exist both for individuals who are jailed and for individuals who are imprisoned, though the disparity in imprisonment rates is

---

[6] The Court follows the Plaintiffs in using the term "Latinos" as a noun to refer to a group of people of Latin American family origin that includes at least one person who does not identify as female.

[7] The term "white" is here used to refer to non-Latino whites and the term African-American is here used to refer to non-Latino African-Americans, except where otherwise noted.

greater. At year-end in 2015 in the United States, 169 in 100,000 white adults were incarcerated in jails, 174 in 100,000 Latino adults were incarcerated in jails, and 607 in 100,000 African American adults were incarcerated in jails.[8] Zhen Zeng, *Jail Inmates in 2016*, Bureau of Justice Statistics (Feb. 2018), at Table 2, *available* at https://www.bjs.gov/content/pub/pdf/ji16.pdf; *see* Fed. R. Evid. 201(b)-(c). Also at year-end in 2015 in the United States, 312 in 100,000 whites were imprisoned for sentences of more than 1 year, 820 in 100,000 Latino adults were imprisoned were imprisoned for sentences of more than one year, and 1,745 in 100,000 African American adults were imprisoned for sentences of more than one year. E. Ann Carson and Elizabeth Anderson, *Prisoners in 2015*, Bureau of Justice Statistics at 2, Figure 4 (Dec. 2016), available at https://www.bjs.gov/index.cfm?ty=pbdetail&iid=5869.

As to arrests, Latinos comprised 42% of federal drug arrests made in 2014, nearly three times their share of the population. [Dkt. 118-1 ¶71]. [9] In total, 64% of

---

[8] The Court follows the Plaintiffs in using the term "Latino" as an adjective when referring to a group of people of Latin American family origin that includes at least one person who do not identify as female.

[9] Citing Mark Motivans, Bureau of Justice Statistics, U.S. Department of Justice, Federal Justice Statistics, 2013-14, at 10 (March 2017), https://www.bjs.gov/content/pub/pdf/fjs1314.pdf; 2014 ACS 1-year Demographic Estimates. Defendants object that this data is irrelevant to the proposition for which it is used, given that it is only specific to federal drug arrests, but the Court finds that it is sufficiently relevant, as drug arrests were the second most common federal arrest in 2014 after immigration. Motivans at 7.  Further, accurate data on overall arrests of Latinos from criminal justice institutions is limited, as demonstrated below for Connecticut.

Plaintiffs do not present national total arrest data, though Plaintiffs' expert Dr. Christopher Wildeman stated, that his certainty "would be extremely high" "that the disparities [he] observed in the incarceration data also exist at the level of arrest, charge and conviction" because "the transition probabilities from each stage would have to be so much lower for Whites than for Native Americans and

federal drug arrests were of Latinos and African Americans, who comprised 29% of the total population. *Id.* Only 31% of federal drug arrestees were of whites, less than half their share of the population. *Id.* African Americans and Latinos are more likely than whites to be arrested, convicted, and sentenced for drug offenses even though their rates of drug use are comparable to those of whites. *Id.*

In 2016, African Americans comprised 29.88% of all arrestees in the State of Connecticut. State of Connecticut Department of Emergency Services and Public Protection, Crime in Connecticut at 29 (2016) (hereineafter "Crime in Connecticut 2016").[10] But, as of 2016, African Americans comprised only 10.6% of Connecticut's population. U.S. Census Bureau, 2016 American Community Survey 1-year Estimates, Table DP05: ACS Demographic and Housing Estimates (hereinafter "2016 ACS 1-Year DP05").[11] Connecticut does not track arrests by ethnicity, so the percentage of arrestees who are Latinos is unknown (and Connecticut's reported numbers of arrestees who are African American and white includes Latino arrestees). *Id.*

The percentage of the population who is African American and the percentage of the population who is Latino differs between Connecticut cities and

---

Hispanics and their starting rates of experiencing those events would have to be so much higher that [non-disparities] would just be… a statistical aberration." [Dkt. 116-46 (Wildeman Dep.) at 79:13-80:12].

[10] Available at:
http://www.dpsdata.ct.gov/dps/ucr/data/2016/Crime%20in%20Connecticut%202016.pdf.

[11] Available at data.census.gov. Reported figure has a 0.2% margin of error. An additional 0.9% of the population reports being Black and White or Black and Native American.

Connecticut suburbs or rural areas and is higher for renters looking for affordable or subsidized housing than for those who are not. [Dkt. 114-1 ¶¶56-57].

### D. *CrimSAFE & the Purpose of Criminal Records*

RPS has identified the purposes served by CrimSAFE and its policies as tenant safety and landlord liability avoidance. [Dkt. 114-1 at ¶89]. RPS states that the purpose of its criminal records screening products is to protect safety and property in housing complexes because "[c]riminals can disrupt –and even endanger –the entire neighborhood." *Id.* at ¶90. It claims that its products allow housing providers to more rapidly and accurately screen applicants according to the standards of the housing providers. *Id.* ¶¶13-14.

The federal Bureau of Justice Statistics has found that 83% of released prisoners are arrested again within 9 years, with an average of 5 arrests per released prisoner. [Dkt. 114-1 ¶59]. The federal Bureau of Justice Statistics has found that 18% of violent victimizations took place in the victim's home, 16% took place near the victim's home, and 9% took place at a friend's, neighbor's, or relative's home. *Id.* ¶ 60.

RPS's proffered expert, Jay Kacirk, stated in a September 2019 deposition that "information about arrest records that did not lead to convictions... would not be relevant to the decision whether a [rental housing] applicant should be accepted or rejected because we are not able to use arrest records to base an approval or denial on." [Dkt. 126 at 28] (citing [Dkt. 126-1 ¶74] (citing [Dkt. 125-14 (Ex. 12 to Pl.'s Opp.: Kacirk Dep.) at 43:8-21])). He later stated that pending charges "could affect the tenancy of someone on the verge of incarceration," but reiterated that "you

have to be careful using arrests as far as decision-making." [Dkt. 132 (Ex. J to Ex. 4 to Def.'s Opp: Kacirk Dep.) at 294]. Dr. Lila Kazemian, one of Plaintiff's preferred experts, said that "anybody who has their name already in the system becomes more likely to have more contacts with the criminal justice system," such that individuals who were previously arrested have elevated statistical levels of re-arrest. [Dkt. 129-1 ¶14].

E. *CrimSAFE's Role in Mikhail Arroyo's April 2016 Rental Application Rejection*

On April 4, 2016, HUD's Office of General Counsel published a document titled "Application of Fair Housing Act Standards to the Use of Criminal records by Providers of Housing and Real Estate-Related Transactions." The document stated: "Nationally, racial and ethnic minorities face disproportionately high rates of arrest and incarceration," and that, "the fact of an arrest is not a reliable basis upon which to assess the potential risk to resident safety or property posed by a particular individual." *Id.* at 3, 5 [hereinafter HUD OGC 4/4/2016 Guidance].

On April 15, 2016, over a week before Mikhail Arroyo's application, RPS shared with some of its clients an email which highlighted (a) per the HUD OGC 4/4/2016 Guidance, arrest records that don't result in convictions are not reliable bases to assess the potential risk resident safety or property; and (b) "according to HUD, a blanket policy to deny any applicants with a criminal record may have a disparate impact on African Americans and Hispanics." [Dkt. 125-17 (Ex. 15: 4/15/16 RPS Email) at 2]; *see also* [Dkt. 125-18 (April 2016 RPS HUD Training PowerPoint)]]. In the email, RPS "recommends that our customers work with their legal counsel to review their eligibility requirements and related policies around the use of

criminal background data to… determine [whether] changes need to be made to your CoreLogic product settings." [Dkt. 125-17 at 2].

The email also states that "RPS is currently reviewing our products to determine what changes, if any, to make in order to best support our clients in light of this new guidance from HUD. Once this review is complete, any changes will be communicated to clients with enough notice to allow for clients to adjust their processes." [Dkt. 125-17 at 3]. Despite the HUD OGC 4/4/2016 Guidance, as of September 5, 2019, Stephanie Dachtler, a Relationship Manager for RPS, was not aware of any changes made to CrimSAFE. [Dkt. 118-8 (Ex. 26 to Pl.'s Mot. Summ. J.: Dachtler Dep.) at 75:18-23 There is no evidence on the record that RPS informed its customers that they could change their CrimSAFE settings to reverse their election to suppress from line staff and applicants the basis on which CrimSAFE categorized applicants "disqualified," so they could proceed with their communities screening policies consistent with the HUD OGC 4/4/2016 Guidance.

WinnResidential has used RPS screening products since 2008 and used CrimSAFE through at least July 31, 2019. [Dkt. 118-1 ¶30]. As of April 2016, WinnResidential CrimSAFE settings included all charges for "theft" occurring within the prior three years. [Dkt. 114-1 ¶23]. WinnResidential made changes to its CrimSAFE settings in May of 2016 and July of 2016 in response to the HUD OGC 4/4/2016 Guidance. *Id.*

On April 26, 2016, Ms. Arroyo applied for housing at WinnResidential on behalf of Mr. Arroyo at the Artspace Windham in Willimantic Connecticut. [Dkt. 114-1 ¶25]. WinnResidential electronically requested from RPS a tenant screening

report on Mr. Arroyo. *Id.* ¶ 26. That day, RPS provided WinnResidential a screening report on Mr. Arroyo that included a "Score Decision" regarding Mr. Arroyo's credit-worthiness and a "Crim Decision" regarding his suitability as a tenant based on his criminal background. [Dkt. 118-1 ¶44]. WinnResidential suppressed the underlying criminal records from the view of its leasing agents. [Dkt. 126-1 ¶91].

The "Crim Decision" for Mikhail Arroyo stated "Record(s) Found," which is the text that appeared on reports RPS prepared for WinnResidential when it determined that disqualifying records were found. *Id.* ¶45. The fourth page of the screening report specifies, "Based upon your community CrimSAFE settings and the results of this search, disqualifying records were found. Please verify the applicability of these records to your applicant and proceed with your community's screening policies." *Id.* ¶46; *see* [Dkt. 116-33 (Ex. 30 to Pl.'s Mot. Summ. J.: Adverse Action Letter to Mikhail Arroyo)].

The parties dispute whether any other decisionmakers at WinnResidential had Mr. Arroyo's criminal record. *Compare* [Dkt. 116-41 (Aff. Ans. of WinnResidential to Administrative Compl.) ¶23] *and* [Dkt. 116-35 (6/13/2017 Fact Finding Hearing Tr.) at 50, 52, 68-71] *with* [Dkt. 114-2 (Kayani Decl.) ¶15] and [Dkt. 114-2 at Ex. D (Administrator Version of Mikhail Arroyo Screening Report Generated May 3, 2018)].[12] The Court finds there is a genuine issue of fact as to

---

[12] The parties each argue that the other party's evidence on this point is inadmissible. RPS argues that Dkt. 116-41 (Aff. Ans. of WinnResidential to Administrative Cmplt.) is inadmissible hearsay, *see* Fed. R. Evid. 802; Dkt. 114-2 (Kayani Decl.) and that  Dkt. 116-35 (Carmen Arroyo Decl.) were not made on the basis of personal knowledge*, see* Fed. R. Evid. 602, *Roberts v. Ground Handling,*

whether WinnResidential knew the basis on which RPS categorized Mr. Arroyo as disqualified because WinnResidential elected to suppress records and there is no evidence it was given the option to or did change that election.

The sole criminal record upon which RPS relied in making the CrimSAFE report for Mikhail Arroyo is a single charge in Pennsylvania for "grade S" retail theft under 18 Pa. C.S.A. § 3929(a)(1) filed on July 18, 2014, when he was twenty years old and prior to his accident. [Dkt. 118-1 at ¶51]. A "Grade S" in Pennsylvania means "summary offense," which is below the level of a misdemeanor and is often called a non-traffic citation. *Id.* at ¶ 52.  A charge for summary offense retail theft indicates that this was his first offense and the value of the merchandise he allegedly stole was under $150. 18 Pa. C.S.A. § 3929(b)(1). *Ibid.* The charge had not led to a conviction as of the date it was reported. *Id.* ¶54.

Mr. Arroyo's application was rejected. *Id.*  ¶30. As a matter of law, Mr. Arroyo was innocent of the charge. *See Coffin v. United States*, 156 U.S. 432 (1895) ("the principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary...").  Mr. Arroyo was never convicted and, on April 20, 2017, the charge against Mr. Arroyo was withdrawn. *Id.* ¶¶53, 54. Mr. Arroyo remained in a nursing home until June 2017. *Id.*  ¶¶30, 63.

---

*Inc.*, 499 F. Supp. 2d 340, 360 (S.D.N.Y. 2007) ("It is axiomatic that affidavits submitted in support of or in opposition to a summary judgment motion must 'be made on personal knowledge"). Plaintiffs argue that [Dkt. 114-2 at Ex. D] cannot be authenticated as a copy of a document that CoreLogic returned to WinnResidential on 4/26/2016 as claimed, as it is a document generated on 5/3/2018, *see* Fed. R. Evid. 901. However, neither party demonstrates that the other *cannot produce* admissible evidence. *see* Fed. R. Civ. P. 56(c)(2).  The Court finds that a dispute of fact remains.

**F.** _Mr. Arroyo's Consumer File Disclosure Request_

RPS regularly processes requests from consumers for their files. [Dkt. 114-1 (Def.'s Unredacted 56(a)1 Statement) ¶ 36]. It maintains written policies and procedures for the ways in which consumers making file disclosures must be authenticated. *Id.* ¶37. Those authentication procedures generally require consumers to provide their personal identifying information, government documentation, and/or answers to a series of personal security questions. *Id.*

In addition to regularly disclosing consumer files directly to the requesting consumer, RPS processes the disclosure of consumer files to third-party legal guardians acting on the consumer's behalf. *Id.* ¶ 38. To protect consumer privacy in the situation where a third party is seeking a copy of a consumer's file, RPS's written policies generally require a notarized power of attorney, the consumer's name, proof of the address to where the disclosure should be mailed, and confirmation of the last four digits of the consumer's Social Security number. *Id.* (citing [Dkt. 114-6 (Barnard Decl.) ¶ 8 & Ex. A at pp. 3]). Based on RPS's written authentication policy, in "any scenario" where those requirements cannot be fulfilled, the RPS employee who is handling the file disclosure request must escalate the request to a "supervisor." [Dkt. 114-1 ¶39]. A situation in which a consumer is disabled and cannot execute a power of attorney requires adjustment of third-party authentication process and supervisory review. *Id.* (citing [Dkt. 114-6 at ¶ 13 & Ex. A at 3]).

Carmen Arroyo first contacted RPS on April 27, 2016 to request Mikhail Arroyo's consumer file. [Dkt. 114-1 ¶40]. RPS informed Ms. Arroyo of the process

for obtaining the file in a third-party capacity, which required her to submit a disclosure request form and certain documentation. *Id.* at ¶ 41. Three days later, on April 29, 2016, RPS mailed Ms. Arroyo a consumer disclosure request form and instructions. *Id.* ¶ 42. The form asked for Mr. Arroyo's name, date of birth, social security number or Tax Identification Number, phone number, current address, and signature. [Dkt. 125-10 (Pls.' Opp. to Def.'s Mot. Summ. J. Ex. 8: 6/14/16 Arroyo File Disclosure) at 2].

Ms. Arroyo signed the form as Mr. Arroyo's mother and mailed the first consumer disclosure request form (the "First Disclosure Request") to RPS on June 14, 2016. *Ibid.* RPS received it on June 27, 2016. *Ibid.* The First Disclosure Request did not list Mikhail Arroyo's Social Security number, it did not contain his complete previous address information, and it was signed just below the line designated. *Ibid.* With the First Disclosure Request, Ms. Arroyo submitted a copy of Mr. Arroyo's Pennsylvania driver's license, a copy of her driver's license, and a copy of a certificate of conservatorship. *Ibid.* The certificate of conservatorship states on its face that it is "NOT VALID WITHOUT COURT OR PROBATE SEAL IMPRESSED." [Dkt. 125-10 at 3]. It contains the name of the probate court, case number, and case caption. *Ibid.* At the lower left hand corner, there is a circular area that appears shaded or scratched out by a pen or pencil, through which one can see the outlines of what appear to be letters, and in the center of which are the typewritten words "Court Seal." *Ibid.* The First Disclosure Request was escalated to two supervisors. [Dkt. 114-1 ¶46]. The supervisors informed their employees that they could not accept the "conservatorship court paper," and that a power of

attorney and Mr. Arroyo's signature were needed. [Dkt. 112-8 (Ex. 9 to Def.'s Mot. Summ. J., Barnard Decl. at Ex. B: 6/30/2016 Consumer Relation Remarks) at 11].

