## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **Connecticut Fair Housing Ctr, et al.** | : | |
| | : | |
| **Plaintiffs,** | : | **No. 18-cv-705** |
| | : | |
| **v.** | : | |
| | : | **March 30, 2021** |
| **CoreLogic Rental Property Solutions, LLC],** | : | |
| | : | |
| **Defendant.** | : | |

### MEMORANDUM OF DECISION ON MOTIONS IN LIMINE

Plaintiffs Connecticut Fair Housing Center ("CFHC") and Carmen Arroyo ("Ms. Arroyo"), individually and as next friend for Mikhail Arroyo ("Mr. Arroyo") (collectively, "Plaintiffs") bring the instant litigation against Defendant CoreLogic Rental Property Solutions, LLC ("Defendant" or "RPS") alleging that RPS violated the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA"), the Connecticut Unfair Trade Practice Act, Conn. Gen. Stat. §§ 42-110a *et seq.* ("CUTPA") and the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA").

In April of 2016, Carmen Arroyo attempted to move her disabled son, Mikhail Arroyo, for whom she was conservator, into her apartment complex ArtSpace Windham, but his application was rejected. Two separate actions by Defendant regarding that incident motivate the instant lawsuit: first, Defendant, through its CrimSAFE product, notified apartment manager WinnResidential that "disqualifying records" were found for Mr. Arroyo; second, RPS did not disclose Mr. Arroyo's criminal records to Ms. Arroyo on behalf of Mr. Arroyo until the start of this litigation, despite her numerous requests and production of many documents.

1

Before the Court are the following motions in limine: (1) the Plaintiffs' Motion to Exclude Testimony of Jay Kacirk, Dkt. 157; (2) the Defendant's motion to exclude the expert witness report of Lila Kazemian, Dkt. 177; (3) the Defendant's motion to exclude Plaintiffs' statistical experts, Dkt. 175; (4) the Plaintiffs' motion to limit testimony of Dr. William Huber, Dkt. 179; (5) the Defendant's motion to exclude the expert witness report of Nancy B. Alisberg, Dkt. 176; (6) the Defendant's motion to exclude certain medical/injury evidence, Dkt. 173; (7) the Defendant's motion to exclude certain marketing evidence, Dkt. 174; (8) the Plaintiffs' motion to exclude exhibits as improper hearsay, Dkt. 180; and (9) the Plaintiffs' motion to exclude report of the Bureau of Justice, Dkt. 181.  Oppositions have been filed with respect to each motion.  Dkts. 163, 187, 184, 185, 186, 182, 183, 189, 188 (respectively).

## I.    BACKGROUND

On August 7, 2020, the Court entered an extensive decision on the parties' motions for summary judgment.  Dkt. 194 (Dec. on Summ. J.).  That decision contains a thorough recitation of the material facts relevant to this case.  *Id.* at 2–22.  Those findings are adopted and incorporated herein by reference.  The Court provides only those facts relevant to each respective motion as discussed below.

As outlined in the decision on summary judgment, the following claims are proceeding to trial: (1) a FHA claim for disparate impact on the basis of race or ethnicity, (2) a FHA claim for disparate treatment on the basis of race or ethnicity, (3) a claim under CUTPA, and (4) a FCRA claim for the period from June 30, 2016 to November 18, 2016.  Dec. on Summ. J.  There has been no jury demand in this case and the parties have elected for the Court to sit as fact finder in a bench trial.

## II.  LEGAL STANDARD

"The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotation marks omitted). "A court's determination of a motion in limine is preliminary and may be subject to change as the case unfolds." *State v. Deutsche Telekom AG*, 419 F. Supp. 3d 783, 787 (S.D.N.Y. 2019).

"Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *Walker v. Schult*, 365 F. Supp. 3d 266, 275 (N.D.N.Y. 2019).   "The movant has the burden of establishing that the evidence is not admissible for any purpose." *Id.* (citing to *United States v. Goodale*, 831 F.Supp.2d 804, 808 (D. Vt. 2011)).  "The trial judge may reserve judgment on a motion *in limine* until trial to ensure the motion is considered in the proper factual context." *Id.*

"When the judge sits as the trier of fact, it is presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose." *Williams v. Illinois*, 567 U.S. 50, 69 (2012).  "There is a "well-established presumption" that "*the judge [has] adhered to basic rules of procedure,*" when the judge is acting as a factfinder." *Id.* at 69–70 (emphasis in original). *See also United States v. Duran-Colon*, 252 Fed. App'x 420, 423 (2d Cir. 2007) ("In the context of a bench trial such as that conducted in this case, however, the factfinder knows the

3

purpose for which evidence is admitted and is presumed to rest his verdict on the proper inferences to be drawn from such evidence."); *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997) (finding that "many of the management problems which a trial court invariably has to wrestle with in order to guard against unfair prejudice when one takes the proverbial Fifth simply do not exist in the context of a bench trial.").

Generally relevant evidence is admissible unless the United States Constitution, a federal statue, the Federal Rules of Evidence or Supreme Court rules say otherwise.  Fed. R. Evid. 402.  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.   Relevant evidence can be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Rule 401's "basic standard of relevance . . . is a liberal one."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993).; *see also Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 257 (S.D.N.Y. 2015) (The "standard of relevance established by the Federal Rules of Evidence is not high.") (citing to *United States v. Southland Corp.,* 760 F.2d 1366, 1375 (2d Cir. 1985)).   "Evidence need not be conclusive in order to be relevant." *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 927 (2d Cir. 1977).

Rule 702 governs admissibility of trial expert testimony and provides that:

**A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:**

**(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;**

**(b) the testimony is based on sufficient facts or data;**

**(c) the testimony is the product of reliable principles and methods; and**

**(d) the expert has reliably applied the principles and methods to the facts of the case.**

"[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589 (1993). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591. In assessing relevancy and reliability, the court is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). An opinion that does little more than "rehash[es] otherwise admissible evidence about which [an expert] has no personal knowledge" are inadmissible. *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, No. 16-CV-885 (JPO), 2020 WL 1673687, at *3 (S.D.N.Y. Apr. 6, 2020). "Regarding relevance, Rule 401 shapes the question facing the court: whether the proffered expert testimony has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Vicuna v. O.P. Schuman & Sons, Inc.*, 298 F. Supp. 3d 419, 443 (E.D.N.Y. 2017) (citing to *Campbell v. Metropolitan Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001)).

The Court plays a gatekeeping function to all expert testimony, not just scientific testimony. *Kumho Tire Co.*, 526 U.S. at 147. Reliability, particularly in cases where the expert opinion is not scientific in nature, is tied to the facts of the particular case. *Id.* at 150. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"As a general rule an expert's testimony on issues of law is inadmissible." *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 268 (D. Conn. 2017) (citing to *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). "'Generally, the use of expert testimony is not permitted if it will 'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.' . . . Clearly, an opinion that purports to explain the law to the jury trespasses on the trial judge's exclusive territory." *United States v. Stewart*, 433 F.3d 273, 311 (2d Cir. 2006) (internal citations omitted). "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. "However, Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions." *United States v. Scop*, 846 F.2d 135, 139 (2d Cir.), *on reh'g*, 856 F.2d 5 (2d Cir. 1988).

"It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions." *United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined No. of Cans of*

*Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994). An expert may not "supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016). "[W]here expert reports read like legal briefs and threaten to usurp judges' duty to determine the relevant law, courts may reasonably exclude such evidence at trial." *State v. Deutsche Telekom AG*, 419 F. Supp. 3d 783, 790 (S.D.N.Y. 2019).

"The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the *Daubert* framework by a preponderance of the evidence standard." *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 243 (E.D.N.Y. 2014).

III.     DISCUSSION

A.     First Motion

The Plaintiffs requests that the Court exclude the testimony of the Defendant's expert witness Jay Kacirk. Dkt. 157.

1.     *Background*

Mr. Kacirk is a purported "Property Management Expert Witness For: Single Family Homes / Condominium Units, Multi Family Apartments, Community Interests Developments, Ethics Matters, Fair Housing Issues, and Landlord Standard of Care." Dkt. 157-1 at 16. Mr. Kacirk has a Bachelor of Business Administration degree and was awarded the Certified Property Manager designation by the Institute of Real Estate Management ("IREM"). *Id.* at 17. He is an executive vice president for a property management company in California. *Id.*

at 3, 16.  Mr. Kacirk is also an instructor for IREM, where he teaches courses that include residential apartment management and apartment leasing that implicate compliance with federal housing laws in the operation of rental housing.  *Id.* at 3. He indicates he has "substantial experience working with criminal background screening providers, including providers that apply a housing provider's set criteria to criminal records matched to applicants to ensure compliance with the housing provider's criminal record policies, much like the CrimSAFE product at issue in this case."  *Id.* at 4.

Mr. Kacirk states he reviewed certain pleadings in this case, discovery, and conducted interviews with the Defendant's personnel "to obtain additional knowledge regarding the operation and purpose of the CrimSAFE product."  *Id.* at 4.  Mr. Kacirk's report and the Defendant's opposition indicate that Mr. Kacirk was hired to present evidence relating to the Defendant's defense to the FHA disparate impact claim and the CUTPA claim.

