**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| Connecticut Fair Housing Ctr, *et al.* | : | |
| | : | |
| Plaintiffs, | : | No. 3:18-cv-705-VLB |
| | : | |
| v. | : | |
| | : | July 20, 2023 |
| CoreLogic Rental Property Solutions, LLC, | : | |
| | : | |
| Defendant. | : | |

<u>**MEMORANDUM OF DECISION AND ORDER**</u>

Following a serious accident that left Mikhail Arroyo severely disabled and unable to care for himself, his mother, Carmen Arroyo, became his court appointed conservator.  Ms. Arroyo applied for Mr. Arroyo to move in with her in the apartment complex where she lived.  Mr. Arroyo's application was denied because, a year before his accident, he was arrested in another state and charged with minor theft.  The leasing staff did not tell Ms. Arroyo why Mr. Arroyo's application was denied.  Rather, the leasing staff told Ms. Arroyo to obtain Mr. Arroyo's background report directly from the screening company.  She tried, but her efforts fell short.  Ms. Arroyo sought help from a local non-profit housing advocacy group, Connecticut Fair Housing Center ("CFHC").  Together, they brought a complaint before the Commission on Human Rights and Opportunities ("CHRO") against the housing provider who denied Mr. Arroyo's application.  Thereafter, the housing provider changed its decision and accepted Mr. Arroyo's application.

Before the Court is the case brought by CFHC and Ms. Arroyo, both for herself and as conservator for Mr. Arroyo (the "Plaintiffs"), against CoreLogic

Rental Property Solutions, LLC ("CoreLogic"), the background screening company that the housing provider used to check Mr. Arroyo's criminal history and creditworthiness.  The Plaintiffs allege CoreLogic's use and advertisement of its criminal background screening product, CrimSAFE, (1) has a disproportionate adverse impact on Latinos and African Americans as compared to similarly situated whites; (2) has the intention of discriminating on the basis of national origin and race; and (3) intentionally encourages, facilitates, and assists housing providers' with unlawful discrimination, all in violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA") and the Connecticut Unfair Trade Practice Act, Conn. Gen. Stat. §§ 42-110a *et seq.* ("CUTPA").  The Plaintiffs also allege that CoreLogic violated the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA"), in failing to disclose Mr. Arroyo's consumer report upon request, by failing to establish reasonable requirements for proper identification, and by placing unreasonable preconditions on the disclosure of a consumer report.

The Court conducted a ten-day bench trial.  Having considered the evidence and arguments submitted at trial and in the parties' written submissions, the Court rules in favor of CoreLogic on the Plaintiffs' FHA and CUTPA claims and rules in favor of Mr. Arroyo on the FCRA claim.

Below are the Court's findings of fact and conclusions of law.[1]

---

[1] *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").

## I.   FINDINGS OF FACT

### A.   The Parties

1.      Mikhail Arroyo, a plaintiff in this action, is a Latino male.[2]  (SOF ¶ 13.)  In July 2015, Mr. Arroyo was in a serious accident that caused a traumatic brain injury, left him completely unable to walk or talk, and rendered him in need of assistance with all activities of daily living and mobility.  (SOF ¶ 16.)  Mr. Arroyo was hospitalized following the accident until early 2016, when he was transferred to a nursing home where he could continue to recover.  (SOF ¶ 19; Tr. 3/14/2022 6:3–4.)  In April 2016, Mr. Arroyo was authorized to be discharged from the nursing home to live with his mother, who will be his primary caregiver.  (SOF ¶ 20.)

2.      Mr. Arroyo's mother is Carmen Arroyo, who is also a plaintiff in this action.  Ms. Arroyo serves as one of Mr. Arroyo's court-appointed conservators.  (SOF ¶ 18; Tr. 3/14/2022 4:14–16.)

3.      The Connecticut Fair Housing Center is a housing advocacy non-profit organization.  CFHC aids individuals it believes have been victimized by housing discrimination in asserting their rights by taking actions that include bringing lawsuits on their behalf.  (Tr. 10/28/2022 747:3–21.)  In addition, CFHC provides education programs for victims and housing providers, and is involved in public policy formation.  (Tr. 10/28/2022 747:22–748:6.)  In late November 2016, Ms.

---

[2] The Plaintiffs use "Latino" and "Hispanic" interchangeably to identify Mr. Arroyo's ethnicity.  (SOF ¶ 13; Tr. 3/14/2022 6:11–12.)  The Court will use the term "Latino" for the sake of this decision.

Arroyo reached out to CFHC for assistance in her efforts to move Mr. Arroyo into her apartment with her.  (Tr. 3/14/2022 20:16–21:1; Tr. 10/25/2022 at 720:6–8.)

4.      CoreLogic is a tenant screening company that offers multi-family housing providers a number of tenant screening products and services, including credit and criminal history screening.  (SOF ¶¶ 1, 4.)  CoreLogic provides these products and services to customers nationwide, including more than 20 customers in the State of Connecticut.  (SOF ¶ 3.)

5.      Though not a party, WinnResidential plays a central role in this litigation. WinnResidential is a multi-family owner and manager of apartment buildings throughout the country, managing over 120,000 units nationwide.  (Tr. 3/14/2022 126:3–8.)  During relevant times, WinnResidential managed 16 properties in Connecticut, including ArtSpace Windham—an apartment complex in Windham, Connecticut.  (SOF ¶¶ 10–11.)  Artspace Windham is the apartment complex where Ms. Arroyo lived while Mr. Arroyo was in the nursing home recovering after his accident and where Ms. Arroyo applied for Mr. Arroyo to live when he was cleared to leave.  (Tr. 3/14/2022 6:23–7:4.)  WinnResidential has been a customer of CoreLogic since 2006 and used its tenant screening products from 2008 until 2020.  (SOF ¶ 9.)  In March 2010, CoreLogic's predecessor, First Advantage SafeRent, and WinnResidential entered into a Screening Service Agreement.  (Ex. J.)  The agreement provides that WinnResidential is solely and exclusively responsible for complying with all laws as they relate to use of consumer reports. (*Id.*)  The agreement also provides that CoreLogic is not an agent of WinnResidential.  (*Id.*)

### B.   CoreLogic's Tenant Screening Products

6.   CoreLogic offers a criminal history screening product called CrimSAFE. (SOF ¶ 4.)

7.   CoreLogic's criminal history products, like CrimSAFE, are web-based software programs that match criminal records and generate reports of data from CoreLogic's large criminal records database.  The database contains criminal records from over 800 jurisdictions throughout the nation with over half a billion criminal records collected and categorized pursuant to CoreLogic's record classification criteria.  (Tr. 11/3/2022 17:5–16.)

8.   CoreLogic's classifications for categorizing criminal records in its database largely mirror classification criteria used by the Federal Bureau of Investigation in its National Incident-Based Reporting System.  (Tr. 11/3/2022 19:9–15; Tr. 11/7/2023 64:1–5; Ex. AW.)  All records fall within three primary categories: (1) "Crimes Against Property," (2) "Crimes Against Persons," and (3) "Crimes Against Society."  (SOF ¶ 5.)  Within these categories are more specific sub-categories totaling 36 sub-categories.  (SOF ¶ 5.)  The subcategories for "Crimes Against Persons," for example, include: "assault related offenses," "family related offenses, nonviolent," "homicide related offenses," "kidnapping/abduction related offenses," "sex related offenses, forcible," "sex related offenses, nonforcible," and "all other person related offenses."  (Ex. 3.)

9.   CoreLogic has a similar background screening product called CrimCHECK. CrimCHECK provides users with unfiltered access to any and all criminal records within CoreLogic's criminal records database that match the tenant applicant's

identification information.  (Tr. 11/3/2022 17:2–4; Tr. 11/7/2022 62:23–63:2, 87:16–25.)

10.     CrimSAFE, like CrimCHECK, matches records from the CoreLogic criminal records database to a tenant applicant.  Unlike CrimCHECK, CrimSAFE filters out records that the housing provider deemed irrelevant for their housing decision. (Tr. 11/7/2022 62:1–64:11.)  CrimSAFE filters out records based on three criteria (1) type of offense, (2) severity/disposition, and (3) age of offense.[3]  (*Id.*)

11.     In practice, CrimSAFE filters out a large number of criminal records from housing provider consideration.  During the same period of time involving the same applicant pool, CrimCHECK reported 14% of applicants had a criminal record, where CrimSAFE reported only 6% of applicants with criminal records. (Tr. 11/3/2022 29:14–30:1)

12.     By filtering out records a housing provider deems irrelevant to their housing decision, CrimSAFE increases the number of automatic acceptances for individuals that have older and minor criminal histories.  This unburdens the housing provider's staff and provides faster processing of tenant applications. The filtering function is an added feature, which is why CrimSAFE is more expensive than CrimCHECK.  (Tr. 11/7/2022 245:5–8.)

---

[3] The Court will address the filtering function in greater detail in a later portion of this decision.  The filtering function is mentioned at this point in the decision to demonstrate the difference between CrimCHECK and CrimSAFE.

**CrimSAFE Advertising**

13.     CoreLogic advertises its tenant screening products to housing providers. In one of CoreLogic's product briefs on CrimSAFE issued in or around 2016 (the "2016 Product Brief") CoreLogic describes CrimSAFE as follows:

> Registry CrimSAFE® automates the evaluation of criminal records. Registry CrimSAFE is designed for clients who want CoreLogic® SafeRent® to process criminal history records and notify the leasing staff when criminal records are found that do not meet the criteria established by your community.   Registry CrimSAFE helps you implement consistent decisions, which improves Fair Housing compliance and frees your staff from interpreting criminal records.

(Ex. 11.)

14.     The 2016 Product Brief lists the benefits of CrimSAFE as: "Maintain[ing] a safer community for residents, guests, and staff," "Reduc[ing] potential liability from criminal acts," "Improv[ing] Fair Housing compliance by helping you screen applicants consistently," and "Sav[ing] time for leasing staff."  (Ex. 11.)

15.     The 2016 Product Brief also lists the features of CrimSAFE as: "Flexible configuration – more than 30 criminal categories allow you to determine precisely how to handle different types of offenses," "Administrative control – powerful set up tool to configure and change your settings," and "Comprehensive reporting – management reports allow you to monitor property performance and provide feedback on offenses found."  (Ex. 11.)

16.     The 2016 Product Brief contains a sample screenshot of CrimSAFE's customer interface when criminal records are matched to an applicant.  (Ex. 11.) The example shows the program displaying the following message: "Record(s) Found," "Based upon your community CrimSAFE settings and the results of this search, disqualifying records were found. Please verify the applicability of these

records to your applicant and proceed with your community's screening policies." (Ex. 11.) The screenshot sample in the advertisement also contains a section titled "Agent Decision," with a dropdown option for an agent to select when an applicant was accepted or declined. (Ex. 11.)

17.     In a "Request for Proposal" CoreLogic issued on August 10, 2015, CoreLogic described CrimSAFE as follows:

> CoreLogic SafeRent is the only company that offers Registry CrimSAFE®, a robust tool that relieves your staff from the burden of interpreting criminal search results and helps ensure consistency in your decision process. You set the policies for accepting or declining categories of criminal offenses. Then, criminal record search results are evaluated using our own advanced, proprietary technology and an accept/decline leasing decision is delivered to your staff. With CrimSAFE, your policies are consistently implemented, Fair Housing compliance is optimized and your community enjoys an improved level of safety. Registry CrimSAFE works in conjunction with all of our criminal checking services, whether you use our multi-state, statewide, county searches or Multi-State Sex Offender Search.