On June 30, 2016, RPS mailed a letter to Mr. Arroyo at the nursing home address listed as his current address, asking him to contact RPS, which would "accurately provide information [he] need[ed]." [Dkt. 114-1 ¶46]; *see* [Dkt. 114-6 (Barnard Decl.) at Ex. D]. The letter was returned as undeliverable. *Id.* The letter did not mention any deficiencies in the form or conservatorship appointment and did not inform Mr. Arroyo or Ms. Arroyo that she could submit a corrected form and conservatorship appointment certificate with a legible raised seal. *Id.* Although Ms. Arroyo's address was listed on the copy of the certificate of conservatorship, RPS did not send any mail to her or notify her that she needed to provide additional information to complete Mr. Arroyo's consumer disclosure request. [Dkt. 125-10]; [Dkt. 114-6 at Ex. D].

Three months later, on September 7, 2016, Ms. Arroyo called RPS to discuss the status of the disclosure. [Dkt. 114-1 ¶47].  During that call, she was instructed that she had to provide a notarized power of attorney. [Dkt. 114-6 (Barnard Decl.) at Ex. B at 3]. RPS did not inform her of the other deficiencies in the application or the critical absence of a legible raised seal on the Probate court conservatorship appointment.

RPS's next contact with Ms. Arroyo did not occur until November 1, 2016, when she called to ask why RPS had not yet provided her with Mikhail Arroyo's consumer file. [Dkt. 118-1 ¶48]. RPS escalated the matter to its consumer relations department, its compliance department, and then its internal legal department and

outside attorneys, while staying in contact with Ms. Arroyo. *Id.* ¶¶ 49, 50. On November 14, 2016, RPS asked Ms. Arroyo send RPS a new certificate of conservatorship with the court seal visible, as well as proof of current address documentation. *Id.* ¶50.

On November 15, 2016, Ms. Arroyo faxed additional documentation and a new consumer disclosure form (the "Second Disclosure Request") to RPS. *Id.* at ¶51. The Second Disclosure Request included Mr. Arroyo's social security number, and was signed by both Ms. Arroyo, who identified herself as Mr. Arroyo's mother and co-conservator, and by Tod Stimpson, who identified himself as Mr. Arroyo's co-conservator. [Dkt. 125-12 at 4]. Ms. Arroyo also attached an updated copy of the conservatorship certificate which also stated it was invalid without a seal. *Id.* at 5. At the lower left-hand corner, there is a faint circle of stray marks, more darkly shadowed at the bottom, and in the center of which are the typewritten words "Court Seal." *Ibid.* No letters can be made out. *Ibid.*

The Second Disclosure Request and supporting documentation was escalated to RPS's compliance and legal departments, including consultation with outside counsel. *Id.* ¶52. RPS found the documentation insufficient because the conservatorship appointment did not have a visible court seal, Ms. Arroyo signed her name instead of Mr. Arroyo's, and there was no proof of address. [Dkt. 114-6 at Ex. F at 1-2 (RPS Emails Regarding Request)].   On November 16 and November 18, 2016, RPS attempted to contact Ms. Arroyo by telephone to discuss the documentation she submitted with the Second Disclosure Request. *Id.* at ¶53.  Ms.

Arroyo did not return these calls. *Id.* There is no evidence RPS sent Ms. Arroyo a letter explaining the deficiencies.

In mid-December 2016, a paralegal at the CFHC contacted RPS and stated the CFHC was assisting Ms. Arroyo in the file disclosure process. *Id.* ¶ 54. RPS requested additional documentation from the CFHC in the form of a power of attorney to establish that the CFHC was formally representing Ms. Arroyo. *Id.* RPS then mailed and emailed the CFHC a consumer disclosure request form and instructions on the documents the CFHC should submit. *Id.* RPS did not receive any documentation from the CFHC in response. *Id.* RPS had no further contact with CFHC or Ms. Arroyo until this suit was filed. *Id.* at ¶55.

Plaintiffs are not aware of any other conserved individual who has requested a file disclosure from RPS, and RPS also has no record of any other conserved individual requesting a file disclosure. [Dkt. 114 ¶45], [Dkt. 126-3 (Barnard Dep.) 120:15-124:24].

### G. *CFHC Involvement*

Plaintiff CFHC is a nonprofit corporation incorporated in Connecticut. [Dkt. 1 (Compl.) ¶28]. Its mission is "eliminating housing discrimination and ensuring that all people have equal access to housing of their choice." *Id.* ¶¶ 19, 185-87, 192.

Ms. Arroyo retained the CFHC in 2017 to bring an administrative complaint against WinnResidential for failing to reasonably accommodate Mr. Arroyo's disability by refusing to admit him. [Dkt. 114-1 ¶32]. WinnResidential appeared at

21

an initial administrative fact-finding hearing on June 13, 2017, and a settlement was reached following the hearing. *Id.* ¶ 34.

The settlement agreement included no provision requiring that WinnResidential allow Mr. Arroyo to move into the apartment. [Dkt. 125-9 (Ex. 7: Conciliation Agreement)]. However, Mr. Arroyo moved into the apartment after the hearing. [Dkt. 116-35 at Ex. A at 16-28, 68-71, 52].

CFHC received $13,00 in connection with that settlement as attorneys' fees for CFHC's representation of the Arroyos, work that has not been claimed as diversion damages. [Dkt. 125-13 (Ex. 11 to Pl.'s Opp, Kemple Decl.) ¶¶ 3-5]. CFHC separately, from other sources, received grants totaling $380,000 to address criminal record tenant screening in the housing application process. [Dkt. 114-1 ¶ 63].

## II.   Legal Standard

Summary judgment "shall be granted" if, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Ibid.*

"In ruling on a motion for summary judgment, 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his

favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson*, 477 U.S. at

255)). "Credibility determinations, the weighing of evidence, and the drawing of

legitimate inferences form the facts are jury functions, not those of a judge."

*Anderson*, 477 U.S. at 255.  Put another way, "[i]f there is any evidence in the record

that could reasonably support a jury's verdict for the nonmoving party, summary

judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container

Line, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal citation and quotation

omitted).

>   A party asserting that a fact cannot be or is genuinely disputed must support

the assertion by:

>   >   (A) citing to particular parts of materials in the record, including
>   >   depositions, documents, electronically stored information,
>   >   affidavits or declarations, stipulations (including those made for
>   >   purposes of the motion only), admissions, interrogatory answers,
>   >   or other materials; or

>   >   (B) showing that the materials cited do not establish the absence
>   >   or presence of a genuine dispute, or that an adverse party cannot
>   >   produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). A party asserting that a fact is or is not true must present

admissible evidence to support their assertion. Fed. R. Civ. P. 56(c)(2).

>   Where the movant presents admissible evidence tending to show there is no

genuine issue of material fact for a jury to decide and she is entitled to judgment

as a matter of law, "the burden shifts to the nonmovant to point to record evidence

creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273

(2d Cir. 2006). Fed. R. Civ. P. 56(c), (e). Rule 56(c) "mandates the entry of summary

judgment… against a party who fails to make a showing sufficient to establish the

existence of an element essential to a party's case, and on which that party will

bear the burden of proof at trial." *Bedor v. Friendly's Ice Cream Corp.*, 392 F. Supp. 2d 367, 373 (2005) (quoting *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986)).

### III.   Analysis

RPS moves for summary judgment on all counts of the complaint: the FHA disparate impact claim on the basis of race and national origin; the FHA discriminatory treatment claim on the basis of race and national origin; the FCRA claims; the FHA disparate impact claim on the basis of disability;  the FHA discriminatory treatment claim on the basis of disability; the CUTPA claims on the basis of CrimSAFE and on the basis of file disclosure; and CFHC's claim for compensatory damages. It further argues that Ms. Arroyo does not have individual standing. Plaintiffs respond to RPS's motion for summary judgment, and also themselves move for partial summary judgment on their FHA disparate impact claim on the basis of race and national origin and their CUTPA claim on the basis of CrimSAFE. They also separately move for partial summary judgment on the FCRA claims, the FHA disparate impact claim on the basis of disability, and the CUTPA claim on the basis of file disclosure. The Court analyzes each claim in turn but starts with standing.

### A.  *Standing*

To establish constitutional standing, "the plaintiff must show an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and 'that is likely to be redressed by a favorable judicial decision.'" *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302 (2017) (quoting *Spokeo, Inc. v. Robins,* 578 U.S. ——, —

—, 136 S.Ct. 1540, 1547 (2016)). A plaintiff must also satisfy "statutory standing," that is, demonstrate that her "interests fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. ——, ——, 134 S.Ct. 1377, 1387-88 and n.4 (2017).

### 1. *Carmen Arroyo's Standing for Fair Housing Act (FHA) Claim*

RPS argues that Carmen Arroyo does not meet either requirement for standing for her FHA claim: she does not experience "injury in fact" required for standing under any of FHA claims because she was not denied housing at any point; and she does not have statutory standing because lack of companionship and emotional distress are outside the zone of interests protected by the FHA. [Dkt. 114 at 44-45].

To allege constitutional injury-in-fact, a plaintiff must allege "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Citizens for Resp. & Ethics in Wash. v. Trump*, 953 F.3d 178, 189 (2d Cir. 2019), *as amended* (Mar. 20, 2020) (quoting *Lujan v. Def.'s of Wildlife,* 504 U.S., 555, 560 (1992)).

Statutory standing under the FHA is "as broad[] as is permitted by Article III of the Constitution." *Trafficante v. Metro. Life. Ins. Co.*, 409 U.S. 205, 209 (1972) (citations omitted). The FHA allows any "aggrieved person" to bring a housing-discrimination lawsuit. 42 U.S.C. § 3613(a). An "aggrieved person" includes "any person who claims to have been injured by a discriminatory housing practice…" 42 U.S.C. § 3602(i)(1); *see* 24 C.F.R. 100.65 (Discriminatory housing practices

include conduct that "limits the use of privileges, services, or facilities associated with a dwelling because of race color…. of an owner, tenant or a person associated with him or her"); 42 U.S.C. § 3604(f)(1)-(2) (prohibiting discrimination in the sale or rental, or in terms, conditions, or privileges of sale or rental, "because of a handicap of… (b) a person intending to reside in that dwelling after it is… rented or made available; or (C) any person associated with a that buyer or renter."). The FHA provides a cause of action for individuals in a housing complex who are not themselves denied housing on the basis of discrimination, but who allege deprivation of relationships with individuals who are: it "allows suits by white tenants claiming that they were deprived benefits from interracial associations when discriminatory rental practices kept minorities out of their apartment complex." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. at 1303 (citing *Trafficante* at 209-212).

Here, Ms. Arroyo alleges that RPS's discriminatory housing practices segregated her from her son on the basis of ethnicity and ability, and she claims emotional injuries on that basis. Ms. Arroyo's claims are similar to, and even more compelling than, the plaintiffs' claims in *Trafficante*, 409 U.S. 205. In *Trafficante*, the Court found that two tenants, one who was white and one who was African American, had constitutional and statutory standing to pursue FHA claims alleging their landlord racially discriminated against rental applicants, depriving tenants of the social and professional benefits of living in an integrated community. *Id.* at 206-12. Like Ms. Arroyo, the aggrieved tenants were already living in the complex. *Id.* at 206. Like Ms. Arroyo, the tenants' grievance was based on their interest in an

integrated community. *Id.* at 209. The *Trafficante* Court held protected the mutual benefit of diverse associations and acquiring multi-cultural competency. *Id.*

Here, not only would Ms. Arroyo and her son benefit from mutual association, Ms. Arroyo was also deprived of familial association, highly valued in our society.  She was also deprived of the ability to fully and effectively discharge her maternal and legal duty as conservator of Mr. Arroyo to protect both his person and interests as ordered by the Probate Court by having him live with her rather than in a nursing home. These are concrete, particularized, and actual injuries within the scope of interests protected by the FHA.

RPS cites two cases in opposition, but neither is apposite. First, in its motion, RPS quotes *Vaughn v. Consumer Home Mortgage Co.*, 297 F. App'x 23, 26 (2d Cir. 2008) for the proposition that FHA standing extends "only to those persons who are 'personally denied equal treatment by the challenged discriminatory conduct.'" *Id.* at 26, *cited by* [Dkt. 114 at 45]. But this quotation misrepresents the sentence: the sentence qualifies that it is only speaking to one "line of authority," among others, and that line of authority concerns "government-erected barriers," which are not issue here. *Id.* at 26. Second, in its reply, RPS quotes *Wartluft v. Milton Hershey School & School Trust*, 400 F. Supp. 3d 91, 102-103 (M.D. Pa. 2019) for the proposition that "a '[loss] of companionship' and related emotional distress damages as falling outside of the zone of interests protected by the FHA." [Dkt. 140 at 18]. But in *Wartluft* the plaintiffs were parents bringing an FHA claim on the basis that a school's discriminatory expulsion of their daughter led to her suicide; they

themselves did not live at the allegedly discriminatory residence or wish to live there. Therefore, it also is not persuasive here.

The Court finds that Ms. Arroyo's claim falls squarely within the zone of interests protected by the FHA, and that she has standing.

### 2. Carmen Arroyo's Standing for Connecticut Unfair Trade Practices Act (CUTPA)

RPS also contends Ms. Arroyo does not have standing to pursue her CUTPA claim.  To sustain a claim under CUTPA a person must suffer an ascertainable loss of money or property. Conn. Gen. Stat.  § 42-110g. RPS argues that, as a matter of undisputed fact, Ms. Arroyo did not suffer an adverse housing decision, and cannot point to an ascertainable loss. In response, Plaintiffs argue that RPS's actions delayed Mr. Arroyo's admission to ArtSpace Windham by about a year through RPS's CrimSAFE report regarding Mr. Arroyo and its misinforming Ms. Arroyo about the documentation needed to obtain Mr. Arroyo's CrimSAFE file. During this year, Plaintiffs allege, Mr. Arroyo remained in a nursing home, Ms. Arroyo and Mr. Arroyo had additional medical, travel, and housing expenses, and Ms. Arroyo had higher housing expenses without Mr. Arroyo's housing subsidy. *See* [Dkt. 1 (Compl.) at ¶102]. The Court finds that Ms. Arroyo's claimed associational deprivation and financial and emotional injuries are sufficient to establish her statutory and constitutional standing to bring the CUTPA claim.

### 3. Standing for claims on behalf of African American rental applicants

The Arroyos are not African-American and, unlike the white plaintiff in *Trafficante*, do not claim to be injured themselves by RPS's alleged discrimination

against African-American applicants, so they do not have statutory standing to allege claims on the basis of discrimination against African Americans. *Cf. Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 208 (1972). But, in light of CFHC's inclusion as a Plaintiff, the Court holds that it is still appropriate to consider Plaintiffs' FHA and CUTPA claims on the basis of discrimination against African Americans. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 (2006) ("The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

Organizations who allege that a defendant's actions have "frustrated the organization [plaintiff]'s… services, with a consequent drain on resources" have standing to bring FHA claims. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 369 (1982); *Ragin v. Harry Macklowe Real Estate*, 6 F.3d 898 (2d Cir. 1993) (reversing finding that nonprofit agency lacked standing to bring discrimination claim against real estate advertisers). On this basis, an organization may bring claims on behalf of individuals not otherwise represented in the action. For example, in *Saint-Jean v. Emigrant Mortg. Co.*, where the plaintiffs were African American, the court held that the fact that jury instructions mentioned alleged housing discrimination against Hispanic communities was not a basis for retrial. 337 F. Supp. 3d 186, 198 n.4 (E.D.N.Y. 2018) (citing *Ragin*, 6 F.3 898); *see also Veasey v. Perry*, 29 F. Supp. 3d 896, 903-04 (S.D. Tex. 2014) (holding that organizations had standing to challenge voter identification law as racially discriminatory against African-Americans and Latinos based on pleaded mission statements including "to

empower young people, particularly those of color," and to "serv[e] as an advocacy group for the working poor").