Relevant to this analysis is the law on these claims.  As stated in greater detail in the Court's decision on summary judgment, a disparate impact claim cognizable under the FHA generally requires the following:

> First, a plaintiff . . . must come forward with a prima facie case; and second, the defendant. . . . may rebut the prima facie case by proving that the 'challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.' [Third], the burden of proof shifts back to the *plaintiff* to show that the 'substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.'

*See Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016) (appeal following a bench trial) (quoting 24 C.F.R. § 100.500(c)(3)); *see Texas Dept. of*

*Housing and Community Affairs v. Inclusive Communities Project*, 576 U.S. 519, 527, 541 (2015).

CUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *See* Conn. Gen. Stat. § 42-110b.  When analyzing the first element, whether plaintiffs alleged an unfair act, the Court must apply the "cigarette rule" which considers whether the act: (1) "offends public policy as it has been established by statutes, the common law, or otherwise"; (2) is "immoral, unethical, oppressive, or unscrupulous"; or (3) "causes substantial injury to consumers." *See Harris v. Bradley Memorial Hosp. and Health Ctr., Inc.*, 296 Conn. 315, 351 (2010).

2.  *Discussion*

The Plaintiffs argue that Mr. Kacirk should not be permitted to offer expert testimony on ultimate legal issues to be decided in this litigation. Dkt. 157.  Further, the Plaintiffs argue that Mr. Kacirk's proffered testimony on supposed justifications for CrimSAFE does not meet the standards for reliability and relevance.  Lastly, the Plaintiffs argue that Mr. Kacirk's opinion that CrimSAFE users nonetheless conduct individualized assessments of rental applicants before denying admission due to criminal history is unfounded.

The Defendant opposes the motion to exclude the testimony of Mr. Kacirk, arguing that Mr. Kacirk does not opine on any ultimate legal conclusion.   Dkt. 163.  They also argue that Mr. Kacirk's testimony regarding the categorization and filtering benefits of CrimSAFE is relevant and does not hinger on technical knowledge regarding how CrimSAFE filters records.  The Defendant argues that

the Plaintiffs' argument relating to Mr. Kacirk's experience with CrimSAFE and the "state of the record" provide no basis to exclude his testimony.   Lastly, the Defendant argues that Mr. Kacirk provides expert testimony regarding why products like CrimSAFE are used by the industry and the non-discriminatory intent behind the offering and use of such products.

Here, Mr. Kacirk's expert opinion may be found relevant in determining whether the Defendant has a substantial, legitimate, and nondiscriminatory interest, as required for a defense under an FHA claim.   Specifically, by virtue of his experience he may have personal knowledge which enables him to offer credible evidence on the necessity of using background checks in general and CrimSAFE background checks in particular to achieve one or more substantial, legitimate, nondiscriminatory interests of the defendant.   His expert opinion may also be relevant in imparting knowledge about whether the Defendant's conduct is not immoral, unethical, oppressive, or unscrupulous as required under a CUTPA claim.   This is because Mr. Kacirk's, as a property management expert who has used background checking services, can testify about the background check industry, including the existence and features of the various products available, the prevalence of the use of such products, the manner in which they are used in the industry and the availability or lack of alternate means of fulfilling their purpose.

With that said, the Plaintiffs are correct in their argument that Mr. Kacirck's report contains opinions that he has not shown he is qualified to make.   Mr. Kacirk's report states he "was retained as an expert witness for RPS to render a professional opinion on whether or not the challenged practices and services that

RPS provides to its clients promote legitimate public and/or business interests, and whether those practices and services are necessary to achieve those interests." Dkt. 157-1 at 2. While his testimony may address industry interests and how they can and are achieved, their legitimacy and necessity are findings within the exclusive province of the fact finder and the Court.

      i.    Improper Legal Opinions

The Plaintiff's point to two statements within Mr. Kacirk's report that they argue contain improper legal opinions to which he should not be permitted to testify. First, the Plaintiffs' mis-cite Mr. Kacirk's report where he says: "Attempting to impose legal liability on an important screening service provider, such as RPS's CrimSAFE product, will not further the legitimate and valid interests of tenant safety and non-discrimination." *Id.* at 14. The Plaintiffs distorted this sentence asserting that Mr. Kacirk was asserting that such liability is unlawful in his opinion. The Court rejects the Plaintiffs' assertion and interpretation of this sentence. However, this sentence does contain an improper opinion that the interests his report discusses are both legitimate and valid. This is not for Mr. Kacirk to decide rather it is for the factfinder to decide. Further, this statement is essentially legal argument, which is for counsel to argue not an expert witness; particularly when that witness is not a lawyer or trained in the law. Therefore, Mr. Kacirk is prohibited from testifying in a manner consistent with this statement—i.e., he is prohibited from testifying that the interests he sets forth in his report meet the second step of the FHA disparate impact analysis.

The Plaintiffs' also cite to Mr. Kacirk's report where he says "Given the above considerations, RPS cannot be said to have created any disparate 'impact' because any result the CrimSAFE product provides is not a final decision since the housing provider is still obligated to conduct an individualized review and make the final decision on the application."  Dkt. 157-1 at 11.  The Plaintiffs' originally argued that this opinion improperly usurps the role of the factfinder as an ultimate issue. However, the Plaintiffs have narrowed the issue in this case in a way that makes this portion of Mr. Kacirk's report irrelevant now that the Plaintiffs argue that disparate impact comes solely from the automated decision process and not when final reports are provided to housing providers.  Dkt. 157 at 9 ("Here, the pertinent inquiry relates to what legitimate purposes the automated CrimSAFE decisions serve.").  Because this conclusion reached by Mr. Kacirk is no longer relevant, it will not help the trier of fact and is inadmissible.

Therefore, Mr. Kacirk is prohibited from testifying that, in his expert opinion, the Defendants have not created a disparate 'impact' because of an individualized review by the housing provider.

ii.     Tort and Insurance Liability Opinion

In Mr. Kacirk's report, he states that "[t]he failure to conduct [criminal background] screenings can lead to substantial liability that can threaten financial viability of properties."  Dkt. 157-1 at 7.  This statement is outside of Mr. Kacirk's expertise because he has based this conclusion on legal research and financial assumptions.  *Id.*  Mr. Kacirk has no legal training or expertise in the law.  This statement may reflect his anecdotal experience as a property manager and  reflect

an opinion he gives as an instructor, but it lacks the methodological basis for testimony of an expert in a court of law, unless supported by sound statistical data offered by a statistician or other data compilation and analysis expert.  Mr. Kacirk is prohibited from testifying about knowledge outside of his experience and personal observations, including the intent of others who conduct, the necessity of conducting, the legitimacy of conducting and potential tort liability for not conducting criminal background screenings.  He must limit his testimony to the existence, nature and features of criminal background checking products and his usage of these products.

Mr. Kacirk's report discusses how increased liability can affect a property management companies ability to obtain insurance at reasonable rates. Dkt. 157-1 at 7.  Mr. Kacirk's expertise as an experienced property manager qualifies him to testify to his experience in obtaining insurance, he is not qualified to hypothesize on insurance underwriting standards and valuations.  His personal knowledge or experience, that a particular property manager(s), subject to tort liability for failing to conduct background checks, paid higher insurance rates, standing alone, is anecdotal.  Insurance underwriting is technical and complex and therefore an opinion based on anecdotal information, and not on a reliable statistical methodology, is not reliable expert testimony.  For these reasons, Mr. Kacirk is not permitted to testify about how insurance rates are affected by litigation.

iii.   Opinions Based on Categorization, Sorting, and Filtering

Mr. Kacirck's report contains a section relating to the legitimate interests served by "categorization" products like CrimSAFE, which focuses on the sorting

and filtering functions offered by CrimSAFE.  Dkt. 157-1 at 7–10.  In this section he discusses the relationship between housing providers and criminal screening companies, such as the Defendant.  *Id.* at 7.  His report is premised on the belief that criminal screening companies routinely return a "list of criminal records that are associated with an applicant."  *Id.*  That is not the issue here.  The issue here is whether a report classifying an applicant as unqualified without accompanying records violates the FHA.  Again, Mr. Kacirk may testify fully and fairly about the processes generally employed by various screening companies, representative of the industry as a whole if such testimony explains relevant industrywide customs or the various categories of background checking services.  The Court will preclude or disregard testimony which is irrelevant or unreliable because it is anecdotal or is not founded on a reliable factual and analytical basis. *See State v. Deutsche Telekom AG*, 419 F. Supp. 3d 783, 791 (S.D.N.Y. 2019).

By way of example, Mr. Kacirck's report opines that "[p]roducts such as CrimSAFE are necessary to ensure the timely, objective, and accurate categorization of criminal records in today's environment of mobility where there are large volume of electronic applications and large number of unique crimes across federal, state and local ordinances."  Dkt. 157-1 at 14.  These opinions are beyond the scope of his expertise, are not founded on any reliable analytical methodology, and thus beyond the scope of his permissible expert testimony.

Mr. Kacirk's expertise includes requesting, receiving, and reviewing criminal screening reports.  He also indicates an expertise in working with criminal screening companies as vendors.  Meaning, he does have some expertise and

would logically have some knowledge of the workings of such programs as someone who hires and utilizes these services. He could also testify about his experience in their accuracy to the extent he has confirmed criminal records after receiving reports. However, he presents no factual or analytical basis to opine about such reports categorically. He cannot testify that such reports are objective.