(Ex. 7, 12; Tr. 10/25/2022 606:4–607:15.)

**CrimSAFE Purchase and Initial Configuration**

18.     When a customer, particularly a large customer, decides to purchase CrimSAFE, CoreLogic assigns a Senior Account Manager to help the housing provider with the initial configuration of their CrimSAFE settings. (Tr. 11/7/2022 48:24–49:3, 50:25–51:3.)

19.     CoreLogic and the housing provider enter into a "Screening Service Agreement." Typically, the Screening Service Agreement provides that the housing provider is solely and exclusively responsible for complying with all federal, state, and local laws as it relates to use of consumer reports. (Tr.

8

11/7/2022 56:7–18; Ex. J.)  The agreement also provides that CoreLogic and the customer are not agents of the other.  (Tr. 11/7/2022 57:3–12.)

20.     When a new customer purchases CrimSAFE, they must complete an initial configuration of their CrimSAFE settings.  (Tr. 11/7/2022 71:11–18.)  A housing provider can submit their initial configuration in one of two ways.  They can submit the forms to the Senior Account Manager assigned to their account and that manager will input the data into CrimSAFE.  (Tr. 3/14/2022 137:9–22; Exs. 1, 8.)  Alternatively, the housing provider can input the configuration directly into CrimSAFE themselves.  (Tr. 3/14/2022 137:9–22; Exs. 1, 8.)

21.     The CrimSAFE configuration platform contains a section titled "MANAGE CRIMINAL ACCEPTANCE DECISIONS."  (Ex. 8.)  Under this title is the following text: "For each criminal category, enter the minimum number of years that your community wants to decline an applicant for the specified type of crime. Please note that applicants whose criminal record are older than the number of years for the specified crime will result in an accept for your community."  (Ex. 8.)  The "minimum number of years," as used above, is known as the "lookback period." Following this instruction is a configuration matrix.  (Ex. 8.)  The rows of the configuration matrix are the criminal offense subcategories that CoreLogic uses to organize its criminal records database.  *See* (FF ¶ 8).  The configuration matrix has four columns representing different crime severities and dispositions: (1) felony conviction, (2) other felony charge, (3) other conviction, and (4) other criminal charge.  (Ex. 8.)  The intersection between the rows and columns—i.e., the matrix elements—represent the lookback period, which again is the number

of years after which criminal records will not match with the applicant.  (Ex. 8.)
The lookback periods for all <u>convictions</u> can be between zero and 99 years.  (Ex.
8.)  The lookback periods for all <u>charges</u> can be between zero and seven years.
(Ex. 8.)

22.    In training materials on CrimSAFE configuration, CoreLogic used the term
"Decline" to describe when criminal records were matched to an applicant.
(11/7/2022 240:7–11, 244:4–9.)  For example, in a PowerPoint presentation on how
to configure CrimSAFE settings, the slide states "All crime categories must be
configured with the client's criteria – Failure to configure will result in high
declines."  (Ex. 48 § 4.8.)

23.    In 2012, CoreLogic used a paper configuration form that instructed the
formfiller to: "[e]nter number of years counting backward from today that will
cause an application decline."  (Ex. 1.)  The older forms also include decision
messages—which is the language used in the tenant screening reports—of either
"accept" or "decline."  (Ex. 1.)

24.    During the initial configuration stage, some housing providers ask the
CoreLogic sale and account managers for advice about selecting lookback
periods under each category.  (Tr. 10/25/2022 579:25–581:6, 583:17–24.)
CoreLogic managers respond by sharing choices made by its other housing
provider customers.  (Tr. 3/15/2022 164:24–165:10; Tr. 10/25/2022 589:13–23,
603:9–11; Tr. 11/7/2022 121:5–11.)  CoreLogic does not make a recommendation
on what the housing providers should choose and expressly tells housing

providers that the ultimate decision is theirs.  (Tr. 10/25/2022 590:8–9, 603:9–11, 637:14–21; Tr. 11/7/2022 121:18–19.)

25.     CrimSAFE provides two levels of access to criminal record reports: one that shows all available data on criminal records found and one that displays a suppressed version only showing that records were found but not the actual records found.  Each new user is, by default, authorized to receive the full data.  (Tr. 11/7/2022 80:21–22, 115:3–4, 248:10–19; Ex. 46.)  CrimSAFE does not limit how many users can have full access.  (Tr. 11/7/2022 81:17–19.)

26.     Some housing providers, including WinnResidential, configure their CrimSAFE to give selected senior level managers full access to criminal records and to deny access to onsite leasing staff.  (Tr. 3/15/2022 151:16–25, 153:1–7; Tr, 10/25/2022 604:14–23; Ex. 7 at p.14.)  A WinnResidential executive explained that they suppress reports from onsite staff because they fear the staff will use personal interests (such as leasing commissions) in making a leasing decision that the executives believe should be made by someone in a more elevated position.  (Tr. 3/15/2022 156:3–12, 186:1–13.)  To limit access to criminal records, housing providers must affirmatively go into the CrimSAFE configuration settings and uncheck a box for "backup data."  (Tr. 10/25/2022 603:22–12; Tr. 11/3/2022 60:18–20; Ex. 8.)

27.     CrimSAFE affords housing providers the ability to customize the language that populates in the tenant screening reports they request.  (Tr. 10/25/2022 587:6–588:9; Tr. 11/7/2022 73:24–74:14; Ex. 8.)  For example, the housing provider can adjust the language in the screening reports when disqualifying records are

found.  (*Id.*; Tr. 10/25/2022 609:25–610:3.)  The default language for when disqualifying records are found is "Record(s) Found."  (Tr. 11/3/2022 32:12–17; Tr. 11/7/2022 73:8–12, 78:17–23.)  Some CoreLogic customers have changed this default language to say: "further review."  (Tr. 11/7/2022 79:2–11.)  Housing providers can also customize text providing instructions to the onsite leasing staff for when records were matched with an applicant.  In the case of WinnResidential's screening report settings at the time Mr. Arroyo applied for tenancy, the language that accompanied the "Record(s) Found" message was: "Please verify the applicability of these records to your applicant and proceed with your community's screening policies."  (Ex. 30.)  The instruction to consult community screening policies is a topic covered in the CoreLogic training program as discussed below.  This language is similar to the default language provided by the program.  (Tr. 11/7/2022 79:8–24.)

**CrimSAFE Training and Use**

28.     Once a customer's CrimSAFE settings are configured, CoreLogic provides training on how to use CrimSAFE to the housing provider's staff, including onsite leasing staff who typically submit applicant screening information into CrimSAFE.  (Tr. 10/25/2022 594:16–23; Tr. 11/7/2022 157:8–13.)

29.     When submitting an applicant's information for screening, the housing provider staff access the CrimSAFE web-based software program and input the applicant's name, date of birth, and current address.  (SOF ¶ 6.)  The program then uses CoreLogic's proprietary matching process to identify criminal public records of the applicant.  (SOF ¶ 7.)  Almost instantly, the CrimSAFE program

12

generates a tenant screening report.  (Tr. 10/25/2022 591:16–21; 608:4–10.)
CoreLogic does not interact with applicants during the application stage. (SOF ¶
8.)

30.     The tenant screening report has three sections: "Report Information,"
"Lease Decision," and "Screening Details."  (Ex. 30.)

a.       "Report Information" includes information about the screening transaction
itself, such as the applicant's name, who performed the screening (meaning the
onsite leasing agent), and when the report was generated.  (*Id.*)

b.       "Lease Decision," includes a summary of the credit score and a criminal
history decision.  (*Id.*)  For a credit score decision, an applicant can be
"accepted," "accepted with conditions," or "declined," depending on their credit
score.  (*Id.*)  For a criminal history decision, an applicant can be accepted or, in
Mr. Arroyo's case, the report says "Record(s) Found," "Please verify the
applicability of these records to your applicant and proceed with your
community's screening policies."  (*Id.*)  As explained above, the housing provider
selects the language that appears when criminal records are matched with an
applicant and what records will trigger a report.

c.       "Screening Details," include several subsections for "Applicant
Information," "Reports," and "Letters."  (*Id.*)  Included in "Reports" is a
"CrimSAFE Report,"  which contains a section titled "CRIMSAFE RESULTS."  (*Id.*)
Under the title is the following statement: "BASED UPON YOUR COMMUNITY
CRIMSAFE SETTINGS AND THE RESULTS OF THIS SEARCH, DISQUALIFYING
RECORDS WERE FOUND. PLEASE VERIFY THE APPLICABILITY OF THESE

RECORDS TO YOUR APPLICANT AND PROCEED WITH YOUR COMMUNITY'S
SCREENING POLICIES." (*Id.*)

31.     In the case of Mr. Arroyo's tenant screening report, the "CRIMSAFE
RESULTS" only showed that Mr. Arroyo had a "CRIMINAL COURT ACTION" out of
Pennsylvania. (*Id.*)  After the record is boilerplate language about confirming that
the information used to generate the report is correct. (*Id.*)  This section ends
with: "Remember, you must comply with your obligations under the federal Fair
Credit Reporting Act, your Service Agreement, and the other applicable federal,
state and local laws." (*Id.*)

32.     A user with access to the full backup data, as explained above, would also
have access to the Multi-State Criminal Search Report. (Tr. 11/3/2022 153:11–14;
Ex. 27.)  This report provides a summary for each record found, such as: the
reporting agency, case number, file date, offense, disposition and sentence (if
available). (*Id.*)  The report does not show what offense category, (FF ¶ 8), the
conduct fell within the CoreLogic criminal records database. (Tr. 11/3/2022
178:20–23.)  A user denied full access to the criminal records by the housing
provider would be unable to view the Multi-State Criminal Search Report and
would otherwise not have access to specific information about the criminal
record. (Tr. 11/7/2022 201:25–202:17.)

33.     CoreLogic trains housing provider's onsite leasing staff to review the
criminal records to confirm they are attributable to the applicant and to refer to
the housing provider's tenant selection plans with respect to any criminal records
found through CrimSAFE. (Tr. 11/7/2022 163:13–16.)  CoreLogic is not involved in

the decision.  (Tr. 3/14/2022 127:16–22; Tr. 10/25/2022 623:11–624:7.)  CoreLogic

trains housing providers to designate someone to receive the records, but the

housing provider decides who within their organization has access to the full

criminal reports and whether the records are in fact reviewed as CoreLogic

advises.  (Tr. 10/25/2022 634:3–6.)

34.     If the housing provider decides to accept an applicant, it can report in

CrimSAFE the acceptance notwithstanding any matched criminal records.  (Tr.

11/3/2022 145:1–2, 145:25–146:1; Tr. 11/7/2022 151:7–17, 173:5–174:7.)

35.     If a housing provider decides to decline an application or set additional

conditions of tenancy, they typically provide an applicant with an Adverse Action

Letter. [4]  CrimSAFE has a letter-generating function that inserts an applicant's

contact information into a template adverse action letter composed by the

housing provider.  (Tr. 11/3/2022 115:3–17.)  CrimSAFE contains a sample adverse

action letter that the housing provider can review in composing their own letter,

which they can change at any time.  (Tr. 11/3/2022 49:8–11; 115:5–6.)