In this case, Plaintiffs allege the disparate impact of CrimSAFE on African American and Latino applicants frustrates CFHC's mission is ensuring that *all* people have equal access to the housing of the choice. [Dkt. 1 ¶19]. As to resource drain, there is evidence that housing providers have reached out to CFHC for guidance on the use of criminal records, [Dkt. 125-21 (Ex. 19: Kemple Dep.) at 98:19-24], and that CFHC has changed its public trainings and presentations to account for RPS's policies regarding criminal records, *id.* at 97-111. Therefore, the Court finds that CFHC has standing to bring FHA and CUTPA claims based on ethnicity and race discrimination against both Latinos and African Americans.

### B. *FHA Disparate Impact Claim on the Basis of Race or Ethnicity*

The FHA prohibits a person or entity from "mak[ing] unavailable or deny[ing] a dwelling to any person because of race or national origin." 42 U.S.C. § 3604(a). Section 3604(b) prohibits discrimination "in the terms, conditions, or privileges" of a rental. "Otherwise make[s] unavailable" is a "catchall phrase" that "look[s] to consequences, not intent." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2519 (2015).

Disparate impact claims are cognizable under the FHA. *Id.* at 2525. 24 C.F.R. § 100.500 sets forth the regulation of the Department of Housing and Urban Development ("HUD") on discriminatory effects, which the Second Circuit has adopted to analyze FHA disparate impact claims:

**First, a plaintiff… must come forward with a prima facie case; and second, the defendant… may rebut the prima facie case by proving that the 'challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.' [Third], the burden of proof shifts back to the *plaintiff* to show that the 'substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.'**

*See Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016) (appeal following a bench trial) (quoting 24 C.F.R. § 100.500(c)(3)); *see Inclusive Communities Project*, 135 S. Ct. at 2514-15; 2522-23.

To establish a *prima facie* case, a plaintiff must show "that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1). This standard has three elements: (i) "certain outwardly neutral practices," *Mhany*, 819 F.3d at 617; (ii) "a significantly adverse or disproportionate impact on persons of a particular type, *ibid.*; and (iii) "a causal connection between the facially neutral policy and the allegedly discriminatory effect," *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003) (bench trial). Both RPS and Plaintiffs move for summary judgment on Plaintiffs' FHA disparate impact discrimination claim. The Court addresses first addresses their arguments as to causal connection, and next addresses their arguments about disparate impact.

### 1. Prima Facie Case

#### i. Proximate Cause

In their motion for summary judgment, Plaintiffs argue that they have established undisputed facts that show RPS was a proximate cause of housing availability on the basis of race or ethnicity. [Dkt. 118 at 9-18]. RPS rejects this

claim, arguing that it was not a proximate cause, is not an agent of WinnResidential, and CrimSAFE is not a "decisioning" product. [Dkt. 129 at 24-33].

"As the agency charged with enforcement of the FHA, HUD's construction of the statute 'is entitled to great weight.'" *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 567 n.11 (D. Conn. 2015) (quoting *Trafficante,* 409 U.S. at 210). HUD regulations provide:

> It shall be unlawful, because of race,… handicap,… or national origin, to engage *in any conduct relating to the provision of housing or of services and facilities in connection* therewith that otherwise makes unavailable or denies dwellings to persons.

24 C.F.R. § 100.70(b) (emphasis added).

A defendant makes housing unavailable "when [it] engages in a series of actions that imposes burdens on… a protected class of residents or intended residents, making it more difficult for the members of the protected class to obtain housing or conveying a sense that the members of the protected class are unwanted." *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, No. 3:17-CV-627 (VAB), 2019 WL 7037795, at *20 (D. Conn. Dec. 20, 2019). "[P]roximate cause under the FHA requires 'some direct relation between the injury asserted and the injurious conduct alleged';" "foreseeability" alone is not sufficient. *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1306 (2017) (quoting *Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258 (1992)). "A link that is too remote, purely contingent, or indirec[t] is insufficient." *Empire Merchs., LLC v. Reliable Churchill LLP*, 902 F.3d 132, 141 (2d Cir. 2018) (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)) .

Discrimination may have "multiple proximate causes," and the possibility that one decisionmaker may be overridden by a higher decisionmaker does not "automatically render the link to the [subordinate's] bias 'remote' or 'purely contingent'" for proximate cause purposes, especially where the ultimate decisionmaker's judgment is neither "independent" nor unforeseeable. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011). In *Staub*, a Uniformed Services Employment and Reemployment Rights Act case, the Supreme Court held that for the purposes of showing illegal antimilitary bias, a biased supervisor's unfavorable report could be a proximate cause for the plaintiff's ultimate discharge, even though supervisor did not make ultimate decision. *Id.* "[T]he supervisor's biased report may remain a causal factor if the [decisionmaker's] independent investigation takes it into account without determining that the adverse action was, apart from the [biased] supervisor's recommendation, entirely justified." *Id.* at 421, *cited by Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 274-75 (2d Cir. 2016) (recognizing that co-worker's statements may proximately cause the plaintiff to be fired).

An agency relationship is neither necessary nor sufficient to show proximate cause. Both *Staub* and *Vasquez* address whether an employer may be held liable for an employee's discriminatory actions and animus, and conclude, on the basis of agency principles, that an employer can be held liable for an employee's discriminatory motives. *Staub,* 562 U.S. at 419-21; *Vasquez,* 835 F.3d at 274-75. But both treat the question of proximate causation independently from the agency

analysis of motive attribution. *Staub,* 562 U.S. at 419-21; *Vasquez,* 835 F.3d at 274-75.

Ultimately, "issues of proximate causation… involve application of law to fact, which is left to the factfinder." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840–41 (1996). Proximate cause becomes a question for a court only where "…there are active and efficient intervening causes, or where reasonable [factfinders] could reach only one conclusion regarding the issue of proximate cause." *Margrave v. British Airways*, 643 F. Supp. 510, 513 (S.D.N.Y. 1986). Whether there are multiple reasonable conclusions is a separate question from whether there are disputed issues of fact. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Mosheuvel v. D.C.*, 191 U.S. 247, 252 (1903).

The Court finds that a reasonable factfinder could find RPS one proximate cause of housing unavailability but need not necessarily do so; and leaves the question of whether that unavailability is on a discriminatory basis for the following sections. RPS markets CrimSAFE as "rendering a decision on an applicant's suitability for tenancy based on their criminal history." [Dkt. 118-1 ¶¶5, 6, 9, 33]. CrimSAFE has many features which demonstrate the truth of the marketing promise: It informs a housing provider whether there is a "record found" that would be disqualifying under the criteria set by the client. [114-1 ¶8]. It allows clients to disqualify innocent people who have been charged but not convicted, even where the charges are non-criminal infractions. [Dkt. 118-1 ¶¶51-52]. It also allows clients to suppress the remainder of the full reports from the view of their onsite leasing staff, as WinnResidential did, so that onsite leasing staff see only the "records

found" notification." [Dkt. 118-1  ¶¶ 26, 36]. It chose to use the criminal categories created by the FBI's national incident-based reporting system as those available as CrimSAFE configuration criteria. [Dkt. 129-1 ¶8]. It establishes the maximum lookback periods of 7 years for non-convictions. *Id.* ¶ 11.

With its CrimSAFE product, RPS CoreLogic always returns information about whether disqualifying records are or are not found but does not always the full criminal record to the staff of the housing provider. If it always returned the criminal record, the staff of the housing provider might consider only the fact of the existence of a criminal record, but they would also be able to investigate it themselves, and weigh the criminal record  in light of everything else they knew about a particular applicant – whether the charge was a conviction or a pending arrest or a dismissal, whether it was a charge for first-degree assault or shoplifting or a traffic accident involving damage, and whether the applicant provided any other information in their application that would mitigate the particular records found.

Instead, CrimSAFE always "categorizes" records: first into types of offenses, and then into whether the record is disqualifying or not according to the housing provider's choices from CrimSAFE's menu. *See* [Dkt. 114-1 ¶¶5, 6, 7, 8]. Importantly, categories do not just separate out offenses by distinguishing characteristic, they also *combine* them*,* and, in the combination, CrimSAFE reduces housing providers' discretion. So, for instance, at the first level of categorization: in the "Destruction Damage Vandalism of Property" category, CoreLogic includes "traffic accidents involving damage," which even CoreLogic's

expert concedes has no relationship to suitability for tenancy. [Dkt. 136-1 (Pl.'s Reply 56(a)1 Statement) ¶103]. The same category also includes vandalism and property damage, *id.*, so a housing provider cannot exclude vandals without also excluding people involved in traffic accidents. At the second level of categorization, CoreLogic transforms the criminal records review process into a yes/no switch, eliminating the possibility staff may be able to weigh a dismissed arrest for theft differently than a pending charge for disorderly conduct differently than a conviction for assault.

By allowing clients to elect to suppress the full criminal record information, RPS allows clients to disable their staff from fully assessing the suitability of a tenant applicant and enabled its clients to deny housing to individuals whose records did not suggest they posed any risk to the property of its occupants.  It continued this practice even after HUD issued guidance that arrest records were not a proper basis to disqualify a tenant although it could have readily informed clients to alter their search parameters pending its review of its produce. And it is no surprise that it did so: what distinguishes CrimSAFE from other RPS screening products, its unique value-proposition, is the fact that it categorizes records for the housing providers and simplifies decision-making. Were RPS clients to never use CrimSAFE's "record(s) found" message as a basis for a decision, CrimSAFE logically could not provide RPS's claimed benefits:  speeding up background screenings and ensuring that housing providers' employers were adhering to the community standard. [Dkt. 114-1 ¶¶ 13-14].

RPS argues in response that it is not a direct cause of any housing discrimination because its housing manager customers set the criteria for deciding which criminal records should result in rejection and determine whether to suppress the full reports from onsite housing staff. [Dkt. 129 at 24-32]. RPS further argues that its housing manager clients can override RPS's recommendation of denial based on individualized review, and that, when doing so, they can take account of the underlying criminal record because the reports are always available to someone at the client housing provider. [Dkt. 129 at 24-32]; [Dkt. 114 at 27].

The fact that RPS's statement of "record(s) found" may be overridden by its client does not eliminate its responsibility—discrimination may have multiple causes and parties other than final decisionmakers may be liable. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011); *Vasquez,* 835 F.3d at 274-75.  Therefore, the Court finds that a reasonable factfinder could find RPS a proximate cause of housing unavailability, but would not necessarily do so.

The parties' arguments do not compel another decision. The only decision Plaintiffs cite that is specific to proximate cause holds only that a fact-finder *could* reasonably find proximate cause where there is another decisionmaker, not that such a finding is compelled or that the opposite is unreasonable. *See* [Dkt. 136 at 5] (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011)) (reversing and remanding Seventh Circuit court holding that defendant was entitled to judgment as a matter of law, itself a reversal of the jury verdict).

The three cases RPS cites also do not compel a grant of summary judgment. RPS first cites *Zabriskie v. Federal National Mortgage Association*, 912 F.3d 1192

(9th Cir. 2019), in which the Ninth Circuit considered whether an entity that provided software that "automatically applies [underwriting] guidelines and requirements" to consumer credit information input by a potential lender to assess "a loan's eligibility for purchase" was a consumer reporting agency such that it could be held liable under the FCRA. *Id.* at 1195. In finding that the defendant could not be held liable because it did not "evaluate" applications, the Ninth Circuit stated the "commonsense principle" that "when a person uses a tool to perform an act, the person is engaging in the act; the tool's maker is not." *Id.* But, the opinion was amended, and the amended opinion omitted this reasoning, and instead based its conclusion on the fact that the information gathered was used for a different purpose than making consumer reports, a conclusion irrelevant to the instant issue. *Zabriskie v. Fannie Mae*, 940 F.3d 1022, 1025 (9th Cir. 2019). Further, unlike the instant case, the question was not of proximate cause but instead of the scope of the FCRA. 912 F. 3d. at 1192.

Next, RPS cites *National Fair Housing Alliance v. Deutsche Bank*, No. 18CV0839, 2018 U.S. Dist. LEXIS 196636 (N.D. Il. Nov. 19, 2018), in which the court dismissed an  FHA claim that "Defendants' [maintenance] delegation practice resulted in poorly-executed property maintenance, which led to racially-disparate effects," finding that the claim alleged "chain-link causation" with "intermediate steps" that the FHA does not permit. *Id.* at *38-39. But when considering a second motion to dismiss the amended complaint, which alleged the same FHA claims as those dismissed in the original complaint, the court found the plaintiffs had sufficiently alleged proximate cause, noting that intervening Circuit decisions had

rejected its previous "method of counting 'steps' between an action and an injury" as too prone to manipulation by the counter. *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18 CV 839, 2019 WL 5963633, at *5 (N.D. Ill. Nov. 13, 2019) (citing *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018) and *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019), *cert. granted, judgment vacated as moot sub nom. Wells Fargo & Co. v. City of Miami, Fla.*, 140 S. Ct. 1259 (2020))).

For the same reason, the Court finds the reasoning cited by RPS unpersuasive. RPS and WinnResidential acted hand-in-glove to deny Mr. Arroyo housing.  RPS allowed screening on the basis of charges that did not lead to a conviction and allowed its customer to conceal from its line staff the basis for an "unqualified" classification.  In so doing RPS was an integral participant in the denial of housing by WinnResidential to persons charged with an offense even though the charges were dismissed. Parties cannot escape liability by sharing decision making and shielding one another because no single entity is wholly responsible.

Third, RPS cites *Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517 (S.D.N.Y. 2013), a case in which the court considered a RICO claim against a bank that had set up and serviced an escrow account, facts distant from the instant ones. The plaintiff alleged that money was transferred out of the escrow account by a fraudulent actor, the U.N. *Id.* In rejecting the claim for lack of proximate cause, the court held that "because [the bank] BNP released and accepted funds into the U.N. escrow account at the UN's direction, however, BNP's servicing of that account cannot have been the proximate cause of Iraq's injury. . . . Contingent relationships

of this sort are too indirect to support [any] recovery. " *Id.* at 550. But this case is not analogous. RPS did not perform a ministerial or administrative function like BNP; WinnResidential relied on RPS's expertise, and WinnResidential's options were determined by RPS. RPS's CrimSAFE product is unique, so its relationship with its customer is not "contingent" in the way the bank's was, and RPS determined the framework of the criteria which its customers could use, so it was not simply following a customer's instructions.

### ii.  Statistical Showing of Causation of Disparate Impact

Plaintiffs and RPS both assert that there is no genuine issue of material fact as to whether Plaintiffs have shown disparate impact. Plaintiffs assert that they have. [Dkt. 118 at 18-24]. RPS asserts that Plaintiffs have not made the required statistical showing and cannot do so. [Dkt.114 at 27-34.]. After considering the law and the facts presented, the Court finds that Plaintiffs have presented sufficient statistical evidence to put into dispute whether RPS's practice of reporting housing applicants' criminal records to housing providers as potentially disqualifying records has a disparate impact on African American and Latino people.

Disparate impact liability exists where a discriminatory policy "actually or *predictably* results in a disparate impact on a [protected] group…" 24 C.F.R. § 100.500(a) (emphasis added). "A robust causality requirement ensures that '[r]acial imbalance… does not, without more, establish prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2523 (2015). "A plaintiff who fails to allege facts… or

produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Id.* "A plaintiff has not met its burden if it merely raises an inference of discriminatory impact." *Tsombanidis*, v. *W. Haven Fire Department*, 352 F.3d 565, 575 (2d Cir. 2003) (appeal following bench trial). To make out a *prima facie* case of disparate impact, "plaintiffs must… utilize the appropriate comparison groups. They must first identify members of a protected group that are affected by the neutral policy and then identify similarly situated persons who are unaffected by the policy." *Tsombanidis,* 352 F.3d at 576–77.