### iv.     Ultimate Conclusion Opinions

Mr. Kacirck also opines that tenant screening is necessary to protect property and the assets of property management companies, and "is also an important component of a housing provider's duties to ensure a safe environment for tenants." Dkt. 157-1 at 7. Mr. Kacirck's report nor his CV explain how he is qualified to make or how he arrived at that conclusion. Whether the criminal screenings at issue in this case are necessary is a factual and legal determination for the court to make. Whether the criminal screenings at issue actually protect property and tenants, is an opinion Mr. Kacirk is not qualified to make.

Mr. Kacirk's report also states that a criminal screening report was provided in this case and bases this on his review of the records provided to him. Dkt. 157-1 at 13. The Court, sitting as factfinder, will not find helpful such testimony because this testimony is based on Mr. Kacirk's ability to review documents that can be admitted into the record, which is something the Court is capable of doing on its own.

For the above reasons, the Plaintiffs' motion to exclude testimony of Mr. Kacirk; Dkt. 157; is granted in part and denied in part. Mr. Kacirk may testify at

trial, but his testimony is to be limited to only testimony that is relevant, reliable, and based on his personal knowledge or expertise, as detailed above.

B. <u>Second Motion</u>

The Defendant has filed a motion in limine seeking to exclude expert witness report of the Plaintiff's expert witness Dr. Lila Kazemian.  Dkt. 177.

1. *Background*

Dr. Kazemian has a PhD in criminology and is an associate professor in the sociology department at the City University of New York.  Dkt. 177-1 at 15.  Dr. Kazemian authored an expert report in this case that "presents evidence from social science research to assess the public safety risk posed by individuals with criminal histories."  *Id.* at 5.  Her report goes on to state that it specifically "examines whether the existing empirical evidence and official statistics provide support for the methods and criteria used by CrimSAFE, a criminal record screening tool that assesses whether housing applications should be accepted or denied on the basis of an individual's criminal record."  *Id.*

As discussed above, if the Plaintiffs set forth a prima facie case of FHA disparate impact, the Defendant can rebut that by proving that the "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *See Mhany Mgmt., Inc.*, 819 F.3d at 617.  Dr. Kazemian's report is evidence that could rebut a claim by the Defendant that the challenged practice is necessary to achieve one or more substantial, legitimate, non-discriminatory interest.

2. *Discussion*

16

The Defendant argues that (1) disclosure of Dr. Kazemian was untimely, (2) Dr. Kazemian's opinions are not relevant, and (3). Dr. Kazemian's opinions are not reliable. Dkt. 187. The Plaintiff objects arguing that (1) disclosure of Dr. Kazemian's report was timely, (2) Dr. Kazemian's opinions clearly fit the Plaintiffs' case, demonstrating no business necessity justifies CrimSAFE, and (3) Dr. Kazemian's opinions are reliable. The Court addresses each issue below.

i.    Timeliness

The Defendant first argues that Dr. Kazemian's report was untimely. Dkt. 177 at 1, 2–4. The Plaintiffs object, arguing that the report was transmitted within the deadline that the parties agreed to via email. Dkt. 187 at 2–3.

On September 6, 2018, the parties filed a Rule 26(f) report in which the parties agreed that they will designate trial experts and provide opposing counsel with reports from said expert on any issues on which they bear the burden of proof by January 15, 2019, on any issues on which they do not bear the burden of proof by March 15, 2019, and rebuttal experts on June 23, 2019. Rule 26(f) Report at 9, Dkt. 22. On September 10, 2018, the Court entered a scheduling order approving the deadlines set within the Rule 26(f) report except for some deadlines not relevant here. Dkt. 27.

On January 18, 2019, the parties agreed over email that the deadline to disclose experts on issues on which they do not bear the burden of proof would be extended to May 15, 2019. Dkt. 187-1. On May 8, 2019, the parties agreed to extend this deadline again to June 10, 2019. *Id.* On June 10, 2019, Dr. Kazemian's report was disclosed to the Defendant's counsel. Dkt. 187-2.

Rule 29 of the Federal Rules of Civil Procedure provides that: "Unless the court orders otherwise, the parties may stipulate that: . . . (b) other procedures governing or limiting discovery be modified—but a stipulation extending the time for any form of discovery must have court approval if it would interfere with the time set for completing discovery, for hearing a motion, or for trial."  The Court did not preclude the parties from stipulating to modifying their expert witness disclosure deadlines.

The Court finds that Dr. Kazemian's report is not untimely because it was disclosed within the time that the Defendant's counsel agreed to accept such report.  The parties were not precluded from stipulating to extend the deadline as permitted under Rule 29.  Therefore, the Court rejects the Defendant's argument that Dr. Kazemian's report was untimely.

ii.    **Relevancy**

Dr. Kazemian's report sets forth five general opinions, each of which the Defendant argues is irrelevant.

a.  **Dr. Kazemian's First Opinion**

Dr. Kazemian's first opinion is that "Given American criminal justice trends over the course of the past decades, it cannot be assumed that individuals with a criminal record pose a significant threat to the community."  Dkt. 177-1 at 5.  She further opines that "a criminal record does not necessarily imply persistent or violent offending."  *Id.* at 6.

The Defendant argues that this opinion is irrelevant because it is not linked to any aspect of CrimSAFE's record found reporting, metrics, structure, or use;

18

and is improperly narrowed to violent offenses.   The Plaintiffs argue that the Defendant failed to provide the reporting metrics and misinterpret Dr. Kazemian's report.

The Court rejects the Defendant's argument that Dr. Kazemian's opinion must be directly linked to CrimSAFE in order to be relevant.  First, the utility of background checks is relevant. Defendant sought to offer expert testimony that they were necessary and without which the financial viability of housing developments was perilous.  While these conclusions are beyond the ken and expertise of the Defendant's expert, the pros and cons of background checks is relevant to the exercise of weighing the substantial, legitimate, nondiscriminatory interests served by the CrimSAFE background check at issue and whether the interests served by using it could be served by another practice that has a less discriminatory effect.

There is no reason why having CrimSAFE metrics would have any affect on her opinion.  The Court also rejects the Defendant's argument that Dr. Kazemian's opinion is not relevant because it is improperly narrowed to violent offenses because her opinion expressly includes both persistent and violent offenses.  Dkt. 177-1 at 5–6.

b.  Dr. Kazemian's Second Opinion

Dr. Kazemian's second opinion is that criminal background checks have several shortcomings. Dkt. 177-1 at 6–7.  The Defendant argues that Dr. Kazemian does not have the experience to opine on the  accuracy of criminal background checks.  The Plaintiff did not address this argument in its opposition.   The Court

is unable to determine based on Dr. Kazemian's CV and report whether she has experience in or has studied the accuracy of criminal background checks.   The Court agrees with the Defendant and finds that Plaintiffs have not established Dr. Kazemian is qualified to opine on the  accuracy of criminal background checks authoritatively.

### c.  Dr. Kazemian's Third Opinion

Dr. Kazemian's third opinion is that "[t]he criminal justice system is heavily skewed towards ethnic and racial minorities."  Dkt. 177-1 at 7–8.   The Defendant argues that this opinion is untimely because it supports issues on which the Plaintiffs bear the burden of proof.  The Plaintiffs contend Dr. Kazemian's report goes to an issue on which Defendants have the burden of proof.

Dr. Kazemian reaches her third opinion after relying on reports and statistics of racial disparities in the criminal justice system.  These disparities result in the underrepresentation of certain segments of the population and overrepresentation of others.   She contends her opinion goes to whether the CrimSAFE background check used to exclude the named Plaintiff is predictive of risk and therefore necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.  Her opinion challenges the theory that CrimSAFE is predictive of an applicant's future risk.   In other words, she hypothesizes that the background check at issue does not accurately measure risk, making it not necessary.   Put another way, the overrepresentation of minorities among arrestees misrepresents their relative risk and fails to predict the risk of underrepresented segments of the population.  In other words, her opinion goes to

whether background checks which categorically underrepresent populations which pose a risk achieves the substantial, legitimate, nondiscriminatory interests of a property owner.

The Court further finds Dr. Kazemian reaches her third opinion after relying on reports and statistics of racial disparities in the criminal justice system and is has a sound factual and analytical basis. Dr. Kazemian's disparate treatment third opinion is timely.

### d. Dr. Kazemian's Fourth Opinion

Dr. Kazemian's fourth opinion is that "[c]riminal histories have a diminished ability to accurately predict offending behavior over time." Dkt. 177-1 at 8–9. Dr. Kazemian summarized her fourth opinion as follows:

> the extent empirical research has demonstrated that screening procedures that indiscriminately disqualify all individuals with a criminal record cannot be justified on the basis of public safety concerns. The past offending rate and the time since the last offense are variables that must be jointly considered in order to determine whether a criminal record is predictive of future offending and whether the individual is likely to pose a threat to the community.

Dkt. 177-1 at 9.

The Defendant argues that this opinion is foreclosed by Congressional policy and law. The Defendant cites to federal regulations, the FCRA, and rejected state legislative proposals to support its conclusion that "[c]riminal screening has been expressly endorsed by Congress in numerous ways." *Id.* at 8. The Plaintiff argues that Congress has not adopted any law inconsistent with Dr. Kazemian's conclusion that criminal histories' predictive value diminishes over time." Dkt. 187 at 7–9.