36.     The adverse action letter generated for Mr. Arroyo states: "At this time we

are unable to approve your application."  (Ex. 30.)  It then states that the decision

was based on information contained in a consumer report generated by

CoreLogic and provides CoreLogic's contact information.  (*Id.*)  The letter states:

---

[4] An adverse action letter is provided in compliance with a legal requirement
under the FCRA, which "requires, among other things, that 'any person [who]
takes any adverse action with respect to any consumer that is based in whole or
in part on any information contained in a consumer report' must notify the
affected customer."  *Safeco Ins. Co. of America v. Bur*, 551 U.S. 47, 52 (2007).
"The notice must point out the adverse action, explain how to reach the agency
that reported on the consumer's credit, and tell the consumer that he can get a
free copy of the report and dispute its accuracy with the agency."  *Id.* at 53.

> **In evaluating your application, information obtained from and through CoreLogic SafeRent, LLC, which may include credit information or consumer information from one or more of the credit bureaus or consumer reporting agencies, may have influenced our decision in whole or in part.  These consumer reporting agencies and/or credit bureaus did not make the decision to take adverse action and are unable to provide specific reasons why adverse action was taken."**

(*Id.*)

37.     CoreLogic trained housing provider onsite leasing staff on how to access an adverse action letter in CrimSAFE.  (Tr. 11/7/2022 157:17–158:7.)   The staff was trained to give the letter to an applicant when the housing provider decides to accept an applicant "with conditions" or decline for any reason.  (Tr. 11/7/2022 157:17–158:7.)   However, it is up to the housing provider on whether, and if so when, to give the adverse action letter to an applicant.  (Tr. 10/25/2022 632:8–13.)

38.     CrimSAFE can be configured to send adverse action letters via email to housing applicants.   (Tr. 11/8/2022 40:2–7.)  The release of the email is delayed, during which time the housing provider can cancel the letter.  (Tr. 11/8/2022 40:7–12.)  The delay affords housing providers the opportunity to assess the applicant's qualifications consistent with their own community standards, as advised in the CoreLogic training.  WinnResidential used the email function for a period of time, but not for ArtSpace Windham.  (Tr. 11/8/2022 40:18–24.)

39.     CoreLogic trains housing providers how to receive daily emails containing the CrimSAFE decision reports for applicants with records found.  (Tr. 11/7/2022 84:5–85:5.)  A user with authorization to view the full backup data can access these reports at any time.  (Tr. 11/7/2022 85:6–16.)

40.     CoreLogic had quarterly meetings with WinnResidential executives to review the screening process and data generated during the preceding quarter.

(Tr. 3/15/2022 159:18–160:6; Tr. 10/25/2022 627:16–24.)  In a summary from January 30, 2019, CoreLogic provided statistical reports for 2018.  (Ex. 43 at p.8.) The summary shows that in 2018, 762 searches (representing 2.2% of all applicants) yielded disqualifying criminal records matched based on WinnResidential's CrimSAFE configuration.  (*Id.*)  This was .6% less than the previous year.  (*Id.*)  The meeting summary also says: "If having issues with criminal element at the properties, possibly increase:" and provides a list of WinnResidential's current configuration settings.  (*Id.* at pp.8–9.)

### C.  Mikhail Arroyo's Application Process

41.    On November 20, 2015, Carmen Arroyo entered into a lease contract with ArtSpace for a one-bedroom apartment for a lease period of November 24, 2015 through October 31, 2016.  (Tr. 3/14/2022 7:5–7, 7:14–16, 43:23–25; Ex. 37.)

42.    Partway through the lease term, in July 2015, Ms. Arroyo's son, Mikhail Arroyo, was involved in a serious accident and was hospitalized until moved to a nursing home in early 2016.  (FF ¶ 1.)

43.    In April 2016, Mr. Arroyo was ready to be discharged from the nursing home to live with Ms. Arroyo as his primary caregiver.  (*Id.*)

44.    On April 4, 2016, the United States Department of Housing and Urban Development ("HUD") issued the "Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions."  (Ex. 98.)  The HUD Office of General Counsel begins the Guidance by discussing the overrepresentation of African Americans and Hispanics in the criminal justice

system.  (*Id.* 1–2.)  The Guidance goes on to provide the general legal framework for disparate impact liability,  which includes evaluating whether a criminal history policy or practice has a discriminatory effect, then whether it is necessary to achieve a substantial, legitimate, nondiscriminatory interest.  (*Id.* 2–8.)  In addressing whether there is a substantial, legitimate, nondiscriminatory interest in exclusions based on arrests, the Guidance states, "A housing provider with a policy or practice of excluding individuals because of one or more prior arrests (without any conviction) cannot satisfy its burden of showing that such policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest."  (*Id.* 5.)  The Guidance explains that "arrest records do not constitute proof of past unlawful conduct and are often incomplete (*e.g.*, by failing to indicate whether the individual was prosecuted, convicted, or acquitted) . . . ."  (*Id.*)  As to convictions, the Guidance provides that a criminal history practice or policy that "fails to consider the nature, severity, and recency of criminal conduct is unlikely to be proven necessary to serve a 'substantial, legitimate, nondiscriminatory interest' of the provider."  (*Id.* 7.)  The Guidance identifies one statutory exemption from FHA liability in cases involving individuals with prior convictions for manufacturing or distributing controlled substances as defined in the Controlled Substances Act.  (*Id.* 8.)  The Guidance states that housing providers conduct an individualized assessment of an applicant's criminal history rather than using a blanket ban.  (*Id.* 10.)

45.    On April 15, 2016, 11 days after the HUD Guidance was released, CoreLogic sent an email to its active customers with the subject line: "CoreLogic Response

to New HUD Guidance," which informed customers of the new guidance and provided a hyperlink to the guidance.  (Tr. 11/3/2022 55:11–56:15, 57:16–18; Tr. 11/7/2022 96:23–25; Ex. F.)  In the email, CoreLogic summarized the guidance.  (*Id.*)  The email stated:

> The Registry CrimSAFE® tool can help with categorization of criminal records, but it is the responsibility of each customer to set their own criteria for making tenancy decisions.  CoreLogic recommends that our clients work with their legal counsel to review their eligibility requirements and related policies around the use of criminal background data to ensure compliance with all federal and state laws.

(*Id.*)

46.     CoreLogic's senior account manager on the WinnResidential account contacted WinnResidential directly to confirm they received the email notifying customers of the HUD guidance.  (Tr. 11/7/2022 103:19–104:18.)  On April 16, 2016, Lynn Bora, a vice president for WinnResidential, responded stating that she received the email and will have a call with their internal legal department to discuss the approach they will take.  (Ex. G.)  CoreLogic's account manager had several communications with WinnResidential, where she conveyed some strategies her other customers were taking, such as implementing review boards.  (Tr. 11/7/2022 104:19–21.)  CoreLogic also engaged outside legal counsel, who conducted a training course for CoreLogic's largest clients on the new HUD guidance.  (Tr. 11/7/2022 100:19–103:10.)

47.     In April 2016, Ms. Arroyo, then living in a one-bedroom apartment, informed the onsite property manager at ArtSpace, Melissa Dejardins, that she wanted to move from her one-bedroom apartment to a two-bedroom apartment with her son, Mr. Arroyo.  (Tr. 3/14/2022 8:8–12, 8:17–19, 48:23–49:6, 64:1–3.)  Ms. Arroyo

informed Ms. Dejardins that Mr. Arroyo was disabled.  (Tr. 3/14/2022 103:24–8.)
Ms. Dejardins told Ms. Arroyo to submit paperwork so WinnResidential could
conduct a background check of Mr. Arroyo, which Ms. Arroyo did.  (SOF ¶ 21; Tr.
3/14/2022 8:17–23.)

48.      On April 26, 2016, Ms. Dejardins entered Mr. Arroyo's identification
information into the CrimSAFE program and received a screening report.  (Ex.
30.)  The report indicated that the "Score Decision," which as explained above
reflects his credit history, said "Accept with Conditions."  (*Id.*)  The report also
provided under the "Crim Decision": "Record(s) Found."  (*Id.*)  Under the
"Record(s) Found" message, the report directed the reader to "Please verify the
applicability of these records to your applicant and proceed with your
community's screening policies."  (*Id.*)  The adverse action letter composed by
WinnResidential in CrimSAFE stated "we are unable to approve your application
. . . this decision was based on information contained in consumer report(s)
obtained from and through CoreLogic RPS SafeRent, LLC."  (SOF ¶ 24.)  The
letter informed that Mr. Arroyo had a right to obtain the information in his
consumer file.  (SOF ¶ 24.)  The adverse action letter also stated that CoreLogic
"did not make the decision to take adverse action."  (SOF ¶ 24.)  The decision to
send the adverse action letter was made by WinnResidential.  (SOF ¶ 25.)

49.      Ms. Dejardins did not have access to the specific criminal record that
CrimSAFE matched with Mr. Arroyo because WinnResidential did not give this
level of access to onsite leasing staff.  (Tr. 3/15/2022 155:20–23.)  However,

20

WinnResidential executives did have access to the full criminal report.  (Tr. 3/15/2022 153:1–7.)

50.     Ms. Dejardins verbally told Ms. Arroyo that Mr. Arroyo's application was denied and gave Ms. Arroyo CoreLogic's phone number on a sticky note.  (Tr. 3/14/2022 68:8–16.)  Ms. Arroyo did not receive the adverse action letter, (Tr. 3/14/2022 67:10–68:7), even though Artspace had a tenant selection plan that required onsite staff to notify every denied applicant in writing about a denial. (Tr. 10/25/2022 704:14–15.)

51.     After learning of the denial, Ms. Arroyo had numerous conversations with WinnResidential in 2016 and 2017, in which she informed WinnResidential that Mr. Arroyo was disabled and asked for further details on the denial of his application.  (SOF ¶ 26.)  WinnResidential did not immediately provide her with information nor did it reverse its decision at that time.  (SOF ¶ 26.)  During this time, WinnResidential's regional manager, Michael Cunningham, became involved and escalated the issue to WinnResidential vice presidents.  (Tr. 10/25/2022 654:22–25, 669:5–25.)

52.     Ms. Arroyo moved forward with transferring from her one-bedroom apartment to a two-bedroom apartment at Artspace.  On November 1, 2016, Ms. Dejardins completed a Unit Transfer Request Form, which requested that only Ms. Arroyo be transferred to a two-bedroom unit effective November 15, 2016. (Ex. AO.)

53.     In November 2016, the exact date not shown, Ms. Arroyo moved into a two-bedroom unit in ArtSpace.  (Tr. 3/14/2022 35:20–22, 45:6–10.)  Ms. Arroyo testified

that she did not seek to move sooner because Mr. Arroyo's application was denied.  (Tr. 3/14/2022 35:12–36:13.)

54.     On November 28, 2016, a CFHC representative contacted Mr. Cunningham, Ms. Dejardin's supervisor, about Mr. Arroyo's application.  (Tr. 10/25/2022 at 720:6–8.)  On December 12, 2016, CFHC sent a letter via email to Mr. Cunningham seeking a reasonable accommodation for Mr. Arroyo in light of his disability.  (Tr. 10/25/2022 718:22–719:14.)