National or state general population statistics may be used as the appropriate comparison groups in at least three situations: First, national or state statistics are appropriate where "there is no reason to suppose" that the local characteristics would differ from the national statistics. *Dothard v. Rawlinson* 433 U.S. 321, 330 (June 27, 1977). [13] In *Dothard v. Rawlinson*, the Court held that use of national height and weight statistics was appropriate to find a discriminatory effect on Alabama women where "there was no reason to suppose that physical height and weight characteristics of Alabama men and women differ markedly from those

---

[13] Defendants cite *Townsend v. Nassau Cty. Med. Ctr.*, 558 F.2d 117, 119 (2d Cir. June 30 1977) for the proposition that "a statistic relating only to the general population, and not to the employment practices of the particular defendant" is not sufficient to demonstrate that a job prerequisite "operates to exclude" minorities. *Id.* at 119-20. But that holding relies on an interpretation of *Griggs* v. *Duke Power Co.*, 401 U.S. 424, 431 (1971) that the Supreme Court had rejected just three days before in *Dothard. Compare Dothard,* 433 U.S. at 330, *with Townsend*, 558 F.2d at 120. The case is also distinguishable, *see infra.*

of the national population." *Id; see* **U.S. Dept. of Housing and Urban Development,**
**April 4, 2016 Office of General Counsel Guidance.**

Second, "studies based on general population data and potential applicant
pool data" may be the "initial basis of a disparate impact claim, especially in cases
[where] the actual applicant pool might not reflect the potential applicant pool, due
to a self-recognized inability on the part of potential applicants to meet the very
standards challenged as discriminatory." *E.E.O.C. v. Joint Apprenticeship Comm.*
*of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 119 (2d Cir. 1999) (employment
discrimination context). In this situation, the potential applicant pool data may
provide a more accurate depiction of the true discriminatory impact than the actual
applicant pool data, though there is a question of who is reasonably a part of the
potential applicant pool. For instance, in *Wards Cove Packing Co. v. Atonio*, an
employment discrimination case, the Court held that a "proper comparison" in a
disparate impact case is "between the racial composition of the [at issue jobs] and
the racial composition of the qualified population in the relevant labor market," so
the general population "cannot be used as a surrogate for the class of qualified job
applicant" for specialized job. 490 U.S. 642, 650-51 (1989). T

Third, national or state general statistics are appropriate where actual
applicant data is not available. *Hazelwood Sch. Dist. v. United States*. 433 U.S. 299,
308-09 n.13 (1977). In *Hazelwood*, an employment discrimination case, the Court
held that data on pool of eligible candidates is appropriate to consider where
reliable actual applicant data was not available. *Id.* Defendants cannot insulate

42

themselves from disparate impact claims by failing to keep records of the race of applicants.

The Second Circuit has signaled that it is open to statistics based on the pool of potential applicants:

> [P]laintiffs might have been able to meet their burden by providing statistical evidence (1) that $x$% of all of the [members of protected class] in West Haven need (or have good reason) to live in the "group settings" prohibited by the facially neutral fire regulations at issue, (2) that $y$% of all of the [similarly situated persons outside the protected class] in West Haven need (or have good reason) to live in such group settings prohibited by the fire regulations, and, crucially, (3) that $x$ is significantly greater than $y$.

*Tsombanidis*, 352 F.3d at 577. In that case, the defendant city and city fire department set policies for landlords but were not themselves landlords. A post-*Inclusive-Communities Project* case confirms the validity of the use of the potential applicant pool: in *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 428 (4th Cir. 2018), *cert. denied sub nom. Waples Mobile Home Park Ltd. P'ship v. de Reyes*, 139 S. Ct. 2026, (2019), the Fourth Circuit found that plaintiffs sufficiently alleged a prima facie case of disparate impact where they pled undocumented immigrants constitute 36.4% of the Latino population in Virginia compared with only 3.6% of the non-Latino population, demonstrating that Latinos are ten times more likely than non-Latinos to be adversely affected by the policy requiring documentation evidencing legal status.

Here, it is undisputed that actual applicant data is unavailable. RPS does not receive the race of housing applicants from its clients. And, even if a housing

applicant is matched with a criminal record, the record only sometimes includes the race of the applicant: RPS has no record of the race or ethnicity of approximately 19% of the individuals who it reported had criminal records, where the applicant had a Connecticut address and had applied to rent an apartment. [Dkt. 118-1 ¶84 n. 19].[14]

In the place of statistics on actual applicants, Plaintiffs present uncontroverted evidence that, nationally and in Connecticut, and at every income level, African Americans and Latinos are more likely to be arrested than whites and are more likely to be incarcerated than whites. [Dkt. 118-1 ¶¶ 72-82].[15] Plaintiffs present uncontroverted evidence that, nationally, African Americans and Latinos are more likely to be arrested for federal drug crimes than whites, [Dkt. 118-1 ¶71], and, in Connecticut, African Americans are more likely to be arrested than whites. *Compare* Crime in Connecticut 201 at 29, *with* 2016 ACS 1-Year DP05. The question, then, is whether the statistics offered by the Plaintiff reflect the experiences and profiles of the *eligible* rental applicant pool for RPS's Connecticut clients.

---

[14] **RPS argues that Plaintiffs should have taken discovery of WinnResidential to gather this information, even if RPS itself did not have it. [Dkt. 129 at 18].  However, Plaintiffs' claims are not limited to ArtSpace Windham, to Plaintiff's knowledge WinnResidential no longer manages that property, and RPS has not produced the list of properties using CrimSAFE in Connecticut. *See* [Dkt. 124 (Order on Mot. to Compel)]. Therefore, the Court finds that Plaintiffs have not failed in their discovery obligations.**
[15] **Other courts have questioned whether incarceration data is a sufficient proxy for conviction data but have not granted summary judgment on the basis of the argument. *See Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 175-76 (E.D.N.Y. 2019).**

The Court finds that  this is a disputed question of fact because "although the decisions of Plaintiff's experts to rely on a broader potential applicant pool outside of the actual pool of… applicants is reasoned, adequately based in law and sufficient for the Court to find the testimony admissible, the more tangential nature of the analysis may diminish the weight a fact-finder would afford the conclusions." *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 176 (E.D.N.Y. 2019) (collecting cases and denying summary judgment on FHA disparate impact claim on the basis of race discrimination where housing provider allegedly did not accept tenants with criminal convictions). Specifically, the parties dispute whether the statistics offered by Plaintiffs reflect the reasonable eligible applicant pool on two bases: that Plaintiffs' statistics are, at most granular, state-wide, and that Plaintiffs' statistics are not specific to city renters. After considering the presented evidence, the Court finds that a reasonable fact-finder might find for either party.

First, the Court finds that  there is a disputed question of material fact as to whether Plaintiffs have presented sufficient evidence that Connecticut is the market area of RPS's Connecticut clients so that there is no gap between the people reflected in the statistics offered by Plaintiffs and the eligible rental applicant pool for RPS's Connecticut clients. Connecticut is a small state consisting of 4,842 square miles of land, with a water surface area of  701 square miles. *See* U.S. Census Bureau, Geography Division, *TIGERweb Decennial: Connecticut (Census 2010), available at* https://tigerweb.geo.census.gov/tigerweb/. It is a commutable state serviced by three interstate highways, I-84, I91, and I-95,

and several state highways which traverse the entirety of the state. *See* **Connecticut Department of Transportation,** *State Highway System Map* **(2019),** *available at* **https://portal.ct.gov/DOT/PP_Bureau/Documents/Maps. Since RPS serves more than 120 properties in the small state of Connecticut, [Dkt. 118-1 ¶ 100], the entire state may be within the market area for one or more of the clients served by RPS. See** *R.I. Comm'n for Human Rights v. Graul***, 120 F. Supp. 3d 110, 125 (D.R.I. 2015) (granting plaintiff summary judgment on FHA disparate liability, finding statewide rental market for housing complex in middle of small state served by major highways);** *Fortune Soc'y***, 388 F. Supp. 3d a  169 (denying both parties summary judgment for 8 county market). Although RPS states "many of [its] customers operate subsidized/affordable housing communities," it does not provide evidence that there are parts of the state which are not in the market area for at least one of its clients. [Dkt. 114-4 ¶5]. But since "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence," the Court does not grant the Plaintiffs summary judgment on this issue.** *See Deutsch v. Novartis Pharm. Corp.***, 768 F. Supp. 2d 420, 434 (E.D.N.Y. 2011) (quoting** *Quiet Tech. v. Hurel–Dubois UK Ltd.,* **326 F.3d 1333, 1340–41 (11th Cir.2003)).**[16]

---

**[16] There are two ways to collect data on arrests and convictions by race: bottom-up, by asking individuals whether they have been arrested or convicted or incarcerated in a certain time period, or top-down, by asking law enforcement agencies, courts and prisons about the characteristics of who they have arrested, convicted, and imprisoned in a certain period. Both have limits: it is difficult to construct and administer a national- or state-representative survey of individuals and their answers may not be accurate, and it is difficult to collect and harmonize**

Next, the Court considers RPS's argument that a reasonable fact finder could not find Plaintiffs' evidence specific enough to reflect the arrest profile of the pool of applicants to affordable/subsidized rental housing in Connecticut. Were the Court to find that RPS had demonstrated that the eligible rental applicant pool should be narrowed to individuals eligible for and/or interested in subsidized and affordable housing in cities, similar to the applicant pool for the ArtSpace Windham, the relevant question would be whether the experiences of African Americans and Latinos statewide in terms of arrests and incarcerations differ from the experiences of African Americans and Latinos eligible for and/or interested in subsidized and affordable housing in cities in terms of arrests and incarcerations. Plaintiffs have demonstrated that African Americans and Latinos face higher rates of arrest and incarceration regardless of their income and regardless of their state geography. This evidence gives the Court reason to believe that, since African Americans and Latinos face higher rates of arrest regardless of their socio-economic status, state-wide arrest and incarceration statistics reflect the arrest and incarceration profile of the pool of applicants for affordable/subsidized housing.

---

data from diverse criminal justice institutions. (This point is, in fact, the basis of RPS's business model. *See* Dkt. 114-1 ¶13.).

Here, there is an additional question of who the appropriate pool is: while this case is focused on Connecticut, a Connecticut housing applicant may have, like Mr. Arroyo, a criminal record from another state or from the federal government, so top-down statistics from Connecticut criminal justice institutions only may not completely capture the criminal record of Connecticut housing applicants. However, Plaintiffs provide national data in addition to state-level data, and RPS does not argue that there are state-by-state disparities not captured by national level data.

RPS argues at length that there is a large variation in the population demographics within Connecticut. It provides evidence that the percentage of the population who is African American and the percentage of the population who is Latino differs between Connecticut cities and Connecticut suburbs or rural areas, and between renters looking for affordable or subsidized housing and those who are not. [Dkt. 114-1 ¶¶56-57]. But RPS's population statistics do not definitively speak to the key question: whether differences in *rates of arrest and incarceration by race and ethnicity* differ between geographic localities and income levels and propensity to rent. For example, the fact that 38% of the population of Hartford is African-American while 7% of the population of Willimantic is African-American, [Dkt. 114-5 at Ex. I], does not necessarily say anything about whether the arrest rate of African Americans in Willimantic is more or less disproportionately high than the arrest rate of African Americans in Hartford. *See Inclusive Communities Project*, 135 S. Ct. at 2522 (cautioning against drawing conclusions about policies from bare statistical disparity). RPS simply has not given the Court any definitive "reason to suppose that" relative rates of criminal justice experience of urban Connecticut renters "differ markedly from those of the [Connecticut] population." *See Dothard,* 433 U.S. at 330.

RPS's cases are not to the contrary, as they are all from the employment discrimination context. *See* [Dkt. 114 at 20-24]; *Townsend v. Nassau County Medical Center*, 558 F.2d 117 (2d Cir. 1997) (finding that national data on those with and without college degrees insufficient to answer question about populations with and without a B.S. degree); *Mandala v. NTT Data, Inc.*, No. 18-CV-6591 CJS, 2019

WL 3237361, at *4 (W.D.N.Y. July 18, 2019) (finding that national statistics regarding conviction and arrests could not be assumed to reflect statistics for those qualified to be "viable candidates" for positions of Salesforce and web developers ); *Wards Cove Packing Co. v. Atonio*, 490 U.S. at 650 (finding that statistics on cannery workers insufficient given question of who would be qualified to be managers); *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 152 (2d Cir. 2012) (finding data on all employees insufficient given question of who was eligible for a promotion among employees who had passed required test). But the employment discrimination context is materially different from the housing context because jobs often require unusual additional qualifications—consider the requirements described in the cases above—and so there *is* a reason to suppose that the characteristics of the "eligible labor pool" differ in systematic and relevant ways from the characteristics of the general state population. *Chin,* 685 F.3d at 152. [17] In contrast, "eligibility" for renting an apartment largely depends on income and geographic preference, characteristics Plaintiffs have accounted for.

In its reply brief, RPS argues that, without evidence of the number of African Americans and Latinos who apply to rent housing from RPS's Connecticut clients, Plaintiffs cannot prove a *prima facie case.* In support, it cites *Ungar v. New York City Hous. Auth.*, 363 F. App'x 53, 56 (2d Cir. 2010) (Summary Opinion):

---

[17] In the employment discrimination context, "in the typical disparate impact case the proper population for analysis is the applicant pool or the *eligible* labor pool." *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 152 (2d Cir. 2012).[17]RPS's citation of this authority omits the phrase, "the eligible labor pool," a mis-citation which incorrectly heightens the standard statistics must meet to be acceptable. [Dkt. 114 at 19-20].

> To know whether TSAP has disparate impact on Hasidic Jews, we would need to know, at a minimum, the percentage of the approximately 80,000 people who apply for public housing each year that is Hasidic. Because plaintiffs have not provided this information, they failed to establish a prima facie case of discrimination.

But in light of the support of *Tsombiandis*, 352 F.3d at 577, and *Reyes,* 903 F.3d at 428m for the use of a potential applicant pool, and in light of the distinction that the instant Plaintiffs have offered a causal story for the disparate impact while the *Ungar* plaintiffs did not, the Court does not find *Ungar* persuasive.

Finally, RPS argues, without legal citation, that even if there is a disparate impact, it is not "substantial," as fewer than 7% of all rental housing applicants in Connecticut between 2016 and the present have had any "record found" through CrimSAFE. [Dkt. 114 at 16-17]; [Dkt. 114-1 ¶11]. In the Second Circuit, "courts should take a 'case-by-case approach' in judging the significance or substantiality of disparities, one that considers not only statistics but also all the surrounding facts and circumstances." *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 153 (2d Cir. 2012) (quoting *Waisome v. Port Auth. of N.Y. & N.J.,* 948 F.2d 1370, 1376 (2d Cir.1991)). Disparate impact claims have been found valid even where a relatively small percentage of individuals are affected. *See, e.g., Jones v. City of Bos.,* 752 F.3d 38, 44-45, 52-53 (1st Cir. 2014) (disparate impact was established even though less than 1% were affected by neutral rule). Here, in light of the facts discussed above and below, the Court finds that Plaintiffs have provided sufficient evidence to put into question whether there is a disparate impact.

For these reasons, the Court does not grant either party summary judgment as to this issue.

50

### 2. Business Purpose

If a statistical disparate impact is shown, the "defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests," 24 C.F.R. § 100.500(c)(2). "HUD has clarified that this step of the analysis 'is analogous to the Title VII requirement that an employer's interest in an employment practice with a disparate impact be job related.'" *Inclusive Communities Project, Inc.*, 135 S. Ct. at 2514-15. (quoting Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed.Reg. 11460, 11470 (2013)). Here, any business justification must address (a) why excluding applicants with arrests and convictions is justified *and* (b) why *categorizing* criminal records is justified. As to (a), RPS argues first that screening for arrests and convictions is legally required for federally subsidized properties and, second, screening for arrests and convictions is permitted to protect health and safety; as to (b), RPS argues CrimSAFE's categorization has unique advantages in accurately categorizing the risk level of arrests and convictions, as well as in minimizing bias in the screening process. [Dkt. 129 at 33-38; Dkt. 114 at 24-26].

Landlords of federally-assisted housing must reject applicants recently evicted for drug activity or who are registered sex offenders and must perform "necessary criminal history background checks in the State where the housing is located and in other states where the household members are known to have resided." 24 C.F.R. §§ 5.856; *see* 24 C.F.R. § 5.854. With respect to an applicant "evicted… for drug-related criminal activity," landlords must consider individual

factors, such as whether the individual has completed a rehabilitation program or no longer resides with household members seeking housing, though a tenant may have been evicted without satisfying a criminal conviction standard of proof for the activity. 24 C.F.R. §§ 5.854(a), 5.861. But these statutes do not provide a justification in this case because they apply to only a very narrow set of applicants—sex offenders and applicants who have previously been evicted for drug-related criminal activity—of which Mr. Arroyo is not one.