21

The Defendant is mistaken because there is federal policy that having a criminal conviction alone, irrespective of timing, is not evidence of risk of recidivism.  In other words, federal policy recognizes that recency of a conviction is predictive of recidivism.   The United States Sentencing Commission (the "Commission") has studied the factors which predict recidivism.   The Commissions' guidelines sentencing table provides sentencing ranges based on an offender's offense level and criminal history category. See U.S.S.G., Ch.5 Pt.A. The offense level is calculated using offense specific aggravating and mitigating factors prescribed by the guidelines. See U.S.S.G. § 1B1.1(a)(1)-(5).   The criminal history category is based on the recency and severity of an offender's prior sentences and supervision status.  See U.S.S.G. § 4A1.1.  Generally, offenses are not counted in computing an offender's criminal history fifteen or ten years, depending on the prior sentence imposed, after the sentence imposed is served. U.S.S.G. § 4A1.2(e)(2).   The sentencing range is determined by "[t]he intersection of the Offense Level and Criminal History Category" on the sentencing table. USSG § 5A, Application Note 1.

> The Commission's 2004 report, Measuring Recidivism, served as a "performance review" of the predictive ability of these provisions, i.e., the predictive statistical power of the criminal history measure to reflect subsequent recidivism among federal offenders.  That report concluded that these provisions largely succeeded in predicting subsequent risk of reoffending.

Hunt, Kim Steven and Dumville, Robert, *Recidivism Among Federal Offenders: A Comprehensive Overview*, United States Sentencing Commission, at p.3 (Mar. 2016).  Thus, the length of time between a conviction and consideration of the risk of a person reoffending is a predictive factor recognized by federal policy.

Even if the Court accepted the Defendant's contention that Congressional policy and law endorse criminal background screenings, that challenge goes to the persuasiveness not the admissibility of the opinion. Further, Dr. Kazemian's opinions are not directly contrary to that contention. Dr. Kazemian's opinions relate to how certain types of criminal background checks may be overinclusive, and by negative implication underinclusive, and thus fail to satisfy their purported purpose. If Dr. Kazemian's opinion is different than Congressional policy, that is a legal and factual issue for the Court to decide and is not a basis for excluding her testimony. Therefore, the Court rejects the Defendant's argument relating to Dr. Kazemian's fourth opinion.

e. Dr. Kazemian's Fifth Opinion

Dr. Kazemian's fifth opinion is that "[t]he ability to secure safe and affordable housing constitutes a major barrier to prisoner reentry and increases the risk of reoffending." Dkt. 177-1 at 9–10.

The Defendant argues this opinion is not relevant to the issues in this case, which relate to whether there is a legitimate, nondiscriminatory justification for the criminal background screenings at issue. The Plaintiffs argue that the Defendant misconstrues Dr. Kazemian's opinion. The Plaintiffs state that Dr. Kazemian's fifth opinion is that the Defendant's policies reduce safety, which is directly in conflict with their argument that CrimSAFE is necessary to achieve substantial, legitimate, nondiscriminatory interests.

The Court finds that the Defendants are correct that this opinion does not directly relate to the Defendant's background screening products, rather it appears

to be a rebuke to any criminal background screening that results in the rejection of someone with a criminal history. However, the Plaintiffs are also right that this opinion is relevant to show that the interests the Defendant will likely set forth in justifying its product—safety and security—is to be balanced by crime that could be the result of the Defendant's product. At this stage, this opinion is minimally relevant. Any prejudice that may result from the introduction of this opinion would be minimal because the Court is sitting as the factfinder and is capable of disregarding this opinion if, after hearing the other evidence in this case, that opinion is not relevant. Therefore, the Court rejects the Defendant's argument relating to Dr. Kazemian's fifth opinion.

iii.    **Reliability**

The Defendant argues that Dr. Kazemian's expert report should be precluded because her conclusions about recidivism are unreliable for three reasons. Dkt. 177 at 10–15.

a.  **"Control Group"**

First, the Defendant argues that Dr. Kazemian's studies are not reliable because they are not benchmarked against the general population. Dkt. 177 at 11. In other words, the Defendant is claiming that Dr. Kazemian's methodology, which did not include determining recidivism rates by members of the applicant pool who do not have a criminal history, is so flawed it must be excluded. The Plaintiffs argue that the "control group" standard purported by the Defendant is baseless.

The Defendant did not provide any proof that inclusion of members without criminal histories is methodology required for this field of expertise. Whether Dr.

Kazemian's opinions should have included a "control group" would go to the weight of the evidence, not the admissibility.  The Defendant will have the ability to cross-examine Dr. Kazemian to explain why this failure renders her opinions incorrect.

b.  Location and BJS Studies

Second, the Defendant argues that Dr. Kazemian did not account for the location of crimes.  Dkt. 177 at 12–13.  The Court cannot square this argument with the Defendant's motion, which immediately thereafter argues that Dr. Kazemian should have relied on a Bureau of Justice Statistics ("BJS") *national* statistics report in forming her opinion.  The Plaintiff's argue that the recent BJS report validates Dr. Kazemian's opinions.

The Court finds that the Defendant's challenges based on location of crime and the BJS study do not go to the admissibility of the evidence, rather the weight. The Defendant could attempt to present the BJS report through its own expert and can cross-examine Dr. Kazemian about how those reported statistics compare to her opinions.

c.  Lookback Period

Third, the Defendant argues that Dr. Kazemian's refusal to set forth any specific lookback period that she believes the Defendant should have adopted renders her opinion unreliable because it is too theoretical.  Dkt. 177 at 14–15.  The Plaintiffs' object to the claim that Dr. Kazemian did not provide a lookback period, citing to Dr. Kazemian's report and her deposition where she explained that a

"lookback period" by itself is not a metric that should guide the Defendant's policy. Dkt. 187 at 17–18.

> During Dr. Kazemian's deposition she explains that
>
> you need to have a grid of several factors. Not just the time since the last offense. . . . we need to consider a wide range of different variables together. This [CrimSAFE] configuration form does not allow for that. But only allows at one factor at a time and that's a problem.

Dkt. 187-6 at 9. Her opinions as expressed in her report and her deposition is not so theoretical to be irrelevant as the Defendant argues. Though the Defendant may wish for a specific lookback period, it may be inappropriate here, which is something the Plaintiffs can try to prove through Dr. Kazemian.

Therefore, the Court rejects the Defendant's arguments that Dr. Kazemian should be excluded because her opinions are unreliable.

In conclusion, the Court denies the Defendant's motion in limine to exclude Dr. Kazemian, however, as outlined above, her testimony is to be limited to what is relevant, reliable and based on personal experience and/or her expertise.

C.  <u>Third Motion</u>

The Defendant has filed a motion in limine to exclude the testimony of Plaintiffs' statistical experts, Dr. Christopher Wildeman and Dr. Allan Parnell. Dkt. 175.

1.  *Background*

Dr. Wildeman is a Professor of Policy Analysis and Management and Sociology (by courtesy) at Cornell University with a PhD in sociology and demography. Dkt. 175-1 at 2. He has become an expert on using methods to estimate cumulative risk of, among other things, being arrested, being convicted

26

of a crime, and being incarcerated.  *Id.*  Dr. Wildeman was hired by the Plaintiff to (1) "consider arrests, convictions, sentences to prison and jail incarceration, (2) to look at the risk of ever experiencing each of those events, as well as the risk of experiencing each of those events in the last four years and the last seven years, and (3) to perform these analyses for all individuals, as well as those who fall below certain income thresholds."  *Id.* at 1.  Dr. Wildeman relied on several national-level studies including the National Longitudinal Survey of Youth 1979 (NSLY79) and prison incarceration data from the Survey of Inmates in State and Federal Corrections Facilities.  (SISFCF).  *Id.*  Dr. Wildeman then compared the national study results with incarceration and racial disparities in Connecticut.  *Id.*

Dr. Parnell is the Vice President and Research Director of the Cedar Grove Institute for Sustainable Communities, a Senior Fellow at the Frank Hawkins Kenan Institute on Private Enterprise at the University of North Carolina at Chapel Hill, and President of McMillan and Moss Research, Inc.  Dkt. 175-3 at 2–3.  He has a PhD in sociology with a specialization in demography.  *Id.* at 3.  Dr. Parnell was hired by the Plaintiff to assess whether CrimSAFE disproportionately disqualifies African Americans and Latinos from securing rental housing in the Connecticut markets where the Defendant sells this service.  *Id.* at 1.  Dr. Parnell relied on Dr. Wildeman's calculations of cumulative risk of incarceration for Whites, African Americans, and Latinos and compared the risk with White to African American households that rent and White to Latino households that rent in the housing markets identified by the Defendant.  *Id.* at 2, 8–10.