55.     On or before December 28, 2016, after CFHC became involved, Ms. Arroyo learned that the reason Mr. Arroyo was denied was because of a criminal record. (Tr. 3/14/2022 21:6–18; Ex. AL (letter dated December 28, 2016 discussing the charges).)  The pending charge was for "Retail Theft-Take [Merchandise]" in violation of Pennsylvania law 18 Pa.C.S.A. § 3929.  (Ex. AK.)  After learning of the pending charge, Ms. Arroyo spoke with a court in Pennsylvania and was told to submit Mr. Arroyo's medical history, which she did.  (Tr. 3/14/2022 23:19–21.)

56.     In February 2017, with CFHC's assistance, Ms. Arroyo filed a complaint with the CHRO against WinnResidential and ArtSpace Windham seeking a reasonable accommodation for Mr. Arroyo.  (SOF ¶ 29; Tr. 3/14/2022 22:8–23:12, 52:17–19.)

57.     WinnResidential submitted an "Answer" to the CHRO complaint, which Mr. Cunningham signed, that states:

> Respondents [(WinnResidential)] are not privy to the exact details as to the denial of each applicant.  Respondents pay for this third-party screening service and are provided with a report which they make their acceptance or denial decision.  This is the same report that the complain[ant]s have and Connecticut Fair Housing Center has. Every denied applicant has the ability to contact CoreLogic to obtain more

information and Respondents give applicants the information to contact CoreLogic when requested.

(Tr. 10/25/2022 692:8–693:8; Ex. 48 at p.4.)  The Answer also states that "Respondents have admitted that they do not know the facts behind the criminal background findings, however they hire a third-party vendor to perform the checks, and trust in the results they are given and therefore make their decisions based on these results."  (Ex. 48 at p.5.)  The Answer is inconsistent with Mr. Cunningham's testimony that WinnResidential did have a way of obtaining the criminal record details.  (Tr. 10/25/2022 740:21–22.)  Further, any claim that WinnResidential did not have access to the full report may arguably be true as to some but not all WinnResidential employees, a fact to which WinnResidential's executive vice president testified.  (*See supra*, FF 26.)

58.     On April 20, 2017, a letter was sent to Ms. Arroyo from a Pennsylvania court informing her that the charge against Mr. Arroyo was withdrawn.  (SOF ¶ 27; Tr. 3/14/2022 23:22–24:14; Ex. AK.)

59.     On June 13, 2017, the CHRO conducted a factfinding hearing.  (Tr. 3/14/2022 56:21–57:3.)  Ten days later, on June 23, 2027, WinnResidential accepted Mr. Arroyo's application to move into ArtSpace.  (SOF ¶ 30; Tr. 3/14/2022 57:4–6.)  CoreLogic was not involved in the decision to allow Mr. Arroyo to move in, nor was CoreLogic involved in the CHRO action.  (Tr. 10/25/2022 736:4–18.)

60.     The CHRO action resulted in a settlement.  (Tr. 3/14/2022 54:25–55:4.)  The settlement agreement was executed on August 9, 2017, wherein WinnResidential

and ArtSpace agreed to pay $50,000 to the claimants and to train its staff on fair housing compliance.  (Ex. 49.)

### D.   Consumer Report Disclosure

61.    The following section discusses Ms. Arroyo's efforts to obtain a copy of Mr. Arroyo's consumer report, which was the basis for denying his application. Many of the events detailed below occurred during the events discussed above.

62.    CoreLogic is a consumer reporting agency as defined under the FCRA.[5] (SOF ¶ 2.)

63.    CoreLogic has a consumer relations department that is responsible for processing consumer report requests.  (SOF ¶¶ 33–34.)

64.    CoreLogic maintains written policies and procedures for granting consumers access to their consumer file, including specific policies governing third parties acting on behalf of consumers.  (SOF ¶ 34.)  Section 2.3 of the policy is titled "Third Party Authentication," which has as a general rule that CoreLogic will not release a consumer report to a third party unless the consumer provides third-party authorization.  (Ex. AF.)  The section then provides an exception to the general rule for consumer authorization, which provides for disclosure of the consumer report if the third party can produce specific information on the consumer and a "Valid (including notariz[ed]) Power of Attorney, or Limited

---

[5] The Court will address the legal implications of being a "consumer reporting agency" in the Conclusions of Law section of this decision.  For the purpose of framing the following findings of facts, it is important to understand that a consumer reporting agency, like CoreLogic, is generally obligated to provide consumers with "all information in the consumer's file at the time of the request." 15 U.S.C. § 1681g.  The consumer reporting agency is required to set as a condition of disclosure that the consumer "furnish proper identification."  15 U.S.C. § 1681h(a)(1).

Power of Attorney authorizing the third party to discuss the matter." (*Id.*)  The

policy explains that if a third party is unable to provide the necessary information,

the customer service representative must conduct a conference call with both the

consumer and the third party.  (*Id.*)  Further, the policy has a section titled "Note,"

which instructs the representative to call a supervisor for any scenarios not

covered, "including how to determine if [a Power of Attorney] is valid."  (*Id.*)  All

customer service representatives are trained on the written policies and undergo

on-the-job training directly from a supervisor or leader.  (Tr. 10/28/2022 889:20–

890:1.)  CoreLogic rarely receives requests from third parties.  (Tr. 10/28/2022

888:23–889:1.)

65.     As stated above, after Ms. Arroyo was told by the ArtSpace onsite leasing

agent that Mr. Arroyo's application was denied, she was given CoreLogic's phone

number and instructed to call that number to request a copy of Mr. Arroyo's

consumer report.  (Tr. 3/14/2022 9:13–15.)  On April 27, 2016, the day after Mr.

Arroyo's application was denied, Ms. Arroyo called CoreLogic and told them she

was Mr. Arroyo's conservator.   (Tr. 3/14/2022 9:17–18; Ex. 24.)   CoreLogic told

Ms. Arroyo they would send her a consumer disclosure form for her to complete

and send back.  (Tr. 3/14/2022 9:17–18; Ex. 24.)  Two days later, on April 29, 2016,

CoreLogic mailed the forms to Ms. Arroyo.  (Ex. 24.)

66.     On June 24, 2016, approximately two months after the forms were mailed to

Ms. Arroyo, she mailed back a partially completed form.  (Ex. 28.) The form

indicates that Mr. Arroyo's current address was 745 Main Street, East Hartford,

Connecticut, which is the address for the nursing home where he resided at the time.  (*Id.*; Tr. 3/14/2022 6:3–4.)

67.     In many ways, the June 24, 2016 form was incomplete.  Ms. Arroyo was required to list Mr. Arroyo's social security number, but she did not list it.  (Ex. 28.)  Ms. Arroyo was required to provide a tax or utility bill when the current address for the consumer is different than their photo ID—which was the case for Mr. Arroyo—but no such bill was attached.  (*Id.*)   Ms. Arroyo was required to list all of Mr. Arroyo's prior addresses for the last seven years, but she did not list the address on Mr. Arroyo's drivers license that was issued within seven years of the request.  (*Id.*)  Lastly, Ms. Arroyo included with her paperwork a purported State of Connecticut Probate Court Certificate of Conservatorship.  (*Id.*)  The certificate says it is "NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED," and there was no impressed seal.  (*Id.*)  The certificate was not valid on its face.

68.     CoreLogic received the packet on June 27, 2016.  (*Id.*)

69.     One June 30, 2016, three days after receiving the initial forms, CoreLogic sent a letter to Ms. Arroyo.  (Ex. 25.)  The June 30, 2016 letter requested Ms. Arroyo contact the CoreLogic Customer Service Center about her request.  (Ex. 25.)  The letter was addressed to 745 Main Street, East Hartford, (*id.*), which was the address on the June 24, 2016 form submitted by Ms. Arroyo.  (Ex. 28.)

70.     The June 30, 2016 letter was returned to CoreLogic on July 28, 2016 with "WRONG ADDRESS RETURN TO SENDER" written across the envelope.  (Ex. 25.)  According to CoreLogic's internal record system, the request was deemed incomplete because CoreLogic would need a power of attorney for Mr. Arroyo to

process his consumer report request.  (Ex. 24.)  The internal notes state that CoreLogic could not accept an appointment of conservatorship. (Ex. 24.)

71.     CoreLogic's consumer operations team manager, Angela Barnard, testified during the trial about Ms. Arroyo's efforts to obtain Mr. Arroyo's consumer file. (Tr. 10/28/2022 881:25–950:13.)  Ms. Barnard did not have any direct communications with Ms. Arroyo, but rather read notes maintained in CoreLogic's internal call logs and formed opinions about what happened from those notes.[6]

72.     On September 7, 2016, Ms. Arroyo called CoreLogic to determine the status of her request.  (Tr. 3/14/2022 15:21–16:3; Ex. 24.)  A CoreLogic representative told Ms. Arroyo she would need to submit a power of attorney.  (Tr. 3/14/2022 16:3–8; Ex. 24.)

73.     Mr. Arroyo lacks capacity to designate a power of attorney.  (SOF ¶ 15.) Thus, CoreLogic's customer service team required Ms. Arroyo to provide a legal document she could not possibly obtain.  (*See infra*.)

74.     After the September 2016 call, Ms. Arroyo spoke with a probate lawyer, who told her CoreLogic does not need a power of attorney because the conservatorship affords Ms. Arroyo more rights than a power of attorney.  (Tr. 3/14/2022 16:11–14.)

---

[6]  The Court does not credit Ms. Barnard's interpretation of the internal notes because she was not the author of any of the notes and several of her characterizations were directly inconsistent with the plain statements made in the notes.  The Court will determine what was stated during the calls based on the notes.

75.     Ms. Arroyo called CoreLogic on November 1, 2016 to inform them of what the probate attorney told her.  (Tr. 3/14/2022 16:18–17:2; Ex. 24.)

76.     Ms. Arroyo's request was internally escalated to a team lead, Tina Marie Santos,[7] to determine why they are not able to accept the conservatorship paperwork.  (Ex. 24; Tr. 10/28/2022 902:11–18.)  The matter was then escalated to CoreLogic's legal department.  (Ex. 24.)

77.     On November 4, 2016, a CoreLogic representative called Ms. Arroyo to let her know they were still waiting on a response from their legal team.  (Ex. 24.)

78.     On November 14, 2016, Ms. Santos spoke with Ms. Arroyo informing her that she needed to submit corrected forms, including a new conservatorship certificate with a visible seal.  (Ex. 24.)

79.     On November 15, 2016, Ms. Arroyo faxed proof of her address, a completed Consumer Disclosure Request Form (that contained Mr. Arroyo's social security number and prior address in Pennsylvania), and a purported conservatorship certificate, again, without an impressed seal.  (Ex. 26.)

80.     On November 16, 18, and December 19, 2016, Ms. Santos left messages for Ms. Arroyo to call her back.  (Ex. 24.)  Ms. Arroyo did not respond to these messages.  (*Id.*)

81.     Ms. Arroyo contacted CFHC to see if they could help her.  (Tr. 3/14/2022 20:21–21:1.)  On December 20, 2016, Maria Cuerda from CFHC called CoreLogic and spoke with Ms. Santos, who told her what CoreLogic needed to complete the

---

[7] Ms. Santos was unable to testify as she is deceased.  (Tr. 10/28/2022 903:5–8.)

consumer report request.  (Ex. 24.)[8]  There was no evidence presented at trial

when, if ever, Ms. Arroyo or her representatives provided CoreLogic with a

conservatorship certificate with a visible seal.