42 U.S.C. § 13661(c) permits criminal background screening to detect any other criminal activity that would harm the "health, safety, or right to peaceful enjoyment of the premises by other residents the owner, or public housing-agency employees." Except in limited circumstances not applicable here, a consumer reporting agency may not make a consumer report containing "records of arrest that, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is the longer period." 15 U.S.C. § 1681c(a)(2). Under the statute, a record of a conviction of a crime which antedates the report by more than seven years may be included. *Id.* at 1681c(a)(5). RPS suggests that because 15 U.S.C. § 1681c allows screening reports to reflect the criminal records for up to seven years for non-convictions and for no time limit for convictions, Plaintiffs cannot challenge the time periods under the FHA. [Dkt. 129 at 33] (quoting *Eldred v. Ashcroft*, 537 U.S. 186, 208 (2003) ("[C]ourts are not at liberty to second-guess congressional determinations and policy judgments…, however debatable or arguably unwise they may be")).

RPS provides neither legal nor empirical support for the proposition that the lone fact that an applicant has a pending arrest record is sufficient for a housing provider to determine that an individual poses a threat to the health and safety of a residential community, although it does provide sufficient evidence to put into dispute whether an older conviction is sufficient evidence of a threat to health and safety.

15 U.S.C. § 1681c and 42 U.S.C. § 13661(c) do not establish that Congress determined that a pending arrest record alone may be the basis for a housing denial.  "It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." *United States v. Wells*, 519 U.S. 482, 496 (1997) (quoting *NLRB v. Plasterers' Local Union No. 79,* 404 U.S. 116, 129–130 (1971)). 15 U.S.C. § 1681c does not explicitly endorse the use of screening reports reflecting criminal records of non-convictions and older convictions; it only does not prohibit them.

The statute's silence is especially treacherous in light of the answering silence in the FHA. The FHA states that its protections do not apply to any decision denying housing because an applicant "has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance." 42 U.S.C. § 3607(b)(4). If silence speaks, then "the specific carveout for drug convictions provides a strong inference that Congress presumed the Act could sometimes require housing providers to overlook other types of criminal records to avoid having discriminatory effects on members of protected classes…." *Simmons v. T.M. Assocs. Mgmt., Inc.*, 287 F. Supp. 3d 600, 603 (W.D. Va. 2018).

And this interpretation of congressional silence has been validated by the administering agency: HUD has released guidance that clarified that an arrest record by itself—in the absence of consideration of a police report or other additional facts—may not be the basis for denying admission, terminating assistance, or evicting tenants from public and other federally-assisted housing, *see* Guidance for Public Housing Agencies (PHAs) and Owners of Federally-Assisted Housing on Excluding the Use of Arrest Records in Housing Decisions, HUD PIH Notice 2015-19, (November 2, 2015), available at: http://portal.hud.gov/hudportal/documents/huddoc?id=PIH2015-19.pdf (hereinafter "HUD Nov. 2, 2015 Guidance").

HUD states "that the fact that an individual was arrested is not evidence that he or she has engaged in criminal activity" sufficient to warrant denial of admission." *Id. at 3.* A housing owner may only "make an adverse housing decision based on the conduct underlying an arrest if the conduct indicates that the individual is not suitable for tenancy and the PHA or owner has sufficient evidence other than the fact of arrest that the individual engaged in the conduct," "such as police reports detailing the circumstances of the arrest, witness statements, and other relevant documentation to assist them in making a determination that disqualifying conduct occurred." *Id.* at 3-4.  This requirement that housing owners look at conduct is specific to arrests: "reliable evidence of a conviction for criminal conduct that would disqualify an individual for tenancy may also be the basis for determining that the disqualifying conduct in fact occurred." *Id.* at 3.

This guidance is not a product of notice-and-comment and is neither binding, *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 807 (D.C. Cir. 2006), nor entitled to *Chevron* deference. *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (" Interpretations contained in policy statements… do not warrant *Chevron*-style deference.") (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984)). Rather, this guidance is accorded weight according to *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944). *Id.* "Under *Skidmore,* the weight [courts] accord an agency interpretation depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Boykin v. KeyCorp*, 521 F.3d 202, 208 (2d Cir. 2008) (quoting *Skidmore,* 323 U.S. 134); *see also United States v. Mead Corp.*, 533 U.S. 218, 228 (2001).

Here, the Court finds that the November 2, 2015 HUD Guidance is persuasive: it is thorough, synthesizing a review of the relevant case law, a review of the specifics of the governing regulations, and relevant governmental statistics regarding arrests. *Id.* at 3-4. Its reasoning is careful, drawing a distinction between relying on an arrest record itself and other evidence of the conduct underlying the arrest. And it is consistent with later pronouncements, particularly the April 4, 2016 HUD Guidance. Therefore, the Court finds that the November 2, 2015 Guidance undermines RPS's claim that 15 U.S.C. § 1681c and 42 U.S.C. § 13661(c) establish the time limits during which a pending arrest charge or an old conviction alone may be the basis for a housing application denial.

With regard to empirical evidence, RPS provides that the federal Bureau of Justice Statistics has found that 83% of released prisoners are arrested again within 9 years, with an average of 5 arrests per released prisoner. [Dkt. 114-1 ¶59]. 18% of violent victimizations took place in the victim's home, 16% took place near the victim's home, and 9% took place at a friend's, neighbor's, or relative's home. *Id.* ¶ 60. In response, Dr. Lila Kazemian, one of Plaintiff's offered experts, stated that "anybody who has their name already in the system becomes more likely to have more contacts with the criminal justice system," such that individuals who were previously arrested have elevated statistical levels of re-arrest. [Dkt. 129-1 ¶14]. She also states that, based on her review of the relevant academic literature, "[t]here is no compelling empirical evidence to suggest that old criminal records are predictive of future offending" because "the more time that passes since the last crime, the less likely it is that the individual will engage in the crime in the future." [Dkt. 118-1 ¶95].

This evidence puts into dispute whether individuals with old convictions may be excluded to protect health and safety, especially since the term "old conviction" remains undefined and is used to mean convictions from five to ninety-nine years old. But none of this evidence supports the proposition that individuals with pending arrests are threats to health and safety. The evidence from the Bureau of Justice Statistics does not speak to the dangerousness of individuals who have been arrested, but not charged. Dr. Kazemian's comments only beg the question of the dangerousness of arrestees: the fact that someone who has been arrested once is more likely than others to be arrested again only demonstrates that

whatever characteristics are associated with being arrested likely persist over time—and many characteristics, including implicit bias, cultural incompetence, race and place of residence, persist over time.[18]

This evidence demonstrates that there is a material dispute of fact as to whether there is a business justification for screening for old convictions, that is, whether the justifications offered by RPS, with the support offered by RPS, demonstrate that screening for old convictions is "necessary" to achieve one or more substantial, legitimate, nondiscriminatory interests. But, in light of the HUD Guidance and empirical evidence cited, no reasonable fact finder could find that there is a business justification for screening solely on the basis that someone has a pending arrest, in the absence of the details of the arrest.

---

[18] Neither party presents any evidence of the percentage of arrests that lead to convictions or other measurements of risk. But, as an aside, the Court notes that state and local government data demonstrate that conviction rates have changed over time and that they vary considerably depending on the charge. *Compare* Brian A. Reaves, Bureau of Justice Statistics, U.S. Dep't of Justice, Felony Defendants in Large Urban Counties, 2009, at 22, Table 21 (2013), http://www.bjs.gov/content/pub/pdf/fdluc09.pdf (in the 75 largest counties in the United States in 2009, approximately one-third of felony arrests did not result in conviction, with about one-quarter from all cases ending in dismissal.), *cited by* U.S. H.U.D., Office of Public and Indian Housing, *Guidance for Public Housing Agencies (PHA) and Owners of Federally-Assisted Housing on Excluding the Use of Arrest Records in Housing Decisions,* (PIH 2015-19; Nov. 2, 2015) at 3 n. 8, *with,* Issa Kohler-Hausmann, <u>Misdemeanorland: Criminal Courts and Social Control in an Age of Broken Windows Policing</u> 68-69 (2018) (author's analysis of data from New York State Department Division of Criminal Justice Services showing that, in New York City between 2010 and 2015, more than 50 percent of misdemeanor arrests were dismissed, an increase from the 1985 dismissal rate), *with,* Malcolm Feeley, <u>The Process is the Punishment: Handling Cases in a Lower Criminal Court</u> at xxviii, 127 (1979) (author's analysis of 1970s New Haven Court of Common Pleas dispositions).

The offered evidence is especially insufficient in the face of the bedrock principle of our legal system that a person who is arrested is presumed innocent – and that innocence alone does not undermine probable cause to arrest. *See Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 241 (1957) ("The mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense."); *United States v. Di Re*, 332 U.S. 581, 595 (1948) ("the presumption of innocence is not lost or impaired by neglect to argue with a policeman"); *Coffin v. United States*, 156 U.S. 432 (1895) ("the principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."); *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000) ("Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent."); *Panetta v. Crowley*, 460 F.3d 388, 395–96 (2d Cir. 2006) ("an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause" to arrest).

And even if RPS had demonstrated that screening for old convictions indisputably contributes to safety, a dispute remains whether CrimSAFE, which characterizes and *categorizes* criminal records, allows property managers to more quickly and accurately screen for these safety risks. *Compare* [Dkt. 120 (Jay Kacirk Decl.) at 3, 6, 9, 11] & [Dkt. 128-3 ¶26] (applicants dispute RPS's tenant screening

reports in less than 1% of instances), *with, e.g.,* [Dkt. 116-31 (Ex. 28: Kazemian Rep.) at 2] (estimating that industry-wide, approximately 30% of criminal history reports contain inaccuracies). The parties also dispute whether CrimSAFE helps to remove potential explicit or implicit bias at the individual property manager level, or whether it gives individual property managers more information. *Compare* [Dkt. 114-2 (Kayani Decl.) ¶¶18, 19], *with id.* at Ex. C at p. 4 (CrimSAFE result listing a "race" category, but listing Mr. Arroyo's race as "unknown").

Finally, RPS makes two additional arguments: first that the Court should not rely solely on statistics, as some crimes, though low probability, may have dramatic consequences on a community; and second, that the Court should consider the liability for failing to review criminal records that housing providers might face. [Dkt. 129 at 38-39]. But, as the Court will go on to note, the alternative to CrimSAFE is returning more detailed reports of criminal records to line staff decisionmakers, rather than not returning criminal records reports at all. This alternative does not ignore the possibility of a low probability event, but allows for it, and the Court sees no reason why the alternative would necessarily lead to worse community consequences or greater housing provider liability.

For these reasons, Court finds that RPS and Plaintiffs provide sufficient facts to demonstrate the existence of a material dispute as to whether there is a business purpose for screening for convictions and denies the parties' motions for summary judgment on that basis. But the Court finds that the Plaintiffs have shown that there is no business justification for screening applicants on the basis of the fact of a pending arrest alone.

### 3. Less Discriminatory Alternatives

After a defendant has shown a legitimate business interest for its facially neutral practice, the burden shifts to the Plaintiffs to show that there is a "less discriminatory alternative," which must be 24 C.F.R.§ 100.500(c)(3). "[A] a less discriminatory alternative must serve the respondent's or defendant's substantial, legitimate nondiscriminatory interests, must be supported by evidence, and may not be hypothetical or speculative." Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. at  11,473 (Feb. 15, 2013); *see also Inclusive Communities Project*, 135 S. Ct. at 2518 (stating that before rejecting a business or public interest, "a court must determine that a plaintiff has *shown* that there is 'an *available* alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs'" (emphases added)).

In their motion for summary judgment, Plaintiffs advance four less discriminatory alternatives to achieve the goals of protecting safety and property: (1) RPS could exclude arrests that have not or did not result in a conviction from being considered as a basis for a CrimSAFE decision; (2) RPS could set a "reasonable, evidence-based" cap on the lookback period for convictions, and exclude older arrests from being considered as a basis for a CrimSAFE decision; (3) RPS could evaluate each criminal record on an individualized basis by considering the record and relevant mitigating circumstances outside the criminal record itself to determine the actual risk to safety before reporting a housing provider that the applicant is disqualified; and (4) RPS could provide the underlying information about the criminal history to the housing provider without providing a

leasing decision the landlord can do an individualized assessment. [Dkt. 118 at 29 -31].

RPS first argues that the first two alternatives are precluded under Rule 37(c) because plaintiffs did not disclose these "alternatives" during discovery. [Dkt. 129 at 41-42]. Rule 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37. Rule 26(e)(1) states: "A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission— must supplement or correct its disclosure or response in a timely manner. . . ." Fed. R. Civ. P. 26(e)(i).

This argument is unavailing. Far from sandbagging RPS, Plaintiff produced all relevant information during discovery. When RPS asked Plaintiffs to "describe … the factual basis of your [Complaint's] allegation that there exist 'less discriminatory alternatives'," Plaintiffs responded that RPS "has available to it the less discriminatory alternative of . . . consideration of such factors as the … *the outcome or disposition of the case*" and *"the amount of time since the criminal activity occurred"* (emphasis added). [Dkt. 136-1 (Pl.'s Reply Facts) ¶¶ 47, 109]. In addition to the interrogatory response, Plaintiffs disclosed expert reports to RPS, which specifically included that "arrest[s] … should not even be included" in CrimSAFE.", *id.* ¶ 14, and that an appropriate "guideline for policy" based on the

empirical studies is *"five to nine years"* provided this is considered "in conjunction with some of the other factors" the expert had discussed. *Id.*

Although RPS argues that the Rule 26(e) burden applies to "theories," in addition to information, it cites only *Agence France Presse v. Morel*, 293 F.R.D. 682, 686 (S.D.N.Y. 2013), in support. *See* [Dkt. 129 at 41-42]. But, there the "theory" at issue was a damages calculation, *Morel,* 293 F.R.D. at 686, and Rule 26 specifically requires parties to disclose "a computation of each category of damages claimed by the disclosing party." There is no corresponding Rule or regulation requiring discovery disclosure of less discriminatory alternative theories. So, the Court considers the alternatives on their merits.

First, the Court finds that it is undisputed that RPS could cease considering arrests that do not result in conviction. However, since disputes of fact remain as to whether this would diminish the disparate impact caused by excluding such people, this is not a basis in and of itself for a grant of summary judgment.

As to the second alternative, a "reasonable, evidence-based" cap on the lookbook period for conviction is not sufficient to win Plaintiffs' summary judgment as too many disputed facts remain. First, Plaintiffs do not specify what an "evidenced-based" number of years, and Plaintiffs' expert could not specify what she thought was an "evidence-based" lookback period for any particular CrimSAFE category of crime. [Dkt. 132 at 228-29]. The Court cannot find that RPS could undertake an alternative the outline of which even Plaintiffs do not know. Second, the number of years is in dispute in light of the BJS study discussed above.

Plaintiffs' third alternative fails because, as RPS points out, RPS does not have the majority of the information that would lead to a leasing decision. It receives an applicants' identifying information. [Dkt. 118-1 ¶14]. It then returns information about the applicant's offense record, if any. *Id.* ¶19. But it does not have other information, and so it could not itself undertake a holistic individualized review of the applicant.  Since there is no evidence that RPS's clients would give RPS such information, it is speculative and not truly available. *See ICP* at earlier cite; *Allen v. City of Chicago*, 351 F.3d 306, 313-14 (7th Cir. 2003) (On appeal of summary judgment, "Without any evidence that the officers' alternative of increasing merit promotions would lead to a workforce substantially equally qualified, we cannot accept the officers' alternative as substantially equally valid.").

Plaintiffs' fourth alternative is not a satisfactory basis for summary judgment in their favor. At a minimum, RPS provides its clients with the option to view the underlying criminal report information, though the client may choose suppress that information from on-site managers and other levels of administrators. [Dkt. 118-3 at ARROYO0001750]. The parties submit dueling evidence on whether RPS always provides at least one person in the client company with access to the full records, or whether RPS may prevent everyone at the company from accessing the full records, so it is disputed. *Compare id.* (From 2016 training, "Consider the Backup Reports setting on this screen as the "MAIN SWITCH" for making backup reports viewable. When unchecked, NO USERS will have access to criminal backup reports, not even administrators." ) *with* [Dkts. 129-2 (Kayani Decl.) at ¶¶ 11 ("The CrimSAFE section of a report is always accompanied by another portion of the

report that displays the full public data of any record(s) identified via CrimSAFE, including the date the offense was committed, the severity level, and its current status…. The administrative version of the report, with the full details of any records found by the CrimSAFE product, is made available to the identified supervisor(s) at the customer simultaneous with the leasing-agent version of the report via hyperlink., 24, Ex. D (Arroyo BackUp Report)]  and [Dkt. 129-3 (Dacthler Decl.) at 18]. While RPS responds that CrimSAFE should include the full criminal history with every report, and eliminate the features that enable suppression of details, there is, as explained above, a dispute of facts as to whether there is a legitimate business justification for RPS's suppression.