Though this motion seeks to exclude the testimony of Dr. Wildeman and Dr. Parnell only, the Defendant's expert, Dr. Huber, is relevant to this discussion.  Dr. Huber is a Senior Statistician with Analysis & Inference, Inc. and has a PhD in mathematics.  Dkt. 175-5 (Huber Report) at 3.  Dr. Huber raises several challenges to Dr. Wildeman and Dr. Parnell's reports.  Though Dr. Huber indicates that Dr. Wildeman did not report statistical errors, he does not say this is contrary to established methodology of experts in this field, he simply says it is contrary to some of Dr. Wildeman's prior publications.  *Id.* at 14. Dr. Huber does not challenge the "well-established fact that, nationally, African Americans and Hispanics have been jailed and incarcerated at higher rates than Whites" but challenges the broken-down age/income brackets reported by Dr. Wildeman. Dr. Huber takes specific aim at the determination of statistical significance of Hispanics with a look back period of 4 years, finding the standard of error for this group so significant that the data is not usable.  *Id.* at 15. Dr. Huber challenges several "assumptions" that he claimed Dr. Parnell made that are incorrect and make his opinions invalid and misleading.   Some of the assumptions he challenges are Dr. Parnell's assumption that Dr. Wildeman's numbers are correct, that the experiences from the 1979 survey have not varied, and that the county-level estimates constitute a random sample for the purposes of statistical testing.  *Id.* at 6–10.

Dr. Wildeman issued a rebuttal declaration to Dr. Huber's report, where he addresses the claim that Dr. Wildeman failed to use statistical error.  Dkt. 175-2. Dr. Wildeman explained that:

> I did not do so because I evaluated all of the evidence referenced in
> my report as a body of evidence rather than individual pieces, and

**concluded that the pattern of differences reflected in my Tables 1-3 was consistent with the literature, with which I am familiar, and was internally consistent. Individual breakouts (e.g., Hispanics with four-year lookback period) should not be evaluated in isolation from the rest of the data. Overall, the pattern of disparities are substantial, as I concluded in my expert report, and the report did not need to cite to the specific levels of statistical significance to reach that conclusion to a degree of expert certainty.**

*Id.* at 1. Dr. Wildeman also responded to Dr. Huber's challenge specific to the breakout sample of Hispanics, by explaining that when Hispanics and African Americans are pooled there is a statistical significance of disparity. *Id.* at 2.

The Court's summary judgment decision; Dkt. 194; which was entered after the parties filed their motions in limine, reached several conclusions that are relevant in determining whether the testimony of the Plaintiffs' statistical experts should be excluded. The summary judgment decision addressed the dispute between the parties on whether statistical evidence had been shown establishing a disparate impact. *Id.* at 40. The Court found that the Plaintiffs . . . presented sufficient statistical evidence to put in dispute whether RPS's practice of reporting housing applicants' criminal records to housing providers as potentially disqualifying records has a disparate impact on African Americans and Latinos. *Id.* In reaching that decision, the Court outlined the legal requirements for satisfying the causal connection requirement for a *prima facie* FHA disparate impact claim. *Id.* at 40–43.

Of relevance for this decision is the Court's discussion on when national or state general population statistics may be used as the appropriate comparison group. *Id.* at 41. The first occurs when there is no reason to suppose that the local characteristics would differ from the national statistics. *Id.* (citing to *Dothard v.*

29

*Rawlinson*, 433 U.S. 321, 330 (1997)).   The second occurs when "the actual applicant pool might not reflect the potential applicant pool due to a self-recognized inability on the part of the potential applicants to meet the very standards challenged as discriminatory." *Id.* at 42 (citing to *E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 119 (2d Cir. 1999)).   The third occurs when actual applicant data is not available. *Id.*

The Court found that national or state general statistics may be used in this case because the actual applicant data is unavailable. *Id.* at 43.   In addition, the Court found that there was a disputed question as to whether the Plaintiffs have presented sufficient evidence that Connecticut is the market area of the Defendant's Connecticut clients so that there is no gap between the people reflected in the statistics offered by the Plaintiffs and the eligible rental pool for RPS's clients. *Id.* at 45.   The Court rejected the Defendant's claim that the applicant pool must be narrowed to applicants for only affordable/subsidized rental housing in Connecticut because the Plaintiffs set forth evidence demonstrating that African Americans and Latinos face higher rates of arrest and incarceration regardless of their income and state geography. *Id.* at 47.   For those reasons and more, the Court found that the Plaintiff provided sufficient evidence to put into question whether there is a disparate impact. *Id.* at 50.

*Fortune Soc'y v. Sandcastle Towers Housing Development Fund Corp.*, 388 F. Supp. 3d 145 (E.D.N.Y. 2019) (hereinafter "*Fortune*") is a substantially similar case to the present case.   In *Fortune*, the plaintiff (a non-profit organization in New York that provides re-entry and re-integration services for formerly incarcerated

30

individuals) filed a complaint against the defendant (the owner of an apartment complex in New York) alleging that the defendant's housing policy of automatically excluding applicants with a criminal conviction record violated the FHA and New York State and City law. *Id.* at 152, 159. Of relevance at this stage of the pleadings is the *Fortune* court's decision on the defendant's motion to exclude expert testimony of Dr. Parnell—who is one of the two experts the Defendant here wishes to exclude. *Id.* at 167. In *Fortune*, the court found that Dr. Parnell's analysis was "sufficiently relevant, reliable and reasoned to be admissible as evidence of a possible disparate impact" over the defendants' arguments that Dr. Parnell failed to address data specific to the defendants' actual applicants, that Dr. Parnell's data pool included persons who would not be entitled to housing at the defendants' complex, and that Dr. Parnell relied on inadequate and unreliable data. *Id.* at 170. The court explained that the defendants' challenges went to the weight of the evidence, not its admissibility. *Id.* In *Fortune*, like here, the defendants claimed that Dr. Parnell wrongfully relied on Dr. Wildeman's data. *Id.* at 170–71. The court rejected this argument finding that Dr. Parnell's reliance on Dr. Wildeman's data was "entirely appropriate" because an expert can base its assumptions on the facts of other experts. *Id.* at 171 (citing to *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 331 F. Supp. 2d 134, 136 (E.D.N.Y. 2004)). Whether the relied upon data is flawed would go to the weight, not the admissibility. *Id.* at 171–72.

2. *Discussion*

The Defendant argues that the Court should exclude testimony of Dr. Wildeman because his opinions are both irrelevant and unreliable. Dkt. 175.

i.      Dr. Wildeman: Relevance

The Defendant argues that Dr. Wildeman's opinion is not relevant because it is based on national statistics and this case requires statistics on "the Connecticut applicant pools."  Dkt. 175 at 1–2, 7–14.  The Defendant argues that the applicant pool should be limited to African American, Hispanic, and White applicants for housing at the Connecticut complexes that use CrimSAFE.  *Id.* at 8.  Further, the Defendant argues that the circumstances that justify national statistics do not apply here because the Plaintiff has not established the unavailability or discouragement excuse.  *Id.* at 11.  The Defendant also argues that Dr. Wildeman's expert opinion is not relevant because  he relies on the NLSY79 study in forming his opinion, which studied the lives of a sample of people born between 1957-64; i.e., people between the ages 56 and 63 as of 2021.  Dkt. 175 at 14–19.  In addition, the Defendants argue that Dr. Wildeman's reliance on the NLSY79 study is flawed because that study did not provide results specific to Connecticut.  *Id.* at 15.

The Plaintiff argues that cases support use of national statistics and that Dr. Wildeman did present Connecticut-specific opinions that compare Connecticut to the national data.  Dkt. 184.  The Plaintiff also argues that the data from the NLSY79 study is consistent with more recent studies that Dr. Wildeman provided in his report.

The Court agrees with the Plaintiffs.  In the summary judgment decision, the Court concluded that the Plaintiffs can rely on national statistics because the actual applicant pool data is unavailable.  *See* Dkt. 194 at 43–44.  Regardless, Dr. Wildeman's report includes an analysis of the national statistics as they compare

to Connecticut specific data.  Dkt. 175-1 at 8.  The Defendant's challenge to Dr. Wildeman's reliance on the NLSY79 study misinterprets Dr. Wildeman's report, where he states plainly that he did not solely rely on the NLSY79 study; he relied on data from the SISFCF, the National Corrections Reporting Program, from year end reports of prisons, CDC Wonder, and the Bureau of Justice.  Dkt. 175-1 at 3–5. Whether Dr. Wildeman relied too heavily on outdated reports that are not a proper representation of the potential applicant pool is an issue on the weight of his opinion, not the admissibility.  Therefore, the Court rejects the Defendant's arguments that Dr. Wildeman's testimony should be excluded on relevance grounds because the Defendant's arguments go to the weight of Dr. Wildeman's testimony not the admissibility.

   ii.   Dr. Wildeman: Reliability

   a.   Standard of Error

   The Defendant argues that Dr. Wildeman's opinion is unreliable because he fails to provide a meaningful analysis of standard of error in his survey numbers. Dkt. 175 at 2–3, 19–24.  The Defendant argues that by not including a standard of error, Dr. Wildeman deviated from an essential and fundamental statistical technique.  Dkt. 175 at 21.  In other words, the Defendant argues that Dr. Wildeman has not used the same intellectual rigor in this case that is used in the field.  *Id.* The Defendant cites to two sources as proof that providing a standard of error is a basic norm of statistical expertise: the American Statistical Association (ASA) (2018), *Ethical Guidelines for Statistical Practice*. April 14, 2018 at p. 2, *available at* https://www.amstat.org/asa/files/pdfs/EthicalGuidelines.pdf  (last visited June 11,

2020) (hereinafter "ASA Guidelines") and the Federal Judicial Center, Reference Manual on Scientific Evidence (3rd ed. 2011) at p. 240, *available at* https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf (last visited June 11, 2020).[1] The Defendant argues that the failure to provide statistical error violated *Daubert* and cites to *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03-civ-7037, 2005 WL 4684238, at *18 (S.D.N.Y. Apr. 11, 2005) and *Pinello v. Andreas Stihl Ag & Co. KG,* No. 8:08-cv-452(LEK/RFT), 2011 WL 1302223, at *9 (N.D.N.Y. Mar. 31, 2011) for support.