E.    **Procedural History**

82.    **On April 24, 2018, the Plaintiffs commenced this action against CoreLogic**

**raising the following causes of action: (1) national origin and race discrimination**

**in violation of the FHA, 42 U.S.C. §§ 3601 *et seq*. on behalf of all Plaintiffs; (2)**

**disability discrimination in violation of the FHA, 42 U.S.C. §§ 3601 *et seq*. on**

**behalf of all Plaintiffs; (3) disability discrimination in violation of the FHA, 42**

**U.S.C. §§ 3601 *et seq*. on behalf of the Arroyo Plaintiffs; (4) violation of the FCRA,**

**15 U.S.C. § 1681g on behalf of Mr. Arroyo only; (5) violation of the FCRA, 15**

**U.S.C. § 1681h on behalf of Mr. Arroyo only; and (6) violations of CUTPA on**

**behalf of the Arroyo Plaintiffs.  (Compl., ECF No. 1.)**

83.    **CoreLogic filed a motion to dismiss all claims raised by CFHC for lack of**

**standing, and Counts I, II, III, and IV for failure to state a claim.  (Dec. on Mot. to**

**Dismiss, ECF No. 41.)  The Court denied the motion to dismiss finding the**

**Plaintiffs sufficiently alleged CFHC's standing and claims under Counts I, II, III,**

**and IV.  (*Id.*)**

---

[8] **The Court does not recall any evidence presented during the trial on exactly when the consumer file was ultimately turned over to Ms. Arroyo, however, the Court was left with the impression it was some time after this litigation began. When the report was ultimately turned over is of no consequence to this decision as explained in the Conclusions of Law.  The Court mentions it solely for the purpose of closing out the narrative.**

84.    After the clos e of discovery, the parties filed cross motions for summary judgment and partial summary judgment.  (Dec. on Mot. for Summ. J., ECF No. 194.)  At the summary judgment phase, where the Court is required to construe the evidence in the light most favorable to the non-moving party, the Court found Article III standing for Ms. Arroyo, and permitted the following claims to proceed to trial: (1) the FHA disparate impact claim on the basis of race or ethnicity, (2) the FHA disparate treatment claim on the basis of race or ethnicity, (3) the FCRA claim for the time period from June 30, 2016 and November 18, 2016, and (4) the CUTPA claim.   (*Id.*)  Based on the evidence presented on summary judgment, there was a genuine, now inexplicable, dispute of material fact as to whether housing providers had access to the full information on criminal records matched to an applicant.   (*Id.*)  The Court granted summary judgment for CoreLogic on the FHA disparate impact and treatment claims on the basis of disability.  (*Id.*)

85.    Prior to trial, the parties were given the opportunity to and did file motions in limine.  (ECF No. 209.)  The parties both tried to introduce last minute evidence, which was rejected by the Court because the proffered evidence was voluminous, inexcusably beyond the deadline for such submissions, and would have delayed trial due to the objections the parties made to the other's proposed submissions. (ECF No. 251.)  Then, the case was finally ready for trial.

86.    The trial took place over ten days between March 14, 2022 and November 8, 2022.

II.     **CONCLUSIONS OF LAW**

In a bench trial, the "judge acts both as determiner of whether a case meets the legal requirements for decision by a fact-finder and as a fact-finder."  *Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir. 1994).  "[I]t is the Court's job to weigh the evidence, assess credibility, and rule on the facts as they are presented;"  if the "evidence is equally divided . . . 'the party with the burden of proof loses.'"  *Mann v. United States*, 300 F. Supp. 3d 411, 418–19 (N.D.N.Y. 2018).  "It is axiomatic that in a civil action, the plaintiff bears the burden of proving all essential elements of a claim."  *Birdsall v. City of Hartford*, 249 F. Supp. 2d 163, 169 (D. Conn. 2003) (citing to *Ruggiero v. Krzeminski*, 928 F.2d 558, 562 (2d Cir. 1991)).  The Plaintiffs must prove their allegations by a preponderance of the evidence, which "requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence."  *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 232 (S.D.N.Y. 2013) (citing to *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997)).

The Court must now determine whether the Plaintiffs have met their burden to prove (1) the FHA disparate impact claim on the basis of race or ethnicity, (2) the FHA disparate treatment claim on the basis of race or ethnicity, (3) the FCRA claim for the time period June 30 through November 18, 2016, and (4) the CUTPA claim.  The Court begins with the FHA claims.

A.     FHA Claims

Count I of the Complaint alleges CoreLogic's policies and practices: (1) have a disproportionate adverse impact on Latinos and African Americans as

compared to similarly situated Whites; (2) have the intention to discriminate on the basis of national origin and race; and (3) intentionally encourages, facilitates, and assists housing providers' unlawful discrimination in violation of the FHA. The complaint alleges this conduct violates the FHA as codified in sections 3604(a) and (b) of Title 42 of the United States Code.

Before addressing the substance of the Plaintiffs' arguments, the Court will begin with the societal context and legislative history of the FHA, as described by the Supreme Court in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015).  On July 29, 1967, President Lyndon B. Johnson established through executive order the National Advisory Commission on Civil Disorders, commonly known as the Kerner Commission.  *Id.* at 529; Exec. Order No. 11365, 32 FR 11111 (1966-1970 Comp.). The Commission was tasked with investigating and making recommendations in response to then-recent major civil disorders in the nation's cities.  Exec. Order No. 11365.

On February 29, 1968, seven months after its establishment, the Kerner Commission issued an extensive 424-page report defining the civil disorders it was tasked to investigate, why they happened, and what could be done about it.[9] "[T]he Commission identified residential segregation and unequal housing and economic conditions in the inner cities as significant, underlying causes of social unrest."  *Inclusive Communities*, 576 U.S. at 529.  The Commission recommended

---

[9] Report of the National Advisory Commission on Civil Disorders (1968), available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/national-advisory-commission-civil-disorders-report.

enacting "a comprehensive and enforceable open-occupancy law making it an offense to discriminate in the sale and rental of any housing . . . on the basis of race, creed, color, or national origin." *Id.* at 529–30 (citing to Report of the National Advisory Commission on Civil Disorders 91 at 263 (1968)).

In the week following Dr. Martin Luther King, Jr.'s assassination, Congress swiftly passed the Civil Rights Act of 1968, which was signed by President Johnson on April 11, 1968. *Inclusive Communities*, 576 U.S. at 530.   Title VIII of the Act, known as the Fair Housing Act of 1968, "was enacted to eradicate discriminatory practices within [the housing] section of our Nation's economy." *Inclusive Communities*, 576 U.S. at 539.

Under the FHA, it is "unlawful—(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(a).  In addition, it is unlawful "To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).  In recognition of the pervasive and insidious problem of housing discrimination, the Supreme Court found the "language of the Act is broad and inclusive," and Congress's priority can only be carried out "by a generous construction." *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209, 212 (1972).  *See also Cabrera*, 24 F.3d at 388 ("The provisions of 42 U.S.C. § 3604 are to be given broad and liberal construction.").

As an initial matter, the Court cannot address the discriminatory impact and discriminatory treatment claims without deciding whether CoreLogic is subject to the FHA.  The relevant statutory language requires the Plaintiffs to prove that CoreLogic, "make[s] unavailable or den[ies]" housing and/or sets "terms, conditions, or privileges of sale or rental of a dwelling."  §§ 3604(a)–(b); *see also* 24 C.F.R. § 100.70(b) ("It shall be unlawful, because of race, color, . . . or national origin, to engage in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons.")  The Plaintiffs have not met their burden in showing that CoreLogic in any way sets the terms, conditions, or privileges of rental.

Accordingly, the central question is whether CoreLogic "makes unavailable or denies" housing.   "Congress' use of the phrase 'otherwise make unavailable' refers to the consequences of an action rather than the actor's intent."  *Inclusive Communities*, 576 U.S. at 534. "[T]he word 'make' has many meanings, among them [t]o cause to exist, appear, or occur.'"  *Id.* (citing *United States v. Giles*, 300 U.S. 41, 48 (1937)).

> Courts have found that a defendant 'otherwise makes [housing] unavailable' under the Fair Housing Act when the defendant engages in a series of actions that imposes burdens on or constitutes harassment of a protected class of residents or intended residents, making it more difficult for the members of the protected class to obtain housing or conveying a sense that the members of the protected class are unwanted.

*Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 432 F. Supp. 3d 46, 72 (D. Conn. 2019) (citing to cases involving landlord-defendants).

Traditional forms of discrimination prohibited by the FHA include circumstances where landlords discriminate against individuals based on their protected status by outright refusing to rent to them, adopting burdensome procedures and delay tactics, or claiming there are no units available when there are.  *See Schwemm, Robert*, Housing Discrimination Law and Litigation, § 13:2 Traditional discrimination: Refusals to sell, rent, and negotiate (Aug. 2022); *see also Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1033, 1039 (2d Cir. 1979) (defendant-apartment cooperative, may be liable under the FHA for putting a Black applicant through a burdensome screening process that it did not put a similarly situated White applicant through); *United States v. Hylton*, 944 F. Supp. 176, 187 (D. Conn. 2013) (defendant reneged on agreement to sublet to the plaintiff only after learning her race); *Thurmound v. Bowman*, 211 F. Supp. 3d 554, 564–65 (W.D.N.Y. 2016) (defendant-landlord liable for refusing to rent to the plaintiff because she had two young children).  Other forms of discrimination prohibited by the FHA include steering,[10] exclusionary zoning,[11] and redlining.[12]

---

[10] Racial steering is the "directing [of] prospective home buyers interested in equivalent properties to different areas according to their race."  *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 94 (1979) (addressing standing of residents and a village to raise an FHA claim against real estate brokers and sales personnel for steering prospective home buyers to different residential areas according to race, in violation of the FHA).

[11] The term "exclusionary zoning" encompassed "all exclusionary land-use action by governmental authorities."  *Schwemm*, § 13:8 n.1.  This includes confining subsidized housing in primarily minority areas.  *See United States v. Yonkers Bd. of Ed.*, 837 F.2d 1181 (2d Cir. 1987).

[12] "Redlining" means "mortgage credit discrimination based on the characteristics of the neighborhood surrounding the would-be borrower's dwelling."  *Cartwright v. Am. Sav. & Loan Ass'n*, 880 F.2d 912, 914 n. 1 (7th Cir. 1989)

*Schwemm*, § 13:4 Traditional discrimination: Refusals to sell, rent, and negotiate. *See also Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016) ("The phrase 'otherwise make unavailable' has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning restrictions . . . ."); *Lynn v. Village of Pomona*, 373 F. Supp. 2d 418, 426–27 (S.D.N.Y. 2005) ("[T]he prohibition against making a residence unavailable has been applied to situations where government agencies take actions to prevent construction of housing when the circumstances indicate a discriminatory intent or impact against anticipated future residents who are members of a class protected . . . ."); *Mitchell v. Shane*, 350 F.3d 39, 49–50 (2d Cir. 2003) (defendant-broker could be liable under the FHA for discriminating against minority prospective purchasers if he violated local custom by failing to disclose the existence of a competing offer to bidders because of their race); *Wheatley Heights Neighborhood Coal. v. Jenna Resales Co.*, 429 F. Supp. 486, 488 (E.D.N.Y. 1977) (finding that the FHA prohibits racial steering).  All of these scenarios share a common characteristic: that the defendants took affirmative steps to make housing unavailable.