Because of these remaining factual disputes, the Court denies the parties' motions for summary judgment as to Plaintiffs' FHA claim for disparate impact on the basis of race. These claims will proceed to trial.

## C. *Fair Housing Act Claim for Disparate Treatment on the basis of Race or National Origin*

RPS argues that Plaintiffs' FHA claim for discriminatory treatment on the basis of race or national origin in Count I must fail because there is no evidence of racial animus because RPS was not aware of Mr. Arroyo's race or ethnicity. [Dkt. 114 at 15-17]. In response, Plaintiffs argue that the Court can and should consider the "totality of the circumstances" to determine the disparate treatment claim on the basis of race [or national origin], and that such evidence suffices for the claims to proceed to trial.  [Dkt. 126 at 25-29]. The Court agrees with Plaintiffs.

"Discriminatory intent may be inferred from the totality of the circumstances." *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 400 (S.D.N.Y. 2013)

(quoting *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 48 (2d Cir.2002)). "A plaintiff can establish a prima facie case of disparate treatment 'by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'" *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016)(government actor context) (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995)) "Because discriminatory intent is rarely susceptible to direct proof, a district court facing a question of discriminatory intent must make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether it bears more heavily on one race than another may provide an important starting point.'" *Ibid.* (2d Cir. 2016) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266, (1977)). "But unless a 'clear pattern, unexplainable on grounds other than race, emerges,' 'impact alone is not determinative, and the Court must look to other evidence.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 266); *see Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 464 (1979) ("disparate impact and foreseeable consequences, without more, do not establish a constitutional violation.").[19] Other relevant considerations for

---

[19] *See also Soberal-Perez v. Heckler*, 717 F.2d 36, 42 (2d Cir. 1983) ("while it is true that…. the fact that a particular action has a foreseeable adverse impact may be relevant evidence in proving an equal protection claim… standing alone that fact is insufficient to establish discriminatory intent"); *Washington v. Davis,* 426 U.S. 229, 241-42 (1976 (discriminatory impact alone does not show discriminatory intent but it is a relevant factor to consider along with the totality of relevant facts). *See also United States v. City of New York*, 717 F.3d 72, 82 (2d Cir. 2013); *United States*

discerning a racially discriminatory intent include" '[t]he historical background of the decision ... particularly if it reveals a series of official actions taken for invidious purposes,' '[d]epartures from the normal procedural sequence,' '[s]ubstantive departures,' and '[t]he legislative or administrative history ... especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 266-68). "Questions of subjective intent can rarely be decided by summary judgment." *United States v. City of New York*, 717 F.3d 72, 82 (2d Cir. 2013) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 816 (1982)) (claim for disparate treatment in hiring under Title VII).

Here, Plaintiffs point to evidence that, as of mid-April of 2016, RPS was aware that its CrimSAFE screening product's use of arrest records may have a disproportionate and arbitrary effect on African Americans and Latinos, and that it has not taken affirmative steps to end its screening product's use of those records.

On April 4, 2016, HUD's Office of General Counsel published a document titled Application of Fair Housing Act Standards to the Use of Criminal records by Providers of Housing and Real Estate-Related Transactions, in which it stated "Nationally, racial and ethnic minorities face disproportionately high rates of arrest and incarceration," and that, "the fact of an arrest is not a reliable basis upon which to assess the potential risk to resident safety or property posed by a particular

---

*v. City of Yonkers*, 96 F.3d 600, 603 (2d Cir. 1996) (post-trial).

individual." HUD OGC 4/4/2016 Guidance at 3-5. On April 15, 2016—over a week before Mikhail Arroyo's application—RPS shared with some of its clients an email which highlighted (a) per HUD, arrest records that don't result in convictions are not reliable bases to assess the potential risk resident safety or property; and (b) "according to HUD, a blanket policy to deny any applicants with a criminal record may have a disparate impact on African Americans and Hispanics." [Dkt. 125-17 at 2]; *see also* [Dkt. 125-18]. The email also stated that RPS was considering changes to its products:

> RPS is currently reviewing our products to determine what changes, if any, to make in order to best support our clients in light of this new guidance from HUD. Once this review is complete, any changes will be communicated to clients with enough notice to allow for clients to adjust their processes.

[Dkt. 125-17 at 3]. But, as of September 5, 2019, Stephanie Dacthler, a Relationship Manager for RPS, was not aware of any changes made to CrimSAFE based on the HUD Guidance. [Dkt. 118-8 at 75:18-23].

This scenario is far from one in which "the issue of race was first introduced [to the defendants] upon filing this action." *Cf. Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 280 (S.D.N.Y. 2019) (granting summary judgment on disparate treatment claim). Instead, there is at least a disputed question of fact as to whether RPS's decision to continue to allow its housing clients to use CrimSAFE to screen for arrest records in the face of the legal interpretation of HUD's Office of General Counsel that African Americans and Latinos are disproportionately more likely to be arrested  is motivated by discriminatory intent. For this reason, the Court denies

RPS's motion for summary judgment as to the FHA claim for disparate treatment on the basis of race or ethnicity. The claim will proceed to trial.

### D.  FCRA Claims

In Count IV and V of the Complaint, Plaintiffs allege that RPS violated the Fair Credit Reporting Act ("FCRA"), specifically, 15 U.S.C. §§ 1681g and 1681h, by failing to disclose Mikhail Arroyo's file to Carmen Arroyo and by failing to establish reasonable requirements for proper identification, and that such violations were both negligent and "willful."

The FCRA balances protecting individuals from identity theft by requiring the submission of personally-identifying information before disclosure with promoting access to consumer files by minimizing the personally-identifying information required. 15 U.S.C. § 1681g requires that a consumer reporting agency "shall, upon request, and subject to section 1681h(a)(1) of this title, clearly and accurately disclose to the consumer… all information in the consumer's file at the time of the request." Section 1681h(a)(1) in turn provides that "a consumer reporting agency shall require, as a condition of making the disclosures required under section 1681g of this title, that the consumer furnish proper identification."

The FCRA does not define "proper identification," however, and the case law illustrates how the tension between its two goals has frustrated courts' filling in of the gap. In *Howley v. Experian Info. Sols., Inc.*, a court denied the defendant's motion for summary judgment on the plaintiff's § 1681h(a) claim against a consumer reporting agency for disclosing his information to a third party who shared the same first name as the plaintiff and shared all digits but the last of his

social security number. 813 F. Supp. 2d 629 (D.N.J. 2011). There, the court found that there was a question of fact as to whether the agency had disclosed the information without proper identification. 813 F. Supp. 2d 629. *Id.* On the other hand, in *Menton v. Experian Corp.,* a court denied a related defendant's motion to dismiss a plaintiff's § 1681g(a) claim for failing to disclose his file where he had provided a copy of his driver's license, a bank statement with his name and address, his law firm website, and a notarized copy of his signature. No. 02 CIV. 4687 (NRB), 2003 WL 941388, at *1 (S.D.N.Y. Mar. 6, 2003). There, the court held that there was "no reason that Experian could not have verified Mr. Menton's identity and provided him with his credit report soon after receiving the various alternative forms of identification which he did furnish." *Id.* at 3. By *Menton*'s lights, proper identification may include documents whose validity is determined by local state law: for example, state driver's licenses, or notarized documents, such as a power of attorney or written authorization. *See, e.g., id.*

A consumer reporting agency must implement consumer identification requirements that "ensure that the information is sufficient… to match consumers with their files" and "commensurate with an identifiable risk of harm arising from misidentifying the consumer." 12 C.F.R. § 1022.123(a). RPS, a nationwide specialty consumer reporting agency, must implement a file disclosure which "[c]ollect[s] only as much personal information as is reasonably necessary to properly identify the consumer…." 12 C.F.R. § 1022.137(a)(2)(ii). Further, "[i]n the event that  a consumer requesting a file disclosure cannot be properly identified in accordance with the FCRA, [a consumer report agency must] provid[e] a statement that the

consumer's identity cannot be verified; and directions on how to complete the request, including what additional information or documentation will be required to complete the request, and how to submit such information,"… or "accept the request." 12 C.F.R. § 1022.137(a)(2)(iii)(C), (e)(1)-(2) (promulgated as an implementation of 15 U.S.C. § 1681g, among others).

Here, the only FCRA violations that Plaintiffs allege arise out of violations of Mikhail Arroyo's FCRA rights, and so RPS can only be liable for damages to him. The FCRA authorizes a third party to "accompany" a consumer to receive disclosures provided that person provides "reasonable identification," which may include the consumer's "written statement granting permission… to discuss the consumer's file in such person's presence." 15 U.S.C. § 1681h(d); *see* 15 U.S.C. § 1681b(a)(2) ("any consumer reporting agency may furnish a consumer report… in accordance with the written instructions of the consumer to whom it relates."). But 15 U.S.C. 1681g(a) does not give a person "a right to receive information from a third party's file." *Neclerio v. Trans Union LLC,* 983 F. Supp. 2d 199, 219 (D. Conn. 2013) (VLB); *see Oses v. Corelogic Saferent, LLC*, 171 F. Supp. 3d 775, 782 (N.D. Ill. 2016) (same).  And third parties do not have remedies under the FCRA—a person who negligently or willfully fails to comply with the FCRA "with respect to any consumer is liable to *that consumer*" for damages including "actual damages sustained *by the consumer.*" 15 U.S.C. §§ 1681n(a),1681o(a) (emphases added).

Plaintiffs argue that RPS violated its duty to make the required consumer disclosures because it did not disclose Mr. Arroyo's information to Ms. Arroyo on behalf of Mr. Arroyo until the start of this litigation. [Dkt. 87 at 9-10]; [Dkt. 105 at 1-

5].  RPS argues that Plaintiffs cannot show damages and because Ms. Arroyo failed to present proper identification. The Court preliminarily addresses RPS's argument regarding damages, and then addresses the parties' arguments regarding disclosure and proper identification.

RPS argues that Plaintiffs cannot show damages based on RPS's conduct throughout the disclosure process because (1) Plaintiffs have not developed testimony from WinnResidential that Ms. Arroyo could have used the file disclosure information to persuade WinnResidential to overlook Mr. Arroyo's criminal history; and (2) such testimony would not be helpful, because WinnResidential already had the criminal record but refused to grant access to housing until it was sued. [Dkt. 114 at 34].

The Court denies RPS summary judgment on this basis because the relevant facts are disputed. Plaintiffs have presented some evidence that WinnResidential might have allowed Mr. Arroyo to move in before June 2017 after Plaintiffs provided WinnResidential with details about Mr. Arroyo's criminal history that WinnResidential had located on their own. *E.g.* [Dkt. 116-35 at Ex. A (6/13/2017 Fact Finding Hearing Transcript)]:[20] Plaintiffs present evidence that they provided WinnResidential with new information about Mr. Arroyo's Pennsylvania arrest after the CHRO Complaint and at the mediation. *Id.* at 68:5-71:10. Plaintiffs present evidence that relevant decision-making WinnResidential employees did not have

---

[20] Defendants object that this affidavit is hearsay but, since the Exhibit includes statements by WinnResidential employees with personal knowledge of the events discussed, Court finds that the affidavit is admissible for the purposes of summary judgment. [Dkt. 140-1 (Def'dt's Rule 56(a)(1 Reply Statement of Facts) at ¶87].

this information, and that WinnResidential employees considered "the crux of issue" as to why "Mikhail Arroyo ha[d] not been allowed to move in to ArtSpace at Windham" to be that they had not had that information. *Id.* at 52:14-24, 50:16-25. But, Plaintiffs also present evidence that WinnResidential did not immediately allow Mr. Arroyo to move in once it received his criminal records—WinnResidential went forward with the fact-finding hearing. This is sufficient evidence for a reasonable fact-finder to possibly but not necessarily find that (a) WinnResidential did not have Mr. Arroyo's criminal history;[21] (b) Mr. Arroyo's actual criminal record would have changed Winn Residential's decision; and (c) therefore, if RPS had provided the Arroyos with the file disclosure earlier, Mr. Arroyo would have had a better opportunity to enjoy the housing of his choice. Although RPS objects that WinnResidential only permitted Mr. Arroyo to move into the complex after being sued and settling that lawsuit, [Dkt. 140-1 at ¶87], the objection does not definitively undermine the importance of the Mr. Arroyo's criminal history: settlement terms

---

[21] The parties agree that WinnResidential suppressed the underlying criminal records from the view of its leasing agents since 2015. [Dkt. 126-1 ¶91]. However, the parties dispute whether any other decisionmakers at WinnResidential had Mr. Arroyo's criminal record, and neither party offers admissible evidence on the question, *see* Fed. R. Civ. P. 56(c)(2): Dkt. 116-41 (Aff. Ans. of WinnResidential to Administrative Cmplt.) is inadmissible hearsay, *see* Fed. R. Evid. 802; Dkt. 114-2 (Kayani Decl.) & Dkt. 116-35 (Carmen Arroyo Decl.) were not made on the basis of personal knowledge*, see* Fed. R. Evid. 602, *Roberts v.Ground Handling, Inc.*, 499 F. Supp. 2d 340, 360 (S.D.N.Y. 2007) ("It is axiomatic that affidavits submitted in support of or in opposition to a summary judgment motion must 'be made on personal knowledge") and [Dkt. 114-2 at Ex. D] cannot be authenticated as a copy of a document that CoreLogic returned to WinnResidential on 4/26/2016 as claimed, as it is a document generated on 5/3/2018, *see* Fed. R. Evid. 901.

depend on the strength of the parties' positions, for which Mr. Arroyo's criminal history was a factor.[22]

The Court next considers the parties arguments as to "proper identification:" whether, under the FCRA, Ms. Arroyo submitted "proper identification" for herself as conservator for Mr. Arroyo. The Court holds that, on the undisputed facts, she did not. *See* [Dkt. 101 at 10-14].[23]   A conservatorship certificate with an impressed seal is necessary for "proper identification" of a Connecticut conserved person under the FCRA. Where state law defines the validity of an identification document, state law defines "proper identification" under the FCRA. *See Menton,* 2003 WL 941388. Ms. Arroyo was appointed to be Mr. Arroyo's conservator under Connecticut state law. Under Connecticut law, as stated plainly on the face of a conservatorship seal itself, a conservatorship certificate "is not valid without a probate seal impressed." *See* [Dkt. 125-10 at 3]; *Johnson v. Raffy's Cafe I, LLC*, No. CV106002069S, 2015 WL 2166123, at *3 (Conn. Super. Ct. Apr. 6, 2015) (finding probate certificate valid for purposes of establishing jurisdiction "after reviewing the probate certificate" and finding "that it contained the raised seal"). The heightened state standard for conservatorship documents is consistent with the FCRA's requirement that proper identification be   "commensurate with an

---

[22] Plaintiffs also allege damages on the basis of Ms. Arroyo's time and mental annoyance spent following up, [Dkt. 126 at 30-31], but, since the FCRA claim is for the disclosure of Mr. Arroyo's files, and FCRA liability is only to the consumer, 15 U.S.C. §§ 1681n &1681o, the Court finds that damages to Ms. Arroyo do not support Mr. Arroyo's FCRA claim.

[23]     The Court recognizes that, in its motion for summary judgment, RPS does not make this argument on the FCRA claim, [Dkt. 114 at 35-36], but notes that RPS does earlier make this argument as a reason for granting it summary judgment on the FHA disability disparate impact claim. *Id.* at 31.

identifiable risk of harm arising from misidentifying the consumer" in light of the heightened risks of identity theft for a person who would qualify to be conserved under Connecticut law. *See* Conn. Gen. Stat. §§ 45a-644(c); 45a-650.