The Plaintiff argues that Dr. Wildeman is not required to spell out significance measures in his report in order for the results to be deemed significant. Dkt. 184. Specifically, the Plaintiff's argue that the Defendant has not presented evidence to suggest that a standard of error is required in this field.

Defendant's reliance on the ASA Guidelines is unsupported by evidence that the Guidelines represent an established methodology for conducting statistical analysis. There is no way for the Court to determine from simply looking at the ASA Guidelines that providing a statistical error, particularly when reaching conclusions such as Dr. Wildeman's that relied on overall patterns, is an established methodology for expert statisticians. The citation to the FJC Manual also does not establish that the failure to include a standard of error breaks from established methodologies, it simply identifies that "a statistician can assess the

---

[1] The Defendant also cites to Dr. Wildeman's published academic articles, but the citation given was not to Dr. Wildeman's published academic articles. Therefore, the Court could not address whether such evidence supports the Defendant's argument.

likelihood that random error will create spurious patterns of certain kinds." FJC Manual at 240. This does not discuss the established methodologies for statisticians rendering a similar report as Dr. Wildeman. Meaning, Defendant has not shown that Dr. Wildeman deviated from established methodologies based on the argument raised.

The two cases cited by the Defendant in support of its argument that the failure to produce a standard of error violates *Daubert* are distinguishable and do not stand for the proposition the Defendant claims. The first citation is to *Lava Trading, Inc.*, 2005 WL 4684238 at *18, where an adopted report and recommendation stated that the expert—who was the subject of the motion to exclude—conceded that he did not attempt to measure or estimate error rate. This error was by no means the sole reason justifying the exclusion of the expert from trial; rather this expert was excluded for a substantial amount of other errors including relying on unsupported data provided by his client, failing to provide methodologies used, failing to explain his actual calculations, failing to explain the basis for alterations between reports, and much more. In the twenty-two page decision, filled with explanations for why the expert should be excluded, only one sentence was devoted to the conceded failure to measure an error rate. The second citation is to *Pinello*, 2011 WL 1302223 at *9, where the court noted that the expert did not meet any of the *Daubert* factors, including the failure to make reference to the known or potential error rate. These cases do not prove that the failure to provide statistical error is a violation of *Daubert* in and of itself justifying

35

exclusion.   Such rule would be contrary to the precedent that finds *Daubert's* reliability test is flexible.  *Daubert*, 509 U.S. at 595; *Kumho Tire*, 526 U.S. at 141–42.

    b. *Ipse Dixit*

The Defendant also argues that Dr. Wildeman's rebuttal report is *ipse dixit* and wholly inadequate because Dr. Wildeman states that the pattern of disparities is based on a "body of evidence" and comes after an evaluation of "all the evidence referenced in his report."  Dkt. 175 at 23.  The Defendant cites to *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 50 (2d Cir. 2004) to support this argument.

The Plaintiffs did not directly address this argument.  Dkt. 184.

The Court cannot find that the Defendant's argument is correct.  This is because Dr. Wildeman's rebuttal report does not stand on its own, it incorporates by reference his actual report that outlines the data relied upon, the methodologies used, and the conclusions drawn therefrom.  His rebuttal report does not assert any new claims or propose new conclusions.  The rebuttal simply responds to critiques and explains why the critiques are misplaced; something he would have otherwise done on cross-examination.  The Defendant's reliance on *Wills*, 379 F.3d 32 is misplaced.  In *Wills*, the expert admitted that his opinion was a product of his own "background experience and reading, rather than scientific testing and peer review." *Id.* at 49.  The district court in *Wills* also found that the expert failed to satisfy *any* of the relevant *Daubert* factors.  *Id.*  That fact pattern is not here, Dr. Wildeman's rebuttal report clearly indicates an incorporation of the data and studies relied upon in his original report.  Contrary to the Defendant's argument that Dr. Wildeman is saying "trust me"; Dkt. 175 at 23; Dr. Wildeman is directing

the reader of his rebuttal report to look at the body of research he relied upon to form his original and only conclusions.   The Court rejects the Defendant's argument that the rebuttal report is *ipse dixit* and justifies the exclusion of Dr. Wildeman's testimony.

### iii.   Dr. Parnell

The Defendant argues that Dr. Parnell's "statistical significance" analysis was wrong in concept and wrong in execution making his conclusions unreliable. Dkt. 175.  The Defendant makes four arguments to support this basis for exclusion. First, the Defendant argues that, because Dr. Wildeman's numbers should be excluded, so should Dr. Parnell's.   Second, the Defendant argues that Dr. Parnell's acceptance of Dr. Wildeman's numbers as the exact truth wrongfully ignores that Dr. Wildeman's rebuttal concedes that the national numbers he used lack "independent significance."   Third, the Defendant argues that Dr. Parnell compounded errors with basic errors in statistical execution.   Fourth, the Defendant argues that Dr. Parnell has no factual basis to render an opinion on disparate impact.

The Plaintiff argues that Dr. Parnell's reliance on Dr. Wildeman's numbers is appropriate and his analysis is appropriate and accepted elsewhere. Dkt. 184.  The Plaintiff also argues that Dr. Parnell did not assess how CrimSAFE was used because that is the role of the fact finder, not an expert statistician such as Dr. Parnell.

The Defendant's first argument is moot because Dr. Wildeman's numbers have not been excluded as discussed above.

The Defendant's second argument is based on a misinterpretation of Dr. Wildeman's report and rebuttal. Dr. Wildeman did not say his individual breakout numbers were inaccurate and should not be relied on, he said that some of the breakouts do not have sufficient statistical significance alone but do when pooled. Wildeman Rebuttal at 2.

The Defendant's third argument is unsupported. No evidence other than the Defendant's own expert's, Dr. Huber, opinion has been presented showing that Dr. Parnell failed to use certain methodologies that Dr. Huber would have used. A motion in limine is not the proper vehicle for a battle of the experts on who's methodology is best where there is a lack of evidence that either is wholly unreliable. The Court cannot determine based on the competing reports which expert is right.

The Defendant's fourth argument misinterprets the role of an expert statistician. Dr. Parnell's role is not to determine how CrimSAFE works; his role is to aid the Court with his expertise as a statistician in determining whether the alleged discriminatory policy actually or predictably results in a disparate impact on a protected group. Dr. Parnell does not have a special expertise in determining how tenant criminal screening procedures work and his opinion on that would not have been accepted by the Court regardless.

For the aforementioned reasons, the Defendant's motion to exclude the Plaintiffs' statistical experts; Dkt. 175; is denied.

D. <u>Fourth Motion</u>

The Plaintiff has filed a motion in limine seeking to limit the testimony of Defendant's rebuttal expert Dr. William Huber.  Dkt. 179.

### 1. *Background*

Dr. Huber is a statistical consultant at a research firm in Springfield Pennsylvania with a PhD in mathematics.  Dkt. 179-3 at 2, 4.  Dr. Huber states in his report that he was hired by the Defendant to review the expert opinions of Drs. Wildeman and Parnell, focusing on statistical assumptions that are the foundation of those opinions and "to assess the validity of the data analysis and statistical testing used to arrive at those opinions."  Dkt. 179-2 at 3.

### 2. *Discussion*

The Plaintiff's motion does not seek to limit Dr. Huber's statistical opinions, rather it seeks to limit opinions that Dr. Huber makes that are not based on his expertise as a statistician.  Dkt. 179 at 5 n.1.   The Plaintiffs' motion groups the opinions it believes are entitled to exclusion into four groups: opinions on (1) housing markets, (2) rental property management, (3) criminal history and spatial variability, and (4) legal conclusions.  Dkt. 179.

The Defendant filed an opposition, which is a regurgitation of the arguments it made in its motion to exclude Dr. Wildeman and Dr. Parnell.  Dkt. 185.  The Defendant argues that the record supports Dr. Huber's critiques of Dr. Wildeman and Dr. Parnell's reports.

There is a common theme in each of the Plaintiffs' groups of opinions it seeks to exclude, which is that some of Dr. Huber's challenges to Dr. Wildeman

and Dr. Parnell's reports are based solely on common sense and ones ability to review the record.  The Court, as the fact finder, has both common sense and an ability to review the record, and will not find helpful testimony based merely on that.    For example, Dr. Huber critiques Dr. Parnell's opinion for assuming the individual counties in Connecticut constitute local housing markets.  Dkt. 179-2 at 9.  He presents no statistical evidence showing that the individual counties in Connecticut are statistically different than the "local housing markets" he claims Dr. Parnell should have based his opinions on.  He is merely pointing out that such assumption is wrong.  This is not helpful.  At best it is an attempt to impeach Dr. Parnell's opinions using common sense.  That is something counsel can do in cross-examining Dr. Parnell.   Dr. Huber's "opinion" is an attempt to supplant the role of counsel and adds nothing to what will otherwise be elicited during cross-examination and argued in post-trial briefs.  Dr. Huber is not legal counsel and is not permitted to supplant that role under the auspice of "expert."