To state succinctly, before the Court can evaluate whether the Plaintiffs have met their burden on the elements of their disparate impact and treatment claims, the Plaintiffs must prove that CoreLogic denies or otherwise makes housing unavailable.[13]  42 U.S.C. § 3604(a).

---

[13] The Plaintiffs here are not raising a claim of vicarious liability against CoreLogic for the conduct of housing providers.  *See Hylton*, 944 F. Supp. 2d at 190 (discussing vicarious liability under the FHA).  Nor could they, because the record does not show an agency relationship between CoreLogic and its housing

The Plaintiffs raise two theories for how CoreLogic's use of CrimSAFE denies or makes housing unavailable.  First, the Plaintiffs claim CrimSAFE automatically and without an individualized assessment determines and reports to a housing provider that an applicant is disqualified for rental housing based on the existence of a criminal record.  (Compl. ¶¶ 194–95.)  Second, the Plaintiffs claim CrimSAFE prevents housing providers from conducting an individualized assessment of relevant mitigation information, which encourages, facilitates, and assists housing providers in violating the FHA.  (Compl. ¶ 196.)  Based on the facts presented during trial, the Court concludes that neither of the Plaintiffs' theories of liability are supported by a preponderance of the evidence.

### i.  Whether CrimSAFE Disqualifies Applicants

The Plaintiffs did not prove their first theory: that CrimSAFE disqualifies applicants.  The Court finds that the evidence at trial establishes CrimSAFE matched applicants with data, but it was the housing provider—not CrimSAFE—that decided whether an applicant is qualified for housing.  The housing provider controls the disqualification process by making four key decisions in how it uses CrimSAFE: (1) who within their organization receives criminal reports, (2) what criminal records are relevant for their decision, (3) how to review the records, and (4) when to accept an applicant.

---

provider customers.  *Id.* (agency relationship requires: "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; *and* (3) the understanding of the parties that the principal is to be in control of the undertaking.") (citing to *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 522 (2d Cir. 2006)).

Beginning with the first decision, the housing provider alone decides who within their organization receives the full criminal reports.  CrimSAFE defaults to allowing everyone to receive the report, which can only be overridden by the affirmative action of the housing provider.  The Plaintiffs have not presented a persuasive argument that a housing provider violates the FHA when it limits which staff members have access to criminal records.  Nor is such conduct inherently wrong.  A housing provider may justifiably limit access if the goal is to prevent local onsite staff from taking adverse action against an applicant where it is inappropriate to take such action against.  A housing provider may wish to leave the individualized assessment up to one or more people who are specially trained to conduct a fair and unbiased individualized assessment.  Also, it is not uncommon for business organizations to limit what type of information some employees have to protect its customers' privacy interests.  However, even if it was unlawful, the Plaintiffs have not presented persuasive argument on how a housing provider's choice to manage its staff's access to company records can be imputed to CoreLogic.

Moving on to the second decision, the housing provider decides what criminal records are relevant to their assessment of an applicant's qualification.[14] The housing provider configures the look back periods with no significant input from CoreLogic.  The mere fact that CoreLogic provides some housing providers

---

[14] To the extent the Plaintiffs are trying to argue that reporting any criminal history is a violation of the FHA, they have failed to prove this.  The HUD Guidance that the Plaintiffs heavily rely on does not go so far as to say that providing criminal history information violates the FHA.  Rather, the Guidance warns that it is what the housing provider does with that information that can cause an FHA violation.

with samples of other-housing provider configurations does not mean that CrimSAFE disqualifies applicants. This is particularly true where CoreLogic staff expressly tells housing providers that they are not providing an opinion or recommendation as to what lookback periods are appropriate. Housing providers have the power, at any point and without involvement of CoreLogic, to change their configuration. This shows that CoreLogic does not play a significant role in deciding what configuration the housing providers use.

As for the third decision, the housing providers decides how the criminal records are reviewed. The housing providers control this process in several ways. They determine what language populates in the CrimSAFE report for when criminal records are matched to an applicant. The housing provider also sets their own community screening policies. CoreLogic plays no role in the drafting, reviewing, training, or enforcing of the housing provider's community screening policy. CoreLogic trains the housing provider staff to consult their organizations tenant screening policies. The fact that some housing provider staff members fail to comply with their training is not wrongful conduct that can be imputed to CoreLogic.

The final decision made by housing providers is the ultimate one: whether to accept or decline an applicant based on a criminal history. The fact that WinnResidential employees used CrimSAFE in a way that was contrary to CoreLogic's training and their community policies is not conduct that can be imputed to CoreLogic. This is especially true because there is no agency between CoreLogic and WinnResidential. *See supra* n.13. The housing provider

also decides when, and if so how, to convey its decision to decline an applicant. That housing providers use the adverse action letter function in CrimSAFE does not demonstrate any exercise of discretion or action by CoreLogic. The housing providers, not CoreLogic, composes the letter and decides if, when, and how the letter is to be sent to applicants. CoreLogic plays no appreciable role in the adverse action letter process other than having a letter generating function in CrimSAFE.

Next, no housing provider who uses CrimSAFE could reasonably believe that CoreLogic makes housing decisions for them. CoreLogic training instructs the housing provider to use its own community standards to assess an applicant's qualification for housing. The Court recognizes that some of the advertising materials used terms such as "Decline," seeming to suggest that CrimSAFE makes decline decisions for housing providers. However, many of the advertising materials that used "Decline" terminology were older and in conflict with more recent materials. The screening report and adverse action letter generated for Mr. Arroyo's application did not use decline terms. More recent materials demonstrated that CoreLogic advertised CrimSAFE's value as the filtering function, because it filters out records that housing providers would find irrelevant to a housing decision. This is why customers pay more for CrimSAFE than CrimCHECK.

CrimSAFE also uses default language clearly indicating to housing providers that the housing provider makes the ultimate decision on housing. For example, the screening report default language when criminal records have been

found that match the housing providers configuration criteria is "Record(s) Found," and "Please verify the applicability of these records to your applicant and proceed with your community's screening policies." By contrast, the results of the credit screening, which are next to the results from the criminal screening, does use the term "decline." By juxtaposing credit results' "Decline" language with criminal results' "Record(s) Found" language, CoreLogic demonstrates that the "Record(s) Found" was not meant to and could not be read to demonstrate a decision being made. Rather, "Record(s) Found" alerts the housing provider to review the records and decide an applicant's admission. CrimSAFE also has a function allowing housing providers to report when an applicant is accepted even when the applicant has criminal records. The fact that the housing provider can unilaterally report an accept decision when criminal records are matched to an applicant proves that no reasonable user would think CrimSAFE makes a housing decision for the housing provider.

The adverse action letter sample provided in CrimSAFE also states expressly that CoreLogic "did not make the decision to take adverse action and are unable to provide specific reasons why adverse action was taken." (Ex. 30.) Housing providers who use the CrimSAFE adverse action email option should reasonably understand that in the time between when the screening report matches a criminal record to an applicant and when the letter is scheduled to be emailed to the applicant, they are to conduct their assessment. The fact of the delay anticipates and affords a housing provider the opportunity to review their community standards as CoreLogic advises in its written material and training

sessions.  Further, simply because an applicant receives an adverse action letter does not mean that the application for tenancy has been denied.  This is because the adverse action letter is sent to applicant's with accepted applications if the acceptance is made conditional, such as requiring a higher deposit for an applicant who has a poor credit history.

CrimSAFE customers were also required to sign a contract, acknowledging that CoreLogic is not an agent of the housing provider, and the housing provider had the obligation to follow the FHA.  CoreLogic also provides CrimSAFE customers training on how to use the CrimSAFE program reminding the housing providers that they are solely responsible for complying with all FHA requirements.  CoreLogic provided training to customer onsite staff to consult with their own community standards when criminal records are found.  Thus, it would be unreasonable for a housing provider to think that CrimSAFE makes housing decisions or in any way impedes on a housing providers ability to make an individualized assessment.

The Court does not find Mr. Cunningham's testimony that he believes CrimSAFE decided whether an applicant was qualified for housing credible because Mr. Cunningham was unsure about most of his answers and seemed to have almost no memory of the events involving the Arroyos.  To the extent his memory was clear, the Court does not find persuasive Mr. Cunningham's understanding of CrimSAFE because Mr. Cunningham gave responses that were inconsistent with more credible testimony from a more senior WinnResidential employee, WinnResidential's executive vice president Lynn Bora.

To be clear, the Court is not saying that CoreLogic needs to be the ultimate decisionmaker to be found liable under the FHA.  An entity can be liable under the FHA even when they are not the ultimate decisionmaker, such as with exclusionary zoning and racial steering.  In *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581 (2d Cir. 2016), an affordable housing developer sued a city and the county in which it was located alleging they violated the FHA. Specifically, the developer argued that the city's action in rezoning land for single-family homes rather than multi-family homes was racially discriminatory and the county failed to prevent it.  *Id.* at 598.  On summary judgment, the district court allowed the claims against the city to proceed to a bench trial.  *Id.*  But, the district court entered judgment for the county concluding that the county "was not causally responsible for the alleged discriminatory conduct of" the city.  *Id.* On appeal, the Second Circuit affirmed judgment for the county, finding a lack of evidence to establish a genuine issue of fact that the county was legally responsible for the rezoning by the city.  *Id.* at 620.  The Second Circuit found that "even if disapproving potentially discriminatory actions by municipalities does fall within the ambit of the Commission authority, the County's role in the ultimate decision is to tenuous."  *Id.* at 621.  *Mhany* teaches that, while an entity other than a landlord or property seller can be liable for violating the FHA (such as the city), the FHA does not reach entities whose involvement is "tenuous" (such as the county).  *Id.*

Here, the connection between CoreLogic and the decision on housing availability is as tenuous, if not more, than the county in *Mhany Management*.  In

*Mhany Management*, the county had some power over the city's conduct that violated the FHA.  They could have intervened, requiring the city to take additional steps to override the county.  The county did not do that, and yet, they still were not found causally connected to the city's FHA violation.  CoreLogic does not have any power to intervene over its housing provider customers.  It cannot direct a housing provider to accept an applicant; it is not even part of the discussion when a housing provider decides to accept an applicant.  CoreLogic is not the agent or supervisor of their housing provider customers.  CoreLogic has no say in whether housing providers accept or decline applicants, it merely provides the housing provider with publicly available information.  Thus, the Plaintiffs have shown only a tenuous connection between CoreLogic and the housing provider's decision, which is not enough to find CoreLogic "makes unavailable or denies" housing.

Another example of non-ultimate-decisionmaker liability under the FHA is in *Cabrera*, where the Second Circuit affirmed in relevant part a jury verdict against landlords and a real estate brokerage firm for racial steering.

> Racial steering is a practice by which real estate brokers and agents preserve and encourage patterns of racial segregation in available housing by steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited by primarily members of other races or groups.

*Cabrera* 24 F.3d at 378 n.2.  In *Cabrera*, the plaintiffs were "testers" of different races that would pose as a prospective renter for the purpose of collecting evidence of racial steering.  *Id.* at 377–79.  The Black testers were told there were no apartments available by the real estate brokers and by the landlord directly,

44

when White testers were told there were. *Id.* The jury found, and the Second Circuit affirmed, liability against the individual brokers—directly, as agents for the realty company, and as agents for the landlords. *Id.* at 379. *Cabrera* teaches that individuals who do not make the ultimate decision on housing may be liable if they engage in conduct that directly results in fewer housing opportunities on the account of race (such as refusing to show available housing options). *Id.* at 390. By contrast, CoreLogic's computer program categorizes information as programmed by the housing provider and instructs the housing provider to review that information in light of the housing provider's own community standards in accordance with the law. The housing provider determines whether to make housing available or not. Thus, unlike *Cabrera*, there is no direct connection.