Plaintiffs argue that courts have held that the absence of a visible embossed seal on a copy of a document does not make it invalid, as long as the original document carries the seal. *See, e.g.* [Dkt. 105 at 4-6] (citing *In re Robinson v. Chase Home Fin. LLC*, 403 B.R. 497, 503 (Bankr. S.D. Oh. 2008) (applying Ohio law to mortgage copy held in public records); *Schwab v. GMAC Mortg. Corp.*, 333 F.3d 135, 138 (3d Cir. 2003) (applying Pennsylvania statute regarding mortgage validity, which did not require embossment to be legible on mortgage copy); *Warfield v. Byron*, 137 Fed. App'x 651, 655 (5th Cir. 2005) (finding that absence of embossed seal on photocopy of summons did not invalidate district court's jurisdiction); *Oliver v. NY State Police*, 2019 WL 453363, at 6 (W.D.N.Y. 2019) (same); *Smith v. Nat'l Credit Sys., Inc.*, 2015 WL 12780446, at *2 (N.D. Ga. 2015) (lack of visible embossed notary seal on copy of affidavit filed with court did not affect validity of affidavit). But Plaintiffs' cited cases are simply inapposite: none were decided in Connecticut courts or speak to Connecticut law, none address cases in which the document states on its face that it is not valid without an embossed seal, and none concern proper identification for the purposes of the FCRA. If anything, the cited cases demonstrate that it is commonly understood that impressed seals are not visible on photocopies. See *Schwab*, 33 F.3d at 138 and *Warfield*, 137 Fed. App'x at 655.

The parties agree that Ms. Arroyo submitted copies of her conservatorship certificates in June 2016 and November 2016. [Dkt. 114-1 ¶¶44, 51]. The parties submitted copies of conservatorship certificates with their motions for summary judgment. *See* [Dkt. 125-10 at 3]; [Dkt. 125-12 at 5]. Upon review, the Court holds that no reasonable factfinder could find that that the copies of the certificates demonstrate that the probate seal was impressed. As to Ms. Arroyo's June 2016, submission, in the lower left-hand side of the page, there is a shaded-in circle, through which some white outlines are visible. [Dkt. 125-10 at 3]. White marks which may be the remnants of a shaded-out impressed seal are not themselves an impressed seal. As to Ms. Arroyo's November 2016 submission, there are only some stray marks in the same area, and nothing that establishes the presence of an impressed seal. [Dkt 125-12 at 5]. "Although the Court can understand [Plaintiffs]' frustration with [RPS]'s extreme attention to detail, it is mindful that [RPS] has a duty to protect the confidentiality and security of [Mr. Arroyo's] information." *Ogbon v. Beneficial Credit Servs., Inc.*, No. 10 CIV. 3760 PAE, 2013 WL 1430467, at *9 (S.D.N.Y. Apr. 8, 2013).

But the Court goes on to consider whether, having found that Mr. Arroyo could "not be properly identified in accordance with the FCRA," RPS nevertheless violated its duty under 15 U.S.C. § 1681g by failing to "provid[e] a statement that the consumer's identity cannot be verified; and directions on how to complete the request, including what additional information or documentation will be required to complete the request, and how to submit such information." *See* 12 C.F.R. § 1022.137(a)(2)(iii)(C). The Court finds that Plaintiffs have submitted sufficient

evidence to put into question whether RPS violated this duty: while RPS mailed Mr. Arroyo a letter in June of 2016 asking him to contact RPS to discuss the First Disclosure Request, [Dkt. 114-1 ¶46], it is not clear that they would have instructed her that they could not accept the "conservatorship court paper" because of the seal defect or because of the missing power of attorney. *See* [Dkt. 114-6 at 11]. Further, when Ms. Arroyo called RPS in September 2016 to discuss the status of the disclosure, [Dkt. 114-1 ¶47], she was instructed that she had to provide a notarized power of attorney. [Dkt. 114-6 (Barnard Decl.) at Ex. B at 3]. The Court finds that these facts are sufficient to put into question whether RPS violated its duty to disclose by providing directions on how to complete a disclosure request for the period starting with RPS's response to Ms. Arroyo's first set of documentation and ending with its second call trying to reach Ms. Arroyo. Therefore, the Court grants RPS summary judgment as to Plaintiffs' FCRA claims before June 30, 2016 and after November 18, 2016, and denies the parties' motions for summary judgment as to Plaintiffs' FCRA claims for the period from June 30, 2016 and November 18, 2016.

### i. Willfulness

"[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69, 127 S. Ct. 2201, 2215 (2007). A company's interpretation of the statute is objectively unreasonable when courts or the

overseeing regulatory agencies have offered guidance that "might have warned it away from the view it took." *Id.* at 70. Where there is a "dearth of guidance" and a "less-than-pellucid statutory text," a misreading of the statute is not objectively unreasonable. *Safeco*, 551 U.S. at 70.

Mr. Arroyo seeks punitive damages for a "willful" violation of the FCRA. [Dkt. 1 at Counts IV and V].  Plaintiffs argue that RPS's failure to disclose was willful because its alleged policy of requiring a power of attorney was reckless, it failed to correct its erroneous policy despite multiple opportunities, and the necessary correction would have been simple. [Dkt. 87 at 10-13]. RPS argues that not accepting certificates of conservatorship with non-visible impressed seals that state on their face that they are not to be accepted without a seal cannot be considered "willful" because of the lack of specification in the statute and the lack of binding or even apposite case precedent. Plaintiffs reply that there is a disputed question of fact as willfulness: first, RPS's failure to accept such certificates is unsupported by law; second, RPS failed to follow reasonable procedures for evaluating disclosure requests by failing to escalate Ms. Arroyo's request and by informing her that a power of attorney was needed.

The Court finds that, in light of the regulations and facts outlined above, there is a disputed question of fact as to whether RPS acted "objectively unreasonably" in failing to provide accurate directions on how to complete Ms. Arroyo's request on behalf of Mr. Arroyo, including what additional information or documentation would be required to complete the request, and how to submit such information. Therefore, the Court denies the parties' motions for summary

judgment as to the Plaintiff's willfulness claims for the period from June 30, 2016 to November 18, 2016, but otherwise grants RPS summary judgment as to Plaintiffs' willfulness claim.

### E. *Fair Housing Act Disparate Impact on the Basis of Disability*

In Count II, brought on behalf of all Plaintiffs, Plaintiffs allege that RPS's file disclosure "policy" of refusing to provide disclosures to conservators has a disparate impact on disabled individuals in violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*

Liability may be established under the Fair Housing Act where a "practice" "actually or predictably results in an disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a). The Second Circuit "evaluate[s] claims that a defendant discriminated 'because of' a disability under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792…'" the same three-part burden shifting framework laid out for the Plaintiffs' previous FHA claims*. Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 40 n.11 (2d Cir. 2015) (quoting *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir.2003) (FHA case)).

Although "statistical proof almost always occupies center stage in a prima facie showing of a disparate impact claim," *Robinson v. Metro-North Commuter R*.R., 267 F.3d 147, 160 (2d Cir. 2001), to inevitably require statistical proof when a policy categorically applies to a protected class would be to equate what is real with what is measured (not even with what is measur*able*!). Thus, in *Cripe v. City*

78

*of San Jose*, 261 F.3d 877, 889-90 (9th Cir. 2001), the Ninth Circuit found that the plaintiffs had shown a prima facie case without statistical analysis for purposes of the Americans with Disabilities Act where the City's policy required all police officers to serve in a beat-patrol assignment before obtaining a specialized assignment, a policy which rendered the class of disabled plaintiffs categorically ineligible for specialized assignments. Statistics are not necessary if a challenged policy categorically applies to a protected class. *See* 24 C.F.R. § 100.500(a) (disparate impact liability may apply where a policy "predictably results in a disparate impact").

But a plaintiff must "identify the targeted practice with sufficient particularity… that defendants have adequate notice of precisely what actions" are at issue. *Rodriguez v. Bear Stearns Companies, Inc.*, No. 07-CV-1816 (JCH), 2009 WL 5184702, at *6 (D. Conn. Dec. 22, 2009). In *Inclusive Communities Project, Inc.,* the Supreme Court held, "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." 135 S.Ct. at 2523. It reasoned that without such identification, defendants may be "held liable for… disparities they did not create." *Id.* What is true for claims based on a statistical disparity is even more true for claims based on a policy's categorical application to a protected class: if plaintiffs cannot point to a specific policy, then there is no basis for deducing that the policy categorically applies to a protected class, and so there is no basis for the claim at all.

Plaintiffs characterize RPS's process as: "policies and practices of (1) refusing to allow court-appointed conservators or guardians to receive the consumer file of the individual subject to the conservatorship or guardianship; (2) requiring that third-parties, including court-appointed conservators or guardians, submit a "power of attorney" executed by the consumer in order to receive the consumer file; and/or (3) requiring that court-appointed conservators or guardians provide more onerous documentation of their authority than an individual holding a power of attorney designated by a consumer in order to request and receive a consumer file." [Dkt. 1 at ¶165].

The Court finds that the undisputed facts have demonstrated that RPS does not implement the first two policies but does implement the third. RPS processes the disclosure of consumer files to third-party legal guardians acting on the consumer's behalf. [Dkt. 118 at ¶38]. To protect consumer privacy in the situation where a third party is seeking a copy of a consumer's file, RPS's written policies generally require a notarized power of attorney, the consumer's name, proof of the address to where the disclosure should be mailed, and confirmation of the last four digits of the consumer's Social Security number. *Id.* (citing [Dkt. 114-6 (Barnard Decl.)] at ¶ 8 & Ex. A at 3). But, based on RPS's written authentication policy, in "any scenario" where those requirements cannot be fulfilled, the RPS employee who is handling the file disclosure request is required to escalate the request to a "supervisor." [Dkt. 114-1 ¶39]. A situation in which a consumer is disabled and cannot execute a power of attorney would require adjustment of third-party

authentication process and supervisory review. *Id.* (citing [Dkt. 114-6] at ¶ 13 & Ex. A at 3).

The Court finds that Plaintiffs have shown sufficient evidence of a disparate impact to prove a prima facie case. The relevant comparison is between those disabled individuals under a conservatorship who requested disclosure from RPS and all persons who requested disclosure through a third-party. Conserved persons are categorically unable to execute powers of attorney.[24] As RPS acknowledges in its statement of facts, all cases in which a consumer is disabled such that she cannot execute a power of attorney "require… supervisory review," adding an additional step to the process that conserved persons face. [Dkt. 114-1 ¶39].

Next, the Court considers whether RPS's third party authentication policy serves a legitimate and statutorily required interest of safeguarding consumer policy. RPS argues that its requirement that a Connecticut conservator submit a valid certificate of conservatorship is mandated by the FCRA, 15 U.S.C. § 1681h(a)(1), and, as explained above, the Court agrees. [Dkt. 114 at 31].

---

[24] A probate court may only order an involuntary conservatorship if it is the least restrictive means of  intervention to assist the individual in managing his or her affairs and caring for him or herself. Conn. Gen. Stat. § 45a-650. Because a power of attorney is significantly less restrictive than a conservatorship, a person with the mental capacity to execute a power of attorney should not be involuntarily conserved.  A valid durable power of attorney that a person signed before being conserved may, after October 1, 2016, remain valid as well. *See* Conn. Gen. Stat. § 45a-650.

The Court therefore considers whether there exists a less-discriminatory alternative to requiring more onerous documentation from conservators. Plaintiffs argue that there is: making the fully visible seal requirement part of a clear documentation policy and readily communicating that requirement to conservators. [Dkt. 126 at 40-42]. But this proposed alternative is not actually an alternative to the RPS's conservator documentation requirement—instead, it is a proposed *addition* to RPS's conservator documentation requirement.

Or, to put it another way: this proposed alternative demonstrates that Plaintiffs' targeted practice is not really RPS's documentation requirement, but instead RPS's *communication* about its documentation requirement. And Plaintiffs have not provided sufficient evidence that RPS's communication about its conservatorship documentation requirement "actually or predictably results in a disparate impact:" Plaintiffs have not provided statistical evidence that RPS invariably fails to communicate its conservatorship requirement, and Plaintiffs have not provided evidence that RPS has a policy that would mean that it would invariably fail to communicate its policy on conservatorship documentation. On the other hand, RPS has provided evidence that, at least once, in November 2016, it did attempt to communicate its conservatorship documentation requirement. [Dkt. 114-1 ¶¶51-53]. [25]  Therefore, Plaintiffs have not demonstrated an "actual or predictable" disparate impact.

---

[25] RPS also argues that a disparate impact claim may not be based on a "one isolated decision." [Dkt. 140 at 12], [Dkt. 114 at 30] (citing *Reidt v. Cty of Trempealeau*, 975 F.2d 1336, 1341 (7th Cir. 1992)). Plaintiffs are not aware of any

The Court understands Mr. Arroyo's frustration with RPS's 2016 process. However, in light of the undisputed facts, Plaintiffs do not state an FHA claim for disparate impact based on disability. The Court therefore grants RPS's motion for summary judgment as to this claim.

### F.  *Fair Housing Act Disparate Treatment on the Basis of Disability.*

In Count II of the Complaint, Plaintiffs claim that RPS intentionally discriminated against Mr. Arroyo on the basis of his disability.

The Second Circuit "evaluate[s] claims that a defendant discriminated 'because of' a disability under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792…'" the same three-part burden shifting framework laid out for the Plaintiffs' previous FHA claims." *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 40 n.11 (2d Cir. 2015) (quoting *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir.2003) (FHA case)). Where plaintiffs have not "submitted any evidence demonstrating that the non-discriminatory reasons articulated by [the defendant] for [the challenged decisions] were mere pretexts," summary judgment is warranted. *Lee v. ITT Standard*, 268 F. Supp. 2d 315, 346 (W.D.N.Y. 2002), *report*

---

other conserved individual who has requested a file disclosure from RPS, and RPS also has no record of any other conserved individual requesting a file disclosure. [Dkt. 114 ¶45] [Dkt. 126-3 (Barnard Dep.) 120:15-124:24]. But the facts of *Reidt* demonstrate its un-persuasiveness in this circuit: Plaintiff Debra Reidt alleged that her employer, a sheriff's department, violated Title VII when it denied her application to a certain position because she was a woman. The court found that the decision was an "isolated" one because she was the only woman who applied to the position. *Id.* at 1339. This kind of reasoning—if a discriminatory policy discourages enough individuals in a protected class, then it is not discriminatory— has been rejected by the Second Circuit. *See E.E.O.C.*, 186 F.3d at 119.

*and recommendation adopted in part sub nom. Estate of Lee v. ITT Standard*, 268 F. Supp. 2d 356 (W.D.N.Y. 2003) (granting motion for summary judgment)

Here, it is undisputed that RPS had in place written policies and procedures for processing consumer file disclosure made by third parties. [Dkt. 114-1 ¶38]. It is undisputed that RPS processed Mr. Arroyo's claim in the way that it did because the claim was brought by a third party, Ms. Arroyo. *Id.* ¶¶41, 46, 48-50. It is also undisputed that RPS's decision to deny Ms. Arroyo access to Mr. Arroyo's consumer file was based on the documentation submitted, and that the decision was made after multiple levels of review by the legal and compliance teams. *Id.* ¶¶44, 46, 48-50, 52. Plaintiffs have not presented any evidence that RPS's application of its third-party disclosure guidelines was a mere pretext, and in fact, has not opposed their motion for summary judgment on this claim. Therefore, the Court grants RPS summary judgment as to this claim.

### G. *Fair Housing Act Failure to Accommodate Claim*

In Count III, brought on behalf of the Arroyos, Plaintiffs allege that RPS refused to make a "reasonable accommodation" to allow Ms. Arroyo access to Mr. Arroyo's consumer file in violation of 42 U.S.C.§ 3604(f)(2) and (f)(3).

"To prove a failure-to-accommodate claim, a plaintiff must show (1) that the plaintiff or a person who would live with the plaintiff had a handicap within the meaning of § 3602(h); (2) that the defendant knew or reasonably should have been expected to know of the handicap; (3) that the accommodation was likely necessary to afford the handicapped person an equal opportunity to use and enjoy

the dwelling; (4) that the accommodation requested was reasonable; and (5) that the defendant refused to make the requested accommodation." *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 156 (2d Cir. 2014).

Plaintiffs argue that Mr. Arroyo had a handicap, that RPS knew of the handicap, that the accommodation was likely necessary to afford him equal access to housing, that his requested accommodation, that Ms. Arroyo as conservator request and receive Mr. Arroyo's consumer file on his behalf, was reasonable, and that RPS refused the accommodation. [Dkt. 87 at 14-18]. Defendants argue Plaintiffs' reasonable accommodation claim fails for two reasons. First, Defendants argue that Plaintiffs fail to show that, but for the accommodation, they likely were denied an equal opportunity to enjoy the housing of their choice, as (a) RPS has no authority to override any housing decision by WinnResidential and (b) Plaintiffs have not supported their claim with any testimony from WinnResidential. [Dkt. 114 at 32]. Second, Defendants argue that Plaintiffs did not request a reasonable accommodation, because the request that RPS ignore the requirement of a fully visible seal on the conservatorship form is not reasonable. [Dkt. 114 at 33]. After evaluating the evidence, the Court grants summary judgment on the basis of RPS's second argument.