This conclusion is consistent with all the other opinions the Plaintiffs challenge; including Dr. Huber's critique of Dr. Parnell's failure to consider factors other than criminal history alone, the use and reliance on national statistics, and bottom line conclusions.  The Court is not saying that the critiques and challenges are not admissible, rather, they are not admissible through Dr. Huber.  The Defendant will have the opportunity to elicit testimony on and argue that Dr. Wildeman and Dr. Parnell's opinions are not sound for all the reasons included in Dr. Huber's report.

Therefore, the Plaintiff's motion to limit testimony of Dr. Huber; Dkt. 179; is granted.

E. <u>Fifth Motion</u>

The Defendant seeks to exclude expert report of Plaintiff's expert witness Nancy Alisberg, arguing that Ms. Alisberg's testimony is not relevant. Dkt. 176. The Plaintiffs state that Ms. Alisberg's opinions advance the Plaintiffs' disability disparate impact claims. Dkt. 186.

As stated above, the motions in limine and their respective objections were all filed prior to the Court's ruling on the summary judgment motions. The Court granted summary judgment in favor of the Defendant on the disability disparate impact claims. Summ. J. Dec. at 834. Meaning, Ms. Alisberg's testimony is no longer necessary because the claims that her testimony and report intended to advance have since been decided.

Therefore, the Defendant's motion to exclude the expert report of Nancy Alisberg; Dkt. 176; is granted.

F. <u>Sixth Motion</u>

The Defendant filed a motion to exclude anticipated evidence from the Plaintiffs relating to injuries Mr. Arroyo suffered from while under the care of a nursing home. Dkt. 173. The Defendant argues that such evidence is not relevant because the alleged denial of housing is not a proximate cause for said injuries, or, in the alternative, is unduly prejudicial under Federal Rules of Evidence 403. *Id.*

The Plaintiffs' object arguing that Arroyo Plaintiffs' injuries are well within the chain of harm that can be redressed under the FHA and the evidence is not unfairly prejudicial.  Dkt. 182.

1. *Background*

The Defendant states that based on the Plaintiffs' amended damages analysis and deposition testimony from Ms. Arroyo, the Plaintiffs' intent to introduce evidence that Mr. Arroyo suffered certain injuries—including a fall during the winter of 2016 and a hospitalization for pneumonia and other medical conditions—that the Plaintiffs intent to attribute to the Defendant's alleged misconduct.  Dkt. 173 at 6.  The Defendant attached a single page of the Plaintiffs' purported damages analysis, which sets forth the Mikhail Arroyo is seeking compensatory damages in the form of both economic and emotional distress damages.  Dkt. 173-1.  The page provided by the Defendant includes a section that states as follows:

> **Economic Damages: As a consequence of Defendant's discriminatory policies and practices, Mikhail Arroyo incurred increased medical expenses resulting from his prolonged stay in the nursing home from approximately May 2016 until June 2017. The nursing home expenses were at least $2,460; Plaintiffs are awaiting additional billing records and reserve the right to amend this estimate.**

> **Emotional Distress: As a consequence of Defendant's discriminatory policies and practices, Mikhail Arroyo suffered significant emotional distress. For 13 months, Mr. Arroyo was stuck in a nursing home, unable to move into his mother's apartment. During that time, he suffered anxiety and sadness that was proximately caused by Defendant's discriminatory role in the denial of his housing application and compounded by Defendant's discriminatory refusal to produce his consumer file to his conservator and mother. Mr. Arroyo also suffered a fall in the nursing home that resulted in a week-long hospitalization and significant additional pain and suffering.**

42

*Id.*

The Defendant also provided an excerpt of Ms. Arroyo's deposition. Dkt. 173-2. The Defendant has redacted and failed to provide the context needed to fully understand the deposition testimony. *Id.* For example, while the testimony discusses someone being transported to the hospital and suffering from medical conditions, at no point in the text provided does Ms. Arroyo state that the person she is speaking of is her son. *Id.* The Defendant claims in its motion that this testimony relates to Mr. Arroyo but the Court cannot find this is accurate based on the evidence presented. *Id.* In addition, on a single page of the deposition transcript, surrounded by redactions is a single statement that says "[h]e was sitting in the bathroom and I guess the CNA left the scene and he fell." *Id.* at 3.

The underlying complaint does not allege any claims relating to a fall or other medical injury incurred by Mr. Arroyo during the time between when his application to WinnResidential was denied and when he was ultimately accepted. Compl., Dkt. 1. Rather it simply states that Mr. Arroyo attributed "increased medical costs as a result of his prolonged stay in a nursing home." *Id.* at ¶¶ 216, 222, 231.

   2. *Discussion*

The Court is unable to make a determination of whether this evidence should be excluded because the Defendant has not provided a full factual record. The Defendant has provided segmented pieces of a deposition transcript that is almost entirely redacted. The Defendant did not seek permission to file a sealed version of the deposition transcript as required under Local Rule 5 of the Local Rules of

Civil Procedure.  Any decision based on what has been provided would not be based on the full and complete record.  Therefore, the Court denies the motion to exclude the medical and injury evidence.

The denial of the motion is without prejudice to re-filing, where the Defendant is expected to set forth the complete record.  Though the motion in limine deadline has passed, additional time to address this matter is warranted because it is likely that this evidence would be irrelevant and needlessly time consuming at trial.  Fed. R. Civ. Pro. 1.  This is because, based on the conclusory allegations and evidence currently before the Court, the Plaintiff's did not raise these injuries in its complaint and the Defendant was not properly on notice.   Further, there is sufficient time before trial to address this issue in writing because the trial is scheduled for approximately 4 months from the date of this decision.

Therefore, the Court denies the motion to exclude certain medical and injury evidence but authorizes the Defendant to re-file this motion setting forth the full factual record that supports its motion.

G. <u>Seventh Motion</u>

The Defendant filed a motion to exclude certain marketing evidence arguing that the (1) the marketing materials are not relevant because they do not show actual conduct of the parties and there is no evidence of customer use, (2) the marketing materials should be excluded because they are significantly outdated, and (3) even if deemed marginally relevant, evidence of the marketing materials should be precluded under Rule 403.  Dkt. 174.  The Plaintiff's filed a response

arguing that the marketing materials are relevant and do not pose a risk of unfair prejudice to the Defendant.  Dkt. 183.

1.  *Background*

The "marketing evidence" that the Defendant seeks to exclude includes product brochures, website materials, opinion columns, specific marketing to WinnResidential, FHA compliance certificates, and user training materials.  Dkt. 174 at 2 n.1 (Plaintiffs' Ex. Nos. 7, 9-12, 44, 46, 50-62).  These materials contain information about CrimSAFE and other screening products the Defendant offers, such as basic functions, manner of use, features, and benefits.

As outlined in greater detail in the summary judgment decision, one of the issues remaining for trial is the decision on whether the Defendant is the proximate cause of the alleged injuries in this case.  Summ. J. Dec. at 34.  Part of this dispute relates to the conflicting evidence on whether the Defendant always returns a copy of a report that displays the full public data of an applicant's criminal record to someone at the client housing provider and, more specifically to Mr. Arroyo, whether any decision makers at WinnResidential received Mr. Arroyo's criminal record.  *Id.* at 7, 15.

Relevant for this discussion are the events that took place in April 2016.  As outlined in greater detail in the summary judgment decision, on April 4, 2016 HUD's Office of General Counsel published a document titled "Application of Fair Housing Act Standards to the Use of Criminal records by Providers of Housing and Real Estate-Related Transactions."  *Id.* at 13.  The document states that: "Nationally, racial and ethnic minorities face disproportionately high rates of arrest and

incarceration," and that, "the fact of an arrest is not a reliable basis upon which to assess the potential risk to resident safety or property posed by a particular individual." *Id.* On April 15, 2016, the Defendant sent an email to some of its clients discussing this guidance and recommended clients contact their own legal counsel to review eligibility requirements. *Id.* at 13–14. The email indicated that the Defendant is reviewing its products to determine if any changes need to be made in light of the new HUD guidance. *Id.* at 14. Approximately a week later, Ms. Arroyo applied for housing at WinnResidential on behalf of Mr. Arroyo. *Id.* WinnResidential requested a screening report for the Defendant and a decision came back stating that disqualifying record(s) were found. *Id.* at 15.