### ii.   *Whether CrimSAFE Prevents Individualized Assessment*

The Plaintiffs also claim that CoreLogic violates the FHA by preventing housing providers from conducting individualized assessments. The Plaintiffs have not proven this. While there was some testimony that the program may allow a housing provider to decide to suppress the reports from all users within an organization, there was also testimony that this is not the default setting, and no customer has done that. This hypothetical is too speculative to justify liability. CoreLogic trained housing providers to designate someone to receive records and how to do that unilaterally in the program. To the extent the Plaintiffs are arguing that CrimSAFE's feature limiting full report access to some of an organization's staff is a violation of the FHA, the Court is unpersuaded as

45

explained above.  Because CrimSAFE gives the housing provider the power to limit access to the full criminal record, the feature can hardly serve the role of decisionmaker where the program's default provides unlimited access.

### 2.   *Conclusion*

In summary, CoreLogic provides to its housing provider customers a fully customizable criminal records reporting program.  The housing provider decides what criminal records are relevant to their decision on an applicant's qualifications, how to convey when disqualifying records are found, who within their organization will have access to the full records, whether to accept an applicant after considering their own community standards, and how they will convey to an applicant when the application has been denied.  The CrimSAFE marketing materials, the CoreLogic training, and the CrimSAFE sample and default language all inform CrimSAFE users that CoreLogic does not decide whether an applicant is qualified for housing; rather, the decision lies with the housing provider alone.  For these reasons, the Court finds in favor of CoreLogic on the FHA claims because the Plaintiffs have failed to prove by a preponderance of the evidence that CoreLogic's use of CrimSAFE denies or otherwise makes unavailable housing pursuant to section 3604(a).

### B.   Fair Credit Reporting Act Claims

Counts IV and V of the Complaint allege that CoreLogic violated the FCRA as to Mikhail Arroyo.[15]  In Count IV, Mr. Arroyo claims that CoreLogic violated

---

[15] Third parties do not have remedies under the FCRA—a person who negligently or willfully fails to comply with the FCRA "with respect to any consumer is liable to *that consumer*" for damages including "actual damages sustained *by the*

section 1681g of Title 15 of the United States Code in failing to disclose his consumer report upon proper request.  Count V raises two theories of liability under the FCRA.  First, Mr. Arroyo claims CoreLogic violated section 1681h by failing to establish reasonable requirements for proper identification so as to enable consumers subject to a conservatorship or guardianship and/or consumers with disabilities without the legal capacity to execute a power of attorney to receive a copy of their consumer file.  Second, Mr. Arroyo claims CoreLogic violated section 1681h by placing unreasonable preconditions on the disclosure of consumer files to consumers subject to a conservatorship or guardianship and/or consumers with disabilities without the legal capacity to execute a power of attorney.

 The FCRA claims raised in this case are applicable only to "consumer reporting agencies." The parties have stipulated CoreLogic is a consumer reporting agency.  Under the FCRA, "Every consumer reporting agency shall, upon request, and subject to section 1681h(a)(1) of this title, clearly and accurately disclose to the consumer" their consumer report.  15 U.S.C. § 1681g(a).  Section 1681h(a)(1) requires consumer reporting agencies only disclose the consumer report if the customer gives "proper identification."  In other words, a consumer reporting agency is required to disclose to a consumer their consumer report if the consumer (1) requests it and (2) furnishes proper identification.  The key dispute in this case centers on the proper identification requirement.

---

*consumer.*" 15 U.S.C. §§ 1681n(a),1681o(a) (emphasis added).  Thus, the only plaintiff alleging damages under the FCRA is Mr. Arroyo.

The FCRA does not define "proper identification" and there is very little case law on what constitutes proper identification.  *See Howley v. Experian Info. Sols., Inc.*, 813 F. Supp. 2d 629 (D.N.J. 2011) (denying summary judgment to a defendant finding an issue of fact of whether the consumer reporting agency had proper identification triggering its obligation to disclose); *Menton v. Experian Corp.*, No. 02 CIV 4687 (NRB), 2003 WL 941388 (S.D.N.Y. Mar. 6, 2003) (finding a consumer furnished proper identification triggering the obligation to disclose by sending a copy of his driver's license, a bank statement with his name and address, his law firm website, and a notarized copy of his signature).

Regulations promulgated pursuant to the FCRA require consumer reporting agencies to "develop and implement reasonable requirements for what information consumers shall provide to constitute proof of identity." 12 C.F.R. § 1022.123(a).  The regulations also require consumer reporting agencies to ensure the information is sufficient to enable the consumer reporting agency to match consumers to files and "[a]djust the information to be commensurate with an identifiable risk of harm arising from misidentifying the consumer." 12 C.F.R. § 1022.123(a).  Reasonable information requirements for proof of identity might include, for example, a "consumer file match" to full name, address, social security number, and/or date of birth, or additional proof of identity such as government issued identification documents, utility bills, or methods such as "answering questions to which only the consumer might be expected to know the answer." 12 C.F.R. § 1022.123(b).

### 1. 12 C.F.R. § 1022.137(a)(2)(iii)(C)

On summary judgment, the Court held that Ms. Arroyo did not submit proper identification because she did not submit a conservatorship certificate with an impressed seal, which is necessary for proper identification of a Connecticut conserved person under the FCRA.  Notwithstanding Ms. Arroyo's failure to submit proper identification, the Court allowed the FCRA claims to proceed finding the Plaintiffs submitted sufficient evidence to overcome summary judgment on a theory that CoreLogic violated its duty under 15 U.S.C. § 1681g by failing to comply with the requirements set forth in 12 C.F.R. § 1022.137(a)(2)(iii)(C).

> Pursuant to 1022.137(a)(2)(iii)(c),
>
> [a]ny nationwide specialty consumer reporting agency shall have a streamlined process for accepting and processing consumer requests for annual file disclosures. The streamlined process required by this part shall: . . .
>
> (2) Be designed, funded, implemented, maintained, and operated in a manner that: . . .
>
> (iii) Provides clear and easily understandable information and instructions to consumers, including but not necessarily limited to: . . .
>
> (C) In the event that a consumer requesting a file disclosure cannot be properly identified in accordance with the FCRA, section 610(a)(1), 15 U.S.C. 1681h(a)(1), and other applicable laws and regulations, providing a statement that the consumers identity cannot be verified; and directions on how to complete the request, including what additional information or documentation will be required to complete the request, and how to submit such information.

CoreLogic raises three arguments as to why the FCRA claims fail as a matter of law.  First, CoreLogic argues that Mr. Arroyo did not properly raise a claim under 12 C.F.R. § 1022.137(a)(2)(iii)(C) in the complaint.  CoreLogic notes

that the only time this regulation was raised in this litigation prior to the Court's summary judgment ruling was in the Plaintiffs' reply brief to CoreLogic's opposition to the Plaintiffs' motion for summary judgment.  Second, CoreLogic argues that the regulation does not confer a private right of action and is not traceable to the FCRA claims raised under sections 1681g and 1681h.  Third, CoreLogic argues that this regulation does not create a private right of action.  The Plaintiffs have not responded to CoreLogic's arguments, rather they rely on the Court's summary judgment ruling finding that this regulation applies.

Upon further consideration, the Court agrees with CoreLogic on its arguments as to the applicability of 12 C.F.R. § 1022.137(a)(2)(iii)(C).  The regulation was not raised as a cause of action in the complaint.  *See Mediavilla v. City of New York*, 259 F. Supp. 3d 82, 106 (S.D.N.Y. 2016) ("It is well settled that a litigant may not raise new claims not contained in the complaint in opposition to a motion for summary judgment.").  Rather, the regulation was only raised for the first time in a reply brief without any meaningful analysis of its application to the facts of this case.  *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").  In addition, this regulation only applies to "nationwide specialty consumer reporting agenc[ies]," which is defined under the FCRA as "a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis relating to-- (1) medical records or payments; (2) residential or tenant history; (3) check writing history; (4) employment history; or (5) insurance claims."  15 U.S.C. § 1681a(x).  The Plaintiffs did not present evidence establishing that CoreLogic is a nationwide

specialty consumer reporting agency.  Finally, even if the Plaintiffs raised this regulation as a basis for finding liability and the claim was supported by evidence, the Plaintiffs have presented no legal authority or argument that this regulation establishes a private right of action.  *See Lussoro v. Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 492 (E.D.N.Y. 2020) ("A regulation, by itself, may not create a private right of action.").

Therefore, the Court finds the Plaintiffs have failed to establish that 12 C.F.R. 1022.137(a)(2)(iii)(c) confers a private right of action; and in the absence of such a right, there can be no liability.  Notwithstanding the Court's finding that 12 C.F.R. § 1022.137(a)(2)(iii)(c) does not apply, the Court still must determine if CoreLogic violated the FCRA for the reasons properly raised in the Complaint and argued at trial.

### 2. *Violation of 15 U.S.C. §§ 1681g, 1681h*

As stated above, the FCRA requires a consumer reporting agency, like CoreLogic, to disclose to a consumer their consumer report if the consumer (1) requests it and (2) furnishes proper identification.  15 U.S.C. §§ 1681g, 1681h(a)(1).  Mr. Arroyo argues that Ms. Arroyo did furnish proper identification.  Alternatively, Mr. Arroyo argues that CoreLogic violated the FCRA by failing to establish reasonable requirements for proper identification and placed unreasonable preconditions on providing proper identification.

On summary judgment, the Court concluded that, based on the undisputed evidence, Ms. Arroyo never submitted proper identification for herself as a conservator for Mr. Arroyo.  (Summ. J. Dec. 73.)  The document she submitted to

prove she was a conservator for Mr. Arroyo, which could prove she was entitled to request a copy of Mr. Arroyo's consumer report on his behalf, was facially invalid. The certificate of conservatorship states on its face it is not valid without a court impressed seal.  Ms. Arroyo never sent a copy of the certificate with a court impressed seal.  Meaning, Ms. Arroyo never sent a valid certificate of conservatorship proving she was legally authorized to make the consumer report request for Mr. Arroyo.  Thus, the Court finds Mr. Arroyo has failed to prove that proper identification was furnished.

However, even though Ms. Arroyo never furnished proper identification as required under the FCRA, this does not end the inquiry into CoreLogic's liability. CoreLogic may be liable for violating the FCRA by making it impossible for a consumer to exercise its rights to their consumer file.  A consumer reporting agency cannot circumvent its legal obligation to disclose a consumer report by making it impossible for a consumer to properly request it.  This is consistent with the purpose of the FCRA, which is "to require reporting agencies to adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements" of the FCRA.  15 U.S.C. § 1681(b).

The Court finds that CoreLogic violated the FCRA by making it impossible for Ms. Arroyo to request a consumer report for Mr. Arroyo.  CoreLogic created the impossibility on June 30, 2016, when it set as a condition for obtaining Mr.