"Requested accommodations are reasonable where the cost is modest and they do not pose an undue hardship or a substantial burden on the housing provider." *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 156 (2d Cir. 2014). RPS argues that Mr. Arroyo's request that RPS ignore its requirement of a fully visible seal on the conservatorship form is not reasonable, as the authenticating features are

there for the protection of the conserved person and are legally required. [Dkt. 114 at 33] and [Dkt. 140 at 12-14]. Plaintiffs respond that a fully visible seal on the conservatorship form is not necessary to establish "proper identification," which is all that is required under the FCRA, and that the seal on the forms Ms. Arroyo submitted was visible enough. As discussed above, the Court finds that an impressed seal on the conservatorship form is necessary to establish "proper identification" under the FCRA, so the request to waive that requirement is not reasonable. The Court therefore grants RPS summary judgment on this claim.

### H. *CUTPA Claim*

Plaintiffs plead a claim under CUTPA, Conn. Gen. Stat. § 42-110b(a) in Count VI of the Complaint.

CUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *See* Conn. Gen. Stat. § 42-110b. A CUTPA claim may be brought by "[a]ny person who suffers any ascertainable loss of money or property." *See* Conn. Gen. Stat. § 42-110g(a). When analyzing the first element, whether plaintiffs alleged an unfair act, the Court must apply the "cigarette rule" which considers whether the act: (1) "offends public policy as it has been established by statutes, the common law, or otherwise"; (2) is "immoral, unethical, oppressive, or unscrupulous"; or (3) "causes substantial injury to consumers." *See Harris v. Bradley Memorial Hosp. and Health Ctr., Inc.*, 296 Conn. 315, 351 (2010).

> All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three

> **. . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy.**

*Caires v. JP Morgan Chase Bank, N.A.*, 880 F. Supp. 2d 288, 299 (D. Conn. 2012) (internal citation and quotation marks omitted). Consumers may prove a CUTPA violation using either the unfairness standard or the deception standard. *See, e.g., Caldor, Inc. v. Heslin,* 215 Conn. 590, 577 A.2d 1009 (1990) (deception); *Conaway v. Prestia*, 191 Conn. 484, 493, 464 A.2d 847, 852 (1983) (unfairness).

Plaintiffs move for summary judgment on the basis that undisputed facts establish that RPS's CrimSAFE product constitutes an unfair practice because it is against public policy, causes substantial injury, and facilitates discrimination, [Dkt. 118 at 32-42], and that RPS's file disclosure policies violate the FCRA. [Dkt. 87 at 18 - 19]. RPS moves for summary judgment on the basis that (1) Plaintiffs' claim based on CrimSAFE must fail because there is no evidence that it has engaged in "unfair" or "deceptive acts; and (2) Plaintiffs' claim on the basis of file disclosure must fail because file disclosure is not part of "trade" or "commerce," and there is no evidence of any damages alleged caused by RPS. [Dkt. 118 at 36-38]. RPS further opposes Plaintiffs'  CrimSAFE claim on the grounds that (a) Plaintiffs cannot prove a violation of the FHA, (b)  RPS does not "facilitate" discriminatory conduct, and (c) the Connecticut state legislature recently failed to pass a 2019 legislative proposal to "limi[t] criminal records lookback period that a landlord may use when evaluating the housing application of a prospective tenant," was defeated in the Connecticut state legislature. CT. S.B. No. 54 (2019).[Dkt. 129 at 44-46].

### 1.  File Disclosure

The Court denies the parties' motions for summary judgment as to Plaintiff's CUTPA claim on the basis of file disclosure, as there is a disputed question of material fact regarding whether RPS's file disclosure policies did violate 15 U.S.C. § 1681g. And, as the Court  has previously stated, RPS's conduct is sufficiently related to its business to established relationship to trade or commerce. *See* Dkt. 41 at 32-33 (Order on Mot. to Dismiss); *Nastro v. D'Onofrio*,  263 F. Supp. 2d 446, 457-58 (D. Conn. 2003) (denying motion to dismiss CUTPA claim where defendants' property transfers were sufficiently related to their underlying business to establish a relationship to trade or commerce); see also *Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 643 (2002) (explaining that CUTPA does not require a consumer relationship). Finally, the Court has established that there is a question of material fact as to whether Plaintiffs suffered any damages from RPS's actions in not disclosing Mr. Arroyo's file. *See supra* Section III.F.

### 2. CrimSAFE

#### i. Public Policy & Facilitation

The Court finds that there remains a material question of fact as to whether RPS violated CUTPA "through its CrimSAFE product, violating the Fair Housing Act to the detriment of housing applicants with criminal records, who are disproportionately likely to be African American or Hispanic." *See* [Dkt. 1 (Compl) ¶ 226.g.].

Conduct that violates the FHA offends Connecticut public policy and is actionable under CUTPA. *See Green v. Konover Residential Corp.*, No. 95CV1984, 1997 WL 736528, at *7 (D. Conn. Nov. 24, 1997) ("The Connecticut courts have read

CUTPA broadly enough to encompass the claims of plaintiffs, which include . . . violations of the Fair Housing Act by virtue of defendants' discriminatory repair practices.").  Connecticut has adopted the public policy goals of the FHA. In its Constitution, Connecticut provides that "no person shall be… subjected to segregation or discrimination in the exercise or enjoyment of his civil … rights because of … race, color, ancestry or national origin." Connecticut Constitution, Sec. 20. And, in 1990, Connecticut passed comprehensive fair housing legislation modelled after the FHA. *See* Conn. Gen. Stat. § 46a-64b, *et seq*; *see also* Statement of Senator Blumenthal, 33 S. Proc., Pt. 11, 1990 Sess. 3494 ("[t]his is landmark legislation ... that sets out a separate fair housing act with all the standards and assurances that exist under Federal law. Indeed, it incorporates the federal standards into our state statute ...."). Connecticut courts construct Connecticut's FHA consistent with the federal courts' interpretation of the analogous provisions of the FHA. *Comm'n on Human Rights & Opportunities v. Savin Rock Condo. Ass'n, Inc.,* 273 Conn. 373, 384-85, 870 A.2d 457, 463 (2005).

The Court cannot determine as a matter of law that RPS did or did not violate the FHA. *See Section III.B., supra.*  For the same reasons that there is a question of whether RPS violated the FHA, there is a question of whether RPS violated CUTPA as a matter of public policy or facilitation of  housing providers' discrimination: CrimSAFE may be, but is not necessarily as a matter of law, a proximate cause of housing discrimination against African Americans and Latinos, including Mr. Arroyo.

Finally, RPS argues that the Connecticut state legislature recently failed to pass a 2019 legislative proposal to "limi[t] criminal records lookback period that a landlord may use when evaluating the housing application of a prospective tenant." [Dkt. 129 at 44-46] (citing CT. S.B. No. 54 (2019)). But, of course, "it is at best treacherous" to rely on "congressional silence," and there are any number of reasons such a measure might have failed to pass. *United States v. Wells*, 519 U.S. 482, 496 (1997).

### ii. Substantial Injury

For the same reason the Court finds that there is a question as to RPS's proximate cause of housing denials generally, *see supra* Section II.B.1.i, the Court finds that there is a question of whether RPS caused Mr. Arroyo's housing denial. Therefore, the Court denies Plaintiffs' motion for summary judgment as to this claim.

### iii. Ascertainable Loss

Because the Court denies Plaintiffs' motion for summary judgment as to its CUTPA claim based on CrimSAFE on other grounds, the Court does not address the question of ascertainable loss.

### l. CFHC's Damages Claim

Alleging that a particulardefendant's actions have "frustrated the organization [plaintiff]'s [services], with a consequent drain on resources" suffices to allege organizational injury-in-fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 369 (1982). The CFHC seeks compensatory damages consisting of

"frustration of mission" and "diversion of resources." RPS moves for the Court to grant it summary judgment dismissing these claims. RPS argues that the claims are not compensable because (1) CFHC's contemplated educational marketing campaign is prospective and undeveloped; (2)  CFHC has not demonstrated the link between the diverted resources and RPS; and (3) any damages have been offset by third-party awards. [Dkt. 114 at 38-44]. CFHC responds that prospective damages may be compensated, that they have provided sufficient evidence to put into question RPS's responsibility for the diversion, and that third-party grants are "collateral sources" that should not be setoff against RPS's damages. [Dkt. 126 at 47-53]. The Court agrees with the Plaintiffs.

In the Second Circuit, an organization's expenses for investigation of a particular defendant's conduct and advocacy against that particular defendant, including litigation expenses, demonstrate injury-in-fact through diversion of resources. *See Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013) (citing *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 904 (2d Cir.1993)) (affirming litigation expenses demonstrate diversion-of-resources injury in fact);  *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014) (affirming that investigation and advocacy on behalf of specific clients demonstrates diversion-of-resources injury in fact). But, "there must be evidence directly tying these damages to the defendant's alleged wrongdoing." *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, No. 3:10-cv-83, 2015 WL 853193, at *9 (S.D. Ohio Feb. 26, 2015) (citing *Ragin*, 6 F.3d at 909).  While CFHC may have received

compensation, the sufficiency of that compensation is not established, particularly given the fact that litigation continues long thereafter.

Further, the Fair Housing Act authorizes the Court to award "such affirmative action as may be appropriate." 42 U.S.C. § 3613(c)(1); *see United States v. Hylton*, 944 F. Supp. 2d 176, 194 (D. Conn. 2013), *aff'd,* 590 F. App'x 13 (2d Cir. 2014).[26] The Court must tailor such relief to vindicate "the statute's goals of preventing future violations and removing lingering effects of past discrimination." *United States v. Space Hunters, Inc.*, 2004 U.S. Dist. LEXIS 23699, at *22 (S.D.N.Y. Nov. 22, 2004), *aff'd in part, vacated and remanded in part on other grounds*, 429 F.3d 416, 421 (2d Cir. 2005). "To recover, a fair housing organization must establish that expenditures in education, counseling and/or outreach are necessary to counterbalance the effects of a defendant's discriminatory practices." *Fair Hous. of Marin v. Combs,* No. C 97-1247 MJJ,  2000 WL 365029, at *4 (N.D. Cal. Mar. 29, 2000).  The Fair Housing Act is a remedial statutory scheme designed to rid the nation of costly and destructive discriminatory housing practices and the work of entities like CFHC is instrumental to the fulfilment of its objectives.

---

[26] RPS cites two out-of-circuit cases on injury-in-fact for the purposes of standing for the proposition that CFHC cannot recover damages for its future work. [Dkt. 114 at 38-39]. (citing *Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 77 (3d Cir. 1998), and *Chesapeake Climate Action Network v. Exp.-Imp. Bank of the United States*, 78 F. Supp. 3d 208, 232 (D.D.C. 2015)). Neither are persuasive in light of the apposite statutory and in-circuit authority.

CFHC claims $82,639.93 in diversion of resources, up to $350,000 for an educational marketing campaign to inform the public that blanket bans are illegal, and its attorneys' fees. [Dkt.114-5 at Ex. H]. Of its $82,639 in claimed diversion damages, $9,447 is for CFHC's work advocating for the Arroyos against RPS; the remainder is for "education and outreach," "testing," "testing costs," "client work," and "grant writing." [Dkt. 114-5 at Ex. G ].

The Court finds that CFHC has introduced sufficient evidence for its damages claims to go forward. CFHC may recover for prospective damages. *See Hylton*, 944 F. Supp. 2d at 194. CFHC has demonstrated clear ties between the litigation expenses for this case and the $9,447 "CoreLogic" tab of its diversion log to RPS to support its claim. As to the proposed marketing campaign and the remainder of the $82,639 in diverted expenses, CFHC has introduced sufficient evidence to demonstrate a dispute of fact as to whether those expenses "are necessary to counterbalance the effects of a defendant's discriminatory practices," in light of its evidence of RPS's marketing efforts, its evidence that housing providers have reached out to it for guidance, [Dkt. 125-21 at 98:19-24], its evidence that it has changed its public trainings and presentations to account for RPS's policies, *id.* at 97-111, and its evidence that it has consulted with an advertising company on how such a campaign would be conducted, *id.* at 140:7-141:21.

Finally, RPS argues that any damages owed to CFHC should be offset by the $380,000 in grant funding CFHC has received to address criminal record tenant screening in the housing application process. [Dkt. 114-1 ¶65]. The parties disagree about whether the grant funds CFHC has received are better characterized as

"recovery" for the same injury or as "collateral sources." On the one hand, "a plaintiff may not recover twice for the same injury…. When a plaintiff receives a payment from one source for an injury, defendants are entitled to a credit of that amount against any judgment obtained by the plaintiff as long as both payments represent common damages." *Phelan v. Local 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada*, 973 F.2d 1050, 1063 (2d Cir. 1992). On the other hand, "[t]he weight of common law authority is that collateral sources are not deductible from a tort damage award." *Equal Employment Opportunity Comm'n v. Enterprise Ass'n Steamfitters Local No. 638,* 542 F.2d 579, 591 (2d Cir.1976). On this basis, a Connecticut district court found in a Fair Housing Act Case that the funds a plaintiff received from a state agency and tax credit "were collateral sources and that the defendants are not entitled to a set off of those amounts in the event of an award of damages by the Court in plaintiffs' favor," although they " in part, defrayed expenses that are claimed as damages suffered by plaintiff." *Valley Hous. LP v. City of Derby*, No. 06-CV-1319 TLM, 2011 WL 2144633, at *2-3 (D. Conn. May 31, 2011).

Here, CFHC did not receive the grant funding from another "source of the injury," so Plaintiffs argue that the grant funding is from a "collateral source," and does not offset any damages that RPS may owe.  This Court finds that reasoning compelling.  Funds allocated for systemic or programmatic endeavors beneficial to the constituency of the recipient as a whole should not be diverted to the advocacy on behalf of a single person or subset of the constituency of the entity.

RPS also separately argues that CFHC's recovery in this case should be offset by CFHC's $13,000 recovery from the settlement with WinnResidential. [Dkt. 114 at 42] (citing SUMF 64).[27] But, as Plaintiffs point out, this money was not "in settlement of the administrative action," but rather represented attorneys' fees for CFHC's representation of the Arroyos, work that has not been claimed as diversionary damages. [Dkt. 125-13 (Ex. 11 to Pls.' Opp: Kemple Decl.) at ¶¶ 3-5.]. Therefore, it also does not offset any damages that RPS may owe for, particularly for efforts which post-dated the services the award was made to compensate.

For the reasons given above, the Court denies RPS summary judgment as to CFHC's compensatory damages.

IV.   <u>Conclusion</u>

For the reasons stated above, the Court holds as follows:

Carmen Arroyo does have standing to bring claims under the FHA and under CUTPA.

---

[27] RPS does not cite any law regarding offsetting settlements, but it is a nuanced question. To the question of whether non-settlign defendant's damages should be offset by a settlement,  the Second Circuit applies a three-party standard to determine: "First, if federal law is neither deficient nor inapplicable, it will apply. Second, if federal law does not apply, state law does apply, unless, third, state law would be inconsistent with the Constitution and laws of the United States." *Restivo v. Hessemann*, 846 F.3d 547, 582 (2d Cir. 2017). Further, here, CFHC did not sue RPS and WinnResidential in the same action, so there is less of an argument for applying any settlement as an offset.

The Court denies both parties summary judgment as to the FHA claims on the basis of race and disability, and as to the CUTPA claims. These claims will proceed to trial.

The Court grants RPS's motion for summary judgment as to the FHA claim for disparate claim on the basis of disability, the FHA claim for disparate treatment on the basis of disability, and the FHA failure to accommodate claim. The Court grants RPS's motion for summary judgment as to  Mr. Arroyo's FCRA claims for the period from April 26, 2016 to June 30, 2016, and after November 18, 2016.  The Court denies the parties' motions for summary judgment as to Mr. Arroyo's FCRA claims for the period from June 30, 2016 to November 18, 2016, and also denies the parties' motions for summary judgment as to whether its actions were "willful" under the FCRA for this period. These claims will proceed to trial.

The Court denies RPS summary judgment as to CFHC's compensatory damages, so their claims will proceed to trial.

SO ORDERED.

                                    _____/s/_____

                                    **Hon. Vanessa L. Bryant**

                                    **United States District of Connecticut**

Dated: August 7, 2020 at Hartford, Connecticut