2. *Discussion*

Here, the marketing evidence that the Defendant seeks to exclude is relevant. These materials provide unbiased snapshots of what the Defendant was telling its clients and the public on how its products work. Though this evidence does not prove how CrimSAFE actually worked, it tends to prove what the Defendant wanted its clients and the public to know about how it worked. It is not unreasonable or arbitrary for a factfinder to make a logical inference that the way a product is advertised is the way the product is unless there is evidence to the contrary. How CrimSAFE worked is of consequence in this case, particularly in resolving the disputes as to whether the Defendant always returns copies of underlying reports and whether the Defendant did so with respect to Mr. Arroyo. Though the advertising materials are not conclusive on these issues, they do not need to be conclusive to satisfy the low standard of relevance.

i.      Conduct Evidence

The Defendant argues that this evidence does not prove actual conduct of the parties and there is no evidence that any customers used these materials. Dkt. 2–4. It is the Defendant's position that, for this evidence to be relevant and admissible, the Plaintiff must prove that the Defendant's customers viewed the material and such material affected conduct. *Id.* at 3. The Defendant relies on products liability cases to establish the existence of such a rule. *Id.* (citing to *In re Wright Med. Techs., Inc.*, No.: 1:13-cv-297-WSD, 2015 WL 6690046, at *12 (N.D. Ga. Oct. 30, 2015) and *Z.H. v. Abbott Labs., Inc.*, No. 1:14cv746, 2017 WL 104168, at *2 (N.D. Ohio Jan. 10, 2017).

The Plaintiffs argue that admissibility of marketing material does not categorically require proof of actual reliance by specific housing providers. Dkt. 183. The Plaintiffs state that the cases cited by the Defendant are distinguishable. The Plaintiffs also cite to excerpts of the Defendant's designees' deposition transcript stating that these training and marketing material were given to clients. Dkt. 183 at 8 n.12 (training slides and compliance certificates were provided to some of the Defendant's customers).

The Court agrees with the Plaintiff. The Defendant has not established that proof of use is required for the admission of marketing material. In *In re Wright Med. Techs., Inc.*, 2015 WL 6690046 at *12 the court held that marketing material "not actually reviewed by [the defendant-physician or the plaintiff] cannot be used to establish reliance by [the defendant-physician or the plaintiff]." *In re Wright Med. Techs.* is distinguishable because the Plaintiff here is not trying to prove that

47

WinnResidential or the Defendant relied on these material.  The issue is whether these material tend to prove how CrimSAFE worked and how it worked with respect to Mr. Arroyo.  In *Z.H. v. Abbott Labs., Inc.*, No. 1:14cv746, 2017 WL 104168, at *2 (N.D. Ohio Jan. 10, 2017), the court held that marketing material related to the off-label use of a prescription drug at issue in the litigation is not relevant because the plaintiff was not prescribed the drug for off-label use. The court in *Z.H.*, allowed the evidence of the marketing material for other use.  *Id. Z.H.* is also distinguishable because the marketing material here are not being introduced for purposes unrelated to this litigation.  As explained above, this evidence is relevant to proving facts that are still at issue in this case.

   ii.    **Outdated Evidence**

   The Defendant next argues that the marketing material should be excluded because it is significantly outdated.  Dkt. 174 at 4–6.  Specifically, the Defendants argue that any marketing material issued before April 2016 are outdated because the intervening events that occurred within that month made such material ineffective.[2]  *Id.*  The Plaintiffs argue that the Defendant did not make changes following the April 2016 HUD Guidance and even if it did, Mr. Arroyo's application was submitted before any such changes were implemented.  Dkt. 183 at 6–7.

---

[2] The Defendant also argues that the material that predates Mr. Arroyo's application cannot fit with the "presumption of backward relation" because the Plaintiff did not present evidence that housing providers relied on those materials.  Dkt. 174 at 4.  This is simply repeating the argument already raised about the relevancy of the evidence.  As previously found, this evidence is relevant in tending to prove or disprove the Defendant's conduct.

Whether the Defendant still utilizes the services at issue in this case is a decision best made after the Court has had the opportunity to hear the evidence directly from the witnesses, not from their deposition testimony.   Even if the intervening events nullified prior marketing, it does not entirely remove the relevancy of the pre-intervention conduct.   This is particularly so because it is quite possible that any intervening event took place after Mr. Arroyo's application was denied; he applied within the same month of the HUD Guidance and only a week after the Defendant indicated in an email to clients that it will determine if it needs to make changes to its services.   If the Defendant proves at trial that the intervening events nullified prior marketing materials, the Court as the fact finder may disregard the invalidated marketing materials.   At this stage, there is simply not enough conclusive evidence that such material are irrelevant.

iii.    Prejudice

The Defendant argues that even if this evidence is relevant it should be precluded under Rule 403 because it will shift the Court's attention away from the actual issues in this case.   Dkt. 174 at 6.   The Defendant's argument here is largely dependent on its prior arguments that the material do not show actual conduct or are outdated.   The Plaintiffs argue that the marketing material at issue do not present any risk of unfair prejudice to CoreLogic.

As already found, this evidence is relevant regardless of whether it is conclusive evidence of the parties' actual conduct or its date in comparison to intervening events.   The Defendant has not explained how this evidence is otherwise unfairly prejudicial, will confuse the issues, cause undue delay, waste

time, or is needlessly cumulative.  Therefore, the Court rejects the Defendant's Rule 403 argument.

For the aforementioned reasons, the Defendant's motion to exclude certain marketing material; Dkt. 174; is denied.

H. <u>Eighth Motion</u>

The Plaintiff filed a motion in limine seeking to exclude six of the Defendant's proposed exhibits as improper   Dkt. 180.   These exhibits include email correspondence between the Defendant and WinnResidential, CrimSAFE Terms & Conditions, the screening service agreement between the Defendant and WinnResidential, and a spreadsheet purporting to include WinnResidential's CrimSAFE settings.  Def.'s Exs. D, G, H, I, J.  The Plaintiff argues that these exhibits are not admissible under the business records exception to the hearsay rule.  *Id.* The Defendant argues, *inter alia*, that the Plaintiffs' motion is premature because trial witnesses could lay a proper foundation to authenticate the documents for admission as business records.  Dkt. 189.

1.  *Legal Standard*

Hearsay is an out of court statement offered for the truth of the matter asserted and is generally inadmissible.  Fed. R. Evid. 801.  There are many exclusions and exceptions to the hearsay rule.  One of those exceptions include the business record rule.  The business record rule is satisfied upon a showing that the purported statement or evidence is:

> A record of an act, event, condition, opinion, or diagnosis if: (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business,

organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Rule 803(b)(6).

### 2. *Discussion*

The Defendant has not had an opportunity to meet the requirements under the business record rule because the satisfaction of the requirements can be "shown by testimony." Rule 803(b)(6)(D). There has been no testimony in this case. Exclusion for this reason is inappropriate at this stage of litigation. Further, even if at trial the Defendant is unable to lay a proper foundation for the admission of this evidence under the business record rule, there are other non-hearsay bases in which they could admit this evidence. A decision as to whether this evidence is admissible, at this stage of the litigation, is premature.

Therefore, the Plaintiff's motion in limine to exclude exhibits as improper hearsay; Dkt. 180; is denied.

### I. <u>Ninth Motion</u>

The Plaintiffs have filed a motion in limine to exclude a 2008 Bureau of Justice Statistics ("BJS") report; Def.'s Ex. AD; as irrelevant and more prejudicial than probative. Dkt. 181. The Plaintiffs' argue that the report—which states that 1 in 3 victims experience violent crime in or near their homes—is not relevant to the issue of whether perpetrators of crime commit violent crime near their own homes. *Id.* The Plaintiffs also argues that the report is more prejudicial than probative

because it will tend to elicit an emotional response by associating the thought of violent crime with one's home.  *Id.*

The Defendant objects, arguing that the 2008 BJS report is relevant because it shows, *inter alia*, that people are most vulnerable in their homes, regardless of where the perpetrators lives and tends to support the Defendant's argument of non-discriminatory interests for its criminal screening policies.  Dkt. 188.

Here, the 2008 BJS report may be relevant to the Defendant's claim of non-discriminatory interests because it shows that housing providers are rightfully concerned with the safety of their tenants while the tenant is on the provider's property.  The argument that this evidence does not tend to prove that criminal background screenings reduce the risk of being a victim goes to the weight of the evidence not the admissibility.  The Court in this case is sitting as the fact finder and can disregard this evidence if it is offered to prove something that it does not stand for.  Further, the admission of this evidence would not be unduly prejudicial because, again, the Court is sitting as the fact finder and will not be emotionally affected by the introduction of this evidence in the way that the Plaintiffs fear.

The Plaintiff's motion in limine to exclude the 2008 BJS report is denied.

IV.   CONCLUSION

For the aforementioned reasons:

- The Plaintiffs' motion in limine to exclude testimony of Mr. Kacirk; Dkt. 157; is granted in part and denied in part.

- The Defendant's motion in limine to exclude expert witness report of Dr. Kazemian; Dkt. 177; is denied.

- **The Defendant's motion in limine to exclude testimony of Plaintiffs' statistical experts; Dkt. 175; is denied.**

- **The Plaintiffs' motion in limine to limit the testimony of Dr. Huber; Dkt. 179; is granted.**

- **The Defendant's motion in limine to exclude the expert report of Ms. Alisberg; Dkt. 176; is granted.**

- **The Defendant's motion to exclude certain medical/injury evidence; Dkt. 173; is denied without prejudice.**

- **The Defendant's motion to exclude certain marketing evidence; Dkt. 174; is denied.**

- **The Plaintiffs' motion in limine to exclude exhibits as improper hearsay; Dkt. 180; is denied.**

- **The Plaintiffs' motion in limine to exclude report from the 2008 BJS report; Dkt. 181; is denied.**

**IT IS SO ORDERED.**

_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated this day in Hartford, Connecticut: March 30, 2021**