Arroyo's consumer report the furnishing of a power of attorney.  Furnishing a power of attorney is legally impossible for Mr. Arroyo, who was severely disabled and under a conservatorship.  *See Beaucar v. Bristol Fed. Sav. & Loan Ass'n*, 6 Conn. Cir. Ct. 148, 157–58 (1969) ("A person who is not in a mental condition to contract and conduct his business is not in a condition to appoint an agent for that purpose. . . . . One who is *non compos mentis* is incapable of executing a valid power of attorney.").  CoreLogic required Ms. Arroyo to produce a power of attorney *after* she proffered what was ostensibly a conservatorship appointment, albeit without a seal.  While CoreLogic may have questioned the authenticity of the conservatorship appointment, it did not direct Ms. Arroyo to submit one with an original seal.  Instead, CoreLogic required Ms. Arroyo to produce a document that she legally could not produce, thereby making it impossible for her to obtain her conserved son's consumer report.

CoreLogic did not rescind this impossible condition until November 14, 2016, when it ultimately told Ms. Arroyo that a valid conservatorship certificate would constitute proper identification.  Thus, the time period during which CoreLogic set an impossible condition for Ms. Arroyo to request a consumer report on Mr. Arroyo's behalf, and thus violating the FCRA, was between June 30, 2016 and November 14, 2016.

### 3.    *Damages*

Now that the Court has found CoreLogic violated the FCRA, the Court must determine damages.  The FCRA has two remedial provisions, one for willful

noncompliance and one for negligent noncompliance.  Mr. Arroyo claims that CoreLogic's conduct amounts to willful noncompliance.

Willful noncompliance under the FCRA includes both known and reckless violations.  *SafeCo Ins. Co. of America v. Burr*, 551 U.S. 47, 57 (2007).  Proving recklessness for establishing willful noncompliance is subject to the same standards for proving recklessness in common law civil cases.  *Id.* at 68–69.  The conduct must violate "an objective standard," meaning an "action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"  *Id.* at 68.  Objectively reasonable misinterpretations of ones obligations under the FCRA do not amount to willful noncompliance.  *See SafeCo Ins. Co. of America*, 551 U.S. at 69–70 (finding a violation that was not reckless because the defendant's reading of the statute had a foundation in the statutory text and was sufficiently convincing to the district court that ruled in favor of the defendant's erroneous reading); *Shimon v. Equifax Info. Services, LLC*, 994 F.3d 88, 94 (2d Cir. 2021) (finding a lack of recklessness where the defendant's understanding was reasonable, even if ultimately wrong).

Here, the Court finds that CoreLogic's FCRA violation amounts to willful noncompliance.  It was objectively unreasonable for CoreLogic to think that setting a condition entirely blocking a consumer's ability to exercise their right to their consumer report is a fair reading of the FCRA disclosure requirements.  *See SafeCo Ins. Co. of America*, 551 U.S. at 69–70.  Setting such a condition does not just set a high risk of harm, it ensures harm will come to people who are subject to conservatorships or guardianships.  This case is unlike *SafeCo* and *Shimon*

where there was a fair, but ultimately erroneous, interpretation of the FCRA. Here, no reasonable person reading the FCRA could interpret it to allow a consumer reporting agency to completely thwart a consumer from obtaining their consumer report by setting conditions for disclosure that could never be met.

This is not a one-off circumstance involving one or two employees who made a mistake. The CoreLogic written policies, which reasonably were the product of time and consideration, supported the position by the consumer representatives that they needed a power of attorney. The policy only identifies a power of attorney as a means of validating a third party's agency over a consumer. Nothing in the policy identifies circumstances such as Mr. Arroyo's— when someone suffers from a lack of capacity to designate an agent. This is an entirely foreseeable circumstance as many people are subject to conservatorships (also known as guardianships in some states).[16] In many cases, including Mr. Arroyo's, a person can lack physical and/or mental capacity to make a valid power of attorney. CoreLogic's written policies entirely overlooked this group of people with the effect of denying Mr. Arroyo his right to his consumer report.

Therefore, the Court finds that CoreLogic is subject to liability for willful noncompliance with the FCRA.

---

[16] *See Eyewitness News Investigations finds alarming issues in Tri-State's adult guardianship systems*, ABC7NY (Jan. 18, 2023), available at https://abc7ny.com/investigation-adult-guardianship-law/12712558.

### Damages Calculation

**Section 1681n, provides that willful noncompliance results in liability**

**in an amount equal to the sum of—(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000 . . . (2) such amount of punitive damages as the court may allow; and (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.**

### i.    Actual Damages

**The Court starts with actual damages.  CoreLogic argues that Mr. Arroyo has failed to prove any actual damages because there was no evidence at trial that, had Ms. Arroyo received Mr. Arroyo's consumer report sooner, Mr. Arroyo could have moved sooner.  The Court agrees that Mr. Arroyo has not proven actual damages stemming from the FCRA violation.  Two reasons support this conclusion.**

**First, the evidence does not show whether, and if so when, Ms. Arroyo would have furnished proper identification for the consumer report had CoreLogic not violated the FCRA as found above.  There were significant delays attributable to Ms. Arroyo in the processing of her request for the consumer report.  It took her approximately two months after CoreLogic sent the forms to her for her to complete and return them to CoreLogic.  Her submission was clearly deficient as detailed above.  It took her approximately two more months to follow up with CoreLogic on the status of her request after the forms were submitted.  Thereafter, when she was clearly and plainly told that she needed to furnish proper identification in the form of a valid conservatorship certificate, she failed to provide the required documentation.  CoreLogic called her three times**

over the course of the following month, and she did not return any of those phone calls.  There was no evidence presented that she *ever* furnished proper identification even after she knew what was needed.  Thus, the Court cannot determine the effect of CoreLogic's violation on when Ms. Arroyo would have furnished proper identification, if ever.

Second, even if the Court could determine if and when Ms. Arroyo would have given proper identification to CoreLogic and received Mr. Arroyo's consumer report, the Court cannot determine how receipt of that report would have changed Mr. Arroyo's ability to move into ArtSpace.  There was no credible testimony on whether a two-bedroom unit was available when she applied.[17]  Nor was there credible evidence that WinnResidential would have allowed Ms. Arroyo to breach her lease agreement six-months early to move into one of their two-bedroom units.  If the Court assumed there was a unit available and WinnResidential would have allowed the breach, the Court would then need to assume that WinnResidential would have accepted Mr. Arroyo's application sooner.  However, the Court cannot make that assumption because there was no evidence why WinnResidential ultimately accepted Mr. Arroyo's application.  The Court may be able to infer that bringing the CHRO action was at least a cause for WinnResidential changing its decision and that, if the action was brought sooner, then WinnResidential would have changed it decision sooner.  However, there

---

[17] It is unclear whether Mr. Arroyo could have lived with Ms. Arroyo in her one-bedroom unit.  Ms. Arroyo simply testified that her son was not going to move into the one-bedroom unit with her, which is why she was looking to transfer to a two-bedroom unit.  (Tr. 3/14/2022 at 8:8–10. ("  Q: How was Mikhail going to live with you in a one bedroom apartment? A: He wasn't. I was looking into a two bedroom."))

was no evidence showing why the CHRO action was filed when it was filed. The CHRO action was filed approximately two months after Ms. Arroyo knew the reason WinnResidential denied Mr. Arroyo's application. The Court cannot discern on its own that this delay was a typical pre-litigation progression or if some other justification supported filing in February 2017 rather than any month prior. There are simply too many unanswered questions for the Court to find by a preponderance of the evidence that WinnResidential would have accepted Mr. Arroyo's application sooner had Ms. Arroyo received Mr. Arroyo's consumer report sooner.

Accordingly, the Court does not find any actual damages attributable to CoreLogic's violation of the FCRA.

### ii.      Statutory Damages

Section 1681n provides for statutory damages of not less than $100 and not more than $1,000. The Court finds that $1,000 in statutory damages are warranted based on the seriousness and obviousness of CoreLogic's violation, as detailed above.

### iii.      Punitive Damages

Section 1681n also provides that the Court may grant punitive damages. "The purpose of punitive damages under the FCRA . . . is deterrence." *Northrop v. Hoffman of Simsbury, Inc.*, 12 Fed. Appx. 44, 51 (2d Cir. 2001). Again, for the reasons detailed above, the Court finds punitive damages are warranted due to the seriousness and obviousness of CoreLogic's violation. The Court finds the appropriate punitive damages are three times the statutory damages—$3,000.

iv.      Attorneys' Fees

When it comes to attorney's fees, it has long been held that the "American Rule" governs: "that each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).  Mr. Arroyo has succeeded in his FCRA claim but not his FHA claims.    As mentioned above, section 1681n of the FCRA states, "in the case of any successful action to enforce any liability under this section," the plaintiff may recover "the costs of the action together with reasonable attorney's fees as determined by the court."  15 U.S.C. § 1681n(a)(3).  Mr. Arroyo is therefore statutorily entitled to reasonable attorney's fees.

Mr. Arroyo is permitted to submit a motion for reasonable attorney's fees, supported by a memorandum of law and evidence of reasonable attorney's fees incurred *for the FCRA portion of this suit*.  *See generally Hensley*, 461 U.S. at (addressing reasonable attorney's fees under 42 U.S.C. § 1988 and explaining, "Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee").  The Court recognizes that some of the legal work may be indivisible between the two claims, *see id.* at 435, but also notes that the Supreme Court has advised "[t]he applicant should exercise 'billing judgment' with respect to hours worked … and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims," *id.* at 437.  If a motion is filed, it must be accompanied by

59

detailed billing records showing the time spent, work performed, and hourly rate charged in six-minute increments.  Mr. Arroyo may file his motion within 35 days of this order.  CoreLogic is afforded 21 days to respond to any such motion.  Mr. Arroyo is afforded 14 days to reply to CoreLogic's response.

To summarize, the Court finds no actual damages, statutory damages in the amount of $1,000, punitive damages in the amount of $3,000, and reasonable attorney's fees to be determined.

### C.   Connecticut Unfair Trade Practices Act Claim

The Plaintiffs' raised a claim under CUTPA in their complaint under multiple theories of liability relating to CoreLogic's use of CrimSAFE and Mr. Arroyo's file disclosure.  In their pre-trial proposed findings of fact and conclusions of law, the Plaintiffs have asserted a single theory of liability relating to CoreLogic's use of CrimSAFE.  For the same reasons that the FHA claims failed, the CUTPA claims relating to the use of CrimSAFE fail.  All of the CUTPA theories of liability relating to CrimSAFE require the Court to find that CrimSAFE causes housing unavailability.  As explained above, the Plaintiffs have not met their burden and thus the theories of CUTPA liability premised on this claim fail as well.

The Plaintiffs have abandoned their CUTPA claims as they relate to Mr. Arroyo's file disclosure because the Plaintiffs did not set forth the legal framework for such a claim in its trial submissions and did not make specific arguments during trial.  *See United States v. Livecchi*, 605 F. Supp. 2d 437, 451

(W.D.N.Y. 2009) (finding the failure to discuss claim in trial briefing constitutes abandonment) (collecting similar cases).

Therefore, the Court rules in favor of CoreLogic on the CUTPA claims.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of CoreLogic on the Plaintiffs' FHA and CUTPA claims and finds for Mr. Arroyo on his FCRA claim for $1,000 in statutory damages, $3,000 in punitive damages, and reasonable attorneys fees in an amount to be determined.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this day in Hartford, Connecticut: July 20, 2023